UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., et al., | ) ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) | Case No. 16-cv-10386-LTS |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, et al., | ) ) ) ) |  |
| Defendants. | ) ) |  |

ORDER ON MOTIONS TO DISMISS (DOCS. 46, 57) AND
MOTION FOR RECONSIDERATION (DOC. 68)

January 24, 2017

SOROKIN, D.J.

For the reasons that follow, the Court: (1) ALLOWS IN PART AND DENIES IN PART, WITHOUT PREJUDICE, Defendant Hewlett-Packard Financial Services Company's ("HPFS") Motion to Dismiss (Doc. 46); (2) DENIES WITHOUT PREJUDICE Defendant Hewlett-Packard Financial Services (India) Private Limited's ("HPFS India") Motion to Dismiss (Doc. 57); and (3) DENIES Plaintiffs' Motion for Reconsideration (Doc. 68). Plaintiffs have until **February 8, 2017**, to file a motion for leave to amend, with a proposed amended complaint, if they wish. Defendants may file any opposition to that motion within 14 days of its filing. Alternatively, if Plaintiffs do not file a timely motion for leave to amend, Defendants may renew arguments from the instant Motions to Dismiss that the Court has not decided..

I.   BACKGROUND

On December 9, 2015, Plaintiffs Integrated Communications & Technologies, Inc. ("Integrated"), and its employees Jade Cheng, Jason Yuyi, and Cathy Yu ("Individual Plaintiffs") commenced this action in Massachusetts Superior Court. Doc. 1-1 at 7. Plaintiffs essentially allege Defendants knowingly or negligently sold counterfeit information-technology equipment to Integrated, which led Chinese authorities to take various hostile actions toward Integrated and the Individual Plaintiffs. Doc. 41 at 1-2.

On February 23, 2016, Defendants removed the action to this Court. Doc. 1. On March 31, 2016, HPFS filed a motion to dismiss. Doc. 19. On July 8, 2016, the Court allowed a request by Plaintiffs to amend the complaint and found HPFS's motion moot. Doc. 40.

On July 18, 2016, Plaintiffs filed the instant Amended Complaint ("Complaint"). Doc. 41. On August 18, 2016, HPFS filed its Motion to Dismiss (Doc. 46), and on October 5, 2016, HPFS India filed its Motion to Dismiss (Doc. 57).[1]

On January 4, 2017, Plaintiffs filed a motion for leave to file a second amended complaint. Doc. 64. The Court denied the motion without prejudice, and Plaintiffs have filed the instant Motion for Reconsideration (Doc. 68).

---

[1] HPFS India's Motion is timely pursuant to its Waiver of Service, filed on July 26, 2016. Doc. 42.

II.     THE COMPLAINT'S ALLEGATIONS

   A.     FACTUAL ALLEGATIONS[2]

          1.     Integrated Agrees to Buy and Resell Used Equipment from HPFS India.

In 2010, HPFS India, a wholly owned subsidiary of HPFS, purchased new information-technology equipment manufactured by Hewlett-Packard Company ("HP") and H3C Technologies Co., Ltd. ("H3C").[3] Doc. 41 at 5. HPFS India purchased the equipment from "an authorized HP distributor in India" called Inspira. Id. HPFS India leased the equipment it purchased to another company. Id.

At the end of the leases, in 2011, HPFS India received the equipment back. Id. It hired a company, TT Global, to process equipment returns. Id. Pursuant to HPFS's standard operating procedures, TT Global "or other persons acting on behalf of HPFS India inspected the returned equipment (the '2011 Inspection')." Id. at 6. HPFS India "would have become aware that the equipment was counterfeit as a result of that inspection." Id.

