Joffe Law P.C.
December 20, 2016 Draft

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, <br><br> Plaintiffs, <br><br> v. <br><br> HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, MARGARET CUSHING "MEG" WHITMAN, JOHN SCHULTZ, DAVID GILL, GIBBONS P.C., and G. DANIEL MCCARTHY, <br><br> Defendants. | Civil Action No. 1:16-CV-10386 (LTS) <br><br><br> **SECOND AMENDED COMPLAINT** |

"*Oh, what a tangled web we weave when we first practice to deceive.*"  *Marmion*, by Sir Walter Scott.  The malicious deceit in this case has been practiced, in concert, by the erstwhile Fortune 50 Hewlett-Packard Company ("HP"); by HP's celebrity CEO, President and Chairman Defendant Margaret Cushing "Meg" Whitman; by HP's General Counsel, Executive Vice President and Corporate Secretary Defendant John Schultz; by HP's wholly-owned U.S. subsidiary Defendant Hewlett-Packard Financial Services Company ("HPFS") and HPFS' wholly-owned Indian subsidiary Hewlett-Packard Financial Services (India) Private Limited ("HPFS India"); by HPFS' General Counsel, Vice President and Secretary Defendant G. Daniel McCarthy, now a partner at Defendants' outside counsel, itself a Defendant Gibbons P.C.; and by HPFS' Assistant General Counsel and Assistant Secretary Defendant David Gill.

And the web of lies that these Defendants had been weaving for the last several years was so dense that it took Plaintiffs and their counsel until now to untangle, and the following 100+page narrative to set out with the requisite Rule 9(b) particularity.  But untangle it we must, to vindicate the innocent victims of the Defendants' egregious fraud, frame job and cover-up, to punish its callous and conceited perpetrators, and finally to put an end to their malicious, and thus far successful, deception.

## Table of Contents

I.  Summary.................................................................................................x

II.  Parties..................................................................................................x

III.  Statement of Facts..................................................................................x

A.  **2011: The Initial Crime-Fraud**.......................................................x

1.  The Equipment:  returned to the HPFS Defendants after a short-term lease.......x

2.  The Negotiations:  the HPFS Defendants identify the Equipment as H3C's.......x

3.  The Contracts:  the HPFS Defendants sold the Equipment as H3C's for resale...x

4.  Plaintiffs' attempts to resell the Equipment; discovery of its substandard condition…….…….........................................................................x

B.  **2012-13: The Frame Job**..................................................................x

1.  The counterfeit nature of the Equipment revealed;
ICT's Chinese office raided; the Individual Plaintiffs arrested......................x

2.  The early months of incarceration:  Defendants pretend to assist
the Individual Plaintiffs' release while withholding exculpatory evidence;
thoroughly inspect the seized Equipment…………………………..…...........x

3.  The long-awaited answer:  Defendants admit selling counterfeit
Equipment to Plaintiffs in the March 2013 Letter; then secretly
delete that admission from the April letter, and lie about it………………..........x

4.  Defendants fail to file their sanitized letter with the
prosecution or the police as ICT requested, and lie about it………..…............x

C.  **2013-present:  The Cover Up**............................................................x

1.  June – July 2013:  Individual Plaintiffs on bail awaiting
criminal trial; Plaintiff Styller appeals directly to HP, its CEO Defendant

Whitman, and its General Counsel Defendant Schultz for help......................x

2.  Defendants hold up the agreed refund to ICT in an
attempt to extort release from the Individual Plaintiffs...........................x

3.  July 2013 – December 2015:  Individual Plaintiffs on bail
awaiting criminal trial; Defendants engage in a fraudulent
cover-up campaign of blackmail, intimidation, threats, and lies.................x

D.  **Conclusion on the facts**.............................................................x

IV.  Statement of Claims...........................................................................x

Count I         For Fraudulent Misrepresentation against the HPFS Defendants
on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs......x

Count II        For Negligent Misrepresentation against the HPFS Defendants
on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs......x

Count III       For Breach of Contract against Defendant HPFS India
on behalf of Plaintiff ICT.........................................................x

Count IV        For Fraudulent Inducement against the HPFS Defendants
on behalf of Plaintiff ICT.........................................................x

Count V         For Breach of Warranty against the HPFS Defendants
on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs......x

Count VI        For Breach of M.G.L. 93A against the HPFS Defendants
on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs......x

Count VII       For Fraud against all Defendants on behalf of
Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs....................x

Count VIII      For Breach of M.G.L. 93A against all Defendants on behalf of
Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs....................x

Count IX        For False Imprisonment against all Defendants on behalf of
the Individual Plaintiffs.........................................................x

Count X         For Negligence against all Defendants on behalf of
Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs....................x

Count XI        For Civil Conspiracy against all Defendants on behalf
of all Plaintiffs.................................................................x

Count XII       For intentional infliction of mental anguish and emotional distress
on behalf of Individual Plaintiffs, Plaintiff Styller and the
Family Plaintiffs.................................................................x

Count XIII      For loss of consortium on behalf of Plaintiffs Jade Cheng
and Caroline Marafao Cheng.......................................................x

V.  Prayer for Relief and Jury Demand........................................................x

3

## I.   Summary

1.      This story begins in 2011, when Defendants HPFS and HPFS India (the "HPFS Defendants") offered Plaintiff ICT a large quantity of used IT networking equipment (the "Equipment") for resale purposes.  The HPFS Defendants expressly and repeatedly represented the Equipment as manufactured by their Chinese affiliate H3C Technologies Co., Ltd. ("H3C") and identified it specifically as the "HP/H3C" Equipment during the sale negotiations and in the sale contracts themselves, as well as by the Equipment's "HP/H3C" manufacturing codes, "H3C" serial numbers, and "H3C" trademark logos.  Indeed, the parties expressly referred to the Equipment as the "H3C Equipment," and to the transaction as the "H3C deal," during the negotiations.  The H3C deal required ICT to use its best efforts to resell the Equipment and to share the resale proceeds with HPFS India.  The HPFS Defendants, as well as H3C, were at all relevant times wholly-owned subsidiaries of HP; Plaintiff ICT was HP's authorized vendor.

2.      When Plaintiffs commenced reselling the first shipment of the Equipment in China in 2012, however, H3C caused Plaintiffs' Beijing office to be raided by the local police, the Equipment seized, and ICT's local sales associates Plaintiffs Jade Cheng, Jason Yuyi and Cathy Yu (the "Individual Plaintiffs") detained and arrested based on H3C's allegations that they were engaged in marketing *counterfeit* H3C equipment.  H3C repeatedly urged the Chinese authorities to prosecute the Individual Plaintiffs for selling counterfeit goods, relentlessly pushing for criminal trial virtually certain to result in convictions and 10-year prison sentences.

3.      The Individual Plaintiffs spent the next *seven horrifying months* in the torture-like conditions of the Haidian Detention Center in western Beijing, infamous for its brutal treatment of detainees.  The severe hardship of the Individual Plaintiffs' lives behinds bars of

4

the Haidian Detention Center – in addition to the initial shock of the arrest, the day-to-day loss of liberty, fright, anxiety, stress, humiliation and anguish -- is recounted in heart-breaking details in their affidavits accompanying this Complaint.  In short, the Detention Center fully lived up to its gruesome reputation:  for seven months, the innocent young Chinese office workers -- Cathy was 22-years-old when arrested, and at times thought she would not survive the ordeal; Jason was 26 and survived by fighting off gangsters; Jade was 31, and still has nightmares about his detention --  were forced to sleep on the cold toilet floor of a 300-square-foot cell overcrowded with 40 inmates and ruled by a criminal boss; to take 10-minute-long ice-cold showers every morning naked in freezing cells; to spent their waking hours sitting motionless on a bench, not even allowed to talk; without any family visits or medical treatment, among numerous other deprivations.  The innocent Plaintiffs' hardship was made so much worse by their knowledge that they had been unjustly imprisoned by HP for doing nothing more than selling HP's equipment for HP's ultimate benefit.

4.      The Individual Plaintiffs then spent a year on bail, with its severe restrictions on travel, communications, and employment, living in the grim shadow of the looming criminal trial with a potential 10-year prison term and the overwhelming reality of the 99.93% conviction rate in the Chinese criminal justice system in 2013.  *See* The Washington Post, *China Scored 99.9 Percent Conviction Rate Last Year*, March 11, 2014.  And in 2013-2016, the overall criminal conviction rate in China was an astonishing 99.984%; cases withdrawn after the arrest were only 0.007%, and the prosecutors decline to bring charges in only 1.4% of cases.  *See* www.thepaper.cn, *The Acquittal Judgment Rate is Only 0.016% in Recent 3 Years*, November 7, 2016.   Indeed, the gross miscarriage of justice was avoided by a hair in this case – despite the Defendants' efforts to have the innocent Plaintiffs tried and convicted on false charges.

5.      Afterwards, the Individual Plaintiffs remained criminal suspects and spent another year-and-a-half trying to clear their names and obtain "no criminal records" letters from the police, carrying a stigma of criminal prosecution and unable to find any employment.

6.      All the while, Plaintiff ICT, with its Chinese office shut and its business in tatters following the debacle, its CEO and owner Plaintiff Alexander Styller, their outside counsel, solo practitioner Lester Riordan, and the frightened, anxious and frustrated families of the Individual Plaintiffs (the "Family Plaintiffs"), desperately tried to secure their release, to avoid the trial, and to clear their names.

7.      And all the while, the Defendants – the real culprits who had caused the Individual Plaintiffs' imprisonment by selling them counterfeit Equipment in the first place – and their Chinese affiliates H3C and HP China withheld exculpatory evidence from the state officials and the Plaintiffs, stonewalled the Chinese police's requests to confirm the Individual Plaintiffs' alibis, and blatantly lied about it to the Plaintiffs while pretending to assist them.

8.      And while H3C continued its relentless push for the criminal prosecution of the innocent Individual Plaintiffs, the Defendants unleashed against them a humiliating campaign of demonstrable lies, outrageous threats and outright extortion, designed to cover up the Defendants' frame job and to bully the Plaintiffs into releasing their claims in exchange for Defendants' "possibly making some small settlement payment to resolve this issue in its entirety" – while continuing to withhold exonerating evidence from the Plaintiffs and stonewalling their requests for it.

9.      All Defendants knew or must have known, as it is public knowledge, that the criminal conviction rate in China is extremely high -- if put to trial that year, at H3C's request and with Defendants' aid, the Individual Plaintiffs would have had a 99.93% chance of being

convicted and sentenced to lengthy prison terms for the HPFS Defendants' own crimes, notwithstanding the Plaintiffs' complete innocence.  Defendants withheld the exculpatory evidence from the Plaintiffs and the state officials and pushed for their trial with that knowledge, in outrageous disregard for the plight of the innocent victims of their own crimes and their anxious families, and in extreme bad faith.

10.     During that period, H3C – the manufacturer of the H3C Equipment and the exclusive trademark holder of the H3C brand name and logo – unequivocally, on numerous occasions, and under oath testified to the Chinese police that the Equipment was counterfeit. H3C also assured the police that the word of its security experts was the ultimate authority on the question of whether its own products were counterfeit, that no other tests were necessary or capable of disproving it; and that nobody else, not even HP, had any rights to the H3C trademark.

11.     The HPFS Defendants themselves admitted in their draft submission to the Chinese authorities shared with ICT -- but ultimately concealed from with the Chinese authorities themselves -- that "*the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT*," and that "*the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases*" (the "March 2013 Letter") (emphasis added throughout).

12.     Defendants further admitted in the March 2013 Letter that "upon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment." And in their April 1 revision of the March 2013 Letter, HPFS Defendants further admitted that "*HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description*

*of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard*."

13.     H3C's statements to the police attesting to the counterfeit nature of the Equipment, coupled with HPFS Defendants' own admissions in the March 2013 Letter shared with the Plaintiffs confirming that the Equipment they had sold to Plaintiffs was counterfeit -- if true -- would have exculpated the Individual Plaintiffs but would have exposed those Defendants to criminal liability in India for selling counterfeit goods to the Plaintiffs (*see* Affidavit of Vivek Mapara on Indian law), as well as to civil liability to the Plaintiffs arising out of the fraudulent sale.

14.     If the counterfeiting allegations were false, however, that would have also exonerated the Individual Plaintiffs forthwith while criminally inculpating the HPFS Defendants and their Chinese affiliate for making knowingly false statements to the police and withholding exculpatory evidence with the intention of framing the innocent Plaintiffs (*see* Affidavit of Ma Li on Chinese law), as well as to civil liability to the Plaintiffs for false imprisonment and/or malicious prosecution, fraud, and economic and personal injuries arising therefrom.

15.     Accordingly, from the very beginning of the Individual Plaintiffs' ordeal, Defendants knew that the Individual Plaintiffs were absolutely innocent under either scenario but could not disclose the exonerating evidence in their possession without placing themselves in criminal jeopardy either in India (if the Equipment was counterfeit) or in China (if it was genuine).  And so Defendants and their Chinese affiliates decided to conceal and withhold that exculpatory evidence, to stonewall the police's and Plaintiffs' requests for it, to sacrifice the innocent victims of their own fraud, and to use them as scapegoats for their own crimes.

16.     There is a situation in chess known as **zugzwang**, in which a player must make a move, but any such move inevitably makes that player's position worse.  But whereas the chess players must make their moves in turn, Defendants decided to avoid making their next move by secretly deleting their key admissions from the final version of the March 2013 Letter before submitting it to the Chinese authorities in April 2013, blatantly lying about it to the Plaintiffs, and embarking on a fraudulent, insidious campaign of intimidation, threats, and lies designed to cover up their own crime-fraud and frame job, and to bully the Plaintiffs into releasing their claims (while allowing the clock to run out on the criminal statutes in India and/or China) – *without ever admitting or denying* whether the Equipment was counterfeit or authentic, remaining strategically agnostic and ambiguous about its provenance, and continuing to withhold the exculpatory evidence from the Chinese police and from the Plaintiffs while their criminal trial was looming.

17.     The fact that the lives of three young innocent victims and of their families were ruined, and a small U.S. business left in tatters as a result of Defendants' outrageous frame job and its cover-up did not seem to bother Defendants at all, none of them expressing any empathy, any concern, or any remorse for Plaintiffs' sufferings in Defendants' hands.

18.     In the early months of the Individual Plaintiffs' imprisonment, Defendants pretended to be assisting ICT in securing the release of the Individual Plaintiffs, and conducted numerous inspections of the seized Equipment.

19.     However, Defendants' sham "assistance" having proven completely ineffective and worse, and in the face of the fast-approaching criminal trial, Plaintiff Styller appealed personally to HP's CEO Defendant Whitman and General Counsel Defendant Schultz in June

2013 -- at the time when the innocent Individual Plaintiffs were enduring their 6th month in jail waiting to be tried for Defendants' own crimes:



June 12, 2013

**BY FEDERAL EXPRESS**

Ms. Meg Whitman
President and Chief Executive Officer
Hewlett-Packard
3000 Hanover Street M/S 1050
Palo Alto, California 94304-1112

Dear Ms. Whitman:

My name is Alex Styller. I am the President and owner of ICT, Inc. ICT is an IT asset recovery company and we partner with HP Financial Services on several projects around the world. ICT assists HP in recovering residual value from the secondary market.

In 2011, ICT entered into a profit-sharing arrangement with HPFS (India) to sell H3C branded networking assets. This product was leased through HP for India's Commonwealth games. We remarketed the product in China.

According to my sources, H3C, HP's Chinese subsidiary, either filed a formal complaint or instigated the filing of criminal charges against three of ICT's representatives in China. As a result, the ICT representatives – Jade Cheng, Jason Yu and Cathy Yu - have been incarcerated since December 2012 and face trial in a month. Jade, Jason and Cathy are exposed to sentences of ten years - for doing no more than remarketing HP's products for HP's benefit. HPFS India communicated to the local authorities that it was the source of the product. However, despite this acknowledgment, H3C is still insisting that the case go forward.

Our focus is entirely on the humanitarian issue. I have previously offered to do anything I can to address any concerns raised by H3C. I stand willing to meet with anyone to address this unfortunate situation. However, we should all agree that Jade, Jason and Cathy should be released.

Our appeal to you is a personal one. We ask that you use your office and position to put a stop to this. I ask that you contact H3C to get to the bottom of the issue. I also ask that you use your influence to see that the charges are withdrawn.

I am cognizant of the demands on your time – and very respectful of your position. These circumstances, however, involve personal liberty – and on this basis I reach out to you. I restate that I will personally do anything I can to address any issue of concern of H3C. I appreciate you consideration greatly. I am available to speak with you directly at your earliest convenience. My direct number is (617) 605-3333.

Very truly yours,

Alex Styller
President, ICT, Inc.

cc: John F. Schultz. Esquire

20.     Mr. Styller's desperate and urgent plea was addressed personally to Defendant Whitman, whom HP prominently quoted on the inside cover of its Annual Report of the very same year:



We want to be a company known for its ethical leadership—a company where employees are proud to work; a company with which customers, business partners, and suppliers want to do business.

Meg Whitman
President and CEO

21.     Plaintiff ICT was indeed HP's business partner and did want to do business with the company:  as a result, ICT's business was ruined, and its sales associates framed, falsely imprisoned, and maliciously prosecuted by the Defendants, including Defendant Whitman.

22.     In response to Plaintiffs' plea, HP's "ethical leadership" proceeded to behave in the most despicable manner.  Mr. Styller's letter to Defendant Whitman herself was met with a stone-cold-hearted silence – despite the fact that the innocent Plaintiffs were facing a criminal trial, a virtually certain conviction, and lengthy prison sentences for the alleged crimes committed by the HPFS Defendants themselves; and despite the fact that HP itself, and its Chinese subsidiaries H3C and HP China, were no doubt aware of the overwhelming reality of the Chinese criminal conviction rate.

23.     It fell to Defendant Schultz to respond to Plaintiffs' appeal, and respond he did by retaining Defendants Gibbons P.C. and McCarthy to conduct, on behalf of the trio of HP itself and its subsidiaries H3C and HPFS India, the ensuing cover-up campaign of naked lies, threats, extortion and sheer intimidation against the innocent Plaintiffs, victims of Defendants' own fraud and scapegoats for Defendants' own crimes.

24.     Defendant McCarthy served as the General Counsel and Secretary of Defendant HPFS until March 2013, when he joined Defendant Gibbons P.C. as a partner, a director of its corporate department, and an outside counsel to HP, and was therefore personally aware of the relevant facts.

25.     Defendants Whitman and Schultz were personally aware of and either instigated, orchestrated, directed, approved, condoned, consented to, acquiesced with, willfully ignored, or recklessly disregarded the fraudulent cover-up scheme carried out by Defendants McCarthy and Gibbons P.C. on behalf of the Defendants.

26.     In conducting their malicious campaign against the innocent Plaintiffs, Defendants exhibited nothing but callous disregard for their "Dickensian plight" -- in Defendants' own words and of Defendants' own making:  they stonewalled Plaintiffs' and the

police's requests for exculpatory evidence needed to clear innocent Plaintiffs' names; deliberately withheld that information; and even threatened to sue Plaintiffs for contract breach – at the very time when the Individual Plaintiffs were facing criminal trial in China with its virtually certain lengthy prison terms.

27.     The critical element of Defendants' cover-up was to maintain strategic ambiguity about whether the Equipment was counterfeit or authentic, as any admission – one way or the other -- would have exposed them to criminal liability, either in India if it was counterfeit, or in China if it was authentic.  And so, from the time of their secretly revised submission to the Chinese police in April 2013 and until today, Defendants studiously avoided stating unequivocally whether the Equipment was counterfeit or genuine, and maintained that studied ambiguity in their submissions to the Chinese police, in their correspondence with Plaintiffs, and in their filings with this Court (which now run into hundreds of pages), even though they had known beyond peradventure the answer to that key question all along.

28.     Solely as a result of Defendants' wrongful actions and through no fault of their own, Individual Plaintiffs each spent 7 months in the extremely harsh conditions of the Haidian Detention Center, a year on bail awaiting criminal trial almost certain to result in lengthy prison terms, another year-and-a-half living with the stigma of criminal suspects, suffering from loss of freedom, loss of face, physical pain and sickness, severe emotional distress and mental suffering, loss of consortium, as well as from loss of earnings and employment.   Their families, the Family Plaintiffs, spent all that time desperately trying to secure their release and themselves experienced severe emotional distress and mental suffering as the result of Defendants' egregious misconduct.

29.     Solely as a result of Defendants' wrongful actions and through no fault of their own, Plaintiff ICT suffered severe economic and reputational injury to its business and property; its CEO Plaintiff Styller expended significant time, effort and expense to secure the release of the Individual Plaintiffs and to clear their names, and suffered serious emotional distress and mental suffering as the result of Defendants' malicious campaign designed to intimidate him and the other Plaintiffs into surrendering their claims in exchange for Defendants' "possibly making some small settlement payment to resolve this issue in its entirety."

30.     Defendants' egregious misconduct constitutes fraudulent and/or negligent misrepresentation; fraudulent cover-up; breach of contract or, alternatively, fraudulent inducement; breach of warranty; deceptive business practices in violation of M.G.L. 93A; false arrest and imprisonment; civil conspiracy; negligence; and intentional infliction of emotional distress, entitling Plaintiffs to, among other relief, compensatory, consequential, statutory treble damages and/or exemplary damages in light of Defendants' outrageous concerted actions, and attorney's fees and costs incurred in pursuit of this action.

31.     In particular, Plaintiffs seek to hold the HPFS Defendants jointly and severally liable for the original 2011 fraud and the related causes of action, and *all* Defendants jointly and severally liable for the 2013-2016 fraudulent frame job, cover-up and the related causes of action.

II.     **Parties**

32.     Plaintiff Alexander Styller is the CEO and owner of ICT, a U.S. citizen and a resident of Massachusetts, with the business address at c/o ICT, 239 Commercial Street, Malden, Massachusetts 02148.

14

33.     Plaintiff ICT is a Massachusetts corporation doing business at 239 Commercial Street, Malden, Massachusetts 02148.  Since its establishment in 1993, ICT has been primary involved in the business of remarketing excess and end-of-life inventory of computer parts and components.  In February 2011, ICT received an authorized vendor code to provide goods and services to HP.

34.     Plaintiff Jade Cheng is a citizen of China, a former independent sales associate of ICT, and a supervisor of Plaintiffs Cathy Yu and Jason Yuyi in ICT's Beijing office.  In February 2016, Mr. Cheng became a permanent resident of the U.S., currently residing at 235 Hanover St., Apt. 303, Manchester, New Hampshire, 03104.  Mr. Cheng is the only child in his family.

35.     Plaintiff Jason Yuyi is a citizen of China and a former independent sales associate of ICT, residing at Wanke Jiari Fengjing Bldg. 43, Apt. 304, Yongda St., Yantai City, Shandong Province, China 265500.  Mr. Yuyi has one brother.

