# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI AND CATHY YU<br><br>Plaintiffs,<br><br>vs.<br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED<br><br>Defendants. | Civil Action No. 1:16-CV-10386 (LTS)<br><br><br><br>Leave to file extended opposition brief granted on February 21, 2017 |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT .................................................................... 1

PROCEDURAL HISTORY............................................................................ 2

STATEMENT OF FACTS ............................................................................ 4

    Newly Added Plaintiffs........................................................................... 5

    The Transaction and Arrests ................................................................. 6

    The Cover-Up Scheme Theory .............................................................. 8

    Allegations Against New Defendants .................................................. 10

LEGAL ARGUMENT ................................................................................ 12

    I.    Leave To Amend Should Be Denied For Futility............................... 12

    A.    The Proposed Amendment Is Futile In That It Fails To State A Cause Of Action Against The New Defendants ......................................................... 12

        1.    Plaintiffs Fail To Provide Any Actionable Claims Against New Defendants ........................................................................ 13

        2.    The Allegations Against G. Daniel McCarthy And Gibbons P.C. Are Barred By Massachusetts' Absolute Litigation Privilege ................. 15

        3.    The Proposed Pleading Does Not Even Attempt To Tie Newly Added Defendants To The Negligence Claims ........................................ 17

        4.    The Proposed SAC Does Not State A Claim For False Imprisonment .................................................................... 17

            i.    Intent is missing ........................................................... 17

            ii.    The false imprisonment claim is too attenuated ........................... 19

            iii.    The Act of State Doctrine bars the claim.................................... 20

        5.    The Pleading Is Premised On An Implausible Theory Of The Case ........ 20

    B.    The Proposed Amendment Does Not Relate Back to the Original Pleading........ 22

    C.    All Claims By And Against The Newly Added Defendants Fall Outside The Relevant Limitations Periods......................................................... 26

Table of Contents (continued)

Page

1.  Fraud and Negligence-based Claims ........................................................ 26

2.  False Imprisonment Claim ....................................................................... 29

3.  Breach of Warranty Claim ....................................................................... 29

II.  Leave To Amend Should Be Denied for Undue Delay ........................................ 30

III.  Plaintiffs' Motion For Leave Is Filed In Bad Faith, Improper Purpose, And
     To Cause Prejudice To Defendants ............................................................ 31

A.  The SAC Was Filed In Bad Faith And For Improper Purpose ............................ 32

B.  The SAC Fails To Cure Identified Deficiencies In Prior Pleadings .................... 34

CONCLUSION ...................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Abdallah v. Bain Capital LLC,
   752 F.3d 114 (1st Cir. 2014) ...................................................................................28

Albrecht v. Clifford,
   767 N.E.2d 42 (Mass. 2002) ...............................................................................27, 28

Am. Glue & Resin, Inc. v. Air Prod. & Chemicals, Inc.,
   835 F. Supp. 36 (D. Mass. 1993) .............................................................................30

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ...........................................................................................18, 21

Banco Nacional de Cuba v. Sabbatino,
   376 U.S. 398 (1964) .................................................................................................20

Calderon-Serra v. Wilmington Trust Co.,
   715 F.3d 14 (1st Cir. 2013) .....................................................................................32

Cambridge Plating Co. v. Napco, Inc.,
   991 F.2d 21 (1st Cir. 1993) .....................................................................................27

Doe v. Nutter, McClennen & Fish,
   668 N.E.2d 1329 (Mass. App. Ct. 1996) ......................................................15, 16, 33

Foman v. Davis,
   371 U.S. 178 (1962) .................................................................................................32

United States ex. Rel. Gagne v. City of Worcester,
   565 F.3d 40 (1st Cir. 2009) ................................................................................12, 34

United States ex rel. Ge v. Takeda Pharm. Co.,
   737 F.3d 116 (1st Cir. 2013) ...................................................................................13

Harrington v. City of Nashua,
   610 F.3d 24 (1st Cir. 2010) .....................................................................................29

Hochen v. Bobst Grp., Inc.,
   198 F.R.D. 11 (D. Mass. 2000), aff'd sub nom. Nyer v. Winterthur Int'l, 290
   F.3d 456 (1st Cir. 2002) ...........................................................................................33

United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,
   360 F.3d 220 (1st Cir. 2004) ...................................................................................13

Krupski v. Costa Crociere S. p. A.,
    560 U.S. 538 (2010)............................................................25

Leonard v. Parry,
    219 F.3d 25 (1st Cir. 2000)........................................24, 25

Lucia v. City of Peabody,
    971 F. Supp. 2d 153 (D. Mass. 2013) ...................................18

Lund v. Henderson,
    22 F. Supp. 3d 94, 104 (D. Mass. 2014) ...............................18

Mass. Hous. Opportunities Corp. v. Whitman & Bingham Assoc., P.C.,
    983 N.E.2d 734 (Mass. App. Ct. 2013) .................................27

Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,
    412 F.3d 215 (1st Cir. 2005)...............................................28

McEneaney v. Chestnut Hill Realty Corp.,
    650 N.E.2d 93 (Mass. App. Ct. 1995) ...................................27

Meltzer v. Grant,
    193 F. Supp. 2d 373 (D. Mass. 2002) 80 ...............................16

Miller v. Home Depot USA, Inc.,
    949 N.E.2d 948 (Mass. App. Ct. 2011) .................................29

Nocula v. UGS Corp.,
    520 F.3d 719 (7th Cir. 2008) ..............................................21

O'Rourke v. Jason Inc.,
    978 F. Supp. 41 (D. Mass. 1997) ....................................27, 28

Okoli v. Okoli,
    963 N.E.2d 737 (Mass. App. Ct. 2012) .................................27

Pagliuca v. City of Boston,
    626 N.E.2d 625 (Mass. Ct. App. 1994) .................................27

Sarvis v. Boston Safe Deposit & Trust Co.,
    711 N.E.2d 911 (Mass. App. Ct. 1999) .................................20

Siebe, Inc. v. Louis M. Gerson Co.,
    908 N.E.2d 819 (Mass. App. Ct. 2009) .................................30

Sriberg v. Raymond,
    345 N.E.2d 882 (Mass. 1976) .............................................16

Taygeta Corp. v. Varian Assocs., Inc.,
   436 Mass. 217 (2002) ...........................................................................27

Taygeta Corp. v. Varian Assocs., Inc.,
   763 N.E.2d 1053 (Mass. 2002) ..............................................................28

Timberlane Lumber Co. v. Bank of Am.,
   549 F.2d 597 (9th Cir. 1977) .................................................................21

United States v. Bestfoods,
   524 U.S. 51 (1998)...........................................................................19, 22

Hagerty ex rel. United States v. Cyberonics, Inc.,
   844 F.3d 26 (1st Cir. 2016)....................................................................30

**Statutes**

Mass. Gen. Laws, ch. 106 § 2-313(1)(b) ......................................................30

Mass. Gen. Laws, ch. 106 § 2-725 ...............................................................30

Mass. Gen. Laws, ch. 106 § 2-725(2) ...........................................................30

Mass. Gen. Laws, ch. 260 § 2 ......................................................................30

Mass. Gen. Laws ch. 260, § 4 .....................................................................29

**Other Authorities**

1 W. Fletcher,
   Cyclopedia of Law of Private Corporations § 33, p. 568 (rev. ed. 1990)..............................19

**Rules**

Fed. R. Civ. P. 8 ................................................................................3, 34

Fed. R. Civ. P. 9(b) .......................................................................... *passim*

Fed. R. Civ. P. 11 ...................................................................................4

Fed. R. Civ. P. 11(b) ...............................................................................33

Fed. R. Civ. P. 11(b)(1)............................................................................33

Fed. R. Civ. P. 15 ...................................................................................25

Fed. R. Civ. P. 15(a)(1)............................................................................24

Fed. R. Civ. P. 15(c)(1)(B) ....................................................................23, 24

Fed. R. Civ. P. 15(c)(1)(C) ...............................................................................1, 23, 24, 26

Fed. R. Civ. P. 15(c)(1)(C)(i)..............................................................................................25

Fed. R. Civ. P. 15(c)(1)(C)(ii)............................................................................................25

Local Rule 7.1(b) .........................................................................................3, 22, 32

Local Rule 7.1(b)(1) .......................................................................................................3

Local Rule 15.1(a) ......................................................................................................31

Local Rule 15.1(b) ..............................................................................................22, 32

Rule 4(m) .......................................................................................................23, 24, 25

## PRELIMINARY STATEMENT

The proposed Second Amended Complaint ("**SAC**") seeks to add eight new plaintiffs, most of whom are Chinese citizens, while also adding seven new defendants, including parent corporations, senior officers of parent corporations and defense counsel.

While leave to amend a pleading can be liberally granted, it is well settled that leave can be denied where, as here, the proposed amendment would be futile, there was undue delay, the motion was filed in bad faith or with dilatory motive, there is undue prejudice to the opposing parties, and the motion reflects a repeated failure to cure deficiencies.

The proposed SAC is futile for several reasons – it does not state fraud with specificity against newly added defendants; it fails to allege any predicate facts as against certain of the newly added defendants to justify assertion of *any* cause of action against them; it fails to state a cognizable claim against the outside attorney and his law firm pursuant to the Massachusetts absolute litigation privilege; and it conjures a fantastic tale of a global conspiracy and cover-up that cannot pass the plausibility test mandated by the United States Supreme Court.  Moreover, the claims asserted do not relate back to the original action because Plaintiffs have not established the elements of Fed. R. Civ. P. 15(c)(1)(C) in naming new parties; and the relevant statutes of limitation have passed on all of the claims by and against the new parties, rendering them futile.

