# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————————

ALEXANDER STYLLER, INTEGRATED
COMMUNICATIONS & TECHNOLOGIES,
INC., JADE CHENG, JASON YUYI, CATHY YU,
CAROLINE MARAFAO CHENG, PUSHUN
CHENG, CHANGZHEN NI, JUNFANG YU,
MEIXIANG CHENG, FANGSHOU YU, and
CHANGHUA NI,

                              Plaintiffs,

    v.

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, HEWLETT-PACKARD
FINANCIAL SERVICES (INDIA) PRIVATE
LIMITED, HP INC., HEWLETT PACKARD
ENTERPRISE COMPANY, and DAVID GILL,

                              Defendants.

—————————————————————————

**Civil Action No. 1:16-CV-10386 (LTS)**

**SECOND AMENDED COMPLAINT**

Leave to file granted July 28, 2017
(ECF 95)

 

Plaintiffs, by their undersigned counsel, bring this Second Amended Complaint for fraud and other wrongdoings against Defendants arising out of Defendants' sale of certain networking equipment to Plaintiffs expressly for resale purposes, and the subsequent arrest and imprisonment of the Plaintiffs reselling that equipment, which turned out to be counterfeit.

## Parties

1.     Plaintiff Alexander Styller is the CEO and owner of Plaintiff Integrated Communications & Technologies, Inc. ("ICT"). Plaintiff Styller is a U.S. citizen and a resident of Massachusetts, with the business address at c/o ICT, 239 Commercial Street, Malden, Massachusetts 02148.

2.     Plaintiff ICT is a Massachusetts corporation doing business at 239 Commercial Street, Malden, Massachusetts 02148. Since its establishment in 1993, ICT has been primary

involved in the business of remarketing excess and end-of-life inventory of computer parts and components. In February 2011, ICT received an authorized vendor code to provide goods and services to HP.

3.      Plaintiff Jade Cheng is a citizen of China, a former independent sales associate of ICT, and a supervisor of Plaintiffs Cathy Yu and Jason Yuyi in ICT's Beijing office. In February 2016, Plaintiff Cheng became a permanent resident of the U.S., currently residing at 235 Hanover St., Apt. 303, Manchester, New Hampshire, 03104. Plaintiff Cheng is the only child in his family.

4.      Plaintiff Jason Yuyi is a citizen of China and a former independent sales associate of ICT, residing at Wanke Jiari Fengjing Bldg. 43, Apt. 304, Yongda St., Yantai City, Shandong Province, China 265500. Plaintiff Yuyi has one brother.

5.      Plaintiff Cathy Yu, who is now married to Plaintiff Yuyi, is a citizen of China and a former independent sales associate of ICT, residing at Wanke Jiari Fengjing Bldg. 43, Apt. 304, Yongda St., Yantai City, Shandong Province, China 265500.  Plaintiff Yu is the only child in her family except for her step-brother.

6.      Plaintiffs Jade Cheng, Jason Yuyi and Cathy Yu are collectively referred to herein as the "Individual Plaintiffs."

7.      Plaintiff Caroline Marafao Cheng is the wife of Plaintiff Cheng, a citizen of Brazil and a permanent resident of the U.S. Plaintiff Marafao Cheng resided in China during her husband's ordeal; she currently lives with him at 235 Hanover St., Apt. 303, Manchester, New Hampshire, 03104.

8.      Plaintiff Pushun Cheng is the father of Plaintiff Cheng, a citizen of China residing at No. 606, Dongshan Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

9.       Plaintiff Changzhen Ni is the mother of Plaintiff Cheng, a citizen of China residing at No. 606, Dongshan Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

10.      Plaintiff Junfang Yu is the stepfather of Plaintiff Cathy Yu, a citizen of China residing at No. 50, Dugezhuang Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

11.      Plaintiff Meixiang Cheng is the mother of Plaintiff Yu, a citizen of China residing at No. 450, Dugezhuang Villiage, Xingcun Town, Haiyang City, Shandong Province, China.

12.      Plaintiff Fangshou Yu is the father of Plaintiff Jason Yuyi, a citizen of China residing at No. 698, Nanyangjun Villiage, Yangjun Town, Laiyang City, Shandong Province, China.

13.      Plaintiff Changhua Ni is the mother of Plaintiff Yuyi, a citizen of China residing at No. 698, Nanyangjun Villiage, Yangjun Town, Laiyang City, Shandong Province, China.

14.      Plaintiffs Caroline Marafao Cheng, Pushun Cheng, Changzhen Ni, Junfang Yu, Meixiang Cheng, Fangshou Yu, and Changhua Ni are referred to herein as the "Family Plaintiffs." The Family Plaintiffs bring a claim against all Defendants for the intentional infliction of emotional distress, and Family Plaintiff Marafao Cheng also for the loss of consortium.

15.     Defendant Hewlett-Packard Financial Services Company ("HPFS") was a wholly-owned subsidiary and one of the seven business segments of Hewlett-Packard Company ("HP"), a Fortune 50 company and a leading global provider of IT products and technologies. After HP split into two companies, Hewlett Packard Enterprise Company ("HPE") and HP Inc. ("HPI"), in November 2015, Defendant HPFS became a wholly-owned subsidiary of Defendant HPI. Defendant HPFS is in the business of providing financing and asset management services with respect to IT hardware and software products from HP and other manufacturers. Through its operating subsidiaries located in its business regions of the Americas, EMEA (Europe, Middle East and Africa), and APJ (Asia Pacific and Japan), Defendant HPFS provides financial life cycle management services including leasing, financing and asset recovery of IT equipment. According to its website, "remarketing older assets is a key part of HP Financial Services' business." Defendant HPFS has a business office at 165 Dascomb Road, Andover, Massachusetts, and conducts its business through various operating subsidiaries located throughout the world, including its wholly owned subsidiary HPFS India.

16.     Defendant HPFS was directly involved in the negotiations and execution of the relevant contracts with Plaintiff ICT through its senior executives and managers including James O'Grady, Director of HPFS Asset Management; JT Silvestri, Manager of HPFS Global Product Management; Tom Harris, HPFS Global Product Manager; and Defendant David Gill, Assistant General Counsel and Assistant Secretary of HPFS.

17.     The relevant contractual documents were executed on behalf of Defendant HPFS India by Kevan Bartley, Asset Management Delivery Manager for Defendant HPFS' APJ Region; by Javlin Lim, Defendant HPFS' APJ Service Delivery Team Lead, and by Mr. O'Grady himself.

18.     Defendant Hewlett-Packard Financial Services (India) Private Limited ("HPFS India") is an Indian company with a registered office at 20th Floor Nirmal, Nariman Point, Mumbai, India 400021, and its headquarters at 24 Salarpuria Arena, Hosur Main Road, Adugobi, Bangalore 560030. Defendant HPFS India is a wholly-owned subsidiary of Defendant HPFS and part of its APJ business region. Defendant HPFS India provides financing and asset management services to HP customers in India. To the best of Plaintiffs' knowledge and belief, no representatives of Defendant HPFS India itself were directly involved in the 2011 sale negotiations, which were conducted solely by Defendant HPFS' representatives dealing directly with ICT's representatives in Massachusetts.

19.     Defendants HPI and HPE are the two publicly traded companies resulting from the split of the legacy company HP. The split became effective on November 2, 2015, following which HP changed its name to HPI as a matter of corporate form. Defendant HPI is headquartered at 1501 Page Mill Road, Palo Alto, California, 94304, and is the legal successor to HP; Defendant HPE is headquartered in the same office complex as Defendant HPI, with the address at 3000 Hanover Street, Palo Alto, California, 94304.

20.     Defendant David Gill is the Assistant General Counsel and Assistant Secretary of Defendant HPFS. Defendant Gill resides at 160 Woodland Street, Balgowlah, New South Wales, NA 2093, Australia; his business address is c/o HPFS, 410 Concord Road, Rhodes NSW 2138, Australia.

**Statement of Facts**

A.     **2011:  The Initial Sale of the Equipment.**

1. **The Equipment: returned to the
   HPFS Defendants after a short-term lease.**

21.     In 2010, in preparation for the Commonwealth Games in Delhi, India, the Games

Organizing Committee retained Tata Consultancy Services Limited ("Tata") to provide IT

services for the Games.

22.     Tata and Defendant HPFS India then entered in a series of lease transactions

whereby HPFS India purchased brand new IT networking equipment manufactured by HP/H3C

from Inspira Enterprise Private Limited ("Inspira"), an authorized HP distributor in India, and

simultaneously leased that equipment to Tata. In total, HPFS India and Tata Consultancy

entered into four lease transactions for the Equipment dated between July and October 2010.

23.     Upon closing of the Games and expiration of the leases in 2011, Tata returned

the Equipment to HPFS India after less than one year (7-10 months) in use. The process of

returning the Equipment was handled by TT Global, a company specializing in IT logistics and

disposition services, which was retained by and acted on behalf of HPFS India as its agent.

24.     According to Defendant HPFS' standard operating procedures, the processing of

used equipment returned upon lease expiration included a product-specific test and audit

procedure. Upon information and belief, pursuant to this procedure, TT Global or other persons

acting on behalf of Defendant HPFS India inspected the returned equipment at that time (the

"2011 Inspection"), and Defendant HPFS India would have become aware that the Equipment

was counterfeit as a result of that inspection. Indeed, according to Defendants' March 2013,

2017 draft letter to the Chinese authorities (the "March 2013 Letter"), "the company HPFS

India engage[d] in India to process and refurbish returned lease equipment" – *i.e.*, TT Global --

also took photos of the Equipment during the 2011 Inspection, prior to the sale of the

Equipment to ICT and its importation into China. Defendants subsequently cited these very

photos in their March 2013 Letter as showing that "***the counterfeit H3C Equipment seized in***

***China is the same equipment sold by HPFS to ICT***" (emphasis added throughout unless

otherwise indicated).

### 2. The Negotiations:  the HPFS Defendants identify the Equipment as H3C's.

25.     In the summer of 2011, Defendant HPFS contacted ICT and offered it the

Equipment for remarketing purposes, and ICT agreed to purchase the Equipment from HPFS.

The negotiations and conclusions of the relevant transactional documents took place

predominantly in the Commonwealth of Massachusetts during late summer/fall of 2011, where

Plaintiff ICT and Defendant HPFS conduct business, where representatives of Defendant HPFS

conducted the negotiations on behalf of the HPFS Defendants and made the complained-of

misrepresentations, and where representatives of ICT conducted the negotiations and received,

relied and acted upon Defendants' misrepresentations.

26.     In particular, on or about June 14, 2011, Defendant HPFS' manager JT Silvestri

offered ICT's representative Alexander Pekar the Equipment for remarketing purposes,

explained that the Equipment was H3C-manufactured equipment coming off a short-term lease

from HP's Asia region, and provided Mr. Pekar with a preliminary list of that Equipment

identified as H3C-manufactured equipment. In his contemporaneous emails memorializing that

conversation for others at ICT, Mr. Pekar wrote: "This product is coming out of HP ASIA.  As

far as I know (not sure if correct 100%) this product is coming out of lease and I'm assuming

product is refurbished.  (I'm trying to verify condition and warranty). . . .  Please determine

market value and liquidity on this shipment."

27.     In another email sent to others at ICT later that day, Mr. Pekar wrote: "Additional details, it was a 7 month lease (I would assume most of the product is new in original box). HP will provide 90 days warranty and there might be original warranty by H3C."

28.     On or about June 15, 2011, ICT forwarded the Equipment list to its office in China to determine the Equipment's market value and liquidity there, because H3C was a China-based brand, and China presented the best resale market for the H3C Equipment. A cover email from ICT to Plaintiff Jade Cheng, titled "HP H3C Urgent," stated: "Hi Jade, you know the list we were working on bidding for, with the S5000? . . .  Attached is the list. Can you and Jason [Yuyi] work on this, and identify which parts are hot, and what prices we can sell at. We need this info to help formulate our bid to buy the materials." Plaintiff Cheng responded with the "HPH3C.xls" spreadsheet identifying hot items on Defendants' list of Equipment and their estimated resale prices in China.

29.     On or about June 16, 2011, Mr. Pekar had another telephone call with Defendant HPFS' Mr. Silvestri regarding the H3C products offered by Defendant HPFS, during which Mr. Silvestri asked ICT to prepare a proposal for the Equipment, including purchase price, profit sharing arrangements, and other terms. In his contemporaneous email memorializing that conversation for others at ICT, Mr. Pekar wrote: "I had a long conversation with HP regarding the H3C products.  In the next couple days, we need to give them few options on this project."

30.     On or about September 1, 2011, Defendant HPFS forwarded Mr. Pekar at ICT a version of the sale contract for the Equipment drafted by Defendant Gill, HPFS' in-house counsel. Mr. Pekar then circulated the draft to others at ICT, with a cover note stating: "Please review the contract we received from HP on the H3C deal."

31.     Also in or about September 2011, ICT's representative Mr. Pekar met with Mr. O'Grady, Director of Defendant HPFS' Asset Management who was in charge of the H3C project, to discuss this and an unrelated project in Russia. In his email dated September 29, 2011 memorializing that meeting for others at ICT, Mr. Pekar wrote: "Regarding meeting with Jim O'Grady, I have met with him, he knows who we are and what we trying to do, he is the one who send in the team to do an initial audit of our facility. He is in charge of H3C project and Russian Facility project, his team is working with us on both."

32.     On or about September 29, 2011, Defendant HPFS forwarded the next version of draft contractual documents to ICT for review. One of the drafts was titled "ICT Sale Document JT – H3C Equipment.docx," where "JT" stands for the initials of Defendant HPFS' manager JT Silvestri handling the negotiations, and "H3C Equipment" describes the Equipment that was the subject of those negotiations.

33.     On or about November 8, 2011, Defendant HPFS forwarded another version of the draft contract to ICT, with the document name "110917 ICT Sale Document JT – H3C Equipment.pdf."

34.     On or about November 21, 2011, Defendant HPFS forwarded yet another version of the draft contract to ICT, with the document name "111121 ICT Sale Document JT – H3C Equipment.docx," which included revisions made by Defendant Gill, HPFS' in-house counsel. Defendant Gill concealed and did not disclose to ICT that the Equipment was not "H3C Equipment" as stated in the draft but counterfeit, as Defendant Gill would himself later admit.

35.     On or about December 1, 2011, HPFS forwarded to ICT's Mr. Pekar two spreadsheets titled "Copy of H3C all schedules part numbers 080811 Shipment1.xlsx" and "Copy of H3C all schedules part numbers 080811 First Shipment.xlsx," drafted by Mr. Harris,

Defendant HPFS' Global Product Manager. The spreadsheets identified the Equipment by its HP/H3C manufacturing model codes. Mr. Pekar then circulated the spreadsheets to others at ICT, with a cover note stating: "Attached list of the 1st shipment, please feel free to go through to make sure all correct as we agreed on this couple months ago."

### 3.     The Contracts:  the HPFS Defendants sold the Equipment as H3C's.

36.     On or about December 6, 2011, the parties executed the sale contracts. The remarketing arrangement between HPFS India and ICT contemplated four shipments of the Equipment, with the initial payment of $250,000 due from ICT for the first installment, and a sharing of the net resale proceeds between ICT and Defendant HPFS India.

37.      Because HP's internal policy required a local entity for export-import transactions, the remarketing arrangement was documented in two concurrent contracts. First, Defendant HPFS India entered into a Referral and Revenue Share Agreement with ICT dated December 6, 2011 ("RRSA"), whereby Defendant HPFS India agreed to sell the Equipment "AS IS" to an Indian broker Shinto Creative Elements Private Limited ("Shinto"), and ICT agreed to acquire the Equipment from the broker for the purposes of reselling that Equipment and sharing the net proceeds of any such resale with Defendant HPFS India. The RRSA required ICT "to use its best efforts to remarket the Active Equipment at the highest possible prices" and "without identifying HPFS" as the source of the Equipment. The RRSA was executed by Javlin Lim, Defendant HPFS' APJ Delivery Team Lead, on behalf of Defendant HPFS India.

38.     Second, as contemplated by the RRSA, Defendant HPFS India entered into a Wholesale Sale Agreement (the "WSA"), also dated December 6, 2011, with Shinto for the sale of the first installment of the Equipment for $250,000 for the purpose of reselling the

Equipment to ICT. The WSA identified the sold Equipment by their "HP" and "H3C" manufacturing model codes and was executed by Kevan Bartley, Defendant HPFS' Global Operations Manager, on behalf of Defendant HPFS India. The execution version of the WSA also bears a legend "111202 ICT Sale Document JT – H3C Equipment 1st Batch.doc" printed in the footer.

39.     The purchase order issued by Shinto to Defendant HPFS India pursuant to the WSA likewise identified the purchased items as "HP/H3C"-manufactured equipment, and was executed by Mr. O'Grady, Director of Defendant HPFS' Asset Management in charge of the H3C project, on behalf of Defendant HPFS India.

40.     Accordingly, pursuant to the RRSA and the WSA, ICT purchased the Equipment represented by the HPFS Defendants as genuine HP/H3C-manufactured equipment, and had no reason to believe otherwise: ICT contracted with an HP entity; Defendant HPFS' representatives engaged in negotiations specifically identified and described the Equipment as the "H3C Equipment" on numerous occasions in the course of those negotiations; the contracts themselves specifically identified the Equipment as HP/H3C-manufactured equipment; and the Equipment had been inspected by Defendant HPFS India or its agents upon the lease expiration and return of the Equipment to Defendant HPFS India, prior to the sale to ICT. Indeed, in their March 2013 Letter the HPFS Defendants themselves admitted that "***[u]pon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment.***"

41.     As shown above, this was not merely an assumption on ICT's part as the Equipment was specifically represented to be H3C-manufactured equipment by representatives

of Defendant HPFS during the contract negotiations and expressly identified as such in the contracts themselves.

