## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,<br><br>               Plaintiffs,<br><br>      v.<br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL,<br><br>               Defendants | Civil Action No. 1:16-CV-10386 (LTS) |

## AFFIDAVIT OF ALEXANDER STYLLER

I, Alexander Styller, a plaintiff in the above-captioned matter, hereby depose and state as follows:

1.    I am the President, Chief Executive Officer and owner of Integrated Communications & Technologies, Inc. ("ICT"), a Massachusetts corporation doing business at 239 Commercial Street, Malden, MA 02148.  ICT is also a plaintiff in the above-captioned matter.

2.    This affidavit is made on my first-hand knowledge, except where otherwise stated upon information and belief.

3.    I am a small business owner engaged in the business of remarketing excess and end-of-life inventory of computer parts and components through my company ICT. I have been

involved in this business since 1993 and have established many successful long-term commercial relationships within the computer and information technology asset recovery industry.

4.      Hewlett-Packard ("HP"), a publicly traded Fortune 50 company and a leading global provider of IT products and technologies,[1] had been one of these valued entities. I have been involved with HP and its affiliates on multiple projects. We had, prior to this case, enjoyed a mutually beneficial and financially lucrative working relationship.

5.      ICT's relationships with HP began initially through the digital electronics manufacturer 3Com. ICT had a working relationship with 3Com since 2000 or 2001 providing global asset recovery for all major lines of products. ICT had been working since that time with the U.S. and European offices of 3Com collecting equipment in the U.S., Ireland, the Netherlands and Singapore.

6.      In 2007, 3Com acquired 100% ownership of H3C Technologies Co., Ltd. ("H3C"), in a joint venture with China-based Huawei Technologies. In April, 2010, 3Com was acquired by HP and it and H3C were incorporated into the HP structure. ICT continued to do the same asset recovery business with HP during the transition. During the transition time, ICT initiated additional relationships with HP, specifically through HP's subsidiary, Hewlett-Packard Financial Services Company ("HPFS").

7.      HPFS is a wholly-owned subsidiary of HP, which has its business office at 165 Dascomb Road, Andover, Massachusetts. HPFS is in the business of providing financial life cycle management services including leasing, financing and asset recovery of IT hardware and

---

[1]      In November 2015, HP split into two entities, Hewlett Packard Enterprise Company and HP Inc., both headquartered in HP's office complex in Palo Alto.

software products from HP and other manufacturers. According to its website, "remarketing older assets is a key part of HP Financial Services' business."

8.      HPFS conducts its business through various operating subsidiaries located in throughout the world, in business regions of the Americas, EMEA (Europe, Middle East and Africa), and APJ (Asia Pacific and Japan) and is one of seven business segments of HP. Its APJ region includes its wholly owned subsidiary HPFS India, which provides financing and asset management services to HP customers in India.

9.      On February 9, 2011, ICT received an authorized vendor code to provide goods and services to HP. At that time, ICT was working with U.S. and European offices of HPFS to create a reverse logistics program to support a residual value based leasing program in Russia. ICT was also working with HPFS offices to help them resell off-lease equipment they had in Russia, as well as selling equipment to the procurement arm of HP on an RFQ basis.

10.     It was during this time period that ICT also started to look into actively purchasing off-lease equipment from HPFS in Andover, and was introduced to HPFS' business managers for this business line, including James O'Grady, Director of HPFS Asset Management, and JT Silvestri, Manager of HPFS Global Product Management.

11.     In June of 2011, Mr. Silvestri of HPFS' Andover office contacted my ICT business associate Alexander Pekar regarding the potential sale and remarketing of a large quantity of off-lease material (the "Equipment"), H3C inventory, in the possession of HPFS India. Mr. Silvestri expressly represented the Equipment as manufactured by H3C and identified

the Equipment as "H3C" equipment in these initial discussions, during which it was clarified that the originally brand-new Equipment had been returned after a short-term lease.[2]

12.   Upon information and belief, HPFS had been unsuccessful in their attempts to sell the H3C Equipment for some time, at least 6 months before we began working with them and their team, and was purportedly pleased when they realized that ICT could be a partner in moving this inventory.

13.   On June 14, 2011, Mr. Silvestri provided ICT's representative, Mr. Pekar, a preliminary proposal for the Equipment. Mr. Silvestri explained to Mr. Pekar that the Equipment was originally brand-new H3C-manufactured equipment coming off a short-term lease from HP's Asia region, and provided Mr. Pekar with a preliminary list of that Equipment specifically identified as "H3C" equipment.

14.   In his contemporaneous email memorializing these discussions, Mr. Pekar wrote: "This product is coming out of HP Asia. As far as I know (not sure if correct 100%) this product is coming out of lease and I'm assuming product is refurbished. (I'm trying to verify conditions and warranty. Please determine market value and liquidity on this shipment.")

---

[2]   Upon information and belief, in 2010, in preparation for the Commonwealth Games in Delhi, India, the Games Organizing Committee retained Tata Consultancy Services Limited ("Tata") to provide certain IT services for the Games. Tata and HPFS India then entered into a series of lease transactions whereby HPFS India purchased certain new IT networking equipment manufactured by HP/H3C from Inspira Enterprise Limited ("Inspira"), an authorized HP distributor in India, and simultaneously leased that equipment to Tata. After the Games, and upon expiration of the leases, with less than one year of use, Tata returned the equipment to HPFS India. Pursuant to standard industry protocol, HPFS India used a third-party vendor, TT Global, a company specializing in IT logistics and disposition to handle the returned equipment. TT Global, upon receipt of the returned Equipment inspected such equipment in a product-specific test and audit procedure. As part of that inspection procedure, TT Global photographed the Equipment and generated a master list of materials.

15.     Mr. Pekar's follow-up email of the same day clarified that "it was a 7-month lease (I would assume most of the product is new in original box). HP will provide 90 days' warranty and there might be original warranty by H3C."

16.     On or about June 15, 2011, ICT forwarded the Equipment list received from HPFS to its office in China to determine the Equipment's market value and liquidity there, because H3C was a China-based brand, and China presented the best resale market for the H3C Equipment. A cover email from ICT to our sales team in China headed by Jade Cheng, titled "HP H3C Urgent," stated: "Hi Jade, you know the list we were working on bidding for, with the S5000? . . . Attached is the list.  Can you and Jason [Yuyi] work on this, and identify which parts are hot, and what prices we can sell at.  We need this info to help formulate our bid to buy the materials."

17.     Jade responded with the "HPH3C.xls" spreadsheet identifying hot items on HPFS' list of Equipment (including H3C transceivers) and their estimated resale prices in China.

18.     On or about June 16, 2011, Mr. Pekar had another phone call with Mr. Silvestri regarding the H3C products offered by HPFS. At that time, Mr. Silvestri asked ICT to prepare a proposal for the Equipment, including purchase price and profit sharing terms, among others. Mr. Pekar, in an email to ICT regarding that phone call, wrote: "I had a long conversation with HP regarding the H3C products. In the next couple of days we need to give them a few options on this project." Based on these representations, we proceeded to negotiate the terms of the purchase and remarketing agreement.

19.     On or about September 1, 2011, HPFS forwarded to Mr. Pekar  a version of the sale contract for the Equipment drafted by Mr. Gill.  Mr. Pekar circulated the draft to others at

ICT, with a cover note stating: "Please review the contract we received from HP on the H3C deal."

20.     I reviewed and discussed the contract with Mr. Pekar, who conducted contract negotiations. Those negotiations were conducted by ICT representative from ICT's offices in Malden, MA, and by HPFS' representatives from HPFS' offices in Andover, MA, during the late summer and fall of 2011. In fact, I do not recall anyone from HPFS India ever participating in those negotiations in any form.

21.     Also in September 2011, ICT's representative Mr. Pekar met with Mr. O'Grady, HPFS' Director of Asset Management in charge of the H3C deal. Mr. Pekar e-mailed me about that and memorialized the meeting as follows: "Regarding meeting with Jim O'Grady, I have met with him, he knows who we are and what we trying to do, he is the one who sent in the team to do an initial audit of our facility.  He is in charge of H3C project and Russian Facility project, his team is working with us on both."

22.     On or about September 29, 2011, HPFS forwarded the next version of the draft contractual documents to ICT for review. One of the drafts was titled "ICT Sale Document JT-H3C Equipment.docx," where "JT" stands for the initials of Mr. Silvestri and "H3C Equipment" described the Equipment that was the subject of the negotiations.

23.     On or about November 8, 2011, HPFS forwarded another version of the draft contract to ICT, with the document name "110917 ICT Sale Document JT – H3C Equipment.pdf."

24.     On or about November 21, 2011, HPFS forwarded another version of the draft contract to ICT, with the document name "111121 ICT Sale Document JT-H3C Equipment.docx," which included revisions made by Mr. Gill.

6

25.     On or about December 1, 2011, HPFS forwarded to ICT's Mr. Pekar two spreadsheets titled "Copy of H3C all schedules part numbers 080811 Shipment.xlsx" and "copy f H3C all schedules part numbers 080811 First Shipment.xlsx," drafted by Mr. Harris. The spreadsheets identified the Equipment by its HP/H3C manufacturing model codes. Mr. Pekar then circulated the spreadsheets to me and the others at ICT, with a cover note stating: "Attached list of the 1st shipment, please feel free to go through to make sure all correct as we agreed on this couple months ago."

26.     The remarketing arrangement between HPFS India and ICT contemplated four shipments of the Equipment, with the initial payment of $250,000 due from ICT for the first installment, and a sharing of the net resale proceeds between ICT and Defendant HPFS India.

27.     Because HP's internal policy required a local entity for export-import transactions, we had to agree to document remarketing arrangement in two concurrent contracts. First, HPFS India entered into a Referral and Revenue Share Agreement with ICT dated December 6, 2011 ("RRSA"), whereby HPFS India agreed to sell the Equipment "AS IS" to an Indian broker Shinto Creative Elements Private Limited ("Shinto"), and ICT agreed to acquire the Equipment from the broker for the purposes of reselling that Equipment and sharing the net proceeds of any such resale with HPFS India. The RRSA required ICT "to use its best efforts to remarket the Active Equipment at the highest possible prices" and "without identifying HPFS" as the source of the Equipment. The RRSA was executed by Javlin Lim, HPFS' APJ Delivery Team Lead, on behalf of HPFS India.

28.     Second, as contemplated by the RRSA, HPFS India entered into a Wholesale Sale Agreement (the "WSA"), also dated December 6, 2011, with Shinto for the sale of the first installment of the Equipment for $250,000 for the purpose of reselling the Equipment to ICT.

The WSA identified the sold Equipment by their "HP" and "H3C" manufacturing model codes and was executed by Kevan Bartley, HPFS' Global Operations Manager, on behalf of HPFS India. The execution version of the WSA also bears a legend "111202 ICT Sale Document JT – H3C Equipment 1st Batch.doc" printed in the footer.

29.     The purchase order issued by Shinto to HPFS India pursuant to the WSA likewise identified the purchased items as "HP/H3C"-manufactured equipment, and was executed by Mr. O'Grady, Director of HPFS' Asset Management in charge of the H3C project, on behalf of HPFS India.

30.     Accordingly, pursuant to the RRSA and the WSA, ICT purchased the Equipment represented by HPFS as genuine HP/H3C-manufactured equipment, and had no reason to believe otherwise: ICT contracted with an HP entity; HPFS' representatives engaged in negotiations specifically identified and described the Equipment as the "H3C Equipment" on numerous occasions in the course of those negotiations; the contracts themselves specifically identified the Equipment as HP/H3C-manufactured equipment; and the Equipment had been inspected by HPFS India or its agents upon the lease expiration and return of the Equipment, prior to the sale to ICT.

31.     ICT's decision to proceed with the H3D deal was based on HPFS' express representations regarding the nature and provenance of the Equipment. My work with HP has always been based on high standards, loyalty and the ability to work directly with HP staff. ICT entered into this transaction based on the word of HPFS' representatives. This is quite standard for contractual arrangements in this industry where the parties have established ties and high level of trust. I believed that we were working with the professionals we could trust.

32.     Naturally, had I or anybody on my team known or suspected that the Equipment was counterfeit, we would not have ever agreed to remarket it – as no experienced and legitimate businessman would – and would have terminated the negotiations forthwith. But that possibility did not even begin to cross my mind, as we were negotiating with an HP entity for the remarketing of HP's own Equipment.

33.     During negotiations, we specifically asked and were specifically assured (what was clear from the contract as well) that ICT was not restricted from remarketing the Equipment geographically. The reason for this was that we planned exclusively to re-market this Equipment through our sales office in China. The Equipment was H3C branded, a well-known name in China; accordingly, China was the best market for it. We told HPFS all along, and HPFS knew very well, that we intended to remarket the Equipment in China, and never raised any objections to it. Moreover, as I recall they were very supportive of the idea since the Chinese market promised best return and their 50% profit share supposed to be higher.

34.     ICT had been in the process of establishing offices in China over the course of the previous two years. We initially opened a representative office in Shanghai in 2010, but realized it was not the right location for the business we were in and closed it in late 2011, relocating everything to Beijing.

35.     Our Beijing sales team was headed by Jade Cheng (Cheng Yongguo), who supervised our sales associates Jason Yuyi and Cathy Yu. Jade, at the time I hired him, was an accomplished professional with university education and nine years' of very impressive experience of overseas marketing, extremely successful sales management, open bidding, overseas company set-up and operations in many countries of the world, including:

- April 2009-April 2011 -- Rosenberger Asia Pacific (Germany) Electronic Co., Ltd., Titles: Philippines Sales Director, Latin American Sales Director; Brazil Sales Chief;

- April 2005-February 2009—Huawei Technologies, Titles: Senior Purchase Manager of Pakistan; Senior Purchase Manager of Bangladesh; Outsourcing Product Sales Manager; Optical Network Product Sales Manager; Department Director of Huawei Southeast Asia; Key Account Manager of Philippines;

- September 2004-April 2005—Foxconn Shenzhen, Title: IT Product Manager.

36.     Jason Yuyi had 3 years' experience of overseas sales and 2 years' experience of channel sales in China, including working for Ericsson and managing telecom sales in Vietnam and Philippines.

