UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,

                 Plaintiffs,

vs.

HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL

                 Defendants.

Civil Action No. 1:16-CV-10386 (LTS)

## JOINT STATEMENT

Plaintiffs and Defendants, Hewlett-Packard Financial Services Company ("HPFS"), Hewlett-Packard Financial Services (India) Private Limited ("HPFS (India)"), HP Inc. ("HPI") and Hewlett Packard Enterprise Company ("HPE") (collectively, "Defendants"),[1] file this Joint Statement pursuant to the Court's instructions at the preliminary conference held on October 20, 2017.

At the October 20, 2017 conference, the Court instructed the parties to confer concerning the logistics of transporting the equipment that is the subject of the above-captioned matter to the United States for inspection. The parties have been unable to reach agreement on transportation of the equipment and set forth their respective positions in detail below.

The parties agree inasmuch as the Hague Convention provides optional, but not mandatory, procedures by which evidence located abroad may be obtained.

### PLAINTIFFS' POSITION

Briefly, Plaintiffs have proposed three alternative procedures, two of which are available pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), and the third pursuant to Rule 34(a)(2) of the Federal Rules of Civil Procedure. Moreover, in light of these readily available, applicable, reasonable and safe procedures, Plaintiffs strongly object to Defendants' insistence on placing them in potential legal

---

[1] David Gill, named as a defendant, has not joined issue or appeared in this action as of this date.

jeopardy inherent in Defendants' own shipping proposal as abusive, and respectfully ask the Court to give their objections "the most careful consideration" as instructed by the Supreme Court in *Societe Nationale Industrialle Aerospatiale v. U.S. District Court for the Southern Dist. of Iowa*, 482 U.S. 522 (1987).

### 1. The Hague Convention procedures are available and applicable to this litigation.

The Hague Convention, which was originally proposed by the U.S. and to which both the U.S. and China are signatories, provides two methods for taking evidence abroad: by 'Letter of Request" pursuant to Chapter I of the Convention, or by "Diplomatic Officers, Consular Agents and Commissioners" pursuant to Article 15 of Chapter II (in acceding to the Convention, China declared that "the provisions of Chapter II of the Convention except for Article 15 will not be applicable.")

The Letter of Request procedure provided for under Chapter I of the Hague Convention is as follows: Article 1 states that "in civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of the State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence or to perform some other judicial act." Article 2 further provides that "Letters [of Request] shall be sent to the Central Authority of the State of execution without being transmitted through any other authority of that State." Article 3 further provides that "where appropriate, the Letter shall specify . . . (g) the documents or other property, real or personal, to be inspected."

The Diplomatic/Consular procedure under Article 15 of Chapter II of the Hague Convention is as follows: "in a civil or commercial matter, a diplomatic officer or consular agent of a Contracting State may, in the territory of another Contracting State and within the area where he exercises his functions, take the evidence without compulsion of nationals of a State which he represents in aid of proceedings commenced in the courts of a State which he represents."

The Supreme Court in *Societe Nationale Industrialle Aerospatiale v. U.S. District Court for the Southern Dist. of Iowa*, 482 U.S. 522 (1987), provides a useful guidance on the Hague Convention and its use in the U.S. Courts, which Plaintiffs believe is squarely applicable here.

*First*, the Supreme Court in that case determined that the Convention provided two permissive methods of obtaining evidence abroad, as set out above. *See id.* at 535.

*Second*, the Supreme Court has held that the Hague Convention does apply to discovery sought from a foreign litigant in an American court: "While the Hague Convention does not divest the District Court of jurisdiction to order discovery under the Federal Rules of Civil Procedure, the optional character of the Convention procedures sheds light on one aspect of the Court of Appeals' opinion that we consider erroneous. That court concluded that the Convention simply 'does not apply' to discovery sought from a foreign litigant that is subject to the jurisdiction of an American court." *Id.* at 540.

The Supreme Court explained the Court of Appeals' error as follows: "the text of the Convention draws no distinction between evidence obtained from third parties and that obtained from the litigants themselves; nor does it purport to draw any sharp line between evidence that is 'abroad' and evidence that is within the control of a party subject to the jurisdiction of the requesting court. Thus, it appears clear to us that *the optional Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention. Although these procedures are not mandatory, the Hague Convention does 'apply to the production of evidence in a litigant's possession in the sense that it is one method of seeking evidence that a court may elect to employ.*" *Id.* at 541 (emphasis added throughout).

