1              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
2

3     - - - - - - - - - - - - - - - - - - x

4     INTEGRATED COMMUNICATIONS &          :
      TECHNOLOGIES, INC., et al.,
5                                          :    Civil Action No.
           Plaintiffs,                          1:16-cv-10386-LTS
6                                          :

           v.
7                                          :

      HEWLETT-PACKARD FINANCIAL SERVICES
8     COMPANY, et al.,                     :

9          Defendants.                     :

10    - - - - - - - - - - - - - - - - - - x

11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13
                      SCHEDULING CONFERENCE
14

15
                   Friday, October 20, 2017
16                        2:00 p.m.

17

18
           John J. Moakley United States Courthouse
19                    Courtroom No. 13
                      One Courthouse Way
20                   Boston, Massachusetts

21

22
                   Rachel M. Lopez, CRR
23                 Official Court Reporter
             One Courthouse Way, Suite 5209
24            Boston, Massachusetts  02210
                     raeufp@gmail.com
25

1                    **A P P E A R A N C E S**

2

      On behalf of the Plaintiffs:

3

          LAW OFFICE OF DIMITRY JOFFE
4         BY:  DIMITRY JOFFE
          230 Park Avenue
5         10th Floor
          New York, New York  10169
6         (212) 309-8711
          dimitry@joffe.law

7

8         LAW OFFICE OF JOSH MCGUIRE
          BY:  JOSHUA A. MCGUIRE
9         51 Winchester Street
          Suite 205
10        Newton, Massachusetts  02461
          (617) 461-6400
11        josh@joshmcguirelaw.com

12

13    On behalf of the Defendants:

14        GIBBONS, P.C.
          BY:  ANTHONY P. CALLAGHAN AND PAUL A. SASO
15        One Pennsylvania Plaza
          37th Floor
16        New York, New York  10119
          (212) 613-2015
17        acallaghan@gibbonslaw.com

18

          CHOATE HALL & STEWART LLP
19        BY:  STUART M. GLASS
          Two International Place
20        100-150 International Place
          Boston, Massachusetts  02110
21        (617) 248-4804
          sglass@choate.com

22

23

24

25

01:51:19  1                    **P R O C E E D I N G S**

01:51:19  2            (In open court.)

02:00:10  3            THE DEPUTY CLERK:  This is civil action 16-10386,

02:00:13  4   Integrated Communications & Technologies, Inc., et al.,

02:00:17  5   versus Hewlett-Packard Financial Services Company, et al.

02:00:19  6            Will counsel please identify yourselves for the

02:00:19  7   record.

02:00:22  8            MR. MCGUIRE:  Good afternoon, Your Honor.  Josh

02:00:24  9   McGuire, as local counsel to the plaintiffs.

02:00:27 10            THE COURT:  All right.

02:00:31 11            MR. JOFFE:  Dimitry Joffe as counsel for the

02:00:31 12   plaintiffs.  Good afternoon.

02:00:32 13            THE COURT:  All right.  Good afternoon, Mr. Joffe.

02:00:34 14            MR. CALLAGHAN:  Good afternoon, Your Honor.

02:00:35 15   Anthony Callaghan and Paul Saso from Gibbons, PC, counsel for

02:00:41 16   the plaintiffs [sic], with Stuart Glass from Choate Hall as

02:00:57 17   local counsel.

02:00:57 18            THE COURT:  All right.  Good afternoon.  So I have

02:00:57 19   the parties' submission on the Rule 16.  I just have one --

02:01:10 20            Nobody is confused, by the way, as to those claims

02:01:13 21   that are or are not pending?

02:01:13 22            (No responses from counsel.)

02:01:24 23            THE COURT:  Usually people answer.

02:01:27 24            MR. JOFFE:  Sorry.

02:01:27 25            THE COURT:  I don't know how they do it elsewhere,

| | | |
|---|---|---|
| 02:01:30 | 1 | since you're not from -- but usually the way it works in |
| 02:01:31 | 2 | court is when I ask a question, what happens -- you can think |
| 02:01:34 | 3 | about it, and I'm happy to give you as much time to think |
| 02:01:35 | 4 | about it.  Ordinarily, a response on the record is right -- |
| 02:01:39 | 5 | that's the court reporter.  Like a "yes" or a "no," or, |
| 02:01:42 | 6 | "We're not sure what you're asking for, Judge, and could you |
| 02:01:45 | 7 | clarify the question."  I'm happy to clarify it, if there is |
| 02:01:45 | 8 | some confusion.  But that's what I'm thinking about. |
| 02:01:49 | 9 | Am I missing something here? |
| 02:01:51 | 10 | MR. JOFFE:  Okay, Your Honor, sorry.  Maybe |
| 02:01:53 | 11 | clarify, because I misunderstood. |
| 02:01:55 | 12 | THE COURT:  Sure.  So the reason that I'm asking is |
| 02:01:58 | 13 | anybody confused as to the claims and counterclaims that |
| 02:02:01 | 14 | remain pending is because, as my understanding of your last |
| 02:02:06 | 15 | motion to dismiss, Mr. Joffe, is you sought to dismiss claims |
| 02:02:10 | 16 | that hadn't been brought.  So I ruled as to -- I ruled on the |
| 02:02:14 | 17 | merits as to those claims you sought to dismiss that had been |
| 02:02:17 | 18 | brought, and I made a ruling on the merits.  But I noted that |
| 02:02:21 | 19 | as to those claims that I thought had not been brought, that |
| 02:02:24 | 20 | your motion to dismiss to was moot. |
| 02:02:26 | 21 | But that raised in my mind a question.  Either, |
| 02:02:30 | 22 | (a), it's conceivable that I could have erred, although there |
| 02:02:33 | 23 | was no motion for reconsideration filed by you.  Or I just |
| 02:02:36 | 24 | wanted to make sure that everyone thinks that they understand |
| 02:02:39 | 25 | those claims that you brought, the plaintiffs brought, that |

02:02:43 1 have survived the motion to dismiss, that they had filed, are

02:02:46 2 pending, and that the counterclaims they have brought are

02:02:50 3 pending; that since we've all conferred with each other for

02:02:53 4 the Rule 16, that you're all on the same page as to what

02:02:57 5 claims are pending.

02:02:59 6 　　　　MR. JOFFE:  I believe we are.

02:03:01 7 　　　　MR. CALLAGHAN:  Yes, Your Honor, we believe we

02:03:03 8 understand the claims that are pending.

02:03:05 9 　　　　THE COURT:  Okay.  Fine.  I ask the question, only

02:03:09 10 because it's unusual to have a motion to dismiss claims that

02:03:11 11 hadn't been brought.  So I just want to make sure that either

02:03:14 12 I hadn't missed something, or there wasn't something along

02:03:17 13 the way.

02:03:18 14 　　　　All right.  I have, then, one other question to

02:03:21 15 ask.

02:03:22 16 　　　　With respect to the equipment, the equipment is in

02:03:24 17 China now; is that right?

02:03:26 18 　　　　MR. JOFFE:  That's correct, Your Honor.

02:03:27 19 　　　　THE COURT:  And it's in the possession of whom?

02:03:30 20 　　　　MR. JOFFE:  It's located in the house of plaintiff

02:03:36 21 Jade Cheng, who is actually living now in the United States

02:03:40 22 since February of last year, he moved to the United States.

02:03:44 23 He is now a resident of New Hampshire.

02:03:46 24 　　　　THE COURT:  All right.

02:03:47 25 　　　　MR. JOFFE:  But the house where the equipment is, I

02:03:49 1    believe, it's his father's house.  So it's in China.

02:03:54 2              THE COURT:  All right.  So he received -- did he --

02:03:57 3    is it your understanding that he received possession of the

02:04:00 4    equipment back from the Chinese police, or whatever?

02:04:03 5              MR. JOFFE:  From Chinese police.

02:04:04 6              THE COURT:  He took possession of it, put it in the

02:04:07 7    home of his father, which was the home in which he was living

02:04:09 8    at the time.

02:04:10 9              MR. JOFFE:  Correct.  And never touched it again.

02:04:12 10             THE COURT:  And it's remained there since -- and

02:04:14 11   then at some point in time thereafter, he moved to the United

02:04:17 12   States, and the equipment remained there.

02:04:19 13             MR. JOFFE:  Correct, Your Honor.

02:04:19 14             THE COURT:  And his father continues to live in

02:04:21 15   that home?

02:04:22 16             MR. JOFFE:  Yes.  In that home or nearby.

02:04:26 17             THE COURT:  His father --

02:04:28 18             MR. JOFFE:  It's a small village.

02:04:29 19             THE COURT:  -- continues to maintain possession and

02:04:32 20   control of that house.

02:04:34 21             MR. JOFFE:  Right.  Correct, Your Honor.

02:04:34 22             THE COURT:  So is there any -- putting aside the

02:04:35 23   fact that each want the other to bring it back, is there any

02:04:39 24   like legal impediment to bringing it into the United States?

02:04:44 25             MR. JOFFE:  Well, it's equipment as to which the

02:04:46  1    exclusive trademark owner testified repeatedly to be

02:04:52  2    counterfeit.  So without any paperwork or anything else, and

02:04:58  3    having already spent several months in horrendous condition

02:05:05  4    of the jail, asking my plaintiffs to handle counterfeit

02:05:10  5    equipment, ship it across China and across the border, I

02:05:14  6    believe, and they strongly believe, is just dangerous to

02:05:17  7    their safety and health.  They could be just easily

02:05:22  8    intercepted along the way.  It's counterfeit equipment.

02:05:25  9         It's boxes -- I don't know how big, but they tell

02:05:28  10   me it's quite substantial number of units all together, and

02:05:32  11   they're deathly afraid of even touching it.

02:05:35  12        THE COURT:  But not so deathly afraid that they're

02:05:38  13   unwilling to live with it.

02:05:41  14        MR. JOFFE:  Well, they're not living with it.

