UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————

INTEGRATED COMMUNICATIONS &
TECHNOLOGIES, INC., et al.,

                Plaintiffs,      Civil Action
                                   No. 16-10386-LTS
V.
                                   July 12, 2019

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, et al.       3:12 p.m.

                Defendants.

———————————————————————

TRANSCRIPT OF STATUS CONFERENCE

BEFORE THE HONORABLE LEO T. SOROKIN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
 1      APPEARANCES:

 2      FOR THE PLAINTIFFS:

 3      DIMITRY JOFFE, ESQ.
        Law Office of Dimitry Joffe
 4      230 Park Avenue
        10th Floor
 5      New York, NY 10169
        212-309-8711
 6
        JOSHUA A. McGUIRE, ESQ.
 7      Law Office of Josh McGuire
        51 Winchester St., Suite 205
 8      Newton, MA 02461
        617-461-6400
 9
        FOR THE DEFENDANTS:
10
        ANTHONY P. CALLAGHAN, ESQ.
11      PAUL A. SASO, ESQ.
        Gibbons P.C.
12      One Pennsylvania Plaza
        37th Floor
13      New York, NY 10119
        212-613-2015
14
        G. MARK EDGARTON, ESQ.
15      Choate, Hall & Stewart LLP
        Two International Place
16      100-150 Oliver Street
        Boston, MA 02110
17      617-248-5101

