## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,<br><br>    Plaintiffs,<br><br>        v.<br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL,<br><br>    Defendants. | Civil Action No. 1:16-CV-10386 (LTS) |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

August 16, 2019

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

FACTUAL BACKGROUND .................................................................................................... 1

ARGUMENT ............................................................................................................................ 7

I.  Legal standards ............................................................................................................... 7

II.  Defendants' requests for additional discovery should be denied...................................... 8

    1.  ICT's Inspection of the Equipment.......................................................................... 8

    2.  The Non-Corporate Plaintiffs' Medical Histories.................................................... 9

    3.  Dates of Discovery of Causation of Alleged Injuries ........................................... 11

    4.  ICT's Experience with Counterfeit Equipment .................................................... 13

    5.  Jade Cheng's Employment History ...................................................................... 14

    6.  The "Sources" of Plaintiffs' ESI .......................................................................... 14

    7.  ICT's First Communication re: Equipment Quality ............................................. 14

    8.  Litigation Hold Notice ......................................................................................... 15

    9.  Prior Arrests of the Non-Corporate Plaintiffs....................................................... 15

    10.  Plaintiffs' Other Lawsuits .................................................................................... 16

    11.  Third-Party Funding Sources ............................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

Ameristar Jet v. Signal Composites, 244 F. 3d 189 (1st Cir. 2001) ................................................. 7

Benitez v. Lopez, No. 17-cv-3827, 2019 WL 1578167 (E.D.N.Y Mar. 14, 2019) ..................... 17

Conlon v. Rosa, 2004 WL 1627337 (Mass. Land Ct. 2004) ......................................................... 18

Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519 (2009). ..................................................... 7

Gbarabe v. Chevron Corp., 2016 WL 4154849 (N.D. Cal. Aug. 5, 2016) ................................... 18

In re National Prescription Opiate Litig., No. 1:17-MD-2804, 2018 WL 2127807
   (N.D. Oh. May 7, 2018) ............................................................................................................ 18

Kaplan v. SAC Capital Advisors LP, 12-cv-9350, 2015 WL 5730101
   (S.D.N.Y. Sept. 10, 2015) ......................................................................................................... 17

Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holding, Inc., No. 16-538,
   2018 WL 466045 (W.D. Pa. Jan. 18, 2018) .............................................................................. 18

Leader Tech. Inc. v. Facebook, Inc., 719 F. Supp. 2d 373 (D. Del. 2010) ................................... 19

Mackenzie Architects PC v. VLG Real Estate Dev. LLC, 15-cv-1105, 2017 WL 4898743
   (N.D.N.Y. March 3, 2017) ......................................................................................................... 18

Miller U.K Ltd. v. Catterpillar, Inc., 17 F. Supp. 3d 711 (N.D. Ill. 2914) ................................... 19

Mississippi Pub. Employees' Retirement Sys. v. Boston Scientific Corp., 649 F.3d 5
   (1st Cir. 2011) ............................................................................................................................ 20

MLC Intellectual Prop., LLC v. Micron Tech., Inc. Case No. 14-cv-03657-SI
   (N.D. Cal. Jan. 7, 2019). ........................................................................................................... 18

SEC v. Navellier & Assocs., Inc., C.A. No. 17-11633-DJC (D. Mass. Feb. 19, 2019) ................. 7

Space Data Corp. v. Google LLC, No. 16-cv-03260, 2018 WL 3054797
   (N.D. Cal. June 11, 2018) .................................................................................................... 17, 18

United Therapeutics v. Watson Laboratories, 200 F. Supp. 3d 272 (D. Mass. 2016). ................... 7

VHT, Inc. v. Zillow Group, Inc., 15-cv-1096, 2016 WL 7077235
   (W.D. Wash. Sept. 8, 2016) ...................................................................................................... 17

Yousefi v. Delta Elec. Motors, Inc., No. 13-CV-1632, 2015 WL 11217257
   (W.D. Wash. May 11, 2015) ...................................................................................................... 17

**<u>Statutes</u>**

Rule 26(b)(1) of the Federal Rules of Civil Procedure ................................................................. 7

Rule 26(b)(2) of the Federal Rules of Civil Procedure ................................................................. 7

## **FACTUAL BACKGROUND**

Plaintiffs have produced over 56,000 documents in response to Defendants' 96 document requests, including their tax returns, medical histories, employment records, Facebook posts, sales, billing, shipping, accounting and inventory records, Chinese police files, hundreds of spreadsheets (in native format, as required by the ESI Protocol), thousands of pages of call logs, and tens of thousands of internal emails (with full metadata, as required by the ESI Protocol), including thousands of emails with Jade Cheng and others in China going back to 2010.

By contrast, Defendants have produced a total of 569 documents, with the bate range of 1-2884. In addition, Defendants withheld 639 documents as privileged. Therefore, Defendants have identified only 1208 documents as responsive (569 produced and 639 withheld). These numbers by themselves, without more, make it utterly unbelievable that Defendants -- two Fortune 500 companies and their subsidiaries and affiliates spread around the world -- have accounted for all responsive documents and ESI in their possession related to events that span several years and several continents. But there is more.

