**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,

Plaintiffs,

v.

HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL,

Defendants.

**Civil Action No. 1:16-CV-10386 (LTS)**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' UPDATE REPORT**

Defendants in their Update Report filed on August 15, 2019 (Dkt. 214) ask the Court to require Plaintiffs to reimburse Defendants for the cost of Defendants' proposed technology-assisted review of Plaintiffs' Non-Responsive documents. Defendants' request is based on demonstrably false and misleading statements and should be denied. Likewise, Defendants' attempt to preclude Plaintiffs' motion to compel should be denied in light of Defendants' severe discovery misconduct and their failure to respond to Plaintiffs' requests for a meet-and-confer conference.

**A. Non-Responsive Documents**

Defendants consider Plaintiffs' 56,000 responsive documents insufficient while having themselves collectively produced only 569 documents -- 1% of Plaintiffs' production. Beyond its dismal numbers, Defendants' production reveals a whole host of other no less troubling issues.

*First*, only 4 custodians produced all of Defendants' documents, which represents 3.5% of the 113 of Defendants' employees identified as involved in the events by Defendants' own meager production and by their privilege log. Declaration of Dimitry Joffe dated August 19, 2019 ("Joffe Decl.") Exh A.[1] This means that 96.5% of Defendants' employees involved in the relevant events did not produce anything at all.

*Second*, the 4 custodians who produced the documents -- Defendant Gill, Kevan Bartley, JT Silvestri and Tom Harris -- all work for Defendant HPFS. This means that 3 out of 5 Defendants – HPE, HPI and HPFS India -- did not produce any documents at all, despite the involvement of scores of their employees in the events.

*Third*, of the 569 produced documents there are only 234 unredacted internal documents, of which only 8 that relate to the core issues of counterfeiting and imprisonment, despite the involvement of at least 72 of Defendants' employees (and at least 4 additional H3C employees) in those issues. In sum, less than 5% of Defendants' already miniscule production relate to the core issues.

Instead of properly collecting and producing their own responsive documents, Defendants pat themselves on the back for having sagely predicted that "plaintiffs' Email Subject Line Proposal would not accurately yield all responsive documents," and now propose to review the documents that Plaintiffs have designated as non-responsive while asking the Court to order Plaintiffs to reimburse them for that review. As shown below, Defendants' proposal and request are based on false and misleading statements, and should be denied.[2]

---

[1] Defendants' production and privilege log reveal the involvement of at least 113 of Defendants' employees in written communications deemed responsive by Defendants, which is likely an understated number.

[2] Defendants' term "Email Subject Line Proposal" itself is a pejorative misnomer. What Plaintiffs had proposed and carried out was counsel's review of the produced documents based not solely on the "email subject line" but on the combination of the subject line, sender, recipients, and date information. See Plaintiffs' July 19, 2019 proposal, Dkt.

**Defendants' claim 1**: "As one example, plaintiffs failed to designate ICT0017229-33 (Ex. A) as responsive. This document is an email dated April 14, 2016 with the subject line "Scan docs." While there is no text in the body of this email, it attaches a Chinese-to-English translation of the letter that HPFS India submitted to the Chinese authorities on April 22, 2013 to assist in securing the release of the Individual Plaintiffs—unquestionably a central focus of plaintiffs' allegations."

**Plaintiffs' response 1**: The email between Mr. Styller and his administrative assistant is indeed empty, , and merely transmits the attached translation of the HPFS letter (in April 2016, after this action commenced). The translation itself attached to the email has been produced as ICT0000160-73 and ICT0001562-65.[3]

**Defendants' claim 2**: "More concerning, and more difficult to explain, plaintiffs declined to designate several additional emails as responsive, *despite* subject lines that are, on their face, wholly responsive. For example: Email subject line, 'China HR, Angela,' includes discussion of Jade Cheng being responsible for selling H3C inventory in China as early as July 2010, more than a year before ICT received any H3C equipment from defendants, suggesting that *ICT had sources of H3C equipment other than HPFS India*. ICT0508027-28 (Ex. B)."

