## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | **Civil Action No. 1:16-CV-10386 (LTS)** |
| v. | ) ) ) | |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL, | ) ) ) ) ) **)** | |
| Defendants. | ) ) | |

## PLAINTIFFS' MOTION TO COMPEL AND
## <u>SUPPORTING MEMORANDUM OF LAW</u>

August 23, 2019

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

PROCEDURAL BACKGROUND ............................................................................................. 3

ARGUMENT ............................................................................................................................ 4

A.   Legal standards .............................................................................................................. 4

B.   Defendants' inadequate production, by the numbers ........................................................ 5

C.   Key documents withheld by Defendants ......................................................................... 6

   1.   Origination of the Equipment, 2010 ................................................................... 6

   2.   Return of the Equipment and its sale to ICT, 2011 .............................................. 6

   3.   Inspection of the equipment remaining in India, 2012 ......................................... 7

   4.   Disposition of the equipment remaining in India, 2012-13 .................................. 8

   5.   Inspection of the Equipment seized in China, 2013 ............................................. 9

   6.   Communications concerning the Equipment
        or the Individual Plaintiff's incarceration ......................................................... 11

D.   Documents improperly withheld or redacted as privileged ............................................. 12

   1.   The underlying facts are not protected by any privilege ...................................... 12

   2.   Chinese law applicable to the inspections and communications in China
        does not recognize attorney-client or attorney work product privileges ............. 14

   3.   Defendants waived privilege by disclosing their communications ....................... 16

   4.   The crime-fraud exception may overcome privilege ........................................... 18

CONCLUSION ....................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

Clarendon Nat'l Ins. Co. v. Arbella Mutual Ins. Co., 60 Mass. App. Ct. 492 (2004) .................. 14

FDIC v. Ogden Corp., 202 F.3d 454 (1st Cir. 2002) ...................................................... 14

Hickman v. Taylor, 329 U.S. 495 (1947) ................................................................ 13

In re Grand Jury Proceedings, 417 F.3d 18 (1st Cir. 2005) ............................................. 18

In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180 (2d Cir. 2007) ............................ 13

In re Keeper of Records (XYZ Corp.), 348 F. 3d 16 (1st Cir. 2003) ..................................... 15

In re Reorganization of Elec. Mut. Liability Ins. Co., 425 Mass. 419 (1997) ............................ 12

In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007 (1st Cir. 1988) .......................... 15

In re Teleglobe Comms, 493 F.3d 345 (3d Cir. 2007) .................................................... 16

In the Matter of A Grand Jury Investigation, 437 Mass. 340 (Sup. Ct. 2002) ............................ 19

Messing, Rudavsky & Weliky, P.C. v. President and Fellows of Harvard College,
    436 Mass. 347 (Mass. 2002) ...................................................................... 18

Radiant Burners, Inc. v. Am. Gas Ass'n, 320 F.2d 314 (7th Cir. 1963) .................................. 12

State of Maine v. US Dept. of Interior, 298 F. 3d 60 (1st Cir. 2002) .................................. 13

United States v. Gorski, No. 14-1963, 2015 WL 8285086 (1st Cir. Dec. 9, 2015) ........................ 19

United States v. Joyce, 311 F. Supp. 3d 398 (D. Mass.2018) ........................................... 18

United States v. Massachusetts Inst. Of Tech., 129 F.3d 681 (1st Cir. 1997) .......................... 16

United States v. Nobles, 422 U.S. 225 (1975) ......................................................... 13

United States v. United Shoe Machinery Corp., 89 F. Supp. 357 (D. Mass. 1950) ............... 12, 16

Upjohn Co. v. United States, 449 U.S. 383 (1981) ..................................................... 12

Wultz v. Bank of China Limited, No. 1:11-cv-01266-SAS-GWG
    (S.D.N.Y. Oct. 25, 2013) ........................................................................ 15

## **<u>Other authorities</u>**

Federal Rule of Evidence 501 ................................................................................... 14

Restatement (Second) of Conflicts of Laws, § 139, Comment e ................................. 14

Rule 26(b)(1) of the Federal Rules of Civil Procedure .................................................. 4

## PRELIMNARY STATEMET

Defendants have abused the discovery process by making a woefully deficient document production, by withholding key evidence essential to the preparation of Plaintiffs' case, and by asserting unfounded privilege claims. Defendants' litigation misconduct that denies Plaintiffs discovery of critical information is a continuation of Defendants' underlying fraudulent coverup and the suppression of exonerating evidence alleged in the complaint.

*First*, the five Defendants in this case – two Fortune 500 companies and their affiliates – collectively produced only 569 documents from only 4 custodians despite the involvement of at least 113 of Defendants' employees in the relevant events spanning several years and continents. Three of the five Defendants – HPI, HPE and HPFS India – did not produce any documents at all, brazenly flaunting their discovery obligations. The very paucity of Defendants' production in the context of this case makes it utterly unbelievable that Defendants had properly collected all responsive documents. See Part B below.

