# **<u>EXHIBIT A</u>**

1          UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3     - - - - - - - - - - - - - - - - - x

4     INTEGRATED COMMUNICATIONS &           :
      TECHNOLOGIES, INC., et al.,
5                                           :    Civil Action No.
             Plaintiffs,                         1:16-cv-10386-LTS
6                                           :

             v.
7                                           :

      HEWLETT-PACKARD FINANCIAL SERVICES
8     COMPANY, et al.,                      :

9            Defendants.                     :

10    - - - - - - - - - - - - - - - - - x

11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13
                        STATUS CONFERENCE
14

15
                     Monday, June 10, 2019
16                         2:45 p.m.

17

18
             John J. Moakley United States Courthouse
19                      Courtroom No. 13
                        One Courthouse Way
20                     Boston, Massachusetts

21

22
                     Rachel M. Lopez, CRR
23                   Official Court Reporter
               One Courthouse Way, Suite 5209
24             Boston, Massachusetts  02210
                       raeufp@gmail.com
25

1                   **A P P E A R A N C E S**

2

     On behalf of the Plaintiffs:

3
         LAW OFFICE OF DIMITRY JOFFE
4        BY:  DIMITRY JOFFE
         230 Park Avenue
5        10th Floor
         New York, New York  10169
6        (212) 309-8711
         dimitry@joffe.law

7

8        LAW OFFICE OF JOSH MCGUIRE
         BY:  JOSHUA A. MCGUIRE
9        51 Winchester Street
         Suite 205
10       Newton, Massachusetts  02461
         (617) 461-6400
11       josh@joshmcguirelaw.com

12

13   On behalf of the Defendants:

14       GIBBONS, P.C.
         BY:  ANTHONY P. CALLAGHAN AND PAUL A. SASO
15       One Pennsylvania Plaza
         37th Floor
16       New York, New York  10119
         (212) 613-2015
17       acallaghan@gibbonslaw.com

18

19       CHOATE HALL & STEWART LLP
         BY:  MICHAEL H. BUNIS
         Two International Place
20       100-150 International Place
         Boston, Massachusetts  02110
21       (617) 248-4030
         mbunis@choate.com

