# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) **Civil Action No. 1:16-CV-10386 (LTS)** |
| v. | ) ) |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL, | ) ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFFS' RENEWED MOTION TO COMPEL AND SUPPORTING MEMORANDUM OF LAW

October 4, 2019

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 1

PROCEDURAL HISTORY.................................................................................................... 3

ARGUMENT ........................................................................................................................ 5

A.     Legal standards ....................................................................................................... 5

B.     Defendants' inadequate production, by the numbers........................................... 6

C.     Key documents withheld by Defendants ............................................................ 13

      1.     Return of the Equipment and its sale to ICT, 2011................................ 13

      2.     Inspection of the equipment remaining in India, 2012 ......................... 14

      3.     Disposition of the equipment remaining in India, 2012-13 .................. 15

      4.     Inspection of the Equipment seized in China, 2013 ............................. 16

      5.     Counterfeit nature of the Equipment...................................................... 18

      6.     Communications concerning the Equipment
           and/or the Individual Plaintiffs' incarceration ...................................... 20

D.     Documents improperly withheld or redacted as privileged ............................... 21

      1.     The underlying facts are not protected by any privilege....................... 21

      2.     Chinese law applicable to the inspections conducted in China
           does not recognize attorney-client or attorney work product privileges............23

      3.     Defendants waived privilege by disclosing their communications to H3C.......... 24

      4.     The crime-fraud exception may overcome privilege ............................ 26

CONCLUSION.................................................................................................................... 28

## **TABLE OF AUTHORITIES**

**Cases**

Addamax Corp. v. Open Software Found., 148 F.R.D. 462 (D. Mass. 1993) ............................... 9

Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135
  (S.D.N.Y. 1997) ............................................................................................................... 9

Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon,
  No. 14 Civ. 9372 (S.D.N.Y. May. 14, 2018) ............................................................. 12

Breuder v. Board of Trustees, No. 15 CV 9323 (N.D. Ill. Jul. 26, 2019) .................................... 12

Clarendon Nat'l Ins. Co. v. Arbella Mutual Ins. Co., 60 Mass. App. Ct. 492 (2004) ................. 23

Cutter v. HealthMarkets, Inc., No. 10-11488-JLT, 2011 WL 613703
  (D. Mass. Feb. 10, 2011) ................................................................................................. 5

Dahl v. Bain Capital Partners, LLC, 2009 U.S. Dist. LEXIS 52551
  (D. Mass. June 22, 2009) ............................................................................................... 6n.

FDIC v. Ogden Corp., 202 F.3d 454 (1st Cir. 2002) ................................................................... 23

Hatamian v. Advanced Micro Devices, Inc., No. 14-cv-00226-YGR (JSC)
  (N.D. Cal. Apr. 13, 2016) ............................................................................................. 13n.

Hickman v. Taylor, 329 U.S. 495 (1947) .................................................................................... 21

In re EpiPen Mktg., Sales Practices & Antitrust Litig., MDL No: 2785
  (D. Kan. Mar. 15, 2018) ................................................................................................ 13

In re Grand Jury Proceedings, 417 F.3d 18 (1st Cir. 2005) ........................................................ 27

In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180 (2d Cir. 2007) ......................... 22n.

In re Keeper of Records (XYZ Corp.), 348 F. 3d 16 (1st Cir. 2003) .......................................... 24

In re Reorganization of Elec. Mut. Liability Ins. Co., 425 Mass. 419 (1997) ............................ 21

In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007 (1st Cir. 1988) .......................... 24

In re Syngenta AG MIR 162 Corn Litig., No. 14-02591-JWL-JPO
  (D. Kan. June 23, 2015) ............................................................................................... 13n.

In re Teleglobe Comms, 493 F.3d 345 (3d Cir. 2007) ................................................. 24, 25, 26n.

In the Matter of A Grand Jury Investigation, 437 Mass. 340 (Sup. Ct. 2002) ............................ 27

Kleen Products LLC v. Packaging Corp. of Am., No. 10 CV 5711, 2012 WL 4498465
(N.D. Ill. Sept. 28, 2012) ................................................................................ 12

MariCal, Inc. v. Cooke Aquaculture, Inc., No. 1:14-CV-00366-JDL, 2016 WL 9459260
(D. Me. Aug. 9, 2016) ..................................................................................... 13

Mount Hawley Insurance Co. v. Felman Producution, Inc., 269 F.R.D. 609
(S.D.W.V. 2010) .............................................................................................. 13

Radiant Burners, Inc. v. Am. Gas Ass'n, 320 F.2d 314 (7th Cir. 1963)........................................ 21

Seaman v. Duke Univ., No. 1:15 CV 462 (M.D.N.C. Mar. 21, 2018) ..................................... 13n.

United States v. Gorski, No. 14-1963, 2015 WL 8285086 (1st Cir. Dec. 9, 2015)...................... 27

United States v. Massachusetts Inst. Of Tech., 129 F.3d 681 (1st Cir. 1997) ............................ 24

United States v. Nobles, 422 U.S. 225 (1975) .......................................................................... 22n.

United States v. United Shoe Machinery Corp., 89 F. Supp. 357 (D. Mass. 1950) .................... 22

Upjohn Co. v. United States, 449 U.S. 383 (1981) .................................................................. 22n.

Wultz v. Bank of China Limited, No. 1:11-cv-01266-SAS-GWG
(S.D.N.Y. Oct. 25, 2013) ................................................................................. 23

## Other authorities

Rule 26(b)(1) of the Federal Rules of Civil Procedure.................................................................. 5

Restatement (Second) of Conflicts of Laws, § 139, Comment e................................................. 23

## PRELIMINARY STATEMENT

Defendants have abused the discovery process by making a woefully deficient document production, by withholding key evidence essential to the preparation of Plaintiffs' case, and by asserting unfounded privilege claims.

*First*, the five Defendants in this case – two Fortune 500 companies and their affiliates – have collectively produced 580 documents (less than 1% of Plaintiffs' production) from only 4 custodians despite the involvement of at least 113 of Defendants' employees in the relevant events spanning several years and continents. Three of the five Defendants – HPI, HPE and HPFS India – did not produce any documents at all. See Part B below.

*Second*, Defendants suppressed key factual evidence related to the authenticity of the Equipment sold to ICT. Plaintiffs had sought those documents throughout their incarceration and criminal investigation in China, but Defendants rebuffed them at every turn while H3C repeatedly urged the PSB to prosecute the Individual Plaintiffs and while HP China stonewalled the PSB's requests for information, falsely claiming ignorance of the matter.

As Defendants' production and especially their privilege log have now revealed, H3C and HP China had been in frequent communications with Defendants since early February 2013 on such subjects as the "arrest of ICT sales representatives," "H3C transceivers," "equipment sold to ICT," "seized equipment," "incident involving ICT sales representatives," "investigation of ICT claims," "product verification," "equipment sent to China," "update to litigation," "letter to Chinese police," "verification report and draft letter," and "draft product sample verification report." Dkt. 219-2 (Defendants' privilege log). While in close communications with Defendants, H3C testified to the PSB in May 2013 and in August 2014 that the seized transceivers were counterfeit H3Cs. Defendants themselves in their April 2013 letter to the PSB

1

admitted that "part of the Sold Equipment supplied by Inspira did not come from HP Company," and in their earlier, March draft of that letter stated that "the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases." Defendants also assured Plaintiffs in 2013 that "HP [was] reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it." Dkt. 101, SAC ¶¶ 125, 141.

In May 2013, Defendants also asked H3C to inspect a sample of transceivers in TT Global's possession from the same batch of the Commonwealth Games equipment as the transceivers sold to ICT; following that inspection, Defendants discussed instructing TT Global to destroy the rest of the equipment due to its questionable nature and origination, and paying $200,000 to TT Global for it. See the accompanying Declaration of Dimitry Joffe dated October 4, 2019 ("Joffe Decl."), Exh. A.

