# EXHIBIT I



765 Amsterdam Avenue, 2c
New York, New York 10025
917.929.1964
dimitry@joffe.law
www.joffe.law

July 12, 2019

**By Email**
Paul A. Saso, Esq.
Gibbons, P.C.
One Pennsylvania Plaza, 37th Fl.
New York, NY 10119-3701
psaso@gibbonslaw.com

Re: <u>Styller, et al. v, Hewlett-Packard Fin. Servs. Co., et al., No. 1:16-cv-10386 (LTS)</u>

Dear Paul,

    I am writing with regards to serious deficiencies in Defendants' document production and improper withholding of key documents. In part A, I address Defendants' production, and in part B, their withholding and/or redactions of documents based on improper privilege designations.

    The overarching deficiency in Defendants' production is the incredible paucity of internal documents and correspondence specifically concerning the counterfeit allegations and Plaintiffs' imprisonment, which is the key issue in this case. This paucity appears all the more astounding in light of the sheer number of Defendants' employees involved in this particular aspect of the case.

    As Defendants' production and their privilege log demonstrate, scores of Defendants HP, HPE and HPFS' employees were parties to internal communications concerning the counterfeit allegations and Plaintiffs' imprisonment. These employees include, in addition to Defendant Gill:

1) John Schultz
2) Jim O'Grady
3) Kevan Bartley
4) Brian Slattery
5) Gerri Gold
6) Ian Fowlis
7) Richard Olson
8) Ross West
9) Alistair White
10) Ching Chua
11) James Silvestri
12) Yves Nolin

July 12, 2019
Page 2 of 10

13) Lori Correla
14) Gopi Jayachandran
15) Thomas Pressentin
16) Robert Corrolina
17) Shawn Zhao
18) Stuart Patterson
19) Rishi Varma
20) Kuno Muno
21) Robert McCarthy
22) Rebecca Nichols
23) Tom Harris
24) Sheau Tyan (Javlin) Lim
25) Any Chang
26) Stanislav Colin Prem Joseph
27) Jimmy Kwok
28) Yang Li
29) Catherine-Lei Zhao
30) Meng Tao
31) Keliang Shao
32) Robin Yap
33) Terence Toh
34) Bruce Yves
35) David Bruscino
36) Jie Yang
37) Alexandra Schmidt
38) Petti Yu
39) Rupkamal Brahma
40) Misha Lulla
41) Jasvinder Singh
42) Rajeev Nair
43) Deepak Bhowmick
44) Josephine Lim
45) Puay Hoon Ang
46) James Yeow
47) Xiao-Lin Fu
48) Kan Liang
49) James Wong
50) Michael Swan
51) Sameer Dhingra

52) Tom Perkins
53) Thomas Thoppil
54) Ashley Watson
55) David Antozak
56) Lucinda Stamm
57) Jean Pan
58) Casey Daum Nakata
59) Ying-Ying He
60) Manjit Kaur
61) May-Wm Lam
62) Tian Tiong Goh
63) Alexander Suresh Thomas
64) Paula Rozell
65) Susan Roach
66) Heng Zhang
67) David Cao
68) Agnes Tsou
69) Carmen Mercado
70) Paul Roeder
71) Robert Particelli[1]

In addition, several **H3C** employees appear in Defendants' communications concerning the counterfeiting allegations and Plaintiffs' imprisonment, including most notably Liu Rui, lr@h3C.com, *see* part B below.

Compare this extensive list of people involved in the counterfeit/imprisonment issue with Defendants' meager production of relevant documents catalogued below.

A. Produced documents

Defendants have made 4 document productions (DEF001-DEF004), producing documents bates-numbered 1-2884 in total (I omit prefix zeros from the bates numbers). With respect to the key issue in this case -- the counterfeiting allegations and Plaintiffs' imprisonment -- Defendants produced virtually no internal documents, however.

---

[1] This list does not include additional employees of Defendants' involved in the contemporaneous RMA refund issue, or more generally in any issues in dispute other than the counterfeit allegations and Plaintiffs' imprisonment.

