## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

ALEXANDER STYLLER, INTEGRATED
COMMUNICATIONS & TECHNOLOGIES,
INC., JADE CHENG, JASON YUYI, CATHY
YU, CAROLINE MARAFAO CHENG,
PUSHUN CHENG, CHANGZHEN NI,
JUNFANG YU, MEIXIANG CHENG,
FANGSHOU YU, and CHANGHUA NI,

                          Plaintiffs,

     vs.

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, HEWLETT-
PACKARD FINANCIAL SERVICES (INDIA)
PRIVATE LIMITED, HP INC., HEWLETT
PACKARD ENTERPRISE COMPANY, and
DAVID GILL

                          Defendants.

Civil Action No. 1:16-CV-10386 (LTS)

Leave to file granted on October 18, 2019

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO COMPEL

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ......................................................................................................................... 4

I.  Defendants Have Not Withheld Key Documents Or Asserted Objections
To Discovery For This Court to Overrule ................................................................ 6

    A.  Return Of The Equipment And Its Sale to ICT, 2011 ................................. 6

    B.  Inspection Of The Equipment Remaining In India, 2012 ........................... 7

    C.  Disposition Of The Equipment Remaining In India, 2012-2013 ............... 7

    D.  Inspection Of The Equipment Seized In China, 2013 ............................... 8

    E.  Counterfeit Nature Of The Equipment ...................................................... 9

    F.  Communications Concerning The Seized Equipment And/Or The
Individual Plaintiffs' Incarceration .......................................................... 10

II.  Plaintiffs Fail To Establish A Reason To  Expand The Scope of
Defendants' ESI Searches ...................................................................................... 11

    A.  The Executive Group Should Not Be Added As Custodians ................... 11

    B.  Meng Tao And James Kwok Should Not Be Added As Custodians ........ 13

    C.  Jessica Liu Should Not Be Added As A Custodian ................................. 14

    D.  Defendants Abided By The ESI Protocol Concerning De-
Duplication ............................................................................................... 15

III.  Defendants' Assertions Of The Attorney-Client Privilege And Work
Product Doctrine Are Proper .................................................................................. 15

    A.  Defendants Have Not Improperly Withheld Factual Information ........... 15

    B.  Chinese Law Does Not Apply To Documents Defendants Withheld
As Privileged ........................................................................................... 18

2756292.1 108164-84842

1.      Massachusetts Privilege Law Should Apply Because
        Massachusetts Substantive Law Supplies the Rule of
        Decision In This Action ............................................................... 18

2.      Massachusetts Privilege Law Should Apply Because
        Massachusetts Is Plaintiffs' Chosen Forum ................................. 19

3.      Massachusetts Conflicts-of-Law Analysis Favors
        Massachusetts Privilege Law ....................................................... 20

C.      Defendants Have Not Waived The Attorney-Client Privilege  By
        Communicating With Their Corporate Affiliates .................................... 22

D.      Plaintiffs Have Not Established the Crime-Fraud Exception .................. 24

CONCLUSION ............................................................................................................ 25

2756292.1 108164-84842

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amarin Plastics, Inc. v. Maryland Cup Corp.*,
116 F.R.D. 36 (D. Mass. 1987)................................................................16

*In re: Bard IVC Filters Prods. Liability Litig.*,
MDL No. 15-2641, 2016 WL 3970338 (D. Ariz. July 25, 2016)............................18

*Bi-Rite Enterprises, Inc. v. Bruce Miner Co.*,
757 F.2d 440 (1st Cir. 1985).................................................................20

*Comm'r of Revenue v. Comcast Corp.*,
453 Mass. 293 (2009) .......................................................................16

*Command Transp., Inc. v. Y.S. Line (USA) Corp.*,
116 F.R.D. 94 (D. Mass. 1987)...............................................................20

*Enslin v. Coca-Cola Co.*,
2:14-cv-06476, 2016 WL 7042206 (E.D. Pa. June 8, 2016) ...................................12

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938)..........................................................................18

*F.D.I.C. v. Ogden Corp.*,
202 F.3d 454 (1st Cir. 2000)................................................................19

*Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*,
173 F.R.D. 7 (D. Mass. 1997)............................................................19, 24

*FM Generator, Inc. v. MTU Onsite Energy Corp.*,
2016 U.S. Dist. LEXIS 189539 (D. Mass. Aug. 25, 2016).....................................13

*Ford Motor Co. v. Edgewood Properties, Inc.*,
257 F.R.D. 418 (D.N.J. 2009)................................................................6

*Ghana Supply Comm'n v. New England Power Co.*,
83 F.R.D. 586 (D. Mass. 1979)...........................................................18, 19

*In Re John Doe Grand Jury Investigation*,
408 Mass. 480, 562 N.E.2d 69 (1990) .......................................................24

*Lluberes v. Uncommon Prods., LLC*,
663 F.3d 6 (1st Cir. 2011)..................................................................15

2756292.1 108164-84842

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
 167 F. Supp. 2d 108 (D. Mass. 2001) ......................................................................19

*McLaughlin v. McDonald's Corp.*,
 203 F.R.D. 45 (D. Mass. 2001) ...............................................................................20

*Purcell v. District Attorney for Suffolk Dist.*,
 424 Mass. 109 (1997) ...............................................................................................24

*Pyramid Controls, Inc. v. Siemens Industries*,
 176 F.R.D. 269 (N. D. Ind. 1985) ............................................................................19

*In re QLT Phototherapeutics, Inc.*,
 25 F. App'x 825 (Fed. Cir. 2001) .............................................................................19

*Ret. Fund v. J.P. Morgan Chase & Co.*,
 297 F.R.D. 99 (S.D.N.Y. 2013) ...............................................................................12

*Safeco Ins. Co. of Am. v. M.E.S., Inc.*,
 289 F.R.D. 41 (E.D.N.Y. 2011) ...............................................................................18

*In re Teleglobe Comms.*,
 493 F.3d 345 (3d Cir. 2007) .....................................................................................23

*Upjohn Co. v United States*,
 449 U.S. 383 (1981) ...........................................................................................15, 17

*Wultz. v. Bank of China Ltd.*,
 979 F. Supp. 2d 479 (S.D.N.Y. 2013) ......................................................................18

**Rules**

Fed. R. Evid. 501 ..............................................................................................................18, 19

Local Rule 7.1(b)(1) ..................................................................................................................4

Local Rule 37.1(b) ....................................................................................................................4

Mass. R. Evid. 502(b)(3) .........................................................................................................23

**Treatises**

Restatement (Second) of Conflict of Laws § 6(2) ..................................................................20

2756292.1 108164-84842

Defendants submit this memorandum of law and Declaration of Paul A. Saso, dated October 18, 2019 ("Saso Decl.") in opposition to Plaintiffs' Renewed Motion to Compel (the "Motion").

## PRELIMINARY STATEMENT

The Motion amounts to little more than Plaintiffs' unsupported opinion that Defendants are withholding something that they are not. Tellingly, Plaintiffs quote their discovery requests and Defendants' objections and responses thereto, but do not state what objection(s) they request that this Court overrule. With rare exceptions, there are none. Defendants have produced responsive, non-privileged documents and, in many instances, have simply informed Plaintiffs that the documents that they requested do not exist and/or were not yielded by the agreed-upon ESI search terms that were designed to target specific categories of documents.

