```
1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - - x

4    INTEGRATED COMMUNICATIONS &            :
     TECHNOLOGIES, INC., et al.,
5                                           :    Civil Action No.
             Plaintiffs,                         1:16-cv-10386-LTS
6                                           :

         v.
7                                           :

     HEWLETT-PACKARD FINANCIAL SERVICES
8    COMPANY, et al.,                       :

9            Defendants.                    :

10   - - - - - - - - - - - - - - - - - - x

11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

                         STATUS CONFERENCE
14

15

                    Friday, September 13, 2019
16                          2:00 p.m.

17

18

             John J. Moakley United States Courthouse
19                       Courtroom No. 13
                        One Courthouse Way
20                   Boston, Massachusetts

21

22

                     Rachel M. Lopez, CRR
23                   Official Court Reporter
              One Courthouse Way, Suite 5209
24            Boston, Massachusetts  02210
                      raeufp@gmail.com
25
```

```
 1                       A P P E A R A N C E S

 2
        On behalf of the Plaintiffs:
 3
             LAW OFFICE OF DIMITRY JOFFE
 4           BY:  DIMITRY JOFFE
             230 Park Avenue
 5           10th Floor
             New York, New York  10169
 6           (212) 309-8711
             dimitry@joffe.law
 7

 8           LAW OFFICE OF JOSH MCGUIRE
             BY:  JOSHUA A. MCGUIRE
 9           51 Winchester Street
             Suite 205
10           Newton, Massachusetts  02461
             (617) 461-6400
11           josh@joshmcguirelaw.com

12

13      On behalf of the Defendants:

14           GIBBONS, P.C.
             BY:  ANTHONY P. CALLAGHAN AND PAUL A. SASO
15           One Pennsylvania Plaza
             37th Floor
16           New York, New York  10119
             (212) 613-2015
17           acallaghan@gibbonslaw.com

18
             CHOATE HALL & STEWART LLP
19           BY:  MICHAEL H. BUNIS
             Two International Place
20           100-150 International Place
             Boston, Massachusetts  02110
21           (617) 248-4030
             mbunis@choate.com
22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (In open court.)

 3              THE DEPUTY CLERK:  The United States District Court

 4    for the District of Massachusetts is now in session, the

 5    Honorable Leo T. Sorokin presiding.

 6              Today is September 13th, the case of Integrated

 7    Communications vs. Hewlett-Packard, civil action 16-10386

 8    will now appear before this Court.

 9              Counsel, please identify themselves for the record.

10              MR. MCGUIRE:  Josh McGuire, on behalf of

11    plaintiffs.

12              MR. JOFFE:  Good afternoon, Your Honor, Dimitry

13    Joffe on behalf of plaintiffs.

14              MR. BUNIS:  Your Honor, Michael Bunis on behalf of

15    the defendants.

16              MR. CALLAGHAN:  Your Honor, Anthony Callaghan and

17    Paul Saso from Gibbons P.C. on behalf of defendants.

18              THE COURT:  Okay.  Good afternoon, all of you.

19              So there's one or two things that I want to talk to

20    you about and a couple of things that I want to go over, a

21    lot of pending issues.  So just give me a moment.  There are

22    so many papers and I want to pull out the right one.

23              Maria, can you hand me that piece of paper you were

24    ready to give me?  Okay.

25              All right.  So just first, maybe there's some
```

1    confusion about the way the judicial -- the purpose -- first,

2    I have this question.  Mr. Joffe, do you object to them

3    making argument in support of their motion for leave to file

4    a reply?

5              MR. JOFFE:  No, I don't object to making argument.

6              THE COURT:  So then why would you object to them

7    filing a reply?

8              MR. JOFFE:  Well, Your Honor, I think, following

9    your instructions, I put in a two and a half page --

10             THE COURT:  I actually don't think you followed my

11   instructions, but you did follow my instructions in the sense

12   that if you're going to oppose it or abide by it, but I think

13   I told you don't address the merits of the motion to strike

14   or the motion to compel.  Just address why they should or

15   shouldn't be allowed to file a reply.  I think -- and to that

16   extent, you went, I think, beyond that, in the two and a half

17   pages, which is then not following my instructions.  So in

18   that sense, I don't think you followed my instructions.

19             I'm not going to do anything, because I think you

20   didn't follow my instructions there.  But since you said it,

21   and I do think words matter and I think the record should be

22   clear, in my view, is I don't think you followed that

23   instruction.

24             But my larger point is this, okay?  I was at a

25   Boston Bar Association panel yesterday, where a couple of

1    judges were just talking to lawyers about practice, and so I

2    will tell you one of the things that I said.  I don't know

3    that it's particularly helpful, but it comes to my mind when

4    I think about your case.  One of the suggestions that I said

5    to all the lawyers there was keep your eye on the ball.

6    Okay?  What do you think the ball is in this case, for your

7    clients?

8              MR. JOFFE:  To win, Your Honor.

9              THE COURT:  Right.  To win.  And what is it that

10   they would like -- how do you think they win this case?

11             MR. JOFFE:  By surviving until getting to trial and

12   prevailing there.

13             THE COURT:  Right.  Yes.  So let me give you two

14   examples about how I think you're losing sight of the ball.

15   Okay.  One is, my general view, which I don't think is

16   unusual among the federal judiciary or among judges,

17   generally, is that the idea of the judicial process is that

18   the Court hears from both sides.  Okay?  And it makes a

19   decision.  What they asked for in a motion for leave to file

20   a reply was the opportunity to submit more information and

21   argument to the Court.  As a general matter, I don't really

22   understand why or the basis for a lawyer to object to another

23   lawyer providing information to the Court.

24             That's why I asked you if you would object to

25   Mr. Callaghan or Mr. Saso arguing the motion to strike.

1    Because if you're not going to object to them arguing it,

2    they can stand up and say all the same things they said in

3    the reply, except that your meter would be running, and you

4    would be charging your client while you sat here, as opposed

5    to them filing a reply.  And so if you don't object to them

6    addressing it, then why would you object to a reply?  Except

7    if you lost sight of the ball, which is trying to move this

8    case to the end.

9         You're not alone in having objected to someone

10   filing a reply.  It's a very small group in all my years on

11   the bench, but it's not alone and I just don't get it.  Okay.

12   And I understand that when someone opposes sur-replies and

13   sur-sur-replies, there's a limit to how much briefing should

14   happen.  But in the ordinary course -- for example, if

15   there's a motion for summary judgment, are you going to

16   oppose them filing a reply?

17             MR. JOFFE:  No, Your Honor, I wouldn't.

18             THE COURT:  So --

19             MR. JOFFE:  But --

20             THE COURT:  Go ahead.

21             MR. JOFFE:  If I may, in this case, we filed our

22   position on September 4th and Your Honor entered an order

23   scheduling this conference on that same day.  They had our

24   motion and our papers for a week, you know, and then I got

25   the call on September 11th that they want to file a reply,

1    leaving me, essentially, one day to process and prepare for

2    it and so forth.  And that reply, I don't think it provided

3    new information.  It just --

4          THE COURT:  So you would -- so if Mr. Callaghan had

5    stood up and said everything that's in the reply, would you

6    have stood up and said, Judge, I think you should strike

7    that?

8          MR. JOFFE:  No.

9          THE COURT:  Right.  And if you did, I would deny

10   it.  And you wouldn't stand here -- if you stood here and

11   said, Judge -- I doubt you would stand here and say I can't

12   process that information in the time he spoke about it.  You

13   might fairly say, if he brought something up that required

14   you to look into something, he might just say, Judge, he just

15   brought that up for the first time and I need to look at

16   that, or I need to think about that, or that causes me to

17   want to look at something.  And I would ask the Court, before

18   you decide, to give me a little time to look into that.  I

19   could understand that.

20          But it's not like -- honestly, with all due

21   respect, Mr. Joffe, that reply -- and no disrespect intended

22   to you, Mr. Callaghan, that reply is not rocket science.

23   What that reply says is a few things about the merits of the

24   motion to compel that responds to things you said in your

25   motion to compel and in your opposition to the motion to

1   strike, which presumably, you were prepared -- had thought
2   about anyway, because you wrote the motion to compel way back
3   when and presumably thought about all of those kinds of
4   things, so it wouldn't be stunning.  And some additional
5   information or argument that he wanted me to hear.  It's a
6   couple of pages, it's not -- it certainly didn't take me very
7   long to process.

