1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3     - - - - - - - - - - - - - - - - - - x

4     INTEGRATED COMMUNICATIONS &              :
      TECHNOLOGIES, INC., et al.,
5                                              :    Civil Action No.
              Plaintiffs,                           1:16-cv-10386-LTS
6                                              :

7         v.                                   :

8     HEWLETT-PACKARD FINANCIAL SERVICES
      COMPANY, et al.,                         :

9             Defendants.                      :

10    - - - - - - - - - - - - - - - - - - x

11

12        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13
                          STATUS CONFERENCE
14

15
                     Tuesday, April 24, 2018
16                          2:53 p.m.

17

18
             John J. Moakley United States Courthouse
19                      Courtroom No. 13
                       One Courthouse Way
20                    Boston, Massachusetts

21

22
                     Rachel M. Lopez, CRR
23                   Official Court Reporter
               One Courthouse Way, Suite 5209
24              Boston, Massachusetts  02210
                      raeufp@gmail.com
25

1                       **A P P E A R A N C E S**

2

   On behalf of the Plaintiffs:

3

         LAW OFFICE OF DIMITRY JOFFE
4        BY:  DIMITRY JOFFE
         230 Park Avenue
5        10th Floor
         New York, New York  10169
6        (212) 309-8711
         dimitry@joffe.law
7

8        LAW OFFICE OF JOSH MCGUIRE
         BY:  JOSHUA A. MCGUIRE
9        51 Winchester Street
         Suite 205
10       Newton, Massachusetts  02461
         (617) 461-6400
11       josh@joshmcguirelaw.com

12

13   On behalf of the Defendants:

14       GIBBONS, P.C.
         BY:  ANTHONY P. CALLAGHAN AND PAUL A. SASO
15       One Pennsylvania Plaza
         37th Floor
16       New York, New York  10119
         (212) 613-2015
17       acallaghan@gibbonslaw.com

18

         CHOATE HALL & STEWART LLP
19       BY:  STUART M. GLASS
         Two International Place
20       100-150 International Place
         Boston, Massachusetts  02110
21       (617) 248-4804
         sglass@choate.com

22

23

24

25

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE DEPUTY CLERK:  Today is April 24th, the case of

4    Integrated Communications vs. Hewlett-Packard, civil action

5    16-10386 will now appear before this Court.

6          Counsel, please identify themselves for the record.

7          MR. JOFFE:  Dimitry Joffe from Joffe Law, P.C., for

8    the plaintiffs.

9          MR. MCGUIRE:  Josh McGuire, also for the

10   plaintiffs.

11         MR. CALLAGHAN:  Anthony Callaghan from Gibbons P.C.

12   on behalf of the defendants.

13         MR. SASO:  Paul Saso from Gibbons P.C. on behalf of

14   the defendants.

15         MR. GLASS:  Stuart Glass, Choate Hall & Stewart,

16   for the defendants.

17         THE COURT:  Okay.  So I have -- I read through the

18   stipulation regarding electronic discovery protocol that you

19   filed and noted within it a number of points upon which you

20   seem to have disagreed, so I thought I would schedule a

21   conference.  But that's -- little time has lapsed since we

22   changed the date for all of you.

23         So why don't you first tell me, is there any

24   updates to that?  Should I just go through the things that

25   I've identified as issues, or have some of them been resolved

1  or narrowed?

2          MR. CALLAGHAN:  None of them have been resolved,

3  Your Honor.  The outstanding issues are still there.

4          THE COURT:  So it pretty much stands where it did

5  when you filed that.  Would that be fair?

6          MR. JOFFE:  Correct, Your Honor.

7          THE COURT:  All right.  Fine.  So then what we'll

8  do is I'll go through and raise with you the ones identified;

9  and then at the end of that, if there's other things that you

10  wish to raise, you can raise them.

11          So the first issues that I noted were -- one thing

12  that would be helpful in the future, when you file documents,

13  is page numbers, but -- so I'm referring to ECF page numbers.

14  So the ECF document is 149 on page 5, which is defendants'

15  position about defendants' request for discovery conference

16  with the Court.  There are a couple of issues that the

17  defendants complain about with respect to clarity from

18  plaintiffs' counsel as to whether the ICT servers are no

19  longer available, or only backups have been lost; second,

20  with respect to which ICT custodian's e-mails were part of

21  the migration and which may have been destroyed; and third,

22  near the bottom of the page, about when and who was

23  responsible for the, quote/unquote, disposition of certain

24  computer hard drives.

25          And so then plaintiff, Mr. Joffe, you have your

1    response generally to their issues.  And I -- I guess what I

2    would say to you is those issues, one way or another, need to

3    be clarified.  In other words, you can clarify them,

4    Mr. Joffe, to their satisfaction, right?  They're fair

5    questions to ask, and it may be that there's perfectly -- I

6    have no view as to what the answers are, as to whether there

7    was any misconduct, but you need to clarify them.  Like you

8    know that you can clarify them by talking to them.  And if

9    they're satisfied, they're satisfied.  If they're not, they

10   can serve you with interrogatories, or they can take

11   deposition testimony.  In other words, you can do it the easy

12   way or the hard way, but there's only one way it's going to

13   be done.

14          Those are reasonable things for them to figure out.

15   If computers were disposed of, there may be perfectly -- it

16   may have been old, and there was perfectly reasonable methods

17   and explanations, and it might not implicate anything.  But

18   it's a fair topic for discovery.  And if you don't satisfy

19   them, they're going to take the under oath testimony of your

20   clients to figure it out.  So you decide which way you want

21   to do it.

22          But like what I would say to all of you is that

23   this was filed on August 6th, and part of what you said,

24   which seemed reasonable to me at the time, Mr. Joffe, was

25   that you thought a conference was premature, because I

1    took -- and you said particularly since they haven't

2    responded to -- the defendants haven't responded to your

3    deficiency letter about certain discovery responses.  So I

4    guess I'd say two things about that.

5            One is, what I took that to mean, premature about

6    these issues, is that you would all be engaging in it.  But,

7    well, nothing's been resolved.  I don't know whether there's

8    been information to clarify, and they're not satisfied.

9            And what I would suggest to all of you is, really,

10   if Mr. Joffe is giving you information and you're not

11   satisfied, then you're -- I think what you have to do is take

12   discovery on that.  In other words, you, you know -- you

13   ask -- you refer to like -- you believe that if destruction

14   overriding or non-migration, if there was some of that, it

15   might be spoliation and that might warrant the severest of

16   possible sanctions.  But I think you know that that just

17   depends.  Right?  It depends on, (a), whether it happened,

18   and (b), if it happened, why it happened.

19           It would be wholly different if you proved to me

20   with admissible evidence that someone has intentionally

21   destroyed evidence that they -- that was subject to a

22   spoliation order, and they knew they shouldn't destroy.  It

23   would be completely different if they got all computers back,

24   migrated what they thought was useful, and years before there

25   was litigation, they threw the old computers away.  And I

1    don't know whether that's right or wrong, and there would be

2    inferences from that, but those are not the same situations

3    and you know that.  And so sure, if what your point is that,

4    if they spoliated things, there could be sanctions, there

5    could be.  But I think Mr. Joffe knows that.

6          So I guess my perspective is, you need to be

7    practical.  So they want to know what happened to those

8    things; you need to tell them.  If you don't tell them,

9    they're going to take discovery on it, which is fine.  And I

10   will let them take extra discovery on it, if they want to

11   take phased discovery.  Do some of that first, before they

12   get to sort of the subject, I would be open to that, if

13   that's what it takes to figure it out.  Because ordinarily

14   these are things that you all ought to mostly be able to

15   figure out and explain to each other's satisfaction.

16         With respect to them not responding to deficiency

17   letter, I would say just two things as a general matter,

18   since it seems that this is a case that may require more than

19   the usual amount of attention.

20         MR. CALLAGHAN:  Your Honor, just to clarify that

21   issue.  We did not see that as something that was before the

22   Court today.  We have --

23         THE COURT:  I don't view it as before the court.  I

24   don't expect you to argue it.

25         MR. CALLAGHAN:  We have, in fact, responded, and

1    we've conferred with our own deficiency letter.  So that's

2    something we've agreed to talk about in the next two days.

3            THE COURT:  Perfect.  So that's great.  The only

4    point that I make about that is, I don't view discovery as

5    pay to play, so to speak.  What I mean by that is you serve

6    discovery on them.  If you're unhappy with their responses,

7    and you've had the appropriate back and forth and conferral,

8    you can come to court and complain.  It is not a defense for

9    the defendants to say to me, in response to your motion to

10   compel:  Judge, they were deficient, too.

11           Okay.  I don't view it -- I understand how big

12   firms work, okay, and I understand how people in New York

13   practice law.  I practiced law there.  I understand how

14   people practice here.  I understand.  I was not born

15   yesterday.  So in my view, it is wholly inappropriate for

16   lawyers to withhold evidence because they think the other

17   side is withholding evidence.  And I'm not saying anyone is

18   doing that, but I view that as wholly inappropriate.

19           I also view it as utterly irrelevant to Mr. Joffe's

20   motion to compel, if he made one -- and we haven't reached

21   there yet -- for you to say he's not been responding to his

22   request.  If his request is a valid request, I'm going to

23   decide his motion to compel on the merits.  The response for

24   you, if he hasn't done it, is move to compel.

25           And likewise, you're -- it's no defense to them

1   complaining about yours, if you haven't done it.  I'm not

2   saying you haven't done it.  But in other words, that comes

3   up sometimes in litigation.  I find it, I'm telling you all

4   now, it's a waste of your clients' money and the ink.  I'm

5   not interested.

6           If what you say to me is:

7           Judge, we don't think you should have discovery

8   conference on Monday, May 5th, because we're just about --

9   we're pretty much, by Monday, May 5th, would be ready with

10  defendants' issues, we'll have joined them and they'll be

11  ready.  We're not going to have them all resolved, we've

12  narrowed them as best we can, but there's issues to decide.

13  We have some issues, too.  We think, from an efficiency

14  perspective, making our clients pay for all of you, five of

15  you, to come to court would be cheaper to have them come

16  once.  We'd rather do it on May 15th or May 25th or May 12th,

17  or whatever, because by then, we'll have joined the other

18  half of the issues, and then we can address everything with

19  you once.  It would be more efficient and we'd rather do

20  discovery once.

21          And yes, perfect sense.

22          So I guess what I would tell you all, with respect

23  to the issues about this, is, I don't see -- is it *Callaghan*,

24  or *Callaghan*?

25          MR. CALLAGHAN:  *Callaghan*, Your Honor.

1        THE COURT:  *Callaghan*, I'm sorry.

2        Mr. Callaghan, I don't know exactly what you want

3    me to do here, other than what I've said.  In other words, if

4    Mr. Joffe isn't giving you answers to explain these things to

5    your satisfaction, I think that these are things that you're

6    entitled to know the answers to, but what do you want me to

7    do?

8        MR. CALLAGHAN:  Your Honor, to the extent that we

9    don't get satisfaction, and we haven't, we would ask that we

10   be allowed to probe that very issue before we start getting

11   into a plethora of other issues in discovery.  Because if

12   there is a destruction of computer equipment, a destruction

13   of e-mails, a destruction of documents, and a migration and

14   an overriding -- overwriting of memory devices, if all of

15   that happened, we believe that should be the stuff of

16   spoliation, because this was supposed to have happened at

17   some undetermined date.

18       THE COURT:  Let me ask you this, though.

19       MR. CALLAGHAN:  Yes.

20       THE COURT:  If you -- but how does that change?  I

21   understand that you might take that discovery, and if it

22   turns out the way part of you hopes it turns out, that it

23   would give you -- you would then be coming to me with a

24   motion to say that I should throw this case out, or I should

25   do some other severe as possible sanctions, in your words.  I

1   should impose those.  Right?

2         But how does that, in the meantime, change the

3   course -- in other words, the discovery that you do take,

4   either if I denied your request for sanctions and said no

5   sanctions are appropriate, or the discovery that you'd be

6   taking as you're on course to move this case to a trial,

7   until I gave you everything you wanted or something in

8   between on your motion, how would it be affected by this

9   discovery about this topic?

10        MR. CALLAGHAN:  Well, Your Honor, I hear what Your

11  Honor said about it's not a *quid pro quo*, and it's not a you

12  give me this and I'll give you that.  And we understand that,

13  Your Honor.  But there is a certain burden on the plaintiff

14  to prove their case and to establish that they have a basis

15  to get judgment on the case.

16        And here you have an instance where Your Honor,

17  yourself, recognized it, as early as 2013, the parties were

18  in the zone of litigation, litigation was in the distance.

19  And there was even a demand -- a settlement demand made by

20  the plaintiffs, or on behalf of the plaintiffs, in November

21  of 2013.  So the writing is on the wall.  And then we turn

22  around, and in 2014, there's a migration of e-mail, there's a

23  migration of data, there's a destruction of computers.

24        And what we're saying, Your Honor, is because of

25  all of those circumstances, we believe that the plaintiffs,

1    having asserted their theories, should be forced to put their

2    proofs out, and if those proofs don't exist and they don't

3    exist -- if we find that they don't exist, or we believe that

4    they don't exist for nefarious reasons, then we would be in a

5    position, Your Honor, to come back before the Court and seek

6    the severest of sanctions, which would be up to and including

7    a dismissal of the case.

8            So we feel as if, if that were probed, if we could

9    probe that issue, we would be in a better position to maybe

10   allay the remainder of the case.  Perhaps that's

11   self-serving, but that's our view in terms of how that might

12   play out, Your Honor.

13           THE COURT:  All right.  So this is what I'd say

14   about that.  I think that this issue should be resolved.

15   When I say "this issue," what I mean is the answers to these

16   questions that appear on page 5 that they've raise, you're

17   going to have to answer those questions in one form or

18   another, Mr. Joffe.  They're relevant things for them to

19   probe into.

