**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) **Civil Action No. 1:16-CV-10386 (LTS)** |
| v. | ) ) |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL, | ) ) ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF
THE COURT'S ORDER DENYING THEIR MOTION TO COMPEL**

November 25, 2019

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 3

ARGUMENT ............................................................................................................................. 6

I.       Applicable standards ................................................................................................... 6

II.      The Missing ESI .......................................................................................................... 7

         A.       Missing email ESI ....................................................................................... 7

         B.       Missing non-email ESI .............................................................................. 10

                  1.       Defendants' cover letter to the PSB ............................................... 12

                  2.       Defendants' verification reports ..................................................... 14

                  3.       Key decisionmakers' documents .................................................... 16

III.     The improper "self-collection" of ESI ..................................................................... 17

IV.      The interests of justice favor reconsideration ......................................................... 18

CONCLUSION ......................................................................................................................... 20

CERTIFICATE OF CONFERRAL ......................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

<u>Bacchi v. Massachusetts Mut. Life Ins. Co.</u>, 110 F. Supp. 3d 270 (D. Mass. 2015) .................... 16

<u>Chin v. Port Authority of New York & New Jersey</u>, 685 F.3d 185 (2d Cir. 2012) ...................... 18

<u>In re Grand Jury Subpoena</u>, 274 F.3d 563 (1st Cir. 2001) ............................................................ 15

<u>Jones v. Bremen High School Dist. 228</u>, 2010 WL 2106640 (N.D. Ill. May 25, 2010) .............. 18

<u>Johnson v. J. Walter Thompson U.S.A., LLC</u>, No. 16 Civ. 1805 (S.D.N.Y. Oct. 25, 2017) ... 3, 17

<u>M & G Polymers USA, LLC v. Carestream Health, Inc.</u>, 2010 WL 1611042 (Del. Sup. 2010) . 18

<u>Marie v. Allied Home Mortgage Corp.</u>, 402 F.3d 1 (1st Cir. 2005) ................................................ 6

<u>Markey v. Lapolla Industries, Inc.</u>, No. 12 CV 4622, 2015 WL 5027522
(E.D.N.Y. Aug. 25, 2015) ........................................................................................................... 17

<u>McCambridge v. Hall</u>, 303 F.3d 24 (1st Cir. 2002) ...................................................................... 10

<u>Neelon v. Krueger</u>, No. 12-cv-11198-IT (D. Mass. July 14, 2015) ............................................. 16

<u>Northington v. H & M International</u>, No. 08-CV-6297, 2011 WL 663055
(N.D. Ill. Jan. 12, 2011) ............................................................................................................. 17

<u>Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC</u>,
685 F. Supp. 2d 456 (S.D.N.Y. 2010) ........................................................................................ 18

<u>Resolution Trust v. North Bridge Assoc.</u>, 22 F.3d 1198 (1st Cir. 1994) ...................................... 19

<u>Thelen Reid & Priest LLP v. Marland</u>, 2007 WL 578989 (N.D. Cal. Feb. 21, 2007) ................. 16

<u>United States. v. Roberts</u>, 978 F.2d 17 (1st Cir. 1992) ................................................................... 6

<u>United States v. Siciliano</u>, 578 F.3d 61 (1st Cir. 2009) .................................................................. 6

## <u>Other authorities</u>

Rule 26 of the Federal Rules of Civil Procedure ............................................................... 17, 19, 20

Rule 56(d) of the Federal Rules of Civil Procedure ..................................................................... 19

Local Rule 34.1 ............................................................................................................................. 15

## PRELIMINARY STATEMENT

Plaintiffs, through their counsel, respectfully move the Court to reconsider its order entered on November 15, 2019 denying their motion to compel (the "Order," Doc. No. 280), on the grounds of newly discovered evidence and in the interests of justice.

Defendants' November 13, 2019 report (the "Report," Doc. No. 279), to which Plaintiffs have had no opportunity to respond until now, assured the Court that "all responsive non-privileged" email and non-email ESI had been produced, leading the Court to conclude that Defendants "have met their discovery obligations under the Final ESI Protocol." Doc. No. 280 at 15. Significant new evidence has come to light that was not before the Court when it issued the Order, however, showing that there are numerous identifiable responsive emails and non-email files missing from Defendants' production that should have been produced according to the Final ESI Protocol and the Report (the "Missing ESI").

***First***, Plaintiffs have recently discovered 17 emails missing from Defendants' ESI custodians' email production, all of which are responsive, nonprivileged, within the relevant time period and the custodian and search parameters, and within Defendants' possession unless destroyed. Plaintiffs' counsel discovered the first missing email on or about October 25, 2019, proceeded to investigate further, and on November 12, 2019 advised counsel for Defendants about the 17 missing emails, stating that the "key issue is not with these particular missing emails, which Plaintiffs themselves have preserved and produced – the issue is rather with an unknown number of other responsive emails, to which Plaintiffs were not parties, that may be likewise missing from Defendants' production for the same reason." Declaration of Dimitry Joffe ("Joffe Decl."), Exh. R.

In their November 20, 2019 response (Joffe Decl. Exh. U), Defendants tried to minimize the number and significance of the missing emails while offering invalid excuses for the failure

to produce them -- but they do not deny that there are indeed responsive emails missing from Defendants' production, and do not address the underlying cause(s) of their absence. See Part II.A below.

