UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,<br><br>Plaintiffs,<br><br>vs.<br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL,<br><br>Defendants. | Civil Action No. 1:16-CV-10386 (LTS) |

## JOINT REPORT

WHEREAS, on November 15, 2019, the Court set a 90-day schedule for the parties to exchange expert reports regarding whether the transceivers at issue in this case were counterfeit and to conduct expert depositions, and for Defendants to take a Rule 30(b)(6) deposition regarding their spoliation argument [Dkt. No. 280];

WHEREAS, the parties have completed the above-described matters;

WHEREAS, the Court ordered the parties to submit a status report by February 27, 2020, and scheduled a status conference for March 10, 2020 [Dkt. No. 305];

THE PARTIES HEREBY submit their respective reports concerning the counterfeit issue and the anticipated schedule of fact witness depositions:

I.  **The Counterfeit Issue**

    A.    **Plaintiffs' Position**

Plaintiffs have retained Dr. Nicholas Fang, an MIT professor with expertise in optics and holograms, as their expert witness through a Boston expert search agency, Rubin/Anders Scientific Inc. Dr. Fang inspected the holographic labels on the seized transceivers and determined that the majority of the inspected holograms contained one or more of the indicators of counterfeiting described in the contemporaneous H3C verification report of the seized transceivers produced by Defendants, and in the H3C security bulletin describing the features of its holographic security labels on the transceivers generally. Dr. Fang laid out his opinions in his expert report and consistently testified about them during his 2-hour deposition.

Defendants have retained Shelley Raina of True Pedigree LLC as their expert witness. As Mr. Raina revealed on his deposition, True Pedigree LLC was formed in January 2017 by Sideman & Bancroft LLP, a California law firm that serves as regular outside counsel to HP and its affiliates in litigation matters. True Pedigree LLC is located at the same address and on the same floor as the law firm. The law firm is the sole investor in True Pedigree LLC; the law firm's managing partner Jeffrey Hallam and its litigation partner Richard Nelson (who represents HP in a number of pending litigation matters), along with Mr. Raina, constitute its board of directors. The only employees of True Pedigree LLC are Mr. Raina and Daniel Mascaro, who is also a current employee of Sideman & Bancroft and a former HP brand security manager. Daniel Mascaro participated in the inspection of the transceivers in May 2019 while employed by the law firm.

Mr. Raina himself was employed by Sideman & Bancroft from January through December of 2017 in a support staff position in the law firm's Brand Integrity and Innovation Group, whose other non-legal members included Robert Cozzolina, HP's former anti-counterfeit

program manager involved in the events underlying this lawsuit, and Daniel Mascaro. Mr. Raina was interviewed for that position by Jeffrey Hallam and Richard Nelson, and reported to Jeffrey Hallam.

According to Mr. Raina, he was made the CEO of True Pedigree LLC in January 2018 by the company's board of directors composed of Hallam, Nelson and Raina. Even though ostensibly the CEO of True Pedigree LLC, Mr. Raina did not recall the company's full name, its corporate form (LLP or LLC), or its office phone number. During his deposition, Mr. Raina also revealed the existence of another firm, True Pedigree Consulting LLC, which is a clone of True Pedigree LLC – formed by the same law firm of Sideman & Bancroft, with the same address and floor as the law firm, with the same team of the law firms' Hallam, Nelson, and Mascaro, all serving in the same positions as in True Pedigree LLC, with Raina as the CEO of both companies. *See* Raina Tr. 12-26, 33-83.

Accordingly, Mr. Raina's consulting firms are creatures of HP's outside counsel – formed, owned, controlled, and staffed by Sideman & Bancroft. Mr. Raina himself is beholden to the law firm -- HP's outside counsel -- and could be fired from his CEO positions at True Pedigree LLC and True Pedigree Consulting LLC by the companies' boards controlled by the law firm's partners Hallam and Nelson.

In April 2019, prior to his inspection of the transceivers, Mr. Raina asked Defendants for information on the holographic labels, and "was told that there was no information, no document that would explain the features of the holographic label." Raina Tr. 93/7-19. At the time, Defendants had in their possession the H3C verification report with information on the holographic labels submitted to the PSB but withheld that key document from their expert

witness Mr. Raina despite his request. Accordingly, Mr. Raina "did not analyze the holographic labels" on the transceivers. Raina Tr. 253/11-12.

