# EXHIBIT 1



# REFERRAL AND REVENUE SHARE AGREEMENT

This Referral and Revenue Share Agreement (the "**Agreement**") is entered into as of 6th December 2011 (the "**Effective Date**") between the parties identified below.

## THE PARTIES

Hewlett-Packard Financial Services (India) Private Limited of 3rd Floor, Calcot House, 8/10 M P Shetty Marg, Tamarind Street, Fort, Mumbai, India ("**HPFS**")

AND

ICT Company of 239 Commercial Street, Unit B, Malden, MA 02148, USA ("**ICT**")

## BACKGROUND

A. HPFS will sell all or part of the Equipment to the Broker under one or more sale documents entered into between HPFS and the Broker. Equipment sold by HPFS to a Broker is referred to in this Agreement as "Active Equipment".

B. ICT intends to acquire title to the Active Equipment from Broker and then arrange for its sale to third parties.

C. In return for HPFS referring the opportunity to remarket the Active Equipment to ICT, ICT will pay HPFS a fee calculated in accordance with this Agreement.

## AGREEMENT

In consideration of each party's rights and obligations under this Agreement, the parties agree as follows.

1 **Definitions**

Capitalized terms used in this Agreement and not otherwise defined will have the meanings ascribed to them in this Section:

Broker: Shinto Creative Elements Private Limited or such other broker nominated by ICT for the sale of any Equipment.

Equipment: The equipment owned by HPFS described in Exhibit A to this Agreement.

2 **Acquisition and Sale of the Equipment by ICT**

2.1. Prior to HPFS acquiring any Equipment from a Broker, HPFS and ICT will agree the United States Dollar ("USD") price for the sale of the Equipment. HPFS will sell the Equipment to Broker at an Indian Rupees

("INR") equivalent of that USD amount. The USD and INR amounts will be specified in sale agreement entered into between HPFS and Broker.

2.2. ICT will have sole responsibility for taking the necessary steps to acquire title to the Active Equipment from Broker.

2.3. ICT will have the sole right to direct the re-sale of the Active Equipment for a period of 12 months commencing on the Effective Date (the "Sale Period") and ICT agrees to use its best efforts to remarket the Active Equipment at the highest possible prices in accordance with this Agreement. ICT will execute and deliver all documents evidencing or effecting the sale or transfer of the Active Equipment to third parties without identifying HPFS. ICT will sell the Active Equipment only to commercial customers as whole units or for use as parts or components or to resellers for this purpose. In the course of selling the Active Equipment ICT will at all times comply with Hewlett-Packard's General Specifications for Environment, DWG No. A-5951-1745-1 (www.hp.com/go/supplierE). In the event it is necessary to do so ICT will dispose or recycle the Active Equipment in full compliance with all applicable laws and regulations.

2.4. If ICT is unable to re-market any of the Active Equipment within the Sale Period it will promptly notify HPFS in writing. Upon receiving such notification HPFS may, at its discretion, elect to extend the Sale Period or assume control of the sale of the unsold Active Equipment. If HPFS elects to assume control of the unsold Active Equipment then HPFS will make all material decisions related to the on-sale of the Active Equipment and ICT will comply with all of HPFS' reasonable directions connected to such sale.

3 Sales Report

3.1. Within 45 days of the expiration of the Sale Period ICT will provide a report to HPFS setting out details with respect to ICT's sale of the Active Equipment (the "Sale Report"). The Sale Report will include the following information:

   3.1.1. Details of the tax exclusive revenue received from the sales calculated in accordance with Section 3.2 (the "Revenue");
   3.1.2. Details of the deductions incurred with respect to the sales calculated in accordance with Sections 3.2 and 3.3 (the "Deductions");
   3.1.3. The net revenue calculated by deducting the Deductions from the Revenue (the "Net Revenue"); and
   3.1.4. The sum (such amount the "Base Cost") of:
      (a) The USD equivalent (as specified in the relevant sale agreements entered into between HPFS and Broker) of the sale price paid to HPFS when it sold the Active Equipment to Broker; plus
      (b) Any reasonable and documented, sales commissions or other reasonable compensation amounts paid by ICT to Broker upon Broker selling Active Equipment to ICT (including any margin between the sale price referenced in Section 3.1.4(a) and the price paid by ICT to acquire the Active Equipment from Broker).

   The amounts referenced in paragraphs (a) and (b) will be calculated on a tax inclusive basis except to the extent that either Broker or ICT is able claim any input tax credit or other credit with respect to the relevant sale.

