# EXHIBIT 7



765 Amsterdam Avenue, 2c
New York, New York 10025
917.929.1964
dimitry@joffe.law
www.joffe.law

**By Email**                                                    February 16, 2020

Paul A. Saso, Esq.
Gibbons, P.C.
One Pennsylvania Plaza, 37th Fl.
New York, NY 10119-3701
psaso@gibbonslaw.com

Re: Styller, et al. v. Hewlett-Packard Fin. Servs. Co., et al., No. 1:16-cv-10386 (LTS)

Dear Paul,

I write in response to your letter of February 6, 2020, concerning the Seized Equipment.

The PSB seized 781 transceivers in China: 3 initially on December 7, 2012 (SAC ¶ 54), and 778 subsequently during the raid on December 9, 2012 (SAC ¶ 55).

After the PSB returned the 781 seized transceivers to Jade Cheng, they were stored in Jade's house in China until their shipment to Boston, where they were stored in the OceanAir warehouse.

In 2018, Defendants' consulting expert inspected the seized transceivers, and Defendants produced the results of the consulting expert's inspection for purposes of mediation around May 2018. The next inspection of the transceivers was conducted by Defendants' testifying expert on May 6-9, 2019.

After the transceivers were returned to the warehouse following Defendants' 2018 consulting expert's inspection and prior to Defendants' 2019 testifying expert's inspection, Plaintiff Alex Styller assisted by ICT's employee Nick Makarovsky inventoried the transceivers by their serial numbers and placed them in zip-lock bags to facilitate counting.

The total number of transceivers was 781, out of which 750 had serial numbers that appeared on the master list of the Commonwealth Games batch of equipment that ICT had initially intended to purchase from HPFS India, produced by Defendants in mediation as "Schedules 1 2 3 – In stock.pdf," as well as in subsequent discovery.

The 31 remaining transceivers had serial numbers that did not appear on the master list. Of those, 28 had serial numbers whose nomenclature followed the nomenclatures for the transceivers on the master list, and 3 had serials numbers that did not follow any nomenclatures on the master list. The transceivers were sorted in bags as follows: the 28 transceivers with the serial numbers not on the master list but with the same nomenclature as those on the master list were put in bag

16; the 3 transceivers with serial numbers not on the master list and not following the nomenclatures in bag 19; and the rest of the transceivers with serial numbers on the master list were put in the other bags.

Prior to delivering the transceivers to Defendants' testifying expert in May 2019, Alex Styller also placed slips of paper indicating the number of transceivers in each bag. These handwritten notes made by Mr. Styller are dated May 2, 2019 and state how many transceivers are in each bag and the bag's number.

On May 6, 2019, Kevin Quigley of Choate picked up 781 transceivers from the OceanAir warehouse and delivered it to Choate's offices at 2 International Place, Boston. *See* attached receipt signed by Mr. Quigley. While the equipment was in Choate's custody, Mr. Raina, Mr. Mascaro of Sideman & Bancroft, and Defendants' counsel had an unfettered access to the transceivers for three days and nights.

After Defendants' testifying witness inspected the equipment and returned it to the OceanAir warehouse, Plaintiffs did not re-count the transceivers. The equipment remained stored in the warehouse until delivered by Plaintiff Alex Styller to Plaintiffs' expert witness Prof. Fang's MIT office for inspection in September 2019.

Prof. Fang received, counted and inspected 779 transceivers, as stated in his report. Accordingly, there are 2 transceivers that had gone missing between the time of the equipment delivery to Defendants' testifying expert on May 6, 2019, and the time of its delivery to Plaintiffs' expert.

Since the delivery to Prof. Fang, the equipment has been stored in Professor's secured MIT office. According to Prof. Fang, only he and his assistant have keys to the office (and the assistant does not use it). The transceivers will be returned from Prof. Fang's office to the warehouse next week.

In sum, the record in this Action reflects the total number of the Seized transceivers as follows:

1. Transceivers seized by the Chinese PSB: 781;
2. Transceivers released by the PSB into Jade's custody: 781;
3. Transceivers stored in Jade's house in China and shipped to the US: 781;
4. Transceivers received from the warehouse by Defendants' consulting expert: 781;
5. Transceivers returned by Defendants' consulting expert to the warehouse and inventoried by Plaintiff Styller: 781;
6. Transceivers received by Defendants' counsel, delivered to Choate's offices and analyzed by Messrs. Raina and Mascaro on May 6-9, 2019, as stated in the expert report: 781;
7. Transceivers returned by Defendants' counsel after the inspection: unknown;
8. Transceivers delivered from the warehouse to Prof. Fang's MIT office: 779.

