# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, <br><br> Plaintiffs, <br><br> v. <br><br><br> HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL, <br><br> Defendants. | **Civil Action No. 1:16-CV-10386 (LTS)** |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERT

April 17, 2020

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 2

ARGUMENT ......................................................................................................................... 4

I.      Legal standards ............................................................................................................ 4

II.     Dr. Fang's testimony is admissible under Rule 702 and *Daubert* ..................................... 5

        1.   Dr. Fang's testimony is reliable and relevant  ............................................................ 5

        2.   Dr. Fang's testimony is helpful to the jury .................................................................. 8

III.    Dr. Fang's testimony is not a conduit for inadmissible hearsay ......................................... 9

        1.   Dr. Fang's expert testimony is not a "mere conduit"
             for the Verification Report and the Security Bulletin  ................................................. 9

        2.   The Verification Report is not hearsay ....................................................................... 10

        3.   The Security Bulletin is not hearsay .......................................................................... 12

        4.   In any event, Rule 703 permits Dr. Fang's testimony ............................................... 12

IV.     The Verification Report and the Security Bulletin are properly authenticated ................ 16

IV.     Defendants' challenges to the weight of Dr. Fang's evidence
        are meritless and in any event not proper grounds for exclusion .................................... 18

CONCLUSION ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358 (3d Cir. 1992). ............ 11

<u>Cruz-Vázquez v. Mennonite General Hospital, Inc.</u>, 613 F.3d 54 (1st Cir. 2010) ........................ 5

<u>Daubert v. Merrell Dow Pharmaceuticals</u>, Inc., 509 U.S. 579 (1993)............................................ 4

<u>Ford Motor Co. v. Heritage Mgmt. Grp., Inc.</u>, 911 F. Supp. 2d 616
    (E.D. Tenn. 2012) ............................................................................................................ 7

<u>Gilmore v. Palestinian Interim Self-Government Auth.</u>, 843 F.3d 958
    (D.C. Cir. 2016) ............................................................................................................ 13

<u>International Adhesive Coating Co. v. Bolton Emerson Int'l</u>, 851 F.2d 540
    (1st Cir. 1988) .............................................................................................................. 13

<u>Maiorana v. U.S. Mineral Products Co.</u>, 52 F.3d 1124 (2d Cir. 1995)...................................... 20

<u>Marvel Characters, Inc. v. Kirby</u>, 726 F.3d 119 (2d Cir. 2013) ............................................... 10

<u>Milward v. Acuity Specialty Prods. Group</u>, 639 F. Supp. 11 (1st Cir. 2011)............................. 20

<u>Nardi v. Pepe</u>, 662 F.3d 107 (1st Cir. 2011) ......................................................................... 13

<u>Pagés-Ramírez v. Ramírez-González</u>, 605 F.3d 109 (1st Cir. 2010)............................................ 5

<u>People v. Stamps</u>, 3 Cal. App. 5th 988 (Cal. App. 2016) ...................................................... 14, 15

<u>People v. Veamatahau</u>, S249872 (Ca. Feb. 27, 2020). ........................................................ 14, 15

<u>Perfect 10, Inc. v. Cybernet Ventures, Inc.</u>, 213 F. Supp. 2d 1146
    (C.D. Cal. 2002)............................................................................................ 12, 15, 17

<u>Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F.3d 77
    (1st Cir. 1998) ........................................................................................................ 4, 8

<u>Societe Des Prouuits Nestle v. Casa Helvetia</u>, 982 F.2d 633 (1st Cir. 1992) ............................. 7

<u>Telewizja Polska USA, Inc. v. Echostar Satelline Corp.</u>, No. 02 C 3293, 2004
    WL 23640 (N.D. Ill. Oct. 15, 2004)............................................................................. 15

<u>Trustees of Boston Univ. v. Everlight Elec. Co.</u>, 141 F. Supp. 3d 147
    (D. Mass. 2015)............................................................................................................ 9

<u>U.S. v. Brewer</u>, 783 F.2d 814 (9th Cir. 1986)......................................................................... 9

<u>U.S. v. Cameron</u>, 762 F. Supp. 2d 152 (D. Me. 2011) ........................................................... 12

U.S. v. Corey, 207 F.3d 84 (1st Cir. 2000) ............................................................ 5, 13

U.S. v. Dukagjini, 326 F.3d 45 (2d Cir. 2002) ........................................................ 13

U.S. v. Diaz, 300 F.3d 66 (1st Cir. 2002) ................................................................. 4

U.S. v. Harvey, 117 F.3d 1044 (7th Cir. 1997) ........................................................ 16

U.S. v. Kantengwa, 481 F.3d 545 (1st Cir. 2015) .................................................... 10

U. S. v. May, 622 F.2d 1000 (9th Cir. 1980) ............................................................ 12

U.S. v. Mejia, 545 F.3d 179 (2d Cir.2008) ............................................................. 13

U.S. v. Rodríguez-Berríos, 573 F.3d 55 (1st Cir. 2009) .......................................... 8

U.S. v. Rosado-Cancel, Crim. No. 13-0731, 2015 WL 1968508 (DRD)
  (D.P.R. May 1, 2015) ........................................................................................... 17

U.S. v. Silva, 749 F.3d 173 (1st Cir. 2015) ............................................................. 9

Van Westrienen v. American Collection Corp., 94 F. Supp. 2d 1087 ...................... 15

