# EXHIBIT A

1        UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - - x

4    INTEGRATED COMMUNICATIONS &           :
     TECHNOLOGIES, INC., et al.,
5                                          :    Civil Action No.
            Plaintiffs,                         1:16-cv-10386-LTS
6                                          :

        v.
7                                          :

     HEWLETT-PACKARD FINANCIAL SERVICES
8    COMPANY, et al.,                      :

9           Defendants.                    :

10   - - - - - - - - - - - - - - - - - - x

11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

                  TELEPHONIC STATUS CONFERENCE
14

15

                 Tuesday, March 10, 2020
16                      3:36 p.m.

17

18

               John J. Moakley United States Courthouse
19                      Courtroom No. 13
                        One Courthouse Way
20                      Boston, Massachusetts

21

22

                      Rachel M. Lopez, CRR
23                   Official Court Reporter
               One Courthouse Way, Suite 5209
24              Boston, Massachusetts  02210
                      raeufp@gmail.com
25

1              **T E L E P H O N I C   A P P E A R A N C E S**

2

3     On behalf of the Plaintiffs:

4         LAW OFFICE OF DIMITRY JOFFE
          BY:  DIMITRY JOFFE
          230 Park Avenue

5         10th Floor
          New York, New York  10169

6         (212) 309-8711
          dimitry@joffe.law

7

8         LAW OFFICE OF JOSH MCGUIRE
          BY:  JOSHUA A. MCGUIRE

9         51 Winchester Street
          Suite 205

10        Newton, Massachusetts  02461
          (617) 461-6400

11        josh@joshmcguirelaw.com

12

13    On behalf of the Defendants:

14        GIBBONS, P.C.
          BY:  ANTHONY P. CALLAGHAN AND PAUL A. SASO

15        One Pennsylvania Plaza
          37th Floor

16        New York, New York  10119
          (212) 613-2015

17        acallaghan@gibbonslaw.com

18

19        CHOATE HALL & STEWART LLP
          BY:  MICHAEL H. BUNIS, KEVIN C. QUIGLEY,
          AND G. MARK EDGARTON

20        Two International Place
          100-150 International Place

21        Boston, Massachusetts  02110
          (617) 248-4030

22        mbunis@choate.com
          kquigley@choate.com

23        medgarton@choate.com

24

25

```
 1                   P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  The United States District Court
 4    for the District of Massachusetts is now in session, the
 5    Honorable Leo T. Sorokin presiding.
 6              Today is March 10th, the case of Integrated
 7    Communications, et al., vs. Hewlett-Packard, et al., civil
 8    action 16-10386.
 9              Counsel, please identify themselves for the record.
10              THE COURT:  So first, for the plaintiff, we have
11    Mr. Joffe?  Are you on the phone, Mr. Joffe?
12              MR. JOFFE:  Yes, I'm on the phone, Your Honor.
13    Mr. Joffe is here.
14              THE COURT:  You have to speak up louder.  We're
15    having a hard time hearing you, Mr. Joffe.
16              MR. JOFFE:  Okay.
17              THE COURT:  Much better.  I can hear you.  You're
18    there.
19              All right.  And then Mr. McGuire, we have you?
20              MR. MCGUIRE:  Yes, Your Honor.
21              THE COURT:  And then for the defendants, who do we
22    have?  Mr. Saso?
23              MR. SASO:  Yes, Your Honor.
24              THE COURT:  And Mr. Callaghan?
25              MR. CALLAGHAN:  Yes, Your Honor.
```

1          THE COURT:  And Mr. Edgarton?

2          MR. EDGARTON:  Yes, Your Honor.

3          THE COURT:  And Mr. Bunis?

4          MR. BUNIS:  Yes, Your Honor.

5          THE COURT:  And then you have some people on the

6     phone with you, as well, from your side, who are just

7     listening, right?

8          MR. SASO:  That's correct.

9          THE COURT:  Fine.  Okay.

10         All right.  So I'll tell you a number of things

11    that I wanted to talk about in the status conference.  I have

12    a number of items, and then I'm sure you may have some things

13    that you wish.  So I'll start, first, with the small one.

14         How did two transceivers go missing?  And I guess

15    the real question for me is this:  This is what I understand

16    from reading the status report, and you can correct me if I'm

17    wrong.  There were 781 transceivers returned by the Beijing

18    police.  There were 781 received in the United States.  There

19    was 781 examined by defendants' consulting expert in 2018.

20    781 signed out by defendants in 2019 for their testifying

21    expert.  781 examined by defendants' testifying expert, and

22    seemingly, 781 put back in the bags by this expert, based on

23    the documents I read.

24         Some unknown number returned by defendants to

25    plaintiff, because it appears that they weren't, again,

1    counted either -- that is, defendants said, "We looked at

2    781, put them back in the bags.  We took all of the bags and

3    returned them," but I don't know that anybody -- I don't have

4    anything before me that says somebody counted the bags or the

5    items as they were returned.  And likewise, I don't think I

6    have anything that says the plaintiffs counted them when they

7    received them back.

8          Some unknown number possessed at the warehouse by

9    plaintiffs.  I say that only because I don't think I have

10   anything before me of a record of a count while they were

11   then in the warehouse, after they had been returned from the

12   testifying expert.  And I don't have any information on

13   whether they were examined during that period of time or not.

14         Some unknown number given to plaintiffs' expert,

15   because I don't have anything about how many -- a count as to

16   when it was handed over.  The plaintiffs' expert examined

17   779.  And I infer from his information that he -- he examined

18   all the ones that he had had then in his possession.

19         Is that a fair summary of where things stand on the

20   number of transceivers?

21         MR. JOFFE:  Your Honor, this is Mr. -- Dimitry

22   Joffe.  Yes, that's correct, with one clarification.

23         When the defendants took custody of the

24   transceivers for the expert witness inspection, in May of

25   2019, they obtained the custody of 781 transceivers.  But

1  when they returned the transceivers, they returned them

2  directly to the warehouse, and plaintiffs did not count them

3  after they were returned from defendants.  And then

4  plaintiffs just delivered what was in the warehouse to their

5  expert, Mr. Fang, and Mr. Fang then inspected 779.

6          THE COURT:  And then you draw the conclusion what?

7          MR. JOFFE:  We draw the conclusion that the

8  transceivers went -- the two of them went missing between the

9  time they were given to defendants and the time when they

10  were given to plaintiffs' expert.

11          THE COURT:  Okay.  Well, I guess I would draw --

12  and I take it -- I hate to ask a really basic question, but

13  has anyone recounted them?  Where are they right now, and has

14  anyone recounted them?

15          MR. JOFFE:  I believe they're back in the warehouse

16  right now, and they were counted by Professor Fang, who

17  counted 779 of them.

18          THE COURT:  Right.  Okay.  So let me just suggest

19  an obvious thing.  Like we have multiple counts at 781, and

20  we have one count at 779.  So I'll give you an example.  Like

21  I don't know why this kind of issue seems to come up in this

22  case.  Suppose -- suppose Person A is paying Person B $72,

23  and counts out 72 one-dollar bills, and says, "I counted 72

24  one-dollar bills.  Here they are," and hands it to them.  And

25  then Person 2 later counts them and says, "There's 69

1    one-dollar bills."  Rather than spilling a lot of ink, two

2    dollars must have gone missing along the way, I think the

3    first thing that I would suggest somebody do is, how about

4    recount?  Maybe somebody made a mistake.  I know he's a

5    professor at MIT -- I'm not saying he made a mistake; I have

6    no idea.  But the first thing to do would be to count how

7    many are in the warehouse.  Just see.  People do make

8    mistakes, even professors at MIT.

9         So I don't know.  You all can approach the problem

10   however you want, but it seems to me that before I'm going to

11   do anything about whether somebody stole transceivers,

12   somebody lost two transceivers, my suggestion would be, like,

13   count them.  Like -- would be the following:

14        One, if you -- if one or both of you think it's

15   meaningful, count how many there are now.  Both the two of

16   you send out two paralegals.  Go there and together count

17   them, and see if they can agree how many are there.  Maybe

18   there's 779, and then two definitely seem to have gone

19   missing along the way.  And then I would -- has anyone been

20   in the warehouse between the time they were --

21        When the defendants return them, who took

22   possession of them?  Mr. Joffe?

23        MR. JOFFE:  Yes, Your Honor.  The defendants

24   returned the transceivers to the warehouse, to the warehouse

25   manager.

1      THE COURT:  So the warehouse manager took the --

2 presumably they were -- presumably they were in bags, and the

3 bags were in a box.

4      MR. JOFFE:  Yes.

5      THE COURT:  And he took the box and put them where?

6 They maintain possession of them, the warehouse?

7      MR. JOFFE:  In the warehouse.

8      I believe Mr. Quigley, Kevin Quigley, who is on the

9 line, was the one who returned the transceivers to the

10 warehouse.

11      THE COURT:  And then does the warehouse keep track

12 of each time the box is accessed?

