# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, | Civil Action No. 1:16-CV-10386 (LTS) |

                                        Plaintiffs,

        vs.

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, HEWLETT-
PACKARD FINANCIAL SERVICES (INDIA)
PRIVATE LIMITED, HP INC., HEWLETT
PACKARD ENTERPRISE COMPANY, and
DAVID GILL,

                                        Defendants.

## UNIFIED STATEMENT OF UNDISPUTED MATERIAL FACTS

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In 2011, HPFS India and ICT entered into a resale contract regarding computer networking equipment ("Equipment") that HPFS India previously leased to another company for use at the 2010 Commonwealth Games in Delhi, India.  Dkt. No. 101 (Second Amended Complaint), ¶¶ 23, 25, 36; Dkt. No. 317-1 (RRSA).

RESPONSE: Admitted.

2.      The Equipment included H3C-branded transceiver devices. Dkt. No. 101, ¶ 46.

RESPONSE: Admitted.

3.      ICT's broker, Shinto, took possession of the first installment of Equipment and shipped the same to ICT in China (via Hong Kong) in or after December 2011. Dkt. No. 101, ¶ 46.

RESPONSE: Admitted, except that Shinto was never in physical possession of the Equipment. Dkt. No. 331-15 ¶ 3.

4.      The inventory list attached to the relevant purchase order identified over 3,000 transceivers by serial number (the "Shinto Inventory List"). Dkt. No. 101, ¶ 46, Dkt. No. 317-2.

RESPONSE: Disputed.

a.      There was no inventory list with serial numbers attached to or accompanying the purchase order. Dkt. No. 331-15 ¶ 4. The "purchase order" itself is a three-page document (Dkt. No. 317-2 pp. 2-4 (the "Purchase Order"); Dkt. No. 331-15 ¶ 2. The "inventory list" with the equipment's serial numbers in the remaining part, Dkt. No. 317-2 pp. 5-102, was never attached to the Purchase Order. Dkt. No. 331-15 ¶ 2. On its face it appears to be a Service Request from HPFS India to TT Global for "pick and packing" the equipment for shipping to ICT, and a part of the preexisting Master Service Agreement between HPFS India and TT Global to which ICT was never a party or privy. Dkt. No. 317-2 p. The inventory list of the equipment for "pick and packing" attached to the Service Form was neither created by ICT nor shared with it by HPFS India. Dkt. No. 331-15 ¶ 4. Accordingly, the Quigley Declaration's statement that "Exhibit 2 is a true and correct copy of a document titled 'Purchase Order,' along with attachments thereto, from Shinto Creative Elements Private Limited to Hewlett-Packard Financial Services (India) Private Limited" is false.

b.      There was no "Shinto Inventory List" because Shinto did not create any inventory lists for the equipment, did not have the equipment's serial numbers necessary to do it, and was never in physical possession of the Equipment. Dkt. No. 331-15 ¶ 2. There were no other inventory

lists with the equipment's serial numbers accompanying the Purchase Order; indeed, ICT never received an inventory list with the serial numbers of the Equipment it purchased from HPFS India and shipped to China until Defendants produced it in discovery in this Action (in native format as DEF000 1174, the "Inventory List"). Dkt. No. 331-15 ¶ 3. The only list with serial numbers provided by HPFS India in the course of the parties' discussions and negotiations leading up to the sale was a master list with over 12,000 items of the equipment returned by Tata after the Commonwealth Games upon expiration of the leases (the "Master List," DEF0000546), not the list of 3370 items sold to ICT and shipped to China. Dkt. No. 331-15 ¶ 5. The Master List itself was never a part of any contract between ICT and HPFS India, any purchase order, or any invoice. Dkt. No. 331-15 ¶ 5.

b.      The Purchase Order lists 2200 SFP and 300 FPS transceivers, for the grand total of precisely 2,500 -- not "over 3,000" as Defendants claim -- which should be immediately apparent from the face of the Purchase Order. Dkt. No. 317-2 p.2; Dkt. No. 331-15 ¶ 2. It is careless for Defendants to represent such a patently incorrect statement as an "undisputed fact."

c.      The Purchase Order identified the transceivers by their part numbers only -- H3C-0231A563 for SFP and H3C-0231A438 for FPS -- not by their serial numbers. Dkt. No. 317-2 pp.2-4; Dkt. No. 331-15 ¶ 2.

d.      The Inventory List does not accurately identify the equipment actually sold to ICT and shipped to China. Dkt. No. 331-15 ¶¶ 6-8. *First*, some of the seized transceivers not on the Inventory List (Dkt. lines 33-127 and 133-35 of Mr. Raina's spreadsheet titled "Units Not on the Inventory List"), appear on the Master List, Dkt. No. 331-15 ¶ 7, and are thereby traceable to the Commonwealth Games batch. *Second*, the Inventory List of the equipment presumably sold to ICT includes 299 transceivers that also appear on the TT Global's list of the equipment remaining in India in 2012 after the JCT sale. Dkt. No. 331-15 ¶ 8; Dkt. No. 331-16.

3

5.     Plaintiffs affirm that ICT employees began marketing the Equipment in China in 2012. Dkt. No. 101, ¶¶ 47, 52.

RESPONSE: Admitted.

6.     Plaintiffs admit that ICT was also reselling H3C-branded transceivers in China that ICT had acquired from sources other than HPFS India.  Dkt. No. 219 at p. 6 (Plaintiffs' Status Report:  "[T]he fact that ICT was trading in H3C equipment both before and after the 2011 deal is borne out by hundreds of other produced documents[.]").

RESPONSE: Disputed.

Plaintiffs did not admit that ICT was reselling H3C-breaded transceivers in China that ICT had acquired from sources other than HPFS India, either in Dkt. No. 219 or elsewhere. Plaintiffs' Status Report states: "ICT is in the business of trading and recycling computer parts, of which HP, Huawei, 3COM, H3C, Cisco etc. are all major manufacturers, and their products are Plaintiffs' stock in trade. Indeed, Plaintiffs have produced hundreds of emails showing that they had traded in those brands both before and after the 2011 India deal, including with HP and HPFS. Indeed, the earliest email produced by Plaintiffs, dated December 30, 2009, refers to ICT's trading in "H3C parts" (ICT0621872), as is the email dated May 5, 2017 referring to ICT's "3Com H3C inventory" (ICT0183812) -- none of which have anything to do with the 781 H3C transceivers seized by the PSB as counterfeit." Dkt. No. 219 p. 4.

