UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,<br><br>Plaintiffs,<br><br>vs.<br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL,<br><br>Defendants. | Civil Action No. 1:16-CV-10386 (LTS) |

**DEFENDANTS'**

**(I)   REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' COUNTERFEITING CLAIMS (COUNTS I-VI)**

*AND*

**(II)   OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page(s)

I. PLAINTIFFS CANNOT SURVIVE SUMMARY JUDGMENT MERELY BY ATTACKING DEFENDANTS' EXPERT ......................................................................... 2

II. H3C'S HEARSAY CANNOT BE ATTRIBUTED TO DEFENDANTS, AND SHOULD BE EXCLUDED AT SUMMARY JUDGMENT. .......................................... 4

    A. Defendants Had No Involvement With H3C's Initial Report to the Chinese Police .................................................................................................................. 5

    B. Defendants Had No Involvement With the H3C Verification Report. ................... 6

    C. H3C's Statements are Inadmissible Hearsay. ......................................................... 8

III. DR. FANG'S REPORT SHOULD BE EXCLUDED BECAUSE IT IS A MERE CONDUIT FOR H3C'S HEARSAY, AND IS IRRELEVANT IN ANY EVENT. .......... 9

IV. PLAINTIFFS' NON-HEARSAY EVIDENCE CANNOT SUSTAIN THEIR BURDEN AT SUMMARY JUDGMENT, PARTICULARLY IN LIGHT OF DEFENDANTS' AFFIRMATIVE SHOWING. ................................................................ 9

V. PLAINTIFFS' CROSS-MOTION SHOULD BE SUMMARILY DENIED. .................. 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Avocent Redmond Corp. v. Rose Elecs.*,
  No. 06-1711RSL, 2012 U.S. Dist. LEXIS 162177 (W.D. Wash. Nov. 13, 2012) ............................................................................................................................... 7

*Begovic v. Water Pik Techs., Inc.*,
  No. 04-CV-447-SM, 2005 U.S. Dist. LEXIS 5898 (D.N.H. Apr. 6, 2005) .............................. 3

*Big Apple BMW, Inc. v. BMW of North America, Inc.*,
  974 F.2d 1358 (3d Cir. 1992) ................................................................................................... 8

*Council of Ins. Agents & Brokers v. Juarbe-Jimenez*,
  443 F.3d 103 (1st Cir. 2006) .................................................................................................... 3

*LeBaron v. Mass. P'ship for Corr. Healthcare*,
  No. 14-14138-LTS, 2017 U.S. Dist. LEXIS 213577 (D. Mass. Dec. 1, 2017) ........................ 4

*Reynolds v. Target Corp.*,
  2014 U.S. Dist. LEXIS 158396 (D. Mass. Nov. 7, 2014) (Sorokin, J.) .................................... 3

*United States v. Kantengwa*,
  481 F.3d 545 (1st Cir. 2015) .................................................................................................... 8

*Venegas v. Global Aircraft Serv.*,
  2016 U.S. Dist. LEXIS 130164 (D. Me. Sept. 23, 2016) ......................................................... 8

**Other Authorities**

Fed. R. Evid. 801(d)(2) ........................................................................................................... 7, 8

To survive summary judgment, Plaintiffs bear the burden of identifying admissible evidence that would enable a reasonable jury to find that HPFS India sold counterfeit equipment to ICT.

Plaintiffs spend 18 of the 21 pages of their opposition brief criticizing the opinions of *Defendants*' expert, Mr. Raina, attacking his credibility, and insisting that alleged factual disputes regarding his report "preclud[e] summary judgment for Defendants" (*e.g.,* p. 12). Plaintiffs' novel arguments directed to the strength of Mr. Raina's report not only lack merit, but they are beside the point. Upon the filing of Defendants' properly supported motion for summary judgment, the burden shifted to *Plaintiffs* to produce admissible — and more than "merely colorable" — evidence of their own to demonstrate a triable issue that the equipment sold by HPFS India to ICT was counterfeit.

