## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI, <br><br>          Plaintiffs, <br><br>        v. <br><br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL, <br><br>          Defendants. | **Civil Action No. 1:16-CV-10386 (LTS)** |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS BASED ON ALLEGED SPOLIATION

April 30, 2020

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

1.    2012: no hint of litigation with Defendants ................................................................ 2

2.    2013: Plaintiffs seek Defendants' help in securing freedom for
the Individual Plaintiffs and a non-litigious resolution of the matter ................................ 2

3.    2014: Styller's and Cheng's emails preserved in the email migration; the Individual
Plaintiffs' laptops returned by the PSB damaged beyond repair. ...................................... 8

ARGUMENT ...................................................................................................................... 10

I.     Legal standards ......................................................................................................... 10

II.    No duty to preserve at the time of the alleged spoliation ............................................ 10

III.   No intent to deprive Defendants of any evidence ...................................................... 16

IV.   No prejudice to Defendants ........................................................................................ 18

V.    No bad faith in discarding damaged laptops or recycling irrelevant parts .................... 20

CONCLUSION ................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

<u>A.O.A. v. Rennert</u> 2018 WL 11251827 (E.D. Miss. March 12, 2018)................................. 10, 15

<u>Anderson v. Cryovac, Inc.</u>, 862 F.2d 910 (1st Cir. 1988).............................................. 10

<u>Benjamin v. Aroostook Med. Ctr., Inc.</u>, 57 F.3d 101 (1st Cir. 1995). ......................... 17

<u>Bouchard v. USTA</u> 2017 WL 3868801 (S.D.N.Y. Sept. 5, 2017)................................. 18

<u>Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.</u>, 244 F.R.D. 614 (D. Colo. 2007)............. 13

<u>Chin v. Port Auth. of N.Y. & N.J.</u>, 685 F.3d 135 (2d Cir. 2012) ................................. 18

<u>Clark Const. Group, Inc. v. City of Memphis</u>, 229 F.R.D. 131 (W.D. Tenn. 2005) ................... 16

<u>Collazo-Santiago v. Toyota Motor Corp.</u>, 149 F.3d 23 (1st Cir. 1998)................................. 16, 17

<u>Design Basics, LLC v. Drexel Bldg. Supply, Inc.</u>, No. 13-C-560
    (E.D. Wis. Sep. 12, 2016) ........................................................................... 13

<u>Eshelman v. Puma</u>, 2017 WL 2483800 (E.D. N.C. June 7, 2017)................................. 18

<u>Forest Labs. v. Caraco Pharm. Laboratories</u>, No. 06-CV-13143
    (E.D. Mich. Apr. 14, 2009)......................................................................... 11, 16

<u>Goodman v. Praxair Servs., Inc.</u>, 632 F. Supp. 2d 494 (D. Md. 2009)........................... 13

<u>Gordon v. Dreamworks Animation SKG, Inc.</u>, 935 F. Supp. 2d 306 (D. Mass. 2013)............... 10

<u>Hefter Impact Techs., LLC v. Sport Maska, Inc.</u>, 2017 WL 3317413
    (D. Mass. Aug. 3, 2017)........................................................................ 13, 16, 20

<u>Hynix Semiconductor Inc. v. Rambus, Inc.</u>, 591 F. Supp. 2d 1038
    (N.D. Cal. Jan. 5, 2006) ............................................................................. 14

<u>In re Abilify Prods. Liab. Litig.</u>, No. 3:16-md-2734 (N.D. Fla. Oct. 5, 2018) ........................... 11

<u>In re Delta/Airtran Antitrust Litig.</u>, 770 F. Supp. 2d 1299 (N.D. Ga. 2011) ............................... 12

<u>Indem. Ins. Co. of N. Am. v. Liebert Corp.</u>, 1998 WL 363834
    (S.D.N.Y. Jun. 29, 1998) ........................................................................... 11

<u>Jones v. Norton</u>, 809 F.3d 564 (10th Cir. 2015) ....................................................... 12

<u>Knight v. Boehringer Ingelheim Pharms., Inc.</u>, 323 F. Supp. 3d 837 (S.D.W. Va. 2018) ........... 17

<u>Massachusetts v. Mylan, Inc.</u>, No. 03-11865, at *2 (D. Mass. July 12, 2010) ........................... 13

McGuire v. Acufex Microsurgical, Inc. 175 F.R.D. 149 (D. Mass. 1997) .................................. 12

McKeague v. One World Techs., Inc., 858 F.3d 703 (1st Cir. 2017)........................................... 17

Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1131 (Fed. Cir. 2011) .......................................... 15

Millenkamp v. Davisco Foods Int'l, 562 F.3d 971 (9th Cir. 2009) ............................................ 11

Moore v. Lowe's Home Ctrs., LLC, No. 2:14-cv-01459-RJB
  (W.D. Wash. June 24, 2016)................................................................................................. 14

Newberry v. Cty. of San Bernardino, 750 F. App'x 534 (9th Cir. 2018) .................................... 20

Perez–Garcia v. P.R. Ports Auth., 871 F. Supp. 2d 66, 69 (D.P.R. 2012) .................................. 13

Philmar Dairy, LLC v. Armstrong Farms, No. 18-cv-0530 (D.N.M. July 11, 2019)....... 11, 12, 15

Postle v. Silkroad Tech., Inc., 2019 D.N.H. 26 (D.N.H. 2019) ................................................... 10

RealNetworks, Inc. v. DVD Copy Control Ass'n, Inc., 264 F.R.D. 517 (N.D. Cal. 2009).......... 11

Richard Green v. McClendon, 262 F.R.D. 284 (S.D.N.Y. 2009) ................................................ 14

Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598 (S.D. Tex. 2010) .. 10, 16, 19

