UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC. et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil No. 16-10386-LTS ) |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY et al., | ) ) ) |
| Defendants. | ) ) |

ORDER ON MOTION FOR SPOLIATION SANCTIONS (DOC. NO. 320)

August 13, 2020

SOROKIN, J.

Defendants seek various sanctions pursuant to Fed. R. Civ. P. 37(e) for Plaintiffs' alleged failure to preserve—and their alleged deliberate or reckless spoliation of—electronically stored information (ESI) potentially relevant to this litigation.  Doc. No. 320.[1]  The motion is fully briefed and the Court heard argument on July 9, 2020.  For the reasons that follow, the Defendants' motion is ALLOWED IN PART insofar as the Court: (a) finds that Plaintiffs willfully and recklessly destroyed various kinds of evidence that was potentially relevant to this litigation after their duty to preserve such evidence had been triggered, and (b) imposes the sanctions detailed below.  The motion is otherwise DENIED.

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

I.    <u>FACTS</u>

The events that gave rise to this litigation began in early 2012, when Plaintiff ICT received certain "H3C-manufactured" transceivers it had purchased from Defendant HPFS India and discovered that the equipment "was in a substandard condition (scrap-grade), with physical damage, rust, scratches and other defects, and not marketable as anticipated." <u>Doc. No. 101</u> ¶¶ 26, 47; <u>Doc. No. 321-10 at 7-8</u> (supplemental response to interrogatory). A dispute arose between Plaintiffs and Defendants over the ensuing months regarding the quality of the transceivers. By July 2012, Mr. Alexander Pekar, the then-employee of ICT who had established ICT's relationship with HP, was "working hard with HP on the price reduction for the remainder of H3C shipments." <u>Doc. No. 321-10 at 8</u> (supplemental response to interrogatory).

On December 9, 2012, the Chinese police raided ICT's offices, seized 781 transceivers, and arrested Plaintiffs Cathy Yu and Jason Yuyi based on allegations that they were selling counterfeit H3C equipment. <u>Doc. No. 341</u> (Joint Statement of Undisputed Facts) ¶¶ 7, 9. Their supervisor, Plaintiff Jade Cheng, was arrested on December 21, 2012, when he went to the Haidian Detention Center searching for his missing colleagues. <u>Id.</u> ¶ 8; <u>Doc. No. 101</u> ¶ 55. Plaintiffs allege that the raid and arrests were precipitated by a report to the Chinese police alleging that ICT was selling counterfeit H3C equipment. <u>Doc. No. 341</u> ¶ 10. When the Individual Plaintiffs were arrested, the Chinese police also seized their personal laptop computers, which the Individual Plaintiffs had used for ICT-related work. Doc. No. 321-36 (Styller Dep. Tr.) at 12:10-16:22.

Plaintiff Styller has testified that after Individual Plaintiffs Cathy Yu and Jason Yuyi were arrested, and before Plaintiff Jade Cheng went to the police department in search of them, Styller authorized the erasure of the Individual Plaintiffs' email accounts, and that of another then-current ICT employee, Ryan Quinn, at Cheng's request, so as to prevent the Chinese police from accessing

the content of those accounts.  Doc. No. 321-35 (Styller Dep. Tr.) at 201:18-203:19; 206:23-209:9; 220:7-15; 231:17-232:14; 238:13-239:4.  Cheng transmitted his request that Styller authorize the deletion of their email accounts through Quinn.  Id. 201:18-203:19; 205:20-206:17.  Styller complied with the request immediately.  Id. at 209:1-9.  The accounts contained email correspondence on which Plaintiff Styller was not copied.  Id. at 100:13-17; 109:3-1011:11; 125:4-13; 135:5-139:22; 140:11-141:7; 143:16-19.  Plaintiffs did not first backup the emails or take any other steps to preserve the information the emails contained before destroying them, and they are not preserved.

In February 2013, Plaintiff Styller and another ICT employee assessed their damages from the "ruined" operation in China at over $2 million.  Doc. No. 321-43 at 2.  The following month, they discussed the question of where a legal action to resolve the dispute might be brought, noting that the contract between the parties identified Massachusetts as the proper forum.  Doc. No. 321-44 at 2.  Also in March 2013, they discussed the possibility that the Family Plaintiffs would bring a lawsuit against HP in China, and the possibility that ICT would also sue HP and share any compensation it received with the Family Plaintiffs.  Doc. No. 321-46 at 2.

For documents created as far back as April 2, 2013, Plaintiffs have claimed work product protection for documents on the ground the documents were prepared in anticipation of litigation.  See Doc. No. 321-16 at 2 (privilege log).  On June 10, 2013, Plaintiff Styller sent various law firms a factual "brief" describing the facts giving rise to this lawsuit.  See Doc. Nos. 321-47, 321-48, 321-49.  The following month, Ryan Quinn, a former employee of Plaintiff ICT, informed one of the Family Plaintiffs that Styller was planning to sue HP.  Doc. No. 321-50.  Also in July 2013, Styller emailed a Chinese lawyer to discuss the potential "case against HP/H3C" and whether they should "sue H3C in China."  Doc. No. 321-52 at 11-12.

