UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC. et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 16-10386-LTS |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY et al., | ) ) ) | |
| Defendants. | ) ) ) | |

ORDER ON PENDING MOTIONS (DOC. NOS. 315, 318, 334, and 339)

August 13, 2020

SOROKIN, J.

In response to the joint suggestion of all the parties, the Court phased the discovery and motion practice in this case. The parties first exchanged paper discovery and then proceeded to submit dispositive motions focusing on Plaintiffs' allegation that HPFS India sold counterfeit goods to ICT. Thus, prior to the filing of the now-pending motions, the parties had completed discovery on this issue. All parties requested that the Court resolve the counterfeiting allegation before they and the Court proceeded to the remainder of the discovery or further dispositive motion practice. In March, the Court established a firm trial date of May 3, 2021 with all of the foregoing proceedings occurring prior to that date. See Doc. No. 312.

Several motions are pending before the Court: Defendants' motion for summary judgment as to the counterfeiting counts (Counts I – VI) (Doc. No. 315)[1]; Defendants' motion to exclude

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

1

Plaintiffs' counterfeiting expert witness (Doc. No. 318); Plaintiffs' combined cross-motion for summary judgment as to the counterfeiting counts and motion to exclude Defendants' counterfeiting expert witness (Doc. No. 334); and Defendants' motion to strike Plaintiffs' combined cross-motion for summary judgment as to the counterfeiting counts and motion to exclude Defendants' counterfeiting expert witness (Doc. No. 339). The motions are extensively briefed and the Court heard argument on July 9, 2020.

After careful review of the parties' submissions and arguments, the Court ALLOWS Defendants' motion for summary judgment (Doc. No. 315); ALLOWS IN PART Defendants' motion to exclude Plaintiffs' counterfeiting expert (Doc. No. 318); DENIES Plaintiffs' cross-motion for summary judgment (Doc. No. 334); DENIES Plaintiffs' motion to exclude Defendants' expert (Doc. No. 334); and DENIES Defendants' motion to strike (Doc. No. 339).

I.   BACKGROUND

Counts I – VI of the operative Complaint are all based on an allegation that the goods at issue in this case—the transceivers that HPFS India sold to ICT in 2012 and that were seized by the Chinese police, which led to the imprisonment of the Individual Plaintiffs (the Seized Transceivers)—were counterfeit (the Counterfeiting Counts). These counts are: fraudulent misappropriation (Count I); negligent misrepresentation (Count II); breach of contract (Count III); fraudulent inducement (Count IV); breach of warranty (Count V); and breach of M.G.L. 93A (Count VI). Doc. No. 101 ¶¶ 237 – 289.

Defendants note the plain and uncontested legal proposition that for Plaintiffs to prevail on any one or all of these claims, Plaintiffs must establish that the goods sold by HPFS India to ICT were counterfeit at the time of sale. Defendants move for summary judgment as to these Counterfeiting Counts principally on the grounds that Plaintiffs have no admissible evidence to

prove that the Seized Transceivers were in fact counterfeit; Defendants contend they also have admissible evidence proving that a majority of the Seized Transceivers were genuine. <u>See generally</u> <u>Doc. No. 316</u>. Defendants also move to exclude the testimony of Plaintiffs' expert witness on the grounds that he is unqualified to render an opinion as to whether the Seized Transceivers were counterfeit, and that even if he were so qualified, his opinion must be excluded because it improperly relies on inadmissible hearsay. <u>See generally</u> <u>Doc. No. 319</u>.

Plaintiffs oppose Defendants' motion for summary judgment on the grounds that their evidence that the Seized Transceivers are counterfeit is admissible and that there are genuine issues of material fact as to Defendants' evidence that the Seized Transceivers are authentic. <u>See generally</u> <u>Doc. No. 330</u>. Plaintiffs also oppose Defendants' motion to exclude their expert witness, arguing that he is qualified and that his opinion is based on admissible evidence. Doc. No. 332.

Plaintiffs cross move for summary judgment as to the same six Counterfeiting Counts. <u>Doc. No. 334</u>. In the same motion, Plaintiffs seek to exclude the testimony of Defendants' counterfeiting expert. <u>Id.</u> Defendants move to strike or summarily deny Plaintiffs' cross-motion on the grounds that Plaintiffs failed to comply with Local Rule 7.1

The Court addresses each motion in turn.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir. 1995) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256

(1986)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

On a motion for summary judgment, courts are "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  At the same time, courts may not credit "conclusory allegations, improbable inferences, and unsupported speculation."  Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008).  When cross-motions for summary judgment are presented, courts "must consider each motion separately" and draw all inferences against each moving party in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

III.   DISCUSSION

    A.   Defendants' Motion for Summary Judgment as to the Counterfeiting Counts (Doc. No. 315) Defendants' Motion to Exclude Plaintiffs' Counterfeiting Expert (Doc. No. 318), and Plaintiffs' Motion to Exclude Defendants' Counterfeiting Expert (Doc. No. 334).

The Court begins with Defendants' motion for summary judgment, drawing all reasonable inferences in Plaintiffs' favor, as the Court must on Defendants' motion.  Defendants assert that Plaintiffs lack any admissible evidence that the Seized Transceivers were in fact counterfeit.  See generally Doc. No. 316.