On or about June 14, 2011, an HPFS manager offered the used equipment to a representative from Integrated, a Massachusetts corporation, specifically "for remarketing purposes." Id. The HPFS manager, JT Silvestri, explained to the representative, Alexander Pekar, that the equipment was manufactured by H3C Technologies Co., Ltd. ("H3C"), and was "coming off a short-term lease from HPFS's Asia region." Id. at 7. Silvestri provided Pekar with a preliminary list of the equipment. Id. Integrated then forwarded the list to its office in China to determine its market value there, since H3C "was a China-based brand" and "China

---

[2] In considering the Motions to Dismiss, the Court must accept the Complaint's factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. Saldivar v. Racine, 818 F.3d 14, 16 (1st Cir. 2016).

[3] HPFS, HPFS India, and H3C "were at all relevant times wholly-owned subsidiaries of" HP. Doc. 41 at 1. The Complaint sometimes capitalizes "equipment" and sometimes does not, apparently based on the equipment to which it refers. E.g., id. at 5 ¶16. For the sake of simplicity, the Court only uses lower-case letters to refer to equipment, and has changed certain quotes from the Complaint accordingly.

3

presented the best resale market" for the equipment. Id. Silvestri "concealed and did not disclose to Mr. Pekar that the equipment was counterfeit." Id.

In September 2011, Pekar met with another HPFS employee, by the name of Mr. O'Grady, who "was in charge of the H3C project," to discuss the purchase of the equipment. Id. at 8. Mr. O'Grady also "concealed and did not disclose to Mr. Pekar that the equipment was counterfeit." Id.

On or about November 21, 2011, HPFS's in-house counsel, David Gill, sent a draft contract to Integrated for the equipment purchase. Id. Gill "concealed and did not disclose to [Integrated] that the equipment was not 'H3C equipment' as stated in the draft but counterfeit." Id.

On or about December 6, 2011, HPFS India entered into a Referral and Revenue Share Agreement ("RRSA") with Integrated.[4] Id. at 9. In the RRSA, HPFS India "agreed to sell the equipment 'AS IS' to an Indian broker, Shinto Creative Elements Private Limited ('Shinto')." Id. Integrated agreed to acquire the equipment from Shinto for the purposes of reselling it, and to share fifty percent of any net profit from the resale with HPFS India. Id. at 9, 11. Integrated was required to remarket the equipment without identifying HPFS as the source of the equipment. Id. at 9.

On the same date that HPFS India and Integrated entered into the RRSA, HPFS India and Shinto entered into a Wholesale Sale Agreement ("WSA"). Id. at 10. In the WSA, Shinto

---

[4] The Complaint states that "to the best of Plaintiffs' knowledge and belief, . . . the [equipment] sale negotiations . . . were conducted on [HPFS India's] behalf solely by Defendant HPFS' representatives dealing directly with [Integrated's] representatives in Massachusetts." Doc. 41 at 5; see also id. at 6 ("The negotiations and conclusions of the relevant transactional documents took place predominantly in the Commonwealth of Massachusetts during late summer/fall of 2011 . . . .").

4

agreed to purchase the equipment from HPFS India, specifically for the purpose of reselling it to Integrated. Id.

Both the RRSA and WSA "specifically identified the equipment as HPFS/H3C-manufactured equipment," and Integrated "had no reason to believe otherwise." Id. However, "the equipment was not H3C-manufactured equipment but a counterfeit." Id. at 11. "Defendant HPFS, which conducted the sales negotiations, and Defendant HPFS India, the party named in the contracts as the seller of the equipment, both concealed the fact that the equipment was counterfeit." Id. Had Defendants "told the truth, [Integrated] would not have agreed to purchase and remarket the equipment because counterfeit equipment is unlawful to sell." Id.

At the end of December 2011, Integrated received, in China, the first shipping installment of the equipment from Shinto. Id. That installment consisted of approximately 3,000 transceivers purportedly manufactured by H3C. Id. Upon receiving the first installment, Integrated representatives "realized that the equipment was in a substandard condition . . . and not marketable as anticipated." Id. at 12. Integrated's "originally arranged customers, who expected the equipment in an 'AS IS' but relatively new condition, backed out and refused to buy the equipment." Id. "[T]he condition would have become apparent to Defendants during the 2011 Inspection," and "should have raised a red flag for the Defendants indicating potential substitution of the equipment with a counterfeit." Id. Integrated's sales team in China "started to develop new resale channels, which . . . produced lower gross sales receipts." Id.