36.     Plaintiff Cathy Yu, who is now married to Plaintiff Yuyi, is a citizen of China and a former independent sales associate of ICT, residing at Wanke Jiari Fengjing Bldg. 43, Apt. 304, Yongda St., Yantai City, Shandong Province, China 265500.  Plaintiff Yu is the only child in her family except for her step-brother.

37.     Plaintiffs Jade Cheng, Jason Yuyi and Cathy Yu are collectively referred to herein as the "Individual Plaintiffs."

38.     Plaintiff Caroline Marafao Cheng is the wife of Plaintiff Cheng, a citizen of Brazil and a permanent resident of the U.S.  Plaintiff Marafao Cheng resided in China during her husband's ordeal; she currently lives with him at 235 Hanover St., Apt. 303, Manchester, New Hampshire, 03104.

39.     Plaintiff Pushun Cheng is the father of Plaintiff Cheng, a citizen of China residing at No. 606, Dongshan Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

40.     Plaintiff Changzhen Ni is the mother of Plaintiff Cheng, a citizen of China residing at No. 606, Dongshan Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

41.     Plaintiff Junfang Yu is the stepfather of Plaintiff Cathy Yu, a citizen of China residing at No. 50, Dugezhuang Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

42.     Plaintiff Meixiang Cheng is the mother of Plaintiff Yu, a citizen of China residing at No. 450, Dugezhuang Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

43.     Plaintiff Fangshou Yu is the farther of Plaintiff Jason Yuyi, a citizen of China residing at No. 698, Nanyangjun Villiage, Yangjun Town, Laiyang City, Shandong Province, China.

44.     Plaintiff Changhua Ni is the mother of Plaintiff Yuyi, a citizen of China residing at No. 698, Nanyangjun Villiage, Yangjun Town, Laiyang City, Shandong Province, China.

45.     Plaintiffs Caroline Marafao Cheng, Pushun Cheng, Changzhen Ni, Junfang Yu, Meixiang Cheng, Fangshou Yu, and Changhua Ni are referred to herein as the "Family Plaintiffs." The Family Plaintiffs bring a claim against all Defendants for the intentional infliction of emotional distress, and Plaintiff Marafao Cheng also for the loss of consortium.

16

46.    Defendant HPFS was a wholly-owned subsidiary and one of the seven business segments of HP, a Fortune 50 company and a leading global provider of IT products and technologies.  After HP split into two companies, Hewlett Packard Enterprise Company ("HPE") and HP Inc. ("HPI"), in November 2015, Defendant HPFS became a wholly-owned subsidiary of Defendant HPI.  Defendant HPFS is in the business of providing financing and asset management services with respect to IT hardware and software products from HP and other manufacturers.  Through its operating subsidiaries located in its business regions of the Americas, EMEA (Europe, Middle East and Africa), and APJ (Asia Pacific and Japan), Defendant HPFS provides financial life cycle management services including leasing, financing and asset recovery of IT equipment.  According to its website, "remarketing older assets is a key part of HP Financial Services' business."  Defendant HPFS has a business office at 165 Dascomb Road, Andover, Massachusetts, and conducts its business through various operating subsidiaries located throughout the world, including its wholly owned subsidiary HPFS India.

47.    Defendant HPFS was directly involved in the negotiations and execution of the relevant contracts with Plaintiff ICT through its senior executives and managers including James O'Grady, Director of HPFS Asset Management; JT Silvestri, Manager of HPFS Global Product Management; Tom Harris, HPFS Global Product Manager; and Defendant David Gill, Assistant General Counsel and Assistant Secretary of HPFS.

48.    The relevant contractual documents were executed on behalf of Defendant HPFS India by Kevan Bartley, Asset Management Delivery Manager for Defendant HPFS' APJ Region; by Javlin Lim, Defendant HPFS' APJ Service Delivery Team Lead, and by Mr. O'Grady himself.

49.     Defendant HPFS India is an Indian company with a registered office at 20th Floor Nirmal, Nariman Point, Mumbai, India 400021, and its headquarters at 24 Salarpuria Arena, Hosur Main Road, Adugobi, Bangalore 560030.  Defendant HPFS India is a wholly-owned subsidiary of Defendant HPFS and part of its APJ business region.  Defendant HPFS India provides financing and asset management services to HP customers in India.  To the best of Plaintiffs' knowledge and belief, no representatives of Defendant HPFS India itself were directly involved in the 2011 sale negotiations, which were conducted solely by Defendant HPFS' representatives dealing directly with ICT's representatives in Massachusetts.

50.     Defendants HPI and HPE are the two publicly traded companies resulting from the split of the legacy company HP.  The split became effective on November 2, 2015, following which HP changed its name to HPI as a matter of corporate form.  Defendant HPI is headquartered at 1501 Page Mill Road, Palo Alto, California, 94304; Defendant HPE is headquartered in the same office complex as Defendant HPI, with the address at 3000 Hanover Street, Palo Alto, California, 94304.

51.     Defendant Margaret Cushing "Meg" Whitman was the CEO, President and Chairman of HP until the split, and is now the CEO and President of HP's successor Defendant HPI, and Chairman of Defendant HPE.  Defendant Whitman resides in California; her business address is c/o HPI, 1501 Page Mill Road, Palo Alto, California, 94304.

52.     Defendant Whitman executed the required Sarbanes-Oxley executive certification for the HP 2013 Annual Report, stating *inter alia* that "I . . . have . . . designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant [HP], including its consolidated subsidiaries [the HPFS Defendants and H3C among them], is made known to us by others within those entities," and further certified that "I have

18

disclosed . . . to the registrant's auditors and the audit committee of the registrant's board of directors . . . ***any fraud, whether or not material***, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

53.      Defendant John Schultz was the General Counsel, Executive Vice President and Corporate Secretary of HP during the relevant period, and now holds the same positions at Defendant HPE.  Defendant Schultz resides in California; his business address is c/o HPE, 3000 Hanover Street, Palo Alto, California, 94304.

54.      Defendant David Gill was the Assistant General Counsel and Assistant Secretary of Defendant HPFS, reporting directly or indirectly to Defendant McCarthy while the latter was General Counsel and Secretary of Defendant HPFS.  Defendant Gill resides at 160 Woodland Street, Balgowlah, New South Wales, NA 2093, Australia; his business address is c/o HPFS, 410 Concord Road, Rhodes NSW 2138, Australia.

55.      Defendant Gibbons P.C. is a 200-lawyers law firm headquartered in New Jersey, with offices in New York, Delaware and Pennsylvania.  Defendant Gibbons P.C. is headquartered at One Gateway Center, Newark, New Jersey, 07102.

56.      Defendant G. Daniel McCarthy was the General Counsel, Vice President and Secretary of Defendant HPFS until March 2013, when he became a member of Defendant Gibbons P.C. and a director of its corporate department.  Defendant McCarthy resides in New Jersey; his business address is c/o Gibbons P.C., One Gateway Center, Newark, New Jersey, 07102.

57.      In his May 2013 interview published by the Metropolitan Corporate Counsel, titled *Dan McCarthy of Gibbons P.C.:  From The General Counsel's Office to Law Firm Partnership*, Defendant McCarthy boasted of putting in place while in-house "a funneling

19

system that ensures that all significant risk issues flow to a group of highly experienced senior managers for prompt review and decision."

**III.**   **Statement of Facts**

**A.**   **2011:  The Initial Crime-Fraud**

**1.   The Equipment:  returned to the**
**HPFS Defendants after a short-term lease.**

58.     In 2010, in preparation for the Commonwealth Games in Delhi, India, the Games Organizing Committee retained Tata Consultancy Services Limited ("Tata") to provide IT services for the Games.

59.     Tata and Defendant HPFS India then entered in a series of lease transactions whereby HPFS India purchased brand new IT networking equipment manufactured by HP/H3C from Inspira Enterprise Private Limited ("Inspira"), an authorized HP distributor in India, and simultaneously leased that equipment to Tata.  In total, HPFS India and Tata Consultancy entered into four lease transactions for the Equipment dated between July and October 2010.

60.     Upon closing of the Games and expiration of the leases in 2011, Tata returned the Equipment to HPFS India after less than one year (7-10 months) in use.  The process of returning the Equipment was handled by TT Global, a company specializing in IT logistics and disposition services, which was retained by and acted on behalf of HPFS India as its agent.

61.     According to Defendant HPFS' standard operating procedures, the processing of used equipment returned upon lease expiration included a product-specific test and audit procedure.  Upon information and belief, pursuant to this procedure, TT Global or other persons acting on behalf of Defendant HPFS India inspected the returned equipment at that time (the "2011 Inspection"), and Defendant HPFS India would have become aware that the Equipment was counterfeit as a result of that inspection.  Indeed, according to Defendants' March 2013

20

Letter, "the company HPFS India engage[d] in India to process and refurbish returned lease equipment" – *i.e.*, TT Global -- also took photos of the Equipment during the 2011 Inspection, prior to the sale of the Equipment to ICT and its importation into China.  Defendants subsequently cited these very photos in their March 2013 Letter as showing that "the counterfeit H3C Equipment seized in China is the same equipment sold by HPFS to ICT."

<b>2.      The Negotiations:  the HPFS Defendants identify the Equipment as H3C's.</b>

62.      In the summer of 2011, Defendant HPFS contacted ICT and offered it the Equipment for remarketing purposes, and ICT agreed to purchase the Equipment from HPFS. The negotiations and conclusions of the relevant transactional documents took place predominantly in the Commonwealth of Massachusetts during late summer/fall of 2011, where Plaintiff ICT and Defendant HPFS conduct business, where representatives of Defendant HPFS conducted the negotiations on behalf of the HPFS Defendants and made the complained-of misrepresentations, and where representatives of ICT conducted the negotiations and received, relied and acted upon Defendants' misrepresentations.

63.      In particular, on or about June 14, 2011, Defendant HPFS' manager JT Silvestri offered ICT's representative Alexander Pekar the Equipment for remarketing purposes, explained that the Equipment was H3C-manufactured equipment coming off a short-term lease from HP's Asia region, and provided Mr. Pekar with a preliminary list of that Equipment identified as H3C-manufactured equipment.  In his contemporaneous emails memorializing that conversation for others at ICT, Mr. Pekar wrote: "This product is coming out of HP ASIA.  As far as I know (not sure if correct 100%) this product is coming out of lease and I'm assuming product is refurbished.  (I'm trying to verify condition and warranty). . . .  Please determine market value and liquidity on this shipment."

64.     In another email sent to others at ICT later that day, Mr. Pekar wrote: "Additional details, it was a 7 month lease (I would assume most of the product is new in original box).  HP will provide 90 days warranty and there might be original warranty by H3C."

65.     On or about June 15, 2011, ICT forwarded the Equipment list to its office in China to determine the Equipment's market value and liquidity there, because H3C was a China-based brand, and China presented the best resale market for the H3C Equipment.  A cover email from ICT to Plaintiff Jade Cheng, titled "HP H3C Urgent," stated: "Hi Jade, you know the list we were working on bidding for, with the S5000? . . .  Attached is the list.  Can you and Jason [Yuyi] work on this, and identify which parts are hot, and what prices we can sell at.  We need this info to help formulate our bid to buy the materials."  Plaintiff Cheng responded with the "HPH3C.xls" spreadsheet identifying hot items on Defendants' list of Equipment and their estimated resale prices in China.

66.     On or about June 16, 2011, Mr. Pekar had another telephone call with Defendant HPFS' Mr. Silvestri regarding the H3C products offered by Defendant HPFS, during which Mr. Silvestri asked ICT to prepare a proposal for the Equipment, including purchase price, profit sharing arrangements, and other terms.  In his contemporaneous email memorializing that conversation for others at ICT, Mr. Pekar wrote: "I had a long conversation with HP regarding the H3C products.  In the next couple days, we need to give them few options on this project."

67.     On or about September 1, 2011, Defendant HPFS forwarded Mr. Pekar at ICT a version of the sale contract for the Equipment drafted by Defendant Gill, HPFS' in-house counsel.  Mr. Pekar then circulated the draft to others at ICT, with a cover note stating: "Please review the contract we received from HP on the H3C deal."

22

68.     Also in or about September 2011, ICT's representative Mr. Pekar met with Mr. O'Grady, Director of Defendant HPFS' Asset Management who was in charge of the H3C project, to discuss this and an unrelated project in Russia.  In his email dated September 29, 2011 memorializing that meeting for others at ICT, Mr. Pekar wrote:  "Regarding meeting with Jim O'Grady, I have met with him, he knows who we are and what we trying to do, he is the one who send in the team to do an initial audit of our facility.  He is in charge of H3C project and Russian Facility project, his team is working with us on both."

69.     On or about September 29, 2011, Defendant HPFS forwarded the next version of draft contractual documents to ICT for review.  One of the drafts was titled "ICT Sale Document JT – H3C Equipment.docx," where "JT" stands for the initials of Defendant HPFS' manager JT Silvestri handling the negotiations, and "H3C Equipment" describes the Equipment that was the subject of those negotiations.

70.     On or about November 8, 2011, Defendant HPFS forwarded another version of the draft contract to ICT, with the document name "110917 ICT Sale Document JT – H3C Equipment.pdf."

71.     On or about November 21, 2011, Defendant HPFS forwarded yet another version of the draft contract to ICT, with the document name "111121 ICT Sale Document JT – H3C Equipment.docx," which included revisions made by Defendant Gill, HPFS' in-house counsel. Defendant Gill concealed and did not disclose to ICT that the Equipment was not "H3C Equipment" as stated in the draft but counterfeit, as Defendant Gill would himself later admit.

72.     On or about December 1, 2011, HPFS forwarded to ICT's Mr. Pekar two spreadsheets titled "Copy of H3C all schedules part numbers 080811 Shipment1.xlsx" and "Copy of H3C all schedules part numbers 080811 First Shipment.xlsx," drafted by Mr. Harris,

Defendant HPFS' Global Product Manager. The spreadsheets identified the Equipment by its HP/H3C manufacturing model codes. Mr. Pekar then circulated the spreadsheets to others at ICT, with a cover note stating: "Attached list of the 1st shipment, please feel free to go through to make sure all correct as we agreed on this couple months ago."

### 3.   The Contracts:  the HPFS Defendants sold the Equipment as H3C's.

73.     On or about December 6, 2011, the parties executed the sale contracts. The remarketing arrangement between HPFS India and ICT contemplated four shipments of the Equipment, with the initial payment of $250,000 due from ICT for the first installment, and a sharing of the net resale proceeds between ICT and Defendant HPFS India.

74.     Because HP's internal policy required a local entity for export-import transactions, the remarketing arrangement was documented in two concurrent contracts. First, Defendant HPFS India entered into a Referral and Revenue Share Agreement with ICT dated December 6, 2011 ("RRSA"), whereby Defendant HPFS India agreed to sell the Equipment "AS IS" to an Indian broker Shinto Creative Elements Private Limited ("Shinto"), and ICT agreed to acquire the Equipment from the broker for the purposes of reselling that Equipment and sharing the net proceeds of any such resale with Defendant HPFS India. The RRSA required ICT "to use its best efforts to remarket the Active Equipment at the highest possible prices" and "without identifying HPFS" as the source of the Equipment. The RRSA was executed by Javlin Lim, Defendant HPFS' APJ Delivery Team Lead, on behalf of Defendant HPFS India.

75.     Second, as contemplated by the RRSA, Defendant HPFS India entered into a Wholesale Sale Agreement (the "WSA"), also dated December 6, 2011, with Shinto for the sale of the first installment of the Equipment for $250,000 for the purpose of reselling the

Equipment to ICT. The WSA identified the sold Equipment by their "HP" and "H3C" manufacturing model codes and was executed by Kevan Bartley, Defendant HPFS' Global Operations Manager, on behalf of Defendant HPFS India. The execution version of the WSA also bears a legend "111202 ICT Sale Document JT – H3C Equipment 1st Batch.doc" printed in the footer.

76.     The purchase order issued by Shinto to Defendant HPFS India pursuant to the WSA likewise identified the purchased items as "HP/H3C"-manufactured equipment, and was executed by Mr. O'Grady, Director of Defendant HPFS' Asset Management in charge of the H3C project, on behalf of Defendant HPFS India.

77.     Accordingly, pursuant to the RRSA and the WSA, ICT purchased the Equipment represented by the HPFS Defendants as genuine HP/H3C-manufactured equipment, and had no reason to believe otherwise: ICT contracted with an HP entity; Defendant HPFS' representatives engaged in negotiations specifically identified and described the Equipment as the "H3C Equipment" on numerous occasions in the course of those negotiations; the contracts themselves specifically identified the Equipment as HP/H3C-manufactured equipment; and the Equipment had been inspected by Defendant HPFS India or its agents upon the lease expiration and return of the Equipment to Defendant HPFS India, prior to the sale to ICT. Indeed, in their March 2013 Letter the HPFS Defendants themselves admitted that "[u]pon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment."

78.     As shown above, this was not merely an assumption on ICT's part as the Equipment was specifically represented to be H3C-manufactured equipment by representatives

of Defendant HPFS during the contract negotiations and expressly identified as such in the contracts themselves.

79.     Indeed, the HPFS Defendants subsequently admitted in their April 1, 2013 revision of the March 2013 Letter that that "*HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard.*"

80.     As it turned out, those representations were false because the Equipment was not H3C-manufactured equipment but counterfeit, according to the Equipment's manufacturer, trademark holder, and a wholly-owned HP subsidiary at the time, H3C itself.  Accordingly, the HPFS Defendants' statements referenced in paragraphs __--__ above describing the Equipment as H3C-manufactured equipment were all false.

81.     Defendant HPFS, which conducted the sales negotiations, and Defendant HPFS India, the party named in the contracts as the seller of the Equipment, both concealed the fact that the Equipment was counterfeit.  Had the HPFS Defendants or any of them told the truth, ICT would not have agreed to purchase and remarket the Equipment because counterfeit equipment is unlawful to sell and is worthless for remarketing purposes, and would have terminated its negotiations with Defendants forthwith; the Individual Plaintiffs would not have attempted to resell the Equipment in China.

82.     The HPFS Defendants actions in 2011 constitute a crime under the Indian law (selling counterfeit goods and possession of counterfeit goods for sale, *see* the accompanying affidavit of Vivek Mapara), as well as fraud upon the Plaintiffs, hence referred herein as "crime-fraud."

4.     **Plaintiffs' attempts to resell the Equipment;**
       **discovery of its substandard condition.**

83.     Unaware of the counterfeit nature of the Equipment, and in anticipation of

reselling it, Plaintiffs used their sales offices in China to arrange prospective customers to

purchase the first installment of the Equipment for the total amount of $1.5 million.  Pursuant to

the RRSA, ICT was to share 50% of the net resale profits with Defendant HPFS India.

84.     At the end of December 2011, Shinto arranged for the export of the first of four

installments of the Equipment to Hong Kong, from where the Equipment was forwarded to

Beijing, China by a local forwarder.  That shipment included approximately 3000 transceivers

purportedly manufactured by H3C; the remaining part of the Equipment still in India included

approximately 5000 transceivers purportedly manufactured by H3C.

85.     Upon receipt of the Equipment in China, ICT representatives realized that the

Equipment was in a substandard condition (scrap-grade), with physical damage, rust, scratches

and other defects, and not marketable as anticipated.  ICT's originally arranged customers, who

expected the Equipment in an "AS IS" but relatively new condition – with reasonable wear and

tear after a 7-10 month lease, as represented by the HPFS Defendants -- backed out and refused

to buy the Equipment.  ICT's sales team in China then started to develop new resale channels,

which took longer than originally anticipated and produced lower gross sales receipts and net

profits.

86.     Upon information and belief, the fact that the Equipment was in a substandard

scrap-grade condition was known to, or recklessly ignored by, the HPFS Defendants prior to the

sale of the Equipment to ICT and its importation to China because that condition would have

become apparent to those Defendants during the 2011 Inspection when the Equipment was

returned to Defendant HPFS India upon lease expiration.   The company engaged by Defendant

HPFS India "to process and refurbish returned lease equipment" – TT Global -- inspected and took photos of the Equipment during the 2011 Inspection.

87.     At the very least, the fact that the originally brand-new Equipment coming off a short-term lease was in a substandard scrap-grade condition should have raised a red flag for the Defendants indicating potential substitution of the Equipment with a low-quality counterfeit.

88.     In October/November 2012, ICT's representative Mr. Pekar together with Defendant HPFS' representative Mr. Harris conducted a joint inspection of the remaining three installments of the Equipment in India (the "2012 Inspection") and agreed that the remaining Equipment was likewise in a substandard scrap-grade condition.  Defendant HPFS then offered the remaining Equipment to ICT at a whopping 500% discount to the original price (for $150,000 instead of $750,000) but ICT declined, and the parties determined not to go through with the remaining installments. Upon information and belief, Defendants subsequently disposed of the three installments of the Equipment remaining in India.

89.     Neither during the 2012 Inspection nor afterwards during Plaintiffs' remarketing efforts did any of the Defendants inform ICT that the Equipment was counterfeit.  ICT itself had no knowledge, expertise or technical means to determine whether the Equipment was genuine or counterfeit; indeed, it continued to believe – and had no reason not to believe – that the Equipment was genuine HP/H3C equipment, albeit in a substandard condition, because ICT bought the equipment as such from HP companies themselves and was entitled to rely and did rely on their representations regarding its HP provenance.  Upon information and belief, Defendants had the knowledge, expertise and technical means to determine that the Equipment was counterfeit during the 2012 Inspection.

**B.**   <u>**2012-2013:  The Frame Job**</u>

  **1.  The counterfeit nature of the Equipment revealed;**
      <u>**ICT's Chinese offices raided; the Individual Plaintiffs arrested.**</u>

90.     In the meantime, Plaintiffs continued to use their best efforts to resell the first

installment of the Equipment in China.  In December 2012, however, shortly after the 2012

Inspection and the parties' decision not to proceed with the remaining installments,

representatives of H3C lodged a complaint with the local police accusing Plaintiffs in marketing

counterfeit H3C products because the transceivers contained counterfeit H3C trademark logos,

without informing the police that the Equipment was sold to ICT by H3C's affiliates, the HPFS

Defendants, as genuine H3C Equipment.

91.     In its statements to the police made under oath, commencing in December 2012

and at least until August 2014, H3C consistently and unequivocally identified the Equipment as

"counterfeit H3C."

92.     H3C first reported to the police that the Equipment was counterfeit on December

7, 2012, after seizing three transceivers sold by the Individual Plaintiffs over the Internet.  In its

Appraisal Certificate of that date, H3C reported to the police that "our company hereby declares

that, after the investigation of the seized products, the above products with 'H3C' logo are

confirmed to be counterfeit, our company hereby asks the law enforcers to confiscate and

destroy all the counterfeit products, and seriously punish the related people and the company,

including charging them with the criminal responsibilities."