Plaintiffs make no attempt to justify their undue delay in filing the proposed SAC now -- more than four years after their last notice of the events and alleged injuries in question, and more than a year after the action was initially filed.  All the new plaintiffs and defendants have been known since the inception of the matter, and their alleged injuries have been known to them for years.  The proposed SAC also fails in that it was filed in bad faith and for improper motive; and it fails to cure prior deficiencies.

1

For each of these reasons, Plaintiffs' motion should be denied.

## PROCEDURAL HISTORY

On December 9, 2015, Plaintiffs Integrated Communications & Technologies, Inc. ("**ICT**") and three individuals Jade Cheng, Jason Yuyi and Cathy Yu ("**Individual Plaintiffs**") filed their 16-page Complaint in Massachusetts state court against Hewlett-Packard Financial Services Company ("**HPFS**") and Hewlett-Packard Financial Services (India) Private Limited ("**HPFS (India)**") (collectively, the "**HPFS Defendants**"), alleging fraudulent and negligent misrepresentation, breach of contract against HPFS (India), breach of warranty, breach of Massachusetts General Laws, Chap. 93A, and False Arrest/Imprisonment.  HPFS removed the matter to this Court on February 23, 2016.  [ECF Doc. No. 1].

On March 31, 2016, HPFS moved to dismiss on several grounds [ECF Doc. No. 20], and the Court heard oral argument on July 8, 2016.  Preliminarily concluding that Plaintiffs had failed to plead the majority of their claims in accordance with Fed. R. Civ. P. 9(b), and expressing concern that the false arrest/false imprisonment claim was "attenuated" and may be barred by the Act of State Doctrine, the Court nonetheless granted Plaintiffs' oral motion for leave to amend and, thus, deemed the motion to dismiss moot.  July 8, 2016 transcript at 66:13-23, 68:13-69:9, 71:16-72:14, 75:1-7.

On July 18, 2016, Plaintiffs filed their 41-page Amended Complaint [ECF Doc. No. 41], adding claims for fraudulent inducement, negligence, and civil conspiracy.  The Amended Complaint was materially deficient, forcing HPFS to again move to dismiss on August 18, 2016.[1]  [ECF Doc. No. 47].  On October 5, 2016, HPFS (India) filed a separate motion to dismiss

---

[1] The grounds for dismissal were as follows: (a) Act of State Doctrine mandated dismissal; (b) the Individual Plaintiffs failed to state a claim for false imprisonment and fraudulent and negligent misrepresentation; (c) the Individual Plaintiffs failed to plead with particularity; (d) HPFS did not owe a duty to the Individual Plaintiffs; (e)

the Amended Complaint [ECF Doc. No. 58], adopting many of the arguments made by HPFS, and separately arguing the application of a mandatory and exclusive forum selection clause in the agreement that governed the sale of the subject computer equipment.

On January 4, 2017, Plaintiffs moved for leave to file a Second Amended Complaint [ECF Doc. No. 64], based on the same factual scenario as in the earlier pleadings, but setting out a radical new theory of the case -- premised on a convoluted "zugzwang" conjecture rooted in a conspiracy theory of global dimensions.   The germ of this new theory was that a host of new defendants were caught between a rock and a hard place by application of Chinese and Indian law, and that they conceived a convoluted fraud/cover-up ranging across several years and continents.   The story and the theory hinge wholly on two affidavits — one from Vivek Mapara on Indian law and the second from Ma Li on Chinese law — neither of which was included with Plaintiffs' motion.   In addition to the multiple new defendants, Plaintiffs also sought to add a host of new plaintiffs (without explanation) and a number of new claims, including fraud, intentional infliction of mental anguish/emotional distress, and loss of consortium.

On January 13, 2017, the Court dismissed Plaintiffs' motion for leave to file a Second Amended Complaint *sua sponte* [ECF Doc. No. 67], identifying numerous deficiencies in Plaintiffs' motion, supporting brief, and proposed Second Amended Complaint.[2]   The Court also expressed concern about Plaintiffs' compliance with Fed. R. Civ. P. 8, and with the viability of fraud claims against newly added defendants – warning that any party bringing fraud claims that

---

Individual Plaintiffs could only recover damages for their confinement through a claim for malicious prosecution; and (f) consequential damages were not available on Plaintiffs' breach of warranty claim.  [ECF Doc. No. 47].

[2] Among other things, the Court found that the motion for leave to amend had been filed without a supporting memorandum, in violation of Local Rule 7.1(b).  In so doing, the Court may have been referring in part to the fact that the motion was filed without supporting documentary evidence (e.g., the two previously referenced affidavits on which the "zugzwang" theory wholly relies).   That defect is rooted in Local Rule 7.1(b)(1), which instructs that "[a]ffidavits and other documents setting forth or evidencing facts on which the motion is based shall be filed with the motion" -- an issue presented to the Court by the HPFS Defendants in a January 6, 2017 letter. [ECF Doc. No. 65].

patently fail to comply with FRCP 9(b) risk being sanctioned pursuant to FRCP 11.  On January 18, 2017, Plaintiffs moved for reconsideration.  [ECF Doc. No. 68].

On January 24, 2017, the Court entered an order (i) denying in part and allowing in part, HPFS' motion to dismiss the First Amended Complaint, (ii) denying without prejudice HPFS (India)'s motion to dismiss, (iii) denying Plaintiffs' motion for reconsideration, and (iv) granting Plaintiffs permission to file a motion for leave to amend with a proposed pleading.  [ECF Doc. No. 69].  The Court did not address several of the arguments advanced by HPFS and HPFS (India) on their respective motions to dismiss, instead inviting them to renew these arguments if the Plaintiffs elected not to file a motion for leave to amend.  [ECF Doc. No. 69].

On February 8, 2017, Plaintiffs filed the instant motion for leave to file a Second Amended Complaint [ECF Doc. No. 79], attaching a proposed Second Amended Complaint that is identical to the one rejected by the Court in its January 13, 2017 Order.  As before, their theory relies wholly on two affidavits that they failed to include with the motion.  In both form and substance, Plaintiffs failed to address the concerns raised by the Court in its January 13, 2017 *sua sponte* order, or redress the deficiencies in the earlier motion.

## STATEMENT OF FACTS

In light of the fact that, through prior motions to dismiss, the Court is familiar with the transaction underlying this dispute (involving used computer equipment that was sold in India, transported to China for re-sale, and seized by the Chinese authorities as allegedly counterfeit), this brief shall summarize the history of the transaction and subsequent events, while focusing primarily on the deficiency and futility of the "new" theories/claims by and against the newly added parties in the proposed 119-page Second Amended Complaint ("**SAC**").

*Newly Added Plaintiffs*

The SAC seeks to add eight new Plaintiffs to the case.[3]   The brief in support of the motion for leave to file the SAC attempts to explain that these eight new Plaintiffs could not have asserted any claims previously because the Amended Complaint sounded in "negligence" and would not have supported the newly added Plaintiffs' "intentional tort" claims (presumably, this inability to sue precluded claims against the *existing HPFS Defendants* as well as the newly added Defendants).   See Moving Brief at p. 6 [ECF Doc. No. 79-1].   But the newly added Plaintiffs must have been known to Plaintiffs' counsel *ab initio*.   No legal or factual substantive justification is given as to why they first appear now, more than a year after the suit began, more than four years after the subject arrests and seizure, and more than five years after the underlying transaction took place – and well outside the statute of limitations window for all of the new claims asserted.

Nonetheless, ICT and the Individual Plaintiffs (all of whom are **existing** Plaintiffs) are now joined by the ***newly added*** Mr. Styller and the ***newly added*** family members of the Individual Plaintiffs now seeking to hold the **existing** HPFS Defendants jointly and severally liable for the previously alleged "2011 fraud and the related causes of action, and ***all Defendants*** [***including those newly added***][4] jointly and severally liable for the 2013-2016 fraudulent frame job, cover-up and the related causes of action."   See SAC at ¶ 31.

---

[3] Plaintiffs are:
- Existing Plaintiff ICT.
- Existing Individual Plaintiffs.   The proposed SAC reveals that existing Individual Plaintiff Cheng, a supervisor of the other Individual Plaintiffs, is now a permanent resident of the United States, and notably that *he was given back the seized equipment on his release from bail in September of 2014, and it is still in his custody and control (in China)*.   SAC ¶279.
- **The newly added Alexander Styller**, CEO and owner of ICT.
- **Seven newly added** family members of the Individuals Plaintiffs ("**Family Member Plaintiffs**").

[4] The **newly added Defendants**, who along with the HPFS Defendants comprise "***all Defendants***" are :
- **HP Inc.**

_The Transaction and Arrests_

As did the Amended Complaint, the proposed SAC alleges the history of the transaction between HPFS (India) and ICT.  In summary, the proposed SAC alleges that HPFS (India) sold used equipment in India to ICT's broker.  To accommodate the various parts of the deal, the parties entered into two separate agreements, both dated December 6, 2011: (a) a Wholesale Sale Agreement ("WSA") between HPFS (India) and ICT's Indian broker, Shinto Creative Elements Private Limited ("Shinto"); and (b) a Referral and Revenue Share Agreement ("RRSA") between ICT itself and HPFS (India).  See SAC ¶¶ 73-76.  The WSA and the RRSA are already in the record. [ECF Doc. Nos. 21-1 & 21-2].