42.     Indeed, the HPFS Defendants subsequently admitted in their April 1, 2013 revision of the March 2013 Letter that that "*HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard*."

43.     As it turned out, those representations were false because the Equipment was not H3C-manufactured equipment but counterfeit, according to the Equipment's manufacturer, trademark holder, and a wholly-owned HP subsidiary at the time, H3C itself. Accordingly, the HPFS Defendants' statements referenced in paragraphs 26 through 35 above describing the Equipment as H3C-manufactured equipment were all false.

44.     Defendant HPFS, which conducted the sales negotiations, and Defendant HPFS India, the party named in the contracts as the seller of the Equipment, both concealed the fact that the Equipment was counterfeit. Had the HPFS Defendants or any of them told the truth, ICT would not have agreed to purchase and remarket the Equipment because counterfeit equipment is unlawful to sell and is worthless for remarketing purposes, and would have terminated its negotiations with Defendants forthwith; the Individual Plaintiffs would not have attempted to resell the Equipment in China.

**4.      Plaintiffs' attempts to resell the Equipment;
         discovery of its substandard condition.**

45.     Unaware of the counterfeit nature of the Equipment, and in anticipation of reselling it, Plaintiffs used their sales offices in China to arrange prospective customers to

purchase the first installment of the Equipment for the total amount of $1.5 million. Pursuant to the RRSA, ICT was to share 50% of the net resale profits with Defendant HPFS India.

46.     At the end of December 2011, Shinto arranged for the export of the first of four installments of the Equipment to Hong Kong, from where the Equipment was forwarded to Beijing, China by a local forwarder. That shipment included approximately 3000 transceivers purportedly manufactured by H3C; the remaining part of the Equipment still in India included approximately 5000 transceivers purportedly manufactured by H3C.

47.     Upon receipt of the Equipment in China, ICT representatives realized that the Equipment was in a substandard condition (scrap-grade), with physical damage, rust, scratches and other defects, and not marketable as anticipated. ICT's originally arranged customers, who expected the Equipment in an "AS IS" but relatively new condition – with reasonable wear and tear after a 7-10 month lease, as represented by the HPFS Defendants -- backed out and refused to buy the Equipment. ICT's sales team in China then started to develop new resale channels, which took longer than originally anticipated and produced lower gross sales receipts and net profits.

48.     Upon information and belief, the fact that the Equipment was in a substandard scrap-grade condition was known to, or recklessly ignored by, the HPFS Defendants prior to the sale of the Equipment to ICT and its importation to China because that condition would have become apparent to those Defendants during the 2011 Inspection when the Equipment was returned to Defendant HPFS India upon lease expiration. The company engaged by Defendant HPFS India "to process and refurbish returned lease equipment" – TT Global -- inspected and took photos of the Equipment during the 2011 Inspection.

49.     At the very least, the fact that the originally brand-new Equipment coming off a short-term lease was in a substandard scrap-grade condition should have raised a red flag for the Defendants, indicating potential substitution of the Equipment with a low-quality counterfeit.

50.     In October/November 2012, ICT's representative Mr. Pekar together with Defendant HPFS' representative Mr. Harris conducted a joint inspection of the remaining three installments of the Equipment in India (the "2012 Inspection") and agreed that the remaining Equipment was likewise in a substandard scrap-grade condition. Defendant HPFS then offered the remaining Equipment to ICT at a whopping 500% discount to the original price (for $150,000 instead of $750,000) but ICT declined, and the parties determined not to go through with the remaining installments. Upon information and belief, Defendants subsequently disposed of the three installments of the Equipment remaining in India.

51.     Neither during the 2012 Inspection nor afterwards during Plaintiffs' remarketing efforts did any of the Defendants inform ICT that the Equipment was counterfeit. ICT itself had no knowledge, expertise or technical means to determine whether the Equipment was genuine or counterfeit; indeed, it continued to believe – and had no reason not to believe – that the Equipment was genuine HP/H3C equipment, albeit in a substandard condition, because ICT bought the equipment as such from HP companies themselves and was entitled to rely and did rely on their representations regarding its HP provenance. Upon information and belief, Defendants had the knowledge, expertise and technical means to determine that the Equipment was counterfeit during the 2012 Inspection.

B.      **2012-2013:  The Frame Job**

1.  **The counterfeit nature of the Equipment revealed;
    ICT's Chinese offices raided; the Individual Plaintiffs arrested.**

52.      In the meantime, Plaintiffs continued to use their best efforts to resell the first

installment of the Equipment in China. In December 2012, however, representatives of H3C

lodged a complaint with the local police accusing Plaintiffs in marketing counterfeit H3C

products because the transceivers contained counterfeit H3C trademark logos, without

informing the police that the Equipment was sold to ICT by H3C's affiliates, the HPFS

Defendants, as genuine H3C Equipment.

53.      In its statements to the police made under oath, commencing in December 2012

and at least until August 2014, H3C consistently and unequivocally identified the Equipment as

"counterfeit H3C."

54.      H3C first reported to the police that the Equipment was counterfeit on December

7, 2012, after seizing three transceivers sold by the Individual Plaintiffs over the Internet. In its

Appraisal Certificate of that date, H3C reported to the police that "our company hereby declares

that, after the investigation of the seized products, the above products with 'H3C' logo are

confirmed to be counterfeit, our company hereby asks the law enforcers to confiscate and

destroy all the counterfeit products, and seriously punish the related people and the company,

including charging them with the criminal responsibilities."

55.      On December 9, 2012, H3C applied to the police, stating that it was the holder of

the H3C logo and trademark and requesting the police to search ICT's office, seize the

counterfeit H3C products and investigate the Plaintiffs for criminal violations. On that day, the

police raided ICT's offices, seized the remaining 778 transceivers, and arrested Plaintiffs Cathy

Yu and Jason Yuyi (their supervisor Plaintiff Jade Cheng was arrested on December 21, 2012,

when he came to the Haidian Detention Center on his own accord, searching for his missing associates).

56.     Following the seizure, H3C provided the police with another Appraisal Certificate dated December 9, 2012, likewise stating with respect to the 778 transceivers seized that day that "after investigation of the seized products, the above products with 'H3C' logo are confirmed to be counterfeit," and again calling for the criminal prosecution of the Plaintiffs.

57.     On December 27, 2012, H3C submitted another declaration to the Chinese police, stating that the Individual Plaintiffs were "selling counterfeit 'H3C' transceivers which Logo is owned by Hangzhou H3C Technologies, Ltd.," and further that "'H3C' Logo and its translations are ONLY owned by: Hangzhou H3C Technologies, Ltd., our company never shared it with other companies or individuals. Our company never assigns rights to HP to sell or distribute the products with H3C Logo in China."

58.     H3C's police complaint requesting criminal prosecution of the Plaintiffs was misleading, and the ensuing arrest and imprisonment of the Individual Plaintiffs was unjustified, because even if the Equipment was counterfeit, H3C did not disclose that the Equipment was supplied to Plaintiffs by H3C's HP affiliates, the HPFS Defendants, as genuine H3C equipment, and was marketed by Plaintiffs as such pursuant to the revenue-sharing agreement with the HPFS Defendants and without any knowledge that it was counterfeit.

59.     The Individual Plaintiffs' imprisonment was further unjustified because the HPFS Defendants' fraudulent sale of counterfeit Equipment to Plaintiffs in 2011, for the express purposes of resale, unreasonably exposed the Individual Plaintiffs reselling it to a substantially certain risk of arrest and imprisonment. The HPFS Defendants committed their fraud with

knowledge or reckless disregard for the fact that the Individual Plaintiffs' confinement would, to a substantial certainty, result from it.

60. Based solely on H3C's representations, the Individual Plaintiffs were detained and imprisoned; ICT's Chinese offices were raided and shut down; and the remaining unsold part of the Equipment was seized. That was the first time when Plaintiffs learned that the Equipment was counterfeit.

61. As soon as ICT learned about the arrest of its sales representatives in China, it set out to assemble and translate the necessary documentary evidence and other materials to secure their release. In January 2013, ICT learned that the criminal trial of the Individual Plaintiffs could be expected as early as April 2013, and started racing against the clock.

62. While ICT was desperately trying to obtain the release of the Individual Plaintiffs from their hellish incarceration, the Defendants withheld exculpatory evidence and stonewalled the Chinese state officials' requests to confirm the Individual Plaintiffs' alibis, and then embarked on an insidious cover-up scheme to conceal their frame job, even though that meant continuous imprisonment, the overhanging threat of criminal prosecution with a virtually certain conviction (the criminal conviction rate in China in 2013 was 99.93%), and long prison sentences for the innocent Individual Plaintiffs.

## 2. The early months of incarceration: Defendants pretend to assist the Individual Plaintiffs' release while withholding exculpatory evidence; thoroughly inspect the seized Equipment.

63. The Individual Plaintiffs spent the next seven months in the torture-like conditions of the Haidian Detention Center, notorious for its brutal treatment of detainees. *See*, *e.g.*, The New York Times, *Urging Treatment for Activist in Jail in China, 16 are Briefly Detained Themselves*, March 20, 2013 ("The group went to the Haidian Detention Center in

17

western Beijing to deliver a note asking if Ms. Wu was being forced to sleep on the floor, as she

had told her lawyer, and whether she had been sent to a hospital for treatment."); Vice News,

*The Beijing Five:  Calls Grow for Release of Chinese Feminists Held Without Charge*, April 10,

2015 ("For weeks, Wu Rongrong awoke each day on the cold concrete floor of her cell within

Beijing's Haidian District Detention Center, where she had been caged since early March on

suspicion of 'picking quarrels and provoking trouble.' Her skin had grown yellow, and she was

coughing up bloody phlegm."); Minghui.org, *Ms. Wei Hui Taken Again to Haidian Detention*

*Center, Known for Torturing Practitioners*, February 18, 2015 ("That particular detention center

is known for torturing [Falun Gong] practitioners and some have died.")

64.     The initial shock of the arrest, the day-to-day loss of liberty, loss of face, fright,

anxiety, stress, humiliation, anguish and physical, emotional and mental suffering associated

with imprisonment were compounded in the Individual Plaintiffs' case by the cruel conditions

of the Haidian Detention Center, described in detail in the accompanying affidavit of Plaintiff

Cheng. The Individual Plaintiffs' suffering was also magnified by their knowledge that they

were unjustly imprisoned by HP for doing nothing more than selling HP's Equipment for HP's

ultimate benefit.

65.     Shortly after his arrest, Plaintiffs Cheng explained to the police that the

Individual Plaintiffs were selling the Equipment provided by the HPFS Defendants to ICT

pursuant to the WSA and RRSA as genuine H3C Equipment.

66.     On January 10, 2013, the Chinese police contacted HP China to verify Individual

Plaintiffs' alibis, and recorded HP China's response as follows:

> We contacted with Meng Tao, who is working in the Security
> Department of HP China, regarding several agreements made between
> ICT USA and HPFS submitted by [Individual Plaintiff Jade Cheng],
> Meng Tao replied on the phone and we took record as he said: "***All HP***

18

*contracts/agreements can be downloaded freely by anyone from HP website.  HP China does not admit any contract signed by another party (HPFS)* and requires the party who signed the contract to provide the detailed contact information for HP China to verify the contract."

67.     Thus, HP China refused to confirm the Individual Plaintiffs' alibis; moreover, HP contracts **cannot** in fact "be downloaded freely by anyone from HP website."

68.     HP China would go on to stonewall the police's requests for exonerating evidence for the next *seventeen months* of the Individual Plaintiffs' confinement and bail, in coordination with the Defendants and in facilitation of their frame job and cover-up.

69.     Thus, two months later, on March 2, 2013, the Chinese police again contacted HP China to see if HP China was able to verify the contracts and thus confirm the Individual Plaintiffs' alibis, and recorded its response as follows: "the person from HP China said *HP China is contacting HPFS currently*."

70.     Fifteen more months later, in August *2014*, the Chinese police once again contacted HP China and received exactly the same non-response as it did in January and March of 2013: "We contacted with Fu YuLin who is from Legal Department of HP China (his contact +86-18901088737), we asked HP China to verify the products, to make sure where the products came from. *Fu YuLing replied that he is contacting the related departments of HP*. *But till now, we have not got a reply from him.*"

71.     Thus, from January 2013 and through the whole period of the Individual Plaintiffs' ordeal, HP China represented to the police that it was unable to contact its parent company HP or its affiliate Defendant HPFS in order to verify the Individual Plaintiffs' alibis, and stonewalled the police requests for that exonerating evidence.

72.     In January 2013, after their own early efforts to obtain release of Individual Plaintiffs from custody proved unsuccessful, Plaintiffs ICT and Styller brought their concerns to

the attention of the HPFS Defendants, requesting their assistance with securing the Individual

Plaintiffs' release.

73.     Instead of making prompt, complete and truthful disclosure of the relevant facts

to the Chinese authorities that would have confirmed the Individual Plaintiffs' alibis, fully

exonerated them, and secured their early release, however, the HPFS Defendants dragged their

feet for several months until the end of April 2013 while the Individual Plaintiffs remained in

jail -- and then only to make a woefully inadequate and misleading disclosure that failed to

secure their release, to withhold exculpatory evidence that would have exonerated them, and to

cover up their perfidy with a campaign of lies, threats and intimidation.

74.     Thus, by email dated January 31, 2013, ICT's representative Ryan Quinn

explained the situation to Defendant HPFS' representative Mr. Silvestri, asked Defendant HPFS

to "straighten this issue out internally with HP China & H3C China, and have it clarified with

the Police," and stated that "a formal letter from HP will be very helpful explaining the situation

& stating that ICT did in fact buy this batch of H3C material from HP." Mr. Silvestri was the

HPFS' representative who had introduced that very H3C Equipment to Plaintiffs in 2011.

75.     Next day, February 1, 2013, Mr. Quinn sent another email to Mr. Silvestri,

thanking him for "taking this so seriously and ***escalating it so quickly***."

76.     Nothing happened for the next ten days, however, prompting Mr. Quinn to write

to Mr. Silvestri again on February 12: "Is it possible to get this letter from HP? A formal letter

from HP will be very helpful explaining the situation and stating that ICT did, in fact, buy this

batch of H3C material from HP."

77.     In response, Mr. Silvestri wrote on February 14: "Here is what ***the HP legal***

***team*** thinks we can do which is to provide a formal letter covering the following: Details of all

equipment purchased by ICT from HPFS; Confirming that based on our sampling some of the assets seized are within this list; and to the extent any of the assets seized were supplied by HPFS, we do not believe that ICT should be held responsible if they are counterfeit. We would like your feedback on this and if you would like us to pursue we would also need to confirm this with our **HP local legal teams**."

78.     On February 17, 2016, Defendant Gill, Defendant HPFS' in-house counsel, became involved in the matter, writing to Mr. Styller of ICT: "JT asked me to reach out to you with respect to the above. I have been reviewing the issue with **the HP legal and security teams** in China so it would make sense for you to speak directly with me."

79.     After another week of inaction – another torturous week for the Individual Plaintiffs and their families – Mr. Styller wrote to Defendant Gill on February 22: "Can you please make an effort to convince your H3C counterpart in China to instruct police to free our people. The level of allegation is not proportionate to the level of detention. 60 days in jail and counting for allegation of such magnitude is ridiculous. Set aside that they done nothing wrong, there is no justification to detain people without bail in jail on small economic charge like that. Those people have no prior convictions and will not go anywhere. I will appreciate if you try. I know they can do the magic. Thank you very much. I feel those people pain. Hope you understand."

80.     Plaintiff Styller's emotional plea was met with a perfunctory response from Defendant Gill: "I hope to have an update later today. Please bear with me and please be assured that **we have a number of people working on this** so that it can be resolved as soon as possible."

81.     The utter lack of empathy in Defendant Gill's response would become, without fail, a common theme in all of Defendants' correspondence with the Plaintiffs throughout the whole ordeal.

82.     Mr. Styller replied: "Thank you, David for giving this a priority. Every day in jail must be most horrible life experience. I never being detained but I am afraid to imagine. Have a nice day and feel free to contact me any time day or night if my participation is necessary."

83.     On February 25, Defendant Gill notified Mr. Styller: "The PBS have granted us permission to view the seized goods on Thursday. *Our internal audit team* should have a report on Wednesday."

84.     That Wednesday came and went, and with no such report forthcoming and the Individual Plaintiffs enduring their 81st day in confinement, nine days later, on March 5, Plaintiff Styller wrote to Defendant Gill: "Hope you had a nice weekend. I am wondering if you have any new information from China. Last time I know that your team was 40% through the inspection of material in China. Please update on current status." Defendant Gill responded: "The officer in charge was travelling for a few days and was expected to return today. As soon as he returns *our audit team* will attempt to complete the reconciliation asap."

85.     Another week passed by – fourteenth of the Individual Plaintiffs' incarceration – and Plaintiff Styller wrote yet another letter to Defendant Gill on March 12: "It is about two weeks since your team started inspection of product. Innocent people still in jail (for about 3 full months by now). I appreciate your process but your legal team must arrange for release of our team immediately. Bail or not bail, whatever it is they must go home. I am getting pressure from the families; elderly parents of our sales team members are going crazy. It breaks my heart to

see letters from them. They think I can do something to help. At this point, can you please arrange for your legal team get in touch with our lawyer there and explain the situation? Hope this move will provide some clarity and comfort to families. Hope that move at least will help them understand that HP and ICT are working together to have all the mess cleaned up. I would appreciate if you call me your morning on my cell to discuss and update. JT, if you can do something, please help."