37.     Cathy Yu graduated in July 2012, and joined ICT in September 2012, working as Sales Assistant in Beijing.

38.     After Jade confirmed that China was the right market for the H3C Equipment, I requested our China sales team to collect soft orders or letters of intent from prospective customers subject to delivery. Jade, Jason and Cathy then started to reach out to customers there to see if they were interested in purchasing the Equipment, and ultimately arranged prospective customers to purchase the first shipment of the Equipment. The total amount of sale was $1.5 million subject to receipt and inspection of material to be as described and represented by us to the customers.

39.     At the end of December 2011, Shinto arranged for exporting the first installment of the Equipment to Hong Kong, where the Equipment was then forwarded to Beijing by a local forwarding company specializing in HK-Beijing leg. That shipment involved approximately 3000 transceivers purportedly manufactured by H3C. A portion of that equipment was

photographed by Jade when he received it in Beijing. The remaining part of the Equipment, still in India, included approximately 5000 transceivers purportedly manufactured by H3C.

40.     The entire first installment of Equipment turned out to be totally different from what was originally represented; it was, in fact, in horrible physical conditions. Units were rusted, dusted, physically damaged, scuffed, scratched and dented, that is what we call in the industry "scrap grade" and technically the product in those conditions is not considered resellable. The products in this condition in the industry do not pass quality inspection and go directly to recycling for metals recovery. ICT's arranged customers who were anticipating the Equipment in the "as is" but relatively new condition as it was initially brand-new, with reasonable wear and tear after a short-term, 7-10-month lease. When they realized the condition of the Equipment, they refused to purchase it. Not only they refused to purchase it for agreed price, they refused to purchase it for any money. At this point of time our sales team in China then had to develop new resale channels. They were already on the mission not to make money but save what we put in there. We all were afraid that we were going to lose all the investment.

41.     Half a year passed and very hard non-stop work of our office in China didn't bring much result, we sold only fraction of the shipment. That was extremely disappointing since the original plan was to sell all equipment upon arrival to prearranged customers and get 6 times more the investment. We needed to do something. In October/November 2012, ICT representative Mr. Pekar, together with defendant HPFS' representative Mr. Harris, conducted a joint inspection of the remaining three installments of the Equipment in India (the "2012 Inspection") and agreed that the remaining Equipment was likewise in a unusable condition. The parties then determined not to go through with the remaining installments. HPFS offered us the remaining equipment at a vastly reduced price (a 500% discount) but we refused. That was junk

11

and we realized that equipment cannot be reused. Upon information and belief, HPFS then disposed of the remaining installments of the Equipment in India.

42.     Despite the substandard nature of the Equipment, my sales team had committed to using their best efforts to resell the first installment of the Equipment and they worked throughout 2012 to find new marketing channels and customers who could have made sense of the scrap we got. They did ultimately secure purchasers, but the remarketing process took much longer than anticipated and resulted in significantly reduced revenue than originally anticipated.

43.     Upon information and belief, on December 9, 2012, five Chinese police officers and an H3C security expert came to ICT's Beijing office, apparently based on H3C's complaint to the Beijing Shuangyushu Police station ("BSP") that ICT had been selling counterfeit H3C transceivers. The police raided the ICT office, seized the remaining unsold Equipment, and took away Jason and Cathy who were there at the time of the raid.

44.     Following the seizure, H3C provided the police with an Appraisal Certificate, stating, with respect to the 778 seized transceivers, that "after investigation of the seized products, the above products with 'H3C' logo are confirmed to be counterfeit." The H3C security expert had determined that the Equipment was counterfeit based on a visual inspection of the security features and placements of the H3C logos on the transceivers and, upon information and belief, did not do any other tests. H3C also did not inform the police that the Equipment was sold to ICT by H3C affiliates as genuine H3C.

45.     The BSP then proceeded to incarcerate Jason and Cathy pending investigation into the allegations of counterfeiting of H3C products.

46.     Following the disappearance of Jason and Cathy, their families and their supervisor Jade immediately commenced looking for them but were unable to get in touch with

12

them through either telephone, cellphone or Internet. He recollected to me the trauma and distress as the events unfolded: "I contacted the families of Jason and Cathy, everybody moved out to look for Jason and Cathy, together with the relatives in Beijing. The relatives in Beijing went to the address but the door was locked, so they called the police and the police could not open the door, due to China policy—within 48 [hours] cannot regard people as missing. [I] drove far from his home to Jason's parents and Cathy's parents, to calm them down and try to find more ways. A struggled day!"

47.     On or about December 12, 2012, the relatives from Beijing got the news from the police station that Jason and Cathy were arrested due to "Trademark Infringement." According to the accounts of Jason and Cathy, "all the related families got frightened. Jade Cheng called a lot with all the families and prepared all the necessary documents, including the scanned contract signed by HPFS & HP USA, the Employee Letter from ICT, the Declare Letter."

48.     As their ordeal continued to unfold, the families became increasingly frantic. On December 16, 2012, Jade and Cathy's father went to Beijing to look for a lawyer's office (in a case such as this, a lawyer must be used to talk with the government). Jade and Cathy's father went to the lawyer's office several times per day, with documents, money, and anything else the lawyer deemed important to secure the release of the incarcerated Plaintiffs.

49.     On the afternoon of December 20, 2012, the police at the Haidian Detention Center in Beijing, where the young people were being held, called Jade. They said that they wanted to ask him to explain the documents submitted through the lawyer, and made an appointment for him to meet at the police station in the morning of December 21, 2012.

50.     On December 21, 2012, the police came to meet Jade at the gate of the jail and told him that "H3C has submit[ted] the Appraisal Report and confirmed that the transceivers

13

from your side are 'Trademark Infringement' and you are the leader, so you should be also in."
The BSP then arrested Jade on the spot and incarcerated him.

51.     As Jade later told me, on the day of the arrest he was placed in a 300-square-foot
cell with 40 other detainees, forced to strip naked in front of them and to take an ice-cold shower
for 10 minutes, with windows opened while it was snowing and -15 C outside. Jade's, Jason's
and Cathy's long, horrific ordeal in the dark, cold cell behind bars of the Haidian Detention
Center, notorious for its brutal treatment of detainees, was just beginning.

52.     Upon information and belief, on December 27, 2012, H3C submitted yet another
declaration to the Chinese police, stating that Jade, Jason and Cathy had been "selling counterfeit
'H3C' transceivers which Logo is owned by Hangzhou H3C Technologies Ltd."

53.     In early January 2013, I and the rest of us here in ICT learned that the criminal
trial of the individual plaintiffs was expected as soon as April.

54.     Later we also learned that in year 2013, the conviction rate in China was
reportedly 99.93%, and even higher in the next three years. Thus, if put to trial on false charges
and despite their complete innocence, Jade, Jason and Cathy had a vanishingly small, 7:10000
chance of acquittal. The families of our sales team felt horrified and this feeling was in the air for
all of us on ICT team.

55.     As soon as I realized what exactly was happening to our China team I
immediately contacted my ICT colleagues and requested that the issue be addressed with H3C
through internal channels to achieve the release of the ICT sales team. We began frantically to
assemble further documentary evidence and other materials we were told would be necessary to
secure their release.

56.     As we are getting deeper and deeper in understanding that not only the product we got from HPFS was not really re-sellable or reusable, but also that H3C did not arrest my people and product because of small misunderstanding and it all would not be resolved quick and easy, I started feeling more and more psychologically down. I was losing sleep, I couldn't eat, working and communicating with others became harder day by day. Every day the feeling got deeper and deeper to the level that I had to seek medical help. My doctor diagnosed me with depression and on January 9, 2013 I was prescribed anti-depressant medicine Wellbutrin, due to "worsening anxieties over the last few months due to pressures and stresses at work."

57.     I learned through the China Police documents that on January 10, 2013, the Chinese police contacted HP China, H3C's sister company and a wholly-owned subsidiary of HP in China, to verify our team's alibi that they were selling the equipment pursuant to ICT's contract with HPFS India. HP China's response was recorded as follows: "We contacted Meng Tao, who is working in the Security Department of HP China regarding several agreements made between ICT USA and HPFS submitted by (Jade).  Meng Tao replied on the phone: 'All HP contracts/agreements can be downloaded freely by anyone from HP website. HP China does not admit any contract signed by another party (HPFS) and requires the party who signed the contract to provide the detailed contract information for HP China to verify the contract."  (The information provided by HP China to the police and recorded in this document was complete and clear lie. No contracts of such a nature are ever available for public viewing as a matter of common business practice. Still, we subsequently tried to download contracts from HP website but, of course, did not find any.)

15

58.     By mid-January, when our own efforts proved unsuccessful, ICT informed our

business contacts at HPFS of the situation, hoping that they would be able to quickly resolve it

by explaining the H3C deal to the Chinese authorities and H3C, confirming our alibis.

59.     On January 31, 2013, my ICT colleague, Ryan Quinn fully briefed Mr. Silvestri

of HPFS on the facts:

> I just spoke with Mike, and he asked me to email you details of this
> situation:  Three guys working for ICT have been arrested in Beijing and
> have been held by the police since early December.  Their names & ID#s
> are in the attached file.  They are being held at:
>
> - Haidian Detention Center in Beijing
>
> Policeman in charge of this case:
>
> - Mr. Zhang Jian (address): 010-82587440
>
> Lawyer representing them (and the only person that is allowed to have any
> communication with them):
>
> - Mr. Huang:  13581924142
>
> These guys were doing business development, and helping to facilitate
> some sales with clients.  For some reason (we suspect an accusation of
> someone in the industry), the police went after them, and is accusing them
> of selling counterfeit H3C branded transceivers.
>
> H3C China (sounds like low level & inexperienced technician) did a
> visual inspection of the transceivers, and said they are counterfeit.  As far
> as we know, this is the only evidence.
>
> They say the transceivers are inconsistent in appearance, and some have
> H3C logo/sticker/hologram, while others do not.
>
> - The transceivers are from several different OEM (HiSense, Finisar, etc),
>   and this was explained, but the H3C guy still said they are counterfeit
>
> - The two transceiver part numbers that ICT bought from HP are 0231A563
>   (2200 pcs) & 0231A438 (300 pcs).
>
> - All along, the ICT guys have said these transceivers bought by ICT direct
>   from HP. H3C has said this is impossible. Their transceivers only have
>   H3C logo in China. Any transceivers out of China have HP logo.

As of right now, the lawyer is advising us to take 2 simultaneous paths:

> 1.  Have HPFS straighten this issue out internally with HP China & H3C China, and have it clarified with the Police. Hopefully H3C/Police will realize the error and they can be released immediately.

> 2.  Prepare as much documentation/evidence as possible for our lawyer. This includes contracts, letters, summaries, serial numbers etc. & translations, and all units will need to be authenticated by Chinese Embassy in US.  ICT is working on this now.  A formal letter from HP will be very helpful explaining the situation & stating that ICT did in fact buy this batch of H3C material from HP.

Your help is greatly appreciated!

60.     On February 1, 2013, I spoke with Mr. Silvestri further regarding the situation. After our conversation, I wrote to him: "Nice speaking with you just now. Thank you for taking this so seriously and escalating it so quickly. We really appreciate it." I then sent him photographs we had taken of the Equipment when it was forwarded to ICT in Beijing: "Attached are some additional photos of the transceivers after the green oval HP asset tag was removed."

61.     After ten days of HPFS' inaction, on February 12, 2013, I again wrote to Mr. Silvestri: "Is it possible to get this letter from HP? A formal letter from HP will be very helpful explaining the situation and stating that ICT did, in fact, buy this batch of H3C material from HP."

62.     On February 14, 2013, Mr. Silvestri responded:

Here is what the HPFS legal team thinks we can do which is to provide a formal letter covering the following:

- Details of all equipment purchased by ICT from HPFS;

- Confirming that based on our sampling some of the assets seized are within this list; and

- To the extent any of the assets seized were supplied by HPFS, we do not believe that ICT should be held responsible if they are counterfeit.

We would like your feedback on this and if you would like us to pursue we would also need to confirm this with our HP local legal teams. China is shut down this week, it would be mid to late next week for a draft letter.

63. Meanwhile, the horrendous experience of incarceration in the Haidian Detention Center, notorious for its brutality, was unfolding for the Plaintiffs. As Jade later described his day-to-day ordeal for me: "Can you image what we have suffered in the jail":

1. Ice-cold shower in the winter with snowing outside;

2. Naked before others;

3. No allow talking or moving around for the first month. No allow wash face, brush teeth in the 1st week, got permit to use toilet only, only 2 minutes to make shit!

4. Slept on the ground, heading the toilet in the 1st month, clearly watching and smelling the people using the toilet;

5. Sit on the board all day long till the ass is painful with the skin scab;

6. Dirty air till the Nasal cavity full of black dust;

7. Dirty water with white Precipitate …

64. HPFS appeared to escalate the matter quickly. They assigned HPFS' Assistant General Counsel and Assistant Secretary, Australia-based David Gill, to lead this process. Mr. Gill contacted me on February 17, 2013, assuring me that "I have been reviewing the issue with the HP legal and security teams in China so it would make sense for you to speak with me directly." Upon information and belief, legal and security are central corporate functions run directly from HP's corporate headquarters in Palo Alto and report directly to the top HP executives.

65. After I informed Mr. Gill of the details during our February 19, 2013 telephone conversation, I immediately forwarded to him the contact information of our Chinese lawyer.

66. As my team and I worked urgently to secure the release of our colleagues from their wholly undeserved and horrifying confinement, I was forthcoming about all details of the

18

transaction, and I provided HPFS with as much information regarding the events unfolding in China as I had access to through Jade, Jason and Cathy's Chinese lawyers and families.

67. I, in turn, accepted at face value the representations made by HPFS representatives at the time. I placed great hopes on our relationships with HP and was prepared to do everything possible to work collaboratively with HP so we could achieve the overriding goal of releasing Jade, Jason and Cathy from jail. Naturally, I believed Mr. Gill when he responded: "I hope to have an update later today. Please bear with me and please be assured that we have a number of people working on this so that it can be resolved as soon as possible."

68. I was comforted by the thought that HPFS is taking this issue seriously and had "a number of people working on" it, and was grateful for HPFS' purported assistance, and I wrote back to Mr. Gill: "Thank you David for giving this a priority. Every day in jail must be most horrible life experience. I never dreamed but I am afraid to imagine. Have a nice day and feel free to contact me any time day or night if my participation is necessary."