The Supreme Court then stated in vacating the Court of Appeal's judgment: "The Court of Appeals erred . . . in stating that the Evidence Convention does not apply to the pending discovery demands. . . . [S]uch a rule would deny the foreign litigant a full and fair opportunity to demonstrate appropriate reasons for employing Convention procedures in the first instance, for some aspects of the discovery process." *Id.* at 547. This holding applies with full force here.

Based on the above, Plaintiffs believe that the two Convention procedures for obtaining the equipment from China are clearly applicable here under the Supreme Court's holding in *Societe Nationale* as "available whenever they will facilitate the gathering of evidence by the means authorized in the Convention," and provide reasonable and safe means of taking the evidence from China to the U.S., particularly where such evidence is a substantial shipment of networking equipment certified to the Chinese police by its manufacturer and exclusive trademark owner H3C, an affiliate of the Defendants, as bearing counterfeit H3C logos. Accordingly, Plaintiffs have "demonstrate[d] appropriate reasons for employing Convention procedures in the first instance, for some aspects of the discovery process."

Furthermore, these applicable, available and tried procedures, which were the product of careful negotiations by the parties to the Convention with the strong support of the U.S., are superior by far to the Defendants' proposal to have Plaintiffs ship illicit goods cross-border by DHL (which would be illegal in China).

Finally and most importantly from the Plaintiffs' perspective, these Convention procedures resolve their reasonable safety concerns as the obtaining of evidence by these methods does not involve their handling the counterfeit material in a manner hazardous to their safety.

### 2. Rule 34(a)(2) provides a reasonable and safe alternative procedure.

Plaintiffs also propose an alternative method pursuant to Rule 34(a)(2), which provides that "[a] party may serve on any other party a request within the scope of Rule 26(b) . . . to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."

Accordingly, Plaintiffs propose, pursuant to Rule 34(a)(2), that they permit access to the equipment to Defendants' affiliates in China, H3C and/or HP China, who would then inspect,

survey, take or sample the equipment for testing, and submit their inspection report(s) to the Court and the parties, obviating the need for and the risks attendant to handling and shipping the counterfeit equipment cross-border.

### 3. In light of the applicable, safe and reasonable procedures available under the Convention and/or the FRCP, Defendants' <u>insistence on subjecting Plaintiffs to legal jeopardy is abusive.</u>

In light of the available, applicable, reasonable -- and safe -- procedures available to the Court and the parties as set out above, Plaintiffs strongly object to Defendants' insistence on submitting the Plaintiffs to the unreasonable risks of their DHL shipping proposal. Plaintiffs believe that Defendants' attempts to place Plaintiffs in significant legal jeopardy – again! – constitutes the type of the discovery abuse which the Supreme Court instructed the federal courts to be especially vigilant against in *Sociale Nationale*, 482 U.S. at 454-46:

> Some discovery procedures are much more "intrusive" than others. . . . *American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses.* For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to "abusive" discovery that foreign litigants advance should therefore receive the most careful consideration. In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. See Hilton v. Guyot, 159 U.S. 113 (1895). American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication.

Accordingly, Plaintiffs respectfully ask the Court to give their objections below "the most careful consideration." *Societe Nationale*, 482 U.S. at 546.

*First*, Plainitffs believe that Defendants have misdirected the conference's and the Court's attention to one particular aspect of discovery -- transferring the counterfeit equipment from China for inspection to the US, and the attendant host of legal, logistical and safety concerns this raises, making it probably the most cumbersome piece of discovery -- claiming that it was crucial to the case and should precede any other discovery.

In *Limone v. U.S.*, 579 F.3d 79 (1st Cir. 2009), the First Circuit upheld the district court's judgment awarding $100 million to the mafia members wrongfully convicted for the murder they did not commit, against the FBI which had concealed the exonerating evidence in its possession. There was no need in that case to re-examine the old murder scene to establish liability because all the relevant information – including exonerating evidence – had long been in the FBI files, and it was the FBI's concealment of that evidence that had caused plaintiffs' injuries and served as the basis of the FBI's liability in that case.

Here, too, the exonerating evidence is already in the Defendants' hands in the form of the written reports summarizing Defendants' numerous contemporaneous inspections of the Equipment, the underlying data, and the related correspondence. As the SAC alleges, based on documentary evidence, "by mid-March [2013] . . . numerous HP legal, security and audit teams had thoroughly inspected the seized Equipment: they 'analyzed the photos of the labels,' the 'sample of the equipment . . . sent by our processing vendor in India to China for analysis,' the inventory lists of the Equipment, and physically inspected 40% of the seized Equipment." ¶ 118. Also in 2013, "*H3C inspected the seized equipment on behalf of HPFS India*," and "*HP [was] reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it.*" *Id.* at ¶ 125.