02:05:43  15        THE COURT:  Well, he did live with it.  You told me

02:05:45  16   that it was in his home, where he was living for a period of

02:05:45  17   time.

02:05:48  18        MR. JOFFE:  Right.  But what was he supposed to do

02:05:51  19   with that equipment?

02:05:51  20        THE COURT:  Well, he took it back from the Chinese

02:05:54  21   authorities.  They gave it back to him, right?

02:05:55  22        MR. JOFFE:  They gave it back to him, and the only

02:05:57  23   place he could put it was his house where he went after jail.

02:06:01  24   And that's where he put it and stores it, and that's where

02:06:04  25   it's stored.  And he's not going to --

02:06:06  1          THE COURT:  And all the time it's been stored, the

02:06:08  2  Chinese police have not come -- the Chinese police know it's

02:06:12  3  there, or have reason to believe it's there, since they gave

02:06:15  4  it to him and they know where he lived, right?

02:06:18  5          MR. JOFFE:  Right.  China is a big country, and he

02:06:21  6  starts sending it somewhere to the port, where somebody will

02:06:26  7  pick them up, who knows.  It's a big collection of

02:06:30  8  counterfeit, fake equipment.  He's going to be potentially,

02:06:35  9  again, arrested.  There is a real --- it's not joke.  It's a

02:06:38 10  substantial likelihood that moving counterfeit equipment, a

02:06:41 11  substantial shipment of counterfeit equipment attested by --

02:06:44 12          THE COURT:  So why won't they be arrested?

02:06:44 13          MR. JOFFE:  Why would they --

02:06:44 14          THE COURT:  Why won't they be arrested if they

02:06:44 15  move?

02:06:48 16          MR. JOFFE:  They are HP, they have HP China, they

02:06:52 17  can take it, and as HP, as a company, they probably could

02:06:57 18  somehow ship their own, whatever counterfeit or not equipment

02:07:02 19  or not, I hope.  They will be in a better position than my

02:07:05 20  plaintiffs would.  And they didn't spend seven months in

02:07:11 21  jail, Your Honor, for that equipment.  So I don't see how

02:07:15 22  requiring my plaintiffs, who --

02:07:16 23          THE COURT:  So I -- let me say a couple of things.

02:07:18 24  One, I think it -- I feel very badly for your clients, if

02:07:21 25  they spent seven months in jail.  But the fact that they

02:07:25  1   spent seven months in jail doesn't mean that every legal

02:07:29  2   argument that you make, Mr. Joffe, is not necessarily

02:07:32  3   advanced by the fact that they spent seven months in jail.

02:07:35  4   So it is not necessarily -- it's a fact that's relevant to

02:07:39  5   this case, because it makes this case an important case.

02:07:42  6   Every case is important to the parties.  But it isn't

02:07:44  7   necessarily a fact that particularly bears on each particular

02:07:47  8   issue in each particular case.

02:07:49  9        You can bring it up every time you want, if you

02:07:51 10   wish.  I'm not going to prevent you from bringing anything

02:07:55 11   up.  But I point it out only because it's not clear to me the

02:07:59 12   legal -- particular legal relevance of that fact.

02:08:02 13        If you're telling me there are -- I understand it,

02:08:04 14   to the extent you explain it, that they are worried or

02:08:07 15   deathly afraid of doing anything that might cause the Chinese

02:08:11 16   authorities to arrest them again, because the experience was

02:08:14 17   searing.  I get that.  Okay?  But they did bring the case.

02:08:17 18        And it must not have been lost on them, because I'm

02:08:21 19   sure that you talked to them and must have said to them

02:08:24 20   before that you filed -- whichever number of -- you didn't

02:08:27 21   file the original complaint, but you filed many amended

02:08:30 22   complaints.  You must have talked to them and told them that,

02:08:33 23   in all likelihood, the equipment would have to be examined,

02:08:37 24   and in all likelihood would have to be examined here, and in

02:08:40 25   all likelihood, if this case went to trial, those things

02:08:43  1   would have to be produced here.  And at the moment, they were

02:08:46  2   their possession, custody, and control.  So it's a reasonable

02:08:49  3   possibility that they might have to produce it, or be --

02:08:51  4   participate in some way in its production.

02:08:53  5        And so it's not to say that it necessarily means

02:08:57  6   that they -- that they're absolved from it, but --

02:09:03  7        So your proposal it it's their problem, they pick

02:09:06  8   it up, and they bring it here.  Is that your proposal?

02:09:10  9        MR. JOFFE:  My proposal -- and Your Honor, I

02:09:12 10   understand your reference to the jail, but in this particular

02:09:16 11   respect, with respect to shipping the equipment, this is, I

02:09:20 12   believe, very relevant fact.  Because the whole case started

02:09:24 13   with plaintiffs selling the equipment to defendants for a

02:09:29 14   sale, and then the defendants were arrested for doing it, for

02:09:33 15   handling or selling the equipment.  They are now saying that,

02:09:36 16   again, the plaintiffs should now take that equipment and ship

02:09:40 17   it, without any, you know, documents, even, that were

02:09:43 18   originally --

02:09:44 19        THE COURT:  So what do you propose?

02:09:46 20        MR. JOFFE:  My proposal is they have HP China, a

02:09:50 21   big subsidiary in China.  They have H3C that was their

02:09:54 22   subsidiary.  It's not longer a subsidiary, but it was.  They

02:09:55 23   have people in China who can take that equipment, or part of

02:09:58 24   it, whatever they choose, will be happy to -- for inspection,

02:10:03 25   we made it available for inspection.  It's in China, let them

02:10:07  1    take it in China.  And I believe it will be much safer for

02:10:12  2    the company, HP, to ship this equipment, than plaintiffs,

02:10:18  3    who -- who are really afraid of touching it.

02:10:22  4              THE COURT:  What do you say about that?

02:10:25  5              MR. CALLAGHAN:  Your Honor, we believe that it's an

02:10:29  6    elemental aspect of the first seven or eight counts of the

02:10:32  7    complaint that the equipment is put in the suit, and we

02:10:38  8    believe, too, that it's subject to inspection, and we believe

02:10:38  9    it should be they who have put it in issue.

02:10:41 10              THE COURT:  So let me ask a practical question,

02:10:43 11    okay.  It strikes me there are three issues here, none of

02:10:45 12    which, so far, I'm hearing the answer to.  One is it's going

02:10:47 13    to cost some amount of money to get the equipment here.

02:10:50 14    Okay.  That seems like obvious, right?  Somebody is going to

02:10:52 15    have to pay for it to go on a plane or to go on a boat and

02:10:55 16    get here.

02:10:56 17              The second is, it's going to come here.  Okay?

02:10:58 18    Because the way I view it, sooner or later, this case is

02:11:03 19    going to go to trial, unless summary judgment enters or

02:11:06 20    unless you settle the case.  But I operate under the

02:11:09 21    assumption, we're thinking about the trial, as we go forward

02:11:12 22    with the case, even though I recognize most cases don't go to

02:11:15 23    trial.  So for the trial, I think you're going to have to

02:11:18 24    have the equipment here, because the jury is going to be --

02:11:20 25              It's a jury claim, right?

02:11:22  1          MR. JOFFE:  Right.  Yes, we did the jury.

02:11:24  2          THE COURT:  So the jury -- it's going to be an

02:11:26  3  exhibit, you're going to have to produce that -- that to show

02:11:29  4  it, so the jury can see it, and they'll make their own

02:11:33  5  assessment as to what the evidence shows.

02:11:35  6          So I think as a practical matter, it has to come to

02:11:37  7  the United States.  And this is the forum that the plaintiffs

02:11:42  8  have chosen, might or might not have any views on the Chinese

02:11:48  9  legal system or the Indian legal system, but the plaintiffs

02:11:51 10  chose to come here, so I think it comes here.

02:11:53 11          How the cost of bringing it here is one issue to be

02:11:57 12  resolved by all -- either by all of you or me.  But I mean,

02:11:57 13  we're not --

02:12:00 14          It all fits in his house, so how much -- what is

02:12:03 15  the volume of this equipment?  Are we talking like a whole

02:12:06 16  container of a shipping container, or more like a pick-up

02:12:10 17  truck's worth, or like two boxes from Amazon?  I mean, do we

02:12:14 18  have any idea how much volume this equipment is?

02:12:17 19          MR. JOFFE:  According to plaintiffs, it's heavy.

02:12:19 20  It's not so much volume, I think, but the weight.  It's heavy

02:12:25 21  metal pieces.

02:12:26 22          THE COURT:  So I mean, do you think the whole thing

02:12:27 23  is like the size of the table that you're sitting at?  Floor

02:12:31 24  up to the table, or less?

02:12:33 25          MR. JOFFE:  Your Honor, honestly, I saw pictures,

02:12:35   1   but I can't -- it's probably ten cubic feet maybe.  Maybe.

02:12:41   2           THE COURT:  So certainly way less.

02:12:43   3           MR. JOFFE:  It's not a half a container, but it's

02:12:45   4   not something that you can pack in a --

02:12:48   5           THE COURT:  A single box.

02:12:50   6           MR. JOFFE:  Just a -- you can select some --

02:12:51   7           THE COURT:  Right.  So then the question is, if

02:12:54   8   somebody packs it up, I mean -- it's going to come here.

02:12:59   9   There's only a couple ways it can come here, right?  You're

02:13:02  10   either going to hire a commercial service like FedEX or UPS,

02:13:02  11   put it in a bunch of boxes, call them up and either deliver

02:13:08  12   it to their pick-up station, or have them pick it up and then

02:13:10  13   ship it.

02:13:11  14           So the question is, as a practical matter,

02:13:13  15   plaintiff says they're afraid, because they're afraid of

02:13:15  16   getting arrested if they do it.  From defendants'

02:13:19  17   perspective, is that a realistic concern, or are you

02:13:22  18   concerned?  What are the issues that are presented by

02:13:25  19   shipping it, and what kind of documents would be needed to

02:13:28  20   bring it into the country?