18

19

20

21

22

23

24

25
```

1        P R O C E E D I N G S

2              (The following proceedings were held in open

3    court before the Honorable Leo T. Sorokin, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on July 12, 2019.)

7              THE CLERK:  Case number 16-10386, Integrated

8    Communications & Technologies v. Hewlett Packard.

9              Would counsel please state your name for the record.

10             MR. McGUIRE:  Good afternoon.  Josh McGuire on behalf

11   of plaintiffs.

12             MR. JOFFE:  Good afternoon, your Honor.  Dimitry Joffe

13   on behalf of plaintiffs as well.

14             THE COURT:  Good afternoon.

15             MR. CALLAGHAN:  Good afternoon, your Honor.  Anthony

16   Callaghan and Paul Saso from Gibbons PC on behalf of

17   defendants.

18             THE COURT:  Good afternoon.

19             MR. EDGARTON:  Good afternoon, your Honor.  Mark

20   Edgarton from Choate on behalf of defendants.

21             THE COURT:  What's the matter, Mr. Bunis doesn't work

22   on Fridays in the summer?

23             MR. EDGARTON:  He's golfing.

24             THE COURT:  That's what happens when you work in the

25   private sector, I guess.

1          Okay.  So I read the request for a status report.

2          Let me just summarize what I understand the defendants

3    are asking for, and then I'll -- if I don't have it right, you

4    tell me, I'll hear from the two of you what you think.

5          What I essentially hear them saying, Mr. McGuire and

6    Mr. Joffe, you were late, they don't really ask for a whole lot

7    of relief from your being late, but they say you're late, but

8    you were late where the wale came after the minnow.  The minnow

9    was 2,700 and the wale was 770,000 pages, and the wale came a

03:14 10   couple of days late.  But they don't really complain about that

11   other than to say the July 22nd date for motions to compel

12   might be a little tight for them.  But, really, it sounds like

13   they say tight for them, less so much about the three days.  So

14   I'm not really focused on the timing issue.  Unless I'm

15   misreading their papers, I don't really hear them -- they raise

16   that what it means as the case cascades forward.

17          Really what I hear them saying is the 770,000 pages is

18   to, quote-unquote, data dump, is the word they use, but that

19   it's filled with lots of irrelevant and nonresponsive material

03:14 20   and that you're not entitled to do that.  That, yes, they would

21   concede, I think from reading it, that all of these documents

22   popped up from the search terms that they selected, and when I

23   read the letters you told them you were getting a lot of

24   documents with these search terms.  And they tweaked it a

25   little bit but that didn't make a fundamental difference in

1    terms of the amount of documents that came up.  So they say,

2    Hey, we're buried with a lot of garbage, and it's unfair and

3    unreasonable to force us -- to shift to us the burden to ensure

4    that these are responsive documents.  So, unfair.  They say

5    they want a solution.  They propose this indexing solution as a

6    form of a solution.  They say that would do it for them, or

7    they want some other solution.

8         So I suppose the question is, are they right?  Why

9    aren't they right?  If they're not right, there's nothing to

03:15 10    do; and if they are right, why shouldn't they do what they want

11    or do something -- if I should do something else, what should I

12    do.

13         MR. McGUIRE:  I think that's an accurate summary of

14    the complaints they have that brought us to this point.

15         There's a few corrections I could make to their

16    recitation of the events that led to this point, but I think

17    that if we just start with the fundamental question that's

18    before you at this moment, that's probably the best place to

19    begin.  Are they entitled to have the plaintiffs index the

03:16 20    entire production in the way that they have described and

21    proposed.

22         THE COURT:  So step back a little bit, sort of bring

23    the question back a little more genally, because this is the

24    way I think about it.  I'm not sure -- what I understand the

25    indexing is a method that they propose to remedy what they say

1    is not right, which is, they say, dumping 770,000 pages of

2    which has a lot of nonresponsive documents in it, that's what

3    they say.  So before we get to the question of whether they can

4    do that, the way I see this if you were -- if you were -- if

5    the 770,000 pages you gave them is a reasonable response to the

6    document requests made and is by and large responsive

7    documents, not every single page, I'm sure there's some pages

8    that aren't -- but I don't understand them to be saying that --

9    that then I'm not imposing any remedy and I don't need to think

03:17 10   about whether indexing is right.  On the other hand, if this is

11   like a dump of a lot of stuff and there's thousands of

12   nonresponsive documents, then some sort of remedy is needed,

13   and then the question is what?  Maybe the one they propose,

14   maybe not the one they propose, maybe a different one.  So I'm

15   wondering, first, should there even be a remedy, or -- and

16   then, if so, what do we talk about.

17         MR. McGUIRE:  Okay, I'll start with that question.

18   The term "dump" is a term that I disagree with because it has

19   pejorative connotations that it was done intentionally for the

03:17 20   purposes of obscuring relevant, responsive documents; that was

21   not its purpose.  But it is the case that there are a

22   substantial quantity of nonresponsive documents in the

23   production; we don't disagree with that.

24         The best way to deal with that situation is the

25   question of whether or not that should be their responsibility

1   or the plaintiffs' responsibility to cull out the documents

2   that are not responsive, not germane, and to get to the sort of

3   heart of the fruit of the production.

4          We believe that they are in a much better position to

5   do that for any number of reasons that we can get to in a

6   little bit.  But as to the actual premise as to whether or not

7   there is a large production, there is.  Are those documents

8   responsive --

9          THE COURT:  A large production or a large

03:18 10   production -- a large number of nonresponsive --

11         MR. JOFFE:  A large number of documents that I think

12   we would agree are not responsive to the requests, but they are

13   responsive to the search terms that the defendants selected

14   initially that we didn't push back on initially and then, when

15   it became clear that there are were a large number of hits

16   coming to these documents, we attempted to push back some.

17         There was some further negotiation and refinement of

18   some of those terms, and with respect to some others, the

19   defendants took the position that the term was fine as is and

03:19 20   we should keep it, including such a broad term as "H3C," which

21   I note, sort of ironically, that is one of the ones that they

22   specifically complained about in the motion that brought us

23   here today.  That's a term that we tried to tell them was

24   entirely too broad, given that there were other sources of

25   business lines that included those sorts of machines, and that

1    that was producing a very large volume of hits.  They complain

2    in their papers, Hey, if we try to search "H3C" within this

3    mess, we get a large number of hits.  Of course you do.

4        So all of the documents that have been provided to

5    them were responsive to the search terms that they crafted and

6    we then further negotiated.  The question is how to best narrow

7    beyond the universe of documents that are responsive to those

8    hits.

9        It is, under the circumstances, it was, not practical

03:20 10   for the plaintiffs to review each and every document for

11   responsiveness to their requests before producing it.  I don't

12   think that that's something that we are obligated to do.  I've

13   asked the defendants several times to point me to some source

14   of that obligation; they've not been able to do so.  And the

15   question then is if you have to have some mechanism for

16   reviewing those documents, either page by page or by some

17   further set of search terms, I think it's the defendants who

18   are in the best position to do that, both in terms of their

19   resources and in terms of being able to craft a solution that

03:20 20   targets the documents that they, in fact, truly care about.

21       The page count number that they continue to use in

22   their papers and in hearings is a little bit misleading.  The

23   actual number of documents, not pages, is just under 230,000.

24   I know that they had said something the last time that we were

25   in this room about the math associated with what it would take

1   to review those.  My own back of the envelope says that 20

2   seconds per document, which I think is a long time to do a