Of the 569 produced documents, 194 – or 34% of the total production -- are heavily redacted emails. Of the remaining unredacted 375 documents, 141 are external communications with Plaintiffs themselves or their counsel, leaving only 234 internal documents produced by Defendants.

All of the Defendants' production comes from only 4 custodians – mostly from David Gill and Kevan Bartley, with few documents from Tom Harris and JT Silvestri -- all of whom work for Defendant HPFS. Shockingly, none of the other Defendants – HPFS India, HPE or HPI -- produced any documents, notwithstanding the involvement of at least *113* of Defendants' employees in the relevant events: at least 72 of Defendants' employees involved in the

1

counterfeit and imprisonment issues in 2013-14 (including employees of Defendants HPE and HPI), and at least 41 additional employees involved in the original 2011 Equipment sale and the 2013 RMA request (including employees of Defendant HPFS India).

Most glaringly, despite the apparent involvement of 72 of Defendants' personnel just in the issues of the counterfeit nature of the Equipment and Plaintiffs' imprisonment, Defendants' meager production contains virtually ***no*** internal documents or correspondence on these two key issues.[1]

Moreover, a small handful of unredacted internal documents that Defendants did produce on these two issues are explosive, strongly suggesting that the documents that Defendants had failed to produce hide even more damning facts. For example:

1.      In March 2013, Kevan Bartley of HPFS requested samples of the transceivers that had remained in India after ICT had refused to buy them and that were subsequently sold by Defendants to TT Global, who then transported them to Dubai. HPFS requested that TT Global sent samples of the transceivers from Dubai to H3C's auditor Wang You for testing.

In a March 25, 2013 response to a series of emails involving David Gill, Kevin Bartley and Ching Chua of HPFS concerning Wang You's contact information, Liu Rui of H3C wrote: "The mobile no is correct one and I just called him [Wang You] with this number to notify him to be ready to receive the sample."

Accordingly, Defendant HPFS was working directly with Wang You and Liu Rui of H3C in arranging for the inspection of the transceivers held by TT Global. And after inspecting the transceivers seized in China and the sample of the transceivers received from Dubai, Wang You

---

[1]      There are numerous other deficiencies in Defendants' production raised in Plaintiffs' counsel's letter dated July 12, 2019, to which Defendants have not responded and which Plaintiffs intend to raise in their motion to compel.

on behalf of H3C then reported to the PSB on May 23, 2013, that "the transceivers seized are counterfeit H3C," and confirmed it again in another PSB testimony in August 2014.

Liu Rui was more than just a conduit between Defendants and H3C's auditor Wang You arranging for the testing of the transceivers. Ms. Rui (lr@h3c.com) appears in *38* email communications from February 2, 2013 until April 16, 2013 listed on Defendants' privilege log. In particular, she appears in Defendants' email communications on such critical topics as the "arrest of ICT sales representatives," "transceivers," "equipment sold to ICT," "seized equipment," "agreements with ICT and Shinto," "incident involving ICT sales representatives," "product verification," "equipment sent to China," "update to litigation," "letter to Chinese police," "verification report and draft letter," and "draft product sample verification report." (None of the emails themselves or the referenced reports have been produced.)

Other H3C employees were also involved in direct, highly relevant communications with Defendants: for example, zhuchunyu@h3c.com appears in the April 2013 email chains concerning "verification report and letter to the BJ PSB"; chenxiaodong@h3c.com appears in the July 2013 email chains concerning 'investigation of ICT claims" and the "verification report."

2.      At the very same time when H3C, in close coordination with Defendants, was pressing to have Plaintiffs criminally prosecuted in China, Defendants quietly paid TT Global to destroy the rest of the transceivers originally left by ICT in India and then sold by Defendants to TT Global and moved to Dubai. On May 7, 2013, Kevan Bartley wrote to James O'Grady and Ross West of Defendant HPFS regarding the remainder of the equipment sold to TT Global for approximately $200,000, stating that "the origination of the equipment is questionable, and as such, we should not allow TT-G to re-sell what they purchased from us," and suggesting that

3

"we should work with TT-G to ensure that they are not financially impacted by this" "before instructing TT-G to destroy the equipment."

Mr. O'Grady in response agreed that HPFS should fully refund TT Global "due to questionable nature of product" but left the ultimate resolution for Ross West. Although Defendants have produced **no** communications or documents on this highly relevant topic beyond one email chain, they have admitted in their interrogatory responses that the remaining H3C transceivers were indeed destroyed -- while the criminal investigation in China was ongoing.

Significantly, Defendants' decision to instruct TT Global to destroy the remaining transceivers because of their admittedly "questionable" nature and origination came **after** TT Global had sent samples of those transceivers to H3C for inspection at the direction of HPFS. Defendants have not produced any results of their inspections of those transceivers, the "sample verification report" or any other reports referenced on their privilege log, but their actions speak for themselves – Defendants would not have instructed TT Global to destroy $200,000 worth of equipment if it were authentic.[2]

Moreover, Defendants have apparently made TT Global whole for the destroyed equipment on their own initiative, while holding ICT's own RMA request hostage and, through H3C, urging the PSB to have the Individual Plaintiffs criminally prosecuted in China.