**Plaintiffs' Response 2**: Jade Cheng joined ICT in May 2011, see Dkt. 208-08 (Mr. Cheng's interrogatory response). He was not "responsible for selling H3C inventory in China," or doing anything else for that matter, in July 2010; naturally, Mr. Cheng is not mentioned in the email sent

---

206 ("Plaintiffs have requested their vendor to create a log of all the 227,425 ESI documents (produced in Plaintiffs' document productions ICT003-ICT010) in the form of an excel spreadsheet listing each document by its individual bates numbers and including for each document such information as the subject matter, sender, recipients, and date. Plaintiffs undertake to review the log and code each document as responsive or non-responsive based on this information"; see also Plaintiffs' August 7, 2019 Status Update (Dkt. 209) ("Plaintiffs' counsel then reviewed the log entries (and in certain instances the documents themselves to ascertain their responsiveness), [and] coded each document as responsive or non-responsive based on that review").

[3] To avoid cluttering up the docket, Plaintiffs refrain from attaching their discovery materials referenced herein as exhibits, but will file them if required by the Court or Defendants.

almost a year prior to his joining ICT. Defendants, who go through Plaintiffs' discovery responses with fine-tooth comb, could not have been unaware of the basic chronology of events.

The email is actually about a prospective job candidate to assist Ryan Quinn, and the discussion refers to Mr. Quinn; the email is sent by ICT's manager in Ireland Brian Warren, not involved in the India deal or the Chinese events.

Moreover, this non-responsive email is not needed to show that ICT had sources of H3C equipment other than HPFS India: ICT is in the business of trading and recycling computer parts, of which HP, Huawei, 3COM, H3C, Cisco etc. are all major manufacturers, and their products are Plaintiffs' stock in trade. Indeed, Plaintiffs have produced hundreds of emails showing that they had traded in those brands both before and after the 2011 India deal, including with HP and HPFS. Indeed, the earliest email produced by Plaintiffs, dated December 30, 2009, refers to ICT's trading in "H3C parts" (ICT0621872), as is the email dated May 5, 2017 referring to ICT's "3Com H3C inventory" (ICT0183812) -- none of which have anything to do with the 781 H3C transceivers seized by the PSB as counterfeit. What makes the 2011 India deal special is not that it was Plaintiffs' only transaction in H3C equipment – it was the only one where Plaintiffs were arrested for reselling counterfeit H3Cs.

**Defendants' claim 3**: "Email subject line, 'Licenses,' includes a request from Alex Styller that H3C equipment not be entered into ICT's inventory using old part numbers, nearly *a year before* ICT received any H3C equipment from defendants. ICT0260763 (Ex. C)."

**Plaintiffs' Response 3:** In this 2010 email Mr. Styller instructs an ICT employee how to enter H3C part numbers in ICT's internal database for record-keeping purposes. Plaintiffs have produced numerous documents discussing the use of particular part numbers where the same equipment has different part numbers assigned by different manufacturers, which is a standard industry practice. See, e.g., ICT0277064 (Subject line "Removing HP equivalents from our system," stating "We decided that

Hp equivalents for 3Com and H3C not needed. Please remove them from our website and the system as a whole.”). Indeed, Defendants’ own spreadsheets for the Equipment sold to ICT list both HP’s and H3C’s part numbers (manufacturing codes) for the same equipment (*e.g.*, ICT0606988).

Moreover, the fact that ICT was trading in H3C equipment both before and after the 2011 deal is borne out by hundreds of other produced documents, which Defendants could not have been unaware of.

**Defendants’ claim 4**: “Email subject line, ‘ICT China Quickbooks,’ includes discussion of a 2018 review of ICT China’s accounting for the purposes of determining ICT’s damages in this action, and providing Jade Cheng access to that information. ICT0184455-62 (Ex. D).”

**Plaintiffs’ Response 4**: Plaintiffs have produced ***eight*** email chains containing the underlying email with the “discussion of a 2018 review of ICT China’s accounting for the purposes of determining ICT’s damages in this action, and providing Jade Cheng access to that information,” (*e.g.*, ICT0192728, ICT0776206), and forwarding that email to others (*e.g.*, ICT0187077, ICT0191497, ICT192733), as well as ICT China Quickbooks spreadsheets themselves (*e.g.*, ICT0783978).

This particular email coded non-responsive is merely a reply by ICT’s computer support employee Mr. Makarovsky forwarding technical instructions for accessing the Quickbooks, and not itself responsive aside from the initial email, which had been produced eight times.