*Second*, Defendants suppressed key evidence related to the origination and authenticity of the Equipment sold to ICT. Plaintiffs had desperately sought those exonerating documents throughout their incarceration and the PSB's criminal investigation in China, but Defendants rebuffed them at every turn while H3C repeatedly urged the PSB to prosecute them and HP China stonewalled the PSB's requests for information, falsely claiming ignorance of the matter.

As Defendants' miniscule production and especially their privilege log have now revealed, H3C had been in frequent communications with Defendants since at least February 2013 on such subjects as the "arrest of ICT sales representatives," "transceivers," "equipment sold to ICT," "seized equipment," "incident involving ICT sales representatives," "investigation of ICT claims," "product verification," "equipment sent to China," "update to litigation," "letter

to Chinese police," "verification report and draft letter," and "draft product sample verification report." Dkt 219-2 (Defendants' privilege log).

While in close communications with Defendants, H3C testified to the PSB in May 2013 and in August 2014 that the seized transceivers were counterfeit H3Cs. Defendants themselves in their April 2013 letter to the PSB admitted that "part of the Sold Equipment supplied by Inspira did not come from HP Company," and in their earlier, March draft of that letter stated that "the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases." Defendants also assured Plaintiffs that "HP is reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it." SAC ¶¶ 125, 141. In May 2013, Defendants asked H3C to inspect a sample of transceivers in TT Global's possession and, following that inspection, instructed TT Global to destroy the rest of the equipment. Yet, Defendants did not produce any of their "verification report," "sample verification reports," the results of their "investigation of ICT claims," the testing of TT Global's transceivers or their destruction, the factual basis for their conclusions that counterfeiting occurred prior to the sale to ICT, or the results of HP's review of that initial sale.

By withholding these documents, Defendants attempt to hide what they and H3C knew about the transceivers in 2013-14 when they in unison pronounced them counterfeit and took actions consistent with that view. Defendants concealed that information from the PSB and Plaintiffs then, and continue to conceal it from Plaintiffs now, even though its relevance and significance to the case are beyond peradventure. See Part C below.

*Third*, to the same end, Defendants withheld or heavily redacted numerous documents (more than they produced) by making unfounded privilege assertions. In particular, Defendants

attempt to (i) conceal the underlying *facts* of the Equipment's origination and authenticity under the guise of privileged information by funneling them through their inhouse counsel; (ii) assert privilege with respect to H3C's inspections and related communications in China even though Chinese law does not recognize any such privilege; (iii) shield their communications with H3C under the broad corporate entity umbrella while asserting that H3C "operated separately and autonomously from HP and its subsidiaries and affiliates"; and (iv) claim privilege with respect to communications that facilitated their fraud and coverup. See Part D below.

## PROCEDURAL HISTORY

Defendants stated in their Status Report dated June 3, 2019, that they "completed their document productions on April 15, 2019." Dkt. 194. At the June 10, 2019 conference, the Court set the deadlines for the parties' motions to compel to be filed by July 22, relying on the parties' representations. Despite their representation to the Court and to Plaintiffs that they had completed their production, Defendants surprised Plaintiffs with another, unannounced document production made on June 17, 2019. On June 24, 2019, Defendants produced their highly revealing privilege log. Having reviewed Defendants' production and privilege log, on July 12, 2019, Plaintiffs' counsel sent Defendants' counsel a 10-page letter complaining of serious deficiencies. Dkt. 219-3.

During the July 12 Conference, the Court discussed that it would be "pretty tight to do motions to compel on July 22nd" and instructed the parties to update the Court in a week "how do you propose revising the date." Dkt. 208-20 at 41. On July 19, the parties submitted their respective proposals, with Plaintiffs' proposing August 23 as a filing date. Defendants objected, stating that Plaintiffs' July 12 letter did not constitute a proper "meet and confer" proposal and therefore Plaintiffs could not file any motion to compel. Defendants also represented to the Court that "to the extent defendants have the specifically delineated non-privileged documents referenced in counsel's July 12 letter, defendants do

not object to producing them." Dkt. 206. Pg. 11 n.4.

On July 22, 2019, Plaintiffs' counsel by email asked Defendants' counsel to "please let me know when to expect Defendants' production of those documents that defendants 'do not object to producing,' according to your statement in the July 19 Report, and your availability for a meet-and-confer to address Plaintiffs' concerns raised in my July 12 letter, which I believe would make most sense to conduct following that production." Dkt. 219-4. Defendants did not produce any such documents in response and ignored Plaintiffs' request to schedule a meet-and-confer.[1]

On July 26, 2019, Plaintiffs' counsel once again asked Defendants' counsel for their "availability for a meet and confer with respect to the outstanding deficiencies in Defendants' production set forth in my July 12 letter, to which Defendants have failed to respond." Dkt. 219-5. Defendants have not responded to that email, ignoring Plaintiffs' request for a meet-and-confer.