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  Today is June 10th, the case of
 4    Alexander Styller, et al., v. Hewlett-Packard, et al., civil
 5    action 16-10386 will now appear before this Court.
 6              Counsel, please identify themselves for the record.
 7              MR. JOFFE:  Dimitry Joffe, counsel for plaintiff,
 8    and with me is Josh --
 9              MR. MCGUIRE:  Josh McGuire, also on behalf of the
10    plaintiffs.
11              THE COURT:  Good afternoon.
12              MR. JOFFE:  Good afternoon.
13              MR. MCGUIRE:  Good afternoon.
14              MR. CALLAGHAN:  Anthony Callaghan, Your Honor, and
15    Paul Saso from Gibbons PC, on behalf of the defendants.
16              MR. BUNIS:  Michael Bunis, Choate, Hall, & Stewart
17    on behalf of the defendants, as well, Your Honor.
18              THE COURT:  All right.  Good afternoon.  So I
19    looked at both of your status reports and let me see if --
20    there haven't been any developments since you filed those,
21    right?
22              MR. CALLAGHAN:  Yes, Your Honor, there have.
23              THE COURT:  Oh, all right.  Maybe I should hear
24    that first.
25              MR. CALLAGHAN:  In our version of the status
```

1    report, we identified that we had received a production of

2    documents from the plaintiffs.

3              THE COURT:  162,000 pages, I thought.

4              MR. CALLAGHAN:  Yes.  That was a sweetener, Your

5    Honor.  We've since received another 620,000 pages as of this

6    past Friday and I believe when we were on the train on the

7    way up here, we received almost another 1,000 pages on top of

8    that and we have issues with those, we'll address them when

9    Your Honor pleases.

10             THE COURT:  Okay.  So this is just -- I want to

11   summarize where I think you all are and what's what, and then

12   what questions are to resolve.

13             So the way I see it is the first question is

14   inspection of the equipment and, from the defendants'

15   perspective, you're done with inspecting it, you've had your

16   experts look at it.  They're preparing expert reports and I

17   assume at some point those reports are ready.

18             MR. BUNIS:  That's right, Your Honor.  Exactly

19   correct.  We did the inspection in early May and we have a

20   proposed schedule for dealing with that in the --

21             THE COURT:  Right.  From the plaintiffs'

22   perspective, you haven't inspected it yet.

23             MR. JOFFE:  Not yet, Your Honor.

24             THE COURT:  And are you -- you're intending to

25   inspect it, in your view, in advance of when the -- your

1    expert would have to do his or her expert report.

2               MR. JOFFE:  Yes, Your Honor.

3               THE COURT:  All right.  Okay.  Then with respect to

4    documents and interrogatories, the way I read the reports are

5    the production of documents and the answers to

6    interrogatories from the defendants, that is defendants'

7    answers to plaintiffs' requests, defendants' view is you're

8    done.  You've done your document discovery, you've answered

9    the interrogatories.  From defendants' view, there's no

10   issues, at least in the status report.

11              From plaintiffs' view, with respect to defendants,

12   it seems that there are some issues, from your perspective,

13   that you think need to be conferred about and might or might

14   not lead to a motion to compel.  Would that be fair?

15              MR. JOFFE:  That's fair, Your Honor.

16              THE COURT:  All right.  And then from -- with

17   respect to documents and interrogatories' answers from the

18   plaintiffs, what I infer from what's been described in the

19   papers, plus Mr. Callaghan's short additional summary is that

20   it's either -- well, I don't know whether it's done from --

21   in plaintiffs' view, are you done producing, subject only to

22   if they're unhappy with something that you agree with or

23   subject only to a motion to compel, or are you not yet done

24   in your view?

25              MR. MCGUIRE:  I think there's a small number of

1    documents still to be produced, much smaller than the volume

2    that's been produced to date, and that should be within the

3    next week.

4              THE COURT:  All right.  So would you be, fair to

5    say, that by June 17th you'd be done?

6              MS. MCGUIRE:  I think that's a fair estimate.

7              THE COURT:  Okay.  And when you say a small number,

8    small vis-à-vis 1,000, small vis-à-vis 160,000, or small

9    vis-à-vis 600,000 documents?

10             MS. MCGUIRE:  Much closer to the first.

11             THE COURT:  1,000.

12             MS. MCGUIRE:  Yeah.  It's sort of a clean up,

13   additional set of search terms to be applied to a very small

14   set of one custodian.

15             THE COURT:  Okay.  So close to done, subject to,

16   from what I hear from Mr. Callaghan today and from what

17   you've described in your status report, you think there are

18   issues that maybe get resolved in meet and confer, and if

19   they don't, lead to motion practice.

20             MR. CALLAGHAN:  Your Honor, when we submitted the

21   status report, that was our position.  I think it may have

22   become a little more unwieldy since then.  We received on the

23   Friday before the status report the 160, whatever it was,

24   thousand pages.  We have those uploaded on to a system that

25   allows us to read them and sort of interpret them.  That

1    hadn't been done by the time we submitted our status report.

2    This stuff that we -- god knows when that will be done and

3    unloaded so we can read it, but we have had a chance to

4    review the stuff that came Friday a week ago --

5            THE COURT:  I don't think god's going to give you

6    an answer to that question.  I think you're going to have to

7    figure that answer out yourself.

8            MR. CALLAGHAN:  Well, I'm always hopeful, Your

9    Honor.

10           THE COURT:  It's good to have hope.  Some people

11   say pray like there is god, but act like there isn't.

12           MR. CALLAGHAN:  And stand at the back and leave

13   after the first collection, Your Honor.

14           We've had a chance to review the indexes and some

15   samples of the documents that were in that production.  And

16   our review, Your Honor, is -- and we have not had a chance to

17   meet and confer on this, but our view is a large proportion

18   of that which we reviewed is entirely nonresponsive, is

19   completely irrelevant, and would, in any other context -- and

20   I don't like to cast aspersions, but in any other context

21   would be viewed as a dump of spam.  And that's really

22   concerning to us, so --

23           Where we were at the time our status report has

24   shifted.  We have not met and conferred on this.  But

25   somebody is going to have to review these documents and what

```
1    we just got last Friday and ascertain, number one, their

2    relevance.  Number two, their responsiveness.  Number three,

3    some of the custodians that appeared to have produced these

4    documents were never identified before.  Some maybe will be

5    useful to us going forward.  We may want to come back and get

6    from those custodians, because we didn't know they existed,

7    but there's 780,000 pages to be reviewed, your Honor.  If

8    it's on us to review them, we will be coming back before Your

9    Honor and ask for a shifting of fees.

10                THE COURT:  All right.

11                MR. CALLAGHAN:  If not a preclusion.

12                THE COURT:  Okay.  So then what I read -- so what I

13   read from all of this is that one issue is you all want --

14   there may be motions to compel or various discovery motions

15   of one form or another coming and we need a date for that,

16   that you both agree that June 14th for privilege logs, right?