Yet, Defendants did not produce any of their contemporaneous "verification report," "sample verification reports," any results of their inspection of TT Global's transceivers, any documented basis for their conclusion that counterfeiting occurred prior to the sale to ICT, or any results of HP's review of the initial sale to determine how the counterfeit equipment was produced and by whom. By withholding these documents, Defendants attempt to hide what they and H3C knew about the transceivers in 2013-14 when they in unison pronounced them counterfeit and took actions consistent with that view. Defendants concealed that information from the PSB and Plaintiffs then, and continue to conceal it from Plaintiffs now, even though its relevance and significance to the case are beyond peradventure. See Part C below.

*Third*, Defendants withheld or heavily redacted 833 documents (more than they produced) by making unfounded privilege assertions. In particular, Defendants attempt to (i)

conceal the underlying *facts* of the Equipment's origination and authenticity under the guise of privileged information by funneling them through their inhouse counsel; (ii) assert privilege with respect to the inspections conducted in China by the Chinese companies H3C and HP China even though the Chinese law applicable to these inspections does not recognize any such privilege; (iii) shield their communications with H3C under the broad corporate entity umbrella while asserting that H3C "operated separately and autonomously from HP and its subsidiaries and affiliates"; and (iv) claim privilege with respect to communications that facilitated their fraud and coverup. See Part D below.

## **PROCEDURAL HISTORY**

On July 12, 2019, following the review of Defendants' 569-document production and 833-entry privilege log, the undersigned sent Defendants' counsel a 10-page letter complaining of serious deficiencies in Defendants' production. Joffe Decl. Exh. I. On July 19, 2019, the parties submitted their Joint Report to the Court, in which Defendants took the position that Plaintiffs' July 12 letter did not constitute a proper "meet and confer" request, and stated that "to the extent defendants have the specifically delineated non-privileged documents referenced in counsel's July 12 letter, defendants do not object to producing them." Dkt. 206. Pg. 11 n.4.

On July 22, 2019, Plaintiffs' counsel by email asked Defendants' counsel to "please let me know when to expect Defendants' production of those documents that defendants 'do not object to producing,' according to your statement in the July 19 Report, and your availability for a meet-and-confer to address Plaintiffs' concerns raised in my July 12 letter, which I believe would make most sense to conduct following that production." Dkt. 219-4. Defendants did not produce any such documents in response and ignored Plaintiffs' request to schedule a meet-and-confer.[1]

---

[1] Instead, on July 26, 2019, Defendants' counsel sent an email to Plaintiffs' counsel, stating: "We are looking into the substance of your July 12 letter. I will be out of the office next week. In the event that the Court issues an order

On July 26, 2019, Plaintiffs' counsel again asked Defendants' counsel for their "availability for a meet and confer with respect to the outstanding deficiencies in Defendants' production set forth in my July 12 letter, to which Defendants have failed to respond." Dkt. 219-5. Defendants did not respond to that email, ignoring Plaintiffs' request for a meet-and-confer.

On September 11, 2019, Defendants produced one email (previously produced) and an attached spreadsheet (not previously produced) as the documents they said they did not "object to producing" in the July 19 Report.

On September 16, 2019, the Court issued an order denying Defendants' motion to strike Plaintiffs' motion to compel, dismissing Plaintiffs' motion to compel for failure to comply with Local Rule 37.1(b) without prejudice to renewing it by October 4, 2019, and directing the parties to meet and confer prior to renewing the motion. Dkt. 234.

On September 23, 2019, counsel for Plaintiffs Dimitry Joffe and counsel for Defendants Anthony Callaghan and Paul Saso met and conferred telephonically in an effort to narrow the discovery issues raised by Plaintiffs. The conference lasted two hours and for the most part concerned the deficiencies claimed by Plaintiffs (a part of the conference was dedicated to the issues that Defendants had raised with respect to Plaintiffs' privilege log).

On October 1, 2019, Defendants produced one email (previously produced) with eight attached pictures (not previously produced), bringing their total production to 580 documents. Defendants' counsel also sent two follow-up letters to Plaintiffs' counsel after the meet and confer, on September 27 and October 1, 2019 (Joffe Decl. Exhs. B and C, respectively), making the following representations: (a) with respect to the 2010 equipment importation documents,

---

permitting plaintiffs to pursue further discovery, after not filing a discovery motion by July 22, perhaps we can schedule a call and discuss these issues further once I return on August 5." Dkt. 219-5.

including its serial numbers, Defendants' counsel state that they "have inquired further internally and there is no evidence to suggest that Inspira ever sent these documents to Defendants, despite their requests. Accordingly, we believe that they are not within Defendants' possession, custody or control" (Joffe Decl. Exh. C at p. 1); (b) with respect to the 2011 return of the equipment and its sale to ICT, Defendants' counsel state that "TT Global did not perform any authentication testing on the equipment" (Joffe Decl. Exh. B at p. 3); and (c) with respect to the 2011 inspection of the equipment sold to ICT and the 2012 inspection of the equipment sold to TT Global, Defendants' counsel state that "the only written 'results' of any 'audit,' 'testing' or inspection performed by TT Global, and in Defendants' possession, custody or control, are the spreadsheets that have already been produced by Defendants." Joffe Decl. Exh. C at p. 1. These representations have somewhat narrowed the disagreement between the parties but have not eliminated the need for this renewed motion to compel.[2]

## ARGUMENT

### A.    Legal Standards

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of information that is "relevant to any party's claim or defense and proportional to the needs of the case," taking into account such factors as "the importance of the issues at stake," "the parties' resources," "the importance of the discovery is resolving the issues," and "whether the burden or expense of the proposed discovery outweighs its likely benefit." The party seeking discovery to which an adversary has objected bears the burden of showing relevance. See Cutter v. HealthMarkets, Inc., No. 10-11488-JLT, 2011 WL 613703, at *2 (D. Mass. Feb. 10, 2011).

---

[2] In few instances, Defendants' counsel stated in their letters that they were "continuing to inquire internally as to whether there may be additional responsive, non-privileged documents," and "have [produced] or will produce" the requested documents; however, Defendants have neither made any further production nor stated whether any additional documents would be forthcoming by the October 4th due date of the motion.

**B.**     <u>**Defendants' inadequate production, by the numbers**</u>

Defendants' total production of 580 documents is less than 1% of Plaintiffs' own 60,000-document production of 1,191 non-ESI documents, 54,842 responsive ESI documents, and additional 4,077 ESI documents of disputed responsiveness produced pursuant to the Discovery Expert's report (and not counting additional documents to be produced pursuant to the Court's Order granting in part Defendants' motion to compel). Defendants withheld 637 documents as privileged, which means they have identified only 1217 documents (580 produced and 637 withheld) as responsive.[3]

Of the 580 produced documents, 196 – or 33% of the total production -- are heavily redacted emails. Of the remaining unredacted 384 documents, 141 are Defendants' external communications with Plaintiffs, leaving only 243 internal unredacted documents produced.

All of Defendants' production comes from only 4 custodians, representing 3.5% of at least 113 of Defendants' employees identified as involved in the events by Defendants' production and by their privilege log.[4]

The 4 custodians who produced all the documents -- Defendant Gill and Messrs. Bartley, Silvestri and Harris -- all work for Defendant HPFS. This means that 3 out of 5 Defendants – HPE, HPI and HPFS India -- did not produce any documents despite the involvement of scores of their employees in the events.[5]

---

[3] The bates range of the produced documents is 1-2898, which page count includes 931 single-page TIFF images of various excel spreadsheets produced without the native files required by the ESI protocol. See ESI Protocol, Dkt. 149 at p. 11 ("Excel and other types of spreadsheets will be produced in native format."); <u>Dahl v. Bain Capital Partners, LLC</u>, 2009 U.S. Dist. LEXIS 52551 (D. Mass. June 22, 2009) (requiring production of spreadsheets in native format due to the integral nature of metadata to their usefulness).