July 12, 2019
Page 4 of 10

1.	Defendants' first production DEF001, bates-numbered 1-932, consists of 931 single-page images of various excel spreadsheets and a 1-page "Form Service Request" referring to HPFS' agreement with TT Global. <u>There are no documents concerning the counterfeiting allegations or Plaintiffs' imprisonment in Defendants' first production</u>.

In addition, Defendants did not produce those excel spreadsheets in native format as the ESI protocol requires and as Defendants themselves have done in their subsequent productions after Plaintiffs raised the issue.

2.	Defendants second production DEF002, bates-numbered 933-1537, consists of documents dated 2011 concerning the original sale of the equipment, documents dated 2012 concerning the equipment remaining in India and Defendants' sale of that equipment to TT Global, and documents dated 2013 concerning the RMA refund issue (separate and distinct from the counterfeiting allegations and Plaintiffs' imprisonment), as well as Plaintiffs' own correspondence with Defendants. <u>There are no internal documents concerning the counterfeiting allegations or Plaintiffs' imprisonment in Defendants' second production</u>.

In addition to this overarching key deficiency, Defendants have failed to produce other relevant documents referenced in their second production. In particular:

(i)	Document bates-stamped 940 refers to the "huge file" with all 4 schedules of the equipment; the file itself, however, is not attached. It might have been produced elsewhere in Defendants' productions but given the large number of various spreadsheets in Defendants' production, Defendants should produce the file referenced in the email or indicate by bates numbers if it has been produced elsewhere.

(ii)	Defendants requested from Inspira the original importation documents of the equipment leased to Tata Consultancy, which document should have included the list of the equipment's serial numbers (*see* bates number 956) and a copy of the bill of entry (*see* bates number 963). According to Inspira, "correlation of serial nos with individual bill of entries are important. Due to numerous shipments and urgent circumstances in which they were cleared from customs . . . paperwork is getting very complex" (*see* bates number 984). Defendants produced some of Inspira's documents in their fourth production (copies of agreements and tax invoices); however, they have failed to produce the list of the original serial numbers of the equipment imported by Inspira and leased to Tata, the bill of entry, or any documents correlating the serial numbers with the bill of entry. Accordingly, Defendants have failed to produce any documents showing what original equipment Inspira had actually delivered to Tata for the Commonwealth Games.

(iii)	On August 8, 2011, Tom Harris forwards a complete list of H3C equipment offered for sale to ICT to Mike Pekar, stating that "I have combined all 4 schedules" (*see* bates number 991). The list, however, is not attached to the email; it might have been produced elsewhere in Defendants' production but, given the large number of various spreadsheets,

Defendants should produce Mr. Harris' "complete list of H3C equipment" referenced in his email or indicate by bates number if it has been produced elsewhere.

    (iv)    An email dated June 17, 2011 from HPFS' Bevan Goodwin (bates-stamped 985) states that "all 4 lease schedules have been received into our Delhi facility . . . some are still going through audit." The results of that audit do not appear to have been produced. They might have been produced elsewhere as part of a spreadsheet in Defendants' production but given the large number of various spreadsheets, Defendants should produce the audit results or indicate by bates number if it has been produced.

    (v)    Tom Harris' October 2012 email referring to the 2012 inspection of the equipment left in India (bates number 1111) states that "security and material control very questionable," and references pictures from the TT Global facility sent by Mr. Harris. Defendants have failed to produce the pictures.

    (vi)    An October 2012 email from Edward Chin of HPFS (bates number 1121) references "delicate and sensitive discussions with Ric [TT Global]" and states: "from the picture it looks like a logistics carrier tag not a customer tag. It is part of our vendor's process to remove customer tags and COA labels during the audit and testing phase." Defendants have failed to produce the results of the referenced "audit and testing" of the equipment conducted by TT Global; Defendants have also failed to produce the referenced picture of the equipment's tags.