Unsatisfied that the dozens of search terms that they demanded Defendants apply to their emails did not uncover the global conspiracy that their claims rest upon, Plaintiffs turn instead to requesting that the Court compel Defendants to expand the scope of their searches. Nearly a year after agreeing to the list of Defendants' custodians, and with document discovery complete for half a year, Plaintiffs request that this Court essentially suspend this action so that Defendants can start from scratch—applying the same search terms to additional HP custodians' emails for a five-year period, potentially requiring months of additional attorney time in reviewing search term hits for relevant and responsive documents. Plaintiffs make this request without any evidentiary support (or even unsupported reason) to believe that such extensive searches would lead to additional, non-duplicative evidence.

Finally, Plaintiffs seek to compel Defendants to produce privileged documents based upon theories that, among other things, are unrecognized in the law and would essentially eviscerate the attorney-client privilege. For example, Plaintiffs demand that Defendants produce all

communications with counsel if they contain factual information, even if for the purpose of obtaining or providing legal advice.  Likewise, Plaintiffs argue that the everyday act of corporate affiliates with common legal interests seeking and providing legal counsel amongst one another breaks the attorney-client privilege.

Plaintiffs also ask this Court to set aside Massachusetts privilege law and compel Defendants to produce otherwise privileged communications that were sent to or received from China because China does not recognize the attorney-client privilege.  Their oversimplified conflicts of law analysis misses the mark, but also ignores that they assert all of their claims under Massachusetts law, that they chose this forum, and that they themselves withheld as privileged volumes of communications that crossed (and continue to cross to this day) Chinese borders.

As a final salvo, Plaintiffs request that this Court review the hundreds of communications on Defendants' privilege log to determine whether the crime-fraud exception applies, despite submitting zero evidence to support this claim.  Defendants respectfully request that the Court deny this and every other factually and legally unsupported claim in the Motion.

## STATEMENT OF FACTS

Plaintiffs served their only set of Documents Requests ("Requests") upon all Defendants and their only set of Interrogatories upon the corporate Defendants on February 16, 2018.  (Saso Decl. ¶ 3.)  Defendants served their initial responses thereto on March 16, 2018.  (*Id*. ¶ 4.)

Plaintiffs sent Defendants a deficiency notice, dated March 28, 2018.  (*Id*. Ex. A.)  On April 26, 2018, the parties held a telephonic meet and confer conference (the "2018 M&C") that lasted for over two hours, during which the parties each discussed the alleged deficiencies in one another's discovery responses.  (*Id*. ¶ 6.)  During the 2018 M&C, Plaintiffs only discussed the Requests and Interrogatories that were the subject of Plaintiffs' March 28, 2018 letter.  (*Id*. ¶ 7.)

2

Shortly after the 2018 M&C, the parties agreed to participate in a mediation with Magistrate Judge Dein and agreed to suspend and stay further discovery during that process.  (*Id.* ¶ 10.)   Following the unsuccessful mediation, on November 29, 2018, the Court issued a scheduling order, setting certain discovery deadlines.  [ECF 178].

The parties initially negotiated and filed a Stipulation Regarding Electronic Discovery Protocol on April 6, 2018 [ECF 149] (the "Original ESI Protocol").  (*Id.* ¶ 11.)  The parties further negotiated and submitted a final Stipulation Regarding Electronic Discovery Protocol on December 21, 2018, [ECF 183] (*id.* Ex. B) (the "ESI Protocol") which governs, *inter alia*, the parties' identification of the location of relevant electronically-stored information ("ESI"), preservation plans, scope and form of production, methods for searching and reviewing ESI, and agreed-upon search terms and custodians.[1]   The ESI Protocol was so-ordered by the Court on January 2, 2019.  [ECF 184]

Defendants served Amended Responses to Plaintiffs' Requests on March 27, 2019 and Amended Responses to the Interrogatories on April 17, 2019.  (*Id.* ¶ 17.)

Pursuant to the case schedule, Defendants began their document productions on January 30, 2019 and completed them on April 15, 2019.  (*Id.* ¶ 18.)  Just in advance of a status conference with the Court, Plaintiffs filed a Status Report on June 4, 2019, stating that there was a deficiency in Defendants' document production.  (*Id.* ¶ 20.)  Plaintiffs did not contact Defendants directly concerning this deficiency either before or after the June conference.  (*Id.* ¶ 21.)  Nevertheless, shortly following the June conference, Defendants produced documents that addressed Plaintiffs' concern.  (*Id.* ¶ 22.)

---

[1]        Throughout the Motion, Plaintiffs inaccurately cite to the Original ESI Protocol as the applicable protocol for searching, collecting and producing ESI.  (*See*, *e.g.*, Motion at 6 n.3, citing ECF 149.)

2756292.1 108164-84842

Just hours before the July 12, 2019 status conference with the Court, Plaintiffs sent a letter to Defendants containing alleged deficiencies in Defendants' document productions. (Joffe Decl. Ex. I.) The July 12, 2019 letter was the first time that Plaintiffs contacted Defendants concerning any alleged discovery deficiencies since Plaintiffs' March 28, 2018 letter and the 2018 M&C. (Saso Decl. ¶ 23.)

Plaintiffs filed a motion to compel on August 23, 2019 and the Court denied that motion with leave to renew subject to (1) the parties meeting and conferring, (2) Plaintiffs' complying with Local Rule 37.1(b), and (3) "limit[ing any renewed motion to compel] to the issues in the [July 12, 2019] letter." [ECF 234 & 239.]

The parties met and conferred on September 23, 2019 (*id.* ¶ 24) (the "2019 M&C") and Defendants sent Plaintiffs a letter memorializing that conference on September 27, 2019. (Joffe Decl. Ex. B.) Defendants sent a further letter and produced some additional documents on October 1, 2019. (Saso Decl. ¶ 27; Joffe Decl. Ex. C.)

## ARGUMENT

At the outset, Defendants note Plaintiffs' failure to comply with Local Rule 7.1(b)(1), requiring a moving party to submit "[a]ffidavits and other documents setting forth the evidencing facts on which the motion is based…" Throughout the Motion, Plaintiffs purport to submit facts with no evidentiary support. Plaintiffs make unsupported statements concerning, among other things, the amount of information produced by Defendants, which Defendants produced documents, in what format they were produced, and Defendants' ESI custodians.[2] Plaintiffs do

---

[2]     As one example of Plaintiffs' unsupported and inaccurate statements concerning Defendants' production, Plaintiffs state that Defendants produced "931 single-page TIFF images of various excel spreadsheets … without the native files required by the ESI protocol." (Motion at 6 n.3.) Plaintiffs lodged that complaint with Defendants via letter dated March 18, 2019. (Saso Decl. Ex. C.) Defendants disabused Plaintiffs of their misinterpretation of the ESI Protocol via letter two days later, noting that the very section of the ESI Protocol that Plaintiffs cite actually requires that spreadsheets maintained in "static form" (*e.g.*, pdf) should be produced as "static images" such as TIFF images. (*Id.* Ex. D.) Providing this clarification has not deterred Plaintiffs' counsel from repeating this same falsehood in

not even submit Defendants' privilege log as evidence in connection with this Motion, despite their attempt to challenge the designations therein.  The Court should disregard entirely any factual statement by Plaintiffs that is unsupported by the evidence submitted on this motion and should decline to take notice of any attempt by Plaintiffs to cure this deficiency by submitting new facts or evidence on reply—which would effectively deprive Defendants of any opportunity to appropriately respond.