8          And so the reason that I'm making what seems like a
9   very big deal out of what is a very small thing is I think
10  it's symptomatic of this case.  And the reason that I'm
11  bringing it up is because today is a new day.  Today is the
12  beginning of the rest of your lives, as it is every day, it
13  is also the beginning of the rest of this case, and I'm done
14  with the way this case has been going.  And I will be frank
15  with you, Mr. Joffe, that I do think a lot of the way this
16  case has been going; that is, the eye not on the ball, it
17  doesn't completely arise from you, but it does arise from
18  you.

19         That motion was a waste of time, the opposition.
20  Okay?  There's no reason you should have opposed a reply.
21  There's generally very little reason to oppose a reply.  It
22  would be fine if you told me to strike something, because it
23  was scandalous or impertinent or not admissible, or what have
24  you, but just the same reason you wouldn't stand up and
25  object to him arguing it.  It's the same thing.  And so --

1    and apropos of that, I'll give you an example of something

2    else that I think is a piece of that, of not keeping your eye

3    on the ball, because I actually think here, lest there be any

4    confusion, that six to nine months, which is that each of

5    those three plaintiffs who went to prison spent in the prison

6    in China; is that right?

7                MR. JOFFE:  It seven months.

8                THE COURT:  How many?

9                MR. JOFFE:  Seven months.

10               THE COURT:  Seven.  Each one was seven?

11               MR. JOFFE:  Yes.

12               THE COURT:  Okay.  So seven months.  I think that's

13   a pretty big deal.  And there's no dispute that they spent

14   seven months in prison.  The defendants aren't disputing

15   that.  The question is why, right?  And your position is the

16   why is it's their client's fault, and therefore, there should

17   be damages for it.  And their defense, in some form or

18   another, is likely that it happened, but not because of them,

19   that they're not legally responsible for it.  But that's kind

20   of a pretty big deal that somebody went to jail and that's an

21   important thing.  I take it pretty seriously.  All right.

22   And so -- and I would like this case to be adjudicated in a

23   reasonable period of time.

24               It's already, albeit, late in 2016, but it's a 2016

25   case.  We're in 2019 and we're still not at depositions.  And

1    so let me give you another example of what I mean about not

2    having your eye on the ball.

3              There was -- give me a moment.

4              So on February 16, 2018, the defendant served,

5    among other things, interrogatory requests on some of you --

6    on you for your clients.  Okay?  One of those requests,

7    Interrogatory Number 10, as to Mr. Styller, and there's a

8    similar interrogatory to Mr. Cheng, that has a different

9    number, but asks for medical records, for medical history,

10   describe in detail your medical history from 1990 to the

11   present.  Okay?  You remember that, I'm sure.  So that was on

12   February 16th, to 18.

13             On March 16, 2018.  So timely, within the 30 days,

14   without even having to seek a response, that's good.  You

15   responded to those two interrogatories asking for the medical

16   history.  Both of those plaintiffs, I'll remind you, have --

17   one was in prison, Mr. Cheng, and the other was not.  But

18   both are claiming emotional, psychological injuries, and

19   various ailments arising either directly from the

20   imprisonment, or in Mr. Stiller's case, because his employees

21   were imprisoned.

22             MR. JOFFE:  Right.

23             THE COURT:  So they're putting their health in

24   issue.

25             And so the objections, the response, was object

1  it's overly broad and unduly burdensome, not proportional to

2  the needs of the case, burdens outweigh the -- so forth and

3  it's not relevant.  Okay?  So -- really?  Not relevant?  So

4  what's my view of the request?  The request is too much.

5  These events happened in 2012 or 2013.  So to go back to

6  1990, too far.  I'm not going to give you until 1990.  Okay.

7        So what does a lawyer do who thinks they punch me,

8  I'm just going to punch them back?  They respond like you

9  did.  It may be a New York way of doing business, I have no

10  idea.  I did go to law school in New York, but I never really

11  practiced law in New York.  So I don't know how people

12  practice law in New York.  I only know how people practice

13  law here, but you responded -- it's just the position that

14  it's not relevant is simply wrong.  Their medical history is

15  relevant.

16        I'll give you an example, if your client is

17  claiming anxiety and depression, and if the evidence is that

18  in the year before the three people were imprisoned, they all

19  had anxiety and depression, and in the year after, their

20  anxiety and depression were reported exactly the same way on

21  all the medical records, and the doctors didn't see any

22  difference, then that would be relevant.  So it is relevant.

23  And so to say it's not relevant is just not -- is not

24  correct.

25        But in terms of just getting to the end, keeping

your eye on the ball, you want to get to judgment.  You know
it's relevant.  You're an intelligent lawyer.  And so what
you -- the way I think a sensible lawyer would respond would
be that's overbroad, it's unduly burdensome.  It's
unreasonable, 1990.  We're not going to give you 1990.  We'll
give you one year back, or we'll give you three years back,
or we'll give you five years back, but some period of time,
because it is relevant.  You would agree to something, you
would produce, you would answer the interrogatory to that
extent, and then you'd move on.

        And if they think that it's -- they really want
1990, they can confer with you, and the two of you can reach
an agreement.  Or if they don't, they would ask for -- they
can file a motion to compel.  And then you would stand in
front of me on the motion to compel and say, Judge, we're
trying to keep this case moving.  We responded one month
after the discovery and we gave them what we thought was
reasonable one year, two years, three years, whatever, five
years, whatever you thought was reasonable and they --
they're asking for what's unreasonable.

        Now, what happened here was on July 1, 2019, so
sometime later, Mr. Cheng, in an amended supplemental
interrogatory response, reiterated the entire objection,
which is at least -- it is correct that it's too broad, but
it's incorrect that it's not relevant, in my view.  And gave,

1    in the interrogatory response, some post-prison medical

2    information.  Okay?  Mr. Styller responded on the same day,

3    but gave -- and he did give some pre-imprisonment of the

4    other three people, medical history.  So although he made the

5    same objection, he actually gave information inconsistent

6    with the objection.  But my point in all this is I don't

7    understand why that would take 17 months.

8            In other words, the response to the interrogatory,

9    I could see a response on March 1st, that says it's overly

10   broad, it's unduly burdensome, we're not going to give you

11   back the 1990, because it's too much, but we'll give you

12   something, but I need to gather it.  So here's my response,

13   we'll give you three years back and we're going to supplement

14   promptly, after I talk to my clients, and we gather the

15   information, and the like.  I wouldn't think it would take

16   16 months to figure it out.

17           So in any event, I make those observations because

18   those are two things that are giving rise to my view that

19   this case is taking too long.  Okay?  And where I see -- not

20   all, but some of the problems come from.  So let me tell you,

21   because I want to move expeditiously, rather than spend too

22   much time just complaining, forward.

23           So the motion for leave to file a reply is allowed.

24   You, Mr. Joffe, are ordered, that you may not charge your

25   client for writing the opposition to the motion for leave to

1    reply.  And if you ever prevail on this case on a ground that

2    entitles you to attorney's fees, you may not seek to recover

3    fees for writing that opposition.  Okay?  That opposition is

4    on you.  And that's number one.

5         Number two, with respect to your motion to compel,

6    okay?  This is how I view this and this is just -- the

7    deadline was July 22nd, right?  I haven't moved that

8    deadline.  The deadlines, so we're all clear, are established

9    by the Court and they're not for you to just do whatever you

10   feel like with.  They're not aspirational.  And so yes, it is

11   correct, I think, that back when we were here in June,

12   that --

13        Well, what I think I made very clear was the

14   deadline was July 22nd, that I thought it was reasonably

15   likely, but I didn't actually allow it then, that they, the

16   defendants would be able to get an extension on a motion to

17   compel arising out of the 722,000 pages, because that seemed

18   like a lot to review between mid June and the July 22nd

19   deadline, but I wasn't giving it to them, that extension.

20   And that I would -- there was also the possibility that you

21   all could propose, or you -- unstated, but certainly there,

22   that you separately could ask for an extension.  You could

23   all seek a later date on July 22nd for everybody, or you

24   could seek a later date, and you ultimately did ask in the

25   form of the status report, I think it was.  I don't think it

1    was in a separate motion, but fair enough.

2              You asked for an extension on the July 22nd date.

3    And then you went and filed the motion.  But so one of --

4    this gets to another view that I have about litigation.