20           And so it's -- you need to -- it's your decision

21   about how you resolve those.  You can provide them the

22   explanations by way of just, you know, attorney communication

23   and representation like you both do on many issues, and if

24   that satisfies them, that satisfies them.  You can -- but if

25   it doesn't satisfy them, then they're going to take

1   discovery.  The only real question is, in what sequence do

2   they take the discovery.  Right?  They're certainly going to

3   be able to take it in conjunction with everything else.

4           So I would urge you all to first try to talk to

5   each other, to at least -- I mean, it's really you,

6   Mr. Joffe, to see if you can solve it.  Because what I hear

7   them saying is that they're going to ask -- they're going to

8   file a motion to say that they should get some certain

9   focused discovery on this topic, before all the regular

10  discovery begins.  I'm not resolving that question now,

11  but -- but, you know, you're the plaintiff.

12           MR. JOFFE:  Yes, Your Honor.

13           THE COURT:  And presumably, you want to get to

14  judgment, right?

15           MR. JOFFE:  I do, Your Honor.

16           THE COURT:  And so presumably, then, you want to

17  eliminate hurdles.

18           MR. JOFFE:  I do.

19           THE COURT:  So one way to eliminate is that maybe

20  you can answer these things and narrow it.

21           MR. JOHNSTON:  Yes.

22           THE COURT:  Or you -- and so see.  So why don't we

23  do this:  Why don't you talk to each other about that, and if

24  you -- I'll give you, say, a -- if you -- what I hear you

25  likely to put before me is a request to stage the discovery.

1          MR. CALLAGHAN:  That would be correct, Your Honor.

2          THE COURT:  All right.  If you want to file that

3    motion to stage it on this issue, then, you know, how much

4    time do you need to talk to each other?  Do you need to talk

5    to each other to see if we can resolve the issue before you

6    get to filing such a motion?  And part of resolving it is

7    seeing whether these things have answers that satisfy them in

8    some way or not.

9          And how much time do you think you need to talk to

10   each other about that.

11         MR. JOFFE:  Well, I'll be happy to talk to them.

12   My only objection to having conference today was that it was,

13   in my view, a bit premature, because they've bombarded me

14   with clarifying questions.  It's not just asking clarifying

15   questions, I have resent e-mail with overall six categories

16   of questions, five sub-questions in each.  So it's like 30

17   more interrogatories that I have to respond.

18         And my concern was that, when I'm trying to respond

19   and get information from various groups of plaintiffs located

20   throughout, and then I don't have time to answer all of the

21   detailed questions.  And I tried, and one of them, I said I

22   will follow-up, following up.  They used that as the reason

23   to run to the Court immediately, and run to the Court on

24   absolutely -- with no absolute basis.

25         They're saying that ICT reports do not have any

1    relevant data or may not have any ESI to produce.  That's not

2    true.  We have plenty of ESI to produce.  We have plenty of

3    relevant data.  This is all pure speculation, based on the

4    fact that I was not quick enough on their beck and call, when

5    they send me 30 questions to answer, including questions that

6    have no relevance to discovery and are completely not

7    proportionate.

8             I'm not opposed to doing it in cooperative and

9    practical manner, Your Honor, at all.  And I'll be happy to

10   engage in discussions with them, because we have many, many

11   questions about their proposed ESI product on our own.  For

12   example, the custodians that they want to give us, their

13   description of their own system is just, you know --

14             THE COURT:  Remember what I said, Mr. Joffe?

15             MR. JOFFE:  What?

16             THE COURT:  Remember what I said?

17             MR. JOFFE:  Yes.

18             THE COURT:  What does their system have to do right

19   now with their questions about yours?

20             MR. JOFFE:  No, no, no.  I was referring, Your

21   Honor, to a practical way of resolving.

22             THE COURT:  Yes, I agree with you.  So there's a

23   lot of practical questions.  And so how many of these

24   questions that I identified here have you resolved or looked

25   into since April 6th?

1           MR. JOFFE:  I think, since that time, they've

2     responded to our deficiency letter.

3           THE COURT:  No, I'm talking about the ones on

4     page 5.

5           MR. JOFFE:  Since April 6th.

6           THE COURT:  That's the date that you filed this.

7     So on that date, you responded in the way you did, which is

8     fine.  But what I understand your response to be is that you

9     describe many things you do have, and I don't -- I'm not --

10    by highlighting the issues they're complaining about on this

11    topic, I'm not saying I agree with them, either that they're

12    correct that your clients did anything wrong, or they're even

13    correct that I should stage the discovery.  But I'm

14    highlighting that they raised these things, which seemed like

15    reasonable questions.

16          For example, how did the hard drives get disposed

17    of, or what custodian's e-mails were part of the migration,

18    and which ones were destroyed?  Or what about current

19    employees or not?  And those are practical questions.  In my

20    experience, before you embark on electronic discovery, the

21    more things you can plan out and figure out and resolve in

22    advance, the cheaper it is, because it's an expensive, time

23    consuming process, and you don't want to do it twice.  And so

24    my only point is --

25          I guess my other point is this.  The way these --

1    the way cases work -- which I know you know, you brought the

2    case, which is fine.  I'm happy to come here every day, and

3    you're certainly -- like the case before that I heard just a

4    few minutes ago, presents many interesting questions, but

5    cases are hard work.  That's the way it works.  They're hard

6    work for defendants, they're hard work for plaintiffs,

7    they're hard works for the court.

8            And the way, you know, you're going to have to

9    deal -- you've brought claims that are challenging them,

10   which is that's what plaintiffs do.  And they are -- these

11   are important claims to your clients, with a lot of potential

12   money at stake.  People's liberty -- although the case

13   doesn't put someone's liberty at risk now, it involves

14   questions of liberty, and so they're, you know, fighting it

15   hard.  And so -- which is what you would expect.  And just

16   the way you were fighting it hard.

17           But so my point is only you got to talk to each

18   other about those things, because they're not joined in a way

19   that I'm going to resolve at the moment.  But I think you

20   need to talk to each other about those issues.

21           One issue that was brought to my attention in that

22   was this question about personal electronic devices.  And so

23   I'll give you a couple of general -- because I take it that

24   issue stands where it did when this was filed?

25           MR. JOFFE:  Well, to the extent it's not

1    reciprocal, because otherwise, we've agreed that personal

2    electronic devices will be within category of inaccessible

3    data, but for some reason, now it only works for defendants.

4    For plaintiffs, they want to search --

5            THE COURT:  So let me explain why it's not

6    reciprocal to Mr. Joffe.  If you want the psychiatric records

7    of Mr. Gill, on the present record, do you know what the

8    answer is?

9            MR. JOFFE:  Not Mr. Gill --

10           THE COURT:  He's a defendant, right?

11           MR. JOFFE:  Right.

12           THE COURT:  And if you want his psychiatric

13   records.  I have no idea if psychiatric records exist.  But

14   do you know what my answer is if you want them?

15           MR. JOFFE:  I don't know, Your Honor.

16           THE COURT:  You don't know.  Do you have any idea,

17   based on your experience as a lawyer, your familiarity with

18   the issues, and the principles of law that might govern that

19   request?

20           MR. JOFFE:  Well, it's disproportionate to the

21   discovery.

22           THE COURT:  Would it perhaps not be relevant?

23           MR. JOFFE:  Not relevant.

24           THE COURT:  Relevance would actually be before

25   proportionality, perhaps?

1          MR. JOFFE:  Yes.

2          THE COURT:  Right.  So in fact, can you think of

3     any nonfrivolous argument that you could make that would make

4     Mr. Gill's psychiatric records, based on the present record,

5     relevant for discovery?

6          MR. JOFFE:  No, but I'm not looking for them.

7          THE COURT:  And you're not looking for them,

8     exactly.  But your clients' psychiatric records, if they

9     exist, some of your clients, those who brought claims of

10    mental and emotional health, possibly would be relevant.  I'm

11    not saying that they are relevant, but would you agree with

12    me that they're possibly relevant?

13         MR. JOFFE:  Sure, Your Honor.

14         THE COURT:  Right.  And so it's not a reciprocal

15    issue.

16         MR. JOFFE:  No, no, no.  I'm not -- I didn't mean

17    the subject matter of the search, I mean the media on what

18    the search is conducted.

19         THE COURT:  So my point is reciprocality is not

20    really -- I don't see why -- discovery is not governed by

21    principles, if you give that, we have to give that.

22    Discovery is governed by what are your claims, what are your

23    damages, what are you seeking with respect to those, what are

24    the defenses, and what things are put in play by the

25    defenses.

1          So here the claims are business claims.  The claims

2     arise out of a business transaction.  So in the ordinary

3     course, I would think that the discovery on your clients is

4     focused on business devices, and on their client it is

5     focused on business devices.  And until that -- the way I

6     would view this, like any commercial litigation case, until

7     someone shows me that a business person was using their

8     personal phone to do business, you wouldn't have to subject

9     your personal phone to discovery.

10          So for example, if one of you was sued for

11     employment discrimination in the course of your law practice

12     or malpractice -- god forbid, in the course of your law

13     practice, or breach of contract in your lease on your office,

14     I would ordinarily assume that your personal phone and your

15     personal papers at home, that are unrelated to your law

16     practice, are not subject to discovery, and you wouldn't have

17     to look through them, unless someone showed some reason why.

18          But in this case, what strikes me as different is

19     that some of the claims as to some of the plaintiffs, advance

20     claims that, with respect to personal things, not only with

21     respect to business things.  So as with respect to the

22     personal things, then I would think that the question isn't

23     really -- it would be different.  That principle that we

24     wouldn't ordinarily look -- it's a business case, you look at

25     business things -- wouldn't apply any longer.  That doesn't

1    mean that everything they have is subject to discovery, but I

2    don't know --

3           For example, if your client went and sought --

4    bring some of the claims for mental and emotional health,

5    went to a counselor, presumably they might have paid for that

6    personally.  That would be a reasonable possibility.

7           Would you agree with me?

8           MR. JOFFE:  Yes, Your Honor.  Of course.  And we'll

9    produce responsive documents.

10          THE COURT:  And you'll produce those records,

11   right?

12          MR. JOFFE:  My only concern is it's not the subject

13   matter.  We're in a position to search more various devices

14   that the defendant is not.  We're put under the burden and

15   expense of going and searching the devices that the parties

16   agreed to exclude from the general media search.  I'm sure

17   that they will have some relevant information on backup

18   tapes.  We decided that backup tapes would be unaccessible --

19   well, with some proviso that --

20          THE COURT:  Right.

21          MR. JOFFE:  But this is exactly that issue, whether

22   it's reasonable, accessible, or not.

23          THE COURT:  In my view, that argument is not the

24   same.  So in my view, backup tapes you all made an agreement.

25   With respect to business backup tapes, it makes sense.  I

1   think that was a prudent decision and you have certain

2   exceptions, and I'm not going to upset the arrangement you

3   made on that.

4           Here you disagree on whether -- what I understand

5   the dispute to be is defendants say, as to those plaintiffs

6   who are bringing claims for physical, mental, and emotional

7   health damages with respect to their physical, mental, and

8   emotional health.  You don't want their personal electronic

9   information to be categorically excluded from the subject of

10  discovery.  And what I understand the plaintiffs' position to

11  be is it should be equal.  Either nobody has -- it should be

12  like backup tapes, either no one searches the personal

13  devices, or everybody searches the personal devices.

14          MR. JOFFE:  Yes, Your Honor.  In our view that

15  would be a proportionate approach to discovery.

16          THE COURT:  So I guess my view is that

17  proportionality is, at first, irrelevant to this

18  determination.  The first determination is relevance.

19  There's nothing before me that suggests that the personal

20  devices of any of the defendants have relevant information.

21  At this stage of the proceeding, no one has suggested that.

22  And so it's not to say it's inconceivable that there isn't a

23  stray e-mail or something on someone's personal device, but

24  that would be disproportionate, and there's no reason to go

25  to that end.

1              But the plaintiffs here who brought claims for

2     damages of personal, mental, and emotional health.  I can

3     think of no conceivable principle, which is the line that

4     you're attempting to draw, Mr. Joffe, that says -- there is

5     no principle that says personal documents are off limits from

6     discovery.  You're not making that argument.  I understand

7     that.  You're not making that argument, because such an

8     argument would be frivolous.

9              MR. JOFFE:  I'm not making it.

10             THE COURT:  And you're not making it.  I understand

11    that.  What you're saying is that it's disproportional to

12    look at electronic devices, because it's too burdensome

13    unless it's reciprocal.  I reject the reciprocal argument.  I

14    think, in this context, it makes no sense.  With respect to

15    the proportionality argument, it's not grounded in anything.

16    The proportionality argument you're making is grounded in

17    your reciprocal argument, which doesn't make sense, with all

18    due respect.

19             If what you're trying to say, but haven't said, is

20    that, Judge, the particular clients I have, the kinds of

21    things that they might have that would be appropriate and

22    responsive to physical, mental, and emotional discovery, are

23    not likely to be on their electronic devices, and therefore,

24    it would be a waste of time and money to search their

25    electronic devices, that argument is not made in this and you

1    haven't articulated that yet.  I'm articulating it for you,

2    because it seems like maybe what you're trying to say, but

3    haven't said.

4          You are going for the argument that, if we have to

5    do it, they have to do it, which I find a wholly unpersuasive

6    argument.

7          So with respect to that argument, that's a

8    potentially reasonable argument.  What I would say to you all

9    about the physical, mental, and emotional discovery, is it

10   depends on what the request is.

11         In other words, I don't think -- on the line you're

12   drawing, no.  I reject that.  I'm not saying that you, (a),

13   get free range on all of the electronic devices.  The first

14   question is, what are the discovery requests?  I imagine

15   there's going to be some disputes about the scope of

16   discovery with respect to that, and you need to either

17   resolve that among yourselves or narrow it and present what

18   there is to me.