**Second**, Defendants' Report reveals the existence of "the Corporate Defendants' share drive" (the "Share Drive") to which their employees were required to upload "all responsive non-email files . . . as well as key correspondence" prior to discovery. Doc. No. 279 ¶ 2. The Report states that Defendants then searched that ESI without any limitations on custodians and produced "all responsive non-privileged documents in the share drive." Id. However, Defendants' entire 580-document production, necessarily including the Share Drive collection, came from only four HPFS employees -- who also happened to be the only four ESI custodians producing any emails. No ESI of any other employees (among more than a hundred involved) whom Defendants had required to upload responsive documents to the Share Drive had been produced.

Defendants' disclosure of the Share Drive with the ESI collected and reviewed regardless of custodians raises two main concerns. First, Defendants' production is missing potentially smoking gun documents such as their final "cover letter to the PSB" and the "verification report" of the TT Global transceivers – i.e., non-email files that should have been produced from the Share Drive collection, according to the Report. Second, also missing from the Share Drive production are documents from Defendants' key employees with the decision-making authority in the ICT matter. The issue here is not whether those "Executive Group" employees should have been designated as ESI custodians, which was before the Court on the motion to compel – the issue is rather new and concerns Defendants' failure to produce any of these employees' ESI (or ESI of any other employee of Defendants HPFS India, HPI and HPE ESI) from the Share Drive ESI collection not limited by custodians. See Part II.B below.

**Third**, the Report also revealed that Defendants engaged in a "self-collection" of the ESI by requiring their employees themselves to make relevancy determinations and upload responsive documents to the Share Drive. "It is unreasonable to allow a party's interested employees to make the decision about the relevance of such documents, especially when those same employees have the ability to permanently delete unfavorable email from a party's system." Johnson v. J. Walter Thompson U.S.A., LLC, No. 16 Civ. 1805, at *9 (S.D.N.Y. Oct. 25, 2017). This newly disclosed "self-collection" likely contributed to the paucity of Defendants' production and to the Missing ESI in particular. See Part III below.

**Finally**, Plaintiffs respectfully submit that the interests of justice favor reconsideration of the Order. Defendants repeatedly assured the Court and Plaintiffs that they had produced all responsive nonprivileged documents in full compliance with the Final ESI Protocol, and cannot blame Plaintiffs for acting on those assurances until their recent discovery of the Missing ESI rendering those assurances false. The evidence of the emails' absence was neither obvious nor readily available; it was hidden within Defendants' production and required a purposeful and considerable effort to uncover. It was also concealed by Defendants' false assurances and required inquiry notice to trigger a duty to investigate further. Plaintiffs' counsel was put on such notice by a fortuitous discovery of the first missing email on or about October 25. And Plaintiffs only learned about the existence of the Share Drive collection not limited by custodians on November 13 from the Report. See Part IV below.

## . **BACKGROUND**

On June 3, 2019, Defendants reported to the Court that they "completed their document productions on April 15, 2019," Doc. No. 194 at 3. At that time, Defendants produced 436 documents. See Joffe Decl. ¶ 31. Defendants then made three additional productions of 144

documents (a quarter of the total 580), their final email and non-email files produced on October 1, 2019. See id. On October 18, Defendants reported that they had "fully complied with the ESI protocol." Declaration of Paul Saso (Doc. No. 258), ¶ 16.

On October 25, Plaintiffs filed their reply papers on their motion to compel and included as one of their exhibits an email sent by JT Silvestri to Plaintiff Styller on March 12, 2013, disclosing the involvement of "the top level leaders" in the counterfeit investigation, which email was produced by Plaintiffs. Doc. No. 266-3 (ICT0003269). When Plaintiffs' counsel attempted to find that email in Defendants' own production, fully expecting it to have been produced as part of Silvestri's custodial ESI, counsel was unable to locate it. Joffe Decl. ¶¶ 2-3. The absence of that email was puzzling as it was not merely responsive but known to Defendants as such since it was quoted in the complaint.[1] The email was authored by one of the four Defendants' ESI custodians who had produced any documents, contained ESI search terms "Styller," "ictcompany" and "RMA," and was within the relevant time period, meaning that had Defendants properly applied the agreed-upon ESI search terms to Silvestri's properly preserved ESI, their search would have necessarily yielded that particular email. Joffe Decl. Exh. A.

Plaintiffs' counsel then proceeded to investigate Defendants' production for Plaintiffs' other communications with Defendants' ESI custodians produced by Plaintiffs themselves. Joffe Decl. ¶ 4.[2] That process eventually led to the discovery of 17 emails missing from Defendants' production that should have been included because each missing email satisfied all of the

---

[1] See SAC, Doc. No. 101, ¶ 86 ("I am not in the loop on this as it is at the top level leaders. They do not provide me updates and I can do no more here to assist. That's a big company policy. So appreciate you working with David [Gill]."). The email also discussed the RMA refund, see Joffe Decl. Exh. A.

[2] This time-consuming process involved first locating the relevant communications in Plaintiffs' 60,000 document collection, and a document-by-document search for those communications within Defendants' production. It was made more difficult by Defendants' failure to provide the emails' sent/received time and date metadata as required by the Final ESI Protocol (Doc. 183 ¶ IV.B.6), making more efficient methods of comparison unworkable. Joffe Decl. ¶ 4.

following criteria: (i) one or more of Defendants' four producing ESI custodians are parties to the email; (ii) the email is relevant to one of more of Plaintiffs' document requests; (iii) the email contains one or more of the ESI search terms, and is within the relevant period; and (iv) the email has been produced by Plaintiffs themselves so there are no doubts about its existence.

Plaintiffs' counsel summarized their findings and concerns in a 5-page letter emailed to Defendants' counsel on November 12, requesting a meet and confer. Joffe Decl. Exh. R.[3] On November 14, Defendants' counsel replied: "We are in receipt of your letter and are looking into the alleged discrepancies as between plaintiffs' production and defendants', in addition to addressing the issue with our vendor, and will revert after that process is complete." Joffe Decl. Exh. S.