Mr. Raina also testified that he did "not consider holographic labels as anti-counterfeit feature," (Raina Tr. 260/10-11), and that in his opinion transceivers with counterfeit labels could still be deemed genuine. Raina Tr. 254/15-23. Instead, Mr. Raina used the serial numbers from the transceivers' labels and an electronic power-on test to verify their authenticity, which is contrary to H3C's own practice as stated in the verification report, and contrary to Defendants' own practice, *see*, *e.g.*, Raina Tr. 263/4-270/5 (quoting from HPE's verification guidance that states "Beware that it is a common practice for counterfeiters to 'reuse' serial numbers listed on the packaging and often on the invoice and the number printed on the product label in an effort to convince a customer that the product is authentic. This serial number is not intended to be used for product validation," and refers instead to HPE's "fluorescent holograms for authentication."). And even with respect to serial numbers, Mr. Raina admitted at his deposition that some of the indicators of counterfeiting he had applied in his expert report were "false." Raina Tr. 110/5-111/10.

Based on the above, Plaintiffs believe that Mr. Raina's opinions about counterfeiting could not be relied upon and intend to oppose Defendants' motion for partial summary judgment on the issue of counterfeiting and to cross-move for partial summary judgement on this issue in their favor. Plaintiffs are also considering a motion to strike Mr. Raina's report in conjunction with their partial summary judgment motion.

In their motion for partial summary judgment, Plaintiffs intend to show that the transceivers that Defendants admitted were sold by them to ICT bear holographic H3C labels that H3C determined to be counterfeit in its verification report submitted to the PSB, as

confirmed by Dr. Fang's inspection. Plaintiffs also intend to show that HPFS India had delivered to ICT a number of transceivers not listed on the inventory list of the sold transceivers, potentially including the 31 transceivers deemed counterfeit by Mr. Raina.

### B. Defendants' Position

The Second Amended Complaint asserts 12 causes of action. An essential element of each of the first six causes of action requires Plaintiffs to carry their burden of proving, by a preponderance of the evidence, that the transceivers sold by HPFS India to ICT were counterfeit.

This is not a new issue in the case. Since at least October 2017, the Court questioned how Plaintiffs intend to carry their burden.[1] Plaintiffs repeatedly indicated that they intended to rely on (non-party) H3C's initial report to the Chinese police as evidence that the Seized Equipment sold by HPFS to ICT was *in fact* counterfeit. But, as the Court cautioned Plaintiffs' counsel, Plaintiffs have no apparent path to convert that textbook hearsay into admissible evidence – because, through years of litigation, Plaintiffs chose not to sue H3C and chose not to seek any discovery from H3C. *See, e.g.,* Dkt. No. 189 at p. 37-47 (transcript of Jan. 11, 2019 status conference); Dkt. Nos. 280, 300 (denying Plaintiffs' motions to compel and for reconsideration). Nor – despite having control of the Seized Equipment for years both before and after its Court-ordered shipment to the United States – did Plaintiffs inspect the Seized Equipment to confirm whether it was actually counterfeit, and whether any such counterfeit equipment was sold to ICT by HPFS India, as opposed to some other entity from which ICT purchased similar devices.

On November 15, 2019, in response to Defendants' proposal to streamline the case, the Court ordered the parties to conduct expert discovery on the counterfeit issue and set a schedule for the filing of summary judgment motions. Dkt. No. 280.

---

[1] *See* Transcript of Oct. 20, 2017 Status Conference at, *e.g.*, 29-30 (Dkt. No. 129).

Defendants engaged a qualified expert witness, Shelley Raina, who devised a comprehensive testing methodology (based on his nearly twenty years of experience in the field of brand security and counterfeit prevention) to determine whether the Seized Equipment was counterfeit. After conducting his testing, Mr. Raina concluded:

- All units of Seized Equipment that were sold by HPFS India to ICT (with the exception of one that was too damaged to completely analyze) were ***authentic***.

- Numerous units of Seized Equipment that were *not* sold by HPFS India to ICT were ***counterfeit***.