3.2. For the purposes of Section 3.1 all Revenue and Deductions data contained within the Sale Report will be provided in USD. If ICT sells any of the Active Equipment or incurs any Deductions in a currency other than USD (each, a "Foreign Currency") then it will convert the relevant sale proceeds or costs into USD by using the spot exchange rate for the Foreign Currency and USD quoted on Bloomberg's Cross-Rates Exchange Rate ("FXC") as of the date on which the relevant sale was completed or cost incurred.

3.3. For the purposes of Section 3.1.2, ICT will be permitted to itemize Deductions with respect to the on-sale of the Active Equipment as follows:

- 3.3.1. All reasonable out-of-pocket expenses incurred by ICT with respect to the handling and/or on-sale of the Active Equipment including, except to the extent ICT is entitled to an input tax credit or other tax credit, any indirect taxes payable with respect to those expenses;
- 3.3.2. The unrecoverable indirect taxes (if any) paid by ICT with respect to ICT's acquisition of the Active Equipment from Broker except to the extent that (a) such cost is included within the calculation of the Base Cost and/or (b) ICT is able to claim an input tax credit or other credit with respect to the acquistion; and
- 3.3.3. Any damaged equipment debit ("Damaged Equipment Debit"), as calculated under Section 3.4.

For the avoidance of doubt, ICT will not be permitted to itemize Deductions with respect to:

- 3.3.4. Any internal costs incurred with respect to the sale of the Active Equipment (including, without limitation, commissions paid to employees and internal administration costs); and
- 3.3.5. Any indirect taxes payable with respect to ICT's sale of the Active Equipment to a third party.

3.4. In the event any of the Active Equipment is, as of ICT's receipt of the Active Equipment, not operational and in good working order (any such equipment, the "Damaged Equipment") and provided that:

- 3.4.1. The value of the Damaged Equipment exceeds 5% of the Base Cost of all the Active Equipment;
- 3.4.2. The Damaged Equipment was not damaged in the period between Broker collecting the Active Equipment from HPFS and delivering it to ICT; and
- 3.4.3. The Damaged Equipment is damaged beyond economic repair and has been recycled or returned to HPFS;

ICT may claim a Damaged Equipment Debit with respect to the Damaged Equipment equal to the Base Cost of the Damaged Equipment when HPFS sold it to Broker.

4  **Revenue Share Payment**

ICT will pay HPFS an amount (the "Referral Fee") equal to:

*(Net Revenue less Base Cost) multiplied by 0.5*

HPFS will invoice ICT for the Referral Fee. The Referral Fee amount is inclusive of any applicable taxes and HPFS' invoice will be for a total amount, inclusive of any taxes, equal to the Referral Fee.

For the avoidance of doubt, no amount will be payable by HPFS to ICT if the Base Cost exceeds the Net Revenue.

5  **Payment Terms**

HPFS' invoice for the Referral Fee will be denominated in USD and payable by ICT within 30 days of the date on which the invoice is issued. In case of delay in payment of the Referral Fee, ICT will pay interest on the unpaid portion at 2% p.a. above the prime rate quoted by the Wall Street Journal. ICT must make all payments due under this Agreement without abatement, deduction, withholding or set-off of any kind.

6  **Sale Proceeds**

ICT will hold all Revenue on trust for HPFS until accounted for in accordance with this Agreement.

7  **Audit**

HPFS reserves the right to audit, inspect and make copies of or extracts of ICT's records and processes connected with ICT's performance under this Agreement at any time with twenty four hours prior notice to ICT.

8  **Export Compliance**

If the re-sale of the Active Equipment requires it to be exported, re-exported or imported, ICT will be responsible for complying with all applicable laws and regulations and for obtaining all required export and import authorizations. ICT acknowledges that the Active Equipment (including any software and/or source code and/or any technology, technical data and technical assistance, including without limitation blueprints, plans, engineering designs, specifications, manuals, instructions, and training) obtained by ICT pursuant to this Agreement may be subject to the export control laws and regulations of the United States and other governments. ICT agrees that (i) it will not export, re-export, or transfer any such software or source code or any direct product thereof to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments and (ii) it will not use such technology, technical data, and technical assistance or the products thereof in the design, development, or production of nuclear, missile, chemical, or biological weapons and it will not transfer such technology, technical data, and technical assistance to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States government and other applicable governments. This Section 8 will survive the expiration or earlier termination of this Agreement.

9  **Risk Of Loss**

HPSF will not be responsible for risk of loss to Active Equipment from the moment Broker collects it from HPFS' designated premises. Risk of loss to the Active Equipment after such time will be a matter to be agreed between ICT, Broker, their sub-contractor, customers and any other relevant third person.