For their part, Plaintiffs were very surprised to learn that Daniel Mascaro participated in the May 6-9, 2019 inspection conducted in Choate offices alongside Defendants' testifying expert witness

February 16, 2020
Page 3 of 4

Mr. Raina, and personally handled the transceivers – a material fact that Mr. Raina has failed to disclose in his Expert Report.

As you and Mr. Raina are no doubt aware, Mr. Mascaro is currently, and was at the time of the inspection, a non-attorney employee of the law firm of Sideman & Bancroft LLP. He is listed on the law firm's website as the Global Investigations Director in the firm's Brand Integrity and Innovations Group ("BIIG") – the same group that Mr. Raina testified he had worked in while at the law firm, and where Robert Cozzolina, HP's former Anti-Counterfeit Global Program Manager directly involved in the events giving rise to this litigation, has been working as the Global Customs and Investigations Director since 2014. *See* https://www.sideman.com/professionals/robert-cozzolina/. "Prior to becoming a member of the Sideman & Bancroft team, Mr. Cozzolina managed the global cross-regional anti-counterfeit investigations program at Hewlett-Packard Company." *Id.*

Mr. Mascaro's firm bio states: "He served as the Global Investigations Manager for HP's Brand Security Group and was the lead investigator on multiple cases of discount and warranty fraud referred to federal law enforcement for prosecution in the US. Mr. Mascaro has extensive experience managing international investigations and received HP Global Security's highest award for his work in a multinational criminal case resulting in a conviction for wire fraud and money laundering. While at HP, Mr. Mascaro developed and delivered specialized training for investigators on brand related issues and conducting ethical investigations. He worked on a cross functional team responsible for updating and rewriting HP's investigative governance documents." *See* https://www.sideman.com/professionals/daniel-g-mascaro/ (last accessed today). The bio also details Mr. Mascaro's law enforcement background. *See id.*

Please answer the following questions regarding the handling and access to the transceivers while in Choate's custody on May 6-9, 2019:

(a) On what basis were the transceivers in question accessed and handled by the Global Investigations Director of the law firm of Sideman & Bancroft, which currently serves as an outside counsel to HP?

(b) Who among Defendants or their outside counsel (including Sideman & Bancroft LLP) instructed Mr. Raina to allow Mr. Mascaro access to the transceivers during the inspection, and to leave that fact out of his Expert Report?

(c) Whom did Mr. Mascaro communicate with regarding the equipment around the time of the May 6-9 inspection, including without limitation any such communications with any of the Defendants or their counsel, Sideman & Bancroft (including without limitation Robert Cozzolina, Jeffrey Hallum and Richard Nelson), or any other third party?

(d) What exactly was Mr. Mascaro's role during the three-day inspection, and/or during the drafting the Expert Report? Please provide the chronology of Mr. Mascaro's access to and handling the transceivers, and any comments he might have provided to the Expert Report;

February 16, 2020
Page 4 of 4

(e) Who had access to, or authorization to access, the equipment while it was in Defendants' custody on May 6-9, 2019?

(f) Was Mr. Mascaro paid any compensation, whether his regular salary or otherwise, by Sideman & Bancroft for the period of the May 6-9 inspection?

(g) What is Mr. Mascaro's reporting and working relationship with Mr. Cozzolina at Sideman & Bancroft's BIIG group, now and during the May 6-9, 2019 inspection?

(h) Why was Mr. Mascaro's involvement in the inspection and his handling of the transceivers concealed and not disclosed in the Raina Expert Report?

I propose a meet and confer regarding this particular issue on February 23, 2020. Please note that I am still going through the transcript of Mr. Raina's deposition and intend to raise Plaintiffs' many other grave concerns arising from Mr. Raina's revelations, beyond Mr. Mascaro's involvement in the inspection, in due course.

Best Regards,

Dimitry Joffe

Attachment
cc: Joshua McGuire, Esq.
    Anthony Callaghan, Esq.
    Michael Bunis, Esq.
    Mark Edgarton, Esq.