**Statutes**

15 U.S.C. § 1114 .................................................................................................... 6

15 U.S.C. § 1116 .................................................................................................... 7

15 U.S.C. § 1127 .................................................................................................... 7

18 U.S.C. § 2320 .................................................................................................... 6

18 U.S.C. § 2323 .................................................................................................... 7

**Other Authorities**

Fed. R. Evid. 104 ................................................................................................... 17

Fed. R. Evid. 702 ................................................................................................ 4, 9

Fed. R. Evid. 703 .......................................................................................... 5, 13, 16

Fed. R. Evid. 801 .................................................................................................. 11

Fed. R. Evid. 901 .................................................................................................. 16

Joseph M. McLaughlin, Jack B. Weinstein, Margaret A. Berger,
Weinstein's Federal Evidence, § 801.10[2] (Lynne Avakian Campbell ed., 2010 ed.) ............... 12

## PRELIMINARY STATEMENT

Plaintiffs' expert witness Dr. Nicholas Fang teaches his MIT students how to design and generate holograms and how to "print with light" objects 100 times smaller than human hair (a 3-minute videoclip available on Dr. Fang's website at http://web.mit.edu/nanophotonics/ explains how). Dr. Fang brought expertise, academic rigor, and independent unbiased judgment to not very challenging yet quite demanding task of analyzing hundreds of minutely seized holographic labels, each with variable optical patterns that must be looked at from four different angles, and an array of other indicia of counterfeiting that Dr. Fang had designed by reviewing and synthesizing different features described in two independent sources: the trademark holder's own anti-counterfeiting guidance available to the public on its official website since 2013 substantially unchanged and undoubtedly authentic, see current English version at http://www.h3c.com/en/Support/Online_Help/Home/201905/1189908_294551_0.htm; and, secondly, the Verification Report produced by Defendants after Plaintiffs' pleas, requests, and demands for it since 2013. Defendants also "produced" the Verification Report in the sense that it is their own product: Defendants had their then wholly owned subsidiary H3C inspect the equipment "on behalf of" Defendants; together with H3C drafted the Verification Report summarizing the inspection and in unison declaring the seized transceivers "obvious counterfeits"; and had H3C deliver the Report to the PSB so that the "Chengyu Gang in the Beijing Case" could be prosecuted for "selling commodities bearing counterfeit registered trademarks" under Article 214 of the PRC Criminal Code.

From these two independent sources of information, Dr. Fang put together his own array of counterfeiting indicators, then methodically reviewed hundreds of logos half the size of his fingernail, recorded 857 data points from his observations, formulated his own independent

opinions based on that data (including some at variance with the Verification Report), and presented them in a clear and forthright manner. No reasonable jury would find that this evidence is unhelpful, confusing, or "adds no value," as Defendants argue. Dkt. 315 p. 2.

Just as absurdly, Defendants argue that Dr. Fang serves as a "mouthpiece" -- for Defendants' own statements! -- and that it is somehow of great prejudice to them. In fact, to find a true "mouthpiece" who "adds no value here" they could look no further than their own expert. Dr. Fang's own Report, by contrast, is relevant, reliable, unbiased, and helpful to the jury in resolving the question of counterfeiting to meet the <u>Daubert</u> test. <u>See</u> Point II below.

Dr. Fang properly relied on the Verification Report and Security Bulletin in formulating his opinions. The Verification Report is a non-hearsay statement of a party-opponent under Fed. R. Evid. 801(d)(2) because it relays the results of the inspection conducted on behalf of Defendants by H3C and was drafted jointly by Defendants and H3C. Dr. Fang was also entitled to rely on the Security Bulletin for its photographic images of the H3C holographic logos illustrating their optical patterns, which are not "statements" for purposes of hearsay rules. Even if these documents were hearsay, Rule 703 permits Dr. Fang to rely on them because other experts in his position would reasonably be expected to rely on them, as witnessed by Defendants' own expert Mr. Raina's "seeking information on the H3C holographic labels as it related to the products that they were applied on," and because the probative value of this information far outweighs its prejudicial effect, if any. <u>See</u> Point III below. Finally, both documents have been sufficiently authenticated. <u>See</u> Point IV below.

## **FACTUAL BACKGROUND**

Following the arrest of the Individual Plaintiffs and the seizure of the equipment by the PSB, the trademark holder and HP's then-wholly owned subsidiary H3C "***inspected this***

***equipment on behalf of HPFS India***," according to Defendants' letter to the PSB dated April 22, 2013. Dkt. 331-4. The results of that inspection were summarized in the Verification Report jointly drafted by Defendants and H3C and submitted to the PSB in support its criminal investigation of the Individual Plaintiffs on suspicion of selling commodities bearing counterfeit registered trademarks. The 11-page Verification Report describes the features of the holographic security labels on the seized transceivers and concludes that those holographic labels were "abnormal, which is sufficient enough to determine that at least most of the seized transceivers are counterfeit H3C," and that "it is pointless to test the electrical performance of ***these obvious counterfeits***." Dkt. 331-18. Defendants in their April letter to the PSB separately confirmed to the PSB that "***based on the logos found on the equipment***, *[H3C] believed that this equipment was counterfeit*," Dkt. 332-4.