13      MR. JOFFE:  I'm not certain about that, Your Honor.

14      THE COURT:  And does -- do you know -- I take it

15 who -- who can authorize access?

16      MR. JOFFE:  Well, plaintiffs can authorize access.

17 They can call the warehouse.

18      THE COURT:  Hold on one second, Mr. Joffe.  Just

19 start again.

20      So you were saying plaintiffs can authorize access.

21      MR. JOFFE:  Yes.  They will call the warehouse

22 manager and authorize.

23      THE COURT:  And am I correct that no one else can

24 authorize access?

25      MR. JOFFE:  That's my presumption.

```
 1              THE COURT:  So in other words, if John Q. Smith or
 2   Mr. Callaghan showed up at the warehouse and said, "I'd like
 3   to see them," the warehouse manager would say, "Well, I don't
 4   have you on the list.  You're not authorized.  I would need
 5   to get permission from plaintiffs' counsel or plaintiff."
 6              MR. JOFFE:  That would be my presumption, Your
 7   Honor.
 8              THE COURT:  All right.  And do you know whether
 9   anyone else saw them between defendants' return and sending
10   it out to your expert?
11              MR. JOFFE:  Yes.  I know that Plaintiffs Styller
12   and Jade Cheng looked at them in the warehouse, in the summer
13   of 2019.  Correct.
14              THE COURT:  After defendants' testifying expert,
15   and plaintiffs' expert?
16              MR. JOFFE:  Correct.
17              THE COURT:  And did they count them?
18              MR. JOFFE:  No, they didn't count them at the time.
19   They just spot-checked them.
20              What happened is defendants produced their H3C
21   certification report in the summer of 2019.  That report
22   describes the features of the holographic security labels on
23   the transceivers.  And defendant -- and plaintiffs went to
24   the warehouse to check the labels to see if they could find,
25   you know, those indicia of counterfeit among them.
```

1          THE COURT:  I see.

2          MR. JOFFE:  They didn't count the full set of

3    transceivers.

4          THE COURT:  And no lawyers went with them?

5          MR. JOFFE:  No.

6          THE COURT:  Okay.  All right.  Well, in any event,

7    I don't know -- what, if anything, do all of you want to do

8    about the seeming missing -- apparently missing two

9    transceivers?  From my perspective -- let me tell you, as a

10   general picture, I brought that up because I thought it might

11   be -- at least we have the facts somewhat clarified.  You can

12   figure that out, if you want.

13         Let me tell you a couple of things that I want to

14   figure out today or talk about.  But some of the questions

15   that I was thinking about are these:

16         What I understand where we are is that the next

17   step is going to be motions for summary judgment regarding

18   the question of the counterfeit question.  And what I

19   understand from the status report is that defendants wish to

20   make two additional motions related to that.

21         One is, they wish to make a motion to exclude

22   plaintiffs' expert.  And so a question that I have is a

23   little -- I wanted to hear a little more about the basis for

24   that, but also whether the two sides think that -- I'm

25   inclined to think it should be simultaneous with summary

1    judgment; that is, move for summary judgment, and separately,

2    or within your motion, explain why it should be struck.  And

3    then, you know, you could say, "You win, without -- the

4    expert should be struck for this reason, and without him, you

5    win for this reason."  And even if you lose the striking, I

6    assume you think you win, anyway.  I don't know that, but I'm

7    just guessing.

8            And then you could oppose, Mr. Joffe, and say why

9    your expert doesn't get struck, and why, therefore, he's in,

10   and why you prevail -- you defeat the motion, whether he's in

11   or out.  I assume that's likely to be your position.

12           MR. JOFFE:  Yes, Your Honor.

13           THE COURT:  So I guess the question -- does that

14   make sense, we should do it simultaneously?

15           MR. BUNIS:  Your Honor, this is Michael Bunis.  And

16   let me address the question about whether we should do it

17   simultaneously.

18           But first, I want to make sure I understand it

19   correctly, that at least as late as the filing of the joint

20   report, the plaintiffs indicated that they would be moving

21   for summary judgment, a cross-motion for summary judgment.

22   And our position, with respect to that motion, is that

23   there's no basis for the plaintiff to move for summary

24   judgment on the issue that the products are counterfeit, even

25   with the Fang report, but certainly with not -- without the

1    Fang report.

2            And frankly, as I think Your Honor knows, set forth

3    in the defendants' position on the joint report, the Fang

4    report -- first of all, Dr. Fang, although an expert, doesn't

5    give any opinion that the equipment is counterfeit.  He --

6    that is not his opinion at all, and he admits that in his

7    deposition.

8            Second, as we also put forth in the report,

9    Dr. Fang's report, it was -- really just compares his view of

10   these transceivers to two hearsay documents, which are

11   entirely improper for summary judgment and are, in our view,

12   completely inadmissible in this case.

13           And frankly, the Court identified this issue, dare

14   I say, a year or more ago.  And so our position is that there

15   shouldn't be any cross-motion for summary judgment on the

16   part of the plaintiffs, because they don't have a good-faith

17   basis to do so.

18           With respect to the defendants' motion for summary

19   judgment, we have a draft *Daubert* motion to exclude Dr. Fang.

20   We are prepared to file that.  If the Court would prefer that

21   we file that together with the motion for summary judgment,

22   we can do that.  We -- currently, the *Daubert* motion, Your

23   Honor, is nine pages.

24           THE COURT:  I guess my preference is I wouldn't

25   want to delay summary judgment until the resolution of that

 1    issue.  I don't have an objection to -- if you wanted to file

 2    your *Daubert* motion today, and summary judgment is not due, I

 3    don't have it in front of me, to whatever date, I don't mind

 4    then if they're separate.  But what I don't want to do is,

 5    say, hold summary judgment until that issue is resolved.

 6              MR. BUNIS:  No problem.  We will file them -- we

 7    will not delay summary judgment on the filing of that, and we

 8    will file *Daubert* right away.  I just want to tee up the

 9    issue of --

10              THE COURT:  I get it.

11              Mr. Joffe, are you planning to cross-move for

12    summary judgment on the counterfeit issue, based on your

13    expert's report?

14              MR. JOFFE:  Yes.  Yes, Your Honor.

15              THE COURT:  So my question would be this.

16    Assuming, for the moment, for sake of discussion, that I were

17    to reject their motion challenging your expert.  So your

18    expert was in and was somebody who could be relied upon.  And

19    assuming that he could rely upon those documents upon which

20    he did rely, don't I have to draw -- it's your motion for

21    summary judgment.  I would have to draw all reasonable

22    inferences in their favor, correct?

23              MR. JOFFE:  Correct.

24              THE COURT:  I would not be able to draw inferences

25    in your favor.

1          MR. JOFFE:  That's correct, Your Honor.

2          THE COURT:  So he doesn't -- he does not say it is

3    counterfeit; he says it has indicia -- he says there are

4    these markers of counterfeiting that have been identified by

5    the company H3C.  I find those here.  I understand why, if

6    the report's in evidence, why, perhaps, it's a reasonable

7    inference for a fact-finder to draw from that, that they were

8    counterfeit.  But why -- how can I draw that inference on

9    summary judgment?

10          MR. JOFFE:  Well --

11          THE COURT:  In your favor, on your motion.

12          MR. JOFFE:  On my motion, we will challenge --

13    obviously we will challenge Mr. Raina's report and

14    conclusions.

15          THE COURT:  Sure.  But hold on.  You have two

16    parts.  One part is they're going to move for summary

17    judgment on counterfeit.  You're going to oppose.  You get to

18    do that whether or not you have your expert.  You get to

19    oppose that.  No problem.  I don't know what the resolution

20    of that motion is, but no problem.

21          You want to cross-move for summary judgment.  Your

22    cross-motion says, "Plaintiffs win.  These things are

23    counterfeit, and we can win that.  And we win that" -- I am

24    assuming now, for that motion, that your expert report is in.

25    But how do you win that, even on your expert report, even if

1    there's no other evidence?  I have to draw an inference in

2    your favor in order to reach the counterfeiting conclusion,

3    and how do I do that on your motion?

4            MR. JOFFE:  There is also, in addition to

5    Professor Fang report, there is other evidence in our favor,

6    Your Honor, the evidence -- the documents that Mr. Fang cites

7    in his opinion, the HC3 certification report.  It was

8    produced by defendants themselves last summer.  It was

9    described in Mr. Saso's declarations as a verification report

10   that H3C provided to the PSB, the Chinese police.  It

11   describes it as the verification report submitted and

12   explaining the position concerning the counterfeiting

13   allegations.  That's also in Mr. Saso's declaration.  And the

14   privilege log contains numerous entries for defendants' own

15   comments, edits, draft, and template regarding the

16   certification report.

17           And then they have a letter to the PSB, final

18   letter, that says that H3C determine, based on the labels,

19   holographic labels attached to the transceivers, that the

20   transceivers were counterfeit.  Not just March draft of the

21   letter, but they want a sanitized version in April.