"At the time of ICT's sales of the Equipment in China in 2012, JCT also had a batch of H3C-branded equipment previously acquired from 3COM, which it was in the process of marketing. However, the 3COM equipment we had left in 2012 did not contain H3C transceivers with the same part numbers, H3C-023 I A563 and H3C-023 I A438, that ICT purchased from

HPFS India. ICT's only source of these H3C transceivers marketed or sold in China in 2012 was the Equipment acquired from HPFS India." Dkt. No. 331-15 ¶ 10.

7.      On December 9, 2012, Chinese police conducted a raid and arrested Plaintiffs Cathy Yu and Jason Yuyi based on allegations that they were selling counterfeit H3C equipment. Dkt. No. 101, ¶ 55.

RESPONSE: Admitted.

8.      Their supervisor, Plaintiff Jade Cheng, was arrested several days later (collectively, with Yu and Yuyi, the "Individual Plaintiffs"). Dkt. No. 101, ¶ 55.

RESPONSE: Admitted.

9.      The Chinese police also seized 781 transceivers in connection with their investigation of ICT (the "Seized Equipment"). Dkt. No. 101, ¶¶ 54, 55.

RESPONSE: Admitted.

10.     Plaintiffs allege that the raid and arrests were precipitated by a report to the Chinese police alleging that ICT was selling counterfeit H3C equipment. Dkt. No. 101, ¶¶ 54, 55.

RESPONSE: Admitted.

11.     The Individual Plaintiffs were released on bail in July 2013, and Chinese authorities later issued "no criminal record" letters. Dkt. No. 101, ¶ 194.

RESPONSE: Admitted.

12.     The Chinese authorities also returned the 781 units of Seized Equipment to Jade Cheng. Dkt. No. 317-7 (February 16, 2020 Letter from D. Joffe).

RESPONSE: Admitted.

13.     Thereafter, Jade Cheng stored the Seized Equipment in the basement of his parents' home in China. Dkt. No. 317-7 (February 16, 2020 Letter from D. Joffe).

RESPONSE: Disputed. "After the PSB returned the 781 seized transceivers to Jade Cheng, they were stored in Jade's house in China until their shipment to Boston, where they were stored in the OceanAir warehouse." Dkt. No. 317-7 p. 2.

14.     Plaintiffs filed this lawsuit in December 2015 in Massachusetts Superior Court; it was then removed to this Court.  Dkt. No. 1; Dkt. No. 1-1.

RESPONSE: Admitted.

15.     The first six claims of the now-operative Second Amended Complaint are premised in part on the allegation that HPFS India sold counterfeit H3C equipment to ICT.  Dkt. No. 101, Counts I-VI, *e.g.*, ¶¶ 240, 255, 264, 267, 273; 285.

RESPONSE: Admitted.

16.     Plaintiffs did not sue H3C itself.  Dkt. No. 1; Dkt. No. 101.

RESPONSE: Admitted.

17.     Plaintiffs have not sought any third-party discovery from H3C.  Dkt. No. 280 (Order Denying Plaintiffs' Motion to Compel), pp. 2, 13.

RESPONSE: Admitted.

18.     At Defendants' request, the Court ordered Plaintiffs to ship the Seized Equipment to the United States.  Dkt. No. 129 (Tr. of Oct. 20, 2017 Scheduling Conference), p. 48.

RESPONSE: Admitted.

19.     In 2019, the Court ordered the parties to retain experts to inspect the Seized Equipment to determine whether some or all of it was *in fact* counterfeit.  Dkt. No. 262 (Tr. of Sept. 13, 2019 Status Conference), p. 54; Dkt No. 280 (Order Denying Motion to Compel and Setting Schedule).

RESPONSE: Admitted that the Court ordered the parties to retain experts to inspect the Seized Equipment to determine whether some or all of it was "counterfeit." Dkt. No. 280 ("[T]he plaintiffs have thirty days from the date of this Order to produce their expert report(s) regarding whether the goods at issue in this case were counterfeit.")

Disputed to the extent Defendants imply any distinction between the term "counterfeit" as used by the Court and the terms "*in fact* counterfeit" as used and italicized by Defendants. Cf. Dkt. No. 249-11 p. 7 ("HPE further objects on the ground that this Interrogatory seeks information protected by the attorney-client privilege and/or attorney work product doctrine because it seeks legal conclusions as to whether the equipment was ultimately 'counterfeit' or 'carried counterfeit trademarks.'").

20.     The parties agreed that the issue of whether HPFS India sold ICT counterfeit goods was ripe for dispositive adjudication.  Dkt. No. 306 (Tr. of Jan. 7, 2020 Status Conference), pp. 21, 23-24; Dkt. No. 211 (Tr. of June 10, 2019 Status Conference), pp. 13-14.

RESPONSE: Admitted.

21.     The Court set a schedule for the filing of summary judgment motions directed to the counterfeit issue.   Dkt. No. 280.

RESPONSE: Admitted.

22.     Plaintiffs did not retain a counterfeiting expert.  Dkt. No 317-4 (Fang Report), pp. 1-2; Dkt. No. 317-6 (Fang Dep.), 18:17-20:7.

RESPONSE: Admitted that Plaintiffs' expert Dr. Fang has no experience in counterfeiting; disputed to the extent Dr. Fang's expertise in holograms is directly relevant to the issue whether the transceivers' holographic trademark labels are counterfeit. Dkt. No. 317-4; Dkt. No. 317-6.

23.     Plaintiffs retained an MIT professor of nanophotonics, Nicholas Xuanlai Fang, Ph.D., to examine the Seized Equipment. Dkt. No. 317-4 (Fang Report), p. 1.

RESPONSE: Admitted, except Dr. Fang is "a professor of Mechanical Engineering at MIT" specializing in "optics, photonics and micro/nano manufacturing" as well as nanophotonics. Dkt. No. 317-4 p. 3.

24.     Dr. Fang did not offer any opinion regarding whether the Seized Equipment was, in fact, counterfeit. Dkt. No. 317-4 (Fang Report); Dkt. No. 3176 (Fang Dep.), 23:7-11.

RESPONSE: Disputed to the extent Defendants ascribe any significance to the qualifier "in fact." Dr. Fang did offer his opinion "that the majority of the hologram labels inspected (343 of 394, or 87.1%) show indicators of counterfeiting described in the H3C security bulletin and the verification report." Dkt. No. 317-4 p. 25.

25.     Dr. Fang was instructed by Plaintiffs' counsel to compare his observations of holographic labels present on certain of the transceivers with alleged "indicators of counterfeiting" set forth in two documents furnished to him by Plaintiffs' counsel: (1) a "Security Bulletin" purportedly printed from H3C's website; and (2) a document presumed to be H3C's report to the Chinese police regarding the Seized Equipment (the "Verification Report"). Dkt. No. 317-4 (Fang Report), p. 2.