Plaintiffs' chief affirmative evidence in support of their counterfeit allegation remains non-party H3C's statements to the Chinese police, and Dr. Fang's expert report that makes comparisons and observations that merely rehashes those H3C statements. As explained in Defendants' opening brief, H3C's hearsay statements are inadmissible and may not be considered at summary judgment. Plaintiffs concede the legal premises, and concede that they have no way of introducing such statements through H3C — but offer instead a fanciful counterfactual narrative that attributes H3C's statements to Defendants. That narrative, based on a deliberate misreading of the undisputed record and of Defendants' privilege log, has already been rejected by the Court. It does not create any genuine dispute of material fact. Nor, as detailed in Defendants' *Daubert* briefing, can Plaintiffs admit that same hearsay evidence through the backdoor of Dr. Fang's report. Having chosen not to sue H3C, having failed to seek third-party discovery from H3C, and having failed even to retain a counterfeiting expert, Plaintiffs cannot avail themselves of inadmissible H3C hearsay in order to survive or obtain summary judgment.

With H3C's hearsay and Dr. Fang's report excluded, Plaintiffs' few remaining bits of purported affirmative evidence are no more probative of Plaintiffs' position than Defendants'. That evidence is less than colorable and does not provide a basis for a reasonable jury to find in Plaintiffs' favor on the counterfeiting question — particularly in view of Mr. Raina's unrebutted opinion that the Seized Equipment sold to ICT by HPFS India was authentic. Defendants' motion for summary judgment on Counts 1-VI should be granted.

The last four pages of Plaintiffs' brief address their attempted (and untimely and procedurally defective) cross-motion for summary judgment. That cross-motion is subject to Defendants' pending motion to strike because, among other things, Plaintiffs never conferred with Defendants before filing it, as required by Local Rule 7.1. In any event, the cross-motion has no merit. It is premised on the same set of inadmissible and/or non-probative evidence as Plaintiffs' opposition, and cannot overcome Defendants' affirmative expert evidence — particularly with all inferences in *Defendants*' favor. The cross-motion never should have been filed, and it should be denied.

**I.    PLAINTIFFS CANNOT SURVIVE SUMMARY JUDGMENT MERELY BY ATTACKING DEFENDANTS' EXPERT.**

Plaintiffs assert that "Defendants' motion for partial summary judgment should be denied because of the genuine issues of material facts concerning Defendants' evidence of authenticity." Dkt. No. 330 at 18.[1] Plaintiffs have the standard exactly backwards. Plaintiffs bear the burden of proving at trial that the Seized Equipment sold by HPFS India to ICT was counterfeit — an essential element of Plaintiffs' first six claims. Counts I-VI. Defendants do not bear any burden of proving that the equipment was authentic. At summary judgment, "the moving party need only

---

[1]    *See also, e.g.,* Dkt. No. 330 at 12 (asserting that anything "more than a 'metaphysical doubt' concerning Mr. Raina's credibility and the weight of his opinions preclud[es] summary judgment for Defendants").

2

identify the deficiencies in the nonmoving party's evidence which demonstrate the absence of a genuine issue of fact and needs not provide additional evidence negating the opponent's claim." *Reynolds v. Target Corp.*, C.A. No. 13-cv-10648-LTS, 2014 U.S. Dist. LEXIS 158396 (D. Mass. Nov. 7, 2014) (Sorokin, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Thus, Plaintiffs cannot survive summary judgment merely by criticizing Defendants' evidence of authenticity; they must instead produce their own admissible, probative evidence of counterfeiting to such an extent that a reasonable jury could conclude that the Seized Equipment was in fact counterfeit.  *See Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 110 (1st Cir. 2006) (nonmoving party's "failure to controvert [the moving party's] version of the facts with her own evidence [was] fatal" on summary judgment); *see also Begovic v. Water Pik Techs., Inc.*, Civil No. 04-CV-447-SM, 2005 U.S. Dist. LEXIS 5898, at *23 (D.N.H. Apr. 6, 2005) (plaintiff's claim failed on summary judgment where "plaintiff summarily criticize[d] defendant's evidence and question[ed] its validity, but produce[d] no evidence of his own tending to refute defendant's supported assertions.").  As shown *infra*, Plaintiffs cannot make the required showing, even without — but especially with — the admission of Mr. Raina's expert opinion.