Salvatore v. Pingel, No. 08-cv-00312-BNB-KMT, 2009 WL 943713
  (D. Colo. Apr. 6, 2009)......................................................................................................... 14

Schlumberger Tech. Corp. v. Greenwich Metals, Inc., 2009 WL 5252644
  (D. Kan. Dec. 31, 2009)......................................................................................................... 13

Sharp v. Hylas Yachts, LLC, 872 F.3d 31 (1st Cir. 2017)........................................................... 17

Simon v. New York, 2017 WL 57860 (S.D.N.Y. Jan. 5, 2017) ................................................... 19

Townsend v. American Insulated Panel Company, 174 F.R.D. 1 (D. Mass. 1997) ..................... 15

Trask-Morton v. Motel, 534 F.3d 672 (7th Cir. 2008) ............................................................... 12

Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136 (10th Cir. 2009) ........................................... 12

Vick v. Tex. Employment Comm'n, 514 F.2d 734 (5th Cir. 1975)............................................... 17

Wai Feng Trading Co. Ltd v. Quick Fitting, Inc., No. CV 13-33WES,
  2019 WL 118412 (D.R.I. Jan. 7, 2019) ................................................................. 10, 11, 13, 17

Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003)............................................. 11

## PRELIMINARY STATEMENT

Defendants' spoliation theory of Plaintiffs' "cover-up" with "the intent to deprive Defendants of evidence" is made out of whole cloth. While some ESI has indeed been lost -- as Plaintiffs were the first to admit – it was lost before Plaintiffs' duty to preserve evidence was triggered, with no intent and no prejudice to Defendants due to its marginal value. Plaintiffs have produced the vast majority of the relevant communications because Styller was copied on all emails of any significance and preserved at his end all such emails with the Chinese team whose own accounts were deleted to prevent them from falling into the hands of the PSB.

*First*, **no duty** to preserve evidence was triggered at the time of the alleged spoliation. Defendants' claim that Plaintiffs anticipated litigation "as early as February 2012" or at the time of the arrest in December 2012 fails because Plaintiffs had no dispute with Defendants, and no thoughts of suing them. The evidence also shows Plaintiffs pursuing a non-litigious resolution in 2013, with no decision to proceed to litigation, which was neither imminent, probable, nor likely at that time and did not crystalize for another two years. See Part II.

*Second*, there was **no intent** to deprive Defendants of any evidence. The reason behind the deletion of the email accounts at the time of the arrest in and the disposal of the damaged laptops after the release -- is the PSB, not Plaintiffs. The remaining equipment with no transceivers was shipped to the US and recycled by ICT in a regular course of its business with Defendants' knowledge. And the 2014 email migration to the cloud (which Defendants themselves undertook in 2015) was for a "good house-keeping" purpose, and the ESI loss was insignificant and on the margins of what was preserved and produced. See Part III.

*Third*, any lost ESI was of marginal relevance and occasioned **little prejudice** to Defendants because Styller preserved all correspondence of any significance – any

communication "which involves purchasing, sales, logistics, and financial" – which most of over 60,000 documents produced by Plaintiffs. See Part IV.

## FACTUAL BACKGROUND

### 1.    2012: no hint of litigation with Defendants

Defendants claim that Plaintiffs should have anticipated litigation as early as February 2012 when they found the equipment in poor condition. Plaintiffs did find upon the equipment's arrival in China in February 2012 that "substantial scratching, aging, random stickers are prevalent," "some parts have writing on them," 'units are beat up," "not 'new/like new' like we were expecting," "appearance is well below what we expected," "appearance low to medium," "product on the pictures looks really ugly," "horrible," a "mess." Exhs. A-F.[1] However, Plaintiffs never brought any claims arising out of the equipment's quality (as opposed to its counterfeit nature), and never contemplated or threatened any such claims. What is more, Defendants themselves observed the same conditions of the equipment remaining in India during the October 2012 inspection,[2] but that discovery did not trigger Defendants' own duty to preserve (as they destroyed their relevant ESI as late as February-June 2013, Dkt. 300 p. 3).

In December 2012, when Cathy Yu and Jason Yuyi were arrested by the PSB, Jade Cheng was about to be arrested, and Ryan Quinn was in fear of being arrested, Styller deleted their email accounts at their request not because of any "incriminating" information but because of their well-grounded fear of the PSB. Dkt. 321-1 at 217/3-6 ("This is China. This is not United States. You cannot go to court. You cannot ask for due process. This is not a situation where you

---

[1] Exhibits references herein are attached to the Declaration of Dimitry Joffe dated April 30, 2020 ("Joffe Decl.")

[2] Defendants observed that TT Global's control over the equipment was "very questionable," the equipment "very very dusty" and "so dirty," with "customer information and tags left on the units" and not properly packaged -- mirroring Plaintiffs' own complaints (even pictures of the equipment taken in India and in China look similar). Exh. G.

ask for due process."); id. at 219/1-9 ("I was asked to delete it and I -- I am from the same background as Chinese people. I know what KGB is, I know what the police is in a totalitarian country like China. And when I hear a request to delete emails, I do not ask questions. You might not understand this, being here born in the United States and enjoying our due process. But that's what we experience, and we know how it works, and that's how we act.").