On July 17, 2013, the Individual Plaintiffs were released on bail after 7 months' incarceration, and Chinese authorities later issued them "no criminal record" letters. Doc. No. 341 ¶ 11. Plaintiffs continued to pursue non-litigious resolutions of their dispute with defendants throughout 2013 and 2014. Doc. No. 344 at 8-12. Plaintiff Styller has testified that he first anticipated litigation by late spring/early summer 2014. Doc. No. 321-35 at 311:24–312:6.

Sometime in the summer or early fall of 2014, the Individual Plaintiffs were asked to retrieve their seized belongings from the police. These included their personal laptop computers, which they had used for ICT-related business in China (the Seized Computers). Doc. No. 321-36 (Styller Dep. Tr.) at 18:21–19:14; 20:24–22:17; 25:5–27:8; 34:4–35:5; Doc. No. 321-35 (Styller Dep. Tr.) at 101:19–22; 259:18–24; Doc. No. 321-54. The Seized Computers apparently did not work when they were retrieved from the Chinese police, so the Individual Plaintiffs sold them for parts to avoid the cost of repair. Doc. No. 321-36 (Styller Dep. Tr.) at 31:7–32:21; 35:6–39:5. They did so without first retrieving any data off of the Seized Computers. Doc. No. 321-36 (Styller Dep. Tr.) at 37:22–39:12. There is no evidence suggesting that anyone undertook a forensic examination of these computers.

Around the same time—July to September 2014—ICT migrated its email from a physical server to the cloud (the "Email Migration"). Doc. No. 321-35 (Styller Dep. Tr.) at 60:23–61:9; 189:9–190:22; Doc. No. 321-42. The Individual Plaintiffs' emails and those of ICT employee Ryan Quinn had already been erased so they were not affected by the Email Migration. Doc. No. 321-35 (Styller Dep. Tr.) at 194:8–200:8; 205:16–207:9; 231:18–232:5; 235:22–237:4; Doc. No. 321-9. When ICT decided to migrate its email from a physical server to the cloud, it made a business decision to migrate only the emails of its then-current employees. Doc. No. 321-35 (Styller Dep. Tr.) at 96:7–11; 192:2–194:1. It therefore did not migrate the emails of its former

employee, Alexander Pekar, who had "developed the relationship between ICT and HP, communicated about the equipment, and traveled to India to inspect equipment not yet shipped to and ultimately not purchased by ICT." Doc. No. 322 at 9-10 (citing amended complaint, Doc. No. 101 ¶¶ 25-36, 50). ICT then "repurposed" the storage device backing up the physical server resulting in the overwriting, over time, of Mr. Pekar's email account. Doc. No. 321-35 (Styller Dep. Tr.) at 86:17–20; 88:3–20; 92:17–94:7; 186:8–188:2; 190:23–192:1; 233:18–234:13; Doc. No. 321-42.

In December 2015, ICT and some of the other Plaintiffs filed an action in state court against some of the Defendants. Those Defendants removed the action to federal court. Thereafter, the original Plaintiffs amended the complaint adding claims, plaintiffs and defendants. Not until March 2016 did Plaintiffs' counsel issue any litigation hold notice. Doc. No. 321-10 at 9 (supplemental response to interrogatory). The hold was issued verbally, not in writing, and only to Plaintiff Styller, who did not communicate it to anyone else. See Styller Dep. Tr. (Doc. No. 321-35) at 288:1–290:17. Styller "told no one to preserve evidence. Even when ICT migrated its emails, Styller did not tell any IT personnel or the outside vendor performing the migration about the need to preserve any evidence." Doc. No. 322 at 17 (citing Styller Dep. Tr. (Doc. No. 321-35) at 190:23–194:1).

## II.    LEGAL STANDARD

"The duty to preserve evidence arises when litigation is reasonably anticipated." Gordon v. Dreamworks Animation SKG, Inc., 935 F. Supp. 2d 306, 314 (D. Mass. 2013) (internal quotation marks and citation omitted). "Spoliation can be defined as the failure to preserve evidence that is relevant to pending or potential litigation." Gonzalez-Bermudez v. Abbott Labs. PR Inc., 214 F. Supp. 3d 130, 160 (D.P.R. 2016) (internal quotation marks and citation omitted).