      1.  <u>Plaintiffs' fact evidence of counterfeiting</u>

To support their claim that the equipment sold by HPFS India to ICT was counterfeit,[2] Plaintiffs rely principally on two documents[3]—the "Verification Report," an undated document that purports to contain H3C's statements to the Chinese police regarding the Seized Transceivers, <u>Doc. No. 331-18</u>,[4] and the "Security Bulletin," a document allegedly printed from H3C's website in the summer of 2014, <u>Doc. No. 317-4 at 41-53</u>.[5]

Defendants object to both documents, contending each constitutes inadmissible hearsay. <u>Doc. No. 316 at 10</u>.  Hearsay evidence is inadmissible unless one of the exceptions to the hearsay rule applies, for "'[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment' for the truth of the matter asserted."  <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir. 2014) (quoting <u>Dávila v. Corporación de P.R. para la Difusión Pública</u>, 498 F.3d 9, 17 (1st Cir. 2007)); <u>see also</u> Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

---

[2] For purposes of the pending motion, Defendants assume, without conceding, that the goods sold by HPFS India to ICT and the Seized Transceivers are one and the same as Plaintiffs contend.

[3] As discussed in the next section, Plaintiffs also rely on the testimony of their expert witness, Dr. Nicholas Fang, who in turn relied on the same two documents to arrive at his opinion of counterfeiting.

[4] There are two versions of the Verification Report in the record, one at <u>Doc. No. 331-18</u>, which contains a version in Chinese and a certified English translation provided by Defendants, and another at Doc. No. 266-5, which contains what appears to be the same Chinese version, and an uncertified English "office translation," provided by Plaintiffs.  Because Plaintiffs do not contest the accuracy or completeness of the certified English translation in <u>Doc. No. 331-18</u>, the Court refers to that version of the Verification Report here.

[5] Plaintiff Alexander Styller has submitted an affidavit attesting that he downloaded the copy of the Security Bulletin in effect in August 2014 from H3C's website.  <u>See Doc. No. 331-15</u>, ¶¶ 11-14.  It is this version of the Security Bulletin on which Plaintiffs rely and to which the Court refers herein.

Plaintiffs allege H3C sent the Verification Report, <u>Doc. No. 331-18</u>, to the Chinese police to substantiate H3C's assertion that ICT's employees in China were selling counterfeit goods in violation of Chinese law.   <u>Doc. No. 330 at 12</u>.   Unsurprisingly, H3C wrote the document in Chinese.   <u>See</u> <u>Doc. No. 331-18 at 14-24</u>.   Defendants have produced an official English translation of the document, <u>id.</u> at 2-13, the accuracy and completeness of which Plaintiffs do not contest.

According to the English translation provided by Defendants, the Verification Report appears to be a statement by H3C asserting that the Seized Transceivers were compared with genuine H3C products in terms of product packaging, product appearance, and labeling, and that the Seized Transceivers bore indicia of being inauthentic with reference to all three dimensions, thus infringing H3C's trademark.   <u>See</u> <u>Doc. No. 331-18 at 3-13</u>.   The Verification Report does not bear a date, <u>see id.</u>, and there is no evidence in the record indicating when it was transmitted to the Chinese police.

According to the record before the Court, the Security Bulletin on which Plaintiffs rely appeared on H3C's website in 2014.   <u>See</u> <u>Doc. No. 331-15</u>, ¶¶ 11-14 (Styller Aff.).[6]   It depicts various security labels featuring holograms that were being used on H3C products to make it easier for consumers and others to determine whether goods bearing H3C labels were genuine or fake. <u>See</u> <u>Doc. No. 317-4 at 41-53</u>.   The Security Bulletin describes various characteristics and dimensions of the new security labels in detail.   <u>See</u> <u>id.</u>

---

[6] There are two versions of the Security Bulletin in the record—one in Chinese (<u>Doc. No. 317-4 at 41-45</u>) and one in English (<u>id.</u> at 46-53).   It is not clear whether the English version also appeared on H3C's website in 2014, or was generated by  Plaintiff Styller using Google Translate.   <u>See</u> <u>Doc. No. 331-15</u> ¶ 11.

*a. The Verification Report is not hearsay*

Plaintiffs seek to rely on the Verification Report to establish that the Seized Transceivers were in fact counterfeit. That is, they seek to rely on the truth of the matters asserted within the Verification Report to prove their allegation that the Seized Transceivers were counterfeit. To do so, Plaintiffs must first establish that the document is not hearsay.[7]

Plaintiffs contend the Verification Report is admissible as "a non-hearsay statement by a party-opponent under Rule 801(d)(2) because it was co-authored by Defendants themselves and HP's wholly-owned subsidiary H3C acting on behalf of HPFS India, and produced and authenticated by Defendants themselves." Doc. No. 330 at 29.

The Verification Report is not the statement of a party-opponent in any direct sense. H3C is not now, and has never been, a party to this action; thus, it is not a party-opponent. Still, Plaintiffs advance other theories by which the Verification Report qualifies under the party-opponent provision of Rule 801(d)(2). The Court addresses each theory in turn.

First, Plaintiffs contend that the Verification Report is either "Defendants' own statement under Fed. R. Evid. 801(d)(2)(A)," or "their adoptive statement under Rule 801(d)(2)(B)." Doc. No. 332 at 15. Rule 801(d)(2)(A) provides that a statement that "was made by the party in an individual or representative capacity" is not hearsay. And Rule 801(d)(2)(B) provides that a statement that "the party manifested that it adopted or believed to be true" is not hearsay.