In "October/November 2012," Pekar and an HPFS representative "conducted a joint inspection of the remaining three installments" of the equipment ("2012 Inspection"). Id. They agreed that the remaining equipment "was likewise in a substandard" condition and "determined not to go through with the remaining installments." Id. Unlike Integrated, "[D]efendants had the

knowledge, expertise and technical means to determine that the equipment was counterfeit during the 2012 Inspection." Id. at 13. However, at no point did "any of Defendants' representatives inform [Integrated] that the equipment was counterfeit." Id.

Plaintiffs continued to try to resell the first installment of equipment. Id.

### 2. H3C Complains that Integrated Is Selling Counterfeit H3C Equipment, Which Leads to Action by the Chinese Police.

In December 2012, "representatives of H3C lodged a complaint with the local police accusing Plaintiffs [of] marketing counterfeit H3C products because the transceivers contained counterfeit H3C trademark logos." Id. However, those representatives did not disclose to the police that Integrated bought the equipment from HPFS and HPFS India, which are "H3C's affiliates" and had represented that the equipment was "genuine." Id.

Based on H3C's report to the police, around "December 9-10, 2012," Integrated's China offices "were raided and the remaining unsold part of the equipment was seized." Id. at 14. The date of the raid is "when [Integrated] learned that the equipment was counterfeit." Id. In addition, based on the police report, the Individual Plaintiffs were all arrested because they were sales associates for Integrated. Id. at 4, 14.

In January 2013, Integrated learned that the criminal trial of the Individual Plaintiffs was "expected as soon as April 2013." Id. at 14. Integrated attempted to obtain release of the Individual Plaintiffs but was unsuccessful. Id.

On January 10, 2013, the Chinese police contacted HP China, another HP entity in China, to verify Plaintiffs' claim that they were selling the equipment pursuant to contracts with HPFS India. Id. at 19. An HP China representative directed the police to the HP website, where "[a]ll

HP contracts/agreements can be downloaded freely by anyone," and stated that "HP China does not admit any contract signed by another party (HPFS)." Id.

In early February 2013, Integrated requested Defendants' assistance in securing the release of the Individual Plaintiffs. Id. at 14.

On March 2, 2013, the Chinese police again contacted HP China to verify the contracts, and HP China said it was "contacting HPFS currently." Id. at 20.

On March 12, 2013, Integrated's CEO Alex Styller wrote to David Gill, HPFS's in-house counsel, that HPFS's "legal team must arrange for release of our team immediately." Id. at 14. In response, Gill "requested additional documents from" Integrated, apparently regarding Integrated's "incorporation [and] custom clearance." Id. at 15. Styller responded that Integrated had "already provided all necessary documentation to our lawyer, and the only issue in question is the authenticity of these H3C transceivers." Id.

On the same date, Styller contacted Mr. O'Grady, the person in charge of "the H3C project" at HPFS, and asked to have a conversation regarding the transaction between Integrated and HPFS India. Id. "Mr. O'Grady flatly refused to help or even to talk to Mr. Styller," explaining that he did "not believe that [he] could personally add anything to the conversation" Integrated was already having "with HPFS about the India transaction." Id.

On March 20, 2013, Gill wrote to Integrated that "legal teams supporting HPFS and H3C are working on this matter," and that it was his "hope that we will send the letter to the [Chinese] authorities soon." Id.

On March 27, 2013, HPFS sent Integrated a draft of a letter, in English, intended for the Chinese authorities. Id. at 16. The letter was drafted by Gill on behalf of HPFS India. Id. The letter stated that "[b]ased on the available evidence HPFS India believes that the counterfeit H3C

7

equipment seized in China is the same equipment sold by HPFS to Integrated (through Shinto)." Id. The letter further stated that it appeared that the counterfeiting activities "occurred at some point in time prior to the return of the [equipment] to HPFS India upon the expiration of the leases." Id. Finally, the letter stated that Integrated "was entitled to assume that it was buying genuine equipment." Id.