93.     On December 9, 2012, H3C applied to the police, stating that it was the holder of

the H3C logo and trademark and requesting the police to search ICT's office, seize the

counterfeit H3C products and investigate the Plaintiffs for criminal violations.  On that day, the

police raided ICT's offices, seized the remaining 778 transceivers, and arrested Plaintiffs Cathy

Yu and Jason Yuyi (their supervisor Plaintiff Jade Cheng was arrested on December 21, 2012,

when he came to the Haidian Detention Center on his own accord, searching for his missing

associates).

94.      Following the seizure, H3C provided the police with another Appraisal

Certificate dated December 9, 2012, likewise stating with respect to the 778 transceivers seized

that day that "after investigation of the seized products, the above products with 'H3C' logo are

confirmed to be counterfeit," and again calling for the criminal prosecution of the Plaintiffs.

95.      On December 27, 2012, H3C submitted another declaration to the Chinese

police, stating that the Individual Plaintiffs were "selling counterfeit 'H3C' transceivers which

Logo is owned by Hangzhou H3C Technologies, Ltd.," and further that "'H3C' Logo and its

translations are ONLY owned by:  Hangzhou H3C Technologies, Ltd., our company never

shared it with other companies or individuals.  Our company never assigns rights to HP to sell

or distribute the products with H3C Logo in China."

96.      H3C's police complaint requesting criminal prosecution of the Plaintiffs was

misleading, and the ensuing arrest and imprisonment of the Individual Plaintiffs was unjustified,

because even if the Equipment was counterfeit, H3C did not disclose that the Equipment was

supplied to Plaintiffs by H3C's HP affiliates, the HPFS Defendants, as genuine H3C equipment,

and was marketed by Plaintiffs as such pursuant to the revenue-sharing agreement with the

HPFS Defendants and without any knowledge that it was counterfeit.

97.      The Individual Plaintiffs' imprisonment was further unjustified because the

HPFS Defendants' fraudulent sale of counterfeit Equipment to Plaintiffs in 2011, for the express

purposes of resale, unreasonably exposed the Individual Plaintiffs reselling it to a substantially

certain risk of arrest and imprisonment.  The HPFS Defendants committed their fraud with

knowledge or reckless disregard for the fact that the Individual Plaintiffs' confinement would, to a substantial certainty, result from it.

98.     Based solely on H3C's representations, the Individual Plaintiffs were detained and imprisoned; ICT's Chinese offices were raided and shut down; and the remaining unsold part of the Equipment was seized.  That was the first time when Plaintiffs learned that the Equipment was counterfeit.

99.     As soon as ICT learned about the arrest of its sales representatives in China, it set out to assemble and translate the necessary documentary evidence and other materials to secure their release.  In January 2013, ICT learned that the criminal trial of the Individual Plaintiffs could be expected as early as April 2013, and started racing against the clock.

100.     While ICT was desperately trying to obtain the release of the Individual Plaintiffs from their hellish incarceration, the Defendants withheld exculpatory evidence and stonewalled the Chinese state officials' requests to confirm the Individual Plaintiffs' alibis, and then embarked on an insidious cover-up scheme to conceal their frame job, even though that meant continuous imprisonment, the overhanging threat of criminal prosecution, and its 99.93% probability of conviction and long prison sentences for the innocent Individual Plaintiffs.

101.     Defendants' actions in furtherance of their fraudulent scheme are laid out in detail in the Chronology of the Cover-up and supported by the accompanying exhibits annexed to this Second Amended Complaint, and are summarized below.

> **2.  The early months of incarceration:  Defendants pretend to assist the Individual Plaintiffs' release while withholding exculpatory evidence; thoroughly inspect the seized Equipment.**

102.     The Individual Plaintiffs spent the next seven months in the torture-like conditions of the Haidian Detention Center, notorious for its brutal treatment of detainees.  *See,*

*e.g.*, The New York Times, *Urging Treatment for Activist in Jail in China, 16 are Briefly Detained Themselves*, March 20, 2013 ("The group went to the Haidian Detention Center in western Beijing to deliver a note asking if Ms. Wu was being forced to sleep on the floor, as she had told her lawyer, and whether she had been sent to a hospital for treatment."); Vice News, *The Beijing Five:  Calls Grow for Release of Chinese Feminists Held Without Charge*, April 10, 2015 ("For weeks, Wu Rongrong awoke each day on the cold concrete floor of her cell within Beijing's Haidian District Detention Center, where she had been caged since early March on suspicion of 'picking quarrels and provoking trouble.'  Her skin had grown yellow, and she was coughing up bloody phlegm."); Minghui.org, *Ms. Wei Hui Taken Again to Haidian Detention Center, Known for Torturing Practitioners*, February 18, 2015 ("That particular detention center is known for torturing [Falun Gong] practitioners and some have died.")

103.    The initial shock of the arrest, the day-to-day loss of liberty, loss of face, fright, anxiety, stress, humiliation, anguish and emotional and mental suffering associated with imprisonment were compounded in the Individual Plaintiffs' case by the cruel conditions of the Haidian Detention Center, described in detail in the accompanying affidavits of the Individual Plaintiffs.  The Individual Plaintiffs' suffering was also magnified by their knowledge that they were unjustly imprisoned by HP for nothing more than selling HP's Equipment for HP's ultimate benefit.

104.    Shortly after his arrest, Plaintiffs Cheng explained to the police that the Individual Plaintiffs were selling the Equipment provided by the HPFS Defendants to ICT pursuant to the WSA and RRSA as genuine H3C Equipment.

105.    On January 10, 2013, the Chinese police contacted HP China to verify Individual Plaintiffs' alibis, and recorded HP China's response as follows:

32

> We contacted with Meng Tao, who is working in the Security
> Department of HP China, regarding several agreements made between
> ICT USA and HPFS submitted by [Individual Plaintiff Jade Cheng],
> Meng Tao replied on the phone and we took record as he said: "All HP
> contracts/agreements can be downloaded freely by anyone from HP
> website. ***HP China does not admit any contract signed by another party
> (HPFS)*** and requires the party who signed the contract to provide the
> detailed contact information for HP China to verify the contract."

106.   Thus, HP China refused to confirm the Individual Plaintiffs' alibis; note also that
HP contracts ***cannot*** in fact "be downloaded freely by anyone from HP website," as Plaintiffs
and their counsel have tried without success (and the readers are welcome to try for
themselves).

107.   HP China would go on to stonewall the police's requests for exonerating
evidence for the next ***seventeen months*** of the Individual Plaintiffs' confinement and bail, in
coordination with the Defendants and in facilitation of their frame job and cover-up.

108.   Thus, two months later, on March 2, 2013, the Chinese police again contacted
HP China to see if HP China was able to verify the contracts and thus confirm the Individual
Plaintiffs' alibis, and recorded its response as follows: "the person from HP China said ***HP
China is contacting HPFS currently***."

109.   Fifteen more months later, in August ***2014***, the Chinese police once again
contacted HP China and – incredibly – received exactly the same non-response as it did in
January and March of 2013: "We contacted with Fu YuLin who is from Legal Department of
HP China (his contact +86-18901088737), we asked HP China to verify the products, to make
sure where the products came from. ***Fu YuLing replied that he is contacting the related
departments of HP. But till now, we have not got a reply from him.***"

33

110.    Thus, from January 2013 and through the whole period of the Individual Plaintiffs' ordeal, HP China represented to the police that it was not able to contact its parent company HP or its affiliate Defendant HPFS in order to verify the Individual Plaintiffs' alibis, and stonewalled the police requests for that exonerating evidence.

111.    In January 2013, after their own early efforts to obtain release of Individual Plaintiffs from custody proved unsuccessful, Plaintiffs ICT and Mr. Styller brought their concerns to the attention of the HPFS Defendants, requesting their assistance with securing the Individual Plaintiffs' release.

112.    Instead of making prompt, complete and truthful disclosure of the relevant facts to the Chinese authorities that would have confirmed the Individual Plaintiffs' alibis, fully exonerated them, and secured their early release, however, the HPFS Defendants dragged their feet for several months until the end of April 2013 while the Individual Plaintiffs remained in jail -- and then only to make a woefully inadequate and misleading disclosure that failed to secure their release, to withhold exculpatory evidence that would have exonerated them, and to cover up their perfidy with a malicious campaign of lies, threats and intimidation.

113.    Thus, by email dated January 31, 2013, ICT's representative Ryan Quinn explained the situation to Defendant HPFS' representative Mr. Silvestri, asked Defendant HPFS to "straighten this issue out internally with HP China & H3C China, and have it clarified with the Police," and stated that "a formal letter from HP will be very helpful explaining the situation & stating that ICT did in fact buy this batch of H3C material from HP." Mr. Silvestri was the one who had introduced that very H3C Equipment to Plaintiffs in 2011.

114.    Next day, February 1, 2013, Mr. Quinn sent another email to Mr. Silvestri, thanking him for "taking this so seriously and *escalating it so quickly*."

34

115.     Nothing happened for the next ten days, however – while the Individual Plaintiffs continued to sleep on the toilet floor in the overcrowded jail cell – prompting Mr. Quinn to write to Mr. Silvestri again on February 12: "Is it possible to get this letter from HP? A formal letter from HP will be very helpful explaining the situation and stating that ICT did, in fact, buy this batch of H3C material from HP."

116.     In response, Mr. Silvestri wrote on February 14: "Here is what *the HP legal team* thinks we can do which is to provide a formal letter covering the following:  Details of all equipment purchased by ICT from HPFS; Confirming that based on our sampling some of the assets seized are within this list; and to the extent any of the assets seized were supplied by HPFS, we do not believe that ICT should be held responsible if they are counterfeit.  We would like your feedback on this and if you would like us to pursue we would also need to confirm this with our *HP local legal teams*."

117.     On February 17, 2016, Defendant Gill, Defendant HPFS' in-house counsel, became involved in the matter, writing to Mr. Styller of ICT:  "JT asked me to reach out to you with respect to the above. I have been reviewing the issue with *the HP legal and security teams* in China so it would make sense for you to speak directly with me."

118.     After another week of inaction – another torturous week for the Individual Plaintiffs and their families – Mr. Styller wrote to Defendant Gill on February 22: "Can you please make an effort to convince your H3C counterpart in China to instruct police to free our people.  The level of allegation is not proportionate to the level of detention. 60 days in jail and counting for allegation of such magnitude is ridiculous.  Set aside that they done nothing wrong, there is no justification to detain people without bail in jail on small economic charge like that.  Those people have no prior convictions and will not go anywhere. I will appreciate if you try. I

35

know they can do the magic.  Thank you very much.  I feel those people pain.  Hope you understand."

119.    Plaintiff Styller's emotional plea was met with a perfunctory response from Defendant Gill: "I hope to have an update later today.  Please bear with me and please be assured that *we have a number of people working on this* so that it can be resolved as soon as possible."

120.    The utter lack of empathy in Defendant Gill's response would become, without fail, a common theme in all of Defendants' correspondence with the Plaintiffs throughout the whole ordeal.

121.    Mr. Styller replied:  "Thank you, David for giving this a priority. Every day in jail must be most horrible life experience. I never being detained but I am afraid to imagine. Have a nice day and feel free to contact me any time day or night if my participation is necessary."

122.    On February 25, Defendant Gill notified Mr. Styller:  "The PBS have granted us permission to view the seized goods on Thursday.  *Our internal audit team* should have a report on Wednesday."

123.    That Wednesday came and went, and with no such report forthcoming and the Individual Plaintiffs enduring their 81st day in confinement, nine days later, on March 5, Mr. Styller wrote to Defendant Gill:  "Hope you had a nice weekend. I am wondering if you have any new information from China.  Last time I know that your team was 40% through the inspection of material in China.  Please update on current status."  Defendant Gill responded: "The officer in charge was travelling for a few days and was expected to return today. As soon as he returns *our audit team* will attempt to complete the reconciliation asap."

124.    Another week passed by – fourteenth of the Individual Plaintiffs' incarceration –
and Mr. Styller wrote yet another letter to Defendant Gill on March 12: "It is about two weeks
since your team started inspection of product.  Innocent people still in jail (for about 3 full
months by now).  I appreciate your process but your legal team must arrange for release of our
team immediately.  Bail or not bail, whatever it is they must go home.  I am getting pressure
from the families; elderly parents of our sales team members are going crazy.  It breaks my
heart to see letters from them.  They think I can do something to help.  At this point, can you
please arrange for your legal team get in touch with our lawyer there and explain the situation?
Hope this move will provide some clarity and comfort to families. Hope that move at least will
help them understand that HP and ICT are working together to have all the mess cleaned up. I
would appreciate if you call me your morning on my cell to discuss and update.  JT, if you can
do something, please help."

125.    In response to Mr. Styller's pleas for help, Mr. Silvestri wrote on March 12: "I
am not in the loop on this as *it is at the top level leaders*. They do not provide me updates and I
can do no more here to assist.  That's *a big company policy*.  So appreciate you working with
David [Gill]."

126.    Apparently, Defendant McCarthy's brainchild, the "funneling system that
ensures that all significant risk issues flow to a group of highly experienced senior managers" --
which he credited himself with establishing while in-house counsel at Defendant HPFS --
quickly picked up the brewing scandal in China, "funneled" it to the "top level leaders" within
HP, and kept the others out of the loop with Chinese walls as a matter of "big company policy."

127.    Defendant Gill in his turn on March 11, 2013, in response to Mr. Styller's
desperate pleas, requested additional information and documents from ICT and demanded that

ICT through its local counsel arranged for HP to inspect the remaining 60% of the seized Equipment by "H3C's auditors," expressing no sympathy whatsoever for the Individual Plaintiffs or for their suffering families, the Family Plaintiffs, and offering no support or encouragement to Mr. Styller.

128.    Mr. Styller responded: "Your email did not resonate well, where you seemed to 'pass the ball' back to ICT saying there is paperwork needed about our incorporation & custom clearance. Our lawyer has confirmed this has not been requested by anyone. We've already provided all necessary documentation to our lawyer, and *the only issue in question is the authenticity of these H3C transceivers.*"

129.    Mr. Styller further explained that seeking access to the remaining 60% was "a long and unneeded process," urged that "H3C should go to authorities with result of the first 40% -- and formally state whether these are the parts bought from HP," and unequivocally requested: "*We need to know the result of your audit of the 40% of material.*"

130.    Indeed, given that fact that H3C had already inspected *all* the seized transceivers, determined them *all* to be counterfeit, and so reported to the police (*see* H3C's Appraisal Certificate of December 9, 2012), the re-inspection of 40% of them by Defendant HPFS and "H3C auditors" should have been able definitively either to confirm or disprove that the Equipment was counterfeit, without any need to inspect the remaining 60%.

131.    In the internal correspondence of the same date, Mr. Quinn presciently wrote to Mr. Styller: "In thinking more about this today, I am suspecting that they are hesitant to answer this as they can smell a lawsuit. I bet they are bringing up the customs issue & incorporation as a defense strategy. We'll see if he continues to avoid answering this."

132.    Mr. Styller responded:  "*I think they are legitimate organization and covering up simple thing as result of the inspection is not a good idea.*"  Yet, that was exactly what the Defendants did:  in responding to Mr. Styller's request, Defendant Gill conspicuously ignored that key and "only" question about the results of their audit of the 40% of the seized Equipment, writing on March 12:  "I am not trying to pass the ball back to ICT.  I am just relaying information that our auditor came back with after visiting the police.  If this is information the police want then it is in everybody's interest to get it to them as soon as possible. I will also do what I can today to get into contact with *the local teams* to see what we can do to move this more quickly."

133.    Frustrated by the lack of progress and anxious about the impending trial, Mr. Styller also contacted Mr. O'Grady of HPFS, who was in charge of the H3C project, writing on March 12, 2013:  "Hi Jim, I was hoping to have a conversation with you regarding the transaction between ICT and HPFS India.  I am sure you remember this deal."

134.    Mr. O'Grady flatly refused to help or even to talk to Mr. Styller, writing back two days later:  "My understanding is that ICT has been in communication with HP regarding the India transaction.  I do not believe that I could personally add anything to the conversation. I believe your existing HP communications are the best way to address any remaining inquiries on the transaction."  That was a callous – and most likely drafted by Defendant HPFS' counsel - - response by the same O'Grady, Director of HPFS Asset Management, who was "in charge of the H3C project" and whose team was working on it with the Plaintiffs in 2011.

135.    On March 14, 2013, Styller wrote a two-line email to Defendant Gill, again asking the same direct and unambiguous question:  "*We need to know the result of your audit of the 40% of material. Please answer this question*. Thank you."

136.    Defendant Gill responded: "Apologies for the delayed reply.  I was out of the office today.  The equipment we were able to inspect comprised of 293 line items.  We were able to reconcile most of these assets back to the list of equipment sold by HPFS India to Shinto Creative Enterprises.  It was not possible to reconcile 73 items." Yet again, Defendant Gill managed to avoid answering the key and only question about the authenticity of the inspected items.

137.    Having received this transparently evasive reply, Mr. Styller wrote back to Defendant Gill on March 15, 2013: "Thank you for your reply. Hope all is well.  It is a 'public knowledge' (between all of us) that list of equipment supplied with shipment was very poor quality. I am not surprised that it was 'not possible to reconcile 73 items' out of 293. *Since the allegation that keeps our people in jail 'selling counterfeit' product, next question -- any of the product inspected found counterfeit*?"

138.    Yet, once again Defendant Gill failed to answer that key question, which called for a simple "yes" or "no" answer.  Instead, Defendant Gill responded with a long email, only stating in the relevant part: "Based on our analysis of approximately 40% of the equipment it appears that the equipment seized is the same equipment sold by HPFS to Shinto and onto ICT. . . . I am also making inquiries with respect to whether the counterfeit allegations relate to the labeling only or if there are other concerns." Whether the inspected Equipment was found counterfeit or authentic, Defendant Gill did not say, again withholding exonerating evidence from the Plaintiffs.

139.    Defendant Gill's evasive email also attached a request by the Chinese prosecutor to the Chinese police regarding evidence-gathering for the case, without any explanation how

40

this confidential internal document (which disclosure is illegal in China) ended up in Defendants HPFS' and Gill's possession.

140.    Also on March 15, 2013, Mr. Styller wrote to Defendant Gill after communicating with ICT's Chinese counsel: "He has received call from Ms. Liu -- a lawyer with HP or H3C, who keeps pushing for incorporation issues, saying these guys should not have been selling the transceivers.  It sounds like *she is being aggressive, rather than trying to help resolve this*."

141.    Another week passed by – 15th week of the Individual Plaintiffs' horrific ordeal - - with Defendants' requesting additional information, documents and photos of the Equipment from ICT, and ICT's providing such information promptly, which information Defendant Gill on several occasions stated he would "pass on" to unnamed parties.

142.    On March 19, 2013, Mr. Styller wrote to Defendant Gill:  "Do you have any update for me? Is letter ready?  *When you pass along our request to drop charge, where all this information go?*  We hear no feedback and our people still in jail.  We are getting more and more concerned with [lack of] progress."

143.    Defendant Gill responded:  "*A number of people within HP are devoting a significant amount of time to this matter* and trying to work it out as quickly as possible.  *It is not a simple situation. . . .*"  Defendant Gill was right – the situation was quite dicey for HP, dicey enough to have "a number of people within HP . . . devoting a significant amount of time" scheming how to get out of this zugzwang.

144.    In his response, Defendant Gill also requested additional documents and information from ICT – yet again without disclosing the results of HP's inspection of the

Equipment and, in particular, yet again avoiding the key question whether "any of the product inspected [was] found counterfeit."

145.    In his March 19, 2013 email exchange with Defendant HPFS' Mr. Silvestri, Plaintiff Styller expressed the frustration and anxieties running high at ICT and among the Family Plaintiffs: "Please understand the endless questioning can't go on forever. It is already 2 months since HP is involved. It is clear that our people didn't do anything wrong.  Your anti-counterfeit team randomly checked 40% of material provided by police. Nothing was found. Police refuse to provide more product for checking. H3C is pushing for more and more scrutiny clearly trying to manufacture the case out of thin air and HP is not helping us stop the madness. There is nothing there justifying holding people in jail. H3C came up with a fake label now, that was not found by your team. This is absolutely unacceptable and unjustified continuation of the situation. All necessary questions answered, all necessary prove is collected. We demand your higher management to get involved and instruct H3C to drop the case immediately and release our people."

146.    Mr. Styller wrote further to Mr. Silvestri:  "Here is our feeling about working with David Gill. While he is very responsive and professional individual we think he has not enough authority to get things moving. We are getting very concerned that *since we have HP involved there is no progress noted in our China situation*. We are developing impatience and more and more unclear on HP's agenda.  *It appears that H3C wants to keep our people in jail, and HPFS AP or Worldwide doesn't mind, and doesn't seem to be helping ICT*.  So far random test of 40% of material prove that we done nothing wrong and our people were marketing HPFS India material. But our people are still in jail and charges are not dropped. This is absolutely unacceptable. We demanded charges dropped and our people released immediately

multiple times but this was just passed along with no results. We require HP contact with authority above H3C China to be involved and start handling the situation and help us to get our people out of jail.  To start I suggest we meet and discuss this at your first possible convenience. I also suggest Jim O'Grady to participate in meeting. Please let me know when are you available for the meeting."

147.    Yet, Mr. Styller's proposals and pleas for a meeting were flatly rejected by HP, with Mr. Silvestri's writing back: "Please work with David on this directly as we discussed this is *within the legal teams in HP* to address.  Your focal point and contact is with David Gill." Thus, the Defendants funneled all Plaintiffs' communications to the "legal teams in HP" and their point person Defendant Gill, who continued to pass Plaintiffs' desperate pleas "to get our people out of jail" along to his unnamed superiors – where they all died a quiet death.

148.    And Defendants steadfastly refused to disclose the identities of those senior decision-makers to the Plaintiffs, as their questions -- such as "When you pass along our request to drop charge, where all this information go?" -- were answered only with vague references to "the HP legal teams supporting HP Financial Services and H3C."

149.    Notably, at this time – in March 2013 – Defendant McCarthy transitioned from being an in-house counsel for Defendant HPFS to becoming an outside counsel for HP, HPFS India and H3C, handling this matter on behalf of all three entities.

150.    On March 21, 2013, with no further information from Defendants, Mr. Styller wrote to Defendant Gill: "As you know we are frustrated with the lack of progress and fact that our people are still in jail.  These are the major questions we are still looking for, and *keep getting the run-around from HP on*.  Please help to answer them. We need to update the families on what is going on. Who is leading this effort, and where is all this information being

43

"passed on" to?  Where is the report that we expected on Monday?  What is HP's action plan?