The proposed SAC alleges that Shinto took delivery of this first batch of equipment on in December of 2011 (SAC ¶¶ 73 & 84), and arranged for some or all of the equipment to be shipped to Hong Kong and, ultimately, to mainland China where, allegedly, it was found to be not marketable as anticipated.  See SAC ¶ 85.  Plaintiffs allege that HPFS (India) led ICT to believe the equipment was in essentially like-new condition, but that this would later prove to be untrue in that it was largely substandard condition/scrap-grade equipment.  See SAC ¶¶ 85-87. Indeed, Plaintiffs affirmatively and unequivocally allege that the equipment was **counterfeit when sold** to ICT by HPFS (India), the sale of this equipment constituted a "crime fraud," and that because HPFS and HPFS (India) allegedly failed to disclose that the equipment was counterfeit, ICT presumed it was genuine.  See, e.g., SAC page 20 (subheading characterizing the equipment sale as "The Initial-Crime Fraud"); ¶¶ 82, 89, 286.

---

- **HP Enterprise Company.**
- **Margaret Cushing "Meg" Whitman,** HP's CEO, President and Chairman.
- **John Schultz,** HP's  General Counsel, Executive Vice President, and Corporate Secretary.
- HPFS Assistant General Counsel and Assistant Secretary, **David Gill**.
- Former HPFS General Counsel, and current outside counsel, **G. Daniel McCarthy**.
- Outside counsel **Gibbons P.C.**

Allegedly acting solely on a tip from representatives of ***non-party H3C*** (the independent China-based manufacturer and marketer of computer equipment, owned by Hewlett-Packard Company ("**HP**")), the Chinese police arrested the Chinese Individual Plaintiffs for marketing counterfeit equipment, and the equipment was seized.  Id. at ¶¶ 90-93.  Specifically, the proposed SAC alleges that, on December 7, 2012, representatives of H3C lodged a complaint with the local police accusing the Individual Plaintiffs of marketing counterfeit H3C products because the transceivers contained counterfeit H3C trademark logos; but the complainants made no mention that the Equipment had been sold to ICT by another Hewlett Packard entity as genuine H3C equipment.  Id. at ¶ 92.  H3C then allegedly made a second statement to the Chinese authorities on December 9, 2012, again accusing the existing Plaintiffs of selling counterfeit products and requesting that the authorities seize the counterfeit equipment and criminally prosecute the responsible individuals. Id. at ¶ 93.   Consequently, it is alleged that, on December 9, 2012, the police raided ICT's offices, seized the remaining 778 transceivers, and arrested the Individual Plaintiffs – who allegedly tried to explain to the police that they were selling the equipment sold by HPFS (India) to ICT as genuine H3C Equipment. Id. at ¶¶ 93, 98, 99, 104.  Nonetheless, on January 10, 2013, the Chinese police allegedly recorded a conversation with a H3C representative who disavowed knowledge of any such sale or contract. Id. at ¶ 105.

There is no allegation that any of the existing HPFS Defendants or any of the newly added Defendants were aware of the arrests or seizure when they occurred -- or that they even knew of H3C's alleged complaint to the police.  Instead, Plaintiffs allege that, weeks after the arrest ("in January 2013"), ICT and newly added Plaintiff Styller "brought their concerns" to the HPFS Defendants. Id. at ¶ 111.  The first specific allegation is that on January 31, 2013 (**nearly two months after the arrest),** ICT representative Ryan Quinn sent an email to James Silvestri of

HPFS explaining the situation, and asking the HPFS Defendants to submit a formal letter to the Chinese authorities to assist in convincing the authorities that the seized equipment was the same equipment sold to Shinto/ICT in India. Id. at ¶ 113.

*The Cover-Up Scheme Theory*

The sequence of events that followed is also familiar to the Court.  The proposed SAC alleges that on February 14, 2013, Mr. Silvestri indicated that the HP legal team would provide a formal letter stating the following: "Details of all equipment purchased by ICT from HPFS; Confirming that based on our sampling some of the assets seized are within this list; *and to the extent any of the assets seized were supplied by HPFS, we do not believe that ICT should be held responsible if they are counterfeit.*" Id. at ¶ 116 (emphasis added).  Notably, there is no allegation that the HPFS Defendants expressly promised to represent to the Chinese authorities that the seized equipment definitively was supplied by the HPFS Defendants, or that they were counterfeit.

A *draft* letter that used language more expansive than Mr. Silvestri's February 14 email was circulated for discussion and input, but when the letter was finally submitted to the authorities by HPFS (India), that final version differed from earlier drafts.  Id. at ¶¶ 164-180. Essentially, the final letter more closely tracked Mr. Silvestri's February 14 email, recounted the events that had occurred, acknowledged the sale of equipment to ICT, and noted the apparent similarity between what was sold in India and what was seized in China. Id. at ¶¶ 138, 179-180; ECF Doc. No. 22-4.  Stressing that it had a pending request in to the Chinese authorities to examine all of the equipment and verify its bona fides, HPFS (India) stated in the letter that "[b]ased on the available evidence, HPFS India suspects that the [SIC] part of the seized equipment, the information on which was obtained from the police, might be the same equipment

that HPFS (through Shinto) sold to ICT" and that ICT was entirely reasonable in assuming the "sold equipment is original H3C equipment." See ECF Doc. No. 22-4, p. 3.

In the two earlier versions of their pleading, Plaintiffs asserted fraud-based causes of action based on the distinction between the draft letter and the final version of the letter submitted to the Chinese authorities.  Now, in their proposed SAC, Plaintiffs allege that the final letter and all subsequent events establish a cover-up scheme based on a "zugzwang" conspiracy. This contrived theory is premised on numerous conclusory assertions.  For example, one key element is Plaintiffs' conclusory assertion that the edits made to the draft letter shared with Plaintiffs were the sole reason that the Individual Plaintiffs remained imprisoned; that if the draft letter was submitted unaltered (without regard to the truth of its contents), that would have secured the release of the Individual Plaintiffs. See, e.g., SAC ¶ 358 ("The scheme continued with the Defendants' secret substitution of their letter to the Chinese authorities **whereby Defendants deleted their key admissions that would have resulted in the Individual Plaintiffs' release . . .**") (emphasis added), ¶ 360 ("Defendants thus withheld exonerating evidence **that would have secured the release of the Individual Plaintiffs. . .**") (emphasis added).[5]

The entire "zugzwang" theory is summarized at paragraph 15 of the proposed SAC:

> Accordingly, from the very beginning of the Individual Plaintiffs' ordeal, **Defendants** knew that the Individual Plaintiffs were absolutely innocent under either scenario but could not disclose the exonerating evidence in their possession **without placing themselves in criminal jeopardy either in India (if the Equipment was counterfeit) or in China (if it was genuine)**. And so Defendants and their Chinese affiliates decided to conceal and withhold that exculpatory evidence, to stonewall the police's

---

[5] Not only is this wholly conclusory and baseless, it is contradicted by representations made elsewhere in the pleading. See, e.g., id. at ¶ 186 (alleging that all Defendants "failed to make a complete, honest and timely disclosure to the Chinese authorities that **could have** effectively led to the Individual Plaintiffs' release") (emphasis added).

> and Plaintiffs' requests for it, to sacrifice the innocent victims of their own fraud, and to use them as scapegoats for their own crimes.

SAC at ¶ 15 (emphasis added).

This contrived theory, running 119 pages, is Plaintiffs' sole basis for joining newly added Plaintiffs who could have been parties *ab initio*, and for joining newly added Defendants who could not have foreseen being sued here; against whom no actionable misconduct is alleged; about whom no specificity is provided to justify fraud claims; and against whom no cause of action can survive under governing law (all on a theory grounded in affidavits that do not accompany the motion). Id. at ¶¶ 13-14.

### ***Allegations Against New Defendants***

The only specific allegations as against **Ms. Whitman** are that that ICT's CEO, Mr. Styller, sent her a letter in June of 2013; that she did not respond to Mr. Styller's letter; and that she was quoted in HP's 2013 Annual Report about wanting the company to be known for "ethical leadership." SAC at ¶¶ 19-22 and ¶¶ 207-211. Beyond that, there are only conclusory statements, unsubstantiated allusions, and vague references to Ms. Whitman's general "awareness" and tacit approval of the alleged "cover-up scheme" See, e.g., id. at ¶ 25.

As for **Mr. Schultz**, the General Counsel of Hewlett Packard during the relevant time period, the allegations are that he was copied on Mr. Styller's June, 2013 letter to Ms. Whitman (SAC at ¶ 19); he got a separate letter from Mr. Riordan, ICT's counsel, to which he responded with phone call and voicemail saying he would have someone from his team look into the matter (id. at ¶¶ 210-11) (which he apparently did); that he hired outside counsel to act on his company's behalf (id. at ¶368); and that, like Ms. Whitman, he was generally aware of, and directed or acquiesced in the alleged "cover-up scheme." Id. at ¶ 370.

The allegations regarding **Mr. McCarthy** allude to the fact that he served as in-house counsel for Defendant HPFS until March of 2013, thereafter joining the Gibbons P.C. law firm (SAC at ¶¶ 24, 233).  Plaintiffs also allege that, during his time as HPFS general counsel, David Gill "reported directly or indirectly" to Mr. McCarthy (see, e.g., id. at ¶¶ 54, 157, 366), but they make no specific allegation that, at any time before he left HPFS, Mr. McCarthy was aware of or privy to Gill's communications with ICT or the events developing in China.[6]  The proposed SAC quotes an interview given by Mr. McCarthy in May of 2013 where he referenced a risk management system that he had implemented while at HPFS (id. at ¶¶ 57, 233).