86.     In response to Mr. Styller's pleas for help, Mr. Silvestri wrote on March 12: "I am not in the loop on this as *it is at the top level leaders*. They do not provide me updates and I can do no more here to assist. That's *a big company policy*. So appreciate you working with David [Gill]."

87.     Defendant Gill in his turn on March 11, 2013, in response to Mr. Styller's desperate pleas, requested additional information and documents from ICT and demanded that ICT through its local counsel arranged for HP to inspect the remaining 60% of the seized Equipment by "H3C's auditors," expressing no sympathy whatsoever for the Individual Plaintiffs or for their suffering families, the Family Plaintiffs.

88.     Mr. Styller responded: "Your email did not resonate well, where you seemed to 'pass the ball' back to ICT saying there is paperwork needed about our incorporation & custom clearance. Our lawyer has confirmed this has not been requested by anyone. We've already provided all necessary documentation to our lawyer, and *the only issue in question is the authenticity of these H3C transceivers.*"

89.     Mr. Styller further urged that "H3C should go to authorities with result of the first 40% -- and formally state whether these are the parts bought from HP," and unequivocally requested: "*We need to know the result of your audit of the 40% of material.*"

90.     Indeed, given that fact that H3C had already inspected **all** the seized transceivers, determined them **all** to be counterfeit, and so reported to the police, *see* paragraphs 55-56 above, the re-inspection of 40% of them by Defendant HPFS and "H3C auditors" should have been able definitively either to confirm or disprove that the Equipment was counterfeit, without any need to inspect the remaining 60%.

91.     In the internal correspondence of the same date, Mr. Quinn presciently wrote to Plaintiff Styller: "In thinking more about this today, I am suspecting that they are hesitant to answer this as they can smell a lawsuit. I bet they are bringing up the customs issue & incorporation as a defense strategy. We'll see if he continues to avoid answering this."

92.     Mr. Styller responded: "***I think they are legitimate organization and covering up simple thing as result of the inspection is not a good idea***." Yet, that was exactly what the Defendants did: in responding to Mr. Styller's request, Defendant Gill conspicuously ignored that key and "only" question about the results of their audit of the 40% of the seized Equipment, writing on March 12: "I am not trying to pass the ball back to ICT. I am just relaying information that our auditor came back with after visiting the police. If this is information the police want then it is in everybody's interest to get it to them as soon as possible. I will also do what I can today to get into contact with ***the local teams*** to see what we can do to move this more quickly."

93.     Frustrated by the lack of progress and anxious about the impending trial, Plaintiff Styller also contacted Mr. O'Grady of HPFS, who was in charge of the H3C project, writing on March 12, 2013: "Hi Jim, I was hoping to have a conversation with you regarding the transaction between ICT and HPFS India. I am sure you remember this deal."

94.     Mr. O'Grady flatly refused to help or even to talk to Mr. Styller, writing back two days later: "My understanding is that ICT has been in communication with HP regarding the India transaction.  I do not believe that I could personally add anything to the conversation. I believe your existing HP communications are the best way to address any remaining inquiries on the transaction." That was a callous response by the same Mr. O'Grady, Director of HPFS Asset Management, who was "in charge of the H3C project" and whose team was working on it with the Plaintiffs in 2011.

95.     On March 14, 2013, Styller wrote a two-line email to Defendant Gill, again asking the same direct and unambiguous question: "***We need to know the result of your audit of the 40% of material. Please answer this question***. Thank you."

96.     Defendant Gill responded: "Apologies for the delayed reply. I was out of the office today. The equipment we were able to inspect comprised of 293 line items. We were able to reconcile most of these assets back to the list of equipment sold by HPFS India to Shinto Creative Enterprises.  It was not possible to reconcile 73 items." Yet again, Defendant Gill managed to avoid answering the key and only relevant question about the authenticity of the inspected items.

97.     Having received this transparently evasive reply, Plaintiff Styller wrote back to Defendant Gill on March 15, 2013: "Thank you for your reply. Hope all is well. It is a 'public knowledge' (between all of us) that list of equipment supplied with shipment was very poor quality. I am not surprised that it was 'not possible to reconcile 73 items' out of 293. ***Since the allegation that keeps our people in jail 'selling counterfeit' product, next question -- any of the product inspected found counterfeit?***"

98.     Yet, once again Defendant Gill failed to answer that key question, which called for a simple "yes" or "no" answer. Instead, Defendant Gill responded with a long email, only stating in the relevant part: "Based on our analysis of approximately 40% of the equipment it appears that the equipment seized is the same equipment sold by HPFS to Shinto and onto ICT. . . .  I am also making inquiries with respect to whether the counterfeit allegations relate to the labeling only or if there are other concerns." Whether the inspected Equipment was found counterfeit or authentic, Defendant Gill did not say, again withholding exonerating evidence from the Plaintiffs.

99.     Defendant Gill's evasive email also attached a request by the Chinese prosecutor to the Chinese police regarding evidence-gathering for the case, without any explanation how this confidential internal document (which disclosure is illegal in China) ended up in Defendants HPFS' and Gill's possession.

100.    Also on March 15, 2013, Plaintiff Styller wrote to Defendant Gill after communicating with ICT's Chinese counsel: "He has received call from Ms. Liu -- a lawyer with HP or H3C, who keeps pushing for incorporation issues, saying these guys should not have been selling the transceivers. It sounds like *she is being aggressive, rather than trying to help resolve this*."

101.    Another week passed by – 15th week of the Individual Plaintiffs' horrific ordeal -- with Defendants' requesting additional information, documents and photos of the Equipment from ICT, and ICT's providing such information promptly, which information Defendant Gill on several occasions stated he would "pass on" to unnamed parties.

102.    On March 19, 2013, Plaintiff Styller wrote to Defendant Gill: "Do you have any update for me? Is letter ready? *When you pass along our request to drop charge, where all this*

26

*information go?* We hear no feedback and our people still in jail. We are getting more and more concerned with [lack of] progress."

103.    Defendant Gill responded: "***A number of people within HP are devoting a significant amount of time to this matter*** and trying to work it out as quickly as possible. ***It is not a simple situation****. . . .*"

104.    In his response, Defendant Gill also requested additional documents and information from ICT – yet again without disclosing the results of HP's inspection of the Equipment and, in particular, yet again avoiding the key question whether "any of the product inspected [was] found counterfeit."

105.    In his March 19, 2013 email exchange with Defendant HPFS' Mr. Silvestri, Plaintiff Styller expressed the frustration and anxieties running high at ICT and among the Family Plaintiffs: "Please understand the endless questioning can't go on forever. It is already 2 months since HP is involved. It is clear that our people didn't do anything wrong. Your anti-counterfeit team randomly checked 40% of material provided by police. Nothing was found. Police refuse to provide more product for checking. H3C is pushing for more and more scrutiny clearly trying to manufacture the case out of thin air and HP is not helping us stop the madness. There is nothing there justifying holding people in jail. H3C came up with a fake label now, that was not found by your team. This is absolutely unacceptable and unjustified continuation of the situation. All necessary questions answered, all necessary prove is collected. We demand your higher management to get involved and instruct H3C to drop the case immediately and release our people."

106.    Plaintiff Styller wrote further to Mr. Silvestri: "Here is our feeling about working with David Gill. While he is very responsive and professional individual we think he has not

enough authority to get things moving. We are getting very concerned that since we have HP involved there is no progress noted in our China situation. We are developing impatience and more and more unclear on HP's agenda. ***It appears that H3C wants to keep our people in jail, and HPFS AP or Worldwide doesn't mind, and doesn't seem to be helping ICT***. So far random test of 40% of material prove that we done nothing wrong and our people were marketing HPFS India material. But our people are still in jail and charges are not dropped. This is absolutely unacceptable. We demanded charges dropped and our people released immediately multiple times but this was just passed along with no results. We require HP contact with authority above H3C China to be involved and start handling the situation and help us to get our people out of jail. To start I suggest we meet and discuss this at your first possible convenience. I also suggest Jim O'Grady to participate in meeting."

107.    Yet, Plaintiff Styller's proposals and pleas for a meeting were flatly rejected by HP, with Mr. Silvestri's writing back: "Please work with David on this directly as we discussed this is ***within the legal teams in HP*** to address. Your focal point and contact is with David Gill." Thus, the Defendants funneled all Plaintiffs' communications to the "legal teams in HP" and their point person Defendant Gill, who continued to pass Plaintiffs' desperate pleas "to get our people out of jail" along to his unnamed superiors – where they all died a quiet death.

108.    And Defendants steadfastly refused to disclose the identities of those senior decision-makers to the Plaintiffs, as their questions -- such as "When you pass along our request to drop charge, where all this information go?" -- were answered only with vague references to "the HP legal teams supporting HP Financial Services and H3C."

109.     Also in March 2013, Defendant Gill's boss Mr. McCarthy transitioned from being an in-house counsel for Defendant HPFS to becoming an outside counsel for HP, HPFS India and H3C, and subsequently handled this matter on behalf of all three entities.

110.     On March 21, 2013, with no further information from Defendants, Plaintiff Styller wrote to Defendant Gill: "As you know we are frustrated with the lack of progress and fact that our people are still in jail. These are the major questions we are still looking for, and **keep getting the run-around from HP on**. Please help to answer them. We need to update the families on what is going on. Who is leading this effort, and where is all this information being "passed on" to? Where is the report that we expected on Monday? What is HP's action plan? What is HP's agenda? Please answer those questions for us. We owe to frustrated families of the men and women of ICT China Team."

111.     Defendant Gill responded, stating *inter alia*: "**The HP legal teams supporting HP Financial Services and H3C are working on this matter**. . . . A draft has been prepared. **The letter needs to be as clear as possible to be effective**. H3C has been analyzing the photos of the labels. A sample of the equipment is also being sent by our processing vendor in India to China for analysis by H3C. **An HP attorney from the U.S. will be in China next week**. **He will be assessing the situation which I think will be very helpful.**  It is my hope that we will send the letter to the authorities soon. However, you need to appreciate that **this situation is not simple**. . . . We don't have an agenda. HP always has an interest in protecting its intellectual property but would never want to see innocent individuals incarcerated."

112.     Plaintiff Styller replied: "Thank you for your answers. For all fairness we and families are spending enormous amount of time and money to defend and support our guys also.

. . . I will pass your answers to the frustrated and angry families who are all over me for results. Hope that they understand things better."

113.    On March 25, Plaintiff Styller wrote another email to Defendant Gill: "Please update me on the development of the situation in China and now I hope that letter promised is ready and hope to receive this letter sometime soon."

114.    Defendant Gill replied: "I think we should have a draft letter completed today. I do think we have a better momentum on this now. ***We now have the right people involved in this matter***." Presumably, the "right people involved in this matter" now included the unnamed "HP attorney from the U.S." recently visiting China to assess the situation.

115.    Another email from Defendant Gill of that day stated: "A quick update. I have completed the draft letter today. It is in China for review. I will keep you updated."

116.    Conspicuously, in none of this correspondence did Defendant Gill ever answer the key question repeatedly asked by ICT – was any of the inspected Equipment found counterfeit or not? Accordingly, Defendant Gill -- no doubt in consultation with his HP superiors and the "HP legal teams" (which would include his direct boss at HPFS Mr. McCarthy and those above him in the HP corporate hierarchy) – withheld exculpatory evidence from the Plaintiffs and stonewalled their repeated, desperate requests for it.

117.    To summarize the post-arrest events up to this point: Defendants were notified of the arrest as early as January 2013; the matter was quickly "***escalated***" to the "***top level leaders***" and decision-makers above Defendant Gill's pay-grade, to whom he was passing along Plaintiffs' desperate pleas for help. The others, including even Defendant HPFS' business people who negotiated the original deal Messrs. Silvestri and O'Grady, were cut off from that loop as a matter of "***a big company policy***." By mid-February, "***the HP legal and security***

30

*teams* in China" had already been reviewing the issue with Defendant Gill's involvement.

Defendant Gill, Defendant HPFS' Assistant General Counsel reporting to HPFS' General

Counsel at the time, Mr. McCarthy, who was appointed as a focal point and contact person to

deal with the Plaintiffs on behalf of the HPFS Defendants, kept passing ICT's requests for

information and assistance to "*the HP legal teams supporting HP Financial Services and H3C*

*working on this matter*." According to Defendant Gill, the "situation [was] not simple" and "*a*

*number of people within HP [were] devoting a significant amount of time to*" it, including

"*the HP legal team*," "*HP local legal teams*," "*the HP legal and security teams*," its "*internal*

*audit team*," and the "*HP attorney from the U.S.* . . .  assessing the situation," among others, as

well as Defendant Gill himself "spending an enormous amount of time on this matter."

118.    By mid-March, these numerous HP legal, security and audit teams had

thoroughly inspected the seized Equipment: they "analyzed the photos of the labels," the

"sample of the equipment . . . sent by our processing vendor in India to China for analysis," the

inventory lists of the Equipment, and physically inspected 40% of the seized Equipment.

119.    It is inconceivable that after all these inspections by numerous top experts – HP's

own *legal, security and audit teams* -- Defendants still did not know whether any of the

inspected Equipment was counterfeit or not, particularly given that its Chinese subsidiary H3C

had the Individual Plaintiffs arrested, thrown in jail and investigated for serious crimes based on

the visual inspection of the security features and placements of the Equipment logos –

inspection that took H3C itself just one day, the 9th of December 2012, to conduct on the 778

seized transceivers. Yet, Defendants studiously avoided answering that key question when

directly and repeatedly asked by ICT, even though the Individual Plaintiffs' fate and freedom

depended on that.

120.     As it were, Defendants remained mute while the Individual Plaintiffs continued

to endure their horrific confinement in the Haidian Detention Center and ICT desperately tried

to have them released. Worse than mute – as shown, they and their Chinese affiliates

deliberately withheld exculpatory evidence that would have led to the Individual Plaintiffs'

release, and stonewalled numerous express requests from the state authorities and from the

Plaintiffs themselves for its disclosure.

121.     During the same period, HP China already twice – in January and March 2013 –

stonewalled the police's requests for exonerating evidence, falsely pleading ignorance despite

working closely with the Defendants on the matter and being fully aware of the facts. HP China

would go on to do so again a year and a half later, in August 2014.

122.     At the same time, H3C – which was also working closely with the Defendants

during this period – likewise stonewalled the police's requests for exonerating evidence, falsely

pled ignorance, and continued its relentless and aggressive push for the Individual Plaintiffs'

trial on false charges, despite its and the Defendants' knowledge that the Individual Plaintiffs'

complete innocence would not help them against the 99.93% underlying criminal conviction

rate in China at the time.

123.     At all relevant times, all the Defendants, as well as H3C and HP China, were part

of the same HP company, and acted in concert to facilitate Defendants' frame job.

> **3.  The long-awaited answer: Defendants admit selling counterfeit
> Equipment to Plaintiffs in the March 2013 Letter; then secretly
> <u>delete that admission from the April letter, and lie about it.</u>**

124.     On March 27, 2013, Defendant HPFS finally provided ICT with a long-awaited

draft submission to the Chinese authorities (in English), drafted by Defendant Gill on behalf of

Defendant HPFS India and reviewed by "the right people" prior to its release.

125.    After laying out the relevant background facts, Defendant HPFS stated in its

March 2013 Letter:

> HPFS India immediately commenced investigating the matter. H3C
> inspected the seized equipment on behalf of HPFS India and also
> obtained lists of the seized equipment from the [insert name of relevant
> Chinese police entity]. HPFS India compared this data against its data for
> the Sold Equipment. ***Based on the available evidence HPFS India
> believes that the counterfeit H3C equipment seized in China is the same
> equipment sold by HPFS to ICT*** (through Shinto).
>
> HPFS India has also viewed photos of the Sold Equipment taken prior to
> its import into China.These photos were obtained from ICT's USA office
> and from the company HPFS India engaged in India to process and
> refurbish returned lease equipment. Based on these photos it appears that
> ***the logos currently affixed to the Sold Equipment were present on the
> Sold Equipment at the time of the sale from HPFS India to ICT***.
> Copies of the relevant photos obtained are attached as Annex D.
>
> In these circumstances, notwithstanding that ***the seized equipment is
> counterfeit***, HPFS India does not believe that ICT or its representatives
> should reasonably be held responsible for selling counterfeit equipment.
> ***Upon purchasing the equipment from HPFS India and taking into
> account that both HPFS India and H3C are ultimately owned by HP,
> ICT was entitled to assume that it was buying genuine equipment.
> Based on the available evidence it would appear that the relevant
> counterfeiting activities occurred at some point in time prior to the
> return of the Sold Equipment to HPFS India upon the expiration of the
> Leases***. HP is reviewing the initial sale to try to determine how the
> counterfeit equipment was produced and who produced it.

126.    The import of these statements is crystal clear: the HPFS Defendants and H3C

thoroughly investigated the matter and unequivocally concluded that "the seized equipment is

counterfeit"; that the counterfeiting activity took place before the sale of the Equipment to ICT;

that ICT was entitled to assume it was buying genuine Equipment; and that ICT or its sales

associates should not be hold responsible for reselling counterfeit Equipment. Moreover,

according to Defendant Gill, the HPFS Defendants' parent company HP was "reviewing the

initial sale to try to determine how the counterfeit equipment was produced and who produced it."

127.    ICT regarded the March 2013 Letter as an admission of guilt by HPFS Defendants because Defendants' admissions made in that Letter clearly exposed them to criminal liability in India (for selling counterfeit goods and for possession of counterfeit goods for sale), and to civil liability to Plaintiffs in connection with the 2011 sale.