69. Meanwhile, Jade, Jason and Cathy were experiencing their "most horrible life experience" -- the one I was afraid even to imagine – every day of their confinement, which was by that time entering its third month, and was still very far from over. According to Jade:

      1. People scoring and fighting;

      2. work for the "boss," clean their clothes, clean the floor and toilet by hand;

      3. take duty for 2 hrs. from 10 p.m. to 6 a.m. in turn standing;

      4. stay with killers, Rapist, gangs;

      5. sleep with 40 people in 30 SQM;

      6. use the jail dirty clothes and covers, which never washed for more than 1 year;

      7. no allow call, meet families;

8. all the letters are checked and limited info, only allow to say "I am ok, need money;" no allowed to write in English, lost contact with my Brazilian wife;

9. eat vegetable cooked by water without meat;

10. got sickness;

11. stay in the jail for the important days, what's the feelings you want me to describe?

70.     Within hours of our initial February 19 phone conversation, I sent to Mr. Gill our Chinese lawyer contact information.

71.     We repeatedly urged HPFS to expedite matters but the lack of urgency in HPFS' actions was too evident to ignore. Thus, on February 21, 2013, I tried to contact Mr. Silvestri: "Left you a message on Monday. Please let me know when you have time for a quick meeting to review the Indian deal. That is important. Thank you." My response was an Automatic Message: "I am out of the office the week of the 18th."

72.     The next day, on February 22, 2013, I contacted Mr. Gill again:

David, good morning. Can you please make an effort to convince your H3C counterpart in China to instruct police to free our people. The level of allegation is not proportionate to the level of detention, 60 days in jail and counting for allegations of such magnitude is ridiculous. Set aside that they done nothing wrong, there is no justification to detain people without bail on small economic charge like that. Those people have no prior convictions and will not go anywhere. I will appreciate if you try. I know they can do magic. Thank you very much. I feel those people pain. Hope you understand.

73.     On February 25, 2013, Mr. Gill informed ICT that "[t]he PSB have granted us permission to view the seized goods. Our internal audit team should have a report on Wednesday." According to subsequent correspondence from Mr. Gill, their "internal audit team" included H3C auditors, who were able to access and re-inspect 40% of the seized Equipment --

which they themselves had already inspected in full just two months earlier, in December 2012, and reported to the police as counterfeit both at that time and on several subsequent occasions.

74.     Upon information and belief, the HP audit teams did a thorough job in evaluating the Equipment: they reviewed photographs of the transceivers taken by TT Global during the 2011 Inspection, compared the serial numbers from the photographs against a master list of the inventory, and physically inspected the Equipment. As Mr. Gill would later described in his correspondence with me, "a sample of the equipment is also being sent by our processing vendor in India to China for analysis by H3C"; "H3C inspected the seized equipment on behalf of HPFS India and also obtained lists of the seized equipment from the [PSB]"; "H3C has been analyzing the photos of the labels." Mr. Gill also requested at some point that we somehow arranged for "the H3C's auditors" to re-inspect the remaining 60% of the seized Equipment.

75.     In the meantime, I replied to Mr. Gill on February 25, 2013:

> Thank you for the update. I still encourage you to push your H3C counterpart to orchestrate release our people. Nothing in this situation justifies the incarceration and every day in prison is hell. Please if possible check where the seized material was collected. Obviously, if some material is not HPFS and was not collected from our people directly, neither our people [nor] HP has to be linked to it by any means and people released. Thinking forward if material is mixed (that we don't have evidence of the mixture as of now, I suppose) and collected from 3rd party warehouse or any other facility and has no direct and clear link to our people we all must be free and clear from allegations right away.

76.     There was no response to this from Mr. Gill.

77.     Upon information and belief, on March 2, 2013, two months after their initial contact, the Chinese police once again reached out to HP China to see if HP China was able to verify the HPFS-ICT contracts and thus confirm Jade, Jason and Cathy's alibis, and recorded the following response: "The person from HP China said HP China is contacting HPFS currently." Thus, the police's attempt to verify the young people's alibis was again thwarted by HP China.

78.     The horrors in China continued to unfold. My Chinese team, Jade, Jason and Cathy, incarcerated for almost three months by this time, were suffering unimaginably day in and day out, both physically and emotionally. Their elderly parents and other family members were devastated, horrified and tremendously stressed, trying to do anything and everything they can to get their children out of the prison, trying to visit them, spending horrendous amounts of money on travel and accommodations to be close to them and attorneys making all and any effort to ease their innocent children situation. We constantly received their letters and phone calls full of desperation, anger and chilling fear for Jade, Jason and Cathy fate, and it was breaking my heart to hear their pleas and not being able to help. The policy in China at that time was one child per family, and these families' precious only children were in jail (only Jason had a sibling in his family), their wholly unjustifiable plight needlessly protracted.

79.     Jade's Brazilian wife, Caroline, who recently moved to China to join her husband, lived with Jade and Jade's parents when he was arrested. After his incarceration in December, she was struggling in unimaginable ways in the Chinese village many hours of travel from any big city, finding herself all alone, speaking no Chinese and nobody in the village was speaking Portuguese or English.

80.     I was constantly working to reassure the very angry, terrified and anxious elderly parents and other family members that we were doing absolutely anything and everything within our power to secure Jade's, Jason's and Cathy's release. It was heartbreaking for me to not be able to give them answers or at least some hope in the face of their overwhelming and growing day by day anxiety, fear and desperation. I myself was overwhelmingly anxious, angry and frustrated by my inability to assure them that their children would be safe and released from

prison soon. My depression was growing and deepening due to the feeling of uselessness based on the terrible lack of progress.

81.     In my correspondence with HPFS, I constantly mentioned the families' unbelievable sufferings and pains because I believed it was an important fact that should clearly motivate HPFS to act faster and more effectively to secure the release of their absolutely innocent children who got imprisoned while working hard trying to make profit for HPFS.

82.     On March 5, 2013, having still received no word from Mr. Gill or HP regarding the inspection, I inquired: "I am wondering if you have any new information from China.  Last time I know your team was 40% through the inspection of materials in China." Mr. Gill responded that "the officer in charge was traveling . . . . As soon as he returns, out audit team will attempt to complete the reconciliation ASAP."

83.     A week later, on March 12, 2013, I, trying to keep cool under the worsening circumstances, sent Mr. Gill another message: "It is about two weeks since your team started inspection of product. Innocent people still in jail (for about 3 months now). I am getting pressure from families, elderly parents of our sales team members are going crazy. At this point, can you please arrange for your legal team get in touch with our lawyer there and explain the situation? Hope that move will provide some clarity and comfort to the families. Hope that move at least will help them understand that HP and ICT are working together to have all this mess cleaned up."

84.     I could not understand why HP's legal and audit teams had not been in touch with our Chinese lawyers as I had provided them with their contact information, and why they were not sharing with us more details about their audit teams' findings. But even more, I was unable

23

comprehend why the HP organization was effectively doing nothing to get our guys out of jail to start with.

85.     Mr. Gill, in his response, did not give us any information as to whether the inspected materials had been determined to be counterfeit. Instead, he responded: "The PSB did not give our auditor access to inspect the remaining 60% of the equipment. It is suggested that your local counsel make a formal request via letter and that such letter includes a request for H3C's auditors to be granted access to inspect the equipment. It would be fine for us to provide supporting letters indicating that we support and have no objections to the application. I am just confirming with our colleagues in the PRC that they would also be OK with this."

86.     Mr. Gill then proceeded to request additional information regarding customs clearance and local incorporation: "The PSB advised that it is still waiting for ICT to provide data with respect to its incorporation/establishment in the PRC. Apparently a request was made but no response has been received. I would guess that they are looking for copies of business licenses etc. but this is something that your counsel will need to take up directly with the authorities. Similarly, the PSB requested from ICT and is still waiting to receive customs clearance documentation for the equipment. Again, this is something that you and your counsel will need to attend to." We had never heard of this information being requested from our lawyer. This information seemed irrelevant to the critical question, which was *whether the Equipment was counterfeit.*

87.     I was now becoming more and more annoyed and frustrated by HP's responses and could not understand why Mr. Gill was continuing to insist on further audits that seems to be less and less relevant under the circumstances when a substantial percentage of the Equipment

had been carefully evaluated by the same H3C team who had recently inspected all of the seized

transceivers and reported them as counterfeit. In any event, I responded to Mr. Gill as follows:

> 1.  We need to know the result of the audit of the 40% of material.

> 2.  This issues involves 651 seized transceivers, with a value appraised at
> 157,000 RMB by the authorities.

> 3.  Regarding your suggestion to request our counsel [to] write a letter
> allowing inspection of the last 60%: We have discussed this with our
> lawyer in China. That's not the proper process. H3C needs to go to
> authorities with result of the first 40% -- and formally state whether these
> are the parts brought from HP. This issue also involves H3C originally
> saying the H3C sticker on the transceivers is fake. Now need H3C to
> confirm in writing that these are indeed from HP, and not modified. Their
> original accusation was wrong. *We need to know the result of your audit
> of the 40% of material . . . .*

> Your email did not resonate well, where you seemed to "pass the ball"
> back to ICT saying there is paperwork needed about our incorporation and
> customs clearance. Our lawyer has confirmed this has not been requested
> by anyone. We've already provided all necessary documentation to our
> lawyer and *the only issue at question is the authenticity of these H3C
> transceivers . . . .* Dragging this out with the long process you suggested
> is good for no one. I strongly urge HP/H3C to use the existing audit as
> enough evidence to <u>formally drop this case</u> and get our team released.

88.     Mr. Gill responded on March 12, 2013 by denying he was trying to "pass the ball"

and insisted he was "just relaying information that our auditor came back with after visiting the

police . . . . I will also do what I can today to get into contact with the local teams to see what we

can do to move this more quickly."

89.     By this time, my colleagues at ICT began to question HPFS' motives for refusing

to provide answers to my questions regarding the outcome of the inspections. Ryan Quinn wrote

to me that day: "In thinking more about this today, I am suspecting that they are hesitant to

answer this as they can smell a lawsuit. I bet they are bringing up the customs issue &

incorporation as a defense strategy. We'll see if he continues to avoid answering this." However,

25

I still believed – and wrote to Mr. Quinn -- that "they are a legitimate organization and covering up simple things as result of the inspection is not a good idea."

90.     Also on March 12, 2103, I attempted to reach Mr. O'Grady, HPFS' executive who was in charge of the H3C deal, writing to him: "Hi Jim, I was hoping to have a conversation with you regarding the transaction between ICT and HPFS India. I am sure you remember this deal."

91.     His response was less than helpful, shockingly disinterested, and looked like drafted by a lawyer: "My understanding is that ICT has been in communication with HP regarding the India transaction. I do not believe that I could personally add anything to the conversation. I believe your existing HP communications are the best way to address any remaining inquiries on the transaction."

92.     During this same time period, I also reached out to Mr. Silvestri to try and get some insight, as we had continued our working relationship with him on a purely commercial transaction contemplated under the contract, whereby we had filed for monetary reimbursement for the remainder of the Equipment from the first installment.[3]

93.     On March 13, 2013, Mr. Silvestri responded: "I am not in the loop on this as it as at the top level leaders. They do not provide me updates and I can do no more here to assist. That's a big company policy. So appreciate you working with David. Also I have sent the RMA up to management for review as I am not the approval person and not allowed to approve transactions. They will advise back."

---

[3]     Following the seizure of the unsold Equipment by the police, Plaintiffs had submitted a Return Merchandise Authorization ("RMA") to HPFS India seeking a $150,000 reimbursement for the balance of the unsold merchandise. An RMA is a standard business practice for returning or exchanging products that are substandard, and was completely unrelated to the criminal case in China. ICT's business team, including Mr, Pekar, was working directly with HPFS' business team, specifically Messrs. Bartley and Silvestri, on the mechanics of the RMA reimbursement.

94.     Thus, I was cut off from communicating with very same HPFS' business people who sold the Equipment to us in the first place, and was told to communicate exclusively with HPFS' legal team and Mr. Gill in particular. That added a level of frustration since I realized that the business people I have done business with and speak the same language were cut out of the chain of communication. I was left one on one with the lawyer in Australia who seems to be slipping and not achieving anything during past few months of efforts.

95.     As for the imprisoned Jade, Jason and Cathy, their ordeal continued as horrible and as unabated as before. As they would later recall:

> All the time, nobody see any family or friends [because] they are not allowed to meet the people in the cells.No any phone call allowed. Only allows to write letters but must get checked and approval by the jail then may be can be sent out. If sick, jail doctor will give some medicine, but never know the name of the medicine. Must remember the jail rules which is pasted on the wall of the cell and the boss of the cell will test everyone. Have to be smart to survive in the cell and share the good food we buy to the boss to get a better treatment. Stay with all kinds of people in the cell, some have mental problem, murders, thief, robber, drug dealers . . . . Anyway, only stay inside can know how bad it is.

96.     I continued to believe that our mutual cooperation and coordination of efforts with HP would ultimately result in our team's being released from incarceration. I also did not want to jeopardize my business affiliations with HP as I had worked hard to establish a good working relationship with them. I repeatedly cautioned my colleagues and outside counsel to avoid taking any measures that might negatively affect our existing business relationships with HP.

97.     On March 14, 2013, I again wrote to Mr. Gill, stating that "[w]e need to know the result of your audit of the 40% of materials.  Please answer this question." However, in his response, Mr. Gill again avoided answering the key question: "The equipment we were able to inspect comprised of 293 line items. We were able to reconcile most of. these assets back to the list of equipment sold by HPFS India to Shinto Creative Enterprises. It was not possible to

reconcile 73 items." There was not a word about the Equipment's counterfeit or authentic nature in Mr. Gill's response.

98.     My colleagues and I thought it was an evasive response: "That is strange. Could be anything though. Note that their list of assets was very bad with major mistakes and blatant contradictory information." I then responded to Mr. Gill, stating so much and again asking the only question on everyone's mind: "It is 'public knowledge' (between all of us) that list of equipment supplied with shipment was very poor quality, I am not surprised that it was 'not possible to reconcile 73 items' out of 293. Since the allegation that keeps our people in jail 'selling counterfeit' product, next question -- *any of the products inspected found counterfeit?*"

99.     Once again avoiding this question, Mr. Gill responded by attaching the prosecutor's request for information regarding ICT's customs clearance for the Equipment. Mr. Gill explained that he was preparing a formal response to the prosecutor's request and would include the following pertinent facts: information regarding HPFS's authorization to ICT to sell the Equipment pursuant to the referral agreement; the fact that the Equipment was supplied to HPFS India by an authorized HP distributor in India; and that the 40% of seized Equipment re-inspected was the same Equipment originally sold by HPFS to Shinto and then to ICT. He also made a formal request to analyze the remaining Equipment or a full inventory list so that the list of seized equipment could be reconciled against the assets originally sold by HPFS to Shinto. He proposed that he would try to ascertain "whether the counterfeit allegations relate to the labeling only or if there are other concerns."