Plaintiffs suffered their injuries because the Defendants had knowingly concealed the exonerating evidence in their possession at the time – in 2012-14 -- from the Chinese police and from Plaintiffs. That evidence is squarely in the Defendants' own contemporaneous files here in the U.S., not in the remaining equipment in China. Accordingly, Defendants' insistence on the reinspection of the Equipment without first producing their files of the original contemporaneous inspections appears to be a case of misdirection. As the Supreme Court instructed in *Societe Nationale*, the courts should "*exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.*"

*Second*, last summer on the motion to dismiss the original complaint, the Court and the counsel labored under the misimpression that the remaining equipment was either in the custody of the Chinese Police or had been since destroyed; however, that fact did not prevent the Court from denying the Defendants' motion to dismiss or stay the case: "It just means that there is not -- that evidence doesn't exist and you'll have to figure out how to prove the counterfeit or non-counterfeit nature of the goods from other evidence and who might bear responsibility for, if any of you, for the destruction and the inferences that might draw from that . . . ." Tr. at 9-11.

The Court further stated at the July 8, 2016 Hearing (Tr. at 16):

[T]here would be a lot of information that you could gather in discovery in any event without looking at the goods. And it may be that after some amount of discovery there might be enough there to suggest that looking at the goods really doesn't matter and we wouldn't need to stay it or maybe it really does matter and at that point maybe, you know, a stay would make sense if, in fact, the goods might some day come back. But if they're not, if they destroyed them, then it just seems to me, you know, we decide cases all the time on imperfect

information. We would decide on imperfect information with the caveat that, like in any other case, it may be that inferences are drawn against one party or another out of the destruction even though none of you destroyed the evidence, if they did destroy it, but I don't really see that as ripening into a stay in the near future .... And ... even if they determine, for example, that the goods are not counterfeit, that doesn't necessarily exonerate you and your client ....

*Finally*, it was the Defendants – not the Plaintiffs – who had destroyed or otherwise "disposed off" the three-quarters of the Equipment remaining in India (apparently at the time when the criminal case against the Individual Plaintiffs was still pending in China.)

The Plaintiffs, on the other hand, did not destroy any evidence and in fact preserved the remaining equipment, and should not be now penalized or put at a disadvantage for doing so by the very same Defendants who had already placed them in significant legal jeopardy once with their counterfeit equipment, and who had since destroyed the rest of that evidence that was in their own possession, custody or control.

## **DEFENDANTS' POSITION**

Plaintiffs' position concerning making the equipment available for inspection has been ever-changing. During the parties' telephone conference on October 5, 2017, in advance of the Rule 16 court conference, plaintiffs' counsel agreed that plaintiffs would transport the equipment to the U.S. and make it available for inspection, and did not raise any concerns about the logistics of expeditiously doing so. After that call and at the October 20, 2017 court conference, plaintiffs retreated from that position and instead argued that defendants should appear at the Cheng household in China and be responsible for shipping the equipment.

At the conference, the Court ordered the parties to confer about the logistics of transportation and for defendants to provide any guidance based on any past experience shipping equipment out of China and to the U.S. Defendants complied with that instruction, as more fully described below, by providing plaintiffs with information about shipping the equipment through a customs broker, just as defendants would be required to do.

In response, plaintiffs shifted their position once more, claiming first in an email dated October 26, 2017, that the Hague Convention provided the exclusive means by which the equipment could be obtained. After defendants pointed out, in an email dated October 27, 2017, that the Hague procedures were permissive, not mandatory, plaintiffs backtracked to adopt that position in a letter dated October 30, 2017. It appeared that plaintiffs had engaged in minimal efforts, if any, to ascertain what logistical complications may be involved in transporting the equipment following the October 20 conference and, instead, sought only to complicate the process. Accordingly, the parties agreed to submit their respective positions to the Court in this Joint Statement.

The simple fact is that this Court is empowered to order plaintiffs to bring to the U.S. the equipment that is the subject of their own claims, and which is currently in their possession so that defendants may inspect it for the very first time. The Court can and should do so without

resort to the Hague Convention. The Convention procedures (1) will not alleviate plaintiffs' burden of shipping the equipment—the only reason they claim those procedures are advisable, and (2) will add a tremendous amount of undue delay in obtaining an inspection—potentially six months to a year just to serve an Evidence Request in China. The Hague Convention procedures should be employed only if they would "facilitate" discovery and, here, they would do anything but.