02:13:31  21           MR. CALLAGHAN:  Your Honor, to the extent that an

02:13:32  22   order would issue from this Court, I'm sure that would give

02:13:34  23   some absolution to whoever is shipping it, that it's required

02:13:37  24   for production in a legal proceeding in the US -- a certain

02:13:41  25   request made of the Court.  Other than that, we have not,

02:13:43   1   frankly, given a whole lot of analysis.  We could do so and

02:13:47   2   we could confer further with Mr. Joffe, but we do believe

02:13:50   3   that it's necessary to have it here.  We believe the

02:13:52   4   plaintiffs put it in issue, and it should be their burden to

02:13:56   5   produce it.

02:13:56   6           THE COURT:  So here's the way I look at it.  I

02:13:59   7   think it should be here.  The plaintiffs brought the case

02:14:01   8   here, it needs to come here, it's critical evidence in the

02:14:04   9   case.  So it needs to come to the United States.  And

02:14:06  10   certainly it's going to need to be here for the trial.  You

02:14:10  11   might as well have it here now.  All of you are in the United

02:14:11  12   States.  It's going to facilitate the inspection.

02:14:13  13           I assume all of you would want to look at it.  I

02:14:16  14   assume you might have witnesses who want to look at it.  You

02:14:17  15   might have experts that want to look at it.  If this were --

02:14:19  16   if this equipment were located somewhere in the United

02:14:22  17   States, I would be stunned if the five of you stood up in

02:14:25  18   front of me and said, "Judge, we are not interested in the

02:14:28  19   equipment.  We never want to look at it.  We don't want any

02:14:28  20   witness to look at it, and we're never going to bring it in

02:14:30  21   front of the jury."

02:14:31  22           MR. JOFFE:  We never said that.

02:14:32  23           THE COURT:  No, I know.  You're not.  All right.

02:14:34  24   So you need to bring it here, I think, is the point.  I mean,

02:14:36  25   I say "you," I mean, all of you.  It needs to come here.

02:14:40  1          So I'm happy if it's helpful to all of you -- so my

02:14:44  2   view is, (a), it needs to come here; (b), in the ordinary

02:14:48  3   course, I would say it's plaintiff's responsibility to bring

02:14:51  4   it here, because plaintiff brought the case, plaintiff has

02:14:54  5   possession, custody, and control of the property, and has had

02:14:57  6   throughout the time.

02:14:57  7          That said, I think the concern Mr. Joffe raises is

02:15:01  8   a reasonable one.  At least it's reasonable -- it's

02:15:06  9   reasonable, I say, not in the sense -- I'm not making a

02:15:09 10   finding that, in fact, any of those things would happen.  But

02:15:12 11   it is reasonable to at least be concerned about that as a

02:15:15 12   prospect to figure out how you're going to do this in a way

02:15:17 13   that doesn't expose somebody to a problem.  So --

02:15:20 14          And given the individual plaintiffs' experience, it

02:15:25 15   would at least be -- I can understand why they would want to

02:15:27 16   tread very carefully before they did something with the --

02:15:32 17   with the goods.  So expense doesn't seem to me to be the

02:15:42 18   primary issue, because if you just packed it up and -- it

02:15:46 19   might cost some amount of money for FedEx or UPS or whomever

02:15:46 20   to ship it here, but it's nothing that -- it doesn't seem to

02:15:52 21   me to be the issue that divides you.  And in the ordinary

02:15:54 22   course, I view that as plaintiff's responsibility, you get

02:15:56 23   it.  If it was in Omaha, I'd tell you, bring it to wherever

02:16:00 24   it is, and a reasonable location.

02:16:02 25          So the real issue is, is it going to expose someone

02:16:05  1    to liability.  That seems a reasonable concern.  And I

02:16:07  2    think -- my suggestion is this:  All of you need to figure

02:16:10  3    out -- it doesn't sound like you've all explored in a

02:16:13  4    specific way, like how you're actually going to get it here

02:16:16  5    and what does that actually mean.  I think you should do that

02:16:19  6    together.  I'm perfectly happy to issue a court order that

02:16:22  7    says:  This property, identified in some specific way that

02:16:25  8    you tell me that specifically identifies it, is required in

02:16:29  9    the United States for adjudication of legal claims between

02:16:32 10    the parties over whether -- over their various issues.  And

02:16:37 11    that either the parties agree or there's a question --

02:16:40 12          At least it's certainly in my mind, it's raised as

02:16:42 13    a question, put in play that it's counterfeit.  I'm not

02:16:46 14    prepared to find that it's counterfeit based on the

02:16:50 15    complaint, but I'm certainly prepared to find that they

02:16:54 16    stated a claim that it's counterfeit.  And whatever -- if

02:16:56 17    there's particular language that you think is helpful, I'm

02:17:00 18    happy to issue an order like that.  But I think that you

02:17:06 19    should all --

02:17:07 20          So I think it's worthy of some discussion about how

02:17:11 21    it's actually going to get here.  I mean, one possibility

02:17:15 22    like would be, you know, your client tells his dad -- I

02:17:18 23    assume it's in boxes or no?  Put it in shipping boxes and

02:17:22 24    call --

02:17:22 25          What would happen if they called FedEx and said we:

02:17:25  1    Have these boxes, we want them shipped to your office,

02:17:29  2    Mr. Joffe, or wherever, you know.  And what would happen,

02:17:32  3    what paperwork is needed, and what kind of concerns do people

02:17:35  4    have?  And to the extent defendants, you can do something to

02:17:39  5    help facilitate that, then fine.

02:17:42  6         Yes, I agree it has to come here.  Yes, I agree in

02:17:45  7    the ordinary course, the responsibility would be plaintiffs.

02:17:49  8    But there's an extra wrinkle here, and I think you should

02:17:52  9    cooperate with each other and figure out how we're going to

02:17:55 10    get it here.  And if that means that, you know, HP should

02:18:00 11    issue the order to UPS to get it here, fine.  Then why

02:18:06 12    wouldn't you --

02:18:07 13         You'll have to make arrangements with him, because

02:18:10 14    it's your client's house, and I don't think you can sit back

02:18:12 15    and say:  Given what happened, their problem to get it here.

02:18:16 16    It's coming here, in the ordinary course, your responsibility

02:18:20 17    as the plaintiff to bring it here.  But yes, I think the

02:18:22 18    concern that you raise is a real one and worthy of at

02:18:26 19    least -- so you should talk to each other.  Maybe it has to

02:18:29 20    go through HP.  If it does, I would think you could work that

02:18:31 21    out and that's fine.

02:18:32 22         Maybe there's a particular document in addition to

02:18:34 23    my court order.  I don't know what the Chinese authorities,

02:18:37 24    if anything, they're going to want in order to bring it out,

02:18:40 25    or FedEx, or whatever international transport service you use

02:18:45 1    is going to want to -- in order -- are they going to need

02:18:51 2    documentation to bring it out, and what's that going to take?

02:18:54 3    And I think you should figure that out.  Because whomever is

02:18:57 4    doing it, it's going to be -- you're going to need the same

02:18:59 5    paperwork, whether the plaintiff does it or the defendant

02:19:01 6    does it.  And you both have an interest, at this point

02:19:05 7    essentially an obligation to get it out.  So I think you

02:19:08 8    should talk to each other to work that out.

02:19:11 9          And if you need, then, either a further order, or

02:19:14 10   if it leads to some dispute between you as to a particular,

02:19:18 11   like aspect of that, I'm happy to try to resolve that.  But I

02:19:23 12   think that --

02:19:27 13         Does that make sense?  Any questions about that?

02:19:29 14         MR. JOFFE:  Your Honor, I have, rather, two

02:19:31 15   comments, if I may, on this.

02:19:32 16         THE COURT:  Yes.

02:19:33 17         MR. JOFFE:  I am grateful for your proposed

02:19:37 18   resolution of this issue.  But I also want to refer to the

02:19:40 19   sequence of -- in time.  It -- the moving of the equipment,

02:19:46 20   whoever moves it, I think to me, would be involved and maybe

02:19:51 21   complicated process with the orders and getting it

02:19:55 22   physically.  And there is absolutely no reason for wait with

02:20:00 23   discovery requests as defendant suggested, until the

02:20:05 24   equipment gets here.  And that's one.  I think we can proceed

02:20:08 25   with discovery of documents in parallel with getting the

02:20:12  1    equipment out.  That's my first comment.

02:20:14  2            And the second, I would like to refer Your Honor to

02:20:17  3    Local Rule 26.3 on phasing of discovery, that says that the

02:20:23  4    judge can limit, can sequence discovery and phase it, and

02:20:27  5    limit the first phase of the -- to develop information needed

02:20:31  6    for a listed assessment of the case.  And if the case does

02:20:35  7    not terminate, the second phase will be directed at

02:20:38  8    information needed to prepare for trial.  And the reason I

02:20:43  9    cite this rule is the following, Your Honor, and it goes to

02:20:48 10    the whole view of sequencing the discovery -- I apologize.

02:20:52 11            The defendants inspected that equipment sever1al

02:20:54 12    times in 2012/2013 framework.  We know that.  H3C inspected

02:21:00 13    it, HP inspected it, people from United States came, HP legal

02:21:08 14    and lawyer team.  They have reports, they have finding that

02:21:11 15    they relaid the data.  All that data and the reports, and the

02:21:18 16    statements that they made is actually what caused the

02:21:21 17    disaster.  It was done in 2013.  They have in their

02:21:24 18    possessions those case files, those reports of the

02:21:27 19    inspections, and all the underlying data.  This is very easy

02:21:32 20    to produce.  It's ready and accessible.  You don't need to go

02:21:36 21    into multiple servers across the country.  HP was doing the

02:21:40 22    inspections.