3   document review, collection, where you're looking at spam, but

4   even at 20 seconds per document, it would take eight people

5   reviewing full time four weeks.  Four weeks is how long they've

6   had the documents.  If they had hired eight contract attorneys

7   and had them review every document before now, we'd be done.

8        So -- and I'm not suggesting that that's necessarily

9   the best way to do it, because I think that very easily, given

03:21   10   what they have observed about the nature of the production

11   itself and the additional information --

12        THE COURT:  That would be $250,000 at $200 an hour,

13   wouldn't it?

14        MR. JOFFE:  I don't know what the going rate is for a

15   contract attorney, I think it's less than that for doing for

16   document review.  I know that it can be done internationally, I

17   know there are other ways to handle that.  I'm not suggesting

18   that it's not a large amount of money to do it that way, that's

19   why we weren't able to do it.

03:22   20        But there are methods that can be used.  That's the

21   sort of the brute force method.  Also, it would be absolutely

22   feasible given the observations they've made about the nature

23   of the documents, the source, and the information we've given

24   them to cut a few thousand of them out -- actually, tens of

25   thousands of them out just by saying these are documents we

1   don't think are useful.

2         THE COURT:  Let me ask you this.  So they serve

3   document requests.  All of this is produced in response to

4   document requests, right?

5         MR. McGUIRE:  Yes.

6         THE COURT:  They produced -- they serve document

7   requests, you respond lawyer-crafted answers to document

8   requests that shape the scope of what might be produced,

9   they -- one of you initiates a proposal for search terms

03:22 10   because a lot of this stuff is going to be electronically

11   retrieved.

12         MR. McGUIRE:  Correct.

13         THE COURT:  The 2,000 or so documents that are

14   produced prior to this big production I'm inferring are

15   produced by targeted review of a particular person's e-mail or

16   a particular person's folder of documents or the paper file or

17   something, so there might be a paper or electronic

18   correspondence file about this problem, everything in it except

19   for privilege goes over, and it's things like that that are the

03:23 20   2,000 --

21         MR. McGUIRE:  The low-hanging fruit.

22         THE COURT:  The low-hanging fruit.

23         Then everything on all the servers is searched there's

24   a discussion about search terms, those search terms are agreed

25   to, search is getting a lot of hits, some discussion, boom,

1  it's done, and there's 770,000, and it's shipped over.

2       MR. McGUIRE:  And there's one other step in there that

3  I want to bring to the Court's attention, and that is that a

4  bulk of those documents came from backup servers and images of

5  people's hard drives that the client located late in the

6  process of review -- of searching for responsive ESI materials.

7  And by their nature, backup images of old computers and images

8  within images that took a fair amount of time for us to sort of

9  electronically unpack to get access to, required -- I think our

03:24 10  vendor had to go out and buy a different piece of software in

11  order to access it, but, in any event -- but there's a bulk of

12  it that comes from ESI storage hard drives that ordinarily I

13  think we might have said is not the sort of information that we

14  should be expected to search, or we might have deemed to not be

15  reasonably accessible because I think that in the ordinary

16  course you would say the backup images from people's computers

17  dating from years and years ago is not the sort of thing that

18  you would ordinarily search as part of your ESI Protocol.  But

19  given the fact that there was an issue already sort of in play

03:24 20  in this case about the fact that an e-mail migration by the

21  company had caused some of the users' e-mails to not be copied

22  over to the new server, we said --

23       THE COURT:  No longer be available.

24       MR. McGUIRE:  To no longer be available, we said we

25  need to look to every available opportunity to find the ESI,

1    and, who knows, it's possible that some of those e-mails in

2    fact will be recovered as part of looking through these old

3    computer images.  We didn't know because it was unclear looking

4    at the actual names of the images and where they came from what

5    they really represented except for a few of them.  And so a lot

6    of it is the result of sort of, I would say, taking an extra

7    step or two to scrape out as much of the available ESI that we

8    could to try to plug this gap.

9          Now, it is also true that it can be very easily

03:25 10   ascertained and determined which portion of the bulk production

11   is from those sources.  And so one of the things that the

12   defendants could do is they could say at the end of the day we

13   think that those sources are not likely to have responsive

14   documents, in the ordinary course of things they never would

15   have been searched, let's start by looking at the data that was

16   pulled off of the real servers, the current servers, the

17   current e-mail from these various custodians and whatever we

18   get, we see what we're left with.

19         THE COURT:  So in what form is it produced?

03:26 20        MR. McGUIRE:  It's all produced electronically with

21   images with metadata associated with it.

22         THE COURT:  So there was an e-mail that was pulled off

23   somewhere, is that a document within the production?

24         MR. McGUIRE:  Yes.

25         THE COURT:  So each separate -- so there's 220,000

       1  files that are produced, essentially.

       2          MR. McGUIRE:  Electronic files.

       3          THE COURT:  Electronic files.  And each file is a PDF

       4  or --

       5          MR. McGUIRE:  It's a file, it is a .tif image with

       6  associated metadata, associated that it can be loaded in a

       7  review platform and organized and searched accordingly.  All of

       8  the text of the document is searchable.

       9          THE COURT:  So it's all searchable.

03:26 10          MR. McGUIRE:  And all of the senders, to, from, by

      11  date, the whole thing.

      12          THE COURT:  Okay.

      13          Yes.

      14          MR. SASO:  Your Honor, so I think your Honor has asked

      15  at least two questions here, whether or not there is an

      16  obligation for a producing party to review their documents

      17  prior to production, and then, of course, what is the

      18  appropriate way to remedy the situation that we're in.

      19          As to the first question, I think I would point the

03:27 20  Court's attention to the ESI Protocol that the parties

      21  negotiated and agreed to.

      22          First of all, on page 14 where it does read that the

      23  parties may use reasonable search terms to filter for relevancy

      24  prior to review and production.  The understanding, of course,

      25  was always that the parties would use search terms just as a

1   way to locate responsive documents, not as a replacement for

2   review.

3         Likewise, the Massachusetts Practice Series gives a

4   discussion of what's appropriate for parties to do in

5   negotiating an ESI Protocol, how to produce, what kind of

6   format that the parties should produce, and it does state that

7   even where parties reach agreement on the search terms, the

8   producing party still needs to review the documents resulting

9   from the search for responsiveness, and cites at least one

03:28 10   case, this is in the Southern District of California, which

11   makes clear that a party should not conflate a hit on the

12   party's proposed search terms with responsiveness.  The two are

13   not synonymous.  Search terms are an important tool parties may

14   use to identify potentially responsive documents.

15         THE COURT:  So you view it as a two-step process.

16   Step one is you apply the search terms to get a potential

17   universe of documents from which you might draw responsive

18   documents.  The search term hits might not be perfect, so there

19   might be responsive documents that might not be ever be, in

03:28 20   this case in the 770,000, 220 or 230 thousand documents, but

21   those people are satisfied that's just the way the cookie

22   crumbles unless they're in the low-hanging fruit pile which got

23   produced in a different way.  The likelihood of there being a

24   particularly useful and meaningful responsive document outside

25   the scope of search terms everybody lives with unless it comes

up in some other way.  So step one is to do that, and step two
is then some sort of review process.  And there's essentially
two processes that people can undertake, one is a human being
can read all of the documents for responsiveness, or could read
some number of them, or you could apply some -- what are they
called "TAR"?

MR. McGUIRE:  So TAR is, right, technology assisted