---

[2]       As the Defendants' meager production makes clear, H3C and Defendants inspected the seized transceivers in 2013, concluded that they were counterfeit, but improperly withheld the results of their inspections from Plaintiffs since 2013 and until now, despite Plaintiffs' numerous requests for those reports made before this case commenced and despite Plaintiffs' discovery requests for those reports made in the course of litigation. Instead of producing those contemporaneous documents, Defendants claim that their newly retained expert, who on May 6-8, 2019 inspected all 781 transceivers, concluding that all transceivers sold by Defendants to ICT were authentic – which conclusion appears to be completely contrary to the conclusions reached by Defendants themselves and H3C, the trademark holder, in 2013 following contemporaneous inspections and numerous internal discussions, and as H3C reported to the PSB. Plaintiffs intend to show that many of the transceivers admittedly sold by Defendants to ICT in 2011 bear clear indicia of counterfeiting, just like H3C and Defendants themselves concluded in 2013.

3.      At the very same time, in May 2013, Defendants were apparently involved in another "HP counterfeit investigation in China" that concerned an unrelated company, Shenzhen Kingtech Co., Ltd., but involved the very same parties as Plaintiffs' own counterfeit investigation -- HPFS, H3C and TT Global. Even though Defendants have not produced any documents beyond a single 2-page email chain disclosing this investigation, the email suggests that the investigation too involved the allegedly counterfeit H3C equipment that TT Global had purchased from HPFS and was reselling at the time until instructed by Defendants to destroy it.

4.      There are a few more of such emails among less than a dozen communications Defendants produced on the key issues of counterfeiting and criminal investigation, revealing *inter alia* that HP Company (the predecessor of Defendants HPE and HPI) was involved in the matter of the Plaintiffs' arrest as early as February 2013; Defendants' privilege log also shows that Defendant HPE's General Counsel John Schultz and Deputy General Counsel Brian Slattery were frequent participants in the relevant discussions and communications throughout 2013-14, as were Defendant HPFS' top brass including its director, CFO, COO, Chief Counsel and others. Notwithstanding, the vast majority of the responsive documents have been heavily redacted, withheld as privileged, not otherwise produced, or not even searched for by Defendants.

In sum, Defendants have committed serious discovery misconduct: 3 out of 5 Defendants, and 109 out of at least 113 employees involved, did not produce any documents at all, while all Defendants withheld or concealed highly relevant documents on the key issues of the case.[3]

---

[3]      Furthermore, the relatively few documents that Defendants did produce were produced in a manner to make Plaintiffs' review of those documents unnecessary difficult, unduly burdensome and contrary to the ESI Protocol and the duty to cooperate in discovery. Thus, included in the 2884 page count of Defendants' total production are 931 single-page images of various excel spreadsheets, which comprised Defendants' very first production bates-numbered 1-932, without the native-format files required by the ESI Protocol for excel spreadsheets ("Excel and other spreadsheets will be produced in native format"). To make Plaintiffs' review of Defendants' production even more difficult, Defendants have also apparently tampered with the metadata of the emails they had produced by deleting the "date" and "time" fields from the metadata even though the ESI Protocol requires that electronic mail "shall be produced with the following metadata fields:

Seeking to distract Plaintiffs and the Court from these glaring deficiencies and failures in their own dismal production, Defendants have proceeded to manufacture disputes about side issues that bear little relevance to the merits of the case, and to bombard Plaintiffs with endless harassing demands for additional discovery that is way out of proportion to the needs of the case, and only designed to burden Plaintiffs with additional wasteful expense and aggravation. Among many such requests, Defendants claim that they are entitled to obtain documents such as:

(a) prior arrests of all Plaintiffs, including Family Plaintiffs, to test whether any such prior arrests "***inured them to the conditions of their detention***";

(b) any lawsuits ever filed by or against any of the Plaintiffs to test "whether plaintiffs have ever taken conflicting legal or factual positions";

(c) medical histories of all Plaintiffs going back to ***1990*** – 23 years before the relevant events, when Plaintiff Jade Cheng was 9 years old, Plaintiff Jason Yuyi, 4, Plaintiff Marafao Cheng, 2, and Plaintiff Cathy Yu was a newborn – including all the medicines taken since then, as well as the names of the Chinese dentists who had extracted the Family Plaintiffs' teeth;

(d) Plaintiffs Jade Cheng's and Caroline Marafao Cheng's green card applications;

(e) identification of the precise locations where "each folder [containing ESI] was found on Styller's personal laptop, work computer, removable USB drive, etc.";

(f) litigation financing, and many other such matters that are side issues at best, and more often impermissible "fishing expeditions" aimed to harass and oppress Plaintiffs.