**Defendants’ claim 5**: “Email subject line, ‘H3C,’ includes discussion of excess HP and 3Com equipment *half a year before* ICT received any H3C equipment from defendants. ICT0259732 (Ex. E).”

**Plaintiffs’ Response 6**: Defendants again pretend not to know that ICT had been involved in trading HP, 3COM and H3C equipment (among other brands) before and after the India deal; ICT produced numerous responsive emails with respect to its trading in such equipment in China prior to

the India deal.

This particular email from ICT's then-manager in Ireland Brian Warren states: "I've sent off a mail to the person responsible for excess within the HP and 3Com facility to see if we can get any information about any excess that may or may not have been released or any that may be coming available. Will keep you posted." Mr. Warren is enquiring about a potential release of excess inventory from the "HP and 2Com facility" that could be acquired by ICT in a regular course of business; Mr. Warren had no involvement in the India deal or the Chinese events, and this email in substance is non-responsive (or marginally responsive at best).

**Defendants' claim 6**: "Email subject line, 'Brokerbin Broadcast WTS 3COM , NEW, qty 1000, CALL, We're looking to liquidate several 3COM and H3C lots,' includes discussion of ICT's interest in liquidating H3C lots in September 2013, two months following the release of the Individual Plaintiffs. ICT0149475 (Ex. F)."

**Plaintiffs' Response 6**: Again, this email reflects a run-of-the-mill business posting made in ICT's regular course of business of buying, selling and recycling computer parts. Indeed, the sender of the email, Val Faybush, has regularly employed the following tagline in many of his emails: "Looking to buy, sell, or trade 3COM, HP, EMC, Cisco? Call me! We also offer recycling and asset Management services!" (*E.g.*, ICT0230398). Moreover, ICT produced dozens of emails discussing its interest in liquidating the H3C equipment before and after September 2013. See, e.g., August 2013 email from Plaintiff Styller stating "I would like to liquidate all H3C we have here as a wholesale deal to one or 2 or 3 good clients" (ICT0259534).

**Defendants' Claim 7**: "[P]laintiffs failed to mark as responsive, documents concerning [1] shipping equipment out of Beijing in February 2013 (during the Individual Plaintiffs' detention) (ICT0407114), [2] inquiries from Styller to Jade Cheng concerning 3Com equipment in China within

weeks of his release from prison (ICT0199185), and [3] the shipment of H3C equipment to Beijing in May 2012 (ICT0028908).

**Plaintiffs' Response to claim 7.1**: Plaintiffs have produced both the underlying substantive email (ICT0041084, ICT0403887, ICT0744122), as well as the forwarding email (ICT0403884).

**Plaintiffs' Response to claim 7.2**: Plaintiffs have produced several forwarding emails (ICT00031505, ICT0166520, ICT0276757, ICT0424776, ICT0582009), which included the email in question.

**Plaintiffs' Response to claim 7.3**: "The shipment of H3C equipment to Beijing in May 2012 (ICT0028908)" referenced in the email is actually the shipment of *software*, not equipment (as the email itself shows). Moreover, Plaintiffs have produced 18 variations of this email (*e.g.*, ICT0749519).

In sum, Defendants' "spot check" actually confirms the overall accuracy of Plaintiffs' review of over 227,000 ESI documents containing Defendants' search terms, with its yield of 52,000 responsive emails and attachments. Defendants' 9 proffered examples of inaccuracies are either outright false, relate to marginally responsive or non-responsive documents, or to documents that had been actually produced by Plaintiffs. These claims provide zero basis for Defendants' "Modified TAR proposal" where they seek to burden Plaintiffs with Defendants' expenses of reviewing Plaintiffs' non-responsive documents (which Defendants would not have even seen had Plaintiffs reviewed the documents prior to production rather than afterwards).

There is little doubt that a 175,000 document collection could contain additional documents of marginal relevance that Defendants might dig out to make another attempt at justifying their vested position and harassing Plaintiffs. This exercise would be likewise wasteful and disproportional, and ultimately pointless: the main question in this case is about the 781 transceivers currently in a Boston warehouse. It is this particular set of H3C transceivers which the PSB had seized in China, and which

H3C and Defendants had claimed as counterfeit in 2013-14. Defendants have now admitted that at least 647 of them were sold to ICT by HPFS India. The question is whether or not these particular transceivers are counterfeit, and what Defendants knew when they called them counterfeit in 2013.