Local Rule 37.1(a) provides: "Failure of opposing counsel to respond to a request for a discovery conference within 7 days of the request shall be grounds for sanctions, which may include automatic allowance of the motion." In light of Defendants' failure to respond to Plaintiffs' July 12th letter of deficiencies, their repeated failure to respond to Plaintiffs' requests for a meet and confer, and their woefully deficient document production and suppression of key evidence, Plaintiffs respectfully submit that their motion to compel should be allowed.

## ARGUMENT

### A.  Legal Standards

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of information that is "relevant to any party's claim or defense and proportional to the needs of the case," taking

---

[1] Instead, on July 26, 2019, Defendants' counsel sent an email to Plaintiffs' counsel, stating: "We are looking into the substance of your July 12 letter. I will be out of the office next week. In the event that the Court issues an order permitting plaintiffs to pursue further discovery, after not filing a discovery motion by July 22, perhaps we can schedule a call and discuss these issues further once I return on August 5." Dkt. 219-5.

into account such factors as "the importance of the issues at stake," "the parties' resources," "the importance of the discovery is resolving the issues," and "whether the burden or expense of the proposed discovery outweighs its likely benefit." As demonstrated below, Defendants have systematically withheld key documents that are indisputably relevant and proportional – indeed, central -- to the case.

## B.    Defendants' inadequate production, by the numbers

Defendants have produced 569 documents -- 1% of Plaintiffs' 56,000-document production. In addition, Defendants withheld 639 documents as privileged, which means they have identified only 1208 documents (569 produced and 639 withheld) as responsive.[2]

Of the 569 produced documents, 194 – or 34% of the total production -- are heavily redacted emails. Of the remaining unredacted 375 documents, 141 are Defendants' external communications with Plaintiffs, leaving only 234 internal documents produced.

All of the Defendants' production comes from only 4 custodians, which number represents 3.5% of the 113 of Defendants' employees identified as involved in the events by Defendants' production and by their privilege log. This means that 96.5% of Defendants' employees involved in the relevant events did not produce anything at all.

The 4 custodians who produced the documents -- Defendant Gill and Messrs. Bartley, Silvestri and Harris -- all work for Defendant HPFS. This means that 3 out of 5 Defendants – HPE, HPI and HPFS India -- did not produce any documents at all, despite the involvement of scores of their employees in the events: at least 72 of Defendants' employees were involved in the counterfeit and imprisonment issues in 2013-14, and at least 41 additional employees were

---

[2] The bates range of the produced documents is 1-2884, which page count includes 931 single-page images of various excel spreadsheets (produced without the native files required by the ESI protocol).

involved in the original 2011 Equipment sale and the 2013 RMA request. Defendants should be required to search the ESI and documents of all 113 employees involved in these matters.

## C.  **Key documents withheld by Defendants**

### I.  **Origination of the Equipment, 2010**

Request 1.     Documents sufficient to identify the equipment leased to Tata by HPFS India in 2010 for the Commonwealth Games, as described in paragraphs 21-22 of the SAC.[3]

In preparation for the sale of the Equipment to ICT, Defendants requested from their distributor Inspira the 2010 importation documents for the equipment originally leased to Tata, which documents, according to Inspira, should have included the serial numbers and the bills of entry showing the equipment actually imported to India, and the documents correlating serial numbers with the bills of entry. Defendants, however, have failed to produce any of these documents.

Accordingly, Defendants have failed to produce key documents showing the origination and nature of the equipment that Inspira had actually imported into India and delivered to Tata in 2010. This failure is particularly troubling in light of Defendants' own admission to the PSB that "part of the Sold Equipment supplied by Inspira did not come from HP Company."

### II.  **Return of the Equipment and its sale to ICT, 2011**

Request 2.     All documents concerning the return of the leased equipment from Tata in 2011 upon the expiration of the leases.

Request 3.     All documents concerning the 2011 Inspection, including reports, inventories, results, photographs, and internal and external communications concerning same.

Request 17.    All documents concerning HP's "reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it," referenced in the March 2013 Letter, including any reports or results of that review and any communications concerning same.

---

[3] Declaration of Dimitry Joffe dated August 23, 2019 ("Joffe Decl."), Exh. A.

When Tata returned the equipment to Defendant HPFS India in 2011, HPFS India and/or its agent TT Global should have audited and tested the equipment pursuant to HP's standard operating procedures. Indeed, in an email dated June 17, 2011, HPFS' representative states that "all 4 lease schedules have been received into our Delhi facility . . . some are still going through audit." Other than the lease schedules themselves, however, Defendants did not produce the results of their audit of the returned Equipment that would confirm their authenticity and origination, or any related correspondence.

Further, when Defendants sold the Equipment to ICT at the end of 2011, they did not provide ICT with the serial numbers of the parts shipped to China, and did not produce that list until discovery in this action. Significantly, the produced list includes 299 transceivers that also appear on the TT Global's list of the equipment remaining in India in 2012. Defendants have failed to produce any documents identifying what transceivers were actually shipped to China in lieu of those 299 transceivers remaining in India.