17                MR. CALLAGHAN:  Not to speak for learned counsel,

18   Your Honor, but that may have been a miscommunication on the

19   final version of what we submitted.  I think it was

20   tentatively agreed that the date would be the 24th and there

21   was a misstatement in an e-mail back and forth, but I think

22   it was --

23                THE COURT:  So June 24th, rather than the --

24                MR. CALLAGHAN:  Is that correct, Dimitry, that we

25   meant the 24th?
```

1          MR. JOFFE:  I believe we also -- we discussed it,

2     Your Honor, in the context of expediting the decision on the

3     issue of the counterfeit versus authentic equipment on

4     exchange, expert reports, and actually staying fact

5     discovery, staying further depositions, or request for

6     admission, in a sense putting the issue of counterfeit --

7          THE COURT:  Yes.  So what I understand you all

8     wanted to do was resolve the paper discovery issues.  That

9     there would -- that the further production to come would be

10    there might be some privilege logs, whether it's the 14th or

11    24th, then you wanted to resolve those questions.  Then you

12    wanted to proceed to resolved the -- you both agreed to

13    proceed to resolve on the question of the -- the authenticity

14    or the counterfeit nature of the equipment at the time it was

15    sold in -- not in India, but from India, and that the

16    disagreement -- that you both agree to that process.

17          The disagreement was that plaintiffs thought that,

18    in addition to the paper -- it seems like, from the

19    defendants' perspectives, the paper discovery plus experts

20    was enough, plus possibly your 30(b)(6) with respect to the

21    ESI.  That that was the universe of discovery for proceeding

22    to resolve the counterfeit question; is that right?

23          MR. CALLAGHAN:  That's correct, Your Honor.

24          THE COURT:  And depositions and request for

25    admissions we've put off until after that was resolved, from

1   your view.

2           In my impression from your status report,

3   Mr. Joffe, was that you agreed with that with one caveat, and

4   that was that you wanted, in addition, fact discovery into

5   the March 13th -- I think it was 2013, but whatever your Gill

6   letter, in which there were certain statements based on

7   available evidence, what the letter expresses about the

8   equipment.

9           MR. JOFFE:  Exactly right, Your Honor, and just a

10  little bit broader.  In 2013, the defendants inspected the

11  equipment, wrote a letter in March, and in April, making

12  statements.

13          THE COURT:  When you say "defendants inspected the

14  equipment," who actually inspected the equipment?

15          MR. JOFFE:  There were teams of HP and HP China,

16  and HPFS, in China, inspecting the equipment.

17          THE COURT:  So there were people, you say, from the

18  entities you have sued?

19          MR. JOFFE:  Correct, Your Honor.

20          THE COURT:  Who went to China and who actually

21  physically looked at the equipment.

22          MR. JOFFE:  Looked -- well, their representative

23  Ming Dao, I believe, looked at the equipment.  They have

24  requested samples of transceivers from TT Global, who was in

25  possession of three quarters of that equipment still.  They

1    requested photos of that equipment and they --

2            THE COURT:  So my question is, so first of all, do

3    you -- what discovery do you want into that Gill letter, in

4    any inspection?

5            MR. JOFFE:  I want to -- to receive at least

6    documents underlying the conclusions that they've reached in

7    2013, because those conclusions --

8            THE COURT:  And you've asked for those documents

9    already.

10           MR. JOFFE:  I've asked and I have not received.

11           THE COURT:  So that's -- so we're not going to

12   argue in a big way -- first, we're going to -- we're not

13   going to bleed into argument in the motion to compel at the

14   moment.  You all basically, if I were to summarize it, are

15   unhappy with the document production from the other side.

16   Anybody disagree with that?

17           MR. CALLAGHAN:  No, Your Honor.

18           THE COURT:  Do you agree or disagree, Mr. Joffe?

19   You're either happy with their document production, or

20   unhappy with it.

21           MR. JOFFE:  We're not very happy.

22           THE COURT:  Right.  Exactly what I said.  So you

23   agree with me?

24           MR. JOFFE:  I agree with you.  Yes, Your Honor.

25           THE COURT:  Yes.  Okay.  So you're going to have

1    to -- we're going to talk about that in a minute.  We're

2    going to get that resolved.  Maybe not today, but we're going

3    to get it resolved.  So what I want to know is not about your

4    unhappiness with their document production.  I want to know,

5    other than what you get out of the motions to compel with

6    each other, either the meet and confer, and if not, coming to

7    me and me ordering whatever with respect to documents, is

8    there anything else -- is that everything that you want in

9    terms of that Gill letter?

10           In other words, you have what you have right now,

11   you get what you get from meet and confer, you get whatever

12   you get by coming to me.  I'm going to give you all a chance

13   to do that.  And then when you're done with that, you'd have

14   experts, you each have expert reports and expert depositions

15   regarding this counterfeit question and then you're planning

16   on doing a motion for partial summary judgment on that.

17   That's the universe of discovery for this?  I was unclear

18   whether, in your status report, you wanted more than that.

19   That's my question.