[4] At least 72 of Defendants' employees were involved in the counterfeit and imprisonment issues in 2013-14 (not counting H3C employees), and at least 41 additional employees were involved in the original 2011 Equipment sale and the 2013 RMA request, according to Defendants' production and privilege log.

[5] In their Reply Brief on the motion to strike, Defendants argued that HPI and HPE did not produce any documents because "HP Inc. and Hewlett Packard Enterprise Company did not exist until 2015, after defendants' discovery

During the meet and confer conference, Defendants defended their production by stating

that they had searched 6 custodians according to the ESI Protocol, and produced ESI from 4 of

them, with the other 2 custodians' ESI deduplicated against the producing custodians and/or

privileged.[6]

Plaintiffs had originally proposed 11 custodians, whose identities were derived from

Defendants' designations of the persons with relevant knowledge in their Initial Disclosures

(Joffe Decl. Exh. D), and from Plaintiffs' own contacts with Defendants' representatives during

the relevant period (which contacts were restricted by Defendants to David Gill during the

critical 2013 period and in any event involved only few other employees of Defendants). The

behind-the-scene involvement of over a hundred of Defendants' other employees was unknown

to Plaintiffs at the time, nor did Defendants mention anyone other than Kevan Bartley, Tom

Harris, JT Silvestri, David Gill, James O'Grady, James Kwok and Meng Tao as persons with

relevant knowledge in Defendants' Initial Disclosures.

Plaintiffs' proposed custodians included all 7 persons identified by Defendants as having

the relevant knowledge, and 4 additional persons with whom Plaintiffs had communicated on the

relevant issues: John Schultz, Meg Whitman, Daniel McCarthy and Stuart Patterson. Defendants

successfully resisted the inclusion of 5 of the proposed custodians by representing, in particular,

---

cutoff in 2014." Dkt. 229-1 at 4. Defendants have retreated from that argument on the September 23 meet and confer, stating that "that is not Defendants' position." Joffe Decl. Exh. B.

[6] According to Defendants, James O'Grady was one of their custodians but his files were "wholly duplicative" of the ESI of the four producing custodians or otherwise privileged. In fact, Mr. O'Grady was a VP and Director of HPFS outranking the 4 producing custodians, and it is highly unlikely that he would have copied lower-level managers on all of his relevant communications, particularly up his corporate chain of command. Moreover, the ESI Protocol provides that "[a] party may de-dupe electronic documents, other than email, only within custodians." Dkt. 149 at p. 14. In light of Mr. O'Grady's involvement in both the initial 2011 sale and the 2013 events, it is unlikely that his ESI contained no responsive documents, which documents (other than emails) should not have been deduplicated against other custodians. Defendants should be required to make additional searches of James O'Grady's custodial files and produce any such responsive documents without deduplication.

that their General Counsel John Schultz "ha[d] no relevant information that would not otherwise be duplicative of other custodians, and the Court ha[d] already determined that any suggestion of involvement by Schultz . . . [was] implausible, conclusory and without merit." Dkt. 149 at p. 19.

Contrary to Defendants' representations, their own privilege log shows Schultz's personal involvement on such subjects as "HPFS/H3C/Grey Market Matter," "HPFS/H3C/ICT Grey Market Issue in China," and "HPFS/H3C/ICT -- Status Update."[7] Schultz's Deputy General Counsel Brian Slattery appears on 177 privilege log entries, while another member of Mr. Schultz's legal department, Associate General Counsel Stuart Patterson, appears on 234 privilege log entries; overall, no fewer than 30 of Defendants' in-house lawyers were involved in these events, see Joffe Decl. Exh. B at p. 2 (Defendants stating that "nearly half of the 71 people identified in your July 12 letter are attorneys."). None of their ESI was produced except for David Gill's, whose own 298 custodial document production was purportedly made not only on behalf of himself but also on behalf of his employer HPFS, and on behalf of HPFS India.[8]

Defendants also succeeded in excluding James Kwok and Meng Tao as ESI custodians by representing that they had not been employed by Defendants but by "other HP-affiliated entities." Dkt. 149 at p. 19. Both Messrs. Kwok and Meng were employees of HP China, Defendants HPI/HPE's wholly owned subsidiary (Mr. Meng was erroneously identified as H3C's employee in the ESI Protocol), and used the @hp.com email domain accounts jimmy.kwok@hp.com and meng-tao.meng@hp.com. As Defendants represented in the ESI Protocol, Defendant HPI "hosted Microsoft Exchange user accounts for all of the Corporate

---

[7] See Dkt. 219-2, Privilege log entries 526, 527, 579, 590, 591, 594, 596, 652, 689, 690, 691, 693.

[8] As Defendants state, their "document production includes documents from custodians [who] were employed by HPFS and who acted on behalf of HPFS India." Joffe Decl. Exh. B at p. 1. Thus, while David Gill is wearing three hats in discovery, none of HPFS India's employees themselves have produced any documents, and neither have any of HPE's or HPI's employees.

Defendants using the '@hp.com' email domain" until March 2015, when it migrated them to Office 365. Dkt. 149 at p. 4. Accordingly, Defendants HPI/HPE should be "in possession" of their custodial emails from the relevant period within the meaning of Rule 34(a).

Moreover, Defendants should be "in control" of those emails because "documents are considered to be under a party's control for discovery purposes when that party has the right, authority, or practical ability to obtain the documents from a nonparty to the suit." Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997). This Court in Addamax Corp. v. Open Software Found., 148 F.R.D. 462, 466-68 (D. Mass. 1993), applied this concept of "control" to compel a subsidiary to produce its corporate parent's documents. The Addamax ruling applies *a fortiori* to Defendants HPI/HPE who are the parent companies of their wholly owned subsidiary HP China, and hosted the relevant HP China employees' ESI.

Both Messrs. Kwok and Meng have been described by Defendants in their Initial Disclosures as persons knowledgeable with respect to "(1) Inspections and/or analysis of inventory of the equipment seized by the PSB; (2) Efforts to secure the release of the Individual Plaintiffs from detention in China; (3) The April 22, 2013 letter from HPFS (India) to the PSB, and drafts thereof; (4) ICT and Styller's failure to confirm that the Individual Plaintiffs were legitimate ICT employees and ICT's failure to establish that it was an authorized employer or trader in China and issues concerning the importation of the equipment to China; and (5) the proprietary trademarks, logos, security tags, and/or other indicia of authenticity affixed to the subject equipment." Yet, there is no mention of either James Kwok or Meng Tao in Defendants' production, although the former appears on 48 privilege log entries, and the latter on 61.

Furthermore, Defendants' production and privilege log reveal scores of Defendants' other non-legal employees involved in the relevant communications, including high-ranking

executives whose ESI is unlikely to be duplicated by the ESI produced by the lower-level custodians. These executives with knowledge of the key events were not disclosed by Defendants in their Initial Disclosures, and their behind-the-scene involvement had remained completely unknown to Plaintiffs at the time of the ESI Protocol negotiations and until it was revealed by Defendants' production and privilege log.