    (vii)    An October 18, 2012 email from Tom Harris (bates number 1125-26) states: "With regard to the test, if TTG tested and wiped the equipment on the inbound and the equipment has been stored in one location for the entire time they have had it I don't see the need for extra testing. If it was not tested or if the equipment has been moved by TTG during which damage could occur I think they should be re-tested." Defendants have failed to produce the results of TT Global's testing or retesting of the equipment.

    (viii)    An October 9, 2012 email from Tom Harris (bates number 1131) stating "I thought you might like to see some pictures of the equipment and the storage facility it's located in." Plaintiffs would like to see the pictures that Tom Harris sent from the 2012 Inspection; alas, Defendants have failed to produce them.

    (ix)    A September 2012 email chain (bates number 1135) refers to the attached "list of assets not found in IMT" and the September 2012 report of Tata's stock remaining in India. Defendants have failed to produce the referenced list and report.

    (x)    Defendant Gill in his February 25, 2013 email to Plaintiff Styller (bates number 1382) states that "our audit team should have a report [of the inspection of the Seized Equipment] on Wednesday." In his email of February 27, 2013 (Wednesday) to Plaintiff Styller (bates number 1385), Defendant Gill further states that the audit team has "inspected about 40% of the seized products." Other than a spreadsheet listing the inspected transceivers, Defendants have failed to produce any results of their inspection of the 40% of the Seized Equipment.

July 12, 2019
Page 6 of 10

  3. Defendants' third production DEF003, bates numbers 1538-2349, includes some internal documents dated 2013 dealing with the counterfeit allegations and Plaintiffs' imprisonment. Such documents appear in bates ranges 1692-1903 and 2013-2141 of the third production (339 pages altogether, with documents on the separate RMA refund issue included in those ranges). However, with very few exceptions, all these internal documents concerning the counterfeit allegations and Plaintiffs' imprisonment have been redacted (*see* part B below addressing Defendants' improper redactions and withholding of documents).

  In addition, Defendants' third production is marked by the following deficiencies:

  (i) Kevin Bartley in his email dated May 7, 2013 to Jim O'Grady and Ross West (bates number 1843) states: "You may be aware that we sold the remainder of the equipment to TT-G that ICT did not purchase from us. The sale was for appox. USD200k. TT-G moved the assets to Dubai at the time the issue with ICT in China came up. As a result, we asked TT-G to hold on to the assets whilst the overall issue is investigated as to the originality of the assets. Ching and David from legal have been working with the brand protection team and whilst there hadn't been a concrete determination as to the authenticity of the assets, the advice that we are getting is that the origination of the equipment is questionable, and as such, we should not allow TT-G to re-sell what they purchased from us. As a result, TT-G will be out of pocket and it is fair to say would be looking to us to make them whole. Nothing has been committed to TT-G, hence wanting to get your acknowledgment that this is the correct course of action before instructing TT-G to destroy the equipment." Defendants have failed to produce any of their correspondence with TT-G or any internal correspondence concerning Defendants' decision to instruct TT-G to destroy the equipment while the criminal prosecution of Plaintiffs in China was ongoing.

  (ii) Jim O'Grady's same-day response to the above-quoted email states (bates number 1843): "This would obviously would be a Ross call due to financial impact. My gut says we should fully refund due to questionable nature of product." Wess Ross' response of May 10, 2013, states: "Jim, let's clear this up when you, JT and I are together in Andover next week." Defendants have failed to produce any documents concerning the referenced meeting in Andover or any follow-up to those discussions, which apparently led to the remaining equipment being destroyed by TT Global on Defendants' instructions.

  (iii) An email exchange dated May 28-29, 2013 (bates numbers 1847-48), subject line "Shenzhen Kingtech Co., Ltd.," refers to "this HP counterfeit investigation in China" and references TT Global. Kevan Bartley's response states: "HPFS received the same request directly and a response has already been provided." Defendants have failed to produce the request to HPFS or HPFS' response referenced in this email exchange.