Plaintiffs have also disregarded this Court's order "limit[ing any renewed motion to compel] to the issues in the [July 12, 2019] letter."  [ECF 239].  When Plaintiffs attempted to expand the scope of their discovery complaints during the 2019 M&C by addressing issues that were not in the July 12 letter, Defendants reminded Plaintiffs that any renewed motion to compel must be limited to the contents of the July 12 letter, but Plaintiffs' counsel insisted that they were not so limited.  (Saso Decl. ¶ 25.)  Plaintiffs now attempt to avoid this restriction by arguing that, because the July 12 letter was aimed at the "overarching deficiency in Defendants' production," Plaintiffs should be entitled to address any and all purported discovery deficiencies that they deem appropriate.  (Motion at 14 n.13.)  This is a wholesale re-writing of the restriction imposed by the Court at the July 12, 2019 status conference, and Plaintiffs' position is the exception that swallows the rule.  Indeed, if Plaintiffs may cast their July 12 letter as an "overarching" attack on all of Defendants' discovery responses, what limitation does the July 12 letter afford at all?

Defendants specifically note below which portions of the Motion were not the subject of the July 12 letter.

---

multiple court filings thereafter.  (*See*, *e.g.*, ECF 209 at 3, ECF 217 at 5 n.3, ECF 223 at 5 n.2, and again in the Motion at 6 n.3.)  In addition to inaccurately describing the ESI Protocol requirements, Plaintiffs also falsely claim that Defendants have not produced the "native files" (*i.e.*, in Excel spreadsheet format).  In fact, after the exchange of letters in March 2019, Defendants produced three of the four spreadsheets in native format when they were located. (Saso Decl. ¶ 30.)

## I.     Defendants Have Not Withheld Key Documents Or Asserted Objections To Discovery For This Court to Overrule

Although Plaintiffs now quote their Requests and Defendants' Responses in their entirety, they do not argue that Defendants are standing on any objection asserted in their Responses. (Motion § C.)  That is because, except for stating that Defendants have conducted a reasonable search pursuant to the terms of the highly-negotiated ESI Protocol, Defendants are not objecting to producing responsive, non-privileged documents in connection with any of the specific categories of documents that are identified in the Motion.  Accordingly, Defendants fail to see what objection(s) Plaintiffs are requesting the Court to overrule in the Motion.  Instead, Plaintiffs simply surmise that responsive documents must inherently exist and request that the Court command that Defendants produce them, but the "notion that a document production is insufficient based on a belief that documents must exist simply is not enough to grant a motion to compel…." *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 428 (D.N.J. 2009).

### A.     Return Of The Equipment And Its Sale to ICT, 2011

Plaintiffs cite Request 17 (Motion § C.I), which was not the subject of the March 28, 2018 letter, the 2018 M&C, or the July 12, 2019 letter.  (Saso Decl. Ex. A; Joffe Decl. Ex. I.)

Defendants do not object to producing responsive, non-privileged documents in response to this Request, other than stating that requiring any searches beyond those negotiated and documented in the ESI Protocol would be overly burdensome and not proportional to the needs of this case.  Indeed, Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents.[3]

---

[3]     These search terms include, but are not limited to:  (1) Tata, (2) "Referral and Revenue Share Agreement," (3) RRSA, (4) Wholesale Sale Agreement, (5) WSA, (6) ICT, (7) "Integrated Communications" w/2 Technologies, (8) India and (counterfeit or fake), (9) China and (counterfeit or fake), (10) "serial number" w/5 (H3C, ICT, Tata or Shinto), (11) ("TT Global" or TTG or "Tokyo Trading") w/5 (H3C, ICT, Tata or Shinto), (12) Shinto, (13) "Inspira Enterprise," (14) "Commonwealth Games," (15) India w/10 H3C, and (16) (transceiver! Or transceiver! Or equipment of H3C or trademark) w/10 (counterfeit! Or genuine or authent! Or fake! Or original!).  (Saso Decl. Ex. B.)

### B.      Inspection Of The Equipment Remaining In India, 2012

Plaintiffs cite Request 6 (Motion § C.II), which was not the subject of the March 28, 2018 letter, or the 2018 M&C.  (Saso Decl. Ex. A.)

Defendants do not object to producing responsive, non-privileged documents in response to this Request, other than stating that requiring any searches beyond those negotiated and documented in the ESI Protocol would be overly burdensome and not proportional to the needs of this case.  Indeed, Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents.[4]  Further, the "2012 Inspection" to which Plaintiffs refer in Request 6 was conducted by Tom Harris, and Mr. Harris was included as one of Defendants' ESI custodians.  (Saso Decl. Ex. B.)

### C.      Disposition Of The Equipment Remaining In India, 2012-2013

Plaintiffs cite Request 7 (Motion § C.III), which was not the subject of the March 28, 2018 letter, or the 2018 M&C.  (Saso Decl. Ex. A.)

Defendants do not object to producing responsive, non-privileged documents in response to this Request, other than stating that requiring any searches beyond those negotiated and documented in the ESI Protocol would be overly burdensome and not proportional to the needs of this case.  Indeed, Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents.[5]  In addition to the search terms, Defendants have committed

---

[4]      These search terms include, but are not limited to:  (1) ICT, (2) "Integrated Communications" w/2 Technologies, (3) "serial number" w/5 (H3C, ICT, Tata or Shinto), (4) ("TT Global" or TTG or "Tokyo Trading") w/5 (H3C, ICT, Tata or Shinto), (5) (warranty or equipment or computer or manufactur!) w/10 H3C, (6) (manufactur! or audit!) w/5 H3C, (7) scrap w/2 grade, (8) (transceiver or equipment) w/10 (inspect! or track! or review! or test!) w/10 H3C, and (9) RMA w/5 ICT or Shinto.  (Saso Decl. Ex. B.)

[5]      These search terms include, but are not limited to:  (1) ICT, (2) "Integrated Communications" w/2 Technologies, (3) "serial number" w/5 (H3C, ICT, Tata or Shinto), (4) ("TT Global" or TTG or "Tokyo Trading") w/5 (H3C, ICT, Tata or Shinto), (5) (warranty or equipment or computer or manufactur!) w/10 H3C, (6) (manufactur! or audit!) w/5 H3C, (7) (transceiver or equipment) w/10 (inspect! or track! or review! or test!) w/10 H3C, (8) RMA w/5 ICT or Shinto, (9) Tata, (10) India and (counterfeit or fake), (11) China and (counterfeit or fake), (12) Shinto, (13) "Inspira Enterprise," and (14) "Commonwealth Games."  (Saso Decl. Ex. B.)

to inquiring further internally about whether there are additional communications with TTG about the disposition of the equipment that was not shipped to ICT.  (Joffe Decl. Ex. C.)  To Defendants' knowledge, Plaintiffs have not engaged in any third-party discovery.  (Saso Decl. ⁋ 31.)