5              I don't like adjectives.  I think adjectives, by

6    lawyers, especially in discovery disputes, generally belie

7    problems in the caliber of the arguments.  In other words,

8    I'll give you a simple example.  If you write a motion and

9    you say the defendants did terrible, outrageous things, and

10   they should be sanctioned, or they should be -- you should

11   give all sorts of relief, do you know what my response -- I

12   read those kinds of papers all the time, not just from you,

13   though you do write those kind of papers, but do you know my

14   response to that is prove it.  Okay?

15             All you've done is told me your opinion, with all

16   due respect, your opinion, and this is not personal to you,

17   but the opinion of a lawyer that the other side is engaging

18   in misconduct is about one of the least persuasive forms of

19   information that can be provided in a motion.  Okay?  And I'm

20   not going to do anything in response to that.  I'm going to

21   see what the evidence is.  If you show me --

22             The lawyer who comes in and says, Judge, we served

23   our discovery request on Monday, Jan 1st, on 30 days later,

24   we hadn't heard anything.  We wrote an e-mail and we said

25   where's the response, it's late.  Do you need a little more

1   time, but we need to get a response to discovery.  We called

2   the lawyer, we left three messages, there were no responses.

3   We wrote a letter that said we'd like to engage in a meet and

4   confer.  And we proposed three times and we received no

5   response.  So we're now filing this motion and we ask you to

6   give a court order that they respond to our discovery

7   requests.  Not a single adjective.  It's just a description

8   of the facts.

9           Do you remember Dragnet?  Did you ever watch that

10  TV show?

11          MR. JOFFE:  No, I didn't.

12          THE COURT:  All right.  You can look it up on

13  YouTube.  Just the facts.  That's what the character in that

14  show said.

15          That motion, do you know what I'm going to do,

16  boom, that day, I'm going to issue an order to the other

17  side, saying what's going on, and schedule a hearing, because

18  I don't need them telling me.  It is outrageous if that

19  happened over a substantial period of time.  I want to know

20  what's going on.  Maybe the lawyer is sick and he's in the

21  hospital and he's a solo practitioner and he doesn't have

22  anyone to cover his office and I'll find that out.  But short

23  of something like that -- but I didn't -- the lawyer didn't

24  tell me he proved it or she proved it.  So that's what I'm

25  interested in, proof.  Okay?  Not adjectives that people

1   engaged in misconduct.

2         So with respect to your motion to compel, there

3   are -- I'm going to do the following.  First, I'm going to

4   remind you about something that you disregarded.  When you

5   were here at the status -- so it is late, in my view, but I'm

6   going to deal with that, because I'll come back to that.

7         At the status conference in June, another part that

8   neither of you quoted, but I went over it very specifically

9   when I talked about the motions to compel, I said, pay

10   particular attention, or words to that effect, to Local Rule

11   37.  I know you're familiar with our local rules, because

12   you're a member of this court by pro hac vice, right?

13         MR. JOFFE:  Yes, Your Honor.

14         THE COURT:  And you certified when you became a

15   member pro hac vice that you had reviewed and were familiar

16   with of all the rules of this court, right?

17         MR. JOFFE:  Correct.

18         THE COURT:  And that's true.  It was a true

19   statement then, correct?

20         MR. JOFFE:  Correct.

21         THE COURT:  And now.

22         MR. JOFFE:  Yes, Your Honor.

23         THE COURT:  Right.  And so that local rule says

24   when you file a discovery motion, it shall state the request,

25   it shall state the response to the request, and then it shall

1    state what you want, or why you get what you want.  Okay?

2    Your motion did not do that.  Okay.  So that is not a

3    technical deficiency.  Okay.  The problem with that is I

4    can't decide the motion.

5         Then there's two ways to do it.  You can do it that

6    way, and then I can read it, and I know what you're looking

7    for, and then I read the response, and then I can decide the

8    request.  Or you can do it your way, okay, which is you just

9    say I want this or this or this, but you don't.  And you can

10   attach all the exhibits and then you force my law clerk and I

11   to take your document and print out all those things and

12   cross reference everything.  I'm not doing that.  Okay.

13        That's not how the rules work and the reason the

14   rules work the way they do is because it's your job to

15   synthesize and present it to us.  Just the same way it's your

16   job to go through all the summary judgment papers and decide

17   which ones are relevant to make your argument for or against

18   summary judgment.  You don't get to take all of the discovery

19   materials, hand them into the court, and say, Judge, we win

20   summary judgment because we've shown a breach of contract,

21   and it's proven in these papers.  And so I brought it up

22   specifically at the status conference in June, and I referred

23   to that.

24        And the reason that I brought it up specifically,

25   as I often do, is because it's an important rule, it's very

1    helpful, it leads to better results, faster results, and many

2    people forget about it.  Okay.  Your motion didn't comply

3    with that.  So for that reason, and only that reason, I'm

4    going to deny your motion to compel.

5           However, okay, I'm going to deny it without

6    prejudice, and I'll tell you why.  It's not for all the

7    invective that you put in the motion.  I find that

8    unpersuasive about their disregarding all of that.  I have no

9    idea -- as I sit here now, I don't know whether they

10   disregarded all their discovery obligations, as you assert,

11   or not.  Because of course, many of the things that you

12   asserted, you didn't include factual citations for.

13          The reason the denial is without prejudice is

14   because this is an important case and because I don't think

15   that resolution of it, if, in fact -- a fact of which I don't

16   know -- they didn't comply with their discovery, or if, in

17   fact, there's some additional discovery that's material and

18   meaningful to which you're entitled, then the Rule 1 directs

19   that cases should generally be resolved on the merits and I

20   would prefer to decide this case and all cases on the merits.

21          So I'm going to allow you to file another motion to

22   compel.  You're going to confer with them.  They didn't

23   confer with you before, because they took the position,

24   aggressive, I will say, that you were -- at the end, it was

25   too late, and so they didn't have to confer with you.  It's

untimely.  And it is true that if you were, in fact, too
late, they're not under an obligation to necessarily confer
with you.  It's not always the tactic people take.  I grant
that it's an aggressive tactic, but you have -- well, I leave
it at that.

So in any event, so with respect to your motion to
compel, it's denied, and I'm going to memorialize this in a
little order, but I'm explaining more of it now so you
understand.  It's denied without prejudice and you can renew
it subject to the following, which I will put in the order.

One, you have to confer with them.  They'll confer
with you now, because I've allowed them -- you to file a
motion.  Two, your limited -- the issues you're limited to
are what's in your letter.  You don't get to go beyond -- you
don't get to come up with new things now.  And I'm going
to -- probably three weeks for the meet and confer and the
filing of your motion.

They can file an opposition and I'm not now
allowing you to file a reply, only because it's my ordinary
practice not to address replies on discovery motions in
advance.  But if you sought leave to file a reply, I would be
stunned if they opposed a motion for leave to reply, even if
I hadn't said all the things that I've said at this hearing.
But of course, they'd be free to do that, if they wished to.

So -- but I caution you, you should listen very

1    carefully, something I'm not persuaded you were doing the

2    last time you were here, okay, that I mean what I say about

3    the local rule.  If you don't comply with that rule about

4    Local Rule 37, in the way -- the form that the discovery

5    motions are supposed to be, I will deny your motion, and that

6    denial will not be without prejudice.  Okay.  You have one

7    more chance, but you do it following the rules or you're

8    done.

9             Are you clear?

10            MR. JOFFE:  Yes, Your Honor.  Thank you.

11            THE COURT:  Now, you might be wondering, because I

12   know that you're a New York lawyer, that, well, Judge, their

13   motion didn't fully follow that format.  So why are you

14   picking on me in this way and why aren't you going to do the

15   same to them and are you going to do the same to them?  I

16   don't know if you're going to make that argument if you've

17   thought of that or not, but I'm going to address it, because

18   in this case, as in every other case, I try to be even-handed

19   in my application of the rules.  They, in their discovery

20   motion, included each request.  Sometimes they did, which is

21   sensible and reasonable, they said here's a request to

22   Mr. Styller, and there's other requests that are the same

23   language to different people.  There is no reason to include

24   all the other requests, because they're the same.  And so it

25   would be a waste of your time, my time, and paper to include

1  all ten.  They reference them.

2           They don't include a block quote of your response

3  and I noticed that and I thought about that.  And the reason

4  that I'm not denying their motion without prejudice, like

5  yours, for not complying with the local rule, is because

6  they're -- after they quoted their request, they -- and block

7  quote the request, they quoted your response.  Okay.  And

8  (a), their quotations of your responses, I found, fair, in

9  that I didn't just, to be frank with you -- and you -- I

10  didn't accept their quotations as, oh, that's all I need to

11  know.  I actually went and read all of your responses that

12  they cited to be sure that their responses -- that what they

13  quoted was a fair representation of your response and didn't

14  omit something that materially changed what your response to

15  the interrogatory or the document request was.  And I found

16  it fair, and they described it, so I thought it was

17  sufficient, and it would be a waste of all of your client's

18  money for me then to stand on a literal point for no purpose

19  to deny it without prejudice.