19         Once there's a question that -- once the scope of

20   discovery of documents, which is what we're talking about, is

21   resolved in some fashion, then you might be able to then

22   actually have a principled, lawyerly argument that there's no

23   reason to think that there's discovery that's within the

24   scope of what they're seeking on their devices.  But you've

25   already conceded to me, essentially, for example, Mr. Joffe,

1    that your position isn't right, because if your client has --

2    receives bills from their therapist electronically, and

3    therefore, the bills would be on their phone, you've already

4    conceded to me those bill are discoverable, probably, and

5    that you'd probably be willing to produce them.  So you'd

6    have to get them off the phone.

7            So it's not about like -- the question is what's

8    the scope of what they're looking for.  So you all need to

9    figure out -- and one thing that I want to be careful about,

10   just because I'm saying you can do this, doesn't mean now --

11   which I don't think you understand it this way, but if you

12   do, Mr. Callaghan --

13           MR. CALLAGHAN:  Callaghan, Your Honor.

14           THE COURT:  Callaghan, I'm sorry.

15           MR. CALLAGHAN:  *Dirty Harry*.

16           THE COURT:  Oh, there you go.  That will help me.

17   *Dirty Harry*.  Okay.

18           Is that how you introduce yourself to opposing

19   counsel?

20           MR. CALLAGHAN:  First time I've ever used it in

21   court, Your Honor.

22           THE COURT:  I see.

23           So it doesn't mean you get free range on

24   everything.  Just because they put it in play, it doesn't

25   mean that everything about anything is fair game, and it

```
 1    doesn't mean you get to look at everything on their iPhone.
 2    You know, that's a totally different question.  All I'm
 3    saying is the line -- like in this day and age --
 4              And how old are your clients, the ones who have
 5    these claims?
 6              MR. JOFFE:  My clients?
 7              THE COURT:  The ones who have the claims for --
 8              MR. JOFFE:  45 and -- Alex Styller is 45, Jade is
 9    younger.
10              MR. CALLAGHAN:  At the end of it, the plaintiffs,
11    Your Honor, who are alleging these damages are in their 20s,
12    30s.  They're the detained individuals.
13              MR. JOFFE:  Oh, the three individuals detained?
14    Yeah, they're younger.  Alex Styller is 45 or something --
15              THE COURT:  Right.  Do you want to take a risk --
16    take a stab.  Take like a bold guess.  Do you think that
17    people in their 20s and 30s have more of their lives recorded
18    electronically than you, who I am guessing is over 25?
19              MR. JOFFE:  I am, I am, Your Honor.
20              THE COURT:  All right.  Or less than you recorded
21    electronically about their life?
22              MR. JOHNSTON:  I would think, yes.  They use more
23    of course.
24              THE COURT:  Right.  It's conceivable that they have
25    no paper, whatsoever, and everything they do is on their
```

1   phone, potentially.  We don't know.

2          So that's why I mean, like the phones are

3   available.  Whether you actually get to search them, what the

4   parameters of your discovery requests are, what the scope is,

5   whether it's burdensome, given what likely would be there,

6   and what the discovery requests, those are questions that are

7   fair game to disagree about.  But other than that, I think my

8   position is clear on that issue.

9          All right.  So that takes me through the first

10  part.

11          Next, we're under relevant time frame.  And I'm not

12  quite clear what the dispute is there.  What do you want for

13  the plaintiffs?

14          MR. CALLAGHAN:  Your Honor, the position that we

15  took is -- the position that we take is the individual

16  plaintiffs, after they were arrested, they were ultimately

17  released in the middle of 2013.

18          THE COURT:  Yup.

19          MR. CALLAGHAN:  And to the extent that there was

20  some large conspiracy, or whatever the theory is, that kept

21  them in prison, that horse had bolted when they were

22  released.  Thereafter, in the middle of 2014, they were given

23  their equipment back.  They were given an apology by the

24  prosecutor, they were told that they would not be prosecuted,

25  that they could go forward with their lives.  To me, the

1    horse has definitely bolted at that stage.  The only thing

2    that's alleged in the second amended complaint to happen

3    after that is that they got their no criminal prosecution, no

4    criminal record letters from the authorities.

5            THE COURT:  So let me ask you, do you both agree on

6    the start date?

7            MR. CALLAGHAN:  The start date, we believe, should

8    be around 2010.  I'm not sure there's any disagreement on

9    that.

10           THE COURT:  All right.  So both of you agree that

11   the scope of discovery begins on whatever that date is

12   in 2010.

13           MR. CALLAGHAN:  Right.

14           THE COURT:  You say it ends either when they're

15   released, or a year later when they are given the apology and

16   the computers were returned.

17           MR. CALLAGHAN:  We go even farther, Your Honor.  We

18   say at the end of December of 2014.  That gives you

19   retrospect, that gives you whatever it is you'd be looking

20   for from the defense side.  That will give us what we're

21   looking for from the corporate plaintiffs' side.  Because the

22   only thing that happened thereafter, happened in China by the

23   authorities.

24           THE COURT:  What happened after the -- what do you

25   mean?

1          MR. CALLAGHAN:  They got the no criminal records

2     letters.

3          THE COURT:  When did that happen?

4          MR. CALLAGHAN:  December 15th and May 16th.  That

5     has nothing to do with -- there's nothing alleged that we had

6     anything to do with that.  In fact, we were doing everything

7     we could, apparently, to stymy that, according to the

8     allegations -- that's not an admission.

9          Your Honor, we're saying December of 2014 is enough

10    for the corporate parties.  The reason we want to carry it on

11    for the individual plaintiffs who have mental, physical, and

12    emotional damages --

13         THE COURT:  That's just the three detained

14    individuals and their family members who claimed their loss

15    of consortium?

16         MR. CALLAGHAN:  And Mr. Styller.  Mr. Styller has

17    suffered a lot of anguish, as well, apparently as a result of

18    being aware that his people were arrested.  He's claiming a

19    million dollars in damages for emotional, physical, and

20    trauma-related effects.

21         THE COURT:  So you want to have two end dates; one

22    end date of December of 2014 for everybody, except with

23    respect -- it's really for everybody and everything, except

24    for the individual plaintiffs with respect to discovery about

25    mental and emotional health and physical damage claims.

1          And as to that damage discovery, you want it to go

2     until when?

3          MR. CALLAGHAN:  Up to the present day, Your Honor,

4     because it's allegedly ongoing.

5          THE COURT:  Right.  All right.  So -- and what's

6     your position on the end dates?  How does it differ from his

7     position?

8          MR. JOFFE:  Well, Your Honor, our position is that

9     the -- the coverup continued until the filing of the lawsuit.

10    We filed the lawsuit in December of 2015.  We think the

11    cutoff date should be December of 2015.  They were cited

12    respondents with the defendants --

13         THE COURT:  So he wants December 14th, you want

14    December --

15         MR. JOFFE:  December 9, 2015, is our proposed

16    cutoff day, which is the filing of the first complaint in the

17    state court.  The reason that we would like to have that date

18    as the cutoff is --

19         THE COURT:  Why wouldn't you -- that complaint

20    doesn't allege a coverup.

21         MR. JOFFE:  That does not.

22         THE COURT:  That does not.  So why would you want

23    to wait until you filed the complaint that alleged the

24    coverup?  Why did -- that complaint alleged no coverup,

25    correct?

```
 1              MR. JOFFE:  The original state law complaint,
 2    correct, Your Honor.
 3              THE COURT:  And so why did a lawsuit that alleged
 4    no coverup, why did it end the coverup?
 5              MR. JOFFE:  Well, it didn't -- well, it was already
 6    a lawsuit.  We were already in litigation.  And if I believe
 7    correctly --
 8              THE COURT:  You're dealing with people who threw
 9    your clients, essentially, in jail is your theory.  Why would
10    the lawsuit have stopped them?  Or is it just a practical end
11    date?
12              MR. JOFFE:  It is a practical end date.
13              And Your Honor, one of the practical consideration
14    in discovery in general, I think, is relevant under the rules
15    is, you know, I -- again, I'm quoting proportionality, but it
16    also accounts for the relative resources of the parties.  And
17    one of the concerns that we have is that the discovery for
18    us, for the parties who are obviously not in the same
19    position as the defendants, is that it becomes burdensome and
20    incremental with every additional --
21              THE COURT:  But you want more, he wants less.
22              MR. JOFFE:  No, he wants more.  He wants the
23    present.
24              THE COURT:  No, no, no.  He wants all discovery for
25    all things to end in December of 2014, with one exception.
```

1  The one exception is just as to his discovery about the

2  individual defendants, and just as to those individual

3  defendants as they're claimed for personal damage of

4  physical, mental, and emotional health.  He wants that

5  discovery to continue to the present, but all other discovery

6  to be shorter, ending in -- a year before you.  That's his

7  only exception to that year.

8          So in other words, his discovery, all the -- his

9  discovery, all the discovery from your corporate client, all

10  the discovery about the merits of the claims on both sides,

11  liability, would be through December 2014.  The difference

12  would be, since the claims for damages are ongoing, he can

13  take -- when he asks your client the question, "Well, how did

14  you suffer in 2016, from mental and emotional health," you

15  wouldn't be able to say, "Irrelevant.  2016."  You would --

16  he would be able to ask that.  But if he said, "What happened

17  in 2016 to support your claims of liability," you could say

18  "irrelevant," and he would have to agree that it was.

19          MR. JOFFE:  Yes, Your Honor.  But I think what we

20  are discussing here is the practical, for

21  electronic information only.  It's not the whole scope of

22  discovery when it should be --

23          THE COURT:  Well, is your client going to claim

24  that they suffered any harm or want any damages for things

25  that happened to them after December 9, 2015?  In other

1    words, are your clients claiming that they suffered any

2    compensable mental, emotional, or physical damages, after the

3    filings of the date that the state law claim was filed?

4              MR. JOFFE:  No.  The actions were taken and --

5    before the --

6              THE COURT:  No, we're not talking about the

7    actions.  That's liability.  I'm talking about damage.  Are

8    they claiming any compensable damage arising or incurred by

9    them after December 9, 2015?

10             MR. JOFFE:  I don't believe they do.  You know,

11   they suffered emotional damages as a --

12             THE COURT:  Did you sign the complaint?

13             MR. JOFFE:  I did sign the complaint, yes.

14             THE COURT:  Do you recall what the complaint says?

15   You didn't -- to December 9th, there were no such claims made

16   on December 9th.

17             MR. JOFFE:  No, Your Honor.

18             THE COURT:  Just to be clear, the reason that I'm

19   asking carefully -- this is a serious question.  Because if

20   you are answering the way you're answering, you're waiving

21   things, and I will then possibly cut off their discovery, but

22   you will then have given up any claim for damages forever

23   after, after that date.  And so I want to be clear.  I'm not

24   trying to trick you.

25             MR. JOFFE:  I don't want to make that concession

1   without clearly reviewing what's in the complaint.

2           THE COURT:  Right.  That's why I'm asking.  So let

3   me explain what I'm asking you.

4           Mr. McGuire, do you understand what I'm driving at?

5           MR. MCGUIRE:  I think I do, Your Honor.

6           THE COURT:  Okay.  So let me explain it to both of

7   you.  You think about it, but I want to -- he -- the way I

8   understand your claims, the claims that I'm talking about now

9   are claims for which you seek damages of personal -- of

10   physical, mental, and emotional damages.  I understand those

11   to be claimed that they suffered harm, that the harm is

12   ongoing, and that some of the damage from that harm, they've

13   incurred on an ongoing basis right up to at least the day the

14   complaint that alleges those claims was filed, if not to

15   today.  And the nature of those claims are --

16           This is not like someone who says:  I broke my arm

17   in 2010, I was in pain for three weeks, I was in recovery for

18   six months.  Nine months later, my arm was as good as new,

19   all the damages were over and that closed the window of time.

20           These are damages of psychological nature that are

21   ongoing in some way.  That's how I understand them.

22           Do I misunderstand them?  Or do you think that's

23   fair?

24           MR. JOFFE:  No, it's fair understanding, Your

25   Honor.

```
1              THE COURT:  Right.  Do you agree, Mr. McGuire?

2              MR. MCGUIRE:  Yes, Your Honor.

3              THE COURT:  All right.  That would ordinarily mean

4     that your clients are seeking dollars for what happened to

5     them after December 9, 2015, when the state law complaint was

6     filed.  Would you agree with me?

7              MR. JOFFE:  Yes, Your Honor.

8              THE COURT:  That would ordinarily mean that they're

9     entitled to take discovery about things, the harm that your

10    client suffered after December 9, 2015.  Would you agree with

11    me that on that?

12             MR. JOFFE:  Yes, Your Honor.

13             THE COURT:  All right.  So if that's the case, if

14    you -- then how -- why aren't they entitled, as to that

15    narrow topic, to take discovery about things that happened

16    after December 9, 2015, on that aspect?

17             MR. JOFFE:  Well, no, they're not not entitled.

18    They are entitled to take discovery on that aspect, Your

19    Honor.

20             THE COURT:  Right.  That's not what you said

21    before.

22             MR. JOFFE:  My objection to the time limit for

23    electronic -- I do get that, not as a discovery schedule or

24    document request, this is a practical for electronic

25    recoverable information.
```

1          THE COURT:  Right.  But for electronic recoverable

2     information, what he's saying is there would be two dates.

3     In other words, even you are saying now that there are two

4     dates.  In other words, with all due respect, you need to

5     figure out what your position is, because I think you're

6     taking a sensible position now.  The reason I was probing you

7     before was because I didn't think that was the position.

8          I think that your clients would have been very

9     angry with you if you had taken the other position, and you

10    would be coming back to me with either a change or you would

11    have had all sorts of problems.  So you are taking, unless

12    I'm missing something --

13         Mr. McGuire, am I missing anything?  You have a

14    notice of appearance in this case.  That the plaintiffs'

15    position is there should be two end dates to discovery.  One

16    date, all merits discovery -- all discovery for everything

17    should end on December 9, 2015, except that discovery about

18    the damage claims of the individual plaintiffs about

19    physical, mental, or emotional health runs through the

20    present, and both defendants can take discovery on that and

21    you're claiming losses through the present.  You can claim

22    losses.

23         MR. JOFFE:  Your Honor, I agree with that position.

24    I think that's halfway between what we proposed and what they

25    proposed.