In the interim, on November 13, Defendants filed their Report with the Court, attesting that they had produced "all responsive, non-privileged documents" without mentioning the missing emails. Doc. No. 279. On November 14, Plaintiffs' counsel emailed Defendants' counsel: "Plaintiffs intend to make a motion for leave to file a response to Defendants' Report of November 13 (ECF 279); please let me know if Defendants consent or oppose the motion." Joffe Decl. Exh. T. On November 15, Defendants' counsel responded: "What specifically do Plaintiffs plan to address in their response?" Plaintiffs' counsel replied: "I intend to provide further information to the Court concerning Defendants' Report paragraph 2 ('share drive') and paragraph 3 ('other reasonably accessible ESI')." Joffe Decl. Exh. T. Defendants in response resisted Plaintiffs' providing their evidence of the missing emails to the Court.[4]

---

[3] Plaintiffs' letter states that Defendants' failure to produce the 17 known emails "undermines any confidence in the integrity of Defendants' 580-document production overall, and in Defendants' numerous statements made to the Court that 'Defendants applied agreed-upon search terms to their ESI that would have yielded any responsive documents,' Doc. No. 257, and that Defendants 'fully complied with the ESI Protocol.'"

[4] "Defendants expressly do not consent to Plaintiffs submitting any 'response' that (1) raises issues not previously raised in your July 12 deficiency letter, (2) are the subject of any outstanding unresolved issues about which the

Later that day, the Court issued its Order denying Plaintiffs' motion to compel and stating that "[h]aving reviewed the defendants' response (Doc. No. 279), the Court is satisfied that they have met their discovery obligations under the Final ESI Protocol." Doc. 280 at 15.

On November 20, 2019, Defendants responded to Plaintiffs' November 12 letter about the missing emails. Joffe Decl. Exh. U. In their response, Defendants seek to minimize the number of the missing emails and offer invalid excuses for their failure to produce them, but do not deny that there are indeed emails missing from their custodians' production. They also threatened to move for fees and costs if Plaintiffs brought a motion on the grounds of such evidence.

## ARGUMENT

### I.   Applicable standards

Motions for reconsideration are appropriate "if the moving party presents newly discovered evidence, if there has been an intervening change in the law, or if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust." Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 7 n. 2 (1st Cir. 2005).

"When faced with a motion for reconsideration, district courts should apply an interests-of-justice test." United States v. Siciliano, 578 F.3d 61, 72 (1st Cir. 2009). "Because an interests-of-justice test covers considerable ground, the trial court should strive to acquaint itself with the totality of the relevant circumstances." United States. v. Roberts, 978 F.2d 17, 22 (1st Cir. 1992) (listing seven relevant factors, including nature of the suit and the seriousness of allegations,

---

parties are yet to meet and confer, and/or (3) relate to Defendants' production of *email* ESI, because the Court's order [ECF 276] and Defendants' Report [ECF 279] are directed to and limited to Defendants' *non-email* ESI." Joffe Decl. Exh. T (emphasis original). In fact, Defendants' Report on its face is not "limited to Defendants' *non-email* ESI," but addresses "active and archived email accounts" among other "reasonably accessible ESI," see Doc. No. 279 ¶ 3.

tardiness, prejudice, administration of justice, and futility, but stating that "[w]e do not say that courts must necessarily look at each and all of these factors in every case, or that courts cannot, in a proper case, examine other factors. At any rate, the list of factors will require tailoring to reflect the nature of the ruling that underlies the motion to reconsider.").

## II.     The Missing ESI

### A.     Missing email ESI

With respect to emails, the Final ESI Protocol states that "[t]he Corporate Defendants will search for relevant ESI in the relevant custodians' files." Doc. No. 183 ¶ I.B.1. The Report represents that "Defendants collected ESI from the active email accounts of their ESI custodians pursuant to the terms of the Final ESI Protocol (_i.e._, applying the agreed-to search terms, custodian information, and date restrictions)," and "utilized TAR in the[ir] review," so that "all responsive, non-privileged documents were produced to Plaintiffs." Doc. No. 279 ¶ 3(a)(i).

As Plaintiffs have recently discovered, however, the following responsive non-privileged emails are missing from Defendants' production (see Joffe Decl. ¶¶ 5-6):

- an email from Plaintiff Styller to JT Silvestri asking for a "quick meeting to review Indian deal" in February 2013 (id. Exh. B);

- an email from Silvestri to Styller disclosing that the "top level leaders" were running the investigation and directing Styller to work with David Gill on the China issue, and forwarding the RMA request "up to management for review" (id. Exh. A);

- an email from Styller to Silvestri stating that Plaintiffs were "working with David trying to improve [the Chinese] situation" (id. Exh. C);

- an email from Styller to Silvestri complaining about "the horrible damage to the company, our people and our financial position" (id. Exh. D);

- an email from Defendant Gill stating: "The prosecutor is not presently permitting us to inspect the remaining 60% of the equipment. We may need the counsel you have engaged to assist us. The prosecutor is apparently also still waiting for some information from ICT. I will contact you within the next 48 hours with a further update. We have lots of people working on this but we cannot make the prosecutor do

7

anything which I appreciate is difficult to do given the circumstances." <u>Id.</u> Exh. Q, and

- a dozen emails between Styller, Silvestri and/or Kevan Bartley concerning the RMA refund issue (<u>id.</u> Exhs. E-P).