*See* attached Expert Report of Shelley Raina.

In spite of the Court's prior admonitions, Plaintiffs did not retain a qualified expert to opine on whether the Seized Equipment is genuine or counterfeit. Instead, Plaintiffs chose to commission a professor with no expertise in counterfeiting to take pictures of the Seized Equipment and observe the presence of supposed "indicators" of counterfeiting found in H3C's purported statements to the Chinese police and on its website. The expert himself readily admitted that his report does not address the question of whether the devices are *in fact* counterfeit. As detailed below, Plaintiffs' expert "analysis" is a transparent attempt to have admitted in evidence unreliable hearsay documents in a bid to withstand (and perhaps obtain) summary judgment.

Both parties now agree that no further record is required for the Court to rule on the counterfeit issue.[2] Based on Mr. Raina's expert report, and on a forthcoming *Daubert* motion to strike the report of Plaintiffs' proposed expert, Nicholas Xuanlai Fang, Defendants intend to move for summary judgment dismissing all claims and theories predicated on the allegation that HPFS India sold counterfeit equipment to ICT (i.e. Counts I-VI). Defendants also intend to move for

---

[2] *See* Transcript of Jan. 7, 2020 Status Conference (Dkt. No. 306), pp. 21, 23-24; *see also* Transcript of June 10, 2019 Status Conference (Dkt. No. 211), pp. 13-14 ("THE COURT: So all that's left to tee this issue up about the counterfeit, is to resolve the [motion to compel disputes] and then the experts, and then we're done with that. Is that fair? Do you both agree to that? MR.MCGUIRE: We agree. MR. JOFFE: Yes, Your Honor.").

sanctions in light of Plaintiffs' (now-admitted) destruction of evidence critically relevant to the counterfeit issue, which has prejudiced Defendants' ability to defend against Plaintiffs' claims.

### 1. Dr. Fang's Unreliable Analysis Should be Excluded

Defendants intend to file a *Daubert* motion to strike Dr. Fang's report. Unlike Mr. Raina, Dr. Fang is not (and does not claim to be) an expert in counterfeiting. He did not provide (and does not claim to hold) any opinion regarding whether any of the Seized Equipment is *in fact* counterfeit. Instead, Dr. Fang merely made basic, naked-eye observations of holographic labels on certain units of Seized Equipment, and then compared them to supposed "indicators" of counterfeiting gleaned from the H3C police report and a "security bulletin" on H3C website. Dr. Fang's report amounts to nothing more than Plaintiffs' backdoor effort to introduce inadmissible – and fundamentally unhelpful – unauthenticated hearsay.

Dr. Fang is a professor at MIT specializing in nanophotonics. Dr. Fang is an expert in his field – but his field has nothing at all to do with the counterfeit issue in this case. He has no expertise, and no experience, in counterfeiting analysis, supply chain security, or transceivers. Ex. C, Fang Tr., 18:17-20:7. Though he has studied holograms, Dr. Fang does not claim to be an expert in holographic security labels like the ones he examined here. *Id.*, 21:3-8.

Thus, the observations set forth in Dr. Fang's report are not helpful to answer the core question at this stage: are the transceivers in fact counterfeit? Dr. Fang readily admits that his "opinions" are not relevant to this issue:

> Q: [Y]ou are not offering an opinion regarding whether the transceivers are, in fact, counterfeit, correct?
>
> A: Correct.

*Id.*, 23:7-11.  Nor does he have any basis to dispute Mr. Raina's conclusions.  *Id.*, 15:1-5; 77:9-22. Dr. Fang does not provide any relevant expert opinion, and that alone is sufficient reason to exclude his testimony.