10  **General Terms**

   10.1.  **Taxes**
   In connection with its sale of the Active Equipment to third parties, ICT will be responsible for paying and recovering any and all sales, transactional, use or other taxes (including, without limitation, any goods and services, value-added tax, customs duty, sales tax, excise duty, stamp duty, other duty, governmental charge, fee, levy or impost).

   10.2.  **HPFS Warranties**
   To the maximum extent permitted by applicable law, HPFS makes no warranty whatsoever concerning the Active Equipment and no such warranty will be implied.

   10.3.  **HPFS Liability**
   To the fullest extent permitted by law, HPFS' liability under this Agreement will in no event exceed the Referral Fee. In no event will HPFS be liable to ICT for incidental, indirect, exemplary or consequential damages or for any loss of profits, revenue, interest or goodwill arising in connection with this Agreement.

   10.4.  **Indemnity**
   ICT will indemnify HPFS and its affiliates, officers, directors, agents and employees harmless from and against any and all claims, actions, proceedings, losses, expenses (including reasonable attorneys' fees), demands or judgments which result or arise from the ICT's use, operation, handling, treatment, storage, disposal, transportation, recycling, re-sale or destruction of any Active Equipment. This Section 10.4 will survive the termination of this Agreement.

   10.5.  **Miscellaneous Term**
   This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements and understandings, both written and oral, related to its subject matter. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that ICT may not assign its rights and obligations under it without the prior written consent of HPFS. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired. All written notices must be sent by certified or first class mail or recognized overnight delivery service, postage

prepaid, to each party's respective address given above or to such other address as either party may later give in writing.

## 11 Law and Jurisdiction

This Agreement will be governed by the laws of Commonwealth of Massachusetts. The parties consent to the jurisdiction of any courts of the Commonwealth of Massachusetts and waive any objection to the venue of any legal process on the basis that the process has been brought in an inconvenient forum.

## 12 Counterparts

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original of equal force and effect. No changes, modifications or amendments to this
Agreement shall be accepted or made a part hereof unless expressly agreed to in writing by Seller.

The parties have executed this Agreement as of the date and year first above written.

Agreed and Accepted:

| HPFS: | ICT: |
|---|---|
| By: *[signature]* (on behalf) | By: *[signature]* |
| Name: JAVUN UM | Name: Mike Alexander Pekav |
| Title: APJ Delivery Team Lead | Title: Vice President |
| Address: | |



Exhibit A

| Part number | Product Types | Total |
|---|---|---|
| 0213A01S | Others(Power Supply) | 15 |
|  | Power Equipment (Power Supply) | 50 |
| 0213A01T | Others(Power Supply) | 1 |
|  | Power Equipment (Power Supply) | 6 |
| 0231A0AE | Network Product (Switch) | 31 |
|  | Others(Network Product) | 40 |
| 0231A27N | Network Product (XFP Module Card) | 186 |
| 0231A27P | Network Product (Ethernet Module Card) | 316 |
| 0231A438 | Network Product (Transceiver Module) | 109 |
|  | Others(Network Product) | 805 |
| 0231A563 | Network Product (Transceiver Module) | 5520 |
|  | Others(Network Product) | 1243 |
| 0231A66A | Power Equipment (Power Supply) | 261 |
| 0231A72D | Others(Cables/Cable Accessories) | 501 |
| 0231A72E | Others(Cables/Cable Accessories) | 111 |
| 0231A753 | Network Product (Card) | 95 |
|  | Others(Network Product) | 37 |
| 0231A81W | Others(Power Supply) | 80 |
|  | Power Equipment (Power Supply) | 66 |
| 0231A86P | Network Product (Switch) | 55 |
|  | Others(Network Product) | 80 |
| 0231A936 | Network Product (Switch) | 52 |
|  | Others(Network Product) | 40 |
| 0235A0BS | Network Product (Switch) | 466 |
|  | Others(Network Product) | 50 |
| 0235A10B | Network Product (Switch) | 991 |
|  | Others(Network Product) | 300 |
| 0235A24U | Network Product (Switch) | 187 |
|  | Others(Network Product) | 62 |
| 0235A25N | Enclosure | 28 |
|  | Others(Network Product) | 40 |
| 0235A26G | Network Product (Firewall) | 92 |
|  | Others(Network Product) | 40 |
| With asset above | Others(Software) | 5 |
|  | Others(Power Supply) | 15 |
|  | Power Equipment (Power Supply) | 50 |
|  | FAN | 28 |
|  | Others(FAN) | 40 |
| Grand Total |  | 12084 |