In April 2019, Defendants' newly retained expert Shelley Raina "was seeking information on the H3C holographic labels as it related to the products that they were applied on for the products in question and the time frame that they were applied on, so any information on the holographic labels during that time period." Dkt. 331-1, Raina Tr. 311/14-20. Defendants falsely assured their expert that "there was no information, no document that would explain the features of the holographic label" (Raina Tr. 93/7-19), as if the collective judgment of HP and H3C about "these obvious counterfeits" was not it. Mr. Raina then proceeded to inspect the transceivers' serial numbers while refusing to take the holographic labels into account even though Defendants themselves, the trademark owner, the Lanham Act, the PRC Criminal Code and the PSB all do.

In June 2019, after Defendants finally produced the Verification Report, Plaintiffs through a Boston expert search agency Ruben/Anders Scientific retained Dr. Fang, who analyzed

the holograms and found various indicia of counterfeiting on most of them. Defendants' expert Mr. Raina in his "rebuttal" report does not and cannot challenge Dr. Fang's findings – because Mr. Raina himself did not inspect the holographic labels on the seized transceivers (and has no experience or expertise with holograms, or with H3C transceivers for that matter).

Defendants now move to exclude Dr. Fang's report on the grounds of hearsay and unhelpfulness while asking the Court to award them summary judgment solely on the strength of Mr. Raina's expert testimony, because he is their one and only evidence of authenticity.

## ARGUMENT

### I.    Legal standards

Rule 702 of the Federal Rules of Evidence permits expert testimony where "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). As the First Circuit explained in U.S. v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002):

> The review for reliability encompasses an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. As to the relevancy criterion, "expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche, 161 F.3d at 81 (citation omitted) (citing Daubert, 509 U.S. at 591-92).

Furthermore, Rule 703 permits an expert to rely on inadmissible evidence of a type on which experts in the same field would reasonably rely, and which probative value in helping the factfinder evaluate the expert's opinion substantially outweighs its prejudicial effect.

## II.   Dr. Fang's testimony is admissible under Rule 702 and *Daubert*.

"[T]he Rules of Evidence require that the judge admit expert testimony relevant to the disposition of the case when it will assist the trier of fact in understanding a fact in issue and rests on a reliable foundation." Cruz-Vázquez v. Mennonite General Hospital, Inc., 613 F.3d 54, 60 (1st Cir. 2010), quoting Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 116 (1st Cir. 2010). "Rule 702 imposes three requirements: (1) the expert must be qualified to testify, by 'knowledge, skill, experience, training, or education'; (2) the testimony must concern 'scientific, technical or other specialized knowledge'; and (3) the testimony must be such as to 'assist the trier of fact to understand the evidence or to determine a fact in issue." U.S. v. Corey, 207 F.3d 84, 88 (1st Cir. 2000) (internal citations omitted). As shown below, Dr. Fang's expert testimony should be admitted under Rule 702 and Daubert as reliable and helpful to the jury in resolving the factual dispute on the issue of counterfeiting.

### 1.   Dr. Fang's expert testimony is reliable and relevant.

***First***, Dr. Fang is well-qualified to testify about his observations of the features of the trademark holographic logos based on his "knowledge, skill, experience, training, or education." Id. Dr. Fang "specialize[s] in optics, photonics and micro/nano manufacturing"; conducts academic "research related to holograms"; "use[s] the hologram principles to design and measure different optical structures"; and teaches his classes "how the hologram is generated." Dkt. 317-6. Dr. Fang authored numerous peer-reviewed research papers, including on holograms and holographic principles. Dkt. 317-4. Since 2011, Dr. Fang has served as an Associate Professor

and then Full Professor with tenure at MIT, teaching classes "in instrumentation and measurements, optics and photonic materials." Id.

**Second**, Dr. Fang applied his specialized knowledge and a methodology accepted in the scientific community to inspect trademark H3C holographic labels. Dr. Fang viewed and took measurements of the labels in his lab using a digital microscope with an integrated digital camera, and a software ruler, following the methodology for measuring holograms' optical parameters generally accepted in the scientific community and his own extensive professional knowledge and experience. Dr. Fang then recorded his observations with respect to each of the 779 transceivers in his spreadsheet database with 857 data points (Dkt. 317-4 at Exh. 5), and summarized his findings in the Report itself.

**Third**, Defendants' argument that Dr. Fang's testimony is irrelevant because he does not offer an opinion whether the transceivers themselves "are in fact counterfeit" rests on a meaningless dichotomy between the goods themselves and counterfeit trademarks attached to them. This dichotomy is false because in the eyes of the law, whether U.S. or Chinese, knowing sale of goods bearing counterfeit trademarks without question constitutes a counterfeiting offense, and the goods bearing such counterfeit marks are subject to seizure as counterfeits.

In the U.S., the Trademark Counterfeit Act of 1984, which amended the Lanham Act, imposes criminal penalties on anyone who "traffics in goods . . . and knowingly uses a counterfeit mark on . . . such goods," 18 U.S.C. § 2320, without requiring the goods themselves to be "in fact counterfeit," whatever Defendants mean by that. The Act imposes civil liability on anyone who "use[s] in commerce any . . . counterfeit . . . registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods." 15 U.S.C. § 1114. The Act further provides that "a mark shall be deemed to be in use in commerce on goods when (A) it is

placed in any manner on the goods or . . . on the tags or labels affixed thereto . . . and (B) the goods are sold or transported in commerce." 15 U.S.C. § 1127. The Act defines "a counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Importantly, the Act authorizes seizure, forfeiture and/or destruction of the goods bearing counterfeit trademarks. 18 U.S.C. § 2323; 15 U.S.C. § 1116(d)(1)(A).