22           THE COURT:  So you concede, then, that your expert

23   report can't be a basis for you to win summary judgment, is

24   what I hear you saying.  And it's not really a sensible -- I

25   mean, you can say -- I guess what I hear you saying is,

1    "Judge, I can win summary judgment, not on my report, expert

2    report, but I could win summary judgment because there's a

3    letter that H3C sent to the Beijing police, and that letter

4    says that the transceivers are counterfeit."

5         MR. JOFFE:  And the H3C verification report have

6    fingerprints of defendants on it.  They've drafted it

7    together.

8         And there is another important fact that TT Global

9    transceivers, at the same time, when they were in the hands

10   of ICT, they were tested by H3C, and then the defendants had

11   TT Global destroy those transceivers because of their

12   questionable nature.  And they paid $200,000 to TT Global to

13   destroy those transceivers.

14        And there is also defendants' own correspondence

15   with Inspira, the original provider of that equipment,

16   showing that Inspira never provided defendants with serial

17   numbers of the transceivers on the bills of entry, and that

18   HPFS India never inspected the transceivers upon receipt.

19        So there is a chain of documents that shows pretty

20   clearly that --

21        THE COURT:  And you believe that those documents,

22   drawing all reasonable inferences against you --

23        Right?

24        MR. JOFFE:  Reasonable inferences from those

25   documents, drawn in defendants' favor, I believe that those

1    documents will show that the transceivers did, in fact, carry

2    the counterfeit trademark, registered trademarks.

3          And Your Honor, my clients were investigated and

4    detained in China, based on the suspicion of selling

5    commodities bearing counterfeit registered trademark.  That

6    was the charge that the police --

7          THE COURT:  Do you understand the difference

8    between probable cause and truth?

9          MR. JOFFE:  The difference between probable cause

10    and truth, well, that's --

11          THE COURT:  Your clients were detained.  Nobody

12    disputes that.  Your clients were detained based on an

13    allegation that they were selling counterfeit transceivers.

14    I not -- I don't think defendants dispute that, although I'm

15    not positive.  But in our parlance -- I'm not saying that the

16    Chinese follow our parlance, but I imagine that the concepts,

17    in some way, are similar -- they were detained for those

18    things.  That doesn't mean it's true that they did those

19    things.  They were exonerated by the Beijing police.

20          There are many reasons why they could have been

21    exonerated.  One reason they could have been exonerated is

22    they didn't know what they were doing, that is, they didn't

23    know they were selling counterfeit devices.  Another reason

24    they could have been exonerated is the determination that the

25    devices weren't counterfeit.  I don't know.  But all I'm

1    saying is the fact that they were detained is not proof --
2    that's like probable cause.  It isn't proof that, in fact,
3    the things were counterfeit.
4         And so I guess, to your point, Mr. Bunis, your
5    point, as I understand it, Mr. Bunis, is you don't think
6    Mr. Joffe has a good-faith basis to file a motion for his own
7    motion for summary judgment, because you don't think that
8    drawing -- applying the Rule 56 standard, drawing all
9    reasonable inferences in your favor, as would be -- as is
10   required and he concedes, that there would be a basis for
11   summary judgment.  As to whether that's -- that seems fairly
12   clear as to his expert, and I don't hear Mr. Joffe explaining
13   how his expert can support his own motion for summary
14   judgment.
15        It doesn't mean his expert, if in, can't support
16   judgment at trial.  I'm not weighing in on that at the
17   moment.  But it doesn't seem like his experts can support a
18   motion for summary judgment.  Maybe it can be explained to me
19   why it could.  He's identified a bunch of other evidence.  I
20   don't think it's a -- that we're going to resolve that
21   question at the time, at the moment.
22        What I suggested is this:  The summary judgment
23   sequence should be defendants move for summary judgment,
24   supported by their memo in support of summary judgment.  Then
25   plaintiffs -- this is right out of my standard policy on

1    summary judgment.  Plaintiffs have an opportunity to file one

2    document that's an opposition and a cross-motion for summary

3    judgment, a memo.  Obviously I would assume that it would

4    address, to some degree separately, the two issues, because

5    separate legal standards apply.  Then you have the

6    opportunity, defendants, or you, Mr. Bunis, whoever is doing

7    it, to file one document, which is your opposition and reply.

8    And then you get one more document, Mr. Joffe, which is your,

9    essentially, sur-reply.

10           I will -- you may raise, Mr. Bunis, in your

11   opposition reply, if you think there's no good faith -- that

12   you not only win the motion, but there's no good-faith basis

13   for it, you can win -- you can raise that.  As a general

14   practice, not always, but I'll tell you, I generally try to

15   eyeball motions when they're filed so that if I see something

16   that stands out, that might lead to quicker resolution, I can

17   jump in.

18           You have alerted me that I should look at the

19   motion and see whether I might jump in, if I read it in light

20   of this, and I think, "Wait, there's no basis for this

21   motion."  If I don't do that, it doesn't mean there isn't, it

22   just may mean that I didn't do it or it may mean that I'm

23   leaving it to you.

24           But I'm not sure, unless you have another

25   suggestion, Mr. Bunis, that there's more that we can do with

1    that at the moment.

2          MR. BUNIS:  That's fine.  This is Michael Bunis,

3    Your Honor.  We understand, and that's fine.

4          I just want to point out one other point when you

5    ask me did I agree with that, just before you laid out the

6    schedule, and I wanted to say, yes, I do agree with that.  I

7    just wanted to point out one other thing.  With respect to

8    any plaintiffs' motion for summary judgment, you know,

9    Rule 56 is clear that you can't rely on inadmissible evidence

10   to form the basis of a motion for summary judgment.

11   Actually, you shouldn't rely either way to oppose or to move

12   for summary judgment.

13         And the rule is clear that if the -- the evidence

14   is challenged, that is to say, if the documents -- and in

15   this case, it's more than just Exhibit 3 and 4 to the Fang

16   report; it's also several of the documents that Mr. Joffe

17   referred to when he was asking you about the additional

18   evidence.  If that's challenged, and it is, it's clear that

19   we've challenged this all along as being improper hearsay,

20   the burden is on the plaintiff to demonstrate the

21   admissibility of those documents.

22         So I really just wanted to sort of point that out,

23   Judge, because we obviously don't think that there's any

24   basis that any of that stuff comes in.  And in fact, my

25   memory is that the Court identified exactly this issue to the

1    plaintiff some time ago, pointing out, for example, in the

2    transcript, that H3C was not a defendant in this case, and

3    frankly, at that time, over a year ago, asking, for example,

4    whether they intended to seek discovery directly from H3C,

5    and clearly they haven't.

6            In fact, as we pointed out in the report, they

7    haven't even obtained certified translations of these Chinese

8    documents.  And again, those are just the documents that are

9    attached to the Fang report.  The same issue with respect to

10   admissibility applies to certain of the other documents that

11   I presume the plaintiffs would use to support their

12   cross-motion for summary judgment.

13           So anyway, I apologize for going on, Your Honor,

14   but there's an issue of admissibility, as well.

15           THE COURT:  Right.

16           My only suggestion is this, further suggestion on

17   that.  I'm a big believer in conferral.  I am -- and I, even

18   on dispositive motions, because I think sometimes you can

19   narrow the issues of dispute, I commend it to you.  I

20   understand that it's not always a successful process.  And

21   so -- but I would urge you to do that, because I think that

22   it will aid all of you in focusing the issues, and it will

23   save your clients money.

24           And the second, I'll just remind you all, with

25   respect to the summary judgment briefing that's coming, that

1  as a general matter, I -- as I've sometimes said to some

2  lawyers, I wish there were a plug-in to Adobe when I'm

3  reading the PDFs that eliminated all adjectives, because I

4  find that characterizations don't advance the ball.  If the

5  other side was outrageous, just show me the facts.  But the

6  opinion that it's outrageous doesn't really move me.  So

7  anyway.  All right.  So that is one of the issues.

8          Are there any -- another question that I had was

9  the defendants indicate they are going to make a spoliation

10 motion.  Does that bear on summary judgment?

11         MR. SASO:  Your Honor, this is Paul Saso on behalf

12 of the defendants.

13         It is possible that one of the sanctions that the

14 Court could imply -- apply in the case could impact summary

15 judgment.  We think that you could, for example, take adverse

16 inferences from the spoliation, not just at trial or instruct

17 a jury at trial, but that Your Honor could also take such an

18 adverse inference on summary judgment.

19         THE COURT:  Well, let me circle back to this in a

20 moment.

21         The way I see this case proceeding is we have

22 summary judgment process coming.  If possible, you're going

23 to do some depositions while summary judgment is being

24 briefed, because this is an old case and it's taking too

25 long.

1           And then when summary judgment is done, I'll review

2    the papers, I'll decide it.  Once it's done, the resolution

3    of that, putting aside spoliation for the moment, neither of

4    you seem to think, from the Court's perspective, resolves the

5    case.  And then what I understand is you think it focuses it.