RESPONSE: Admitted, except that (1) Plaintiff Styller attested that he did print out the Security Bulletin from H3C's website, which printout is a true and correct copy of the document provided to Dr. Fang, Dkt. No. 331-15 ¶¶ 11-14; and (2) Defendants produced the "Verification Report" (DEF0002807-17), and identified it both as "a document referred to as a 'verification report' in their privilege log," Dkt. No. 257 p. 22; Dkt. No. 258 p. 5; and as "a document submitted by H3C to the Chinese authorities." Dkt. No. 291 p.18.

26.     Dr. Fang has no opinion about the accuracy or authenticity of those documents, made no effort to determine whether the statements therein were true and accurate.  Dkt. No. 317-6 (Fang Dep.), 23:12-24:8; 27:2-5.

RESPONSE: Admitted.

27.     Dr. Fang does not know whether the "indicators" of counterfeiting contained in the Security Bulletin and/or H3C Verification Report are in fact true and accurate indicators of counterfeiting applicable to the transceivers at issue.  Dkt. No. 317-6 (Fang Dep.), 18:17-24; 23:12-24:8; 27:2-5; 64:15-65:1.

RESPONSE: Admitted.

28.     Dr. Fang has no prior experience with documents of this type.  Dkt. No. 317-6 (Fang Dep.), 31:10-17.

RESPONSE: Admitted.

29.     Defendants retained Shelley Raina, an expert in counterfeiting with nearly twenty years of experience in brand security and counterfeit prevention.  Dkt. No. 317-5 (Raina Report), ¶¶ 5-10.

RESPONSE: Disputed. Mr. Raina testified that for the first ten years of his career after graduation in 1995 and until 2005, he worked as a hardware engineer and did not deal with counterfeiting issues in that capacity. Dkt. No. 331-1, Tr. 26/3-9 ("Q. And you started your professional career at Cisco as a hardware design engineer in 1995, correct? A. That is correct. Q. In that position did you deal with anti-counterfeiting issues and investigations? A. Not in my role as a hardware design engineer.").

30.     Mr. Raina devised a reliable testing methodology based on his extensive training and experience with identifying counterfeit transceivers.   Dkt. No. 317-5 (Raina Report), ¶¶ 51-53.

RESPONSE: Disputed for the reasons stated at length in Plaintiffs' memorandum on the summary judgment motions, including without limitation that Mr. Raina's Report contains false statements as admitted by Mr. Raina. Dkt. No. 331-1, Tr. 111/1-11 ("Q: . . . 'the serial numbers on all of the authentic transceivers began with BP or EX.' My question to you: Is that a false statement? Can you say yes or no, please? A. Yes. It does -- yes. And I would like to -- I -- yes."); Dkt. No. 331-1, Tr. 112/3-7 ("Q. Is it a false statement? A. Yes.").

31.     The results of his testing are as follows:

- Of the 781 units of Seized Equipment provided for inspection, 647 bear serial numbers that appeared on the Shinto Inventory List. He determined that 646 units of Seized Equipment acquired from HPFS India by ICT were authentic, and one device was too damaged to inspect and reach a conclusive determination.

- Of the remaining 134 units of Seized Equipment not on the Shinto Inventory List – and therefore presumptively not acquired from HPFS India by ICT – at least 31 units of Seized Equipment were counterfeit.

Dkt. No. 317-5 (Raina Report), ¶ 50.

RESPONSE: Admitted that these are the results of Mr. Raina's testing as stated in his Report; disputed that Mr. Raina referred to the "Shinto Inventory List" in his Report or at his deposition. Dkt. No. 317-5 (Raina Report); Dkt. No. 331-1 (Raina Depo).

32.     In later attorney correspondence, Plaintiffs took the position that the relevant inventory list is not the Shinto Inventory List attached to ICT's purchase order and used by Mr. Raina, but instead a fuller "Master List" of equipment returned to HPFS India's agent after the Commonwealth Games.   Dkt. No. 317-7 (February 16, 2020 Letter from D. Joffe); Dkt. No. 317-3.

RESPONSE: Admit that Plaintiffs' position is that the relevant inventory list to trace the seized transceivers to their source (HPFS India) is the "Master List" of equipment returned to "HPFS India's agent" TT Global after the Commonwealth Games. Dispute the existence of "the Shinto Inventory List attached to ICT's purchase order," or the accuracy of the Inventory List produced by Defendants as DEF0001141-74, as stated in Response No. 4(d).

33.     Plaintiffs determined that 750 (rather than 647) out of the 781 pieces of Seized Equipment originated with HPFS India. Dkt. No. 317-7 (February 16, 2020 Letter from D. Joffe).

RESPONSE: Admitted, except that the equipment originated with HPFS India and sold to ICT included at least 299 transceivers in lieu of the 299 transceivers mistakenly included on the Inventory List but in fact remaining in India, as stated in Response No. 4(d).

34.     Plaintiffs agree that the 31 devices identified as counterfeit by Mr. Raina are not listed on any inventory of equipment sold to ICT by HPFS India. Dkt. No. 317-7 (February 16, 2020 Letter from D. Joffe); Dkt. No. 317-5 (Raina Report), Appendix A.

RESPONSE: Admitted.

35.     Plaintiffs also rely on the "Security Bulletin" — a printout of statements purportedly translated from H3C's Mandarin website in 2014. Dkt. No. 317-4 (Fang Report), p. 2, Ex. 3.

RESPONSE: Disputed. The Security Bulletin itself is in Mandarin, which is Dr. Fang's native language, and Dr. Fang relied on the Security Bulletin for the images of the H3C holographic logos and their optical patterns. Dkt. No. 317-4 pp. 5-6.

36.     Dr. Fang assumed that any label similar to the one pictured in the Security Bulletin was in fact manufactured after May 10, 2010. Dkt. No. 317-4 (Fang Report), p. 2; Dkt. No. 317-6 (Fang Dep.), 64:15-65:1.

RESPONSE: Disputed. Dr. Fang did not "assume[] that any label similar to the one pictured in the Security Bulletin was in fact manufactured after May 10, 2010," and did not need to make that assumption for his analysis. As Dr. Fang explained in his Report: "The bulletin describes H3C security holographic labels for its products, including transceivers, used by H3C since May 2010. . . . The bulletin demonstrates the specific optical patterns that should be visible if an authentic holographic logo is viewed from different angles. The security bulletin also mentions the old version of the logo (with background Chinese characters) that does not contain those security features (H3C bulletin, page 1 and the illustration of the old and new logos). . . A total of 150 hologram labels on the transceiver devices received are found bearing Chinese logos on the hologram. According to the H3C security bulletin, these holograms with Chinese characters were old logos manufactured prior to 2010. Because the H3C security bulletin and the verification report do not contain any criteria regarding the security features of the old trademark logos, these logos were not further investigated for indicators of counterfeiting (except as mentioned in point 3 below)." Dkt. No. 317-4 pp. 5-6, 15.