Defendants' Opposition to Plaintiffs' *Daubert* Cross-Motion, submitted herewith, confirms that Mr. Raina's opinions are relevant, reliable, and admissible.  Dkt. No. 344.  Plaintiffs' arguments to the contrary fall short.  As Mr. Raina (a well-qualified and experienced counterfeiting expert) explained in his deposition, he employed a holistic analysis to reach his determination.  Contrary to Plaintiffs' assertions, certain minor mistakes in his description of ancillary pieces of data did not change his overall conclusions.  Nor are his conclusions any less relevant here because he analyzed the transceivers themselves — the most reliable method of counterfeiting analysis — rather than their holographic labels, about which neither he nor Defendants (nor Plaintiffs, for that

3

matter) have reliable guidance. *See* Dkt. No. 344. Finally, Plaintiffs' protests regarding Mr. Raina's connections to the law firm of Sideman & Bancroft are overwrought. Mr. Raina disclosed his previous experience at Sideman on his resume, candidly discussed the corporate relationship at his deposition, and testified that he alone drafted his expert report, and no one at Sideman had even read his report, much less influenced its analysis or conclusions. Dkt. No. 331-1, 83:5-13.[2]

Properly considered, Plaintiffs' burden is only heightened by the admission of Mr. Raina's expert opinion. Plaintiffs must show that a reasonable jury could find that their admissible (non-hearsay) evidence, in a vacuum, proves that the Seized Equipment sold by HPFS India is counterfeit — and that such evidence could ***overcome*** Mr. Raina's conclusion that the same equipment was authentic. *See LeBaron v. Mass. P'ship for Corr. Healthcare*, C.A. No. 14-14138-LTS, 2017 U.S. Dist. LEXIS 213577, at *28 (D. Mass. Dec. 1, 2017) (granting defendants summary judgment where plaintiff offered inadequate evidence to support his claim and where defendant's "expert opinion [stood] unrebutted"). Plaintiffs' efforts to poke holes in his analysis or to suggest bias might theoretically go to the weight and credibility of Mr. Raina's testimony, but they do not constitute affirmative evidence sufficient to create an issue of fact to survive summary judgment.

## II.  H3C'S HEARSAY CANNOT BE ATTRIBUTED TO DEFENDANTS, AND SHOULD BE EXCLUDED AT SUMMARY JUDGMENT.

Plaintiffs' only real support for their claim of counterfeiting remains non-party H3C's alleged statements to the Chinese police in 2012 and 2013 — and, in particular, the H3C Verification Report. But "hearsay evidence cannot be considered at summary judgment."

---

[2]  To address any evidentiary concern regarding Mr. Raina's signature appearing on the cover page of his report as opposed to sworn and undersigned (raised by Plaintiffs at Dkt. No. 330, n. 4), Defendants submit herewith a sworn declaration from Mr. Raina affirming that he stands by the truth and accuracy of his report, as qualified by his sworn deposition testimony. Ex. A.

*Hannon*, 645 F.3d at 49.  Conceding that legal principle, and recognizing that they have no prospect of introducing the H3C hearsay through an H3C witness (Dkt. No. 341 (SOF) ¶¶ 16-17), Plaintiffs strain to recast H3C's statements as Defendants' own admissions.  *E.g.*, Dkt. No. 330 at 5-7; Dkt. No. 332 at 10-12.  The undisputed record, however, confirms that H3C made those statements without even Defendants' prior knowledge — much less with Defendants' input or at their instruction.  The law is clear:  H3C's statements are inadmissible hearsay.