Even though the email accounts of his Chinese team were deleted for fear of the PSB, Styller preserved all their emails in which he was in copy – and he was copied on "whatever has any purchasing, sales, logistics, or financial impact." Dkt. 321-1 at 103/3-6; see also id. at 101/20-23 ("they all perfectly know they cannot buy, sell, or make a logistics decision or accounting decision without -- without having me in copy."). Styller did not delete any of his emails and produced tens of thousands of them, including his almost daily communications with his Chinese team during the relevant period, records of all sales, and corresponding invoices. To the extent any relevant ESI was then, it was preserved by Styller.[3]

Styller testified that the Chinese team's "corresponding with the customers does not impact our financial position [because] [i]f they made an agreement with customers, subject to approval with the management, then they come back to me.'" Dkt. 321-1 at 109/2-9. See, e.g., Exh. H. The sales communications as such were of no significance to Styller or ICT, and is of marginal relevance to this case. If there was any "incriminating" information in them, it would have made its way up to Styller and into the 60,000 most relevant documents already produced –

---

[3] Plaintiffs produced over 15,000 responsive emails from Styller and over 12,000 emails to Styller; over 7,000 emails from Quinn and over 5,000 emails to Quinn; nearly 5,000 emails from Cheng and over 4,000 emails to Cheng. Plaintiffs also produced over a thousand emails to and from Cathy Yu, Jason Yuyi, and Mike Pekar together. Joffe Decl. ¶ 18. By contrast, Defendants HPFS and Gill produced 580 documents in total while Defendants HPE, HPI and HPFS India produced nothing at all.

yet, Defendants did not cite a single email showing that Plaintiffs rather than Defendants were responsible for the counterfeit transceivers on their summary judgment motion.[4]

## 2.     2013: Plaintiffs seek Defendants' help in securing freedom for the Individual Plaintiffs and a non-litigious resolution of the matter.

In January 2013, with the hopes for a quick release faded, ICT reached out to Defendants for help. On January 31, Quinn wrote to Silvestri that "a formal letter from HP will be very helpful explaining the situation & stating that ICT did in fact buy this batch of H3C material from HP. Your help is greatly appreciated!" Exh. I. For the next months, Styller continued to regard Defendants (albeit with mounting concerns) as helping to secure the Individual Plaintiffs' release in good faith, and sought a non-litigious resolution of the matter, maintaining frequent communications with Defendants without any threats of litigation.

For example, on February 25, Styller wrote to Silvestri stating that "we are working with David [Gill] trying to improve the situation in China." Dkt. 283-4. On March 12, Silvestri wrote to Styller that "I am not in the loop on this as it is at the top level leaders . . . So appreciate your working with David." Dkt. 283-5. In his March 13 response, Styller wrote "I wish I am not in the loop in this mess myself. Horrible damage to the company, our people and our financial position," and offering to "buy more product" from HPFS and "help recycling if you have any material for scrapping." Dkt. 283-5. On March 12, Styller wrote to Gill: "I am getting pressure from the families, elderly parents of our sales team members are going crazy," asking Gill's help to "provide some clarity and comfort to families. . . . [and] help them understand that HP and

---

[4] Defendants contend that 31 of the seized transceivers were counterfeit but did not come from them. However, Defendants also admit that none of those 31 transceivers' serial numbers is found in Plaintiffs' voluminous production. If they were procured by ICT, however, there should have been some record of it in Styller's ESI -- but there would be no record if those 31 transceivers were among the transceivers with unknown serial numbers shipped to China in lieu of the 299 transceivers that appeared on the Inventory List but actually remained in India.

ICT are working together to have all the mess cleaned up," to which Defendant Gill replied, "[w]e may need the counsel you have engaged to assist us." Dkt. 283-18.

The emails referenced above were deleted by Defendants in 2013 but preserved by Styller, see Dkt. 283 pp. 10-11. Plaintiffs also preserved and produced numerous other communications with Defendants of the same tenor; indeed, there are no threats or hints of litigation whatsoever in ICT's June 12, 2013 letters to HP's CEO Whitman and its General Counsel Schultz. Exhs. J-K. This evidence shows that Plaintiffs consistently sought a non-litigious resolution of the matter and did not decide to proceed towards litigation in 2013.

Defendants for their part cite several communications, mostly between Styller and Ryan Quinn, to show that Plaintiffs nevertheless anticipated litigation in 2013; however, even Defendants' best evidence only confirms that Plaintiffs took a non-litigious route, made no threats of litigation, did not retain litigation counsel, and did not decide to pursue litigation in 2013. Thus, according to Defendants, in the February 15, 2013 email exchange, "Quinn encouraged seeking financial damages" from HP, sent Styller his estimates, and asked for Styller's thoughts. Dkt. 321-12. In response, however, Styller wrote: "My thoughts was to initiate closure of the case through the internal recourses and H3C connections." Exh. L. It is undisputed that Styller did not threaten litigation or made a demand upon Defendants following the February 15 exchange (aside from RMA which he pursued in a regular course of business).

The March 12 email exchange that Defendants characterize as "Consultation with Counsel" was prompted by Styller's inclusion of his personal and business attorney Riordan in correspondence with Gill. Riordan corresponded with Defendants from March 2013 until August 2014, but was not retained to represent any Plaintiff in any litigation with Defendants at that

time, and only played a limited role in the eventual litigation filed two and a half years later.[5] In the email exchange, Styller half-heartedly discussed the "jurisdictional mess" with Quinn, but he was not in favor of litigation at that time. Dkt. 321-1 at 297/2-21. What Defendants omit is Styller's own response to Quinn's suggestions: "I think they are legitimate organization and covering up simple thing as result of the inspection is not a good idea." Exh. M.[6]

This was also the case with the alleged "March 17, 2013 Discussion of Suing HP," where Ouinn wrote: "Got email from jades family that they can not take this anymore. Jades mom is very ill from this stress. The 3 families are planning to sue HP in china. I will call them tonight to discuss further. I think then we can also inform HP. We should tell parents that you plan to sue HP as well, and share compensation with them." Dkt. 321-15. Quinn did write what he thought, but Styller did not follow up on any of Quinn's suggestions. ICT, Styller and the Individual Plaintiffs did not bring this action until December 2015; the families never sued HP in China, and did not bring their claims here until 2017; Quinn did not bring his claims until 2018.