Courts have inherent power to impose sanctions on parties that have spoliated evidence. Chambers v. NASCO, Inc., 501 U.S. 32, 43-45 (1991). "In determining what sanctions to apply upon a finding of spoliation, courts consider, among other things, whether a party acted in good faith or bad faith, and whether prejudice resulted from the destruction of evidence." Hefter Impact Techs., LLC v. Sport Maska, Inc., No. 15-13290-FDS, 2017 U.S. Dist. LEXIS 122122, *21-22 (D. Mass. Aug. 3, 2017). "[O]f particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party and the degree of fault of the offending party." Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998).

"Willful or purposeful destruction of relevant evidence can lead to the 'ultimate' sanction of dismissing a claim. Courts may also impose the lesser sanction of an adverse inference in cases of willful destruction of documents." In re Pharm. Indus. Average Wholesale Price Litig., No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 100125, *70 (D. Mass. Mar. 14, 2007) (internal citation omitted). Mere negligence may also be sufficient to merit sanctions. Id. (citing Sacramona v. Bridgestone/Firestone Inc., 106 F.3d 444, 447 (1st Cir. 1997)).

Rule 37(e) of the Federal Rules of Civil Procedure permits a variety of sanctions for spoliation of evidence, which vary in accordance with the prejudice to the moving party and the intent of the spoliator. Rule 37(e)(1) provides that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37 (e)(1).

More severe sanctions are available under Rule 37(e)(2), which applies "only upon finding that the party acted with the intent to deprive another party of the information's use in the

litigation." Fed. R. Civ. P. 37(e)(2).  If the court makes such a finding, it "may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."  Id.

The First Circuit has explained that "[t]he intended goals behind excluding evidence, or at the extreme, dismissing a complaint, are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss of evidence."  Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 42 (1st Cir. 2017) (quotation marks and citation omitted).  "While a district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  Id. (quotation marks and citation omitted).  The court has counseled that in light of its "preference that adjudications be driven by the merits of a case, . . . dismissal should be granted only in extreme cases."  Id. (quotation marks, modification, and citations omitted).

## III.   DISCUSSION

Plaintiff Styller conceded in his testimony that he anticipated litigation by late spring/early summer 2014, before ICT undertook the Email Migration.  Doc. No. 321-35 at 3011:24–312:6. Clearly, Plaintiffs had a duty to preserve any ESI they had at that time that might be relevant to this litigation—including most particularly the email of their former employee, Alexander Pekar, who had established the relationship with HP and was with ICT as the events giving rise to this litigation unfolded.  They did not do so.

But the record shows that Plaintiffs anticipated litigation well before the late spring/early summer of 2014.  By their own (albeit implicit) admission, Plaintiffs anticipated litigation by April

2, 2013, because they have claimed work product protection going back that far.  See Doc. No. 321-16 at 2 (privilege log).  The work product doctrine protects work done by an attorney in anticipation of litigation from discovery by the opposing party.  Blattman v. Scaramellino, 891 F.3d 1, 4 (1st Cir. 2018).  Thus, claiming work product protection for a document withheld from discovery is an admission that litigation was anticipated at the time the document was created. Plaintiffs cannot in the same breath both claim and dispute that they anticipated litigation as of April 2, 2013.

Other evidence confirms the basis for the privilege assertion as 2013 progressed.  On June 10, 2013, Plaintiff Styller sent various law firms a factual "brief" describing the facts giving rise to this lawsuit.  See Doc. Nos. 321-47, 321-48, 321-49.  The following month, in July 2013, ICT employee Ryan Quinn, informed one of the Family Plaintiffs that Styller was planning to sue HP. Doc. No. 321-50.  The same month, Styller emailed a Chinese lawyer to discuss the potential "case against HP/H3C" and whether they should "sue H3C in China."  Doc. No. 321-52 at 11-12.

Plaintiffs' anticipation of litigation did not begin on April 2, 2013, however.  In February 2013, Plaintiff Styller and another ICT employee assessed their damages from the "ruined" operation in China at over $2 million.  Doc. No. 321-43 at 2.  This was plainly an evaluation with an eye toward litigation.  The following month, in March 2013, they discussed the question of where a legal action to resolve the dispute might be brought, noting that the contract between the parties identified Massachusetts as the proper forum.  Doc. No. 321-44 at 2.  They also discussed the possibility that the Family Plaintiffs would bring a lawsuit against HP in China, and the possibility that ICT would also sue HP and share any compensation it received with the Family Plaintiffs.  Doc. No. 321-46 at 2.

Plaintiffs argue that these communications are irrelevant because Plaintiffs continued to pursue non-litigious resolutions throughout 2013 and 2014, and that the prospect of litigation was therefore neither desired nor likely at that time.  Doc. No. 344 at 8-12.  That is not the issue.  The question is not whether Plaintiffs desired litigation or whether they believed it was likely.  The question is whether they reasonably anticipated litigation.  In re Pharm. Indus. Average Wholesale Price Litig., 2007 U.S. Dist. LEXIS 100125, *73 ("The weight of authority indicates that a duty to preserve evidence arises when a party knows or should know about potential litigation.").  All of the foregoing facts triggered Plaintiffs'[2] duty to preserve evidence by the spring of 2013.