---

[7] That the Chinese police "heard" or received H3C's statement as to whether the Seized Transceivers were in fact counterfeit does not render the document admissible for the truth of the matter asserted here: i.e., that the Seized Transceivers were counterfeit. Plaintiffs have not argued that the Verification Report is admissible merely to establish H3C's state of mind, rather than for the truth of the matter that the Seized Transceivers were counterfeit. Thus, this argument is waived. In any event, such use under the present circumstances would merely be an improper recasting of the use of the document for the truth of the matters asserted.

Plaintiffs present no evidence to support their contention that Defendants "made" the statements in the Verification Report, or that they  co-authored the Verification Report in accordance with Fed. R. Evid. 801(d)(2)(A).   Their only support for their contention that Defendants participated in drafting the verification report is a series of entries on Defendants' privilege log referencing a "verification report," which Plaintiffs speculate is the H3C Verification Report at issue.  See Doc. No. 332 at 14 n.4.  See also Doc. No. 341 ¶ 49 ("Following the inspection [of the Seized Transceivers], H3C and Defendants collaborated on drafting the Verification Report reflecting the results of that inspection.") (citing Doc. No. 331-10 (Privilege Log entries 410, 414, 416, 417, 420, 427, 428, 429, 430, 431, 433, 446, and 651) and Doc. No. 258 ¶ 44).  Plaintiffs also contend that "Defendants' and H3C's representatives including David Gill, Liu Rui (lr@h3c.com and jesica.liu@hp.com), Stuart Patterson, Shawn Zhao (shawn.zhao@hp.com), Ching Chua (ching.chua@hpe.com), Yang Li (yang.li9@hpe.com), and Chun-Yu Zhu, (eric.zhu@hp.com) shared drafts, comments and advice on the Verification Report."  Id. ¶ 50.

Defendants dispute both of these contentions but cite to no record evidence to support their disagreement.  See id. ¶¶ 49-50 (responses).  Ordinarily, the Court would deem admitted any facts presented by Plaintiffs in the Joint Statement of Undisputed Facts that Defendants dispute without evidentiary support.  See, e.g., Zimmerman v. Cambridge Credit Counseling Corp., 529 F. Supp. 2d 254, 258 n.3 (D. Mass. 2008) (Ponsor, J.) ("Although Defendants lodged objections to a number of statements in Plaintiffs' [Rule] 56.1 statement, they often did not cite any record evidence to support their disagreement despite the requirement of Local Rule 56.1 that in opposing a motion for summary judgment a party must 'include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to

affidavits, depositions and other documentation.'  In such instances, the court has taken the Plaintiffs' account as true.") (quoting Local Rule 56.1) (internal citation to the record omitted).

Here, however, the record contains a sworn declaration by Defendants from earlier in these proceedings stating that "[n]o prior drafts of the verification report concerning the counterfeiting allegations, were logged as privileged because none were withheld as privileged."  Doc. No. 292 ¶ 43.  The declaration explained that the verification report referenced in entry 410 of the privilege log, which discloses an "[e]mail containing the legal advice of Jessica Liu [inhouse counsel at HP] enclosing verification report and draft letter" "refers to the verification report concerning the two sample devices sent by TT Global to H3C at the direction of counsel" and not to the H3C Verification Report at issue.  Id. ¶¶ 40-41.

In their reply in support of their motion for summary judgment, Defendants further explained that they "did not provide input, edits, or advice on drafts of the H3C Verification Report because they never received or had in their possession any drafts thereof in the first place." Doc. No. 342 at 10.  As the Court observed in its Order on Plaintiffs' motion for reconsideration, "Plaintiffs offer no basis to conclude that any such documents [i.e., drafts of the H3C Verification Report] were improperly withheld as privileged or within the scope of discoverable information but not produced."  Doc. No. 300 at 4.

Defendants have since submitted another sworn declaration stating that "[n]one of the April 2013 emails/privilege log entries cited by Plaintiffs relate to the verification report understood to have been submitted by H3C to the Chinese authorities (the "H3C Verification Report") and relied upon by Plaintiffs' expert, Dr. Fang."  Doc. No. 342-2 ¶ 3 (citing Doc. No. 332 at 14 n.4).  "Only two privilege log entries with the term 'verification report' reference emails related to the H3C Verification Report, which had previously been submitted to the PSB.  Both of those emails are

from July 2013 . . .," after the Verification Report had been submitted to the Chinese police.[8]
Id. ¶¶ 4-5.  Presumably, these are the "privileged communications about this verification report
[that] were withheld and were all logged."  Doc. No. 292 ¶ 44.  The Court therefore finds that
Plaintiffs have not met their burden of showing that the Verification Report is admissible under
the exception to the rule against hearsay provided by Fed. R. Evid. 801(d)(2)(A).

As for Plaintiffs' contention that the Verification Report comports with the requirements
of Fed. R. Evid. Rule 801(d)(2)(B) because Defendants have "manifested that [they] adopted or
believed [its statements] to be true," the First Circuit has held that "[t]he burden of showing the
manifestation is on the party offering the evidence."  Pilgrim v. Trustees of Tufts College, 118
F.3d 864, 870 (1st Cir.  1997).  The court went on to explain that it has "identified the correct
approach where documents are concerned as asking whether 'the surrounding circumstances tie
the possessor and the document together in some meaningful way.'"  Id. (citing United States v.
Paulino, 13 F.3d 20, 24 (1st Cir. 1994)).

The only evidence that any Defendant believed the statements in the Verification Report
to be true comes from a draft letter by HPFS India to the Chinese police dated March 25, 2013 that
HPFS India shared with Plaintiffs.  The letter does not make any reference to the Verification
Report, but it does refer to the Seized Transceivers as being "counterfeit":

> On 1 February 2013 ICT advised HPFS India that its representatives in China had
> been detained. ICT advised HPFS India that it believed that the seized equipment
> was the Sold Equipment [i.e., the equipment HPFS India sold to ICT].
>
> HPFS India immediately commenced investigating the matter. H3C inspected the
> seized equipment on behalf of HPFS India and also obtained lists of the seized
> equipment from the [insert name of relevant China police entity]. HPFS India

---

[8] Although the Verification Report is undated, it was likely submitted to the Chinese police before
July 2013, when the Individual Defendants were released from prison.  See also Doc. No. 331-13
at 3 (March 14, 2013 letter from Chinese police recommending prosecution of the Individual
Plaintiffs based in part on "7 documents").

compared this data against its data for the Sold Equipment.  Based on the available
evidence HPFS India believes that the counterfeit H3C equipment seized in China
is the same equipment sold by HPFS to ICT (through Shinto).

HPFS India has also viewed photos of the Sold Equipment taken prior to its import
into China. These photos were obtained from ICT's USA office and from the
company HPFS India engages in India to process and refurbish returned lease
equipment.  Based on these photos it appears that the logos currently affixed to the
Sold Equipment were present on the Sold Equipment at the time of the sale from
HPFS India to ICT. . . .

In these circumstances, notwithstanding that the seized equipment is counterfeit;
HPFS India does not believe that ICT or its representatives should reasonably be
held responsible for selling counterfeit equipment. Upon purchasing the
equipmpent [sic] from HPFS India and taking into account that both HPFS India
and H3C are ultimately owned by HP, ICT was entitled to assume that it was buying
genuine equipment. Based on the available evidence it would appear that, the
relevant counterfeiting activities occurred at some point in time prior to the return
of the Sold Equipment to HPFS India upon the expiration of the Leases. HP is
reviewing the initial sale to try to determine how the counterfeit equipment was
produced and who produced it.

Doc. No. 331-11 at 4 (emphasis and first modification added).[9]

HPFS India submitted its letter to the Chinese police the following month.  Like the March

25, 2013 draft letter, the letter HPFS submitted to the Chinese police, dated April 22, 2013, does

not make any reference to the Verification Report.  See Doc. No. 331-4.  But unlike the March 25

draft letter, it does not contain any statement suggesting that HPFS India believed that the seized

equipment was counterfeit.  See Doc. No. 331-4.

Given that the statement HPFS India actually made to the Chinese police did not manifest

a belief that the Seized Transceivers were counterfeit, and that the Plaintiffs have not pointed to

any other evidence tying Defendants and the Verification Report "together in some meaningful

---

[9] HPFS India went on to say that "in order to quickly resolve the situation, HPFS India humbly
requests that H3C be given access to the seized equipment as soon as possible in order to
conclusively confirm that the seized equipment and the Sold Equipment are one and the same[.]"
Id.  For purposes of the pending motions, Defendants do not dispute that the seized equipment and
the Sold Equipment are one and the same.

way," the Court finds that Plaintiffs have not met their burden of showing that the Verification Report is admissible under the exception to the rule against hearsay provided by Fed. R. Evid. 801(d)(2)(B), notwithstanding the text of the draft letter, which itself did not adopt expressly the Verification Report.

Next, Plaintiffs argue that to the extent the Verification Report is a statement of H3C and not of Defendants, it is nevertheless not hearsay because it is a "a statement by a person authorized by a party to make a statement concerning the subject." Doc. No. 332 at 15 (quoting Rule 801(d)(2)(C)). Plaintiffs contend that "Defendants directed H3C to inspect the transceivers on their behalf, participated in drafting the Verification Report, and requested, authorized and/or condoned H3C's submission of the Report to the PSB." Id.

The record does contain evidence that Defendant HPFS India directed H3C to inspect the Seized Transceivers on its behalf after the equipment had been seized and after H3C's initial inspection of the seized equipment. In its April 22, 2013 letter to Chinese police, HPFS India wrote:

> [C]ertain employees of ICT have been incarcerated by Public Security Bureau in China due to allegedly selling counterfeit H3C products. Furthermore, the relevant equipment was seized. After the equipment had been seized, H3C inspected this equipment and, based on the logos found on the equipment, believed that this equipment was counterfeit products.
>
> On 1 February 2013, ICT informed HPFS India about the above incident; ICT believed that the seized equipment was the Sold Equipment.
>
> HPFS India immediately started the investigation of this matter. H3C inspected the seized equipment on behalf of HPFS India and also obtained a partial list of the seized equipment from the Beijing City Haidian District Public Security Bureau.

See Doc. No. 331-4 at 3. In itself, however, this is not evidence that HPFS India or any of the other Defendants "participated in drafting the Verification Report," Doc. No. Doc. No. 332 at 15,

or otherwise "authorized" H3C's statements to the Chinese police.  Thus Rule 801(d)(2)(C) does not authorize admission of the document.

Next, Plaintiffs argue that Rule 801(d)(2)(D) also applies to render the H3C Verification Report a non-hearsay statement of a party-opponent because the Report is "a statement of Defendants' 'agent . . . concerning a matter within the scope of the agency . . . made during the existence of relationship.'"  Id. (quoting Rule 801(d)(2)(D)).  In support of this argument, Plaintiffs state that "[n]ot only was H3C a wholly-owned subsidiary of HP and a good candidate for Rule 801(d)(2)(D) as such, but in this particular counterfeiting matter H3C clearly acted as Defendants' agent and on its behalf."  Id. (citing Big Apple BMW Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1373 (3d Cir. 1992)).

Defendants concede that H3C was a wholly-owned subsidiary of HP in 2013, but argue that that is of no assistance to Plaintiffs, for such status does not transform H3C's statements into the statements of defendants on an agency theory.  Indeed, the very case upon which Plaintiffs rely establishes that even though H3C was a subsidiary entity when the events giving rise to this litigation took place, that is not enough to show that H3C's statements are Defendant's statements within the meaning of the rules of evidence.  As the Third Circuit explained in Big Apple, "[t]he statement of a subsidiary may be attributed to its corporate parent, consistent with agency theory, where the parent dominates the activities of the subsidiary."  974 F.2d at 1373.  The court also made clear that evidence of such domination was required before the statement of a subsidiary may be attributed to its corporate parent.  Id.  The fact of the subsidiary's status as a subsidiary is not enough.  See, e.g., Venegas v. Global Aircraft Serv., Civ. No. 14-249, 2016 U.S. Dist. LEXIS 130164, *7 (D. Me. Sept. 23, 2016) ("[T]he Plaintiffs, as proponents of the disputed evidence, must show that [company A] was [company B's] agent and that the statements were made within

13

the scope of their agency relationship" for company B's statements to be admissible as non-hearsay under Rule 801(d)(2)(D)).  Plaintiffs present no evidence of such dominance here,[10]

Nevertheless, Plaintiffs have presented admissible evidence in the form of the April 22, 2013 letter from HPFS India to the Chinese police, which permits the conclusion that H3C served as an agent of HP India for purposes of inspecting the seized goods.  Doc. No. 331-4 at 3 ("On 1 February 2013, ICT informed HPFS India about the [arrest of ICT's employees on counterfeiting charges]; ICT believed that the seized equipment was the Sold Equipment.  HPFS India immediately started the investigation of this matter.  H3C inspected the seized equipment on behalf of HPFS India and also obtained a partial list of the seized equipment from the Beijing City Haidian District Public Security Bureau.") (emphasis added); see also Doc. No. 331-18 (Verification Report) ("Transceivers seized from the 'Sales of Counterfeit Products by Chengyu Gang in Beijing Case' were compared in terms of product packaging and product appearance with authentic H3C products.").

"To qualify as nonhearsay under Rule 801(d)(2)(D), a statement must concern a matter within the scope of the declarant's agency or employment.  The statement itself is not required to be within the scope of the declarant's agency.  Rather, it need only be shown that the statement be related to a matter within the scope of the agency."  Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 72 (1st Cir. 2001) (internal quotation marks and citations omitted).  The Advisory Committee Notes to Rule 801(d)(2), which excepts statements made by party opponents from the rule against hearsay, explain that "[t]he freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance,

---

[10] Moreover, defendants assert that H3C "was a largely autonomous Chinese entity that became an HP subsidiary in 2010 as a result of HP's acquisition of 3Com."  Doc. No. 241 ¶ 53 (response). There is no contrary evidence.

and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility." Fed. R. Evid. 801(d)(2) Advisory Committee Notes. The Notes to Rule 801(d)(2)(D) further explain that the admissibility threshold for statements made by party opponents pursuant to an agency relationship have relaxed over time: "Since few principals employ agents for the purpose of making damaging statements, the usual result was exclusion of the statement. Dissatisfaction with this loss of valuable and helpful evidence has been increasing. A substantial trend favors admitting statements related to a matter within the scope of the agency or employment." Fed. R. Evid. 801(d)(2)(D) Advisory Committee Notes.

In light of this authority, and drawing all reasonable inferences in Plaintiffs' favor, HPFS India's April 22, 2013 letter, which states that H3C inspected the seized transceivers on behalf of HPFS India, Doc. No. 331-4 at 3, coupled with an examination of the Verification Report, which states that H3C inspected the transceivers after they had been seized by the Chinese Police, Doc. No. 331-18 at 3, together permit the conclusion that H3C made the statements in the Verification Report pursuant to an inspection it undertook on behalf of, and within the scope of its agency relationship, with HPFS India sufficient to admit the document into evidence under Rule 801(d)(2)(D).

Accordingly, the Court concludes that Plaintiffs have established that the Verification Report is a non-hearsay document that the Court may consider for the truth of the matters asserted therein.

### b.  The Security Bulletin is  hearsay

To the extent the failed arguments Plaintiffs advanced to support admission of the Verification Report also apply to the Security Bulletin, the arguments fail as to the Security

Bulletin for the same reasons.  In addition, the basis for admission of the Verification Report has no application to the Security Bulletin.

Plaintiffs make additional admissibility arguments specific to the H3C Security Bulletin. They contend that "[t]he photographs of the trademark H3C holographic logos and their optical patterns from the H3C Security Bulletin that Dr. Fang relied upon do not constitute 'statements' for hearsay purposes" because photographs do not qualify as assertions for purposes of the hearsay rule.  Doc. No. 330 at 29.  "These images currently appear on the official H3C website, have been produced by Plaintiffs, and there is no doubt as to their authenticity." Id.  There are three problems with this argument.  First, the issue is substantive admissibility—i.e., whether the document contains hearsay—not one of authentication.  Second, the images are statements that the document asserts are examples of genuine or counterfeit labels.  Finally and most importantly, Plaintiffs rely on the explanatory (Chinese) text to give meaning to the images.  They plainly rely upon the statements for the truth of the matters asserted therein: what are and are not counterfeit hologram labels, what are and are not signs of counterfeit products.  The Court therefore finds that the H3C Security Bulletin is hearsay and is not saved from this finding by the fact that it contains images.

Although Plaintiffs did not raise or argue for them, the Court also examined other potential exceptions to the rule against hearsay that might apply to the Security Bulletin and to the Verification Report.  One such exception applies if "the record [in question] was made at or near the time by—or from information transmitted by—someone with knowledge" and "the record was kept in the course of a regularly conducted activity of a business, . . . " and "making the record was a regular practice of that activity," provided that "all these conditions are shown by the testimony of the custodian or another qualified witness."  Fed. R. Evid. 803(6)(A)-(D).  Here, Plaintiffs do not offer the testimony of the custodian or another qualified witness as to the contents

of the Security Bulletin.  The exception to this requirement provided by Rule 803(6) also does not apply because Plaintiffs have not provided a certification complying with Rule 902(12) as to the Security Bulletin.  See Fed. R. Evid. 803(6)(D).[11]  For these same reasons, the business record exception to hearsay rule does not apply to the Verification Report.

Rule 803(17) also does not apply.  It recognizes as an exception to the hearsay rule "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." Fed. R. Evid. 803(17).  But neither the Security Bulletin nor the Verification Report involves compilations of disparate data points—the threshold fact that creates the basis for admission of evidence under this exception to the rule prohibiting hearsay.

Finally, the residual exception to hearsay provided by Rule 807 also does not apply. It provides:

---

[11] Rule 902(12) provides:

> In a civil case, the original or a copy of a foreign record that meets the requirements of Rule 902(11), modified as follows: the certification, rather than complying with a federal statute or Supreme Court rule, must be signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed. The proponent must also meet the notice requirements of Rule 902(11).

Fed. R. Evid. 902(12).  In turn, Rule 902(11) provides:

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record — and must make the record and certification available for inspection — so that the party has a fair opportunity to challenge them.

Fed. R. Evid. 902(11).

(a) In General. Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:

    (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

    (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

(b) Notice. The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing—or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

Fed. R. Evid. 807.

Plaintiffs have made no showing that the hearsay Security Bulletin   is "more probative" than other admissible evidence they could have gathered with "reasonable efforts."  Despite four years of litigation and substantial motion practice on peripheral issues, Plaintiffs point to no efforts at all, let alone "reasonable efforts" to obtain alternative admissible evidence.  They could have sought to take depositions of H3C employees with knowledge of the H3C's website, of the report submitted to the Chinese police, and of how H3C determines whether items are counterfeit or have counterfeit labels.  They made no such effort.  Doc. No. 341 ¶ 17.  Similarly, they could have served letters rogatory perhaps to transform the Security Bulletin into an admissible business record, to gather information regarding the circumstances of the making of the document, or to obtain similar business records.  They did none of these things.  Id.  Other avenues were available to them, but they pursued none of them.  Indeed, Plaintiffs identify no efforts at all that would satisfy this prong of the requirements of the residual exception. Thus, the residual exception does not apply.

For these reasons, the Court concludes that the Security Bulletin is hearsay evidence to which no exception applies and, as such, is not admissible for the truth of the matters asserted therein.

### 2. Plaintiffs' expert evidence as to the counterfeiting issue.

Defendants also challenge the admissibility of the opinion testimony of Plaintiff's expert witness, Dr. Nicholas Fang, on the counterfeiting issue.  Doc. No. 316 at 10-11; Doc. No. 318 (motion to exclude the testimony of Dr. Fang).

Dr. Fang is a professor of mechanical engineering at the Massachusetts Institute of Technology who specializes in optics, photonics and micro/nano manufacturing as well as nanophotonics, and conducts research related holograms.  Doc. No. 341 ¶ 17; Doc. No. 317-6 at 7 (21:9-17)).   The Court finds that Dr. Fang is an expert qualified to testify generally about holograms and to provide expert testimony both comparing holograms—such as whether the holographic labels on the Seized Transceivers match the holographic labels depicted in the Verification Report or Security Bulletin—and to identify the presence or absence of particular features in a hologram.  The Court assumes without deciding that evidence that the labels affixed to particular goods are counterfeit may be evidence that the goods themselves are counterfeit. Nonetheless, Dr. Fang's expert testimony falls short of the requirements of Rule 702.

To arrive at his opinion that the Seized Transceivers were counterfeit, Dr. Fang examined the labels on each of the 779 Seized Transceivers, compared those labels to images of labels in the H3C Verification Report and Security Bulletin identified in those documents as genuine or counterfeit, and determined that the labels on a majority of the Seized Transceivers contained indicia of counterfeiting as described in those two documents.  Doc. No. 332 at 10; see also Doc. No. 317-6 (Fang Dep. Tr.).

Insofar as Defendants generally object to Dr. Fang's testimony, that objection is OVERULED.  As noted above, he qualifies as an expert and may give testimony on the topics noted above.  Such testimony, however, provides no evidence that the Seized Transceivers are counterfeit or that their labels are counterfeit.  To reach those conclusions, Dr. Fang relied on the assertions in the text the Security Bulletin as to what constitute indicia of counterfeiting as well as which holograms are exemplars of genuine or counterfeit holograms.  Defendants object to Dr. Fang's reliance on those statements contending he relied improperly on inadmissible hearsay.

Plaintiffs point out that Rule 703 of the Federal Rules of Evidence permits experts to rely on inadmissible evidence in some circumstances.  It provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703.

Nothing in the record supports the conclusion that experts in Dr. Fang's "particular field would reasonably rely upon" the Security Bulletin or similar types of documents.  Dr. Fang is not an expert in brand identification or counterfeit goods.  Whether such an expert would reasonably rely upon such documents is not before the Court, but Dr. Fang cannot avail himself of that basis for he is not that type of expert.

Dr. Fang admitted in his deposition that he has never undertaken an evaluation of the kind he undertook in this case, i.e., to determine whether goods are counterfeit.  Doc. No. 317-6 (Fang Dep. Tr.) at 6 (20:3-7); id. at 7 (23:12-24:16); id. at 9 (31:10-17).  Unsurprisingly, then, he did not say—and could not have said—that experts in his field (or experts in any field for that matter) reasonably rely upon these types of documents, facts, or data (e.g., the Security Bulletin).  Plaintiffs

themselves offered no evidence that experts in Dr. Fang's field or experts in any other field reasonably rely upon these types of documents, facts, or data.

Nor do Plaintiffs offer any other basis for Dr. Fang to rely on the Security Bulletin.  Dr. Fang himself conceded that he does not know whether the counterfeiting indices contained in the Security Bulletin are in fact true and accurate indicators of counterfeiting applicable to the Seized Transceivers at issue. Id. at 6 (18:17-23); id. at 7 (23:12-24:16); id. at 8 (26:18-27:10).

Dr. Fang also relied on the Verification Report, see, e.g., id. at 6 (17:11-20), which the Court has determined is admissible.  Nonetheless this document provides no basis for Dr. Fang's opinions that the Seized Transceivers are counterfeit.  The Verification Report describes packaging, labels, product appearance, product condition, and the location of labels.  See generally Doc. No. 331-18.  The Court perceives no nexus between Dr. Fang's expertise and any of these statements, nor does the Court perceive the basis for an expert in optics to derive an opinion regarding counterfeiting from the information in the Verification Report.[12]

Thus, while Dr. Fang may testify about holograms generally, his opinions that the Seized Transceivers are counterfeit are STRUCK, as is his reliance on anything in the Security Bulletin. Accordingly, the Court ALLOWS IN PART Defendants' motion to exclude Plaintiffs' counterfeiting expert (Doc. No. 318).

### 3. Plaintiffs' motion to exclude defendants' expert (Doc. No. 334)

Defendants present the opinion of their own counterfeiting expert witness, Mr. Shelley Raina, who allegedly "has nearly twenty years of experience in the field of brand security and

---

[12] To the extent Dr. Fang concluded that logos in the Seized Transceivers were off-center based upon the discussion in the Verification Report of the location of the logos, the Court finds that is neither particular helpful testimony for the jury, nor within his optics expertise and in any event cannot support his counterfeiting opinions.

counterfeit prevention," that all of the Seized Transceivers that were sold by HPFS India to ICT, with the exception of one that was too damaged to completely analyze, were authentic, and that 31 of the Seized Transceivers that were not sold by HPFS India to ICT—and whose origin remains unknown—were counterfeit.  Doc. No. 316 at 11-12; see also Doc. No. 341 ¶ 34.  Mr. Raina based his conclusion that the majority of the Seized Transceivers were genuine on what Defendants describe as "a comprehensive testing methodology."  Doc. No. 316 at 11.

Plaintiffs move to strike Mr. Raina's expert report and testimony for two reasons: first, that he is biased because his consulting company, True Pedigree LLC, was "founded, owned, staffed, hosted, and controlled by Sideman & Bancroft LLP, a California law firm that serves as regular outside counsel to Defendants where Mr. Raina himself had been employed in a support staff position from January 2017 until January 2018, when the firm appointed him as the CEO of True Pedigree LLC."  Doc. No. 330 at 6.  Mr. Raina's alleged bias is not a basis to exclude him.  Cruz-Vazquez v. Mennonite Gen. Hosp., 613 F.3d 54, 59 (1st Cir. 2010) ("Assessing the potential bias of an expert witness, as distinguished from his or her specialized training or knowledge or the validity of the scientific underpinning for the expert's opinion, is a task that is properly left to the jury.") (internal quotation marks and citations omitted).  At most, an expert's bias goes to the weight or credibility of his testimony.  Id.

Second, Plaintiffs take issue with various aspects of Mr. Raina's methodology.  For example, they point out that Mr. Raina did not review the Verification Report even though it presented H3C's basis for believing that the Seized Transceivers were counterfeit—i.e., that the labels did not conform to H3C's standards—and he made no effort to evaluate that basis.  Doc. No. 330 at 20-23.  Plaintiffs also point out that Mr. Raina failed to undertake an evaluation of the holographic labels on the Seized Transceivers despite the HP Defendants' own reliance on

holograms for product authentication.  Id.; Doc. No. 341 ¶¶ 98-99.  Mr. Raina focused instead only on the Seized Transceivers' serial numbers, which are much easier to reproduce than are holographic labels.  Doc. No. 330 at 18.  Whatever its shortcomings might be, Mr. Raina's methodology is also not a basis to exclude his expert testimony.  Based on the record before the Court, Mr. Raina followed a methodology generally accepted in the field.  Milward v. Acuity Specialty Prods. Group, 639 F.3d 11, 15 (1st Cir. 2011) ("So long as an experts scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process . . . 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590, 596).  The alleged omissions or deficiencies in Mr. Raina's approach are trial matters going to the weight and credibility of his testimony.

Accordingly, Plaintiffs' motion to exclude Defendants' expert (Doc. No. 334) is DENIED.

4.  Plaintiffs have advanced sufficient evidence of counterfeiting for purposes of surviving summary judgment

Plaintiffs advanced three, and only three, sources of evidence to establish that the Seized Transceivers were counterfeit: the Verification Report, the Security Bulletin and the opinions of Dr. Fang.  Only the Verification Report is admissible.  Nonetheless, based on references Plaintiffs made at various points and on the Court's own independent review of the record, there are several additional pieces of relevant evidence concerning the possible counterfeit nature of the Seized Transceivers:  first, the twin facts that the Chinese police arrested the three ICT employees for selling counterfeit equipment—for these purposes the equipment sold to ICT by HPFS India—and that the Chinese police later exonerated these three employees.  However, these facts are of little, if any, significance because Plaintiffs have failed to offer any evidence of the legal standard

governing either of these conflicting actions by the Chinese police.  Without such evidence, there is no context or meaning to be derived from the actions.

Second, there is the March 25, 2013 draft letter by Defendant HPFS asserting that the Seized Transceivers are counterfeit.  Doc. No. 311 at 4 ("Based on the available evidence HPFS India believes that the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT . . .  [N]otwithstanding that the seized equipment is counterfeit . . .").  And third, Defendants admit that after the lease on the later-Seized Transceivers expired and the transceivers were returned to them in 2011, "Defendants considered reselling [the equipment] themselves and requested Inspira to provide the original importation documents, including the serial numbers of the Equipment and the corresponding bills of entry into India," but Defendants never received these documents despite multiple requests.  Doc. No. 342 ¶¶ 42-43.

The Court need not evaluate the significance, if any, of the March 25, 2013 draft letter or of Defendants' failure to obtain the original importation documents because, for purposes of summary judgment, the Verification Report is sufficient evidence permitting the conclusion that the Seized Transceivers are counterfeit.  This is so because it is an admissible document describing the results of an inspection made by the manufacturer acting as agent of Defendants. That the Defendants' expert concludes otherwise is not enough for Defendants to prevail on summary judgment even though there are no other conflicting expert opinions.

That said, although it is resolved for summary judgment purposes, the counterfeit issue is far from settled.  The only expert opinion—that of Mr. Raina, Defendants' expert witness—contradicts the Verification Report, although the weight of his testimony is subject to significant challenge.  Plaintiffs present the undated Verification Report with very little context.  Whether the Verification Report  describes an inspection conducted by H3C on behalf of HPFS India after it

had learned of the arrest of ICT's employees, or an inspection conducted by H3C prior to HPFS

India's learning of the arrests is not established.  One reading of the April 22, 2013 letter from

HPFS India to the Chinese police suggests that H3C inspected the seized items twice, once soon

after the items were seized and again later pursuant to HPFS India's request.  See Doc. No. 331-4

at 3 ("After the equipment had been seized, H3C inspected this equipment and, based on the logos

found on the equipment, believed that this equipment was counterfeit products.  On 1 February

2013, ICT informed HPFS India about the above incident . . .  HPFS India immediately started the

investigation of this matter.  H3C inspected the seized equipment on behalf of HPFS India . . .").

However, that is not the proper reading of the letter under the standard applicable to considering

Defendants' motion for summary judgment.

For these reasons, Defendants' motion for summary judgment as to the Counterfeiting

Counts (Counts I – VI) (Doc. No. 315) is DENIED.

### B.  Plaintiffs' Cross-Motion for Summary Judgment as to the Counterfeiting Counts (Doc. No. 334)

Plaintiffs cross-move for summary judgment as to Counterfeiting Counts.  Doc. No. 334.

Defendants' motion to strike or summarily deny Plaintiffs' motion on the grounds that Plaintiffs

failed to comply with Local Rule 7.1 (Doc. No. 339) is DENIED.[13]

As for the merits, Plaintiffs' cross-motion for summary judgment (Doc. No. 334) is

DENIED.  First, Defendants' expert's opinion alone is sufficient basis to defeat Plaintiffs' cross-

motion.  Second, even in the absence of that opinion, drawing all reasonable inferences in

Defendants' favor, the cross-motion fails because a finder of fact could reject the Verification

---

[13] The same ruling applies to Defendants' request to deny summarily the motion to strike
Defendants' expert (Doc. No. 339).

Report, conclude it is insufficient, or reject it as a statement of an inspection performed at the direction of HPFS India.  Any one of these reasons suffices.[14]

IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment (Doc. No. 315); ALLOWS IN PART Defendants' motion to exclude Plaintiffs' counterfeiting expert (Doc. No. 318); DENIES Plaintiffs' cross-motion for summary judgment (Doc. No. 334); DENIES Plaintiffs' motion to exclude Defendants' expert (Doc. No. 334); and DENIES Defendants' motion to strike (Doc. No. 339).

The parties shall file a status report within 14 days presenting their respective positions as to the further discovery and motion practice required in advance of the trial scheduled in this case.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[14] The parties agree that thirty-one of the Seized Transceivers are counterfeit.  As to these transceivers, Plaintiffs bear the burden to establish that they were supplied by Defendants. Because there are genuine issues of material fact regarding the origin of these 31 counterfeit transceivers, Plaintiffs' motion is denied even as to these concededly counterfeit transceivers.