Integrated proposed revisions to the draft letter that HPFS ultimately refused. Id. at 17.

On April 10, 2013, Styller wrote to Gill that HPFS needed to send the letters because "trial can start any time" and "[w]e need our people out of jail now!" Id.

On April 22, 2013, Defendants sent the letter to the Chinese police "and provided a copy" to Integrated. Id. Gill told Integrated's outside counsel that "the letter is substantively the same as the last English version you saw," with "some minor amendments but nothing changed [in] the description of the relevant sequence of events between HPFS India and [Integrated]." Id. However, the letter HPFS sent to the Chinese police "differed considerably from the English draft shared with [Integrated]," such that it "mischaracterized or altogether omitted" "key facts." Id. at 18. For example, rather than stating that HPFS India "believe[d]" that the counterfeit H3C equipment seized in China "is" the same as the equipment HPFS sold to Integrated, the Chinese letter stated that HPFS India "*suspect[ed]*" the equipment "*might*" be the same as the equipment HPFS sold to Integrated. Id. (emphases added). "This watered-down and misleading version of the March 2013 Letter . . . failed to secure the release of the Individual Plaintiffs" from jail. Id.

On May 2, 2013, H3C wrote a letter to the Chinese authorities stating that H3C and HPFS were "separately operating organizations" and that H3C did not know whether HPFS had actually sold some of the seized counterfeit transceivers to Integrated. Id. at 20.

8

On May 23, 2013, an H3C representative "confirmed under oath that 'the transceivers seized are counterfeited H3C's.'" Id.

On July 7, 2013, a Chinese prosecutor returned the case to the police for additional investigation because there was "not enough proof" to support H3C's position. Id.

On July 18, 2013, the Individual Plaintiffs were released on bail. Id.

Throughout 2013 and 2014, Defendants refused "repeated requests" by Integrated "for information needed to exonerate the Individual Plaintiffs." Id. at 22. The Individual Plaintiffs remained in legal jeopardy. Id. at 21.

On September 3, 2014, "the lead prosecutor in China personally apologized to all three Individual Plaintiffs for their undeserved suffering." Id. at 23.

On December 24, 2015, Cheng received a letter from the Chinese police stating that she had no criminal record. Id. On May 4, 2016, Yuyi and Yu each received such a letter as well. Id. "Upon information and belief, the Chinese authorities have closed the case without bringing any charges." Id.

Defendants have "refused to refund the initial payment of $250,000 made by [Integrated] with respect to the first installment of the equipment." Id. at 21.

B. LEGAL CLAIMS

The Complaint contains nine counts.[5] First, all Plaintiffs claim Defendants engaged in fraudulent misrepresentation, on the basis that they "knew, or were reckless in not knowing, that the equipment was counterfeit[,] but concealed that knowledge from Plaintiffs." Id. at 25-26. Plaintiffs allege that as a "direct and proximate result of HPFS's misrepresentations, all Plaintiffs

---

[5] The counts are misnumbered. Doc. 41 at 32, 35 (numbering two separate claims for relief both as "Count V").

9

suffered severe injuries," including Integrated's loss of profits and diminished reputation, and the Individual Plaintiffs' imprisonment and attendant suffering. Id. at 29.

Second, all Plaintiffs claim Defendants engaged in negligent misrepresentation. Id. Plaintiffs state: "By virtue of their superior knowledge and expertise regarding HP/H3C-manufactured equipment and trademarks, Defendants ought to have been aware that their representations as to the genuine nature of the equipment sold to [Integrated] were false." Id.

Third, Integrated claims "HPFS breached the RRSA and WSA contracts by selling counterfeit equipment to [Integrated] instead of genuine equipment as provided for by the aforementioned contracts." Id. at 31.

Fourth, Integrated claims it "was fraudulently induced to enter into the RRSA agreement" due to "Defendants' misrepresentations and omissions" regarding the genuineness of the equipment. Id. at 32.

Fifth, under Mass. Gen. Laws ch. 106, § 2-313(1)(b), all Plaintiffs claim Defendants created an "express warranty that the equipment was genuine" by describing the equipment as "H3C equipment," and then breached the warranty was selling counterfeit equipment instead. Id. at 33.

Sixth, under Mass. Gen. Laws ch. 93A, § 2, all Plaintiffs claim Defendants engaged in "unfair and deceptive trade practices within the meaning of" Mass. Gen. Laws 93A, § 2, by "fail[ing] to disclose to Plaintiffs the fact that the equipment was counterfeit." Id. at 35.

Seventh, the Individual Plaintiffs claim they were falsely imprisoned because Defendants failed to disclose that the equipment was counterfeit and because, in their April 22, 2013, submission to the police, they "deliberately mischaracterized or omitted" statements from the

10

March 2013 letter that "would have led to the release of the Individual Plaintiffs, thereby prolonging their imprisonment." Id. at 37.

Eighth, all Plaintiffs claim Defendants were negligent because they first "unreasonably delayed making their submission to the Chinese police for almost three months," then "failed to make a complete and truthful disclosure of the relevant facts," then "rejected repeated requests by Plaintiffs made in 2013 and 2014 for information and assistance necessary to clear the Individual Plaintiffs' names and terminate the prosecution." Id. at 38.

Ninth, all Plaintiffs claim civil conspiracy, i.e., that "Defendant HPFS and its wholly owned subsidiary Defendant HPFS India acted in concert and unison to commit tortious acts against Plaintiffs." Id. at 39.

III. DISCUSSION

To survive a motion to dismiss, a complaint "must provide fair notice to the defendants" and "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Bruns v. Mayhew, 750 F.3d 61, 71 (1st Cir. 2014) (citation and internal quotation marks omitted); Ashcroft v. Iqbal, 556 U.S. 662, 678 (citation and internal quotation marks omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citation omitted); see also id. at 679 (noting that a complaint must "permit the court to infer more than the mere possibility of misconduct") (citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (citation omitted).

11

A.  Whether the Act of State Doctrine Mandates Dismissal

Defendants argue that the act of state doctrine bars Plaintiffs' claims because they "are premised upon China's enforcement of Chinese laws in China." Doc. 20 at 9. According to Defendants, "the Court is effectively being asked to deem invalid the Chinese authorities' arrest of Chinese citizens and the seizure of equipment," since "[o]nly if such acts were improper could" Integrated and the Individual Plaintiffs have claims to relief. Id. at 10. At a minimum, Defendants argue, the act of state doctrine should bar any claims asserted by the Individual Plaintiffs, since their "entire case is that they were unjustifiably arrested and imprisoned by the Chinese authorities," notwithstanding their "attempt[] to color their claim for relief as one based on a contrived chain of events set in motion by the Defendants." Doc. 47 at 10 (emphasis omitted); see also id. at 11 ("[T]he specific relief the Individual Plaintiffs are seeking on all of their claims unavoidably requires an examination of whether China was justified or not when it enforced its own laws in China.").

The act of state doctrine "reflect[s] the strong sense of the Judicial Branch" not to "hinder the conduct of foreign affairs." W.S. Kirkpatrick & Co., Inc. v. Env. Tectonics Corp., Int'l, 493 U.S. 400, 404 (1990) (citation and internal quotation marks omitted). It "requires that, in the process of deciding [cases], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." Id. at 409. Thus, the doctrine bars any suit that requires a United States court "to declare invalid the official act of a foreign sovereign performed within its own territory." Id. at 405. For example, in one case, the doctrine barred a suit in which the plaintiff alleged that a Venezuelan military commander unlawfully detained him in Venezuela, as judgment for the plaintiff would have required denying the legality of the commander's act. Id. (discussing Underhill v. Hernandez, 168 U.S. 250, 254 (1897)). In another instance, the doctrine

12

barred a suit in which the plaintiff alleged title to Mexican property, as judgment in his favor would have required a court to declare the Mexican government's "prior seizure of the property" invalid. Id. (discussing Oetjen v. Central Leather Co., 246 U.S. 297, 304 (1918), and Ricaud v. American Metal Co., 246 U.S. 304, 311 (1918)).

Nevertheless, the doctrine does not bar a suit in which judgment for the plaintiff would merely "imput[e] to foreign officials an unlawful motivation in the performance of . . . an official act." W.S. Kirkpatrick, 493 U.S. at 401. Nor does it bar a suit in which judgment for the plaintiff would "embarrass" a foreign government, "impugn[]" its actions, or "*support* a finding that" its actions were illegal. Id. at 406-07, 409 (emphasis added). The Supreme Court has emphasized that the doctrine only applies when a court "*must decide* – that is, when the outcome of the case turns upon – the" legality of a foreign government's action within its territory. Id. at 406 (emphasis in original). Thus, in W.S. Kirkpatrick, the doctrine did not bar a suit in which the plaintiff, a company that lost a bid for a Nigerian military procurement contract, claimed its competitor had won the contract by bribing Nigerian officials, which is illegal under both American and Nigerian law. Id. at 402. The Court stated that although judgment in the plaintiff's favor "may *suggest*" the Nigerian military contract was illegal, its legality was "simply not a question to be decided." Id. at 406 (emphasis added). The Court noted that the plaintiff "was not trying to undo or disregard [Nigeria's] governmental action, but only to obtain damages from private parties who had procured it." Id. at 407.

The act of state doctrine does not apply to Counts One through Six, Eight, or Nine. Those counts do not require the Court to declare any act by the Chinese government invalid. See id. at 405. A court could, for example, find that HPFS India knowingly or negligently sold Integrated counterfeit equipment but still "deem[] valid" the Chinese government's acts in

13

response to H3C's complaint about the equipment – i.e., its seizure of the equipment, its investigation of Integrated, and its arrest of the Individual Plaintiffs. Id. at 409. Like the plaintiff in W.S. Kirkpatrick, Plaintiffs are not trying to invalidate China's "governmental action, but only to obtain damages from private parties who" caused it. Id. at 407; cf. Sietins v. Joseph, 238 F. Supp. 2d 366, 375-76 (D. Mass. 2003) (holding that the police were not culpable when they "reasonably relied" on a false complaint to arrest the plaintiff). Thus, the act of state doctrine does not bar Counts One through Six, Eight, or Nine.[6]

### B. Whether the Complaint States a Claim for False Imprisonment

Defendants argue that the Individual Plaintiffs' false imprisonment claim "as against HPFS is far too attenuated to survive as a matter of law." Doc. 47 at 11. Defendants note that the Complaint "unabashedly and repeatedly alleges that the Chinese authorities acted solely on the basis of representations by non-party H3C." Id. (citations omitted). Defendants argue that any events occurring after the Individual Plaintiffs were detained cannot support a false imprisonment claim because once a victim is imprisoned, "false imprisonment ends" and the "unlawful detention forms part of the damages for the entirely distinct tort of malicious prosecution." Id. at 12-13 (quoting Wallace v. Kato, 549 U.S. 384, 388-89 (2007)) (emphasis, citations, and internal quotation marks omitted). Plaintiffs counter that they have stated a false imprisonment claim because they allege (1) HPFS's "false statements" to Plaintiffs regarding the equipment "exposed the Plaintiffs to a substantially certain risk of imprisonment and eventually caused it"; and (2) "Defendants and their Chinese affiliate H3C made false statements to the

---

[6] The Court not need analyze whether the act of state doctrine bars Count Seven, in which the Individual Plaintiffs claim false imprisonment, as Plaintiffs fail to adequately plead that claim. See infra Section III.B.

14

police as well, which . . . caused Plaintiffs' prolonged imprisonment." Doc. 48 at 9 (citation omitted).

Under Massachusetts law, false imprisonment "consists of the (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." Lund v. Henderson, 22 F. Supp. 3d 94, 104 (D. Mass. 2014) (citations and internal quotation marks omitted). To satisfy the first element at this stage, Plaintiffs must allege sufficient facts to state a plausible claim that the Defendants acted "with the intent to confine" the Individual Plaintiffs. Lucia v. City of Peabody, 971 F. Supp. 2d 153, 170 (D. Mass. 2013) (citation and internal quotation marks omitted). Plaintiffs have failed to do so: there is no indication in the Complaint that, before the sale, either Defendant knew of the existence of the Individual Plaintiffs, let alone harbored some desire to see them falsely imprisoned for handling counterfeit equipment that they would sell to their company. Moreover, the Court, drawing on its "common sense," Iqbal, 556 U.S. at 679, finds implausible the Individual Plaintiffs' bald suggestion that Defendants made insufficient efforts to obtain their release because they intended to keep them confined. Thus, Plaintiffs have failed to state a false imprisonment claim.[7]

C.  Whether the Breach of Warranty Claim Is Precluded

Defendants argue that "Mass. Gen. Laws ch. 106, § 2A-214 precludes any breach of warranty claim" (Count Five) because "the equipment was sold 'as is' and all warranties were expressly disclaimed." Doc. 20 at 20. This argument is almost frivolous. The provisions of

---

[7] Even assuming the Individual Plaintiffs could show such remarkable, specific animus on Defendants' part, the Court questions – but need not decide – whether Defendants' acts are too attenuated from the Individual Plaintiffs' confinement to state a false imprisonment claim.

Section 2A only "appl[y] to any transaction . . . that creates a *lease*." Mass. Gen. Laws ch. 106, § 2A-102 (emphasis added). Because this case deals with a sale, not a lease, Section 2A-214 does not bar the breach of warranty claim.

IV.     CONCLUSION

For the foregoing reasons, the Court: (1) ALLOWS IN PART AND DENIES IN PART, WITHOUT PREJUDICE, Defendant HPFS's Motion to Dismiss (Doc. 46); (2) DENIES WITHOUT PREJUDICE Defendant HPFS India's Motion to Dismiss (Doc. 57); and (3) DENIES Plaintiffs' Motion for Reconsideration (Doc. 68). Plaintiffs have until **February 8, 2017**, to file a motion for leave to amend and a proposed amended complaint, if they wish.[8] Defendants may file any opposition to the motion within 14 days of the motion's filing.[9] Alternatively, if Plaintiffs do not file a motion for leave to amend within 14 days, Defendants may renew any arguments from the instant Motions to Dismiss that have not been decided.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[8] If Plaintiffs file a motion for leave to amend, the Court warns that the proposed amended complaint accompanying the motion must comply with Federal Rule of Civil Procedure 8. The Court may dismiss a complaint in its entirety if "pertinent factual allegations . . . [are] buried amidst conclusory and argumentative passages," or if it is "excessively long and unnecessarily redundant." National Org. for Marriage v. Daluz, 654 F.3d 115, 117 (1st Cir. 2011) (internal quotation marks omitted); Kuehl v. FDIC, 8 F.3d 905, 908 (1st Cir. 1993); see also Lowden v. William M. Mercer, Inc., 903 F. Supp. 212, 216 (D. Mass. 1995) (noting that "disorganized, verbose, and argumentative complaints" may be dismissed under Rule 8) (citation omitted).

[9] If Defendants oppose the motion, they may not incorporate or direct the Court to their previous motions to dismiss in this case. Furthermore, the Court warns that it will not consider any argument that is vague, conclusory, or made without citation to supporting authority.