What is HP's agenda?  Please answer those questions for us. We owe to frustrated families of

the men and women of ICT China Team."

151.   Defendant Gill responded, stating *inter alia*:  "***The HP legal teams supporting***

***HP Financial Services and H3C are working on this matter***.  . . .  A draft has been prepared.

***The letter needs to be as clear as possible to be effective***.  H3C has been analyzing the photos

of the labels.  A sample of the equipment is also being sent by our processing vendor in India to

China for analysis by H3C.  ***An HP attorney from the U.S. will be in China next week***.  ***He will***

***be assessing the situation which I think will be very helpful***.  It is my hope that we will send

the letter to the authorities soon.  However, you need to appreciate that ***this situation is not***

***simple***. . . .  We don't have an agenda.  HP always has an interest in protecting its intellectual

property but would never want to see innocent individuals incarcerated."

152.   Mr. Styller replied: "Thank you for your answers.  For all fairness we and

families are spending enormous amount of time and money to defend and support our guys also.

. . .  I will pass your answers to the frustrated and angry families who are all over me for results.

Hope that they understand things better."

153.   On March 25, Mr. Styller wrote another email to Defendant Gill:  "Please update

me on the development of the situation in China and now I hope that letter promised is ready

and hope to receive this letter sometime soon."

154.   Defendant Gill replied:   "I think we should have a draft letter completed today. I

do think we have a better momentum on this now. ***We now have the right people involved in***

***this matter***."  Presumably, the "right people involved in this matter" now included the unnamed

"HP attorney from the U.S." recently visiting China to assess the situation.

44

155.    Another email from Defendant Gill of that day stated: "A quick update. I have completed the draft letter today. *It is in China for review*. I will keep you updated."

156.    Conspicuously, in none of this correspondence did Defendant Gill ever answer the key question repeatedly asked by ICT – was any of the inspected Equipment found counterfeit or not?  Accordingly, Defendant Gill -- no doubt in consultation with his HP superiors and the "HP legal teams" (which included Defendant McCarthy and those above him in the HP corporate hierarchy) – withheld exculpatory evidence from the Plaintiffs and stonewalled their repeated, desperate requests for it.

157.    To summarize the post-arrest events up to this point in the narrative:  Defendants were notified of the arrest as early as January 2013; the matter was quickly *"escalated"* to the *"top level leaders"* and decision-makers above Defendant Gill's pay-grade, to whom he was passing along Plaintiffs' desperate pleas for help.  The others, including even Defendant HPFS' business people who negotiated the original deal Messrs. Silvestri and O'Grady, were cut off from that loop as a matter of *"a big company policy."*  By mid-February, *"the HP legal and security teams* in China" had already been reviewing the issue with Defendant Gill's involvement.  Defendant Gill, Defendant HPFS' Assistant General Counsel reporting to HPFS' General Counsel at the time, Defendant McCarthy, who was appointed as a focal point and contact person to deal with the Plaintiffs on behalf of the HPFS Defendants, kept passing ICT's requests for information and assistance to *"the HP legal teams supporting HP Financial Services and H3C working on this matter."*  According to Defendant Gill, the "situation [was] not simple" and *"a number of people within HP [were] devoting a significant amount of time to"* it, including *"the HP legal team,"* *"HP local legal teams,"* *"the HP legal and security teams,"* its *"internal audit team,"* and the *"HP attorney from the U.S.* . . .  assessing the

situation," among others, as well as Defendant Gill himself "spending an enormous amount of time on this matter." As Defendant Gill conceded, "we now have *the right people* involved in this matter."

158.    By mid-March, these numerous HP legal, security and audit teams – "the right people" -- had thoroughly inspected the seized Equipment: they "analyzed the photos of the labels," the "sample of the equipment . . . sent by our processing vendor in India to China for analysis," the inventory lists of the Equipment, and physically inspected 40% of the seized Equipment.

159.    It is inconceivable that after all these inspections by numerous top experts – HP's own *legal, security and audit teams* -- Defendants still did not know whether any of the inspected Equipment was counterfeit or not, particularly given that its Chinese subsidiary H3C had the Individual Plaintiffs arrested, thrown in jail and investigated for serious crimes based on the visual inspection of the security features and placements of the Equipment logos – inspection that took H3C itself just one day, the 9th of December 2012, to conduct on the 778 seized transceivers! Yet, Defendants studiously avoided answering that key question when directly and repeatedly asked by ICT, even though the Individual Plaintiffs' fate and freedom depended on that.

160.    As it were, Defendants remained mute while the Individual Plaintiffs continued to endure their horrific confinement in the Haidian Detention Center and ICT desperately tried to have them released. Worse than mute – as shown, they and their Chinese affiliates deliberately withheld exculpatory evidence that would have led to the Individual Plaintiffs' release, and stonewalled numerous express requests from the state authorities and from the Plaintiffs themselves for its disclosure.

161.   Indeed, during the same period, HP China already twice – in January and March 2013 – stonewalled the police's requests for exonerating evidence, falsely pleading ignorance despite working closely with the Defendants on the matter and being fully aware of the facts. HP China would go on to do so again a year and a half later, in August 2014.

162.   At the same time, H3C – which was also working closely with the Defendants during this period – likewise stonewalled the police's requests for exonerating evidence, falsely pled ignorance, and continued its relentless and aggressive push for the Individual Plaintiffs' trial on false charges, despite its and the Defendants' knowledge that the Individual Plaintiffs' complete innocence would not help them against the 99.93% (or worse) underlying criminal conviction rate.

163.   At all relevant times, all the Defendants, as well as H3C and HP China, were part of the same HP company, shared information and acted in concert with each other in facilitating Defendants' frame job.

### 3. The long-awaited answer:  Defendants admit selling counterfeit Equipment to Plaintiffs in the March 2013 Letter; then secretly delete that admission from the April letter, and lie about it.

164.   On March 27, 2013, Defendant HPFS finally provided ICT with a long-awaited draft submission to the Chinese authorities (in English), drafted by Defendant HPFS' in-house counsel Defendant Gill on behalf of Defendant HPFS India and reviewed by "the right people" prior to its release.

165.   After laying out the relevant background facts, HPFS stated in its March 2013 Letter:

> HPFS India immediately commenced investigating the matter.  H3C inspected the seized equipment on behalf of HPFS India and also obtained lists of the seized equipment from the [insert name of relevant Chinese police entity].  HPFS India compared this data against its data

for the Sold Equipment. *Based on the available evidence HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT* (through Shinto).

HPFS India has also viewed photos of the Sold Equipment taken prior to its import into China. These photos were obtained from ICT's USA office and from the company HPFS India engaged in India to process and refurbish returned lease equipment. Based on these photos it appears that *the logos currently affixed to the Sold Equipment were present on the Sold Equipment at the time of the sale from HPFS India to ICT*. Copies of the relevant photos obtained are attached as Annex D.

In these circumstances, notwithstanding that *the seized equipment is counterfeit*, HPFS India does not believe that ICT or its representatives should reasonably be held responsible for selling counterfeit equipment. *Upon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment. Based on the available evidence it would appear that the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases*. HP is reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it.

166.    The import of these statements is crystal clear: the HPFS Defendants and H3C thoroughly investigated the matter and unequivocally concluded that "the seized equipment is counterfeit"; that the counterfeiting activity took place before the sale of the Equipment to ICT; that ICT was entitled to assume it was buying genuine Equipment; and that ICT or its sales associates should not be hold responsible for reselling counterfeit Equipment. Moreover, according to Defendant Gill, the HPFS Defendants' parent company HP was "*reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it.*"

167.    ICT regarded the March 2013 Letter as an admission of guilt by HPFS Defendants – which is what it was, because Defendants' admissions made in that Letter clearly

exposed them to criminal liability in India (for selling counterfeit goods and for possession of counterfeit goods for sale), and to civil liability to Plaintiffs for fraud.

168.    Upon receipt of the letter, on March 28, ICT's outside counsel Mr. Riordan provided his comments to Defendant Gill, including: "you indicate that ICT should not be 'held responsible for selling counterfeit equipment.' You also indicate that ICT was entitled to 'assume it was buying genuine equipment.' Can the above be made stronger? Note as follows: the agreements warranted that HPFS was the 'lawful' owner; your exhibit (manifest) listed the equipment as HP equipment; the agreement required ICT to maintain the integrity of the equipment as HP equipment to maximize profit. It seems to me that the letter should directly state that ICT is not responsible" (emphasis original).

169.    On April 1, Defendant Gill responded to Mr. Riordan's comments by email and included a draft of the March 2013 Letter with suggested revisions. The following statement was added to the draft, among other revisions: "*HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard.*" The other key admissions (see ¶__) made in the March Letter were repeated in the April 1 draft *verbatim*.

170.    On April 2, Messrs. Gill and Riordan had a telephone call, following which Mr. Riordan wrote to Defendant Gill on April 3: "Thank you so much for speaking with me yesterday and also *for adopting the suggestions regarding your letter. . . . [Y]our letter should be sent out immediately and directed to both the prosecutor and the police.*" Mr. Riordan's email included "*the contact for the prosecutor, whom you should send letter directly*" (the name, address, telephone number) and "the contact for the police" (with the same details).

171.    On March 29, 2013, Mr. Styller also wrote to Defendant Gill:  "the letter is an important document that we want to put together the right way. *It is important* that we have this letter finalized ASAP, translated, chopped (stamped in China) and *delivered to prosecution*."

172.    Another week passed by – week 17 of imprisonment for the Individual Plaintiffs, extreme anxiety for the Family Plaintiffs, frustrations by ICT representatives and severe distress for Mr. Styller personally – when he wrote to Defendant Gill on April 4, 2013:  "I hope the letter will be available to everybody rather earlier than later next week."

173.    By April 9, 2013, Defendants having failed to make their submission as promised, ICT's representative Ryan Quinn wrote to Mr. Styller:  "It was promised early this week. *Lots more upset calls and emails from families these two days*."

174.    The next day, April 10, Mr. Styller wrote to Defendant Gill:  "We were expecting the letters done in the beginning of this week.  It is almost Thursday your time.  We still got nothing. *We are quickly running out of time now and must have letters now. Everybody on our side getting very nervous and concerned as trial can start any time.  We need our people out of jail now!*"

175.    On the same day, Defendant Gill informed ICT that "I have received the translated letter last night and will have one of our Chinese attorneys review it today."

176.    Five days later, on April 15, Defendant Gill wrote to ICT:  "*I have shared your letter with the relevant personnel within HP China and H3C.  We have an internal meeting tomorrow and I will update you then*."  And then another week had passed before Defendant Gill on April 22 provided the final version of the letter – in Chinese – to ICT.

177.    In response to an inquiry by ICT's outside counsel whether Defendants' final submission (in Chinese) was substantially the same as the March 2013 Letter (in English)

shared with ICT, Defendant Gill represented that "*the letter is substantively the same as the last English version you saw.* There were some minor amendments but *nothing changed the description of the relevant sequence of events* between HPFS India and ICT."

178.    The "last English version" was the reference to the April 1 revised draft of the March 2013 Letter, which included all of the admissions made in the March Letter and the additional statement made in the April 1 version.  As such, the "last English version" stated that "*the seized equipment was counterfeit,*" that "*the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India,*" and that "*HPFS India sold the equipment to ICT as genuine H3C equipment . . . and ICT was entitled to rely on HPFS India's representations in this regard.*"

179.    In fact, contrary to the HPFS Defendants' representation, the final Chinese version of the letter differed markedly from the English draft shared with ICT, with Defendants' own key admissions set out in their March 2013 Letter altogether omitted, mischaracterized,  or considerably softened and qualified in HPFS' favor.

180.    Thus, the statement "the seized equipment is counterfeit" disappeared from the letter altogether.  The statement "HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT" became "HPFS India suspects that the seized equipment might be the same equipment sold by HPFS to ICT."  The statement "the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the leases" became "part of the Sold Equipment supplied by Inspira did not come from HP Company."  The sentence "HP is reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it" was omitted, while several self-serving statements not present in the March

51

2013 Letter added, such as that "HPFS India . . . previously did not know anything about the allegedly counterfeit equipment it handled."  And the statement that "***HPFS India sold the equipment to ICT as genuine H3C equipment . . . and ICT was entitled to rely on HPFS India's representations in this regard***" that Defendant Gill purportedly added to the March Letter in his April revision in response to Mr. Riordan comments, and which Defendant Gill falsely assured Mr. Riordan would be included in the letter, disappeared from the Chinese version as well.

181.    Thus, during the period between April 1 (the last English version) and April 22 (the Chinese version), Defendants thoroughly sanitized the Letter by deleting clearly exculpatory evidence that would have led to the Individual Plaintiffs' release, concealed those deletions, and affirmatively misled the Plaintiffs about them.  It stands to reason that the Letter had been altered following the April 15th "internal meeting" between Defendant Gill and his unnamed HP colleagues.

182.    The letter was executed on behalf of Defendant HPFS India by Defendant Gill as its director, even though Defendant Gill was only a ***non***-executive director of Defendant HPFS India while serving as Assistant General Counsel and Assistant Secretary of Defendant HPFS.

183.    This sanitized, self-serving, purposely vague, strategically ambiguous, and highly misleading version of the March 2013 Letter, with the key facts as determined by Defendants' own thorough investigation – the facts exonerating the Individual Plaintiffs and implicating the Defendants instead -- mischaracterized or altogether omitted, predictably failed to secure the release of the Individual Plaintiffs, who remained in jail for several more months after that submission and were not released on bail until July 17, 2013, having endured more than 7 months each in the harsh conditions of the Chinese prison.

184.    Indeed, even though Defendants fully realized that, in the words of Defendant Gill, "the letter needs to be as clear as possible to be effective," Defendants purposely made the letter anything but clear or effective.

185.    The only admission left in the letter was the fact that the HPFS Defendants sold the seized Equipment to ICT – which fact the HPFS Defendants could not deny anyway, given the WSA and RRSA contracts, the Equipment serial numbers, and photos of the transceivers in Plaintiffs' possession, shared with the police.  And even that admission was massaged into "HPFS India suspects that the seized equipment might be the same equipment sold by HPFS to ICT," with plenty of weasel words and wiggle room thrown in.  The admissions exculpating the Individual Plaintiffs and implicating the real culprits – the HPFS Defendants – were all deleted.

186.    Accordingly, having first created the intolerable situation where innocent young people languished in jail through absolutely no fault of their own and solely as the result of the HPFS Defendants' wrongful actions and omissions, the Defendants then failed to make a complete, honest and timely disclosure to the Chinese authorities that could have effectively led to the Individual Plaintiffs' release, choosing instead to place Defendants' own selfish interests above those of their innocent victims and their families, with outrageous indifference to their plight.  Moreover, Defendants blatantly lied to Plaintiffs about the contents of their submission: Defendant Gill's statements that the Chinese submission was "substantively the same as the last English version" and "nothing changed the description of the relevant sequence of events" were knowingly false and fraudulent.

187.    And, in the end, the HPFS Defendants did not file even that sanitized letter – and blatantly lied about it to the Plaintiffs as well.

### 4. **Defendants fail to formally file their sanitized letter with the** **prosecution or the police as ICT requested, and lie about it.**

188.    Defendants did not formally file even their thoroughly sanitized letter with the

prosecutor or the police, as requested by Plaintiffs, while falsely assuring them otherwise.

189.    Thus, on May 2, 2013, Defendant Gill wrote to ICT that *"the letter has been*

*filed*."

190.    That statement was false, however:  on May 16, 2013 – after two more weeks of

the Individual Plaintiffs' imprisonment -- Mr. Riordan informed Defendant Gill that "we are

getting some communications from the contact in China that the letter has not been delivered, or

that the prosecutors do not have it yet. My client has asked me to call you tonight regarding any

information confirming delivery. Can you help out with this?"

191.    Defendant Gill responded:  *"The letter was definitely filed*.  It was submitted to

Mr. Zhang Xiaole, (+8613801382217), the captain of Haidian PSB."  Defendant Gill said

nothing about sending the letter to the prosecutor, and that telling omission made clear that the

HPFS Defendants did not in fact do so despite Plaintiffs' clear, repeated and urgent requests.

192.    In response, Mr. Riordan on May 18 informed Defendant Gill that "the letter was

delivered to the wrong individual. . . . Your information indicates that it went to Mr. Zhang

Xiaole (+86138011382217), captain of Bejing Police-Hai Dian.  The Information provided was:

Mr. Zhang Jian, Bejing Police Station Hai Dian Branch, Room 803, 25 Wen Yang Road

SuJiaTuoZhen, Hai Dian, Bejing 100194, 010-82587440."

193.    On May 20, Defendant Gill responded blithely:  "One of our people attended the

PSB on Friday *so I'm sure the letter found its way to the right person*."

194.    On May 22, when ICT requested an update, Defendant Gill answered with

another breezy response: "I can confirm that PSB *have reviewed the letter*.  It appears that, in

order for them to be willing to take the contents into account, it will be necessary for ICT to prove a connection between the company and these individuals."

195.    What did those blithe statements "I'm sure the letter found its way to the right person" and "PSB have reviewed the letter" even mean?  Whatever they meant, what is clear is that the Defendants did not file the letter *with the prosecutor*, as was specifically, repeatedly, and urgently requested by the Plaintiffs for months, as far back as March 28, 2013 (email from Mr. Styller to Defendant Gill stating that "it is important that we have this letter finalized ASAP, translated, chopped (stamped) in China and delivered to prosecution") and April 3, 2013 (email from Mr. Riordan to Defendant Gill stating that "your letter should be sent out immediately and directed to both the prosecutor and the police.")

196.    Furthermore, it appears from Defendant Gill's responses that Defendants never formally filed their letter with the police either:  according to Defendant Gill, the letter was initially sent (if it was sent at all) to the wrong person at the Haidian Detention Center, even though the Plaintiffs provided Defendants with the correct name and contact information for both the police and the prosecutor well in advance.  Then the letter – on which the Individual Plaintiffs' fate depended -- was supposed to somehow "find its way to the right person," and at the end was merely "reviewed" by somebody unnamed in the police department -- but not filed as part of the police investigation record, contrary to Defendant Gill's statements that "the letter was filed" and "the letter has been definitely filed."

197.    In fact, Defendant Gill subsequently admitted in his letter to Mr. Riordan dated July 1, 2013, that "HP has been advised that the Chinese authorities are unwilling to admit a link between ICT and the incarcerated individuals and consequently do not regard the letter submitted by Hewlett-Packard Financial Services (India) Private Limited as relevant to the

proceedings." If true, Defendants were apparently pleased with the police's alleged refusal to accept their letter: they did not appeal the police's refusal, unexpected and unusual considering the evident thoroughness of the police investigation, and never shared their letter with the prosecutor, not even after the police itself purportedly rejected it.

198.    Indeed, nothing had changed for the better in the Individual Plaintiffs' ordeal after the Defendants' letter, delivered or not.  Thus, on May 2, 2013, H3C wrote another letter to the Chinese authorities, stating: "The trademark protection department of H3C provided a certificate indicating that [the seized] transceivers were suspected to be low-quality counterfeits. After the fact, Hewlett-Packard Financial Services India, Ltd (further called HPFS), another subsidiary of H3C's parent company HP USA, submitted a written notification to H3C, indicating the possibility that some of the above-mentioned and appraised transceivers could have been sold by HPFS to ICT Company.  H3C hereby expressly declares that HPFS and H3C operate independently of each other. *H3C has never known whether the transaction between HPFS and ICT described above took place or not*."

199.    HP China's and H3C's withholding of the exculpatory evidence and stonewalling the state authorities' requests thus continued in concert with the Defendants' own wrongful actions – sanitizing the letter from all the damaging admissions, failing to file even the sanitized letter, lying about it to Plaintiffs, and stonewalling their requests for exonerating evidence – all in common pursuit of Defendants' outrageous frame job.

200.    Moreover, according to HP China's and H3C's statements to the police referenced above, purportedly neither company was in communications with the Defendants (except for HPFS India's letter received and dismissed by H3C); neither company could

confirm the existence of the contract between ICT and Defendant HPFS India; and neither

company could verify whether the seized Equipment was sold to ICT by the HPFS Defendants.

201.    However, the numerous contemporaneous statements made by the HPFS

Defendants to ICT attest to the fact that both H3C and HP China were working closely with the

HPFS Defendants and HP since at least mid-February 2013, and would have certainly known

about the contracts between ICT and HPFS and the provenance of the seized Equipment by the

Spring of 2013:

- "We would also need to confirm this with our *HP local legal teams*" (February 14, 2013 email from Mr. Silvestri of HPFS);

- "It is suggested that your local counsel make a formal request via letter and that such letter includes a request *for H3C's auditors* to be granted access to inspect the equipment" (March 11, 2013 email from Defendant Gill of HPFS);

- "I will also do what I can today to get into contact with *the local teams* to see what we can do to move this more quickly" (March 12 email from Defendant Gill of HPFS);

- "*The HP legal teams supporting HP Financial Services and H3C* are working on this matter. . . . *H3C has been analyzing the photos of the labels*. A sample of the equipment is also being sent by our processing vendor in India to China *for analysis by H3C*" (March 21, 2013 email from Defendant Gill);

- "I have completed the draft letter today. *It is in China for review.*" (March 25 email from Defendant Gill; the draft letter referenced and exhibited the sales contracts between the HPFS Defendants and ICT);

- "I have shared your letter with *the relevant personnel within HP China and H3C*. We have an internal meeting tomorrow and I will update you then." (April 15, 2013 email from Defendant Gill regarding the meeting at which the March 2013 Letter was most likely switched from its latest English draft of April 1 to the adulterated Chinese version of April 22).

202.    Accordingly, either Defendant HPFS' representatives Messrs. Silvestri and Gill

were lying to the Plaintiffs wholesale, or else H3C's and HP China's representatives were lying

to the police -- because it would have been impossible for H3C not to know "whether the trade

happened or not" in March or May of 2013, or for HP China to be contacting its affiliates without success from January 2013 until August 2014 and pleading ignorance in the meantime, if Messrs. Gill and Silvestri's accounts of these local HP entities' heavy involvement in the matter were true.

203.    In any event, Plaintiffs continued to suffer through absolutely no fault of their own while Defendants on both sides of the Pacific continued withholding the exonerating evidence and consistently stonewalling the state officials' requests for exculpatory information that would have confirmed the Individual Plaintiffs' alibis and led to their early release from their wholly unjustified imprisonment.  And the web of lies at this point was tangled enough to make it increasingly difficult for the Defendants and their Chinese affiliates to keep track of its various strands, as reflected in their mutually exclusive statements.

204.    And on May 23, 2013, H3C's representative was once again interrogated by the Chinese police, and once again unequivocally confirmed under oath that "*the transceivers seized are counterfeited H3C's*."  By that time, H3C had already inspected the entire seized Equipment on December 9, 2012 and reported it to the police as counterfeit, and then re-inspected, together with the HPFS Defendants 40% of it in March 2013, and the HPFS Defendants reported to Plaintiffs that "the seized equipment is counterfeit."

205.    The H3C expert also explained how H3C could be so certain of its appraisal based only on the visual inspection of the logo's security features:

> A:  The transceivers seized are counterfeited H3C's.  Such kinds of transceivers mostly are used for transmission of network signals. They are the important part of high-speed transmission of network.

> Q:  Tell us what parameters you based on to make sure that the transceivers seized are counterfeited?

**A:** The H3C's transceivers have the complete package (Includes: package box, shockproof foam, anti-static bag, installation brochure, and the label which is pasted on the transceiver and box, and can be tracked and legalized), and also, security label pasted on the transceivers; H3C's transceivers are qualified, sourced, manufactured completed by H3C, the quality of the products is same. The package of the seized transceivers is different from the H3C's, don't have any H3C's package, but carry H3C's registered label, the security label on the seized transceivers is not same as the H3C's, the position pasted is not same (the position of H3C's security label pasted on is fixed) and the outside of some seized transceivers are different from original H3C's units.

**Q:** Do you identify counterfeit product only from outside?

**A:** We identify counterfeited products first of all from the outside that includes package, and label. And, if there is anything unusual found outside we also can inspect the transceivers label through testing (in short, is power on test) as an additional way.  But if the exterior inspection didn't pass the test there is no need to do the power-on test.

**Q:** Why say power-on test is only just an additional way to verify?

**A:** Because power-on test is needed to inspect product through reading the electronic info of the transceivers (is writing the electronic info of the transceivers), but the electronic info can written or revised through program, and moreover, it will not leave any trace, what means, the transceivers passed the power-on test, can not be proved positively if they are genuine and original H3C's products.  So the power-on test is just an additional way to test.

**Q:** Can the P/N (Serial Number) be identified through the power-on testing?

**A:** The content of electronic label includes the P/N, so that we can say the P/N can be created or modified with proper software.

**Q:** Do you have something to say more?

**A:** No.

**Q:** Is everything you said true and correct?

**A:** Yes.

### C.    2013-present:  The Cover Up

#### 1.    June – July 2013:  Individual Plaintiffs on bail awaiting criminal trial; ICT appeals directly to HP, its CEO Defendant Whitman, and its General Counsel Defendant Schultz for help.

206.    On May 28, 2013, Mr. Riordan wrote to Defendant Gill seeking answers to the very basic questions which the Defendants had avoided for several months:  "what did HP communicate to the authorities regarding the equipment at issue?  Did HP institute a formal charge or complaint? . . . Can you put me in contact with the HP representative handling this matter in China?  Can you put me in contact with the HP representative handling this matter or otherwise responsible for the contract involving ICT?  Is this person in the United States?  In light of conflicting information that we are receiving, we are asking for definitive action."

207.    With no answers and no definitive actions forthcoming from the Defendants, and with the Individual Plaintiffs' enduring their sixth month of sleeping on the toilet floor in a cell overcrowded with gang members and ruled by the criminal boss, in anticipation of a criminal trial that could send them to prison for the next ten years with the likelihood of 99.93%, Plaintiffs in desperation turned to the top of the HP corporate hierarchy -- its celebrity CEO Defendant Whitman, and its General Counsel Defendant Schultz.

208.    With their involvement, the fraudulent cover-up intensified, and the story became truly ugly and outrageous.

209.    Thus, on June 12, 2013, Mr. Styller sent a one-page letter to Defendant Whitman, copying Defendant Schultz.  The letter is reproduced in full on page __ above.

210.    On the same day, Mr. Riordan made the same appeal to Defendant Schultz personally, of the same tenor but with more detailed facts.  Laboring under the misimpression created by the HPFS Defendants, Mr. Riordan also stated in his letter: "Mr. Gill directed a letter to authorities clarifying the facts.  Specifically, HPFS acknowledged that is was the source of the product and that the product was consistent with the remaining materials in India.  HPFS also agreed that even if the product contained counterfeit marks, HPFS delivered this material to ICT with the marks and that ICT was authorized to remarket the product *as is*."

211.    Mr. Styller's desperate plea to Defendant Whitman was met with the stone-cold silence.  Defendant Schultz, however, responded by calling Mr. Riordan's office on June 14, 2013, and leaving a voicemail message: "Sorry for not getting back to you. I will have someone on my team look into it and get right back to you."

212.    The following week, Defendant Gill and Stuart Patterson, an in-house counsel at HP and presumably a member of Defendant Schultz's "team," had a conference call with Mr. Riordan to discuss the matter, with Mr. Patterson staying on the background of the conversation.

213.    Following the call, on June 26 – the Individual Plaintiffs' 200th day in prison – Mr. Riordan sent yet another letter to Defendant Gill, asking him the very basic questions that, after months and months of investigations by HP's legal, security and audit teams, Defendant Gill, his unnamed superiors, and now Defendant Schultz and his team, HP should have been able to answer forthwith:  "What did HP communicated to the authorities regarding the equipment?. . . *Our request to HP is to address the issue that was raised regarding the allegation of counterfeit marks. I think this should be the only focus.  In any event, and given what is at stake, I am still unclear as to whether this issue has been resolved.* In addition to

my questions above, has HP (or its subsidiary organizations) made clear that HP/H3C is the source of the materials in question?"

214.    Defendant Gill's reply of July 1, 2013 was, like his prior responses, nothing but evasive.  Defendant Gill claimed that "neither H3C nor any other HP affiliate is a party to these proceedings" – even though it was H3C that lodged the original request to arrest the Individual Plaintiffs and continued making sworn statements to the police that the Equipment was counterfeit, and even though HPFS, HPFS India, HP China and HP itself were directly involved in and had knowledge of those proceedings (though formally not a "party" to them), and even though the HPFS Defendants and Defendant Gill himself had in their possession confidential internal correspondence between the Chinese police and prosecutors.

215.    With respect to HP's communications with the Chinese authorities, Defendant Gill stated that "HP clearly explained the history of the transaction in [its] letter" (which was a lie because HP's letter was sanitized) but "the Chinese authorities are unwilling to admit a link between ICT and the Incarcerated Individuals and consequently do not regard the letter submitted by Hewlett-Packard Financial Services (India) Private Limited as relevant to the proceedings" (which meant, the preposterous excuses aside, that Defendants had never formally filed the letter with the police).

**2.   Defendants hold up the agreed refund to ICT in an
attempt to extort release from the Individual Plaintiffs.**

216.    Another telling episode in this saga occurred in early July 2013, following the active involvement of HP and Defendants Whitman and Schultz in the matter.

217.    Thus, completely unrelated to its efforts to release the Individual Plaintiffs, ICT had been in negotiations with Defendant HPFS' business representatives regarding the so-called Return Merchandize Authorization ("RMA"), which refers to the standard industry practice of

returning or exchanging products that are defective or substandard for a refund.  Plaintiffs had applied for an RMA seeking reimbursement for the balance of the unsold Equipment from the first shipment. Plaintiffs had sold approximately $100,000 worth of the Equipment from that first shipment, for which they paid HPFS $250,000, and were requesting a refund of the remaining $150,000.

218.    Plaintiffs negotiated with Defendant HPFS' business representatives Messrs. Bartley and Silvestri for the adjustment and reached an agreement in principle in March 2013; the terms were then submitted to "legal" for approval.  The only outstanding term at that time was the payment mechanism; all discussions between the parties from March to June 2013 were related to that issue.  On or about June 30, 2013, Mr. Bartley of Defendant HPFS advised ICT that the RMA had been resolved and that he was waiting for instructions from the legal department to document it.

219.    However, on July 7, 2013, Mr. Bartley wrote to Mr. Styller:  "I am really sorry for not responding since I have been back in KL.  *To be honest, I have been delaying my response for as long as possible hoping that the status would change*.  When we last spoke I mentioned that we had solved for the payment mechanism and that all I needed was to check with legal on how to document this.  *Unfortunately, due to all of the ongoing legal issues I have been instructed to place the RMA on hold*.  Regrettably, I cannot tell you what the specifics of the issues are nor how long the hold will remain in place.  I regret that we have gotten so far only to stall for reasons that are beyond my control."

220.    Bewildered by this about-face, Mr. Styller wrote back:  "I don't understand what does it mean.  Does it mean that I just need to ask Shinto to proceed from there?"

221. "No sorry Alex, it means that *my legal team will not allow HPFS to process the RMA*," wrote Mr. Bartley in response, and identified "David Gill and his team" as the legal team who put the RMA on hold, leading Mr. Styller to respond: "We are in contact with David Gill, cooperating on China matter. I am surprised and disappointed that he placed on hold the RMA. I will ask my lawyer to clarify with David directly what seem to be the problem and hopefully we can resolve it to mutual satisfaction."

222. Mr. Styller's hopes for resolution of the RMA issue were soon dashed as the Defendants made it crystal clear that they were holding the RMA payment as ransom in an extortionist attempt to force the Plaintiffs into a global settlement, which were to include the release of the Individual Plaintiffs' claims.

223. On July 10, 2013, Mr. Riordan sends a letter to Defendant Gill regarding the RMA, stating among other things that "this issue was resolved and agreed to through the ordinary course of business – and not connected with the Chinese criminal issues. . . . If there is now a nexus between the Chinese issue and the RMA, I would find it disappointing. . . . Our primary and overriding goal was to ensure that the individuals in China are freed from criminal process. I am sure this is HPFS's goal as well, as those individuals were engaged in activities to re-sell product for the benefit of HPFS and ICT. My client has lost a great deal of money on this transaction and is now expending significant resources relative to this matter. He runs a small company and, as you can imagine, these types of issues create a significant strain."

224. "I have just returned from vacation and will get back to you shortly," responded Defendant Gill on July 17, 2013, after another week of horrific confinement for the Individual Plaintiffs, agony for the Family Plaintiffs, and anxiety and frustration for ICT's Mr. Styller and others trying to help them.

225.     Then another two weeks passed by, and on July 29, 2013, Mr. Riordan again wrote to Defendant Gill: "I do need to speak with you regarding the RMA issue.  I did call as we agreed, but you were not available.  My client really does need to move this issue along.  We [were] very surprised to learn that the agreed payment had been held up.  It is still not clear to me why that is the case."

226.     That email elicited the following response from Defendant Gill: "As communicated on our call last week, HP would like to obtain additional clarity about the status of the proceedings in China before progressing discussions around the RMA.  Do you have any further information in this regard?"

227.     Mr. Riordan replied on July 30: "My understanding was that the RMA issue was resolved by agreement and you held that up.  I have also asked what you mean by 'clarify' and further asked for you to shed some light on what the nexus is between your 'clarity' and progression of discussions.  I won't ask again as you don't seem to desire to answer.  I will advise my client as to your unwillingness to respond."

228.     In a last-ditch effort to resolve the issue with Defendant Gill, on August 8, 2013, Mr. Riordan sent him yet another letter, in which he set out the history of RMA negotiations and of the criminal case against the Individual Plaintiffs, and noted that the RMA issue "has nothing to do with the China situation."  Mr. Riordan also noted in his letter that "I have provided to you all the information available to us through our communications with the Chinese attorneys.  On the other hand, *I have repeatedly been rebuffed relative to my requests for basic information*.  The bottom-line is that your involvement did not resolve anything, but created a problem that did not previously exist.  The Chinese situation was exacerbated.  You have now halted the RMA payment despite the agreement of your business team."

229.    Mr. Riordan then requested:  "1.  Immediate payment of the RMA; 2. Immediate disclosure as to all material facts relating to accusations made by H3C to the PBS relating to counterfeiting or import/export violations; and 3. Record documentation of HPFS' handling of the contract materials from its receipt (after lease) until its delivery to ICT. . . .  If you do not comply, then I will contact a short list of U.S. based individuals at HP in an attempt to resolve the matter."  Mr. Riordan concluded:  "for any such conversation to prove fruitful, we require good faith and honest disclosure.  If you have something constructive to offer, I will certainly listen.  If you are uninterested, action will follow."

230.    But Defendants could not make any good-faith honest disclosures in response to the ICT counsel's requests without exposing themselves to criminal liability *regardless* of what those disclosures would have been.  That is so because, if the facts confirmed the HPFS Defendants' statements in the English version of the letter (never shared with the Chinese authorities) that they sold counterfeit Equipment to Plaintiffs, then Defendants were facing the prospect of criminal prosecution for selling counterfeit goods and the inevitable business and reputational fallout in India, one of HP's largest overseas markets.  Conversely, if the facts demonstrated that the Equipment was genuine all along, then Defendants were facing the prospect of criminal prosecution for making false statements to the police in China, another large HP market.

231.    Accordingly, the Defendants found themselves in zugzwang but decided to avoid making the next move by stalling, intimidating, lying, and railroading the Plaintiffs to prevent them from taking any action – preferably at all, but at least until the criminal statutes of limitation run out – all the while *without admitting or denying* that the Equipment was counterfeit.  That ambiguity was strategic, and the fact that three young innocent victims' lives,

and a small U.S. business, were ruined as a result of Defendants' fraud and cover-up did not seem to bother the Defendants at all.

232.    And they wheeled out a heavy artillery against the innocent Plaintiffs to facilitate this cover-up – Defendant Gibbons P.C., "a leading law firm in New Jersey, New York, Pennsylvania and Delaware" with over 200 lawyers, and its newly minted partner and corporate director Defendant McCarthy with his lucrative book of HP's business.

233.    During the early months of the Individual Plaintiffs' imprisonment and immediately prior to joining Defendant Gibbons P.C. in March 2013, Defendant McCarthy served as the Vice President, General Counsel and Secretary of Defendant HPFS, leading its legal department of more than 22 attorneys, including Assistant General Counsel and Assistant Secretary Defendant Gill.  Defendant McCarthy boasted in a May 2013 interview about putting in place "a funneling system that ensures that *all significant risk issues flow to a group of highly experienced senior managers for prompt review and decision*," and was no doubt aware of the Chinese situation while still at Defendant HPFS.

> **3.    July 2013 – December 2015:  Individual Plaintiffs on bail awaiting criminal trial; Defendants engage in a fraudulent <u>cover-up campaign of blackmail, intimidation, threats, and lies.</u>**

234.    In the meantime in China, on July 18, 2013, the prosecutor released the Individual Plaintiffs on bail from their long and harrowing confinement.  At no time prior to the release or afterwards did Defendants or their Chinese affiliates disclose to the police the exculpatory evidence in their possession that would have led to the earlier release of the Individual Plaintiffs.

235.    From the time of their release on July 18, 2013 and until the receipt of the "no criminal record" letters from the Chinese police in late 2015-early 2016, the Individual

Plaintiffs remained in legal jeopardy in China as the criminal cases against them had not been closed. Despite repeated requests by ICT, Defendants flatly refused to provide any information or any assistance to clear the Individual Plaintiffs' names or to provide any compensation for their loss of freedom, lost earnings, physical pain and emotional and mental anguish caused by Defendants' own conduct.

236.    Defendants also flatly refused to share with ICT the results of their investigations into the relevant counterfeiting activities, despite ICT's numerous requests for that information needed to exonerate Individual Plaintiffs and to clear their names.

237.    In fact, notwithstanding the results of their own investigation showing that the counterfeiting happened before the Equipment was sold to ICT, Defendants then deliberately adopted the "blame the victim" attitude in response to Plaintiffs' requests, which only added insults to the injury and prolonged the injury itself.

238.    Significantly, the events described below all occurred following ICT's letters to HP's top executives Defendants Whitman and Schultz and the acknowledged involvement of Defendant Schultz and his HP legal team in the matter.

239.    Thus, in response to Mr. Riordan' August 8, 2013 letter to Defendant Gill, ICT received a letter from Defendant McCarthy and his new law firm, Defendant Gibbons P.C. dated August 26, 2013.

240.    ***That letter was a noxious mix of lies, threats, intimidation and conceit, without an iota of empathy or concern for the Plaintiffs' admittedly "Dickensian plight."*** And it set the tone for Defendants McCarthy's and Gibbons P.C.'s ensuing year-long correspondence with Mr. Riordan, better read on an empty stomach.

241.    In the letter, Defendant McCarthy advised Plaintiffs that Defendant Gibbons P.C. has "been retained by Hewlett-Packard ('HP') Company and its various subsidiaries and affiliates who may have been involved in any way with your client's purchase of used equipment in India, and your client's attempted sale of such equipment in China. The applicable subsidiaries are Hewlett-Packard Financial Services (India) Private Limited ("HPFS India"), H3C Technologies Co. Limited ("H3C"), and their respective subsidiaries and affiliates," leaving out Defendant McCarthy's former employer Defendant HPFS itself despite the central role played by HPFS in this debacle, but expressly mentioning H3C.

242.    Defendant McCarthy then proceeded to "set the record straight" and followed with the first blatant lie in the very next paragraph: "First, contrary to your allegations, no HP entity ever provided your client with legally binding representations that the equipment at issue was 'in very good condition (as good as new with reasonable wear and tear'). Your client was fully aware that *the old equipment that it purchased from HPFS India had been used for a number of years* by another third party, Tata Consultancy, in connection with the 2010 Commonwealth Games in Delhi, India."

243.    In fact, it is undisputed that the Equipment was leased by the HPFS Defendants to Tata Consultancy as brand-new and was returned to them after short-term, *7-10 month leases*. Indeed, the HPFS Defendants represented the Equipment to ICT during the 2011 negotiations as almost new, and it was so understood by ICT. *See, e.g.*, Mr. Pekar's email of July 14, 2011 ("Additional details, it was a 7 month lease (I would assume most of the product is new in original box)"). In any event, the Equipment had not been used *"for a number of years"* as Defendant McCarthy falsely claimed in his letter – and Defendant McCarthy knew it very well as he was the General Counsel of Defendant HPFS at the time of the initial fraudulent

sale and throughout Defendant HPFS' subsequent involvement in the frame job and the cover-up headed by Defendant McCarthy's assistant at HPFS, Defendant Gill.

244.    Warming to the attack, Defendant McCarthy continued in the same paragraph: the Equipment was sold "*with absolutely no equipment representations or warranties whatsoever*."

245.    That was also a known lie because, as the HPFS Defendants themselves admitted, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

246.    Not only did the Defendants expressly represent the Equipment as genuine H3C equipment, but the Equipment was sold with the express warranty of title and the express warranty that the sold equipment confirmed to its description as the "H3C" Equipment in the contracts -- and in breach of all those representations and warranties.

247.    In the next paragraph, Defendants McCarthy and Gibbons P.C. proceeded to blame the Plaintiffs for what the Defendants called their "difficulties in selling the equipment in China":  "If your client failed to abide by China's import/export laws, or if your client failed to properly inspect the equipment to ensure that that there were no counterfeit materials, that is not the fault of any HP entity."

248.    Thus, Defendants appeared to be blaming Plaintiffs for the purported violations of China's import/export laws –violations which the Chinese authorities themselves had neither alleged nor pursued, despite the Defendants' encouragement – and for not discovering Defendants' own fraud earlier than they did.

249.    Defendants McCarthy and Gibbons P.C. continues in the same paragraph: "as an experienced dealer in used equipment your client knew, or should have known, that there are many counterfeit products in the market, and that it should have exercised a reasonable degree of due diligence to inspect old unwarranted equipment before shipping it to China for sale" – as if ICT was buying some old HP equipment from a shady street vendor and not from an HP company itself!

250.    In fact, ICT had never bought any IT equipment in India prior to the H3C transaction, and was not familiar with the counterfeiting situation in the Indian market. Defendants, by contrast, were indeed "experienced dealers in used equipment" operating in the Indian market and thus "knew, or should have known, that there are many counterfeit products in the market, and . . . should have exercised a reasonable degree of due diligence to inspect" the Equipment being returned to them upon lease expiration and before selling it to the unsuspecting Plaintiffs.

251.    Further down in the same paragraph, Defendants McCarthy and Gibbons P.C. claimed that "*your client has been unwilling to share any meaningful information with the HP entities on its legal difficulties in China*" – another outrageous and insulting lie (*see* ¶¶ __-- __ and the annexed Cover-up Chronology).

252.    Then came a threat: "we have no way of knowing whether ITC [sic] did or did not fulfil its contractual obligations by complying with all relevant law. . . ITC [sic] will continue to remain responsible for indemnifying and holding HPFS India harmless from any and all claims or damages that may exist or arise out of your client's non-compliance with relevant law" (The Defendants could not even trouble themselves to call Plaintiff ICT by its proper name.)

253.    More outrageous demands and threats followed in the next paragraph: "please advise as to the whereabouts of the equipment, and outline in detail the efforts that your client made to sell all genuine equipment . . . . *If ITC [sic] has lost control over the equipment due to its failure to properly comply with Chinese law, then there is a serious issue as to whether it has breached its obligations to HPFS India*."

254.    More breathtaking lies followed in the next paragraph of Defendants McCarthy's and Gibbons P.C.'s letter: "your client's attempt to shift the blame to HP for problems that appear to be of your client's and/or other's creation, does not withstand scrutiny.  The HP entities had no dominion or control over the equipment at issue once it was purchased by your client.  There are countless ways in which the equipment at issue may have been tainted or altered before or after it reached China. The true bottom line is that once your client purchased the equipment -- your client was solely and exclusively responsible for any and all subsequent issues."

255.    Compare these statements with the HPFS Defendants' admissions in the March 25 and April 1 versions of their Letter:

- "*the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT*";

- "*the logos currently affixed to the Sold Equipment were present on the Sold Equipment at the time of the sale from HPFS India to ICT*,"

- "*the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases*," and

- "*HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard*."

256.    And then the bottom line, Defendants McCarthy's and Gibbons P.C.'s attempt to

bully ICT into global settlement and release of all claims: "because of the nature of the issues

and many unfounded allegations advanced by ITC [sic], it is highly likely that a resolution of

these matters cannot be had unless the parties enter into a mutually acceptable and

comprehensive Settlement Agreement and Release.  If ITC [sic] is interested in discussing such

an agreement, please contact me."

257.    Defendants McCarthy's and Gibbons P.C.'s letter was written in response to Mr.

Riordan's request to release the agreed-upon RMA that was held up by Defendants, thus

confirming that the Defendants were holding that refund in an extortionist effort to extract

release from the Individual Plaintiffs.

258.    In response to Defendants McCarthy's and Gibbons P.C.'s nauseating letter, and

following a telephone discussion with Defendant McCarthy in September, Mr. Riordan wrote

back on November 27, 2013:

> To summarize, please note the following:
>
> - HPFS misrepresented the quality of off-lease equipment and material ("materials") from India. As far as I understand it, there is no dispute that the materials were useless and could not be marketed as initially represented by HPFS because HPFS downgraded the materials to scrap. This fact was confirmed by an inspection of the materials remaining in India. (fn1:  ICT took possession of 25% of the materials with the expectation that it would take the remaining materials in three additional installments. When the sub-standard condition became clear, HPFS offered the remaining lot at a deep discount. ICT declined). The inspection was conducted by representatives of ICT and HP/HPFS (UK).
>
> - ICT re-marketed the materials in China. H3C and HPFS subsequently made complaints to the Chinese authorities that the materials were "counterfeit." From the documents I reviewed, this is not just an issue of the alleged unauthorized use of a mark. From my understanding, H3C actually tested some of the equipment -- and then persisted with its allegations. The most pernicious part of this conduct is that H3C

73

and HPFS continued to make these allegations after HPFS was informed of the facts. I enclose the initial H3C complaints for your review. (fn2: Defendant Gill-on numerous occasions-represented that he did not know the substance of the complaints and asked us to procure copies. This is one of the reason why there is such a lack of trust. If you look at the official complaints, they contain H3C's official stamp. Your client always had the complaints in their possession. Your client made the complaints).

- In addition, after the Chinese nationals were released HPFS -- through its contacts at H3C -- attempted to take possession of confiscated materials.  If you dispute the facts, the only thing I can suggest that you look back to my correspondence with Defendant Gill and my repeated requests for disclosure as to exactly what H3C told the police.  These requests have been ignored.

- ICT is unaware of any allegations on the part of the Chinese authorities relative to any irregularities relating to the importation of these materials into China. As I have indicated, ICT used professional logistics suppliers. We are aware that H3C and HPFS made new allegations (after the filing of the initial allegations attached to this letter) with the authorities advocating charges based on allegations relating to importation.

- Mr. Styller of ICT came to an agreement with HPFS regarding payment of RMA funds. Mr. Styller was advised that the only hold-up on payment related to the manner and method of payment, but that otherwise all material terms were settled. HPFS repudiated this agreement.

Based on your communications, it is now clear that HP will not resolve the RMA issue absent a comprehensive Settlement Agreement and Release. You suggest that the indemnity provisions of the contract are applicable to the facts at issue. If that is truly the case, I don't understand why you are demanding a separate and general release. My client, of course, does not agree that indemnity is applicable relative to the independent conduct of HP or its subsidiaries-and specifically H3C. What you are doing is holding the RMA monies hostage unless and until ICT agrees to insulate you from any claims that might arise from the conduct of HPFS and H3C relative to this matter.

Prior to this communication, ICT has never threatened a lawsuit or claim. We have asked for disclosure as to the conduct of H3C that led to the filing of the outrageous criminal charges in China. We have also asked for disclosure as to HPFS's interaction with H3C (and H3C's interaction with the Bejing police) regarding these issues. No such disclosures have been forthcoming.

74

259.     Mr. Riordan concluded: "Your position [with respect to RMA] is in extreme bad faith and extortionist. . . .  If it's your final position that you are not going to honor the RMA agreement or address the claims of the Chinese nationals, then simply advise."  Mr. Riordan also stated in the Letter that the Individual Plaintiffs -- who were on bail expecting a criminal trial -- would be willing to settle their claim for spending more than 200 days in jail for a very modest amount of $1.5 million for all three at the time.  Neither the Individual Plaintiffs, nor Plaintiffs ICT and Styller, nor Mr. Riordan were fully aware of the scale of the Defendants' fraudulent frame job and cover-up or the depths of their perfidy at the time, nor the fact that their ordeal was far from over.

260.     In their response dated December 19, 2013, Defendants McCarthy and Gibbons P.C., writing on behalf of HP and its subsidiaries, repeated the same outrageous lies and threats first uttered in the August 26 letter, again claiming that:

- "Your contention that the used equipment did not meet ICT's expectations ignores the fact that ICT purchased the equipment without any representations or warranties whatsoever";

- "Your position that my clients are somehow liable for the problems that ICT encountered in China, ignores the fact that ICT assumed responsibility for complying with the law of all jurisdictions where it chose to remarket the equipment";

- "Because ICT has apparently lost control over the used equipment at issue and cannot now account for the equipment, or provide HPFS India with the additional remarketing proceeds contemplated by the agreements, *it is in breach*. . . .  We trust that you are also aware that ICT is obligated to pay 'reasonable legal fees and other costs and expenses incurred' by HPFS India in enforcing the terms of the WSA.  If ICT wished to litigate, please understand that my clients reserve all rights and defenses in all jurisdictions (US, India and China) and dispute all of ICT's claims. My clients will vigorously defend themselves.  Be guided accordingly."

75

- "While ***HPFS India has been open to considering making some small payment to ICT to resolve this situation*** upon appropriate terms in a non-contentious fashion, your unfounded allegations and tactics are not helpful."

- "If, on the other hand, ICT is truly interested in resolving this matter in a reasonable fashion, we have invited your client to provide HPFS India with the reports and data called for by Section 3 of the [RRSA] and have told you that we would be happy to discuss a global resolution. ICT will, however, need to honor all of its obligations to HPFS India and its affiliates [and] ***contemplate a more realistic monetary settlement amount***."

261.    Defendants McCarthy and Gibbons P.C. also told the Plaintiffs that they were "free to file in China whatever claims they think they have," while also advising them that they "have no valid claims under Chinese law against my clients," as if the Defendants were qualified in Chinese law to be giving such advices.

262.    In any event, the Defendants were no doubt aware that it was a crime under Chinese law to make false statements to the authorities with the intent of framing innocent persons, and that the Plaintiffs had a perfectly valid criminal claim against the Defendants in China at a minimum.

263.    And the following statement from these Defendants really takes the biscuit:  "***It is also disappointing to note that you and your client seem to have forgotten the assistance that helped secure the release of the aforementioned individuals***."

264.    By that time, a full year has passed since the Individual Plaintiffs' arrest, seven months of which they had spent in torture-like jail conditions and were now on bail awaiting criminal trial with its virtually certain lengthy prison terms – all due to the Defendants' fraud, frame job, and cover-up.   And the Individual Plaintiffs ultimately avoided the lengthy prison terms by sheer luck (0.07% chance), not due to the Defendants' sham "assistance" but despite it.

265.   On January 9, 2014, Mr. Riordan responded to Defendants McCarthy's and Gibbons P.C.'s letter, debunking their lies and writing:  "While ICT is absolutely committed to resolving all issues with its remarketing partners, it is difficult to fashion a reply or move to create a foundation for such discussions given both *the numerous inaccuracies in your communications as well as concerns regarding the forthrightness that have characterized HPFS' past communications and which, unfortunately, are reflected by your communication*. . . . . Frankly, one of the main concerns over the past year is *the culture that generates such issues in the first place*.  The recognition that you are not merely a litigator, *but a prior corporate official for HPFS intensifies these concerns*."

266.   Nevertheless, ICT remained open to settlement discussions "based on firm foundation of good faith, forthrightness and integrity."  Unfortunately, Defendants had exhibited *none* of good faith, forthrightness or integrity in this sordid affair.

267.   On February 28, 2014, Plaintiffs offered Defendant McCarthy "to mediate the matter subject to the conditions that (1) the matter be professionally mediated; (2) the mediation take place in the Boston metropolitan area; (3) an individual with authority to settle the matter attends and (4) the mediation occur prior to March 31, 2014. While counsel is obviously encouraged to participate, Mr. Styller expects that a business person with some knowledge of the events will attend. It would also be helpful if an executive involved with the related transactions is available at the mediation or by phone."

268.   On March 20, 2014, Plaintiffs reiterated their offer to mediate.

269.   On April 2, 2014, having not heard a response to their mediation offer, Plaintiffs reiterated it again.  Later that day, Defendant McCarthy responded by email, in effect rejecting

Plaintiffs' offer and instead proposing "a non-binding mediation at my office here in New Jersey, provided that the costs of the mediation are evenly split between the parties."

270.   On August 14, 2014, in the last-ditch effort to resolve the matter, ICT wrote to Defendants McCarthy and Gibbons P.C. again, reiterating the basic facts and writing:

> HPFS stated in its [March 2013] submission that it was "reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it." However, in response to my repeated subsequent attempts to find out the results of HP's investigation of this sordid affair, *HP has so far refused to clarify such basic facts as (a) whether the Sold Equipment was in fact counterfeit in whole or in part; and (b) if yes, when the counterfeiting took place and which party was responsible for it*.

> There can be no doubt that HP ought to know the answers to these questions full well by now. I believe it is incumbent upon HP to provide ICT with this information forthwith, for a number of compelling reasons.

> *First and foremost*, since their release from jail in late 2013, the ICT employees have remained in legal jeopardy in China as the criminal case against them has not been formally closed, and the "no crime" letters have not yet been issued to them. I am sure that you would agree with me that this status quo is simply untenable, particularly in light of the undisputable facts – as stated in HPFS' own March 2013 submission -- that "ICT was entitled to assume it was buying genuine equipment" and that the relevant counterfeiting activities, if any, occurred at some point prior to that sale.

271.   Defendants McCarthy's and Gibbons P.C.'s August 27, 2014 response was the same repulsive mix of lies and conceit that had characterized all of their prior correspondence with the Plaintiffs -- in fact, the Defendants attached their 2013 letters to the response, thereby repeating all the lies first made there, and further stated:

> In your letter of August 14, you suggested that because my clients provided some assistance in securing the release of ICT employees from incarceration in China, that they now have some responsibility to help ICT and its employees deal with whatever charges have been lodged by the Chinese authorities. Your position is not only unsupported by reference to any contractual commitments, but is patently wrong. For all of the reasons stated in the attached letters, which you have ignored, my clients have absolutely no legal obligation to provide assistance to your client or its employees in connection with the charges in China. While it was not

unreasonable for all parties to assume that the equipment sold in China was genuine as of the date of sale, the simple facts of the matter are (1) the equipment was sold by HPFS India to your client on an "as is" basis and without any representations or warranties of any kind; your client solely decided to remarket the equipment in China and bore exclusive responsibility for inspecting the equipment and ensuring that its sale in that jurisdiction would be in complete conformance with Chinese law; and (3) your client and its employees had complete dominion and control over the equipment before and after it was exported to China, and are the only parties that could conceivably provide a rational explanation for what may or may not have occurred. In short, it is the sole and exclusive responsibility of ICT and its employees to deal with the charges in China, and they should not look to my clients for assistance beyond that which has already been provided.

As to your second point, it is also incorrect to suggest that there has been an agreement "in principle to an RMA refund." *While HPFS India did entertain possibly making some small settlement payment to resolve this issue in its entirety*, on April 2, 2014, you indicated that you and your client had no interest in participating in the non-binding mediation that you had previously suggested. If this remains ICT's decision, *we will consider the refund matter closed*.

272.    And so the Defendants regarded the matter closed.  Their insidious cover-up campaign of lies, threats and intimidation waged by the 200-attorney Defendant Gibbons P.C. and its corporate director Defendant McCarthy of behalf of the giant Fortune 50 HP Company and its subsidiaries H3C and HPFS India appeared to have worked, at least thus far, against a small company they had defrauded, its solo practitioner counsel they had steamrolled over, and its three young Chinese sales associates they had falsely imprisoned and maliciously prosecuted.  Nobody had sued the Defendants yet, and no criminal complaints against them had been filed yet either in China or in India.

273.    In the meantime, H3C continued to push for criminal prosecution of the Individual Plaintiffs.  Thus, on July 7, 2014, the prosecutor returned the case to the police, stating that "the facts are still unclear, and there is not enough proof of the case.  By this letter prosecutor returned the case for additional investigation and asked the police to provide more

information to support the H3C positon."  Among other things, the prosecutor wrote to the

police:  "The documents H3C provided concluded counterfeit based on appearance, H3C did

not do any test, and H3C said electronic test is not necessary in this case.  This conclusion is

different from the position of ICT lawyers, and the position of the ICT lawyers agree with

Cheng Yongguo's [Jade Cheng].  Please request (1) H3C to perform the test to clarify if the

equipment counterfeit or genuine, (2) if test proves that product is counterfeit, request H3C to

explain why it showed the transceivers are original and genuine through P/N [product or serial

numbers] lookup on H3C's website."

274.    On July 29, 2014, H3C provided a written explanation to the police why the

serial numbers could not establish whether the transceivers were counterfeit, stating that "P/N

testing only proves this P/N was sold by H3C sometime in the past, but cannot prove that this

exact product is genuine H3C product or counterfeit."

275.    Finally, on August 7, 2014, the police again interrogated H3C's security expert,

who explained why the electronic (power-on) test was unnecessary because it could not

establish whether the transceivers were counterfeit:  "Regarding the case of sales counterfeit

products suspected by Cheng Yongguo and others, we contacted with Wang You who is the

expert of H3C Company.  Wang You replied:  To identify counterfeit or not is just to check the

outward of the products.  Power-on test is only to check how the functions work.  Even though

the functions working comply with the standards of the true products, it cannot prove the

products are true either.  So that there is no necessary to do the power-on test on the products."

276.    In sum, from December 2012 until August 2014, H3C – the manufacturer and

the exclusive trademark owner of the H3C brand and trademark logo, and thus *the ultimate*

*authority* on the subject of counterfeiting with respect to its own products – made several

statements to the police (a) unequivocally confirming that the seized transceivers were counterfeit based on H3C's visual inspection of the security features of H3C trademark logos, (b) explaining why neither the electronic power-on test nor the transceivers' serial product numbers could be used to challenge the results of its visual inspection, and (c) explaining that HP had no license rights to its trademark (let alone any authority to dispute its words on the authenticity of its own trademarked products).

277.    Despite all the efforts by the Defendants and their Chinese affiliates, the prosecutor ultimately refused to bring charges against the Plaintiffs.

278.    On September 3, 2014, *the lead prosecutor in China personally apologized to all three Individual Plaintiffs for their undeserved suffering*.  On December 24, 2015, and May 4, 2016 respectively, Plaintiff Jade Cheng and Plaintiffs Jason Yuyi and Cathy Yu received letters from the Chinese police stating that they had no criminal records during their residency in China.  Upon information and belief, the Chinese authorities have closed the case without bringing any charges.

279.    Indeed, the Chinese authorities did not destroy the seized Equipment but returned it to Plaintiff Cheng and his Chinese counsel upon his release from bail on September 3, 2014, and it is now in Plaintiff Cheng's custody in China in the same condition as was returned by the authorities.  The Defendants and/or H3C are thus free to re-inspect the Equipment for the umpteenth time – except this time they will have to give a sworn answer to the question whether the Equipment was counterfeit or not, without any more evasions, equivocations, ambiguities, or concealments.

280.    Unlike the prosecutor, the Defendants -- whose fraud and cover-up caused Plaintiffs' injuries in the first place – have never apologized to Plaintiffs, and never uttered a

word of sympathy, remorse or concern for the Individual Plaintiffs' admittedly "Dickensian plight."

281.   In sum, Defendants' conduct – including their false representations about the Equipment that caused the arrest of Individual Plaintiffs and ruined ICT's business in China; their withholding of the exculpatory evidence that would had led to the Individual Plaintiffs' release, and stonewalling the police and the Plaintiffs' requests for that information; their woefully inadequate, belated, deliberately misleading and misdirected disclosure to the Chinese authorities after the arrest; and their malicious cover-up campaign conducted in extreme bad faith and in callous disregard for Plaintiffs' plight -- was so egregious and demonstrated such reckless indifference to the rights of the Plaintiffs so as to entitle the Plaintiffs to statutory treble and/or exemplary damages and attorneys' fees in addition to compensatory and other damages claimed herein.

282.   In the First Circuit's decision under Massachusetts law in Limone v. U.S., 579 F.3d 79 (1st Cir. 2009) upholding a $100,000,000 award for intentional infliction of emotional distress for the victims of the FBI's frame job and cover-up made by the District Court after a bench trial, the Circuit Court stated:

- "In the [trial] court's view, the FBI had participated willingly in framing the scapegoats, and then scrambled to cover up the frame job by obstructing the scapegoats' efforts to clear their names.  The court found this conduct 'intentional,' 'outrageous,' 'beyond all bounds of decency,' and to have 'no place in a civilized community'";

- "the FBI covered up its perfidy by stonewalling the scapegoats' post-conviction efforts to win their freedom";

- "The evidence supports the district court's finding that a coverup occurred.  Despite contemporaneous requests by state officials for information bearing upon the scapegoats' petitions for post-conviction relief, the FBI remained mute – and worse.  That recalcitrance is especially damning in the circumstances

[where] the FBI's deliberate misconduct had placed the scapegoats in harm's way."

- "[T]he district court concluded that the indictment, prosecution, conviction and incarceration were all reasonably foreseeable results of the FBI's misconduct. That conclusion strikes us as virtually inescapable."

283.    Deplorable as the FBI conduct in <u>Limone</u> was, the Defendants' behavior here was much more outrageous. Thus, like in <u>Limone</u>, "the particular conduct giving rise to the claims at issue . . . consists of assisting [another] to frame the scapegoats for a . . . crime and covering up the frame job by withholding exculpatory information from state officials."

284.    However, in <u>Limone</u>, the First Circuit stated in conclusion: "This case exemplifies a situation in which the end did not justify the government's use of very unattractive means. *In its zeal to accomplish a worthwhile objective (stamping out organized crime), the FBI stooped too low.* Its misconduct was not only outrageous but also tortious. That misconduct resulted in severe harm to the persons wrongfully convicted and to their families. Under these unfortunate circumstances, the large damages awards mark the last word of a sad chapter in the annals of federal law enforcement."

285.    Unlike the FBI in <u>Limone</u>, the Defendants here pursued no "worthwhile objective" by framing the innocent scapegoats, covering up the frame job, and withholding exculpatory evidence that would have set the innocent free. Not only were the Defendants not trying overzealously to "stamp out organized crime," but their own misconduct here strongly resembles that of a racketeering influenced corrupt organization, raising the specter of a RICO violation. (Plaintiffs reserve all their rights under Rule 15 of the Federal Rules of Civil Procedure to amend their Complaint by adding a civil RICO claim if warranted by evidence).

286.    Moreover, unlike the FBI in <u>Limone</u>, the Defendants had themselves committed the original crime-fraud for which they later framed the scapegoats.

287.    Furthermore, unlike in <u>Limone</u>, the Defendants' scapegoats were not Mafia members, and not even innocent but random bystanders – they were the very victims of Defendants' own crime-fraud.

288.    And unlike the FBI, which eventually disclosed the exculpatory evidence in response to Limone's request, the Defendants here still have not disclosed the truth, and the only reason that the Individual Plaintiffs avoided the prison sentences that befell those in <u>Limone</u> was a stroke of improbable luck in the person of the Chinese prosecutor who ultimately refused to charge the Plaintiffs despite H3C's urging and the Defendants' assistance and acquiescence.

289.    Accordingly, the Plaintiffs seek an award of damages commensurate with the severity of the injury and the emotional trauma that the Defendants intentionally inflicted on the innocent victims of their own fraud with egregious disregard for their wholly undeserved and unjustified suffering.

290.    Moreover, the Family Plaintiffs also seek an award of damages for the intentional infliction of emotional distress, and Plaintiffs Jade Cheng and his wife Plaintiff Caroline Marafao Cheng also for the loss of consortium.

291.    During the Plaintiffs' ordeal, the Defendants were expressly and repeatedly warned that their misconduct was extracting severe toll on the families of the innocent Individual Plaintiffs:

- "I am getting pressure from the families; elderly parents of our sales team members are going crazy.  It breaks my heart to see letters from them.  They think I can do something to help.  At this point, can you please arrange for your legal team get in touch with our lawyer there and explain the situation?  Hope

84

this move will provide some clarity and comfort to families.  Hope that move at least will help them understand that HP and ICT are working together to have all the mess cleaned up. . . .  JT, if you can do something, please help."  (March 12, 2013 email from Plaintiff Styller to Defendant Gill, copy to JT Silvestri);

- "For all fairness we and families are spending enormous amount of time and money to defend and support our guys also. . .  I will pass your answers to the frustrated and angry families who are all over me for the results.  Hope they understand things better."  (March 20, 2013 email from Plaintiff Styller to Defendant Gill);

- "There are major questions we're are still looking for, and keep getting the run-around from HP on.  Please help to answer them.  We need to update the families on what is going on. . . .  Please answer those questions for us.  We owe to the frustrated families of the men and women of ICT China Team"  (March 21, 2013 email from Plaintiff Styller to Defendant Gill);

- "[The letter] was promised early this week.  Lots more upset calls and emails from families these two days."  (April 1, 2013 email from ICT's Ryan Quinn to Plaintiff Styller);

- "We're quickly running out of time now and must have letters now.  Everybody on our side getting very nervous and concerned as trial can start anytime.  We need our people out of jail now!"  (April 10, 2013 email from Plaintiff Styller to Defendant Gill).

292.    Thus, the Defendants knew that their misconduct not only severely injured the incarcerated Plaintiffs themselves but was also extracting severe mental and emotional toll on their "frustrated and angry families."  Yet, the Defendants persisted with their malicious frame job and cover-up with that knowledge and in egregious and callous disregard for the Family Plaintiffs' emotional and mental distress, and are liable to them for their undeserved suffering.

**D.    Conclusion on the facts**

293.    The foregoing long factual narrative and supporting evidence set out how the Defendants *firstly* defrauded the Plaintiffs; *secondly*, ruined their business, caused the innocent Individual Plaintiffs' incarceration, and placed them in significant legal jeopardy with their frame job; *thirdly*, withheld the exculpatory evidence that would have led to their release,

stonewalled state officials' requests to confirm the Individual Plaintiffs' alibis, and provided misleading information to the police; and, *finally*, engaged in a malicious insidious campaign designed to cover-up their frame job, to run out the clock on the Chinese and/or Indian statutes of limitation for the Defendants' own crimes, and to extract a release from liability from the Plaintiffs.

294.    The web of outrageous lies woven by the Defendants in the course of those events has been finally untangled, and its various strands laid out in the narrative above, supported by a wealth of documentary evidence.  But the deception practiced by the Defendants was so successful, and their web of lies was so dense, that it took Plaintiffs and their counsel until this Second Amended Complaint to figure it out.

295.    The extent to which the Plaintiffs were deceived by their ostensible business partners, with whom the Plaintiffs initially deposited their trust and their hopes, manifests itself in the development of this case as reflected in its progression from the Original Complaint filed on December 9, 2015, to the Amended Complaint filed on July 18, 2016, and to the current Second Amended Complaint filed today.

296.    The Original 16-page complaint focused on the initial fraud and false imprisonment of the Individual Plaintiffs, with the Plaintiffs' still duped by the Defendants' cover-up scheme, and still convinced that the Defendants had been assisting them in good faith. Then came Defendant HPFS' motions to dismiss, where -- and it did not escape the Plaintiffs' attention – Defendant HPFS, incredibly, continued to profess complete ignorance regarding the counterfeit *vel non* nature of the Equipment, contrary to the Complaint's factual allegations, the Defendants' own numerous investigations of the Equipment, and their prior admissions that

"the seized equipment is counterfeit" (*see* the March 2013 Letter), and could not even bring

itself to calling the Equipment counterfeit (using instead the incorrect term "contraband").

297.    The centerpiece of the HPFS Defendants' efforts to dismiss the complaint was

the Act of State argument, where the HPFS Defendants tried but failed to convince this Court to

dismiss or stay this action in favor of the Chinese police investigation. *See, e.g.*, Defendant

HPFS' Moving Brief (EFC No. 20) at 1 ("Centered in Asia, the saga involves used computer

equipment currently impounded by the Chinese authorities as part of an ongoing criminal

proceeding which, perforce, will ascertain whether the equipment is counterfeit.  Only after it is

found to be counterfeit could plaintiffs be aggrieved.  [A ridiculous statement – Plaintiffs are

aggrieved already, and will be much more aggrieved if the equipment turns out to be actually

genuine, despite numerous sworn statements by the equipment manufacturer H3C that it is

counterfeit.]  But that adjudication is not one this Court should make.  The Act of State Doctrine

mandates that it be made in China, by China, in the context of China enforcing its own laws.").

Indeed, Defendant HPFS' motion is peppered with numerous statements to that effect.

298.    As it turned out, Defendant HPFS was advancing this argument – which it then

reincorporated in opposition to Plaintiffs' Amended Complaint, and which was also adopted by

its co-defendant HPFS India – while laboring under the misimpression that the Chinese

authorities had already destroyed the seized Equipment.  Thus, at the July 8, 2016 hearing,

counsel for Defendant HPFS informed the Court that the seized goods "have been since

destroyed by the Chinese police."  Tr. at pp. 9-10 (ECF No. 44).  Accordingly, the HPFS

Defendants have made and continue to make the argument that this Court cannot review the

case pending the Chinese authorities' determination of the nature of the Equipment -- while

holding the (wrong) belief that the Chinese authorities had already destroyed the Equipment, meaning that the HPFS Defendants advance their Act of State argument in bad faith.[1]

299.    The 41-page Amended Complaint filed on July 18, 2016 then added a negligence claim reflecting the Plaintiffs' then realization that, even though the Defendants presumably tried to assist the Individual Plaintiffs, their efforts fell far short of their duties owed to the Plaintiffs.  In response, the HPFS Defendants tried to portray their outrageous conduct that put innocent Plaintiffs in jail and almost destroyed their lives and the lives of the Family Plaintiffs merely as "a commercial dispute over equipment."  Finally, the Second Amended Complaint reflects the Plaintiffs' current understanding, knowledge and belief that the Defendants' purported assistance was in fact a sham all along, nothing but a cover-up for their own frame job.

300.    Based on the allegations of this Complaint and its evidentiary support, Defendants' liability to the Plaintiffs under Massachusetts law appears inescapable.  But have we untangled the whole web of Defendants' deception, or just a part of it?  Was this case unique, or were there other similar cases in HP's recent history?  *See, e.g.*, HP Inc Warns UK Channel Over Counterfeit Cartridges, www.channelweb.co.uk, March 1, 2016 (report of HP's seizing counterfeit equipment from its own distributor, whose name remained undisclosed and fate unknown).  How many letters like Plaintiff Styller's does the company's "ethical leadership" receive every year, and do they treat them the same way they did in this case?

---

[1]       Plaintiffs' counsel was under the same misimpression during the hearing but was subsequently informed by Plaintiffs that the Equipment had not in fact been destroyed but was released by the Chinese police in Plaintiff Cheng's custody and is still in China in the same conditions as was returned by the police.  Unlike the Defendants, whose Act of State argument depends squarely on the Chinese authorities' continuing investigation, none of Plaintiffs' arguments depend on it, and Plaintiffs are very happy that it has finally come to an end, and that the material evidence for future trials has been preserved intact.

301.    The cold reality is that Plaintiffs here have escaped the grim consequences of the Defendants' attempts to frame them by sheer luck.  But could there be other, less fortunate victims of the Defendants' fraud, now rotting in jail somewhere in the world, serving time for the Defendants' own crimes -- just like the Individual Plaintiffs would have been but for their improbable 0.07% lucky strike?  The answers to these relevant -- and disturbing -- questions are all in Defendants' possession, and will have to await discovery.

## IV.    Statement of Claims

### COUNT I
### (For Fraudulent Misrepresentation against the HPFS Defendants on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)

302.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

303.    The HPFS Defendants represented the Equipment they sold to ICT for the express purpose of reselling as genuine H3C equipment manufactured by HP's wholly-owned Chinese manufacturer H3C.  Those representations were made by representatives of Defendant HPFS during the contract negotiations as particularized in ¶¶ __--__ above.  In particular, Defendant HPFS' representatives described the Equipment in question as the "H3C Equipment" orally and in writings; identified it by HP and H3C manufacturing codes during the contract negotiations with ICT; and signed contractual documents identifying the Equipment as manufactured by H3C -- all the while concealing the fact that the Equipment was counterfeit. The Equipment itself was identified as H3C equipment by H3C serial numbers and trademark logos.  Those representations went to the heart of the HPFS Defendants' contractual arrangements with ICT and constituted material terms of those arrangements.

304.    The HPFS Defendants knew that Plaintiff ICT, its CEO and owner Plaintiff Styller, and its sales force, the Individual Plaintiffs, would rely on those representations in their

efforts to resell the Equipment, and these Plaintiffs were entitled to rely and did in fact rely on those representations to their severe detriment.

305.    Those representations were in fact false, as the manufacturer of the Equipment and the exclusive holder of the H3C trademark and logo – H3C itself – repeatedly, consistently and unequivocally assured the police that the Equipment was not genuine H3C equipment as represented by HPFS Defendants but counterfeit.  Plaintiffs did not know and had no reasons to know that the sold Equipment was not genuine as represented by HPFS Defendants, and were entitled to rely and did justifiably rely on HPFS Defendants' representations.  Indeed, according to HPFS Defendants' March 2013 Letter, "[u]pon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment."  Furthermore, according to HPFS Defendants' April 1, 2013 revision of the March 2013 Letter, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

306.    The HPFS Defendants made their misrepresentations with the knowledge of their falsity, or with a complete disregard for the truth.  The HPFS Defendants knew, or were reckless in not knowing, that the Equipment was counterfeit but concealed that knowledge from Plaintiffs.

307.    *First*, in his August 26, 2013 letter sent on behalf of HP, H3C and HPFS India to ICT's counsel, Defendant McCarthy stated that "as an experienced dealer in used equipment your client knew, or should have known, that there are many counterfeit products in the market."  In fact, prior to its deal with the HPFS Defendants, ICT never bought any equipment

90

in India, was not experienced in that market, and was not familiar with its counterfeiting situation. The HPFS Defendants, on the other hand, were well established in India and very familiar with that market and its counterfeiting problems; moreover, "remarketing older assets [was] a key part of HP Financial Services' business." Thus, it was the HPFS Defendants themselves -- not Plaintiffs -- who, by Defendant McCarthy's own admission, " *knew, or should have known, that there [were] many counterfeit products in the [Indian] market*."

308.    *Second*, according to HPFS Defendants, "the company HPFS India engaged in India to process and refurbished returned lease equipment" – TT Global – inspected the Equipment pursuant to HPFS' standard operating procedure for off-lease equipment in 2011 and took photos of the Equipment prior to its sale to ICT and importation into China. Defendants subsequently cited these very photos in their March 2013 Letter as showing that "the counterfeit H3C Equipment seized in China is the same equipment sold by HPFS to ICT." Defendants knew or where reckless in not knowing that the Equipment was counterfeit as a result of that 2011 Inspection but concealed that knowledge from Plaintiffs.

309.    *Third*, the Equipment returned to HPFS India after the lease expiration was in substandard, scrap-grade condition despite a relatively short -- less than a year -- lease period. The substandard condition of the returned Equipment should have raised a red flag for the HPFS Defendants indicating that the returned Equipment might have been a counterfeited low-quality substitute of the originally leased brand-new equipment. The HPFS Defendants concealed that knowledge from ICT and sold the Equipment "AS IS WITH DEFECTS," so that ICT itself only learned about its substandard condition upon receiving the first shipment in China in 2012. Even then, however, ICT had no reasons to suspect that the Equipment was counterfeit because it purchased it from an HP company as HP/H3C Equipment.

310.   *Finally*, HPFS Defendants further knew, or were reckless in not knowing, that the transceivers sold to ICT as part of the Equipment were counterfeit as a result of the 2012 Inspection but concealed that knowledge from ICT.  That inspection was conducted by representatives of Defendant HPFS Mr. Harris and of ICT Mr. Pekar, following which the HPFS Defendants offered ICT the remaining Equipment at a 500% discount to the original price but ICT refused.  Unlike Plaintiff ICT's representative, the representative of Defendant HPFS as the seller of the Equipment manufactured by its affiliate had the expertise and technical knowledge to determine that the Equipment was counterfeit during the 2012 Inspection.

311.   In reliance on Defendants' representations, Plaintiffs proceeded to use their best efforts to remarket the Equipment as genuine, "without identifying HPFS" as the original source of the Equipment as such was the requirement of its remarketing contract with HPFS, and continued to do so until such time as they were accused of marketing counterfeit equipment by the HPFS Defendants' affiliate H3C.

312.   The HPFS Defendants themselves admitted that the counterfeiting had happened in India before the sale of the Equipment to ICT and its importation into China.  Thus, in their March 2013 Letter, Defendants explained that "[b]ased on the available evidence HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT," and further that "[b]ased on the available evidence it would appear that the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases."

313.   The HPFS Defendants had both motive and opportunity to commit fraud against the Plaintiffs.  Following the return of the Equipment to HPFS India in a scrap-grade condition after a short-term lease and after the 2011 Inspection, the HPFS Defendants knew, or were

reckless in not knowing, that they were in possession of a large inventory of the Equipment
which included counterfeit transceivers, and which it could not lawfully resell.  Without
disclosing that knowledge to ICT, HPFS Defendants entered into the contract with ICT for the
remarketing of that Equipment by ICT, requiring ICT "to use its best efforts to remarket the
[Equipment] at the highest possible prices" and "without identifying HPFS" as the source of the
Equipment.  Moreover, the RRSA contract provided that "ICT will be responsible for
complying with all applicable laws and regulations and for obtaining all required export and
import authorizations."

   314. The RRSA also required ICT to share the proceeds from the resale of the
Equipment with Defendant HPFS India.  Accordingly, HPFS Defendants would have benefitted
from any resale of the Equipment while shifting any potential liability for selling the counterfeit
Equipment onto the Plaintiffs – which was exactly what had transpired as ICT's business in
China was ruined (and its independent sales associates Individual Plaintiffs arrested) because of
the counterfeiting accusations while HPFS retained the $250,000 paid by ICT for the first
installment of the Equipment, and refused to refund that payment or even the agreed-upon RMA
refund of $150,000, let alone to provide any other compensation to the Plaintiffs.

   315. The HPFS Defendants knew that Plaintiffs would rely on their representations
regarding the genuine nature of the Equipment in their remarketing efforts.  Indeed, the HPFS
Defendants themselves admitted in the April 1, 2013 version of their letter that "HPFS India
sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold
Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was
entitled to rely on HPFS India's representations in this regard."

316.    The HPFS Defendants also knew that reselling counterfeit equipment would expose the persons reselling it – Plaintiffs ICT and Styller and ICT's China team, the Individual Plaintiffs – to a substantially certain risk of imprisonment but concealed the fact that the Equipment was counterfeit from Plaintiffs.

317.    As a direct and proximate result of the HPFS Defendants' fraudulent misrepresentations, the Plaintiffs suffered severe injuries.  Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

318.    The HPFS Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

## COUNT II
### (For Negligent Misrepresentation against the HPFS Defendants on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)

319.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

320.    By virtue of their superior knowledge and expertise regarding HP/H3C-manufactured equipment and trademarks, the HPFS Defendants ought to have been aware that their representations as to the genuine nature of the Equipment sold to ICT were false.  Unlike Plaintiffs, the HPFS Defendants had ample opportunities to discover that the Equipment was

counterfeit, including through the 2011 Inspection and the 2012 Inspection.  Moreover, "as an experienced dealer in used equipment [the HPFS Defendants] knew, or should have known, that there are many counterfeit products in the market" in India and, upon receiving the Equipment in a substandard, scrap-grade condition after a short-term lease, should have realized that it was a counterfeited low-quality substitute rather than the originally leased equipment.

321.    The HPFS Defendants were negligent or grossly negligent in ignoring the suspicious substandard condition of the Equipment after a short-term lease, their knowledge that "there [were] many counterfeit products in the market," and the results of the 2011 Inspection; and in failing to disclose to ICT that the Equipment was counterfeit prior to the sale of that Equipment to ICT in 2011 and in the course of Plaintiffs' remarketing efforts in 2012.

322.    The HPFS Defendants' breach of their duty of care was the direct and proximate cause of the Plaintiffs' injuries.

323.    There was no contributory negligence on the part of the Plaintiffs.  Plaintiffs had no expertise or technical knowledge to determine whether the Equipment was counterfeit and were entitled to rely on Defendants' representations that the Equipment was genuine.  Nor were the Plaintiffs under any duty, contractual or otherwise, to inspect the Equipment to determine whether it was genuine.  Indeed, according to the HPFFS Defendants themselves, "[u]pon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment."  Furthermore, according to the HPFS Defendants, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

324.     As a direct and proximate result of the HPFS Defendants' misrepresentations, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

325.     The HPFS Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

### COUNT III
### (For Breach of Contract against Defendant HPFS India
### on behalf of Plaintiff ICT)

326.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

327.     Defendant HPFS India and Plaintiff ICT are parties to the RRSA contract for the remarketing of the Equipment.  Plaintiff ICT is also a direct and intended beneficiary of the related WSA contract between Defendant HPFS India and Shinto.

328.     Plaintiff ICT duly complied with the terms and conditions of the RRSA and, to the extent necessary for the enforcement of its rights as the third-party beneficiary, with the conditions of the WSA contract.

329.     Defendant HPFS India breached the RRSA and WSA contracts by selling counterfeit Equipment to ICT instead of genuine Equipment as provided for by the aforementioned contracts.

330.    As a direct and proximate result of Defendant HPFS India' breach, Plaintiff ICT was damaged and has suffered significant injury to its business, property and reputation. Defendant HPFS India is liable to Plaintiff ICT for damages in an amount to be determined at trial.

## COUNT IV
### (For Fraudulent Inducement against the HPFS Defendants on behalf of Plaintiff ICT)

331.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.  This Count IV is pleaded in the alternative to Count III (breach of contract) pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

332.    In the course of negotiating the sale of the Equipment to Plaintiff ICT, the HPFS Defendants made false representations concerning the nature of the Equipment and concealed from Plaintiff ICT that the Equipment was counterfeit, as particularized in paragraphs ___--___ above.  These representations were material to the negotiations as they went to the very heart of the contemplated transaction.

333.    Plaintiff ICT was entitled to rely and did reasonably rely on those representations in entering into the RRSA with Defendant HPFS India.  Plaintiff would not have entered into the RRSA but for those representations, which turned out to be fraudulent.  Had the HPFS Defendants told the truth, Plaintiff would have terminated the contract negotiations forthwith.

334.    As a direct and proximate result of the HPFS Defendants' misrepresentations and omissions, Plaintiff ICT was fraudulently induced to enter into the RRSA agreement and was damaged and suffered out of pocket losses, loss of profits, loss of its Chinese business, and a serious injury to its business, property and reputation.  The fraudulently induced RRSA

97

agreement is void, and the HPFS Defendants are jointly and severally liable to Plaintiff ICT for

damages in an amount to be determined at trial.

## COUNT V
**(For Breach of Warranty against the HPFS Defendants
on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)**

335.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through ___

of this Complaint as if set forth in full.

336.    In the course of negotiation and execution of the relevant agreements, the HPFS

Defendants warranted that the Equipment was genuine equipment manufactured by HP/H3C,

bearing genuine HP/H3C trademarks.  The HPFS Defendants described the Equipment as H3C-

manufactured equipment both during the negotiations leading up to the contracts execution, in

the contract documents themselves, and by the Equipment's serial numbers and trademark

logos.

337.    According to M.G.L. ch. 106, § 2-313(1)(b), "any description of the goods which

is made part of the basis of the bargain creates an express warranty that the goods shall conform

to the description."  HPFS Defendants' description of the Equipment as "H3C Equipment"

manufactured by HP/H3C was made part of the basis of the bargain as it went to the heart of

HPFS Defendants' contractual arrangements with ICT and constituted material terms of those

arrangements, and thus created the express warranty that the Equipment was genuine H3C

equipment.

338.    The HPFS Defendants breached that warranty by selling to Plaintiff ICT

counterfeit equipment instead, as a result of which breach of warranty Plaintiff ICT, Plaintiff

Styller and the Individual Plaintiffs suffered their respective injuries as alleged herein.

339.    Further, the WSA provides in Clause 2 that "[t]he title and legal and beneficial ownership of the Equipment shall be transferred to the buyer by way of delivery in the manner set out in clauses 3 and 4 below.  The Equipment shall be transferred to the Buyer free from all liens and encumbrances."  Clause 6 of the WSA provides that "Seller warrants that, on the Actual Delivery Date, (i) Seller is the lawful owner of the Equipment and (ii) the Equipment will be free and clear of all liens and encumbrances whatsoever."  The RRSA also provides that "the equipment [is] owned by HPFS" and that "ICT intends to acquire title to the Active Equipment from Broker and then arrange for its sale to third parties."

340.    According to M.G.L. ch. 106 § 2-312(2), "a warranty [of title] will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have."  The "AS IS with defects" disclaimer does not constitute such "specific language" and does not waive the warranty of title, particularly where, as here, that warranty was expressly set out in contractual provisions.

341.    Because the Equipment was in fact counterfeit and the HPFS Defendants could not lawfully resell it, they could not have transferred "the title and legal and beneficial ownership of the Equipment" as warranted, and are liable for breach of that warranty of title.

342.    Furthermore, according to M.G.L. ch. 106, Section 2-318, "[l]ack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods."  Here, the Equipment

was sold for the specific purpose of resale, and the sale contract required Plaintiff ICT "to use its best efforts to remarket the Active Equipment at the highest possible prices." Accordingly, the HPFS Defendants "might reasonably have expected" that the persons reselling the Equipment – Plaintiffs ICT and Styller, and ICT's sales associates, the Individual Plaintiffs -- would "be affected by" it within the meaning of the statute.

343.    In particular, Defendants should have reasonably expected these Plaintiffs to be exposed to an unreasonable and substantially certain risk of seizure and imprisonment for reselling the Equipment that was counterfeit and not genuine as warranted.

344.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

345.    The HPFS Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

**COUNT VI**
**(For Breach of M.G.L. 93A against the HPFS Defendants**
**on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)**

346.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through ___ of this Complaint as if set forth in full.

347.   The HPFS Defendants are corporations engaged in the conduct of trade or commerce.

348.   Plaintiff ICT is a person engaged in the conduct of trade or commerce who suffered loss of money and property as a result of the HPFS Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

349.   Plaintiff Styller and the Individual Plaintiffs are persons engaged in the conduct of trade or commerce who suffered loss of money and property, as well as personal injuries, as a result of HPFS Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

350.   All Plaintiffs are in direct or indirect privity with the HPFS Defendants and/or substantially connected to the business transaction between ICT and the HPFS Defendants such that these HPFS Defendants knew or should have known that all Plaintiffs would receive goods which the HPFS Defendants knew or should have known were counterfeit, the receipt and resale of which would expose Plaintiffs to harm, including the harm that occurred as described herein.

351.   The HPFS Defendants' misrepresentation of the Equipment as genuine H3C Equipment during the 2011 negotiations and sale transaction constitutes unfair and deceptive trade practices within the meaning of Section 2 of M.G.L. 93A, as HPFS Defendants failed to disclose to Plaintiffs the fact that the Equipment was counterfeit, which disclosure would have caused Plaintiffs not to enter into the resale transaction and/or not to undertake any attempts to resell the Equipment.

352.   HPFS Defendants' unfair and deceptive acts or practices occurred primarily and substantially within the Commonwealth where the negotiations and execution of the relevant

101

agreements took place and the complained-of misrepresentations occurred as particularized in

paragraphs __--__ above.

353.    As a direct and proximate result of the HPFS Defendants' deceptive acts in

violation of M.G.L. 93A, Plaintiff ICT and its owner Plaintiff Styller were damaged and

suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious

injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the

extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial

and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence,

and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress

and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a

criminal prosecution.

354.    The HPFS Defendants are jointly and severally liable to Plaintiffs for their

damages in an amount to be determined at trial.  The HPFS Defendants committed their unfair

and deceptive acts or practices willfully or knowingly, with reckless disregard for Plaintiffs'

rights, entitling Plaintiff to up to three, but no less than two, times of the amount of its actual

damages (to be determined at trial) suffered as a result of the HPFS Defendants' violation of

M.G.L. 93A, as well as attorneys' fees and costs incurred in pursuit of this action.

**COUNT VII**
**(For Fraud against all Defendants on behalf of**
**Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)**

355.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through ___

of this Complaint as if set forth in full.

356.    In addition to the fraud and related causes of action alleged against the HPFS

Defendants in connection with their 2011 crime-fraud as set forth in Counts I-VI above,

102

Plaintiffs hereby allege the following fraud and related causes of action in Counts VII-XIII against *all* Defendants in connection with their fraudulent frame job and cover-up scheme that commenced in 2013 following the police raid on Plaintiff ICT's Beijing offices and the arrest of the Individual Plaintiffs.

357.    Defendants' fraudulent scheme commenced with the sham "assistance" that the Defendants pretended to be providing Plaintiffs purportedly to secure their release, while one of their Chinese affiliates, H3C, was relentlessly and aggressively pushing for their criminal trial on charges carrying a potential 10-year sentence with the 99.93% chance of conviction, and their other Chinese affiliate – HP China – falsely pled ignorance of the matter and stonewalled the police's requests for exonerating evidence to confirm the Individual Plaintiffs' alibis.

358.    The scheme continued with the Defendants' secret substitution of their letter to the Chinese authorities whereby Defendants deleted their key admissions that would have resulted in the Individual Plaintiffs' release -- and expressly lied about it to the Plaintiffs, assuring them that "the letter is substantively the same as the last English version you saw."

359.    Defendants also falsely assured the Plaintiffs that the letter "was definitely filed" whereas in fact Defendants never filed the Letter with the prosecutor, as was expressly and repeatedly requested by the Plaintiffs, and never properly filed with the police either, as a result of which the Letter was merely "reviewed" and then rejected by the police as "not relevant to the proceedings," according to the Defendants.

360.    Defendants thus withheld exonerating evidence that would have secured the release of the Individual Plaintiffs, and stonewalled the Chinese authorities' and Plaintiffs' request for that information, thereby prolonging Plaintiffs' suffering and compounding their injuries.

361.     Following the Individual Plaintiffs' release on bail pending criminal trial, Defendants continued their cover-up scheme in an effort to defraud and intimidate the Plaintiffs into releasing their claims in exchange for the Defendants' "***possibly making some small settlement payment to resolve this issue in its entirety***."

362.     Defendants also continued their frame job and cover-up scheme in order to avoid criminal liability for selling counterfeit Equipment in India if H3C's allegations of counterfeiting were true – or, conversely, to avoid criminal liability in China for making false statements to the police with the intention of framing the Plaintiffs if H3C's allegations of counterfeiting were false, in either case using the Individual Plaintiffs as innocent scapegoats for Defendants' own crimes.

363.     Knowing fully well that their Chinese affiliate H3C continued urging that the Individual Plaintiffs be tried for the crimes they did not commit and that, if tried, highly likely sentenced to lengthy prison terms despite their absolute innocence, all Defendants nevertheless persisted in their insidious frame job and cover-up scheme with the knowledge of its falsity or with reckless disregard for the truth.

364.     The HPFS Defendants and Defendant Gill were aware of the true facts since 2011 as they were directly involved in the sale of the Equipment to Plaintiff ICT.  In early 2013, the HPFS Defendants learned about the arrest in China and H3C's allegations of counterfeiting through their representatives JT Silvestri, James O'Grady, Kevan Bartley, and Defendant Gill.

365.     HP itself (now Defendants HPE and HPI) learned about the counterfeiting allegations in early 2013 as well.  According to Defendants themselves, the matter was "escalated" to the parent company level and its "top level leaders" in the beginning of February 2013, and "the HP legal and security teams" were in China by mid-February reviewing the

issue, joined by HP's "internal audit team" and an "HP attorney from the U.S." in March 2013. Upon information and belief, the legal, security and internal audit were all central corporate departments at HP, run directly from its Palo Alto headquarters and reporting to HP's respective senior executives.

366.    At the same time Defendant Gill, who was Defendants' point man in dealings with the Plaintiffs, kept passing along Plaintiffs' requests for information to his unnamed superiors.  Defendant Gill at the time was Assistant General Counsel and Assistant Secretary of Defendant HPFS, whose General Counsel and Secretary was Defendant McCarthy.  Defendant Gill reported directly or indirectly to Defendant McCarthy until March 2013, when Defendant McCarthy left HPFS to become its outside counsel in his new capacity as a partner at Defendant Gibbons P.C.  In his interview at the time of transition, Defendant McCarthy also boasted that, while in-house, he had implemented "a funneling system that ensures that all significant risk issues flow to a group of highly experienced senior managers for prompt review and decision." Defendant McCarthy was fully aware of Defendants' fraudulent cover-up scheme and directed or approved it, or at the very least acted with reckless disregard for the truth and extreme and callous indifference to Plaintiffs' sufferings.

367.    Defendants Whitman and Schultz knew about the matter since *at least* June 12, 2013, when Plaintiff Styller and ICT's outside counsel Mr. Riordan directly notified them of the impending criminal prosecution of the innocent Individual Plaintiffs and begged for Defendants Whitman's and Schultz's help in securing their release.  Upon information and belief, Defendants Whitman and Schutz knew about or recklessly disregarded the matter even earlier, given the gravity of the situation, its early escalation to the "top level leaders," and the heavy involvement of HP's personnel from its central legal, security and audit functions in the matter.

105

368.     Even though Defendant Whitman cold-heartedly ignored Plaintiff Styller's desperate plea, Defendant Schutz, who reported directly to Defendant Whitman, took very active role in the case and retained Defendant Gibbons P.C. and its partner Defendant McCarthy to prosecute the fraudulent cover-up campaign against the Plaintiffs on behalf of HP and its subsidiaries, including Defendant HPFS India and H3C.  Defendant Whitman directed or approved the fraudulent cover-up campaign, or acted in reckless disregard for the truth and with demonstrably extreme and callous indifference for the Plaintiffs' sufferings.

369.     The HPFS Defendants and Defendant Gill made numerous fraudulent statements in furtherance of the cover-up scheme as alleged in detail herein in paragraphs __-__, with full knowledge or reckless disregard for the truth.

370.     Defendants McCarthy and Gibbons P.C. made numerous fraudulent statements on behalf of HP, H3C and Defendant HPFS India in furtherance of the cover-up scheme as alleged in detail herein in paragraphs __-__, with full knowledge or reckless disregard for the truth, and with knowledge, direction, acquiescence or approval of Defendants Whitman and Schultz, or with their reckless disregard for the truth.

371.     Plaintiffs reasonably relied on Defendants' fraudulent statements and their pretense of "assistance," to Plaintiffs' severe detriment.  Had the Plaintiffs known the truth, they would not have spent the enormous amount of time, efforts, and resources in trying to secure the release of the Individual Plaintiffs by cooperating with the Defendants in good faith and in reliance on Defendants' ostensible -- but sham -- "assistance."  Had the Plaintiffs known the truth, they would have viewed Defendants as adversaries acting in extreme bad faith rather than partners, and would have pursued different legal venues and strategies in their quest to free the Individual Plaintiffs, including without limitation filing criminal complaints against Defendants

in India and/or China.  As it were, Defendants cover-up scheme was so successful in deceiving

the Plaintiffs that it took them and their counsel until now to untangle, to Plaintiffs' severe

detriment and continuing suffering as alleged herein.

372.    Defendants had both motive and opportunity to commit their fraudulent cover-

up.  Their motive was to avoid the criminal exposure in India for selling counterfeit goods

and/or in China for making false statements to the police with the intent of framing innocent

people as criminals, as well as to force Plaintiffs to release their claims in exchange for

Defendants' "possibly making some small settlement payment to resolve this issue in its

entirety."  And Defendants had ample opportunities to commit their fraud, given their resources,

manpower, position, and access to the Chinese police (witness, *e.g.*, Defendant Gill's possession

of confidential correspondence between the Chinese prosecutor and the Chinese police, at

paragraph __ above) – especially when compared to those of the Plaintiffs, with their Chinese

office shut and their whole Chinese team in jail.

373.    Moreover, Defendants' intent to deceive – their scienter – was demonstrated in,

among other things, Defendant Gill's secretly revising the March 2013 Letter and blatantly

lying about it to the Plaintiffs; in Defendant Gill's false assurances to the Plaintiff that the Letter

"was definitely filed" when it was not; and in numerous demonstrable lies made by Defendants

McCarthy and Gibbons P.C. on behalf of HP, H3C and Defendant HPFS India at Defendants

Whitman's and Schultz's directions and/or approval, or with reckless indifference to the truth

and in any event with callous indifference to the Plaintiffs' suffering and in extreme bad faith.

374.    As a direct and proximate result of Defendants' fraudulent frame job and cover-

up, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses,

loss of profits, loss of their Chinese operations, and a serious injury to their business, property

and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

375.    All Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial

## COUNT VIII
### (For Breach of M.G.L. 93A against all Defendants on behalf of Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)

376.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

377.    Defendants are persons engaged in the conduct of trade or commerce.

378.    Plaintiff ICT is a person engaged in the conduct of trade or commerce who suffered loss of money and property as a result of Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

379.    Plaintiff Styller and the Individual Plaintiffs are persons engaged in the conduct of trade or commerce who suffered loss of money and property, as well as personal injuries, as a result of Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

380.    All Plaintiffs are in direct or indirect privity with Defendants and/or substantially connected to the business transaction between ICT and the HPFS Defendants such that these Defendants knew or should have known that all Plaintiffs would receive goods which the Defendants knew or should have known were counterfeit, the receipt and resale of which would expose Plaintiffs to harm, including the harm that occurred as described herein.

381.    Defendants' ensuing frame job and cover-up scheme and the numerous fraudulent statements made by Defendants in furtherance thereof constitute unfair and deceptive trade practices within the meaning of Section 2 of M.G.L. 93A.

382.    Defendants' unfair and deceptive acts or practices occurred primarily and substantially within the Commonwealth where Defendant HPFS and Plaintiffs ICT and Styller conduct business, where the Defendants directed their numerous fraudulent statements, and where those fraudulent statements were received, relied, and acted upon by the Plaintiffs to their severe detriment.

383.    As a direct and proximate result of Defendants' deceptive acts in violation of M.G.L. 93A, these Plaintiffs were damaged and suffered out of pocket losses, loss of profits, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.  Plaintiff Styller also suffered personal injuries in the form of mental and emotional distress caused by Defendants' egregious frame job and cover-up.

384.     Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial.  Defendants committed their unfair and deceptive acts or practices willfully or knowingly, with reckless disregard for Plaintiffs' rights and in extreme bad faith, entitling Plaintiff to up to three, but no less than two, times of the amount of its actual damages (to be determined at trial) suffered as a result of Defendants' violation of M.G.L. 93A, as well as attorneys' fees and costs incurred in pursuit of this action.

## COUNT IX
### (For False Imprisonment against all Defendants on behalf of the Individual Plaintiffs)

385.     Individual Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

386.     Due to Defendants' original crime-fraud and the ensuing frame job and cover-up campaign against the Plaintiffs, and through no fault of their own, Individual Plaintiffs were falsely imprisoned and remained imprisoned for 7 months each.

387.     The HPFS Defendants' fraudulent sale of counterfeit Equipment to Plaintiffs in 2011, for the express purposes of resale, unreasonably exposed Plaintiffs reselling it to a substantially certain risk of arrest and imprisonment.  Under Massachusetts law, the actor is liable for false imprisonment if his act is done with knowledge that such confinement would, to a substantial certainty, result from it.

388.     Further under Massachusetts law, if the actor is under a duty to release the other from confinement, or to aid in such release, his refusal to do so with the intention of confining the other is a sufficient act of confinement to make him subject to liability.  Moreover, under Massachusetts law, a person may be liable for false imprisonment not only when the person's acts directly impose a restrain upon the liberty of another but also when such person, by

providing false information, causes such restraint to be imposed.  Finally, Defendants here were

under a duty imposed by Massachusetts law to rescue the Individual Plaintiffs from their

unjustified confinement because Defendants themselves created the peril that was substantially

certain to result – and indeed resulted -- in their confinement.

389.    H3C's initial December 2012 complaint to the police requesting criminal

prosecution of the Plaintiffs, while revealing the counterfeit nature of the Equipment, was

nonetheless incomplete and misleading in that it did not disclose that the Equipment was sold to

Plaintiffs by H3C's affiliates, the HPFS Defendants, expressly for remarketing purposes as

genuine H3C equipment, and was remarketed by Plaintiffs as such without knowledge of its

counterfeit nature.  H3C and HP China also withheld the exonerating evidence that would have

secured the early release of the Individual Plaintiffs and stonewalled the Chinese authorities'

requests for it.

390.    Defendants' own, belated April 22, 2013 submission to the police was likewise

false and misleading because Defendants deleted and thereby withheld the exonerating evidence

– their own key admissions in the March 2013 Letter -- which, if disclosed, would have led to

the release of the Individual Plaintiffs, and which concealment by the Defendants prolonged the

Individual Plaintiffs' imprisonment and exacerbated their injuries.  Defendants knew that their

letter to the Chinese authorities *needed to be as clear as possible to be effective.*"  The key

admissions made in their March 2013 Letter would have accomplished that purpose; however,

Defendants deliberately mischaracterized or omitted those admissions in their final April 22,

2013 letter as part of their deliberate cover-up campaign.

391.    HP and its top executives Defendants Whitman and Schultz were well aware of

the facts and the Individual Plaintiffs' unjustified imprisonment and impending criminal trial

111

virtually certain to result in their convictions, and with that knowledge they directed the cover-up campaign conducted on behalf of HP, H3C and Defendant HPFS India by Defendants McCarthy and Gibbons P.C., also with full knowledge of or with reckless disregard for the truth and in callous disregard for the Plaintiffs' rights and their "Dickensian plight."

392.    Thus, the imprisonment of the Individual Plaintiffs was unjustified solely due to Defendants' own actions.  Therefore, Individual Plaintiffs are entitled to damages from Defendants regardless of the propriety, validity or legality of the Chinese authorities' actions, which Plaintiffs do not question.  Indeed, the Chinese authorities appeared to have investigated the case quite thoroughly and ultimately did not bring any charges – while the Defendants withheld from the authorities the exonerating evidence that would have secured earlier release of the Individual Plaintiffs.

393.    To the best of their knowledge, the Individual Plaintiffs were never arraigned, never appeared before the judge, and were never charged by the prosecutor, and remained falsely imprisoned for the whole duration of their ordeal without any issuance of process, charging document, or arraignment.  Therefore, their claim for false imprisonment covers the whole period of their confinement.

394.    Moreover, even if, without their knowledge, there occurred in the course of their confinement an equivalent of issuance of process or arraignment, the Defendants withheld critical exonerating evidence from the Chinese authorities, so that the Chinese authorities' decision to issue such a process or arraignment could not have been made in exercise of their informed independent judgment, and therefore does not cut off Defendants' liability for false imprisonment under Massachusetts law.

395.    In the course of their prolonged imprisonment, Individual Plaintiffs suffered

from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental

suffering, loss of consortium, as well as from loss of earnings and employment.

396.    All Defendants are jointly and severally liable to the Individual Plaintiffs for

their injury, in an amount of damages to be determined at trial.

**COUNT X**
**(For Negligence against all Defendants on behalf of**
**Plaintiff ICT, Plaintiff Styller and Individual Plaintiffs)**

397.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through ___

of this Complaint as if set forth in full.

398.    After learning in early 2013 about the Individual Plaintiffs' arrest and

imprisonment for unwittingly reselling counterfeit Equipment supplied by the HPSF

Defendants, the Defendants were under a duty to make a prompt and complete disclosure of true

facts to the police to secure their release, as any reasonable person in these circumstances would

have done.  Indeed, under Massachusetts law, a duty to prevent harm to others arises when one

creates a dangerous situation, whether that dangerous situation was created intentionally or

negligently.

399.    Defendants have utterly failed to carry out that duty.  As alleged in paragraphs

__-___ above, Defendants unreasonably delayed making their submission to the Chinese police

for almost three months until April 22, 2013 while the Individual Plaintiffs languished in jail.

When Defendants did finally make their submission on April 22, 2013, they failed to make a

complete and truthful disclosure of the relevant facts known to them, as a result of which their

submission was woefully inadequate and misleading, and failed to secure the release of the

Individual Plaintiffs.  At the very least, the Defendants were under a duty to provide

exonerating evidence to the Chinese authorities and the Plaintiffs to secure the release of the

Individual Plaintiffs, whose confinement was caused by Defendants' own actions, but they

withheld that information in breach of their duties.

400.    Defendants neglected their duty and exhibited callous disregard for the plight of

the innocent Individual Plaintiffs, whose lives and careers were shattered solely due to

Defendants' own wrongful actions.

401.    Defendants' breaches of duty directly and proximately caused the Plaintiffs'

injuries.  Defendants were aware of the continuing criminal case against the Individual Plaintiffs

but took no actions in order to assist the Individual Plaintiffs to clear their names and terminate

the criminal proceedings against them.  To the contrary, Defendants stonewalled Plaintiffs'

repeated requests for information and assistance necessary to clear the Individual Plaintiffs'

names and terminate the prosecution, withheld the exonerating evidence in their possession, and

blamed the victims themselves.  Defendants' breach of duty was thus continuing, and the

Individual Plaintiffs continued to suffer the stigma of criminal prosecution, loss of face, mental

anguish, loss of employment and loss of earnings until late 2015-early 2016, when they received

the "no criminal record" letters from the Chinese authorities.

402.    Because of the Defendants' breach of duty to make complete, honest and prompt

disclosure to the Chinese authorities, Plaintiff ICT also incurred additional costs and expenses

when its senior executives, including its CEO Plaintiff Styller, were compelled to expend

significant amounts of their time and resources, including in legal expenses, in frantic efforts to

secure the release of the Individual Plaintiffs, and to clear their names after the release.

Plaintiff Styller also suffered personal injuries as a result of Defendants' negligence.

403.   As a direct and proximate result of Defendants' negligence, these Plaintiffs suffered their respective injuries as alleged herein.

404.   Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial.

## COUNT XI
**(For Civil Conspiracy against all Defendants on behalf of all Plaintiffs)**

405.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

406.   All Defendants – successors, subsidiaries, top executives and in-house and outside counsel of the former HP -- acted in concert and unison to commit tortious acts against Plaintiffs as alleged herein.

407.   The HPFS Defendants through their senior executives and managers, including Defendant Gill, negotiated the transaction and/or executed the relevant contractual documents, falsely representing the Equipment as genuine H3C equipment and concealing its counterfeit nature from Plaintiffs.

408.   The HPFS Defendants then sold the Equipment to Plaintiffs pursuant to those contracts, likewise without disclosing its counterfeit nature.

409.   All Defendants then collaborated on facilitating the frame job and the cover-up scheme against the Plaintiffs, as alleged in detail herein.

410.   Thus, each of the Defendants took affirmative steps as alleged herein in concert with the others, with common purpose and/or effect.  Indeed, had *any* of the Defendants told the truth, Plaintiffs' injuries would not have occurred to the extent that they did, or at all.

411.   Moreover, Defendants prevented their other representatives – Messrs. Silvestri, O'Grady, and Bartley, among others – from communicating directly with the Plaintiffs as a

matter of "big company policy," and instead "funnel[ed] . . . [these] significant risk issues . . . to a group of highly experienced senior managers" – Defendants Whitman, Schultz, McCarthy and Gill, all willing and active executioners of Defendants' civil conspiracy to commit tort.

412.   As a direct and proximate result of Defendants' civil conspiracy, all Plaintiffs suffered their respective injuries as alleged herein.  Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial.

<u>**COUNT XII**</u>
**(For intentional infliction of mental anguish and emotional distress
on behalf of Individual Plaintiffs, Plaintiff Styller and the Family Plaintiffs)**

413.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __ of this Complaint as if set forth in full.

414.   Defendants' concerted misconduct as alleged herein – their initial crime-fraud, the frame job, and the cover-up -- was egregious and outrageous, beyond all possible bounds of decency, in extreme bad faith and utterly intolerable in a civilized society.

415.   Defendants' misconduct was the direct and proximate cause of the Individual Plaintiffs', Plaintiff Styller's and the Family Plaintiffs' mental and emotional distress.  The mental and emotional distress sustained by these Plaintiffs, who had to endure Defendants' misconduct for the last three years, was severe and of the nature that no reasonable person could be expected to endure.

416.   Defendants intended to inflict mental and emotional distress on these Plaintiffs, or knew, or should have known, that their conduct would likely result in these Plaintiffs' mental and emotional distress, but proceeded nevertheless without any justification or privilege.

417.   As a direct and proximate result of Defendants' egregious and callous misconduct, the Individual Plaintiffs, Plaintiff Styller and the Family Plaintiffs suffered their

respective injuries as alleged herein.  Defendants are jointly and severally liable to these

Plaintiffs for their damages in an amount to be determined at trial.

**COUNT XIII**
**(For loss of consortium on behalf of**
**Plaintiffs Jade Cheng and Caroline Marafao Cheng)**

418.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through __

of this Complaint as if set forth in full.

419.    At the time of Plaintiff Cheng's arrest and imprisonment, he was legally married

to Plaintiff Caroline Marafao Cheng, a citizen of Brazil.  Jade and Caroline were married on

December 17, 2009 in Sao Paulo, Brazil, and moved to China prior to the events at issue.

420.    Plaintiff Cheng was not allowed any family visits during his confinement, and

was not able to see his wife for seven months, suffering from the loss of his spouse's society,

affection, companionship, comfort, and relations.

421.    During the same period Plaintiff Marafao Cheng endured the same loss of her

spouse's society, affection, companionship, comfort, and relations.  Plaintiff Marafao Cheng,

who did not speak any Chinese, stayed with Plaintiff Cheng's parents, who did not speak any

English or Portuguese, during the whole ordeal while all of them desperately tried to rescue

Plaintiff Cheng and his associates Plaintiffs Yu and Yuyi, Plaintiff Marafao Cheng's suffering

compounded by her inability to communicate with Plaintiff Cheng's family during those critical

times.

422.    For a while, Plaintiff Marafao Cheng tried to keep the news of her husband's

arrest hidden from her Brazilian family in order to save face.  When Plaintiff Cheng missed

major holidays or family events during his imprisonment – Christmas, New Year, Chinese

Lunar New Year, birthdays, weddings – Plaintiff Marafao Cheng would explain to her family

117

that he was out on ICT's business.  But by April 2013, when his long absence was no longer

possible to explain away, Plaintiff Marafao shared the news with her parents, who were shocked

and immediately applied for visas in the Chinese embassy in Brazil, asked their employers for

an unscheduled vacation to be able to come to Beijing to assist Plaintiffs the best they could,

and rushed to China to assist, all on their own expense.

423.    All Defendants knew or recklessly disregarded the fact that the Individual

Plaintiffs' families, including Plaintiff Cheng's spouse, were deeply involved in their loved

ones' terrible plight and themselves suffered from Defendants' misconduct, but carried out their

nefarious scheme regardless.

424.    As a direct and proximate result of Defendants' egregious and callous

misconduct, Plaintiffs Cheng and his spouse Plaintiff Caroline Marafao Cheng suffered from

the loss of consortium.  Defendants are jointly and severally liable to these Plaintiffs for their

damages in an amount to be determined at trial.

## V.    Prayer for Relief and Jury Demand

WHEREFORE, Plaintiffs respectfully request:

A.  Compensatory and consequential damages in an amount to be determined at trial for

   losses incurred by Plaintiffs, and other monetary damages in an amount to be determined

   at trial but in any event well in excess of the $75,000 jurisdictional amount;

B.  Treble damages for willful or intentional violations of Section 11 of MGL 93A, and/or

   exemplary damages in light of Defendants' egregious concerted misconduct;

C.  Interest on those damages;

D.  Reasonable attorneys' fees and costs incurred by Plaintiffs in pursuit of this action; and

E.  Such other relief as is just, fair and equitable; and

    F.  A jury trial on all counts.

January __, 2017

                                            Respectfully Submitted,

                                            DRAFT
                                            _____
                                            Dimitry Joffe
                                            (admitted *pro hac vice*)
                                            Joffe Law P.C.
                                            230 Park Avenue, 10th Floor
                                            New York, NY 10169
                                            Tel: (212) 309-8711
                                            Email: dimitry@joffe.law

                                            *Counsel for the Plaintiffs*