The first "act" alleged against Mr. McCarthy occurred five months after he left HPFS, when he sent a letter to ICT's counsel on August 26, 2013 (id. at ¶ 239) (the start of a "year-long correspondence" as outside counsel (id. at ¶ 240)), allegedly in furtherance of the supposed "cover-up scheme."  Crucially, however, Mr. McCarthy's August, 2013 letter was in response to ICT's counsel's demand letter of August 8, 2013 (id. at ¶ 239), which ended with the threat: "If you have something constructive to offer, I will certainly listen.  If you are uninterested, action will follow." Id. at ¶ 229 (emphasis added).

While Plaintiffs parse through the language of Mr. McCarthy's various letters, all the allegations confirm the fact that his role was that of outside legal counsel representing a client in response to the threat of legal action: namely, communications preliminary to litigation.  The allegations against **Gibbons P.C.** are all premised on the fact that Mr. McCarthy joined the law firm in March of 2013, and are rooted in the actions allegedly taken by him in his capacity as

---

[6] At paragraph 366 of the proposed SAC, Plaintiffs allege that David Gill reported to Mr. McCarthy up until March of 2013, but they do not allege that Gill reported the Chinese incident to Mr. McCarthy before he left HPFS to join Gibbons PC.  Instead, without reference to any particular time period (whether before he left HPFS or after he became involved in the correspondence as outside counsel), Plaintiffs generally and conclusorily allege that Mr. McCarthy was aware of the scheme.  SAC at ¶ 366.  See also id. at ¶ 233 (the conclusory statement that Mr. McCarthy "was no doubt aware of the Chinese situation while still at HPFS").

outside counsel to the corporate defendants after he became associated with the firm.  See, e.g., SAC at ¶¶ 24, 232.

It is unclear what factual allegations or charges are being laid against newly added Defendants **HP Inc.** and **Hewlett Packard Enterprise Company**, other than they are both corporate entities resulting from the split of HP, the parent entity of which defendants HPFS and HPFS (India) were subsidiaries.  See, e.g., id. at ¶ 50.  Other than being held responsible for Ms. Whitman's *zero* role and Mr. Schultz's *next-to-zero* role in events covered by the 119-page proposed SAC, HP and its successor entities are not specifically alleged to have done anything.

## LEGAL ARGUMENT

I.    **Leave To Amend Should Be Denied For Futility**

It is well settled that, while the Federal Rules of Civil Procedure generally are liberal in allowing amendments to pleadings, there are several well accepted reasons for denying leave, including "undue delay in filing the motion, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing parties and futility of amendment."  United States ex. Rel. Gagne v. City of Worcester, 565 F.3d 40, 48 (1st Cir. 2009).

A.    **The Proposed Amendment Is Futile In That It Fails To State A Cause Of Action Against The New Defendants**

The proposed SAC is futile in that it is entirely bereft of substantive allegations against newly added Defendants Margaret Cushing "Meg" Whitman, John Schultz, HP Inc., Hewlett Packard Enterprise Company; and the improper fraud-based claims against these new parties are completely devoid of the requisite specificity for the causes of action pled.  Further, all the claims against newly added Defendants Gibbons P.C. and G. Daniel McCarthy are barred by Massachusetts' absolute litigation privilege.

1.      ***Plaintiffs Fail To Provide Any Actionable Claims Against New Defendants***

The new claims are almost entirely rooted in fraud.  For a fraud claim to survive in federal court, the allegations must comply with FRCP 9(b), which requires "the circumstances constituting fraud or mistake [to] be stated with particularity."  In the First Circuit, pleading fraud with particularity requires the plaintiff to "specify the time, place, and content of the alleged false or fraudulent representations."  United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226 (1st Cir. 2004).  In other words, Rule 9(b) requires "the who, what, when, where, and how" to be laid out.  United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 123 (1st Cir. 2013).  Here, Plaintiffs fail entirely to assert a cognizable fraud claim with the requisite specificity against new Defendants.

The **only** substantive allegation levied against Ms. Whitman is that she failed to respond to a letter that ICT's CEO sent her requesting assistance in attempting to secure the release of the existing Individual Plaintiffs.  See SAC ¶¶ 209, 211.  Likewise, the **only** substantive allegations asserted against John Schultz are that, after receiving a letter from Plaintiff's counsel, he left a voicemail message stating that he would have someone on his team look into the matter; and, after receiving a threatening letter from Plaintiffs' counsel on August 8, 2013, he retained Gibbons P.C. to respond.  See id. ¶¶ 210-211, 228, 229, 239, 365.  This innocuous and routine behavior — where a busy CEO of a Fortune 50 company fails to respond to an unsolicited letter, and its General Counsel initially assigns in-house attorneys to make an inquiry and later retains outside counsel — isn't remotely actionable under any theory asserted, let alone theories sounding in fraud.  No specifics, no acts, no conversations, no inducement, no reliance, no scintilla of specific factual allegation supports fraud claims against these two individuals.  Allowing fraud claims against them to go forward would eviscerate Rule 9(b).

13

The remainder of the proposed SAC attempts to disguise the utter lack of substantive allegations against Ms. Whitman and Mr. Schultz by making conclusory allegations, pointing to unrelated events, and improperly inferring a relationship between them.  For example, the proposed SAC continually cites an interview that Mr. McCarthy gave to a legal publication, discussing a risk management "funneling system" he put in place at *HPFS*, insinuating that Ms. Whitman and Mr. Schultz were within such a funnel. See, e.g., id. ¶¶ 57, 126.  But Ms. Whitman and Mr. Schultz were officers of HP (the parent entity), not HPFS.   There is no specific allegation that they were told of or knew about the China situation before ICT's letters, or that they took any steps in response thereto other than those referenced above.  See id. ¶¶ 126, 233, 364.[7]

Equally striking is the fact that there are no substantive cognizable allegations whatsoever laid against the new corporate defendants -- HP Inc. and Hewlett Packard Enterprise Company -- except that they result from the split of HP, the parent corporation whose subsidiaries HPFS and HPFS (India) were original defendants here.  See, e.g., id. at ¶ 50.  Other than being potentially held vicariously responsible for Ms. Whitman's zero involvement and Mr. Schultz's next-to-zero involvement, there is no specific allegation that HP or its successor entities did anything that would get the fraud claim against them over the high threshold of Rule 9(b).[8]

---

[7] Nor is there any allegation or showing that a that a risk management funnel system implemented at HPFS had any bearing on the actions of top-level management at separate companies such as Hewlett Packard Enterprise Company or HP Inc.  The proposed SAC makes oblique references to statements by HPFS (India) personnel that "top level leaders" were involved, attempting to infer Ms. Whitman's and Mr. Schultz's involvement.  See id. ¶¶ 125, 126, 367.  Again, the nature of this inference is baseless in that "top level leaders" is a generic, undefined term.  Further, the proposed SAC offers no facts to suggest that "top level leaders" must mean senior management at affiliates or at the ultimate corporate parent.

[8] While the generic term "HP" appears repeatedly in alleged correspondence and communications, it appears to serve as short-hand for either HPFS and/or HPFS (India), or some other Hewlett-Packard entity.  In reference to the letter that was being drafted and prepared by HPFS (India) in March of 2013 for submission to the Chinese authorities, HP was identified as the parent of both HPFS (India) and H3C, and was said to be looking into the matter.  See id. at ¶ 165.  Repeated reference in other correspondence to "HP" also apparently serves as Plaintiffs' basis for inclusion of the new corporate defendants, presumably on the theory that HP, their predecessor, was a party

The allegations against Ms. Whitman, Mr. Schultz, and the new corporate defendants —
which are skeletal and utterly lacking in the specificity required by Rule 9(b) — are futile and
the Court should deny the motion to join them as defendants.

### 2. The Allegations Against G. Daniel McCarthy And Gibbons P.C. Are Barred By Massachusetts' Absolute Litigation Privilege

The proposed SAC is entirely bereft of substantive allegations against G. Daniel
McCarthy and Gibbons P.C. that can pass legal muster (conclusory statements and generalized
inferences notwithstanding).  McCarthy is accused of attempting to "bully" the Plaintiffs into a
global settlement, allegedly responding to Plaintiffs' counsel's threat of action with "a noxious
mix of lies, threats, intimidation and conceit."  See Proposed SAC ¶¶ 239-61.  Gibbons P.C. is
also named, apparently because of Mr. McCarthy's association with the law firm when the
subject letters were written.  See, e.g., id. at ¶ 240 (referring to "McCarthy's and Gibbons P.C.'s
ensuing year-long correspondence").

The allegations against Mr. McCarthy and Gibbons fail completely under Rule 9(b)
scrutiny in that no specific act or event is alleged against either one of them to sustain the fraud
claims asserted.  Conclusory statements as to what Mr. McCarthy knew while he was at HPFS
(until March of 2013, when he joined the Gibbons law firm) do not meet the Rule 9(b) threshold.
No "who, what, when, where and how" is pled against Mr. McCarthy before he was retained as
outside counsel, and everything he did as outside counsel was privileged.

The causes of action asserted against the lawyer and the law firm are wholly barred by
the absolute litigation privilege.  That privilege protects attorneys from all civil liability under
any cause of action for statements made "in the institution or conduct of litigation or in
conferences and **other communications preliminary to litigation.**"  Doe v. Nutter, McClennen

---

to the "cover-up scheme."  See, e.g., id at ¶ 272.  But, as referenced above, no clear or identifiable specific
allegation is laid against HP or the new corporate defendants.

& Fish, 668 N.E.2d 1329, 1332 (Mass. App. Ct. 1996) (emphasis added).  The privilege applies not only to ongoing litigation, but also to *proposed* litigation.  See Sriberg v. Raymond, 345 N.E.2d 882, 884 (Mass. 1976).  See also Meltzer v. Grant, 193 F. Supp. 2d 373, 378 (D. Mass. 2002) 80 (citing Nutter, which found that *a response to a demand letter* was absolutely privileged).  "This privilege has been extended not only to defamatory statements, but to claims based on false or malicious statements, intentional infliction of emotional distress, negligence, and violations of the Massachusetts Civil Rights Act.  To rule otherwise would make the privilege valueless if an individual would then be subject to liability under a different theory." Meltzer, 193 F. Supp. 2d at 378.

Here, all the substantive allegations against Mr. McCarthy and Gibbons P.C. commence with and arise from Mr. McCarthy's actions (taken five months after he left HPFS) in response to Plaintiffs' counsel's August 8, 2013 letter and thereafter, and quite clearly concern the contentions and demands made in that and subsequent correspondence.  See, e.g., SAC ¶¶ 228, 239, 365.  The proposed SAC itself makes clear that Mr. McCarthy's letter was sent in response to the threat that "action will follow."  See id. at 229.  Therefore, the allegations against Mr. McCarthy and Gibbons are barred by the absolute litigation privilege.  See, e.g., id. at ¶229 (describing the ICT's demand letter of August 8, 2013, which included the threat that "**If you are uninterested, action will follow.**") (emphasis added).[9]

All claims against Mr. McCarthy and Gibbons are futile in that they concern a lawyer's responses to the threat of litigation, rendering these new Defendants' actions absolutely insulated from civil liability.  Thus, the Court should reject Plaintiffs' efforts to add them as defendants.

---

[9] Moreover, apart from that blatant harbinger of litigation (which obviously was no empty threat), the proposed SAC provides ample other bases on which a reasonable observer could perceive the threat of litigation looming much earlier.  See, e.g., id. ¶ 131 (March 11, 2013 internal ICT email exchange observing that that HPFS "can smell a lawsuit" and speculating as to its defense theories); and ¶ 167 (ICT viewed HPFS (India)'s March 2013 draft letter as an "admission of guilt" by the HPFS defendants which exposed them to criminal and civil liability).

### 3. The Proposed Pleading Does Not Even Attempt To Tie Newly Added Defendants To The Negligence Claims

Plaintiffs claim that a duty to prevent harm to others arises under Massachusetts law when one creates a dangerous situation (which Defendants dispute), but they also acknowledge that *only* the HPFS Defendants sold equipment to Plaintiff ICT. See id. ¶¶ 73-82, 395. The proposed SAC does not allege a cognizable basis for negligence against the newly added Defendants who, by Plaintiffs' own admission, did not create the so-called "dangerous situation" (i.e., selling ICT the computer equipment). Instead, the pleading conclusively asserts that "Defendants" had a "duty to make a prompt and complete disclosure of true facts to the police to secure their release," and subsequently breached that duty. Id. ¶¶ 395-400. But no duty has been established and, without duty, the negligence claim cannot lie.

### 4. The Proposed SAC Does Not State A Claim For False Imprisonment

Plaintiffs largely fail to address the Court's analysis in its January 24, 2017 Order, finding that the Amended Complaint did not state a claim for false imprisonment. [ECF Doc. No. 69]. The proposed SAC does not resolve the lack of an "intentional" element, nor does it resolve the attenuation or Act of State Doctrine concerns the Court raised during the July 8, 2016 hearing.

### i. Intent is missing

False imprisonment "consists of the (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement." Lund v. Henderson, 22 F. Supp. 3d 94, 104 (D. Mass. 2014) (citations and internal quotation marks omitted). As the Court has already found:

> To satisfy the first element at this stage, Plaintiffs must allege
> sufficient facts to state a plausible claim that the Defendants acted
> "with the intent to confine" the Individual Plaintiffs. Lucia v. City
> of Peabody, 971 F. Supp. 2d 153, 170 (D. Mass. 2013) (citation

and internal quotation marks omitted).  Plaintiffs have failed to do so: there is no indication in the Complaint[10] that, before the sale, either Defendant knew of the existence of the Individual Plaintiffs, let alone harbored some desire to see them falsely imprisoned for handling counterfeit equipment that they would sell to their company. Moreover, the Court, drawing on its "common sense," Iqbal, 556 U.S. at 679, finds implausible the Individual Plaintiffs' bald suggestion that Defendants made insufficient efforts to obtain their release because they intended to keep them confined. Thus, Plaintiffs have failed to state a false imprisonment claim.

See January 24, 2017 Order, p.15.

The proposed SAC does not allege that, before the sale, any of the Defendants knew of the existence of the Individual Plaintiffs, or that they intentionally confined them.  Plaintiffs attempt to circumvent the lack of "intent" by arguing that "the allegations that the Defendants here acted 'with knowledge that such confinement would, to a substantial certainty, result from' their acts, are sufficient to satisfy the intent element of the false imprisonment claim under Massachusetts law even where the Defendants acted without malice or without knowing the identity of the particular person whose confinement was substantially certain to arise from Defendants' acts." Id. at 14 (citing various sections of the Restatement of Torts).  However, that precise argument was squarely considered and rejected by the Court in its January 24, 2017 Order. See January 24, 2017 Order, p.14 ("Plaintiffs counter that they have stated a false imprisonment claim because they allege (1) HPFS's 'false statements' to Plaintiffs regarding the equipment 'exposed the Plaintiffs to a substantially certain risk of imprisonment and eventually caused it . . .'").  The alleged "false statements" are the same in the proposed SAC as they were in the Amended Complaint: alleged false representations that the equipment was genuine.  That futile claim should be rejected for a second time.

---

[10] In the opinion, the Court defined the Amended Complaint as the "Complaint." See January 24, 2017 Order, p.2.

### ii.     *The false imprisonment claim is too attenuated*

In the event the Court were to find that Plaintiffs have adequately pled intent, the false imprisonment allegations in the proposed SAC are still too attenuated as a matter of law. Plaintiffs cannot show how all Defendants might be held responsible for the intervening actions of representatives of non-party H3C, on whose alleged complaint the Chinese authorities acted. See, e.g., SAC at ¶¶ 90-93.  Plaintiffs cite no relevant legal authority for imputed liability, nor can they -- "Neither does the mere fact that there exists a parent-subsidiary relationship between two corporations make the one liable for the torts of its affiliate."  United States v. Bestfoods, 524 U.S. 51, 61 (1998) (quoting from 1 W. Fletcher, Cyclopedia of Law of Private Corporations § 33, p. 568 (rev. ed. 1990)).

Plaintiffs cannot overcome the facts that demonstrate the attenuation of their false imprisonment claim, which is why they do not cite to any cases remotely on point.  Here, the equipment was sold in India on December 6, 2011 (SAC ¶¶ 73-76); shipped "at the end of December 2011;" and received by ICT in China, a separate country, presumably sometime in early 2012. Id. ¶¶ 84-85. Plaintiffs engaged in the resale of the equipment in China with no legal issue for nearly a year, until they were arrested in December 2012. Id. ¶ 93.  There is no allegation that any of the Defendants were aware of the arrests or seizure when they occurred -- or that they knew of H3C's alleged complaint.  Instead, on January 31, 2013 (**nearly two months after the arrest**), ICT informed HPFS about the arrests and asked for help. Id. at ¶ 113.

Plaintiffs cite no relevant precedent for such an attenuated, geographically and temporally removed fact pattern underlying a false imprisonment claim, let alone tying it into their "zugzwang" theory which alleges that all Defendants conspired to provide ineffective assistance to secure the release of the Individual Plaintiffs after their arrest.  A false imprisonment claim considers the defendant's behavior *leading up to and causing* the alleged

false imprisonment (see, e.g., Sarvis v. Boston Safe Deposit & Trust Co., 711 N.E.2d 911, 921 (Mass. App. Ct. 1999)), and although Plaintiffs vainly try to expand the term "causing" to include actions taken *after* the confinement (see Moving Brief, p. 16), they offer no credible support for this interpretation.[11]

### iii.        The Act of State Doctrine bars the claim

The Act of State Doctrine also bars the false imprisonment claim, because the Court must necessarily find the confinement to be "unjustified" (the second element) in order for the claim to survive an inquiry into the validity of a recognized sovereign power's public acts committed within its own territory.  See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964); Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 605-07 (9th Cir. 1977)).  A finding that the confinement was "unjustified" would second-guess the validity of China's public acts. C.f. Nocula v. UGS Corp., 520 F.3d 719, 722 (7th Cir. 2008).

Plaintiffs cite no authority permitting a false imprisonment claim to survive when the detention resulted from a foreign sovereign exercising its police power by enforcing its laws. The Act of State Doctrine bars their imprisonment claim.

### 5.        The Pleading Is Premised On An Implausible Theory Of The Case

While the intent-based causes of action asserted against all Defendants (Counts VII, VIII, IX, XI, XII, XIII)[12] are predicated on a "zugzwang" conspiracy theory, the Court should apply its "plausibility" barometer and find that the proposed SAC fails to meet the Iqbal standard. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  See January 24, 2017 Order ("Moreover, the Court,

---

[11] Additionally, the theory relies on the conclusory and baseless assertion that that the edits made to a draft letter to the Chinese authorities shared with Plaintiffs were the sole reason that the Individual Plaintiffs remained imprisoned; that if the draft letter was submitted unaltered (without regard to the truth of its contents), it would have secured the release of the Individual Plaintiffs. See, e.g., SAC ¶¶ 358, 360.  No support is provided for this assertion.
[12] See, e.g., SAC ¶¶ 362 (Count VII), 381 (Count VIII), 386 (Count IX), 409 (Count XI), 414 (Count XII), 423 (Count XIII).

drawing on its "common sense," finds implausible the Individual Plaintiffs' bald suggestion that Defendants made insufficient efforts to obtain their release because they intended to keep them confined.")  (citing Iqbal, 556 U.S at 679).

The entire "zugzwang" theory is set out at paragraph 15 of the proposed SAC:

> **Defendants** knew that the Individual Plaintiffs were absolutely innocent under either scenario but could not disclose the exonerating evidence in their possession **without placing themselves in criminal jeopardy either in India (if the Equipment was counterfeit) or in China (if it was genuine)**.

SAC at ¶ 15 (emphasis added).

Assuming, *arguendo,* that all Defendants could potentially be subject to criminal liability *in India* if the sold equipment was counterfeit, the "zugzwang"[13] theory is utterly implausible because it does not explain (beyond conclusory allegations) how the named Defendants could be subject to criminal liability *in China* if the equipment was genuine.  The pleading itself makes clear that **only H3C --** a non-party – allegedly told the Chinese authorities that the equipment was counterfeit.  See, e.g., id. ¶¶ 90-91.  Thus, only H3C could be criminally susceptible if the equipment was later found to be genuine.  Plaintiffs do not show how the HPFS Defendants (or any other Defendants) might be held responsible for the actions of that non-party, and cite no relevant legal authority for such imputed liability. See Bestfoods, 524 U.S. at 61.

As alleged, the only communication that any of the Defendants had with the Chinese authorities (and even then, it came *solely* from HPFS (India)) was through the submission of an April 2013 letter to the Chinese authorities. See, e.g., SAC ¶ 196.  Plaintiffs concede that that final April letter *declined to take a position* on whether the equipment was counterfeit.  It is

---

[13] The proposed SAC is not even specific about when the "zugzwang" actually occurred.  For example, Paragraph 16 indicates the HPFS Defendants were placed into "zugzwang" shortly after sending Plaintiffs' counsel a March 2013 draft letter, but Paragraph 231 suggests that "zugzwang" did not occur until August 2013.

simply implausible that all Defendants were subject to criminal liability in China for knowingly making false statements to the Chinese authorities if the equipment turned out to be genuine.[14] As pled, only H3C directly represented that the equipment was allegedly counterfeit.  See, e.g., id. ¶¶ 90-91.

Thus, the "zugzwang" position in which all Defendants allegedly found themselves -- a theory essential to the viability of the proposed SAC -- fails once the Court distinguishes between the Defendants and non-party H3C.  It is implausible that the Defendants faced criminal liability in China, regardless of whether the equipment was ultimately deemed counterfeit or genuine.

### B.    The Proposed Amendment Does Not Relate Back to the Original Pleading

The proposed SAC seeks to include eight newly added Plaintiffs and seven newly added Defendants to this action, along with a myriad of new claims, based on a radical new theory of the case.

When a plaintiff seeks to amend its pleadings that "changes the party or the naming of the party against whom a claims is asserted," Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure is applied to determine whether the amendment will "relate back" to the date of the original pleading to avoid a statute of limitations bar.[15]  Specifically, the First Circuit has

---

[14] Plaintiffs rest their position an affidavit concerning Chinese law that is not attached to the motion in violation of Local Rules 7.1(b) and 15.1(b).  Despite the Court's previous observation that Plaintiffs ought to submit their supporting documents with this motion, Plaintiffs have declined to include the affidavit. See ECF Doc. No. 67.

At a minimum, that failure to provide the affidavit should mandate that Plaintiffs be forbidden from trying to cure this to cure the defect on reply.  Instead, respectfully, the Court should decide the instant motion for leave to amend as is and reject any later-filed supporting affidavits not included with the motion.

[15] While Plaintiffs make no effort to address whether their claims relate back to the original pleading, they attempt to squeeze within Rule 15(c)(1)(C) when they suggest that the proposed SAC adds "a number of new parties and claims all arising out of and closely connected to the initial claims set forth in the original and amended pleading." See Moving Brief at p. 8 (parroting Rule 15(c)(1)(B), the predicate requirement for relation back where a new party is named under Rule 15(c)(1)(C)).

explained that the Rule has three requirements, each of which must be satisfied in order to permit

relation back:

> an amendment which changes the party or the naming of the party against whom a claim is asserted relates back to the date of the original complaint **[1]** if — and only if — the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading and,
>
>> within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment **[2]** has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and **[3]** knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Leonard v. Parry, 219 F.3d 25, 28 (1st Cir. 2000) (citing precursor of Fed. R. Civ. P. 15(c)(1)(C))

(numbering not in original).[16]

The first question for Rule 15(c)(1)(C) analysis is whether Rule 15(c)(1)(B) has been met

(i.e., does the new claim arise "out of the conduct, transaction, or occurrence set out … in the

original pleading"?).   Plaintiffs have made no effort to establish that they meet this first

requirement, other than conclusorily saying so: they have added "a number of new parties and

claims all arising out of and closely connected to the initial claims set forth in the original and

amended pleading."   See Moving Brief at p. 8 (paraphrasing Rule 15(c)(1)(B)).   But even a

cursory juxtaposition of the original 16-page Complaint and the 119-page proposed SAC reveals

two wildly differing sets of claims and allegations.   Again, other than simply saying so, Plaintiffs

---

[16] In 2007, Rule 15(c)(1)(C) was amended "as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." See Advisory Committee's Notes, 2007 Amendment.  The Advisory Committee specifically stated that its "changes are intended to be stylistic only." Id.; see also Advisory Committee's Notes, 2009 Amendment (noting that Rule 15(a)(1) was substantively amended, but making no mention of any changes to Rule 15(c)(1)(C)).  Because the Leonard court analyzed a predecessor of Rule 15(c)(1)(C) that was substantively identical to the current Rule (the quoted language largely appears in the current rule), its observations apply equally here.

make no showing that their global conspiracy "zugzwang" theory in the proposed SAC "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]"  Rule 15(c)(1)(B).

Even if they could show that the proposed SAC arose out of the original Complaint, it is clear that neither the second nor the third requirements of Rule 15(c)(1)(C) has been met.  The second requirement is that all the newly added Defendants received notice of the action within the 90-day period provided by Rule 4(m) for serving the summons and complaint, measured from the date the original action was filed (the original action was filed on December 9, 2015; thus Rule 4(m)'s 90-day window would have closed by early March of 2016).  Plaintiffs make no effort to establish that each of the newly added Defendants was on notice of the action in March of 2016.

More importantly, however, even if Plaintiffs could show that each of the newly added Defendants was on timely notice of the action before early March of 2016 (per Rule 15(c)(1)(C)(i)), the third requirement must still be satisfied.  Specifically, did the newly added Defendants know, or should they have known, that the action would have been brought against them, but for the Plaintiffs' mistake as to the "proper party's identity?"  Fed. R. Civ. P. Rule 15(c)(1)(C)(ii).  See also Fed. R. Civ. P. 15 Advisory Committee's note (1966 Amendment) (explaining that the appropriate question is whether the proper party "knew or should have known that the action would have been brought against him **initially** had there not been a mistake concerning [identity]") (emphasis added); Leonard v. Parry, 219 F.3d 25, 28 (1st Cir. 2000) ("To satisfy this criterion, the amendment's proponent must show not only that he made a mistake [as to] the proper party's identity, *but also that the later-named party, within the*

*prescribed time limit, knew or should have known that, but for this mistake, the action would have been brought against her.*") (emphasis added).

Here, there is not even a suggestion that Plaintiffs mistakenly or inadvertently named HPFS or HPFS (India) as defendants, intending instead to actually bring claims against the newly added Defendants.  Far from it -- HPFS and HPFS (India) remain existing Defendants. More importantly, Plaintiffs do not suggest that the original Complaint contained any information that could have reasonably put newly added Defendants on notice that the action could be brought against them. See generally Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 548 (2010) (holding that "[t]he question under Rule 15(c)(1)(C)(ii) is not whether [plaintiff] knew or should have known the identity of Costa Crociere as the proper defendant, but whether Costa Crociere knew or should have known that it would have been named as a defendant but for an error").

The original Complaint gave no clue that the allegations made therein would eventually become vastly expanded to include a radical new theory of the case, and to include claims against senior executives in companies entirely separate from the original Defendants.  It certainly gave no indication that it might include claims against defense counsel.  Plaintiffs have not satisfied this third essential requirement for relation back.

As such, Plaintiffs' proposed SAC has not been shown to relate back to the original filing under Rule 15(c)(1)(C), and each claim must be viewed in the context of the relevant statute of limitations test.

**C.     All Claims By And Against The Newly Added Defendants Fall Outside The Relevant Limitations Periods**

**_1.     Fraud and Negligence-based Claims_**

The majority of claims in the proposed pleading are fraud and negligence-based claims. See SAC, Counts I,[17]  II,[18]  VI,[19]  VII,[20]  VIII,[21]  X,[22]  XI,[23]  XII,[24]  XIII.[25]

Assuming application of Massachusetts' substantive law, tort claims are subject to a **three** year statute of limitations.  See G.L. c. 260, § 2A.  This includes fraud-based claims such as fraud and fraudulent misrepresentation, other intentional torts such as intentional infliction of emotional distress and civil conspiracy, along with negligence-based actions. See Mass. Hous. Opportunities Corp. v. Whitman & Bingham Assoc., P.C., 983 N.E.2d 734, 737 (Mass. App. Ct. 2013); Okoli v. Okoli, 963 N.E.2d 737, 743 (Mass. App. Ct. 2012); McEneaney v. Chestnut Hill Realty Corp., 650 N.E.2d 93, 96 (Mass. App. Ct. 1995); Pagliuca v. City of Boston, 626 N.E.2d 625, 627 (Mass. Ct. App. 1994).  Separately, it should be noted that claims arising under G.L. c. 93A, also known as "Chapter 93A," are subject to a **four** year statute of limitations.  See G.L. c.

---

[17] Fraudulent misrepresentation, asserted by **newly added Plaintiff Styller** against the HPFS Defendants.

[18] Negligent misrepresentation, asserted by **newly added Plaintiff Styller** against the HPFS Defendants.

[19] Chapter 93A, asserted by **newly added Plaintiff Styller** against the HPFS Defendants.

[20] Fraud, asserted by **newly added Plaintiff Styller** against all Defendants (including **newly added Defendants**).

[21] Chapter 93A, asserted by **newly added Plaintiff Styller** against all Defendants (including **newly added Defendants**).

[22] Negligence, asserted by **newly added Plaintiff Styller** against all Defendants (including **newly added Defendants**).

[23] Civil conspiracy, asserted by **all newly added Plaintiffs** against all Defendants (including **newly added Defendants**).

[24] Intentional infliction of emotional distress, asserted by **all newly added Plaintiffs** against all Defendants (including **newly added Defendants**).

[25] Loss of consortium, asserted by the **newly added Family Member Plaintiffs** against all Defendants (including **newly added Defendants**).

260, § 5A; Albrecht v. Clifford, 767 N.E.2d 42, 48 & n.15 (Mass. 2002).  But even that window has closed here.

Generally, claims for negligence accrue at the time of injury.  Cambridge Plating Co. v. Napco, Inc., 991 F.2d 21, 25 (1st Cir. 1993).  Fraud-based claims similarly accrue when the plaintiff learns, or reasonably should have learned, of the misrepresentation. McEneaney, 650 N.E.2d at 97.  The "statute of limitations starts to run when an event has occurred which was reasonably likely to put a plaintiff on notice that *someone* may have caused his injury." O'Rourke v. Jason Inc., 978 F. Supp. 41, 52 (D. Mass. 1997) (emphasis added) (internal citations omitted).  Chapter 93A claims accrue at the time injury results from the allegedly unfair or deceptive acts. Cambridge, 991 F.2d at 25.[26]

Plaintiffs were on notice of their contract and warranty injuries when ICT representatives received the equipment in China and realized it was "scrap-grade" (Id. ¶¶ 84-85), sometime in early 2012), and were on inquiry notice at that stage (the proposed SAC acknowledges that this should have raised a "red flag"). Id. at ¶ 87.[27]

---

[26] While Massachusetts recognizes the "discovery rule," (Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 229 (2002)), that escape hatch does not apply here.  The discovery rule "may arise in three circumstances: where a misrepresentation concerns a fact that was 'inherently unknowable' to the injured party, where a wrongdoer breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive." Albrecht, 767 N.E.2d at 49.

Additionally, under Massachusetts law, a plaintiff has the burden of proving its claims were filed within the applicable statute of limitations.  See O'Rourke, 978 F. Supp. at 46–47 (D. Mass. 1997) ("In Massachusetts, the burden of proof regarding the statute of limitations rests with the plaintiff.") (internal citations omitted).  Here, Plaintiffs have not invoked the discovery rule.  Instead, they simply explain the inordinate delay in asserting their claims by reference to an "unravelling" that took counsel time to accomplish.  In other words, they do not suggest a delay in learning of their injuries, but instead concede that their theories of recovery took time to prepare.

[27] While Plaintiffs may claim this "red flag" should only apply to Defendants, "the appropriate standard to be applied when assessing knowledge or notice is that of a reasonable person in the plaintiff's position." Taygeta Corp. v. Varian Assocs., Inc., 763 N.E.2d 1053, 1063 (Mass. 2002).  In this case, the reasonable person in the plaintiff's position would be a sophisticated reseller of used computer equipment, and the red flag should command attention.

No tolling applies here because, even with fraudulent concealment, if "'the wrongdoer . . . concealed the existence of a cause of action through some affirmative act done with intent to deceive,'" "'[t]he statute of limitations . . . is not tolled if the plaintiff has actual knowledge of the facts giving rise to his cause of action.'" Abdallah v. Bain

With regard to the fraud and negligence-based claims, these accrued no later than December 9, 2012, the date of the arrests/seizure. See, e.g., id. at ¶ 93 (events which were "reasonably likely to put a plaintiff on notice that someone may have caused his injury." O'Rourke, 978 F. Supp. at 52). All alleged injuries asserted in the fraud and negligence-based causes of action flow entirely from the seizure and arrests. See, e.g., SAC ¶¶ 317 (fraud claim linking all damages to the arrest and subsequent imprisonment of the Individual Plaintiffs), 324 (negligence claim which does the same).

There can be no doubt that Plaintiffs had actual knowledge of the facts giving rise to their causes of action no later than December 9, 2012.[28]   That fact was conceded by ***Plaintiffs' counsel when they stated as much to the Massachusetts state court*** prior removal. See Declaration of Christian Stueben, Esq., Exhibit A, ¶ 1 (Plaintiffs' motion to extend the time for service, where counsel stated that "***The Plaintiffs filed this action on December 9, 2015 just prior to the statute of limitations on some of the claims therein***.")[29] Id. (emphasis added).

Plaintiffs' concession in the state court motion before removal underscores the obvious: the fraud and tort-based causes of action (three-year limitation) accrued on December 9, 2012, and are time-barred. So too with the Chapter 93A claim (four-year limitation). Thus, Counts I, II, VI, VII, VIII, X, XI, XII, XIII in the proposed SAC are time-barred.

---

Capital LLC, 752 F.3d 114, 120 (1st Cir. 2014) (quoting Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 239 (1st Cir. 2005)); see also G.L. c. 260, § 12.

[28] Even assuming Plaintiffs failed to appreciate the impact of the events of December 9, 2012, they certainly were aware of their alleged fraud injuries by March 27, 2013, when they received a draft letter from HPFS (India) which Plaintiffs regarded as an "admission of guilt" which "clearly exposed [the HPFS Defendants] to criminal liability in India . . . and civil liability to Plaintiffs for fraud." See, e.g., SAC ¶ 167.

[29] Plaintiffs' counsel was, no doubt, referring at that time to the claims with a three-year statute of limitations period. Now, more than a year later, the bell has also tolled on any claim with a four-year statute of limitations.

### 2.    *False Imprisonment Claim*

The proposed pleading also includes a false imprisonment claim. See SAC, Count IX. False imprisonment claims are subject to a three-year statute of limitations (see Mass. Gen. Laws ch. 260, § 4; Miller v. Home Depot USA, Inc., 949 N.E.2d 948, 948 (Mass. App. Ct. 2011)), and they accrue when the imprisonment ends.  See Harrington v. City of Nashua, 610 F.3d 24, 28 (1st Cir. 2010).  There can be no dispute that, at the very latest, the false imprisonment claim began accruing on July 17, 2013, when the Individual Plaintiffs were released.  See id. ¶ 183. Since more than three years have elapsed since then, the false imprisonment claim, Count IX of the proposed SAC, is time-barred.

### 3.    *Breach of Warranty Claim*

The statute of limitations for a breach of warranty claim predicated in a contract governed by the UCC is four years.[30] See Mass. Gen. Laws, ch. 106 § 2-725; c.f. Siebe, Inc. v. Louis M. Gerson Co., 908 N.E.2d 819, 830 (Mass. App. Ct. 2009) ("It is well established that G.L. c. 106, § 2–725(2), applies to contract-based warranty breaches governed by the UCC.").

The proposed SAC expressly incorporates the UCC into the breach of warranty claim; a clear concession that the UCC governs. See SAC ¶ 337 (relying on Mass. Gen. Laws, ch. 106 § 2-313(1)(b) -- titled "Uniform Commercial Code").  "A breach of warranty occurs when tender of delivery is made … when the breach is or should have been discovered."  Mass. Gen. Laws, ch. 106 § 2-725(2).

Here, the breach of warranty claim in the proposed SAC is predicated on the factual allegation that the computer equipment was counterfeit when sold, and is clearly rooted in a

---

[30] While Mass. Gen. Laws, ch. 260 § 2 calls for a six year statute of limitations for breach of contract actions, this statute is inapplicable, as it only encompasses contracts that are not governed by the UCC. See, e.g., Am. Glue & Resin, Inc. v. Air Prod. & Chemicals, Inc., 835 F. Supp. 36, 41–42 (D. Mass. 1993).

contract-based theory of liability.  See id. at ¶ 341.  At the latest, when the goods were seized as counterfeit on December 9, 2012, the breach of warranty claim accrued.  More than four years have since elapsed, and the warranty claim must perish.

Based on the foregoing, the limitations periods governing all counts by and against the new parties to the proposed SAC have expired, and are futile.  As such, the motion for leave to file the proposed SAC should be denied.

## II.    Leave To Amend Should Be Denied for Undue Delay

It is well settled in this Circuit that "undue delay, on its own, may be enough to justify denying a motion for leave to amend," without a showing of prejudice.  Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016).  Local Rule 15.1(a) requires "Amendments adding parties shall be sought as soon as an attorney reasonably can be expected to have become aware of the identity of the proposed new party." (emphasis added).  Here, the proposed SAC naming eight newly added Plaintiffs and seven newly added Defendants comes nearly fourteen months after their initial Complaint was filed in December 9, 2015.

The Court observed in its sua sponte order dismissing Plaintiffs' initial motion to amend (and can similarly find true with regard to the instant motion) that Plaintiffs have not offered any basis to explain their undue delay, apart from conclusory allegations:

> Plaintiffs make a conclusory allegation that the delay between when they filed their First Amended Complaint, in July 2016, and when they filed the instant Motion is a "testament" to Defendants' deceit. However, **Plaintiffs' counsel does not explain how any alleged deceit could possibly have delayed him from learning of some of the new claims and parties he has added, such as the loss of consortium suffered by certain Plaintiffs' family members or the harm allegedly caused to ICT's CEO.**

January 13, 2017 Court Order Denying Leave to Amend [ECF Doc. No. 67] (emphasis added and internal citation omitted).

The proposed SAC and its supporting brief offer no new or additional factual support to explain the undue delay, other than repeating conclusory allegations and circular reasoning.  See, e.g., Plaintiffs' supporting legal memorandum pp. 2–3 (claiming that the reason for the delay was because it took until now for Plaintiffs' counsel to "unravel[] the Defendants' intricately woven web of lies").  In addition to ignoring the Court's expressed concerns, Plaintiffs offer absolutely no factual or legal basis as to why it took until now for them to "unravel" the alleged conspiracy, especially since the proposed SAC relies heavily, if not entirely, on communications and events which took place years before the filing of the original Complaint.  Moreover, it should be noted that the existing Amended Complaint has its own conspiracy cause of action (Count VIII) related to the letter that HPFS (India) submitted to the Chinese authorities and alleged subsequent cover-up.  Thus, as between the existing Plaintiffs and the existing HPFS Defendants, there was nothing to "unravel."

The same is true with regard to all the newly added parties (both the plaintiffs and defendants) – all of whom were known to Plaintiffs' counsel or their identities were obtainable before the filing of the initial Complaint.  Furthermore, the factual predicates and legal bases for the claims asserted against the newly added Defendants were known or should have been known by Plaintiffs when the original Complaint was filed.  Therefore, leave to amend should be denied for undue delay.  See Calderon-Serra v. Wilmington Trust Co., 715 F.3d 14 (1st Cir. 2013).

### III.    Plaintiffs' Motion For Leave Is Filed In Bad Faith, Improper Purpose, And To Cause Prejudice To Defendants

A motion to amend should be rejected if it was filed in bad faith. See Mogel, 677 F. Supp. 2d at 365 (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  Here, the motion was filed in bad faith, with an improper purpose, and to cause prejudice to the Defendants.

## A.      The SAC Was Filed In Bad Faith And For Improper Purpose

The most glaring reason for this conclusion is the fact that Plaintiffs utterly disregarded the Court's January 13, 2017 *sua sponte* order dismissing the prior motion to amend.  Although the Court identified numerous concerns with the SAC, Plaintiffs discounted them, and filed the exact same pleading (note the same "December 20, 2016 Draft" date on the top right hand corner of page 1 of the proposed SAC).  Such disregard is a clear indication of bad faith.

A second indicator of bad faith is Plaintiffs' failure to include the complete pleading, intentionally omitting two affidavits on Chinese and Indian law that go to the core of their "zugzwang" theory, and omitting "a number of substantial factual affidavits" as well as "a chronology of the [alleged] cover-up, and a bundle of exhibits" -- all in violation of the spirit, if not the letter of Local Rules 7.1(b) and 15.1(b).  Despite Defendants having previously raised the issue before the Court, and despite the Court's instruction that Plaintiffs "seek leave with a sufficient and proper motion," they continue to intentionally withhold the referenced documentation. See ECF Doc. No. 67.

Third, Plaintiffs seek to add the HPFS Defendants' counsel (both in-house and outside) in an effort to deprive the Defendants of their counsel and to undermine the attorney-client privilege.  Rule 11(b) of the Federal Rules of Civil Procedure, along with the case law, provide several examples of prohibited improper purposes behind pleadings or court submissions.  See Rule 11(b)(1) (harassment, unnecessary delay, or needlessly increasing the cost of litigation); Doe v. Nutter, McClennen & Fish, 668 N.E.2d 1329 (Mass. App. Ct. 1996)  (improper purpose behind pleading found where the plaintiff brought frivolous claims against an attorney and his law firm in an attempt to disqualify them from an action); Hochen v. Bobst Grp., Inc., 198 F.R.D. 11, 18 (D. Mass. 2000), aff'd sub nom. Nyer v. Winterthur Int'l, 290 F.3d 456 (1st Cir.

2002) (finding that a frivolous claim was presented for the improper purpose of forcing a higher settlement offer).

In <u>Doe v. Nutter</u>, counsel was sanctioned for bringing frivolous claims against an attorney and his law firm, based on the lawyer's response to a demand letter. <u>Nutter</u>, 668 N.E.2d 1329. Not only did the <u>Nutter</u> court find that the claims barred by Massachusetts' absolute litigation privilege and frivolous (<u>see</u> <u>infra</u>), it sanctioned the plaintiffs' attorney for bringing the action for an improper purpose. <u>See</u> <u>id.</u> at 1332.

Here, Plaintiffs seek to join both Mr. McCarthy and the Gibbons law firm as Defendants in an attempt to deprive Defendants of their defense counsel and/or to eviscerate the attorney-client privilege. Plaintiffs seek to join Ms. Whitman, Mr. Schultz, and the corporate Defendants in the hope of forcing an early settlement. And counsel have already undeniably signaled their intent to unreasonably and vexatiously multiply these proceedings: in their brief in support of the prior motion for leave to file the proposed SAC, counsel threatened that, if the Court were to deny the motion, they would file the proposed SAC anyway as a separate action. <u>See</u> Plaintiffs' Original Supporting Brief, p. 6 (ECF Doc. No. 64, p.6). For these reasons, Plaintiffs acted in bad faith, with improper purpose, and sought to cause prejudice to Defendants by filing this motion, which should be rejected. [31]

---

[31] In a similar vein, counsel have failed to correct a misstatement previously put on the record, as they are required to do pursuant to the Massachusetts Rules of Professional Conduct. <u>See</u> Mass. R. Prof. C. 3.3(a)(1) ("A lawyer shall not knowingly: make a false statement of fact or law to a tribunal or *fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer*[.]") (emphasis added). To wit, during oral argument on HPFS's first motion to dismiss, the Court focused on the availability of the alleged counterfeit computer equipment for use in evidence. <u>See</u> July 8, 2016 transcript, p. 9, line 21 – p. 10, line 16. On the record, Plaintiffs' counsel expressly concurred in defense counsel's understanding that the subject equipment either remained in the custody of the Chinese authorities or had been destroyed. <u>Id.</u> The proposed SAC now reveals that the equipment has long been safely in the custody of Plaintiff Jade Chen, and was in his possession at the time of the oral argument. <u>See</u> SAC ¶ 279 (the equipment was returned upon Chen's release from bail on September 3, 2014).

From the July oral argument until the filing of the first motion for leave to file the proposed SAC, Plaintiffs' counsel have made no attempt to correct the record, disabuse the Court of the false impression that the equipment may not be

### B.        The SAC Fails To Cure Identified Deficiencies In Prior Pleadings

It is well settled that courts can deny leave to amend where the plaintiffs have repeatedly failed to cure deficiencies in their pleadings.  See U.S. ex. Rel. Gagne, 565 F.3d at 48.

Here, deficiencies that existed in both the original Complaint and the First Amended Complaint have not been cured in the proposed SAC.  For instance, the Court's January 24, 2017 Order "warn[ed] that the proposed amended complaint accompanying the motion must comply with Federal Rule of Civil Procedure 8[,]" adding that the Court might dismiss the complaint for conclusory statements and argumentative passages, or it is overlong and redundant.  January 24, 2017 order, p. 16 n.8 [ECF Doc. No. 69]  More importantly, the Court found that Plaintiffs had failed to state a false imprisonment claim in the Amended Complaint, and found that the theory that the HPFS Defendants wished to prolong confinement was implausible.  Id. at 15.

After the entry of the Court's Order, Plaintiffs made no substantive effort to revise the proposed SAC to conform the false imprisonment claim to the Court's reasoning, or to otherwise revise the proposed SAC in light of the Court's instruction.  Instead, Plaintiffs submitted the self-same proposed SAC as they previously filed and that was rejected by the Court.  While Plaintiffs may contend that the SAC is longer than their prior pleadings and reflects necessary revisions, Defendants submit that any such revisions do not suffice in that they fail to substantively redress the deficiencies that the Court previously identified.  In fact, the proposed SAC is replete with "conclusory statements and argumentative passages, [and] is overlong and redundant." See id. at 16 n.8.  As a result, the SAC represents another instance (the Amended Complaint being the first) where Plaintiffs have failed to cure deficiencies in their pleadings.

---

available as evidence, or otherwise honor their duty of candor to the Court.  Despite numerous opportunities to do so, counsel declined to correct the record or alert the Court to the existence of the equipment.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

Motion for Leave to file a Second Amended Complaint.

                                              Respectfully submitted,

Dated: February 22, 2017                  By: /s/ Stuart M. Glass
                                              Stuart M. Glass (BBO # 641466)
                  CHOATE HALL & STEWART LLP
                  Two International Place
                  Boston, Massachusetts 02110
                  Telephone: (617) 248-5000
                  Facsimile: (617) 502-4077

                  Anthony P. Callaghan (admitted *pro hac vice*)
                  Christian A. Stueben (admitted *pro hac vice*)
                  GIBBONS P.C
                  One Pennsylvania Plaza, 37th Floor
                  New York, NY 10119-3701
                  Telephone:  (212) 613-2000
                  Facsimile:  (212) 290-2018

                  *Attorneys for Defendants Hewlett-Packard*
                  *Financial Services Company and Hewlett-Packard*
                  *Financial Services (India) Private Limited*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


Dated:  February 22, 2017

/s/ Stuart M. Glass
Stuart M. Glass (BBO # 641466)
CHOATE HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Telephone: (617) 248-5000
Facsimile: (617) 502-4077