128.    Upon receipt of the letter, on March 28, ICT's outside counsel Mr. Riordan provided his comments to Defendant Gill, including: "you indicate that ICT should not be 'held responsible for selling counterfeit equipment.' You also indicate that ICT was entitled to 'assume it was buying genuine equipment.' Can the above be made stronger? Note as follows: the agreements warranted that HPFS was the 'lawful' owner; your exhibit (manifest) listed the equipment as HP equipment; the agreement required ICT to maintain the integrity of the equipment <u>as HP equipment</u> to maximize profit. It seems to me that the letter should directly state that ICT <u>is not</u> responsible" (emphasis original).

129.    On April 1, Defendant Gill responded to Mr. Riordan's comments by email and included a draft of the March 2013 Letter with suggested revisions. The following statement was added to the draft, among other revisions: "***HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard***." The other key admissions made in the March 2013 Letter, *see* paragraph 125, were repeated in the April 1 draft *verbatim*.

130.    On April 2, Messrs. Gill and Riordan had a telephone call, following which Mr. Riordan wrote to Defendant Gill on April 3: "Thank you so much for speaking with me

yesterday and also *for adopting the suggestions regarding your letter . . . . [Y]our letter should be sent out immediately and directed to both the prosecutor and the police.*" Mr. Riordan's email included "*the contact for the prosecutor, whom you should send letter directly*" (the name, address, telephone number) and "the contact for the police" (with the same details).

131.    On March 29, 2013, Plaintiff Styller also wrote to Defendant Gill: "the letter is an important document that we want to put together the right way. *It is important* that we have this letter finalized ASAP, translated, chopped (stamped in China) and *delivered to prosecution*."

132.    Another week passed by – week 17 of imprisonment for the Individual Plaintiffs, extreme anxiety for the Family Plaintiffs, frustrations by ICT representatives and severe distress for Plaintiff Styller personally – when he wrote to Defendant Gill on April 4, 2013: "I hope the letter will be available to everybody rather earlier than later next week."

133.    By April 9, 2013, Defendants having failed to make their submission as promised, ICT's representative Ryan Quinn wrote to Plaintiff Styller: "It was promised early this week. *Lots more upset calls and emails from families these two days*."

134.    The next day, April 10, Plaintiff Styller wrote to Defendant Gill: "We were expecting the letters done in the beginning of this week. It is almost Thursday your time. We still got nothing. *We are quickly running out of time now and must have letters now. Everybody on our side getting very nervous and concerned as trial can start any time. We need our people out of jail now!*"

135.    On the same day, Defendant Gill informed ICT that "I have received the translated letter last night and will have one of our Chinese attorneys review it today."

35

136.   Five days later, on April 15, Defendant Gill wrote to ICT: "*I have shared your letter with the relevant personnel within HP China and H3C*. *We have an internal meeting tomorrow and I will update you then*." And then another week had passed before Defendant Gill on April 22 provided the final version of the letter – in Chinese – to ICT.

137.   In response to an inquiry by ICT's outside counsel whether Defendants' final submission (in Chinese) was substantially the same as the March 2013 Letter (in English) shared with ICT, Defendant Gill represented that "*the letter is substantively the same as the last English version you saw*. There were some minor amendments but *nothing changed the description of the relevant sequence of events* between HPFS India and ICT."

138.   The "last English version" was the reference to the April 1 revised draft of the March 2013 Letter, which included all of the admissions made in the March Letter and the additional statement made in the April 1 version.

139.   As such, the "last English version" stated that "*the seized equipment was counterfeit*," that "*the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India*," and that "*HPFS India sold the equipment to ICT as genuine H3C equipment . . . and ICT was entitled to rely on HPFS India's representations in this regard*."

140.   In fact, contrary to the HPFS Defendants' representation, the final Chinese version of the letter differed markedly from the English draft shared with ICT, with Defendants' own key admissions set out in their March 2013 Letter altogether omitted, mischaracterized, or considerably softened and qualified in Defendants' favor.

141.   Thus, the statement "the seized equipment is counterfeit" disappeared from the letter altogether. The statement "HPFS India believes that the counterfeit H3C equipment seized

in China is the same equipment sold by HPFS to ICT" became "HPFS India suspects that the seized equipment might be the same equipment sold by HPFS to ICT." The statement "the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the leases" became "part of the Sold Equipment supplied by Inspira did not come from HP Company." The sentence "HP is reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it" was omitted, while several self-serving statements not present in the March 2013 Letter added, such as that "HPFS India . . . previously did not know anything about the allegedly counterfeit equipment it handled."

142.    Finally, the statement that "***HPFS India sold the equipment to ICT as genuine H3C equipment . . . and ICT was entitled to rely on HPFS India's representations in this regard***" that Defendant Gill purportedly added to the March 2013 Letter in his April 1 revision in response to Mr. Riordan comments, and which Defendant Gill falsely assured Mr. Riordan would be included in the final letter, disappeared from the Chinese version as well.

143.    Thus, during the period between April 1, 2013 (the last English version) and April 22, 2013 (the Chinese version), Defendants thoroughly sanitized the Letter by deleting clearly exculpatory evidence that would have led to the Individual Plaintiffs' release, concealed those deletions, and affirmatively misled the Plaintiffs about them. It stands to reason that the Letter had been altered following the April 15th "internal meeting" between Defendant Gill and his unnamed HP colleagues.

144.    The letter was executed on behalf of Defendant HPFS India by Defendant Gill as its director, even though Defendant Gill was only a ***non***-executive director of Defendant HPFS India while serving as Assistant General Counsel and Assistant Secretary of Defendant HPFS.

145.    This sanitized, self-serving, purposely vague, strategically ambiguous, and highly misleading version of the March 2013 Letter, with the key facts as determined by Defendants' own thorough investigation – the facts exonerating the Individual Plaintiffs and implicating the Defendants instead -- mischaracterized or altogether omitted, predictably failed to secure the release of the Individual Plaintiffs, who remained in jail for several more months after that submission and were not released on bail until July 17, 2013, having endured more than 7 months each in the harsh conditions of the Chinese prison.

146.    Indeed, even though Defendants fully realized that, in the words of Defendant Gill, "the letter needs to be as clear as possible to be effective," Defendants purposely made the letter anything but clear or effective.

147.    The only admission left in the letter was the fact that the HPFS Defendants sold the seized Equipment to ICT – which fact the HPFS Defendants could not deny anyway, given the WSA and RRSA contracts, the Equipment serial numbers, and photos of the transceivers in Plaintiffs' possession, shared with the police. And even that admission was massaged into "HPFS India suspects that the seized equipment might be the same equipment sold by HPFS to ICT," with plenty of weasel words and wiggle room thrown in. The admissions exculpating the Individual Plaintiffs and implicating the real culprits – the HPFS Defendants – were all deleted.

148.    Accordingly, having first created the intolerable situation where innocent young people languished in jail through absolutely no fault of their own and solely as the result of the HPFS Defendants' wrongful actions and omissions, the Defendants then failed to make a complete, honest and timely disclosure to the Chinese authorities that could have effectively led to the Individual Plaintiffs' release, choosing instead to place Defendants' own selfish interests above those of their innocent victims and their families, with outrageous indifference to their

plight. Moreover, Defendants lied to Plaintiffs about the contents of their submission:

Defendant Gill's statements that the Chinese submission was "substantively the same as the last

English version" and "nothing changed the description of the relevant sequence of events" were

knowingly false and fraudulent.

149.    And, in the end, the HPFS Defendants did not file even that sanitized letter – and

lied about it to the Plaintiffs as well.

### 4. Defendants fail to formally file their sanitized letter with the prosecution or the police as ICT requested, and lie about it.

150.    Defendants did not formally file even their thoroughly sanitized letter with the

prosecutor or the police, as requested by Plaintiffs, while falsely assuring them otherwise.

151.    Thus, on May 2, 2013, Defendant Gill wrote to ICT that "***the letter has been***

***filed***."

152.    That statement was false, however: on May 16, 2013 – after two more weeks of

the Individual Plaintiffs' imprisonment -- Mr. Riordan informed Defendant Gill that "we are

getting some communications from the contact in China that the letter has not been delivered, or

that the prosecutors do not have it yet. My client has asked me to call you tonight regarding any

information confirming delivery. Can you help out with this?"

153.    Defendant Gill responded: "***The letter was definitely filed***. It was submitted to

Mr. Zhang Xiaole, (+8613801382217), the captain of Haidian PSB." Defendant Gill said

nothing about sending the letter to the prosecutor, and that telling omission made clear that the

HPFS Defendants did not in fact do so despite Plaintiffs' clear, repeated and urgent requests.

154.    In response, Mr. Riordan on May 18 informed Defendant Gill that "the letter was

delivered to the wrong individual. . . . Your information indicates that it went to Mr. Zhang

Xiaole (+86138011382217), captain of Bejing Police-Hai Dian. The Information provided was:

Mr. Zhang Jian, Bejing Police Station Hai Dian Branch, Room 803, 25 Wen Yang Road

SuJiaTuoZhen, Hai Dian, Bejing 100194, 010-82587440."

155.    On May 20, Defendant Gill responded blithely: "One of our people attended the

PSB on Friday *so I'm sure the letter found its way to the right person*."

156.    On May 22, when ICT requested an update, Defendant Gill answered with

another breezy response: "I can confirm that PSB *have reviewed the letter*. It appears that, in

order for them to be willing to take the contents into account, it will be necessary for ICT to

prove a connection between the company and these individuals."

157.    The Defendants did not file the letter with *the prosecutor*, as was specifically,

repeatedly, and urgently requested by the Plaintiffs for months, as far back as March 28, 2013

(email from Mr. Styller to Defendant Gill stating that "it is important that we have this letter

finalized ASAP, translated, chopped (stamped) in China and delivered to prosecution") and

April 3, 2013 (email from Mr. Riordan to Defendant Gill stating that "your letter should be sent

out immediately and directed to both the prosecutor and the police.")

158.    Furthermore, it appears from Defendant Gill's responses that Defendants never

formally filed their letter with the police either, contrary to Defendant Gill's own statements

that "the letter was filed" and "the letter has been definitely filed."

159.    In fact, Defendant Gill subsequently admitted in his letter to Mr. Riordan dated

July 1, 2013, that "HP has been advised that the Chinese authorities are unwilling to admit a

link between ICT and the incarcerated individuals and consequently do not regard the letter

submitted by Hewlett-Packard Financial Services (India) Private Limited as relevant to the

proceedings." If true, Defendants were apparently content with the police's alleged refusal to

accept their letter: they did not appeal the police's refusal, unexpected and unusual considering

the evident thoroughness of the police investigation, and never shared their letter with the prosecutor, not even after the police itself purportedly rejected it.

160.    Indeed, nothing had changed for the better in the Individual Plaintiffs' ordeal after the Defendants' letter, delivered or not. Thus, on May 2, 2013, H3C wrote another letter to the Chinese authorities, stating: "The trademark protection department of H3C provided a certificate indicating that [the seized] transceivers were suspected to be low-quality counterfeits. After the fact, Hewlett-Packard Financial Services India, Ltd (further called HPFS), another subsidiary of H3C's parent company HP USA, submitted a written notification to H3C, indicating the possibility that some of the above-mentioned and appraised transceivers could have been sold by HPFS to ICT Company. H3C hereby expressly declares that HPFS and H3C operate independently of each other. *H3C has never known whether the transaction between HPFS and ICT described above took place or not*."

161.    HP China's and H3C's withholding of the exculpatory evidence and stonewalling the state authorities' requests thus continued in concert with the Defendants' own wrongful actions – sanitizing the letter from all the damaging admissions, failing to file even the sanitized letter, lying about it to Plaintiffs, and stonewalling their requests for exonerating evidence – all in common pursuit of Defendants' frame job.

162.    Moreover, according to HP China's and H3C's statements to the police referenced above, purportedly neither of these HP subsidiaries was in communications with the Defendants (except for HPFS India's letter received and dismissed by H3C); neither company could confirm the existence of the contract between ICT and Defendant HPFS India; and neither company could verify whether the seized Equipment was sold to ICT by the HPFS Defendants.

163.    However, the numerous contemporaneous statements made by the HPFS Defendants to ICT attest to the fact that both H3C and HP China were working closely with the HPFS Defendants and HP since at least mid-February 2013, and would have certainly known about the contracts between ICT and HPFS and the provenance of the seized Equipment by the Spring of 2013:

- "We would also need to confirm this with our *HP local legal teams*" (February 14, 2013 email from Mr. Silvestri of HPFS);

- "It is suggested that your local counsel make a formal request via letter and that such letter includes a request *for H3C's auditors* to be granted access to inspect the equipment" (March 11, 2013 email from Defendant Gill of HPFS);

- "I will also do what I can today to get into contact with *the local teams* to see what we can do to move this more quickly" (March 12 email from Defendant Gill of HPFS);

- "*The HP legal teams supporting HP Financial Services and H3C* are working on this matter. . . . *H3C has been analyzing the photos of the labels*. A sample of the equipment is also being sent by our processing vendor in India to China *for analysis by H3C*" (March 21, 2013 email from Defendant Gill);

- "I have completed the draft letter today. *It is in China for review*." (March 25 email from Defendant Gill; the draft letter referenced and exhibited the sales contracts between the HPFS Defendants and ICT);

- "I have shared your letter with *the relevant personnel within HP China and H3C*. We have an internal meeting tomorrow and I will update you then." (April 15, 2013 email from Defendant Gill regarding the meeting at which the March 2013 Letter was most likely switched from its latest English draft of April 1 to the adulterated Chinese version of April 22).

164.    Accordingly, either Defendant HPFS' representatives Messrs. Silvestri and Gill were lying to the Plaintiffs wholesale, or else H3C's and HP China's representatives were lying to the police -- because it would have been impossible for H3C not to know "whether the trade happened or not" in March or May of 2013, or for HP China to be contacting its affiliates without success from January 2013 until August 2014 and pleading ignorance in the meantime,

if Messrs. Gill and Silvestri's accounts of these local HP entities' heavy involvement in the matter were true.

165.     In any event, Plaintiffs continued to suffer through absolutely no fault of their own while Defendants on both sides of the Pacific continued withholding the exonerating evidence and consistently stonewalling the state officials' requests for exculpatory information that would have confirmed the Individual Plaintiffs' alibis and led to their early release from their wholly unjustified imprisonment.

166.     On May 23, 2013, H3C's representative was once again interrogated by the Chinese police, and once again unequivocally confirmed under oath that "***the transceivers seized are counterfeited H3C's***."

167.     The H3C expert also explained how H3C could be so certain of its appraisal based only on the visual inspection of the logo's security features:

> **A:** The transceivers seized are counterfeited H3C's. Such kinds of transceivers mostly are used for transmission of network signals. They are the important part of high-speed transmission of network.

> **Q:** Tell us what parameters you based on to make sure that the transceivers seized are counterfeited?

> **A:** The H3C's transceivers have the complete package (Includes: package box, shockproof foam, anti-static bag, installation brochure, and the label which is pasted on the transceiver and box, and can be tracked and legalized), and also, security label pasted on the transceivers; H3C's transceivers are qualified, sourced, manufactured completed by H3C, the quality of the products is same. The package of the seized transceivers is different from the H3C's, don't have any H3C's package, but carry H3C's registered label, the security label on the seized transceivers is not same as the H3C's, the position pasted is not same (the position of H3C's security label pasted on is fixed) and the outside of some seized transceivers are different from original H3C's units.

> **Q:** Do you identify counterfeit product only from outside?

**A:**  We identify counterfeited products first of all from the outside that includes package, and label. And, if there is anything unusual found outside we also can inspect the transceivers label through testing (in short, is power on test) as an additional way. But if the exterior inspection didn't pass the test there is no need to do the power-on test.

**Q:**  Why say power-on test is only just an additional way to verify?

**A:**  Because power-on test is needed to inspect product through reading the electronic info of the transceivers (is writing the electronic info of the transceivers), but the electronic info can written or revised through program, and moreover, it will not leave any trace, what means, the transceivers passed the power-on test, can not be proved positively if they are genuine and original H3C's products. So the power-on test is just an additional way to test.

**Q:**  Can the P/N (Serial Number) be identified through the power-on testing?

**A:**  The content of electronic label includes the P/N, so that we can say the P/N can be created or modified with proper software.

**Q:**  Do you have something to say more?

**A:**  No.

**Q:**  Is everything you said true and correct?

**A:**  Yes.

**C.**     **2013-present:  The Cover Up**

      **1.  June – July 2013: Individual Plaintiffs on bail awaiting criminal trial; ICT appeals directly to HP, its CEO Meg Whitman, and its General Counsel Schultz for help.**

168.     On May 28, 2013, Mr. Riordan wrote to Defendant Gill, asking him: "what did HP communicate to the authorities regarding the equipment at issue? Did HP institute a formal charge or complaint? . . . Can you put me in contact with the HP representative handling this matter in China? Can you put me in contact with the HP representative handling this matter or

otherwise responsible for the contract involving ICT? Is this person in the United States? In

light of conflicting information that we are receiving, we are asking for definitive action."

169.     With no answers and no definitive actions forthcoming from the Defendants, and

with the Individual Plaintiffs' enduring their sixth month of incarceration, Plaintiffs in

desperation turned to the top of the HP corporate hierarchy -- its CEO Meg Whitman, and its

General Counsel John Schultz. Thus, on June 12, 2013, Plaintiff Styller sent a one-page letter to

Ms. Whitman, copying Mr. Schultz. In the letter, Plaintiff Styller appealed to Ms. Whitman on

behalf of the Individual Plaintiffs "incarcerated since December 2012 and fac[ing] trial in a

month":

> Jade, Jason and Cathy are exposed to sentences of ten years – for doing
> nothing more than remarketing HP's products for HP's benefit. HPFS India
> communicated to the local authorities that it was the source of the product.
> However, despite this acknowledgment, H3C is still insisting that the case go
> forward. Our focus is entirely on the humanitarian issue. . . . Our appeal to
> you is a personal one. We ask that you use your office and position to put a
> stop to this. I ask that you contact H3C to get to the bottom of the issue. I
> also ask that you use your influence to see that the charges are withdrawn. I
> am cognizant of the demands on your time – and very respectful of your
> position. These circumstances, however, involve personal liberty – and on
> this basis I reach out to you.

170.     On the same day, Mr. Riordan made the same appeal to Mr. Schultz personally,

of the same tenor but with more detailed facts. Laboring under the misimpression created by the

HPFS Defendants, Mr. Riordan also stated in his letter: "Mr. Gill directed a letter to authorities

clarifying the facts. Specifically, HPFS acknowledged that is was the source of the product and

that the product was consistent with the remaining materials in India. HPFS also agreed that

even if the product contained counterfeit marks, HPFS delivered this material to ICT with the

marks and that ICT was authorized to remarket the product *as is*."

171.     Plaintiff Styller's desperate plea to Ms. Whitman was met with silence. Mr.

Schultz, however, responded by calling Mr. Riordan's office on June 14, 2013, and leaving a

voicemail message: "Sorry for not getting back to you. I will have someone on my team look into it and get right back to you."

172.    The following week, Defendant Gill and Stuart Patterson, an in-house counsel at HP and presumably a member of Mr. Schultz's "team," had a conference call with Mr. Riordan to discuss the matter, with Mr. Patterson staying on the background of the conversation.

173.    Following the call, on June 26, 2013 – the Individual Plaintiffs' 200th day in prison – Mr. Riordan sent yet another letter to Defendant Gill, asking him the very basic questions that, after months and months of investigations by HP's legal, security and audit teams, by Defendant Gill, by his unnamed superiors, and now by Mr. Schultz's team, HP should have been able to answer forthwith: "What did HP communicated to the authorities regarding the equipment?. . . *Our request to HP is to address the issue that was raised regarding the allegation of counterfeit marks. I think this should be the only focus. In any event, and given what is at stake, I am still unclear as to whether this issue has been resolved.* In addition to my questions above, has HP (or its subsidiary organizations) made clear that HP/H3C is the source of the materials in question?"

174.    Defendant Gill's reply of July 1, 2013 was, like his prior responses, nothing but evasive. Defendant Gill claimed that "neither H3C nor any other HP affiliate is a party to these proceedings" – even though it was H3C that lodged the original request to arrest the Individual Plaintiffs and continued making sworn statements to the police that the Equipment was counterfeit, and even though HPFS, HPFS India, HP China and HP itself were directly involved in and had knowledge of those proceedings (though formally not a "party" to them), and even though the HPFS Defendants and Defendant Gill himself had in their possession confidential internal correspondence between the Chinese police and prosecutors.

175.     With respect to HP's communications with the Chinese authorities, Defendant Gill stated that "HP clearly explained the history of the transaction in [its] letter" (which was a lie because HP's letter was sanitized, and not filed with the prosecutor), but "the Chinese authorities are unwilling to admit a link between ICT and the Incarcerated Individuals and consequently do not regard the letter submitted by Hewlett-Packard Financial Services (India) Private Limited as relevant to the proceedings."

### 2.    Defendants hold up the agreed refund to ICT in an attempt to extort release from the Individual Plaintiffs.

176.     Completely unrelated to its efforts to release the Individual Plaintiffs, ICT had been in negotiations with Defendant HPFS' business representatives regarding the so-called Return Merchandize Authorization ("RMA"), which refers to the standard industry practice of returning or exchanging products that are defective or substandard for a refund. Plaintiffs had applied for an RMA seeking reimbursement for the balance of the unsold Equipment from the first shipment. Plaintiffs had sold approximately $100,000 worth of the Equipment from that first shipment, for which they paid HPFS $250,000, and were requesting a refund of the remaining $150,000.

177.     Plaintiffs negotiated with Defendant HPFS' business representatives Messrs. Bartley and Silvestri for the adjustment and reached an agreement in principle in March 2013; the terms were then submitted to "legal" for approval. The only outstanding term at that time was the payment mechanism; all discussions between the parties from March to June 2013 were related to that issue. On or about June 30, 2013, Mr. Bartley of Defendant HPFS advised ICT that the RMA had been resolved and that he was waiting for instructions from the legal department to document it.

178.    However, on July 7, 2013, Mr. Bartley wrote to Plaintiff Styller: "I am really sorry for not responding since I have been back in KL. To be honest, I have been delaying my response for as long as possible hoping that the status would change. When we last spoke I mentioned that we had solved for the payment mechanism and that all I needed was to check with legal on how to document this. ***Unfortunately, due to all of the ongoing legal issues I have been instructed to place the RMA on hold***. Regrettably, I cannot tell you what the specifics of the issues are nor how long the hold will remain in place. I regret that we have gotten so far only to stall for reasons that are beyond my control."

179.    Bewildered by this about-face, Plaintiff Styller wrote back: "I don't understand what does it mean. Does it mean that I just need to ask Shinto to proceed from there?"

180.    "No sorry Alex, it means that ***my legal team will not allow HPFS to process the RMA***," wrote Mr. Bartley in response, and identified "David Gill and his team" as the legal team who put the RMA on hold, leading Plaintiff Styller to respond: "We are in contact with David Gill, cooperating on China matter. I am surprised and disappointed that he placed on hold the RMA. I will ask my lawyer to clarify with David directly what seem to be the problem and hopefully we can resolve it to mutual satisfaction."

181.    Plaintiff Styller's hopes for the resolution of the RMA issue were soon dashed as the Defendants made it crystal clear that they were holding the RMA payment as ransom in an extortionist attempt to force the Plaintiffs into a global settlement, which were to include the release of the still-imprisoned Individual Plaintiffs' claims.

182.    On July 10, 2013, Mr. Riordan sends a letter to Defendant Gill regarding the RMA, stating among other things that "this issue was resolved and agreed to through the ordinary course of business – and not connected with the Chinese criminal issues. . . . If there is

now a nexus between the Chinese issue and the RMA, I would find it disappointing. . . . Our primary and overriding goal was to ensure that the individuals in China are freed from criminal process. I am sure this is HPFS's goal as well, as those individuals were engaged in activities to re-sell product for the benefit of HPFS and ICT. My client has lost a great deal of money on this transaction and is now expending significant resources relative to this matter. He runs a small company and, as you can imagine, these types of issues create a significant strain."

183.     "I have just returned from vacation and will get back to you shortly," responded Defendant Gill on July 17, 2013, after another week of horrific confinement for the Individual Plaintiffs, agony for the Family Plaintiffs, and anxiety and frustration for Plaintiff Styller and others trying to help them.

184.     Then another two weeks passed by, and on July 29, 2013, Mr. Riordan again wrote to Defendant Gill: "I do need to speak with you regarding the RMA issue. I did call as we agreed, but you were not available. My client really does need to move this issue along. We [were] very surprised to learn that the agreed payment had been held up. It is still not clear to me why that is the case."

185.     That email elicited the following response from Defendant Gill: "As communicated on our call last week, HP would like to obtain additional clarity about the status of the proceedings in China before progressing discussions around the RMA. Do you have any further information in this regard?"

186.     Mr. Riordan replied on July 30: "My understanding was that the RMA issue was resolved by agreement and you held that up. I have also asked what you mean by 'clarify' and further asked for you to shed some light on what the nexus is between your 'clarity' and

progression of discussions. I won't ask again as you don't seem to desire to answer. I will

advise my client as to your unwillingness to respond."

187.    In a last-ditch effort to resolve the issue with Defendant Gill, on August 8, 2013,

Mr. Riordan sent him yet another letter, in which he set out the history of RMA negotiations

and of the criminal case against the Individual Plaintiffs, and noted that the RMA issue "has

nothing to do with the China situation." Mr. Riordan also noted in his letter that "I have

provided to you all the information available to us through our communications with the

Chinese attorneys. On the other hand, *I have repeatedly been rebuffed relative to my requests*

*for basic information*."

188.    Mr. Riordan then requested: "1. Immediate payment of the RMA; 2. Immediate

disclosure as to all material facts relating to accusations made by H3C to the PBS relating to

counterfeiting or import/export violations; and 3. Record documentation of HPFS' handling of

the contract materials from its receipt (after lease) until its delivery to ICT. . . . If you do not

comply, then I will contact a short list of U.S. based individuals at HP in an attempt to resolve

the matter." Mr. Riordan concluded: "for any such conversation to prove fruitful, we require

good faith and honest disclosure. If you have something constructive to offer, I will certainly

listen.  If you are uninterested, action will follow."

189.    But Defendants could not make any good-faith honest disclosures in response to

the ICT counsel's requests without exposing themselves to criminal liability *regardless* of what

those disclosures would have been. That is so because, if the facts confirmed the HPFS

Defendants' statements in the English version of the letter (never shared with the Chinese

authorities) that they sold counterfeit Equipment to Plaintiffs, then Defendants were exposed to

criminal prosecution for selling counterfeit goods and the inevitable business and reputational

fallout in India, one of HP's largest overseas markets, *see* the accompanying affidavit of Vivek

Mapara. Conversely, if the facts demonstrated that the Equipment was genuine all along, then

Defendants were facing the prospect of criminal prosecution for making false statements to the

police in China, another large HP market, *see* the accompanying affidavit of Ma Li.

190.    Accordingly, the Defendants found themselves in zugzwang but decided to avoid

making the next move by stalling, intimidating, lying, and railroading the Plaintiffs to prevent

them from taking any action – preferably at all, but at least until the criminal statutes of

limitation run out – all the while ***without admitting or denying*** that the Equipment was

counterfeit. That ambiguity was strategic, and the fact that three young innocent victims' lives,

and a small U.S. business, were ruined as a result of Defendants' fraud and cover-up did not

seem to bother the Defendants at all.

191.    And they wheeled out a heavy artillery against the innocent Plaintiffs to facilitate

this cover-up – Defendant Gibbons P.C., "a leading law firm in New Jersey, New York,

Pennsylvania and Delaware" with over 200 lawyers, and its new partner and corporate director

Mr. McCarthy.

192.    During the early months of the Individual Plaintiffs' imprisonment and

immediately prior to joining Gibbons P.C. in March 2013, Mr. McCarthy served as the Vice

President, General Counsel and Secretary of Defendant HPFS, leading its legal department of

more than 22 attorneys, including Assistant General Counsel and Assistant Secretary Defendant

Gill. Mr. McCarthy boasted in a May 2013 interview about putting in place "a funneling system

that ensures that all significant risk issues flow to a group of highly experienced senior

managers for prompt review and decision," and was, upon information and belief, aware of the

Chinese situation while still at Defendant HPFS.

**3.  July 2013 – December 2015:  Individual Plaintiffs on bail
awaiting criminal trial; Defendants engage in a cover-up campaign.**

193.     Meanwhile in China, on July 18, 2013, the prosecutor released the Individual

Plaintiffs on bail from their long and harrowing confinement. At no time prior to the release or

afterwards did Defendants or their Chinese affiliates disclose to the police the exculpatory

evidence in their possession that would have led to the earlier release.

194.     From the time of their release on July 18, 2013 and until the receipt of the "no

criminal record" letters from the Chinese police in late 2015-early 2016, the Individual

Plaintiffs remained in legal jeopardy in China as the criminal cases against them had not been

closed. Despite repeated requests by ICT, Defendants flatly refused to provide any information

or any assistance to clear the Individual Plaintiffs' names or to provide any compensation for

their loss of freedom, lost earnings, physical pain and emotional and mental anguish caused by

Defendants' own conduct.

195.     Defendants also flatly refused to share with ICT the results of their investigations

into the relevant counterfeiting activities, despite ICT's numerous requests for that information

needed to exonerate Individual Plaintiffs and to clear their names.

196.     In fact, notwithstanding the results of their own investigation showing that the

counterfeiting happened before the Equipment was sold to ICT, Defendants then deliberately

adopted the "blame the victim" attitude in response to Plaintiffs' requests, which only added

insults to the injury and prolonged the injury itself.

197.     Thus, in response to Mr. Riordan' August 8, 2013 letter to Defendant Gill, ICT

received a letter from Mr. McCarthy and his new law firm Gibbons P.C. dated August 26, 2013.

198.     In the letter, Mr. McCarthy advised Plaintiffs that Gibbons P.C. has "been

retained by Hewlett-Packard ('HP') Company and its various subsidiaries and affiliates who

may have been involved in any way with your client's purchase of used equipment in India, and your client's attempted sale of such equipment in China. The applicable subsidiaries are Hewlett-Packard Financial Services (India) Private Limited ("HPFS India"), H3C Technologies Co. Limited ("H3C"), and their respective subsidiaries and affiliates."

199.    Mr. McCarthy then proceeded to "set the record straight" and followed with the first lie in the very next paragraph: "First, contrary to your allegations, no HP entity ever provided your client with legally binding representations that the equipment at issue was 'in very good condition (as good as new with reasonable wear and tear'). Your client was fully aware that ***the old equipment that it purchased from HPFS India had been used for a number of years*** by another third party, Tata Consultancy, in connection with the 2010 Commonwealth Games in Delhi, India."

200.    In fact, it is undisputed that the Equipment was leased by the HPFS Defendants to Tata Consultancy as brand-new and was returned to them after short-term, ***7-10 month leases***.  Indeed, the HPFS Defendants represented the Equipment to ICT during the 2011 negotiations as almost new, and it was so understood by ICT. *See*, *e.g.*, Mr. Pekar's email of July 14, 2011 ("Additional details, it was a 7 month lease (I would assume most of the product is new in original box)"). In any event, the Equipment had not been used "***for a number of years***" as Mr. McCarthy falsely claimed in his letter – and Mr. McCarthy knew it very well as he was the General Counsel of Defendant HPFS at the time of the initial 2011 sale and throughout Defendant HPFS' subsequent involvement in the frame job and the cover-up headed by Mr. McCarthy's assistant at HPFS, Defendant Gill.

201.    Warming to the attack, Mr. McCarthy continued in the same paragraph: the Equipment was sold "***with absolutely no equipment representations or warranties***

*whatsoever*." That was also a known lie because, as the HPFS Defendants themselves admitted, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

202.    Not only did the Defendants expressly represent the Equipment as genuine H3C equipment, but the Equipment was sold with the express warranty of title and the express warranty that the sold equipment confirmed to its description as the "H3C" Equipment in the contracts -- and in breach of all those representations and warranties.

203.    In the next paragraph, Mr. McCarthy proceeded to blame the Plaintiffs for what the Defendants called their "difficulties in selling the equipment in China": "If your client failed to abide by China's import/export laws, or if your client failed to properly inspect the equipment to ensure that that there were no counterfeit materials, that is not the fault of any HP entity."

204.    Thus, Defendants appeared to be blaming Plaintiffs for the purported violations of China's import/export laws –violations which the Chinese authorities themselves had neither alleged nor pursued, despite the Defendants' encouragement – and for not discovering Defendants' own fraud earlier than they did.

205.    Mr. McCarthy continues in the same paragraph: "as an experienced dealer in used equipment your client knew, or should have known, that there are many counterfeit products in the market, and that it should have exercised a reasonable degree of due diligence to inspect old unwarranted equipment before shipping it to China for sale" – as if ICT was buying some old HP equipment from a shady street vendor and not from an HP company itself!

206.    In fact, ICT had never bought any IT equipment in India prior to the H3C transaction, and was not familiar with the counterfeiting situation in the Indian market.

Defendants, by contrast, were indeed "experienced dealers in used equipment" operating in the Indian market and thus "knew, or should have known, that there are many counterfeit products in the market, and . . . should have exercised a reasonable degree of due diligence to inspect" the Equipment being returned to them upon lease expiration and before selling it to the unsuspecting Plaintiffs.

207.    Further, Mr. McCarthy claimed that "***your client has been unwilling to share any meaningful information with the HP entities on its legal difficulties in China***" – another false statement, as demonstrated at length above.

208.    Then came a threat: "we have no way of knowing whether ITC [sic] did or did not fulfil its contractual obligations by complying with all relevant law. . . ITC [sic] will continue to remain responsible for indemnifying and holding HPFS India harmless from any and all claims or damages that may exist or arise out of your client's non-compliance with relevant law." (Mr. McCarthy could not even trouble himself to call Plaintiff ICT by its proper name.)

209.    More demands and threats followed in the next paragraph: "please advise as to the whereabouts of the equipment, and outline in detail the efforts that your client made to sell all genuine equipment . . . .  ***If ITC [sic] has lost control over the equipment due to its failure to properly comply with Chinese law, then there is a serious issue as to whether it has breached its obligations to HPFS India***."

210.    More false statements followed in the next paragraph of Mr. McCarthy's letter: "your client's attempt to shift the blame to HP for problems that appear to be of your client's and/or other's creation, does not withstand scrutiny. The HP entities had no dominion or control over the equipment at issue once it was purchased by your client. There are countless ways in

which the equipment at issue may have been tainted or altered before or after it reached China. The true bottom line is that once your client purchased the equipment -- your client was solely and exclusively responsible for any and all subsequent issues." Compare these statements with the HPFS Defendants' admissions in the March 25 and April 1 versions of their Letter:

- "*the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT*";

- "*the logos currently affixed to the Sold Equipment were present on the Sold Equipment at the time of the sale from HPFS India to ICT*,"

- "*the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases*," and

- "*HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard*."

211.    And then came the bottom line, Mr. McCarthy's attempt to bully ICT into global settlement and release of all claims: "because of the nature of the issues and many unfounded allegations advanced by ITC [sic], it is highly likely that a resolution of these matters cannot be had unless the parties enter into a mutually acceptable and comprehensive Settlement Agreement and Release. If ITC [sic] is interested in discussing such an agreement, please contact me."

212.    Mr. McCarthy's letter was written in response to Mr. Riordan's request to release the agreed-upon RMA that was held up by Defendants, making clear that the Defendants were holding that refund in an effort to extract release from the Individual Plaintiffs.

213.    In response, Mr. Riordan wrote back on November 27, 2013, carefully debunking Mr. McCarthy's misstatements and stating: "Prior to this communication, ICT has never threatened a lawsuit or claim. We have asked for disclosure as to the conduct of H3C that

led to the filing of the outrageous criminal charges in China. We have also asked for disclosure as to HPFS's interaction with H3C (and H3C's interaction with the Bejing police) regarding these issues. No such disclosures have been forthcoming."

214.    Mr. Riordan concluded: "Your position [with respect to RMA] is in extreme bad faith and extortionist. . . .   If it's your final position that you are not going to honor the RMA agreement or address the claims of the Chinese nationals, then simply advise." Mr. Riordan also stated in the Letter that the Individual Plaintiffs -- who were on bail expecting a criminal trial -- would be willing to settle their claim for spending more than 200 days in jail for a very modest amount of $1.5 million for all three at the time. Neither the Individual Plaintiffs, nor Plaintiffs ICT and Styller, nor Mr. Riordan were fully aware of the scale of the Defendants' fraudulent frame job and cover-up or the depths of their perfidy at the time, nor the fact that their ordeal was still very far from over.

215.    Mr. McCarthy responded on behalf of HP and its subsidiaries on December 19, 2013, repeating the same lies and threats first uttered in the August 26 letter. Mr. McCarthy also claimed in the letter that, "[b]ecause ICT has apparently lost control over the used equipment at issue and cannot now account for the equipment, or provide HPFS India with the additional remarketing proceeds contemplated by the agreements, *it is in breach*. . . . We trust that you are also aware that ICT is obligated to pay 'reasonable legal fees and other costs and expenses incurred' by HPFS India in enforcing the terms of the WSA." Mr. McCarthy also stated that "HPFS India has been open to considering making some small payment to ICT to resolve this situation upon appropriate terms," but that "ICT will, however, need to honor all of its obligations to HPFS India and its affiliates [and] contemplate a more realistic monetary settlement amount."

216.     And the following statement by Mr. McCarthy takes the biscuit: "***It is also***
***disappointing to note that you and your client seem to have forgotten the assistance that***
***helped secure the release of the aforementioned individuals***." By that time, a full year has
passed since the Individual Plaintiffs' arrest, seven months of which they had spent in torture-
like jail conditions and were now on bail awaiting criminal trial with its virtually certain lengthy
prison terms – all due to the Defendants' fraud, frame job, and cover-up. And the Individual
Plaintiffs ultimately avoided the lengthy prison terms by the stroke of improbable luck (0.07%
chance) -- not due to the Defendants' sham "assistance" but despite it.

217.     On January 9, 2014, Mr. Riordan responded to Mr. McCarthy's letter, debunking
Defendants' lies once again, and writing: "While ICT is absolutely committed to resolving all
issues with its remarketing partners, it is difficult to fashion a reply or move to create a
foundation for such discussions given both ***the numerous inaccuracies in your***
***communications as well as concerns regarding the forthrightness that have characterized***
***HPFS' past communications and which, unfortunately, are reflected by your communication***.
. . . . Frankly, one of the main concerns over the past year is ***the culture that generates such***
***issues in the first place***.  The recognition that you are not merely a litigator, ***but a prior***
***corporate official for HPFS intensifies these concerns***."

218.     Nevertheless, ICT remained open to settlement discussions "based on firm
foundation of good faith, forthrightness and integrity." Unfortunately, Defendants had exhibited
***none*** of good faith, forthrightness or integrity in this sordid affair.

219.     On August 14, 2014, in the last-ditch effort to resolve the matter, ICT wrote to
Mr. McCarthy, reiterating the basic facts and stating that "***HP has so far refused to clarify such***
***basic facts as (a) whether the Sold Equipment was in fact counterfeit in whole or in part; and***

*(b) if yes, when the counterfeiting took place and which party was responsible for it*," which

facts were necessary to extricate the Individual Plaintiffs from the legal jeopardy in China and

to clear their names.

220.     Mr. McCarthy's August 27, 2014 response attached his 2013 letters, thereby

repeating all the lies first made there, and further stated that "*[w]hile HPFS India did entertain*

*possibly making some small settlement payment to resolve this issue in its entirety* . . . *we will*

*[now] consider the refund matter closed*."

221.     And so the Defendants regarded the matter closed. The insidious cover-up

campaign waged by the giant Fortune 50 HP Company and its subsidiaries appeared to have

worked, at least thus far, against a small company they had defrauded, its solo practitioner

counsel they had steamrolled over, and its three young Chinese sales associates they had falsely

imprisoned and prosecuted.

222.     In the meantime, H3C continued to push for criminal prosecution of the

Individual Plaintiffs. Thus, on July 7, 2014, the prosecutor returned the case to the police,

stating that "the facts are still unclear, and there is not enough proof of the case. By this letter

prosecutor returned the case for additional investigation and asked the police to provide more

information to support the H3C position." Among other things, the prosecutor wrote to the

police: "The documents H3C provided concluded counterfeit based on appearance, H3C did not

do any test, and H3C said electronic test is not necessary in this case. This conclusion is

different from the position of ICT lawyers, and the position of the ICT lawyers agree with

Cheng Yongguo's [Jade Cheng]. Please request (1) H3C to perform the test to clarify if the

equipment counterfeit or genuine, (2) if test proves that product is counterfeit, request H3C to

explain why it showed the transceivers are original and genuine through P/N [product or serial numbers] lookup on H3C's website."

223.    On July 29, 2014, H3C provided a written explanation to the police why the serial numbers could not establish whether the transceivers were counterfeit, stating that "P/N testing only proves this P/N was sold by H3C sometime in the past, but cannot prove that this exact product is genuine H3C product or counterfeit."

224.    Finally, on August 7, 2014, the police again interrogated H3C's security expert, who explained why the electronic (power-on) test was unnecessary because it could not establish whether the transceivers were counterfeit: "Regarding the case of sales counterfeit products suspected by Cheng Yongguo and others, we contacted with Wang You who is the expert of H3C Company. Wang You replied: To identify counterfeit or not is just to check the outward of the products. Power-on test is only to check how the functions work. Even though the functions working comply with the standards of the true products, it cannot prove the products are true either. So that there is no necessary to do the power-on test on the products."

225.    In sum, from December 2012 until August 2014, H3C – the manufacturer and the exclusive trademark owner of the H3C brand and trademark logo, and thus ***the ultimate authority*** on the subject of counterfeiting with respect to its own products – made several statements to the police (a) unequivocally confirming that the seized transceivers were counterfeit based on H3C's visual inspection of the security features of H3C trademark logos, (b) explaining why neither the electronic power-on test nor the transceivers' serial product numbers could be used to challenge the results of its visual inspection, and (c) explaining that HP had no license rights to its trademark (let alone any authority to dispute its words on the authenticity of its own trademarked products).

226.     Despite all the efforts by the Defendants and their Chinese affiliates, the prosecutor ultimately refused to bring charges against the Plaintiffs. On September 3, 2014, the lead prosecutor in China personally apologized to all three Individual Plaintiffs for their undeserved suffering. On December 24, 2015, and May 4, 2016 respectively, Plaintiff Jade Cheng and Plaintiffs Jason Yuyi and Cathy Yu received letters from the Chinese police stating that they had no criminal records during their residency in China. Upon information and belief, the Chinese authorities have closed the case without bringing any charges.

227.     Indeed, the Chinese authorities did not destroy the seized Equipment but returned it to Plaintiff Cheng and his Chinese counsel upon his release from bail on September 3, 2014, and it is now in China in the same condition as was returned by the authorities. The Defendants and/or H3C are thus free to re-inspect the Equipment for the umpteenth time – except this time they will have to give a sworn answer to the question whether the Equipment was counterfeit or not, without any more evasions, equivocations, ambiguities, or concealments.

228.     Unlike the Chinese prosecutor, the Defendants -- whose fraud and cover-up caused Plaintiffs' injuries in the first place – have never apologized to Plaintiffs, and never uttered a word of sympathy, remorse or concern for the Individual Plaintiffs' admittedly "Dickensian plight."

229.     In sum, Defendants' conduct – including their false representations about the Equipment that caused the arrest of Individual Plaintiffs and ruined ICT's business in China; their withholding of the exculpatory evidence that would had led to the Individual Plaintiffs' release, and stonewalling the police and the Plaintiffs' requests for that information; their woefully inadequate, belated, deliberately misleading and misdirected disclosure to the Chinese authorities after the arrest; and their malicious cover-up campaign conducted in extreme bad

faith and in callous disregard for Plaintiffs' plight -- was so egregious and demonstrated such reckless indifference to the rights of the Plaintiffs so as to entitle the Plaintiffs to statutory treble and/or exemplary damages and attorneys' fees in addition to compensatory and other damages claimed herein.

230.    Accordingly, the Plaintiffs seek an award of damages commensurate with the severity of the injury and the emotional trauma that the Defendants intentionally inflicted on the innocent victims of their own fraud with egregious disregard for their wholly undeserved and unjustified suffering.

231.    Moreover, the Family Plaintiffs also seek an award of damages for the intentional infliction of emotional distress, and Plaintiffs Jade Cheng and his wife Plaintiff Caroline Marafao Cheng also for the loss of consortium.

232.    During the Plaintiffs' ordeal, the Defendants were expressly and repeatedly warned that their misconduct was extracting severe toll on the families of the innocent Individual Plaintiffs:

- "I am getting pressure from the families; elderly parents of our sales team members are going crazy. It breaks my heart to see letters from them. They think I can do something to help. At this point, can you please arrange for your legal team get in touch with our lawyer there and explain the situation? Hope this move will provide some clarity and comfort to families. Hope that move at least will help them understand that HP and ICT are working together to have all the mess cleaned up. . . . JT, if you can do something, please help." (March 12, 2013 email from Plaintiff Styller to Defendant Gill, copy to JT Silvestri);

- "For all fairness we and families are spending enormous amount of time and money to defend and support our guys also. . . I will pass your answers to the frustrated and angry families who are all over me for the results. Hope they understand things better." (March 20, 2013 email from Plaintiff Styller to Defendant Gill);

- "There are major questions we're are still looking for, and keep getting the run-around from HP on. Please help to answer them. We need to update

the families on what is going on. . . . Please answer those questions for us. We owe to the frustrated families of the men and women of ICT China Team" (March 21, 2013 email from Plaintiff Styller to Defendant Gill);

- "[The letter] was promised early this week. Lots more upset calls and emails from families these two days." (April 1, 2013 email from ICT's Ryan Quinn to Plaintiff Styller);

- "We're quickly running out of time now and must have letters now. Everybody on our side getting very nervous and concerned as trial can start anytime. We need our people out of jail now!" (April 10, 2013 email from Plaintiff Styller to Defendant Gill).

233.    Thus, the Defendants knew that their misconduct not only severely injured the incarcerated Individual Plaintiffs themselves but was also extracting severe mental and emotional toll on their "frustrated and angry families." Yet, the Defendants persisted with their malicious frame job and cover-up with that knowledge and in egregious and callous disregard for the Family Plaintiffs' emotional and mental distress, and are liable to them for their undeserved suffering.

**D.    Conclusion on the facts**

234.    The foregoing factual narrative set out how the Defendants *firstly* defrauded the Plaintiffs; *secondly*, ruined their business, caused the innocent Individual Plaintiffs' incarceration, and placed them in significant legal jeopardy with their frame job; *thirdly*, withheld the exculpatory evidence that would have led to their release, stonewalled state officials' requests to confirm the Individual Plaintiffs' alibis, and provided misleading information to the police; and, *finally*, engaged in a malicious insidious campaign designed to cover-up their frame job, to run out the clock on the Chinese and/or Indian statutes of limitation for the Defendants' own crimes, and to extract a release from liability from the Plaintiffs.

235.    The extent to which the Plaintiffs were deceived by their ostensible business partners, with whom the Plaintiffs initially deposited their trust and their hopes, manifests itself

in the development of this case as reflected in its progression from the Original Complaint filed

on December 9, 2015, to the Amended Complaint filed on July 18, 2016, and to the current

Second Amended Complaint filed today.

236.    The Original Complaint alleged the fraudulent 2011 sale of counterfeit

Equipment and false imprisonment of the Individual Plaintiffs arising from it. The Amended

Complaint filed on July 18, 2016 then added a negligence claim reflecting the Plaintiffs' then

realization that, even though the Defendants presumably tried to assist the Individual Plaintiffs'

release, their efforts fell far short of their duties owed to the Plaintiffs. Finally, this Second

Amended Complaint reflects the Plaintiffs' current understanding, knowledge and belief that the

Defendants' purported assistance was in fact a sham all along, nothing but a cover-up for their

own frame job.

### Statement of Claims

### COUNT I
**(For Fraudulent Misrepresentation against the HPFS Defendants
on behalf of Plaintiffs ICT and Styller and the Individual Plaintiffs)**

237.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236

of this Complaint as if set forth in full.

238.    The HPFS Defendants represented the Equipment they sold to ICT for the

express purpose of reselling as genuine H3C equipment manufactured by HP's wholly-owned

Chinese manufacturer H3C. Those representations were made by representatives of Defendant

HPFS during the contract negotiations as particularized in paragraphs 25 through 35 above. In

particular, Defendant HPFS' representatives described the Equipment in question as the "H3C

Equipment" orally and in writings; identified it by HP and H3C manufacturing codes during the

contract negotiations with ICT; and signed contractual documents identifying the Equipment as

manufactured by H3C -- all the while concealing the fact that the Equipment was counterfeit.

64

The Equipment itself was identified as H3C equipment by H3C serial numbers and trademark logos. Those representations went to the heart of the HPFS Defendants' contractual arrangements with ICT and constituted material terms of those arrangements.

239.    The HPFS Defendants knew that Plaintiff ICT, its CEO and owner Plaintiff Styller, and its sales force, the Individual Plaintiffs, would rely on those representations in their efforts to resell the Equipment, and these Plaintiffs were entitled to rely and did in fact rely on those representations to their severe detriment.

240.    Those representations were in fact false, as the manufacturer of the Equipment and the exclusive holder of the H3C trademark and logo – H3C itself – repeatedly, consistently and unequivocally assured the police that the Equipment was not genuine H3C equipment as represented by HPFS Defendants but counterfeit. Plaintiffs did not know and had no reasons to know that the sold Equipment was not genuine as represented by HPFS Defendants, and were entitled to rely and did justifiably rely on HPFS Defendants' representations. Indeed, according to HPFS Defendants' March 2013 Letter, "[u]pon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment." Furthermore, according to HPFS Defendants' April 1, 2013 revision of the March 2013 Letter, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

241.    The HPFS Defendants made their misrepresentations with the knowledge of their falsity, or with a complete disregard for the truth. The HPFS Defendants knew, or were reckless

in not knowing, that the Equipment was counterfeit but concealed that knowledge from Plaintiffs.

242.    *First*, in his August 26, 2013 letter sent on behalf of HP, H3C and HPFS India to ICT's counsel, Mr. McCarthy stated that "as an experienced dealer in used equipment your client knew, or should have known, that there are many counterfeit products in the market."  In fact, prior to its deal with the HPFS Defendants, ICT never bought any equipment in India, was not experienced in that market, and was not familiar with its counterfeiting situation. The HPFS Defendants, on the other hand, were well established in India and very familiar with that market and its counterfeiting problems; moreover, "remarketing older assets [was] a key part of HP Financial Services' business." Thus, it was the HPFS Defendants themselves -- not Plaintiffs -- who, by Mr. McCarthy's own admission, "***knew, or should have known, that there [were] many counterfeit products in the [Indian] market***."

243.    *Second*, according to HPFS Defendants, "the company HPFS India engaged in India to process and refurbished returned lease equipment" – TT Global – inspected the Equipment pursuant to HPFS' standard operating procedure for off-lease equipment in 2011 and took photos of the Equipment prior to its sale to ICT and importation into China. Defendants subsequently cited these very photos in their March 2013 Letter as showing that "the counterfeit H3C Equipment seized in China is the same equipment sold by HPFS to ICT." Defendants knew or where reckless in not knowing that the Equipment was counterfeit as a result of that 2011 Inspection but concealed that knowledge from Plaintiffs.

244.    *Third*, the Equipment returned to HPFS India after the lease expiration was in substandard, scrap-grade condition despite a relatively short -- less than a year -- lease period. The substandard condition of the returned Equipment should have raised a red flag for the

HPFS Defendants indicating that the returned Equipment might have been a counterfeited low-quality substitute of the originally leased brand-new equipment. The HPFS Defendants concealed that knowledge from ICT and sold the Equipment "as is with defects," so that ICT itself only learned about its substandard condition upon receiving the first shipment in China in 2012. Even then, however, ICT had no reasons to suspect that the Equipment was counterfeit because it purchased it from an HP company as HP/H3C Equipment.

245.    *Finally*, HPFS Defendants further knew, or were reckless in not knowing, that the transceivers sold to ICT as part of the Equipment were counterfeit as a result of the 2012 Inspection but concealed that knowledge from ICT. That inspection was conducted by representatives of Defendant HPFS Mr. Harris and of ICT Mr. Pekar, following which the HPFS Defendants offered ICT the remaining Equipment at a 500% discount to the original price but ICT refused. Unlike Plaintiff ICT's representative, the representative of Defendant HPFS as the seller of the Equipment manufactured by its affiliate had the expertise and technical knowledge to determine that the Equipment was counterfeit during the 2012 Inspection.

246.    In reliance on Defendants' representations, Plaintiffs proceeded to use their best efforts to remarket the Equipment as genuine, "without identifying HPFS" as the original source of the Equipment as such was the requirement of its remarketing contract with HPFS, and continued to do so until such time as they were accused of marketing counterfeit equipment by the HPFS Defendants' affiliate H3C.

247.    The HPFS Defendants themselves admitted that the counterfeiting had happened in India before the sale of the Equipment to ICT and its importation into China. Thus, in their March 2013 Letter, Defendants explained that "[b]ased on the available evidence HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by

HPFS to ICT," and further that "[b]ased on the available evidence it would appear that the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases."

248.     The HPFS Defendants had both motive and opportunity to commit fraud against the Plaintiffs. Following the return of the Equipment to HPFS India in a scrap-grade condition after a short-term lease and after the 2011 Inspection, the HPFS Defendants knew, or were reckless in not knowing, that they were in possession of a large inventory of the Equipment which included counterfeit transceivers, and which it could not lawfully resell. Without disclosing that knowledge to ICT, HPFS Defendants entered into the contract with ICT for the remarketing of that Equipment by ICT, requiring ICT "to use its best efforts to remarket the [Equipment] at the highest possible prices" and "without identifying HPFS" as the source of the Equipment. Moreover, the RRSA contract provided that "ICT will be responsible for complying with all applicable laws and regulations and for obtaining all required export and import authorizations."

249.     The RRSA also required ICT to share the proceeds from the resale of the Equipment with Defendant HPFS India. Accordingly, HPFS Defendants would have benefitted from any resale of the Equipment while shifting any potential liability for selling the counterfeit Equipment onto the Plaintiffs – which was exactly what had transpired as ICT's business in China was ruined (and its independent sales associates Individual Plaintiffs arrested) because of the counterfeiting accusations while HPFS retained the $250,000 paid by ICT for the first installment of the Equipment, and refused to refund that payment or even the agreed-upon RMA refund of $150,000, let alone to provide any other compensation to the Plaintiffs.

250.     The HPFS Defendants knew that Plaintiffs would rely on their representations regarding the genuine nature of the Equipment in their remarketing efforts, and expressly admitted that "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

251.     The HPFS Defendants also knew that reselling counterfeit equipment would expose the persons reselling it – Plaintiffs ICT and Styller and ICT's China team, the Individual Plaintiffs – to a substantially certain risk of imprisonment.

252.     As a direct and proximate result of the HPFS Defendants' fraudulent misrepresentations, all Plaintiffs suffered severe injuries. Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

253.     The HPFS Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

### COUNT II
**(For Negligent Misrepresentation against the HPFS Defendants
on behalf of Plaintiffs ICT and Styller and the Individual Plaintiffs)**

254.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

255.     By virtue of their superior knowledge and expertise regarding HP/H3C-manufactured equipment and trademarks, the HPFS Defendants ought to have been aware that their representations as to the genuine nature of the Equipment sold to ICT were false. Unlike Plaintiffs, the HPFS Defendants had ample opportunities to discover that the Equipment was counterfeit, including through the 2011 Inspection and the 2012 Inspection. Moreover, "as an experienced dealer in used equipment [the HPFS Defendants] knew, or should have known, that there are many counterfeit products in the market" in India and, upon receiving the Equipment in a substandard, scrap-grade condition after a short-term lease, should have realized that it was a counterfeited low-quality substitute rather than the originally leased equipment.

256.     The HPFS Defendants were negligent or grossly negligent in ignoring the suspicious substandard condition of the Equipment after a short-term lease, their knowledge that "there [were] many counterfeit products in the market," and the results of the 2011 Inspection; and in failing to disclose to ICT that the Equipment was counterfeit prior to the sale of that Equipment to ICT in 2011 and in the course of Plaintiffs' remarketing efforts in 2012.

257.     The HPFS Defendants' breach of their duty of care was the direct and proximate cause of the Plaintiffs' injuries.

258.     There was no contributory negligence on the part of the Plaintiffs. Plaintiffs had no expertise or technical knowledge to determine whether the Equipment was counterfeit and were entitled to rely on Defendants' representations that the Equipment was genuine. Nor were the Plaintiffs under any duty, contractual or otherwise, to inspect the Equipment to determine whether it was genuine. Indeed, according to the HPFFS Defendants themselves, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold

Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

259.   As a direct and proximate result of the HPFS Defendants' misrepresentations, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

260.   The HPFS Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

## COUNT III
### (For Breach of Contract against Defendant HPFS India
### on behalf of Plaintiff ICT)

261.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

262.   Defendant HPFS India and Plaintiff ICT are parties to the RRSA contract for the remarketing of the Equipment. Plaintiff ICT is also a direct and intended beneficiary of the related WSA contract between Defendant HPFS India and Shinto.

263.   Plaintiff ICT duly complied with the terms and conditions of the RRSA and, to the extent necessary for the enforcement of its rights as the third-party beneficiary, with the conditions of the WSA contract.

264.     Defendant HPFS India breached the RRSA and WSA contracts by selling counterfeit Equipment to ICT instead of genuine Equipment as provided for by the aforementioned contracts.

265.     As a direct and proximate result of Defendant HPFS India' breach, Plaintiff ICT was damaged and has suffered significant injury to its business, property and reputation. Defendant HPFS India is liable to Plaintiff ICT for damages in an amount to be determined at trial.

**COUNT IV**
**(For Fraudulent Inducement against the HPFS Defendants**
**on behalf of Plaintiff ICT)**

266.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full. This Count IV is pleaded in the alternative to Count III (breach of contract) pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

267.     In the course of negotiating the sale of the Equipment to Plaintiff ICT, the HPFS Defendants made false representations concerning the nature of the Equipment and concealed from Plaintiff ICT that the Equipment was counterfeit, as particularized in paragraphs 25 through 35 above. These representations were material to the negotiations as they went to the very heart of the contemplated transaction.

268.     Plaintiff ICT was entitled to rely and did reasonably rely on those representations in entering into the RRSA with Defendant HPFS India. Plaintiff would not have entered into the RRSA but for those representations, which turned out to be fraudulent. Had the HPFS Defendants told the truth, Plaintiff would have terminated the contract negotiations forthwith.

269.     As a direct and proximate result of the HPFS Defendants' misrepresentations and omissions, Plaintiff ICT was fraudulently induced to enter into the RRSA agreement and was

damaged and suffered out of pocket losses, loss of profits, loss of its Chinese business, and a serious injury to its business, property and reputation. The fraudulently induced RRSA agreement is void, and the HPFS Defendants are jointly and severally liable to Plaintiff ICT for damages in an amount to be determined at trial.

**COUNT V**
**(For Breach of Warranty against the HPFS Defendants**
**on behalf of Plaintiffs ICT and Styller and the Individual Plaintiffs)**

270.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

271.    In the course of negotiation and execution of the relevant agreements, the HPFS Defendants warranted that the Equipment was genuine equipment manufactured by HP/H3C, bearing genuine HP/H3C trademarks. The HPFS Defendants described the Equipment as H3C-manufactured equipment both during the negotiations leading up to the contracts execution, in the contract documents themselves, and by the Equipment's serial numbers and trademark logos.

272.    According to M.G.L. ch. 106, § 2-313(1)(b), "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." HPFS Defendants' description of the Equipment as "H3C Equipment" manufactured by HP/H3C was made part of the basis of the bargain as it went to the heart of HPFS Defendants' contractual arrangements with ICT and constituted material terms of those arrangements, and thus created the express warranty that the Equipment was genuine H3C equipment.

273.    The HPFS Defendants breached that warranty by selling to Plaintiff ICT counterfeit equipment instead, as a result of which breach of warranty Plaintiff ICT, Plaintiff Styller and the Individual Plaintiffs suffered their respective injuries as alleged herein.

274.    Further, the WSA provides in Clause 2 that "[t]he title and legal and beneficial ownership of the Equipment shall be transferred to the buyer by way of delivery in the manner set out in clauses 3 and 4 below. The Equipment shall be transferred to the Buyer free from all liens and encumbrances." Clause 6 of the WSA provides that "Seller warrants that, on the Actual Delivery Date, (i) Seller is the lawful owner of the Equipment and (ii) the Equipment will be free and clear of all liens and encumbrances whatsoever." The RRSA also provides that "the equipment [is] owned by HPFS" and that "ICT intends to acquire title to the Active Equipment from Broker and then arrange for its sale to third parties."

275.    According to M.G.L. ch. 106 § 2-312(2), "a warranty [of title] will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have." The "AS IS with defects" disclaimer does not constitute such "specific language" and does not waive the warranty of title, particularly where, as here, that warranty was expressly set out in contractual provisions.

276.    Because the Equipment was in fact counterfeit and the HPFS Defendants could not lawfully resell it, they could not have transferred "the title and legal and beneficial ownership of the Equipment" as warranted, and are liable for breach of that warranty of title.

277.    Furthermore, according to M.G.L. ch. 106, Section 2-318, "[l]ack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty,

express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods." Here, the Equipment was sold for the specific purpose of resale, and the sale contract required Plaintiff ICT "to use its best efforts to remarket the Active Equipment at the highest possible prices." Accordingly, the HPFS Defendants "might reasonably have expected" that the persons reselling the Equipment – Plaintiffs ICT and Styller, and ICT's sales associates, the Individual Plaintiffs -- would "be affected by" it within the meaning of the statute.

278.    In particular, Defendants should have reasonably expected these Plaintiffs to be exposed to an unreasonable and substantially certain risk of seizure and imprisonment for reselling the Equipment that was counterfeit and not genuine as warranted.

279.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; the Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

280.    The HPFS Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

**COUNT VI**
**(For Breach of M.G.L. 93A against the HPFS Defendants**
**on behalf of Plaintiffs ICT and Styller and the Individual Plaintiffs)**

281.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

282.    The HPFS Defendants are corporations engaged in the conduct of trade or commerce.

283.    Plaintiff ICT is a person engaged in the conduct of trade or commerce who suffered loss of money and property as a result of the HPFS Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

284.    Plaintiff Styller and the Individual Plaintiffs are persons engaged in the conduct of trade or commerce who suffered loss of money and property, as well as personal injuries, as a result of the HPFS Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

285.    All Plaintiffs are in direct or indirect privity with the HPFS Defendants and/or substantially connected to the business transaction between ICT and the HPFS Defendants such that these HPFS Defendants knew or should have known that all Plaintiffs would receive goods which the HPFS Defendants knew or should have known were counterfeit, the receipt and resale of which would expose Plaintiffs to harm, including the harm that occurred as described herein.

286.    The HPFS Defendants' misrepresentation of the Equipment as genuine H3C Equipment during the 2011 negotiations and sale transaction constitutes unfair and deceptive trade practices within the meaning of Section 2 of M.G.L. 93A, as HPFS Defendants failed to disclose to Plaintiffs the fact that the Equipment was counterfeit, which disclosure would have

76

caused Plaintiffs not to enter into the resale transaction and/or not to undertake any attempts to resell the Equipment.

287.    HPFS Defendants' unfair and deceptive acts or practices occurred primarily and substantially within the Commonwealth where the negotiations and execution of the relevant agreements took place and the complained-of misrepresentations occurred as particularized in paragraphs 25 through 35 above.

288.    As a direct and proximate result of the HPFS Defendants' deceptive acts in violation of M.G.L. 93A, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; the Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

289.    The HPFS Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial. The HPFS Defendants committed their unfair and deceptive acts or practices willfully or knowingly, with reckless disregard for Plaintiffs' rights, entitling Plaintiff to up to three, but no less than two, times of the amount of its actual damages (to be determined at trial) suffered as a result of the HPFS Defendants' violation of M.G.L. 93A, as well as attorneys' fees and costs incurred in pursuit of this action.

**COUNT VII**
**(For Fraud against all Defendants on behalf of**
**Plaintiffs ICT and Styller and the Individual Plaintiffs)**

290.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

291.     In addition to the fraud and related causes of action alleged against the HPFS Defendants in connection with the 2011 sale as set forth in Counts I-VI above, Plaintiffs hereby allege the following fraud and related causes of action in Counts VII-XIII against the Defendants in connection with their fraudulent frame job and cover-up scheme that commenced in 2013 following the police raid on Plaintiff ICT's Beijing offices and the arrest of the Individual Plaintiffs.

292.     Defendants' fraudulent scheme commenced with the sham "assistance" that the Defendants pretended to be providing Plaintiffs purportedly to secure their release, while one of their Chinese affiliates, H3C, was relentlessly and aggressively pushing for their criminal trial on charges carrying a potential 10-year sentence with the 99.93% chance of conviction, and their other Chinese affiliate – HP China – falsely pled ignorance of the matter and stonewalled the police's requests for exonerating evidence to confirm the Individual Plaintiffs' alibis.

293.     The scheme continued with the Defendants' secret substitution of their March 2013 Letter to the Chinese authorities whereby Defendants deleted their key admissions that would have resulted in the Individual Plaintiffs' release -- and expressly lied about it, assuring Plaintiffs that "the letter is substantively the same as the last English version you saw."

294.     Defendants also falsely assured the Plaintiffs that the letter "was definitely filed" whereas in fact Defendants never filed the Letter with the prosecutor, as was expressly and repeatedly requested by the Plaintiffs, and never properly filed with the police either, as a result

of which the Letter was merely "reviewed" and then rejected by the police as "not relevant to the proceedings," according to the Defendants.

295.    Defendants thus withheld exonerating evidence that would have secured the release of the Individual Plaintiffs, and stonewalled the Chinese authorities' and Plaintiffs' request for that information, thereby prolonging Plaintiffs' suffering and compounding their injuries.

296.    Following the Individual Plaintiffs' release on bail pending criminal trial, Defendants continued their cover-up scheme in an effort to defraud and intimidate the Plaintiffs into releasing their claims in exchange for the Defendants' "***possibly making some small settlement payment to resolve this issue in its entirety***."

297.    Defendants also continued their frame job and cover-up scheme in order to avoid criminal liability for selling counterfeit Equipment in India if H3C's allegations of counterfeiting were true – or, conversely, to avoid criminal liability in China for making false statements to the police with the intention of framing the Plaintiffs if H3C's allegations of counterfeiting were false, in either case using the Individual Plaintiffs as innocent scapegoats for Defendants' own crimes.

298.    Knowing fully well that their Chinese affiliate H3C continued urging that the Individual Plaintiffs be tried for the crimes they did not commit and that, if tried, highly likely sentenced to lengthy prison terms despite their absolute innocence, all Defendants nevertheless persisted in their insidious frame job and cover-up scheme with the knowledge of its falsity or with reckless disregard for the truth.

299.    The HPFS Defendants and Defendant Gill were aware of the true facts since 2011 as they were directly involved in the sale of the Equipment to Plaintiff ICT. In early 2013,

the HPFS Defendants learned about the arrest in China and H3C's allegations of counterfeiting through their representatives JT Silvestri, James O'Grady, Kevan Bartley, and Defendant Gill.

300.    HP itself (now Defendants HPE and HPI) learned about the counterfeiting allegations in early 2013 as well. According to Defendants themselves, the matter was "escalated" to the parent company level and its "top level leaders" in the beginning of February 2013, and "the HP legal and security teams" were in China by mid-February reviewing the issue, joined by HP's "internal audit team" and an "HP attorney from the U.S." in March 2013. Upon information and belief, the legal, security and internal audit were all central corporate departments at HP, run directly from its Palo Alto headquarters and reporting to HP's respective senior executives.

301.    At the same time Defendant Gill, who was Defendants' point man in dealings with the Plaintiffs, kept passing along Plaintiffs' requests for information to his unnamed superiors. Defendant Gill at the time was Assistant General Counsel and Assistant Secretary of Defendant HPFS, whose General Counsel and Secretary was Mr. McCarthy. Defendant Gill reported directly or indirectly to Mr. McCarthy until March 2013, when Mr. McCarthy left HPFS to become its outside counsel in his new capacity as a partner at Gibbons P.C.

302.    Top executives of Defendants HPI and HPE, Ms. Whitman and Mr. Schultz, knew about the matter since *at least* June 12, 2013, when Plaintiff Styller and ICT's outside counsel Mr. Riordan directly notified them of the impending criminal prosecution of the innocent Individual Plaintiffs and begged for their help in securing their release. Upon information and belief, Defendants HPI and HPE knew about or recklessly disregarded the matter even earlier, given the gravity of the situation, its early escalation to the "top level

leaders," and the heavy involvement of HP's personnel from its central legal, security and audit functions in the matter.

303.    Even though Ms. Whitman ignored Plaintiff Styller's desperate plea, Mr. Schutz, who reported directly to Ms. Whitman, took an active role in the case and retained Gibbons P.C. and its partner Mr. McCarthy to prosecute the fraudulent cover-up campaign against the Plaintiffs on behalf of HP and its subsidiaries, including Defendant HPFS India and H3C, who made numerous fraudulent statements in furtherance of the cover-up scheme as alleged in detail in paragraphs 193 through 225, with full knowledge or reckless disregard for the truth.

304.    Plaintiffs reasonably relied on Defendants' fraudulent statements and their pretense of "assistance," to Plaintiffs' severe detriment. Had the Plaintiffs known the truth, they would not have spent the enormous amount of time, efforts, and resources in trying to secure the release of the Individual Plaintiffs by cooperating with the Defendants in good faith and in reliance on Defendants' ostensible -- but sham -- "assistance." Had the Plaintiffs known the truth, they would have viewed Defendants as adversaries acting in extreme bad faith rather than partners, and would have pursued different legal venues and strategies in their quest to free the Individual Plaintiffs, including without limitation filing criminal complaints against Defendants in India and/or China.

305.    Defendants had both motive and opportunity to commit their fraudulent cover-up. Their motive was to avoid criminal exposure in India for selling counterfeit goods and/or in China for making false statements to the police with the intent of framing innocent people as criminals, as well as to force Plaintiffs to release their claims in exchange for Defendants' "possibly making some small settlement payment to resolve this issue in its entirety." And Defendants had ample opportunities to commit their fraud, given their resources, manpower,

position, and access to the Chinese police (witness, *e.g.*, Defendant Gill's possession of confidential correspondence between the Chinese prosecutor and the Chinese police, at paragraph __ above) – especially when compared to those of the Plaintiffs, with their Chinese office shut and their whole Chinese team in jail.

306.     Moreover, Defendants' intent to deceive – their scienter – was demonstrated in, among other things, Defendant Gill's secretly revising the March 2013 Letter and blatantly lying about it to the Plaintiffs; in Defendant Gill's false assurances to the Plaintiff that the Letter "was definitely filed" when it was not; and in numerous demonstrable misstatements made by Mr. McCarthy on behalf of HP, H3C and Defendant HPFS India, with reckless indifference to the truth and in callous disregard of the Plaintiffs' suffering, and in extreme bad faith.

307.     As a direct and proximate result of Defendants' fraudulent frame job and cover-up, Plaintiff ICT and its owner Plaintiff Styller were damaged and suffered out of pocket losses, loss of profits, loss of their Chinese operations, and a serious injury to their business, property and reputation; Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution.

308.     All Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial.

**COUNT VIII**
**(For Breach of M.G.L. 93A against all Defendants on behalf of**
**Plaintiffs ICT and Styller and the Individual Plaintiffs)**

309.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

310.    Defendants are persons engaged in the conduct of trade or commerce.

311.    Plaintiff ICT is a person engaged in the conduct of trade or commerce who suffered loss of money and property as a result of Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

312.    Plaintiff Styller and the Individual Plaintiffs are persons engaged in the conduct of trade or commerce who suffered loss of money and property, as well as personal injuries, as a result of Defendants' unfair and deceptive acts or practices within the meaning of Section 11 of M.G.L. 93A.

313.    All Plaintiffs are in direct or indirect privity with Defendants and/or substantially connected to the business transaction between ICT and the HPFS Defendants such that these Defendants knew or should have known that all Plaintiffs would receive goods which the Defendants knew or should have known were counterfeit, the receipt and resale of which would expose Plaintiffs to harm, including the harm that occurred as described herein.

314.    Defendants' ensuing frame job and cover-up scheme and the numerous fraudulent statements made by Defendants in furtherance thereof constitute unfair and deceptive trade practices within the meaning of Section 2 of M.G.L. 93A.

315.    Defendants' unfair and deceptive acts or practices occurred primarily and substantially within the Commonwealth where Defendant HPFS and Plaintiffs ICT and Styller conduct business, where the Defendants directed their numerous fraudulent statements, and

where those fraudulent statements were received, relied, and acted upon by the Plaintiffs to their severe detriment.

316.    As a direct and proximate result of Defendants' deceptive acts in violation of M.G.L. 93A, these Plaintiffs were damaged and suffered out of pocket losses, loss of profits, and a serious injury to their business, property and reputation; the Individual Plaintiffs each spent 7 months in the extremely harsh conditions of Chinese prison and then a year on bail expecting criminal trial and its 99.93% chance of conviction and lengthy prison terms despite their complete innocence, and suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, loss of earnings and employment, and the stigma of a criminal prosecution. Plaintiff Styller also suffered personal injuries in the form of mental and emotional distress caused by Defendants' egregious frame job and cover-up.

317.    Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial. Defendants committed their unfair and deceptive acts or practices willfully or knowingly, with reckless disregard for Plaintiffs' rights and in extreme bad faith, entitling Plaintiff to up to three, but no less than two, times of the amount of its actual damages (to be determined at trial) suffered as a result of Defendants' violation of M.G.L. 93A, as well as attorneys' fees and costs incurred in pursuit of this action.

### COUNT IX
### (For False Imprisonment against all Defendants
### on behalf of the Individual Plaintiffs)

318.    Individual Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

319.    Due to Defendants' original 2011 fraud and the ensuing frame job and cover-up campaign against the Plaintiffs, and through no fault of their own, the Individual Plaintiffs were falsely imprisoned and remained imprisoned for 7 months each.

320.    The HPFS Defendants' fraudulent sale of counterfeit Equipment to Plaintiffs in 2011, for the express purposes of resale, unreasonably exposed Plaintiffs reselling it to a substantially certain risk of arrest and imprisonment. Under Massachusetts law, the actor is liable for false imprisonment if his act is done with knowledge that such confinement would, to a substantial certainty, result from it.

321.    Further under Massachusetts law, if the actor is under a duty to release the other from confinement, or to aid in such release, his refusal to do so with the intention of confining the other is a sufficient act of confinement to make him subject to liability. Moreover, under Massachusetts law, a person may be liable for false imprisonment not only when the person's acts directly impose a restrain upon the liberty of another but also when such person, by providing false information, causes such restraint to be imposed. Finally, Defendants here were under a duty imposed by Massachusetts law to rescue the Individual Plaintiffs from their unjustified confinement because Defendants themselves created the peril that was substantially certain to result – and indeed resulted -- in their confinement.

322.    H3C's initial December 2012 complaint to the police requesting criminal prosecution of the Plaintiffs, while revealing the counterfeit nature of the Equipment, was nonetheless incomplete and misleading in that it did not disclose that the Equipment was sold to Plaintiffs by H3C's affiliates, the HPFS Defendants, expressly for remarketing purposes as genuine H3C equipment, and was remarketed by Plaintiffs as such without knowledge of its counterfeit nature. H3C and HP China also withheld the exonerating evidence that would have

secured the early release of the Individual Plaintiffs and stonewalled the Chinese authorities'

requests for it.

323.    Defendants' own, belated April 22, 2013 submission to the police was likewise

false and misleading because Defendants deleted and thereby withheld the exonerating evidence

– their own key admissions in the March 2013 Letter -- which, if disclosed, would have led to

the release of the Individual Plaintiffs, and which concealment by the Defendants prolonged the

Individual Plaintiffs' imprisonment and exacerbated their injuries. Defendants knew that their

letter to the Chinese authorities "*needed to be as clear as possible to be effective.*" The key

admissions made in their March 2013 Letter would have accomplished that purpose; however,

Defendants deliberately mischaracterized or omitted those admissions in their final April 22,

2013 letter as part of their deliberate cover-up campaign.

324.    Defendants were well aware of the Individual Plaintiffs' unjustified

imprisonment and impending criminal trial virtually certain to result in their convictions, and

with that knowledge they conducted their cover-up campaign of withholding exculpatory

evidence and bullying the Plaintiffs into release of their claims, with full knowledge of or with

reckless disregard for the truth and in callous disregard for the Plaintiffs' rights and their

admittedly "Dickensian plight."

325.    Thus, the imprisonment of the Individual Plaintiffs was unjustified solely due to

Defendants' own actions. Therefore, Individual Plaintiffs are entitled to damages from

Defendants regardless of the propriety, validity or legality of the Chinese authorities' actions,

which Plaintiffs do not question. Indeed, the Chinese authorities appeared to have investigated

the case quite thoroughly and ultimately did not bring any charges – while the Defendants

withheld from the authorities the exonerating evidence that would have secured earlier release of the Individual Plaintiffs.

326.     To the best of their knowledge, the Individual Plaintiffs were never arraigned, never appeared before the judge, and were never charged by the prosecutor, and remained falsely imprisoned for the whole duration of their ordeal without any issuance of process, charging document, or arraignment. Therefore, their claim for false imprisonment covers the whole period of their confinement.

327.     Moreover, even if, without their knowledge, there occurred in the course of their confinement an equivalent of issuance of process or arraignment, the Defendants withheld critical exonerating evidence from the Chinese authorities, so that the Chinese authorities' decision to issue such a process or arraignment could not have been made in exercise of their informed independent judgment, and therefore does not cut off Defendants' liability for false imprisonment under Massachusetts law.

328.     In the course of their prolonged imprisonment, the Individual Plaintiffs suffered from loss of freedom, loss of face, physical pain and sickness, emotional distress and mental suffering, loss of consortium, as well as from loss of earnings and employment.

329.     All Defendants are jointly and severally liable to the Individual Plaintiffs for their injury, in an amount of damages to be determined at trial.

**COUNT X**
**(For Negligence against the HPFS Defendants and Defendant Gill on behalf of Plaintiffs ICT and Styller and the Individual Plaintiffs)**

330.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

331.     After learning in early 2013 about the Individual Plaintiffs' arrest and imprisonment for unwittingly reselling counterfeit Equipment supplied by the HPSF Defendants, the Defendants were under a duty to make a prompt and complete disclosure of true facts to the police to secure their release, as any reasonable person in these circumstances would have done. Indeed, under Massachusetts law, a duty to prevent harm to others arises when one creates a dangerous situation, whether that dangerous situation was created intentionally or negligently.

332.     Defendants have utterly failed to carry out that duty. They unreasonably delayed making their submission to the Chinese police for almost three months until April 22, 2013 while the Individual Plaintiffs languished in jail. When Defendants did finally make their submission on April 22, 2013, they failed to make a complete and truthful disclosure of the relevant facts known to them, as a result of which their submission was woefully inadequate and misleading, and failed to secure the release of the Individual Plaintiffs. At the very least, the Defendants were under a duty to provide exonerating evidence to the Chinese authorities and the Plaintiffs to secure the release of the Individual Plaintiffs, whose confinement was caused by Defendants' own actions, but they withheld that information in breach of their duties.

333.     Defendants neglected their duty and exhibited callous disregard for the plight of the innocent Individual Plaintiffs, whose lives and careers were shattered solely due to Defendants' own wrongful actions.

334.     Defendants' breaches of duty directly and proximately caused the Plaintiffs' injuries. Defendants were aware of the continuing criminal case against the Individual Plaintiffs but took no actions in order to assist the Individual Plaintiffs to clear their names and terminate the criminal proceedings against them. To the contrary, Defendants stonewalled Plaintiffs'

repeated requests for information and assistance necessary to clear the Individual Plaintiffs' names and terminate the prosecution, withheld the exonerating evidence in their possession, and blamed the victims themselves. Defendants' breach of duty was thus continuing, and the Individual Plaintiffs continued to suffer the stigma of criminal prosecution, loss of face, mental anguish, loss of employment and loss of earnings until late 2015-early 2016, when they received the "no criminal record" letters from the Chinese authorities.

335. Because of the Defendants' breach of duty to make complete, honest and prompt disclosure to the Chinese authorities, Plaintiff ICT also incurred additional costs and expenses when its executives, including its CEO Plaintiff Styller, were compelled to expend significant amounts of their time and resources, including in legal expenses, in frantic efforts to secure the release of the Individual Plaintiffs, and to clear their names after the release. Plaintiff Styller also suffered personal injuries as a result of Defendants' negligence.

336. As a direct and proximate result of Defendants' negligence, these Plaintiffs suffered their respective injuries as alleged herein.

337. Defendants are jointly and severally liable to Plaintiffs for their damages in an amount to be determined at trial.

## COUNT XI
### (For Civil Conspiracy against all Defendants on behalf of all Plaintiffs)

338. Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236 of this Complaint as if set forth in full.

339. All Defendants – subsidiaries, successors, and executives of the former HP -- acted in concert and unison to commit tortious acts against Plaintiffs as alleged herein.

340. The HPFS Defendants through their senior executives and managers, including Defendant Gill, negotiated the transaction and/or executed the relevant contractual documents,

falsely representing the Equipment as genuine H3C equipment and concealing its counterfeit

nature from Plaintiffs. The HPFS Defendants then sold the Equipment to Plaintiffs pursuant to

those contracts, likewise without disclosing its counterfeit nature.

341.    All Defendants then collaborated on facilitating the frame job and the cover-up

scheme against the Plaintiffs, as alleged in detail herein.

342.    Each of the Defendants took affirmative steps as alleged herein in concert with

the others, with common purpose and/or effect. Indeed, had *any* of the Defendants told the

truth, Plaintiffs' injuries would not have occurred to the extent that they did, or at all.

343.    Moreover, Defendants prevented their other representatives – Messrs. Silvestri,

O'Grady, and Bartley, among others – from communicating directly with the Plaintiffs as a

matter of "big company policy," and instead "funnel[ed] . . . [these] significant risk issues . . . to

a group of highly experienced senior managers" – all willing and active executioners of

Defendants' civil conspiracy to commit tort.

344.    As a direct and proximate result of Defendants' civil conspiracy, all Plaintiffs

suffered their respective injuries as alleged herein. Defendants are jointly and severally liable to

Plaintiffs for their damages in an amount to be determined at trial.

### COUNT XII
**(For intentional infliction of mental anguish and emotional distress
on behalf of the Individual Plaintiffs, Plaintiff Styller and the Family Plaintiffs)**

345.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236

of this Complaint as if set forth in full.

346.    Defendants' concerted misconduct as alleged herein – their initial fraudulent

sale, the frame job, and the cover-up -- was egregious and outrageous, beyond all possible

bounds of decency, in extreme bad faith and utterly intolerable in a civilized society.

347.     Defendants' misconduct was the direct and proximate cause of the Individual

Plaintiffs', Plaintiff Styller's and the Family Plaintiffs' mental and emotional distress. The

mental and emotional distress sustained by these Plaintiffs, who had to endure Defendants'

misconduct for the last three years, was severe and of the nature that no reasonable person could

be expected to endure.

348.     Defendants intended to inflict mental and emotional distress on these Plaintiffs,

or knew, or should have known, that their conduct would likely result in these Plaintiffs' mental

and emotional distress, *see* paragraph 235 herein, but proceeded nevertheless without any

justification or privilege.

349.     As a direct and proximate result of Defendants' egregious and callous

misconduct, the Individual Plaintiffs, Plaintiff Styller and the Family Plaintiffs suffered their

respective injuries as alleged herein. Defendants are jointly and severally liable to these

Plaintiffs for their damages in an amount to be determined at trial.

## COUNT XIII
### (For loss of consortium on behalf of
### Plaintiffs Jade Cheng and Caroline Marafao Cheng)

350.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1 through 236

of this Complaint as if set forth in full.

351.     At the time of Plaintiff Cheng's arrest and imprisonment, he was legally married

to Plaintiff Caroline Marafao Cheng, a citizen of Brazil. Jade and Caroline were married on

December 17, 2009 in Sao Paulo, Brazil, and moved to China prior to the events at issue.

352.     Plaintiff Cheng was not allowed any family visits during his confinement, and

was not able to see his wife for seven months, suffering from the loss of his spouse's society,

affection, companionship, comfort, and relations.

353.     During the same period Plaintiff Marafao Cheng endured the same loss of her spouse's society, affection, companionship, comfort, and relations. Plaintiff Marafao Cheng, who did not speak any Chinese, stayed with Plaintiff Cheng's parents, who did not speak any English or Portuguese, during the whole ordeal while all of them desperately tried to rescue Plaintiff Cheng and his associates Plaintiffs Yu and Yuyi, Plaintiff Marafao Cheng's suffering compounded by her inability to communicate with Plaintiff Cheng's family during those critical times.

354.     For a while, Plaintiff Marafao Cheng tried to keep the news of her husband's arrest hidden from her Brazilian family in order to save face. When Plaintiff Cheng missed major holidays or family events during his imprisonment – Christmas, New Year, Chinese Lunar New Year, birthdays, and their wedding anniversary – Plaintiff Marafao Cheng would explain to her family that he was out on ICT's business. But by April 2013, when his long absence was no longer possible to explain away, Plaintiff Marafao shared the news with her parents, who were shocked and immediately applied for visas in the Chinese embassy in Brazil, asked their employers for an unscheduled vacation to be able to come to Beijing to assist Plaintiffs the best they could, and rushed to China to assist, all on their own expense.

355.     All Defendants knew or recklessly disregarded the fact that the Individual Plaintiffs' families, including Plaintiff Cheng's spouse, were deeply involved in their loved ones' terrible plight and themselves suffered from Defendants' misconduct, but carried out their nefarious scheme regardless.

356.     As a direct and proximate result of Defendants' egregious and callous misconduct, Plaintiffs Cheng and his spouse Plaintiff Caroline Marafao Cheng suffered from

the loss of consortium. Defendants are jointly and severally liable to these Plaintiffs for their damages in an amount to be determined at trial.

### Prayer for Relief and Jury Demand

WHEREFORE, Plaintiffs respectfully request:

A.  Compensatory and consequential damages in an amount to be determined at trial for losses incurred by Plaintiffs, and other monetary damages in an amount to be determined at trial but in any event well in excess of the $75,000 jurisdictional amount;

B.  Treble damages for willful or intentional violations of Section 11 of MGL 93A, and/or exemplary damages in light of Defendants' egregious concerted misconduct;

C.  Interest on those damages;

D.  Reasonable attorneys' fees and costs incurred by Plaintiffs in pursuit of this action;

E.  Such other relief as is just, fair and equitable; and

F.  A jury trial on all counts.

August 4, 2017                                    Respectfully Submitted,

_____
Dimitry Joffe
(admitted *pro hac vice*)
Joffe Law P.C.
230 Park Avenue, 10th Floor
New York, NY 10169
Tel: (212) 309-8711
Email: dimitry@joffe.law

*Counsel for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Dimitry Joffe, hereby certify that on this 4th day of August 2017, I caused a copy of this Second Amended Complaint and accompanying affidavits to be sent electronically to the registered participants in this case through the ECF system.

_____
Dimitry Joffe