100.     We had all agreed from the beginning of ICT's discussions with HPFS that a letter to the Chinese authorities clarifying the details of these transactions should be submitted to both the prosecutors and the police, and that such letter would be critical to securing Plaintiffs'

release. We believed at this point that the Chinese authorities were clearly misinformed about the nature of the transaction and the fact that the Equipment had been sold to ICT by HP/H3C.

101.    While HPFS was working, seemingly endlessly, on their submission to the Chinese authorities, Jade, Jason and Cathy continued to suffer terribly, both emotionally and physically. Jade's later recollection of those times made my heart stop and hair stand up on my head from feeling of unbelievable horror:

> Wake up at 5:30 a.m. and then wash face and brush teeth one by one as order in the washing area in the cell. Then around 7 am take breakfast, normal Chinese bread and corn or rice soup. 1 egg per week. I remember on Wednesday. There [was] meat supply for lunch. 1 time per week. But I didn't get any because all the food will be first given to the boss and he picked out all the good and shared with his fellows then gave the left to others. After food, no allowed to walk around, most stay on bed in lines with hands on the knees, no allowed to chat, no allowed to do anything else except sitting there. If want to [use the restroom] must get the approval from the boss of the cell, and only allow 2 minutes or count from 1 to 50, otherwise get punishment. The boss of the cell was assigned by the jail police, normally the boss of the cell is murder or gang. All the time, the door is locked, no allowed to go out. We never went out to breath fresh [air] except our lawyer or police or the prosecutor to call or ask some info. And if so, locked hands and went out, only around 2 minutes outside going to another building, that was the only chance for us to breath air and saw grasses on the ground. All the time in cells.

102.    On March 15, 2013, I responded to Mr. Gill's letter. I first apprised him of the news that our lawyer had received a call from a Ms. Liu, a lawyer with either HP or H3C, "who kept pushing for incorporation issues, saying these guys should not have been selling transceivers. It sounds like she is being aggressive rather than trying to help resolve this.  Keep in mind we are HP's partner. All this work is for you."

103.    I also noted that "[o]ur lawyer keeps stressing a major point, which is that we need HP to state that there are no modifications on the parts by ICT from the condition you sold them. The case originated when HP/H3C reported to the police that ICT was selling fake transceivers, and they were sure because of the stickers/logos on the units." I then suggested that

29

Mr. Gill included in HPFS' letter the fact that "based on the random sample audit of 40% of the seized stock, that HP did, it appears to be the exact stock sold by HPFS to ICT [through] Shinto. We are confident that this sampling is representative of the entire 651 pieces of stock. These transceivers are in the exact state they were sold in—there was no modification by ICT to the H3C logo, hologram, stickers, labels or parts." We also suggested he "[s]tay away form insisting on inspecting the balance. The random sampling should be plenty sufficient, it will waste a lot of time."

104.    Mr. Gill responded: "I will pass this on. Feel free to call next week for an update." Mr. Gill also asked if we had taken any photos of the equipment before it was shipped to China. We had already sent photographs of the transceivers (taken by Jade when the forwarder delivered the transceivers to him in China) to Mr. Silvestri in early February. Mr. Gill also had the photographs taken by TT Global during the 2011 Inspection. Nevertheless, we re-forwarded Jade's photographs to Mr. Gill on March 16, 2013.

105.    At that time, I also wrote to Mr. Gill: "Can you please do me a favor and send me a copy of the letter we discussed yesterday that you are putting together in response to prosecutor request? Our lawyer needs it and asks for it." I also expressed again our deepest concern about the nature of the interactions with H3C's attorney: "Using this opportunity, I would like to stress again that we are very concern with attitude of H3C attorney who seems to be pushing for trial. Please use your power to stop this and help. Your people in H3C understand that we are partners not competition; we work with HP and for HP. Please make them drop the charges, admit the mistake and let your people go home."

106.    Mr. Gill responded that "I will pass this on and get back to you shortly."

107.   While our numerous and desperate pleas for help were constantly being "passed on" by Mr. Gill to some unknown HP people without any visible results, our people continued to suffer horribly in jail, helpless, angry, scared and powerless to alter their circumstances.  Jade would later write to me:

> Firstly, nobody likes staying in jail, right? Especially the dark China jail! Secondly, nobody like wrongful treatment, right? Especially with no irresponsible! You know what I mean. 3rdly, nobody likes being ignored, right? You know what H3C have acted. Especially in such case of freedom! 4thly, *family members and relatives' sadness in heart, hopeless in mind, ashamed outside, tears on the face, Mental anguish*...you know how only a single kid in one family, how big the suffering is? See the days we have staying in jail due to H3C's fault, dare anybody try their ass in China dark jail? I am sure the guy from H3C cannot avoid it if we cannot get satisfied answer from HP.

108.   On March 19, 2013, Mr. Silvestri, with whom we were still working on the matter of the RMA refund, sent a separate request for the photographs of the transceivers. He wrote: "The legal team has requested the following answers quickly: 1) does ICT still have possession of any of the equipment we sold to them (in particular, transceivers)? 2) If so please have ICT provide photos of the labels asap. Please respond to David directly." He also informed us on that day, in response to a request for status on the commercial negotiations: "The RMA is being worked on in our office in Asia."

109.   I responded, with great frustration and anguish, that Mr. Gill had asked us for all the photos and that we provided them already a couple of days ago. I asked him about the duplicative requests for the photographs that we had already provided, and expressed our deep disappointment with HP's painfully slow process, and our misgivings about working with Mr. Gill:

> Please understand the endless questioning can't go on forever . . . . H3C is pushing for more and more scrutiny clearly trying to manufacture the case out of thin air and HP is not helping us stop the madness. There is nothing

31

there justifying holding people in jail. H3C came up with a fake label now, that was not found by your team.

Here is our feeling about working with David Gill . . . . we think he has not enough authority to get things moving. We are getting very concerned that since we have HP involved there is no progress in our China situation. We are developing impatience and more and more unclear on HP's agenda. It appears that H3C wants to keep our people in jail and HPFS AP or Worldwide doesn't mind and doesn't seem to be helping ICT. . . .

[O]ur people are still in jail and charges are not dropped. This is absolutely unacceptable. We demanded charges dropped and our people released immediately multiple times but this was just passed along with no results. We require HP contact with authority above H3C China to be involved and start handling the situation and help us to get our people out of jail.

To start I suggest we meet and discuss this at your first possible convenience. I also suggest Jim O'Grady to participate in meeting. Please let me know when are you available for the meeting.

110.    Despite our concerns and frustration, Mr. Silvestri directed us to continue working exclusively with Mr. Gill: "Please work with David on this directly as we discussed this is within the legal team in HP to address. Your focal point and contact is David."

111.    Jade, Jason and Cathy meanwhile were continuing to suffer the harsh deprivations of the Haidian Detention Center for the third month and going into fourth without any light in the end of the tunnel. They were allowed no contact with their families, who continued to grow more despondent and suffer with unbelievable anxiety and fears over the more and more probable loss of their children from their lives for years to come. Again and again I kept assuring them that I was doing everything possible for them and their children. Every day was stressful for me as they expressed deeper and deeper anxiety and bigger and bigger pain at the thought of the danger their children were facing every day, and I could not get HPFS to do anything about it. My personal anxiety and fears grow bigger and deeper every day along with pain and frustration of the parents, relatives and friends of Jade, Jason and Cathy.

112.     On March 19, 2013, I wrote to Mr. Gill, asking: "Do you have an update for me? Is [the] letter ready? When you pass along our request to drop charge where all this information go? We hear no feedback and our people still in jail. We are getting more and more concerned with lack of progress."

113.     Mr. Gill's response to me was characteristically vague: "A number of people within HP are devoting a significant amount of time to this matter and trying to work it out as quickly as possible. It is not a simple situation. We now have photos of the equipment from you and our processing partner in India which will help us to move this forward."

114.     To me, the situation was quite simple: either HP confirmed that the HPFS Defendants had sold us the counterfeit Equipment, or that the Equipment was authentic after all - - and in either case innocent Jade, Jason and Cathy should have been immediately released from their unjustified and brutal confinement and reunited with their families.

115.     On March 21, 2013, I contacted Mr. Gill yet again:

> As you know, we are frustrated with the lack of progress and fact that our people are still in jail. These are major questions we are still looking for, and keep getting the run-around from HP on. Please help to answer them. We need to update the families on what is going on. Who is leading this effort and where is all this information being "passed on" to? Where is the report that we expected on Monday? What is HP's action plan? What is HP's agenda? Please answer these questions for us. We owe to frustrated families of the men and women of ICT China Team.

116.     Mr. Gill responded that "[t]he HP legal teams supporting HP Financial Services and H3C are working on this matter. A draft [letter] has been prepared. The letter needs to be as clear as possible to be effective. H3C has been analyzing the photos of the labels. A sample of the equipment is also being sent by our processing vendor in India to China for analysis by H3C. An HP attorney from the U.S. will be in China next week. He will be assessing the situation which I think should be very helpful. It is my hope that we will send a letter to the authorities

soon." At the end of his message, Mr. Gill again mentioned that "you need to appreciate that this situation is not simple."

117.    On March 25, 2013, I again asked Mr. Gill to "[p]lease update me on the development of the situation in China and now I hope the letter promised is ready and hope to receive the letter sometime soon." Mr. Gill responded that "I think we should have a draft letter completed today. I do think we have a better momentum on this now. *We now have the right people involved in this matter.*" Then, later in the day, he wrote: "I have completed the draft letter today. *It is in China for review.* I will keep you updated."

118.    On March 27, 2013, Mr. Gill finally sent us a proposed English draft of the long-awaited letter from HPFS India to the Chinese Authorities. After I read it, I realized it was a clear admission of guilt by HPFS India, because it stated the following:

> HPFS India immediately commenced investigating the matter. H3C inspected the seized equipment on behalf of HPFS India and also obtained lists of the seized equipment from the [insert name of relevant Chinese police entity]. HPFS India compared this data against its data for the Sold Equipment. ***Based on the available evidence HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT*** (through Shinto).

> HPFS India has also viewed photos of the Sold Equipment taken prior to its import into China. These photos were obtained from ICT's USA office and from the company HPFS India engaged in India to process and refurbish returned lease equipment. Based on these photos it appears that ***the logos currently affixed to the Sold Equipment were present on the Sold Equipment at the time of the sale from HPFS India to ICT***. Copies of the relevant photos obtained are attached as Annex D.

> In these circumstances, notwithstanding that ***the seized equipment is counterfeit***, HPFS India does not believe that ICT or its representatives should reasonably be held responsible for selling counterfeit equipment. ***Upon purchasing the equipment from HPFS India and taking into account that both HPFS India and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying genuine equipment. Based on the available evidence it would appear that the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the***

34

*Leases*. HP is reviewing the initial sale to try to determine how the
counterfeit equipment was produced and who produced it.

119.    Once I and rest of us here at ICT had absorbed the content of this letter, and the

explicit admission by HPFS that HPFS India had sold us counterfeit Equipment, we felt that it

should be strengthened to make it explicitly clear that our jailed for the fourth month Chinese

sales team was in no way responsible for any wrongdoing whatsoever, so that they be released

immediately. We believed that the letter should make more explicit that Jade, Jason and Cathy in

no way bore culpability, as HP recognized that the Equipment had been counterfeit when sold to

ICT but failed to inform us; and that our reliance on HPFS' assurances of the provenance of the

Equipment was entirely justified.

120.    To that end, we asked Mr. Gill: "Can the above be made stronger? Note as

follows: The agreement warranted that HPFS was the 'lawful owner'; your exhibit (manifest)

listed the equipment as HP equipment; the agreement required ICT to maintain the integrity of

the equipment as HP equipment to maximize profit." We asked that the following language be

included in the letter to make it "as clear as possible": "Under the circumstances, HP needs to

make a final determination whether and to what extent the equipment was not manufactured by

HP.  However, in all events, HPFS sold equipment to ICT as genuine."

121.    Mr. Gill assured us that he would incorporate that language. On April 1, 2013,

Mr. Gill sent a revised draft letter to us for review. The revised letter, significantly: (1) repeated

all the admissions in the March draft for the second time, reiterating that the seized Equipment

was counterfeit and that the counterfeiting had occurred before the sale of the Equipment to ICT;

and (2) added the new statement that "HPFS India sold the equipment to ICT as genuine H3C

equipment (referring to the description of the Sold Equipment as 'H3C' equipment in Appendix

A of the Shinto Sale Agreement) and that ICT was entitled to rely on HPFS India's representations in this regard."

122.    We approved the revision and on April 4, 2013, I wrote to Mr. Gill: "[S]ince it is already Friday your time, I hope the letter will be available to everybody earlier rather than later next week."

123.    On the same day, Mr. Gill responded: "The letter is being translated by HP's translation department. They told me they would have it for me early next week. I understand the urgency here."

124.    I and the rest of us here at ICT, as well as the families of our incarcerated sales guys, relied on Mr. Gill's promises and were counting days, hours and minutes to the HP letter as our hopes for the release of our struggling in horrible China jail friends and colleagues depended on it, and every passing day meant another day of unrelenting pain and suffering for Jade, Jason and Cathy as well as for their frustrated and stressed families. When the letter promised "early next week" did not materialize, my colleague Ryan Quinn, who was in constant touch with the parents and other members of families of our jailed colleagues, wrote to me on April 9, 2013: "[The letter] was promised early this week. *Lots more upset calls and emails from families these two days*." Meanwhile my personal pain and frustration keeps growing day by day as we don't get the promised letter and pressure from China is growing as shadow of trial getting bigger and bigger posing a clear and present danger over the lives of our people in China.

125.    Jade, Jason and Cathy meanwhile keep struggling in jail. It was now Spring, four months since their initial incarceration. Important family events, never to be replicated, including birthdays, weddings, and anniversaries had come and gone, as family members tried to cope with

the overwhelming stress and uncertainty and their single sons and a daughter struggled to stay alive.

126.    Also on April 9, 2013, as we are losing patience more and more my attorney wrote to Mr. Gill: "Can you give us an ETA regarding your final letter?" Gill responded: "I am waiting for the translation and will follow that up this morning. In addition, we discussed this internally yesterday and HP have requested the police to give us further access to the equipment for further inspection." I smelled more and more delay, frustration kept growing even bigger.

127.    Next day, we again did not get an update from HPFS, so on April 10, 2013, we wrote to Mr. Gill again: "Hope all is well. We were expecting the letters done in the beginning of this week.  It is almost Thursday your time.  We still got nothing. We are quickly running out of time now and must have letters now. Everybody on our side getting very nervous and concerned as trial can start any time. We need our people out of jail now." I was under tremendous pressure feeling responsible for the fate of our Chinese friends and their families and if we could not save them from trial they were certainly going to jail for years and years. We simply could not let it happen.

128.    On April 10, 2013, Gill responded: "I understand it is a very difficult situation for you. I received the translated letter last night and will have one of our Chinese attorneys review it today."

129.    It would take HPFS another 12 days of reviews by H3C, HP China, and internally to have the letter finalized – another 12 miserable days and frightening nights for the imprisoned members of ICT sales team, another 12 days and nights of anguish for their families and their ICT friends and colleagues.

130.     Mr. Gill then proceeded to again express his desire to gain access to the
Equipment for further inspection: "As I mentioned to you last week, we have also been in
contact with the police to request a further inspection of the equipment. There is no guarantee
that they will allow us access. But our hope is that a further inspection will enable us to
categorically determine if the equipment is counterfeit. If it is not, then we would like to amend
the letter to record this as this will clearly help with the police's overall assessment of the
situation. The request was made earlier this week. We were informed that the officials handling
this case are out of the office until early next week. If the inspection request is rejected or if it
looks like there may be a long delay then we would think about submitting the letter as it is
(followed up with a further letter when/if any additional inspection is completed)."

131.     Nobody here at ICT, nor anybody else involved could understand Mr. Gill's
singular focus on the Equipment, in high contrast with the absolute lack of concern and interest
in the well-being of our incarcerated people expressed by him and his HPFS colleagues. That
was totally illogical and strange but we kept working along. Indeed, even when Jade, Jason and
Cathy were released on bail in July 2013, Mr. Gill's first question was, surprisingly, about the
Equipment remaining in the police custody, and not about the people, innocent human beings
whom neither he nor anyone else at HP seemed to care about much if at all.

132.     Moreover, we believed that the Equipment had already been inspected and re-
inspected more than sufficiently to establish its provenance – and by the same H3C who had
inspected the Equipment originally and reported it as counterfeit to the police.

133.     On April 15, 2013, Defendant Gill wrote: "I have shared your letter with the
relevant personnel within HP China and H3C. We have an internal meeting tomorrow and I will
update you then." More delays and uncertainty while my guys were miserable in jail facing trial

and many years in ruthless Chinese prison, pressure from their poor parents and relatives. The stress was getting unbearable.

134.    On April 18, 2013, I still had not heard from Mr. Gill, so we asked: "Is there any update on this relative to your meeting?"

135.    On that same day, Defendant Gill responded: "Apologies for the late reply, crazy morning. The HPFS letter will be signed and countered to China today. It will be submitted by H3C as early as possible next week."

136.    Meanwhile, while we were not sure what "crazy morning" meant for Mr. Gill, but the "crazy mornings" for innocent and never-before jailed Jade, Jason and Cathy, single children of their poor parents, consisted of fending off murderers and rapists and cleaning toilets for "the criminal boss." Understanding this made my and other ICT people's every morning since December very crazy.

137.    Finally, after more than 4 months, about 120 days, almost full 3000 horrible hours of pain and suffering our team in Chinese jail, on April 22, 2013, Mr. Gill provided us with the final Chinese version of the letter. In response to an inquiry by ICT's outside counsel whether "the letter [is] substantially the same as the last draft," Mr. Gill responded: "the letter is substantively the same as the last English version you saw. There were some minor amendments but nothing changed the description of the relevant sequence of events between HPFS India and ICT." At this point we started to hope that our guys would get out soon.

138.    The "last English version" was the reference to the April 1 revised draft of the March 2013 Letter, which included all the admissions made in the March Letter and the additional statement made in the April 1 version. As such, the "last English version" stated that "***the seized equipment was counterfeit,***" that "***the relevant counterfeiting activities occurred at***

*some point in time prior to the return of the Sold Equipment to HPFS India,*" and that "*HPFS India sold the equipment to ICT as genuine H3C equipment . . . and ICT was entitled to rely on HPFS India's representations in this regard.*"

139.   At the time of receipt of this letter, we took Mr. Gill on his word and it was not until much later that we realized that he was lying to us: in fact, the Chinese version was substantially and materially different from the English version: *it did not contain any of these key admissions!*

140.   Trying to make sure that even this sanitized document at least got in a right place and hands, we also realized that HPFS' filing of their letter with the Chinese authorities was itself problematic and full of mishaps and misinformation. To this day I am not fully convinced and it is still unclear to me as to whether HPFS had even filed it with any relevant Chinese authority.

141.   Thus, on March 28, 2013, I emailed Mr. Gill stating that "it is important that we have this letter finalized ASAP, translated, chopped (stamped) in China and *delivered to prosecution.*"

142.   Then on April 3, 2013, our attorney provided Mr. Gill with very specific instructions and contact information for submitting the letter, writing: "The attorney handling the China matter (for ICT) communicated to [me] yesterday as well.  He indicated that your letter should be sent out immediately and directed to both the prosecutor and the police." Our attorney then provided very specific "contact for the prosecutor, whom you should send letter directly," and the police, including full names, specific addresses, and telephone numbers for both.

143.   On May 2, 2013, Defendant Gill wrote us: "I can confirm the letter has been filed."

144.    We initiated tracing of the letter to make sure that this letter was filed and delivered to proper people in China. After two weeks of searching unsuccessfully, we received confirmation from China that the letter had not been delivered to the proper police officers and prosecutor as we had requested and as was represented by Mr. Gill two weeks ago. Needless to say, we felt extremely disappointed and our anxiety started to grow even higher again. My attorney, Les Riordan then contacted Mr. Gill on May 16, 2013: "We are getting some communications from the contact in China that the letter has not been delivered, or that the prosecutors do not have it yet. Can you help out with this?"

145.    Later that day, Mr. Gill again assured us: "The letter was definitely filed. It was submitted to Mr. Zhang Xiaole, the captain of Haidian PSB." This was not the person for whom the letter was supposed to be delivered to take effect and the contact information was clearly and carefully and specifically provided in advance. Incredibly and against all the expectations, Mr. Gill had managed to misdirect this all-important letter even though he had been provided with very specific names and contact information for the relevant officials in the prosecutor's office and the police. Mr. Gill also said nothing about sending the letter to the prosecutor, and that telling omission suggested that he did not in fact do so despite our clear, repeated and urgent requests.

146.    In response, my attorney Mr. Riordan on May 18, 2017 informed Mr. Gill that "the letter was delivered to the wrong individual. . . . Your information indicates that it went to Mr. Zhang Xiaole (+8613801382217), captain of Bejing Police-Hai Dian.  The Information provided was: Mr. Zhang Jian, Bejing Police Station Hai Dian Branch, Room 803, 25 Wen Yang Road SuJiaTuoZhen, Hai Dian, Bejing 100194, 010-82587440."

147.     On May 22, when ICT requested an update, Mr. Gill answered with another breezy response: "I can confirm that PSB have reviewed the letter. It appears that, in order for them to be willing to take the contents into account, it will be necessary for ICT to prove a connection between the company and these individuals."

148.     Indeed, Mr. Gill subsequently admitted in his letter to Mr. Riordan dated July 1, 2013, that "HP has been advised that the Chinese authorities are unwilling to admit a link between ICT and the incarcerated individuals and consequently do not regard the letter submitted by Hewlett-Packard Financial Services (India) Private Limited as relevant to the proceedings." It was hard to believe that the police had dismissed the HPFS letter as irrelevant because the letter, even in its sanitized form, was obviously highly relevant to the proceedings, particularly in light of the police's repeated attempts to confirm the HPFS-ICT transaction and the provenance of the seized Equipment.

149.     In any event, if true, Mr. Gill appeared to be satisfied with the police's alleged refusal to accept their letter: upon information and belief, he did not appeal the police's refusal, unexpected and unusual considering the evident thoroughness of the police investigation, and never shared the letter with the prosecutor, not even after the police itself purportedly rejected it. Neither Mr. Gill nor anyone else at HP ever apologized for delivery of the letter into wrong place and wrong person, and non-delivery to the prosecutor's office, and none of them seemed to make any effort to fix this even after the letter was purportedly rejected.

150.     Indeed, nothing had changed for the better in the Jade, Jason and Cathy's ordeal after the letter, delivered or not. As I learned later studying the communications between H3C and police, on May 2, 2013, H3C sent its own letter in this case to the very relevant and right Chinese authorities, stating:

42

The trademark protection department of H3C provided a certificate indicating that [the seized] transceivers were suspected to be low-quality counterfeits. After the fact, Hewlett-Packard Financial Services India, Ltd. (further called HPFS), another subsidiary of H3C's parent company HP USA, submitted a written notification to H3C, indicating the possibility that some of the above-mentioned and appraised transceivers could have been sold by HPFS to ICT Company. *H3C hereby expressly declares that HPFS and H3C operate independently of each other. H3C has never known whether the transaction between HPFS and ICT described above took place or not.*

151.   That was the same H3C that, according to Messrs. Gill and Silvestri, was working closely with HPFS and HP on this case for months since at least February and could not have "never known whether the transaction between HPFS and ICT . . . took place or not" by May 2013.

152.   At the same time while it was withholding exculpatory evidence from the Chinese authorities, H3C continued to insist unequivocally that the Equipment was counterfeit, relentlessly pushing for trial. Reading later through the Chinese case documents I learned that on May 23, 2013, H3C's representative was once again interrogated by the Chinese police, and once again confirmed under oath that "the transceivers seized are counterfeited H3C's."

153.   The H3C expert made those statements having (a) inspected all the seized transceivers on December 9, 2013, and reported them as counterfeit to the police; (c) re-inspected 40% of the seized transceivers in March 2013, analyzed "a sample of the equipment . . . sent by our processing vendor in India to China," as well as reviewed the photos of the Equipment security labels.

154.   I have read carefully the protocol made by the Chinese police investigator and learned the position of the H3C expert and how he also explained how H3C could be so certain of its appraisal based only on the visual inspection of the logo's security features:

**A:** The transceivers seized are counterfeited H3C's. Such kinds of transceivers mostly are used for transmission of network signals. They are the important part of high-speed transmission of network.

**Q:** Tell us what parameters you based on to make sure that the transceivers seized are counterfeited?

**A:** The H3C's transceivers have the complete package (Includes: package box, shockproof foam, anti-static bag, installation brochure, and the label which is pasted on the transceiver and box, and can be tracked and legalized), and also, security label pasted on the transceivers; H3C's transceivers are qualified, sourced, manufactured completed by H3C, the quality of the products is same. The package of the seized transceivers is different from the H3C's, don't have any H3C's package, but carry H3C's registered label, the security label on the seized transceivers is not same as the H3C's, the position pasted is not same (the position of H3C's security label pasted on is fixed) and the outside of some seized transceivers are different from original H3C's units.

**Q:** Do you identify counterfeit product only from outside?

**A:** We identify counterfeited products first of all from the outside that includes package, and label. And, if there is anything unusual found outside we also can inspect the transceivers label through testing (in short, is power on test) as an additional way. But if the exterior inspection didn't pass the test there is no need to do the power-on test.

**Q:** Why say power-on test is only just an additional way to verify?

**A:** Because power-on test is needed to inspect product through reading the electronic info of the transceivers (is writing the electronic info of the transceivers), but the electronic info can written or revised through program, and moreover, it will not leave any trace, what means, the transceivers passed the power-on test, can not be proved positively if they are genuine and original H3C's products. So the power-on test is just an additional way to test.

**Q:** Can the P/N (Serial Number) be identified through the power-on testing?

**A:** The content of electronic label includes the P/N, so that we can say the P/N can be created or modified with proper software.

**Q:** Do you have something to say more?

**A:** No.

**Q:** Is everything you said true and correct?

**A:** Yes.

155.    At the same time that H3C was clearly obstructing our efforts to secure the release of our Chinese colleagues, HPFS remained non-forthcoming about information that ICT needed to clarify the requests of the authorities. We were time and again practically begging for documentation and specific details regarding the information that the Chinese prosecutors and police allegedly sought, and the results of HP's internal investigations. HPFS refused to provide such information by ignoring all our pleas and rebuffed our attempts to obtain details of investigations. I began to notice this pattern which unfolded as the investigation continued, but the nature of it was completely impossible for me to understand.

156.    On May 28, 2013, our counsel Mr. Riordan wrote to Mr. Gill: "I do have some follow-up questions for you. You did previously mention that the police -- not the prosecutor -- had some concerns regarding the import declarations. However, I do not know what these concerns entail. The individuals handling this matter in China have never contacted ICT directly or indirectly on these issues. The difficulty I have is that I am not aware of the substance of any concerns regarding the importation of the equipment into China or concerns relative to ICT's establishment or business operations in China." We then requested the exact nature of the formal charges, information as to the institution of these charges, including "what did HP communicate to the authorities regarding the equipment at issue? Did HP institute a formal charge or complaint? If so, what was the basis of the complaint?"

157.    Observing full disconnect and non-effectiveness of Mr. Gill's and his associates' efforts, we also requested to be put in touch with the HP representative handling this matter in

China. Disconcertingly, up to this point, over five months since our China team had been incarcerated, HPFS still had not provided us with the very basic information regarding the nature of the charges nor had they allowed access to relevant personnel. According to our Chinese employees and their attorneys, HP's attorneys had never been in touch with our Chinese attorney, even though we had provided contact information immediately after our initial February meeting.

158.    Defendants either had no response or consciously decided not to answer these questions from our counsel.

159.    Thus, Defendants and their affiliates in China, H3C and HP China, although all subsidiaries and affiliates of HP, did nothing to assist the innocent Jade, Jason and Cathy to obtain freedom from torturous, brutal as well as unjust captivity while continued to withhold exculpatory information, in extreme, heartless and cynical disregard for young people's plight.

160.    Although I was completely appalled and frustrated by Defendants' behavior, I still believed that they were behaving as they were out of ineptness, disconnect of a large organization or incompetence of people on the Mr. Gill team, or bureaucratic red tapes inside the company and between the companies under HP umbrella -- but still in a good-faith attempt to help us free our guys from unjust imprisonment, because I could not believe they would put their own corporate interests ahead of the lives of individuals who were suffering terribly because of HPFS' own actions. As the cooperation and communications continued, even though I had expressed impatience, I wanted to assure everybody on HP team of my belief that we were acting in concert and were very committed to maintaining our good business working relationship.

161.    Meanwhile, my heart was continuing to break as we at ICT continued to receive letters and phone calls from the frustrated families of the Plaintiffs. The Plaintiffs themselves

continued their terrifying and horrendous lives in captivity. Jade Cheng's mother was suffering from heart problems and losing weight over the stress she was under; she would ultimately lose over 15 Kg (33 lb) over this time period. Jade Cheng's father, likewise, lost over 12 Kg (26 lb). I continued to suffer from depression and unable to concentrate on my business as the lasting imprisonment of my Chinese team, and HPFS' glacial speed and its lack of any urgency or concern in the face of the looming criminal trial put an unbearable strain on me personally.

162.   In June 2013, plaintiffs had been incarcerated for six entire months, I determined that ICT needed to make the nature of its complaints known to individuals at HP with greater decision-making capacity. I finally got convinced that Mr. Gill just did not have enough authority to resolve this matter, and that his lack of authority was a major drawback. I decided to appeal directly to Meg Whitman, the CEO and President of HP, and to John Schultz, HP's General Counsel, to advise them of the events and to seek their help in restraining HP's subsidiaries from prosecuting innocent people. I was absolutely sure that they would immediately attend to it and with their power and understanding will have the matter resolved right away and all this nightmare will be over once and for all. I felt that we needed to ensure that they had received a full accounting of all of the relevant facts.

163.   I wrote to Ms. Whitman on June 12, 2013, copying Mr. Schultz, a personal letter as a CEO to CEO; my counsel Mr. Riordan separately wrote on the same day to Mr. Schultz, with more factual detail. I intended to make my appeal a personal one, explaining the history of this egregious affair and appealing to their humanitarian nature. I did not even mention any of the economic injuries suffered by ICT itself and did not ask for any compensation for ICT or myself. I felt that if these top HP executives truly understood the situation, they would

47

immediately step in and bring all of their resources to bear to release these individuals to their families and end this suffering.

164.     We first presented, very clearly, the facts. I wrote to Ms. Whitman: "According to my sources, H3C, HP's Chinese subsidiary, either filed a formal complaint or instigated the filing of criminal charges against three of ICT's representatives in China. As a result, the ICT representatives-Jade Cheng, Jason Yu and Cathy Yu (I named them so she would see them as individuals) have been incarcerated since December 2012 and face trial in a month. Jade, Jason and Cathy are exposed to sentences of ten years-for doing no more than remarketing HP's products for HP's benefit. HPFS India communicated to local authorities that it was the source of the product. However, despite this acknowledgment, H3C is still insisting that the case go forward."

165.     Then I made my appeal:

> Our focus is entirely on the humanitarian issue. I have previously offered
> to do anything I can to address any concerns raised by H3C. I stand
> willing to meet with anyone to address this unfortunate situation.
> However, we all agree that Jade, Jason and Cathy should be released. Our
> appeal to you is a personal one. We ask that you use your office and your
> position to put a stop to this. I ask that you contact H3C to get to the
> bottom of the issue. I also ask that you use your influence to see that the
> charges are withdrawn.

166.     A similar letter was sent by Mr. Riordan to Mr. Schultz, which discussed in even greater detail the facts underlying this situation. Again, the main focus of the letter was to appeal to him on a personal level.

167.     We set the facts out very deliberately for Mr. Schultz. My counsel wrote: "Below, I set out the facts as they have been communicated to me. I also enclose with this letter some materials that may assist you in considering this matter-including the HPFS/ICT Contracts, HPFS' letter to the Chinese authorities, and English drafts related to this letter." We set out the

relevant facts in the case and attached Mr. Gill's letter in Chinese, with the notation that Mr. Gill had specifically included the language that: "Under the circumstances, HP needs to make a final determination whether and to what extent the equipment was not manufactured by HP. However, in all events, HPFS sold the equipment to ICT as genuine HP equipment. ICT was entitled to rely on HP's representations in this regard. Further, ICT was authorized and required (under the agreements by HP) to sell the equipment under HP's mark. Therefore, ICT is not responsible for the re-sale to the extent deemed 'counterfeit' because ICT was authorized to sell the equipment under HP's mark by HP. HP is reviewing these transactions to determine conclusively who produced the equipment."

168.    My counsel concluded: "As I indicated at the outset of the letter, the ICT sales team remains incarcerated and will be tried in approximately thirty days. It is my understanding that they are exposed to sentences as great as ten years. I would appreciate anything your office can do to help ICT's sales staff."

169.    Unbelievably, I have not received any response from Ms. Whitman, the same Ms. Whitman whom HP proudly quoted in its 2013 Annual Report as stating: "We want to be a company known for its ethical leadership – a company where employees are proud to work; a company with which customers, business partners and supplies want to do business."

170.    On June 14, 2013, however, we got a good news (as we thought back then): Mr. Riordan received a voice mail from Mr. Schultz, stating "Sorry for not getting back to you. I will have someone on my team look into it and get right back to you." Never mind that his "team" – HP legal department – had been "looking into it" for the last six months while three young innocent people were sleeping on a cold toilet floor in the dark, dump and freezing cell. But back then we got to hope that all will be taken care of fast.

171.    Apparently, our situation was not a high priority for Mr. Schultz, as his team did

not set back to us for another 2 weeks. On June 26, 2013, his team finally did get back to us

when Mr. Gill (same and again) contacted my counsel Mr. Riordan and requested that Mr.

Riordan speak with him and his associate Mr. Stuart Patterson, and HP in-house counsel and

presumably "someone on [Mr. Schultz's] team." We were a bit relieved as we thought that may

be our appeal had worked and that maybe we were finally getting traction.

172.    After speaking with Mr. Gill and Mr. Patterson, my counsel wrote to Mr. Gill to

follow-up with respect to the counterfeiting allegations that we still did not have any clarity on:

> As follow-up to my conversation with you and Stuart Patterson, I have
> requested the formal charging document and will provide it to you on
> receipt.  As I indicated in our phone call, the Chinese attorney had
> specifically indicated that an employee of H3C told the police that the
> seized transceivers are counterfeit. I have also been advised that H3C
> made a very detailed report regarding these allegations -- and that the
> report indicates that while genuine H3C anti-fake trademarks and tags are
> affixed on the transceivers, the transceivers are not genuine. Is the above
> correct?  Do you have a copy of the report?  If you do, would you please
> provide me with a copy of the report?  In my May 28 letter, I requested
> some information from you that has still not been clarified.  Specifically, I
> asked for the following information:  Can you provide me with
> information as to the institution of these charges?  Specifically, what did
> HP communicate to the authorities regarding the equipment at issue? Did
> HP institute a formal charge or complaint?  If so, what was the basis of the
> complaint?  Can you please provide me with a definitive answer to these
> questions?  My assumption at this point is that there is no charge based on
> importation, licensing or the manner of sale. I understand that your
> sources have indicated that these issues exist. If they exist, I am still not
> clear as to whether these issues are formalized or merely concerns. Our
> request to HP is to address the issue that was raised regarding the
> allegation of counterfeit marks. I think this should be the only focus. In
> any event, and given what is at stake, I am still unclear as to whether this
> issue has been resolved. In addition to my questions above, has HP (or its
> subsidiary organizations) made clear that HP/H3C is the source of the
> materials in question? If there are other issues, I presume they can be
> addressed by Chinese counsel. I do want to confirm, however, that HP has
> addressed the counterfeit allegations. Also, once again, I am happy to
> speak directly to your representative in China. Can you put me in contact
> with the HP representative handling this matter in China? For instance,

you indicate that the prosecutor (1) expressed concerns regarding the import declarations and (2) asked for information related to ICT's establishment in China. I would like to find out what was communicated to HP on these issues. What are the specific concerns? What information is desired?

173.    We were very disappointed when Mr. Gill responded to us with more delays, and requests designed to assigned blame and deflect our inquiries. He wrote: "Please see attached reply to your letter below. For us to be able to assist it is important that we have details about the relevant charges. Thanks." In his attachment, Mr. Gill reiterated his requests:

> With respect to the request in paragraphs one to three of your letter, it would be helpful if you could provide copies of the formal charging documents to HP as soon as possible. As already noted in my letter dated June 24, 2013, neither H3C nor any other HP affiliate is a party to these proceedings. Information about the formal charges will provide us with more appropriate context for your additional questions and enable HP to better assist you and to provide relevant information as appropriate.

> With respect to paragraph three, I note that HP does not know if the relevant charges relate to importation, licensing or the manner of sale. However, as previously advised, HP has been advised that the Chinese authorities are unwilling to admit a link between ICT and the Incarcerated Individuals and consequently do not regard the letter submitted by Hewlett-Packard Financial Services (India) Private Limited as relevant to the proceedings.

> With respect to paragraph four I believe that HP addressed the issues in its letter to these Chinese authorities. HP clearly explained the history of the transaction in their letter. HP also provided the Chinese authorities with a complete list of the equipment supplied to ICT.

> With respect to paragraph five, I have previously provided you with all relevant information related to the importation and business establishment issue.

174.    Mr. Gill concluded by once again deflecting, avoiding or ignoring our request for additional information: "HP continues to investigate this matter and the information previously requested (and referenced herein) will benefit our assessment of available options."

175.    Mr. Gill's letter was dismissive and unhelpful and lacked any urgency or concern for our Chinese guys who were, every day, struggling to survive. I was very concerned that Mr. Gill seemed to be deliberately focusing on irrelevancies and not responsive to our basic questions about the allegations of counterfeiting. He also did not show any interest or concern with freeing our guys but more on investigation of all types of issues totally irrelevant to liberating our people. Mr. Gill was back in charge, we saw no more of Mr. Schultz, Mr. Patterson or anybody else.

176.    Desperate to stop the criminal prosecution in China, I was reduced to trying to get second-hand information from my business partners. On July 9, 2013, I asked my colleague Mr. Pekar: "[D]id you have a chance to talk to somebody in HP about our Chinese people?" His response was: "I did but no response so far. I will continue." I then asked: "Whom did you talk to?" Mr. Pekar repied: "it was on a personal level conversation as a [favor] to me. I was asked to not disclose. Since this is a very heated subject with negative PR everybody is protecting their . . . . Beside the point, it is becoming very difficult to talk with them related to this."

177.    Even at this point, though, I was trying to salvage my business relationship with HP. My company was struggling financially with all of the money spent on totally useless product and logistics to deliver it and finally getting this product confiscated, customers ran away and my people jailed, as well as time and energy we were spending on the Chinese situation created by HPFS, the very company I had worked very hard for many years to establish good faith and trustful business relationships. I instructed Mr. Pekar: "Please make sure that your efforts in China don't hurt our current position. I don't want to make impression that we are fighting or getting ready for it. We are cooperating and looking for resolution. Make sure keep me in full disclosure of what you do on ICT related matters."

52

178.    As noted above in this Affidavit, since March 2013, we had been working on our $150,000 RMA request for reimbursement for the balance of the unsold Equipment from the first shipment. Discussing the details regarding the reimbursement process had evolved professionally and uneventfully, and with no incident. Mr. Pekar, my business associate at ICT, and Kevan Bartley of HPFS' business team, were involved in that process.

179.    Whether it was counterfeit or simply "scrap," there was no dispute that HPFS owed us the RMA reimbursement for the unsold part of it, and the only point of negotiation was the methodology of payment and settlement of the depreciated amount.

180.    As the RMA discussion continued, we realized that there was a routine logistical challenge and elevated this to Mr. Silvestri, because, as I noted to my colleague: "I am afraid this assignment is above [Mr. Bartley's] ability and we will have to request JT to help and process refund through Andover since we are effectively unable to get the money out of India directly or indirectly." All RMA discussions between the parties from March to June 2013 were related to these logistical issues.

181.    Once Mr. Silvestri became involved, all outstanding issues were resolved and on or about June 30, 2013, Mr. Bartley advised ICT that the RMA terms were completed and he was awaiting instructions from the legal department how to document the refund.

182.    However, on July 7, 2013, Mr. Bartley sent me the following email: "I am really sorry for not responding since I have been back in KL. To be honest, I have been delaying my response for as long as possible hoping that the status would change. When we last spoke I mentioned that we had solved for the payment mechanism and that all I needed was to check with legal on how to document this. Unfortunately, due to all of the ongoing legal issues I have been instructed to place the RMA on hold. Regrettably, I cannot tell you what the specifics of the

issues are nor how long the hold will remain in place. I regret that we have gotten so far only to stall for reasons that are beyond my control."

183.    When this occurred, I was very surprised and upset, and did not understand the reasons for the RMA holdup. On July 9, 2013, I wrote to Mr. Pekar: "10 days ago our RMA refund was finally found a way to be paid after long and hard ways to get it done. And it was unexpectedly placed on hold by AP legal team at the end of last week in relation of ongoing legal matters. I am very concerned. I hope that is nothing to do with whatever actions you took in China. So please make sure I know and Les knows all what you do there and we coordinate the efforts." Mr. Pekar responded: "I will. Nothing yet was done in China in the process finding right legal people who potentially can help."

184.    I tried to ascertain the reasons for the RMA hold, and wrote back to Mr. Bartley: "I don't understand what does it mean. Does it mean that I just need to ask Shinto to proceed from there?"

185.    "No sorry Alex, it means that my legal team will not allow HPFS to process the RMA," wrote Mr. Bartley in response, and identified "David Gill and his team" as the legal team who put the RMA on hold. I was shocked to hear that Mr. Gill, whom we thought to be cooperating with us on this matter, held up the RMA: "We are in contact with David Gill, cooperating on China matter. I am surprised and disappointed that he placed on hold the RMA. I will ask my lawyer to clarify with David directly what seem to be the problem and hopefully we can resolve it to mutual satisfaction."

186.    But my hopes for a quick resolution of the RMA issue were soon dashed as HP made it crystal clear that they were holding the RMA payment as ransom in an extortionist

attempt to force us into a global settlement and release of all claims, including claims of our still imprisoned sales associates.

187.   Thus, on July 10, 2013, Mr. Riordan sent a letter to Mr. Gill expressing our dismay with this development and stating:

> This issue was resolved and agreed to through the ordinary course of business – and not connected with the Chinese criminal issues. . . . If there is now a nexus between the Chinese issue and the RMA, I would find it disappointing. . . . Our primary and overriding goal was to ensure that the individuals in China are freed from criminal process. I am sure this is HPFS's goal as well, as those individuals were engaged in activities to re-sell product for the benefit of HPFS and ICT. My client has lost a great deal of money on this transaction and is now expending significant resources relative to this matter. He runs a small company and, as you can imagine, these types of issues create a significant strain.

188.   "I have just returned from vacation and will get back to you shortly," responded Mr. Gill on July 17, 2013, after another week of horrific confinement for our Chinese guys, agony for their families, and anxiety and frustration for all of us at ICT as we are all terrified and waiting for the trial that can send our Jade, Jason and Cathy to 10 years in brutality of Chinese imprisonment.

189.   However, a happy resolution on issue of our colleagues' incarceration came unexpectedly from where we did not anticipate it to come from. On or about July 18, 2013, we learned that our Chinese colleagues were finally released from the Haidian Detention Center after 7 months of their wholly undeserved imprisonment, and shared the good news with Mr. Gill, However, our joy was short-lived as we soon learned that they were merely released on bail, with the criminal case against them still continuing and the trial still looming.

190.   From the time of their release on July 18, 2013 and until the receipt of the "no criminal record" letters from the Chinese police in late 2015-early 2016, our colleagues remained in legal jeopardy in China as the criminal cases against them had not been closed. Despite

repeated requests by ICT, Defendants flatly refused to provide any further information or assistance to clear the innocent people's names, or to offer any apology -- let alone to provide any compensation -- for their suffering in Defendants' hands.

191.    Defendants also flatly refused to share with ICT the results of their investigations into the relevant counterfeiting activities, despite ICT's numerous requests for that information needed to exonerate Jade, Jason and Cathy and to clear their names before the friends, relatives, colleagues and neighbors in their communities who were under impression that guys are in prison for real and bad crimes (such as drug dealing).

192.    Instead, as we realized later on as we went further Defendants came to adopt the "blame the victim" attitude, held up the agreed-upon RMA refund, and engaged in a further coordinated campaign of lies, threats and intimidation to cover up their own fraud and frame job, for the purpose of extorting of a release of liability from ICT and the Individual Plaintiffs!

193.    Thus, on July 29, 2013, Mr. Riordan again wrote to Mr. Gill on my instructions regarding the RMA: "I do need to speak with you regarding the RMA issue. I did call as we agreed, but you were not available. My client really does need to move this issue along. We [were] very surprised to learn that the agreed payment had been held up. It is still not clear to me why that is the case. If the payment is not going to be processed immediately, I would appreciate some communication as to why this has not been addressed. If I do not hear from you on this, I think the best approach is to contact HP here in Massachusetts -- as set forth in the contract."

194.    That email elicited the following response from Mr. Gill: "As communicated on our call last week, HP would like to obtain additional clarity about the status of the proceedings in China before progressing discussions around the RMA. Do you have any further information

in this regard?" Thus, according to Mr. Gill, HP indeed linked the agreed-upon RMA refund to the Chinese criminal case against our sales associates.

195.    Mr. Riordan replied on July 30: "My understanding was that the RMA issue was resolved by agreement and you held that up. I have also asked what you mean by 'clarify' and further asked for you to shed some light on what the nexus is between your 'clarity' and progression of discussions. I won't ask again as you don't seem to desire to answer. I will advise my client as to your unwillingness to respond."

196.    In a last-ditch effort to resolve the issue with Mr. Gill, on August 8, 2013, Mr. Riordan sent him yet another letter, in which he set out the history of RMA negotiations and of the criminal case against the Individual Plaintiffs, and noted that the RMA issue "has nothing to do with the China situation." Mr. Riordan also noted in his letter that "I have provided to you all the information available to us through our communications with the Chinese attorneys. On the other hand, *I have repeatedly been rebuffed relative to my requests for basic information*. The bottom-line is that your involvement did not resolve anything, but created a problem that did not previously exist. The Chinese situation was exacerbated. You have now halted the RMA payment despite the agreement of your business team."

197.    Mr. Riordan then requested: "1.  Immediate payment of the RMA; 2. Immediate disclosure as to all material facts relating to accusations made by H3C to the PBS relating to counterfeiting or import/export violations; and 3. Record documentation of HPFS' handling of the contract materials from its receipt (after lease) until its delivery to ICT. . . . If you do not comply, then I will contact a short list of U.S. based individuals at HP in an attempt to resolve the matter."

198.    On August 26, 2013, ICT received a letter from G. Daniel McCarthy on the letterhead of Gibbons P.C. We realized that Mr. McCarthy was General Counsel of HPFS until March 2013, when he joined Gibbons P.C. as a partner and director in its corporate department.

199.    In the letter, Mr. McCarthy first advised us that Gibbons P.C. "has been retained by Hewlett-Packard ("HP") Company and its various subsidiaries and affiliates who may have been involved in any way with your client's purchase of used equipment in China. The applicable subsidiaries are Hewlett-Packard Financial Services (India) Private Limited ("HPFS India"), H3C Technologies Co. Limited ("H3C") and their respective subsidiaries and affiliates."

200.    Thus, in response to our pleas to Mrs. Whitman and Mr. Schultz, HP retained a high-powered law firm and its former corporate executive McCarthy, who immediately adopted the "blame the victim" attitude and proceeded to strong-arm us, a small privately held company compared to the HP publicly-traded behemoth, in the most infuriating manner on behalf of HP.

201.    I read Mr. McCarthy's letter as a mix of lies, threats, intimidation and conceit, and I still cannot read his letter and his subsequent correspondence with my counsel Mr. Riordan without frustration, irritation and even a fair amount of anger! Mr. McCarthy's correspondence and actions on behalf of HP were all the more outrageous because our Chinese colleagues were still on bail at that time (and would remain on bail for the entire year until September 2014), expecting a criminal trial with its virtually certain conviction and lengthy prison sentences, while HP had in its possession clearly exculpatory evidence but flatly refused to share it with us.

202.    In his letter, Mr. McCarthy proceeded to "set the record straight," only to follow up with the first blatant lie in the very next paragraph: "First, contrary to your allegations, no HP entity ever provided your client with legally binding representations that the equipment at issue was 'in very good condition (as good as new with reasonable wear and tear'). Your client was

fully aware that *the old equipment that it purchased from HPFS India had been used for a number of years* by another third party, Tata Consultancy, in connection with the 2010 Commonwealth Games in Delhi, India."

203.    In fact, it is undisputed that the Equipment was leased by HPFS to Tata Consultancy as brand-new and was returned after short-term, *7-10 month leases*. Indeed, HPFS represented the Equipment to ICT during the 2011 negotiations as almost new, and it was so understood by all of us at ICT. *See, e.g.*, Mr. Pekar's email of July 14, 2011 ("Additional details, it was a 7 month lease (I would assume most of the product is new in original box)"). In any event, the Equipment had not been used "*for a number of years*" as Mr. McCarthy falsely claimed in his letter – and Mr. McCarthy knew it very well as he was the General Counsel of HPFS at the time of the initial fraudulent sale and throughout HPFS' subsequent involvement in the frame job and the cover-up headed by Mr. McCarthy's assistant at HPFS, Mr. Gill.

204.    Mr. McCarthy then claimed in the very same paragraph that the Equipment was sold "*with absolutely no equipment representations or warranties whatsoever*." That was also a known lie because, as HPFS themselves admitted, "HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."

205.    Not only did HPFS expressly represent the Equipment as genuine H3C equipment, but the Equipment was sold with the express warranty of title and the express warranty that the sold equipment confirmed to its description as the "H3C" Equipment in the contracts -- and in breach of all those representations and warranties.

206.    In the next paragraph, Mr. McCarthy proceeded to blame ICT for what McCarthy called our "difficulties in selling the equipment in China": "If your client failed to abide by China's import/export laws, or if your client failed to properly inspect the equipment to ensure that that there were no counterfeit materials, that is not the fault of any HP entity."

207.    Thus, Defendants appeared to be blaming us for the purported violations of China's import/export laws – violations which the Chinese authorities themselves had neither alleged nor pursued, despite the Defendants' encouragement – and for not discovering Defendants' own fraud earlier than we did.

208.    Mr. McCarthy continued: "as an experienced dealer in used equipment your client knew, or should have known, that there are many counterfeit products in the market, and that it should have exercised a reasonable degree of due diligence to inspect old unwarranted equipment before shipping it to China for sale" – as if ICT was buying some old HP equipment from a shady street vendor and not from an HP company itself!

209.    In fact, ICT had never bought any IT equipment in India prior to the H3C transaction, and was not familiar with the counterfeiting situation in the Indian market. HPFS, by contrast, was indeed an "experienced dealer[] in used equipment" operating in the Indian market and thus "knew, or should have known, that there are many counterfeit products in the market, and . . . should have exercised a reasonable degree of due diligence to inspect" the Equipment being returned to them upon lease expiration and before selling it to us.

210.    Further down in the same paragraph, Mr. McCarthy claimed that ICT "has been unwilling to share any meaningful information with the HP entities on its legal difficulties in China" – which is an outrageous and insulting lie because we had always shared all the

information we had with HPFS, and it was HPFS and its HP affiliates who continued to withhold exculpatory evidence from us and from the Chinese authorities.

211.    Then came a threat: "we have no way of knowing whether ITC [sic] did or did not fulfil its contractual obligations by complying with all relevant law. . . ITC [sic] will continue to remain responsible for indemnifying and holding HPFS India harmless from any and all claims or damages that may exist or arise out of your client's non-compliance with relevant law." (Mr. McCarthy could not even trouble himself to call my company ICT by its proper name.)

212.    More outrageous demands and threats followed in the next paragraph: "please advise as to the whereabouts of the equipment, and outline in detail the efforts that your client made to sell all genuine equipment . . . .  If ITC [sic] has lost control over the equipment due to its failure to properly comply with Chinese law, then there is a serious issue as to whether it has breached its obligations to HPFS India."

213.    As a small business owner who had already suffered significant business losses from this entire debacle, the threat of a lawsuit was, in fact, very intimidating, even though the only reason my people "lost control over the equipment" was that HP itself through its subsidiaries had falsely accused them of criminal activity and had them all incarcerated.

214.    In any event, my business was in tatters, our Chinese office shut down, our entire Chinese team awaiting criminal trial, and my legal counsel was a solo practitioner – and on the other hand was this multi-billion-dollar corporation and its high-powered 200-lawyer firm threatening to sue us for contract breach and indemnification. It was infuriating and intimidating at the same time.

215.    More breathtaking lies followed in the next paragraph of Mr. McCarthy's and Gibbons P.C.'s letter: "your client's attempt to shift the blame to HP for problems that appear to

be of your client's and/or other's creation, does not withstand scrutiny. The HP entities had no dominion or control over the equipment at issue once it was purchased by your client. There are countless ways in which the equipment at issue may have been tainted or altered before or after it reached China. The true bottom line is that once your client purchased the equipment -- your client was solely and exclusively responsible for any and all subsequent issues."

216.   Compare these statements with HPFS' own admissions in the March 25 and April 1 versions of their Letter:

- *"the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT"*;

- *"the logos currently affixed to the Sold Equipment were present on the Sold Equipment at the time of the sale from HPFS India to ICT,"*

- *"the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases,"* and

- *"HPFS India sold the equipment to ICT as genuine H3C equipment (refer to the description of the Sold Equipment as 'H3C' equipment in Appendix A of the Shinto Sale Agreement) and ICT was entitled to rely on HPFS India's representations in this regard."*

217.   And then came the bottom line -- Mr. McCarthy's attempt to bully ICT into global settlement and release of all claims, including the claims by our Chinese colleagues: "because of the nature of the issues and many unfounded allegations advanced by ITC [sic], it is highly likely that a resolution of these matters cannot be had unless the parties enter into a mutually acceptable and comprehensive Settlement Agreement and Release.  If ITC [sic] is interested in discussing such an agreement, please contact me."

218.   This letter was written in response to Mr. Riordan's request to release the agreed-upon RMA that was held up by HP, thus confirming that the Defendants were holding that

refund in an extortionist effort to extract release from liability from ICT and the Individual Plaintiffs.

219.    On November 27, 2013, Mr. Riordan responded to Mr. McCarthy's letter, carefully debunking Mr. McCarthy's misstatements and noting: "We have asked for disclosure as to the conduct of H3C that led to the filing of the outrageous criminal charges in China. We have also asked for disclosure as to HPFS's interaction with H3C (and H3C's interaction with the Beijing police) regarding these issues. No such disclosures have been forthcoming." Mr. Riordan also stated in the Letter that the Individual Plaintiffs -- who were on bail expecting a criminal trial -- would be willing to settle their claim at that time for a very modest amount of $1.5 million for all three. That low-ball offer was itself a product of HP's intimidation tactics; moreover, none of us were aware of the Defendants' fraudulent frame job and cover-up, or the full depths of their perfidy at the time, nor the fact that our ordeal was far from over.

220.    HP did not make any requested disclosures in response to our letter. Instead, HP through its outside counsel Gibbons P.C. and Mr. McCarthy sent another letter to us on December 19, 2013, doubling down on their outrageous lies and continuing to threaten ICT with legal action for the HP affiliates' own wrongdoings: "Because ICT has apparently lost control over the used equipment at issue and cannot now account for the equipment, or provide HPFS India with the additional remarketing proceeds contemplated by the agreements, it is in breach. . . . We trust that you are also aware that ICT is obligated to pay 'reasonable legal fees and other costs and expenses incurred' by HPFS India in enforcing the terms of the WSA."

221.    Mr. McCarthy also wrote: "While HPFS India has been open to considering making some small payment to ICT to resolve this situation upon appropriate terms in a non-contentious fashion, your unfounded allegations and tactics are not helpful." His letter

concluded: "If, on the other hand, ICT is truly interested in resolving this matter in a reasonable fashion, we have invited your client to provide HPFS India with the reports and data called for by Section 3 of the [RRSA] and have told you that we would be happy to discuss a global resolution. ICT will, however, need to honor all of its obligations to HPFS India and its affiliates [and] contemplate a more realistic monetary settlement amount."

222.    Angry and astounded by the arrogance and hubris of Defendants, as well as their wholly inaccurate portrayal of the facts, my counsel responded on January 9, 2014, both reiterating ICT's commitment to an amicable resolution and expressing our disbelief and disappointment at HP' tone and position:

> While ICT is absolutely committed to resolving all issues with its remarketing partners, it is difficult to fashion a reply or move to create a foundation for such discussions given both the numerous inaccuracies in your communications as well as concerns regarding the forthrightness that have characterized HPFS' past communications and which, unfortunately, are reflected by your communication. . . .
>
> I am sure you understand that reasonable and good faith discussions can never rest on a fiction. Frankly, one of the main concerns over the past year is the culture that generates such issues in the first place. The recognition that you are not merely a litigator, but a prior corporate official for HPFS intensifies these concerns.

223.    Even after Defendants' outrageous accusations and intimidation tactics, I was still committed to salvaging my business relationship with HP that I had worked for so long and so hard to establish and expressly communicated to them that ICT remained open to settlement discussions. Thus, I continued to express my good-faith desire for a favorable resolution to the situation, both from a humanitarian and commercial perspective. I wanted to pursue resolution of issues that were becoming contentious in good faith and we offered, in good faith, both to "discuss a global resolution" and to try to resolve these issues through mediation.

224.    We, in fact, made repeated offers to facilitate this process. On February 28, 2014,

my counsel wrote:

> I have referenced with my client regarding the issues discussed and our
> position remains firm and unchanged.  We are, however, willing to
> mediate the matter subject to the conditions that (1) the matter be
> professionally mediated, (2) the mediation take place in the Boston
> metropolitan area, (3) an individual with authority to settle the matter
> attends and (4) the mediation occur prior to March 31, 2014. While
> counsel is obviously encouraged to participate, Mr. Styller expects that a
> business person with some knowledge of the events will attend.  It would
> also be helpful if an executive involved with the related transactions is
> available at the mediation or by phone.

225.    We received no response to our mediation offer from HP.

226.    On March 20, 2014, we reiterated our offer to mediate, again with no response.

227.    We made one final effort on April 2, 2014. Later that day, Mr. McCarthy

responded by email, in effect rejecting our offer and instead proposing "a non-binding mediation

at my office here in New Jersey, provided that the costs of the mediation are evenly split between

the parties."

228.    Our outrage having reached its apogee, my counsel responded to Defendants'

offer of non-binding mediation, past our proposed date, in their New Jersey offices: "Personally,

I am not interested in coming to your office in New Jersey. I will present your response to my

client, but my expectation is that he will see it as a rejection of the offer. I will let you know if

my client accepts your counter. If you do not hear from me by tomorrow, you can assume that

we didn't agree to travel."

229.    Meanwhile in China, upon information and belief, on July 7, 2014, the prosecutor

returned the case to the police, stating that "the facts are still unclear and there is not enough

proof of the case. By this letter prosecutor returned the case for additional investigation and

asked the police to provide more information to support the H3C position." Among other things,

the prosecutor wrote to the police: "The documents H3C provided concluded counterfeit based on appearance, H3C did not do any test, and H3C said electronic test is not necessary in this case. This conclusion is different from the position of ICT lawyers, and the position of the ICT lawyers agree with Cheng Yongguo's [Jade Cheng]. Please request (1) H3C to perform the test to clarify if the equipment is counterfeit or genuine, (2) if test proves that product is counterfeit, request H3C to explain why it showed the transceivers are original and genuine through P/N [product or serial numbers] lookup on H3C's website."

230.    Thus, astoundingly, the Chinese prosecutor, a full sixteen months after the incarceration began, had to ask H3C, the ultimate authority on whether their equipment was counterfeit or not, to make a determination as to whether the Equipment was counterfeit or not.

231.    Studying Chinese police documentation I learned that on July 29, 2014, H3C provided a written explanation to the police why the serial numbers could not establish whether the transceivers were counterfeit, stating that "P/N testing only proves this P/N was sold by H3C sometime in the past, but cannot prove that this exact product is genuine H3C product or counterfeit."

232.    Finally, on August 7, 2014, still attempting to determine the true nature of the Equipment, the Chinese police again interrogated H3C's security expert, who explained that the electronic ("power-on") test could not establish whether the transceivers were counterfeit:

> Regarding the case of sales counterfeit products suspected by Cheng Yongguo and others, we contacted with Wang You who is the expert of H3C Company. Wang You replied: To identify counterfeit or not is just to check the outward of the products. Power-on test is only to check how the functions work. Even though the functions working comply with the standards of true products, it cannot prove the products are true either. So that there is no necessary to do the power-on test on the products.

233.    Thus, H3C, the manufacturer and exclusive trademark owner of the H3C brand and products under the trademark logo, the ultimate authority of its own products, repeatedly

confirmed that the products were counterfeit based on visual inspection, and that no other

standard determination of authenticity, either electronic power-on test nor the transceivers' serial

product numbers, could be used to challenge the results of the visual inspection. At the same

time, H3C continued its aggressive and relentless push for the criminal trial of our associates

where the chance of lengthy imprisonment was 99.93%.

234.    The same stonewalling was occurring with respect to HP China, even in the face

of the Chinese authorities' attempts to determine the relevant facts. Studying China police

documentation I learned that on August 5, 2014, the Chinese police, seventeen months after their

initial inquiry, again contacted HP China to verify the nature of the products and, incredibly,

received the same response they had heard in January and March of 2013: "We contacted with

Fu YuLin who is from Legal Department of HP China…we asked HP China to verify the

products, to make sure where the products came from. Fu YuLin replied that he is contacting the

related departments of HP.  But till now, we have not got a reply from him."

235.    On August 14, 2014, ICT made one last effort to appeal to HP, stating in a letter

to Mr. McCarthy at Gibbons P.C.:

> HPFS stated in its [March 2013] submission that it was "reviewing the
> initial sale to try to determine how the counterfeit equipment was
> produced and who produced it." However, in response to my repeated
> subsequent attempts to find out the results of HP's investigation of this
> sordid affair, HP has so far refused to clarify such basic facts as (a)
> whether the Sold Equipment was in fact counterfeit in whole or in part;
> and (b) if yes, when the counterfeiting took place and which party was
> responsible for it.
>
> There can be no doubt that HP ought to know the answers to these
> questions full well by now. I believe it is incumbent upon HP to provide
> ICT with this information forthwith, for a number of compelling reasons.
>
> First and foremost, since their release from jail in late 2013, the ICT
> employees have remained in legal jeopardy in China as the criminal case
> against them has not been formally closed, and the "no crime" letters have
> not yet been issued to them. I am sure that you would agree with me that

this status quo is simply untenable, particularly in light of the undisputable facts –as stated in HPFS' own March 2013 submission -- that "ICT was entitled to assume it was buying genuine equipment" and that the relevant counterfeiting activities, if any, occurred at some point prior to that sale.

236.    Mr. McCarthy's August 27, 2014 response on HP's behalf was the same infuriating and intimidating mix of lies, threats and conceit that had characterized all of his prior communications with us on behalf of his client HP:

> In your letter of August 14, you suggested that because my clients provided some assistance in securing the release of ICT employees from incarceration in China, that they now have some responsibility to help ICT and the employees deal with whatever charges have been lodged by the Chinese authorities. Your position is not only unsupported by reference to any contractual commitments, but is patently wrong. For all of the reasons stated…which you have ignored, my clients have absolutely no legal obligation to provide assistance to your client or its employees in connection with the charges in China. While it was not unreasonable for all parties to assume that the equipment sold in China was genuine as of the date of sale, the simple facts of the matter are (1) the equipment was sold by HPFS India to your client on an "as is" basis and without any representation or warranties of any kind; your client solely decided to remarket the equipment in China and bore exclusive responsibility for inspecting the equipment and ensuring that its sale in that jurisdiction would be in complete conformance with Chinese law; and (3) your client and its employees had complete dominion and control over the equipment before and after it was exported to China, and are the only parties that could conceivably provide a rational explanation for what may or may not have occurred. In short, it is the sole and exclusive responsibility of ICT and its employees to deal with the charges in China, and they should not look to my clients for assistance beyond that which has already been provided.
>
> As to your second point, it is also incorrect to suggest that there has been an agreement 'in principle to an RMA refund.' While HPFS India did entertain possibly making some small settlement payment to resolve this issue in its entirety, on April 2, 2014, you indicated that your client had no interest in participating in the non-binding mediation that you had previously suggested. If this remains ICT's decision, we will consider the refund matter closed.

237.    On September 3, 2014, the lead prosecutor in China personally apologized to all three individual Plaintiffs for their undeserved suffering. As Jade described to me: "It was in the

meeting room of the Prosecutor Building. Her name is Qiu Zhiying, Prosecutor Team Leader. She firstly apologized to we 3 in her office when the meeting started and she said sorry for this mistake and this case also help them to improve their work be better and careful. She also said: '[t]his case is a big lesson to them to improve their work, they said they cannot just only trust what manufacture said, which lead them to this false case.' But the police did not, the police tried all their best to avoid to meet us."

238.    Defendants, likewise, never apologized to our Chinese colleagues. In fact, throughout the whole ordeal, Defendants never uttered a word of empathy, concern, or regret for their undeserved and unjustified suffering in Defendants' own hands -- for their "Dickensian plight," in Defendants' own words and of their own making.

239.    Jade, Jason and Cathy were left broke and unemployed following their ordeal, as ICT's Beijing office was shut and I could not offer them any more work in China, while the stigma of criminal prosecution hampered their efforts to find employment elsewhere. I did the best I could to help them, and I sponsored green cards for Jade and his wife Caroline, who came to the U.S. in 2016 and are now permanent residents here. Jason and Cathy actually got married and now live together in China. They recently had a newborn baby.

240.    As far as pursuing our claims against Defendants, HP's intimidation tactics were successful for a while. As a small business owner who had suffered enormous ramifications from these events, I did not have the appetite or resources to fight a team of lawyers financed by a multinational public corporation who promised to countersue ICT for contract breach and for indemnity.

241.    More importantly, HP's elaborate deception and cover-up were successful as well, and it took me and our attorney a very long time to realize and specially accept for myself the

fact (that I could not make myself believe in for very very long time) that their purported "assistance" in securing the release of my Chinese team was nothing but a sham, a front for their own frame job. It was only with the benefit of hindsight, and only as the case developed further after the filing of our initial complaint in December 2015, that I finally was able to see the true picture through the Defendants' many interwoven lies and concealments.

242.    Our original 15-page complaint focused on the initial 2011 fraud and false imprisonment of the Individual Plaintiffs. At the time, we were still duped by Defendants' cover-up scheme, and still convinced that the Defendants had been assisting us to secure the release of the Individual Plaintiffs in 2013. Then came Defendant HPFS' motions to dismiss, where -- and it did not escape our attention – Defendant HPFS, incredibly, continued to profess complete ignorance regarding the counterfeit nature of the Equipment, contrary to the Complaint's factual allegations, contrary to HPFS' own numerous investigations of the Equipment, and contrary to their prior admissions that "the seized equipment is counterfeit" (*see* the March 2013 Letter); HPFS could not even bring itself to calling the Equipment counterfeit, using instead the incorrect term "contraband."

243.    The 42-page Amended Complaint then added a negligence claim arising out of Defendants' post-arrest actions, reflecting our realization that, even though the Defendants presumably tried to assist the Individual Plaintiffs' release in 2013, their efforts fell far short of their duties owed to the Plaintiffs. In response, HPFS argued that they owed no duties whatsoever to assist in the Individual Plaintiffs' release – even though it was HPFS' own fraud that caused their confinement.

244.    Following the filing of the Amended Complaint, I reviewed our correspondence with Ms. Whitman and Messrs. Schultz and McCarthy and only then realized that HP's threats,

intimidation, extortion, and lies were all part of the cover-up campaign conducted by its subsidiaries HPFS and HPFS India under the pretext of "assisting" the Individual Plaintiffs.

245.    Once I was able to put together the pieces of the puzzle and the deceit became clear, I began to understand Defendant's inexplicable actions, and their scapegoating of our innocent colleagues. I had kept all of the correspondence relating to this matter and as I pieced everything together, the cover-up became clear:  I was able to see how Defendants kept withholding exculpatory information from us and from the Chinese authorities throughout the whole period and until now. It became clear that HP's actions were designed not to help secure the release of our colleagues from incarceration, but to insulate HP from any responsibility for their actions while putting the blame on the innocent scapegoats.

246.    It was in that understanding that I saw that the act of sending threatening letters to a small business owner with limited economic resources, and their attempts to intimidate us into taking actions against our legal interests and for the benefit of Defendants, were indicative of a conscious and concerted effort to conceal their frame job. HP and its subsidiaries acted to withhold critical evidence that would have immediately exonerated my Chinese team in order to protect their own interests, to the great detriment of three innocent people and their families. It became clear that the entire HP team was prepared to sacrifice the lives of 3 innocent Chinese people and their families as scapegoats for HP's own wrongdoing.

247.    Accordingly, the Second Amended Complaint reflects our current understanding, knowledge and belief that the Defendants' purported assistance was in fact a sham all along, nothing but a cover-up for their own fraud and frame job.

248.    The state of uncertainty for all ICT team, in USA and China equally, continued for years. From the time of their release, until the receipt of the "no criminal record" letter from

the Chinese police in late 2015-early 2016, Jade, Jason and Cathy remained in legal jeopardy, their reputations and the reputations of their families in tatters as they struggled to rebuild their lives.

249.    The Plaintiffs still struggle with the aftermath of their emotional and mental trauma. As Jade said to me recently: "Honestly, even till now, I always dreamed I was still in the jail which made me feel really afraid to sleep to have such kind of dreams. It is not easy to recover quickly and completely."

250.    HP and its affiliates directly responsible for Plaintiffs' "Dickensian plight" never apologized, never uttered a word of support or sympathy, and never expressed any regret for their outrageous conduct.

251.    I am not accustomed to writing affidavits and was assisted in this task by my counsel, but the statements in this affidavit are mine and I confirm under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Alexander Styller

Signed this 2nd day of August, 2017,

Boston, Massachusetts

TOMMY T. YEM
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
November 10, 2017

08/02/2017

Commonwealth of Massachusetts
Middlesex, S.S. Date 08/02/2017
Then personally appeared the above named
Alexander Styller
and acknowledged the foregoing instrument
to be his/her free act and deed, before me

Notary Public

72