## I. The Logistics of Shipping the Equipment

Six days following the court conference, we provided plaintiffs with defendants' limited insight into shipping the equipment. While it appears to be a relatively straight-forward process, defendants have no particular expertise because they are not and do not act as a Customs Broker, and that they themselves use such an outside service, just as plaintiffs will be required to do.

To that end, defendants recommend using a single shipper/broker, such as DHL, so as to avoid providing the same documents and information multiple times throughout the shipping process. DHL should be able to handle the shipping throughout the entirety of the process. DHL should also be able to provide any necessary forms or documents, such as a commercial invoice, which will require plaintiffs to list the part numbers and quantity of what is being shipped.

ICT should also be prepared to establish ownership of the equipment by providing certified copies of the RRSA and WSA, and any additional documents between ICT and Shinto that show that ICT received the equipment from Shinto.

Representative from our clients also thought that it would be helpful to request that the Court enter an order that could be presented to both Chinese and U.S. Customs to show that the equipment is being transferred to the U.S. for legal, and not commercial, purposes.

Finally, assuming ICT's full cooperation, should the Customs agents have any questions or require any documents, our clients estimate that the equipment could be cleared through U.S. Customs in as little as 2-3 weeks. We propose that the equipment be delivered into the possession of the U.S. Marshals Service in Boston.

At that time, we asked if plaintiffs identified any areas where defendants could be of further assistance. Instead, plaintiffs responded and, for the first time, took the position that the equipment should be sought through the formal Hague Convention procedures. Plaintiffs have not shared any information about what, if anything, they have done since the October 20 conference to identify what would be required to ship the equipment to the U.S. and what obstacles there may be.

## II. The Hague Convention

The U.S. Supreme Court has held that the Hague Convention is not "intended to replace completely the broad discovery powers that the common-law courts in the United States previously exercised over foreign litigants subject to their jurisdiction." *Societe Nationale Industrielle Aerospatiale v. U.S. Distr. Ct. for S. Distr.*, 482 U.S. 522, 536 (1987). A District Court may "order a foreign national party before it to produce evidence physically located within a [foreign] signatory nation," pursuant to the Federal Rules of Civil Procedure, and without

resort to the Hague Convention. *Id.* at 539-40. The notion that the "only way permitted by China to take evidence is by diplomatic/ consular channels" pursuant to the Convention has been rejected by the Supreme Court as an "extreme position." *Id.* at 529.

Because plaintiffs have all voluntarily submitted themselves to the jurisdiction of the Court in Boston and have put the subject equipment directly at issue in this action, this Court may order plaintiffs to make the equipment available for inspection in the U.S. without resort to the Hague Convention procedures.

### A. The Hague Convention Does Not Address Plaintiffs' Purported Concerns

Plaintiffs' proposal to use the Hague Convention procedures appears to be premised on a misunderstanding of how they function. The alleged reason that plaintiffs seek to use the Convention procedures is because of a fear of shipping the equipment to the U.S., but nothing about the procedures would alleviate plaintiffs' burden of doing exactly that. Plaintiffs appear to believe that defendants would become responsible for shipping under the Convention procedures. However, if the Convention were to be employed, defendants would be required to submit a Hague Evidence Request to the proper authorities in China, who would then serve that Request upon plaintiffs. Plaintiffs would then be required to respond to the Request by shipping the equipment to the U.S. The Hague Convention simply provides methods by which evidence may be requested in a foreign country; it does not shift shipping responsibilities from one party to the other. Thus, resorting to Convention procedures does not even address plaintiffs' stated concerns regarding their responsibility for shipping the equipment. Plaintiffs' responsibility for shipping would be precisely the same whether or not the Hague procedures are employed, except that they would be doing so after being served with a Hague Evidence Request by a designated Chinese official at the residential address where the allegedly counterfeit equipment is being held—hardly a scenario plaintiffs should relish in light of their stated concerns.

### B. The Convention Would Complicate and Delay, Not Facilitate, Discovery

The Supreme Court has stated that using the Convention procedures may be advisable where they would "facilitate the gathering of evidence." *Id.* at 541. Far from facilitating or simplifying obtaining the equipment, in this case, the Hague procedures would only serve to unduly delay and complicate that process. According to the Hague Conference on Private International Law (also known as the Hague Conférence/ Conference de la Haye) ("HCCH"), a Hague Evidence Request would have to be translated into Chinese, served upon the Chinese Central Authority ("CCA") in the first instance, and then the CCA would serve the Request upon local authorities, who would then, in turn, serve it upon plaintiffs. The HCCH estimates that the process could take six months to one year simply to serve the Evidence Request. This undue delay is particularly unacceptable given that defendants estimate that the equipment could be made available for inspection within the U.S. between two to three weeks.

### C. Plaintiffs' Fears Should Not Alter Discovery Obligations

Although the Court recognized plaintiffs' concerns during the October 20 conference, those fears are not substantial enough to justify upending discovery in this matter by shielding the most crucial piece of evidence from inspection for potentially up to a year. As the Court noted, plaintiffs Jade Cheng, Marafao Cheng and Pushun Cheng appear to be completely

comfortable living with the equipment for several years. Further, the Chinese authorities chose not to prosecute the Individual Plaintiffs and even returned the equipment to them, making it hard to believe that they would arrest the very same individuals for possessing said equipment. Finally, plaintiffs' claimed fears of handling and shipping the allegedly counterfeit equipment cross-border is further belied by their desire (stated in their October 30 letter to defendants) to retain part of the equipment for future legal proceedings in "China and/or India." Plaintiffs are apparently prepared to ship the equipment cross-border to India for some conjectural suit while shirking their obligation to present the same material in this Court in which they (and the equipment) are already subject to jurisdiction.

### III. Inspection in China

Subsequent to the October 20 conference, and ignoring the Court's instruction for the parties to confer on how to bring the equipment to the U.S., plaintiffs have also suggested making only a "sampling" of the equipment available for inspection in China.

Defendants are entitled to have the equipment available potentially for depositions, expert analysis and trial. Making it available only in China deprives defendants of that opportunity and contradicts this Court's instruction to bring the equipment to the U.S.

Plaintiffs' offer to only make a "sampling" of the equipment available for inspection is equally unacceptable. Defendants have not even been afforded the opportunity to confirm that all of the subject equipment was sold by HPFS (India) to ICT, let alone confirm its authenticity, and they are entitled to a full inspection.

***

Rather than cooperate with defendants in working through the logistics of shipping the equipment to the U.S., plaintiffs appear to have spent the last two weeks devising new and more complicated ways to shield the equipment from inspection by defendants. Defendants, on the other hand, provided plaintiffs with their knowledge concerning shipment and offered assistance if they could specify any additional help they require.

Requiring defendants to request production of the equipment through the Hague Convention, when this Court can simply order plaintiffs to arrange for shipment, serves no discernable purpose. Plaintiffs would still be required to follow the exact same procedures, obtain the same shipping documents and engage a Customs Broker. Maybe more importantly, if the equipment is not made available for nearly a year, the parties would be forced to engage in extensive document discovery, obtain discovery from non-parties and even question witnesses at depositions without knowing the most fundamental questions involved in this litigation: Did ICT buy all of the seized equipment from HPFS (India)? Was that equipment counterfeit? Were logos altered on the equipment such that it led to the accusation that equipment was counterfeit? It simply makes no sense to require the parties to litigate nearly the entire case without these answers when they could be ascertained within a matter of weeks instead.

Accordingly, defendants respectfully request that the Court enter an order requiring plaintiffs to ship the equipment, by a date certain, into the U.S. and be delivered into the possession of the U.S. Marshals Service. Plaintiffs may use that court order to facilitate passing Chinese and U.S. Customs. Finally, defendants respectfully request, particularly given plaintiffs' constantly shifting positions against making the equipment available, that discovery be

sequenced so that an inspection may take place prior to requiring the parties engaging in wasteful discovery that could be avoided after an inspection.

| | |
|---|---|
| **JOFFE LAW P.C.** <br> 230 Park Avenue, 10th Floor <br> New York, New York, 10169 <br> (212) 309-8711 <br> Attorneys for Plaintiffs | **GIBBONS P.C.** <br> One Pennsylvania Plaza, 37th Floor <br> New York, New York, 10119 <br> (212) 613-2000 <br> Attorneys for Defendants |

By: _____/s/ Dimitry Joffe_____
　　　　Dimitry Joffe

By: _____/s/ Anthony P. Callaghan_____
　　　　Anthony P. Callaghan

Dated: November 3, 2017

Dated: _____