02:21:41 23            And so my proposal is, let's see what they know

02:21:44 24    about this equipment, because they've already inspected it.

02:21:51 25    H3C inspected all of it in 2012, and they arrested it.  Every

02:21:56  1   single piece.  They inspected it and reported it all

02:21:58  2   counterfeit.

02:21:58  3            THE COURT:  So what are you asking?

02:22:00  4            MR. JOFFE:  I'm asking that before, or in parallel

02:22:02  5   in getting the equipment itself, let us see what their

02:22:07  6   contemporaneous inspections of those equipments say.  They

02:22:11  7   are sitting here now, telling us to go and bring this

02:22:14  8   equipment from China, and they have in their possessions

02:22:18  9   2013, the reports, inspection reports, reports of all the,

02:22:25 10   you know, investigations that they've done.  They cite it in

02:22:29 11   their letter.  They say that we inspected it, H3C inspected

02:22:36 12   it.  HP immediately commenced investigating --

02:22:37 13            THE COURT:  Have you ever inspected it?

02:22:39 14            MR. JOFFE:  What?

02:22:39 15            THE COURT:  Have you ever inspected it?

02:22:41 16            MR. JOFFE:  I haven't seen it.

02:22:42 17            THE COURT:  Have you ever had anyone inspect it?

02:22:45 18            MR. JOFFE:  No, we haven't -- we were arrested --

02:22:48 19   not -- I mean, plaintiffs were in the office when H3C and the

02:22:53 20   arresting police officer came, and they took all the --

02:22:56 21            THE COURT:  Your clients were released from custody

02:22:58 22   when?

02:22:58 23            MR. JOFFE:  My clients were released from custody

02:23:00 24   in July of, I believe, 2013, on bail --

02:23:05 25            THE COURT:  And the property was returned to Mr. --

02:23:09  1    Mr. Cheng, who --

02:23:11  2              MR. JOFFE:  The property was returned to Mr. Cheng.

02:23:14  3    I understand he couldn't --

02:23:14  4              THE COURT:  When was it returned to Mr. Cheng?

02:23:17  5              MR. JOFFE:  After he's released from prison.  So it

02:23:19  6    would be some time in 2013.

02:23:21  7              THE COURT:  All right.

02:23:22  8              MR. JOFFE:  Or maybe from when he was -- I'm not

02:23:24  9    sure.  He was released from the --

02:23:27 10              THE COURT:  He was released first, and later the

02:23:29 11    charges were dismissed.

02:23:31 12              MR. JOFFE:  Yes, in 2014.  So it might have been

02:23:34 13    2014.

02:23:34 14              THE COURT:  That would seem more likely.

02:23:35 15              MR. JOFFE:  More likely.

02:23:36 16              THE COURT:  But you don't know exactly.

02:23:38 17              MR. JOFFE:  I don't know exactly.

02:23:39 18              THE COURT:  So some time, no later, would it seem,

02:23:42 19    than 2014.  So as far as you know, you haven't had anybody --

02:23:47 20    you, as counsel, haven't had anybody inspect the property

02:23:51 21    since you've been in the case?

02:23:52 22              MR. JOFFE:  No, we haven't.  We haven't.

02:23:54 23              THE COURT:  And you have no idea whether -- is it

02:23:56 24    fair to say or not, that you had no idea whether your

02:23:59 25    clients, any of your clients, after the property was returned

02:24:02  1  to them, inspected the property?

02:24:05  2          MR. JOFFE:  No, I know that they didn't.  That I

02:24:07  3  do.

02:24:07  4          THE COURT:  You know they did not.

02:24:09  5          MR. JOFFE:  Yeah, they did not inspect the

02:24:11  6  property.

02:24:11  7          THE COURT:  All right.

02:24:11  8          MR. JOFFE:  And one more thing about inspections,

02:24:14  9  Your Honor.  This is H3C equipment.  H3C is a manufacturer

02:24:19 10  and exclusive trademark holder of H3C logos and trademarks.

02:24:24 11          THE COURT:  What do you mean when you say it's "H3C

02:24:28 12  equipment"?  What does that mean?  They don't own the

02:24:30 13  equipment, your client owns the equipment.

02:24:32 14          MR. JOFFE:  No, no.  I'm saying H3C manufactured

02:24:35 15  the equipment, so H3C is exclusive trademark owner.

02:24:40 16          THE COURT:  So it's alleged to be -- the allegation

02:24:40 17  is it's really that it's counterfeit H3C equipment.

02:24:45 18          MR. JOFFE:  Right.

02:24:46 19          THE COURT:  Okay.  Not that it's H3C posing --

02:24:47 20          MR. JOFFE:  No, no.  The point is that it's H3C

02:24:50 21  itself, its experts, testified to the police that we're

02:24:54 22  exclusive trademark holder.  We're telling you, police, that

02:24:58 23  this equipment is counterfeit and they, on the record from

02:25:01 24  2012 --

02:25:02 25          THE COURT:  So what you want me to do is order

02:25:04  1   that -- putting aside what I do about the equipment, you want

02:25:06  2   me to order that now, while we're waiting for the equipment,

02:25:11  3   that they should disclose to you whatever documents they have

02:25:18  4   with respect for inspections.

02:25:19  5         What would be the purpose of organizing

02:25:21  6   discovery -- is it your proposal that that should happen

02:25:24  7   before anything else?

02:25:25  8         MR. JOFFE:  Correct, Your Honor.

02:25:25  9         THE COURT:  And no other discovery should happen at

02:25:27 10   the moment?

02:25:28 11         MR. JOFFE:  No, that discovery is a -- we'll be

02:25:32 12   happy to produce all documents.

02:25:33 13         THE COURT:  Are you saying that discovery should

02:25:35 14   just commence generally, right now, and that as part of that,

02:25:39 15   then obviously you would presumably request that as part of

02:25:42 16   their initial disclosures, they would disclose that?  Or

02:25:47 17   that's different?  Or are you saying that this thing should

02:25:50 18   happen automatically first?

02:25:51 19         MR. JOFFE:  No, I'm saying that Rule 26.3 --

02:25:54 20         THE COURT:  I get it, that phasing is permissible.

02:25:54 21         MR. JOFFE:  It's phasing, so --

02:25:57 22         THE COURT:  But I'm asking you, what phasing do you

02:26:00 23   want to do?

02:26:00 24         MR. JOFFE:  I want to first exchange documents from

02:26:02 25   plaintiffs and defendants.

02:26:03  1          THE COURT:  All right.  So you want document

02:26:06  2   exchange to happen right away, of all things.  Not just the

02:26:09  3   one thing you talked about, all document exchange happens

02:26:13  4   right away, and that commencement should not await for the

02:26:17  5   production of equipment for inspection.

02:26:18  6          MR. JOFFE:  Right.  The equipment could -- we can

02:26:20  7   arrange and start talking and delivering this equipment.

02:26:23  8   That's fine.  But they already have, defendants, in their

02:26:28  9   possession, records of contemporaneous inspections of those

02:26:33 10   equipment in 2012, 2013, and testimony in 2014, where H3C is

02:26:40 11   saying to the police, "This is counterfeit equipment, we're

02:26:43 12   the only trademark holder," says H3C.  Nobody else can tell

02:26:49 13   anything, even HP doesn't have trademark to H3C.  That's what

02:26:54 14   H3C says.  So we have the statement of the exclusive

02:26:56 15   trademark holder and owner of the equipment --

02:26:58 16          THE COURT:  Of course, H3C saying it doesn't make

02:27:01 17   it so.

02:27:02 18          MR. JOFFE:  Who else can dispute it, Your Honor, if

02:27:05 19   trademark owner telling you the trademark --

02:27:07 20          THE COURT:  I have lots of trademark cases where

02:27:10 21   people dispute all sorts of things.  I mean, I agree with you

02:27:14 22   that ordinarily you would think that if the trademark is H3C,

02:27:16 23   and H3C is a company, they would hold it.  But I'm just

02:27:20 24   saying that's -- you're telling me what their position is.  I

02:27:22 25   have no idea the relationship between these different

02:27:25  1   companies and what licensing agreements or contractual

02:27:27  2   arrangement they have.  So all I'm saying is I know that what

02:27:31  3   you're telling me is H3C says this, but the fact that H3C

02:27:37  4   says it, that might make it so, but that might not

02:27:41  5   necessarily make it so.  I don't know.  That's a different

02:27:43  6   issue.  But I just note that, because I think it's important

02:27:45  7   to keep track of what's what.

02:27:47  8           MR. JOFFE:  Right.  Except for -- like for example,

02:27:50  9   if you don't -- Gucci says, "This Gucci bag is fake."  Who

02:27:54 10   can say -- which expert can say, "No, Gucci, you're wrong.

02:27:58 11   It's your bag"?

02:27:58 12           THE COURT:  Do you want to know which expert could

02:28:00 13   say?

02:28:00 14           MR. JOFFE:  Which?

02:28:00 15           THE COURT:  We'll start with, do you see those

02:28:00 16   empty chairs over there?

02:28:03 17           MR. JOFFE:  Wonderful.

02:28:03 18           THE COURT:  Do you know who sits in those empty

02:28:05 19   chairs?  Who sits in those chairs?

02:28:06 20           MR. JOFFE:  Jury.

02:28:07 21           THE COURT:  And so let's suppose you have a

02:28:10 22   counterfeit case and Gucci comes on, and Gucci's expert says,

02:28:15 23   "I've worked for Gucci.  I've worked for 40 years for Gucci,

02:28:17 24   and that bag is fake," -- okay?  And if Gucci -- if, at the

02:28:21 25   end of the trial, Gucci's lawyer says, "Judge, we don't even

02:28:25  1    need to go to the jury, our expert says we win," do you know

02:28:28  2    what I would say to them?  Wrong.  The jury decides.  The

02:28:31  3    jury can decide they don't believe the expert.

02:28:39  4         MR. JOFFE:  You're right.  My local counsel

02:28:41  5    suggested to me they're the ones on the record saying that

02:28:44  6    the equipment is counterfeit.  Not even H3C, the defendants.

02:28:51  7    HP is saying it, in a letter that I have.

02:28:53  8         And by the way, I think that I saw somewhere in the

02:28:58  9    papers that these letters are not on the record.  They are.

02:29:02  10   It's document 22-2 and 22-3.  That's where the -- HP

02:29:06  11   Enterprise India, signed by David Gill, says the equipment is

02:29:09  12   counterfeit.  So H3C says it's counterfeit.  HP Enterprise

02:29:14  13   India says it's counterfeit.  David Gill, who is both at HP

02:29:17  14   Enterprise India and HP Enterprise US says it's counterfeit.

02:29:24  15   Well --

02:29:25  16        THE COURT:  It might be counterfeit.  I don't know.

02:29:28  17   But in the end, the expert -- you're asking who decides.  In

02:29:31  18   the end, the jury decides.

02:29:33  19        MR. JOFFE:  Okay.  But Your Honor --

02:29:35  20        THE COURT:  But I get your point.  You're saying

02:29:37  21   why should we wait for discovery --

02:29:39  22        MR. JOFFE:  Let's exchange documents.

02:29:41  23        THE COURT:  Right.  So you're not looking for those

02:29:42  24   one thing.  You're just saying -- if I'm understanding you

02:29:46  25   correctly, you're not saying, the first thing that should

02:29:49  1    happen is they produce inspection documents.  You're saying

02:29:52  2    they have inspection documents.  But what you're saying we

02:29:54  3    should just start -- you're not even really saying phase

02:29:58  4    discovery, if I'm understanding you correctly.  You're just

02:30:01  5    saying we should commence discovery now.

02:30:03  6            One of the things of discovery that will happen is

02:30:06  7    the equipment will be brought over, but we shouldn't have

02:30:08  8    to -- you're actually asking not for phased discovery.

02:30:11  9    You're actually saying you should just start discovery now.

02:30:12 10    You don't want phased discovery under local Rule 26 point

02:30:16 11    whatever, you just want to start discovery now.  One of the

02:30:18 12    things in discovery would be production.  You just don't want

02:30:21 13    to delay the paper discovery for -- to occur -- you don't

02:30:26 14    want to delay paper discovery until after the things come

02:30:30 15    here.

02:30:31 16            MR. JOFFE:  That's correct.

02:30:31 17            THE COURT:  So that's -- in that sense, are you

02:30:32 18    asking for -- it sort of seems like --

02:30:35 19            MR. JOFFE:  Well, in a sense, you know, the point

02:30:37 20    that I'm trying to make is in their possession, there are

02:30:41 21    reports of those inspections --

02:30:42 22            THE COURT:  Yes, I get that.

02:30:43 23            MR. JOFFE:  -- that were done in 2013.  When they

02:30:46 24    produce it and related to respondent, very narrow set of

02:30:48 25    documents, we will see if the case terminates or needs to go

02:30:51 1   to trial.  Because in those reports it may be, because

02:30:54 2   they've determined it, it will say the equipment is

02:30:57 3   counterfeit, or the equipment is --

02:30:59 4        THE COURT:  But suppose those documents say that

02:31:02 5   the equipment is counterfeit.  Let's suppose they say

02:31:05 6   everywhere that the equipment is counterfeit.  How does that

02:31:09 7   terminate the case?

02:31:10 8        MR. JOFFE:  Well, it -- if their documents, based

02:31:12 9   on their contemporaneous inspection, said the equipment is

02:31:15 10   counterfeit, H3C, the manufacturer's equipment, we have their

02:31:20 11   records saying that it's counterfeit, then that might end the

02:31:27 12   case, because it would be then subject to summary judgment,

02:31:32 13   if their documents, themselves, show one way or the other.

02:31:36 14   Then it doesn't have to be counterfeit.  It may say genuine.

02:31:42 15   The equipment is genuine.

02:31:44 16        And people are sitting -- well, I don't want to

02:31:46 17   refer to jail again, but if they knew it was genuine and they

02:31:50 18   haven't admitted it until now, that's one thing.  If they

02:31:54 19   knew it was --

02:31:56 20        THE COURT:  What I'm trying to understand is, for

02:31:58 21   example, you have a false imprisonment claim.  How does the

02:32:01 22   fact that, after your clients were in prison, there's

02:32:04 23   documents supposing that that's what they say.  Supposing the

02:32:07 24   documents unequivocally say that it's counterfeit.  How does

02:32:11 25   that establish -- how does that automatically establish

02:32:16  1  summary judgment?

02:32:18  2          MR. JOFFE:  Because that confirms what they said in

02:32:21  3  their letter in 2013.  And what they say is what our theory

02:32:25  4  is, that the equipment came from HPFS, that it was

02:32:31  5  counterfeit before it was sold to us; that we had all the

02:32:34  6  reasons to rely, they say -- we had reasons to rely on them,

02:32:38  7  because it came from them.  And if the internal documents and

02:32:42  8  the results of inspection confirm all of that, all of it, I

02:32:46  9  don't think there will be a reasonable issue as to whether

02:32:49  10  there's -- equipment is counterfeit or not.  Because we'll

02:32:53  11  have H3C saying, "We inspected all of it and" --

02:32:56  12          THE COURT:  I guess the reason that I'm just asking

02:32:57  13  a question is, like, it seems like an obvious document you

02:33:02  14  would want to see.  It seems like an obviously discoverable

02:33:05  15  document in the ordinary course, unless there's some reason

02:33:08  16  why it wouldn't come up in discovery and be produced --

02:33:14  17          MR. JOFFE:  There is one reason why it --

02:33:15  18          THE COURT:  And -- but I don't know that it's -- to

02:33:16  19  me, while I see a possible dispute between the parties over

02:33:21  20  whether the equipment is fraudulent, in the sense that I'm

02:33:23  21  not prepared to say here -- on the record before the court,

02:33:26  22  that is, there's a motion and pending claims and

02:33:29  23  counterclaims, those, in and of itself, don't establish that

02:33:32  24  the equipment is counterfeit.

02:33:34  25          I'm not saying it's not counterfeit, but there's

02:33:37  1    not been an adjudication of that.  That's not how, as you

02:33:39  2    well know, litigation works.  And you know, you then need a

02:33:40  3    binding stipulation from them, or you need a determination on

02:33:44  4    the record as a result of a motion.  But to me, the way I see

02:33:47  5    it, and maybe I'm missing something, but a possible issue

02:33:54  6    certainly dividing the parties is whether the equipment is

02:33:56  7    fraudulent.

02:33:57  8          But a greater issue dividing the parties strikes me

02:34:00  9    is, even if it is fraudulent, even if it's -- now everyone

02:34:04  10   inspects it, indisputably agrees it's fraudulent -- I have

02:34:08  11   the sense from reading the papers that the parties disagree

02:34:11  12   over whether they knew it was fraudulent, or who knew it was

02:34:15  13   fraudulent and when.  And as to some of the other claims,

02:34:18  14   what -- the various duties and responsibilities.  So do I

02:34:20  15   agree with you that, in the ordinary course, do you get those

02:34:24  16   documents?  Yes.  But I guess I'm just not sure why, if they

02:34:30  17   produce them and if it says what you think it says, it

02:34:34  18   automatically terminates the case in your favor or

02:34:34  19   automatically provides a simple, clear motion for summary

02:34:34  20   judgement that would end the case if they didn't otherwise

02:34:34  21   see it that way.

02:34:38  22          MR. JOFFE:  Well, one of the things they said back

02:34:40  23   in March 2013 was that HP is currently investigating where

02:34:47  24   the counterfeit equipment came from and who -- who made it

02:34:52  25   counterfeit.  That was in March 2013.  If they were

02:34:56  1    investigating it in March 2013, they should have some report

02:35:00  2    that says, "This equipment came from," whatever data or

02:35:05  3    whatnot.  They will have it.  We don't need to reinvent the

02:35:11  4    bicycle here.

02:35:12  5             THE COURT:  Let's see what they say.

02:35:14  6             MR. JOFFE:  Yes.

02:35:14  7             THE COURT:  So as to the request that discovery

02:35:17  8    should commence while we're getting the equipment, or at

02:35:22  9    least paper discovery should commence, not depositions --

02:35:24 10    that's what I understand Mr. Joffe to be saying.  What about

02:35:27 11    that?

02:35:27 12             MR. JOFFE:  Yes.

02:35:28 13             MR. CALLAGHAN:  Well, Your Honor, we think sort of

02:35:31 14    the counterpoint to what Mr. Joffe suggests.  We think, if

02:35:33 15    the equipment was made available and we both had an

02:35:35 16    opportunity to inspect it, it would narrow the issues

02:35:37 17    substantially, either it's counterfeit or it's not.

02:35:40 18             Now, Mr. Joffe says that we, at some point,

02:35:43 19    attested in writing saying, by Mr. Gill, that it wasn't.  But

02:35:47 20    that didn't happen.  As you'll recall, there was a draft

02:35:50 21    letter being exchanged back and forth.  And in the draft

02:35:53 22    letter, there was surmise, or at least at the time that the

02:35:56 23    letter was being drafted, there was surmise.  And it could

02:35:58 24    have been counterfeit when it left India, therefore, they

02:35:59 25    would have been reasonable in relying that it wasn't

02:36:02  1   counterfeit.  That, upon further reflection and upon further

02:36:06  2   consideration, was amended before it was ultimately signed

02:36:09  3   and committed.  So there was nothing signed to say that the

02:36:12  4   equipment was counterfeit when it left us.  Number one.

02:36:15  5            Number two, if the equipment is counterfeit, that

02:36:19  6   sends us in one direction.  If the equipment is not

02:36:22  7   counterfeit, that sends us in another direction.  If the

02:36:25  8   equipment was counterfeit because of something that was done

02:36:28  9   with the labels, that's not an indication that it was

02:36:29 10   counterfeit.  If the equipment is counterfeit because the

02:36:31 11   software that's written on the transceivers was internally

02:36:38 12   counterfeit, that sends us in another direction.  We just

02:36:42 13   need, for the short time it would take to get the equipment,

02:36:45 14   assuming it can be done --

02:36:45 15            THE COURT:  What -- did anybody, for any HP-related

02:36:49 16   entity -- and was H3C a related entity at the time? --

02:36:54 17   inspect the property back then?

02:36:56 18            MR. GLASS:  We believe H3C had access to the

02:37:00 19   property quite a bit after it was seized.  H3C issued a

02:37:03 20   report to the police, which has been quoted, at some length,

02:37:07 21   in the second amended complaint.  That report is available,

02:37:11 22   and H3 C is not part of this case, for some reason, Your

02:37:15 23   Honor.  H3C, if it were here, could answer that question, or

02:37:19 24   we could represent to the Court what it --

02:37:22 25            THE COURT:  Well, what's the corporate relationship

02:37:24  1    between H3C and your clients?

02:37:26  2        MR. GLASS:  The corporate relationship today, we

02:37:28  3    believe, Your Honor, is HPI, which was recently served,

02:37:30  4    that's one of the split-offs from the HP.  So we have HP,

02:37:34  5    HPI, HPE.  HPE is before you today.  HPI, I'm sure, will be

02:37:39  6    here soon.  I think they have to file an answer or a motion

02:37:42  7    at the end of the month or the beginning of the next.  HPI is

02:37:46  8    a minority shareholder, and H3C.  At the time --

02:37:50  9        THE COURT:  Right now.

02:37:51  10       MR. GLASS:  Right now.  I think in 2010, HP

02:37:57  11   purchased.

02:37:58  12       MR. JOFFE:  3Com.

02:38:00  13       MR. CALLAGHAN:  3Com, which was an entity that was

02:38:04  14   a split of Huawei -- please excuse my pronunciation.  H3C was

02:38:06  15   the Chinese subsidiary of 3Com.  HP acquires 3Com.

02:38:12  16       At the time of the acquisition, it's my

02:38:15  17   understanding, that H3C was a standalone, independent, fully

02:38:21  18   autonomous internal Chinese entity that, in order to do

02:38:25  19   business in China, had to be such.  It had to be distant and

02:38:28  20   separate from outside influence that --

02:38:28  21       THE COURT:  So it was owned in some way by 3C, but

02:38:30  22   had to have some autonomy --

02:38:32  23       MR. CALLAGHAN:  A lot of autonomy, we believe, Your

02:38:34  24   Honor.  And then HP comes in as the parent of 3C and takes

02:38:40  25   over, but you still have this autonomous entity working

02:38:44   1     for --

02:38:44   2              THE COURT:  So they begin, and the equipment was

02:38:46   3     branded -- it was always called H -- so the H has nothing to

02:38:50   4     do with Hewlett-Packard.  The H was there beforehand.

02:38:53   5              MR. CALLAGHAN:  I think it had something to do with

02:38:56   6     Huawei or something.

02:38:56   7              THE COURT:  I see.

02:38:57   8              MR. CALLAGHAN:  So in 2010, middle of 2010, HP

02:39:00   9     takes over, right?  It turns out that at some point after HP

02:39:04  10     took over, there became a regime or regimen whereby it -- the

02:39:10  11     equipment was manufactured by H3C for sale in China.  It had

02:39:12  12     the H3C logo and trademarks, if you would.  But if it was

02:39:20  13     going to be sold overseas, outside of China, it had an HP

02:39:25  14     logo.  So at some point after the -- and this isn't Callaghan

02:39:29  15     testifying, Your Honor, I'm just trying to draw you --

02:39:30  16              THE COURT:  Yeah.  Just to your understanding.

02:39:33  17              MR. CALLAGHAN:  When the equipment was sold for

02:39:34  18     use -- the subject equipment was sold for use in the

02:39:38  19     Commonwealth Games with India, would have been before HP took

02:39:42  20     over H3C.

02:39:43  21              THE COURT:  So I see.  When it was sold out or

02:39:46  22     leased out.  It was HP equipment that was not produced by --

02:39:52  23     probably not produced by H3C, because it was prior to the

02:39:56  24     HP's acquisition of 3C?

02:39:59  25              MR. CALLAGHAN:  Well, we understand it was always

02:40:02  1   understood to be H3C equipment, but the equipment itself

02:40:06  2   would have been manufactured, we believe, before HP took

02:40:09  3   over.

02:40:10  4          THE COURT:  I see.  So it was always H3C equipment,

02:40:10  5   but it was sold outside China.

02:40:12  6          MR. CALLAGHAN:  Right.  It was always our client's

02:40:12  7   understanding that it was H3C equipment.

02:40:16  8          THE COURT:  I see.

02:40:17  9          MR. CALLAGHAN:  And H3C is not here.

02:40:19 10          H3C apparently did have an opportunity to examine

02:40:23 11   the equipment.  HPFS India or HPFS never had direct access to

02:40:29 12   the equipment, never inspected it.  So no party before you

02:40:33 13   has inspected the equipment.

02:40:34 14          THE COURT:  All right.  So what about the general

02:40:36 15   proposal that, in a sense -- in a sense, you've proposed

02:40:42 16   phased discovery, and Mr. Joffe, notwithstanding his cite to

02:40:46 17   the rule, hasn't proposed phase discovery.  He says discovery

02:40:50 18   should just begin and that the production happens in the

02:40:53 19   ordinary course.  And you're saying, no, phase it.  First

02:40:53 20   produce the --

02:40:56 21          So you're saying basically, if we see it and if you

02:40:59 22   look at it and your experts look at it and say it's

02:41:01 23   counterfeit, that's one thing.  And then knowing how is it

02:41:04 24   counterfeit might focus and narrow the case.  Focus and

02:41:07 25   narrow it in what way?

02:41:11  1          MR. CALLAGHAN:  Well, Your Honor, in the normal

02:41:13  2   course, the equipment would be in front of us.  We would all

02:41:13  3   have the chance to do content ratings and go forward with

02:41:19  4   that phase of discovery.  We could do that.  In this

02:41:20  5   instance, the equipment has been sitting in China for at

02:41:22  6   least two years, It appears two and a half years.  It could

02:41:24  7   have been here.  And I understand there are perils that have

02:41:28  8   been expressed here that have to be taken into account.

02:41:31  9          If we could somehow get it here in the next month,

02:41:34 10   which is sort of our goal, and thereafter fairly quickly get

02:41:38 11   an examination on both sides.  We then could agree it's a

02:41:42 12   steam led case, or it's this blanket, universal conspiracy

02:41:45 13   case, based on an assumption that something was counterfeit,

02:41:49 14   may or may not have been counterfeit.  An assumption that if

02:41:52 15   it was counterfeit, the guys on one side of the V versus the

02:41:56 16   other side of the V who made it counterfeit, and therefore,

02:41:58 17   we've got this blanket discovery.

02:41:59 18          We think in terms of focusing in -- and maybe it's

02:42:02 19   wishful thinking, but if we could focus in and somehow narrow

02:42:06 20   the case, as a result of examining the equipment, we think

02:42:09 21   that would be the best in terms of just efficiency and

02:42:11 22   hopefully of the Court's management of the case.  Having said

02:42:14 23   that, if Your Honor determined that the equipment can come on

02:42:19 24   the one hand, and normal discovery go forward on the other,

02:42:22 25   of course we would abide by the Court's instruction.

02:42:25  1          THE COURT:  So I guess my question, that I don't

02:42:27  2     really know the answer to that would be helpful to me is, how

02:42:31  3     long is it going to take to get the equipment?  It doesn't

02:42:34  4     seem like -- putting aside the potential peril that Mr. Joffe

02:42:38  5     raises, I would think you could have the equipment in seven

02:42:41  6     days.  I mean, like when Apple wants to bring over, they --

02:42:44  7     and I recognize you're not chartering a jet to bring these

02:42:48  8     things over, but essentially, I mean, it doesn't sound like

02:42:55  9     it's that big.  I mean, there's planes every day that go from

02:42:58 10     Boston to China.  Where is Mr. Cheng's home located?  How far

02:43:02 11     from Beijing?

02:43:04 12          MR. JOFFE:  About a thousand kilometers.

02:43:06 13          THE COURT:  In a major city?

02:43:08 14          MR. JOFFE:  Or more -- I remember he was traveling

02:43:10 15     three days on a bus from jail to home.

02:43:14 16          MR. CALLAGHAN:  Well, he took it on a bus for a

02:43:16 17     thousand miles, Your Honor.  It's not inconceivable that he

02:43:20 18     could get it to an airport or to a UPS store somewhere close

02:43:22 19     to his home.

02:43:22 20          THE COURT:  Did you know -- do you have any -- like

02:43:23 21     did the police deliver it to him and he brought it home, or

02:43:26 22     did they deliver it to his home?

02:43:30 23          MR. JOFFE:  No, I think the police gave it to

02:43:33 24     him -- I don't want to speculate, Your Honor.  I can find out

02:43:37 25     the logistics of how.

02:43:39  1          THE COURT:  So this is what I suggest.  I would

02:43:42  2    think that you could get this -- putting aside the perils, I

02:43:46  3    don't see why you couldn't have it -- why it's not already

02:43:47  4    here, you couldn't have it in seven days.  I mean, maybe

02:43:50  5    14 days is half the price of seven days, then fine.

02:43:56  6          So I think you should talk to each other and tell

02:43:59  7    me how you're going to get it here.  And either you've worked

02:44:04  8    out an arrangement among yourselves to get it here and you're

02:44:07  9    satisfied and you don't need anything from me, or you need

02:44:10 10    this court order that you want.  I'm happy to issue the court

02:44:13 11    order.  And you tell me.  Give me the proposed form of order,

02:44:15 12    and I'll issue it or tweak it if I think there's something

02:44:18 13    wrong with it, or I'll have a telephone conference to express

02:44:23 14    to you if there's some issue that I have with it.  But I'll

02:44:26 15    turn it around and issue right away if you need that.

02:44:29 16          It will give you a chance to figure out the

02:44:32 17    practicalities of getting it here.  And then -- and I guess

02:44:37 18    the question is, do you want to report back to me on that in

02:44:41 19    seven days or 14 days?

02:44:43 20          MR. CALLAGHAN:  I'd proposed 14 days, Your Honor,

02:44:45 21    only because the logistics internally from our side.  Because

02:44:49 22    we have a bunch of parties that are getting involved.

02:44:52 23          THE COURT:  Fine.  So why don't you report back to

02:44:55 24    me on the joint report in 14 days about getting the property

02:44:57 25    here, and then I'd like to know the answer to that.  Because

02:44:59  1    I do think there's a value in --

02:45:05  2          While I don't agree with you, Mr. Joffe, I agree

02:45:08  3    with the point that you're making.  I don't agree with you

02:45:11  4    that it's agreed that the equipment is counterfeit.  But I do

02:45:14  5    agree with you that if there is an agreement as to it's

02:45:17  6    counterfeit, it could be significant.  You both agree to

02:45:21  7    that.  You actually agree more than you all think you do.

02:45:24  8          So -- and knowing -- to the extent it is

02:45:28  9    counterfeit, how it is counterfeit.  If there is an agreement

02:45:31 10    between you both that it is counterfeit, it's only

02:45:34 11    counterfeit in one way, it's counterfeit in three ways.  You

02:45:37 12    both agree it's counterfeit in one way, but it might also be

02:45:41 13    counterfeit in a second way.  That could be meaningful in

02:45:43 14    helping focus the case, because that also --

02:45:47 15          Because I don't understand the case to be solely

02:45:50 16    whether the equipment is counterfeit, but how it's

02:45:53 17    counterfeit and whether -- I mean, as I understand the

02:45:55 18    claims, you have to prove a lot more than that it's

02:45:58 19    counterfeit.  But on the other hand, how it's counterfeit

02:46:01 20    bears on, for example, whether HPFS India would have --

02:46:05 21    reasonably should have known, or what have you, and what

02:46:08 22    other various things.  So I think it could make a difference

02:46:11 23    in narrowing it.

02:46:12 24          So why don't you report back in two weeks on that,

02:46:14 25    and then I will decide on -- and how to proceed with the

02:46:22   1   schedule.

02:46:22   2           I had one other question.  Let me just look over

02:46:27   3   this while I have you here.  I think, in the meantime, you

02:46:58   4   both can do initial disclosures by November 3rd.  You agree

02:47:02   5   on that, and it's independent of anything else, and we should

02:47:05   6   get started on that.  So for now, initial disclosures by

02:47:08   7   November 3rd.  The two weeks from today would be -- that

02:47:16   8   would be November 3rd.

02:47:18   9           MR. CALLAGHAN:  It would be November 3rd.

02:47:18   10          THE COURT:  So you report back to me on

02:47:20   11  November 3rd, and then I'll see where we are and on the rest

02:47:27   12  of the schedule.

02:47:28   13          I don't have any other questions.  Anything else

02:47:52   14  either of you wanted to address?

02:47:54   15          MR. CALLAGHAN:  Not from us, Your Honor.

02:47:55   16          THE COURT:  Anything else, Mr. Joffe and

02:47:57   17  Mr. Miller?

02:47:58   18          MR. JOFFE:  So we have one date, actually, for two

02:48:00   19  events for initial disclosures and --

02:48:03   20          THE COURT:  Yes.  So initial disclosures on

02:48:05   21  November 3rd and a joint report on November 3rd on how you're

02:48:08   22  getting the property back to the United States and when it

02:48:11   23  will be here.  And my hoped for expectation is you're able to

02:48:17   24  report on November 3rd -- but in a perfect world you'll be

02:48:21   25  able to report on November 3rd, there are no problems, we

02:48:24  1   shipped it and it's already here.  But I recognize it might

02:48:26  2   not be here by November 3rd, and I'm not ordering that it be

02:48:27  3   here by November 3rd.

02:48:28  4          I'm ordering that the two of you talk cooperatively

02:48:32  5   with each other and figure out how you're going to get it

02:48:35  6   here.  My general view is, (a), it's coming here, and it's

02:48:38  7   coming here for discovery so everybody who wants to inspect

02:48:41  8   it can inspect it; (b), in the ordinary course, I would view

02:48:43  9   it as plaintiffs' responsibility to bring it here, that is,

02:48:46 10   ordinarily I would tell you ship it from Omaha, put it on

02:48:51 11   FedEx, or ship it from China.  Put it on FedEx or DHL, or

02:48:51 12   whomever, and get it here.

02:48:53 13          Given what happened to your clients in terms of the

02:48:55 14   sale of it, and given that H3C is not a party here, formally,

02:49:02 15   and that it's not clear that H3C -- they're not just a

02:49:07 16   wholly-owned subsidiary of a defendant here that just jumps

02:49:11 17   when Mr. Callaghan's clients say jump, necessarily, I think

02:49:16 18   it's fair to proceed with some measure of caution, given what

02:49:20 19   happened.  So the two of you should talk about how you're

02:49:22 20   going to get it here.

02:49:23 21          I don't really care who ships it here, it's coming

02:49:26 22   here.  And in the ordinary course, I think plaintiff would

02:49:29 23   pay for it, because it would be your responsibility to get it

02:49:32 24   here.  But the question of how, the mechanics and logistics,

02:49:38 25   it's like -- it's at your client's house, you have to be

02:49:40  1    involved in this process, Mr. Joffe.

02:49:42  2           MR. JOFFE:  We'll be involved.  We're going to

02:49:46  3    physically handle the shipping.

02:49:48  4           THE COURT:  Right.  So you need to figure out, like

02:49:50  5    what is -- what is going to be required to get it out of the

02:49:53  6    country and get it through customs to be here?  Would my

02:49:56  7    court order be enough?  What else do you need?  How are you

02:50:00  8    going to do it?  How long will that take?  Whatever, and

02:50:02  9    you'll tell me.  And then based on that, that -- I'll have

02:50:07 10    that information and then I will -- after you give me that

02:50:10 11    joint report, I will then decide on the rest of the issues.

02:50:17 12           I don't have any other questions about the

02:50:19 13    schedule.  I have one minor request, which is just I know

02:50:23 14    that in New York, the federal -- the Southern District loves

02:50:30 15    letters, is my understanding, never having practiced in the

02:50:34 16    Southern District.  I have my own theories as to why they

02:50:37 17    prefer letters as to motions filed on ECF, but I'll keep that

02:50:43 18    to myself, since it's not germane to this case.

02:50:45 19           But I prefer that you file pleadings.  So in other

02:50:48 20    words, I prefer that you do what everybody -- the way -- so

02:50:51 21    when you file a joint statement, file pleadings of the joint

02:50:54 22    statement, rather than a letter to me.  I prefer that, even

02:50:56 23    though you just docket it, it's fine, and what you both filed

02:51:00 24    here is fine.  You just put it on the docket and I know that.

02:51:04 25    But if you -- it's just the format that we're more used to.

02:51:07  1          And the reason I say that is I generally don't like

02:51:10  2   it when lawyers write me letters about pending cases for a

02:51:14  3   couple of reasons.  If you file it on ECF, it's functionally

02:51:18  4   just a document, anyway.  It's not really a letter to me,

02:51:21  5   it's really just on the docket.  But as a practical matter

02:51:24  6   for you, you -- if you file it as a letter, the ECF system

02:51:29  7   doesn't necessarily get coded the same way, and that coding

02:51:33  8   sometimes, in terms of being picked up, and all the things

02:51:36  9   that get filed on all the different cases, you're better off

02:51:39 10   filing it as a joint statement for the Rule 16 or as a

02:51:42 11   motion.

02:51:43 12          If you mail it as the letter, then the problem that

02:51:45 13   you have, besides the fact that I don't like getting ex parte

02:51:49 14   letters, even if you copied the other side -- I prefer not to

02:51:49 15   get those letters.  I'd rather you file them on the docket,

02:51:52 16   because the first thing I'm going to do with it is docket it

02:51:56 17   on ECF.  But the other reason is you actually do your clients

02:52:00 18   a great disservice, because you slow down the speed at which

02:52:02 19   I will respond to it.

02:52:03 20          Because if you docket it, it happens electronically

02:52:06 21   and I will know about it the next day.  If you mail it, it

02:52:08 22   goes through, first, screening by the marshal service before

02:52:11 23   it comes into the building, and then it's going to go to the

02:52:14 24   clerk's office.  Then somebody in the clerk's office is going

02:52:18 25   to see it's directed to me and has to be delivered to my

02:52:18  1    chambers.  That process is going to take way more time than

02:52:22  2    the electronic process.

02:52:24  3         So you know, I know in the Southern District you do

02:52:28  4    it, and I know you're from New York and that's fine.  And I

02:52:31  5    know in New York they want that.  I know in New York you have

02:52:34  6    to file letters before you file motions for summary judgment.

02:52:37  7    I don't -- to me, that's just an extra step.  I have great

02:52:40  8    respect for my colleagues in New York, and obviously given

02:52:43  9    their docket and their -- the issues they confront, it makes

02:52:47 10    sense for them and that's fine.  But just as a practice here.

02:52:52 11         All right.  Anything else for the plaintiff?

02:52:54 12         MR. JOFFE:  Just to clarify, Your Honor, other than

02:52:57 13    November 3rd date, we don't have any --

02:53:00 14         THE COURT:  No other dates.  Because what's going

02:53:02 15    to happen on November 3rd is you'll file the -- you'll do

02:53:06 16    your initial disclosures to each other.  You'll file the

02:53:09 17    joint statement.  And then in response to that joint

02:53:11 18    statement, I will do two things.  I'll respond to the

02:53:15 19    property question, whatever issues that your joint statement

02:53:18 20    raises for me to respond to, if any.  And I have, under

02:53:21 21    advisement, if you will, the schedule.

02:53:24 22         And the particular issue, I'll tell you, that I'm

02:53:30 23    thinking about, is just whether I just start discovery on

02:53:33 24    November 3rd or 5th, or whatever, or whether I should wait

02:53:37 25    for the property and phase it, as they suggest, and have the

02:53:43  1    discovery phased.

02:53:45  2           I will briefly -- since you're here, I might as

02:53:48  3    well comment for you that I'm much more likely to choose

02:53:52  4    the -- an amended pleading date along the lines of what

02:53:55  5    defendant is suggesting at the conclusion of fact discovery.

02:53:58  6    We've been through multiple iterations of amended complaints.

02:54:02  7    The amended complaints started out as this short, tight,

02:54:05  8    narrow six claims, a few pages, and it is now hundreds of --

02:54:10  9    now it's reduced a little bit, but it's quite lengthy.  And I

02:54:13  10   just -- and we went through a year-and-a-half process, with a

02:54:15  11   lot of back and forth between the parties and the Court.  I

02:54:18  12   just don't see why we -- the need, a date at the end of fact

02:54:23  13   discovery.  And it doesn't preclude the possibility of

02:54:25  14   amendments later, it just means you have to show good cause.

02:54:28  15          So I -- the only, really, reason I could see not

02:54:34  16   saying amended pleadings are due today, or November 3rd,

02:54:38  17   would be because I think you should all get to look at the

02:54:41  18   property.  And really, it's mostly for the defendants,

02:54:43  19   because you've had the ability since the lawsuit was filed,

02:54:46  20   to look at it, if you wish.  But nonetheless, whatever date I

02:54:50  21   set is going to be for both of you, not for one of you.  And

02:54:53  22   so as to this issue, which you dispute -- the two of you

02:54:56  23   disagree on, that's what I'm likely to find.

02:54:59  24          I'll look over the ESI protocol issue a little more

02:55:05  25   carefully, but I understand the issue that divides you, and

02:55:08 1   to some extent, this depends on whether it gets narrowed or

02:55:11 2   not.  But I am -- my general view of discovery is do it once,

02:55:14 3   not twice.  And that ESI is expensive and complicated so, to

02:55:20 4   the extent there's a big-picture issue that influences,

02:55:24 5   like --

02:55:24 6          I'll give you a brief example.  I had another case,

02:55:28 7   where they came to me at the Rule 16 and said, "Judge, we

02:55:28 8   have a big dispute about the scope of discovery, and we'd

02:55:32 9   rather resolve it before we do any discovery, than after,

02:55:36 10  because it determined whether we do 40 custodians or four,

02:55:41 11  and it determines whether we do four search terms for each

02:55:41 12  custodian, or 40 for each custodian."  And so I said fine.

02:55:44 13  So that made a lot of sense.  We briefed that first, I

02:55:47 14  resolved that, and then they did the electronic discovery.

02:55:51 15  Because once you do the electronic discovery, you really only

02:55:55 16  want to do it once, it seems to me.

02:55:57 17         MR. JOFFE:  That approach actually works for us.

02:55:59 18  We're happy.  We don't focus on the equipment so much as

02:56:02 19  defendants do.  Our case is not dependent on --

02:56:03 20         THE COURT:  It's focused more.

02:56:05 21         MR. JOFFE:  More what they knew and what they've --

02:56:08 22         THE COURT:  Yes.

02:56:09 23         MR. JOFFE:  -- said in 2013.  And for that reason,

02:56:11 24  their contemporaneous reports from 2013 is much more

02:56:15 25  important for me to make my case.  I don't need the equipment

02:56:19  1    to make my case.  I will have enough with the inspections and

02:56:22  2    the reports and correspondence.  If they want to have the

02:56:25  3    equipment and they focus and they bring it up as a big issue,

02:56:29  4    I brought the case, my plaintiffs brought the case, it's our

02:56:32  5    case, it's the way we plead and prove it is up to us.

02:56:35  6              THE COURT:  Yes.

02:56:37  7              MR. CALLAGHAN:  Your Honor, we --

02:56:41  8              MR. JOFFE:  The equipment is not a critical issue,

02:56:44  9    so much as the reports from 2013 authored by plaintiffs --

02:56:47 10    defendants, I'm sorry, Your Honor.  It is not nothing, for

02:56:51 11    our case turns until we see their 2013 reports and underlying

02:56:57 12    data.

02:56:57 13              THE COURT:  Let me tell you my view of litigation,

02:57:00 14    Mr. Joffe.  If you have a case about a bank robbery, do you

02:57:04 15    know what I think lawyers should do?  Go to the scene of the

02:57:07 16    robbery.  If you have a case about counterfeit equipment, I

02:57:11 17    think that anybody who wants to look at the equipment in

02:57:14 18    which there's a dispute about being counterfeit, is entitled

02:57:16 19    to look at it.

02:57:17 20              Whether it's critical to your case or not, that's

02:57:20 21    for you to decide, not for me to decide.  Whether you need it

02:57:22 22    or not, that's for you to decide, not me to decide.  But

02:57:26 23    the -- an issue in this case is this equipment and is it

02:57:32 24    counterfeit, and if so, in what way is it counterfeit, and if

02:57:36 25    so, how obvious, or what is the significance, or what have

02:57:39  1   you.  An issue is what did they think about whether it was

02:57:44  2   counterfeit, which to some degree might be separate and apart

02:57:45  3   from whether, in fact, it's counterfeit.

02:57:45  4          But nonetheless, having the equipment -- we're

02:57:47  5   going to get the equipment.  And they're entitled to inspect

02:57:51  6   the equipment.  Whether we should start discovery after

02:57:54  7   November 3rd, before we get it or not, depends in part.  But

02:57:57  8   I expect the equipment to come here.  I expect it to be made

02:58:00  9   available.  And I expect all of you to work expeditiously to

02:58:05  10  get it here, because I think it should be brought here soon.

02:58:06  11  I don't think it should get here at the end of fact

02:58:08  12  discovery.  I think it should get here fast.  I think there's

02:58:11  13  no -- like but for the concern you raise about the peril, I

02:58:15  14  wouldn't understand why you didn't go back to your office

02:58:18  15  today, call DHL, say, "How much money to send somebody over

02:58:24  16  there, right now, get it, ship it back?"

02:58:25  17         MR. JOFFE:  I am -- well, on the same page, I would

02:58:27  18  have done it -- we wouldn't be discussing it here, now if

02:58:32  19  there weren't that little wrinkle.

02:58:34  20         But just on the analogy of the bank robbery, you're

02:58:38  21  right, Your Honor.  If there is a bank robbery, you go and

02:58:41  22  inspect the crime scene, which is what they've done in 2013.

02:58:44  23  We have reports of bank robbery inspections.

02:58:47  24         THE COURT:  So actually, the reason that I --

02:58:47  25         MR. JOFFE:  Let us see those reports.

02:58:50  1          THE COURT:  I'll tell you, if you have a bank

02:58:52  2     robbery at Bank XYZ on 1 Main Street and counsel has been to

02:58:59  3     Bank XYZ on Main Street before the robbery, and then later

02:59:02  4     the indictment is brought and he's the prosecutor or he's the

02:59:06  5     defense attorney, he's been to the bank, okay.  He might have

02:59:09  6     even looked around the bank for another robbery.  Okay?  I

02:59:11  7     would think he'd still want to go back to the bank after he

02:59:15  8     knows what the facts -- he knows there's a claim pending

02:59:19  9     about this robbery.

02:59:20  10          You might not do it that way.  You don't have to do

02:59:22  11    it that way.  I don't really care whether you inspect the

02:59:24  12    property or not.  That's up to you.  Okay?  And it's your

02:59:30  13    decision about whether you look at the property or not.  They

02:59:32  14    want to look at it.  I can't think of any reason why I

02:59:35  15    shouldn't order it to be here.  You haven't advanced any

02:59:38  16    reason why it shouldn't come here.

02:59:40  17          MR. JOFFE:  I don't make an argument.

02:59:42  18          THE COURT:  And you're not making that argument.  I

02:59:42  19    understand.  So it's coming here.  What is the significance

02:59:46  20    beyond that?  We'll see.

02:59:47  21          MR. JOFFE:  Right.

02:59:48  22          THE COURT:  Anything else you wanted to say,

02:59:50  23    Mr. Callaghan?

02:59:51  24          MR. CALLAGHAN:  No.  Thank you very much, Your

02:59:52  25    Honor.

02:59:52  1              THE COURT:  All right.  We're adjourned.  Thank you

02:59:52  2     very much.

02:59:55  3              MR. JOFFE:  Thank you, Your Honor.

       4              MR. CALLAGHAN:  Thank you.

       5              THE COURT:  Thank you.

       6              (Court in recess at 2:59 p.m.)

1 **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4        I, Rachel M. Lopez, Certified Realtime Reporter, in

5 and for the United States District Court for the District of

6 Massachusetts, do hereby certify that pursuant to Section

7 753, Title 28, United States Code, the foregoing pages

8 are a true and correct transcript of the stenographically

9 reported proceedings held in the above-entitled matter and

10 that the transcript page format is in conformance with the

11 regulations of the Judicial Conference of the United States.

12

13                        Dated this 6th day of November, 2017.

14

15

16

17        /s/ RACHEL M. LOPEZ

18

19

20        _____
          Rachel M. Lopez, CRR
21        Official Court Reporter

22

23

24

25