review, and that is not a replacement for human review, it is a
way for computers to start learning as humans are reviewing, if
you keep seeing certain types of documents, like the ones that
we've seen, like Groupon ads or discussions of Coke versus
Pepsi.  The computer starts learning that Coke is not relevant
to this case.

THE COURT:  So you might have human review, but
instead of reviewing all 770,000 pages, you could review much
less and you might only have to review 10,000 pages and then
the TAR people would tell you that applying their algorithms
they could tell you which are the responsive documents and you
would only need to -- the value to get 90 percent of the
responsive documents from viewing, say, 10,000 or what have
you, you wouldn't need to review the rest, or the cost of
reviewing the rest wouldn't be worth it.

MR. McGUIRE:  It is a method by which parties review
the production prior to production all the time.  They will use
TAR to do exactly that.

1          THE COURT:  Okay.  So that's what you do when you

2     produce documents.

3          MR. SASO:  Prior to production that is what -- if

4     there is a large volume of documents, prior to production, the

5     producing party can either do a cover-to-cover review of their

6     documents with a human review, or they can use the assistance

7     of technology assisted review and shrink the volume that

8     they're reviewing prior to production.

9          THE COURT:  And you think that step two is what they

03:31 10  should have done, whether they did it by human by human or TAR

11    or any other method.

12         MR. SASO:  That's right.  They certainly could have

13    used TAR and shrunk the 700 -- now we're up to 790,000 pages

14    now, and the computer may have shielded out the Groupon ads and

15    the Coke versus Pepsi documents, and we would not have faced

16    the burden that we are now facing.

17          These are the types of things that parties should at

18    least discuss, and that sort of leads me to what we were

19    discussing here, too, as well, which is that I'm a little bit

03:31 20  surprised to hear opposing counsel talk about the negotiation

21    of the search terms, because we did negotiate the search terms.

22    We initially proposed their search terms and they proposed our

23    search terms.  It was a highly negotiated back and forth.

24    There was no lack of pushing back at the time.  We definitely

25    had a conversation back and forth about what search terms to

1    use.  Of course that was sort of the theoretical, neither side

2    had applied them yet to their ESI to know what number of hits

3    they would receive.

4         Afterwards, we did receive a phone call from

5    plaintiffs' counsel, and they've made some proposals about

6    saying that we need -- it's a very small number of search terms

7    that they asked to revise, maybe a handful or two that they

8    wanted to revise.  And I would think that our willingness to

9    work with them on almost all of those search terms should have

03:32 10   suggested to them that they should have continued to come to us

11   if this was really a three-quarter-of-a-million page problem.

12   They never, ever told us that this is the type of problem we

13   were facing.  They suggested some slight revisions, like moving

14   within ten to within five in their search terms.  And the only

15   search term that we ever said that we think was appropriate

16   where it -- and did not further revise it -- is "H3C," again,

17   the one that plaintiffs' counsel brings up here.  And that's

18   because it's a critical issue.  Our view was that every

19   document that comes up with H3C would show that ICT -- and our

03:33 20   initial review of the first two or three thousand pages show

21   that ICT had H3C equipment in China that it was selling prior

22   to it receiving any of the H3C equipment that it received from

23   HPFS India.

24        THE COURT:  How many documents and pages did you

25   produce?

1           MR. SASO:  We produced approximately 3,000 pages, I

2     believe.

3           THE COURT:  For the total production.

4           MR. SASO:  That's right.  We may -- we recently

5     produced a little bit more, but we may be around 4,000, three

6     to four thousand.

7           And, your Honor, if I may, sort of another example

8     here is the reverse.  We actually had search terms that they

9     had proposed.  One of them was "ITC," which was an expected

03:34 10   misspelling of their company name, ICT.  So we ran that search

11    term, and we found out one of our custodians regularly does

12    business or dealings with applications to the International

13    Trade Commission.  So we were receiving, not spam, but totally

14    nonresponsive documents.  And we thought we shouldn't have to

15    review it.  So we went to the plaintiffs and said, We're

16    getting this back, can you work with us, you know, here's our

17    proposed revision.  We worked it out, and then we did not

18    produce thousands of documents about the International Trade

19    Commission.

03:34 20         And I would say, look -- and I appreciate that

21    cooperation.  It's certainly the cooperation I would have

22    offered if they had told me that this is what we were looking

23    at.

24          But I'll tell you as well that if they had not

25    cooperated and they said, No, I want you to run "ITC" against

all of your ESI, all of your custodians, I would have -- maybe
not me personally, but I would have -- our associates would
have reviewed every hit for "ITC" and they would have screened
out the International --

THE COURT:  I thought your partners never asked your
associates to do what they wouldn't be willing to do.

MR. SASO:  Let me tell you, I have done as many
searches within -- I've been inside the ocean of spam myself, I
will say that.  I have been wading around in the 790,000 pages
trying to find things.  And I want to specifically -- look it,
again, the point of "H3C" where we did not -- it was because we
thought that we would get documents that actually relate to
H3C.  But, as you can see, even when you run "H3C," you get 50
hits, the first 50 hits are from Alibaba.com that have nothing
to do with this case.

If "H3C" returned 5,000 hits or 10,000 hits --

THE COURT:  So what you think they should do is
essentially the TAR review.  In other words, if they had
insisted on "ITC," you would have done one of two things, I
take it.  You either would have come to me and said, Judge,
"ITC" is crazy, we see the theory of misspelling, but it's
crazy because we deal with International Trade Commission, one
of our custodians, and we're getting 100,000 hits in documents
that International Trade Commission has nothing to do with it
and the likelihood that anything relates to this is too low and

1   we can't come up with a solution like "ITC" and not something

2   that might do it, and so don't make us do it.  Or you would

3   have done it, if you weren't able to reach some resolution --

4   or you would have done it, if I said, "no," or if you didn't

5   come to me, you would have done it and then you would have

6   applied some TAR kind of process to try to wipe out all those

7   documents, right?

8              MR. SASO:  Yes.

9              THE COURT:  And so why then, if you are correct that

03:37 10   they should have done something like that, why aren't you

11   saying, Judge, we'll just do that, and you, Judge, should shift

12   the cost?

13              MR. SASO:  Your Honor, that -- we thought that that

14   was actually the more extreme proposal here, that we could --

15   we could do that and shift -- it would be, we believe, hundreds

16   of thousands of dollars, as you already sort of guessed, to do

17   something like that.  But we are certainly open to that as a

18   possibility.  We can do a cover-to-cover review.

19              THE COURT:  But he said cover to cover --

03:37 20              MR. SASO:  Or TAR-assisted review.

21              THE COURT:  I saw a presentation in a conference, I'll

22   just tell you all of you, it's not that I'm some expert on TAR,

23   but there was a presentation for judges at a judicial

24   conference I was at and there were some people talking about

25   TAR, and they were selling it as -- they're pitching it, not to

1    us to buy but as to sort of understand the world, as sort of

2    the greatest thing since sliced bread, and that, you know, you

3    do TAR review and you can save 90 percent of the cover-to-cover

4    human cost, or I forget, but some monumental factor.

5           So if -- now I understand that in my seat of the

6    pants, so to speak, a quarter-million-dollar calculation, the

7    first variable is the rate and the second variable is the

8    hours, and I assume the rate where you are is higher than the

9    rate in Newton where Mr. McGuire is, and -- but, nonetheless --

03:38 10   so, but even accepting that even with the benefits of TAR that

11   it's a pretty -- it's pretty expensive, so you thought this was

12   a cheaper solution.

13          MR. SASO:  It is, and to be honest, we did not believe

14   after our conference on June 10th that the Court was inclined

15   to shift fees here, which is why when we were meeting and

16   conferring, we were looking for other alternatives as well.

17   But we are today certainly open to that as one of -- and many

18   courts do that, right.

19          THE COURT:  Sure.

03:39 20        MR. SASO:  Courts will shift the attorney's fees,

21   courts will sometimes require that the producing party index

22   their production.  There are also courts that have said that if

23   you produce responsive documents in a data dump, that you --

24   there are preclusive sanctions to say that you, as the

25   producing party, are not entitled to use documents that you

1    dumped in half a million pages on the receiving party.  So

2    these are all different options open to the Court, and we are

3    open to any and all of them.

4         After the June 10th conference, we went down the road

5    of proposing --

6         THE COURT:  What did I say in the June 10th conference

7    that particularly shaped you this way?  I've had a lot of

8    conferences since June 10th.

9         MR. SASO:  You know, I think -- maybe I'll defer to

03:40 10   Mr. Callaghan then.

11        MR. CALLAGHAN:  Your Honor, we were unable to obtain a

12   transcript of that particular hearing, we'll get our hands on

13   it, but my recollection is you used the word I'm "disinclined"

14   to go down that road, when I suggested that it would take

15   something like three months of four associates reviewing the

16   documents to try to cull through and I gave calculations on I

17   think on 10 seconds a page, and Mr. McGuire says he would apply

18   20 seconds per document.  I think we had already gone down that

19   road and you indicated a clear inclination, at least on June

03:40 20   10th, to pursue that line of reasoning.

21        THE COURT:  I'd have to look back at the transcript

22   just for the benefit of all of you, but I'm not sure if I was

23   talking about -- I was disinclined to think about a massive

24   extension which is -- I might have been thinking about

25   extension, rather than anything about shifting costs, what have

1  you.

2       MR. CALLAGHAN:  Then the misinterpretation was mine,

3  your Honor.

4       THE COURT:  I'm not saying that that's what I was

5  saying without looking back at a transcript.  But it certainly

6  resonates with me on June 10th when I was talking with you I

7  was not keen about the idea about what that would -- I would

8  have inferred that to be a five- or six-month extension in

9  written discovery before you got to anything else, and nothing

03:41 10  else would happen until you finished that and that seemed to be

11  a pretty substantial delay and I would be disinclined about

12  that.

13       Generally, as a general proposition, A, this is an old

14  case; and B, what underlies this case is the three people being

15  imprisoned, and that seems like a significant issue, and so it

16  shouldn't languish.  No case should languish, but that's

17  particularly important.  So I would like to keep it moving.

18  That's all.

19       So let me tell you just a couple things that I'm

03:42 20  thinking about.  I don't have a firm resolution in my mind.

21       I don't -- one thing I appreciate very much is you're

22  all being very candid, both of you, and I really do mean I

23  appreciate that.  It's really helpful, and it makes both my job

24  a lot easier, which I appreciate, but also, it means that -- it

25  creates less issues when people are candid.  And when people

1    aren't candid, it creates more problems and issues.

2         The issue here, essentially, is who has the burden to

3    review all these documents.  And you're all being very candid

4    about it and what did you and didn't, and you might not totally

5    agree with how much push back there was or wasn't, but you had

6    some discussions, I understand that, I don't think it totally

7    turns on that.

8         So this is what I'm thinking about.  I don't see this

9    as a sanction question, I'm not getting involved, and I know

03:43 10    you're not asking for, like, preclusive effect about documents

11    or anything like that.

12         I think this is a practical question, and I think my

13    general thinking about this is I'd like to solve this problem

14    in a practical way.  I don't -- there's something that rubs

15    me -- it seems not right that you can produce massive amounts

16    of -- knowingly produce massive amounts, large, large, maybe

17    "massive" is unfair, large amounts of nonresponsive documents.

18         I don't say that I think that you are -- that you are

19    trying to bury them and hide the ball.  I'm not saying it in

03:43 20    that way.  You're being very candid and upfront about what

21    happened, and I don't view it that way.  I'm just viewing it

22    that what I think what happened is you said, okay, you want all

23    that, you can have it, but you're going to get a lot of

24    documents and we're not going to spend a lot of money to do a

25    cover-to-cover human review and or to do a technology assisted

1    review and cull it down or we're not going to do something

2    else, not because you were trying to dump it on them as a mess,

3    a mess, that is not even quite right, but not trying to just

4    give them a lot of stuff, but you didn't see a practical way to

5    do it, so it's like, you want all that, you can have it all,

6    but it's your problem.  That's fundamentally what I see.

7           And it doesn't seem to me quite right that you can do

8    that.  I'm not sure that -- I think, essentially, there needs

9    to be -- like there's too much -- it sounds to me like there's

03:44  10    too many nonresponsive documents for you to just -- I

11    understand those are the search terms they wanted, but I think

12    there's some -- you know the system, and there's some

13    obligation on you and your knowledge of the system that in some

14    form along the way of the review to try to limit or

15    eliminate -- not eliminate, you're always going to have

16    nonresponsive documents in an electronic production, but limit

17    that to some reasonable scope.  So that leads me to feel like

18    there's something you have to do to limit it.  It's too much to

19    just turn it over and lay it all on them, that there's some

03:45  20    burden, responsibility, and obligation to match, like, we did

21    the search terms but cull that in some way before you do the

22    production.

23           I'm not sure -- the request they make about the

24    indexing is what you propose, that might be a reasonable

25    method, but there might -- I mean, I will tell you one thing I

thought about when I first read the papers, I haven't thrown it

out there, I'm not -- I'm certainly not ordering it, I'm not --

I probably wouldn't even do it right now if they asked for it.

But it occurred to me was, like, okay, why shouldn't I just let

defendants' technology providers, since you have some third

party, they go into your people's servers and they'll do the

search and produce it.  But then I realized after rereading the

papers and the letters that there's no quarrel about the

electronic search.  The quarrel is about after you have the

03:46 documents, the production.  So I don't see that as a

necessarily viable, practical solution, and in I'll hear from

you in a minute if you want to say something about that, maybe

it is.  But there has to be a better way.  Let me give you an

analogy from the old world when everything was in paper.

I had a case that recently settled that had to do with

a dispute between some providers and an insurance company and

the dispute was about a certain -- some number of claims for

reimbursement submitted by the medical providers to the

insurance company.  In the old world, way back when before

03:47 computers, they would have produced all the claim files.  They

would have gone in and said, Here's all the claim files.  And

if the insurance company had said, Well, the dispute is about

all the claims that you made, you made these claims over ten

years, we're not really sure, we don't have them indexed by

provider, so here's one million claims, okay, we Xeroxed and we

1   put them in a warehouse, go have at it, and your 2,000 claims

2   are in there, we don't know where they're in there, we're not

3   hiding the ball, we don't know where the 2,000 are either.  The

4   only way we're going to be able to find them is we're going to

5   go through them one by one.  And that can't be right, there has

6   to be a better way.  And here there's a little bit of that

7   feeling, not that you're -- I don't say you're intentionally

8   doing it, but it has to with all this technology and with the

9   fact that this isn't all coming from one source, right, it's

03:47 10   coming from multiple custodians, multiple e-mail boxes.  So I'm

11   not sure whether this is something that is -- I guess there's a

12   lot of different remedies to this, but I will be frank with all

13   of you that, you know, I'm -- I have some facility and

14   understanding with computers, but that's probably a dangerous

15   thing for all of you because I've never personally supervised

16   an electronic production of documents as a lawyer because that

17   didn't exist when I practiced law.  And so I understand this

18   from proceedings like this and from conferences, and for me to

19   dive in and, like, land in and say here's four things for you

03:48 20   to do that I make it up, I'm not sure that's a good idea

21   because I might break a lot of China along the way.  I don't

22   know what else there is.  I could adopt their proposal, that's

23   one thing, but you don't want me to do that, I don't think,

24   that's my sense.

25          MR. McGUIRE:  I'm not sure that I fully understand

what their proposal is.  When they say that they want us to
index the entire production, I think what I hear them saying is
that for every document request that they have made that we
should go through the production and identify which Bates
numbers within that production are responsive to that request.
If that's what they're saying, that's far more than they would
ever be entitled to receive as information in our position.

        THE COURT:  And I'm not deciding at the moment whether
I'm going to order what they ask for.

        MR. McGUIRE:  But I want to make sure I understand
what it is that they ask for.  Because I can say that in
response to the problem --

        THE COURT:  I'm going to give you a better chance to
understand what they say for then this courtroom, because the
back and forth in the courtroom is not the best way for them to
explain to you what they want.  It would be --

        MR. McGUIRE:  I understand that.  I just want to make
the Court aware of what we have attempted to this point.

        THE COURT:  Okay.

        MR. McGUIRE:  That includes their Exhibit B, in which
we provided for the requests either where there was a question
about whether or not such documents had even been produced, we
provided Bates numbers illustrating that some of them had; and
for those requests where it was easy for us to describe the
entire Bates range where those documents were, we did so.  So,

1  for example --

2         THE COURT:  Were those illustrative or exclusive

3  answers?

4         MR. McGUIRE:  For many of them, they're illustrative;

5  for some of them, the ones we can do easily, it's exclusive.

6  In other words, where they say where are the social media

7  posts --

8         THE COURT:  Did those answers note when they're

9  exclusive?

03:50 10        MR. McGUIRE:  I think the language was clear in each

11 flavor.

12        THE COURT:  I don't recall seeing anything that seemed

13 to say they were exclusive.

14        MR. McGUIRE:  You don't recall seeing any that were

15 exclusive?

16        THE COURT:  I don't recall that.

17        MR. McGUIRE:  I agree it's few, but there are some.

18        Then we provided them with, for each production that

19 was made, a list of the custodian and source folder as it

03:51 20 existed on the electronic library from which it was culled and

21 how many documents and the Bates range for each of those

22 things.

23        So I don't really understand how that is not an index

24 of the production in that it describes for every given Bates

25 range and every folder where it came from within our source

1    material.

2         Beyond that, it's not clear to me what else we could

3    do or would be obligated to do to help them understand the

4    contours of this production.  And if it's a question of

5    conducting searches within that to find relevant documents, I

6    think one of the things that you can observe is they're at

7    least as able to do that as we are.  They could use TAR, they

8    could modify the search terms themselves.  They've been given

9    the universe of every H3C document that we had that was a hit.

03:52 10   If they wanted to say if we had gone back in time and agreed

11   here's a narrower search term, they can conduct that search

12   right now.

13        We honestly thought, your Honor, that we were, to some

14   degree, doing them a favor by providing them with the full

15   universe of documents responsive to their search terms such

16   that they can conduct whatever searches they want within it.

17        THE COURT:  This is what doesn't feel right.  You have

18   a lawsuit between A and B, and A says, B, from your computers

19   produce every document that relates in the relevant time period

03:52 20   to my business, okay.  It's a business.  And B does the search.

21   And because A's business is called Joe's Auto Body, all right,

22   there is lots and lots of things that are going to come up with

23   reasonable search terms to capture the responsive documents

24   that are unresponsive.  And B has never deleted an e-mail in

25   his life because Google provides unlimited storage, so why

1   would he ever delete an e-mail?  So there's millions of stuff.

2   And you can't -- I don't think B can just turn it over and say

3   we're in the same position, either one of us can do a review

4   for responsiveness, either one has the same technology

5   available.  True, right.  I think B has some obligation to cull

6   the production, even if it's not done intentionally to like

7   obscure where things are.

8          So my sense is here there are too many nonresponsive

9   documents and that something needs to be done.  And the fact

03:53 10   that you've answered about the document requests tells them

11   something but most of them are not exclusive answers, so it

12   doesn't answer whether -- where all of the responsive documents

13   are, it just tells them where there are at least some

14   responsive documents.

15          MR. McGUIRE:  Confirmed that they were produced.

16          THE COURT:  Confirm that you did produce something,

17   and it gives them some start to find responsive documents but

18   nowhere near identifying all of the responsive documents.

19          So it seems like there's some obligation, the contours

03:54 20   of which I'm not sure, and I don't know that in this case I

21   have to define in some legal opinion precisely, but of

22   producing responsive documents.  It's not enough.

23          So I'll just tell you what I'm thinking about.  What

24   I'm thinking about is that the two of you talk to each other,

25   some of it I'd suggest happen now, but you can do it -- I can

give you a short amount of time but you don't have to do it

right now if you don't want to.  A, to the extent you don't

understand or you think there's problems with their proposal,

you can explain it and answer and have a discussion back and

forth, if necessary, and you see whether there's any narrowing.

And then you submit to me, maybe in a week, maybe less than a

week, but no more than a week, I think, a joint statement that

tells me this is what you want, defendants, and this is what

you want them to do, explain what you want me to do, why it is,

why you think that's reasonable and what's involved.  And you

tell me what either -- why you shouldn't have to do that, if

you propose something else, what you propose or nothing need be

done because of what you've already done or what have you.

          And then I'll read it, and then I will do one of two

things:  I'll either do -- any of you baseball fans?  Judge

Young regularly does this, I don't regularly do this, in fact,

I've never done it, but it's possible I would do it here.

Baseball arbitration.  Baseball arbitration, the player and the

club go in before the arbitrators.  Player comes in presumably

higher, teams's in presumably lower.  Arbitrator picks the most

reasonable number, not any other.  So one possible thing is

I'll just look at it, what seems like the most reasonable

proposal, and I'll pick that one.  It could be do nothing

because, given what you've done and given what's involved

nothing more -- the most reasonable proposal is nothing, or it

1    could be what have you.

2         Alternatively, I might do what I ordinary do, which is

3    I look at them, I might pick yours, I might pick yours, and I

4    might fashion my own depending on the circumstances; not

5    promising that I'd do baseball arbitration.  But mostly I'm

6    trying to solve this problem.  In other words, what I'm looking

7    to do here is you have a burden, I think, to produce the

8    responsive documents and not sort of include with it,

9    unintentionally, I'm not finding any -- so far I don't see any,

03:56 10   like, intentional effort to swamp them, but to -- to reasonably

11   produce responsive documents and cull out the others.  It

12   doesn't have to be perfectly, but reasonably so.  And so I'm

13   looking for a reasonable solution to that problem, because when

14   they get the documents, they should be able to start reading

15   the documents and mostly be reading things that seem reasonably

16   responsive to one of their requests.  And so how perfect, I

17   don't expect perfect.

18        MR. JOFFE:  Your Honor, may I just add one

19   consideration in this?

03:57 20        THE COURT:  Sure.

21        MR. JOFFE:  In your effort of crafting a solution,

22   which we're grateful for, but one of the issues that we haven't

23   discussed is the resources of the parties.  It's not just that

24   plaintiffs decided, you know, we're not going to review

25   anything and dump a bunch of nonresponsive documents on

```
 1    defendants, that's not what we did.  As we discussed, we've
 2    collected as much as we could.  And one reason we have so much
 3    compared to, for example, defendants is our obligation was to
 4    look for documents until the present time, whereas they looked,
 5    I think, until the beginning of the lawsuit or even before
 6    that.  So that included several recent years, which includes a
 7    lot of additional documents.  But that's one of the potential
 8    crafting solutions of how to --
 9         THE COURT:  So let me say two things.  One, as a
10    general proposition, if I think a well-heeled party is taking
11    advantage of their wealth to stymie the ability of a less
12    well-heeled party to vindicate their claims, then I will try to
13    do something to be sure that the less well-heeled party will be
14    allowed to have their day in court.  However, so far this
15    dispute doesn't strike me, this narrow dispute before me,
16    doesn't strike me as that, number one.
17         Number two, the solution to that ordinarily -- for
18    example, I had a case recently where a well-heeled party said
19    we would like to see every, every Uber transaction for the last
20    ten years by each of the parties they were suing, and without
21    regard to whether it related to business -- it was a business
22    litigation -- within the scope of the ten-year time period, the
23    case was about a ten-year time period, within the scope of the
24    ten years, but other than that, they wanted every Uber
25    transaction, every text message, every cell phone, the
```

1    record -- there were no recordings -- but they wanted every --

2    the list of every call made, number of calls for ten years.

3    And without any limitation on relevance to, like, business, the

4    claims, anything.  That, in my view, struck me as grossly

5    overreaching.

6            MR. JOFFE:  That's what the defendants have asked to

7    do --

8            THE COURT:  The answer to that, when that happened,

9    was there was a motion by the defendants to say, Judge, that's,

04:00 10   like, unreasonable.  We shouldn't have to -- we move to --

11   like, we're not answering that request -- some of these were

12   third-party subpoenas, they moved to quash the third-party

13   subpoenas.  But they didn't produce all of the documents and

14   then say -- so if the request is too broad, in other words, if

15   it's an onerous request, the answer is to challenge the

16   request, not to challenge after the request the scope of the

17   documents.  I'm not deciding now whether it's too late to

18   challenge the scope or not.

19           In other words, if they asked for every Uber text

04:00 20   message, what have you, it seemed like, in that case, it was

21   unreasonable, then you come to the Court and say, Judge, it's

22   unreasonable, that's too much, that's not proportional to the

23   case, it's not proportional -- at least today in front of me, I

24   don't have a dispute like that.  I have a dispute that there's

25   responsive documents they sought that are reasonable to seek

and obtain, so if -- and the question is there's a lot of
unresponsive documents mixed in, and you're just telling me
that they should have to pay for it because they're rich, which
clearly HP, I would infer, has a lot more money as a general
proposition than your client.  I don't think that's a fair
basis to shift the costs.  I don't think that a well-heeled
party is forced to bear the burden of the litigation brought by
a less well-heeled party.  The well-heeled party's not allowed
to squash the less well-heeled party by onerous requests, but I
don't see this necessarily as that.

Now, if you persuade me that you're reasonable
culling, it's not -- I would say one the other reasons I'm
hesitant is the plaintiff, as we all know, Mr. Joffe, is the
master of his complaint, right, and -- in many ways.  And this
case began, I will remind you, with a very, very broad --
actually, it did not begin, it began with a very focused
complaint brought by counsel for ICT, it then -- pfmmmfph -- I
don't know if the appellate record, if it ever reaches the
Court of Appeals, will memorialize "pfmmmfph" and what that
means in the physical expression that I've given it -- but
that's what happened in the complaint you filed.  And you sued
people who, in my judgment, I warned you under Rule 11 that you
had no basis, I didn't think, suing certain people, and I
specifically warned you that, and I denied the motion to amend
on a technical procedural ground.  I gave you the chance to

amend again, and what you filed again, if I recollect, was
precisely the same thing.  And you disregarded that pretty
clear express warning.  And I bring that up because the
beginning and foundation of this case was sort of overbroad,
and it doesn't -- I take seriously that three of your clients
went to prison, and that's a serious matter, but, you know --
and now -- I narrowed the complaint, I think, to some degree
you still have a lot of claims in there.

So I don't know at the moment as I sit here now
whether their discovery requests are overbroad or not, but it
comes out of a history in this case where you were seeking a
lot, seeking to sue a lot of people on very broad theories,
some of which I've allowed to persist, some of which I didn't.
And so the well-heeled argument, you want to come in and say,
Look, these requests, like this Uber text message I gave you
before in another case, you can make that motion, I'll look at
it, and I'll take it seriously.  But right now we're talking
not about whether requests were overbroad; we're talking about
you produced documents you concede are responsive and within
them are a large -- "large" was the word you used -- large
number of documents not responsive, that's what Mr. McGuire
said.  And the question is who bears the burden of clearing
that.  And if the only basis to shift is that HP is a Fortune
100, Fortune 500, Fortune 10, I don't know, whatever they are,
they're a big company, big publicly traded company, and your

1    client isn't, I don't see that as a basis.  That's no more a

2    basis than if you came in and said, Judge, it's going to cost

3    our client $25,000, $125,000 to hire -- you hired a third-party

4    to do this right, extract the documents.

5         MR. McGUIRE:  Of course we did.

6         THE COURT:  You paid them some amount of money, you

7    don't have to tell me, I assume it's at least 10 or 20 thousand

8    dollars, it easily could have been way more than that.  If you

9    came in to me and said, They're rich, we shouldn't have to pay

04:05 10    for that, to pay for that, I would say, No, you have to pay for

11    your own production.  And you didn't ask for that, I understand

12    that, but this sounds in the same nature.

13        MR. JOFFE:  It's not exactly in the same nature, your

14    Honor, because we negotiated the ESI Protocol and search terms,

15    and we had no conception of how many documents those search

16    terms will produce until after we've collected all the

17    electronic data, loaded it, convert it and run the search

18    terms, and then we ended up with over 200,000 documents on our

19    hands.  And then the question --

04:05 20        THE COURT:  But there are two ways to look at this.

21    One way to look at this is this is a problem to be solved, and

22    I have no doubt, I am certain that it can reasonably be solved,

23    okay, without spending hundreds and hundreds of thousands of

24    dollars, having human beings review what everyone says is large

25    number of irrelevant documents.

```
 1              MR. JOFFE:  My clients don't have hundreds of

 2      thousands of dollars to review those documents, they simply

 3      don't.

 4              THE COURT:  I'm not asking you to.  You're not

 5      listening me, or you're listening but you're not hearing.

 6              What I'm saying is it doesn't require -- obviously, if

 7      you have human beings review every one, it's going to cost

 8      hundreds of thousands of dollars.  What I just said was it can

 9      be solved without doing that, without, without, that means it's

04:06 10      not done, right.

11              MR. JOFFE:  Okay.

12              THE COURT:  Right, yes?

13              MR. JOFFE:  Yes, your Honor.

14              THE COURT:  That's what "without" means.

15              So it's not required to do that.

16              There is a way to solve the problem, okay.  Dumping it

17      all on them doesn't strike me as a solution to the problem.

18              What I'm going to do is, I think it's a problem, I

19      think that it can be practically solved without somebody

04:06 20      spending half a million dollars doing a review to find

21      thousands of documents from Alibaba that are junk e-mails.  So

22      your choice that all of you -- you're going to confer with each

23      other, file by next Friday a joint statement along the lines I

24      described, telling me basically just how do you propose solving

25      the problem.  That's what I want to know.  That's all I'm
```

1    interested in, how do you propose solving the problem and why

2    do you think this is a reasonable solution to the problem.

3    Okay.  You tell me what you want, why it's a reasonable

4    solution.  And you can tell me exactly what your proposal is

5    that you've already proposed, that's fine, I'm not saying it's

6    not reasonable.  Just tell me what it is, why you want it.  And

7    he says he doesn't understand it, maybe he does, maybe he

8    didn't, maybe you've heard about it.  I'm not interested in

9    whether you've talked about it before, I don't care.

04:07 10        Where you said you don't fully understand it,

11   Mr. McGuire, now is your chance to ask them after court, not in

12   front of me, what it is and what you don't understand.  Because

13   when it's done next Friday, I'm going to be hard pressed to

14   believe that you don't understand it, unless you can explain to

15   me very specifically why there's something about it you don't

16   understand.

17        And what I'm interested in is you either both propose

18   a -- you can propose the same proposal, fine, I'll probably do

19   that; you can propose separate ones, you don't have to agree,

04:08 20   that's up to you.  But I just want to know how you reasonably

21   propose solving the problem.

22        And this is not the first time that this ever came up,

23   to deal with a problem like this.  How do you reasonably

24   propose solving it, or if you think you've done enough, then we

25   don't need to do anything because here's what we did.  I'll

1  look at it, and then I'll decide.  Okay?

2        And then there's another issue.  Just timing,

3  scheduling.  So there's no way -- I concede to reality, that

4  July 22nd is not fair as a motion to compel date when there was

5  770,000 pages that might possibly require human review.  Even

6  if you were doing some other review, it would still be pretty

7  tight to do motions to compel on July 22nd.  So I think

8  separate and apart from this, in the same joint report, what

9  the two of you should propose is how do you propose revising

04:09 10  the date.  And I see two solutions, and I leave it to you to

11  figure it out with each other, you can have one proposal or you

12  can have separate, just what do you propose, no more than a

13  paragraph, to explain why you want what you want.  One is we

14  could say July 22nd for all motions to compel other than

15  motions to compel that arise out of the 770,000 pages and

16  issues related to that, and then you can propose some other

17  date for that.  Alternatively, you could say July 22nd for

18  plaintiffs and some other date after the 770,000 for you, or

19  you could say one further date for both of you.  You think

04:09 20  about what makes the most sense and propose whatever you think.

21        MR. SASO:  Your Honor, the only thing that

22  scheduling -- and I understand the proposals for addressing the

23  motion to compel -- the one thing I think you actually opened

24  with was scheduling issues, and I think it's probably

25  worthwhile just to bring to your attention that the problem

1    remains, not so much that the data dump was late, and it was

2    two months after the deadline for production, the plaintiffs

3    still have not completed their document production and have not

4    provided their privilege log.  So -- and although there were

5    deadlines set at the June 10th conference when we were here

6    about a month ago, and so -- I mean, one solution is that

7    those -- a proposal could be that we just aren't required to

8    make a motion to compel about documents we haven't yet received

9    or a privilege log we haven't yet received, or perhaps -- I

04:10 10    don't know if there is something that the Court wants to do

11    today about those deadlines.

12         THE COURT:  So what I don't understand -- I understand

13    this is hard and your client isn't rich, but, like, you're the

14    plaintiff.  And presumably, you want to obtain judgment.  And

15    so this case -- the only solutions that I can foresee are

16    either at some point I just say it's done, and if you didn't

17    produce it, you can't rely on it and you run the risk of an

18    adverse inference if it's not clear that you did all the

19    production you were required to do.  Or I can say all motions

04:11 20    to compel about what there is but any motions to compel that

21    arise out of what you later produce based on what you later

22    produce, they get to do it then.  And -- or some other -- those

23    are the only two solutions I know of.

24         I'm not looking to create preclusive effects and

25    adverse inferences because I much prefer cases to be decided on

1      the evidence and the merits, and that to me is an important

2      consideration and it's the better way to do things.  But

3      just -- your clients -- this case, first of all, has to end at

4      some point because all cases come to end.  But the other is

5      there's some important issues at stake and we need to get it

6      done and move forward, and you can't move forward until all the

7      document production is done.  So I guess the question is when

8      are you going to be done?

9             MR. JOFFE:  Well, your Honor, the additional documents

04:12  10   that we're discussing, with the privilege log, we're reviewing

11     the documents --

12            THE COURT:  So when?  One word, a date, when is the

13     privilege log going to be done?

14            (Discussion off the record.)

15            THE COURT:  I'll tell you what, I'll tell you what,

16     you can tell me in the report next Friday --

17            MR. JOFFE:  Thank you, your Honor.

18            THE COURT:  -- when the privilege log is going to be

19     done, when the document production is going to be done, other

04:12  20   than subject to whatever I order about culling, but, like, what

21     you've produced, all responsive documents, even if it includes

22     nonresponsive.

23            I will tell all of you one of the things in the back

24     of my mind in about this case, I haven't done it because of the

25     way we've been proceeding -- step back.  Ordinarily at a Rule

16 conference, I do not schedule trials.  And the reason I

don't schedule it -- and there's some judges who have a

different view, you should schedule a trial date in every case.

Judge Young's view, you should schedule a trial and you manage

the trial date, and that's the date and you're going on that

date.  I don't do it that way for various reasons, although I

respect -- I think there are a lot of good reasons he does it

his way.  But a lot of judges set trial dates, nonetheless, at

Rule 16s.  I don't do that because I feel like the dates I set

for trial should be real dates.  So my ordinary practice is to

set a date for trial in one of three circumstances:  You tell

me at the end of fact discovery there's no summary judgment

motion, we pick the trial date then.  Two, you're done -- I

rule on summary judgment and I deny the summary judgment

motion, I know there's going to be a trial, I set the trial

date.  Three, in some small number of other cases, either at

the outset the lawyers tell me, Judge, it's a definite trial,

we need a date, let's pick a date 18 months, we know how long

it will take, or there's a case I think that it needs a trial

date to manage against.

       You're not in the other categories, you might be --

you're in the category where I think I should just set a trial

date at some date, not an unreasonable trial date, not November

1st, I'm not going to do something like that.  A date that's

reasonable now looking forward to let you do all the things

1    you'd need to do to prepare your case.  But sometimes people

2    misunderstand the fact that I didn't set a trial date with the

3    idea that it might not ever go to trial.  People who have that

4    understanding are deeply misguided because I move the cases.

5    And as you can see, with the exception sometimes of motions to

6    dismiss, I very much try to resolve things very quickly,

7    because I think parties are entitled to have their cases move

8    quickly.  So I expect this case -- this case is going to go to

9    trial unless they make a winning summary judgment motion or all

04:15 10  of you settle it, but I'm thinking we're going to trial.  And I

11   don't know if they're going to make a motion or not, and I

12   don't know if it will win even if they do.

13        So the reason I bring this up is it's a definite and

14   firm date, is something that imposes a certain discipline on me

15   and on all of you.  And it's something that comes to mind as we

16   sit here struggling to finish paper discovery in the summer of

17   2019 in a case filed in December 2016, so it was really January

18   2017.  Or was it 2015?  2015 in state court and removed.  So

19   it's filed in December 2015.  So a long time ago.  So that's

04:15 20  been in my mind for some time in this case, that I should do

21   that.  And I tell all of you not to -- just tell you how I'm

22   thinking this case has to keep moving and we have to reach a

23   trial of this matter after a fair litigation, after fair

24   opportunity to take the discovery you need and to make the

25   motions you do and with cognizant recognition of the parties'

resources and ability to prepare the case in a reasonable way.
I want you to have the opportunity to do that, and I'm thinking
about that.  But we're going to try the case, and so you need
to think about that.  And you should understand that if I do
set a trial date, I have reserved that time special just for
you, and I don't do what Judge Young does, I respect him for
it, but I don't schedule five cases for the same day.  If I
think it's a two-week trial, I'm going to mark out in my
calendar those two weeks just for you.  So then that means
I'm -- we're going to do that date, unless there's something
extraordinary.

So I'm just -- it needs to keep moving because what do
you say to your clients who are suing that, like, the discovery
deadline was in April and we still haven't done all our
discovery yet?  So that's delaying the case.  I assume they're
asking those questions, and I assume you're regularly meeting
with them and telling them.  And I will tell all of you that
sometimes I require parties to come in because I do think
sometimes it's helpful for parties to hear from the judge, and
I will tell them my views of the case of where it is and
explain everything, because I think the parties are entitled to
transparency, and I do it in criminal cases, too.

So -- and I say that just because, like, all I really
want is you to move the case forward so I can resolve whatever
motions are brought to me on the merits and we either can

1   resolve this case on a dispositive motion, if they make one and

2   it has merit, and you can appeal if I'm wrong, or we resolve

3   it.  If they don't make it or they do make it and it loses,

4   it's a trial and the jury can resolve it.  That's what I'm

5   trying to do it, but you have a part in that.  You've got to

6   keep it moving.  Okay.

7           Have a nice weekend; I'll await the report.

8           THE CLERK:  Court is in recess.  All rise.

9           (Court adjourned at 4:18 p.m.)

10                  - - - - - - - - - - - -

11                      CERTIFICATION

12          I certify that the foregoing is a correct transcript

13   of the record of proceedings in the above-entitled matter to

14   the best of my skill and ability.

15

16

17

18   /s/Debra M. Joyce                July 18, 2019
     Debra M. Joyce, RMR, CRR, FCRR        Date
19   Official Court Reporter

20

21

22

23

24

25