Defendants' tactics are designed to deflect attention away from their own deliberate misconduct -- their utter failure to make adequate discovery, and their continuous withholding of the crucial documents in this serious matter -- and to turn discovery into a war of attrition in which Defendants, as the infinitely better-heeled parties, have an almost insuperable advantage in exhausting Plaintiffs' resources. Defendants' motion to compel is an example of that approach, and should be denied as such.

---

to, from, cc/bcc, *sent date and time*, *received date and time*, subject, and (attachments)."

## ARGUMENT

### I.     Legal Standards

Rule 26(b)(1) of the Federal Rules of Civil Procedure limits discovery to information that is "relevant to any party's claim or defense and proportional to the needs of the case," taking into account such factors as "the importance of the issues at stake," "the parties' resources," "the importance of the discovery is resolving the issues," and "whether the burden or expense of the proposed discovery outweighs its likely benefit." "This definition of relevance reflects amendments made in December 2015 that were intended to '[r]estor[e] proportionality as an express component of the scope of discovery,' thereby preventing over-discovery and the use of discovery 'for delay or oppression.'" United Therapeutics v. Watson Laboratories, 200 F. Supp. 3d 272, 277 (D. Mass. 2016).

Rule 26(b)(2)(C)(iii) "allows the court *sua sponte* 'to limit the frequency or extent of discovery otherwise allowed . . . if it determines that the proposed discovery is outside the scope permitted by Rule 26(b)(1).' Green v. Cosby, Case No. 3:14-CV-30211-MGM, 2017 WL 1377593, at *2 (D. Mass. Apr. 11, 2017)." SEC v. Navellier & Assocs., Inc., C.A. No. 17-11633-DJC (D. Mass. Feb. 19, 2019).

"Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through bank books and records for evidence of some unknown wrongdoing." Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 531 (2009). See also Ameristar Jet v. Signal Composites, 244 F. 3d 189, 193 (1st Cir. 2001) ("We will not allow [defendant] to go on a 'fishing expedition,' with the mere 'hope' that it will obtain [relevant] information. . . . [A] party may not 'undertake wholly exploratory operations in the vague hope that something helpful will turn up.'").

As shown below, Defendants' motion should be denied because Plaintiffs have provided adequate discovery in response to Defendants' requests and/or validly objected to them as irrelevant and disproportionate "fishing expeditions."

**II.     Defendants' requests for additional discovery should be denied.**

1.   ICT's Inspection of the Equipment

ICT stated in its amended response to this interrogatory that when the Equipment arrived in China, "its agents reconciled the received parts with the ordered parts based on the purchase order. The purchase order identified the Equipment by part numbers (for example, the purchase order identified 2200 SFP transceivers by their part number H3C-0231A536), without identifying the individual transceivers or other components by their serial numbers. ICT conducted a visual inspection of the Equipment ***verifying that all parts listed in the purchase order were received***, but that the quality of the Equipment was poor and not as anticipated." Dkt. 208-10.

Plaintiffs also produced (a) the purchase order itself, which lists the part numbers and the quantities of the transceivers and other types of Equipment that ICT verified as received in China; (b) the records of ICT's sales of that Equipment in China, including the transceivers; and (c) numerous emails referencing the poor quality of the Equipment.

Defendants also claim that "despite previously stating that ICT personnel or agents inventoried the Equipment on taking delivery, ICT now declines to share the record results of any such inventory." This claim is false: ICT had never stated that it had "inventoried" the Equipment on taking delivery; in any event, ICT's answer to the interrogatory clearly states that ICT had "verif[ied] that all parts listed on the purchase order were received."

### 2.   The Non-Corporate Plaintiffs' Medical Histories

Each of the Non-Corporate Plaintiffs objected to the overbreadth and irrelevance of Defendants' interrogatories concerning their medical histories from 1990 – 23 years prior to the events at issue. Subject to their objections, the US-based Plaintiffs Alex Styller, Jade Cheng and Caroline Marafao Cheng answered the interrogatories, produced their medical history files, identified their treating physicians, provided their health insurance information; and produced the executed HIPAA forms related to their healthcare providers in response to Defendants' requests.

The China-based Plaintiffs Cathy Yu, Jason Yuyi and the Family Plaintiffs answered these interrogatories, produced their medical histories to the extent such were in their possession, and identified their health providers generally by the names of the hospitals they had received corresponding treatments rather than by the name of the physician (China-based Plaintiffs did not have primary physicians and went to state hospitals for treatment, where they were assigned to physicians based on the treatment required).

For example, Plaintiff Changhua Ni responded to the interrogatory as follows: "plaintiff states that she was treated in June 1998 for gastritis at Xuefang Hospital; in January 2003 for fractured leg at Wendgeng Orthopedic Hospital, for tooth extraction in August 2014 at Yangjun Hospital, and in April 2019 for teeth replacement at Yantai Shunda Hospital. Plaintiff has no psychological history except for the emotional distress caused by her son's imprisonment." Declaration of Dimitry Joffe dated August 16, 2019 ("Joffe Decl."), Exh. A. Other Family Plaintiffs provided similarly worded responses.

Notwithstanding these responses, Defendants demand to see all medical histories going back to 1990 – in the case where Plaintiffs only claim the injuries they had suffered during their long imprisonment and the PSB criminal investigation since 2012, and the resulting emotional

distress they and the Family Plaintiffs had suffered because of it. This is not a medical malpractice or a product liability matter where such 30-year-old medical history could have some conceivable relevance. Plaintiffs have repeatedly objected to the overbroad nature of Defendants' requests, and produced their documents subject to those objections.

Moreover, many of Defendants' specific complaints about Plaintiffs' responses are demonstrably false. *First*, Defendants claim that "[e]xcept for Changhua Ni, none of the Non-Corporate Plaintiffs provided any medical history prior to 2013 (the date of the Individual Plaintiffs' detention), despite the Request for complete medical history 'from 1990 to the present.'" This is false: Plaintiff Styller states in his response that "that he routinely consults his primary physician Dr. Alexeyenko as described in Styller's produced medical records. Styller also has consulted with dermatologist Dr. Allan Rockoff, 28 Andover Street, Andover MA, (978) 475-9230, and gastroenterologists Dr. Manish Tandon, 11 Nevins Street, Brighton MA 02135, (617) 562-0500, Dr. Yajnik Vijay, 55 Fruit St, Boston, MA 02114, (617) 724-6005, and Dr. Joshua Henry Namias, 55 Highland Avenue, 55 Highland Hall, Suite 101, Salem, MA  01970, (978) 741-4171." Dkt. 208-7. And Plaintiff Styller produced his medical records which reference his visits to Dr. Rockoff in 2006 and Dr. Tandon in 2009.

*Second*, Defendants' claim that "except for Jade Cheng, none of the Non-Corporate Plaintiffs identified any medications as 'treatment[s] or therapies' that they have received since 1990" is also false: Plaintiff Styller stated in his original and amended responses to the interrogatory that "in January of 2013, he began seeing Dr. Alexandre Alexeyenko for depression-like symptoms, including apathy and sleep disorder. The doctor diagnosed Styller with anxiety and prescribed the medication Wellbutrin." Dkt. 208-7.

*Third*, Defendants' quibbles with the wording of Plaintiffs' responses regarding their psychological histories have no substance, and their complaint that the China-based Plaintiffs had not identified their dentists by name as their healthcare providers is the very type of the side-issue that Defendants prefer to focus on.

*Finally*, with respect to document requests 38-47 concerning their damages, Plaintiffs have objected to many of Defendants' requests and produced documents responsive to the non-objected-to requests. Dkt. 208-14.

### 3.   Dates of Discovery of Causation of Alleged Injuries

Defendants' claim that "none of the Non-Corporate Plaintiffs provided the dates that they discovered their symptom and/or injury was caused by the allegations set forth in the Complaint, nor the facts that led to that discovery," is false as well. For example, Plaintiff Jason Yuyi states that "he suffered pain in his back and legs, for which he attended the Yan Tai Yu Huang Ding Hospital on August 7, 2015. In prison, the plaintiff also suffered from beriberi. The plaintiff also suffered weight loss, sleep deprivation, heartache, *shenjingbing* (neuropathy), stress, and fear. The plaintiff also feels anxious and depressed. The plaintiff still has joint pains in his feet, back, and knees. The plaintiff still suffers from respiratory problems, caused by the dirty air in the detention center." Joffe Decl. Exh. B.

Plaintiff Alex Styller states that he had sought and received treatment for his anxiety symptoms in January of 2013. Other Non-Corporate Plaintiffs described their emotional distress, and their answers make clear that their distress was continuously caused by the imprisonment and the criminal investigation. For example, Plaintiff Jade Cheng states (Dkt. 208-8):

> The plaintiff states that he suffered pain in his back and legs, for which he took over-the-counter medications after his release.  The plaintiff also suffered

weight loss, lack of sleep, nightmares, heartache, and inability to focus, both during his detention and after his release from prison. The plaintiff also suffered from beriberi while in prison. The plaintiff still suffers from joint pain in the knees, feet, and back. The plaintiff has respiratory problems, caused by the dirty air of the detention center. The plaintiff has been losing hair and teeth.

The plaintiff feels anxious and depressed. The plaintiff also suffers from *shenjingbing* (neuropathy). The plaintiff feels afraid when he hears people talking or laughing behind him, feels uncomfortable when people asked about children, feels afraid when hearing police sirens, and feels nervous whenever he goes multiple days without hearing children's voices. The plaintiff feels afraid to go out and interact with people and would rather hide at home. He has difficulty enjoying life and feels a sense of hopelessness. He no longer has any interest in having children, making money, making food and eating, celebrating holidays, and visiting relatives and friends. He is afraid to listen to calls, has suffered from decreased libido, and feels cold and unfamiliar with people. He has lost interest in making plans for the future, including in regards to his career and family.

In response to a related interrogatory, Plaintiff Jade Cheng further states that "he had a skin cyst surgery in China in 2013 after he was released from prison at Weihai Haida Hospital. At that time, he was also diagnosed with a kidney stone but Plaintiff did not remove it because it was small. Plaintiff never had kidney stones before and believes it may have been caused by the unclean water and the lack of movement during his imprisonment." Dkr. 208-8.

Jade Cheng's father Pushun Cheng described his injuries as follows: "he suffered weight loss of 26 pounds, sleep deprivation, heartache, *shenjingbing* (neuropathy), stress, and fear. The plaintiff also felt anxious and depressed." Joffe Decl. Exh. C. In response to a related interrogatory, Plaintiff Pushun Cheng further states that "he suffered severe emotional and mental distress because his son was wrongfully imprisoned for seven months. He did not know what his son was suffering in prison, and he did not know when, or if, he would be released. He was also humiliated and embarrassed when he had to tell people that his son was in prison." Other Individual Plaintiffs and Family Plaintiffs provided similar answers to Defendants'

interrogatories, and their answers make crystal clear that they had suffered their injuries solely by reason of, and during, the incarceration and criminal investigation.

### 4.   ICT's Experience With Counterfeit Equipment

ICT has been in the computer recycling business for over 25 years and traded in, among other places, China, where counterfeiting is a known problem. ICT's correspondence produced to Defendants contains instances in which ICT's employees suspected that its potential suppliers might be offering fake equipment, or would assure its potential customers that the equipment ICT was selling was authentic. For example:

- "I see a red flag when looking at the label….says 'MADEIN CHINA.' Questions: 1. Is there known to be a lot of counterfeit H3C product around? 2. How can we be sure of the authenticity of this? . . .  they list 'MADEIN', rather than 'MADE IN'. Appears to be fake label to me, so probably fake product."

- In response to an inquiry "One guy from SZ want to buy [transceivers], his price is RMB50" -- "These are original H3C transceivers. We are looking for 600RMB+. 50 is for fake."

- "I assume we are not buying any transceivers from china, correct? \I distinctly remember having this disscussion with ryan. I don't understand why they keep offering, unless something has changed in our 'we don't buy fake' policy?" – "Nothing changed. We don't buy fake."

- In response to "H3C brand host, hard drives and optical modules security bulletin V1.1 - Service Announcements" -- "I will check availability H3C transceivers in stock and the ability to check the counterfeit request on the software side."

Plaintiffs have produced these and similar communications to Defendants; Plaintiffs have also disclosed one instance where ICT was alleged to have sold computers with unlicensed Microsoft software installed.

5. Jade Cheng's Employment History

Plaintiff Jade Cheng answered the interrogatory by providing his detailed employment history from 2004 until March 2014, and stated that he had had no full-time employment since March 2014. Dkt. 208-8. Plaintiff Cheng also produced his US tax returns for 2016-2018, showing his income during those years as a self-employed consultant.

6. The "Sources" of Plaintiffs' ESI

Plaintiffs have described the sources of their ESI in the response to the interrogatory itself, and have produced an excel spreadsheet listing 977 folders from which it was produced. Defendants nevertheless demand that "[f]or example, ICT should identify whether each folder was found on Styller's personal laptop, work computer, removable USB drive, etc." This request is wholly irrelevant to the parties' claims and defenses, and is interposed solely to put Plaintiffs to additional burden and expense.

7. ICT's First Communication re: Equipment Quality

ICT responded to the interrogatory by stating that it "communicated with Defendants on multiple occasions in 2012 concerning the substandard condition of the equipment that had arrived in China" in February 19-20, 2013. ICT had not been able to determine the first date of such communications (because Mr. Pekar, who had handled these communications at the time, left ICT in 2013). However, in light of the already produced documents confirming that the quality of the Equipment was not as expected, the "first date" when ICT alerted Defendants to the equipment's quality is at best a side issue.

Indeed, produced documents show that HPFS had arranged for a joint inspection of the remaining equipment in India in October 2012 by Mr. Pekar of ICT and Tom Harris of HPFS, following which Mr. Harris himself confirmed that the security of storage site and material

14

control were "very questionable," and complained about the equipment's conditions: "customer information left on the units, equipment not cleaned/very very dusty, and not packaged in a manner that he may need to make the sale" – mirroring Plaintiffs' description of the Equipment's poor quality upon its arrival in China.

### 8. Litigation Hold Notice

Plaintiffs have not been able to find a written litigation hold notice and so advised Defendants during the June 17, 2019 meet and confer call. It appears that no such written notice had been issued; nevertheless, the undersigned counsel confirms that he had explained to Plaintiffs the discovery process and advised them of the duty to preserve documents and ESI. Indeed, Plaintiffs have preserved and produced thousands of emails documenting their sales efforts in China virtually on a daily basis, including emails to and from Jade Cheng, Ryan Quinn and Alexander Pekar dating back to 2010.

As the documents produced by Plaintiffs demonstrate, after the Individual Plaintiffs were arrested in December 2012, ICT disconnected their corporate email accounts. In 2014, the email accounts of ICT's then-current employees (and Jade Cheng's post-arrest email account) were transferred to the Office365 cloud during ICT's email migration project. Mr. Styller, however, had preserved all emails for the relevant period in which he was a recipient, a sender, or cc-ed or bcc-ed. As President and CEO of ICT since its inception, Mr. Styller had maintained almost daily communications with his sales team in China, and preserved and produced thousands of emails with Ryan Quinn, Alexander Pekar, Jade Cheng, Jason Yuyi, Cathy Yu, and others, documenting in detail their sales activities in China both before and after the 2011 purchase of the H3C Equipment, and the Individual Plaintiffs' 2012 arrest and its aftermath.

### 9. Prior Arrests of the Non-Corporate Plaintiffs

Defendants requested that Plaintiffs produce all documents concerning "any prior arrest of Alexander Styller, the Individual Plaintiffs, or the Family Plaintiffs." Defendants argue that "they are entitled to probe whether any of them had prior criminal records (whether related to the sale of counterfeit equipment or not) to, among other things, determine whether that past record prolonged their detention and/or informed the Chinese police's investigation, or ***inured them to the conditions of their detention***."

Defendants' request is made for the improper purposes of harassment and oppression, and their argument that they are "entitled" to this information is without merit. The Individual Plaintiffs have produced to Defendants their "no crime" letters from the PSB attesting that the Individual Plaintiffs had no criminal record during their residencies in China, while none of the other Plaintiffs were detained or investigated, as Defendants know full well. And Defendants' contention that the Individual Plaintiffs could have been somehow "inured" to the torture-like conditions of their detention is offensive and outrageous, adding more insults to the injuries Defendants had caused.

### 10. Plaintiffs' Other Lawsuits

Plaintiffs have objected to this request as wholly irrelevant. Defendants claim that this information is relevant to whether: "(a) plaintiffs have ever previously received or sold counterfeit equipment, and/or (b) the Non-Corporate Plaintiffs have claimed damages for physical, medical or psychological injuries in another action. . . . Defendants would also be permitted to discover whether plaintiffs, particularly ICT, have ever taken conflicting legal or factual positions concerning, among other things, their experience in dealing with or detecting counterfeit equipment, revenues and profits, and/or the need to obtain permits and licenses to conduct business in mainland China."

This is the type of a harassing and wasteful "fishing expedition" that is based on nothing but rank speculation (and not even that), has no relevance and is out of proportion to the needs of the case.

11.  <u>Third-Party Funding Sources</u>

Litigation financing is irrelevant to the merits of the case, and federal courts are increasingly refusing to permit discovery into this "side issue at best." <u>Space Data Corp. v. Google LLC</u>, No. 16-cv-03260, 2018 WL 3054797, at *1 (N.D. Cal. June 11, 2018). Recent district court decisions explain that the existence and terms of a litigation financing agreement are not discoverable because they are generally irrelevant to the litigation and/or protected by the attorney work product privilege.

For example, in <u>Benitez v. Lopez</u>, No. 17-cv-3827, 2019 WL 1578167 (E.D.N.Y Mar. 14, 2019), the Court denied the defendants' motion for discovery relating to the plaintiff's litigation financing, discussing at length why plaintiff's financial arrangements are generally irrelevant, and stating that "[m]any such considerations are privileged; and if they are not, they are irrelevant and outside the scope of what a party needs to defend or prosecute its case." See also <u>Yousefi v. Delta Elec. Motors, Inc.</u>, No. 13-CV-1632, 2015 WL 11217257, at *2 (W.D. Wash. May 11, 2015) ("Whether plaintiff is funding this litigation through savings, insurance proceeds, a kickstarter campaign, or contributions from the union is not relevant to any claim or defense at issue."); <u>VHT, Inc. v. Zillow Group, Inc.</u>, 15-cv-1096, 2016 WL 7077235, at *1 (W.D. Wash. Sept. 8, 2016) (denying discovery into the plaintiff's litigation financing where it would be "minimally important in resolving the issues, and unduly burdensome."); <u>Kaplan v. SAC Capital Advisors LP</u>, 12-cv-9350, 2015 WL 5730101, at *5 (S.D.N.Y. Sept. 10, 2015) (denying the defendants' motion to compel discovery of litigation financing because the

documents were not relevant to any party's claim or defense and the defendants' stated

justifications for the discovery were merely speculative); Mackenzie Architects PC v. VLG

Real Estate Dev. LLC, 15-cv-1105, 2017 WL 4898743, at *3 (N.D.N.Y. March 3, 2017)

(refusing to allow discovery of the plaintiff's litigation funding contracts stating that the court

would "not allow this already contentious case to now travel down an unfruitful path in pursuit

of 'litigation motivation'"); Space Data Corp. v. Google LLC, No. 16-cv-03260, 2018 WL

3054797, at *1 (N.D. Cal. June 11, 2018) (the existence of litigation funding "is a side issue at

best"); In re National Prescription Opiate Litig., No. 1:17-MD-2804, 2018 WL 2127807 (N.D.

Oh. May 7, 2018) (refusing to permit discovery of litigation financing "absent extraordinary

circumstances"); Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holding, Inc., No.

16-538, 2018 WL 466045,  (W.D. Pa. Jan. 18, 2018) (work product protection applicable to

the plaintiff's communications with funders and to the agreement itself, even if the

relationship at issue was "commercial," because the funders were "Plaintiff's agents" and the

communications were made in anticipation of litigation).

Defendants rely on Gbarabe v. Chevron Corp., 2016 WL 4154849 (N.D. Cal. Aug. 5,

2016) in support of their request for litigation financing discovery. In Chevron, the Court

considered funding relevant to the issue of lead counsel's financial ability to represent a class

because "the resources that counsel will commit to representing the class" was a relevant factor

under Rule 23(g)(1)(A)(iv). Id. at *2. Indeed, the same Judge Illstone who decided Chevron has

more recently denied discovery of third-party funding in the non-class action case of MLC

Intellectual Prop., LLC v. Micron Tech., Inc. Case No. 14-cv-03657-SI (N.D. Cal. Jan. 7, 2019).

Defendants also rely on Conlon v. Rosa, 2004 WL 1627337 (Mass. Land Ct. 2004),

which was a 2004 state court action against a zoning board. The plaintiff's tenant in that case

funded the zoning challenge to prevent the tenant's business competitor from opening a store nearby. The court ordered production of the funding agreement in redacted form, the plaintiff's lease with its funder, and some related documents.

Here, Defendants too conjure up the image of a secret "market competitor" funding this case, and muse about such hypothetical competitor's ulterior motives to "impact the reputation, competitiveness, market share, standing and/or stock price of defendants." This is nothing but Defendants' counsel's *ipse dixit*, a rank and implausible speculation that seeks to undermine Plaintiffs' legitimate grievances that led to this litigation, and is not proffered in good faith.

Defendants also misleadingly cite <u>Miller U.K Ltd. v. Catterpillar, Inc.</u>, 17 F. Supp. 3d 711 (N.D. Ill. 2914) for the proposition that litigation financing documents are relevant and not protected by privilege. In fact, the <u>Miller</u> decision, which is considered a leading authority on the issue, ***held the exact opposite***: that litigation financing documents were ***not*** relevant to the merits of the case and were ***protected*** by the attorney work product privilege. "The terms of Miller's actual funding agreement would seem to have no apparent relevance to the claims or defenses in this case, as required by Rule 26 as a precondition to discovery." 17 F. Supp. 3d at 721.[4]

The <u>Miller</u> Court also held that the litigation financing documents were protected by the attorney work product privilege: "Any documents containing Miller's lawyers' mental impressions, theories and strategies . . . that were given to prospective funders were only prepared 'because of' the litigation. . . . Materials that contain counsel's theories and mental impressions created to analyze Miller's case do not necessarily cease to be protected because

---

[4] <u>See</u> <u>also</u> <u>id.</u> at 742 ("Caterpillar is not entitled to discover the amount of money sought or received by Miller, the details of the agreement it has with its funder, or how much the funder will receive if Miller wins the case. In the setting of this case, that information is simply irrelevant. It bears repeating that one of the necessary and ultimate limitations on discovery that comes into play is when 'inquiry touches upon the irrelevant. . . .' <u>Hickman</u>, 329 U.S. at 507–08, 67 S.Ct. 385."). The <u>Miller</u> Court also distinguishes <u>Leader Tech. Inc. v. Facebook, Inc.</u>, 719 F. Supp. 2d 373 (D. Del. 2010) relied upon by Defendants, observing that it "does not even discuss the issue of the relevance of funding agreements." 17 F. Supp. 3d at 723.

they may also have been prepared or used to help Miller obtain financing." Id. at 735 (citing Mississippi Pub. Employees' Retirement Sys. v. Boston Scientific Corp., 649 F.3d 5 (1st Cir. 2011)).

The Miller Court also observed that "[p]rotracted discovery is expensive and is a drain on the parties' resources. Where a defendant enjoys substantial economic superiority, it can, if it chooses, embark on a scorched earth policy and overwhelm its opponent." Id. at 718.  So is the case here: this irrelevant request is a pretext for Defendants to continue to harass and oppress Plaintiffs, putting them to even more burden and expense with the hope of overwhelming them, while distracting from their own blatant discovery misconduct.

Finally, discovery of litigation financing documents here would clearly give Defendants an unfair advantage by revealing whether and how much funding Plaintiffs have, providing invaluable information to their adversary throughout the litigation process. Defendants could intensify their scorched-earth defense tactics and/or obtain a leg up during any settlement negotiations if they know that Plaintiff have just about exhausted their litigation budget.

In sum, Defendants' motion to compel Plaintiffs to produce documents of no relevance to the merits of the case, after Plaintiffs had already produced over 56,000 relevant documents, is a smokescreen to hide the serious deficiencies in Defendants' own 569-document production. Plaintiffs respectfully submit that the Court should deny Defendants' motion.

August 16, 2019                                                  Respectfully Submitted,

_____
Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964

Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH
MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Dimitry Joffe, hereby certify that on this 16th day of August 2019, I caused a copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Compel and the accompanying Declaration of Dimitry Joffe with exhibits thereto to be served by ECF upon Defendants' counsel of record.

_____
Dimitry Joffe
*Counsel to Plaintiffs*