**B. Plaintiffs' Motion to Compel**

Defendants attempts to bar Plaintiffs from making a motion to compel are not surprising given the gravity of their discovery misconduct, but these attempts should be denied precisely because this is a case of a very serious misconduct. Moreover, Defendants have failed to respond to Plaintiffs' repeated requests for a meet and confer conference, in violation of Local Rule 37.1.

Defendants stated in their Status Report dated June 3, 2019, that they "completed their document productions on April 15, 2019." Dkt. 194. A week later, at the June 10, 2019 conference, the Court set the deadlines for the parties' motions to compel to be filed by July 22, relying on the parties' representations.

Despite their representation to the Court and to Plaintiffs that they had completed their production, on June 17, 2019, Defendants surprised Plaintiffs with another, unannounced document production. On June 24, 2019, Defendants produced their highly revealing privilege log. Having reviewed Defendants' just-completed production, on July 12, 2019, Plaintiffs' counsel sent Defendants' counsel a 10-page letter complaining of serious deficiencies. Joffe Decl. Exh. B.

During the July 12 Conference, the Court discussed that it would be "pretty tight to do motions to compel on July 22nd" and instructed the parties to update the Court in a week "how do you propose revising the date." Dkt. 208-20 at 41. On July 19, the parties submitted their respective proposals, with Plaintiffs' proposing August 23 as a filing date. Defendants objected, stating that Plaintiffs' July 12 letter did not constitute a proper "meet and confer" proposal and therefore Plaintiffs could not file any motion to compel. Defendants also represented to the Court that "to the extent defendants have the

specifically delineated non-privileged documents referenced in counsel's July 12 letter, defendants do not object to producing them." Dkt. 206. Pg. 11 n.4.

On July 22, 2019, Plaintiffs' counsel by email asked Defendants' counsel to "please let me know when to expect Defendants' production of those documents that defendants 'do not object to producing,' according to your statement in the July 19 Report, and your availability for a meet-and-confer to address Plaintiffs' concerns raised in my July 12 letter, which I believe would make most sense to conduct following that production." Joffe Decl. Exh C.

Defendants did not produce any such documents in response and ignored Plaintiffs' request to schedule a meet-and-confer. Instead, On July 26, 2019, Defendants' counsel sent an email to Plaintiffs' counsel, stating: "We are looking into the substance of your July 12 letter. I will be out of the office next week. In the event that the Court issues an order permitting plaintiffs to pursue further discovery, after not filing a discovery motion by July 22, perhaps we can schedule a call and discuss these issues further once I return on August 5." Joffe Decl. Exh. D.

In the same-day response, Plaintiffs' counsel once again asked Defendants' counsel to "please let me know whether and when Defendants intend to produce the documents they represented to the Court on July 19 as having no objection to producing, and counsel's availability for a meet and confer with respect to the outstanding deficiencies in Defendants' production set forth in my July 12 letter, to which Defendants have failed to respond." Joffe Decl. Exh. D. Defendants have not responded to that email, have not produced any documents, and have once again ignored Plaintiffs' request for a meet-and-confer.

Local Rule 37.1(a) provides: "Failure of opposing counsel to respond to a request for a discovery conference within 7 days of the request shall be grounds for sanctions, which may include automatic allowance of the motion." In light of Defendants' failure to respond to Plaintiffs' July 12th

letter of deficiencies, their failure to produce the documents that they had represented to the Court as having no objection to producing, and their repeated failure to respond to Plaintiffs' requests for a meet and confer, Plaintiffs respectfully submit that their motion to compel should be due on August 23, responses on September 6, and replies on September 13 (as they proposed in the July 19 Joint Report).

August 19, 2019

Respectfully Submitted,

__________________________
Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Dimitry Joffe, hereby certify that on this 19th day of August 2019, I caused a copy of Plaintiffs' Response to Defendants' Update Report with accompanying Declaration of Dimitry Joffe and exhibits thereto to be served by ECF upon Defendants' counsel of record.

Dimitry Joffe
*Counsel to Plaintiffs*