Moreover, Defendants stated in their March 2013 draft letter to the PSB that "[b]ased on the available evidence it would appear that the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases. HP is reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it." Defendants, however, did not produce any results of HP's review of the initial 2011 sale referenced in the March letter, or the "available evidence" cited.

Accordingly, Defendants have failed to produce key documents showing the origination and nature of the equipment returned to HPFS India from Tata and shipped to China in 2011.

### III.   Inspection of the equipment remaining in India, 2012

Request 6.      All documents concerning the 2012 Inspection, including reports, results, photographs, and internal and external communications concerning same.

Tom Harris, HPFS' representative participating in the 2012 Inspection, stated in his October 2012 email from India that TT Global's security and material control over the equipment were "very questionable"; referred to the "testing" and the potential need for "extra testing" or "re-testing" of the equipment; and sent pictures of the equipment and the storage facility. In response to Mr. Harris' reports, Edward Chin of HPFS referenced "delicate and sensitive discussions" with TT Global and referred to the "audit and testing phase." Another HPFS employee complained about the quality of the remaining equipment – customer information and tags left on the units; the equipment being "very very dusty" and "so dirty," and not properly packaged -- mirroring Plaintiffs' own complaints about the parts received in China.

Defendants, however, have failed to produce documents referenced in those few produced emails, such as (i) the results of the "audit and testing" and/or any re-testing of the equipment conducted by TT Global; (ii) the full results of Mr. Harris' inspection; (iii) the referenced pictures of the equipment taken by Mr. Harris in India; and (iv) HPFS' "delicate and sensitive" discussions with TT Global regarding its "very questionable" security and material control over the equipment.

### IV.    Disposition of the equipment remaining in India, 2012-13

Request 7.    All documents concerning the subsequent disposition of the Equipment that was the subject of the 2012 Inspection.

Following the 2012 Inspection, Defendants sold to TT Global the remaining three-quarters of the equipment in India that ICT had refused to buy, and TT Global then transported it to Dubai. In May 2013, with the Individual Plaintiffs imprisoned for selling counterfeit transceivers, Defendants requested TT Global to send pictures and samples of its transceivers to H3C for inspection. Following H3C's inspection, Defendants discussed instructing TT Global to

destroy the remaining equipment because of its "questionable" nature and origination, and

paying TT Global $200,000 for it -- while the criminal investigation in China was ongoing.

Defendants have failed to produce any results of the H3C inspection of TT Global's

transceivers, or any follow-up to their discussions about paying TT Global to destroy them --

while admitting in the interrogatory responses that "the equipment returned by Tata but not sold

to ICT was disposed of by sale to TT Global and, on information and belief, later destroyed."

Joffe Decl. Exh. C. Defendants' actions of instructing TT Global to destroy $200,000 worth of

equipment after H3C's tests and offering to pay TT Global for it speak louder than words; still,

Defendants should be compelled to produce their written words on the subject as well.

### V.   Inspection of the Equipment seized in China, 2013

Request 8.     All documents concerning "the inspections and/or analysis of inventory of
the equipment seized by the PSB," as described in the Defendants' Initial Disclosures.

Request 9.     All documents concerning the 2013 Inspections, including reports, results,
photographs, and internal and external communications concerning same.

Request 30.     All documents concerning the counterfeit or genuine nature of any
trademarks, logos, security tags, and/or any other overt or covert indicia of authenticity affixed to
the Equipment.

Defendants stated in their responses to interrogatories that "examination(s), review(s),

inventory(ies) and/or inspection(s) of the Seized Equipment was/were conducted by or on behalf

of H3C, the results of which appear to be in Plaintiffs' possession. To the extent that a review or

partial inventory of the Seized Equipment by the Defendants, or any of them, was permitted by

the relevant Chinese authorities, the same was carried out or conducted by Meng Tao in or about

February to March 2013. . . . The outcome of that review or partial inventory will be made

available in discovery. Additional analysis or review of Meng Tao's review/inventory that was

subsequently conducted by Defendants or their agents and/or non-legal personnel, to the extent

the same exists, will be produced in discovery." Joffe Decl. Exhs. A, B.

However, Defendants have only produced one stand-alone document, in Mandarin, which

appears to be an H3C report submitted to the PSB stating that the seized transceivers are

counterfeit and detailing the indicia of their unauthenticity. Defendants have failed to produce

any other documents or communications concerning the report itself, how Defendants came in

possession of the report, or any transmitting, preceding or follow-up communications or

discussions about the report or its conclusions. Nor did they produce any "product verification

report," "sample verification report," 'grey marketing issue" report or the results of their

"investigation of ICT claims" oft-mentioned in their privilege log.

With respect to Meng Tao's inspection, Defendants have produced one spreadsheet that

merely lists the serial numbers of 265 confiscated transceivers and their brand, model and part

number information -- without any analysis or conclusions regarding their authenticity or

origination. Defendants have produced no other documents concerning Meng Tao's inspection,

or any other documents concerning the transceivers or their trademark logos.[4]

Moreover, Defendants' limited production and privilege log strongly suggest that the

counterfeiting problem with the H3C transceivers was not limited to ICT but involved other

parties. One email exchange dated May 2013 refers to the "HP counterfeit investigation in

China" that concerned an unrelated company, Shenzhen Kingtech Co., Ltd., but involved the

---

[4] Defendants' initial disclosures describe Meng Tao as a potential witness knowledgeable about "(l) Inspections and/or analysis of inventory of the equipment seized by the PSB; (2) Efforts to secure the release of the Individual Plaintiffs from detention in China; (4) The April 22, 2013 letter from HPFS (India) to the PSB, and drafts thereof; (5) ICT and Styller's failure to confirm that the Individual Plaintiffs were legitimate ICT employees and ICT's failure to establish that it was an authorized employer or trader in China, and issues concerning the importation of the equipment to China; and (6) the proprietary trademarks, logos, security tags, and/or other indicia of authenticity affixed to the subject equipment." Joffe Decl. Exh. D. Plaintiffs' search of Defendants' production, however, has turned up no documents mentioning "Meng Tao" (although he appears on 61 privilege log entries).

very same parties as in Plaintiffs' case: HPFS, H3C and TT Global. Even though Defendants

have not produced a single document beyond this 2-page email chain disclosing the second "HP

counterfeit investigation in China," the email strongly suggests that this "counterfeit

investigation" may have involved the H3C equipment sold by TT Global. Moreover, Defendants'

privilege log contains numerous email correspondence on the subjects of "HPFS/H3C grey

marketing matter" and "HPFS grey marketing issue," potentially pointing to a broader problem

than the particular transceivers seized from Plaintiffs.

> **VI.    Communications concerning the Equipment**
> **or the Individual Plaintiffs' incarceration.**

Request 11.    All communications among and between the HP Entities concerning the Equipment and/or the incarcerated Individual Plaintiffs.

Request 15.    All documents concerning communications with the PSB regarding the Equipment or the Individual Plaintiffs.

Request 16.    All documents concerning the March 2013 Letter.

Request 18.    All documents concerning the April 1, 2013 Letter.

Request 19.    All documents concerning the "internal meeting" referenced in Gill's email dated April 15, 2013, quoted in paragraph 136 of the SAC.

Request 20.    All documents concerning the April 22, 2013 Letter.

Request 21.    All documents concerning the attempts to deliver the April 22, 2013 Letter to the PSB referenced in paragraph 151-159 of the SAC.

At least 72 of Defendants' employees and 4 of H3C's employees were involved in

numerous written communications responsive to these document requests, on subjects such as

the "arrest of ICT sales representatives," "transceivers," "equipment sold to ICT," "seized

equipment," "incident involving ICT sales representatives," "investigation of ICT claims,"

"product verification," "equipment sent to China," "update to litigation," "letter to Chinese

police," "verification report and draft letter," and "draft product sample verification report." Dkt.

219-2. Yet, Defendants' miniscule 569-document production includes virtually ***no*** internal correspondence or documents on these core issues directly responsive to Plaintiffs' requests. Aside from the few aforementioned emails concerning H3C's test of the TT Global transceivers, Defendants produced one email exchange where Mr. Cozzolina, HP Company's Global Anti-Counterfeit Investigation Program Manager, suggests to HPFS' Director James O'Grady on February 22, 2013 that HP should wash its hands off the Chinese investigation and leave the Individual Plaintiffs at the mercy of H3C "working with the authorities."

**D.   Documents improperly withheld or redacted as privileged**

Defendants withheld or redacted 808 documents while producing only 234 unredacted internal documents. Defendants' privilege claims are untenable for the following reasons.

**1.   The underlying facts are not protected by any privilege**

The attorney-client privilege is "strictly construed," In re Reorganization of Elec. Mut. Liability Ins. Co., 425 Mass. 419, 421 (1997), and "does not protect disclosure of the ***underlying facts*** by those who communicated with the attorney." Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981) (emphasis added throughout unless otherwise stated). "[T]he privilege extends only to *communications* and not to facts," and does not allow a person to "refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Id. (emphasis original). "Certainly, the privilege would never be available to allow a corporation to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure." Radiant Burners, Inc. v. Am. Gas Ass'n, 320 F.2d 314, 324 (7th Cir. 1963). See also United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 359 (D. Mass. 1950) (holding that "there is no privilege for

so much of a lawyer's letter, report or opinion as relates to a fact gleaned from a witness") (citing Hickman v. Taylor, 329 U.S. 495 (1947)).

Neither are the underlying facts protected from disclosure by the attorney work product privilege. "Where relevant and nonprivileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." Hickman, 329 U. S. at 511 (1947). See also State of Maine v. US Dept. of Interior, 298 F. 3d 60, 70 (1st Cir. 2002) (Attorney work product privilege "does not protect from disclosure 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'").

The results of the transceivers' inspections and the findings that the transceivers carried counterfeit H3C logos are factual and technical, not legal.[5] That Defendants funneled these "verification reports" and other results of inspections of transceivers through their inhouse legal department does not change their factual nature and does not protect them from disclosure. Defendants should be required to produce all documents containing these underlying facts.[6]

---

[5] Defendants have objected to Interrogatory 5 ("Do you contend that the Seized Equipment was counterfeit or carried counterfeit trademarks?") by claiming that the Interrogatory "seeks legal conclusions as to whether the equipment was ultimately 'counterfeit' or 'carried counterfeit trademarks.'" Joffe Decl. Exh. C. Defendants' implausible claim that the counterfeit nature of the equipment is a legal rather than factual question is undermined by the very next paragraph in Defendants' interrogatory response, where they state that they do not "currently have sufficient independent information to provide a substantive response to this Interrogatory," and reserve their rights "to amend and supplement this response subsequent to an inspection performed by a testifying expert." Thus, in April 2019 (the date of the amended response), after years of numerous discussions with numerous in-house counsel, Defendants did not reach any "legal conclusions" and relied instead on their expert witness to give them a technical (not legal) answer after a 3-day inspection.

[6] Moreover, "[t]he privilege derived from the work-product doctrine is not absolute." United States v. Nobles, 422 U.S. 225, 239 (1975). Like other qualified privileges, it may be overcome by a showing of substantial need. See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 184-87 (2d Cir. 2007). The Individual Plaintiffs were detained and incarcerated based on H3C's incriminating factual statements and Defendants' contemporaneous withholding of exculpatory factual evidence. These factual statements and evidence listed on Defendants' privilege are not available from any other source; they are central to Plaintiffs' claims; and they must be produced even if covered by the attorney work product privilege (which they are not) because of "substantial need."

### 2. Chinese law applicable to the inspections and communications in China does not recognize attorney-client or attorney work product privileges.

Pursuant to Chinese law that applies to the communications received and the inspections performed in China, these communications and inspections are not privileged.

Federal courts sitting in diversity apply the forum state's rules of privilege and its conflict of law rules with respect to privilege. See FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2002) ("We look to Massachusetts law to determine the scope of both the asserted privilege and the exception in this case."); Federal Rule of Evidence 501.

Plaintiffs' search has turned up no Massachusetts state appellate courts' rulings deciding what privilege law applies pursuant to Massachusetts' conflict of law rules where the potentially privileged communication take place outside of Massachusetts. However, "[t]he Massachusetts functional approach is explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." Clarendon Nat'l Ins. Co. v. Arbella Mutual Ins. Co., 60 Mass. App. Ct. 492, 496 (2004). The Restatement's Section 139(1) in turn provides that "[e]vidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum." The comments to the Restatement provide that "[t]he state which has the most significant relationship with a communication will usually be the state where the communications took place . . . which is the state where an oral interchange between persons occurred, *where a written statement was received or where an inspection was made of a person or thing*." Restatement (Second) of Conflicts of Laws, § 139, Comment e.

There are at least two distinct bodies of laws that apply to Defendants' potentially privileged communications in this case – Chinese law that applies to the results of the

"inspections" of the transceivers conducted in China and to Defendants' written communications sent to and received in China by H3C, HP China and/or the PSB, and Anglo-American law of various relevant states (including California, Massachusetts, New Jersey, the U.K., India and Australia) that apply to Defendants' other internal communications.

The key difference between these two bodies of laws for the present purposes is that ***China does not recognize attorney-client or work product privileges***. In <u>Wultz v. Bank of China Limited</u>, No. 1:11-cv-01266-SAS-GWG (S.D.N.Y. Oct. 25, 2013), Judge Shira Scheindlin stated that (i) "American law typically applies to communications concerning 'legal proceedings in the United States' or 'advice regarding American law,' while communications relating to 'foreign legal proceeding[s] or foreign law' are generally governed by foreign privilege law; (ii) "Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law," and (iii) "Chinese law does not recognize the attorney-client privilege or the work-product doctrine." Based on these rulings, the Court ordered defendant Bank of China to produce all documents from its privilege log dated prior to the receipt of plaintiffs' demand letter.

Here, H3C conducted inspections of the seized transceivers and the samples of TT Global's transceivers in China. HP China also conducted its inspection of the seized transceivers in China. Because Chinese law does not recognize attorney-client and work product privileges, Defendants could not have reasonably expected confidentiality of H3C's or HP China's inspections of the transceivers conducted in China and related communications. <u>See</u> <u>In re San Juan Dupont Plaza Hotel Fire Litig.</u>, 859 F.2d 1007, 1016 (1st Cir. 1988) ("Absent an expectation of confidentiality, none accrues."); <u>In re Keeper of Records (XYZ Corp.)</u>, 348 F. 3d 16, 23 (1st Cir. 2003) ("The lack of such an expectation shattered the necessary confidentiality."). In these circumstances, Massachusetts courts guided by the Restatement

would likely apply Chinese law to these inspections and related communications in China to find that they are not privileged, as should this Court sitting in diversity. Accordingly, the results of the investigations conducted in China, and the related written communications received in China by H3C and HP China, should be produced.

### 3. **Defendants waived privilege by disclosing their communications.**

"Disclosing a communication to a third party unquestionably waives the privilege." In re Teleglobe Comms, 493 F.3d 345, 361. (3d Cir. 2007); see also United States v. Massachusetts Inst. Of Tech., 129 F.3d 681 (1st Cir. 1997) (finding waiver through disclosure to third parties).

In Teleglobe, the Third Circuit undertook an in-depth analysis of the possible justifications "for not construing the sharing of communications within the corporate family as a waiver: (1) the members of the corporate family comprise one client, (2) the members of the corporate family are joint clients, and (3) the members of the corporate family are in a community of interest with one another." 493 F.3d at 370 (internal citations omitted). The Court concluded that only the second, joint-clients rationale "withstands scrutiny." Id.[7]

For the joint client exception to the discovery rule to apply, however, the parent and subsidiary must be represented by the same counsel, and "the keys to deciding the scope of joint representation are *the parties' intent and expectations*, and so the district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas." Teleglobe, 493 F.3d at 363.

---

[7] The Court reasoned that "treating members of a corporate family as one client fails to respect the corporate form." Id. at 371-72. The Court also found that "the community-of-interest rationale does not fit as a matter of black-letter law because the community-of-interest privilege only come into play when parties are represented by separate counsel, which is often not the case for parents and subsidiaries. Moreover, the community-of-interest privilege only applies when those separate attorneys disclose information to one another, not when parties communicate directly. Finally, it assumes too much to think that members or a corporate family necessarily have a substantially similar *legal* interests (as they must for the community-of-interest privilege to apply) in all of each other's communications." Id. at 372 (internal references omitted).

In their responses to Plaintiffs' document requests, Defendants stated that "H3C is not now a majority-owned HP entity and, ***during all times relevant to the allegations in the Second Amended Complaint, operated separately and autonomously from HP and its subsidiaries and affiliates.***" Joffe Decl. Exh. A (see also Defendants' Amended Responses objecting to the inclusion of H3C among the "HP Entities," Joffe Decl. Exh. B). Likewise, H3C itself expressly declared to the PSB that "***HPFS and H3C operate independently of each other.***" H3C had its own anti-counterfeit department and its own in-house lawyers (*e.g.*, Liu Rui). Since "the parties' intent and expectations" are "the keys to deciding the scope of joint representations," Defendants' own statements show that there was no such intent and expectations of joint representation by the same inhouse counsel between H3C and Defendants.

Defendants widely shared their privileged communications with H3C: at least 3 H3C representatives are identified on Defendants' privilege log, with Liu Rui (lr@h3c.com) appearing in 38 communications while also maintaining direct contact with H3C's auditor Wang You who had testified to the PSB that the seized transceivers were counterfeit. Defendants have waived any privilege with respect to these communications, which should be produced.[8]

Moreover, Defendants disclosed their communications outside of the corporate legal department to many non-legal employees. In United Shoe, the Court held that "quite apart from the nature of any specific communication, the *relationship* of a person in the patent department to the corporation is not that of attorney and client. Hence, the communication of a person in the patent department is as unprivileged as that of a lawyer who shares offices with his so-called

---

[8] These communications were on such key subjects as the "arrest of ICT sales representatives," "transceivers," "agreements with ICT and Shinto," "equipment sold to ICT," "seized equipment," "incident involving ICT sales representatives," "investigation of ICT claims," "product verification," "equipment sent to China," "update to litigation," "letter to Chinese police," "verification report and draft letter," and "draft product sample verification report."

client and gives him principally business but incidentally legal advice . . . ." 89 F. Supp. at 361 (emphasis original) (internal citations omitted).[9]

### 4.  The crime-fraud exception may overcome privilege.

The Court has "discretion to review privileged materials in camera to determine whether the crime-fraud exception applies. A lesser evidentiary showing is needed for in camera review than to obviate the attorney-client privilege. To justify [in camera] review, the government must set forth a factual basis 'to support a good-faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." US v. Joyce, 311 F. Supp. 3d 398, 407 (D. Mass.2018) (internal citations and quotation marks omitted).

Plaintiffs respectfully request an *in camera* review of a selection of Defendants' documents to determine whether the crime-fraud exception applies. To challenge the attorney-client privilege on the basis of the crime-fraud exception, the challenger must show "(1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." In Re Grand Jury Proceedings, 417 F.3d 18, 22 (1st Cir. 2005), cert denied, 546 U.S. 1088 (2006) (citations omitted).

---

[9] The Supreme Judicial Court's ruling in Messing, Rudavsky & Weliky, P.C. v. President and Fellows of Harvard College, 436 Mass. 347 (Mass. 2002) indicates that Massachusetts has a narrower view of the corporate entity for privilege purposes than the federal law as expressed in Upjohn. The Court ruled that only the following groups of corporate defendant's employees could not be contacted *ex parte* by plaintiffs' counsel: "those employees who exercise managerial responsibility in the matter, who are alleged to have committed the wrongful acts at issue in the litigation, or who have authority on behalf of the corporation to make decisions about the course of litigation." Id. at 357. The Court rejected the broader view as "overly protective of the organization and too restrictive of an opposing attorney's ability to contact and interview employees of an adversary organization." The Court also noted that "[w]hile our interpretation of the rule *may reduce the protection available to organizations provided by the attorney-client privilege*, it allows a litigant to obtain more meaningful disclosure of the truth." Id. at 358. Here, attorney-client privileged would be waived as shared with many Defendants' employees, not all of whom could be reasonably considered a part of the group as defined by the Supreme Judicial Court in Messing.

In <u>United States v. Gorski</u>, No. 14-1963, 2015 WL 8285086 (1st Cir. Dec. 9, 2015), the First Circuit affirmed in part the district court's application of the crime-fraud exception and even expanded it. Using a reasonable basis standard, the Court reviewed the chronology of events and the nature of the communications between Gorski and his attorneys, concluding that there was a reasonable basis to believe that Gorski engaged his attorneys in order to perpetuate his ongoing scheme to demonstrate outward compliance with applicable regulations. <u>See</u> also <u>In the Matter of A Grand Jury Investigation</u>, 437 Mass. 340, 360-63 (Sup. Ct. 2002) (applying crime-fraud exception).

There is a reasonable basis to believe that the Court's in camera review "may reveal evidence" that Defendants were engaged in fraudulent activities at the time of the purportedly privileged communications, and that their communications filtered through in-house lawyers were intended to facilitate Defendants' fraud and coverup. Simply comparing the chronology of Defendants' and HP China's stonewalling statements made to Plaintiffs and the PSB as alleged in SAC with Defendants' privilege log entries showing the extent and character of their contemporaneous internal discussions may reveal that Defendants used privileged communications to commit their fraud and coverup.

Indeed, Defendants, HP China and H3C had all acted in apparently close coordination to keep the Individual Plaintiffs incarcerated by withholding exculpatory evidence from the PSB while lying to the PSB and Plaintiffs. When reached by the PSB to explain the ICT-HPFS India contracts, HP China lied to the PSB that such contracts could be freely downloaded from the Internet; when contacted to verify the HPFS deal, HP China lied that it was trying to contact HP – all the while maintaining close communications with Defendants. H3C lied to the PSB that it did not know anything about the India deal while also maintaining close communications with

Defendants. And Defendants themselves lied to Plaintiffs that their PSB letter was substantially the same as the last draft even though it was drastically different.

These coordinated lies were intended to facilitate the false imprisonment and wrongful prosecution of the Individual Plaintiffs in furtherance of Defendants' own fraud and coverup. Accordingly, Plaintiffs believe there is an ample basis for the Court's in camera review to determine whether Defendants' privileged communications intended to facilitate their fraud and coverup.

## **CONCLUSION**

Defendants' discovery misconduct committed against Plaintiffs is severe and pervasive. From 2013 until now, Defendants have continued to suppress key documents in the face of official investigations, first stonewalling the PSB's and Plaintiffs' requests for exculpatory evidence in the course of the Chinese criminal investigation, now hiding that evidence from discovery in the course of this Court proceeding, all the while aggressively attacking Plaintiffs.

Plaintiffs respectfully submit that Defendants should be compelled to remedy their inadequate discovery and sanctioned for their misconduct. [10]

---

[10] It appears that HP's abuse of the discovery process is not unique to this case. In Hewlett-Packard Co. v. Professional Investigating & Consulting Agency, Inc., C.A. No. N12C-06-196 MMJ CCLD (Del. Sup. Ct.), after the jury had found HP liable for willful and malicious wrongdoing, plaintiff appealed seeking additional sanctions for HP's bad faith conduct in discovery, alleging in their August 17, 2015 appellate brief that HP: "(1) suppressed crucial evidence; (2) sought to abuse the discovery process; and (3) attempted to defraud the trial court," "allow[ed] the very employees accused of wrongdoing to decide which documents would be subject to searching for the agreed upon ESI search terms," "suppressed smoking gun Kwansi emails," "suppressed ISMA/OSAC presentation," "sought to defraud the trial court and continues to deceive"; "purposefully suppressed relevant evidence throughout this litigation and knowingly introduced false evidence at trial." Plaintiff further alleged that "HP knew that Kwasny, Velez, and Cozzolina were central figures in this action and purported to have produced all of their relevant documents. The parties spent millions of dollars and several years litigating this matter, only to find out after trial that HP's entire document production was a sham." As shown, Defendants' document production here is likewise a sham.

August 23, 2019                                    Respectfully Submitted,

_____

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964
Email: dimitry@joffe.law


Joshua McGuire
THE LAW OFFICE OF JOSH
MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

21

## <u>CERTIFICATE OF SERVICE</u>

I, Dimitry Joffe, hereby certify that on this 23rd day of August 2019, I caused a copy of

Plaintiffs' Motion to Compel and Supporting Memorandum of Law, accompanied by Declaration

of Dimitry Joffe with exhibits, to be served by ECF upon Defendants' counsel of record.

_____

Dimitry Joffe