20           MR. JOFFE:  Your Honor, that's pretty much it,

21   except for when you limit to 2013.  That's basically when the

22   statements were made.  However, however, the presumption that

23   the expert is making is that the certain transceivers that he

24   had determined to be counterfeit were not sold in 2011 to us,

25   so they didn't come from HP.  So some of the documents that

1    we want to see would come from 2011.

2            THE COURT:  So those are documents?

3            MR. JOFFE:  Yes.

4            THE COURT:  So you're either going to -- and you

5    don't have those now?

6            MR. JOFFE:  No, we don't have all of the

7    documents --

8            THE COURT:  And you hope to get them in your meet

9    and confer, correct?  Right?  So you hope to get them in your

10   met and confer?

11           MR. JOFFE:  Yes.

12           THE COURT:  And if you don't get them in your meet

13   and confer, then I'm going to give you a chance to file a

14   motion and get them from me.

15           MR. JOFFE:  Correct.

16           THE COURT:  And then at the end of that process --

17   we're not saying whether you get them or you don't, but you

18   have what you have.  And then, at that point, is that the end

19   of discovery about this or not?

20           MR. JOFFE:  About this issue, about the counterfeit

21   versus the -- yes, I believe that would be.

22           THE COURT:  Okay.  So all that's left to tee this

23   issue up about the counterfeit, is to resolve the disputes

24   among yourselves about -- which you'll either resolve

25   yourselves or you'll bring to me about the documents and then

1  the experts, and then we're done with that.  Is that fair?

2  Do you both agree to that?

3          MR. MCGUIRE:  We agree.

4          MR. JOFFE:  Yes, Your Honor.

5          THE COURT:  Okay.  Okay.  So we'll come back to

6  this in a minute, we'll need a schedule, time period for you

7  to meet and confer and then file whatever motions you're

8  going to file.  I just have a couple of questions to clarify.

9          The way I understand it from your experts,

10 Mr. Callaghan, is that there's 700 and some odd pieces of

11 equipment and your expert, having looked at it, and his

12 conclusion or her conclusion is that all of the ones that are

13 by serial number, listed on the serial numbers that were

14 original sold by HP India, he says those are authentic.

15         Among the other 130 odd, whatever it is, putting

16 aside one that is too degraded to know about, of the others,

17 there's 28 that he says are counterfeit and those aren't on

18 the serial number list, and the rest, he hasn't determined

19 yet or he can't determine.

20         MR. CALLAGHAN:  Yes, Your Honor.  We -- in our

21 status report, I think we used the word "counterfeit."  We

22 had previously used the word "inauthentic" and we just need

23 to drill him down on which of those it is.

24         THE COURT:  Fine.  So my question is the theory of

25 your -- and I understand your theory, Mr. Joffe, that just

1    because it's not on the list of serial numbers from HP India

2    doesn't mean they didn't sell it.  But my question is, if he

3    says 28 of these items, of these 734, were counterfeit, then

4    your motion, which is essentially to knock out the first six

5    claims, does that -- how do you win that, if 28 of them, by

6    your expert, are conceded to be inauthentic or not authentic

7    or counterfeit?

8              MR. CALLAGHAN:  I'll let Mr. Bunis deal with that,

9    Your Honor, but I think this came up when we previously

10   talked and that would be the burden is on him to establish

11   that we sold counterfeit goods.

12             THE COURT:  I see.  So basically the theory is the

13   plaintiff has to prove that it came from you, it's not on the

14   serial list, and absent other evidence, plus the Shinto, or

15   whatever, that handled it between, that there wouldn't be a

16   fair inference that it came from you?

17             MR. BROMLEY:  That's correct.  Essentially saying

18   that the transceivers, the equipment that was sold by HPE to

19   the plaintiffs, the corporate entity plaintiffs was genuine,

20   all of it, genuine.

21             THE COURT:  Because the 611 listed on the list of

22   serial numbers your expert says are genuine and so -- and to

23   the extent there's now -- well, it's in the US, but were in

24   China, other ones, that are not genuine.  There's no evidence

25   that -- you say, that it came from you.

1           MR. BUNIS:  That's right and I would limit it to
2    the serial number.  In other words, the expert is going to
3    file a report telling you all the reasons why he, in his
4    expert experience and all that, can tell you why that
5    equipment is genuine.
6           THE COURT:  Right, it's the tying it back is by the
7    serial number.
8           MR. BUNIS:  That's right.  Well, it's that, plus,
9    right?  He didn't limit his inspection to simply looking at
10   the serial numbers and matching it up, but that's correct.
11          THE COURT:  I understand.  Okay.  I get it.  Okay.
12   All right.
13          MR. BUNIS:  Right, and it is his burden to
14   demonstrate that what he said in the complaint, the
15   allegations that are repeated throughout the second amended
16   complaint, about how the equipment was counterfeit, it's his
17   burden to demonstrate that, and we don't see how you get
18   there.
19          THE COURT:  Okay.
20          MR. BUNIS:  In fact, I don't know --
21          THE COURT:  You don't see how you get there?
22          MR. BUNIS:  I don't know that -- to be clear, I
23   don't know that there's a good-faith basis to establish even
24   the allegation that what we sold them was counterfeit.
25          THE COURT:  You'd have to get first summary

```
 1    judgment before you get to the question of good-faith basis
 2    on the allegation.
 3              MR. BUNIS:  Fair enough.  Fair enough.
 4              THE COURT:  Go ahead.
 5              MR. JOFFE:  Yes, Your Honor, to that point, those
 6    are the very words that the defendants stated in 2013, that's
 7    why my clients went to jail.  We're not making up those
 8    conclusions.
 9              THE COURT:  But you can't mix up, Mr. Joffe, people
10    you sued and you didn't sue.  You haven't sued -- was it H3
11    China?
12              MR. CALLAGHAN:  The H- --
13              MR. JOFFE:  No, but I'm referring to the sentencing
14    stated by HPFS India and David Gill in their letters.
15              THE COURT:  Right, and that letter said based on
16    available evidence.  So it says what it says.  We all can
17    read it and we all know what it says.  No one -- you all, I
18    suspect, will concede that the letters says -- it is written
19    in English, right?  You concede that?
20              MR. JOFFE:  Yes, and we have Chinese letters.
21              THE COURT:  But you concede that Mr. Gill's letter
22    is written in English?
23              MR. JOFFE:  Yes.
24              THE COURT:  Right, and it says what it says, right?
25              MR. JOFFE:  Exactly.
```

1          THE COURT:  And no one disputes that it says the

2    words that it says, but the question is what all that means

3    and what the other evidence was at the time, what it means

4    later.  I'm not ruling on that, but it is what it is.  But --

5    and there's no evidence that Mr. Gill contacted the Chinese

6    authorities before your clients were arrested to complain

7    about their activities.

8          MR. JOFFE:  No.  We don't have that evidence.

9          THE COURT:  And you don't allege that.

10         MR. JOFFE:  No, we don't allege that, correct.

11         THE COURT:  Right.  And your allegation is that H3

12   China did that, contacted the Chinese authorities before your

13   clients were arrested?

14         MR. JOFFE:  Yes.

15         THE COURT:  And H3 China is not a defendant, right?

16         MR. JOFFE:  It's not.

17         THE COURT:  So I just think we should be careful in

18   the words we use, to the extent you say defendants told the

19   Chinese authorities that caused their arrest the conduct that

20   most directly seems to have caused their arrest, as to what

21   we know, was a complaint from H3 China.  Maybe their

22   relationship is such that they're responsible in some way, I

23   don't know, but they're not a defendant.  Okay.

24         MR. JOFFE:  But may I --

25         THE COURT:  Yes, you can briefly respond to it.

1    MR. JOFFE:  Another thing that you pointed out,

2  that the expert report presumes that, because the serial

3  numbers are not on the 2011 list of serial numbers that means

4  it didn't come from HPFS.  Your Honor, just to remind you,

5  ICT took just one quarter of the equipment from India to

6  China.  The three quarters of the equipment remained in

7  India, in the hands of TT Global, which acted as an agent for

8  HPFS.  And in 2012, TT Global sent a list of those three

9  quarters of equipment still remaining in India, and that list

10  contained a lot of transceivers, were listed them by serial

11  numbers, 130 something transceivers, that were also not on

12  2011 list.  That was supplied by, in theory, if you recall

13  that.  So that undermines this presumption that the expert is

14  using --

15    THE COURT:  So two things.  Just a practical

16  question.  The reason -- most of this is going to be the

17  subject of your motion, that's your argument and you have

18  your argument and I'll resolve the motion.  My only question,

19  the reason that I'm asking a little bit about it now, is just

20  to understand how sensible it is to go down this road of

21  resolving this -- you both want to do it, so I'm inclined to

22  do it.

23    MR. CALLAGHAN:  Your Honor, just briefly.  This

24  came up the last time we were here.  It was produced to us

25  then and we've since had a chance to analyze it and we

1    haven't met and conferred, because we haven't met and

2    conferred.  There's a simple reason for the missing -- it was

3    actually not 135.  It was 192 pieces of equipment that were

4    listed in the India report from 2012, as opposed to what was

5    in the report in 2011.  The reason for that is they were

6    later returned from Tata Consulting.  The leaser later

7    returned that equipment after the first 2011 schedule.  If

8    learned counsel was to review those particular 195, it would

9    tell you that they were returned after the subject --

10            THE COURT:  So they're on a later schedule.

11            MR. CALLAGHAN:  They're on a later schedule, Your

12   Honor, that's the reason.

13            THE COURT:  Okay.  So -- all right.  So I'm willing

14   to proceed in essentially in the bifurcated way that you both

15   propose.  So when do you want to file -- well, what it seems

16   to me, at most, is coming is two discovery motions, one from

17   the defendants and one from the plaintiffs.  One from the

18   plaintiffs complaining about anything and everything you're

19   unhappy with with the defendants and with respect to

20   documents and interrogatories, one from the defendants

21   complaining about whatever you're unhappy about and want from

22   the plaintiffs.  When -- and you can file them at the same

23   time.  There's no reason they couldn't be filed at the same

24   time, right?  And then you file them and then they'll be

25   oppositions and then replies if you want.  And so how much

1  time do you need to file those?

2          MR. CALLAGHAN:  Well, Your Honor, I did a thumbnail

3  calculation on the way up and I allowed for ten seconds to

4  review each of the 780,000 documents.  That's a full year of

5  one associate's time, that's three months of four associates'

6  time.  In order for us to be --

7          THE COURT:  It's your grandchildren's college

8  tuition.

9          MR. CALLAGHAN:  Thank god.  Again, invoking the

10  deity, and I know he would probably object to appearing.

11  Your Honor, the issue is how do we resolve that before we can

12  tee up our motions on the discovery.

13          THE COURT:  So it seems like you have two issues.

14  Well, there's a couple of things.  First of all, you must --

15  this can't be the first time that you've received, whether it

16  was a spam dump or relevant 600,000 documents.  So I assume

17  you have methods to review those documents.  I will tell you

18  that I was just at a conference a week and a half ago where I

19  heard somebody presenting about something called "tar."

20          Are you familiar with that?

21          MR. CALLAGHAN:  Paul is.

22          THE COURT:  Right.  So there are various methods to

23  review it.  I assume that you don't necessarily need to read

24  all 680,000 documents in order to figure out the scope of

25  whether you're happy or unhappy with what you receive.  I

1    assume that you can talk to Mr. Joffe and that he will tell

2    you what they did and explain it in some detail, so that you

3    can simplify your understanding of what you have and figure

4    out whether you're unhappy with it or not, first in terms of

5    a spam dump, and second in terms of whether everything that

6    you're entitled to is responsive.  And so --

7              Because you certainly don't want a year or three

8    months for four people, right?  So I mean, I -- to some

9    extent, you -- I still get back to the date.  I will suggest

10   that -- as I did for the last lawyers, I think, like, you've

11   got 680,000 documents, it seems like custodians you've never

12   heard of, right?

13             MR. CALLAGHAN:  780, Your Honor.

14             THE COURT:  780 custodians.

15             MR. CALLAGHAN:  No, 780 pages of documents and --

16             THE COURT:  780,000 or 780?

17             MR. CALLAGHAN:  780,000, some from custodians that

18   we didn't know about, but we may be interested in persuing

19   further.

20             THE COURT:  So for like -- I assume, Mr. Joffe, you

21   would like to get to judgment sooner, rather than later.  Is

22   that fair?

23             MR. JOFFE:  Yes, Your Honor.

24             THE COURT:  Your clients were in prison.  They

25   would like to get this case done and win, right?  They would

1    like to get in front of a jury and get the money, so you

2    would like to move quickly, rather than slowly.  So it's in

3    your interest -- I'm sure you would do it anyway, but it's in

4    your interest to sit down with him and say this is how we got

5    780,000 documents.  This is what we searched, this is who we

6    searched, this is who this person is, this is what they do,

7    this is why we searched them, these are the terms, we

8    searched them for, this is the scope of time we searched them

9    for.  That would be helpful to you, right?

10                MR. CALLAGHAN:  Very, Your Honor.

11                THE COURT:  Right.  I mean, you have a choice.  I'm

12   not ordering you to do it, okay?  It seems sensible for you

13   to do it, because I assume you want to actually win money for

14   your clients, so you could do that.  If I find out that that

15   wasn't done and it's -- and I need to delay the case for a

16   long period of time to allow them to review it, then I have

17   half a mind to have a hearing and order your clients in and

18   explain to your client that you wouldn't do that.  That this

19   had delayed their case, and therefore, delayed their day to

20   get before the jury to complain about the time they were

21   imprisoned by the Chinese authorities, for which has

22   substantially impaired their existence, and for which they

23   seek money damages.

24                So all of this is about that.  We are three and a

25   half years into this case, would that be fair?

1          MR. JOFFE:  Yes, Your Honor.

2          THE COURT:  Right.  And the defendants, whether

3    they did it well or not well, they did their documentation

4    production within the time I set, which was April 15th.

5    That's the date from my review of the court docket, which I

6    reviewed last night, said was the date for concluding

7    document production.

8               Does anybody disagree with that date?

9          MR. CALLAGHAN:  No, Your Honor.

10         THE COURT:  Do either of you?

11         MR. JOFFE:  No, Your Honor, though I believe

12   we've -- did we ask for extension?

13         THE COURT:  Not from me.  So -- and the bulk of

14   your document discovery disclosures, some were done on

15   April 17th or 18th.  And 600 or 700,000 documents in --

16   between May 31st and June 9th.  So that's late.  It's late

17   the -- the first problem for being late is one of your own

18   making, which it means this case is going to take at least

19   six weeks longer than it otherwise would.  Because if you did

20   it -- if it had been done before April 15th, we would have

21   been having these discussions earlier.

22              So I just bring it to your attention, so far they

23   haven't complained to me specifically that it was late.  But

24   I just bring it to your attention, because usually it's the

25   opposite.  I see the defendant saying we want more time, we

1    want to delay it, but I bring it up first, because it's your

2    client's case.  It's very serious allegations that you made

3    in the complaint.  Very serious.  And obviously, very serious

4    interests at stake.  These people went to jail and so -- you

5    know, it should be done right and well, but it should be done

6    promptly.

7            So how long -- we know that the document discovery

8    is going to be done by June 10th from the plaintiffs.  So

9    then how long do you want to file the motions?

10           MR. SASO:  Your Honor, today is June 10th, I think

11   we --

12           THE COURT:  I'm sorry, June 17th.  You're right.

13   Thank you, I stand corrected.  June 17th is when the

14   plaintiffs will be done with the document production.  So how

15   long to file the motions?

16           MR. CALLAGHAN:  Based on the volume we've received,

17   Your Honor, unless we can maybe work out with the plaintiffs

18   that they'll whittle down what we got to something more

19   relevant or responsive, we probably need six weeks to review.

20           THE COURT:  How many documents did you produce?

21           MR. CALLAGHAN:  We produced a few thousand, Your

22   Honor, maybe 4,000.

23           MR. JOFFE:  2,000.

24           MR. CALLAGHAN:  2,800, something.

25           THE COURT:  How many people work for the plaintiff?

1           MR. JOFFE:  I'm sorry, Your Honor.

2           THE COURT:  How many people work for the plaintiff?

3    How many employees does it have?

4           MR. JOFFE:  Well, there are not many employees, but

5    for us, the time limit and the number of custodians was much

6    broader than for defendants.  We had to -- I think the search

7    period was from 2010 until now and it turned out that we had

8    a lot of electronic data to process and running searches was

9    very time-consuming and produced a lot of responsive

10   documents.  We -- every time we've run the search and see the

11   results, we would go back to defendants to try to limit the

12   search terms, because we were getting so many hits, Your

13   Honor, and the process, because of that amount of electronic

14   data, the process itself was taking longer than we expected.

15          MR. SASO:  Your Honor, I have to say that the

16   recent productions have sort of come as a shock to us, in

17   part, because you may also remember that there was an e-mail

18   migration that ICT did that we understand has limited ICT to

19   a single custodian that we at least knew about before we

20   received these document productions.  So we thought that, in

21   terms of ICT business e-mails, that they were down to Alex

22   Styller, the president and CEO, was the one and only

23   custodian that they would have e-mails for.  Although, in

24   addition, they may have personal Gmail accounts that they

25   would search.

1          But yes, now we have three quarters of a million

2     pages of e-mails relating to Coke versus Pepsi and, you know,

3     Groupon deals.  So it's not about the amount of custodians or

4     the number of years.  We are talking about not hundreds or

5     thousands, but hundreds of thousands of literal spam.  If you

6     search for the word spam, you will get tens of thousands of

7     hits.

8          THE COURT:  So why don't we do this.  For the

9     motions to compel, July 21st.  If you think that, based on

10    July 21st, there's further issues to be raised based on the

11    volume that you receive, because the explanation and whatever

12    you've done back and forth is not sufficient to put you in a

13    place, then you file a motion to compel as to what you can

14    and you file a separate motion explaining what issues are --

15    what else you have to do, how long you reasonably think it

16    would take, and what potential issues there might be.  They

17    may evaporate as you go along, or they may not.  And you file

18    that at that time and that will give you enough time to at

19    least figure that out.  It seems to me.

20         So July 21st for that.  Two weeks for -- which is

21    essentially 30 days after the production is complete.  Two

22    weeks to opposition, one week for reply.  Five-page minimum.

23    In addition, there's -- so the 22nd, I'm sorry.  22nd,

24    because that's a Monday.  Two weeks after for the opposition,

25    a week after for the reply.

1          I don't need -- for most of the issues with respect

2     to the discovery, I don't need a lot of law.  I'm more

3     interested in what was the request, what was the response,

4     what do you want, and why are you entitled to it, or why

5     aren't they.  And you should pay particular attention with

6     regard to the local rule, which specifies how to do what

7     needs to be within a motion to compel.

8          And second, you had a motion, an issue with respect

9     to one of the two third parties you took discovery from.  Is

10    that resolved, or are you going to want to file a motion with

11    respect to that?

12         MR. CALLAGHAN:  We may give one more -- we take one

13    more opportunity to make them --

14         THE COURT:  Fine.  If you want to file a motion

15    about the third-party discovery, you file it by July 21st,

16    and that will be a different motion addressed to a different

17    party.  That would resolve that.

18         Then my thought would be 30 days after whatever

19    discovery, if any, is produced in response to my order,

20    plaintiffs' expert report is due on the inspection of the

21    equipment.  30 days after that is defendants' report and

22    30 days after that the depositions of the experts.  So if I

23    say no more discovery for anyone, 30 days from the date of my

24    order.  If I say discovery, I'll set a date for when to

25    produce whatever extra discovery I order, and then it would

1   be 30 days after the production, the plaintiffs' expert, and

2   then the defendants' expert.  And if you think, after looking

3   at it and what the nature of the discovery is, you need to

4   push that back for some reason, you can tell me, but

5   otherwise that and 30 days after depositions for expert

6   reports are done.

7        Mr. Callaghan, your motion for partial summary

8   judgment will be due 30 days after that would be the

9   plaintiffs' opposition, two weeks after that, the reply.

10       The Request for Admissions and the depositions,

11  other than the 30(b)(6) deposition with respect to the ESI,

12  will be stayed pending the resolution of motion for partial

13  summary judgment.  After that, I would look to all of you to

14  see what kind of schedule we should set to go forward.  With

15  respect to the 30(b)(6), you can take that whenever you want.

16  I understand why you put that off and that's not subject to

17  the April 15th deadline.  So you can -- you get it once,

18  but -- with respect to that, but if you want to wait until

19  you get all the documents or wait until after, then you can.

20       MR. CALLAGHAN:  Thank you, Your Honor.

21       THE COURT:  All right.  Is there anything else to

22  resolve at the moment?

23       MR. JOFFE:  No, thank you, Your Honor.

24       THE COURT:  All right.  Nothing else for you?

25       MR. CALLAGHAN:  Other than Your Honor had asked

1    previously what these transceivers were.  I brought a couple
2    of samples, if you want to see them, but we can bring them
3    the next time to --
4           THE COURT:  Just let me see one right now for a
5    minute.
6           MR. CALLAGHAN:  May I approach?
7           THE COURT:  Yes.  So these go inside, they
8    basically plug into a computer or a rack?
9           MR. CALLAGHAN:  Yeah, they're sort of a facilitator
10   of communications between equipment on a network and they
11   speed things up and they pass you a volume of gigabytes of
12   information and make it a lot more efficient.
13          THE COURT:  I see.  Okay.  I got it.  So these are
14   what are alleged to have been counterfeit.
15          MR. CALLAGHAN:  There's two versions, XFPs and
16   SFPs.  I that's an SFP you have in your hand.  The SFPs are
17   slightly larger in size.
18          THE COURT:  Okay, but similar in idea.  Okay.
19   Fine.  Thank you.  Anything else?
20          And show it to Mr. Joffe, if he hasn't seen it.
21          Okay.  All right.  Thank you very much -- so I'm
22   not going to set another date to see you, because the next
23   thing will presumably either be a hearing on the motion --
24   motions to compel or summary judgment, depending on how it
25   goes.

1             All right.  Thank you very much.  We're adjourned.

2         (Court in recess at  3:20 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13                  Dated this 8th day of August, 2019.

14

15

16

17                  /s/ RACHEL M. LOPEZ

18

19

20          _____

                    Rachel M. Lopez, CRR
21                  Official Court Reporter

22

23

24

25