*First*, Ross West, Head of Portfolio and Asset Management of HPFS APJ (Asia Pacific & Japan Region), was directly involved in Defendants' decision to instruct TT Global to destroy the three-quarters of the equipment in its custody in Dubai due to its questionable nature and origination, and to pay TT Global $200,000 for destroying it. See Joffe Decl. Exh. A (an email from O'Grady concerning the proposed payment to TT Global: "This would obviously be a Ross call due to financial impact. My gut says we should fully refund due to questionable nature of product," and West's response: "Jim, let's clear this up when you, JT and I are together in Andover next week."). Other than this one email chain, however, Defendants produced no documents on this critical subject, and no custodial ESI from West likely containing such documents.[9]

Moreover, West was involved in Defendants' unsuccessful efforts in 2011 to obtain the importation documents for the equipment originally supplied by Inspira for the Commonwealth Games, see Joffe Decl. Exh. E, and appears on 19 privilege log entries on such subjects as the "H3C project" in 2011 and the "Security incident in China," "ICT China H3C Counterfeit

---

[9] In fact, Defendants state that they "believe that they have produced all of the responsive, non-privileged documents concerning TT Global's disposition of the equipment that was not shipped to ICT, *primarily because the agreed-upon search terms would have yielded any such documents.*" Joffe Decl. Exh. C at p. 2. But the search terms would *not* have yielded such documents if the relevant custodians' ESI was excluded from the searches, as is the case with West in this particular instance, and as is the overarching problem with Defendants' exclusion as custodians of over a hundred of their employees involved in the relevant events.

Incident," "H3C transceivers," "India Commonwealth Games H3C deal," "TT-G Dubai assets,"
"H3C equipment," and "ICT/HPFS(India)/H3C (HP China)," throughout January-June 2013.[10]

*Second*, Defendants' other high-level executives whose relevant ESI is unlikely to be
duplicated by the ESI of the existing custodians include Gerri Gold, VP of Global Sales and
Marketing (currently COO) of HPE Financial Services; Ian Fowlis, CFO of HPFS; and Richard
Olson, VP and Managing Director of HPFS APJ at the time. These executives were among those
first alerted by Mr. O'Grady about the "security incident in China" on January 31, 2013, and
they appear on Defendants' privilege log on such highly relevant subjects as "ICT China H3C
counterfeit incident," "H3C transceivers," "H3C equipment,"  and "ICT/HPFS(India)/H3C (HP
China)" throughout January-June 2013.[11]

*Third*, Robert Cozzolina was HP Company's Global Anti-Counterfeit Investigation
Program Manager involved in the ICT investigation as early as February 5, 2013, and suggested
to Mr. O'Grady on February 22, 2013 that HP should wash its hands off and leave the Individual
Plaintiffs at the mercy of H3C "working with the authorities." See Joffe Decl. Exh. F.
Defendants have produced no other documents on this subject, and no custodial documents from
Cozzolina.

*Fourth*, Liu Rui appears as H3C's in-house counsel (lr@h3c.com) in 38 privilege log
entries and as Defendants' in-house counsel (jesica.liu@hp.com) in 125 privilege log entries. As
an H3C employee, Ms. Liu served as a liaison between Defendants and H3C's auditor Wang
You who had inspected the seized transceivers and reported them as "counterfeit H3Cs" to the

---

[10] See Dkt. 219-2, Privilege log entries 17, 33, 98, 99, 151, 152, 153, 186, 189, 191, 196, 476, 477, 494, 496, 514, 516, 519, 542.

[11] See Dkt. 219-2, Privilege log entries 151, 152, 153, 156, 186, 189, 191, 196, 307, 312, 516, 519, 529, 531, 538, 539, 541.

PSB, and who had also inspected TT Global's transceivers on Defendants' request. See Joffe

Decl. Exh. G. Given her prominent roles in the events as H3C's and Defendants' employee, Ms.

Liu's ESI is likely to include non-duplicative non-privileged documents such as the

factual/technical results of Wang You's inspections of the transceivers seized from ICT, and his

inspection of TT Global's transceivers from the same Commonwealth Games batch.

Defendants should be required to search the files of these additional custodians most

likely to contain non-duplicative ESI and documents to remedy the identified deficiencies in

their production. "[T]he selection of custodians is more than a mathematical count. The selection

of custodians *must be designed to respond fully to document requests* and to produce

responsive, nonduplicative documents during the relevant period." Kleen Products LLC

v. Packaging Corp. of Am., No. 10 CV 5711, 2012 WL 4498465, at *15 (N.D. Ill. Sept. 28,

2012) (emphasis added throughout unless indicated otherwise); Breuder v. Board of Trustees,

No. 15 CV 9323, at *12 (N.D. Ill. Jul. 26, 2019) (same). Where, as here, the selection of

custodians is not "designed to respond fully to document requests," courts require parties to

produce documents from additional custodians reasonably likely to contain non-duplicative

information. In Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon,

No. 14 Civ. 9372, at *23-25 (S.D.N.Y. May. 14, 2018), the court found that:

> [P]laintiffs have adequately demonstrated that ESI searches of the custodial files
> and emails of Hermann and Cerchio "is reasonably calculated to lead to relevant
> evidence that might not be captured if they were excluded[.]" Fort Worth
> Employees Ret. Fund v. J.P. Morgan & Chase Co., supra, 297 F.R.D. at 106. . . .
> [P]laintiffs assert that Hermann and Cerchio possess documents . . . [that] would
> be very important to this case because they relate directly to BNYM's actual
> knowledge of the Sellers' breaches of contract and whether BNYM exercised
> appropriate care in the face of such breaches. . . . BNYM cannot say with
> certainty (or even confidence) that Hermann and Cerchio do not have unique,
> relevant information. See In re Morgan Stanley Mortg. Pass-Through Certificates
> Litig., supra, 2013 WL 4838796 at *1. Thus, plaintiffs have sufficiently
> demonstrated that the additional production is warranted, given that plaintiffs

have identified deficiencies in BNYM's production and have "adequately link[ed] [the] deficienc[ies] with the failure to search the files" of Hermann and Cerchio.

In In re EpiPen Mktg., Sales Practices & Antitrust Litig., MDL No: 2785, at *3 (D. Kan. Mar. 15, 2018), the court designated additional ESI custodians where "the party seeking to compel the designation of a particular additional ESI custodian has [met] the initial threshold burden of showing that the disputed custodian's ESI likely includes information relevant to the claims or defenses in the case." In Mount Hawley Insurance Co. v. Felman Production, Inc., 269 F.R.D. 609, 620 (S.D.W.V. 2010), the court compelled designation of 9 additional custodians finding it "reasonable to believe that they will have additional, highly relevant materials . . . which were not shared with [existing custodians]." And in MariCal, Inc. v. Cooke Aquaculture, Inc., No. 1:14-CV-00366-JDL, 2016 WL 9459260, at *2 (D. Me. Aug. 9, 2016), the court compelled inclusion of defendants' CEO as ESI custodian based upon CEO's position of prominence and the likelihood of his involvement in relevant discussions.[12]

## C.    Key documents withheld by Defendants

### I.    Return of the Equipment and its sale to ICT, 2011

Request 17.    All documents concerning HP's "reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it," referenced in the March 2013 Letter, including any reports or results of that review and any communications concerning same. (Joffe Decl. Exh. H).

Response:    Defendants object to this Request insofar as it seeks the production of information or documents that are equally accessible to Plaintiffs and any of their representatives or agents as they are to Defendants or which can be obtained more readily from a source other than Defendants. Defendants further object to this Request on the

---

[12] See also In re Syngenta AG MIR 162 Corn Litig., No. 14-02591-JWL-JPO (D. Kan. June 23, 2015) (finding good cause to increase the number of designated custodians from five to fifteen upon a showing that they were "fairly high level managers with direct knowledge about important aspects of [that] case"); Seaman v. Duke Univ., No. 1:15 CV 462, at *11 (M.D.N.C. Mar. 21, 2018) (ordering discovery of additional custodians' ESI "responsive to the previously-agreed-to search terms" as proportionate); Hatamian v. Advanced Micro Devices, Inc., Case No. 14-cv-00226-YGR (JSC), at *3 (N.D. Cal. Apr. 13, 2016) ("[B]ecause [defendants] have not demonstrated that Meyer is not a relevant custodian or that searching his ESI during the requested narrow time period would be out of proportion with the needs of the case, Defendants have failed to demonstrate that [designating him as an ESI custodian] is unwarranted.").

ground that it seeks information protected by the attorney client privilege and/or work product doctrine. Subject to and without waiver of the foregoing objections, any non-privileged documents responsive to this Request that are within Defendants' possession, custody or control will be produced.

Defendants stated in their March 2013 draft letter to the PSB that "[b]ased on the available evidence it would appear that the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases. HP is reviewing the initial sale to try to determine how the counterfeit equipment was produced and who produced it." Dkt. 101, SAC ¶ 125. Defendants, however, did not produce any results of HP's review of the initial sale referenced in the March letter, or the "available evidence" cited therein.[13]

## II.    Inspection of the equipment remaining in India, 2012

Request 6.    All documents concerning the 2012 Inspection, including reports, results, photographs, and internal and external communications concerning same.

Response:    Defendants object to the definition of "2012 Inspection" as nonsensical and without meaning, in that the "Equipment," as defined by Plaintiffs, was not in India in the referenced time frame. Defendants further object to Plaintiffs' use of the term "inspection," as Plaintiffs use the term to describe events that either never occurred or cannot fairly be described as inspections. Defendants further object on the ground that this Request seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case because the equipment inventoried was not and is not the subject of this action. Subject to and without waiver of the foregoing objections, Defendants will produce any non-privileged documents that are within Defendants' possession, custody or control will be produced concerning the equipment that was the subject of the RRSA and WSA, but not yet sold to ICT.

---

[13] Defendants object to Plaintiffs' raising the issue of HP's review of the initial sale in Request 17, arguing that "the July 12 Letter does not make any reference to these documents and Plaintiffs are precluded from making them the subject of any renewed motion to compel." Joffe Decl. Exh. B at p. 4. However, Plaintiffs' key complaint in the July 12 letter and the identified "overarching deficiency in Defendants' production" is "the incredible paucity of internal documents and correspondence specifically concerning the counterfeit allegations and Plaintiffs' imprisonment, which is the key issue in this case," and the letter expressly reiterates this key concern with respect to each of the productions made by Defendants. The never-produced results of HP's review of "the initial sale to try to determine how the counterfeit equipment was produced and who produced it" called for by Request 17 are squarely within that "overarching deficiency" raised in the July 12 letter.

Tom Harris, HPFS' representative participating in the 2012 Inspection, stated in his October 2012 email from India that TT Global's security and material control over the equipment were "very questionable." In response to Mr. Harris' reports, Edward Chin of HPFS referenced "delicate and sensitive discussions" with TT Global, while another HPFS employee complained about the quality of the remaining equipment – customer information and tags left on the units; the equipment being "very very dusty" and "so dirty," and not properly packaged -- mirroring Plaintiffs' own complaints about the substandard condition of the parts received in China.

Defendants, however, have failed to produce the complete results of Mr. Harris' 2012 inspection, Defendants' ultimate conclusions about the equipment's conditions, or the substance and outcome of HPFS' "delicate and sensitive" discussions with TT Global regarding its "very questionable" security and material control over the equipment.

### III.    Disposition of the equipment remaining in India, 2012-13

Request 7.    All documents concerning the subsequent disposition of the Equipment that was the subject of the 2012 Inspection.

Response:    Defendants object to this Request on the ground that it seeks information that is in the possession of a source other than Defendants, namely TT Global. Defendants further object to the definition of "2012 Inspection" as nonsensical and without meaning, in that the "Equipment," as defined by Plaintiffs, was not in India in the referenced time frame. Defendants further object to Plaintiffs' use of the term "inspection," as Plaintiffs use the term to describe events that either never occurred or cannot fairly be described as inspections. Defendants further object on the ground that this Request seeks information that is not relevant to any party's claim or defense and is not proportional to the needs of the case because the equipment allegedly disposed of was not and is not the subject of this action. Subject to and without waiver of the foregoing objections, any non-privileged documents that are within Defendants' possession, custody or control will be produced concerning the equipment that was the subject of the RRSA and WSA, but not yet sold to JCT.

Following the 2012 Inspection, Defendants sold to TT Global the remaining three-quarters of the equipment in India that ICT had refused to buy, and TT Global then transported it to Dubai. In May 2013, with the Individual Plaintiffs imprisoned for selling counterfeit

15

transceivers, Defendants requested TT Global to send pictures and samples of its transceivers to H3C for inspection. Following H3C's inspection, Defendants discussed instructing TT Global to destroy the remaining equipment because of its "questionable" nature and origination, and paying TT Global $200,000 for it -- while the criminal investigation in China was ongoing.

Defendants have failed to produce any results of the H3C inspection of TT Global's transceivers, or any follow-up to their discussions about paying TT Global to destroy them -- while admitting in the interrogatory responses that "the equipment returned by Tata but not sold to ICT was disposed of by sale to TT Global and, on information and belief, later destroyed." Joffe Decl. Exh. J. Defendants' actions of instructing TT Global to destroy $200,000 worth of equipment after H3C's tests and offering to pay TT Global for it speak louder than words; still, Defendants should be compelled to produce their written words on this key subject as well.[14]

### IV.   Inspection of the Equipment seized in China, 2013

Request 9.     All documents concerning "the inspections and/or analysis of inventory of the equipment seized by the PSB," as described in the Defendants' Initial Disclosures.

Response:     Defendants object to this Request insofar as it seeks the production of information or documents that are equally accessible to Plaintiffs and any of their representatives or agents as they are to Defendants or which can be obtained more readily from a source other than Defendants. Defendants further object to this Request on the ground that it seeks information protected by the attorney client privilege and/or work product doctrine. Subject to and without waiver of the foregoing objections, any non-privileged documents responsive to this Request that are within Defendants' possession, custody or control will be produced.

Interrogatory No. 3: Please state the results of the 2013 Inspections, including but not limited to whether any of the Seized Equipment was counterfeit or carried counterfeit registered trademarks. (Joffe Decl. Exh. J).

Response:     HPFS objects to this Interrogatory on the ground that the term "results" is vague, ambiguous, and undefined. HPFS further objects to the term "2013 Inspections"

---

[14] Defendants' claim that the issue of TT Global's sample transceivers inspected by H3C "was not raised in your July 12 letter, and Plaintiffs are precluded from raising the issue in any potential renewed motion to compel" is incorrect: the July 12 letter expressly raises that issue, see Joffe Decl. Exh. I at p. 8 (discussing TT Global's "samples of transceivers [sent] to Wang You at H3C") and p. 6 (subsequent discussions by Defendants about destroying the equipment and paying TT Global $200,000 for it).

because HPFS does not possess sufficient independent information at this time to properly ascertain whether such inspections occurred. HPFS further objects on the ground that this Interrogatory seeks information protected by the attorney-client privilege and/or attorney work product doctrine because it seeks legal conclusions as to whether the equipment was ultimately "counterfeit" or "carried counterfeit trademarks." HPFS further objects to this Interrogatory on the ground that it is compound because it requests information relating to multiple "inspections," alleged correspondences and reviews. HPFS also objects on the ground that the Interrogatory seeks information and/or data in the hands of a third party or third parties to this action over which HPFS does not have control and to which Plaintiffs have not addressed discovery requests aimed at obtaining such information and/or data.

Subject to and without waiver of the foregoing objections, on information and belief, examination(s), review(s), inventory(ies) and/or inspection(s) of the Seized Equipment was/were conducted by or on behalf of H3C, the results of which appear to be in Plaintiffs' possession. To the extent that a review or partial inventory of the Seized Equipment by the Defendants, or any of them, was permitted by the relevant Chinese authorities, the same was carried out or conducted by Meng Tao in or about February to March 2013. Such review or partial inventory was conducted with limited access and all additional requests for further review were denied by the Chinese authorities. The outcome of that review or partial inventory will be made available in discovery. Additional analysis or review of Meng Tao's review/inventory that was subsequently conducted by Defendants or their agents and/or non-legal personnel, to the extent the same exists, will be produced in discovery. Analysis by counsel for on or on behalf of Defendants that is privileged shall not be produced but will be identified in Defendant's privilege logs.

With respect to Meng Tao's inspection, Defendants have produced one spreadsheet that merely lists the serial numbers of 265 confiscated transceivers and their brand, model and part number information -- without any analysis or conclusions regarding their authenticity or origination. Defendants have produced no other documents concerning Meng Tao's inspection, or any other internal documents concerning the seized transceivers or their trademark H3C logos.[15]

With respect to H3C's inspection, Defendants have produced one stand-alone document, in Mandarin, which appears to be an H3C report submitted to the PSB unequivocally stating that

---

[15] Following the meet and confer, Defendants have represented that "that spreadsheet is the only written report that they received as a result of H3C's partial 'inspection' of the Seized Equipment." Joffe Decl. Exh. C at p. 2. This representation is doubly wrong: the spreadsheet was the result of the partial inspection conducted by HP China's employee Meng Tao, not by H3C; and Defendants also received and produced a written report of H3C's own inspection of the transceivers provided to the PSB.

the seized transceivers are counterfeit, and detailing the indicia of their unauthenticity. Defendants have failed to produce any other documents or communications concerning the report itself, how Defendants came in possession of the report, or any transmitting, preceding or follow-up communications, any discussions about the report, or any agreement or disagreement with its conclusions. Nor did Defendants produce any "product verification report," "sample verification report," 'grey marketing issue" report or any reports of their "investigation of ICT claims" oft-mentioned in their privilege log.

Moreover, Defendants' production and privilege log strongly suggest that the counterfeiting problem with the H3C transceivers was not limited to ICT but involved other parties. One email exchange dated May 2013 refers to the "HP counterfeit investigation in China" that concerned an unrelated company, Shenzhen Kingtech Co., Ltd., but involved the very same parties as in Plaintiffs' case: HPFS, H3C and TT Global.[16]

### V.      Counterfeit nature of the Equipment

Request 30:     All documents concerning the counterfeit or genuine nature of any trademarks, logos, security tags, and/or any other overt or covert indicia of authenticity affixed to the Equipment.

Response:      Defendants object to this Request on the ground that it seeks information protected by the attorney client privilege and/or work product doctrine. Defendants object to this Request insofar as it seeks the production of information or documents that are equally accessible to Plaintiffs and any of their representatives or agents as they are to Defendants or which can be obtained more readily from a source other than Defendants. Subject to and

---

[16] Defendants produced no other documents on this subject but claimed following the meet and confer that "the investigation concerning Shenzhen Kingtech Co., Ltd. did not involve the equipment that was returned by Tata to HPFS India, and is therefore unrelated to the equipment purchased by ICT. Accordingly, any further documents concerning the Shenzhen Kingtech investigation is irrelevant, non-responsive and not likely to lead to the discovery of admissible evidence." Joffe Decl, Exh. C at p. 2. Defendants' response leaves it entirely unclear why they have considered the one produced email as relevant and responsive but "any further documents" as irrelevant and non-responsive. Moreover, there are 60 privilege log entries on the subject of HPFS or HPFS/H3C "grey marketing" issue in China, suggesting that the ICT investigation could have been part of a broader counterfeiting problem of HPFS' or TT Global's reselling H3C parts in China, which makes the Shenzhen Kingtech counterfeit investigation involving HPFS, H3C and TT Global relevant to the parties' claims or defenses in this action.

without waiver of the foregoing objections, any non-privileged documents responsive to this Request that are within Defendants' possession, custody or control will be produced.

Interrogatory 5:  Do you contend that the Seized Equipment was counterfeit or carried counterfeit trademarks?

Response:      HPFS objects to this Interrogatory on the grounds that it is a contention interrogatory and discovery in this matter is still ongoing. See Fed. R. Civ. P. 33(a)(2) (confirming the court's discretion to defer a party's answers until the litigation has progressed). HPFS further objects to this Interrogatory on the grounds that it vague and ambiguous because it does not specify any temporal limitation. HPFS further objects on the ground that this Interrogatory seeks information protected by the attorney-client privilege and/or attorney work product doctrine because it seeks legal conclusions as to whether the equipment was ultimately "counterfeit" or "carried counterfeit trademarks." Subject to and without waiver of the foregoing objections, HPFS states that it does not currently have sufficient independent information to provide a substantive response to this Interrogatory, as discovery in this matter is ongoing. HPFS reserves the right to amend and supplement this response subsequent to an inspection performed by a testifying expert.

Defendants produced **no** internal documents concerning the counterfeit nature of the Equipment or its trademark H3C logos, one of the pivotal issues in the case. Indeed, other than Mr. Cozzolina's statement that the incarcerated Plaintiffs "may be charged with counterfeiting," there are no references to counterfeiting or H3C logos with respect to the seized transceivers in any of the internal documents produced by Defendants.

Furthermore, Defendants' assertion in its interrogatory response that the counterfeit nature of the equipment is a legal rather than factual question is implausible and is undermined by the very next paragraph in Defendants' response, stating that Defendants do not "currently have sufficient independent information to provide a substantive response to this Interrogatory," and reserve their rights "to amend and supplement this response subsequent to an inspection performed by a testifying expert." Thus, in April 2019 (the date of the amended response), after years of numerous discussions with numerous in-house counsel, Defendants did not reach any "legal conclusions" and relied instead on an expert to give them a technical (not legal) answer about counterfeiting after a 3-day inspection.

19

## VI.    Communications concerning the seized Equipment
### and/or the Individual Plaintiffs' incarceration.

Request 11.    All communications among and between the HP Entities concerning the Equipment and/or the incarcerated Individual Plaintiffs.

Response:    Defendants object to this Request insofar as it seeks the production of information or documents that are equally accessible to Plaintiffs and any of their representatives or agents as they are to Defendants or which can be obtained more readily from a source other than Defendants. Defendants further object to the Plaintiffs' inclusion of H3C as one of the "HP Entities.'" Defendants further object to this Request on the ground that it seeks information protected by the attorney client privilege and/or work product doctrine. Defendants further object that this Request is overbroad and seeks information that is not relevant and proportional to the needs of this case because it does not contain any temporal or substantive limitation. Subject to and without waiver of the foregoing objections, any non-privileged communications between 2010 and 2014 concerning the Equipment and the detention of the Individual Plaintiffs that are within Defendants' possession, custody or control will be produced.

Request 15.    All documents concerning communications with the PSB regarding the Equipment or the Individual Plaintiffs.

Response:    Defendants object to this Request insofar as it seeks the production of information or documents that are equally accessible to Plaintiffs and any of their representatives or agents as they are to Defendants or which can be obtained more readily from a source other than Defendants. Subject to and without waiver of the foregoing objections, any non-privileged documents responsive to this Request that are within Defendants' possession, custody or control will be produced.

At least 72 of Defendants' and HP China's employees, and 3 of H3C's employees, were involved in numerous written communications responsive to these document requests, on the subjects such as the "arrest of ICT sales representatives," "H3C transceivers," "equipment sold to ICT," "seized equipment," "incident involving ICT sales representatives," "investigation of ICT claims," "product verification," "equipment sent to China," "update to litigation," "letter to Chinese police," "verification report and draft letter," "draft product sample verification report," or "HPFS/H3C grey market matter." Dkt. 219-2. Yet, Defendants' 580-document production

includes virtually **no** internal documents responsive to Plaintiffs' discovery requests on these core issues.[17]

## D.     Documents improperly withheld or redacted as privileged

Defendants withheld or redacted 833 documents while producing only 243 unredacted internal documents. Defendants' privilege claims are untenable for the following reasons.

### 1.     The underlying facts are not protected by any privilege.

The attorney-client privilege is "strictly construed," In re Reorganization of Elec. Mut. Liability Ins. Co., 425 Mass. 419, 421 (1997), and "does not protect disclosure of the ***underlying facts*** by those who communicated with the attorney." Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981). "[T]he privilege extends only to *communications* and not to facts," and does not allow a person to "refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Id. (emphasis original). "Certainly, the privilege would never be available to allow a corporation to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure." Radiant Burners, Inc. v. Am. Gas Ass'n, 320 F.2d 314, 324 (7th Cir. 1963).

Neither are the underlying facts protected from disclosure by the attorney work product privilege. "Where relevant and nonprivileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." Hickman v. Taylor, 329 U.S. 495, 511 (1947).

---

[17] Aside from the few aforementioned emails concerning H3C's inspection of TT Global's transceivers, and one email exchange where HP Company's Global Anti-Counterfeit Investigation Program Manager Robert Cozzolina suggests to HPFS' Director James O'Grady on February 22, 2013 that HP should have no involvement in the matter and leave it in the hands of H3C "working with the authorities," Defendants produced no internal documents on this key subject.

The results of the transceivers inspections and the findings that the transceivers carried counterfeit H3C logos are factual and technical, not legal. That Defendants funneled these "verification reports" and other results of inspections of transceivers through their inhouse legal department does not change their factual nature and does not protect them from disclosure.[18]

At the meet and confer, Defendants agreed that "purely factual materials are not privileged" but took a very narrow view of this rule, claiming that "we detached any non-privileged documents from withheld privileged communications and produced those documents while withholding the privileged communications." Joffe Decl. Exh. B at at p. 5. Other than one H3C report to the PSB, however, Defendants produced no "detached" documents concerning the factual issue of the authenticity of the Equipment – *i.e.*, none of their "product verification" report, "verification report," "sample verification report," or the results of their "investigation of ICT claims." Moreover, Defendants' distinction between the factual information contained in a document attached to a privileged communication, and the same factual information reproduced in the communication itself rather than in the attached document, is hyper-technical, does not rest on any principled basis, and finds no support in the law. See United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 359 (D. Mass. 1950) ("[T]here is no privilege for so much of a lawyer's letter, report or opinion as relates to a fact gleaned from a witness.").

---

[18] Moreover, "[t]he privilege derived from the work-product doctrine is not absolute." United States v. Nobles, 422 U.S. 225, 239 (1975), and may be overcome by a showing of substantial need. See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 184-87 (2d Cir. 2007). The Individual Plaintiffs were detained and incarcerated based on H3C's incriminating factual statements and Defendants' contemporaneous withholding of exculpatory factual evidence. These factual statements and evidence listed on Defendants' privilege log are not available from any other source; they are central to Plaintiffs' claims; and they must be produced even if covered by the attorney work product privilege (which they are not) because of "substantial need."

### 2. Chinese law applicable to the inspections conducted in China does not recognize attorney-client or attorney work product privileges.

Pursuant to Chinese law that applies to the inspections of the transceivers conducted in China by the Chinese companies H3C and HP China, these inspections are not privileged.

Federal courts sitting in diversity apply the forum state's rules of privilege and its conflict of law rules with respect to privilege. See FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2002) ("We look to Massachusetts law to determine the scope of both the asserted privilege and the exception in this case."). "The Massachusetts functional approach is explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." Clarendon Nat'l Ins. Co. v. Arbella Mutual Ins. Co., 60 Mass. App. Ct. 492, 496 (2004). The Restatement's Section 139(1) in turn provides that "[e]vidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum." The comments to the Restatement provide that "[t]he state which has the most significant relationship with a communication will usually be the state where the communications took place . . . which is the state where an oral interchange between persons occurred, where a written statement was received or *where an inspection was made of a person or thing*." Restatement (Second) of Conflicts of Laws, § 139, Comment e.

Here, H3C conducted inspections of the seized ICT transceivers and the samples of TT Global's transceivers in China. HP China also conducted its inspection of the seized transceivers in China. In these circumstances, Massachusetts courts guided by the Restatement would likely apply Chinese law to these inspections, as should this Court sitting in diversity.

The relevant feature of Chinese law is that it does not recognize attorney-client or work product privileges. In Wultz v. Bank of China Ltd., No. 1:11-cv-01266 (S.D.N.Y. Oct. 25, 2013),

23

Judge Shira Scheindlin stated that (i) "American law typically applies to communications concerning 'legal proceedings in the United States' or 'advice regarding American law,' while communications relating to 'foreign legal proceeding[s] or foreign law' are generally governed by foreign privilege law; (ii) "Foreign law, though formerly treated as an issue of fact, is now recognized as an issue of law," and (iii) "Chinese law does not recognize the attorney-client privilege or the work-product doctrine."

Because Chinese law does not recognize attorney-client and work product privileges, Defendants could not have reasonably expected the confidentiality of those inspections. See In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1016 (1st Cir. 1988) ("Absent an expectation of confidentiality, none accrues."); In re Keeper of Records (XYZ Corp.), 348 F. 3d 16, 23 (1st Cir. 2003) ("The lack of such an expectation shattered the necessary confidentiality."). Accordingly, the results of the investigations conducted in China by H3C and HP China should be produced.

### 3.   Defendants waived privilege by disclosing their communications to H3C.

"Disclosing a communication to a third party unquestionably waives the privilege." In re Teleglobe Comms, 493 F.3d 345, 361. (3d Cir. 2007); see also United States v. Massachusetts Inst. Of Tech., 129 F.3d 681 (1st Cir. 1997) (finding waiver through disclosure to third parties).

In Teleglobe, the Third Circuit undertook an in-depth analysis of the possible justifications "for not construing the sharing of communications within the corporate family as a waiver: (1) the members of the corporate family comprise one client, (2) the members of the corporate family are joint clients, and (3) the members of the corporate family are in a

community of interest with one another." 493 F.3d at 370 (internal citations omitted). The Court

concluded that only the second, joint-clients rationale "withstands scrutiny." Id.[19]

For the joint client exception to apply, however, the parent and subsidiary must be

represented by the same counsel, and "the keys to deciding the scope of joint representation are

***the parties' intent and expectations***, and so the district court should consider carefully (in

addition to the content of the communications themselves) any testimony from the parties and

their attorneys on those areas." Teleglobe, 493 F.3d at 363.

In their responses to Plaintiffs' document requests, Defendants stated that "H3C is not

now a majority-owned HP entity and, ***during all times relevant to the allegations in the Second***

***Amended Complaint, operated separately and autonomously from HP and its subsidiaries and***

***affiliates.***" Dkt. 223-2 ¶ 10 (see also Defendants' Amended Responses objecting to the inclusion

of H3C among the "HP Entities," Joffe Decl. Exh. H). Likewise, H3C itself expressly declared to

the PSB that "***HPFS and H3C operate independently of each other***." Dkt. 101, SAC ¶ 160. H3C

had its own anti-counterfeit department and its own in-house lawyers (e.g., Ms. Liu). Since "the

parties' intent and expectations" are "the keys to deciding the scope of joint representations,"

Defendants' own statements show that there was no such intent and expectations of joint

representation by the same inhouse counsel between H3C and Defendants.[20]

---

[19] The Court reasoned that "treating members of a corporate family as one client fails to respect the corporate form." Id. at 371-72. The Court also found that "the community-of-interest rationale does not fit as a matter of black-letter law because the community-of-interest privilege only come into play when parties are represented by separate counsel, which is often not the case for parents and subsidiaries. Moreover, the community-of-interest privilege only applies when those separate attorneys disclose information to one another, not when parties communicate directly. Finally, it assumes too much to think that members or a corporate family necessarily have a substantially similar *legal* interests (as they must for the community-of-interest privilege to apply) in all of each other's communications." Id. at 372 (internal references omitted).

[20] At the meet and confer, Defendants took the position that "in certain circumstances, David Gill may have provided legal advice to H3C, which would constitute a joint representation." Joffe Decl. Exh. B at p. 6. But the joint representation privilege applies where a parent and subsidiary are represented by the same counsel, which was not the case here, where H3C was represented by Ms. Liu, and there were instances where Ms. Liu was providing legal advice to Defendants rather than David Gill providing legal advice to H3C (see, e.g., Dkt. 219-2, Privilege log

Defendants widely shared their privileged communications with H3C: at least 3 H3C representatives are identified on Defendants' privilege log -- Liu Rui (lr@h3c.com), zhuchunyu@h3c.com, and chenxiaodong@h3c.com – with Ms. Liu appearing in 38 communications while also maintaining direct contact with H3C's auditor Wang You who had testified to the PSB that the seized transceivers were counterfeit. Accordingly, Defendants have waived any privilege with respect to these communications, which should be produced.

### 4. The crime-fraud exception may overcome privilege.

The Court has "discretion to review privileged materials in camera to determine whether the crime-fraud exception applies. A lesser evidentiary showing is needed for in camera review than to obviate the attorney-client privilege. To justify [in camera] review, the government must set forth a factual basis 'to support a good-faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." US v. Joyce, 311 F. Supp. 3d 398, 407 (D. Mass.2018) (internal citations and quotation marks omitted).

Plaintiffs respectfully request an *in camera* review of a selection of Defendants' documents to determine whether the crime-fraud exception applies. To challenge the attorney-client privilege on the basis of the crime-fraud exception, the challenger must show "(1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client

---

entry 405, "Email chain seeking the legal advice of Jessica Liu regarding draft letter to Chinese police"; entry 410, "Email containing the legal advice of Jessica Liu enclosing verification report and draft letter"; entry 416, "Email chain seeking the legal advice of Jessica Liu regarding draft product sample verification report."). And the common-interest privilege "only comes into play when parties are represented by separate counsel," "have a substantially similar legal interests, and "when those separate attorneys disclose information to one another, not when parties communicate directly," Teleglobe, 493 F.3d at 372, which is also not the case here, where Defendants' and H3C's legal interests were not necessarily aligned, and where Ms. Liu's and David Gill's communications were shared with non-lawyers from HPFS, HPE, HPI, HP China, HP India and H3C. (As Defendants state, "nearly half of the 71 people identified in your July 12 letter are attorneys," Joffe Decl. Exh. B at p. 2, meaning that over half of them are not attorneys).

communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." <u>In Re Grand Jury Proceedings</u>, 417 F.3d 18, 22 (1st Cir. 2005), <u>cert</u> <u>denied</u>, 546 U.S. 1088 (2006) (citations omitted).

In <u>United States v. Gorski</u>, No. 14-1963, 2015 WL 8285086 (1st Cir. Dec. 9, 2015), the First Circuit affirmed in part the district court's application of the crime-fraud exception and even expanded it. Using a reasonable basis standard, the Court reviewed the chronology of events and the nature of the communications between Gorski and his attorneys and concluded that there was a reasonable basis to believe that Gorski had engaged his attorneys in order to perpetuate his ongoing scheme to demonstrate outward compliance with regulations. <u>See</u> <u>also</u> <u>In the Matter of A Grand Jury Investigation</u>, 437 Mass. 340, 360-63 (Sup. Ct. 2002) (applying crime-fraud exception).

There is a reasonable basis to believe that the Court's *in camera* review "may reveal evidence" that Defendants were engaged in fraudulent activities at the time of the purportedly privileged communications, and that their communications filtered through in-house lawyers were intended to facilitate Defendants' fraud and coverup. Simply comparing the chronology of Defendants' and HP China's stonewalling statements made to Plaintiffs and the PSB as alleged in Plaintiffs' complaint with Defendants' privilege log entries showing the extent and character of their contemporaneous internal discussions may reveal that Defendants used privileged communications to commit their fraud and coverup.

Indeed, Defendants, HP China, and H3C had all acted in close coordination to keep the Individual Plaintiffs incarcerated by withholding exculpatory evidence from the PSB while lying to the PSB and Plaintiffs. Thus, when reached by the PSB to explain the ICT-HPFS India contracts, HP China lied to the PSB that such contracts could be freely downloaded from the

27

Internet; when contacted to verify the HPFS deal, HP China lied that it was trying to contact HP – all the while maintaining close communications with Defendants. H3C lied to the PSB that it did not know anything about the India deal while also maintaining close communications with Defendants. And Defendants themselves lied to Plaintiffs that their April 2013 letter to the PSB was substantially the same as their March draft even though it was drastically different.

These coordinated lies were intended to facilitate the false imprisonment and wrongful prosecution of the Individual Plaintiffs in furtherance of Defendants' own fraud and coverup. Accordingly, Plaintiffs believe there is an ample basis for the Court's *in camera* review to determine whether Defendants' privileged communications intended to facilitate their fraud and coverup.

## CONCLUSION

From 2013 until now, Defendants have continued to suppress key documents in the face of official investigations, first stonewalling the PSB's and Plaintiffs' requests for exculpatory evidence in the course of the Chinese criminal investigation, now hiding that evidence from discovery in the course of this Court proceedings. Plaintiffs respectfully submit that Defendants should be compelled to remedy their inadequate discovery and sanctioned for their misconduct.[21]

---

[21] It appears that HP's abuse of the discovery process is not unique to this case. In Hewlett-Packard Co. v. Professional Investigating & Consulting Agency, Inc., C.A. No. N12C-06-196 MMJ CCLD (Del. Sup. Ct.), after the jury had found HP liable for willful and malicious wrongdoing, plaintiff appealed seeking additional sanctions for HP's bad faith conduct in discovery, alleging in their August 17, 2015 appellate brief that HP "(1) suppressed crucial evidence; (2) sought to abuse the discovery process; and (3) attempted to defraud the trial court," "allow[ed] the very employees accused of wrongdoing to decide which documents would be subject to searching for the agreed upon ESI search terms," "suppressed smoking gun Kwansi emails," "suppressed ISMA/OSAC presentation," "purposefully suppressed relevant evidence throughout this litigation and knowingly introduced false evidence at trial." Plaintiff further alleged that "HP knew that Kwasny, Velez, and Cozzolina were central figures in this action and purported to have produced all of their relevant documents. The parties spent millions of dollars and several years litigating this matter, only to find out after trial that HP's entire document production was a sham."

October 4, 2019                                        Respectfully Submitted,

_____

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH
MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 37.1(a)</u>

I, Dimitry Joffe, counsel to Plaintiffs, hereby certify that on September 23, 2019, I met and conferred telephonically with Defendants' counsel in a good-faith effort to narrow the areas of disagreement that is the subject of this motion to compel.

_____
Dimitry Joffe
JOFFE LAW P.C.
Counsel to Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I, Dimitry Joffe, hereby certify that on this 4th day of October 2019, I caused a copy of

Plaintiffs' Renewed Motion to Compel and Supporting Memorandum of Law, accompanied by

Declaration of Dimitry Joffe with exhibits, to be served by ECF upon Defendants' counsel of

record.

_____

Dimitry Joffe
JOFFE LAW P.C.
Counsel to Plaintiffs