  (iv) An email dated February 5, 2013 from Jim O'Grady to Robert Cozzolina (bates numbers 2086-87) states: "Attached are the serial numbers we have from the Tokyo Trading

July 12, 2019
Page 7 of 10

vendor audit. This should match what we sold to ICT." Defendants have failed to produce the serial numbers referenced in the email; they might have been produced elsewhere in Defendants' production but, given the large number of various spreadsheets, Defendants should produce the list specifically referenced in O'Grady's email or indicate by bates number if it has been produced elsewhere.

(v)   In his February 22, 2013 response (bates numbers 2086-87), Mr. Cozzolina, HP's Global Anti-Counterfeit Investigation Program Manager, states: "As you know, H3C is a separate company, they have their own anti-counterfeit program. I've confirmed three ICT employees have been arrested by the PSB (Chinese Public Security Bureau. It 'appears' (I have not been able to confirm) that these employees may be charged with counterfeiting. It also 'appears' they may have been altering the genuine parts to make them look like new rather than used." Defendants have failed to produce any correspondence or documents that were the source of Mr. Cozzolina's referenced statements, or any internal correspondence concerning those statements.

4.   Defendants' fourth and final production DEF004, bates numbers 2350-2884, contains no internal documents at all, and predominantly consists of Inspira's agreements and tax invoices (but not the serial numbers of the imported equipment, the bill of entry, or the reconciliation between the serial numbers and the bill of entry referenced in Defendants' correspondence with Inspira), as well as Plaintiffs' own agreements and correspondence with Defendants. <u>There are no internal documents concerning the counterfeiting allegations or Plaintiffs' imprisonment in Defendants' fourth production</u>.

In addition, DEF004 includes a document in Chinese (bates numbers 2807-2817) that appears to be a report from H3C stating that the seized transceivers are counterfeit and detailing the indicia of their unauthenticity. Defendants, however, have failed to produce any correspondence with H3C or any other transmittal documents accompanying this report, or any internal documents or correspondence concerning this report.

B.   <u>Withheld/redacted documents</u>

In addition to Defendants' failure to produce internal documents/correspondence on the key issue of counterfeiting allegations and Plaintiffs' imprisonment despite the involvement of over 70 of Defendants' employees in this particular issue, Defendants have improperly claimed privilege with respect to numerous withheld/redacted documents.

*First*, an employee of H3C, Liu Rui (lr@h3c.com) appears in **38** communications from February 2, 2013 until April 16, 2013 shielded by Defendants from production as privileged.

Liu Rui appears on email chains purportedly "seeking and containing legal advice" on such key topics as the "arrest of ICT sales representatives," "transceivers," "equipment sold to ICT," "seized equipment," "agreements with ICT and Shinto," "incident involving ICT sales representatives," "product verification," "equipment sent to China," "update to litigation," "letter to Chinese police," "verification report and draft letter," and "draft product sample verification report."

Moreover, Defendants have shared their attorney-client communications with other H3C employees, such as zhuchunyu@h3c.com, who appears on the email chains "enclosing verification report and draft letter" and others, and chenxiaodong@h3c.com, who appears on the email chains regarding 'investigation of ICT claims" and the "verification report."

Defendants' designation of those email chains that include Liu Rui and other H3C employees as privileged because the parties thereto were purportedly "seeking and containing legal advice" is wholly improper. Defendants have shared those attorney-client communications with third parties – *i.e.*, H3C employees -- thereby waiving that privilege. Moreover, Defendants' persistent and widespread sharing of such communications with H3C amounts to a subject matter waiver. Accordingly, Plaintiffs request that Defendants produce all their communications and documents on all these subjects, whether or not H3C employees are included in all such communications.

*Second*, these communications and documents should also be produced pursuant to the crime-fraud exception to the attorney-client privilege because they were made in furtherance of Defendants' fraud. These communications demonstrate beyond any doubt that Defendants, HP China, and H3C were working hand in glove to keep Plaintiffs incarcerated based on their false statements to the Chinese police, and their withholding (and destruction) of exculpatory evidence.

Indeed, not only H3C employees were involved in shaping Defendants' investigations and drafting their submissions to the Chinese police while H3C was providing the police with its false testimony in constant coordination with Defendants, but Lui Riu herself had maintained personal contact with the H3C security person who was providing that testimony, Wang You, while Defendants were directly working with him on verifying the product origination. *See*, *e.g.*, Defendants' email chain dated March 2013, bates numbers 2137-2139, directing TT Global to send samples of transceivers to Wang You at H3C, with Liu Rui writing that "I just called him with this number to notify him to be ready to receive the sample."[2]

---

[2]  Wang You was H3C's security expert whom the Chinese Police interrogated in August 2014 and who assured the Police that it was sufficient to identify the transceivers as counterfeit based on their external appearance, and that the power-on test was neither necessary nor sufficient for that purpose. *See* SAC ¶ 224.

July 12, 2019
Page 9 of 10

  HP China was likewise providing false statements to the Chinese police while working and sharing information with Defendants and H3C on the matter. *Compare* SAC ¶¶ 69-70 ("On March 2, 2013, the Chinese police again contacted HP China to see if HP China was able to verify the contracts and thus confirm the Individual Plaintiffs' alibis, and recorded its response as follows: 'the person from HP China said HP China is contacting HPFS currently.' Fifteen more months later, in August 2014, the Chinese police once again contacted HP China and received exactly the same non-response as it did in January and March of 2013: "We contacted with Fu YuLin who is from Legal Department of HP China (his contact +86-18901088737), we asked HP China to verify the products, to make sure where the products came from. Fu YuLing replied that he is contacting the related departments of HP. But till now, we have not got a reply from him.'"), with Defendants' Privilege Log entry for June 16, 2013, "Email chain containing the legal advice of David Gill regarding phone call with HPN, H3C and HP China Legal," subject line "ICT/HPFS(India)/H3C (HP China)."

  *Third*, aside from and in addition to the waiver and the crime-fraud exception, Defendants have made overbroad privilege designations. It is axiomatic that factual information is not protected by the attorney-client privilege by virtue of being provided to an attorney for purposes of seeking legal advice. Here, the factual or technical information concerning the Equipment origination or authenticity does not become privileged merely because Defendants had designated David Gill or their other legal personnel to serve as an internal clearinghouse for such factual or technical information.

  *Fourth*, Defendants apparently withheld numerous drafts of their submission to the Chinese police on privilege grounds, *see* Privilege Log entries 309, 321, 324, 335, 347, 349, 355, 391, 394, 396, 400, 403, 406, 411. Defendants, however, had selectively provided certain drafts of that submission to Plaintiffs in March and April 2013, and then deceived them by stating that the final version submitted to the police was "substantively the same as the last English version you saw" and "nothing changed the description of the relevant sequence of events between HPFS India and ICT." Defendants cannot cherry-pick some drafts of the submission to share with Plaintiffs while claiming privilege with respect to other drafts in these circumstances.

  *Fifth*, Defendants improperly used blanket redactions to shield communications among business managers not involving any attorneys, *see, e.g.*, completely redacted emails between Jim O'Grady and Kevan Bartley dated February 2, 2013, subject line "Update: Security Incident in China" (bates numbers 1696, 1700); completely redacted email dated June 27, 2013 among Kevin Bartley, Jeffrey Nevitt, Michele Carson and JT Silvestri "Re: RMA" (bates number 1886).

  Defendants' improper privilege claims are clearly designed to shield from discovery their critical documents and communications that are at the heart of this matter, and Plaintiffs fully intend to seek the Court's order compelling their production unless Defendants withdraw their privilege claims.

July 12, 2019
Page 10 of 10

                                            Very Truly Yours,

                                            Dimitry Joffe

cc:  Joshua McGuire, Esq.
      Anthony Callaghan, Esq.
      Michael Bunis, Esq.
      Mark Edgarton, Esq.