**D.  Inspection Of The Equipment Seized In China, 2013**

Plaintiffs cite Request 9 and Interrogatory 3 (Motion § C.IV), which were not the subject of the March 28, 2018 letter, or the 2018 M&C; and Interrogatory 3 was specifically not the subject of the July 12, 2019 letter.  (Saso Decl. Ex. A; Joffe Decl. Ex. I.)  Plaintiffs' July 12 letter did not request that Defendants amend their responses to any Interrogatories.  (*Id.*)

Defendants do not object to producing responsive, non-privileged documents in response to Request 9, other than stating that requiring any searches beyond those negotiated and documented in the ESI Protocol would be overly burdensome and not proportional to the needs of this case.  Indeed, Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents.[6]

Plaintiffs note that Defendants "produced one spreadsheet that merely lists the serial numbers of 265 confiscated transceivers and their brand, model and part number information—without any analysis or conclusions regarding their authenticity or origination."  (Motion at 17.) Defendants have already informed Plaintiffs that that spreadsheet is the "only written report that they received as a result of H3C's partial 'inspection' of the Seized Equipment."  (Joffe Decl. Ex. C.)  It is, therefore, unclear what more Plaintiffs demand.

---

[6]    These search terms include, but are not limited to:  (1) ICT, (2) "Integrated Communications" w/2 Technologies, (3) "serial number" w/5 (H3C, ICT, Tata or Shinto), (4) ("TT Global" or TTG or "Tokyo Trading") w/5 (H3C, ICT, Tata or Shinto), (5) (warranty or equipment or computer or manufactur! w/10 H3C, (6) (manufactur! or audit!) w/5 H3C, (7) (transceiver or equipment) w/10 (inspect! or track! or review! or test!) w/10 H3C, (8) Tata, (9) India and (counterfeit or fake), (10) China and (counterfeit or fake), (11) Shinto, (12) "Inspira Enterprise," (13) "Commonwealth Games," (14) PSB, (15) police, (16) "Chinese authorities," (17) Haidian, (18) detain or detention or prison, (19) jail!, (20) arrest!, (21) incarcerate!, (22) prosecut!, and (23) (hologra! Or sticker or label! Or logo!) w/10 H3C.  (Saso Decl. Ex. B.)

Likewise, Defendants have already informed Plaintiffs that they have "confirmed that the investigation concerning Shenzhen Kingtech Co., Ltd. did not involve the equipment that was returned by Tata to HPFS India, and is therefore unrelated to the equipment purchased by ICT." (*Id.*)  Here, Defendants do object to producing any further documents concerning this equipment because it is non-responsive to Request 9, irrelevant, and not likely to lead to the discovery of admissible evidence concerning the allegations in this action.[7]

### E.    Counterfeit Nature Of The Equipment

Plaintiffs cite Request 30 and Interrogatory 5 (Motion § C.V), which were not the subject of the March 28, 2018 letter, or the 2018 M&C; and Interrogatory 5 was specifically not the subject of the July 12, 2019 letter.  (Saso Decl. Ex. A; Joffe Decl. Ex. I.)  Plaintiffs' July 12 letter did not request that Defendants amend their responses to any Interrogatories.  (*Id.*)

Defendants do not object to producing responsive, non-privileged documents in response to Request 30, other than stating that requiring any searches beyond those negotiated and documented in the ESI Protocol would be overly burdensome and not proportional to the needs of this case.  Indeed, Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents.[8]

---

[7]        Plaintiffs inaccurately state that Defendants take the position that they consider "one produced email [concerning Shenzhen Kingtech] as relevant and responsive but 'any further documents' as irrelevant and non-responsive."  (Motion at 18 n.16.)  In actuality, the one email concerning Shenzhen Kingtech was produced inadvertently.  (Saso Decl. ¶ 19.)  One might expect that Plaintiffs would be sympathetic to the possibility that one non-responsive document might be inadvertently produced given their own production of approximately 600,000 pages of non-responsive materials.

[8]        These search terms include, but are not limited to:  (1) India and (counterfeit or fake), (2) China and (counterfeit or fake), (3) (hologra! Or sticker or label! Or logo!) w/10 H3C, (4) (manufactur! or audit!) w/5 H3C, (5) (transceiver or equipment) w/10 (inspect! or track! or review! or test!) w/10 H3C, (6) (transceiver! Or transceiver! Or equipment or H3C or trademark) w/10 (counterfeit! Or genuine or authent! Or fake! or original!), (7) ICT, (8) "Integrated Communications" w/2 Technologies, (9) "serial number" w/5 (H3C, ICT, Tata or Shinto), (10) ("TT Global" or TTG or "Tokyo Trading") w/5 (H3C, ICT, Tata or Shinto), (11) Tata, (12) Shinto, (13) "Inspira Enterprise," (14) "Commonwealth Games," (15) PSB, (16) police, (17) "Chinese authorities," (18) Haidian, (19) detain or detention or prison, (20) jail!, (21) arrest!, (22) incarcerate!, and (23) prosecut!.  (Saso Decl. Ex. B.)

As noted, Interrogatory 5 was not the subject of Plaintiffs' July 12 letter.  If the Court nevertheless considers this aspect of Plaintiffs' motion to compel and orders an amended Response thereto, Defendants respectfully suggest that they be permitted to amend their Response by simply referring to and incorporating the anticipated expert report to be produced in response to Plaintiffs' expected expert report pursuant to the upcoming expert discovery phase of the case.

### F. Communications Concerning The Seized Equipment And/Or The Individual Plaintiffs' Incarceration

Plaintiffs cite Requests 11 and 15 (Motion § C.VI).  Request 15 was not the subject of the March 28, 2018 letter, or the 2018 M&C; but Request 11 was.  (Saso Decl. Ex. A.)  In their March 28, 2018 letter, Plaintiffs questioned why Defendants objected by stating that communications were equally accessible to Plaintiffs as they were to Defendants.  During the 2018 M&C, Defendants explained that Plaintiffs' definition of "HP Entities" included more than just Defendants, and that Defendants could not and would not produce documents from entities (even within the HP corporate family) other than themselves.  (Saso Decl. ¶ 8.)  Plaintiffs did not further object to that explanation during the 2018 M&C or thereafter.  (*Id*. ¶ 9.)

Subject to that restriction, Defendants do not object to producing responsive, non-privileged documents in response to Requests 11 and 15, other than stating that requiring any searches beyond those negotiated and documented in the ESI Protocol would be overly burdensome and not proportional to the needs of this case.  Indeed, Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents.[9]

---

[9]     These search terms include, but are not limited to:  (1) each of the Individual Plaintiffs' names, (2) PSB, (3) police, (4) "Chinese authorities," (5) Haidian, (6) detain or detention or prison, (7) jail!, (8) arrest!, (9) incarcerate!, (10) prosecut!, (11) India and (counterfeit or fake), (12) China and (counterfeit or fake), (13) (hologra! Or sticker or label! Or logo!) w/10 H3C, (14) (manufactur! or audit!) w/5 H3C, (15) (transceiver or equipment) w/10 (inspect! or track! or review! or test!) w/10 H3C, (16) (transceiver! Or transceiver! Or equipment or H3C or trademark) w/10 (counterfeit! Or genuine or authent! Or fake! or original!), (17) ICT, (18) "Integrated Communications" w/2 Technologies, (19) "serial number" w/5 (H3C, ICT, Tata or Shinto), (20) Tata, (21) Shinto, (22) "Inspira Enterprise," and (23) "Commonwealth Games," (Saso Decl. Ex. B.)

## II.  Plaintiffs Fail To Establish A Reason To Expand The Scope of Defendants' ESI Searches

Faced with the reality that Defendants are not objecting to producing responsive, non-privileged documents in connection with the Requests and Interrogatories enumerated in the Motion and that Defendants have abided by the highly-negotiated ESI Protocol, Plaintiffs now seek to expand the scope of Defendants' searches by undoing that very Protocol in the vain hope that compelling Defendants to apply the same search terms to additional custodians will unveil evidence of an imagined conspiracy.

Although Plaintiffs spend seven pages generically complaining about the "numbers" concerning Defendants' document production (often with no citations to the record) (Motion § B, at 6-13), Defendants understand Plaintiffs to make only four requests:  to compel Defendants to (1) add Ross West, Ian Fowlis, Gerri Gold, Richard Olson, and Robert Cozzolina (the "Executive Group") as ESI custodians (*id*. at 10-11); (2) add Meng Tao and James Kwok as ESI custodians (*id*. at 8-9); (3) add H3C in-house counsel, Jessica Liu (a/k/a Liu Rui) as an ESI custodian (*id*. at 11-12); and (4) not de-duplicate custodians' non-email ESI against one another.  (*Id*. at 7 n.6.)

### A.  The Executive Group Should Not Be Added As Custodians

Plaintiffs argue that the Executive Group should be added to the list of Defendants' ESI custodians and that Defendants should apply the dozens of ESI Protocol search terms against their data for five years (2010-2014).[10]  Plaintiffs essentially argue that the Executive Group should be added as custodians because they were unknown to Plaintiffs at the time of the negotiation of the ESI Protocol.  In support of this request, Plaintiffs cite to a small number of emails that Defendants

---

[10]    Plaintiffs appear to complain that in-house counsel, Stuart Patterson, was not included as a custodian for Defendants (Motion at 7), but Defendants did search Mr. Patterson's custodial files pursuant to the ESI Protocol. (Saso Decl. Ex. B at Ex. 1.)

produced or to the subject lines of emails that were withheld as privileged, on which the Executive Group was carbon copied.

However, a "requesting party must be able to articulate a basis for the court to find that ESI in the possession of the additional custodians would be different from, and not simply duplicative of, information that the responding party has already produced." *Enslin v. Coca-Cola Co.*, 2:14-cv-06476, 2016 WL 7042206, at *2 (E.D. Pa. June 8, 2016) (quotation omitted). Merely having some connection to the relevant events is not enough. *Id.* at *3 (the "fact that a person may have had some connection to the events in question does not automatically mean that such person must be included as an ESI custodian. To justify an order compelling a responding party to search the records of additional custodians, the requesting party must demonstrate that the additional requested custodians would provide unique relevant information not already obtained." (quotation omitted)); *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 107-08 (S.D.N.Y. 2013) (refusing to compel party to search the records of additional custodians despite the fact that each had some connection to the events).

The Motion does not make the required showing. During the negotiation of the ESI Protocol, Defendants proposed the custodians that they then (and still today) view as the core group of persons with substantive knowledge and documents concerning the allegations in this action. (Saso Decl. ¶ 15.) Defendants do not believe the five individuals in the Executive Group would have non-duplicative information or documents when compared with Defendants' six ESI custodians. (*Id.* ¶ 32.) Defendants' document production and privilege log support this position:

- Fowlis appears on the privilege log 7 times and in 3 produced documents. He authored none of those documents. (*Id.* ¶ 33.);
- Cozzolina appears on the privilege log 1 time and on 1 produced document. He authored none of those documents. (*Id.* ¶ 34.);
- Gold appears on the privilege log 12 times and on 3 produced documents. She authored just 1 of the withheld documents. (*Id.* ¶ 35.);

2756292.1 108164-84842

- Olson appears on the privilege log 13 times and on 4 produced documents.  He authored just 2 of the withheld documents.  (*Id.* ¶ 36.);
- West appears on the privilege log 19 times and on 18 produced documents.  He authored only 5 total documents.  (*Id.* ¶ 37.)[11]

Thus, at best, the Executive Group has tangential knowledge and had peripheral involvement in the relevant events.  Instead, it appears that Plaintiffs chose to target potential custodians with the highest-ranking job titles (*e.g.*, CFO, COO) and without respect to the fact that none of the five proposed custodians authored more than a handful of emails.  Plaintiffs simply have not met their burden, and cannot do so, given the limited involvement and knowledge of the Executive Group.

### B.   Meng Tao And James Kwok Should Not Be Added As Custodians

Plaintiffs request that Messrs. Meng and Kwok be added as ESI custodians, but cannot claim that they were unaware of their existence at the time of the negotiation of the ESI Protocol (as they do with the Executive Group).  Plaintiffs have been aware of both individuals for a considerable time.  Indeed, the Second Amended Complaint ("SAC") quotes the portion of the January 10, 2013 Chinese police report that refers to Meng Tao.  (SAC ¶ 66.)  The SAC was filed August 4, 2017 and Plaintiffs' January 2017 draft proposed Second Amended Complaint similarly mentions Mr. Meng.  (ECF 64-1 ¶ 105.)  Defendants also disclosed both Messrs. Meng and Kwok as individuals with knowledge and information in their Initial Disclosures, dated November 3, 2017.  (Joffe Decl. Ex. D.)

It is Plaintiffs' burden to establish that Defendants are "in possession, custody or control" of the requested ESI.  *FM Generator, Inc. v. MTU Onsite Energy Corp.*, 2016 U.S. Dist. LEXIS 189539, *8 (D. Mass. Aug. 25, 2016).  Plaintiffs argue that Defendants are "in possession" of

---

[11]   Four of the five proposed custodians were merely carbon copied on a majority of the emails that contain their names (Fowlis copied on 10 of 10, Gold copied on 11 of 15, Olson copied on 12 of 17, and West copied on 22 of 37). The other (Cozzolina) was a direct recipient of a single produced document and a single withheld document.  (Saso Decl. ¶ 38.)

13

Messrs. Meng and Kwok's ESI based on nothing more than that they at times used @hp.com email addresses.  (Motion at 8-9.)  Plaintiffs have simply not met their burden.

During the negotiation of the custodians included in the Original ESI Protocol, in the spring of 2018, Defendants informed Plaintiffs that Messrs. Meng and Kwok did not work for Defendants during the relevant time period and instead worked for other HP-affiliated entities.  (Saso Decl. ⁋ 12.)  As a compromise, Defendants offered to use Messrs. Meng and Kwok's names as search terms so that Defendants' ESI searches would yield Defendants' communications with and relating to both men.  (*Id.* ⁋ 13.)  This offer is reflected in the Original ESI Protocol.  [ECF 149 at Ex. 1.]  But Plaintiffs did not pursue that course, and when the applicable ESI Protocol was further negotiated and finalized, those search terms were not included.

### C.      Jessica Liu Should Not Be Added As A Custodian

During the relevant time period, Jessica Liu was an employee of H3C and she acted as in-house counsel for that company.  (Saso Decl. ⁋ 40.)  As is the case with Messrs. Meng and Kwok, Plaintiffs fail to meet their burden in establishing that Defendants have possession, custody or control over Ms. Liu's emails.  In any event, as in-house counsel, it would be unproductive (and therefore overly burdensome and not likely to lead to the discovery of admissible evidence) to search her ESI because it would, at most, lead to an expansion of Defendants' privilege log, not their document production.[12]

---

[12]      Plaintiffs demanded, and Defendants agreed, to include Defendants' in-house counsel, Stuart Patterson, and in-house counsel/ Defendant, David Gill, as ESI custodians.  (Saso Decl. Ex. B at Ex. 1.)  Plaintiffs similarly complain that Mr. Patterson is not listed as a custodian on any produced emails and, instead, is listed on Defendants' privilege log hundreds of times.  (Saso Decl. ⁋ 39.)  Given that searching Ms. Liu's emails is not likely to lead to the discovery of admissible evidence, this strategy appears more targeted at harassing Defendants. It serves little purpose to expand the number of lawyers treated as ESI custodians.

### D.   Defendants Abided By The ESI Protocol Concerning De-Duplication

Plaintiffs did not raise any concerns with de-duplication in the July 12 letter or during the 2019 M&C.  (Saso Decl. ⁋ 26.)

In a footnote, Plaintiffs note that the ESI Protocol provides that a "party may de-dupe electronic documents, other than email, only within custodians."  (Motion at 7 n.6, incorrectly citing to the Original ESI Protocol).  The ESI Protocol does contain the same language, but Plaintiffs omitted that the parties "may de-dupe all *e-mail* across custodians."  (Saso Decl. Ex. B at §VII.A.2 (emphasis added).)  Defendants fully complied with the ESI Protocol, de-duplicating email across custodians, and non-email only within custodians.  (Saso Decl. ⁋ 16.)  Had Plaintiffs met and conferred with Defendants about this issue before filing their motion, Defendants would have clarified this point.  In any case, Plaintiffs' request is moot.

### III.   Defendants' Assertions Of The Attorney-Client Privilege And Work Product Doctrine Are Proper

### A.   Defendants Have Not Improperly Withheld Factual Information

Based on little more than the uncontroversial proposition that the attorney-client privilege "does not protect disclosure of the underlying facts by those who communicated with the attorney" (Motion at 21, quoting *Upjohn Co. v United States*, 449 U.S. 383, 395-96 (1981)), Plaintiffs argue that Defendants must produce all communications with their counsel that may contain facts.  That is not the law.  Indeed, such a holding would eviscerate the attorney-client privilege and prevent the free exchange of information between client and attorney,[13] which is the very basis of the privilege's existence and enables effective representation of the client.  *Lluberes v. Uncommon*

---

[13]    Plaintiffs' position that all privileged communications that contain factual information must be disclosed would lead to absurd results.  It would permit Defendants to demand that Plaintiffs produce all of their communications with Plaintiffs' counsel that assisted in the drafting of the SAC and each of their discovery responses.  The correct position—the one that Defendants take—is that the facts within the SAC and discovery responses are discoverable, but not Plaintiffs' communications with their attorneys.

*Prods., LLC*, 663 F.3d 6, 24 (1st Cir. 2011) ("By safeguarding communications between attorney and client, the privilege encourages disclosures that facilitate the client's compliance with law and better enable him to present legitimate arguments when litigation arises.").

Contrary to Plaintiffs' assertion, a confidential attorney-client communication does not lose the privilege against disclosure simply because it contains otherwise discoverable facts. *Comm'r of Revenue v. Comcast Corp.*, 453 Mass. 293, 305 (2009); Restatement (Third) of the Law Governing Lawyers § 71 (2000) ("A communication is in confidence ... if, at the time and in the circumstances of the communication, the communicating person reasonably believes that no one will learn the contents of the communication except a privileged person ... or another person with whom communications are protected under a similar privilege"); *id.* at comment b, at 544 ("The matter communicated need not itself be secret"). Communications are protected if they consist of "facts by a client to his attorney for the purpose of securing legal services." *Amarin Plastics, Inc. v. Maryland Cup Corp.*, 116 F.R.D. 36, 42 (D. Mass. 1987).

Plaintiffs are correct that the privilege does not permit "a corporation to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure." (Motion at 21 (citation omitted)).  And it is for that very reason that Defendants have detached otherwise non-privileged documents from attorney-client communications and produced those documents to Plaintiffs.  (Saso Decl. ¶ 41; Joffe Decl. Ex. B at 5.)  Plaintiffs, however, are not satisfied, and demand that Defendants produce communications with counsel even if they were provided for the purpose of seeking legal advice.[14]

---

[14] It also strains credulity for Plaintiffs to complain about the length of Defendants' privilege log when they elected to pursue the unorthodox strategy of naming Defendants' in-house counsel (David Gill) personally as a defendant and require that Defendants search his ESI custodial files.  Not surprisingly, his ESI generated a substantial amount of privileged material.

Nor is it unusual or unexpected that a corporate defendant would task in-house counsel with leading the investigation into if, and in what manner, it was legally possible, practicable, and advisable to assist the Individual

Plaintiffs selectively and self-servingly quote *Upjohn Co.* for the proposition that the "privilege extends only to communications and not to facts." (Motion at 21, quoting *Upjohn Co.*, 449 U.S. at 395). But the Court would have been better-served if Plaintiffs provided the Court with the entire quote:

> The protection of the privilege extends only to communications and not to facts. *A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.*

*Id.* at 395-96 (emphasis added) (quotation omitted). Defendants have and will continue to be guided by this principle. Defendants do not shield the disclosure of any fact merely because it was communicated to counsel.[15] However, communications with counsel do not become discoverable merely because a Defendant has, in the course of seeking or providing legal advice, communicated factual information.[16]

---

Plaintiffs during their detention. As this Court has often remarked, Plaintiffs have asserted very serious allegations in this action. It is unremarkable that Defendants immediately sought the assistance and guidance of in-house counsel.

[15]    Plaintiffs were entitled to obtain such non-privileged facts via other discovery methods.

[16]    Plaintiffs' specific complaints about Defendants' purported failure to produce "verification reports" (Motion at 22) are the subject of some confusion that Defendants can further clarify here. Defendants produced a document referred to as a "verification report" in their privilege log. (Saso Decl. ¶ 44 (DEF 2807-17).) Although unaware that it is the document that is referenced in the privilege log, Plaintiffs specifically noted Defendants' production of this document in the Motion (at 17-18).

Separately, there is a second document logged on Defendants' privilege log, which was contemporaneously referred to as a "verification report." (That overlapping nomenclature may be the cause of some confusion). That document relates to two sample devices that were sent by TT Global to H3C at the request of counsel for the purpose of providing legal advice. (Saso Decl. ¶ 45.) Although the underlying facts contained in that document may be discoverable through other disclosure methods, the "verification report" itself was properly withheld as work product because it was specifically generated at the direction of counsel. (*Id.* ¶ 46.)

## B.   Chinese Law Does Not Apply To Documents Defendants Withheld As Privileged

Defendants agree with Plaintiffs that federal courts sitting in diversity apply the forum state's rules of privilege and its conflict of law rules with respect to privilege (Motion at 23),[17] but disagree with Plaintiffs' conclusion about what Massachusetts privilege and conflict of law rules require.[18]  In diversity cases, privileges are determined according to the state law of the forum that supplies the rule of decision.  Fed. R. Evid. 501.  Rule 501 does not indicate which state law the forum should apply, however.  "Commentators have suggested several methods of resolving this choice-of-law issue:  (1) use the privilege law of the state whose substantive law provides the rule of decision; (2) apply the privilege law of the state in which the federal court sits; or (3) apply the conflict-of-law doctrine of the state in which the federal court sits."  *In re: Bard IVC Filters Prods. Liability Litig.*, MDL No. 15-2641, 2016 WL 3970338, at *1 (D. Ariz. July 25, 2016); *see also* 2 Weinstein's Federal Evidence § 501[02] (1986).

### 1.   Massachusetts Privilege Law Should Apply Because Massachusetts Substantive Law Supplies the Rule of Decision In This Action

This Court may apply the same privilege law as the state law "which supplies the rule of decision."  *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 45 (E.D.N.Y. 2011) ("Since this

---

[17]   Where a plaintiff asserts state law claims in a diversity action, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) "mandates that state law provide the rule of decision as to claims and defenses. … Fed. R. Evid. 501 thus requires that [courts] look to state law for resolution of the privilege question."  *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 588-89 (D. Mass. 1979).

[18]   After arguing that Massachusetts state law applies to the analysis, Plaintiffs rely upon a federal case that applied federal common law where claimants alleged federal claims involving international terrorism.  (Motion at 23-24, quoting *Wultz. v. Bank of China Ltd.*, 979 F. Supp. 2d 479, 486 (S.D.N.Y. 2013).  This case is inapposite because it determines that China was the forum with the "predominant" interest in whether the withheld communications be deemed privileged because (a) all of the documents were located in China, (b) the individuals involved in the communications were Chinese employees who worked in China and (c) the communications were "almost exclusively" with Bank of China employees located in China.  *Id.* at 489.  By contrast, here (a) none of the documents listed on Defendants' privilege log are located in China, (b) none of Defendants' employees were located in China at the time of these communications and (c) there is not a single communication that is exclusively sent and received within China—instead, there are some cross-border communications between an employee of a non-Defendant HP entity in China to/from an employee of or a Defendant outside of China *in a forum that recognizes the attorney-client privilege*, whether it be in the United States, India or Australia.  (Saso Decl. ¶ 47.)

is a diversity action involving only state-law claims, 'it is state law that defines the elements of the attorney-client privilege.'") (internal citations omitted); *Pyramid Controls, Inc. v. Siemens Industries*, 176 F.R.D. 269, 271 (N. D. Ind. 1985) (in diversity case governed by Illinois law, Illinois law governs attorney-client privilege).  Here, Plaintiffs assert all thirteen of their causes of action under Massachusetts, not Chinese, law.  The logic to this first approach is strong: it prevents Plaintiffs from engaging in forum shopping by, for example, seeking out the benefits of Massachusetts substantive law, while simultaneously arguing that Chinese procedural law should permit them to inspect all of Defendants' confidential and otherwise privileged communications. This is particularly true where, as here, Plaintiffs' causes of action would be largely non-existent or time-barred under Chinese law.

### 2. Massachusetts Privilege Law Should Apply Because Massachusetts Is Plaintiffs' Chosen Forum

This Court has recognized that, where a plaintiff has "selected a United States forum in which to press its claims, … it is therefore only reasonable that [it] should be held to the procedural law of its chosen forum." *Ghana Supply Comm'n* , 83 F.R.D. at 589.  In Massachusetts, courts typically apply the state's own privilege law, "characterizing questions of privilege as procedural." *Id.*   "A district court sitting in a diversity case applies the privilege law of the state in which the district court is located." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 167 F. Supp. 2d 108, 113 (D. Mass. 2001), mandamus granted, order vacated in part sub nom. *In re QLT Phototherapeutics, Inc.*, 25 F. App'x 825 (Fed. Cir. 2001) (citing *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000) (applying Massachusetts law to the issue of attorney-client privilege in a diversity case on appeal from the District Court for the District of Massachusetts); *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 11 (D. Mass. 1997) ("In accordance with Rule 501, Fed. R. Evid., Massachusetts law determines the scope of the attorney

client privilege where, as here, jurisdiction is based on diversity."); *McLaughlin v. McDonald's Corp.*, 203 F.R.D. 45, 48 (D. Mass. 2001) ("This is a diversity case as to which Massachusetts law applies. Therefore, Massachusetts law governs whether Mr. Roberts' mental health records must be produced over his objection.").  Under this second approach too, Massachusetts privilege law should apply.

### 3. Massachusetts Conflicts-of-Law Analysis Favors Massachusetts Privilege Law

Plaintiffs address only the third method for determining which privilege law applies, and they misapply it.  "Massachusetts has adopted an interest analysis approach to choice of law issues."  *Command Transp., Inc. v. Y.S. Line (USA) Corp.*, 116 F.R.D. 94, 95 (D. Mass. 1987). Plaintiffs present this as a simplistic application of Restatement (Second) of Conflicts of Law § 139, Comment e (arguing that because an alleged "inspection" was made in China, Chinese privilege law *per se* applies).  However, as the First Circuit has explained, Massachusetts has moved away from a "rigid, single-factor analysis" towards a "more flexible, multiple-factor 'interest analysis' or 'most significant relationship' analysis."  *Bi-Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir. 1985).

The Restatement (Second) of Conflict of Laws § 6(2) sets forth the analysis that Massachusetts courts employ in determining the applicable law:

> When there is no [contrary statutory] directive, the factors relevant to the choice of applicable rule of law include:  (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* at 444 (quoting Restatement (Second) of Conflict of Laws § 6(2)).

In considering the above factors, the court should consider the need for multinational conglomerates, such as some of the Defendants, to be able to seek and provide confidential, privileged legal advice from, to, and among their corporate affiliates around the world.  The attorney-client privilege is a bedrock principle recognized throughout the United States for the purpose of fostering open and honest dialogue between such entities and their counsel, enabling attorneys to provide the best, most effective advice.  Here, China has no interest in dictating to this Court whether or not these communications should be deemed privileged under Massachusetts law.  Contrary to Plaintiffs' conclusory statement that "Defendants could not have reasonably expected the confidentiality" of its communications, it is clear that, *ab initio*, the parties fully anticipated Massachusetts law to apply to any dispute.  The Referral and Revenue Sharing Agreement ("RRSA") states that Massachusetts law governs its provisions and actions taken thereunder.  (Saso Decl. Ex. E § 11.)  At all times, Defendants communicated to and from counsel with the expectation that those communications would remain confidential and privileged.[19] Retroactively disrupting that reasonable expectation would be inappropriate.[20]

---

[19]    Many of the documents withheld as privileged by Defendants contain the legend "Privileged & Confidential" (Saso Decl. ⁋ 48), indicating that the author of those emails expected, and the recipient understood, that attorney-client privilege applied.

[20]    It is particularly strange for Plaintiffs to argue that Defendants could have no reasonable expectation that communications with counsel that were sent to or received from China would be protected by privilege when Plaintiffs themselves have withheld dozens of emails (as reflected on their privilege log) that were sent to/from China.  (Saso Decl. ⁋ 49.)  If, as Plaintiffs claim, it was "unreasonable" for Defendants to have expected their communications with counsel to be privileged, then so too would it be unreasonable for Plaintiffs to expect that privilege to apply to their Chinese communications concerning such topics as the sale of equipment in China, the detention of the Individual Plaintiffs in China, and/or damages allegedly inflicted and suffered in China.

Plaintiffs narrowly focus on Restatement (Second) of Conflicts of Law § 139 to the extent it suggests that one factor to consider is "where an inspection was made of a person or thing," but ignore other factors such as "where an oral interchange between persons occurred [and] where a written statement was received."  *Id*.  If Plaintiffs were to succeed in establishing that Chinese privilege law applies to communications that merely cross Chinese borders, all such communications on Plaintiffs' own privilege log would require production.  Indeed, not only would contemporaneous communications to/from China in 2013 require production, but so too would all of Plaintiffs' current litigation counsel's communications with eight of the twelve Plaintiffs who have been and remain in China throughout this litigation become discoverable, plus all pre-2016 communications with Jade and Caroline Cheng (who were in China until then).

Finally, even under Restatement (Second) of Conflicts of Law § 139, the outcome is not as simple as Plaintiffs suggest.  Pursuant to the Restatement, the Court should determine the state with the "most significant relationship with a communication," but Comment e states that it will only "*usually* be the state where the communication took place."  (emphasis added).  Indeed, Comment e also provides that where there is a "prior relationship between the parties, the state of the most significant relationship will be that where the relationship was centered unless the state where the communication took place has substantial contacts with the parties and the transaction."  Here, the parties had a prior contractual relationship, pursuant to the RRSA, which chose Massachusetts law.  ICT and then-Hewlett Packard Company (now HPE and HPI) have their headquarters in the United States, and many of the communications that may have touched China also were sent or received in Massachusetts or other forums that recognize an attorney-client privilege, such as India and Australia.  Comment e also states that "in an international case where the great majority of the important contacts are with X, a State of the United States, but the communication occurs abroad, X would probably be the state of most significant relationship."  Accordingly, the Restatement (Second) of Conflicts of Law § 139 does not mandate that the Court find that China has the most significant relationship with these communications.

### C.     Defendants Have Not Waived The Attorney-Client Privilege By Communicating With Their Corporate Affiliates

Plaintiffs argue that Defendants have waived the attorney-client privilege by communicating with their corporate affiliates.  (Motion § D.3.)  The Third Circuit has analyzed at length the three rationales under which courts commonly find that members of a corporate family may maintain the attorney-client privilege:  "(1) the members of the corporate family comprise one client, (2) the members of the corporate family are joint clients, and (3) the members of the

corporate family are in a community of interest with one another." *In re Teleglobe Comms.*, 493 F.3d 345, 370 (3d Cir. 2007).[21]

Plaintiffs' waiver argument rests on nothing more than Defendants' prior statements that H3C "operated separately and autonomously from HP and its subsidiaries and affiliates" and that the entities "operate independently of each other." (Motion at 25.) The fact that Defendants and H3C are separate and autonomous corporate entities has no bearing on the analysis. Separate and autonomous corporate entities may share a common legal interest just as much as separate and autonomous humans may.[22]

Plaintiffs state that "Defendants widely shared their communications with H3C," and specifically identify zhuchunyu@h3c.com and chenxiaodong@h3c.com as H3C employees on Defendants' privilege log who break the privilege. (Motion at 26.) To the contrary, these two individuals were merely copied on a total of five emails that were in just three email chains (hardly a "wide" distribution within H3C). (Saso Decl. ⁋ 42.) Four of those five emails were sent by Jessica Liu, an H3C in-house attorney, and the other was a reply to Ms. Liu's email. (*Id.* ⁋ 43.) In any event, all five emails were sent by or to counsel for either Defendants or H3C, with other persons merely copied. (*Id.*) All recipients were at the time within the corporate family.

---

[21]     Defendants do not argue that the first rationale applies to any of the documents they withheld as privileged. Plaintiffs mischaracterize the holding of *Teleglobe*, however, in suggesting that only the second rationale may ever apply. (Motion at 25 and n.19.) The common interest doctrine simply did not apply *in that case* because, in order for the common interest doctrine to apply, the different corporate entities must use their own counsel. *Id.*, 493 F.3d at 365. During the 2019 M&C, Plaintiffs did not inquire about any particular entries on Defendants' privilege log, but as the Motion itself points out, "H3C had its own … in-house lawyers (*e.g.*, Ms. Liu)" (Motion at 25), thereby justifying Defendants' reliance on the common interest doctrine. Further, unlike the Delaware Rule of Evidence at issue in *Teleglobe*, Mass. R. Evid. 502(b)(3) permits a client to refuse to disclose confidential communications more broadly "between those involved in a joint defense."

[22]     The Court need look no further than the eleven non-corporate Plaintiffs, each of whom are separate and autonomous beings (often with divergent interests), but all of whom undeniably claim a common legal interest, as well as a joint representation, to keep their communications with counsel confidential and privileged in this litigation.

The most that Plaintiffs do to contradict Defendants' common interest privilege is to conclusorily and half-heartedly claim in a footnote that "Defendants' and H3C's legal interests were not necessarily aligned." (Motion at 26 n.20.) However, undeniably, Defendants and H3C did share the common legal interest in globally protecting the HP and H3C brands, logos and trademarks. Plaintiffs have submitted no evidence to undermine, and barely attempted to refute, this common legal interest.

### D.    Plaintiffs Have Not Established the Crime-Fraud Exception

"[T]he opponent of the application of the testimonial privilege, has the burden of showing that the exception applies." *Purcell v. District Attorney for Suffolk Dist.*, 424 Mass. 109, 112, (1997); *see also Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 37 (D. Mass. 1997). Under Massachusetts law, the facts establishing the crime-fraud exception "must be proved by a preponderance of the evidence" that the client consulted the attorney for the purpose of obtaining advice or assistance in the commission of a future crime. *Purcell*, 424 Mass. at 112. A judge may also conduct an *in camera* review of the evidence at issue "on a showing of a factual basis adequate to support a reasonable belief that [such review] may establish that the exception applies." *Id.* at 113.

The party seeking to establish the crime-fraud exception must make a "showing sufficient to warrant the finding that [defendant] consulted counsel 'for the purpose of obtaining advice in furtherance of a crime.'" *Ferrara & DiMercurio, Inc.*, 173 F.R.D. at 13 (internal quotation omitted); *see also In Re John Doe Grand Jury Investigation*, 408 Mass. 480, 486, 562 N.E.2d 69, 72 (1990) (noting the absence of "any threshold showing in the record that the … conference related to the commission of a future crime")).

Plaintiffs submit *no evidence* in support of their baseless argument that Defendants sought legal advice in 2013 for the purpose of carrying out a crime or fraud. Motion § D.4 makes not a

single reference to any factual record.  At most, Plaintiffs rely on the "chronology" they allege in

their own complaint (Motion at 27), apparently based on the misguided view that their allegations

are evidence.  This failure to make even a threshold showing defeats any claim that the crime-

fraud exception applies or that an *in camera* review of hundreds of withheld privileged

communications is warranted.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that Plaintiffs' Renewed Motion

to Compel be denied in its entirety.

Dated:  New York, New York
        October 18, 2019

**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York, 10119
(212) 613-2000

**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, Massachusetts 02110
(617) 248-5000
*Attorneys for Defendants*

By:  _____/s/ Paul A. Saso_____
         Paul A. Saso

2756292.1 108164-84842

## <u>CERTIFICATE OF SERVICE</u>

I, Christina T. Lau, Attorney for Defendants Hewlett-Packard Financial Services Company, Hewlett-Packard Financial Services (India) Private Limited, HP Inc., Hewlett Packard Enterprise Company, and David Gill, hereby certify that the foregoing Defendants' Memorandum of Law in Opposition to Plaintiffs' Renewed Motion to Compel was filed using the CM/ECF system and electronic notice will be sent to registered participants as indicated on the Notice of Electronic Filing (NEF) on October 18, 2019.

/s/Christina T. Lau
Christina T. Lau

26