20           It's a better form, I will tell you, all of you, if

21  you quote the whole thing.  I find it a little easier,

22  because it saves the trouble of verifying it that way, which

23  I will do otherwise.  But in terms of it's sufficient and

24  substantial compliance with that outline of the rule, that

25  I'm able to decide it and that there's no reason to do

1    otherwise.  So that's why those -- theirs is not perfect in

2    following the rule, it was sufficiently close that it seemed

3    sufficient to me and that I'll address it.

4              So that takes care of the motion to strike.  That

5    takes care of your motion to compel.  That takes care of --

6    there's a motion to seal, number 216, I'm going to allow

7    that.

8              And that brings us to two, three remaining issues.

9    One is the defendants' motion to compel the outstanding

10   issues about the 775,000 pages of documents, and then where

11   we're going from here.  So let me tell you about the

12   775,000 pages first, because I've been thinking a lot about

13   that.  So I'll tell you what I'm -- my tentative thought is,

14   and you can then both respond to that.

15             The view I expressed in June, I stand by, which is

16   that merely dumping 775,000 pages, including the junk e-mail

17   boxes, is not sufficient to comply with your disclosure

18   obligations.  I suggested, strongly, I think, that all of you

19   try to see if you can figure something out, short of the

20   defendants having an army of associates sit in the room for

21   millions of dollars, potentially, or hundred of thousands of

22   dollars to review every document.  There has to be a better

23   way.

24             The two of you didn't reach an agreement as to a

25   method and what you did -- what I understand you to have

1    done, for the defendants -- I'm sorry, for the plaintiffs, is

2    had your e-discovery vendor produce a spreadsheet of each

3    document, that's 225,000 line items about, because there's

4    225,000.  These are all e-mails; is that right?

5         MR. JOFFE:  E-mails and attachments.

6         THE COURT:  E-mails and attachments.

7         MR. JOFFE:  So there were a lot of standalone

8    documents, as well.

9         THE COURT:  So the line item for each document.

10   The line item has essentially the name, sender, recipient

11   date, if there's a subject line, subject or title to the

12   document, something like that.  And then what I understand to

13   have happened is you, Mr. Joffe, or you and Mr. McGuire, went

14   through all of the -- went through each line of the

15   spreadsheet.  Based on what was in the spreadsheet, you

16   augmented in some number of instances, an unknown to me

17   number of instances, augmented by looking at the actual

18   document or documents.  You then coded the document -- the

19   line as either responsive or nonresponsive.

20        And then you handed it back to the -- you did two

21   things.  You gave it to the -- the spreadsheet to the

22   defendants and you gave it to your e-discovery vendor and

23   said produce the ones marked responsive.  They did.  That's

24   58,000 pages, I think, or documents.

25        MR. JOFFE:  Documents.  56,000.

1          THE COURT:  56,000 documents.

2          MR. JOFFE:  I think.  54, 56.

3          THE COURT:  Thereabouts.  Okay.  So I'm not -- the

4    defendants object to that as a process, and as I sit here

5    now, I'm not persuaded that that process is sufficient to

6    discharge your discovery obligations.  All right?  So that

7    said, I'm not -- I'm still not prepared to order that you pay

8    for them to engage in a TAR process, or pay for them to

9    review everything, because I'm mindful that that's a very

10   expensive process and because that doesn't seem like the most

11   sensible way to do a disclosure and it doesn't seem to be, to

12   me, this, to be that complicated.  Okay?  I've never

13   encountered this kind of problem, this issue before, in this

14   way.  So I tell you what my tentative plan was and you can

15   respond to it.

16          There is a consulting firm called Driven-Inc.com.

17   How do I know about this consulting firm?  Because they

18   presented at a Federal Judicial Center conference on

19   technology and artificial intelligence that I attended for

20   federal judges in May.  And the woman from that, the director

21   of consulting there, a woman named Tara Emory, who's CV I

22   have here, I have one copy that you can look at in a minute,

23   presented there about TAR methods and generally electronic

24   disclosure information.

25          I called her today and spoke with her and explained

1    to her essentially that this case, in part, arose out of

2    three people who were in prison, that there was a claim that,

3    essentially, HP was responsible, that was about the sum and

4    substance of what I explained about the case.  I said that

5    there were these disclosures, 775,000 pages were disclosed in

6    June.  The discovery deadline was in April.  That it included

7    a lot of things that everyone agreed were not responsive

8    documents, like some junk e-mails.  That I told the parties

9    to see if they could work out a process, that they didn't

10   come to a joint agreement about working out a process, that

11   you did this spreadsheet, as I've just described it to you

12   today, that -- and did what just what I've described.

13         That the defendants say that that's an insufficient

14   process and point out various things they view problems with

15   that process, that you had pointed out ways in which you

16   think that it's a sufficient process.  And that I asked her

17   if I were willing to appoint her to supervise a disclosure

18   and then I expressed to her, without inquiring from her my

19   own view, which I'll explain to you now, which is there has

20   to be a way to do these searchs to not produce all sorts of

21   junk documents.

22         And that the spreadsheet, I'm not persuaded the

23   process that you've done, although I commend you for doing

24   it.  It's an effort and I commend that.  That there has to be

25   a better way to do it and that something she could do, where

she sit ins a room, meets as sort of an appointed special

master, not to do the discovery, but simply to meet with and

supervise a meetings a series of meetings and the process of

some combination of on the plaintiffs' side, plaintiffs'

lawyers and their E-discovery vendor, or just their vendor,

up to you, and the defendants' side lawyers and a technical

person, or whatever you wish, to figure out what kind of

searchs could be done to produce the responsive documents

that are reasonable that aren't then too many.

She says that's something they've done that she

could do.  I said what's the rate you usually charge, she

said $295 an hour and that was the sum and substance of my

conversation with her.  I'm disclosing it to all of you,

because what I'm contemplating is a solution to this problem

is not the spreadsheet good enough and not ordering hundreds

of -- ordering them -- shifting the cost.  So it seems to me

that the most practical solution is to have somebody look it

over who -- I heard her present.  She seemed very sensible.

She's experienced.

Ms. Simeone, you can show them -- you can give them

this document to look at.  She e-mailed it to me, you can

pull it off the web, too, I'm sorry.  It's her CV and her

marketing bio, in summary form.  She went to -- she has both

a JD from Duke in 2003 and an LMN from Duke in 2003.  She was

an associate at Skadden for six years, she was an associate

1    at Cadwalader, Clifford Chance.  And then she's been at this

2    consulting firm since 2013.  It seems like she has a lot of

3    experience in the area.  Does it have to be this person?  No.

4    But this was a person that I met, knew of, was impressed

5    with, seemed reasonable, and it seems like sensible to have

6    an impartial or reasonable person to meet with all of you.  I

7    don't think it will be a lengthy or expensive process and

8    figure out if there isn't some way to bridge the gap.  So

9    that's my thought here if you want to take a look at it now.

10   You can take those.  I don't care.

11           THE DEPUTY CLERK:  One copy?

12           THE COURT:  It's just one of her CV and her

13   marketing bio.  Those are two separate things.  Both of you

14   can look at them.  Comments as to that?

15           One other thing I should disclose to you.  I told

16   her one more thing that I forgot.  I also told her that

17   somewhere along the way, between the beginning of the

18   relevant events in this case and now, the plaintiffs went

19   through some sort of change in computer system or e-mail

20   provider or something like that, and the plaintiffs'

21   position -- there were certain things that the plaintiffs say

22   they don't have, because they weren't like -- I think what I

23   told her was I thought what it was, but I wasn't positive is,

24   they were employees of the company who then left the company,

25   for whatever reason, and so, therefore, their e-mails weren't

1    imported over to the new system and you weren't sure that you

2    necessarily had all of those e-mails anymore.  And so there

3    was an issue about whether there was some -- some things one

4    ordinarily might think would exist that don't exist and the

5    plaintiffs' explanation was that's just what happened,

6    because in the shift along the way, we didn't keep them.  And

7    the plaintiffs -- the defendants wanted some discovery into

8    that and that was potentially a second sort of discovery

9    issue.  So I did -- that's the only other thing that I told

10   her, just in the interest of full disclosure.

11           Okay.  So thoughts about whether I should do that

12   or not, or whether you think I should do something else about

13   this issue, or nothing at all, or anything else related to

14   the 775,000 pages.  And in fairness, because I'm giving this

15   to you, I'm happy to hear your thoughts now, but if you want

16   to have a little bit of time to reflect on it, I'm also

17   prepared to give either or both of you that opportunity.

18           MR. JOFFE:  Well, Your Honor, I'm grateful for your

19   suggestions.  I just want to comment on this review that I've

20   done.  And I think defendants will, I believe, reviewed or at

21   least checked the 56,000 documents that we produced as the

22   result.  Those documents eliminated all the spam and all the

23   irrelevant materials for sure, because it's not just, you

24   know, the subject line review.

25           For example, like I could have reviewed everything

1    that's coming from Alibaba, or other sources of that nature.

2    And if it's something of a continuous, you know, stream of

3    spam or not necessarily spam, but professional type of

4    e-mails, that they were not related to the issues at all,

5    they could have been easily eliminated.  All the spam e-mails

6    that the defendants complained about, I've eliminated all of

7    that.  So the collection of -- substantial collection still,

8    but the substantial collection of 56 that we've extricated

9    from the larger 220, I think, 7,000 documents, are clearly

10   responsive, or at least related closely to the case.  So

11   what's left in the remaining part is all the spam e-mail

12   that's been eliminated and there were also e-mails --

13            THE COURT:  Are you prepared to submit an affidavit

14   that that's all that is left and the rest is spam?

15            MR. JOFFE:  No, I'm prepared to say that there is

16   no spam in the documents that we produced.

17            THE COURT:  Yes.

18            MR. JOFFE:  So that collection of 56,000 documents

19   is responsive.  And I was reading the TAR proposal that

20   defendants were proposing in their reports and they were

21   saying that TAR, itself, doesn't eliminate everything --

22            THE COURT:  Nothing's perfect.

23            MR. JOFFE:  Right.  It floats the most relevant on

24   top, and then it leaves the bulk below, where the probability

25   of finding something relevant is low.

1          THE COURT:  So what you would like to do is say --

2          MR. JOFFE:  So I did the human TAR.  I was the TAR

3     machine who was essentially doing this.  I -- the 56 on top

4     are the very relevant --

5          THE COURT:  How many of the documents did you

6     actually read?

7          MR. JOFFE:  I don't -- hundreds.  Hundreds, because

8     sometimes they appeared -- it's not spam.  I wouldn't read

9     Coke versus Pepsi.  And I wouldn't read thousands that come

10    from Alibaba, or any other -- the company that trades in

11    computer stuff.  They have a lot of e-mails that come from

12    automated things like that, but if there was something that

13    could potentially be relevant, though, you know, between --

14         THE COURT:  It would be fair to say the number of

15    documents you read was more than 100 and less than 1,000?

16         MR. JOFFE:  It was more than 100.

17         THE COURT:  And less than 1,000?

18         MR. JOFFE:  That's hard to say, Your Honor.  I

19    can't say.

20         THE COURT:  Well, the only reason that I'm asking

21    is you said hundreds.  So ordinarily, I would think of

22    hundreds as more than 100, but less than 1,000.

23         MR. JOFFE:  I would say in the ballpark of 1,000

24    for sure.  Up to 10,000.

25         THE COURT:  More or less 10,000?

1      MR. JOFFE:  Probably not more than 10 -- not

2 10,000, no.  I mean, a quarter million of log entries was

3 burdensome enough to go through.  But in the case -- but in

4 the case of *Dowd*, if the document could have been -- because

5 of the recipient --

6      THE COURT:  So what happened is you went through

7 the spreadsheet, you went through each line item of the

8 spreadsheet and you read hundreds of documents, could have

9 been over 1,000, and when you thought that there was a reason

10 to look at the document to try to figure out --

11      MR. JOFFE:  Yes, Your Honor.  I did several stages.

12 I first eliminated all the kind of low-hanging fruit.  So I

13 would run the searches or the sorting by sender, and I would

14 eliminate hundreds of e-mails from Alibaba, hundreds of

15 e-mails from eBay, hundreds of emails from generic stuff.  I

16 would eliminate -- that you will see it, the e-mail is coming

17 from a schoolteacher, you know, somehow they got in.  So I

18 will do that.  And then at the end, what is left, is

19 essentially internal -- the company internal e-mails and, for

20 example, if it's during the relevant period, or with any of

21 the Chinese members, there would be --

22      THE COURT:  So it would be fair to say that's the

23 process that you went through and you feel like that's

24 sufficient and, therefore, you don't think it's necessary to

25 appoint this or some other person to do what I described?

1        MR. JOFFE:  I believe it would not be necessary,

2    particularly because the remaining stuff, defendants -- they

3    have it.  I didn't keep it away from them.  They have it.

4        THE COURT:  Yes, I understand.

5        MR. JOFFE:  And they have people, probably, among

6    themselves, who are very good at -- they sell electronic

7    discovery solutions.  Defendants, themselves.  So having that

8    remaining low hanging -- not low hanging, low probability

9    bunch, which they have, we're not hiding it.  And just, you

10   know, we spent really enough time going over that.

11       THE COURT:  Okay.

12       MR. JOFFE:  I personally did.  And I will put an

13   affidavit to that effect, if necessary.

14       THE COURT:  I don't have any doubt that you did it

15   personally and I don't think they dispute that.

16       MR. JOFFE:  Thank you, Your Honor.

17       MR. SASO:  Your Honor, we don't agree with the

18   plaintiffs that enough has been done to ameliorate the data

19   dump.  We are open to the Court's proposal of a special

20   master.  We obviously proposed what we thought --

21       THE COURT:  Remind me -- your proposal is that you

22   engage somebody to do a TAR review and they pay for it.

23       MR. SASO:  That was the last proposal that we made

24   to the Court.  We believe that the e-mail subject line

25   review that the plaintiffs' counsel has engaged in --

1      THE COURT:  And that would cost how much to do what

2  you propose, about?

3      MR. SASO:  It is -- as we had said in our last

4  joint report on that, that we could get a further estimate.

5  We believe it would be significantly lower than our first

6  estimate, which was between I think 100 and $150,000.  I

7  think that this would be much lower because now -- we would

8  only want to review the 76 percent that has been marked as

9  nonresponsive.  We are putting aside -- we would not do a TAR

10  review for the 56,000 documents that they have marked as

11  responsive.  So it would be a smaller subset to begin with.

12      And on top of that, we now also believe that that

13  76 percent, the percentage of spam and junk e-mails would be

14  much higher, because they've already screened out the stuff

15  that they think is responsive.  So we think it would be

16  actually much more quick and much more cost efficient to use

17  TAR to be able to go through that smaller subset, but I don't

18  have, today, a number.  I could look into that for Your

19  Honor.

20      THE COURT:  So -- all right.  I'll tell you what to

21  do about this.  I'm not persuaded at the moment that the

22  spreadsheet is sufficient, for a number of reasons.  One, as

23  a general matter, I don't think you're entitled to dump

24  775,000 pages, including what you know includes literal junk,

25  as in junk e-mails, on the other side, and just say "here."

1     I just don't think that's proper under the rules.  And the
2     fact that they, the defendants, wanted all these search terms
3     and all I really know about that is they wanted these search
4     terms and you told them -- the plaintiff told them it was
5     producing a lot of documents.  But that seems to me that, in
6     the ordinary course, that could be easily handled by figuring
7     how the searches are done and tweaking them, refining them as
8     you're doing them, so that you don't produce all this junk
9     and so that it's more clear, it's responsive, and tied to
10    things, and then we don't waste all this time litigating over
11    it.
12          In my thought of having this independent special
13    master is simply not for them to do a TAR review and not for
14    them to redo it, but for them to sit down and meet with them
15    to figure out maybe there's different extraction searchs to
16    be done by your -- you, Mr. Joffe, and your plaintiffs'
17    e-discovery vendor, or -- that then produce a reasonable
18    production, and then we're done.  And her rate is not, it
19    seems, strikes me is relatively reasonable.  And I wouldn't
20    imagine that it would take that much time, it's just some
21    meetings and back and forth.  So that's one option that I'm
22    thinking about.
23          I'm prepared to consider what you're proposing, but
24    it depends how much it costs and how long it would take.  So
25    how long -- what's a period of time to talk to them, to

1    figure out, given what your more marrow purpose of what you

2    want, to find out what, roughly, what they think it would

3    cost, and how long it would take them to do it?

4         MR. SASO:  Your Honor, I would expect that we would

5    be able to get an estimate from that vendor by the middle of

6    next week.

7         THE COURT:  Fine.  So why don't we say by a week

8    from today, you file a status report that simply says this --

9    describes what it is you propose them doing and how much they

10   estimate it would cost and how long they say it would take to

11   do, which would be -- I don't need every little detail about

12   what they do, but it should be sufficiently detailed about

13   what they do, so we can all figure out what it is and then

14   what it would cost.  And then I'll think about it.

15        I'm not saying I'm going to do that, I'm not saying

16   I'm going to do what I proposed, but I'll think about what

17   further -- I don't want further briefing on the issue.  I

18   think I might invite either a telephone status conference or

19   a status report, just to talk through the issue a little bit,

20   once it's sort of -- those options, there's -- the "do

21   nothing," which I'm less inclined to do, or these two other

22   options, to see where we are.  So that's, for the moment, all

23   I'm prepared to do on plaintiffs' production, because that

24   will lead to -- unless there's something else about it that

25   someone thinks we need to address.

```
 1              MR. JOFFE:  Well, Your Honor, just one comment on
 2     this.  The -- part of the production that was designated not
 3     responsive, that contains mostly that spam and the
 4     presumption -- I think it was defendants' presumption that it
 5     still has a lot of responsive documents and they gave several
 6     examples and in our response we show that we actually
 7     produced those e-mails that they said were nonresponsive,
 8     versions, variations, chains of those emails were produced in
 9     the 56,000 collection.  So that shows that our selection of
10     responsive documents was actually fairly accurate.
11              THE COURT:  Here's the problem --
12              MR. JOFFE:  And there are a few that might be left
13     in the big pile of what we call -- but they have it, and
14     there would --- there ought to be some proportional --
15              THE COURT:  The problem that I have is this,
16     Mr. Joffe.  The fact that there is one or several relevant
17     responsive documents in the pool of the ones you identified
18     as nonresponsive doesn't persuade me that I should require
19     you or them -- you to do more.  The problem I have is, (a),
20     one, the production came way late.  That's a smaller problem,
21     in terms of this, but it's an issue.
22              Two, it came -- the 775,000 pages was not a proper
23     production.  You cannot just hand over all that, including
24     the junk and spam e-mail, and just say "there."  And then
25     only do something about it when I -- when they complain and
```

1     I'm -- and I'm complaining, which is what happened in June.

2     And so now you did something.

3             MR. JOFFE:  We did.

4             THE COURT:  You did.  I absolutely say you did

5     something.  And it is better than it was in June, for sure.

6     They would agree with that, as well.  And the question is, is

7     it enough.  Okay?  And so on the way you've described what

8     you've done, which is what I have, I'm not fully persuaded

9     that that is the way that is the proper way or a sufficient

10     way to do the discovery.  That's what gives me pause.  The

11     fact that there are a couple of documents, fine, there's a

12     couple of documents, there's going to -- when you're

13     producing, doing an electronic production, if they did a TAR

14     review, you could probably go through by hand and find a

15     couple of responsive documents for sure.

16             But the process itself that you went through is not

17     the kind of process that gives me comfort and so it gives me

18     pause.  And it doesn't arise like a phoenix out of the ashes,

19     it arises in the context of this case and the way this case

20     has been litigated.  And I think about the totality of the

21     circumstances, too.  So all of those things is why -- all of

22     those things are reasons why I'm thinking about doing this

23     and have concern.

24             Am I trying to -- they may or may not -- I know you

25     regularly remind me of two things, Mr. Joffe.  One, that your

1    clients were in prison.  And two, that they're a big, huge

2    Fortune 100, 500, 50, I don't know.  They're a big

3    corporation and they're a big, huge law firm in New York with

4    a lot of money and they're trying to bury you.  And I

5    consider that, but you know what?  You don't get to win

6    motions because your clients were, for seven months, in the

7    Chinese prison.  It makes the case serious, but I have to

8    decide each motion on its merits and they do have a lot of

9    money, but they have a budget, too, and they have limitations

10   and restrictions, and so, if they're trying to bury you, I

11   don't want them to be able to bury you.  Okay.

12          Don't help them bury you.  That would be my advice

13   to you, okay?  That's why you should keep your eye on the

14   ball.  That's why -- this isn't the first time that I've told

15   you to keep your eye on the ball.  And so I'm thinking about

16   that a lot.  Am I mindful -- the reason I didn't do what they

17   wanted me to do in June, because you told me that if I

18   ordered your -- a quarter millions dollars in cost to them,

19   that would be the end of your client's case.  That doesn't

20   seem to be fair.

21          MR. JOFFE:  I can repeat that, yes.

22          THE COURT:  So I'm mindful of that, so the fact

23   that your clients aren't as well healed as HP, doesn't excuse

24   them or allow them to do what -- turn over the 775,000 that

25   way.  Am I thinking about those issues?  I am.  You have the

1    ability to try to figure out solutions to these problems and
2    be practical and work with them, too.  But in the meantime,
3    at the moment, how much does it cost -- you tell me -- in a
4    week?  I understand your position is what you did is
5    sufficient and I shouldn't order anymore.  I'm not ordering
6    anymore at the moment, but I do have the feelings and
7    concerns that I've expressed about the spreadsheet and I'm
8    considering the person I appointed -- I'm appointing somebody
9    to do what I described, which is a little bit different, and
10    if I did, I would appoint that person, unless someone had a
11    good reason why I shouldn't appoint that person, or propose
12    somebody else.  I'm not wedded to that person.  That just
13    seemed like an impressive person I heard speak.
14          And for the record, I've never -- before that
15    conference, met that person, and this is the only
16    communication I've ever had with this person since that
17    conference, and never heard of that firm until today when I
18    looked up where she worked.  So --
19          MR. JOFFE:  Just one quick, last point on this,
20    Your Honor, if I may.  We agree and we admit that producing
21    700 something thousand pages was not the right way to do it.
22    I don't think there was -- or maybe the defendants do -- I
23    don't think they argued that we did it intentionally and I
24    think as we all discussed this several times, this huge
25    universe of documents came because we applied their search

1    terms and we diligently tried to get all --

2             THE COURT:  I didn't say you did it intentionally.

3             MR. JOFFE:  We did not.

4             THE COURT:  I didn't say that, but let me explain

5    one thing.  That part of your job, in my view, is to be

6    practical to solve practical problems.  You had 775,000

7    documents that were being produced.  You had a practical

8    problem.  You knew it contained junk e-mail.  You knew it

9    wasn't a proper way to respond to discovery.  You told

10   them -- what I know is you told them you were producing a lot

11   of documents.  As far as I know, you didn't go to them and

12   propose a solution to that, other than give them less

13   documents.

14            You could have come to the Court and said, Judge, I

15   want to solve this problem, I want to have a status

16   conference.  I file a motion and say they want to do all

17   these search terms, it's producing this, and before we go do

18   everything and produce all the documents, there's a lot of

19   different ways to solve the problem.  You didn't solve the

20   problem.  You dumped 775,000 pages on them that you knew

21   wasn't a proper response to discovery.  That much I know.

22            Did you do it intentionally in a sense where you're

23   trying to bury them?  I didn't conclude that and I'm not

24   saying that, but that's not helpful.  That's not the way you

25   keep the eye on the ball and move the case forward, and I'm

1   not necessarily persuaded that the spreadsheet you did is a

2   reasonable and practical solution to the problem.  And so

3   that's why I've come up with one possible solution of my own,

4   that's why I'm going to hear what they have to say about how

5   much it costs and I'm going to think about it.  And I might

6   invite a telephone conference or some submission from all of

7   you on the issue, if I think that would be helpful, or if I

8   have issues to discuss with you as I think about it.  I fully

9   understand that, as I decide what to do, that you think it is

10  sufficient what you've done, and I shouldn't order anything

11  else and that they're trying to bury you in expense.  I fully

12  appreciate that that's your view of the discovery process.

13          All right.  So that takes care of the issue about

14  plaintiffs' production.

15          So that leaves only the motion to compel.  So I

16  will tell you that I'm going to resolve the motion to compel

17  on the merits and that I've gone through the entire motion

18  and the response and request and all that, I'm going to issue

19  a written order addressing each one, one by one.  I'm not --

20  I have only really one question that I want to go over with

21  you and have time to go over with you today, which is one of

22  the things that you all spent a lot of time on, I'm not quite

23  sure why, but sometimes it's not for me to reason why, was

24  third-party financing.  And so my question about this, why do

25  all of you care so much about it?

1          MR. JOFFE:  Why we care so much about it?  Because

2      for reasons we mention in our brief, because if they know

3      what we have, how much we have left, that will give them huge

4      strategic advantage.  That's all.

5          THE COURT:  So I guess -- that way I thought about

6      is this.  It didn't occur to me -- I assumed, like I do in

7      every case, that the litigation is being paid in some

8      combination between the plaintiffs who are parties to the

9      litigation and some sort of contingency fee arrangement, if

10     there is one.  What I understood the defendants to be asking

11     for is not anything with respect to that universe, but if

12     there's a third party, who's not a party, who -- like -- and

13     not the father -- I assume they're not really care if the

14     father of one of the parties is funding the litigation or

15     something, but I don't know, that it seemed to me a request

16     that was looking for something different, like an investor in

17     the litigation.

18         So you all -- what I will tell you what I infer,

19     because you all care about it, I infer that the defendants

20     have some reason to guess, speculate, or suspect, in fact,

21     there's an investor in the litigation.  The fact that one of

22     the -- the biggest single section in our opposition to the

23     discovery motion is with respect to third-party financing and

24     not with respect to each of the individual things that they

25     want, that relate to the merits of the case, made me think

1    that there might well be an investor in this case, or

2    otherwise why spend all that time and money fighting it, why

3    not say there isn't, good bye.  And so you don't have to tell

4    me at the moment whether there is or there isn't, but I will

5    tell you that that got me thinking about the issue.

6            I'm not at all persuaded that the defendants are

7    entitled to know about any of that, but I am persuaded that I

8    am entitled to know, because you have made representations to

9    me, number one, about your financial condition and I want to

10   know whether those are truthful or not.  I view them very

11   differently, if there is -- if Burford is behind this

12   lawsuit, have you heard of them?

13           MR. JOFFE:  Pardon?

14           THE COURT:  Have you heard of Burford?

15           MR. JOFFE:  Yes, I've heard of it.

16           THE COURT:  So if Burford is investing in this --

17   do you all know who Burford is?

18           MR. CALLAGHAN:  Not specifically, Your Honor, but I

19   believe I understand where you're going.

20           THE COURT:  My understanding of Burford is they're

21   a publically traded, London-based company that invests in

22   lawsuits and they're a billion-dollar company or more.  If

23   Burford is behind this case, then it looks differently to me,

24   your representations about your ability to do this.  If the

25   third party is somebody, I don't know, is the father of one

1    of the plaintiffs and they put in $50,000, I don't know why

2    anybody would really care and it doesn't really change

3    anybody.  It also bears on --

4           I'm not going to get into it, but I will tell you

5    if you go back to mediation, if I were mediating a case, I

6    would expect the investor to be there, or have a role, just

7    the way I would expect the insurance adjustor in the case,

8    the ones with the company, they have a control in the

9    decision, they need to be there, and at least it should be

10   revealed their existence.  I'm not going back to what

11   happened in the mediation that did happen, but if you go back

12   to mediation, if there is.

13          So anyway, I will just tell you about that issue,

14   that I'm not inclined to, at the moment, give it to all of

15   you, but I think there are certain ex parte, in-camera

16   disclosures that might need to be made to me, and I think I'm

17   going to do it in the form of an order to show cause why you

18   shouldn't tell me these things before you do tell me them, to

19   give you a chance to then say whether you think I shouldn't

20   know those things, because I am the presider over the case.

21          And I will tell you that Judge Polster in the

22   opioid litigation in Ohio issued an order to show cause,

23   ordered the people to disclose certain things, I think to him

24   about third-party financing, because it can also bear on your

25   professional obligations.  And so where I'm going with this

1    is not -- I'm going to issue an order to show cause, like

2    these are things I think you should tell me, but you don't

3    have to tell me yet.  I want you to tell me why you shouldn't

4    have to tell me.  And if you agree you should tell me, then

5    fine.  Then I'll tell you to tell me.  And if you don't

6    agree, you'll have the chance to tell me and I'll consider

7    that before you do tell me.

8              Are we clear?

9              MR. JOFFE:  Almost.

10             THE COURT:  It will all be in writing.

11             MR. SASO:  Your Honor, I guess one question would

12   be whether we would have the opportunity to be heard on that

13   order to show cause, as well?

14             THE COURT:  So why -- so the order to show cause,

15   he'll file something, you can file something in response to

16   it, too, if you want.  Yes.  You can tell me why I should

17   order to show cause -- why I should order more things to be

18   told to me or less things or different things.  Or if they

19   say they shouldn't have to tell me, you'll be entitled to

20   tell me why they should have to tell me, for sure.  The order

21   to show cause is going to be public and his response to the

22   order to show cause is public, because his response isn't

23   giving me the third-party financing information.  It's just

24   telling me why I shouldn't or shouldn't be able to know

25   whatever I'm asking about and you could say I should have to

1    ask about more different things.

2         What I'm contemplating at the end of it is an ex

3    parte filing about those things, but you would be -- you can

4    also say why you should get to know it.  I'm just not

5    persuaded why you get to know it.

6         MR. BUNIS:  And Your Honor, I think your thought

7    process that you've just articulated here today actually

8    mirrors some of ours during the meet and confer in the

9    discovery process.  In all of the cases that we've reviewed

10   on this legal topic, in every case that we could find, the

11   existence and identity of the third-party funding source was

12   disclosed.  That was not what was being fought over in any of

13   those cases.  Instead, the question was should the fee

14   agreements be produced, should the communications with the

15   third-party funding source be produced.

16        And so when we asked the question, plaintiffs just

17   tell us, because as interesting of a topic as this is, we do

18   not want to focus on that in our motion to compel, if this is

19   just an academic exercise, and we think that it's at least

20   your meet-and-confer obligation, because we can avoid all of

21   the attorneys' fees that are going to go into this, if there

22   is no such third-party funding source.  So I think that what

23   I would urge the Court is that when it comes to the existence

24   and identity of a third-party funding source, it is my view

25   that that is almost, per se, not privileged and relevant and

1  responsive here.  That it's something that we should know, in

2  particular because the plaintiffs are making a claim for

3  reimbursement.

4  THE COURT:  Well, I do think that if the investor

5  is a publically traded company -- if there is an investor in

6  this lawsuit and if the investor is a publically traded

7  company, there's a local rule about corporate disclosures at

8  the beginning of the case.

9  MR. JOFFE:  Your Honor, if I may, there is no

10  publically traded investor in this case.

11  THE COURT:  Okay.  So if there is an investor in

12  this case, non-publically traded, I still think -- and this

13  is part of the order to show cause, you have to tell me who

14  it is, because, for example, suppose that investor is my

15  next-door neighborhood who I'm good friends with, I'm

16  recusing from this case, because it would be improper for me

17  to be the judge in this case, but you're not telling me even

18  that there -- I should even know about that and what if I'm

19  having dinner with my neighbor and he tells me something

20  about the case and then I discover I've been presiding over

21  it.  And so there's all sorts of -- there's disclosure

22  issues, there's lots of things, so that's one of the reasons

23  I'm ordering to show cause, to address those things.  This is

24  part of like keeping your eye on the ball.

25  And you can solve these problems.  This has

1    ballooned into a waste of time, in a complicated, little

2    issue, that -- like if there is nobody, fine, just say that.

3    Sounds like there's somebody, but it's not publically traded.

4    Okay.  Fine.  But you can spend -- we're going to spend --

5    we've already spilled a lot of money and ink on it, and we're

6    going to spend more, because I'm going to issue the order to

7    show cause and you're going to respond to it and they're

8    going to file something, but there are, you know -- you can

9    choose to fight everything, which is sort of the path that

10   you've gone down, but that seems to me to be a waste of time,

11   and I'm going to be riding this case regularly from now on,

12   because it's taking too long and I don't like the way it's

13   gone.

14          And so like the suggestion is solve these problems,

15   because your clients, who pretty soon I might start ordering

16   to come to these hearings, so that I can explain to them

17   what's going on in this case.  It would not be the first time

18   I've done that in a case, understand why they're not yet in

19   front of a jury.  But in the meantime, that's how I'm going

20   to handle that.  And -- yes?

21          MR. CALLAGHAN:  Sorry, Your Honor, to interject,

22   but to the extent that the Court is inclined, we would ask,

23   as well, that there would be reference made to whether or not

24   the individual plaintiffs ab initio were privy to the

25   existence of any such third-party funder, whether the

1    third-party funder is in a position to dictate the outcome or

2    any potential early resolution of the case.  And in that

3    regard, Your Honor, I'm referring, in reference to our PC 1.7

4    and the existence of a third party that might --

5            THE COURT:  What's RPC?

6            MR. CALLAGHAN:  It's to do with the conflicts, Your

7    Honor, the influence of a third party.  And while Your Honor

8    is going to be reviewing this stuff in camera and it's going

9    to be ex parte, we would simply urge that if you're

10   comfortable with all of that and you're disinclined to let us

11   see it, we would be happy with that, but we would be

12   concerned that somebody, at least, keep an eye to that ball.

13           THE COURT:  Okay.  You can also think about in your

14   response whether I should be the one looking at it, or

15   whether if it -- it should be looked at by the magistrate

16   judge in the case, or by a different district judge who's not

17   me, presiding over it, and you can invite that and I'm open

18   to that.

19           Okay.  All right.  Fine.  So I think that takes

20   care of defendants' motion to compel.  I don't think I need

21   to hear argument about it, by and large.  And I'll resolve --

22   I'm going to issue a written order about all of the other

23   stuff, just briefly, but I wanted to meet with all of you to

24   explain it.  So the last thing then is this.  So in a week,

25   you're going to give me the status report, and then we'll see

1    where we are about plaintiffs' production.  In three weeks,

2    your deadline for filing a motion to compel is three weeks

3    from today.  You got to meet and confer before that.  You'll

4    talk to him, because he gets the opportunity to file it.

5    He's limited to what's in the letter, that -- what was in

6    July, the deficiency letter.  And then we'll get the motion

7    and then if he files it, the motion will comply, because this

8    is the -- we have one time where you read the local rules,

9    when you, before becoming pro hac vice; one time when I

10   reminded you to comply with that ruling when you're filing a

11   discovery motion, which was in June and I specifically

12   reminded all of you to do it.

13           And then you filed it not in compliance, and now I

14   have reminded you again, specifically, and you confirmed for

15   me orally that you understand that rule, that you knew about

16   it before, you've known about it at all times and that you

17   will comply with it.  So I'm expecting that the motion will

18   comply with it.  And I've told you, unambiguously, that if

19   you don't comply with the format of that rule, I will deny

20   your motion, and that will be the end of your motions to

21   compel on paper discovery.

22           So we'll proceed with that three weeks, you'll have

23   two weeks to respond.  If you wish to file a reply, you can

24   file a motion for leave to file a reply.  And you can look at

25   my standard order about how I resolve motions that I don't

1  wait -- I don't promise I'll wait for the reply, but

2  obviously if you file a motion, then you can do it.

3        Going forward, once we're -- we've resolved these

4  outstanding issues, which are whatever further discovery I

5  order out of the defendants' motion to compel, whatever there

6  is about plaintiffs, and whatever, if anything, comes out of

7  plaintiffs' motion as distinct from their production.  Then

8  we're going to need revise the schedule.

9        So let me just explain to you how I'm thinking

10  about going forward.  I'm thinking that we're going to meet

11  regularly.  I know how much you all like to see me.

12        So we're going to meet regularly, because I'm going

13  to want to stay on top of this case to move it forward, and

14  if it means that I have to meet with you every week, I'll

15  meet with you every week, and if it means that I can meet

16  with you every month, I'll meet with you every month, okay?

17        And the way -- but I'm going to meet with you

18  regularly to resolve problems fast to keep this case moving,

19  because it's not moving, and because there's been too much

20  disregard of the rules and obstruction.  And so we'll see --

21  the purpose of those meetings is to keep the case moving and

22  whatever amount of time it takes for me to devote to this

23  case to make sure that it gets resolved on the issues, it may

24  get resolved on summary judgment, and you may lose.  I have

25  no idea, Mr. Joffe, but I'm done with the way it's been going

1    so far.

2              Are we clear?

3              MR. JOFFE:  Yes, Your Honor.

4              MR. CALLAGHAN:  Yes, Your Honor.

5              THE COURT:  Okay.  So I think what comes after that

6    paper discovery, the way you proposed going forward, is some

7    depositions?

8              MR. CALLAGHAN:  Your Honor, we had made the

9    proposal, and the Court agreed, I think all parties agreed,

10   there would be a summary judgment cycle with regard to

11   whether or not the goods were counterfeit, which would

12   potentially cut the case in half, if successful.

13             THE COURT:  Yes.

14             MR. CALLAGHAN:  And I think the proposal was that

15   after the resolution of the -- sorry, Mr. Saso, after the

16   resolution of the data dump, and if there would be no further

17   motions to compel.

18             THE COURT:  After the paper discovery.

19             MR. CALLAGHAN:  Yeah, paper discovery.  That,

20   within 30 days, plaintiffs would propound an expert report,

21   and then we would respond in kind and then set up a motion

22   for summary judgment.

23             THE COURT:  So you don't -- nobody needs any

24   depositions?

25             MR. CALLAGHAN:  We probably need expert

1    depositions.  The previous schedule had that incorporated

2    into it.

3            THE COURT:  Fine.  So you're talking about 90 days

4    for expert deposition, 30 days for the report, 30 days for

5    the response, and 30 days for the depositions?

6            MR. JOFFE:  The parties were supposed to exchange

7    the expert reports.

8            MR. CALLAGHAN:  We understood that the plaintiffs

9    were --

10           MR. JOFFE:  We can go back and look at what was --

11           MR. SASO:  I think it would have been the June

12   conference, Your Honor, where I think that after -- you had

13   set a deadline for compliance with the motion to compel.

14   30 days after that deadline, the plaintiffs would serve their

15   expert report, we would have 30 days, and then 30 days for

16   depositions.

17           THE COURT:  Okay.  Fine.  So then the only

18   depositions that you're all anticipating are the experts?

19           MR. SASO:  Yes, Your Honor.

20           MR. JOFFE:  Prior to --

21           THE COURT:  Prior to that summary judgment on that

22   issue, yes.

23           MR. CALLAGHAN:  And just to be complete, Your

24   Honor, there was also an issue with regard to the 30(b)(6)

25   deposition, to tee up what we believe would be a spoliation

1   motion, which is unrelated to the summary judgment, but that,

2   too, is being teed up after the paper discovery is being

3   completed.

4         THE COURT:  So there would be that 30(b)(6)

5   deposition?

6         MR. CALLAGHAN:  Yes.

7         THE COURT:  Okay.  Fine.  So when you're done with

8   the paper discovery, to the extent we need to -- the schedule

9   runs off when we're done, but we'll have to -- we're going to

10  have to decide together what day it's done, because I'm not

11  going to have litigation over that.  And then we'll review

12  that 30, 30, and 30, for those three steps seems reasonable

13  and I don't see any reason to change that, but I'm going to

14  want to keep this case moving and we'll talk about the pace

15  for the summary judgment process and I'm going to resolve the

16  summary judgment not -- it's not going to be seven months for

17  you to get the summary judgment decision for me.  And then

18  we'll see where we are and we'll go from there.

19        So there isn't going to be any discovery -- and I

20  think the other thing we're going to talk about is what other

21  discovery is to come, because whether we need to do

22  simultaneous or keep it moving or not, or what we're doing.

23  So I want to think about all that.  All right.  Okay.  Thank

24  you very much.  Have a good day.

25        MR. JOFFE:  Thank you, Your Honor.

1        THE DEPUTY CLERK:  This matter is adjourned.

2        (Court in recess at 3:14 p.m.)

3

4                **CERTIFICATE OF OFFICIAL REPORTER**

5

6

7        I, Rachel M. Lopez, Certified Realtime Reporter, in

8   and for the United States District Court for the District of

9   Massachusetts, do hereby certify that pursuant to Section

10   753, Title 28, United States Code, the foregoing pages

11   are a true and correct transcript of the stenographically

12   reported proceedings held in the above-entitled matter and

13   that the transcript page format is in conformance with the

14   regulations of the Judicial Conference of the United States.

15

16                        Dated this 24th day of October, 2019.

17

18

19

20                   /s/ RACHEL M. LOPEZ

21

22

23        _____
                   Rachel M. Lopez, CRR
24                 Official Court Reporter

25