1          THE COURT:  Do you agree?

2          MR. MCGUIRE:  I agree with that position, Your

3     Honor.

4          THE COURT:  All right.  That's the position of the

5     plaintiffs.

6          MR. MCGUIRE:  I believe it is.

7          MR. JOFFE:  So the stop date will be January 1,

8     2010, for everything.  The cutoff for business related

9     communications will be December 9, 2015.

10         THE COURT:  No, that's not what I said.  All I've

11    been spending the last 20 minutes trying to figure out,

12    Mr. Joffe, is what your position is.  Okay.  What I do is I

13    decide between the two of you, but I can't decide until I

14    know what your position is.  Now I know what your position

15    is, which, with all due respect, has changed in the last

16    twenty minutes.  You took the opposite position five minutes

17    ago.

18         Do you understand that?

19         MR. JOFFE:  Yes, Your Honor.

20         THE COURT:  Okay.  Why did you do that?

21         MR. JOFFE:  Well, maybe I wasn't sure about the

22    specific date.

23         THE COURT:  This is not a complicated issue, I

24    don't think.  I mean, you're an experienced lawyer.

25         MR. JOFFE:  I know, Your Honor.  But it means that

1    my clients will have to spend considerable amount of time and

2    money privileged logging everything that happened in this

3    litigation.  Because the majority of this -- that's what I

4    look at it from a practical point.

5            THE COURT:  Right.  You have a choice, right?

6    That's the choice I was asking you.  But you didn't want to

7    take that choice, unless you want to change again, which is

8    fine.  But the choice is, you could decide:

9            You know what, Judge, we don't really think we're

10   going to get a lot of money for what happened between

11   December 9, 2015, and the present.  And it's going to be

12   really burdensome, because there's going to be a lot of

13   communications that we're going to have to log and be

14   privileged.  And there will be all sorts of problems in the

15   depositions, and it's not worth it.  So we're prepared to

16   waive, give up forever after, the entire universe for all my

17   clients and their heirs and their descendents and gone and

18   extinguished for any of the damage that they might have had

19   after December 9th.  We'll take everything up to

20   December 9th, but we're not going to sit here and ask for

21   more.

22           I'm not saying you have to do that.  I'm fine with

23   the discovery up to the present.  But you can't have it both

24   ways.  You can't say they can't get discovery after

25   December 9th, but you want the damages after December 9th.

1    That's all.  And so --

2              MR. JOFFE:  I understand, Your Honor.

3              THE COURT:  So I understand your position is

4    there's the two dates.  So my question, then, is this:  You

5    want -- what happened between -- you want, Mr. Callaghan, you

6    want between -- you want to cut off -- forgetting about the

7    damage discovery that we've now figured out, you want to cut

8    off the other discovery on December of 2014, instead of

9    December 2015.

10             MR. CALLAGHAN:  That's correct, Your Honor.

11             THE COURT:  So why should I cut off the merits

12   discovery, if you will, on liability, on December 2014,

13   rather than the date of the complaint, of the first complaint

14   December 2015?

15             MR. CALLAGHAN:  Because Your Honor, if you look at

16   the second amended complaint, there is not one allegation of

17   anything that occurred after August and September of 2014.

18   In fact, there's an allegation in the second amended

19   complaint that after August of 2014, the plaintiffs regarded,

20   quote, "regarded this matter as closed."  They saw that there

21   was a parting of the ways, there was no resolution, and the

22   issues were as focused as they were ever going to be.

23             THE COURT:  What paragraph?

24             MR. CALLAGHAN:  What paragraph is that?

25             It is the second amended complaint, Your Honor.

1         THE COURT:  Yes.

2         MR. CALLAGHAN:  Paragraph 221.  I'm sorry, I beg

3    your pardon, Your Honor.  It was the defendants'.

4         MR. JOFFE:  It was the defendants'.

5         MR. CALLAGHAN:  I misspoke.  I apologize.

6         THE COURT:  What is it?  All right.

7         MR. CALLAGHAN:  It was that they allege that the

8    defendants saw the matter as closed.  And there's nothing --

9    there's no date alleged after that, other than, Your Honor,

10   we mentioned the no criminal record allegation.  And there is

11   also a reference to a date in --

12        THE COURT:  So with -- the second amended complaint

13   alleges, is that the defendants thought the matter was closed

14   as of August 2014.

15        MR. CALLAGHAN:  Right.

16        THE COURT:  That there's no conduct engaged in by

17   the defendants alleged in the second amended complaint, after

18   August of 2014; that the only conduct of anybody described in

19   the second amended complaint, after August of 2014, is that,

20   at some point in the summer of 2015, there is alleged that

21   the Chinese authorities returned the computers -- no, they

22   had already returned the computers.

23        MR. CALLAGHAN:  They had returned them in

24   September, Your Honor, of 2014.  So -- and they said to the

25   individuals:  You're okay, we're not going to prosecute you.

1    Later on, unilaterally by the Chinese authorities,

2 there was an issuance of a no criminal record letter to the

3 plaintiffs, but that had nothing to do with --

4    THE COURT:  So what you say is everything was all

5 said and done by September/October, so you pick December as a

6 reasonable end date that's more --

7    The only thing in the complaint that's after that,

8 putting aside the harm that -- the ongoing nature of the

9 harm, is a letter of exoneration or apology that's in the

10 summer of 2015.  And what -- do you have any reason to

11 believe that anything you or your clients did prompted that,

12 or are you aware of anything that your clients did between

13 September -- between when they were alleged to have regarded

14 as closed in December of 2015, other than possibly settlement

15 discussions?

16    MR. CALLAGHAN:  There were no settlement

17 discussions after September of 2014, either, Your Honor, to

18 my knowledge.

19    THE COURT:  I see.  So you're not aware of anything

20 by your clients that might have led to the prompting?

21    MR. CALLAGHAN:  Absolutely not, Your Honor.  We

22 were surprised that it happened when it was alleged.  We were

23 obviously delighted that it happened.  We didn't even know

24 that the equipment had been returned, because you'll recall

25 when we made our motions in the first instance here, that was

1    a matter nobody knew.

2            THE COURT:  So Mr. Joffe, other than the filing of

3    the complaint in December of 2015, what makes the period

4    between December 2014 and December 2015 relevant to the

5    merits?

6            MR. JOFFE:  Well, several things, Your Honor.

7    First of all, two weeks or two-and-a-half weeks after we

8    filed the complaint, the first Chinese individual plaintiffs

9    received a letter from the police in December of 2015 -- on

10   December 24th, received a letter exonerating him.  And what

11   we allege in our complaint is that there was a coverup.

12           THE COURT:  Well, but that's outside the timeline

13   that you propose.

14           MR. JOFFE:  Well, no.  We allege there was a

15   coverup in this, continuing until at least the filing of the

16   complaint.

17           THE COURT:  But what conduct in the second -- first

18   we're going to divide this.

19           In the second amended complaint, what conduct or

20   what events do you allege happened after December 2014 and

21   before the cutoff date you propose for December 2015?  One is

22   you say there was an exoneration letter after your cutoff

23   date that was proposed.

24           MR. JOFFE:  Yes.

25           THE COURT:  So that isn't really very persuasive

1   for why I should pick your cutoff date, but it's maybe

2   persuasive for why I should come up with a cutoff date later

3   than the date you came up.  But it's not a very good argument

4   for your cutoff date, because your cutoff date wouldn't reach

5   that, but -- because it happened afterwards.

6               Is what you're telling me.

7               MR. JOFFE:  Well, until, at least, August or

8   September of 2014.

9               THE COURT:  Forget that, because their cutoff

10  date -- what I'm deciding between is December 2014, what they

11  propose, is -- so anything that happened in August of 2014

12  would be the topic of discovery.

13              MR. JOFFE:  Yes.

14              THE COURT:  So what is there between December of

15  2014 that happened that suggests that I should pick

16  December 2015 as the cutoff date, besides the filing of the

17  complaint.  I get that.  That's one fact.

18              MR. JOFFE:  Yes.  The filing of the complaint would

19  then -- prompted the Chinese police letter.  Our substance of

20  the complaint is that defendants withheld exonerating

21  information from plaintiffs throughout the period, and

22  despite repeated requests by plaintiffs for --

23              THE COURT:  What allegations in the second amended

24  complaint, in short and plain statement of your complaint,

25  what allegations describe conduct after December 2014?

```
1              MR. JOFFE:  After December of 2014?

2              THE COURT:  Correct.

3              MR. JOFFE:  They've continued to withhold that

4    information, Your Honor.

5              THE COURT:  Where does it say that?

6              MR. JOFFE:  The whole complaint alleges that

7    they --

8              THE COURT:  Mr. Joffe -- okay --

9              MR. JOFFE:  The fact that we asked -- the last

10   response was in August or September 2014, telling them, "Give

11   us that information," and they refused.  And they didn't

12   provide that information until the filing of the complaint,

13   which means, in their possession, there could be relevant

14   documents.

15             THE COURT:  Who?

16             MR. JOFFE:  HP.  Why they're not reviewing that

17   information.

18             THE COURT:  What information?

19             MR. JOFFE:  Your Honor, through 2013 and 2014, our

20   complaint cites a number of letters of respondents written to

21   the defendants with one request, "Please produce the

22   information that is needed to exonerate our individual

23   Chinese plaintiffs," and they didn't.  They didn't do it in

24   August '14, they didn't do it in September '14, and they

25   continued not to do it until --
```

1         THE COURT:  So are you contending that after

2    December of 2014, your client wrote another letter to --

3         MR. JOFFE:  No, they didn't write another letter to

4    them.

5         THE COURT:  And are you contending that they took

6    affirmative action after December of 2014?

7         MR. JOFFE:  I just -- based on the fact that they

8    did not release that information, I assume that -- what's

9    action they did before, up to August '14, where they withheld

10   it.  They continued --

11        THE COURT:  Why do we need to take discovery about

12   that one year?  In other words, you wrote to them earlier,

13   as -- you allege that you wrote to them earlier.  They

14   responded or didn't respond.  They're not -- are you planning

15   to come back --

16        MR. JOFFE:  They responded, Your Honor.

17        THE COURT:  Are you planning to come back,

18   Mr. Callaghan, and say that after December of 2014, but prior

19   to the filing of the complaint on December 9th, HP did

20   anything with respect to this?

21        MR. CALLAGHAN:  That is not our intention, Your

22   Honor.

23        THE COURT:  So you're not going to be coming and

24   saying:  Well we actually wrote to the Chinese authorities at

25   some point during that one year.

```
 1              MR. CALLAGHAN:  That would be --

 2              THE COURT:  In other words, it wouldn't be fair to

 3     then --

 4              MR. JOFFE:  But we don't know that, Your Honor.

 5              THE COURT:  Well, you've alleged that.  You alleged

 6     that they didn't do anything.

 7              MR. JOFFE:  No, they didn't do it with respect to

 8     us.  They didn't respond to our request.  I don't know what

 9     they did with the police.

10              THE COURT:  You have a good faith basis to believe

11     that they did anything with the police between December 2014

12     and December 2015?

13              MR. JOFFE:  I have good faith to believe that they

14     may not have done something, and there will be internal

15     documents, or could be, discussing why they would not do it.

16              THE COURT:  Do you have a good faith basis to

17     believe that they had a discussion between December 2014 and

18     December 2015 about this?

19              MR. JOFFE:  Well, Your Honor, my clients were

20     still, at that time, in legal jeopardy in China and

21     nothing --

22              THE COURT:  Well, that has nothing to do with your

23     good faith belief.  The question is --

24              MR. JOFFE:  I've asked -- well, plaintiffs asked

25     defendants to produce the information for them that will help
```

 1     them with the police authorities.  They've asked for many --

 2              THE COURT:  You're missing the point, Mr. Joffe.

 3     This is a very simple question, okay, with a very simple set

 4     of answers, one way or the other --

 5              Are you having trouble, Mr. McGuire?

 6              MR. MCGUIRE:  No.

 7              THE COURT:  Maybe you can talk to each other.

 8              But my question is this, it's either a very simple

 9     question, where I'm missing something -- and if I'm missing

10     something, then my apologies; and then one of you needs to

11     explain it to me.

12              The question is simply:  They've made an argument

13     why discovery should end on December '14.  They say it should

14     end on December 2014, because your complaint alleges nothing

15     they did after that time period.  Everything you allege that

16     they did or didn't do happened before.  There's the

17     allegation that they never did anything after that.

18              And they said:  We're not going to be coming in, in

19     this trial or in discovery in this case, with evidence that

20     we did something on -- with relating to any of the claims

21     between December 2014 and December 2015.  Like whatever we

22     did or didn't -- whatever we did, we did before, and you're

23     not going to hear from us that we did something after that.

24              Okay.  So I'm asking what facts you want

25     December 2015.  I'm just trying to decide whether discovery

1    should end in 2014 or 2015.

2              So the question would be what happened in that time

3    period that might make discovery useful?  So one thing would

4    be that they are going to save something that you would

5    fairly be entitled to take discovery on.  They said they're

6    not.  So they're stuck with that now.  They -- might be that

7    you have alleged that they did something that you want to

8    take discovery on.  You haven't -- they say you haven't

9    alleged anything during that time period; I am not hearing

10   you tell me anything in the complaint that you allege that

11   they did do.  One thing might be is that they -- that you

12   have a good faith basis to believe that they were talking

13   about this during the time period, and even though they

14   didn't do anything, there would be internal discussions about

15   it.

16             I didn't hear Mr. Joffe say he has a good faith

17   belief in that.  It would be a difficult thing, in light of

18   paragraph 221, to believe that you had a good faith belief in

19   it, because paragraph 221 alleges that -- your good faith

20   belief that they regarded it as closed as of August of 2014.

21   It doesn't mean it was closed, but the way I interpret that

22   is you think they were all done with it then.  Maybe they

23   shouldn't have been all done with it.

24             MR. JOFFE:  Your Honor, in paragraph 220, right

25   before, I quote their statement, their letter that they

1    consider this matter closed.  That's paragraph 221, just say:

2    So the defendants regarded this matter closed.  But that's

3    all it does.  It's not -- it doesn't carry the same weight

4    that Mr. Callaghan misquoted it.

5              THE COURT:  Fair enough.  So the question is:  Do

6    you have a good faith belief that they were discussing it

7    then?  Is that the reason?  In other words, what is the

8    reason that you want to take discovery during that year?

9              MR. JOFFE:  That's the only reason that I want to

10   take discovery, because that -- you know, there is nothing in

11   the complaint alleged that they --

12             THE COURT:  You concede that.

13             MR. JOFFE:  I concede that, that there's no

14   affirmative act since --

15             THE COURT:  So the reason to take discovery during

16   that time period is to see whether they were discussing --

17   continuing to discuss the matter.  Because if they were, that

18   might be relevant to the claims.

19             MR. JOFFE:  Correct, Your Honor.  And the thrust of

20   the complaint is that HP was withholding, for all these

21   years, until December 24, 2015, when the first individual

22   Chinese plaintiffs received the Chinese police letter of no

23   criminal record.  Until that very time, which coincided with

24   the filing of the state action, HP was withholding relevant

25   exonerating information.  Until August of 2014, they were

1    withholding it with affirmative --

2          THE COURT:  This is just a deadline for electronic

3    discovery, right?

4          MR. JOFFE:  Yes, that's all we're discussing.

5          THE COURT:  December 2014.  I think that the

6    longer -- given what I've heard and the back and forth, I

7    think that the further time period would be just

8    disproportionate and unnecessary and not worth whatever might

9    be discovered.  So December 2014 for electronic discovery,

10    excepting with respect to the individual plaintiffs' claims

11    of physical, mental, and emotional health, which runs to the

12    present.

13          Okay.  I think that takes care of (c).  What I --

14    the next disagreement I saw was on ECF page 19, which is --

15    comes after the custodians.  Plaintiffs' position and

16    defendants' position, it seems to be a dispute about Schultz,

17    Whitman, and McCarthy.  I'll hear you first just about

18    McCarthy.

19          MR. CALLAGHAN:  Thank you, Your Honor.

20          Your Honor, Mr. McCarthy's only alleged involvement

21    here in the second amended complaint was in his capacity as

22    an outside attorney when he was with Gibbons.  He was

23    communicating back and forth with Mr. Riordan and the --

24          THE COURT:  Who is Riordan again?

25          MR. CALLAGHAN:  Mr. Riordan was the predecessor

1   counsel to Mr. Joffe.  He was the one who filed the initial

2   complaint in December of 2015, but he was active on behalf of

3   ICT during this entire process.

4              THE COURT:  Yes.

5              MR. CALLAGHAN:  He was dealing with David Gill at

6   HPFS India, and ultimately he -- Mr. Riordon reached out to

7   Stiller, who we can address in a moment.  And the allegation

8   is that after Stiller, the general counsel of HP, became

9   aware of all of this, McCarthy was hired.  So McCarthy's --

10  allegations against McCarthy's here were in his

11  communications with Riordan.  You already found that the

12  absolute litigation privilege in Massachusetts protects

13  against a claim issuing against McCarthy for those

14  communications.

15             There's another period of time that would be

16  relevant to McCarthy, Your Honor, and it needs -- it merits

17  some clarification.  McCarthy was the general counsel of

18  Hewlett-Packard Financial Services up until he decided to

19  retire in June of 2012.  That retirement was announced in

20  July of 2012.  He transitioned his responsibility through

21  August/September of 2012.  His role as general counsel

22  effectively was taken over by another attorney at that stage.

23  He remained with the company until the end of February of

24  2013.  He was on gardening leave after Christmas of 2012, and

25  he joined Gibbons and --

1          THE COURT:  Remind me when the three individual

2     plaintiffs were arrested.

3          MR. CALLAGHAN:  They were arrested in December of

4     2012, after McCarthy's role had effectively ended.  And HPFS

5     India was first apprised of that arrest at the end of January

6     of 2013.

7          THE COURT:  All right.

8          MR. CALLAGHAN:  And McCarthy is on gardening leave,

9     he tells us, during that period.  That's our good faith

10    understanding, Your Honor.

11         THE COURT:  All right.  And then after that, later,

12    he goes to --

13         MR. CALLAGHAN:  He goes to Gibbons when he retires.

14    He comes to Gibbons as counsel on -- in March.  And he's at

15    Gibbons for a period of time before he gets involved in any

16    of this in the summer, I think, of July/August of 2013.

17    That's when he starts corresponding with Riordan.

18         THE COURT:  And so is your -- is the question to

19    him being a custodian, custodian with respect to Gibson, or

20    as custodian with respect to what he had when he was in his

21    general counsel role?

22         MR. CALLAGHAN:  It's not clear what the plaintiffs

23    are looking for, Your Honor.  But we believe you've already

24    ruled that anything he did with Gibbons would be protected by

25    the absolute litigation purpose --

1        THE COURT:  So are you objecting to -- when you say

2   "custodian," the stuff he had at Gibson, or the stuff he had

3   at HPFS?

4        MR. CALLAGHAN:  HPFS, Your Honor.  Because he

5   didn't have anything is what he tells us.

6        THE COURT:  I'm sorry?

7        MR. CALLAGHAN:  He was unaware of this entire

8   sequence of events during his --

9        THE COURT:  So you're saying, as to the time he's

10  at HPFS, it's just a waste, because he doesn't have anything.

11       MR. CALLAGHAN:  That's our position, Your Honor.

12       THE COURT:  And so it would just be a --

13  burdensome.  And as to Gibson, your view is he shouldn't be a

14  custodian, period.

15       MR. CALLAGHAN:  Absolutely, Your Honor.

16       THE COURT:  I see.

17       What's your position as to him?

18       MR. JOFFE:  Yes, Your Honor.  Mr. McCarthy, as

19  Mr. Callaghan just explained, was a general counsel for

20  defendant HPFS, which is our main defendant, until at least

21  end of February of 2013, at the time -- that time period

22  covers both the 2011 regional sale of the equipment to ICT

23  and the period of arrest.

24       The complaint alleges that Mr. McCarthy was general

25  counsel while Mr. David Gill was engaged in communications

1    with respect to the arrests.  The complaint alleges that

2    Mr. McCarthy was actually -- that David Gill was reporting

3    everything about the incident to Mr. McCarthy, who was his

4    direct boss.  We're not looking for Gibbons files or

5    correspondence.  We're strictly asking him, as a custodian of

6    HPFS, to be --

7              THE COURT:  So you're not seeking anything with

8    respect to him, with respect to his time at the outside law

9    firm?

10             MR. JOFFE:  No.  We're looking for him as a

11   custodian of HPFS, while he was general counsel of HPFS

12   during the relevant period of the events, and his involvement

13   is well alleged in the complaint.  They should have -- HPFS

14   should have had his electronic data after he left in 2013.

15   They should probably have some kind of backup or optical

16   storage devices, or whatever they do with a former senior

17   executive employees when they leave the company.

18             The same applies with Meg Whitman, who left HP --

19             THE COURT:  You really think she's the same as

20   McCarthy?

21             MR. JOFFE:  She is also --

22             THE COURT:  But answer my question.

23             MR. JOFFE:  Yes, McCarthy was a general counsel

24   of --

25             THE COURT:  No.  Is she the same -- you just said

```
 1   she's just like that.  Is she the same as McCarthy?

 2            MR. JOFFE:  She is --

 3            THE COURT:  That's a yes or no question, or you

 4   can't answer it with a yes or no.

 5            MR. JOFFE:  She is the same in terms of she's a

 6   former employee of HPFS -- or HP, I'm sorry, one of the

 7   defendants, and she should have her electronic data

 8   available.

 9            THE COURT:  Are there any former employees who

10   shouldn't have their electronic data available?

11            MR. JOFFE:  No.  The issue is that they raised the

12   objection that McCarthy and Schultz and Whitman are senior

13   employees, senior executives of the company.

14            THE COURT:  Well, that's actually not the objection

15   he raised with respect -- did you read what he said here?

16   The words actually matter, Mr. Joffe.

17            MR. JOFFE:  Yes, Your Honor, I did.

18            THE COURT:  "McCarthy had no involvement with the

19   facts underlying this case, while employed by HP and" --

20            MR. JOFFE:  But that's not what we allege.  We

21   allege that he did have --

22            THE COURT:  But that is his argument.  So his

23   argument is -- and I'm not saying it's right, but his

24   argument is not -- it's not right, it's not truthful to say

25   that his argument is that he's a senior employee and,
```

1    therefore, shouldn't have his electronic discovery.  That's

2    his argument as to other people, but as to this witness, his

3    argument is that the person has no involvement.  So to say

4    his argument is that they're too senior, and, therefore,

5    shouldn't be disclosed, is just not true.

6            MR. JOFFE:  No, I move on to Schultz and Whitman,

7    but on McCarthy, he was general counsel of HPFS until March

8    of 2013.

9            THE COURT:  Right.  But did you hear what he said?

10           MR. JOFFE:  Well, I hear what he just said, for the

11   first time, and that's an easy answer that nobody has any

12   relevant information.  We believe he does.  We believe we've

13   alleged sufficiently and reasonably and that reasonable

14   inference from our allegation is that Mr. McCarthy, while at

15   HPFS, would have relevant, responsive --

16           THE COURT:  So Mr. Callaghan, I think he's waive

17   this.  With respect to Mr. McCarthy at the law firm, he's

18   waived that.  He's not --

19           MR. JOFFE:  I'm not seeking that.

20           THE COURT:  You're fine on that.

21           MR. CALLAGHAN:  Yes.

22           THE COURT:  So you don't have to produce that as

23   custodian or search that.

24           With respect to him at HPFS, what I understand him

25   to be saying, somewhat inartfully, is that he wants to test.

1    It's fair enough that you say this.  He's now abandoned that

2    you're making the senior argument, because you didn't make

3    that argument.  But he's now, with respect to the argument

4    you are making -- your essential argument, as I understand

5    it, is that he didn't have any involvement, because he

6    essentially retired; and though he's on the payroll and had

7    the title, he didn't have anything to do with it, so it's a

8    waste of time and money.

9         So he's saying, re-reciting what we already know,

10   which is in the complaint.  But really what I think he's

11   saying is that he wants to test that.  And he's entitled, I

12   think, to test that.  So it may be that he doesn't have

13   anything, and then so be it.

14        And so I think it's much like the issue that we

15   talked about in the beginning.  You can -- if you have more

16   information you think that you'll show him and you think that

17   he'll engage with, and if you think you can persuade him, and

18   if you agree that it might lead you to decide, you know what,

19   as to him, there's less time period, or what have you.  But

20   if not, I think, during HPFS he was the general counsel, he

21   had the title, and the period that he negotiated -- it sounds

22   like he negotiated, or had a role in negotiating the

23   contract?  No, he didn't.

24        MR. CALLAGHAN:  Your Honor, since we had prepared

25   this, obviously in anticipation of further conversations, I

1    actually communicated with him.  He's no longer with Gibbons,

2    but I communicated with him, and that's where I got the

3    detail about June/July transition, and so on.  So we're happy

4    to --

5            THE COURT:  So my suggestion is a practical one

6    about this, that you talk to each other about it.  If you

7    have a little more information about it, you give it to them.

8    I think in the ordinary universe, it's the kind of thing

9    which the plaintiff is entitled.

10           If you believe it's a waste of time, because you

11   didn't have anything to do with it, explain the basis for

12   that belief to Mr. Joffe.  If you persuade Mr. Joffe then --

13   obviously, and you reach an agreement, then you don't have to

14   do it.  If you don't persuade Mr. Joffe, because Mr. Joffe

15   says, "I want to test that, or be given the role, or given

16   that he got copied on certain e-mails, I think that he would

17   have useful information, either by way of deposition or

18   documents that I want to take," then I think he's entitled to

19   do it.

20           You could -- I'm not inviting this motion, but

21   you're always free to make a motion and say:  Judge, we

22   shouldn't have to do this person.  But then I would need a

23   pretty strong factual basis set forth in an affidavit as to

24   why it would be a waste.  And what I would suggest is, if you

25   make that motion, you should provide that information, in

1    fairness to Mr. Joffe, first, to see if you agree.  And if

2    you don't, then fine.  Otherwise, I think, short of that,

3    short of an agreement, or a real basis that's clear to

4    establish that, that it's really a waste and unnecessary, set

5    forth in a motion, to which they get the chance to respond

6    to, that I would then look at both filings.  Other than that,

7    you would have to do it.

8                MR. CALLAGHAN:  Your Honor, thank you very much.

9    And we're satisfied with the clarification this his time at

10   Gibbons is not the subject of the search.  But for fear of

11   inviting the wrath of the Court, in light of your earlier

12   admonition -- and this is not a reciprocity issue, I see in

13   looking at our list of custodians on their part, that we

14   omitted to include their effective general counsel, ICT's

15   effective general counsel, Lester Riordan, who was

16   negotiating on behalf of ICT during this entire period.  We

17   would ask that we have a chance to amend to include

18   Mr. Riordan as a custodian on their part.

19               THE COURT:  So you can talk about that.  I give you

20   leave to talk to each other about that.  It's not too late.

21   I don't view it as waived because it's too late.  I'm not

22   saying he's an appropriate custodian or not, but you can ask

23   for that and talk to each other about that, and either you

24   reach an agreement or you don't.

25               And with respect to Schultz and Whitman, what is

1    the basis with respect to -- Whitman, I understand, she was

2    the CEO for a time.  Schultz was what?  Was he the overall?

3            MR. CALLAGHAN:  He was the overall general counsel

4    at HP, Your Honor.  And the only involvement that he had in

5    this case, to our knowledge, is that Lester Riordan, on

6    behalf of ICT, effective in-house counsel of ICT, or in-house

7    counsel, wrote him a letter saying:  We're trying to resolve

8    this issue, we're not getting any traction.  Can you help us?

9            Schultz picked up a phone, called Riordan, left him

10    a message saying somebody will get back to you.  Thereafter,

11    somebody got back to Riordan, and the matter progressed.  And

12    the person that got back to Riordan, I believe in the

13    allegations, is a guy called Stuart Patterson.  Stuart

14    Patterson is a target, he's a custodian.  Whatever he's going

15    to disclose or whatever we get from him will tell us if

16    Riordan had any further involvement.

17            But Riordan was general counsel --

18            THE COURT:  Schultz.

19            MR. CALLAGHAN:  Schultz.  I beg your pardon.

20    Schultz.  Schultz was the general counsel of the corporate

21    parent and --

22            THE COURT:  And Whitman's role was she received --

23    she was sent a letter.

24            MR. CALLAGHAN:  She was sent a letter, we don't

25    even know if she received it, Your Honor.

1          THE COURT:  All right.  So why should Schultz

2     and/or -- why are one or both of them subject to electronic

3     discovery, Mr. Joffe?

4          MR. JOFFE:  Yes, Your Honor.  Well, Schultz did

5     receive a letter, Schultz did get involved in the case.

6     Schultz assigned one of his -- Stuart Patterson, one of the

7     attorneys, and Schultz communicated, and then Stuart

8     Patterson got involved.  He was aware and he was involved in

9     the matter.

10          We also, Mr. Styller wrote a letter to Ms. Whitman

11     at the same time, and Ms. Whitman does not deny receiving

12     that letter.  She says she was a busy CEO, but she doesn't

13     deny receiving it.  But what we have now in the case is that

14     there is David Gill, who was the assistant general counsel --

15          THE COURT:  I don't think she has to deny it in the

16     letter, because she's not a party to the lawsuit.

17          MR. JOFFE:  She's not, because --

18          THE COURT:  Did she file an affidavit?

19          MR. JOFFE:  She didn't file an affidavit.

20          THE COURT:  So where did she not deny receiving the

21     letter?

22          MR. JOFFE:  In the -- in one of the papers that

23     they filed.

24          THE COURT:  What paper?

25          MR. JOFFE:  It was a motion to dismiss, I believe.

1          THE COURT:  She filed an affidavit into the -- one

2     of the motions to dismiss?

3          MR. JOFFE:  No, she didn't.  But it was presented

4     in paper, signed by counsel.

5          MR. CALLAGHAN:  Your Honor, you recall that in a

6     motion to dismiss, we assume all alleged facts to be true,

7     and we go forward in that capacity.  To the extent such a --

8     an inference can be drawn from anything we wrote in our

9     papers on a motion to dismiss, that is not a statement, Your

10    Honor --

11         MR. JOFFE:  There is no denial that she received

12    the letter.

13         THE COURT:  When would they deny it, Mr. Joffe?

14         MR. JOFFE:  They didn't deny receiving the letter.

15         THE COURT:  Have you denied beating your wife?  I

16    mean, it's not the same.  If you have a wife, you don't have

17    to deny beating your wife.  Why is she -- what is the

18    significance?  When would she have denied it?  When would be

19    the time for her to deny it?  Explain that to me, Mr. Joffe.

20         MR. JOFFE:  Defendants did not deny the fact.

21         THE COURT:  No, no, Ms. Whitman.  You said

22    Ms. Whitman didn't deny it, right?  Did you say that five

23    minutes ago in court?  Yes or no?  You said that?  Did you

24    say Ms. Whitman did not deny it?

25         MR. JOFFE:  I meant they, the defendants, Your

1    Honor.  She was not the -- she was proposed defendant in

2    the --

3              THE COURT:  No, she was a defendant.  You sued her.

4              MR. JOFFE:  No -- well --

5              THE COURT:  You proposed suing her.

6              MR. JOFFE:  We proposed, but she was never formally

7    a defendant, Your Honor.

8              THE COURT:  So what difference does it make that

9    she didn't deny it?  When would she have had the opportunity

10   to deny?  When would be a time that her failure to deny it

11   would be meaningful and relevant?  Can you identify one as a

12   lawyer?

13             MR. JOFFE:  I can identify, and I will be happy to

14   provide reference in the papers filed on behalf of HPFS.

15             THE COURT:  Where they didn't deny it?

16             MR. JOFFE:  Where they didn't deny that

17   Ms. Whitman --

18             THE COURT:  And would you agree that the law says

19   that all of the facts that you alleged in the proposed

20   amended complaint, they have to accept as true and the

21   reasonable inferences drawn therefrom?

22             MR. JOFFE:  Yes, Your Honor.

23             THE COURT:  And so would you agree that if they had

24   denied it on her behalf, that that denial would not have been

25   something that would have been relevant to my decision?

```
1            MR. JOFFE:  Yes, Your Honor.

2            THE COURT:  So why would it matter that she didn't

3    deny it?

4            MR. JOFFE:  Well, it matters because our

5    allegations state that she was aware of this situation at the

6    time, in June 2012, when the people were still in jail, that

7    she was aware of it.

8            THE COURT:  So that's your allegation, but you

9    didn't say that.  You said she didn't deny it.  So why does

10   that matter?

11           MR. JOFFE:  Because it makes her a relevant

12   custodian for the discovery, Your Honor.

13           THE COURT:  Can you explain to me, Mr. McGuire, why

14   it would matter?

15           MR. MCGUIRE:  Your Honor, what I heard was, at the

16   beginning of this discussion, I heard Mr. Callaghan say, with

17   regard to the allegation, that a letter had been sent to

18   Ms. Whitman, that we don't know whether she ever received it.

19           THE COURT:  Correct.

20           MR. MCGUIRE:  I think that was the statement that

21   Mr. Joffe was --

22           THE COURT:  Do we know whether she received it?

23           MR. MCGUIRE:  I don't know that we do, other than,

24   Your Honor, in the fact that in the ordinary course of letter

25   sent to the CEO of the company through the US Mail,
```

1   presumably reaches the CEO of the company.

2            THE COURT:  Well, presumably reaches the office.

3            MR. MCGUIRE:  Presumably reaches the office, and I

4   don't know of any reason to believe --

5            THE COURT:  But we don't have it as established

6   fact, for example, whether the address was correct or not.

7            MR. MCGUIRE:  That's correct, Your Honor.  For

8   purposes of determining whether her ESI file, now dormant,

9   should be searched in connection with the ESI discovery in

10  this case, to determine whether she, upon receiving the

11  letter, if she did, had a reaction to it that included, in

12  communications -- nonprivileged communications within the

13  company about this matter, that might shed light on the

14  company's position at the time, I think it is fair to say

15  that she should be a custodian, and it's nonburdensome to

16  include her in that capacity.

17           THE COURT:  So the theory is that she should be a

18  custodian because somebody sent her a letter which was never

19  responded to, as far as we know.  As far as we know, for

20  purposes of deciding this.

21           MR. MCGUIRE:  Yes.

22           THE COURT:  I have before me an allegation that she

23  was sent a letter.

24           MR. MCGUIRE:  Correct.

25           THE COURT:  And I have a --

```
 1              MR. MCGUIRE:  The acknowledgment.

 2              THE COURT:  And a lengthy amended -- or a detailed

 3    amended complaint.  Would you agree with me on that?

 4              MR. MCGUIRE:  Yes.

 5              THE COURT:  All right.  That lays out a lot of --

 6    this is not a sparse amended complaint.  Would you agree with

 7    me on that?

 8              MR. MCGUIRE:  Agreed.

 9              THE COURT:  And lays out a lot of the detail, and

10    it does not allege anywhere anything that she ever did.

11              MR. MCGUIRE:  Correct.

12              THE COURT:  And there's no information it was so

13    far from what little discovery might have already happened,

14    that fills that out to suggest anything else to augment her

15    role in this case.

16              MR. MCGUIRE:  Other than the sending of the letter,

17    correct.

18              THE COURT:  But that's not augmented, you knew that

19    already.

20              MR. MCGUIRE:  Agreed.

21              THE COURT:  So why would I -- why should we

22    search -- and will you agree with me that, given her position

23    that you've alleged in the complaint, which seems to be one

24    that she had, that she's likely to have a lot of electronic

25    discovery?
```

1          MR. MCGUIRE:  That she's likely to have a

2   substantial amount of ESI.  I agree with that.  And I think

3   if the parties need to negotiate a narrower time frame and

4   have a more targeted search of her particular ESI, in order

5   to determine whether she received a letter and responded to

6   it with communications that might be relevant to this

7   dispute, I think that that's something that the parties could

8   achieve.  I also think --

9          THE COURT:  You have a greater faith than I that

10  it's achievable.

11         MR. MCGUIRE:  Well, hope springs eternal.

12         THE COURT:  In other words, there's been -- like a

13  lot of time has elapsed, and like that's a pretty obvious

14  discussion, right, Mr. McGuire?

15         MR. MCGUIRE:  Agreed.

16         THE COURT:  In other words, she's the CEO of a

17  Fortune 500 company, and you've got the thinnest possible

18  thread that she has any conceivable connection to this case.

19  You have no evidence whatsoever that she ever did anything.

20  The most you have is an inference that the letter was sent,

21  was not only received by her office -- a fair inference --

22  but you have possible inference that she read the letter.

23  But we don't even know that, because it's a reasonable

24  inference, given her role, that she might receive a lot of

25  mail, right?

1          MR. MCGUIRE:  (Indicating.)

2          THE COURT:  You have to say yes or no for the court

3    reporter.

4          MR. MCGUIRE:  I'm sorry.  Yes, Your Honor, I agree.

5          THE COURT:  So that's all you have.  So the reason

6    I jump on you for achievable, is what I would have expected

7    achievable, when they responded in this filing I got two-plus

8    weeks ago, where it said she's a senior person and we think

9    it's a waste, you -- did anybody on your side go back and

10   say:  Look, we recognize that all we have is this one letter

11   that we sent her.  And we have no evidence, whatsoever, in

12   our 94 page, 356 paragraph complaint that she ever read it or

13   did anything.  We don't allege that.  And so we would be

14   prepared, and we recognize the world, that she might have a

15   lot more, we would be prepared to discuss like maybe we could

16   do something really targeted to see whether it's worth

17   something.

18         That discussion hasn't happened.

19         MR. MCGUIRE:  To this point, Your Honor, part of --

20   and again, I think Mr. Joffe alluded to this earlier.  The

21   conversations relating to discovery scope -- and I would put

22   this in the category of the things addressed in the

23   deficiency letters is scheduled for 48 hours from today.  I'm

24   optimistic that those conversations will be substantially

25   more fruitful than the filings that has taken place to this

1    point.

2              THE COURT:  That's good.  It would be difficult to

3    imagine them being less fruitful than the silence.

4              MR. MCGUIRE:  That's why I'm optimistic.

5              THE COURT:  All right.  My view would be this:  As

6    a general matter, searching Schultz and Whitman's -- all --

7    the entirety of their electronic discovery, which is what I

8    understand the plaintiffs' position to have been, until

9    Mr. McGuire stood up, to be wholly unreasonable on the

10   present record and wholly unsupported.  That said, the notion

11   that they might have something, along with what Mr. McGuire

12   has practically suggested, like some targeted look, I leave

13   to all of you to figure out.

14             And you can see she got a letter.  Well, I assume

15   she got the letter.  And what more than that, what scope of

16   look-see into that, the -- searching every iPhone, every

17   e-mail, every electronic document on her computer, every

18   electronic document she had, with respect to every public

19   filing, every disclosure, that's not only burdensome and

20   frivolous, it's harassing.

21             MR. JOFFE:  We're not asking for it, Your Honor.

22             THE COURT:  No, you are.  That's not true.  You

23   asked for everything.  You asked to look at all of her

24   electronic discovery subject as to the terms that you

25   proposed.  So that's the scope of everything.  You haven't

1    asked for the narrowing that Mr. McGuire articulated.  You

2    might be planning to ask for it, that's fine, but you haven't

3    articulated that to me in this court proceeding, and you

4    haven't referred to having done it before.

5         Okay.  So as to a more reasonable discussion, scope

6    of what she is, and in light of the fact that if you then

7    later learn in discovery that somebody was e-mailing her all

8    the time and she was coming to meetings and participating in

9    a coverup, and popping champagne corks when your clients were

10   in custody, you can obviously get more discovery, in light of

11   what you earned.  But you earned what you have in your

12   complaint, and you can take it as far as that reasonably

13   takes you.  So you talk about that, and see what you work out

14   in the conference that you have in 48 hours.

15        That is -- no, I have one more.  Two more.

16        Oh, there's an issue on page 24.  Plaintiffs object

17   to defendants' request to -- for plaintiffs Cheng and Styller

18   to produce all social media posts and entire call logs as

19   disproportionate, and the like, and -- but apparently then

20   there's recited what Mr. Cheng has said in response to an

21   interrogatory, and Styller.

22        So my suggestion on that is that you should talk to

23   each other about that.  Given the nature of the age of these

24   plaintiffs, the likelihood that they memorialize many things

25   in social media and that the nature of the claims and the

1    specific information that's advanced here, it seems like it

2    would be some disclosure of that would be reasonable.  So a

3    categorical line that they can't look at anything in social

4    media seems unreasonable.

5            Whether the defendants get everything, in every

6    Facebook, every Instagram, every whatever, I'm not saying

7    that.  But the notion that they get nothing, when he says

8    that he has difficulty enjoying life, no interest in

9    celebrating holidays, no interest in visiting relatives or

10   friend, among other things, would seem to be reasonable to

11   see whether, on social media, he exhibits that or not.

12           He's one of the people in his 20s, right?

13           MR. CALLAGHAN:  Yes, Your Honor.

14           MR. JOFFE:  Early 30s, I think.

15           THE COURT:  Early 30s.  And having a hard time

16   working and communicating with others brings to rise

17   potential discovery regarding communication.  It has to be

18   reasonable.  You're not entitled to look at everything, just

19   because they put these things in issue, but I think some

20   discovery on that.  I'll let you all, in the first instance,

21   work that out.

22           On the last page.

23           MR. CALLAGHAN:  Your Honor, to the extent I can

24   interrupt --

25           THE COURT:  Yes.

1          MR. CALLAGHAN:  -- on the Binghui individual, for

2     the moment, we would rather like to postpone that issue until

3     we get more clarification.

4          THE COURT:  Fine.  Okay.  Do either of you have

5     anything else you want to raise?

6          MR. CALLAGHAN:  Yes, Your Honor.  I think something

7     that's relevant, as well.  We talked earlier about the impact

8     of a potential spoliation motion and what that would do to

9     the remainder of the case or not and that would narrow it

10    down.  When we were last here, we were talking about the

11    equipment that had been returned in China.

12          THE COURT:  Yeah.  You got that equipment, right?

13          MR. CALLAGHAN:  We got it.

14          THE COURT:  Quickly, right?

15          MR. CALLAGHAN:  It came very quickly.

16          THE COURT:  Did anyone get arrested at the border

17    in China?

18          MR. CALLAGHAN:  Not to our knowledge, Your Honor.

19          THE COURT:  Did anybody get arrested at the border

20    of the United States?

21          MR. CALLAGHAN:  Not to our knowledge.  But Your

22    Honor had issued an order, which I think probably absolved

23    them.

24          MR. JOFFE:  Thank you, Your Honor.

25          THE COURT:  You're welcome.

1          You don't have any information to suggest anyone

2     got arrested in China or here when that was transferred.

3          MR. JOFFE:  Nobody got arrested.

4          THE COURT:  Good.

5          MR. CALLAGHAN:  They hadn't denied it until now,

6     Your Honor.

7          MR. JOFFE:  They had denied it before.

8          MR. CALLAGHAN:  The reason that I bring it up, Your

9     Honor, is we did have an opportunity to have some folks, on

10    behalf of us as counsel, take a look at the returned

11    equipment, which was the seized equipment, the subject

12    equipment, and there were two categories of transceiver

13    there.  There were XFPs.

14         THE COURT:  What exactly are these transceivers?

15         MR. CALLAGHAN:  They are little thumb drives, Your

16    Honor, with a latent memory associated with them.  And what

17    they do is they are sort of like a catalyst that facilitates

18    the operation of computer equipment.

19         THE COURT:  Would they be inside an individual

20    laptop or a computer, personal computer, or would they be

21    more like a network device like on a board as part of a

22    server?

23         MR. CALLAGHAN:  I'm not -- I'm a little bit of a

24    luddite, Your Honor, so getting down to that level of --

25         THE COURT:  What about *Dirty Harry*?

1          MR. CALLAGHAN:  I have a solution that doesn't
2     require discussion.
3          THE COURT:  Yes.
4          MR. CALLAGHAN:  Our understanding is that they're
5     something like thumb drives in terms of size and shape, and
6     that they allow interconnectivity between larger computer
7     systems or computer networks.  There's a latent memory.  It's
8     called an EPROM, an Electronically Enabled -- something --
9     ROM.
10          THE COURT:  Electronically Programed Random --
11     something -- Memory.
12          MR. CALLAGHAN:  Yes.  And that that then can speak
13     to H3C equipment, computer equipment.  And it allows a back
14     and forth, I believe, between the separate pieces of
15     equipment or the internal network of an H3C system itself.
16          There were two categories of transceiver.  One was
17     this XFP, which is a little bit bigger.  And there was
18     something like 685 SFPs, 95 XFPs.  I can share, under the
19     auspices of 408, because this was done on our behalf as
20     counsel.  And I bring this up again, only in the hope of
21     narrowing the case.
22          Would you agree that I can express our inspector's
23     report to us, under the auspices of 408?
24          MR. JOFFE:  Sure.  Or you can produce it.
25          MR. CALLAGHAN:  Well, I'm not as inclined to

1    produce work-product, perhaps, as you might be.  I'm not

2    intending to produce work-product.  The equipment will be

3    inspected formally, but we wanted an inspection to get our

4    arms around it.

5           And our arms tell us, Your Honor --

6           THE COURT:  The inspection that you have is not the

7    person who's going to testify.

8           MR. CALLAGHAN:  No.

9           THE COURT:  Not the inspection that's going to be

10    used for trial.

11           MR. CALLAGHAN:  Exactly, Your Honor.

12           THE COURT:  This was like to help you figure out

13    how to manage the case.

14           MR. CALLAGHAN:  This was like me going in there and

15    looking at it, but I would have looked at something and not

16    have a clue.  So this was somebody assisting counsel.

17           The conclusion, generally, was -- and we disclosed

18    this in the interrogatories, is that about 95 percent of the

19    SFP transceivers were identifiable to what Tata returned to

20    HPFS India in India and that was ultimately sold to ICT.  Of

21    that 95 percent of the transceivers, all of them are

22    authentic, according to our guys at --

23           THE COURT:  In other words, you expect the evidence

24    to show that 95 percent of what's in that warehouse here,

25    that what purports to be what was returned -- seized and

1     returned by the Chinese authorities, 95 percent of one type

2     of receiver was what was received back by the India company,

3     and you believe it to be authentic.

4              MR. CALLAGHAN:  We can establish that it's

5     authentic.

6              THE COURT:  Five percent?

7              MR. CALLAGHAN:  Five percent came from god knows

8     where, Your Honor.  It didn't come from us, which raises a

9     whole bunch of questions, which are part of our counterclaim

10    that there was intermingling, that there was some dalliance.

11             THE COURT:  So 5 percent, you don't -- you think is

12    not authentic.

13             MR. CALLAGHAN:  It didn't come from us, and it

14    doesn't bear out as authentic on the tests applied.

15             THE COURT:  So it wasn't what Tata returned to HP

16    India and you have reason to believe it wasn't what HP India

17    sold.

18             MR. CALLAGHAN:  We have reason to believe it's not

19    what HP India sold.

20             THE COURT:  All right.  That's as to one category.

21    And as to the other category?

22             MR. CALLAGHAN:  The other category was of a size

23    that was -- our guy didn't have the equipment to actually do

24    an electronic test of the other category so --

25             THE COURT:  We don't know yet.

1          MR. CALLAGHAN:  We don't know a hundred percent.

2     But what we're saying, Your Honor, is that that's an issue

3     that we think is crucial to at least the first seven counts

4     of the second amended complaint.  It should be crucial to the

5     interests of the individual plaintiffs.  It should be crucial

6     to the interests of ICT and all of the plaintiffs, because

7     the large part of this case is premised on the sworn

8     statement that they were sold counterfeit equipment in India

9     by our clients.  We believe, and we believe we can share in

10    good faith under a 408-type analysis, that that's an issue

11    that we could talk through and maybe narrow the case.

12          There's two theories in the case.  One is, we sold

13    counterfeit equipment, and we did so by fraud, by all sorts

14    of devices, and that the sale of that counterfeit equipment

15    resulted in all of the damages that happened.

16          There's a second theory in the case.  The second

17    theory is that H3C made an allegation that the goods were

18    counterfeit, somebody came to a realization that that

19    allegation was either incorrect or equally that there was

20    parallel on the side of HPFS India for having sold

21    counterfeit equipment.  So everybody closed ranks, circled

22    the wagons, and conspired to conceal any information

23    thereafter that might help the plaintiffs.

24          THE COURT:  The coverup.

25          MR. CALLAGHAN:  We believe that the inspection of

1   the equipment, that -- I'm not representing this, but it has

2   been said to the Court before that the plaintiffs themselves

3   never inspected the equipment.  We've inspected the

4   equipment.  We believe it could be established, and maybe

5   they should establish to their own liking, that the equipment

6   is not counterfeit.  That gets rid of the entire first half

7   of the case.  It doesn't get rid of the conspiracy theory,

8   because conspiracies can happen by mistake and the effects

9   could still be what they are.

10          We believe that a good faith discussion back and

11   forth, either under the Court's auspices or somebody --

12          THE COURT:  So how -- what do you want to do?

13          MR. CALLAGHAN:  I would like that to be the topic

14   of a conversation.  I would like the individual plaintiffs to

15   be aware of the outcome of this finding and to actually

16   reason through the steps that would follow from that

17   conclusion.

18          THE COURT:  Are you planning to have somebody look

19   at the second category?

20          MR. CALLAGHAN:  We just need to get our arms around

21   the second category.  And I'm remiss in that I don't have the

22   codes --

23          THE COURT:  Do you think that needs to happen

24   before this kind of -- so what you're proposing is

25   essentially a mediation to try to resolve the first set of

1      claims, without any expectation that a resolution of that

2      would mean, by agreement or by motion, a resolution of the

3      second.   In other words, you think maybe you could resolve

4      the first part, and that leaves the -- could be that there

5      could be a coverup, because people could have thought they

6      sold, or just that they were responsible in some way and

7      didn't want to get involved or have whatever motivations.

8      And so it would leave those claims for litigation.

9              MR. CALLAGHAN:  Well, Your Honor, all I'm saying is

10     that we're not looking to eviscerate the case.  We're not

11     saying this is an all or nothing.  We're saying let's get

12     reasonable, because there's a scope to this thing that --

13             THE COURT:  When do you want to do that, and how do

14     you want to do that?

15             MR. CALLAGHAN:  If we could do it through the

16     auspices of the Court, I believe Rule 16.4 allows the Court

17     to appoint somebody by way of a mediator, or a semiarbiter

18     role, but somebody, a referee in the room to make us at

19     least --

20             THE COURT:  So there's two -- there are a couple of

21     things.  I guess one question would be whether the plaintiffs

22     were interested, and have you raised this with them before?

23             MR. CALLAGHAN:  I haven't.  But Your Honor, I

24     haven't gone through the morass we've gone through today.  I

25     feel like it's an appropriate time to do so.

1          THE COURT:  So let me -- I'll just -- some

2     practical comments on that.  First, I mean, as a general

3     matter, I'm a big believer in people taking control of their

4     own destiny.  And so one benefit of mediation is you have

5     control of your own destiny.  And both of your clients --

6     this applies less to the individual claims, but both of your

7     clients are in business.  And they, by and large, make their

8     money by selling products or making products, and not in

9     litigation.  And so if they proceed in litigation, right,

10    they entrust their treasurer and the outcome of the case to

11    all of you to litigate it well, and then to me, in terms of

12    the rulings I make, and ultimately the jury.  And you can

13    negotiate with each other, but not so much with the jury.

14    And I'm -- but you understand all that.

15          And so -- but that is a benefit that people lose

16    sight of:  control.  You have control in the settlement

17    process in a way that you don't in the litigation process.

18          So what I hear defense counsel basically saying is,

19    look, we think that there's a mechanism to settle part of the

20    case, not suggesting that that's any basis of -- what I hear

21    him saying is he doesn't think that you're at a place to

22    settle the second half of the -- the coverup type claims

23    that -- but he thinks there might be ground to settle the

24    first half.

25          I'd have to look at 16.4, because I haven't looked

1   at that in a long time.  But the -- as a general matter, the

2   Court has a mediation program, which is available to you at

3   any point in time.  The mediation program is essentially the

4   magistrate judges of the court.  And if what you're -- so as

5   a general matter, I would not refer you to the mediation

6   program to meet with a magistrate judge, unless you both

7   wanted to go.  The reason is, I wouldn't want to waste your

8   time, your client's money, and the magistrate judge's time.

9          So one question would be, do you both want to go.

10  And you don't -- you could think about that.  And so

11  essentially --

12         I don't know if you -- you're from here, right,

13  Mr. McGuire?

14         MR. MCGUIRE:  I am, Your Honor.

15         THE COURT:  So I don't know if you've participated

16  in the mediation program here or not.

17         MR. MCGUIRE:  I have.

18         THE COURT:  You have, right.  So in any event, for

19  those of you from out of town, who probably haven't with our

20  program, you go to one of the magistrate judges.  Unless you

21  express a preference, you would be randomly assigned.  If you

22  expressed a preference and you want a particular person, I

23  would make sure that's the person you got.  If you didn't --

24  you said "anybody but," I would make sure you had anybody

25  but.  If you had no preference, then I would either leave it

1    to random, or I would think about whether I thought someone

2    was particularly well-suited and matched to doing this case

3    and then I would send it off.

4         You would then need to submit, just like in a

5    private mediation, or whatever, nondocketed, confidential

6    mediation statements.  You wouldn't see each other's

7    statements.  And I would never see them, because they're not

8    on the docket.  They would go to the magistrate judge.

9         You would meet with the magistrate judge.  You'd be

10   together for a little while, he or she would put you in

11   separate rooms, go back and forth.  It's typically most of

12   the day.  You either resolve -- your clients would have to be

13   there on your side, or a corporate client representative, and

14   for you a representative or the individual defendants.  And

15   sometimes there's -- usually if there's follow-up, because it

16   doesn't always resolve, but sometimes people need to go back

17   and think about it or check on things, and you might have

18   follow-up phone calls.  Occasionally, but rarely you'd have a

19   second session.

20        So I'm perfectly content if you want to do that.

21   I'm fine with that.  If you both want to do that, I think

22   it's reasonable, a reasonable course.  I would think that the

23   claims arising out of the sale of the goods are likely to

24   turn heavily on what are the goods and what is the evidence

25   regarding the chain of custody of the goods at different

1    points in time.  In other words, what is the evidence -- I

2    guess the chain probably starts when Tata sent it back to HP,

3    and he ordered the records of what came back.

4              What was the records of what was received by the

5    plaintiff, what's the evidence of what was received then, and

6    what are the records of what happened to it along the way.

7    And then what are the records that show what it was, you

8    know, when -- or what's the evidence when it went to the

9    Chinese authorities, and what's the evidence, if any of it

10   is, about what the Chinese authorities did with it and stored

11   it.  And what's the evidence of what came back and what

12   evidence of inspections?  You understand.

13             So that's, you know, a big factor in what's going

14   to, I would think, determine those claims, you -- what it

15   looks like now is going to be an important aspect of that.

16   And certainly, it would seem likely that if there was

17   contamination introduced along the way, the contamination

18   would be nonauthentic or different devices.  The likelihood

19   of people interjecting authentic devices into it seems not

20   theoretically impossible, but rather remote.

21             So I'm open to it.  I suppose -- I guess I would

22   want to know what, Mr. Joffe and Mr. McGuire, you thought

23   about it, or whether you want to talk to your clients about

24   it.  Or probably what I would suggest --

25             MR. JOFFE:  We do.

1    THE COURT:  Yes.  You talk to each other about it a

2    little bit of what you're thinking about it, or what

3    Mr. Callaghan is thinking about it, and then talk to your

4    clients and then see.  And I would be open to any of the

5    following:

6        I would be open to you go off to it and continue on

7    discovery, if that's what you want to do.  I would be open to

8    it, you go off, but pause this to see if it -- and then come

9    back.  And if it resolved part of it, you would still be

10   doing discovery, but maybe that would narrow what you do.

11   Maybe not.

12       It doesn't -- I don't see that -- off the top of my

13   head, I don't see why it would change any -- if you resolve

14   part of it, the other claims still stand.  But so I would be

15   open to either way.

16       So I guess what I would say, talk to each other,

17   and then what I would say is file a joint status report with

18   me.  It can be longer, if you want, but for my purposes, it's

19   enough if you either say, in one sentence, we all want to go,

20   and if you have a preference on who you want, tell me, and

21   this is what we want to do in discovery.  Or we don't all

22   want to go.

23       If you don't all want to go, I'm probably not going

24   to -- I'm not going to send you, unless you give me a really

25   good reason that makes this the rare and unusual circumstance

1   why I should do that.

2         If you both want to go, but don't agree on what

3   should happen in discovery, say you both want to go, and tell

4   me what your views are, like briefly, like why discovery

5   should continue or why it shouldn't.

6         But I will tell both of you, one of the things that

7   would -- that would make me think is it should just happen

8   faster, the mediation.  In other words, rather than having a

9   big fight about whether the discovery should proceed or not,

10   why not just go to the mediation sooner.  Because, really, a

11   one-week pause is really irrelevant.  It would be difficult

12   to argue about that.  A four-month pause for it would be

13   different.

14         So really what I would understand you partially

15   telling me is, like, Judge, can you get a magistrate judge to

16   do it very soon, so we don't -- one of us doesn't want to

17   pause discovery, so we don't have to do that.  And -- or, you

18   know, something like that.

19         So that just -- in full disclosure, that's one of

20   the things that I think -- but I recognize there's certain

21   scheduling on your parts and your client parts.

22         Any other questions about that?

23         So I guess the question from you would be, when do

24   you want to file that joint status report?  How much time to

25   talk to each other, talk to your clients, confer back with

1  each other, and then decide what you want to tell me about

2  that?

3           MR. CALLAGHAN:  A couple of weeks.

4           MR. JOFFE:  A couple of weeks.  Yeah.

5           THE COURT:  You tell me, two weeks?  Three weeks?

6  Four?  I mean, it's really up to all of you.

7           MR. JOFFE:  Let's do four.

8           MR. CALLAGHAN:  Four.  Mr. Joffe suggests four.  I

9  have no objection.

10           THE COURT:  Fine.

11           MR. CALLAGHAN:  My only question is, I guess we

12  have the other homework to do in the meantime, as we go

13  forward in the meantime, until we either conclude that we're

14  going to do that or not?

15           MR. JOFFE:  Yeah.

16           THE COURT:  I guess I would say this:  Tell me in

17  four weeks.  You don't have to wait four weeks.  If you

18  resolve it sooner, you can tell me sooner.

19           MR. JOFFE:  If we decide before that.

20           THE COURT:  If you -- the sooner -- the one thing

21  that you should understand is that until you tell me you want

22  to do it, I'm not going to arrange a magistrate judge to do

23  it.

24           MR. MCGUIRE:  Uh-huh.

25           THE COURT:  So -- and there's going to be a certain

1   lead time on getting somebody.  You're not going to get

2   someone in a week.

3            Is that the kind of thing you were thinking about,

4   Mr. Callaghan?  Or were you thinking something else?

5            MR. CALLAGHAN:  No, Your Honor, that would be

6   ideal.  And I think that would allow us all to sort of look

7   soberly at the larger picture and see whether or not there's

8   a wider or narrower case to go forward with.

9            The one last thing I would ask, from a housekeeping

10  perspective, is we have certain deadlines in our scheduling

11  order that are coming up, and simply by dint of this ESI

12  conference and what we're talking about doing going forward,

13  we may need a little more latitude on the deadlines just to

14  accommodate these decisions.

15           THE COURT:  A couple things to think about with

16  that.  One, you should confer with each other and propose --

17  if you want to amend the deadlines, propose a simple -- like

18  this is what the revised schedule should look like.  If

19  you're in agreement, you're more likely to get a positive

20  result than if you're not, though, I'm not saying I wouldn't

21  do it either way.

22           But the second thing, you should just -- I will

23  tell you, that is in the back of my mind about this case, is

24  that I think about the -- one of the things that I think

25  about in scheduling trials and scheduling cases.  So I think

1    it's -- I tell you, because I think it's fair for you to

2    know, because it's in my mind, is when was the case filed and

3    when will it go to trial?  In other words, how long?  And so

4    right now, this case is a ways, somewhat, from trial, and --

5    because you're still at the beginning of discovery.  You have

6    to go through all this, assuming --

7            I operate on the assumption that we actually try

8    all the cases, and recognizing that isn't going to happen.

9    But I address each case as if it's going to go to trial.  And

10   so you have ahead of you a fair bit period for discovery, and

11   then you have a period, I think, for experts, right?  And

12   then this is the kind of case I imagine that defendants are

13   likely to try to seek summary judgment, so they're going to

14   file a summary judgment motion.

15           And I would imagine you're likely to oppose that

16   summary judgment motion.  And I don't know whether there

17   would be any claims on which you would move for summary

18   judgment.

19           But either way, there's going to be summary

20   judgment if the 12(b)(6) litigation is any preview of summary

21   judgment, it's likely to be hotly contested and heavily

22   papered.  And so it will take you some time to prepare those

23   briefs, and it will take me some time to resolve it.

24           And then if the case goes to trial after that, if

25   it doesn't all go away on -- one or both, whatever summary

1    judgement motions, you'll need a certain amount of time

2    before we can try it, just because you need a little bit of

3    time to be ready.

4            Although you should understand that I don't

5    schedule cases for trial, ordinarily, until one of two

6    events.  Either I resolve -- in a civil case, I resolve the

7    summary judgment motion, and then I know it's going to trial.

8    Or you come to me at the end of discovery and say:  We're not

9    going to had have summary judgment.  We might still need to

10   do expert discovery, but there aren't going to be any summary

11   judgment motions.  Then I would talk to you about a trial

12   date.

13           The result of that is I don't have a calendar

14   filled with trial dates that aren't real.  So the only cases

15   that I have scheduled for trial are ones that are pretty

16   likely -- some settle -- but are pretty likely to go.  So

17   when I, let's say, resolve the summary judgment motion, the

18   honest answer as to when does Judge Sorokin want to try the

19   case, it's usually 45 days later, 30 days for you to have all

20   the --

21           Now, I -- I rarely would schedule trials 45 days

22   later, because I think that's unfair to all of you.  You need

23   not only the 30-day ramp-up in the standard pretrial order

24   that I and the other judges in this court typically uses for

25   filling, but you need more than 15 days to get ready for

1    that.  And I recognize that -- reluctantly, that I'm not the

2    only judge before whom you have cases.

3          So I'm likely -- and this case, I don't know how

4    long it will be, but this might not be a four-day day trial.

5    So I might talk to you about it.  I might just schedule

6    trial, but it isn't going to be -- ordinarily, I wouldn't

7    think seven months later.  I'd be thinking promptly, because

8    I'd be ready to go and you would be ready to go, except for

9    putting together your pretrial filings and any scheduling

10   logistics that arose.

11         So I circle back to your request, because I'm

12   thinking about, a little bit, the end date and how far out

13   that is, and I think about that when people come to me.  I

14   try to be reasonable about giving extensions, and I'm likely

15   to give you a reasonable extension, given where we are and

16   what's transpired and the dates.  But I do think about that.

17   And I tell you that because, although I'm not of the school

18   of thought that at the Rule 16, schedule a trial, some people

19   confuse that.  They confuse that for meaning that I'm not

20   interested in moving the case promptly and that it's no

21   worries, it's a long way away.  That's not the case.

22         And the case is, I intend to -- I don't always move

23   as quickly as I would have liked, and -- but I'm thinking

24   about that, it's going to go to trial, unless you resolve it

25   or I resolve it on a dispositive motion.  And I have that in

1    my mind.  So just think about that, in terms of -- I think

2    about that, in terms of the end date, because I'm -- that's

3    in my mind on every motion to continue the schedule.

4            Did you have anything else, Mr. Callaghan?

5            MR. CALLAGHAN:  I don't believe so, Your Honor.

6            THE COURT:  Do you have anything, Mr. Joffe?

7            MR. JOFFE:  I do have one thing.

8            THE COURT:  All right.

9            MR. JOFFE:  And I overlooked it, I'm sorry, Your

10   Honor.

11           We were discussing our custodians that we

12   requested, and we stopped at Schultz, Whitman, and McCarthy.

13           THE COURT:  Yes.

14           MR. JOFFE:  There are two Chinese representatives.

15   They are listed on page 19 of the joint article, on the very

16   top, James Kwon and Meng Tao.

17           THE COURT:  Yes.

18           MR. JOFFE:  And we propose to have them as

19   custodians.  James Kwon was from HP China, which was, at the

20   time, it was a direct -- I'm sorry, it was a wholly-owned

21   subsidiary of H3C.  And H3C, at that time, was also a

22   subsidiary of HP.  And Meng Tao was a representative of H3C.

23   So those are two people who, according to defendants' initial

24   disclosures and according to our complaint, those are the

25   ones who were both inspecting those transceivers back in

1    China in 2013, they were reporting that all of those

2    transceivers --

3              THE COURT:  What's your position about them?

4              MR. JOFFE:  And we would like to have the

5    electronic data, to the extent HP has it.

6              MR. CALLAGHAN:  Yeah, Your Honor, just on the

7    actual custodian list itself, "Mr. Kwon" is actually "Kwok,"

8    K-w-o-k.  That was --

9              THE COURT:  Yes, that's fine, I see that.

10             MR. JOFFE:  Okay.  Okay.  Right.

11             MR. CALLAGHAN:  My understanding is he was an HP

12   China employee.  Meng Tao, I believe, also was an HP China

13   employee, rather than an H3C employee.  We did disclose, and

14   it's our understanding that -- and Paul is better able to

15   speak to this than I am.  But there's a common server for HP

16   e-mail, and even though --

17             THE COURT:  Whatever, at that time.

18             MR. CALLAGHAN:  At that time.  Even though HP China

19   is a separate corporate entity and not a party to this

20   litigation, by their choice, not ours, we believe we can do a

21   search of e-mails of those individuals that would be

22   responsive, and we're willing to do so.

23             MR. JOFFE:  Okay.

24             MR. CALLAGHAN:  But Meng Tao, my understanding

25   is -- and this is from memory.  I don't believe Meng Tao is

1    associated with any of the HP entities anymore, anyway.  And

2    I think the same might be true for Kwok, but I'm not certain.

3    So to the extent that there's something on the common system

4    that's responsive, very good; but we're not standing here

5    saying to Your Honor that we're compelling HP China or that

6    we're reaching through the corporate separateness to get HP

7    China folks to be responsive.  That's not how it's going to

8    be done.  It can be done practically, I believe, through the

9    existing HP --

10    THE COURT:  So the e-mail -- you believe that the

11    e-mail would have whatever e-mail they sent.

12    MR. CALLAGHAN:  We believe so, Your Honor.  That's

13    our understanding.  And if that understanding changes, we

14    will let Mr. Joffe know.

15    MR. JOFFE:  Right.  If they include it, then, in

16    your search as custodians for those e-mails, that's fine,

17    yes.

18    MR. CALLAGHAN:  Yes.  And we're willing to do that

19    practically, but we want to be clear that it's not as if

20    we're responding for queries addressed to employees or

21    individuals associated with a separate corporate entity, who

22    you chose not to include as a party.

23    THE COURT:  Right.

24    MR. CALLAGHAN:  And that is not true, just so you

25    know, Your Honor, there was no commonality between the HP

1    e-mails and the H3C e-mails.  You'll recall what we

2    previously pointed out, that H3C was an island unto itself in

3    China and that it was --

4              THE COURT:  But neither of these people work for

5    H3C.

6              MR. CALLAGHAN:  To my knowledge, no, Your Honor.

7    They were HP China.

8              MR. JOFFE:  HP China.

9              THE COURT:  And that satisfies you?

10             MR. JOFFE:  Yes, with that explanation and the

11   inclusion of the e-mails.

12             THE COURT:  All right.  Do you have anything else,

13   Mr. Joffe?

14             MR. JOFFE:  I don't.  Thank you, Your Honor.  I'm

15   grateful for your directions.

16             THE COURT:  All right.  Thank you very much.  We're

17   adjourned.

18             THE DEPUTY CLERK:  All rise, this matter is

19   adjourned.

20             (Court in recess at 4:43 p.m.)

21

22

23

24

25

1 **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4       I, Rachel M. Lopez, Certified Realtime Reporter, in

5 and for the United States District Court for the District of

6 Massachusetts, do hereby certify that pursuant to Section

7 753, Title 28, United States Code, the foregoing pages

8 are a true and correct transcript of the stenographically

9 reported proceedings held in the above-entitled matter and

10 that the transcript page format is in conformance with the

11 regulations of the Judicial Conference of the United States.

12

13                 Dated this 1st day of June, 2018.

14

15

16

17                 /s/ RACHEL M. LOPEZ

18

19

20                _____

21                 Rachel M. Lopez, CRR
                   Official Court Reporter

22

23

24

25