These emails were sent to or by one or more of Defendants' four producing ESI custodians within the relevant period, were preserved and produced by Plaintiffs themselves, and contain two or more of the ESI search terms. And the main concern here is not with these particular 17 identified emails, which Plaintiffs were parties to and themselves preserved and produced – the concern is that whatever flaws in Defendants' ESI preservation, collection and/or production caused these 17 emails to be missing likely caused other emails, to which Plaintiffs were not parties, to be missing as well. The case of the missing emails affects the ESI of three out of four producing custodians, and could not but undermine any confidence in the overall integrity of Defendants' email production.

Defendants' response to Plaintiffs' complaint about the missing emails (Joffe Decl. Exh. U) has only deepened those concerns. *First*, Defendants attempt to minimize the scale of the problem by claiming that some of the missing emails are part of the email chains, and/or that Defendants produced portions of some of those email chains. In fact, seven of the missing emails are standalone documents (Joffe Dec. Exhs. A, B, F, G, J, K, O), while the other ten missing emails in each instance appear at the top of the email chains and were ***not*** produced even if the prior emails in the chain were. Joffe Decl. ¶ 6.

*Second*, Defendants claim that the missing emails are "of little significance, appear in other forms in either sum or substance, and/or echo or rephrase other contemporaneous exchanges." Joffe Decl. Exh. U at 2. None of these are valid excuses for not producing otherwise responsive emails; indeed, the Final ESI Protocol expressly states that "[a] piece of ESI may be

removed as duplicative *only if it is identical to a piece of ESI that is being produced. For example, for two e-mails to be considered identical, the e-mail bodies and the e-mail attachments must all match*." Doc. No. 183 ¶ VII.A.2 (emphasis added throughout unless indicated otherwise). The missing emails are in each instance not "identical" to any emails produced by Defendants, and should have been produced whether or not they "echo or rephrase" the produced ones. Joffe Decl. ¶ 6.

*Third*, Defendants argue that the missing emails are not attributable to "an inappropriate failure to preserve them. Once Defendants issued a litigation hold notice, ESI was preserved. The emails cited in your letter *all pre-date the litigation hold notice*." Joffe Decl. Exh. U at 2 (emphasis original). It appears from Defendants' privilege log that the litigation hold notice was not issued until January 2014.[5] However, it is Defendants' own position that they had anticipated litigation long prior to the January 2014 issuance of the litigation hold notice. Indeed, Defendants' privilege log lists documents prepared "because of litigation" in the "ICT Matter" as early as mid-March 2013.[6] Defendants also argued previously that "[a]ll claims against Mr. McCarthy and Gibbons are futile in that they concern a lawyer's responses to the threat of litigation," citing Plaintiffs' counsel Attorney Riordan's August 8, 2013 letter, Doc. No. 85 at 23, and the Court agreed that those were "'communications preliminary to litigation.'" Doc. No. 95

---

[5] See Doc. No. 219-2, privilege log entry 799 (January 13, 2014 email chain regarding "draft of notification of litigation hold"); entry 800 (January 14, 2014 email "ICT Company Contract -- Pre-Lit Dispute Mandatory Preservation Notice – Action required/Confidential Legal Communication – Do not delete"); entry 802 (January 24, 2014 email "Contract - Pre-Lit Dispute URGENT – Mandatory Preservation Notice Failure to Certify –Action Required/Confidential Legal Communication").

[6] See, e.g., Doc. 219-2, privilege log entry 282 ("Email prepared because of litigation by David Gill reflecting preparation for internal meeting to discuss litigation," Subject Line "ICT Matter," sent on March 13, 2013); see also log entries 309, 321, 324, 330, 335, 345, 346, 347, 349, (concerning documents prepared "because of litigation" in March 2013).

at 10. The fact that Defendants only issued their litigation hold in January 2014 does not alter their duties to preserve ESI triggered by Defendants' anticipation of litigation in 2013.[7]

*Finally*, Defendants' response focuses exclusively on the 17 missing emails and does not address the key issue raised by Plaintiffs – *i.e.*, the underlying reason(s) for their non-production that potentially caused other emails to be missing as well.

Defendants cannot fault Plaintiffs for not discovering the evidence of the missing emails earlier than they did (which was within a month of Defendants' final production made on October 1) because Plaintiffs were not on inquiry notice of this hidden deficiency, which was not apparent from Defendants' production and required a significant effort to uncover, and because Defendants had repeatedly assured the Court and Plaintiffs that they had produced all responsive nonprivileged emails from the six ESI custodians. Cf. McCambridge v. Hall, 303 F.3d 24, 48 (1st Cir. 2002) ("[T]he prosecutor misrepresented, to both defense counsel and the court, that the exculpatory evidence did not exist. Defense counsel was entitled to rely on that representation.").

## B.    Missing non-email ESI

In contrast to the email ESI, with respect to non-email files the Final ESI Protocol provides: "The Corporate Defendants will search for relevant ESI on any share drives, to the extent any exist," with no limitations on custodians. Doc. No. 183 at ¶ I.B.2. The Report reveals that there was indeed "the Corporate Defendants' share drive" created prior to discovery: "Defendants required employees to upload all responsive non-email files (*e.g.*, Word, pdfs, spreadsheets), as well as key correspondence, to a share drive both prior to and during

---

[7] The missing emails are dated February-June 2013; most of the events relevant to Plaintiffs' incarceration on counterfeiting charges occurred during that period; key documents and correspondence such as Defendants' verification reports and letters to the PSB were created in 2013. Accepting Defendants' premise that they did not have to preserve the missing emails because they "pre-date Defendants' litigation hold notice," issued at the time of their own choosing a year after the arrest, means that all these key documents could be "properly" destroyed as well.

Defendants' efforts to collect responsive ESI." Doc. No. 279, ¶ 2. The Report further states that Defendants reviewed their Share Drive with "*no limitations, such as search terms or custodial information*, to restrict the scope of their review for responsive ESI within the share drive," so that purportedly "all of the responsive, non-privileged documents in the share drive were reproduced to Plaintiffs." Id.[8]

The "employees" required to upload their responsive documents to the Share Drive were not and could not have been limited to Defendants' six "ESI custodians (Bartley, Gill, Harris, O'Grady, Silvestri, and Patterson)." Doc. No. 279, ¶ 1. *First*, the Report itself speaks of "employees" in that sentence while using the term "custodians" consistently throughout in reference to those six identified individuals. *Second*, the list of Defendants' ESI custodians was not finalized until the Final ESI Protocol (Doc. No. 183) was signed by the parties in December 2018 and so-ordered by the Court in January 2019, and could not have been known to Defendants when they had created the Share Drive "prior to the discovery phase of this action." *Third*, it would be unreasonable to require only six out of more than a hundred employees involved in the relevant events to upload their responsive documents on the Share Drive.[9]

It follows that the pool of employees required by Defendants to upload their responsive non-email files and key correspondence to the Share Drive was necessarily greater than just the

---

[8] Indeed, according to the Report, the Share Drive was the "best, most comprehensive source of information for counsel prior to the discovery phase of this action" (id.); its contents were used to "build the TAR index" and "train[] the software" for the subsequent email review (id.); and its existence purportedly obviated any need for Defendants to search for any other potential sources of responsive ESI (id. ¶ 3(b)).

[9] Moreover, the Report states in paragraph 3(a)(i) that "Defendants issued a litigation hold notice *concerning* all six of their ESI custodians long prior to . . . March 2015." Defendants' use of the awkward "concerning" instead of the natural "to" in this sentence strongly suggests that the litigation hold notice was most likely issued to a broader group of Defendants' employees than just their six ESI custodians. Indeed, the litigation hold notice recipients could not have been limited to the six ESI custodians for much the same reasons that the "employees" could not have been so limited. This means that Defendants had first told its employees to preserve their relevant ESI in anticipation of litigation -- but did not produce any of their ESI beyond the six custodians' when it came to actual litigation.

six ESI custodians. Significantly, Defendants were not allowed to deduplicate non-email files across different custodians. See Final ESI Protocol, Doc. 183 ¶ VII.A.2 ("A party may de-dupe electronic documents, other than email, only within custodians.").

Yet, even though "all responsive non-email files" and "key correspondence" should have been uploaded to the Share Drive by a number of unidentified employees beyond the six ESI custodians, and even though Defendants then reviewed the Share Drive with "*no limitations, such as search terms or custodial information*" -- at the end Defendants produced the files and correspondence from only four HPFS employees who also happened to be Defendants' only four ESI custodians producing any email ESI. None of the responsive non-email ESI presumably uploaded to the Share Drive by the other employees was produced.[10]

Furthermore, among the nonprivileged non-email files suppressed by Defendants are the documents that Plaintiffs regard as potential smoking guns, for the following reasons.

### 1.    Defendants' cover letter to the PSB

Defendants' privilege log (Doc. No. 219-2), clarified in their October 18, 2019 opposition to Plaintiffs' motion to compel (Doc. No. 257 at 22 n.16), revealed Defendants' cover letter to the PSB accompanying their "verification report," which report confirmed the counterfeit nature of the transceivers seized in the "Beijing Cheng/Yu counterfeit sales case." Doc. No. 266-2.

Defendants never before disclosed the existence of their "cover letter to the PSB concerning verification report" despite their extensive contemporaneous communications with Plaintiffs. According to the privilege log, Stuart Patterson, David Gill and Liu Rui (lr@h3c.com

---

[10] Indeed, there is not a single document produced by a single employee of Defendants HPE, HPI or HPFS India in this action. This failure to produce any documents from three out of four Corporate Defendants' employees could only have occurred if (a) these Defendants did not require their relevant employees to upload their responsive documents to the Share Drive; or (b) their employees failed to make proper relevancy determination or otherwise failed to upload their responsive documents to the Share Drive in the course of their "self-collection"; or (c) Defendants subsequently removed those documents from production during their review of the Share Drive.

and jesica.liu@hp.com), among others, participated in drafting the letter, which was also shared with Defendants' other employees.[11] Plaintiffs alleged in their complaint that Defendants' purported assistance in securing Plaintiffs' release from incarceration in the first half of 2013 was nothing but a sham and a cover-up for their own frame job. Not only did Defendants delete all the key admissions from their long-promised letter to the Chinese police and deceived Plaintiffs about those deletions in April 2013 (Doc. No. 101 ¶ 143), but it now appears that Defendants sent another letter to the PSB at around the same time with their verification report, and kept that correspondence secret from Plaintiffs.

Thus, Defendants' letter to the PSB is a key document central to Plaintiffs' case that Defendants' actions in 2013 prolonged their imprisonment. Furthermore, Defendants' letter to the PSB enclosing their "verification report" that the seized transceivers were counterfeit is likely to contradict Defendants' current position that the vast majority of the seized transceivers are authentic, upon which they stake their planned motion for summary judgment.[12]

---

[11] See, e.g., Doc. No. 219-2, privilege log entry 428 ("Draft Letter prepared because of litigation by Stuart Patterson reflecting draft cover letter to PSB regarding verification report."); entry 429 ("Email chain containing the legal advice of David Gill regarding edits to draft cover letter to PSB."); entry 433 ("Email chain containing the legal advice of Jessica Liu reflecting edits to draft cover letter to PSB," sent from jesica.liu@hp.com); entry 442 ("Email containing the legal advice of David Gill regarding additional edits to cover letter to PSB."); entry 443 ("Draft Letter prepared because of litigation by Stuart Patterson reflecting draft cover letter to PSB."). The cover letter was also shared with Defendants' non-custodial employees. See, e.g., Doc. 219-2, privilege log entry 410 (draft cover letter shared by Liu Rui (lr@h3c.com) with David Gill, Stuart Patterson, Shawn Zhao (shawn.zhao@hp.com), Ching Chua (ching.chua@hpe.com), and Yang Li (yang.li9@hpe.com)); entry 433 (edits to draft cover letter shared by Liu Rui with Stuart Patterson, David Gill, Shawn Zhao, Ching Chua, and Chun-Yu Zhu (eric.zhu@hp.com)).

[12] Compare Defendants' contemporaneous "verification report" stating that "most of the seized transceivers are determined to be counterfeit H3C products," and that the power-on test was "meaningless," Doc. No. 271-2, with Defendants' current statements that "as a result of the January 2018 inspection, defense counsel was able to conclude that: a. The vast majority (95%) of the seized SFP transceivers inspected was sold by HPFS India to ICT; b. Of the SFP transceivers sold by HPFS India to ICT, the inspectors were able to authenticate all as being authentic H3C equipment" based on "electronic interrogations," Doc. 179 at 6, and "of the 781 pieces of Equipment provided for inspection, 647 bear serial numbers that appeared on the inventory list of products subject to the HPFS/Shinto/ICT resale agreements in 2011. All 647 of these pieces of Equipment were determined to be authentic." Doc. No. 194 at 3.

The letter certainly exists; it is certainly in Defendants' possession; and the version of the letter shared with the PSB is certainly not privileged, <u>see</u> Doc. No. 280 at 16 n.14 ("No privilege attaches to what was shared with the Chinese police."). Yet, Defendants suppress this key nonprivileged letter from their production, and their failure to produce it shows, without more, that their non-email production was incomplete. But there is more.

### 2.   Defendants' verification reports

In their opposition to Plaintiffs' motion to compel, Defendants disclosed the existence of two separate verification reports -- of the ICT transceivers seized by the PSB in China, and of the TT Global transceivers shipped to Dubai – which they conflate as one "verification report" in their privilege log. Doc. No. 257 at 22 n.16. Both reports contain the results of H3C's contemporaneous inspections of the transceivers from the same Commonwealth Games batch. Defendants withheld the ICT verification report itself from their document production completed in April 2019, and only produced it in their June 17 supplemental production following Plaintiffs' complaints. See Doc. No. 271-1 ¶ 2. Defendants did not produce their "verification report" of the TT Global transceivers and did not list it on their privilege log. Joffe Decl. ¶ 32.

The verification report of the TT Global transceivers from the same Commonwealth Games batch of the equipment as the transceivers seized from ICT is highly material. Because Defendants subsequently instructed TT Global to destroy its transceivers based on their "questionable" nature, it stands to reason that the report showed them to be counterfeit. If so, the report would obviously confirm Defendants' own March 2013 statement that "the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases." Joffe Decl. Exh. Z.

Moreover, Defendants did not produce any of the verification reports' drafts referenced in their email communications. These drafts were shared among Defendants' ESI custodians Gill and Patterson and among Defendants' other, non-custodial employees.[13] According to the Report, the Share Drive should have contained multiple copies of the draft and final versions of the verification reports, independently uploaded by several employees and un-deduplicated across those employees pursuant to the Final ESI Protocol. Therefore, these documents should have been produced from both of Defendants' ESI sources – as email attachments from the ESI custodians, and as non-email files from the Share Drive collection not limited by custodians.

The Court ruled in the Order that there was nothing "improper in the defendants' production of a copy of a 'verification report' submitted to the Chinese police, while designating the drafts exchange with counsel as privileged." Doc. No. 280 at 16 n.14. Defendants, however, did ***not*** designate any drafts of either of the two verification reports as privileged on their log of withheld or redacted documents.[14]

Local Rule 34.1 states: "When a claim of privilege is asserted in objection to any document request, or any subpart thereof, and *any document* is not provided on the basis of that assertion, the attorney asserting the privilege shall identify in the objection the nature of the privilege that is being claimed *with respect to each such document*." The caselaw in this Circuit is also clear that a failure to log a document waives the underlying privilege claims. See, e.g., In re Grand Jury Subpoena, 274 F.3d 563, 576 (1st Cir. 2001) ("A party that fails to submit a

---

[13] See, e.g., Doc. No. 219-2, privilege log entries 410, 416, 427 (draft verification report shared among Liu Rui (lr@h3c.com and jesica.liu@hp.com), David Gill, Stuart Patterson, Shawn Zhao (shawn.zhao@hp.com), Ching Chua (ching.chua@hpe.com), Yang Li (yang.li9@hpe.com), and Chun-Yu Zhu, (eric.zhu@hp.com)).

[14] Defendants know how to log draft documents separately from related email communications, listing 105 non-email draft documents on their privilege log while omitting drafts of both verification reports and the final version of the TT Global verification report. Joffe Decl. ¶ 32.

privilege log is deemed to waive the underlying privilege claim."); Bacchi v. Massachusetts Mut. Life Ins. Co., 110 F. Supp. 3d 270, 274 (D. Mass. 2015) ("Generally, a privilege claim is made by serving a privilege log that separately lists each document, specifies who created the document and all recipients, and concisely states the basis for the claim of privilege."); Neelon v. Krueger, No. 12-cv-11198-IT, at *4 (D. Mass. July 14, 2015) (withholding a document on the basis of privilege "is accomplished by serving a privilege log that separately lists each document, specifies who created the document and all recipients, and concisely states the basis for the claim of privilege"); see also Thelen Reid & Priest LLP v. Marland, No. C 06-2071, 2007 WL 578989 (N.D. Cal. Feb. 21, 2007) (finding waiver of privilege for documents not included on privilege log). Accordingly, the final version of the TT Global verification report, and drafts of both ICT and TT Global reports, none of which is listed on Defendants' privilege log, must be produced.

### 3.    Key decisionmakers' documents

Defendants admit that the five "Executive Group" employees who themselves produced no documents appear 81 times in total on the documents collected from four lower-level ESI custodians. Doc. No. 258 ¶ 38. These executives, unknown to Plaintiffs at the time, were among the behind-the-scene decisionmakers in Plaintiffs' "Dickensian plight" (Defendants' words), according to those documents:

- West, Gold, Fowlis, and Olson were among the first employees alerted about the arrest in January 2013 (Doc. No. 219-2, privilege log entry 151);

- Cozzolina was among the first to investigate the arrest in February 2013, recommending that HP had no involvement in the matter and left it to H3C "working with the authorities" (Doc. No. 249-7);[15]

- West was directly involved in the RMA refund issue, Joffe Decl. Exh. W ("I will set a call to discuss [the ICT RMA]");

---

[15] Defendants' representation that Cozzolina "authored none of those documents" on which he appeared (Doc. No. 258 ¶ 34) is plainly false as he is the author of Doc. No. 249-7, the only produced document with his name.

- Fowlis was directly involved in holding up the RMA refund, see Joffe Decl. Exh. V ("Jim O['Grady] and Ian [Fowlis] held a call about this yesterday. I believe they agreed to hold off on [the RMA] payment until more information comes forward.");

- West was the one deciding whether to pay TT Global $200,000 for destroying its transceivers because of their questionable nature, see Doc. No. 249-2 ("This would obviously be a Ross [West] call due to financial impact.");

- these "top level leaders" handled the investigation from early 2013 and did not "provide updates" to the lower-level custodians such as Silvestri (Joffe Decl. Exh. A).

Even if not designated as ESI custodians, these "Executive Group" employees should have uploaded their responsive "non-email files" and "key correspondence" to the Share Drive and Defendants should have produced them without any limitations on custodians, according to the Report. Defendants, however, did not produce any documents from these employees, and thus failed to comply with Rule 26 requiring them to produce "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," and with the Final ESI Protocol requiring production of non-email files without limitations on custodians.

### III.   The improper self-collection of ESI

The Report discloses another flaw in Defendants' discovery that Plaintiffs have had no opportunity to challenge until now: the improper "self-collection" of data, whereby Defendants' employees themselves were required "to upload all responsive non-email files . . . and key correspondence" to the Share Drive. As one District Court summarized the concerns with such self-collection, Johnson v. J. Walter Thompson U.S.A., LLC, No. 16 Civ. 1805 (JPO)(JCF), at *9 (S.D.N.Y. Oct. 25, 2017):

> Courts view the self-collection of data with skepticism. See Markey v. Lapolla Industries, Inc., No. 12 CV 4622, 2015 WL 5027522, at *21 (E.D.N.Y. Aug. 25, 2015) (criticizing process and imposing sanctions where "the attorneys had little to no direct contact with Plaintiffs during the process of gathering the responsive documents"); Northington v. H & M International, No. 08-CV-6297, 2011 WL 663055, at *17 (N.D. Ill. Jan. 12, 2011) (finding defendant at fault where it "never tasked anyone other than the custodians themselves to search their computer hard

17

drives, hard copy documents, or other sources for potentially relevant evidence"); Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC, 685 F. Supp. 2d 456, 473 (S.D.N.Y. 2010) (finding process ineffective where counsel's "directive places total reliance on the employee to search and select what that employee believed to be responsive records without any supervision from Counsel"), abrogated on other grounds by Chin v. Port Authority of New York & New Jersey, 685 F.3d 185 (2d Cir. 2012). That is particularly so where, as here, the individual asked to collect responsive information is an alleged wrongdoer. As one court has reasoned: "[D]efendant directed just three employees (one of whom was at the center of plaintiff's complaints) to search their own email without help from counsel and to cull from that email what would be relevant documents. It is unreasonable to allow a party's interested employees to make the decision about the relevance of such documents, especially when those same employees have the ability to permanently delete unfavorable email from a party's system. . . . Most non-lawyer employees . . . do not have enough knowledge of the applicable law to correctly recognize which documents are relevant to a lawsuit and which are not. Furthermore, employees are often reluctant to reveal their mistakes or misdeeds." Jones v. Bremen High School District 228, No. 08 C 3548, 2010 WL 2106640, at *7 (N.D. Ill. May 25, 2010).

See also M & G Polymers USA, LLC v. Carestream Health, Inc., 2010 WL 1611042, at *66 (Del. Super. 2010) ("Trial counsel's blind reliance upon non-lawyer employees . . . to make their own relevance . . . determinations without proper attorney oversight was at best negligent and at worst intentionally calculated to hide the truth."). Here, according to the Report, Defendants required their employees to upload responsive ESI to the Share Drive, making their own relevance determinations.[16]

## IV.   The interests of justice favor reconsideration.

Plaintiffs respectfully ask the Court to reconsider its ruling in light of the newly discovered evidence. As shown, there are glaring gaps in Defendants' production of non-email ESI with no custodial limitations, and in their production of emails from the six ESI custodians.

---

[16] The Report also states that "Counsel interviewed each of Defendants' agreed-to ESI custodians (Bartley, Gill, Harris, O'Grady, Silvestri, and Patterson) (see Final ESI Protocol Exh. 1) concerning the potential existence and location of *non-email* ESI" (Doc. No. 279 ¶ 1), but does not state the same with respect to any other employee of the Corporate Defendants, whose non-email ESI they apparently did not search or produce.

Plaintiffs are not trying to reopen discovery but to compel Defendants to fill in those gaps and to comply with their discovery obligations under the Final ESI Protocol and Rule 26.[17]

Plaintiffs brought their motion to compel after Defendants had completed their document discovery and not earlier because such sequence was contemplated by the parties and ordered by the Court (Doc. No. 196), and because Plaintiffs could not have determined whether Defendants had failed to produce certain documents until after Defendants' production had been completed.

Furthermore, the Order contemplates Defendants' motion for summary judgment on the counterfeit issue while leaving Plaintiffs without the discovery necessary to oppose that motion. Defendants' cover letter to the PSB enclosing their 2013 verification report unequivocally declaring the seized transceivers counterfeit based primarily on their the fake H3C logos, and expressly decrying reliance on the electronic power-on test as "meaningless" in these circumstances (Doc. No. 266-2), is highly relevant to the counterfeiting issue. The second verification report, of the TT Global transceivers, is also highly relevant to this issue because it contains test results of the TT Global transceivers from the same Commonwealth Games batch, which Defendants then instructed TT Global to destroy due to their "questionable" nature.

These contemporaneous documents drafted by Defendants and H3C are without question relevant and material to the issue of counterfeiting and must be produced before the summary judgement motion. See Resolution Trust v. North Bridge Assoc., 22 F.3d 1198, 1208 (1st Cir. 1994) ("[A] litigant who fails to answer potentially relevant discovery requests on schedule will be unable to demand summary judgment until after he remedies his failure."); Rule 56(d) ("If a

---

[17] There are also gaps in Defendants' Report itself. Defendants should be compelled to disclose the identities of all employees who were required to upload their responsive files and key correspondence to the Share Drive because those employees were "the sources of ESI [Defendants] searched," which sources the Court required Defendants to disclose. Doc. No. 276. Comparing that list of relevant employees with the list of the four producing custodians would demonstrate whose files were collected in the Share Drive but withheld from production.

nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").

Defendants' representations in the Report satisfied the Court "that they have met their discovery obligations under the Final ESI Protocol." Doc. No. 280 at 15. As shown above, these representations were false, and Defendants have not met their discovery obligations under the Final ESI Protocol and under Rule 26 of the Federal Rules of Civil Procedure requiring Defendants to produce "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."

And the end result of those misrepresentations is that Defendants, having produced 580 documents from only four custodians, "satisfied" themselves with that production and did not search for any additional responsive documents from other employees (Doc. No. 279 ¶ 3(b)), and "satisfied" the Court with their misrepresentations made in the Report (Doc. No. 280 at 15), while leaving Plaintiffs holding the bag after putting them through the wringer despite their own 60,000 document production -- hardly a just and fair outcome.

## **CONCLUSION**

Based on the above, Plaintiffs respectfully submit that reconsideration of the Order denying their motion to compel is warranted by the newly discovered evidence and in the interests of justice in this case.

November 25, 2019                                  Respectfully Submitted,

_____

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH
MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

21

## **CERTIFICATE OF CONFERRAL**

I, Dimitry Joffe, counsel to Plaintiffs, hereby certify that on November 20, 2019, I and counsel for Defendants Anthony Callaghan met and conferred telephonically pursuant to Local Rule 7.1(a)(2) concerning Plaintiffs' motion for reconsideration of the Court's Order denying their motion to compel. Following the call, Defendants' counsel responded by email as follows: "Further to our telephone conversation this afternoon, Defendants decline your request and object to Plaintiffs filing a motion for reconsideration of Judge Sorokin's recent order on Plaintiffs' motion to compel. It is obvious that there was no manifest error of law in the Court's written opinion and, clearly, no new relevant or material facts have come to light that might affect the Court's analysis or conclusion – neither since the decision issued, not since briefing on the motion closed.  All documentary discovery and any other bases for objection that might otherwise impact the decision have been in existence and in Plaintiffs' possession for many months.  The same is true with regard to any documentary or ESI material Plaintiffs may suggest they should have received but didn't – you were (or should have been) aware of any such deficiencies for a long time, and all steps taken in response to such alleged deficiencies were fully addressed in the motion to compel (despite the Court's prior admonition limiting argumentation to the contents of your July 12, 2019 letter). Be advised that Defendants shall vigorously oppose reconsideration; and shall request that the Court shift to Plaintiffs all fees and costs incurred in opposing the motion. Please include this email as an exhibit and/or quote this response verbatim in your statement regarding your meet and confer obligations under the Local Rules."

_Dimitry Joffe_

_____
Dimitry Joffe

**CERTIFICATE OF SERVICE**

I, Dimitry Joffe, hereby certify that on this 25th day of November 2019, I caused a copy of Plaintiffs' Motion for Reconsideration accompanied by Declaration of Dimitry Joffe with exhibits, to be served by ECF upon Defendants' counsel of record.

_____
Dimitry Joffe
JOFFE LAW P.C.
Counsel to Plaintiffs

23