Dr. Fang was merely instructed by Plaintiffs' counsel to compare his observations of the holographic labels present on certain of the transceivers with supposed "indicators of counterfeiting" set forth in two documents provided by Plaintiffs' counsel:  a "Security Bulletin" apparently printed from H3C's website (Ex. 3 to his report), and H3C's initial report to the Chinese police (the "Verification Report," Ex. 4).  Fang Report, p. 2.  Dr. Fang acknowledged that "I do not have any opinion about accuracy or authenticity of those" documents, and made no effort to determine whether the statements therein were true and accurate.  Tr., 23:12-24:8; 27:2-5.  That is, Dr. Fang does not know (because he has no independent expertise) whether the "indicators" of counterfeiting in those third party, unauthenticated hearsay documents are in fact true indicators of counterfeiting that are even applicable to the transceivers at issue.  *Id.*, 18:17-23.  With respect to the Security Bulletin, for example, he acknowledges that its guidelines only apply to transceivers manufactured after a certain date, but has "no idea" when the transceivers he examined were actually manufactured.[3]  *Id.*, 64:15-65:1.

Plaintiffs' proffer of Dr. Fang's report – and more specifically Exhibits 3 and 4 – is a textbook example of an improper attempt to use expert testimony as a mere conduit for unauthenticated, inadmissible, and unreliable hearsay.  The Security Bulletin and the Verification Report are purportedly (though unauthenticated) statements of an inaccessible third party, H3C. Both documents are written in Mandarin, and Plaintiffs have yet to provide any certified English

---

[3]  The EEPROM data captured in Appendix A to Mr. Raina's report confirms that dozens of the transceivers with labels Dr. Fang assumes are subject to the Security Bulletin were in fact, manufactured prior to the May 10, 2010 cutoff date stated in the Bulletin.

translation of either.[4] Plaintiffs seek to offer the documents for the truth of the statements allegedly therein, *i.e.*, the "indicators" of counterfeiting and their application to the Seized Equipment. Plaintiffs have not identified any evidentiary exception permitting their admissibility, nor could they. The Security Bulletin and Verification Report are inadmissible hearsay. The Court previously warned Plaintiffs' counsel of this evidentiary obstacle, including specifically with respect to the Verification Report.

Rule 703 permits an expert's reliance on inadmissible hearsay *only* where it is of a type that experts in the same field would reasonably rely on, and where the Court determines that its probative value in helping the jury evaluate the expert's opinion substantially outweighs its prejudicial effect. F.R.E. 703. Here, Plaintiffs cannot show that experts in Dr. Fang's particular field (nanophotonics) would typically rely on such documents. Indeed, Dr. Fang testified that he himself had never before used any document similar to the Security Bulletin or the Verification Report in any of his work. Tr. 31:10-17. That cuts off the Rule 703 analysis.

But even if Plaintiffs could meet the first requirement of the Rule 703 exception, they could not meet the second. The prejudicial effect of permitting Plaintiffs to introduce inadmissible hearsay through Dr. Fang as their sole evidence that the Seized Equipment is counterfeit would vastly outweigh any benefit to the jury in evaluating Dr. Fang's opinion. Plaintiffs intend for the jury to learn about H3C's alleged statements to the Chinese police, and to accept them as true (though Dr. Fang admits he has no idea whether they are true or not and made no effort to verify their truth). Dr. Fang's report would have no value to Plaintiffs otherwise. Indeed, without

---

[4] Plaintiffs' failure to obtain a certified, independent English translation of either document is an additional reason Dr. Fang's report is unreliable. Plaintiffs instead provided their own purported, unsworn "office" translations that are rife with garbled English and formatting issues. Defendants (and the Court, for that matter) cannot fairly evaluate Plaintiffs' evidence in the form presented. In fact, this issue came to a head in Mr. Raina's deposition, when Plaintiffs' counsel repeatedly tried to force Mr. Raina to agree or disagree with purported statements in the Security Bulletin and the Verification Report, which are written in a language Mr. Raina cannot read. *See* Ex. F, Feb. 11, 2020 letter to D. Joffe.

Exhibits 3 and 4, Dr. Fang would have no "opinion" at all. Tr., 18:24-19:4. No jury instruction could remedy this prejudice. The issue presented here falls squarely within the letter and policy of case law prohibiting the use of expert reports merely to parrot inadmissible hearsay.

There is another reason Dr. Fang's report should be excluded. Even if Plaintiffs could introduce a comparison of the counterfeit "indicators" of the Security Bulletin and the Verification Report with the Seized Equipment itself, the jury is perfectly capable of undertaking that comparison on its own without the benefit of Dr. Fang's purported "opinions." Dr. Fang's expertise in nanophotonics adds no value here. He admitted in his deposition that every observation he made – *e.g.*, whether certain holographic labels were damaged, or whether the H3C logo shifted off-center in one direction or another – could be made by a layperson with a naked eye (or, at most, a cell phone camera and a ruler). *See* Tr. pp. 50:16-77:8 (walking through each of Dr. Fang's nine findings and establishing that they could be made by a layperson, and that there is no indication H3C used special equipment in making the observations described in the Verification Report).

Plaintiffs had the opportunity to retain a qualified counterfeiting expert to analyze the Seized Equipment and testify under oath that the Seized Equipment sold by HPFS India is counterfeit. Perhaps they tried, and failed (because such equipment is genuine). Whatever the reason, Plaintiffs cannot use Dr. Fang's report to sidestep the question posed by the Court – is the Seized Equipment *in fact* counterfeit? – in trying to escape (or obtain) summary judgment. Dr. Fang's report should be excluded.

### 2.   Mr. Raina's Analysis

Mr. Raina has nearly twenty years of experience in investigating and identifying counterfeit networking hardware for manufacturers and law enforcement agencies, including as Cisco's former Global Director of Compliance Systems and Investigations.

As explained in his expert report (attached hereto as Ex. B), Mr. Raina applied what he considered the most reliable methodology for evaluating authenticity of transceivers. It is a holistic analysis that focuses primarily on the presence or absence of anomalies in the unique identifying data – especially serial numbers – associated with each transceiver. Because serial number data should be redundant in every place where it is captured – the printed label, the barcodes, and the internal electronic "EEPROM" data – anomalies indicate some level of nefarious interference in the manufacturing process. Counterfeiters often do not have the means or make the effort to achieve that redundancy. For example, counterfeiters often just repeat serial numbers across entire batches of transceivers, or fail to match the electronic data to the printed label.

Mr. Raina determined that 31 devices were counterfeit. These 31 devices had numerous anomalies, including serial number mismatches, duplicative serial numbers, invalid EEPROM data entries, and corrupt barcodes. ¶¶ 70-74. Not one of these devices was on the Inventory List attached to the purchase order for equipment HPFS India agreed to sell to ICT. By contrast, every one of the 647 devices on the Inventory List was determined to be genuine under the same methodology. ¶¶ 57-67.[5]

Mr. Raina also reviewed Dr. Fang's report and the exhibits thereto, and opined that Dr. Fang did not use a reliable methodology for evaluating authenticity, and that nothing in Dr. Fang's report would change Mr. Raina's own methodology or conclusions. ¶¶ 79-87.

---

[5] Though Plaintiffs did not raise the issue in Dr. Fang's expert report or in either deposition, it became apparent in correspondence following the depositions that Plaintiffs view the appropriate "inventory list" to be the full set of equipment returned from the Commonwealth Games rather than the one attached to the ICT purchase order and used by Mr. Raina. Evidently, Plaintiffs determined that 750 (rather than 647) out of the 781 pieces of Seized Equipment originated with HPFS India. *See* Ex. G, Feb. 16 letter from D. Joffe. The 31 devices that Plaintiffs agree are not listed on any inventory of equipment sold to ICT by HPFS India ***correspond exactly with the 31 devices Mr. Raina determined to be counterfeit***. *Id.*

### 3.  Defendants' Forthcoming Motion for Summary Judgment

Along with their *Daubert* motion, Defendants intend to move – simultaneously or *seriatim*, as the Court prefers – for partial summary judgment that the transceivers HPFS India sold ICT were not counterfeit. Plaintiffs bear the burden of proving by a preponderance of the evidence that the Seized Equipment sold to ICT by HPFS India is in fact counterfeit. Based on the evidence they adduced, Plaintiffs cannot meet that burden, and therefore cannot survive summary judgment.

As outlined above, neither Dr. Fang's report nor the unauthenticated (and unauthenticable) H3C hearsay embedded therein can meet Plaintiffs' burden. Defendants, by contrast, provided Mr. Raina's report as affirmative, unrebutted evidence that Plaintiffs' theory is wrong: HPFS India sold ICT only *genuine* equipment, but Plaintiffs were in fact attempting to sell *counterfeit* equipment obtained from other sources when they were arrested. Plaintiffs' efforts to poke holes in Mr. Raina's analysis,[6] or to imagine new conspiracies perpetrated by HP,[7] go only to the credibility of Mr. Raina – not to Plaintiffs' own burden to produce substantial evidence supporting their claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Defendants' motion for partial summary judgment, if granted, will significantly clarify and narrow the scope of the case for further fact discovery and trial. No longer will Plaintiffs be able

---

[6] For example, Plaintiffs' counsel spent a large portion of Mr. Raina's deposition developing a hypothetical scenario where a counterfeiter somehow obtained the Inventory List and spent the time to perfectly replicate every serial number, label, and EEPROM data point in a separate set of counterfeit equipment, undetected by Mr. Raina's methodology. Mr. Raina testified that the chances of that happening, based on his decades of experience, was "absolutely zero." Ex. D, Raina Tr., 197:2.

[7] Plaintiffs profess concern that a law firm affiliated with Mr. Raina's consulting company also has represented HP, and that a colleague who assisted Mr. Raina in taking pictures of the Seized Equipment previously worked at HP. Mr. Raina testified that neither his colleague nor the law firm had any involvement in preparing or editing his report.

to advance various, conflicting, and confusing alternative theories premised on the equipment being both counterfeit and authentic. The issue is ripe for resolution now.

### 4. Motion for Spoliation Sanctions

Defendants intend to file a motion for sanctions based upon Plaintiffs' spoliation of evidence. Defendants took a Rule 30(b)(6) deposition of Alexander Styller on February 12, 2020, (continued on February 25, 2020 to address two topics that Mr. Styller was unprepared to testify about on the original date) concerning spoliation issues. That deposition, and Plaintiffs' document production, reveal that Plaintiffs have engaged in an intentional and/or reckless campaign to destroy relevant information and Defendants have been prejudiced by this destruction.

Defendants will be prepared to address, at the status conference with the Court, all issues with Plaintiffs' destruction of evidence. In brief, they relate to:

a. Plaintiffs' destruction of the Individual Plaintiffs' and Ryan Quinn's entire email accounts and all of the emails/data contained therein, after the arrest of Jason Yuyi and Cathy Yu and during the detention of the Individual Plaintiffs. Plaintiffs expressly destroyed this evidence to prevent the Chinese authorities from obtaining and using it against the Individual Plaintiffs.

b. Plaintiffs' destruction of the entire email account of Alexander Pekar in connection with ICT's 2014 Email Migration.

c. Individual Plaintiffs' disposal/destruction of the laptop computers that they were using for ICT-related business, and that were seized and returned by the Chinese authorities.

d. Plaintiffs' destruction/sale of the remaining equipment sold by HPFS India to ICT that was not seized by the Chinese authorities.

e. Plaintiffs' destruction of all remaining computer devices (*e.g.*, laptops, desktops, etc.) of all of its employees in 2017 when ICT closed its Commercial Street offices and thereafter allowed all of its employees and consultants to work from home on their own personal devices.

    f.   Plaintiffs' failure to implement a timely and appropriate litigation hold notice to all Plaintiffs and all custodians of Plaintiffs' documents and information (*e.g.*, Shinto and iHub Solutions).

## II. Depositions

### A. Proposed Deponents

#### 1. Plaintiffs' Proposed Deponents

Plaintiffs propose to take 10 depositions of the following individuals:

    1. Kevan Bartley

    2. David Gill

    3. Tom Harris

    4. JT Silvestri

    5. Jim O'Grady

    6. Stuart Patterson

    7. Ross West

    8. Liu "Jessica" Rui

    9. an HPFS India 30(b)(6) witness knowledgeable about the 2010 equipment lease to TATA and delivery by Inspira; the 2011 return of the equipment from TATA and its sale to ICT; and the 2012 inspection of the remaining equipment in India and its sale to TTG.

    10. an HPE/HPI 30(b)(6) witness knowledgeable about the 2013 incarceration and counterfeiting investigation.

The first 6 deponents on the list are Defendants' custodians with direct knowledge of the events underlying this litigation. Ross West is an employee of HPFS who was also involved in the underlying events and played a key role in Defendants' decision to instruct TT Global to destroy the remaining transceivers from the Commonwealth Games batch due to their questionable nature and origination, and to pay TT Global $200,000 for their destruction. Liu "Jessica" Rui served as an H3C inhouse counsel in 2013 and was ultimately involved in the

14

counterfeit investigations in China, H3C's inspections of the ICT and TT Global transceivers, and correspondence with the PSB. Ms. Rui used both @hp.com and @h3c.com emails at that time and is currently listed as senior legal counsel for HPE Security on her Linkedin profile. Defendants HPFS India, HPE and HPI did not produce any documents from any of their employees but were directly involved in the initial sale of the transceivers in India and the subsequent counterfeit investigations in China

      **2.**    **Defendants' Proposed Deponents**

1) Plaintiff Alexander Styller
2) Plaintiff Jade Cheng
3) Plaintiff Jason Yuyi
4) Plaintiff Cathy Yu
5) Plaintiff Caroline Marafao Cheng
6) Plaintiff Pushun Cheng
7) Plaintiff Changzhen Ni
8) Plaintiff Junfang Yu
9) Plaintiff Meixiang Cheng
10) Plaintiff Fangshou Yu
11) Plaintiff Changhua Ni
12) Ryan Quinn
13) Alexander Pekar
14) Val Faybush
15) One Shinto representative (identity to be determined)
16) One to two iHub Solutions representative(s) (identities to be determined)
17) Yevgeny Sadovnikov
18) Nick Makarovsky
19) Anatoly Grabkovksy

**B.**    **Objections to Proposed Deponents**

    **1.**    **Plaintiffs' Objections**

Plaintiffs object to the 20 depositions requested by Defendants as excessive, unduly burdensome and disproportionate to the needs of the case. In particular, Defendants admitted that the majority of the seized transceivers now in Boston were sold by HPFS India to ICT, and the key issue is whether those transceivers are counterfeit – as H3C verification report to the PSB

drafted with Defendants' involvement states, and which findings are confirmed in Dr. Fang's expert report -- or authentic, as stated in Mr. Raina's expert report. The third parties who had intermediate access to the equipment, such as Shinto in India or iHub Solutions in China, would have no relevant information on this issue. The other proposed deponents such as ICT's former employees Faybush, Sadovnikov and Grabkovsky, and its current employee Makarovsky, were not involved in the underlying events either in India or in China and would have no relevant information that is not available otherwise. At most, Sadovnikov, Grabkovsky and Makarovsky would have knowledge of ICT's IT system and email migration, on which topics Defendants had already deposed ICT's 30(b)(6) witness. Accordingly, Plaintiffs oppose Defendants' request for depositions of Shinto, iHub Solutions, Faybush, Sadovnikov, Grabkovsky and Makarovsky as a proverbial fishing expedition.

### 2. Defendants' Objections

Defendants do not object to Plaintiffs' proposed deponents, but reserve their right to object to any topic listed in a formal Notice of Deposition pursuant to Rule 30(b)(6) once properly served.

Likewise, Defendants do not object to Plaintiffs naming Ross West and/or Jessica Liu as potential deponents, but note that neither individual is an employee of any Defendant as of this date.

### C. General Schedule for Depositions

### 1. Plaintiffs' Proposal

Plaintiffs propose that the fact witness depositions could commence after the parties brief their respective motions for partial summary judgment and while these motions are pending. The Family Plaintiffs, Jason Yuyi and Cathy Yu are in China and have been under the coronavirus quarantine until recently; there is currently a travel ban on Chinese residents issued by the U.S.

State Department. Accordingly, Plaintiffs propose to commence depositions of those witnesses who are in the U.S. – Alex Styller, Jade Cheng and Caroline Marafao Cheng – and of Defendants' witnesses, and to schedule the depositions of the Chinese witnesses once the ban is lifted.

### 2.     Defendants' Proposal

The Family Plaintiffs[8] could potentially be deposed and their medical/psychological exams scheduled during the pendency of the briefing and decision on the proposed partial motion(s) for summary judgment concerning the counterfeiting issue.  The Family Plaintiffs likely only have knowledge and information concerning their own damages and do not have knowledge or information concerning the Plaintiffs' underlying theories of liability.  For this reason, unlike other proposed deponents, there is no reason to delay obtaining that information pending resolution of the motion(s) for partial summary judgment.

However, Plaintiffs' counsel has represented to Defendants that all of the Family Plaintiffs (except for Caroline Marafao Cheng), as well as Jason Yuyi and Cathy Yu, are currently under quarantine in China due to concerns involving the coronavirus.  Thus, Defendants propose that the deposition and medical/psychological examination of Caroline Marafao Cheng proceed during the summary judgment briefing schedule.  Defendants understand that it is illegal to take or sit for a deposition in mainland China, so remote depositions of the remaining Family Plaintiffs is not an option and depositions of the Chinese residents will have to be delayed on account of the above-referenced quarantines.  Each of the Family Plaintiffs, Yuyi, and Yu must travel to the United States for their depositions, but Defendants understand that that will not be possible until a later

---

[8] The Family Plaintiffs include Caroline Marafao Cheng, Pushun Cheng, Changzhen Ni, Junfang Yu, Meixiang Cheng, Fangshou Yu and Changhua Ni.

date, presuming that the applicable quarantines are lifted.  In the interim, the Family Plaintiffs, Yuyi, and Yu should advise Defendants as to the status of their applications for obtaining visas or other authorizations to travel to the United States for their depositions.  Once the quarantine(s) are lifted, the Family Plaintiffs' depositions and examinations should immediately be scheduled.[9]

With respect to all *other* deponents proposed by Plaintiffs and Defendants, Defendants propose that their depositions be scheduled following resolution of the motion(s) for partial summary judgment.  Plaintiffs' two primary theories of liability rest on two entirely contradictory premises:  (1) Defendants knowingly sold ICT *counterfeit* equipment, and alternatively (2) Defendants knowingly sold ICT *genuine* equipment, but refused to provide that knowledge to the Chinese authorities to assist in the release of the Individual Plaintiffs as part of a "cover up."  Deposing witnesses, both on Plaintiffs' and Defendants' side, while not knowing which of these contradictory theories will be pursued by Plaintiffs poses an almost impossible task in taking and defending against those depositions.

Likewise, the resolution of the motion(s) for partial summary judgment may limit the scope of depositions.  For example, if the Court grants Defendants' motion for partial summary judgment and dismisses SAC Counts I through VI, all depositions of Defendants' witnesses should be limited in time from approximately January 31, 2013 to December 31, 2014—because Defendants could not have attempted to "cover up" the genuine nature of the Equipment from the Chinese authorities until they learned of the arrests on or about January 31, 2013.  It is this very efficiency and ability to narrow the scope of discovery that led the parties to originally propose that discovery be phased

---

[9] In the event that the applicable quarantines are not lifted and/or the Family Plaintiffs, Yuyi, and/or Yu have not obtained travel visas or otherwise made themselves available for their depositions and examinations by the deadline for the completion of fact witness depositions (pursuant to any schedule the Court adopts), Defendants reserve the right to move to dismiss all claims asserted by those Plaintiffs who do not appear.

such that the counterfeiting issue would be resolved prior to proceeding with depositions of fact witnesses.

## CONCLUSION

The parties respectfully submit the above Joint Report for the Court's consideration.

| | |
|---|---|
| **JOFFE LAW P.C.**<br>765 Amsterdam Avenue, #2C<br>New York, New York 10025<br>(212) 309-8711 | **GIBBONS P.C.**<br>One Pennsylvania Plaza, 37th Floor<br>New York, New York, 10119<br>(212) 613-2000 |
| **THE LAW OFFICE OF JOSH MCGUIRE**<br>51 Winchester Street, Suite 205<br>Newton, Massachusetts 02461<br>617-461-6400<br>Attorneys for Styller Plaintiffs | **CHOATE, HALL & STEWART LLP**<br>Two International Place<br>Boston, MA 02110<br>(617) 248-4000<br>Attorneys for Defendants |
| By: __*s/ Dimitry Joffe*_____<br>     Dimitry Joffe | By:___*/s Anthony P. Callaghan*_____<br>     Anthony P. Callaghan |