For example, in Ford Motor Co. v. Heritage Mgmt. Grp., Inc., 911 F. Supp. 2d 616, 631 (E.D. Tenn. 2012), the Court held that the use of counterfeit Ford trademarks in labelling of allegedly genuine Ford parts constituted counterfeiting. And in Societe Des Proouits Nestle v. Casa Helvetia, 982 F.2d 633, 638 (1st Cir. 1992), the First Circuit stated that even "an unauthorized importation" – let alone a fake trademark – "may well turn an otherwise 'genuine' product into a 'counterfeit' one."

Article 214 of the PRC Criminal Code likewise criminalizes the "selling of commodities bearing counterfeit registered trademarks."[1] Indeed, this very charge was the basis of the PSB's investigation of the Individual Plaintiffs in China. Dkt. 331-12, 331-13.

Under these definitions, selling transceivers bearing counterfeit H3C trademarks would plainly expose the seller to criminal liability for counterfeiting and make the transceivers themselves subject to seizure as counterfeits regardless of any redundant unique serial numbers on them. Just imagine Mr. Raina trying to defend against a federal criminal charge of counterfeiting with his "holistic" analysis of the elusive "multiple data points. Accordingly, Dr.

---

[1] Article 214 of the Chinese Criminal Law provides: "Whoever knowingly sells commodities bearing counterfeit registered trademarks shall, if the amount of sales is relatively large, be sentenced to fixed-term imprisonment of not more than three years or criminal detention and shall also, or shall only, be fined; if the amount of sales is huge, he shall be sentenced to fixed-term imprisonment of not less than three years but not more than seven years and shall also be fined." Criminal Law of the People's Republic of China, available at the U.S. Congressional-Executive Commission on China's website, https://www.cecc.gov/resources/legal-provisions/criminal-law-of-the-peoples-republic-of-china, last accessed on April 15, 2020.

Fang's findings of counterfeit H3C trademarks on the seized transceivers is highly relevant to the counterfeiting issue in this case.

### 2.   Dr. Fang's expert testimony is helpful to the jury.

Dr. Fang's testimony is not only directly relevant on the issue of counterfeiting, it is otherwise helpful "in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998).

"There is no more certain test for determining when experts may be used than *the common sense inquiry* whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having specialized understanding of the subject involved in the dispute." U.S. v. Rodríguez-Berríos, 573 F.3d 55, 72 (1st Cir. 2009) (quoting Rule 702 Advisory Committee's Notes).

Dr. Fang inspected hundreds of holographic logos for: (i) the presence and type of the holograms (fully damaged holograms and old holograms with Chinese characters at Figs. 9 and 11 of the Report were excluded from further analysis); (ii) their placement on the transceivers (Figs. 10-11); (iii) their top-layer defects, including delamination (Fig. 13) and complete detachment (Fig. 14); (iv) the positioning of the word "H3C" within the holograms (Fig. 12); (v) the appearance of the word "H.3C" within the holograms (Fig. 17); and (vi) the four optical patterns within each hologram (Figs. 15-16). Dkt. 317-4. Dr. Fang then systematically recorded his findings as 857 data points in the spreadsheet attached to his Report, and concluded that the majority of the inspected holograms met the trademark holder's criteria of counterfeiting.[2]

---

[2] 857 represents the total number of Dr. Fang's entries in the spreadsheet derived from his personal observations.

"The common sense injury" under Rule 702 shows that this not an analysis that the jurors themselves, even armed with magnifying glasses, rulers, cellphone cameras and spreadsheets, could be reasonably expected to undertake "to the best possible degree" in any reasonable amount of time (if at all). Indeed, analyzing hundreds of minuscule holograms with shifting optical patterns against an array of half-a-dozen characteristics is a far cry from figuring out whether a movie is sexually suggestive without requiring expert testimony of English professor, as in U.S. v. Silva, 749 F.3d 173 (1st Cir. 2015), or "compar[ing] the photographs of the robber with those of the defendant" without needing a forensic anthropology expert, as in U.S. v. Brewer, 783 F.2d 814 (9th Cir. 1986).

**III.   Dr. Fang's expert testimony is not a conduit for inadmissible hearsay.**

Defendants' contention that Dr. Fang's expert testimony is "a mere improper conduit for inadmissible hearsay" -- the Verification Report and the Security Bulletin -- rests on bad law and on an absurd construct that Dr. Fang is a "mouthpiece" for Defendants' own statements, which somehow causes great prejudice to them.

**1.   Dr. Fang's expert testimony is not a "mere conduit"
for the Verification Report and the Security Bulletin.**

As a threshold matter, Dr. Fang's Report is not a "mere conduit" for the Verification Report or the Security Bulletin. Dr. Fang reviewed these documents to ascertain the features of the H3C holograms, and consulted other sources. Dkt. 317-4 p. 13 (citing other "literature on security labels"). Dr. Fang then collected 857 data points from personal observations; and drew independent conclusions from that data. None of this information is found in the Verification Report or the Security Bulletin themselves.

Nor did Dr. Fang "parrot" hearsay statements or serve as a "mouthpiece" for them, as in Trustees of Boston Univ. v. Everlight Elec. Co., 141 F. Supp. 3d 147, 149 (D. Mass. 2015), or

"simply as a conduit for introducing hearsay" as in Unites States v. Kantengwa, 481 F.3d 545, 561 (1st Cir. 2015) and Marvel Characters, Inc. v. Kirby, 726 F.3d 119 (2d Cir. 2013).

To the contrary, Dr. Fang applied his independent judgment to his own personal observations even where it led him to conclusions at variance with those in the Verification Report.[3]

## 2.  The Verification Report is not hearsay.

The Verification Report is not hearsay under Fed. R. Evid. 801(d)(2) as an admission of a party-opponent because the Report was jointly drafted by Defendants and H3C based on the inspection conducted by H3C on behalf of Defendants, and Defendants' own admissions authenticate it as such.

Following H3C's inspection of the seized transceivers "on behalf of HPFS India," H3C and Defendants collaborated on drafting the Verification Report reflecting the results of that inspection, with representatives of Defendants and H3C sharing drafts, edits, updates and advice on the Verification Report.[4] In their April 22, 2013 letter to the PSB, Defendants represented that

---

[3] See, e.g., Dkt. 317-4 pp. 23-24 ("The H3C verification report describes some logos as carrying a "H.3C" hologram label illustrated in Figure 4 above. Under white-light illumination specified in the test methodology, I found logos with a pronounced center-dot reflection that overlaps with the bottom-left part of the number '3,' creating an appearance of an elongation or a dot at its end. . . . However, I did not find logos with a separately printed dot between 'H' and '3C,' and did not include any in the total count of the logos showing indicators of counterfeiting. I also note from the 'H.3C' picture in the H3C verification report (Figure 4 above) that there are scratches or tears visible in the high-magnification image, and a dark vertical line appearing on the photo crossing the number 3 which could have created an appearance of a separated dot.").

[4] See Dkt. 331-10, privilege log entries 410, 414, 416, 417, 420, 427, 428, 429, 430, 431, 433, 446, and 651 referring to "verification report" and identifying David Gill, Liu Rui (lr@h3c.com), Stuart Patterson, Shawn Zhao (shawn.zhao@hp.com), Ching Chua (ching.chua@hpe.com), Yang Li (yang.li9@hpe.com), and Chun-Yu Zhu, (eric.zhu@hp.com). See, e.g., log entries 410 ("Email containing the legal advice of Jessica Liu enclosing verification report and draft letter," subject line "Verification Report and Letter to the BJ PSB."); 428 and 430 ("Draft Letter prepared because of litigation by Stuart Patterson reflecting draft cover letter to PSB regarding verification report."); and 431 ("Email chain prepared by and reflecting the mental impressions of Stuart Patterson regarding updates and edits to draft verification report" between Defendant Gill and Stuart Patterson, subject line "Re: Verification Report Template").

"H3C inspected the seized equipment ***on behalf of HPFS India***" and "based on the logos found on the equipment, believed that this equipment was counterfeit." Dkt. 331-4.

Defendants have also confirmed that the Verification Report "is a document submitted by H3C to the Chinese authorities apparently explaining its position concerning the counterfeiting allegations." Dkt. 291 p.18. Defendants have also confirmed that "Defendants produced a document referred to as a 'verification report' in their privilege log." Dkt. 258 ¶ 44. Defendants have identified the produced Verification Report by its production numbers "DEF2807-17" in their court filings. Dkt. 257 p. 22.[5] Accordingly, the Verification Report is not hearsay as Defendants' own statement under Fed. R. Evid. 801(d)(2)(A), or as their adoptive statement under Rule 801(d)(2)(B).

To the extent the Verification Report could be considered an H3C statement, it would not hearsay as "a statement by a person authorized by a party to make a statement concerning the subject" under Rule 801(d)(2)(C) because Defendants directed H3C to inspect the transceivers on their behalf, participated in drafting the Verification Report, and requested, authorized and/or condoned H3C's submission of the Report to the PSB. The Verification Report is also not hearsay as a statement of Defendants' "agent . . . concerning a matter within the scope of the agency . . . made during the existence of relationship" under Rule 801(d)(2)(D). Not only was H3C a wholly-owned subsidiary of HP and a good candidate for Rule 801(d)(2)(D) as such, but in this particular counterfeiting matter H3C clearly acted as Defendants' agent and on its behalf. See, e.g., In Big Apple BMW Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1373 (3d Cir.

---

[5] The Saso Declaration also states that "there is a second document logged on Defendants' privilege log, which was contemporaneously referred to as a 'verification report.' That document relates to two sample devices that were sent by TT Global to H3C at the request of counsel for the purpose of providing legal advice. That second 'verification report' was specifically generated at the direction of counsel." Dkt. 258 ¶¶ 45-46. Notably, the inspection of the TT Global transceivers was also conducted by H3C at the request of Defendants, and the second verification report was withheld by Defendants as their work product. Dkt. 257 p. 22.

1992), cert. denied, 113 S. Ct. 1262 (1993) (statements by an employee of a subsidiary could be attributed to the parent corporation where the parent dominated the activities of the subsidiary).

### 3.   The Security Bulletin is not hearsay.

Dr. Fang in his Report relied on Security Bulletin for its photographic images of the H3C holographic logos illustrating their optical patterns. The Report refers to the Security Bulletin as "demonstrat[ing] the specific optical patterns" of the holograms, and reproduces the images from the Security Bulletin that Dr. Fang then compared with logos on the seized transceivers.[6]

"*In the context of the hearsay rule, photographs do not qualify as assertions*." U.S. v. Cameron, 762 F. Supp. 2d 152, 157-58 (D. Me. 2011) (quoting Joseph M. McLaughlin, Jack B. Weinstein, Margaret A. Berger, Weinstein's Federal Evidence, § 801.10[2] (Lynne Avakian Campbell ed., 2010 ed.)). See also United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980) (stating that "a photograph is not an assertion, oral, written, or nonverbal, as required by Rule 801(a)" and is "admissible as substantive as well as illustrative evidence"); Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002) ("Cybernet objects to the printouts from third-party websites as a violation of the rule against hearsay. . . . To the extent these images and text are being introduced to show the images and text found on the websites, they are not statements at all — and thus fall outside the ambit of the hearsay rule.").

### 4.   In any event, Rule 703 permits Dr. Fang's testimony.

Rule 703 of the Federal Rules of Evidence provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion

---

[6] See Dkt.317-4 p.4, Fig. 1 ("H3C security bulletin Figure 2.1 illustrating specific optical patterns that should be visible if an authentic holographic logo is viewed from different angles") and Fig. 2 ("The H3C security bulletin illustration of the old version of the logo (with Chinese characters) (left panel) and the new version of the logo (right panel)."

on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Under Rule 703, "[a]ttention is directed to the validity of the techniques employed rather than to ***relatively fruitless inquiries whether hearsay is involved***." U.S. v. Corey, 207 F.3d 84, 89 (1st Cir. 2000) (quoting Fed. R. Evid. 703 Advisory Committee's note).

"An expert may rely on hearsay evidence under Fed. R. Evid. 703 provided that he 'form[s] his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.'" Trustees of Bos. Univ. v. Everlight Elec. Co., 141 F. Supp. 3d 147, 148-49 (D. Mass. 2015) (quoting United States v. Mejia, 545 F.3d 179, 197 (2d Cir.2008)); see also Int'l Adhesive Coating Co., Inc. v. Bolton Emerson Intern., Inc., 851 F.2d 540, 545 (1st Cir.1988) (accountant damages expert entitled to rely on interviews with company personnel and company's business and financial records).

"The expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." Gilmore v. Palestinian Interim Self-Government Auth., 843 F.3d 958, 972 (D.C. Cir. 2016); U.S. v. Dukagjini, 326 F.3d 45, 58 (2d Cir. 2002) ("[W]e hold that an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony."); Nardi v. Pepe, 662 F.3d 107, 112 (1st Cir. 2011) ("[A] long tradition exists of allowing experts to rely on hearsay where it is common practice in the profession to rely upon such evidence.").

Here, Dr. Fang formed his own opinions by applying his expertise and personal observations to compare the holographic logos on the transceivers with those on the Verification

13

Report and the Security Bulletins. It would be a common and valid practice for any expert in inspecting trademarks for counterfeiting to rely on the trademark holder's criteria of counterfeiting. There is no better evidence of that than Defendants' own expert in counterfeiting Mr. Raina himself "seeking information on the H3C holographic labels as it related to the products that they were applied on for the products in question and the time frame that they were applied on, so any information on the holographic labels during that time period," and asking Defendants for it. Raina Tr. 93/7-19. Defendants had for years kept that most relevant information from Plaintiffs, and they kept their own expert in the dark as well.

Defendants' brief on their partial summary judgment motion includes section II.B titled "The H3C Security Bulletin is Inadmissible and Unreliable Hearsay." Dkt. 316 p. 10. In that section, Defendants rely on a single authority, People v. Stamps, 3 Cal. App. 5th 988 (Cal. App. 2016), for the proposition that the Security Bulletin is inadmissible and unreliable because it was printed off a third-party website. Curiously, they do not cite it in this brief – perhaps because they have realized that Stamps was expressly *overruled* by the Supreme Court of California not two months ago in People v. Veamatahau, S249872, p. 18 (Ca. Feb. 27, 2020).

Much like Dr. Fang compared the logos on the seized transceivers with the logos pictured on the H3C website's Security Bulletin, the prosecution's expert in Stamps compared "the seized pills to those displayed on the Ident-A-Drug Web site." (Unlike Dr. Fang, who relied on two independent sources to ascertain the features of the H3C trademark hologram labels and his own multi-factor inspection, the expert in Stamps relied solely on the third-party website.) The Court of Appeals in Stamps found that the expert's testimony was inadmissible hearsay because the "Ident-A-Drug content . . . was case specific." Stamps, 3 Cal.App.5th at p. 997.[7] The California

---

[7] Under California state law, "so long as the matter is 'of a type that reasonably may be relied upon by an expert,' it may be relayed to the factfinder 'whether or not admissible.' Accordingly, to support his opinion, an expert is

Supreme Court in <u>Veamatahau</u> disagreed, stating that "[w]e disapprove of <u>People v. Stamps</u>, 3
Cal. App. 5th 988, to the extent it is inconsistent with our opinion":

> We are not persuaded. Simply because the Ident-A-Drug web site served as the basis
> for the expert's ultimate opinion does not make information from the site case-
> specific. The expert's opinion that the seized pills were prescription opioids was not
> hearsay and not otherwise objectionable. . .  Information from the Ident-A-Drug
> database — that pills matching a certain description contain opioids — was hearsay
> but not case-specific.

Here, Plaintiffs' expert Dr. Fang identified optical anomalies in the holographic labels by
visually comparing the labels on the seized transceivers to those displayed in the H3C Security
Bulletin published on its website. The Security Bulletin is not case-specific as it applies
generally to all transceivers manufactured by H3C at the time, and is a type of evidence that
expert witnesses may rely upon in their testimony. <u>See</u> <u>Telewizja Polska USA, Inc. v. Echostar
Satelline Corp.</u>, No. 02 C 3293, 2004 WL 23640, at *7 (N.D. Ill. Oct. 15, 2004) ("[T]he contents
of Polska's website may be considered an admission of a party-opponent, and are not barred by
the hearsay rule."); <u>Perfect 10, Inc. v. Cybernet Ventures, Inc.</u>, 213 F. Supp. 2d, 1146, 1155
(C.D. Cal. 2002) (noting that the printouts of the website are admissible pursuant to the best
evidence rule); <u>Van Westrienen v. American Collection Corp.</u>, 94 F. Supp. 2d 1087, 1109 (D.
Or. 2000) ("Here, Kenneth Van Westrienen, by his own account, personally viewed the website
and submitted an affidavit detailing specifically what he viewed. Therefore, the contents of the
website are not hearsay for purposes of this summary judgment motion.").

Finally, Defendants have failed to identify any "prejudicial effect" from Dr. Fang's
reliance on these documents. As shown, the Verification Report is not hearsay and is not subject

---

permitted to relate to the jury background information that is technically hearsay, including general knowledge . . .
The expert, however, cannot 'relate as true case-specific facts asserted in hearsay statements, unless they are
independently proven by competent evidence or are covered by a hearsay exception.'" <u>Veamatahau.</u> S249872 at 2.

to Rule 703's balancing test; and the images of the holograms and their optical patterns from the

H3C's website printed in the Security Bulletin are not "statements" and not subject to Rule 703

either. To the extent they are, their probative value greatly outweigh any prejudicial effect from

Dr. Fang's reliance on them because Dr. Fang neither endorsed them nor "put the expert's stamp

of approval on [Plaintiffs'] theory" – indeed, if he did endorse or approve anything with his

testimony, that would be Defendants' own statements. Defendants try to bury or run away from

them now to avoid liability – but if they fail, that is no prejudice.

### IV.   The Verification Report and the Security Bulletin are properly authenticated.

"The requirement of authentication or identification as a condition precedent to

admissibility is satisfied by evidence sufficient to support a finding that the matter in question is

what its proponent claims." Fed. R. Evid. 901(a). The bar is not high as the Rule "requires only a

*prima facie* showing of genuineness and leaves it to the jury to decide the true authenticity and

probative value of the evidence." U.S. v. Harvey, 117 F.3d 1044, 1049 (7th Cir. 1997).

The Verification Report was produced by Defendants as DEF0002807-17, and identified

by Defendants as "a document submitted by H3C to the Chinese authorities," Dkt. 291 p.18, and

as "a document referred to as a 'verification report' in [Defendants'] privilege log." The

Defendants' privilege log shows Defendants' representatives as contributors to the Verification

Report, including Defendant Gill, who participated in drafting and sharing advice on the

Verification Report and would be able further to authenticate it and verify its contents at trial.

The Security Bulletin, dated September 9, 2013, titled "H3C Brand Host, Hard Drives

and Optical Modules Security Bulletin V1.1" (in English translation), and attached as Exhibit 3

to Dr. Fang's Report, was published on H3C's official website at

http://www.h3c.com/cn/d_201005/675683_30005_0.htm. Dkt. 317-4 p. 42. (This link now

directs the user to version 1.2 of the Security Bulletin, also in Mandarin). A current English-language version of the Security Bulletin, dated December 31, 2019 and titled "Statement on Anti-counterfeiting for H3C Hosts and Optical Modules V1.1," is currently available on H3C's website at http://www.h3c.com/en/Support/Online_Help/Home/201905/1189908_294551_0.htm. Dkt. 331-17.

All versions of the Security Bulletin contain identical photographic illustrations of the transceivers' holographic H3C logos and their variable optical patterns.[8] Plaintiff Styller downloaded and saved a copy of the 2013 version of the Security Bulletin from H3C's website at http://www.h3c.com.cn/Service/Service_Notice/201005/675683_30005_0.htm in August 2014 and attested to that in his affidavit sworn to on April 16, 2020. Dkt. 331-15. Plaintiffs produced their saved copy of the 2013 Security Bulletin in discovery (ICT0686827-33), and provided a true and correct copy of that document to Dr. Fang. See, e.g., Perfect 10, 213 F. Supp. 2d at 1154 (holding that website printouts were sufficiently authenticated where the proponent declared that they were true and correct copies of pages found on the Internet and the printouts included the appropriate web addresses and the dates printed).[9]

Finally, Defendants' complaint that "[b]oth documents are written in Mandarin, and Plaintiffs have yet to provide any certified English translation of either" (ECF 319 p. 8) misses the mark entirely. *First*, it is undisputed that Plaintiffs did provide English translations of both

---

[8] The 2013 version also contains a comparative illustration of the "old anti-counterfeit labels" used by H3C prior to May 2010 and the new labels used afterwards, which illustration is absent from the current versions of the bulletin.

[9] "Rule 104(b) applies to pre-trial determinations of authentication evidence. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."); United States v. Rosado-Cancel, Crim. No. 13-0731, 2015 WL 1968508 (DRD), at *6 (D.P.R. May 1, 2015) (applying Rule 104(b) to authentication evidence and requiring only that "the jury could reasonably find the proffered evidence authentic.").

documents and Defendants' sole complaint is that those translations are not "certified."

However, there is no federal rule mandating that English translations be "certified," nor is there a

required validation or certification process relating to translation of foreign language documents

or to the qualifications or competence of translators.[10] *Second*, Dr. Fang himself is fluent in

Mandarin and reviewed both documents in their original language. *Third*, Defendants themselves

produced the Verification Report and exchanged and commented on its drafts internally in

English, according to their privilege log. *Fourth*, the Security Bulletin is available on H3C

website in both languages, and was in any event relied upon and cited by Dr. Fang for its

photographic images of the holograms, which are self-explanatory in any language.

## V.   Defendants' challenges to the weight of Dr. Fang's evidence
##        are meritless and in any event not proper grounds for exclusion.

Defendants contend that "[w]ith respect to the Security Bulletin, for example, Dr. Fang

acknowledged in his deposition that its guidelines only apply to transceivers manufactured after

a certain date, but he has 'no idea' when the transceivers he examined were actually

manufactured."[11] Defendants cite this as an "example of Dr. Fang's failure to apply reliable

principles and methods to the facts of the case," but it is rather an example of Defendants' own

---

[10] There are no requirements for "certified" translations in the Federal Rules of Civil Procedure or in the Local Rules of this Court. The Court Interpreters Act, 28, U.S.C. § 1827, only mandated the use of certified and otherwise qualified interpreters in the context of judicial proceedings and does not extend to documentary translations or to translators themselves. Rule 604 of the Federal Rules of Evidence likewise provides that "[a]n interpreter must be qualified and must give an oath or affirmation to make a true translation." In any event, Plaintiffs have now filed a certified translation of the Verification Report, see Dkt. 331-18.

[11] According to Defendants, "the Security Bulletin . . . appears to apply only to H3C devices manufactured after May 10, 2010. Dr. Fang assumed that any label similar to the one pictured in the Security Bulletin was in fact manufactured after May 10, 2010. Dkt. No. 317-4, pp. 3, 16. But data captured from the transceivers' electronic memory, recorded in Appendix A to Defendants' expert report, confirms that dozens of the transceivers with labels Dr. Fang assumes are subject to the Security Bulletin were, in fact, manufactured prior to May 10, 2010. Compare Dkt. No. 317-5 (Raina Report) Appendix A, "Date Code in EEPROM" columns, with Dkt. No. 317-4, at Fang Ex. 5." Dkt. 319 p. 7.

carelessness with the facts. Here is what Dr. Fang actually wrote in his Report (Dkt. 317-4 pp. 5-6, 15):

> The bulletin describes H3C security holographic labels for its products, including transceivers, used by H3C since May 2010. . . . The bulletin demonstrates the specific optical patterns that should be visible if an authentic holographic logo is viewed from different angles. The security bulletin also mentions the old version of the logo (with background Chinese characters) that does not contain those security features (H3C bulletin, page 1 and the illustration of the old and new logos). . . A total of 150 hologram labels on the transceiver devices received are found bearing Chinese logos on the hologram. According to the H3C security bulletin, these holograms with Chinese characters were old logos manufactured prior to 2010. ***Because the H3C security bulletin and the verification report do not contain any criteria regarding the security features of the old trademark logos, these logos were not further investigated for indicators of counterfeiting*** (except as mentioned in point 3 below) [concerning their placement].

Accordingly, Dr. Fang did not "assume[] that any label similar to the one pictured in the Security Bulletin was in fact manufactured after May 10, 2010," and did not need to know the dates when the transceivers were manufactured for his inspection. Instead, he simply identified the transceivers bearing old Chinese-character logos as such in his database, and excluded them from his further analysis.

Defendants' also claim that Dr. Fang did not have an explanation for an apparently off-centered position of the logo identified as genuine in the Verification Report as "further evidence of the unreliable and unhelpful nature of Dr. Fang's 'opinions.'" Dkt. 319 p. 11. However, the Security Bulletin has a much better-quality image of the genuine H3C hologram than the Verification Report, and shows the word "H3C" perfectly centered. Dr. Fang's Report, p. 4 Fig. 2. Dr. Fang was entitled to rely on that illustration as well.

In any event, these arguments attacking the merits of Dr. Fang's findings and conclusions go to the weight of Dr. Fang's evidence, not to its relevance or reliability. Defendants themselves recognize that "'weight and credibility' of expert testimony are factual matters for the jury,"

19

citing <u>Milward v. Acuity Specialty Prods. Group</u>, 639 F. Supp. 11, 22 (1st Cir. 2011). Dkt. 316 p.

12. <u>See</u> <u>also</u> <u>Maiorana v. U.S. Mineral Products Co.</u>, 52 F.3d 1124, 1134 (2d Cir. 1995)

(reversing a district court for invading the province of the jury by weighing the conflicting

evidence and making witness credibility determinations).

<u>**CONCLUSION**</u>

For the reasons stated above, the Court should deny Defendants' <u>Daubert</u> motion and

admit Dr. Fang's expert report.

April 17, 2020                                                    Respectfully Submitted,

_____

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH
MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com

*Counsel to Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Dimitry Joffe, hereby certify that on this 17th day of April 2020, I caused a copy of

Plaintiffs' Memorandum in Opposition to Defendants' *Daubert* motion to be served by ECF

upon Defendants' counsel of record.

_____

Dimitry Joffe
JOFFE LAW P.C.
Counsel to Plaintiffs

21