6           And then there's some more deposition discovery

7    regarding the remaining issues in the case, but you think the

8    resolution of this will help focus that discovery.  And then,

9    after that, we're presumably ready for trial.

10          Is that the general outline of -- and you are

11   obviously free to settle it at any point if you want to.  But

12   that's the resolution, absent a settlement, the process.

13          That big picture, you both agree with that?

14          MR. JOFFE:  This is Dimitry Joffe.  I do, Your

15   Honor.

16          MR. BUNIS:  Presumably, Your Honor, that's the

17   process.  I don't know whether, if there's an outcome of, for

18   example, the spoliation motion that might mean that there

19   would be a subsequent dispositive motion that would eliminate

20   trial on any of the issues.

21          THE COURT:  So I guess that's my question, then, is

22   with respect to spoliation, it seems to me, if you're not

23   asking me to draw -- if the summary judgment that's coming

24   now stands on its own, it stands on its own.  You can make

25   the spoliation motion later.  If what you're saying is -- I

1    don't know what exactly you want from the spoliation.  Do you

2    want -- are you asking me to just draw inferences at

3    the trial, like instruct the jury at the trial, allow

4    introduction of that evidence?  Then it seems like a

5    trial-related motion; we don't need to deal with it yet.

6          Are you asking that, as a sanction, that I enter

7    judgment against the plaintiffs?  That's obviously a -- a

8    very big sanction.  I think the law, generally, favors

9    proportional sanctions and favors resolution on the merits.

10   It isn't to say -- I'm not saying that that isn't possible.

11   I don't know.  But that is the general view of the law in the

12   circuit.

13         So I don't know where -- in terms of scheduling,

14   where you want to locate filing your spoliation motion.

15         MR. SASO:  Yes, Your Honor, again, Paul Saso on

16   behalf of the defendants.  If primarily your question is

17   about timing, the defendants anticipate filing the motion

18   essentially along the same timeline as a briefing schedule

19   for summary judgment.  We do believe that we are ready to

20   make that motion.

21         And I do think that there are multiple parts of the

22   spoliation issue that would lend themselves to different

23   kinds of sanctions.  And some of them may be applicable here

24   at summary judgment; some of them may be applicable later at

25   trial.  But we think that the briefing is ready to be done

```
 1   now.
 2              THE COURT:  All right.  So you want to do it now.
 3              MR. SASO:  Yes, Your Honor.
 4              THE COURT:  And some of the relief you're asking
 5   for would be relief related to summary judgment?
 6              MR. SASO:  We believe that's one of many options,
 7   yes, Your Honor.
 8              THE COURT:  Okay.  All right.  So when --
 9              Maria --
10              Or maybe you can -- I don't have the schedule right
11   in front of me.  When is the summary judgment motion due?
12              Or Maria, do you have the date for that?
13              MR. MCGUIRE:  I believe it's the 16th, Judge.
14              THE COURT:  16th of March?
15              MR. MCGUIRE:  Yes.
16              THE COURT:  All right.  So you anticipate, by
17   March 16th, defendants file a motion for summary judgment, a
18   separate motion for spoliation sanctions, and possibly either
19   incorporated -- either as a separate motion or incorporated
20   into the summary judgment, the motion to strike the
21   plaintiffs' expert?
22              MR. MCGUIRE:  That's correct.
23              THE COURT:  All right.  And then --
24              MR. SASO:  Your Honor, I'm sorry, this is Paul Saso
25   for the defendants.
```

1          I think it is a short period of time.  I think that

2     the 16th is this coming Monday.  I think that given today's

3     conference, whether it is on the substance of the summary

4     judgment, I'll maybe leave that up to my colleagues up at

5     Choate as to whether the discussion during today's conference

6     leads them to think that they may request a little bit more

7     time.  But I think when it comes to the sanction motion, we

8     would also sort of anticipate maybe an additional week or two

9     would be helpful.

10          THE COURT:  Okay.  Mr. Bunis?

11          MR. BUNIS:  I don't want to bid against my

12     colleague, but we -- we'll have the motion for summary

13     judgment and incorporated or separately with the motion to

14     strike in on the 16th.

15          THE COURT:  I'm sorry, you can or -- yes or no?

16          MR. BUNIS:  Yes.

17          THE COURT:  All right.  So you're saying summary

18     judgment and *Daubert* on the 16th.  And Mr. Saso is saying the

19     23rd or the 30th for the spoliation motion.  Is that fair?

20          MR. SASO:  Your Honor, I think that that's -- this

21     is Paul Saso again.  I think that that is fair.  And

22     given that there will -- I don't think that there will be a

23     need for the four-way back and forth with cross-motions.  I

24     think that the briefing may still very well be able to be

25     completed simultaneously with summary judgment.

1          THE COURT:  Okay.  Mr. Joffe, do you want --

2          Well, if we just did the ordinary course, 3/16

3    they're going to file summary judgment and *Daubert*.  Do you

4    want the 23rd or the 30th, Mr. Saso?

5          MR. SASO:  We will have it filed by the 23rd.

6          THE COURT:  3/23 for spoliation.  That would mean

7    two weeks for that ordinarily would be 4/7, and 30 days for

8    summary judgment would be 4/16.  If you want 4/16 for the

9    whole thing, I don't have a problem with that.

10          MR. JOFFE:  Yes, Your Honor, I think 4/16 will do

11    for both of them.

12          THE COURT:  I mean, I'll give you, if you want 4/7

13    for spoliation, you can have that.  I'm not -- what do you

14    want?  Do you want 4/16 to respond to both?

15          MR. JOFFE:  4/16 for both will be fine, Your Honor.

16          THE COURT:  So this is the schedule.  March 16th,

17    summary judgment and *Daubert* motions by defendants.

18          Are you getting this, Maria?

19          THE DEPUTY CLERK:  Yup.

20          THE COURT:  March 23rd, spoliation motion by

21    defendants.

22          April 16th, plaintiffs will file the following:

23    One, an opposition to the spoliation motion; two, a single

24    memo opposing summary judgment that could either be merely an

25    opposition or it can be an opposition -- the memo can be just

1    an opposition or an opposition supporting a cross-motion.

2                For now, am I correct, I should assume for now,

3    Mr. Joffe, that you're filing a cross motion?

4                MR. JOFFE:  Yes, Your Honor.

5                THE COURT:  All right.  So then it's a single memo,

6    30 pages to oppose and supporting cross-motion.

7                And I assume you're doing a separate *Daubert*

8    motion, Mr. Bunis?

9                MR. BUNIS:  That's correct, Your Honor.

10               THE COURT:  And then a separate opposition to the

11   *Daubert* motion, all due on the 16th.

12               Then --

13               MR. JOFFE:  Your Honor, and what's the page limit

14   on the separate position to *Daubert*?

15               THE COURT:  So there will be -- it's 20 pages on

16   the -- this is how it will be.  On the motion for summary

17   judgment, defendants get 20 pages for their memo and 20 pages

18   for their *Daubert* memo, and 20 pages for their spoliation

19   memo, because 20 pages is the maximum -- is the default under

20   the local rules for a memo.

21               And then for your opposition to the spoliation

22   memo, it's 20 pages, and your opposition to *Daubert* is

23   20 pages.  Your summary judgment memo, which is opposing

24   theirs and supporting yours is 30 pages.

25               MR. JOFFE:  Okay.

1          THE COURT:  Okay.  Then you have, for the

2     defendants, a couple things:  a reply to the spoliation and a

3     reply to the *Daubert*, which ordinarily would be five pages

4     and ordinarily seven days.  And then ordinarily your reply

5     opposition memo on the summary judgment, because it's another

6     summary judgment motion, I'd ordinarily give you 30 days.

7          Do you want to do seven days and then 30 days, or

8     how do you want to structure that?

9          MR. BUNIS:  One second, Your Honor.

10          Yeah, Your Honor, I don't think we need 30 days to

11     do the opposition, to the extent there is one, on the

12     cross-motion for summary judgment.  I think we can do it in

13     two weeks.

14          THE COURT:  Okay.  So why don't we say this.  We'll

15     say 4/30, and that will be for everything.  Your reply on

16     spoliation, five pages; your reply on *Daubert*, five pages;

17     and your opposition to your -- one document, which is both

18     your reply in support of your motion for summary judgment and

19     your opposition to Mr. Joffe's motion for summary judgment,

20     which is 20 pages.

21          MR. BUNIS:  Assuming that he makes one, right?

22     There's still hope that that won't happen.

23          THE COURT:  Correct.  If he doesn't make one, if he

24     just opposes you, then that document is just a reply, and

25     then it's five pages.

1      MR. BUNIS:  Understood.

2      THE COURT:  And then assuming he does, because he's

3  told me he will, then, Mr. Joffe, you'll be entitled to file

4  a reply in support of your cross-motion for summary judgment,

5  and that document will be ten pages.

6      And is a week enough time for that?

7      MR. JOFFE:  Yes, Your Honor.

8      THE COURT:  Okay.  So plaintiffs' reply, due

9  May 7th, on the summary judgment, ten pages.  Then we'll be

10  done with the briefing on all of that.  So we have a schedule

11  on that.

12      I will then read it and schedule a hearing, likely.

13      And two, just a couple requests with respect to the

14  summary judgment particularly, but all of this.  One, on the

15  statement of facts, just so we're clear, I think, Mr. Bunis,

16  you might be familiar with this from another case, but I

17  don't recall at the moment.  The rest of you might not be.

18  What I like, it's laid out on the website.  But so you move

19  for summary judgment, you have a statement of facts.  You

20  send it to Mr. Joffe.

21      Mr. Joffe, you're going to, like, fact number one,

22  let's say fact number one, they say is the three individual

23  plaintiffs were detained by the police.  What I want you,

24  Mr. Joffe, to do when you say "admitted," is take the

25  document they sent you, with the assertion of fact, and then

1    right under it say "Admitted," rather than just say, "Number

2    one, admitted."  And then you might add -- and you'll have

3    your response -- so you'll embed your responses in the

4    document he sent you, and then you'll file that document with

5    your opposition.  And you might add facts to it, because

6    maybe there's other facts that bear on your cross-motion, if

7    you make one.

8              And then you, Mr. Bunis, will take that document

9    that he sent back to you in Word, or whatever format, and

10   embed it, so the last -- the document that's filed last of

11   the statement of facts will be the only one any of us really

12   read, especially me, because it will have all of the

13   assertion of facts and all of the responses.

14             Do you all follow me?

15             MR. JOFFE:  Yes, Your Honor.

16             THE COURT:  So I don't have to -- what it saves --

17   I'll just tell you, it saves me printing out multiple

18   documents and matching the admit to the assertion.  So the

19   first request that I have is you follow that practice,

20   because it makes it dramatically easier to resolve your

21   motion for summary judgment.

22             The second request that I have is you should --

23   this is a request, not a requirement, and I mean that

24   seriously, just a request.  But there is something called

25   "LinkBuilder."  Have I referenced it to you before?

1          MR. BUNIS:  You have.

2          MR. JOFFE:  You did, Your Honor.

3          THE COURT:  It allows you to embed hotlinks to ECF

4    documents.  This would be helpful in doing in your briefs.

5    And you could talk -- if you need some help with it, Edis

6    Feldhouse, who's in our IT department.

7          I will tell you, I just had closing arguments in a

8    bench trial in a patent case and they provided me hotlinked

9    of their final briefs, and it was exceptionally helpful in

10   going through.  You can't -- the two things you need to know

11   is you can't link to sealed exhibits, and you need to have

12   whatever you're linking to when you compile the links, need

13   to already be on ECF.

14         It's not that complicated.  I've done it.  The

15   hardest part is getting over the psychological part that it's

16   just one more thing to do.  But it really doesn't take very

17   long.  It's really very easy.  So I'm not requiring you to do

18   it.  If you don't do it, I'm not going to draw an adverse

19   inference or hold it against you.  But if you do do it, it is

20   much appreciated by my law clerks and myself, because it does

21   make a big difference in making it easier, especially in

22   something like this where I imagine there will be a fair

23   number of record cites.

24         The third request with respect to the statement of

25   facts is that some people -- and I don't say that any of you

1  would do this, but I'm bringing it up because it has happened

2  recently a number of times.  Some people seem to digress into

3  argument in the statement of facts.  They -- for example,

4  let's say Mr. Joffe asserts these three people were arrested

5  and detained.  Some people would respond to that by saying,

6  "Well," and give me this long explanation of why it's not

7  defendants' fault that they were arrested and detained.

8         But they were arrested.  I don't think defendants

9  dispute that those three people were arrested and detained

10 for some period of time.  They were -- if the assertion of

11 fact just says they were arrested and detained, just admit it

12 because that's what happened.  You don't dispute that.  That

13 doesn't mean you were responsible.  That's a different thing.

14 And you can argue in your brief about why you're not

15 responsible.

16        And so it's not an opportunity, I guess is my

17 point, to evade the page limitations.  If you really think

18 you need more pages, come to me for more pages.  Don't stick

19 it in in the argument, in the statement of facts.

20        Okay.  So we have the schedule for summary

21 judgment.  You've heard my complaints or my requests.

22        What depositions -- do you think you can agree on

23 what depositions you can do while this is all going on?  In

24 other words, what I'm thinking about is this.  I want to set

25 the trial date.  So let's say all these motions are ripe by

1    May 7th.  I'm going to resolve them.  Don't expect that it's

2    going to take me six months to resolve them.  I'm going to

3    resolve them before that.  But there's going to be a period

4    of time for me to resolve them.  All right.

5          Then you need a period of time to do the rest of

6    the depositions.  Let's suppose, for the moment, you don't do

7    any depositions between now and May 7th.  How long do you

8    need to -- let's say you don't even do any depositions until

9    I resolve it.  Let's say I resolved it on May 31st, which is

10   a bit optimistic.  How long would you need from June 1st to

11   do your depositions?  Approximate.

12         MR. SASO:  Your Honor, Paul Saso for the

13   defendants.  I think that we can conduct all of the

14   depositions in three months from the date of resolution of

15   the summary judgment motions.

16         THE COURT:  All right.  Mr. Joffe?

17         MR. JOFFE:  Your Honor, I agree, but -- I think

18   with the three months sounding like a reasonable period of

19   time.  But I think defendants seeking 20 depositions, I think

20   that's excessive and --

21         THE COURT:  Let me pause you there, Mr. Joffe.

22         When you say that, Mr. Saso, how many depositions

23   do you anticipate taking?

24         MR. SASO:  We anticipate taking -- in the status

25   report, we listed the 19 to 20 depositions that we expect to

1     take.

2              THE COURT:  Okay.  So you would say you want to

3     take 19 to 20.  You can do those in those three months.  And

4     during that time, you can do however many.

5              How many did you say, Mr. Joffe, you want to take?

6              MR. JOFFE:  We have ten, Your Honor.

7              THE COURT:  Ten.  And how many of your ten overlap

8     with his 19 or 20?

9              MR. JOFFE:  They don't overlap, Your Honor.

10             THE COURT:  Okay.  They don't.  So you want to

11    take, essentially, ten people from the defendants, right?

12             MR. JOFFE:  Yeah.  Correct, Your Honor.

13             THE COURT:  And let me just take a look at the

14    list.

15             So you want to depose each of the plaintiffs.

16    That's 11 depositions.

17             Who is Mr. Quinn?

18             MR. SASO:  Your Honor, Mr. Quinn worked for ICT.

19    He's a former employee and worked in China at the time of the

20    events that are relevant to this case, and you also may

21    remember filed a separate case more than a year ago that was

22    dismissed on a motion to dismiss for --

23             THE COURT:  Oh.  I remember the case.  All right.

24             So who's Mr. Pekar?

25             MR. SASO:  Mr. Pekar is also a former ICT employee.

1    He was, I think, instrumental in the early parts.  He was --

2    worked on creating the relationship between ICT and HP and

3    entering into the agreements that underline this case.

4              THE COURT:  And Mr. Faybush.

5              MR. SASO:  Mr. Faybush is a -- I believe he may

6    also be a former ICT employee.  He is in -- he pops up

7    frequently in plaintiffs' document production as someone who

8    was related to buying and selling H3C equipment, as well as

9    shipping back a stock of the equipment from China to the

10   United States, following the imprisonment of the individual

11   plaintiffs.

12             THE COURT:  Sadovnikov?

13             MR. SASO:  Yeah, Mr. Sadovnikov I think is a former

14   shareholder of ICT.  He created their IT infrastructure, and

15   he was -- he participated in the migration of the ICT e-mails

16   from a physical server to the cloud and may have been part of

17   the process of determining whose e-mails would be migrated.

18             THE COURT:  Makarovsky?

19             MR. SASO:  Mr. Makarovsky is, I believe, a current

20   employee at ICT.  He is an -- I'm sorry, an IT person for

21   IC -- for -- excuse me with the abbreviations.  He is an IT

22   person working for ICT, and, therefore, is more knowledgeable

23   with respect to more recent developments in connection with

24   their e-mail and ESI issues.

25             THE COURT:  And Grabkovksy?

1          MR. SASO:  I will make that a little bit more

2     simple.  I understand that he goes by the name of "Tony

3     Grabo."  He was the main point of contact for ICT, with their

4     outside vendor who did the e-mail migration.  He also talked

5     with Mr. Sadovnikov about whose e-mails should be migrated.

6     And he also looked into whether or not any of the data that

7     was lost could -- was backed up and could be retrieved.

8          I'm sorry, one last part about Mr. Grabo, which

9     makes him particularly interesting, is that he is the person

10    who likely performed the deletion of the individual

11    plaintiffs' and Mr. Quinn's e-mails while they were still in

12    prison in China.

13         THE COURT:  And Shinto and iHub?

14         MR. SASO:  Shinto, Your Honor, is the broker who

15    took possession of the equipment in India and was responsible

16    for shipping it to ICT.

17         THE COURT:  And iHub?

18         MR. SASO:  And iHub is also, we understand, sort of

19    a warehousing as well as shipping company that helped ICT get

20    the equipment into and out of China, as well, after the

21    imprisonment and would have information related to, you know,

22    the importation and possibly any other documents that ICT

23    should have obtained in order to do business or sell this

24    equipment in China.

25         THE COURT:  So would it be fair to divide up your

1    deponents the following way?  Persons 12 to 16, which

2    constitutes four or five depositions, plus persons one, two,

3    three, and four, so eight or nine depositions, are people

4    with knowledge of the events giving rise to the lawsuit?

5    That is the sale of the -- they are involved in the sale of

6    the goods.  They are involved in the shipment of the goods.

7    They are involved with the sale of the goods in China.  They

8    were imprisoned in China.  That's those eight or nine people.

9            And then the deponents you list on your document as

10   five to 11, the purpose of their depositions is they're

11   seeking damages, primarily.  And conceivably, they might have

12   knowledge about some of the matters of their relatives who

13   are persons two, three, or four, and so that will be the two

14   purposes for their depositions, primarily.

15           MR. SASO:  Yes, Your Honor.

16           THE COURT:  And then 17, 18, and 19 are about

17   spoliation issues, discovery issues, e-mail, except that 19

18   is also about the delete -- has a little bit of bearing on

19   the merits, because it's the deletion while they were in

20   prison?

21           MR. SASO:  Yes, Your Honor.

22           THE COURT:  Okay.  And which one -- what is --

23   which part is excessive, Mr. Joffe?

24           MR. JOFFE:  Well, Your Honor, the total number is

25   20, 19 or 20, because there are one or two.  I have the --

1          THE COURT:  You have to say that again for the
2   court reporter, Mr. Joffe.
3          MR. JOFFE:  Your Honor, the total number of
4   depositions, 20, seems excessive to us.  The -- as you
5   pointed out, the last three, Sadovnikov, at Makarovsky, and
6   Grabkovksy, they only have information about the ESI issues.
7   They were not involved in the process in China or India at
8   all.  Val Faybush have peripheral involvement in the process.
9          The Shinto and iHub solution employees, those are
10   intermediate parties who transported them, held the equipment
11   from India to China.  And Your Honor, I think defendants
12   agree that the majority of the transceivers now in the
13   warehouse is the ones who were sold by them to the ICT.  So
14   you know, there is no question that those -- that the
15   transceivers in the warehouse are the ones who were sold from
16   India and then seized by the police in China, and then now
17   here.  So the relevance of the intermediate parties, Shinto,
18   who was transporting the equipment, or iHub Solutions, who
19   was storing it in the warehouse in China, is -- it's not --
20   it's not that relevant to the issue.
21          The knowledge -- the additional knowledge of ESI
22   custodians, Sadovnikov, Makarovsky, and Grabkovksy, I think
23   the defendants already took the deposition 30(b)(6)
24   deposition of Styller, the ICT representative, and he
25   testified as to when and how the e-mail boxes were deleted or

1    not.  So this is just cumulative to his testimony.

2            THE COURT:  Okay.  So as to the deposition -- I'm

3    not resolving, conclusively today, which of those depositions

4    that you can take, Mr. Saso.  I would make these

5    observations.

6            I'm not going to limit you to ten.  I'm not -- it's

7    not clear to me that Mr. Joffe is asking me to limit you to

8    the presumptive ten in the rules.  I'm not going to limit you

9    to ten for the following reason.  The plaintiffs -- there are

10   11 plaintiffs.  It would unfair, in this sprawling complaint,

11   in which the three people who were primarily injured,

12   everybody -- all these relatives of theirs and Mr. Styller

13   are bringing all these claims, and then put you to the

14   Hobbesian choice of deposing the people who are suing you for

15   money, or taking all of the relevant fact depositions, which

16   is what a limit of ten would mean here.  So I'm not going to

17   limit you to ten.

18           The -- the first 14 people you list all seem

19   reasonable and appropriate to me because they're all either a

20   person who's suing you, saying they were injured and damaged,

21   or they're a witness with knowledge of the facts that gave

22   rise to the claims or both.  So I presumptively think you can

23   take those 14.

24           As to the second, the next category of persons, 15

25   and 16, maybe I'm not resolving, but I'll just tell you sort

1    of some thoughts is, you know, do you really need them or

2    what difference do they really make?  Is it necessary?  They

3    certainly have some relevant information.  But given what's

4    being agreed to or what's not, or what's in dispute, how

5    significant is it?  Is it proportional to the case or not?

6    I'm not in a position to decide that now, I just urge you to

7    think about those issues.

8             As to 17 to 19, I think I'll just wait.  I'll know

9    more about that after I look at the spoliation memo and

10   whether they're -- and resolve that, whether they're

11   necessary or not.

12            So assuming, for the moment, that there's 14, and

13   then turning to yours, Mr. Joffe, you have ten, are you

14   disputing any of the ten for the defendants?

15            MR. SASO:  Your Honor, again, Paul Saso for the

16   defendants.  We are not objecting to any of the ten

17   depositions, other than that we wanted to specifically note

18   that we reserve, obviously, the ability to object to any

19   particular topic.

20            THE COURT:  Oh.

21            MR. SASO:  In a formal Rule 30(b)(6) deposition

22   that is served.

23            THE COURT:  Sure.  All I'm asking you now is --

24   yes, you can object to topics.  You can object to individual

25   questions.  I'm just, in a big picture way, trying to get a

1  sense of how many.

2       So what I understand you to be saying is he's

3  within the ten, so he doesn't need permission for the ten.

4  And there isn't somebody on that list who you think that --

5  whose deposition you object to out of like, "Judge, you know,

6  Mr. O'Grady, his deposition shouldn't be taken."  I don't --

7  I shouldn't be anticipating a motion like that.

8       MR. SASO:  That's correct, Your Honor, we would not

9  object to the ten listed.

10      THE COURT:  All right.  So let's assume, for the

11 moment, that the minimum is what will occurs.  And so

12 Mr. Joffe, I understand from Mr. Saso, he's saying, even if I

13 limit him to the 14, that will only shorten it.  And with

14 your ten, he thinks three months from the date that the

15 summary judgment motion and other two motions are resolved is

16 reasonable.

17      My question to you is, (a), if he were limited to

18 the 14, is your only argument proportionality, or do you have

19 another argument as to why it ought to be less than the 14?

20      MR. JOFFE:  Less than 14.

21      THE COURT:  Less than persons -- that is, is there

22 somebody between numbers one and 14, listed on his status

23 report -- on the joint status report, which is docket number

24 308, on page 308, on page 15, who I'm not -- like who

25 presumptively you think that, "Judge, no way they should get

1    that person's deposition," or, "Judge, even if they could get

2    any one of those depositions, 14 is presumptively too many."

3         MR. JOFFE:  Well, one person that I want to point

4    out is actually number 14, Val Faybush, who have very

5    peripheral involvement in the events.  So out of the list of

6    14, I would agree that plaintiffs', of course, one through 11

7    could be subject properly to depositions.  Quinn and Pekar --

8         THE COURT:  Probably?  Are you anticipating you're

9    going to object on the grounds it's not reasonable to depose

10   somebody who's brought a lawsuit.

11        MR. JOFFE:  No, no, no, I was not.  Your Honor, but

12   I just wanted to comment on the first 11, with the timing.

13   There is a --

14        THE COURT:  I haven't got to the timing.  I'm

15   trying to give you the chance, Mr. Joffe, to raise

16   everything.

17        I can conceive of two objections.  One, there's

18   somebody whose deposition shouldn't be taken.  You're saying

19   Faybush maybe is too peripheral; or two, you might say,

20   "Judge, all these people are reasonable people to take, but

21   it's unreasonable to take 14 in this case."  I don't -- I

22   just want to give you the chance to say that before I figure

23   out the time.  If there is -- if you want to say that.  If

24   you don't, if you're comfortable with those things, then

25   that's fine, then we can talk about time before we get to

1  time.

2        I hear you saying probably plaintiffs are

3  reasonable to take.  My view is, actually plaintiffs are

4  reasonable to take.  I haven't -- if you want to give me a

5  reason why it's not appropriate to take the deposition of a

6  person who filed a lawsuit and seeks money from the

7  defendants, tell me now.  Otherwise, I'm going to come to the

8  conclusion that each plaintiff is a reasonable person whose

9  deposition to take, and then we'll take about 12, 13, 14, or

10  proportionality.

11        One, is there any reason that it's not reasonable

12  to take the deposition of one of your clients?

13        MR. JOFFE:  No, Your Honor, there isn't.

14        THE COURT:  Okay.  So we've settled that.

15        MR. JOFFE:  Right.

16        THE COURT:  Then Mr. Quinn, putting aside

17  proportionality for a minute, is he a reasonable person?

18        MR. JOFFE:  He is.

19        THE COURT:  And Mr. Pekar?

20        MR. JOFFE:  He is, as well.

21        THE COURT:  And Mr. Faybush you say is on the edge.

22        MR. JOFFE:  No.  My answer is no, because his

23  involvement is peripheral.

24        THE COURT:  Because he's involvement is what?

25        MR. JOFFE:  His involvement was very peripheral.

1          THE COURT:  Oh.  "Peripheral."  Okay.

2          So you would say -- all right.  One, you might

3    object to Faybush.  The rest are reasonable people.

4          From a proportionality perspective, are you

5    objecting to them taking 13 or 14 depositions?

6          MR. JOFFE:  No, Your Honor.

7          THE COURT:  Okay.  All right.  Then let's assume --

8    I'm not going to resolve now Faybush, and I'm not going to

9    resolve now the other people they listed at 15 to 19.

10   Assuming for the moment that there's 13 depositions -- 14

11   depositions for the defendants, but it might be 13 -- but

12   assume 14, Mr. Joffe, because it's more -- and ten for you,

13   what do you say is the reasonable amount of time to do that,

14   from the date of my summary judgment decision?

15         MR. JOFFE:  Your Honor, some of the defendants --

16   some of the plaintiffs, family plaintiffs, are in China

17   currently, and they were under coronavirus quarantine last

18   month.  And as of now, there is a travel ban on traveling

19   from China.

20         THE COURT:  Let's assume the following, that that

21   problem doesn't impede the depositions.  And I'll tell you

22   why.  Obviously, if they're not allowed to leave -- it's my

23   understanding from your filings that they can't do a video --

24   they -- we can't take their depositions by video while

25   they're in China.  That would be against Chinese law?

1          MR. JOFFE:  I'm not sure about that.  I saw it in

2     the --

3          THE COURT:  All right.  So one possibility is, if

4     they're under such a travel ban, we'll figure out what to do

5     then.  Then maybe we can take their deposition by video.

6     Maybe we can't.  Maybe they're allowed to travel to another

7     country, even if they can't come to the United States, and

8     then we can take their video deposition.  Or the lawyers

9     could go there or whatever.

10          And -- or but -- if it's resolved, if there's no

11     coronavirus impediment, if the coronavirus -- I will tell you

12     that if the coronavirus impedes the ability to perform and

13     meet the schedule, that seems like the kind of thing that I

14     would think would be good cause to extend the schedule.  But

15     we don't know where things will be with corona by the time

16     we're ready to do depositions.  So let's assume that's all

17     fixed, and it's all resolved.

18          So let's say we're June 1st that I resolve the

19     motion for summary judgment and the spoliation and everything

20     else, how long would you need for depositions?

21          MR. JOFFE:  Your Honor, I would agree that three

22     months is a sufficient time.

23          THE COURT:  Okay.  For the 24 depositions?

24          MR. JOFFE:  24, 23, yes.

25          THE COURT:  Yes, 23 or -- well, for 24.  It might

1    end up being 23.  You'd have extra time.  But if it's 24,

2    it's reasonable to do it in that period of time.

3                MR. JOFFE:  Yes, Your Honor.

4                THE COURT:  You could do that, you and Mr. McGuire.

5                MR. JOFFE:  We'll do our best to do it.

6                THE COURT:  Not -- Mr. Joffe, this is your moment.

7    Okay?  If you think more time -- I'm asking you what is

8    reasonable.  Mr. Saso has told me what he thinks is

9    reasonable.  I'm expecting, then, that he will do it in the

10   amount of time that he's asked for, and that if coronavirus

11   impedes the schedule, he'll come to me and say, "Judge,

12   coronavirus is good cause."  If some other thing happens that

13   is -- that we can't now anticipate, that interferes with the

14   schedule, that might be good cause.  But I'm assuming,

15   otherwise, he's not going to come to me, after two and a half

16   months, and say, "Judge, I gave it the old college try, or I

17   gave it a good shot, but it just can't be done and it was too

18   much and it was unreasonable."  I'm not going to be very

19   interested in that motion.

20               So I'm asking you now, if you're telling me --

21   you're an experienced lawyer, Mr. Joffe, and you brought this

22   case, and Mr. McGuire.  If you're telling me -- the reason

23   that I'm cross-examining you is speak now.  If you telling me

24   it's reasonable, you are inducing me to render a ruling that

25   I am relying on your word.  If you tell me "three months,"

1     I'm -- the reason that I'm asking you, I just want to be

2     clear.  Then I'm, "Okay.  Three months is enough time."  You

3     know.  I'm not going to be at the depositions.

4            Is the answer, yes, three months is a reasonable

5     period of time to do 24 or 23, if it turns out to be 23?

6            MR. JOFFE:  Yes, Your Honor.

7            THE COURT:  Okay.

8            MR. SASO:  Your Honor, this is Paul Saso for the

9     defendants.  I did want to just make one note here, as well,

10    given that the topic of the coronavirus has come up.  Even if

11    we put the coronavirus to the side for a moment, I also

12    understand that residents of China will be required to obtain

13    a specific visa that would allow them travel outside the

14    country in order to come to the United States for their

15    depositions and also to submit themselves to the medical and

16    psychological examinations that we anticipate, as well.  And

17    I don't know or can't anticipate how long it may take, even

18    in a perfect world where there is no coronavirus, how long an

19    application for such a visa would take.

20          When I said three months, that is with an

21    expectation that all eight Chinese residents are available

22    for travel.  But I think, at a minimum, it may mean that we

23    should be urging those eight Chinese residents to be applying

24    for visas, to the extent that they can, and keeping us

25    apprised of the status of those visa applications so that,

1    again, hypothetically, again, if Your Honor were to resolve

2    the summary judgment motion in June, we know that the visa

3    applications are already in the pipeline and hopefully are

4    even already granted for, you know, some time this summer.

5              THE COURT:  I think that if what you're suggesting,

6    Mr. Saso, is planning ahead, sounds like a very wise course

7    of action to me.  Since there's no -- as I understand it, if

8    plaintiff wins everything on the motions that are filed, we

9    will be taking depositions.  If defendant wins everything

10   that's filed, we will be taking depositions, unless they win

11   not only spoliation, but win spoliation and win a sanction of

12   dismissal.  So it seems pretty likely you should all be

13   planning on you're going to be taking depositions.

14             And coronavirus, I understand, complicates things

15   in a different way, and I understand that your estimates

16   don't account for that.  The three months doesn't account for

17   that, and you fairly can't account for that at the moment.

18   But I would expect -- I think you should be, like, on your

19   side, you should be lining up people to do whatever

20   evaluations are going to happen, and the eight people in

21   China should be putting together their -- you know, making

22   efforts, to the extent they can in the current circumstances,

23   to seek whatever permissions they need to seek to come to the

24   United States.  And to the extent that all of you think that

25   it might be, like, in the end, given corona and whatever the

1    issues are, it might have to occur in some other country,

2    make arrangements to try to work that out.

3         For example, if they can't come here, but you think

4    they could go to, I don't know, some other country in the --

5    not in China, not in the United States, you can think about

6    all arranging it to happen there.  But I leave that, at the

7    moment, to you.

8         So three months for the depositions.  Once we're

9    done with the depositions, then it's ready for trial, right?

10        MR. SASO:  Your Honor, this is Paul Saso for the

11   defendants.  It is maybe a little bit hard to anticipate now,

12   but there is certainly the possibility that there -- we may,

13   again, be in a position where we could move for summary

14   judgment on the second half of plaintiffs' claims after

15   depositions.  And I'm sorry, there would also likely be

16   experts, as well, there.

17        THE COURT:  Experts -- what's the status of

18   experts?

19        MR. SASO:  I'm sorry?

20        THE COURT:  Well, Mr. Joffe, are you going to have

21   any experts to support your claims, besides the ones that

22   you've already disclosed?

23        MR. JOFFE:  The damages experts.  We'll have

24   damages experts or an expert.

25        THE COURT:  Do we have a deadline for disclosing

 1   damage expert reports?

 2             MR. SASO:  No, Your Honor, I don't think that

 3   there's any current schedule for that.

 4             THE COURT:  So why shouldn't that be one month

 5   after the end of depositions?

 6             MR. JOFFE:  Okay.  Thank you, Your Honor.

 7             THE COURT:  And then one month later for

 8   defendants' rebuttal experts.  And one month later for

 9   depositions of those excerpts.

10             You've already taken the depositions of the

11   existing -- the experts whose reports I've seen, right?

12             MR. JOFFE:  Right, Your Honor.

13             THE COURT:  Okay.  So let me just -- we have the

14   schedule for summary judgment that ends on May 7th.  Then we

15   have a deposition schedule of three months that begins on the

16   day that I issue the decisions on the summary judgment and

17   related motions, followed by a further three months, one

18   month for expert -- for the damage expert reports, one month

19   for the rebuttal damage expert reports, and one month for

20   depositions of those experts.  And then -- and your

21   evaluations of your -- of the plaintiffs is essentially by

22   your rebuttal experts, Mr. Saso?

23             MR. SASO:  Your Honor, I'm not sure I heard you.

24   Could you repeat that?

25             THE COURT:  Yes.  The evaluations that you're

1   planning of the plaintiffs are essentially by your rebuttal

2   experts?

3           MR. SASO:  Oh.  Well, so, Your Honor, yeah, I do

4   think, for example, that we -- I'm not sure if this is the

5   question that you are posing, but we do anticipate that we

6   would try to schedule the examinations of the plaintiffs to

7   coincide as close as possible with their depositions so that

8   they could happen while they're in the United States, both

9   for the examination, as well as their deposition.

10          THE COURT:  When are you going to disclose, though,

11  the report of that examination?

12          MR. SASO:  I think that we would be able to do that

13  sort of during the deposition period.  We would have to, I

14  guess, consult with that expert, but I think that they would

15  able to be turned around, you know, prior to this expert

16  schedule that we're setting out right now.

17          THE COURT:  Okay.  All right.  Fine.

18          Assuming that everything that's in the case goes to

19  trial, and either I find on summary judgment that I do or

20  don't enter summary judgment on counterfeiting, one way or

21  the other way, how long, Mr. Joffe, do you anticipate the

22  trial to be for the presentation of your case?

23          MR. JOFFE:  Hum --

24          THE COURT:  You'd be presenting your clients,

25  right?

1           MR. JOFFE:  Yes, Your Honor.

2           THE COURT:  And you'd be presenting your expert

3   you've disclosed, correct?

4           MR. JOFFE:  Yes.

5           THE COURT:  And you'd be presenting, possibly --

6   are you anticipating, possibly, one or two damage experts?

7           MR. JOFFE:  Yes.

8           THE COURT:  And I take if one might be an economic

9   expert for Integrated?

10          MR. JOFFE:  One economic and one for individual

11  plaintiffs.

12          THE COURT:  And likely one expert who's -- as to

13  all of the individual plaintiffs, or multiple, or one for

14  each?

15          MR. JOFFE:  No, most likely one for all.

16          THE COURT:  All right.  And likely to call any

17  treating physician type people?

18          MR. JOFFE:  Well, the only one that could be

19  probably for one plaintiff, Styller.

20          THE COURT:  All right.  And then maybe some of the

21  defendants, employees, some of the people that you're

22  deposing?

23          MR. JOFFE:  Yes, Your Honor.

24          THE COURT:  All right.  And then do you have any

25  idea how long you think it might take to present?

1          MR. JOFFE:  I haven't thought about it yet, Your

2     Honor, so I don't want to just --

3          THE COURT:  Okay.  So have you thought about it,

4     Mr. Saso?

5          MR. SASO:  Your Honor, I think -- we have put some

6     thought into it, although I'm not sure that we're prepared,

7     either, at this point, to give a strong estimate as to the

8     time of trial.

9          THE COURT:  Okay.  Is there anything -- I'll tell

10    you what I'm going to do.  The clerk's notes will memorialize

11    the schedule for summary judgment and the briefing schedule.

12    I think Maria has that already, and she'll put it in the

13    clerk's notes.  I'm going to issue a brief order that

14    summarizes the post summary judgment schedule.

15          To the extent that you think there are people that

16    you can -- I think that in that -- I think the time to

17    resolve the question of those other depositions is after I

18    resolve the summary judgment, because we'll have a better

19    idea whether you need them or not.  And so I might address

20    some timing for that in the brief order that I issue about

21    the post summary judgment schedule.

22          I think I am going to set a date for trial.  I'll

23    likely look at the calendar.  It won't be the Monday after

24    the end of expert depositions.  I will certainly allot a

25    period of time after expert depositions.  You'll need the

1   transcripts, and then there's usually 30 days for filing

2   pretrial motions, and then you probably need a little bit of

3   time in between.  So I will be -- and you need to think about

4   when -- when I might get -- how long it will take me to

5   resolve the pending motions.  And then I'll think about the

6   rest of the schedule and a little time in between, and then

7   there might be a little more time just to allow time for all

8   of you, just in case.

9        And then I won't establish a length of the trial at

10  the moment, but you should be thinking about that.  And I

11  think I'd want to confer again at the end of the summary

12  judgment decisions as to how long it will be, and we could

13  discuss that at that time.

14       If I schedule the trial, and you look at the trial

15  and you say -- which is, obviously, going to be into 2021,

16  and you say, "Oh, my child's getting married that weekend,"

17  or, "I have a graduation that weekend," or you know that

18  there's some life event, or it's like -- it interferes with

19  the school vacation, and that's the time you always take a

20  family vacation, then speak up like within two weeks of me

21  issuing this order, and say, "Judge, can we move it?"  I'd be

22  perfectly happy to move it for something like that.  Because

23  right now, I'm just picking a date, based on my own calendar,

24  looking at it.  And I'm not hard and fast, necessarily,

25  wedded to that date, and I'd be prepared to move it.

1          But if it's the kind of -- but those kinds of

2    things, to the extent you know about them, tell me about them

3    now.  If something comes up along the way, tell me about it

4    as soon as you know.  If you know that something's happening

5    and you tell me six months later, I'm not going to be as

6    moved by that.  If you tell me right away, I'm going to be

7    moved.  I'm not looking to interfere with your life, to the

8    extent important things like that happen.

9          Or you don't need -- if you came back to me and

10   just wanted to move it a little bit right afterwards, you

11   know, you can confer with each other and say, "You know, we'd

12   like to have it this date or that date," I don't need a whole

13   lot of reason down like that.  The further down the road we

14   get, the more reason I'm not going to want to move the trial

15   date.

16         Is there anything else any of you want to address

17   at this status conference?

18         MR. JOFFE:  No, Your Honor.

19         THE COURT:  Anything else for the defendants?

20         MR. SASO:  No, Your Honor.

21         MR. BUNIS:  No, Your Honor.

22         THE COURT:  Okay.  I take it that -- no one has

23   brought it up, so I assume that you, at the moment, wish to

24   proceed, rather than go to any sort of further mediation.  I

25   know you went a long time ago.

1            Let me put it another way, since all of you are

2    standing silent, waiting for the other side to make the first

3    move.

4            I'm proceeding to resolve the case.  This case is

5    an old case.  This is a 2016 or early 2017 case, with a lot

6    of motion practice.  I'm looking to create -- we're now at

7    the point where I can create the schedule for the rest of the

8    case, and I intend to do that.  The date that I set for trial

9    will be a date on which you'll be the only case on for trial.

10   I will be resolving that for you.  That's perfectly fine.  We

11   built this courthouse with courtrooms for trials, so I am

12   perfectly happy to have this case go to trial.

13           And I tell people all the time, though, just remind

14   them, is what happens in a case is you cede control to your

15   lawyers, appropriately, and then your lawyers cede control to

16   me to make various rulings.  And then --

17           It's a jury trial, right?

18           MR. JOFFE:  Yes, Your Honor.

19           THE COURT:  And then to the jury.  And then you

20   can't negotiate with the jury.

21           And the choice that you should all be thinking

22   about, for both of you, all the way through, is option A is

23   like what are my, you know, risks and benefits of option A,

24   which is go down to the final resolution, and what does that

25   look like.  And option B is what's the best I can work out

1    with the people right now.  And the benefit of option B is

2    guaranteed, but you don't everything on option B.  And you

3    just have to decide, make an informed choice over A or B, and

4    those choices change over time because your evaluation of the

5    case changes, and what happens.

6                 And so I don't have a view as to whether you should

7    settle your case or not.  My general view is all lawyers

8    should be thinking about that and be weighing those two

9    choices regularly and talking to their clients about it, and

10   then you make whatever decisions you make.

11                And I merely am reminding you to think about that

12   and reminding you that if you wish to go to the court's

13   mediation program, you can go at any time.  You can go today.

14   You can ask at some further point, and I will send you, if

15   both of you want to go.  My general practice is not to send

16   you unless you both want to go, because it -- since it's --

17   you can't settle the case without the other side.  If one

18   side is not interested, then I ordinarily wouldn't send

19   you -- not never, but ordinarily.

20                So if anybody wants to raise anything about that,

21   speak now; or otherwise, we'll just keep proceeding, until

22   one of you raises it.

23                I take it nothing further, then, so we are

24   adjourned in this matter, and I will wait for your motions as

25   the next step.

1              Thank you very much.  Have a good day, and we're

2       adjourned.

3              THE DEPUTY CLERK:  All rise.  This matter is

4       adjourned.

5              (Court in recess at 5:00 p.m.)

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4            I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                           Dated this 24th day of April, 2020.

14

15

16

17                  /s/ RACHEL M. LOPEZ

18

19

20            _____

                 Rachel M. Lopez, CRR
21               Official Court Reporter

22

23

24

25