37.     Data captured from the transceivers' electronic memory, recorded in Appendix A to Defendants' expert report, confirms that dozens of the transceivers with labels Dr. Fang assumes are subject to the Security Bulletin were, in fact, manufactured prior to May 10, 2010. *Compare* Dkt. No. 317-5 (Raina Report), Appendix A, "Date Code in EEPROM" columns, *with* Dkt. No. 317-4 (Fang Report), Ex. 5.

RESPONSE: Disputed. Dr. Fang did not assume any manufacturing dates and did not need to make that assumption for his analysis, as stated in Response 36. Dr. Raina determined that "[a]ccording to the H3C security bulletin, these holograms with Chinese characters were old logos manufactured prior to 2010. Because the H3C security bulletin and the verification report do not

contain any criteria regarding the security features of the old trademark logos, these logos were not further investigated for indicators of counterfeiting." Dkt. No. 317-4 p. 15.

38.    Dr. Fang testified that every observation he made could be made by a layperson with a naked eye (or, at most, a cell phone camera and a ruler), or, at minimum, he had no basis to disagree with that statement. Dkt. No. 317-6 (Fang Dep.), 50:16-77:8.

RESPONSE: Disputed. Dr. Fang testified that "I don't need to use the microscope [for certain observations] but in the rest of the cases I do," Dkt. No. 317-6 (Fang Dep.), Tr. 51:14-18; "you have to use a microscope because those pictures would be too small under naked eye," (Tr. 53:10-12); "the label by itself is about half of the size of my fingernail, and in order to find the correct placement of the word 'H3C,' then without a microscope I cannot take an accurate measurement," (Tr. 53:17-22); "Q: You didn't need a microscope to make that observation, did you? A. I do, because this is a transparent layer and it's very thin" (Tr. 66:12-15); "Q. It's your testimony that with respect to the delamination condition which you observed, you need to use a microscope for that purpose? A. That's correct. . . . I don't know for certain whether cell phone would be suitable for this purpose." Tr. 68:1-17.

39.    Dr. Fang admitted that he is not qualified to render any opinion rebutting Mr. Raina. Dkt. No. 317-6 (Fang Dep.), 14:18-15:5, 77:16-22.

RESPONSE: Admitted.

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

40.    HPFS India participated as a "passive finance source" in the original 2010 lease transaction with Tata, did not select the Equipment for importation into India, which was done by Inspira, and did not inspect the Equipment prior to or during the leases. Dkt. No. 331-4 pp. 1-2.

RESPONSE: Defendants lack sufficient independent information to admit or dispute whether Inspira selected the Equipment for important into India.  Admitted as to the remainder of the above statements.

41.   Upon expiration of the leases in 2011, Tata returned the Equipment into the custody of TT Global; "TT Global did not perform any authentication testing on the equipment" at that time. Dkt. No. 331-5 p. 4.

RESPONSE:  Disputed.

42.   Following the return of the Equipment in 2011, Defendants considered reselling it themselves and requested Inspira to provide the original importation documents, including the serial numbers of the Equipment and the corresponding bills of entry into India. Dkt. No. 331-7 (Sealed).

RESPONSE: Admitted.

43.   Inspira agreed that the "correlation of serial no's with individual bill of entries are important," but failed to provide those records to HPFS India. Dkt. 331-8 (Sealed). Defendants subsequently confirmed through counsel that "there is no evidence to suggest that Inspira ever sent these documents to Defendants, despite their requests." Dkt. No. 331-6 p. 2.

RESPONSE: Admitted.

44.   In December 2011, HPFS India sold a quarter of the Commonwealth Games equipment to ICT (Dkt. 317-1), and instructed TT Global to "pick and pack" the equipment parts for delivery to Shinto. Dkt. No. 317-2 p. 5; Dkt. No. 331-15 p. 2.

RESPONSE: Admitted.

45.   The purchase order for the Equipment only listed the Equipment's part numbers, without their individual serial numbers. Dkt. No. 317-2 pp. 2-4.

RESPONSE: Admitted.

46.     In October 2012, HPFS' Tom Harris and ICT's Michael (Alexander) Pekar jointly inspected the Commonwealth Games equipment remaining in TT Global's custody in India. Dkt. No. 249-3 p. 5; Dkt. No. 249-4 p. 1; Dkt. No. 249-10 p. 6.

RESPONSE: Disputed.

47.     Following the joint inspection, HPFS India sold the remaining equipment to TT Global, which then shipped it to Dubai. The equipment sold to TT Global included transceivers from the same Commonwealth Games batch as the transceivers sold to ICT. Dkt. No. 331-9.

RESPONSE: Admitted.

48.     After the ICT transceivers were seized by the PSB in Beijing, "H3C inspected the seized equipment on behalf of HPFS India." Dkt. No. 331-4 p. 3; Dkt. No. 331-11 p. 4.

RESPONSE: Disputed to the extent Plaintiffs are suggesting that H3C inspected the seized equipment on behalf of HPFS India at or about the same time that the equipment was seized (December 2012).  To the extent that HPFS India's letter to the Chinese Authorities referenced H3C as having inspected and obtained a partial list of the seized equipment on its behalf, any such inspection would have occurred after HPFS India "started the investigation of this matter" on February 1, 2013.  The Individual Plaintiffs were already in Chinese detention for almost two months by then.

49.     Following the inspection, H3C and Defendants collaborated on drafting the Verification Report reflecting the results of that inspection. Dkt. No. 331-10 (Privilege Log entries 410, 414, 416, 417, 420, 427, 428, 429, 430, 431, 433, 446, and 651); Dkt. No. 258 ¶ 44.

RESPONSE: Disputed.

50.     Defendants' and H3C's representatives including David Gill, Liu Rui (lr@h3c.com and jesica.liu@hp.com), Stuart Patterson, Shawn Zhao (shawn.zhao@hp.com), Ching Chua (ching.chua@hpe.com), Yang Li (yang.li9@hpe.com), and Chun-Yu Zhu, (eric.zhu@hp.com) shared drafts, comments and advice on the Verification Report. Dkt. No. 331-10.

RESPONSE: Disputed.

51.     The Verification Report states that anti-counterfeit holographic labels on the transceivers are "abnormal, which is sufficient enough to determine that at least most of the seized transceivers are counterfeit H3C products." Dkt. No. 331-18 p. 9.

RESPONSE: Admitted that this translated quote from the page of the referenced docket entry appears accurate, although its probative value is contested.

52.     The Verification Report also states that that the "fields in the memory of the transceivers may be rewritten by a counterfeiter," and "the electrical performance testing cannot be used to determine the authenticity of a product." Dkt. No. 331-18 p. 12.

RESPONSE: Admitted that this translated quote from the page of the referenced docket entry appears accurate, although its probative value is contested.

53.     At the time of the 2013 inspection and Verification Report, H3C was a wholly-owned subsidiary of HP. Dkt. No. 108 ¶ 11; Dkt. No. 331-4 p. 1.

RESPONSE: Admitted that H3C was wholly-owned, but noted that it was a largely autonomous Chinese entity that became an HP subsidiary in 2010 as a result of HP's acquisition of 3Com.  Contested to the extent that "2013 inspection and Verification Report" is intended to link Defendants to Docket Entry 331, referenced at paragraph 52 above.

54.     H3C submitted the Verification Report to the PSB. Dkt. No. 291 p.18.

<u>RESPONSE</u>: Defendants lack sufficient independent information to admit or dispute this statement but, upon information and belief, believe it to be true. The PSB investigated the Individual Plaintiffs for selling commodities bearing counterfeit registered trademarks, in violation of Article 214 of the Chinese Criminal Code. <u>Dkt. No. 331-12</u>; <u>Dkt. No. 331</u>- 13.

55.     The PSB investigated the Individual Plaintiffs for selling commodities bearing counterfeit registered trademarks, in violation of Article 214 of the Chinese Criminal Code. <u>Dkt. No. 331-12</u>; <u>Dkt. No. 331</u>- 13.

<u>RESPONSE</u>: Admitted, on information and belief, that the Individual Plaintiffs were investigated for selling counterfeit transceivers.

56.     In their April 22, 2013 letter to the PSB, Defendants stated that H3C inspected the equipment "on behalf of HPFS India," and "based on the logos found on the equipment, believed that this equipment was counterfeit." Defendants also stated in the letter that that "part of the Sold Equipment supplied by lnspira did not come from HP Company." <u>Dkt. No. 331-4</u>.

<u>RESPONSE</u>: Disputed to the extent Plaintiffs are quoting the April 22, 2013 letter to the PSB out-of-order and non-sequentially.  A review of the letter would reveal that the actual timeline is undisputed.  First, "After the equipment had been seized, H3C inspected this equipment and, based on the logos found on the equipment, believed that this equipment was counterfeit products." Then the letter reads: "On 1 February 2013, ICT informed HPFS India about the above incident…" After that, "HPFS India immediately started the investigation of this matter.  H3C inspected the equipment on behalf of HPFS India and also obtained a partial list of the seized equipment from the" PSB.  Any inspection conducted "on behalf of HPFS India" was connected entirely to obtaining a partial list of the serial numbers on the seized equipment.  The prior inspection "after the equipment had been seized," in December 2012, was not conducted "on behalf of HPFS India"

because HPFS India was unaware of the "incident" until "1 February 2013."  Admitted that the April 22, 2013 letter states that: "part of the Sold Equipment supplied by lnspira did not come from HP Company."

57.     In their March 25, 2013 draft of the PSB letter, Defendants also stated that "the seized equipment is counterfeit," that "HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT," and that "the relevant counterfeiting activities occurred at some point in time prior to the return of the Sold Equipment to HPFS India upon the expiration of the Leases," which statements were deleted from the final April 22 version. Dkt. No. 331-11.

RESPONSE:  Admitted to the extent that Plaintiffs accurately state the contents of the March 25, 2013 draft letter.  Disputed as to the accuracy of the statements in this draft letter because, after further investigation, Defendants made a truthful statement to the Chinese police that did not include such language.  The draft correspondence (to the extent it is even admissible) has no bearing on whether the Seized Equipment sold by HPFS India is *in fact* counterfeit.

58.     In March 2013, Kevan Bartley requested TT Global to send samples of its Commonwealth Games transceivers from Dubai to H3C's auditor Wang You for inspection. Dkt. No. 331-14 (Sealed).

RESPONSE:  Admitted, but Defendants contest the probative value of information concerning transceivers not sold by HPFS India to ICT to the current cross-motions.

59.     TT Global sent photos and samples of transceivers from Dubai to H3C in China, and Liu Rui of H3C corresponded with David Gill, Kevin Bartley and Ching Chua of HPFS to arrange for the delivery of the TT Global transceivers to H3C's Wang You for inspection. The

photos of the two sample transceivers show a Hisense-branded transceiver without a visible logo, another with the "new H3C logo" as depicted in the Security Bulletin. Dkt. No. 331-14 (Sealed).

RESPONSE:  Admitted as to the first sentence.  Disputed as to the second sentence to the extent it is unclear what Plaintiffs mean by a "Hisense-branded transceiver without a visible logo" because a Hisense logo is visible on Dkt. 331-14, and to the extent Plaintiffs classify the other transceiver as having a "'new H3C logo' as depicted in the Security Bulletin" because the photo included on Dkt. 331-14 is not clear enough to determine if that is true, and Defendants contest the probative value of information concerning transceivers not sold by HPFS India to ICT to the current cross-motions.

60.    H3C conducted the inspection of the TT Global transceivers at the request of Defendants, who asserted that the verification report created as a result of that inspection was their work product generated at the request of counsel. Dkt. No. 258 ¶¶ 45-46.

RESPONSE: Disputed to the extent that H3C performed the inspection of the TT Global transceivers at the request of any Defendant other than HPFS India.  Admitted that the report generated as a result of that inspection has been withheld by Defendants as privileged work product and that the Court has previously held that "this document, including the drafts, is privileged." Dkt. 300 at 4.  Defendants contest the probative value of information concerning transceivers not sold by HPFS India to ICT to the current cross-motions.

61.    Following the inspection, Mr. Bartley wrote to HPFS' James O'Grady and Ross West, stating that "the origination of the equipment is questionable, and as such, we should not allow TT-G to re-sell what they purchased from us," and proposing to "work with TT-G to ensure that they are not financially impacted by this" "before instructing TT-G to destroy the equipment." Dkt. No. 331-9 (Sealed).

RESPONSE:  Admitted that Dkt. No. 331-9 contains the quoted statements.  Defendants contest the probative value of information concerning transceivers not sold by HPFS India to ICT to the current cross-motions.

62.    O'Grady responded to Mr. Bartley's email: "This would obviously would be a Ross [West] call due to financial impact. My gut says we should fully refund due to questionable nature of product." Dkt. No. 331-9 (Sealed).

RESPONSE: Admitted.  Defendants contest the probative value of information concerning transceivers not sold by HPFS India to ICT to the current cross-motions.

63.    Ross West stated in his May 10, 2013 response: "Jim, let's clear this up when you, JT and I are together in Andover next week." Dkt. No. 331-9 (Sealed).

RESPONSE: Admitted.  Defendants contest the probative value of information concerning transceivers not sold by HPFS India to ICT to the current cross-motions.

64.    TT Global transceivers were subsequently destroyed. Dkt. No. 249-11 p. 17.

RESPONSE: Admitted on information and belief.

65.    In January 2017, Shelley Raina was hired for a support staff position by the law firm of Sideman & Bancroft LLP, reporting to its managing partner Jeffrey Hallam. Dkt. No. 331-1 Tr. 35/10-40/20.

RESPONSE: Admitted.

66.    Sideman & Bancroft has served an outside counsel to Defendants HPE, HPI and their affiliates during Mr. Raina's employment. Dkt. No. 331-1 Tr. 12/19-14/9; Tr. 39/15-40/4; Tr. 74/20-83/4.

RESPONSE: Defendants lack sufficient independent information to dispute whether Sideman & Bancroft served as outside counsel to Defendants HPE or HPI during Mr. Raina's

employment.  Admitted that Sideman & Bancroft served as outside counsel to at least one HP entity during Mr. Raina's employment.

67.     In January 2017, Sideman & Bancroft founded True Pedigree LLC, with the same address and floor as the law firm. Sideman & Bancroft is the sole investor in True Pedigree LLC. Dkt. No. 331-1 Tr. 56/7-73/9.

RESPONSE:  Admitted that True Pedigree LLC was founded in January 217 with the same address and floor as Sideman & Bancroft and that Sideman & Bancroft is the sole investor in True Pedigree LLC.  Disputed that Sideman & Bancroft alone founded True Pedigree LLC.  True Pedigree LLC was co-founded by Mr. Raina and two individuals, Richard Nelson and Jeffrey Hallam.  Dkt. No. 331-1, 44:6-9.

68.     In January 2018, Mr. Raina was made the CEO of True Pedigree LLC by its Board of Directors composed of Mr. Hallam, another Sideman & Bancroft partner Richard Nelson, and Mr. Raina, and has served full time in that position since then. Dkt. No. 331-1 Tr. 21/4-22/20.

RESPONSE: Admitted.

69.     Defendant HPI is a current business client of True Pedigree. Dkt. No. 331-1 Tr. 53/22-54-3.

RESPONSE:  Admitted, as of the time of Mr. Raina's deposition.

70.     Mr. Raina did not disclose his 2017-2018 employment at Sideman & Bancroft as a "product and supply chain security strategist" in the "Expert Credentials" section of the Report which summarized his "nearly two decades of experience in product and supply chain security," and blamed the omission on an "oversight." Dkt. No. 331-1 Tr. 33/9-35/9.

RESPONSE: Admitted.

71.     Mr. Raina on his deposition could not remember True Pedigree LLC's office phone number (and did not have it saved on his cell phone), its corporate form, its full name, or the time he had become its co-founder. Dkt. No. 331-1 Tr. 21/22-65/3.

RESPONSE: Disputed that Mr. Raina at his deposition could not remember the time he co-founded True Pedigree.  Dkt. No. No. 331-1, 21:23-22:22.  Admitted as to the remainder of this statement.

72.     Mr. Raina did not disclose the affiliation between True Pedigree LLC and Sideman & Bancroft in his Report. Dkt. No. 317-5.

RESPONSE: Admitted.

73.     At his deposition, Mr. Raina revealed that he had also been appointed the CEO of True Pedigree Consulting LLC, which was also founded by Sideman & Bancroft and located at the same address and floor as the law firm, with Jeffrey Hallam, Richard Nelson and Mr. Raina constituting its Board of Directors. Dkt. No. 331-1 Tr. 65/4-68/24.

RESPONSE: Admitted that Mr. Raina was appointed CEO of True Pedigree Consulting LLC by its Board of Directors, which is comprised of Jeffrey Hallam, Richard Nelson, and Mr. Raina, and that True Pedigree Consulting LLC is located at the same address and floor as Sideman & Bancroft.  Disputed that True Pedigree Consulting LLC was founded by Sideman & Bancroft. True Pedigree Consulting LLC was co-founded by Mr. Raina and two individuals, Richard Nelson and Jeffrey Hallam.  Dkt. No. 331-1, 65:4-69:8.

74.     Mr. Raina did not disclose True Pedigree Consulting LLC in his Report or on his resume attached to it. Dkt. No. 317-5; Dkt. No. 331-1 Tr. 68/15-24.

RESPONSE: Admitted that the words "True Pedigree Consulting LLC" do not appear in Mr. Raina's Report or resume.  Disputed to the extent that Mr. Raina views True Pedigree LLC

and True Pedigree Consulting LLC as the same business and that Mr. Raina's Report and resume describe "True Pedigree" as a "consulting firm that specializes in anti-counterfeiting and brand protection investigations and strategies for technology companies." Dkt. No. 331-1, 68:15-24; Dkt. No. 317-5, pp. 4, 29.

75.     The only full-time employee of True Pedigree LLC and True Pedigree Consulting LLC other than Mr. Raina is Daniel Mascaro, a former HP manager who is also a full-time employee at Sideman & Bancroft, and who participated in Mr. Raina's inspection of the seized transceivers. Dkt. No. 331-1 Tr. 24/1-17; Tr. 67/15-73/9.

RESPONSE: Admitted.

76.     During his employment at Sideman & Bancroft, Mr. Raina worked on HP's matters in the law firm's BIIG group, which also included former HP employees Robert Cozzolina and Daniel Mascaro. Dkt. No. 331-1 Tr. 39/5-41/6.

RESPONSE:  Admitted.

77.     [Intentionally omitted.]

78.     Prior to his retention by Defendants in March 2019, Mr. Raina had no prior experience with H3C products. Dkt. No. 331-1 Tr. 116/3-24; Tr. 284/23-285/5.

RESPONSE: Admitted.

79.     Mr. Raina does not belong to any professional organizations or associations, has not published any papers on the subject of counterfeiting, and does not cite any studies or authorities in his Report.  Dkt. No. 331-1 Tr. 278/8-13; Dkt. No. 317-5.

RESPONSE: Admitted.

80.     Mr. Raina knew that the Individual Plaintiffs were investigated for selling transceivers bearing counterfeit H3C holographic labels. Dkt. No. 331-1 Tr. 218/4-9.

RESPONSE: Disputed.  Mr. Raina did not so testify.  Dkt. No. 331, 218:4-9.

81.     In April 2019, Mr. Raina asked Defendants for "information on the H3C holographic labels as it related to the products that they were applied on for the products in question and the time frame that they were applied on, so any information on the holographic labels during that time period," but was told that "there was no such information, no document that would explain the features of the holographic label." Dkt. No. 331-1 Tr. 93/7-12; Tr. 311/14-20.

RESPONSE:  Admitted as to the accuracy of the quoted testimony.

82.     Mr. Raina did not inspect the holographic security labels on the seized transceivers, "just casually looked at a few labels." Dkt. No. 331-1 Tr. 245/18-249/9.

RESPONSE:  Admitted as to the accuracy of the quoted testimony, but disputed to the extent Plaintiffs characterize the H3C holographic labels as material to Mr. Raina's analysis.  Mr. Raina further testified that looking at the labels "through [his] naked eyes" allowed him to make the observations Dr. Fang made.  Dkt. No. 331-1, 246:23-248:15.

83.     Mr. Raina denied that the labels were a relevant factor in a counterfeiting investigation, or that a fake label on a transceiver is an indicator of counterfeiting; according to Mr. Raina, "Labels can be counterfeited. That has no bearing on whether the product that the label is applied to on is counterfeit or genuine." Dkt. No. 331-1 Tr. 271/11-14; Tr. 93/20-96/21 ("Q. In general, do you agree that a fake logo is an indicator of counterfeiting? A. No."; "Q. If a transceiver has a fake holographic logo on it, would that mean that the transceiver is counterfeit? Please say it on the record. A.  No."; "Q.  So just the fact that the transceiver carries a counterfeit logo would not lead you to a conclusion that the transceiver is counterfeit? That is correct.").

RESPONSE: Admitted as to the accuracy of the quoted testimony, but disputed as to the characterization of Mr. Raina's testimony as general commentary on "relevant factor[s] in a

counterfeiting investigation."   Mr. Raina provided the quoted testimony in the context of his methodology, which was "a thorough forensic analysis of the product to determine if the product is genuine or counterfeit." Dkt. No. 331-1, 95: 18-23.

84.     In Mr. Raina's opinion, "the mere fact that every one of 647 transceivers [on the Inventory List] contains a unique serial number is itself evidence that they are all authentic." Dkt. No. 331-1 Tr. 160/4-24; Tr. 267/6-268/4.

RESPONSE: Admitted.

85.     At deposition, Mr. Raina testified that these serial numbers are only "unique" in the sense that each such number appears only once among the 647 seized transceivers deemed "authentic," but they are not "unique" in the sense that they could not have been replicated by counterfeiters. Dkt. No. 331-1 Tr. 163/4-17.

RESPONSE:   Admitted that Mr. Raina testified that his definition of "unique" in the relevant context means that each serial number appears only once among the 647 seized transceivers deemed authentic.  Disputed as to the remainder of the above characterization of Mr. Raina's testimony.

86.     In support of his opinion, Mr. Raina relies solely on his "nearly two decades of experience in product and supply chain security" and does not cite any other sources or authorities. Dkt. No. 317-5; Dkt. 331-1 Tr. 21/18-21; 32/6-15.

RESPONSE: Admitted.

87.     Mr. Raina overstated his experience because he was not involved in counterfeiting issues for the first ten years of his career as a hardware engineer. Dkt. No. 331-1Tr. 26/3-9.

RESPONSE: Admitted that Mr. Raina testified that he did not deal with anti-counterfeiting issues and investigations during the first ten years of his professional career as a hardware design

engineer.  Disputed that Mr. Raina overstated his experience, as Mr. Raina is the "co-founder and Chief Executive Officer of True Pedigree, a consulting firm that specializes in anticounterfeiting and brand protection investigations and strategies for technology companies." Dkt. No. 317-5, p. 1.  Additionally, he has "nearly two decades of experience in product and supply chain security," including 18 years as Cisco, where he "built and supervised a global team of more than 40 people responsible for investigating, addressing, and preventing hardware counterfeiting and other supply chain security issues, including with respect to Cisco's transceiver products." *Id.* at 1-2.  And Mr. Raina testified that while working as a hardware design engineer for the first part of his career at Cisco, he "dealt with products where security was paramount.  So I had exposure to product security solutions … and that was one of the primary reasons that I was then selected as the head of the brand protection engineering team in 2005." Dkt. No. 331-1, 32:23-33:8.

88.     Mr. Raina's Report states that "the serial numbers on all of the authentic transceivers began with 'BP' or 'EX.'" Report ¶¶ 71; see also ¶ 58 (same). At deposition, however, Raina admitted that these statements in both paragraphs were "false." Dkt. No. 331-1 Tr. 111/1-11; Tr. 112/3-7.

RESPONSE: Admitted.  However, Mr. Raina further testified: "I did not intend to make a false statement.  That is just an oversight.  But in the end it does not change the overall analysis of the product." Dkt. No. 331-1, 112:11-14.

89.     Mr. Raina states in the Report that "[t]he EEPROM date code for all but one of the 28 devices [deemed counterfeit] was '101028,' which strongly suggests a counterfeit operation where the same date code was written on all EEPROMs. In the 647 genuine transceivers, by contrast, there were 25 different dates of manufacture." Dkt. No. 317-5 p. 25; Dkt. No. 331-1 Tr. 136/7-13.

RESPONSE:  Admitted.

90.     Mr. Raina admitted on deposition that 647 transceivers deemed genuine with 25 different dates makes an average of 26 transceivers with the same date; and that due to an uneven distribution it would be possible to find 100 or more transceivers with the same date among them. Dkt. No. 331-1 Tr. 136/3-143/12.

RESPONSE: Admitted.

91.     Mr. Raina concluded that H3C is not a valid vendor for the transceivers based in part on having been "informed by HP that an authorized vendor for this part number was WTD," but did not capture that information provided by Defendants anywhere in his Report. Dkt. No. 331-1 Tr. 114/7-18.

RESPONSE: Admitted.

92.     All of the seized transceivers inspected by Mr. Raina satisfy the condition that "the serial number printed on the label matched the serial number encoded in the 1D barcode." Dkt. No. 331-1 Tr. 155/17-157/12.

RESPONSE: Admitted.

93.     Mr. Raina admits that the serial number labels are easily counterfeited, that the equipment for counterfeiting is readily available, and the EEPROM data too could be reprogrammed with widely available tools. Dkt. No. 331-1 Tr. 172/17-179/2.

RESPONSE: Disputed that Mr. Raina testified that "serial number labels are easily counterfeited." *See* Dkt. No. 331-1.  Admitted as to the remainder of the above statement.

94.     Mr. Raina admits that the transceivers are high-margin product and counterfeiters have a strong financial incentive to make counterfeit transceivers that. Dkt. No. 331-1 Tr. 177/14-179/2; Tr. 209/8-23.

RESPONSE: Admitted.

95.     In Mr. Raina's opinion, "the chances of successfully replicating the serial numbers on the seized transceivers were 'absolutely zero,'" because "counterfeiters cannot completely replicate genuine OEM identifying information because they must invent serial numbers and other such unique identifiers." and do not bother or cannot afford to replicate serial numbers correctly because "counterfeiters are lazy." Dkt. No. 331-1 Tr. 100/4-102/2; Tr. 141/1-17; Tr. 171/9-175/17; 197/1-6; Tr. 199/3-200/10-23.

RESPONSE: Admitted that Mr. Raina states in his Report that "counterfeiters cannot completely replicate genuine OEM identifying information because they must invent serial numbers and other such unique identifiers."  Disputed as to the remainder of the above statement and the characterization of Mr. Raina's opinion and testimony.  *See* Dkt. No. 331-1.

96.     Mr. Raina was informed by Defendants that WTD was an authorized vendor for the SFP transceivers, and Sumitomo and Finisar for the XFP transceivers, but did not disclose that information in his Report. Dkt. No. 331-1 Tr. 114/13-18; Tr. 115/9-15.

RESPONSE: Admitted that HP informed Mr. Raina that WTD was an authorized vendor for the SFP transceivers and that it is not stated in his report.

97.     Defendants' information about the authorized vendors for the transceivers was wrong because Mr. Raina's own spreadsheets also show Hisense as a vendor on some of the seized transceivers deemed authentic, and photos of the TT Global transceivers sent from Dubai for H3C's inspection also show a Hisense-branded transceiver. Dkt. No. 317-5 p. 40; Dkt. No. 331-1 Tr. 114/19-115/15.

RESPONSE: Admitted as to the cited evidence; disputed as to the conclusion that any information was "wrong."

98.     Defendant HPE's guidance for verification of authentic HPE hard drives and solid state drives introduced as PX15 at Mr. Raina's deposition states that "it is a common practice for counterfeiters to 'reuse' serial numbers listed on the packaging (and often on the invoice) and the number printed on the product label in an effort to convince a customer that the product is authentic," and that "[t]he serial number is not intended to be used for product validation," and refers to holograms for authentication. Dkt. No. 331-2 p. 9.

RESPONSE: Disputed to the characterization of PX15 as "guidance" but admitted as to the remainder of the above statements.

99.     Defendant HPE's guidance for validation of equipment parts introduced as PX14 at Mr. Raina's deposition states in section "Visual Inspection – Label Hologram" that "to help prevent Security Labels from being counterfeited, HPE uses a two-factor authentication system. The Security ID can be validated at the top of this web page, and the hologram can be validated with the guidelines here." Dkt. No. 331-3 p. 9. Mr. Raina testified that he was unfamiliar with the use of holograms in HPE's two-factor authentication system. Dkt. 331-1 Tr. 256/19-258/3.

RESPONSE: Disputed to the characterization of PX14 as "guidance" but admitted as to the remainder of the above statements.

100.    The H3C Security Bulletin dated September 9, 2013, included as Exhibit 3 to Dr. Fang's Report and introduced as Exhibit PX10 at Mr. Raina's deposition, shows the same images of the optical patterns in the holographic H3C trademark logos as the H3C's Statement of Anticounterfeiting dated December 31, 2019, introduced as deposition exhibit PX11. Dkt. No. 331-17 p.3; Dkt. No. 317-4 p. 43.

RESPONSE: Disputed.    Plaintiffs have not offered "H3C's Statement of Anticounterfeiting Dated December 31, 2019" as evidence on summary judgment.   Moreover,

H3C documents, including both the H3C Security Bulletin and the purported Statement of Anticounterfeiting, are inadmissible and unauthenticated hearsay.

101.    Plaintiffs' expert Dr. Fang analyzed the holographic security labels on the seized transceivers, recorded 857 observation points (the number of cells in his Excel populated with Dr. Fang's own observations), and concluded that the majority of the hologram labels inspected showed indicators of counterfeiting described in the Verification Report and the Security Bulletin. Dkt. No. 317-4.

RESPONSE: Admitted, except disputed to the extent that Plaintiffs imply the truth or accuracy of the "indicators of counterfeiting" relied upon by Dr. Fang.

102.    Defendants' expert Mr. Raina did not analyze the holographic security labels and expressed no opinion whether the logos attached to the seized transceivers were authentic or counterfeit. Dkt. No. 317-5 pp. 27-28; Dkt. No. 331-1 Tr. 245/18-24.

RESPONSE: Admitted.

103.    Mr. Raina also speculated that "someone engaged by Plaintiffs performed an analysis of the Seized Equipment . . . and likely reached substantially the same conclusions" because the transceivers were sorted in bags, with those he deemed counterfeit found in two bags only. Dkt. No. 317-5 pp. 26-27.

RESPONSE: Admitted that Mr. Raina so states in his Report but disputed as to the characterization of Mr. Raina's statement as "speculation."

104.    Nobody engaged by Plaintiffs other than Dr. Fang inspected the seized transceivers; the transceivers were sorted in bags by Plaintiffs based on their serial numbers. Dkt. No. 317-7 pp. 2-3.

RESPONSE: Disputed.

105.    The Raina Report is unsworn and not undersigned. Dkt. No. 317-5 p. 28.

RESPONSE: Disputed. The Raina Report is signed on the cover page of the report,  Dkt. No. 317-5, p. 2, and Defendants submit herewith a sworn declaration from Mr. Raina affirming the opinions contained in his Report except as specifically qualified by his deposition testimony. *See* Defendants (I) Reply Brief in Further Support of Defendants' Motion for Summary Judgment on Plaintiffs' Counterfeiting Claims (Counts I-VI) and (II) Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment, Ex. A.

Dated: April 30, 2020                    /s/ *Kevin C. Quigley*

Michael H. Bunis (BBO No. 566839)
G. Mark Edgarton (BBO No. 657593)
Kevin C. Quigley (BBO No. 685015)
**CHOATE HALL & STEWART LLP**
Two International Place
Boston, Massachusetts  02110
(617) 248-5000
mbunis@choate.com
medgarton@choate.com
kquigley@choate.com

Anthony P. Callaghan
Paul A. Saso
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York, 10119
(212) 613-2000

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

     I, Christina T. Lau, Attorney for Defendants Hewlett-Packard Financial Services Company, Hewlett-Packard Financial Services (India) Private Limited, HP Inc., Hewlett Packard Enterprise Company, and David Gill, hereby certify that the foregoing document was filed using the CM/ECF system and electronic notice will be sent to registered participants as indicated on the Notice of Electronic Filing (NEF) on April 30, 2020.

                          /s/*Christina T. Lau*
                          Christina T. Lau

9709564