    **A.**    **Defendants Had No Involvement With H3C's Initial Report to the Chinese Police.**

At various points in their Opposition, Plaintiffs cite to H3C inspections out of sequential order, creating the false impression that H3C conducted an inspection "on behalf of HPFS India" in December 2012 that led to the Individual Plaintiffs' arrests.  In truth, the actual undisputed timeline of events – without Plaintiffs' intentional, self-serving mischaracterizations – shows that Defendants were unaware of H3C's actions or the arrests of ICT's employees until almost two months later:

1. "In [H3C's] Appraisal Certificate of [December 7, 2012], H3C reported to the police that 'our company hereby declares that, after the investigation of the seized products, the above products with 'H3C' logo are confirmed to be counterfeit…'"  [SAC ¶ 54];

2. On December 9, 2012, "the police raided ICT's offices, seized the remaining 778 transceivers, and arrested Plaintiffs Cathy Yu and Jason Yuyi" (and later arrested Plaintiff Jade Cheng on December 21, 2012) [SAC ¶ 55];

3. H3C "provided the police with another Appraisal Certificate dated December 9, 2012, likewise stating with respect to the 778 transceivers seized that day that 'after investigation of the seized products, the above products with 'H3C' logo are confirmed to be counterfeit,'…." [SAC ¶ 56];

4. On December 27, 2012, H3C made another statement to the Police "stating that the Individual Plaintiffs were 'selling counterfeit 'H3C' transceivers which Logo is owned by [H3C]'" and that H3C "never assigns right to HP to sell or distribute the products with H3C Logo in China" [SAC ¶ 57]; and

    5.       It was not until January 31, 2013, that Defendants first became aware of this situation—when "Plaintiffs ICT and Styller brought their concerns to the attention of the HPFS Defendants[.]" [SAC ¶¶ 72, 74.]

It is thus undisputed that H3C's December 2012 inspections and resulting statements as to the alleged counterfeit nature of the seized equipment were wholly independent of HPFS India or any of the named Defendants. To the extent that HPFS India's letter to the Chinese authorities referenced H3C as having inspected and obtained a partial list of the seized equipment on its behalf, any such inspection would have occurred after HPFS India "started the investigation of this matter" on February 1, 2013. Dkt. No. 331-4. The Individual Plaintiffs were already in Chinese detention for almost two months by then. In sum, Plaintiffs counterfactual narrative fails based on the undisputed record evidence.

    **B.**       **Defendants Had No Involvement With the H3C Verification Report.**

Throughout their summary judgment and *Daubert* opposition briefs, Plaintiffs claim that Defendants "drafted," "jointly drafted," "collaborated on drafting," "shared drafts, updates, edits and advice on," and even "co-authored" the H3C Verification Report — *i.e.* the verification report understood to have been submitted by H3C to the Chinese authorities (the "H3C Verification Report") and relied upon by Plaintiffs' expert, Dr. Fang. Dkt. No. 330 at 1, 7, 12, 13, 23, 24; Dkt. No. 332 at 2, 3, 10, 11, 16, 18, Dkt. No. 341 ¶¶ 49-50. Those assertions are false. Plaintiffs have no evidence that they are true (and no good faith basis to make that assertion to the Court). Plaintiffs' only cited support is a set of entries on Defendants' privilege log. As Defendants explained when Plaintiffs previously litigated this issue (and lost), those privilege log entries — referencing other "verification reports"[3] — do not evidence any involvement by Defendants with the H3C Verification Report. Dkt. No. 257 at 17 n.16. This would have been one of the many

---

[3] Including the verification report that prompted the May 2013 decision to remove remaining equipment in Dubai from circulation. *See infra* p. 10, item No. 3.

issues discussed during a pre-filing meet and confer session, had Plaintiffs complied with their obligations under the Local Rules.

None of the April 2013 emails/privilege log entries cited by Plaintiffs (Dkt. No. 341 ¶ 49; Dkt. No. 332 at 10 n.4, citing Privilege Log Entries 410, 414, 416-17, 420, 427, 427-31, 433 and 446) relate to the H3C Verification Report.  Ex. B, ¶ 3.  Only two privilege log entries with the term "verification report" reference emails related to the H3C Verification Report, which had previously been submitted to the PSB.  *Id.*, ¶ 4.  Both of those emails are from July 2013, and Plaintiffs cite only one of them.  Dkt. No. 332 at 10 n.4 (citing Privilege Log Entry 651.  Neither one refers to drafts of, or edits or updates to, the H3C Verification Report.  Dkt. No. 331-10.

In opposition to Plaintiffs' Motion for Reconsideration, Defendants clarified that "No prior *drafts* of [the H3C Verification Report] were logged as privileged because none were withheld as privileged." Dkt. No. 291 at 17 (emphasis in original).  That is, Defendants did not provide input, edits, or advice on drafts of the H3C Verification Report because they never received or had in their possession any drafts thereof in the first place.  In denying Plaintiffs' motion, the Court ruled that "Plaintiffs offer *no basis* to conclude that any such documents [drafts of the H3C Verification Report] were improperly withheld…" Dkt. No. 300 at 4 (emphasis added).  That fact has not changed.  And nothing in the H3C Verification Report itself indicates that it was drafted, authored, edited, requested by, instigated, or submitted to the PSB on behalf of HPFS India or Defendants; or that it was otherwise produced by or submitted in the furtherance of their interests.  Dkt. No. 317-4.  In sum, while conceding that the record is ripe for summary judgment, Plaintiffs have cited no evidence that Defendants even knew of the H3C Verification Report prior to its submission to the Chinese authorities, let alone that Defendants co-authored it.  The H3C Verification Report is H3C's statement alone.  Plaintiffs conceded that the record is ripe for summary judgment (Dkt.

7

No. 341 ¶ 20) and their belated effort to manufacture contrary evidence has no basis in fact or truth.

        **C.**      **H3C's Statements are Inadmissible Hearsay.**

Without any factual basis for attributing H3C's statements to Defendants, Plaintiffs' reliance on party-opponent hearsay exceptions falls apart. *See* Dkt. No. 330 at 24; Dkt. No. 332 at 10-11. The H3C Verification Report is not Defendants' own statement under Rule 801(d)(2)(A) or adoptive statement under Rule 801(d)(2)(B).[4] Nor do the facts support a Rule 801(d)(2)(C) theory that the H3C Verification Report was "a statement by a person authorized by a party to make a statement concerning the subject." There is no evidence Defendants were even aware of the H3C Verification Report prior to its submission to the Chinese police, much less evidence that Defendants "authorized" H3C to speak for Defendants on that subject. Finally, Plaintiffs cannot avail themselves of an agency theory under Rule 801(d)(2)(D) because they have not adduced any evidence that H3C acted as Defendants "agent … concerning a matter within the scope of the agency." The mere fact that H3C was HP's wholly-owned subsidiary does not supplant the required agency analysis, as Plaintiffs' cited case affirms. Dkt. No. 332 at 11; *see Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1373 (3d Cir. 1992) (statements by employee of subsidiary could be attributed to parent under Rule 801(d)(2)(D) only where parent "dominated" the activities of the subsidiary); *see also Venegas v. Global Aircraft Serv.*, No. 2:14-cv-249-NT, 2016 U.S. Dist. LEXIS 130164, at *10 n. 4 (D. Me. Sept. 23, 2016) (striking hearsay at summary judgment where proponent invoked *Big Apple BMW* but made no showing that corporate affiliate was defendant's agent and that statements were made within the scope of that agency relationship).

---

[4] *See Avocent Redmond Corp. v. Rose Elecs.*, Case No. C06-1711RSL, 2012 U.S. Dist. LEXIS 162177, at *8 (W.D. Wash. Nov. 13, 2012) ("[S]imply producing documents in response to a discovery request does not necessarily indicate that the producing party agrees with statements contained in the production or otherwise adopts the statements for purposes of Rule 801(d)(2)").

8

The H3C Verification Report is inadmissible hearsay, and cannot be considered at summary judgment for the truth of the matter asserted. *See Hannon*, 645 F.3d at 49.

### III. DR. FANG'S REPORT SHOULD BE EXCLUDED BECAUSE IT IS A MERE CONDUIT FOR H3C'S HEARSAY, AND IS IRRELEVANT IN ANY EVENT.

For the reasons set forth in Defendants' *Daubert* briefing, Dr. Fang's report cannot be considered at summary judgment, either. Plaintiffs improperly seek to use Dr. Fang "simply as a conduit" for introducing H3C's hearsay — *i.e.*, the Verification Report and the Security Bulletin. *United States v. Kantengwa*, 481 F.3d 545, 561 (1st Cir. 2015).

Dr. Fang's "opinion" is irrelevant in any event. Even accepting Plaintiffs' attempt to reframe the issue as whether the Seized Equipment *labels* are counterfeit, Dr. Fang still would have no opinion. By his — and Plaintiffs' — admission, Dr. Fang has no expertise in counterfeiting, and he has no opinion as to whether the Seized Equipment (or the labels affixed thereon) is *in fact* counterfeit. Dkt. No. 341 ¶¶ 22, 24. As he testified in his deposition, all Dr. Fang did was to look through a microscope and note whether he observed the presence of supposed "indicators" of counterfeiting described in the two hearsay documents. Dkt. No. 341 ¶ 25. Indeed, Dr. Fang admitted that much of his analysis could have been done by any individual with a cell-phone camera. Dkt. No. 341 ¶ 38. Dr. Fang's report simply is not probative of the factual issue before the Court at summary judgment. The Court should disregard it.

### IV. PLAINTIFFS' NON-HEARSAY EVIDENCE CANNOT SUSTAIN THEIR BURDEN AT SUMMARY JUDGMENT, PARTICULARLY IN LIGHT OF DEFENDANTS' AFFIRMATIVE SHOWING.

Without the benefit of H3C's hearsay and Dr. Fang's report, Plaintiffs are left with the following assortment of "affirmative evidence" (Dkt. No. 330 at 4) — none of which, alone or collectively, could support a reasonable jury verdict that the Seized Equipment sold by HPFS India is counterfeit:

9

1. Lack of requested documentation from Inspira (Dkt. No. 341 ¶¶ 40-43);

    o Inspira's inability to produce importation records (for reasons unknown) has no bearing on whether the Seized Equipment was counterfeit when sold to ICT.

2. The March 25, 2013 draft letter to the Chinese police (Dkt. No. 341 ¶ 57);

    o As Defendants worked in good faith through a confusing situation to investigate ICT's assertions in March 2013, they prepared a preliminary draft letter to the Chinese police and shared it with ICT. That draft letter allowed for the possibility that Defendants had inadvertently provided counterfeit equipment to ICT. After further investigation, Defendants made a truthful statement to the Chinese police that did not include such language. The draft correspondence (to the extent it is even admissible) has no bearing on whether the Seized Equipment sold by HPFS India is *in fact* counterfeit.

3. Instructing TT Global to destroy remaining equipment in Dubai (Dkt. No. 341 ¶¶ 61-62);

    o Given that this equipment was not sold to ICT and, therefore not seized by the Chinese authorities, it is irrelevant. Regardless, Plaintiffs emphasize that HPFS India discussed instructing TT Global to destroy the Dubai equipment because its origination was "questionable," but intentionally omit that part of the same email which states that "there hasn't been a concrete determination as to the authenticity of the assets." Dkt. No. 341 ¶ 61; Dkt. No. 331-9.

4. "Defendants' and H3C's use of holographic security labels as anti-counterfeiting features" (Dkt. No. 341 ¶¶ 98-100); and "Chinese and US laws that define selling goods bearing counterfeit trademarks as a counterfeiting offense" (no SOF cited);

    o Neither of these pieces of "affirmative evidence" have any independent relevance, much less probative value, without the admission of H3C's hearsay.

That is, even if they did not also need to overcome Defendants' unrebutted expert opinion, Plaintiffs would not be able to identify "significantly probative" evidence sufficient to carry their burden. *Anderson*, 477 U.S. at 249-50. In other words, no reasonable jury could find, based on

the only "affirmative evidence" cited in Plaintiffs' brief (p. 4), that either the Seized Equipment or the labels affixed thereon are counterfeit.

But Mr. Raina's report raises the bar for Plaintiffs even further. Plaintiffs must show not just that a reasonable jury could find that their non-hearsay evidence, in a vacuum, proves that the Seized Equipment sold by HPFS India is counterfeit — but that such evidence could ***overcome*** the following undisputed facts:

- Every unit of Seized Equipment that Mr. Raina concluded was authentic appears on the "Master List" of inventory that Plaintiffs assert is the relevant list of equipment that HPFS India agreed to sell ICT.

- Not one of the 31 units of Seized Equipment that Mr. Raina concluded was counterfeit appears on the Master List of inventory.

- ICT was trading in H3C equipment acquired from other sources besides HPFS India during the relevant time.[5]

Dkt. No. 341 ¶¶ 31-34; *see also* Ex. C. Faced with those conclusions, and without an expert opinion of their own or the benefit of H3C's hearsay, Plaintiffs cannot come close to meeting their burden of proof at trial — or here at summary judgment.

V. **PLAINTIFFS' CROSS-MOTION SHOULD BE SUMMARILY DENIED.**

Plaintiffs' cross-motion for summary judgment asserts that "there are no genuine disputes of fact that the equipment bear counterfeit registered trademarks." Dkt. No. 334 at 1. Of course, there are. As established in Defendants' summary judgment and *Daubert* briefing, Plaintiffs have no admissible evidence that any of the Seized Equipment, or the trademarks on that equipment, were counterfeit — and have put forth no evidence at all (admissible or otherwise) connecting any

---

[5] Plaintiffs previously represented that fact to the Court. *See, e.g.,* Dkt. No. 219 at 6. Plaintiffs now purport to "clarify" their representation by stating (for the first time) in an affidavit by Plaintiff Styller that such H3C equipment from other sources "did not contain H3C transceivers with the same part numbers … that ICT purchased from HPFS India." Dkt. No. 341 ¶ 6, Dkt. No. 331-15. As detailed in Defendants' pending spoliation motion, Plaintiff Styller is the same person who directed the destruction of all relevant evidence. Dkt. No. 322. Either as a sanction for spoliation or as a matter of evidentiary quality, Court should decline to credit Styller's self-serving, unsupported statement at summary judgment.

11

allegedly counterfeit device to the equipment acquired from HPFS India. Nor do Plaintiffs have any basis to exclude the expert testimony of Mr. Raina finding that such equipment was authentic. Indeed, with all inferences required to be taken in *Defendants*' favor, Plaintiffs have no good-faith basis at all for their cross-motion. For that reason, and because Plaintiffs did not confer with Defendants before filing it — in violation of Local Rule 7.1 and the Court's specific directives — the Court should summarily deny Plaintiffs' cross-motion and grant sanctions against Plaintiffs that the Court believes, within in its discretion, are appropriate to deter such conduct in the future.

## CONCLUSION

For the reasons set forth above, in Defendants' opening memorandum in support of their motion, and in Defendants' *Daubert* briefing, the Court should grant partial summary judgment dismissing Counts I-VI of the Second Amended Complaint and narrowing Plaintiffs' claims to preclude any theory that Defendants sold counterfeit equipment to ICT.

And, for the reasons set forth above and in Defendants' Motion to Strike ([Dkt. No. 339](Dkt. No. 339)), the Court should deny Plaintiffs' Cross-Motion for Summary Judgment.

Dated: April 30, 2020

Respectfully submitted,

/s/ *Michael H. Bunis*
Michael H. Bunis (BBO No. 566839)
G. Mark Edgarton (BBO No. 657593)
Kevin C. Quigley (BBO No. 685015)
**CHOATE HALL & STEWART LLP**
Two International Place
Boston, Massachusetts  02110
(617) 248-5000
mbunis@choate.com
medgarton@choate.com
kquigley@choate.com

Anthony P. Callaghan
Paul A. Saso
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York, 10119
(212) 613-2000

*Counsel for Defendants*

13

**CERTIFICATE OF SERVICE**

    I, Christina T. Lau, Attorney for Defendants Hewlett-Packard Financial Services Company, Hewlett-Packard Financial Services (India) Private Limited, HP Inc., Hewlett Packard Enterprise Company, and David Gill, hereby certify that the foregoing document was filed using the CM/ECF. system and electronic notice will be sent to registered participants as indicated on the Notice of Electronic Filing (NEF) on April 30, 2020.

                                                    /s/*Christina T. Lau*
                                                    Christina T. Lau

9705219