In June 2013, Styller sent several law firms an email setting forth the facts of the situation, but nothing came out of it and none were retained in 2013 (or ever); Styller did not proceed any further in 2013, and did not retain litigation counsel until December 2015. What Defendants labelled as "Consideration of Case Against HP/H3C" is Styller's exchange with Cathy Yu's Chinese attorney on July 19, 2013, just after the release, when Styller learned that it

---

[5] When the litigation was filed in 2015, Riordan served as local counsel in the early stages of the case; as Riordan attested in his withdrawal papers, "Plaintiffs entrusted the case to Attorney Joffe at the inception of the case," with Riordan's own role "limited to facilitating the filing of the papers during the initial stages of litigation." Dkt. 71 ¶ 5.

[6] As Styller testified at deposition, "I was under impression that HP is good, legitimate, honest, and fair organization who is acting in good faith, and they are big and too spread out to different places and countries and time zones and languages, so that's why they just cannot make things and put their stuff together. That's – that was my -- that was my position." Dkt. 321-1 at 299/9-15. See also id. at 300/1-301/6. ("A. March of 2013, my -- in my head were a few things. One is I needed to get my people out of jail. Two, I needed to get my RMA money back from – from HP. And – and another thing was that I was doing business with HP, I was trying to preserve our good relationship with business unit. Those are three things on my mind.").

was H3C who made the initial complaint to the PSB, and asked for "documents showing that H3C was behind false witness and was lying that our product is fake, or H3C was negligent and didn't know what they have done, or HP sold us actually fake product. I need those documents that we can sit down with my attorney and review and see *if* there is a case against HP/H3C or there is nothing"; "we need to see documents to make decision *if* we can make a case or we may want to decide *if* we want to sue H3C in China or do nothing at all"; "we will take our time to study and then decide *if* we want to sue H3C/Hp/Hp India/HP Asia Pacific in China/USA/India or anywhere else."). Dkt. 321-22. In 2013, these "ifs" were *not* resolved in favor of litigation.

Defendants also cite an August 19 email from Cheng stating "[w]hen the [no crime] letter is issued, I'd like to do something with ICT together, such as sue h3c/HP there in the states," which was sent in response to Styller's email: "I didn't understand the phrase 'Today, I had a talk with Caroline, we don't want to continue to lost our current time into the past, we will just use a simple way to close it--- sue H3C/HP in USA with ICT in the future.'" Dkt. 321-23. And in response to Jade Cheng's clarification, Styller merely wrote "I understand. Thank you for explanation," without commenting on, let alone committing to, any future litigation. Exh. N.

As Plaintiff Styller explained at deposition: "I had a lot of angry people around me, so people who lost their jobs and people who'd been in prison and family members who've been – who've been struggling, figuring out when are they going to see their relatives, and they've been trying to push me and -- and put me into strange, awkward position." Dkt. 321-1 at 297/15-21; see also id. at 305/3-9 ("I'm trying to balance and make sure that I keep peace with everybody, that nobody -- nobody goes crazy, because I am the owner and I am the manager of ICT. I need to protect ICT interest, and as I said, the most important thing is the secure release of our people."); Tr. 305/15-306/3 ("My position was always until . . . sometime in 2014 that HP was

honest and ethical organization and they're doing everything they can to help us out. But I have a lot of angry people, and those angry people trying to put pressure on me, and this is very sensitive issue.").

Also in early 2013, ICT shipped the remaining equipment from China to the US and subsequently liquidated it through reselling and recycling in a regular course of ICT's recycling business. Keeping that equipment in China after the PSB raid destroyed ICT's business there made no sense and only cost ICT unnecessary storage and handling fees. Dkt. 321-1 at 273/23-275/19. That equipment contained *no* transceivers and had little relevance to this case. Id. at 266-67.[7] Indeed, the only transceivers remaining from the Commonwealth Games batch were then in Dubai in the custody of TT Global – and those were ordered *destroyed by Defendants themselves* due to their "questionable" nature and origination in the Spring of 2013. Dkt. 331-9.

### 3.   2014: Styller's and Cheng's emails preserved in the email migration; the Individual Plaintiffs' laptops returned by the PSB damaged beyond repair.

Plaintiffs did not pursue litigation in 2014 either, still hoping for a non-litigious resolution. In his January 9, 2014 letter to Defendants' counsel McCarthy, Riordan wrote that "ICT is absolutely committed to resolving all issues with its marketing partners," concluding that "we would be happy to discuss a global resolution. . . . If I do not hear from you, I will assume that the time is not ripe. Feel free, likewise, to provide my contact information to your litigation counsel. We can certainly, at this juncture, agree to disagree." Exh. O. Though litigation was mentioned as an option in the letter, Plaintiffs did not unequivocally threaten it, and were still

---

[7] The transceivers were all either sold by the Individual Plaintiffs prior to the arrest or seized by the PSB during the raid. See Dkt. 321-10 p. 6 ("As shown in ICT's sales records (ICT0000948), ICT sold 1716 transceivers (1586 SFPs with part number H3C-0231A536 and 130 XFPs with part number H3C-0231A438), and 781 were seized in the raid, making for the total of 2497 transceivers."). The three unaccounted for transceivers were likely sent as samples to customers and not returned, but in any event were not part of the equipment remaining in the warehouse. Dkt. 321-1 at 274/7-277/11.

considering a non-litigious resolution later that year, with Riordan in August still asking for information on Defendants' inspection of the equipment and the RMA refund, reserving its rights but not threatening litigation. Exh. P.

From March to September 2014, ICT migrated its IT infrastructure to the cloud-based Office365, transferring the email accounts of its current employees, including Styller's, as well as Cheng's active ICT email account (cheng@ictcompany.com) established in July 2013 after Cheng's release from prison.[8] Pekar's email account was not preserved in the 2014 migration as he was no longer ICT's employee; however, while at ICT, Pekar had followed the same rule of copying Styller on anything of importance to ICT's business and operations, and "the only exception was that when Pekar was communicating with HP, he had his own way of communicating, and he didn't keep me [Styller] in the copy." Dkt. 321-1 at 104/1-4. Except for Pekar's emails with HP, which Plaintiffs did not have in their possession at the time of migration (but Defendants did, and produced dozens of them), Pekar's emails were retained by Styller, and over 1,000 responsive emails "to" or "from" Pekar were produced.[9]

In August-September of 2014, the PSB released the Individual Plaintiffs' personal laptop computers seized in 2012 raid. The computers had been stored in the police department, piled on a wet stone floor, for over a year-and-a-half, and returned to Plaintiffs damaged beyond repair. After unsuccessful attempts to power them up at home and at their local computer shops, the Individual Plaintiffs separately disposed of their computers damaged in the PSB's custody by selling them for parts. Dkt. 321-2 at 24/3-32/3.

---

[8] Cheng's prior email account jade@ictcompany.com was terminated on the eve of his arrest in December 2012, as were Cathy's, Jason's and Ryan's accounts, and not transferred to the cloud.

[9] Caroline Marafao Cheng was never part of ICT or its email system and "used her old computer to communicate during the relevant period by email carol-cheng@live.hk. She left that computer in China but all her communications are retained on the live.hk server" Dkt. 183 p. 4 (Final ESI Protocol); Plaintiffs retrieved them and produced 60 responsive emails "to" or "from" carol-cheng@live.hk. Joffe Decl. ¶ 19.

# ARGUMENT

## I.      Legal Standards

Rule 37(e) provides that if ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," then a court "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." Rule 37(e)(1). Subsection (e)(2) provides that a court may impose severe sanctions, such as an adverse inference or dismissal, "only upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation."

Defendants "bear the burden of proving the threshold requirements that relevant evidence has been lost and cannot be replaced, that it should have been preserved, and that it was not preserved because [Plaintiffs] failed to take reasonable steps to preserve it. It is also [Defendants'] burden to prove that [Plaintiffs] acted with the intent to deprive it of use of that evidence in this litigation." Postle v. Silkroad Tech., Inc., 2019 D.N.H. 26, 3 (D.N.H. 2019) (internal citation omitted). Courts in this Circuit have applied a *clear-and-convincing* standard to discovery misconduct and Rule 37(e) sanctions. See Anderson v. Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988); Wai Feng Trading Co. Ltd v. Quick Fitting, Inc., 2019 WL 118412, at *5 (D.R.I. Jan. 7, 2019); Postle, 2019 D.N.H. 26 at 3-4.

## II.      No duty to preserve at the time of the alleged spoliation

"[S]poliation is the 'intentional, negligent, or malicious destruction of relevant evidence.'" Gordon v. Dreamworks Animation SKG, Inc., 935 F. Supp. 2d 306, 313 (D. Mass. 2013). "[D]eletions, alterations, and losses cannot be spoliation unless there is a duty to preserve the information, a culpable breach of that duty, and resulting prejudice." Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010). "[C]ourts must be

mindful that 'perfection in preserving all relevant electronically stored information is often impossible,' as well as that this factor requires consideration of the ***litigation sophistication*** of the party in possession of the ESI and the ***proportionality*** to the litigation of costly and aggressive preservation efforts." <u>Wai Feng</u>, No. 13-33 at *12-13.

"It goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it." <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). "If [Plaintiffs] had no such duty, then [they] cannot be faulted." <u>See</u> <u>also</u> <u>Forest Labs. v. Caraco Pharm. Laboratories</u>, No. 06-CV-13143, at *3 (E.D. Mich. Apr. 14, 2009) (same). "[C]ase law in existence prior to the newly amended Rule 37(e), regarding when the duty to preserve attaches, still controls." <u>Philmar Dairy, LLC v. Armstrong Farms</u>, No. 18-cv-0530, at *5 (D.N.M. July 11, 2019).

"***[M]uch more than a 'mere possibility of litigation'***" is required to trigger that duty. <u>In re Abilify Prods. Liab. Litig.</u>, No. 3:16-md-2734, at *11 (N.D. Fla. Oct. 5, 2018); <u>see</u> <u>also</u> <u>Philmar</u>, No. 18-cv-0530 at *5-6 (same); <u>RealNetworks, Inc. v. DVD Copy Control Ass'n, Inc.</u>, 264 F.R.D. 517, 523–24 (N.D. Cal. 2009) (the future litigation must be "***probable***"); <u>Indem. Ins. Co. of N. Am. v. Liebert Corp.</u>, 1998 WL 363834, at *3 (S.D.N.Y. Jun. 29, 1998) ("***likely to be commenced***"). In denying a motion for sanctions in <u>Abilify</u>, the court noted that the duty to preserve arises when a party is "on notice of a ***credible probability*** that it will become involved in litigation, ***seriously contemplates*** litigation, or when it takes ***specific actions to commence*** litigation." <u>Id.</u>, at *2-3.

On the plaintiff's side, the Ninth Circuit held that plaintiff had no duty to preserve evidence until it "***determined legal action was appropriate***." <u>Millenkamp v. Davisco Foods Int'l</u>, 562 F.3d 971, 981 (9th Cir. 2009). Other courts have found that "[a] spoliation sanction is proper

where . . . a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." Jones v. Norton, 809 F.3d 564, 580 (10th Cir. 2015), quoted in Philmar Dairy, LLC v. Armstrong Farms, No. 18-cv-0530, at *4-5 (D.N.M. July 11, 2019); accord Trask-Morton v. Motel, 534 F.3d 672, 681 (7th Cir. 2008); Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136, 1149 (10th Cir. 2009); see also McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149, 154 (D. Mass. 1997) ("Gorelick, the leading and possibly the only treatise on the subject of destruction of evidence, identifies four elements that a court must find before imposing sanctions for the destruction: . . . (4) Occurrence of the act at a time after suit has been filed, or, if before, at a time when the filing is *fairly perceived as imminent*.").

Defendants urge the Court to "determine that the Plaintiffs reasonably anticipated litigation by a date certain (as early as February 2012)," Dkt. 322 p. 13, even though this litigation did not crystalize until almost four years later. As shown below, Plaintiffs' duty to preserve was not triggered on any of dates put forth by Defendants because Plaintiffs had chosen to pursue a non-litigious route and had not "determined legal action was appropriate" then.

Thus, Plaintiffs' discovery of the poor quality of the equipment in February 2012 did not trigger any duty because Plaintiffs never contemplated or brought any claims against Defendants based on the poor quality of the equipment as opposed to its counterfeit nature, see Dkt. 101. In December 2012, Styller deleted email accounts of his Chinese team because they feared the PSB -- not in anticipation of any litigation with Defendants, which was not on the horizon yet. Even if the Individual Plaintiffs owed any duty to the PSB at the time (and they did not), the courts have rejected the "shifting duty" rationale as a basis for spoliation sanctions. See In re Delta/Airtran Antitrust Litig., 770 F. Supp. 2d 1299, 1307-8 (N.D. Ga. 2011) (rejecting the argument that a

demand by the DOJ triggered a duty to preserve evidence for use in later litigation by plaintiffs); Abilify, No. 3:16-md-2734 at *13-14 (same).

Throughout 2013, litigation remained no more than a remote and uncertain possibility. See Design Basics, LLC v. Drexel Bldg. Supply, Inc., No. 13-C-560, at *3 (E.D. Wis. Sep. 12, 2016) ("[T]he present lawsuit was too remote and speculative to give rise to a duty to preserve the evidence in question."); Perez–Garcia v. P.R. Ports Auth., 871 F. Supp. 2d 66, 69 (D.P.R. 2012) ("No duty to preserve documents arises prior to the foreseeable filing of an action."); Massachusetts v. Mylan, Inc., No. 03-11865, at *2 (D. Mass. July 12, 2010) (no spoliation occurred when the shredding took place while the case was "*only in the investigatory stage*"); Wai Feng, No. 13-33, at *20 ("At the time of the first electronic communication in issue . . . Quick Fitting had asserted no claims and sent no preservation notice. Therefore, the Wai Feng parties were not subject to a duty to preserve,") citing Hefter Impact Techs., LLC v. Sport Maska, Inc., 2017 WL 3317413 (D. Mass. Aug. 3, 2017).

Plaintiffs' extensive correspondence with Defendants in 2013 plainly shows Plaintiff's choice of a non-litigious route. See Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc., 244 F.R.D. 614, 623 (D. Colo. 2007) (letters that "hinted at the possibility of a non-litigious resolution" did not trigged a duty to preserve: "a party's duty to preserve evidence in advance of litigation must be predicated on something more than an equivocal statement of discontent, *particularly when that discontent does not crystalize into litigation for nearly two years*."); Schlumberger Tech. Corp. v. Greenwich Metals, Inc., 2009 WL 5252644, at *5 (D. Kan. Dec. 31, 2009) (duty to preserve not triggered where "it appears the parties were trying to reach a resolution"); Goodman v. Praxair Servs., Inc., 632 F. Supp. 2d 494, 511 (D. Md. 2009) ("It may

be that a letter that merely identifies a dispute but expresses an invitation to discuss it or otherwise negotiate does not trigger the duty to preserve evidence").

Styller's fleeting contact with law firms in June 2013 did not lead anywhere, and neither did Quinn's and Jade Cheng's speculations about suing. As Styller testified, he and ICT resisted the pressure and did not follow their suggestions at the time, choosing a non-litigious route without giving any serious consideration to a lawsuit. See Moore v. Lowe's Home Ctrs., LLC, No. 2:14-cv-01459-RJB, at *7 (W.D. Wash. June 24, 2016) ("'[M]erely because one or two employees contemplate the possibility that a fellow employee might sue does not generally impose a firm-wide duty to preserve,'") quoting Zubulake, 220 F.R.D. at 217; Crown Castle, 2010 WL 1286366, at *9 ("[T]he duty to preserve evidence may arise when a substantial number of key personnel anticipate litigation," but "speculation by one or two employees regarding a lawsuit" is insufficient); Richard Green v. McClendon, 262 F.R.D. 284, 289 (S.D.N.Y. 2009) (duty can arise when "relevant individuals anticipate becoming parties in imminent litigation.").

Plaintiffs' designation of certain documents created in 2013 as protected by attorney-client and work-product privileges (Dkt. 321-16) does not signify that litigation was imminent, probable, or likely to commence at that time. See Salvatore, 2009 WL 943713 at *7 (rejecting the argument that defendants' assertion of work product immunity established that defendants anticipated litigation for the purpose of triggering the duty to preserve); Hynix, 591 F. Supp. 2d at 1064 ("The fact that Rambus has previously claimed work product protection . . . does not dictate a finding that Rambus was anticipating litigation at the time the documents were created."). This Court, too, has held that Defendants had done nothing wrong by deleting their relevant emails in 2013 *after* they had an "internal meeting to discuss litigation" in mid-March

14

and claimed work product protection for the TT Global verification report prepared in April.[10] See Dkt. 300 p. 3 ("The existence of the missing emails sent or received months before the litigation hold was put into place therefore fails to undermine the integrity of Defendant's ESI production in any way, let alone to a level sufficient to warrant reconsideration.").

Moreover, Styller was trying to preserve ICT's business relationship with HP at that time, and "**when parties have a business relationship that is mutually beneficial . . . litigation will generally be less foreseeable than would litigation resulting from a relationship that is not mutually beneficially or is naturally adversarial**." Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1131, 1325 (Fed. Cir. 2011). See also Philmar, No. 18-cv-0530 at *10 ("The parties' previously amicable relationship weighs against assuming that the fire would have made litigation imminent.").

The 2014 email migration preserved email accounts of ICT's then-current employees including Styller's, as well as Cheng's account opened after his release in 2013. Pekar's email account was not transferred to the cloud as he was no longer an ICT employee, but Pekar's internal communications were preserved by Styller, while his correspondence with Defendants remained in Defendants' own hands. See A.O.A. v. Rennert 2018 WL 11251827, at *3 (E.D. Miss. March 12, 2018) (refusing sanctions because "nothing before me indicates [that the] process of changing computer systems was unreasonable," and the failure to preserve was not an attempt to suppress the truth); Micron, 645 F.3d at 1322 ("[T]here is the innocent purpose of simply limiting the volume of a party's files and retaining only that which is of continuing value. One might call it the 'good house-keeping' purpose.").

---

[10] See, e.g., Dkt. 331-10, privilege log entry 282 ("Email prepared because of litigation by David Gill reflecting preparation for internal meeting to discuss litigation"); log entries 309, 321, 324, 330, 335, 345, 346, 347, 349, (concerning documents prepared "because of litigation" in March 2013); Dkt. 257 p. 22 (the TT Global verification report was "withheld as work product because it was specifically generated at the direction of counsel").

The Individual Plaintiffs' laptops were damaged beyond repair while in police custody and out of Plaintiffs' control, and "absent some of control over the evidence which is in the possession of a nonparty, the plaintiff is not under a duty to act." <u>Townsend v. American Insulated Panel Company</u>, 174 F.R.D. 1, 5 (D. Mass. 1997); <u>see also</u> <u>Rimkus</u>, 688 F. Supp. 2d at 615-16 (a party seeking sanctions must establish that "the party with control over the evidence had an obligation to preserve it at the time it was destroyed"). After the PSB returned the laptops, they were impossible to power up and no longer accessible. <u>See</u> <u>Forest Labs.</u>, No. 06-CV-13143 at *6 ("[I]f the backup tapes destroyed after the trigger date were 'inaccessible,' Plaintiffs were under no duty to preserve them under the general rule."); <u>Hefter</u>, No. 15-13290, at *13 ("[E]ven if the Court assumed that CCM's cursory approach to document production resulted in Gibson's laptop being wiped prior to a thorough review, sanctions are inappropriate because there is insufficient evidence from which to find that CCM acted with the requisite intent, or that HIT will suffer prejudice."); <u>Clark Constr. Group</u>, 229 F.R.D. at 136 ("A party is under no duty to 'preserve every shred of paper, every e-mail or electronic document.").

## III.   No intent to deprive Defendants of any evidence

"The current version of Rule 37(e)(2) provides for the possibility of severe sanctions where a court finds that a party acted with intent to destroy evidence, but rejects the imposition of sanctions under that provision where a party is found to be negligent or grossly negligent. . . . Where electronically-stored information is lost due to the negligence or gross negligence of a party, amended Rule 37(e)(1) permits only the imposition of sanctions that are 'no greater than necessary to cure the prejudice.'" <u>Hefter</u>, No. 15-13290 at *12. "[O]f particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party and the degree of fault of the offending party." <u>Collazo-Santiago v. Toyota Motor Corp.</u>, 149 F.3d 23,

29 (1st Cir. 1998) (no dismissal where "[t]he plaintiff neither maliciously destroyed evidence nor deliberately attempted to prevent the defendant from inspecting the vehicle.").

"The intent requirement in Fed. R. Civ. P. 37(e)(2) is 'stringent' -- it must be based on more than just negligence or even gross negligence in producing or preserving ESI. See Knight, 323 F. Supp. 3d at 845; Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment." Wai Feng, No. 13-33, at *15. In Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 42 (1st Cir. 2017), the First Circuit "counseled that, in light of our 'prefer[ence] that adjudications be driven by the merits of a case,' McKeague v. One World Techs., Inc., 858 F.3d 703, 707 (1st Cir. 2017), dismissal should be granted only in *extreme cases*," citing Collazo-Santiago, 149 F.3d at 28, and Benjamin v. Aroostook Med. Ctr., 57 F.3d 101, 107 (1st Cir. 1995). An adverse inference, too, "is predicated on bad conduct of the defendant. Moreover, the circumstances of the act must manifest bad faith. Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." Vick v. Tex. Empl. Comm., 514 F.2d 734, 737 (5th Cir. 1975).

No negative inference of intent or bad faith should be drawn from the deletion of the Chinese team's email accounts at the time of their arrest in December 2012. First, Plaintiffs deleted their email accounts not because they had "something to hide" but to protect themselves against the feared PSB, which was a reasonable act in a totalitarian society. Second, all emails of any importance (and, as such, involving Styller) were preserved and produced to Defendants. See Rimkus, 688 F. Supp. 2d at 620 (S.D. Tex. 2010) (refusing adverse inference instruction where the record "presents conflicting evidence about the reasons the defendants deleted the emails and attachments, . . . and an extensive amount of other evidence for the plaintiff to use").

Likewise, the absence of a litigation hold at the time of the alleged spoliation does not show any intent to deprive Defendants of evidence. First, as shown above, the ESI was lost at the

17

time when litigation was a remote possibility and when Plaintiffs had no litigation counsel to advise them of their duties and to issue a legal hold. Second, courts have "reject[ed] the notion that a failure to institute a 'litigation hold' constitutes gross negligence *per se*. . . . Rather, we agree that 'the better approach is to consider [the failure to adopt good preservation practices] as one factor' in the determination of whether discovery sanctions should issue. . . . Even if we assume *arguendo* both that the Port Authority was grossly negligent and that the documents here were 'relevant,' we have repeatedly held that a 'case-by-case approach to the failure to produce relevant evidence,' at the discretion of the district court, is appropriate." Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012); see also Bouchard v. USTA 2017 WL 3868801 (S.D.N.Y. Sept. 5, 2017) (denying a motion for sanctions despite the absence of a use of a litigation hold and noting that the failure to adopt good preservation practices is only "one factor in the determination"). In Eshelman v. Puma, 2017 WL 2483800, at *5 (E.D. N.C. June 7, 2017), like here, the party did not have a formal document retention or destruction policy, and a litigation hold was not issued until later. The court concluded that the loss "at most" resulted from negligent conduct, and there was no showing that depositions could not provide the same information.

Finally, ICT's recycling of the remaining equipment that did not include transceivers in 2013 in its regular course of business, and the Individual Plaintiffs' disposal of their personal laptops damaged beyond repair by the PSB, show neither intent nor negligence on Plaintiffs' part, and pale in comparison with the deliberate destruction of the "questionable" TT Global transceivers ordered by Defendants in 2013 while the criminal investigation was ongoing.

## IV. <u>No prejudice to Defendants</u>

"Courts recognize that a showing that the lost information is relevant and prejudicial is an important check on spoliation allegations and sanctions motions. Courts have held that

speculative or generalized assertions that the missing evidence would have been favorable to the party seeking sanctions are insufficient." Rimkus, 688 F. Supp. 2d at 616. See Simon v. New York, 2017 WL 57860 (S.D.N.Y. Jan. 5, 2017) (the loss must be of sufficient consequence to have made a difference in pursuit of claims or presentation of defenses).

"[P]roof that the lost ESI is *important or material to a significant issue* should fall on the movant." Wai Feng, No. 13-33 at *13-14, citing Hefter, 2017 WL 3317413, at *7 (no prejudice where laptop was wiped when there was no duty to preserve and any lost material was "*on the margin*."). The Individual Plaintiffs' low-level sales communications are "on the margin" at best: the unsold transceivers were all seized by the PSB; the sold transceivers were obviously not part of the seized transceivers at issue in the case; and all actual sales were documented in invoices, emails with Styller, and ICT's QuickBooks. Dkt. 321-1 at 176/12-16. If there were any communications concerning the counterfeit nature of those transceivers, they would have without doubt come to Styller's attention and made their way into Plaintiffs' 60,000-document production of the most relevant documents.

Defendants have had Plaintiffs' emails for many months. If there was anything in those emails to show that Plaintiffs were responsible for the counterfeit equipment, Defendants would have been remiss not to highlight it on their summary judgment motion. But there is not a scintilla of evidence of any scheme by Plaintiffs to sell somebody else's counterfeit transceivers instead of the "genuine H3Cs" from HP itself at hand. Indeed, there is little room for any such scheme because 750 of 781, or 96% of the seized transceivers, have been traced to Defendants' Master List of the equipment (with the remaining 4% disputed). And the recycled equipment is even less relevant – there were no transceivers in that lot, and the recycled parts had no relevance to this case and were recycled in ICT's regular course of business with Defendants' knowledge.

19

Finally, "the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties," Rule 37(e) Advisory Committee's note to 2015 amendment, which is a fair description of the situation here. "In light of the weak showing of prejudice and [Plaintiffs'] lack of intent to deprive [Defendants] of evidence, severe sanctions against [Plaintiffs] are not warranted." Hefter, No. 15-13290 at *16.

## V.      No bad-faith in discarding damaged laptops or recycling irrelevant parts

"Amended Rule 37(e) forecloses reliance on the Court's inherent authority to sanction for spoliation of ESI." Philmar, No. 18-cv-0530, at *4, citing Newberry v. Cty. of San Bernardino, 750 F. App'x 534, 537 (9th Cir. 2018). With respect to the non-ESI evidence – the damaged laptops and recycled non-transceiver equipment – the standard for finding spoliation under the inherent authority requires the showing of intent or bad faith. See Hefter, No. 15-13290, at *14-15; Gordon, 935 F. Supp. 2d at 313; Sharp, 872 F.3d at 42 (declining to give adverse inference instruction or to dismiss claim absent bad faith despite lost physical evidence). Individual Plaintiffs' disposal of their personal laptops damaged in the PSB custody, and ICT's recycling of the remains of the equipment (without transceivers), show neither bad faith nor intent to deprive.

## CONCLUSION

Plaintiffs admitted that some of their ESI had been lost, and undertook considerable efforts to make up for that loss by searching otherwise "inaccessible" sources such as archived and encrypted data. These efforts resulted in the 60,000-document production, including almost daily emails between Styller and his team in China prior to their arrest. The allegedly spoliated ESI of marginal relevance was lost before Plaintiffs were under any duty to preserve it, without any bad faith or intent to deprive on their part. Plaintiffs respectfully submit that Defendants' motion should be denied on these grounds.

Dated: April 30, 2020

Respectfully Submitted,

Dimitry Joffe
Joffe Law P.C.
765 Amsterdam Avenue, 2C
New York, NY  10025
Tel: (917) 929-1964
Email: dimitry@joffe.law

Joshua McGuire
THE LAW OFFICE OF JOSH MCGUIRE
51 Winchester Street, Suite 205
Newton, Massachusetts 02461
(617) 461-6400
Email: josh@joshmcguirelaw.com
*Counsel to Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Dimitry Joffe, hereby certify that on this 30th day of April 2020, I caused a copy of

Plaintiffs' Opposition to Defendants' Motion for Sanctions to be served by ECF upon

Defendants' counsel of record.

_____
Dimitry Joffe
JOFFE LAW P.C.
Counsel to Plaintiffs

22