The Court finds, however, that Plaintiffs reasonably anticipated litigation even earlier—at least by the time of the arrest of the first two ICT employees in December 2012.  At that point, Plaintiffs had been unhappy for some time with Defendants' performance under the contract and they were arrested for selling goods that they then believed and still believe they received from Defendants, which, according to the Chinese police, were counterfeit.   Thus, Plaintiffs' duty to preserve evidence was triggered at least by December 2012, when the Individual Plaintiffs were arrested.

From the time their duty to preserve evidence arose, Plaintiffs breached their duty by: (a) willfully destroying the Individual Plaintiffs' work email accounts without first backing them up, (b) willfully failing to preserve additional evidence by selling their Seized Computers for parts without recovering any information that may have been stored on those computers, (c) recklessly undertaking the Email Migration in 2014 without preserving the emails of a former company employee, Alexander Pekar, who had knowledge of the relevant events as they unfolded in 2012,

---

[2] The Court need not probe here whether the duty arose at different times for different Plaintiffs.

and (d) negligently failing to issue a litigation hold until months after this action was initiated and then failing to communicate it to the relevant employees.

Plaintiffs argue that these actions are of no consequence and that there has been no prejudice to Defendants because the destroyed and lost evidence was "of marginal value" or "marginal relevance." Doc. No. 344 at 5. Unfortunately, Plaintiffs have no evidence to support this assertion. And contrary to Plaintiffs' assertions that all relevant emails were preserved during even when the email accounts of the Individual Plaintiffs were erased after they were arrested because Plaintiff Styller was copied on all emails, Doc. No. 344 at 5, Plaintiff Styller himself concedes that he was not copied on all the emails of the Individual Plaintiffs, who are Chinese nationals, because these emails were often in Chinese, which Styller does not read, see Doc. No. 322 at 14 ("Styller also now concedes that he was not copied on all correspondence sent or received by these custodians (he does not speak Chinese), despite Plaintiffs' prior position that nothing of substance could have been lost because Styller was copied on all email.") (citing Styller Dep. Tr. (Doc. No. 321-35) at 100:13–17; 109:3–111:11; 125:4–13; 135:5–139:22; 140:11–141:7; 143:16–19). It is not possible now to recover all that was lost, much of which consisted of highly relevant and material documents that were otherwise unavailable.

The Court need not now determine whether Plaintiffs' various actions were motivated by bad faith or by an intent to deprive Defendants of relevant evidence. Nevertheless, "mere negligence in the destruction of evidence is sufficient to merit sanctions" if the prejudice to the non-offending party is substantial. In re Pharm. Indus. Average Wholesale Price Litig., 2007 U.S. Dist. LEXIS 100125, at *70. Given the facts recited above, the Court finds that the prejudice to Defendants from the destroyed or lost evidence is substantial. The parties' key disputes include the circumstances surrounding the sale of the transceivers at issue, the items the ICT employees

sold in China, and the post-sale communications between the parties.  Meaningful discovery on all of these questions has been lost due to Plaintiffs' actions.  Thus, pursuant to Rule 37(e)(1), the Court orders that in connection with Plaintiffs' claims and Defendants' corresponding defenses thereto, the Court will consider imposing all of the following sanctions: (a) permitting the introduction of evidence, by all parties, regarding the destruction or loss of evidence as well as the reason(s) therefor; (b) precluding testimony from Plaintiffs regarding the content of any unpreserved ESI; and (c) an appropriate instruction permitting the drawing of an adverse inference.

Defendants also request that, pursuant to Rule 37(e)(2), the Court draw an adverse inference against Plaintiffs in connection with Defendants' pending motion for summary judgment as to the counterfeiting claims.  Doc. No. 322 at 23.  Specifically, Defendants ask the Court to draw an adverse inference against Plaintiffs regarding 31 transceivers that did not appear on Plaintiffs' inventory list, and whose origin is a matter of dispute between the parties.  Id.  The Parties agree that the 31 transceivers at issue were counterfeit but disagree as to who supplied them.  Insofar as Defendants request that the Court (1) draw an adverse inference against Plaintiffs regarding the origin of the 31 counterfeit transceivers, and (2) allow their motion for summary judgment as to those transceivers based upon that inference coupled with the fact that these transceivers do not appear on the Plaintiffs' inventory list, the request is DENIED WITHOUT PREJUDICE.  The Court will consider Defendants' request later when it determines the appropriate response to Plaintiffs' discovery actions.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for spoliation sanctions (<u>Doc. No. 320</u>) is

ALLOWED IN PART as described herein and is otherwise DENIED.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge