# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI | Civil Action No. 1:16-CV-10386 (LTS) |

*Plaintiffs*,

v.

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, HEWLETT-
PACKARD FINANCIAL SERVICES (INDIA)
PRIVATE LIMITED, HEWLETT PACKARD
ENTERPRISE COMPANY, and DAVID GILL

*Defendants*.

---

**EXPERT REPORT OF DANIEL C.K. CHOW**

1.      On behalf of Plaintiffs in this litigation, I am submitting this report containing my expert opinions regarding (i) the criminal law and procedure of the People's Republic of China ("PRC" or "China"), (ii) anti-counterfeiting enforcement in the PRC, and (iii) the most advisable practices of a foreign parent corporation seeking to enforce the intellectual property of its wholly-owned China-based subsidiary.

2.      I currently hold the Bazler Chair in Business Law at the Ohio State University Moritz College of Law.  I received my B.A. (summa cum laude, Phi Beta Kappa) from Yale College in 1979 and my J.D. from Yale Law School in 1982.  After law school, I clerked for the Chief Judge of the federal district court for the Southern District of New York and was an associate at Debevoise & Plimpton LLP in New York City.

3.       I am the author of 15 books and over 60 scholarly articles in law reviews, including the leading casebook on International Business Transactions, the leading article on counterfeiting in China[1] and the leading article on the Foreign Corrupt Practices Act and China.[2]

4.       I have written extensively on counterfeiting and am widely considered to be an expert on counterfeiting in China.  I have testified before Congress related to counterfeiting and intellectual property rights infringement on several occasions and was featured on the CBS News Program 60 Minutes in a program entitled "The World's Greatest Fakes" about counterfeiting in China that aired in 2004.  I am fluent in Mandarin Chinese.

5.       From 1997-1999, I lived and worked in China as head of the legal department at Procter & Gamble (China), Ltd. ("P&G").  Among my other duties, I was in charge of protecting P&G's brands from counterfeiting.   In this role, I had broad responsibility for overseeing counterfeiting enforcement policies and practices and personally participated in numerous raids of counterfeiters at their premises along with private investigators and law enforcement officials, including local Administrations of Industry and Commerce (AICs).  I also met personally with the public security bureaus ("PSBs") in several cases concerning the criminal enforcement of trademark rights and trade secrets.

6.       In 1999, I led industry efforts on behalf of P&G in forming the China Anti-Counterfeiting Coalition, a group of leading multinational companies in China with serious counterfeiting problems, to work with the Chinese government in combatting counterfeiting.  I served as the first executive secretary of this group, which is still the leading industry group in China under its current name, the China Quality Brands Protection Committee.  I was the principal

---

[1]       Daniel C.K. Chow, *Counterfeiting in the People's Republic of China*, 78 Wash. U. L. Q. 1 (2000).

[2]       Daniel C.K. Chow, *China under the Foreign Corrupt Practices Act*, 2012 Wis. L. Rev. 573 (2012).

author of the China "White Paper" on counterfeiting for this industry group written in 2000 for the PRC at the request of the Development and Research Center of the State Council.

7.      Since leaving P&G I have remained involved in intellectual property matters in China as a consultant and legal expert in cases handled by U.S. law firms.  Recently, I served as an expert in several cases that involved using the internet to sell counterfeit goods from China and theft of biotechnology trade secrets in China.  A list of all the litigations or proceedings for which I submitted an expert report or testified within the last five years is attached as **Exhibit A**.

8.      I regularly write and review articles on counterfeiting and intellectual property rights in China.  A copy of my curriculum vitae, including a list of all publications I have authored in the last 10 years is annexed to this report as **Exhibit B**.

9.       I continue to travel to China frequently for business and personal reasons, and I frequently speak to Chinese lawyers and academics about intellectual property and other business issues in China.

## SCOPE OF ENGAGEMENT

10.      I have been asked to assess the practices and actions of the Haidian District PSB in Beijing, China in relation to the detention and arrest of three of the plaintiffs in this case, Jason Yuyi, Cathy Yu, and Jade Cheng, including any potential bases for that detention.

11.      I have also been asked to assess the actions of Hangzhou H3C Technologies Co. Ltd ("H3C"), defendants' China-based subsidiary during the relevant time period of 2011 through 2013, as it relates to the enforcement of H3C's intellectual property rights against suspected counterfeiters.

12.      In forming my opinions, I have relied upon, or may rely upon, relevant factual information, including documents obtained through discovery, pleadings, Chinese statutes,

academic articles, deposition transcripts, etc.  A list of all the documents I have reviewed, including those on which I relied to prepare this report, is attached hereto as **Exhibit C.**

13.     In my role as an expert witness for the plaintiffs, I am being compensated at the rate of $750 per hour.  My fees are not contingent on the outcome of this litigation or on any of the opinions expressed herein.

### SUMMARY OF CONCLUSIONS

14.     Based on my review of the documents in this case, including those obtained from the Beijing PSB, and based on my expertise in the customs and practices of the PSB, it is my opinion that the sole basis for the detention and arrest of the plaintiffs in this case was due to the counterfeiting allegations asserted by H3C.

15.     I saw nothing in the record to indicate that the arrest of these plaintiffs was due to the lack of a business license or due to any issue related to the parallel importation of the H3C products.  Had those been factors, I would have expected that to have been reflected in the records based on the PSB's practices.  Moreover, it is my opinion that the lack of a business license or the importation of gray market or parallel imports are not criminal offenses under PRC Criminal Law.

16.     In my experience, the Beijing PSB's criminal investigation of a low-level, victimless, economic crime involving computer equipment worth about USD $25,000 is highly unusual and outside of the PSB's normal practices.

17.     It is also my opinion that the plaintiffs' seven-month, post-arrest detention, in contravention of the requirements of the PRC Criminal Procedure Law, is outside the PSB's normal practice when dealing with a low-level, victimless economic crime.  In my experience, the PSB would not have taken these actions without the trademark holder's affirmative participation.

18.     Given the constraints on their resources and based on their customs and practices, it is my opinion that the PSB would not have continued to detain the plaintiffs if they had received

a clear statement from the trademark holder – in this case, H3C – that the imprisoned individuals were neither responsible for nor aware of the suspected counterfeiting.

19.     Based on my professional experience, a sophisticated, multinational company like Hewlett-Packard ("HP") did not follow the most advisable practices for enforcing its subsidiary's intellectual property rights in the PRC when, according to HP, it adopted a corporate structure through which H3C, its wholly-owned Chinese subsidiary, was allowed to conduct its affairs independent of and shielded from review by HP.  This arrangement, designed to allow the Chinese subsidiary to "continue to do business . . . with the Chinese government"[3] under the "indigenous"[4] culture and practices of China, created significant risks for HP.

20.     HP's asserted lack of supervisory control over H3C gave rise to several risks that materialized in 2012 and 2013 and which may have caused or contributed to the arrests and detention of Plaintiffs Jade Cheng, Cathy Yu, and Jason Yuyi.  Specifically, by allowing H3C to operate independently when "indigenous[ly]" enforcing its intellectual property rights in China, HP created a situation where: (i) HP could not control H3C's interactions with the PSB and was unable to directly obtain the release of the plaintiffs from the PSB; (ii) as the parent company, HP would struggle to communicate directly with authorities since it would not be the trademark holder of record, and thus would be unable to inspect the seized equipment it had sold to ICT; (iii) H3C could engage in unethical and illegal practices without the knowledge of HP; and (iv) HP's lack of institutional controls over its Chinese subsidiary could raise issues under the anti-bribery, books and records, and internal controls provisions of the Foreign Corrupt Practices Act ("FCPA") as discussed further below.

---

[3]    Defs. 30(b)(6) Dep. Tr. at 42:7-9.

[4]    *Id.* at 42:9.

21.     Based on my professional experience and the record in this case, it is my opinion that HP created a corporate structure where it could benefit from allowing H3C to operate without regard to U.S. laws that govern relationships between U.S. parent corporations and their foreign subsidiaries, specifically by creating a structure where H3C could pay case fees to the PSB to initiate criminal investigations into H3C's competitors that harm those competitors.

22.     I understand that allowing H3C to be the registered owner of its trademarks in China is inconsistent with the practices of other sophisticated multinational companies with major operations in China, such as P&G.  A more advisable practice is for the parent company to register trademarks in China under its own name and to then license the trademarks to its China subsidiaries.  Even if the trademark is local in origin and use, the parent company can and should pay the subsidiary to assign the trademark to the parent to avoid many of the risks HP incurred in this case.

23.     Registering a local trademark in the parent company's name and then licensing it back to a local subsidiary was the practice of P&G with its trademarks registered in China.  P&G would pay a premium if necessary to acquire the local trademark and then license it back to the China subsidiary.  Although the premium may have reduced HP's profit margins on H3C's sales in China, I know from my own experience that this practice would have allowed HP to control all enforcement against counterfeiting in China and avoided the problems it faced here when H3C brought a criminal enforcement action and refused to work cooperatively with other HP affiliates over what was, at worst, a civil violation of its trademarks.

24.     I also opine that designating HP as the trademark owner in China would have allowed HP to decide, based on a global perspective, whether to allow parallel imports into China

from India.  Registering H3C's trademarks in HP's name would also have prevented any rivalry and conflict between H3C and other HP affiliates over parallel imports of H3C products.

**RELEVANT BACKGROUND**

**I.      Enforcement against Counterfeiting in China**

25.      In this section, I first describe the overall system established in China for the protection and enforcement of trademarks against counterfeiting, including the roles of the State Administration and Commerce (SAIC), its local branches (AICs), the PSB, and the Procuratorate, based on my understanding of the anti-counterfeit enforcement regime in China from my own experience working in anti-counterfeiting in China.[5]

**A.  Role of the SAIC and AICs in Chinese Law Enforcement**

26.      The PRC Trademark Law contemplates that the AICs should be the first avenue of recourse for trademark owners in a trademark counterfeiting and infringement case to enforce their rights; if the AIC undercovers criminal activity during the course of the AIC's investigation, the AIC shall transfer the case to the PSB (considered part of the judiciary in China) for criminal enforcement.

27.      Thus, under PRC law, the SAIC and its local branches are charged with the primary responsibility of administering trademarks and enforcing trademark rights against infringement and counterfeiting in the first instance.[6]

---

[5]      "Procuratorate" refers to the Chinese official responsible for prosecuting criminal activity.

[6]      Article 2 of the Trademark Law of the People's Republic of China (hereinafter "PRC Trademark Law") provides that the SAIC shall establish a trademark registration system and a trademark review and adjudication board to resolve trademark disputes.  *See* PRC Trademark Law, art. 2.  Article 60 provides that in the case of infringement or counterfeiting the parties "shall request the relevant administrative department for industry and commerce to address the dispute."  PRC Trademark Law, Art. 60.  The parties also have the option to file a lawsuit in a court, but this option is not practical in counterfeiting cases as counterfeiters do not appear in court but disappear at the first sign of trouble.

28.     The PRC Trademark Law sets forth in detail the investigatory powers of the AICs in trademark cases, including the power to interrogate suspects and the power to seize and review financial records.[7]

29.     The PRC Trademark Law further provides "if the administrative department for industry and commerce is of the opinion that the infringement is established, it shall order the relevant party to immediately cease the infringing acts, and shall confiscate and destroy the infringing goods and instruments mainly used for manufacturing the infringing goods and forging the registered trademark."[8]

30.     The AICs also have the power to award compensatory damages to the trademark owner.[9]

31.     The PRC Trademark Law further provides that during the course of a trademark investigation by the AICs, "where a crime is suspected to have been committed, it shall promptly transfer the case to a judicial department for handling in accordance with law."[10]

**B.  Role of the PSBs in Chinese Law Enforcement**

32.     The PSB is the primary police force in China charged with maintaining social stability, one of its basic responsibilities.[11]  To maintain stability and order, the PSB focuses on suppressing violent crimes and political dissent which are viewed as directly threatening social stability.  The prevention and suppression of such crimes are considered the PSB's core duties.

---

[7]     PRC Trademark Law, art. 62.

[8]     PRC Trademark Law, art. 60.

[9]     PRC Trademark Law, art.  63.

[10]     PRC Trademark Law, art.  61.

[11]     The State Council of the People's Republic of China, Ministry of Public Security (updated Aug. 25, 2015), http://english.www.gov.cn/state_council/2014/09/09/content_281474986284154.htm.

33.     The PSBs also have authority to bring a criminal action in counterfeiting cases pursuant to Article 140 of the PRC Criminal Law.[12]  Article 140 uses a threshold test with the level of criminal liability increasing based on the value of sales of counterfeit goods.[13]

34.     While working as P&G's in-house counsel China, I learned that because the PSB does not have the resources or the inclination to investigate counterfeiting cases and determine the amount of sales and whether various thresholds have been met, as a matter of custom and practice, the trademark owner must provide this evidence to the PSB to begin a criminal counterfeiting investigation.

35.     Despite the PSB's key role, limits on funding adversely impact its institutional capacity and ability to do on the ground criminal enforcement.[14]  Funding limits and shortages of manpower are chronic problems for the PSB,[15] making performance of its work difficult and forcing the PSBs to prioritize in choosing the type of cases that they will investigate.  Economic

---

[12]    In order to join the World Trade Organization ("WTO") in 2001, China enacted Article 140, among other changes, to satisfy the WTO requirement that it must have criminal penalties for counterfeiting on a commercial scale. *See* WTO Agreement on Trade-Related Aspects of Intellectual Property Rights, art. 61.

[13]    Article 140 of the Criminal Law of the People's Republic of China (hereinafter "PRC Criminal Law") provides:

> "Any producer or seller who mixes impurities into or adulterates the products, or passes a fake product off as a genuine one, a defective product as a high-quality one, or a substandard product as a standard one, if the amount of earnings from sales is more than 50,000 yuan but less than 200,000 yuan, shall be sentenced to fixed-term imprisonment of not more than two years or criminal detention and shall also, or shall only, be fined not less than half but not more than two times the amount of earnings from sales; if the amount of earnings from sales is more than 200,000 yuan but less than 500,000 yuan, he shall be sentenced to fixed-term imprisonment of not less than two years but not more than seven years and shall also be fined not less than half but not more than two times the amount of earnings from sales; if the amount of earnings from sales is more than 500,000 yuan but less than 2,000,000 yuan, he shall be sentenced to fixed-term imprisonment of not less than seven years and shall also be fined not less than half but not more than two times the amount of earnings from sales; if the amount of earnings from sales is more than 2,000,000 yuan, he shall be sentenced to fixed-term imprisonment of 15 years or life imprisonment, and shall also be fined not less than half but not more than two times the amount of earnings from sales or be sentenced to confiscation of property."  PRC Criminal Law, Art. 140.

[14]    Suzanne E. Scoggins, *Policing Modern China*, 3 China L. and Society Rev. at 3 (2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3358916.

[15]    *Id.*

crimes, such as counterfeiting, are not viewed as priorities and the PSB will actively pursue such cases only in certain special situations that involve victims who have been harmed or killed.  For example, the PSB will actively pursue cases involving counterfeit liquor, which has caused deaths by alcohol poisoning, counterfeit pharmaceuticals, which have caused persons to become sick or die, or counterfeit money, which is viewed as a direct threat to the State.[16]

36.     This aligns with my experience working at P&G, as the PSB informed me on more than one occasion that due to limited resources, they were unable to pursue trademark enforcement actions for counterfeit goods that did not directly impact public health and safety.

37.     In my opinion and experience (discussed further below), the PSB would consider a low-level, victimless economic crime, such as the sale of counterfeit computer equipment worth about USD $25,000, a low priority case and not the type of case that the PSB would normally pursue on its own.

**C. The Registered Trademark Owner's Role in Enforcing Intellectual Property Rights**

38.     In any case of enforcement, either through the AICs or the PSBs, the brand owner plays a critical role.  In order to demonstrate that it is the lawful trademark owner, a brand owner must produce a trademark certificate registered with the SAIC.  In my experience working with the AIC and the PSB, PRC enforcement authorities will not bring any enforcement action without proof that the complainant is the registered trademark owner or has been authorized by the

---

[16]   *See, e.g.,* BBC News, *China arrests 1,900 in Crackdown on Fake Drugs,* (Aug. 6, 2013), https://www.bbc.com/news/world-asia-china-19144556#:~:text=Police%20in%20China%20have%20arrested,(%24182m%3B%20%C2%A3117m)  ("Police in China have arrested more than 1,900 people in a crackdown on the manufacture and sale of fake medicine."); XinhuaNet, *13 Jailed for Making Fake Moutai Liquor in SW China* (Dec. 28, 2020), http://www.xinhuanet.com/english/2020-12/28/c_139624357.htm (Chinese police arrest suspects with 27,000 bottles of fake liquor); XinhuaNet, *Chinese Police Seize 422-mln-yuan Counterfeit Money,* (May 15, 2020), http://www.xinhuanet.com/english/2020-05/15/c_139057549.htm ("Police from Heilongjiang and Guangdong provinces captured 16 suspects and seized equipment and raw materials for money counterfeiting in a joint operation.").

registered trademark owner.  The brand owner then often accompanies the PRC authorities on the enforcement action.

39.     In my experience, brand owners will hire private investigators to monitor the market for counterfeit and infringing goods.  In my position at P&G, I hired private investigation companies based in China and Hong Kong to identify and locate counterfeiters as the work of private investigation can be dangerous.  Some brand owners have large enough internal brand protection programs that they have a dedicated group of in-house investigators.  These private investigators are licensed in the PRC and, based on my experience, are accepted or tolerated by PRC authorities because the authorities do not have the resources or the interest to engage in these investigations themselves.

40.     In the case of P&G, I often served as the company representative in raids conducted through the AICs.  With my private investigators, we appeared at the AIC offices, submitted a written request for a raid, and then showed a copy of the trademark certificate.  At times, an oral request would be sufficient if we had prior dealings with the particular AIC.  Within the hour, we would then board a van with members of the AIC trailed by other vehicles. Only then would we reveal the location of the counterfeiter.  Revealing the location at the last minute was necessary to avoid tip-offs.

41.     During the course of these raids, I identified the suspected counterfeit product to be seized.  The AIC officers depended on me, as a representative of the local brand owner, to identify the counterfeit products because they had no training in or knowledge of identifying a particular brand's goods or trademarks.

42.     Although a parent company may be higher in the corporate hierarchy and in theory has authority over its subsidiary, this organizational structure is not relevant to the PSB.[17]  If a trademark certificate is in the name of the corporate subsidiary, the PSB and any other PRC enforcement authority will take direction only from the subsidiary as the lawful trademark owner.

43.     Further, because the brand owner plays such a critical role in China's trademark enforcement, it is always advisable to register all trademarks in China in the name of the U.S. parent company and then have the parent license the trademarks to all foreign subsidiaries.[18]  In my experience, such a license agreement would contain a provision that the parent-licensor exercises all enforcement rights and that the subsidiary will offer assistance to the parent in enforcement.

44.     In my experience, all P&G trademarks in China were registered by P&G USA and licensed by P&G USA back to the P&G China subsidiaries.  Even when a trademark is completely local in its origin and use, P&G, the USA parent company, would purchase the local trademark from the Chinese subsidiary and pay a premium if necessary.  P&G USA would then license the trademark back to the subsidiary.  By following this process, the USA parent company, and not its China subsidiaries, was the owner of all China trademarks and controlled all trademark enforcement actions.

45.     Although paying a trademark-licensing premium may reduce the parent company's profit margins, in my experience, this practice is generally advisable for multinational companies because it vindicates the principle that the USA parent is the owner of all of the company's

---

[17]   In my opinion, HP should have been aware of this.  HP had "an interest in protecting its [H3C-brand] intellectual property," but because the intellectual property was owned by H3C, it was unable to assert control over the PSB's investigation. *See* DEF0001421.

[18]   Daniel C.K. Chow & Thomas J. Schoenbaum, *International Business Transactions: Problems, Cases, and Materials* 305, 340 (4th ed. 2020) (hereinafter "Chow and Schoenbaum, *International Business Transactions*") (discussing why it is always advisable to have the parent company register all intellectual property in its name).

intellectual property, and there is never a dispute over the ownership of the intellectual property rights. In my work at P&G, even trademarks that were purely local, such as Beijing Panda Detergent, were purchased from the China subsidiary by the USA parent so as to avoid precisely the situation that arose in this case: the parent company allows its subsidiary to pursue a trademark enforcement action based on incomplete information, and the subsidiary makes baseless allegations to the trademark enforcement authorities.

46.     In my experience, this practice is further advisable because it allows multinational companies to keep track of parallel imports of their goods. Parallel imports are imports of genuine trademarked products, not counterfeits, by an entity other than the registered trademark owner and without the permission of the registered trademark owner. Parallel imports have a long history in the United States and are lawful under certain well-known conditions.

47.     When I worked for P&G, and up until recent decisions by the Guangzhou intellectual property courts signaling that the PRC is becoming more receptive to the practice of parallel imports, if a multinational company was not the holder of its Chinese subsidiaries' trademarks, it could not lawfully authorize third parties to sell the trademarked goods in the Chinese market.

## II.     The Parent Corporations' Role Overseeing Foreign Subsidiaries and Attendant Risks Under the U.S. Foreign Corrupt Practices Act

48.     Based on my experience, HP allowing H3C to operate autonomously in China and without any significant oversight or control is highly unusual and not advisable for a publicly-traded U.S. corporation as this lack of supervision could create liability for the parent company based on the foreign subsidiary's actions. One of the most significant risks is that the foreign

subsidiary could engage in actions that result in criminal or civil liability under the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78 et seq. ("FCPA").

49.    The FCPA contains two relevant sets of provisions: (a) the anti-bribery provisions that apply to all U.S. entities,[19] and (b) the books and records and internal control provisions that apply to issuers of publicly-traded securities registered with the Securities and Exchange Commission.[20]   The U.S. Department of Justice ("DOJ") enforces the FCPA's anti-bribery provisions in criminal cases, and the Securities and Exchange Commission ("SEC") enforces the anti-bribery, books and records, and internal controls provisions against issuers in administrative cases.[21]  The anti-bribery provisions are contained in Section 30A of the Securities and Exchange Act of 1934,[22] and the books and records provisions and internal controls provisions are contained in Sections 13(b)(2)(A) and (B) respectively.[23]

50.    The SEC has stated that "[p]ublic companies are responsible for ensuring that their foreign subsidiaries comply with Sections 13(b)(2)(A) and (B), and 30A of the Exchange Act."[24] The anti-bribery provisions of the FCPA, Section 30A of the Exchange Act, prohibit public companies from making improper payments to foreign officials for the purpose of influencing their decisions in order to obtain or retain business.[25]

---

[19]    15 U.S.C. §§ 78dd-1 (issuers), 78dd-2 (domestic concerns), 78dd-3 (persons other than issuer or domestic concerns).

[20]    15 U.S.C. § 78m(b).

[21]    The anti-bribery provisions are contained in Section 30A of the Securities and Exchange Act of 1934 (hereinafter "Exchange Act"), and the books and records provisions and the internal controls provisions are contained in Sections 13(b)(2)(A) and (B) respectively.

[22]    15 U.S.C. §§ 78dd-1, 78dd-2, 78dd-3.

[23]    15 U.S.C. § 78m(b)(2)(A)-(B).

[24]    *Diagnostic Products Corporation*, Exchange Act Release No. 51724 (May 20, 2005) (cease and desist order) (hereinafter "*In re DPC*").

[25]    Section 30 of the Exchange Act, 15 U.S.C § 78dd-1.  For example, *In re DPC* involved a California-based company which manufactured medical diagnostic test systems and test kits and its wholly-owned subsidiary, DePu Biotechnological & Medical Products Inc. (DePu), based in Tianjin, China.  From 1991 to 2002, DePu made payments

51.     Exercising supervisory control over the subsidiary helps to ensure compliance with the FCPA, which forbids payments made to foreign governments for the purpose of "obtaining or retaining business."[26]  In my experience, parent companies adopt practices that do not allow their foreign subsidiaries to operate independently because the parent wants the ability to monitor any day-to-day activities of the foreign subsidiary that the SEC might consider in violation of the FCPA, including a payment in exchange for police enforcement against suspected counterfeiting.

52.     Suppressing counterfeits allows a brand owner to protect and retain sales of its authentic products.  Therefore, the SEC might see the trademark enforcement action as a means of "retaining business."  If a company made payments to facilitate an enforcement action for the purpose of retaining sales of its authentic products, the SEC might believe that a further investigation is warranted into the nature of those payments.

53.     In addition, in my experience, and based on prior administrative decisions by the SEC, it is advisable for an SEC-registered parent corporation to exercise significant supervisory control over its foreign subsidiaries in order to ensure that the independent foreign subsidiary had adequate controls in place to ensure that the subsidiary kept accurate books and records.[27]

---

to doctors and laboratory employees who controlled purchasing decisions.  DPC did not discover these payments until 2002 and instructed DePu to discontinue the payments in January 2003.  Under these facts, the SEC found that "DPC violated Section 30A of the Exchange Act, which prohibits making improper payments to foreign officials for the purpose of influencing their decisions in order to obtain or retain business." *In Re DPC* at ¶¶ 3, 8.

   In the present case, HP was an issuer of securities, and H3C was its wholly owned subsidiary in China at the time all relevant actions occurred in this case, although it has since sold its majority ownership stake in H3C.  *See* Hewlett-Packard Enterprise, *HPE Closes Transaction with Tsinghua Holdings* (May 4, 2016), https://www.hpe.com/us/en/newsroom/press-release/2017/03/hewlett-packard-enterprise-closes-transaction-with-tsinghua-holdings.html.

[26]    This is known as the "business nexus test."  In *United States v. Kay*, 359 F.3d 738, 748 (5th Cir. 2004), the Fifth Circuit rejected a narrow reading of the business nexus test as limited to obtaining or retain government contracts.  The court stated that the business nexus test included payments made "to engender assistance in improving the business opportunities of the payor . . . irrespective of whether it be related to administering the law," awarding or renewing a contract.  *Id.* at 749.

[27]    *See, e.g.*, *Matter of Alexion Pharmaceuticals, Inc.*, Securities Exchange Act Release No. 89214 at 3 (July 2, 2020) (cease and desist order) (hereinafter "*In re Alexion*") (noting that Alexion's "Russia[n subsidiary's] books and records were consolidated into [U.S. parent] Alexion's financial statements").

54.     Section 13(b)(2)(A) of the Exchange Act requires issuers to make and keep books, records, and accounts that accurately and fairly reflect their transactions and dispositions of the issuer's assets to a reasonable level of detail.[28]   Congress enacted this requirement to prevent companies from falsely reporting or disguising illegal payments as innocuous expenses.[29]   The SEC has repeatedly stated that for the purposes of Section 13(b)(2)(A), the books and records of a subsidiary are consolidated with those of its issuer-parent for the purpose of financial reporting requirements, and a U.S. parent corporation can be held liable for violations of these provisions due to the actions of its independent foreign subsidiaries.[30]

## III.     HPFS Sells Equipment to ICT

---

[28]   Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b), provides in relevant part:

> (2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall --
>
> > (A) make and keep books, records, and accounts, which, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

[29]   Chow and Schoenbaum, *International Business Transactions*, *supra* note 18, at 436.

[30]   Based on SEC precedent, it is likely that H3C's transaction records related to enforcement against counterfeiting would be consolidated to the records of HP for the purposes of the books and records provisions of the Exchange Act.   *In re Alexion* involved drug maker Alexion, a Delaware pharmaceutical corporation with its headquarters in Boston and wholly owned subsidiaries in Turkey, Russia, Brazil, and Columbia.  Alexion's Turkey and Russia subsidiaries made improper payments to officials in those countries in exchange for favorable regulatory treatment of Alexion's drugs, but maintained false books and records which did not accurately record these payments. The SEC determined that the inaccurately recorded transactions "in the [subsidiaries'] books and records . . .  were consolidated into Alexion's books and records," (*In re Alexion*, *supra* note 27, at 2, ¶ 3) and that Alexion, the U.S. parent, was liable for a violation of the books and records provisions because of its foreign subsidiaries' inaccurate and false payment records.

The SEC also found Alexion to be in violation of the internal controls provision, Section 13(b)(2)(B) of the Exchange Act, which requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that a subsidiaries' "(i) transactions are executed in accordance with management's authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles, and (II) to maintain accountability for assets . . ." 15 U.S.C. § 78m(b)(2)(B).  The SEC found that Alexion, the U.S. parent, "failed to devise and maintain internal accounting controls that were sufficient to provide reasonable assurances that payments to [health care providers] in Russia were supported by adequate documentation and were for legitimate business purposes." *In re Alexion*, at 6 ¶ 24.  The SEC also found that because its subsidiaries in Turkey, Brazil, and Columbia maintained inaccurate records, Alexion was also in violation of its duty to maintain internal accounting controls to prevent the false reporting by those subsidiaries. *Id.* at 7 ¶ 32.  Thus, the SEC has found that a parent's violation of the books and records provision due to a foreign subsidiary's false reporting can also lead to a violation of the internal controls provision where the parent failed to provide controls to preclude the foreign subsidiary's false reporting.

55.     Based on my review of the documents, I understand that in 2009, HP acquired and became the parent corporation of 3Com Corporation and its China-based subsidiary, H3C.[31]  Near the end of 2011, HPFS (India), a different wholly-owned subsidiary of HP, entered into an agreement with Plaintiff ICT, a computer equipment and hardware reseller, for the sale of previously used networking equipment, including H3C-branded networking equipment.[32]  That ICT would go on to resell this equipment was contemplated by and essential to the parties' agreement[33] which placed no geographical limitation on where ICT was permitted to do so.[34]

56.     Because H3C was the holder of its Chinese trademarks, HPFS did not have the authority to permit parallel imports of H3C goods in to the Chinese market.  Yet, based on my review of the documents and deposition transcripts in this case, I understand that HPFS placed no limits on where ICT could resell the equipment.

57.     During my review of various documents produced during discovery and statements made throughout this litigation, I observed that both HP and H3C have consistently maintained that H3C's operations in China were independent of HP, its U.S. parent.[35]  HP's lack of general

---

[31]     *See* Hewlett-Packard, *HP to Acquire 3Com for $2.7 Billion*, Press Release (Nov. 11, 2009), https://www8.hp.com/us/en/hp-news/press-release.html?id=169454.

[32]     *See* DEF0002355-64 (providing copies of the parties' agreements, including the Wholesale Sale Agreement (WSA), Referral and Revenue Share Agreement (RRSA), and Appendix A listing the H3C Equipment sold in connection with these agreements).

[33]     *See id.* at Section 2.3 ("ICT will have the sole right to direct the re-sale of the [H3C] Equipment . . . and agrees to use its best efforts to remarket") and Section 4, (describing the Revenue Share Payment plan between ICT and HPFS based on ICT's ability to resell the H3C equipment).

[34]     *See* ICT0003419 (in an email to Alexander Styller, David Gill provided that, per the terms of the RRSA, Section 2.3 "clearly authorize[d] ICT to sell equipment" abroad, though that authority was "general and not specific to China," and that Section 3.2 "clearly recognize[d] that ICT was free to sell the equipment outside of the USA. Section 8 also recognizes that ICT's sale of the equipment may involve the export … of the equipment."; *see also* Defs.' 30(b)(6) Dep. Tr. at 54:19-56:5 ("It's my understanding that ICT engaged [its broker] Shinto so that Shinto could export the product from India for ICT to then sell elsewhere . . . [HP never told] ICT they couldn't sell in China").

[35]     *See, e.g.,* ICT0789796 (H3C submits a "Clarification for the Circumstances" to the PSB on Dec. 27, 2012 and states that it is the "sole owner of the 'H3C' trademark and its intellectual properties . . . in China."); DEF0002083-84 (In a Feb. 22, 2013 email from Robert Cozzolina, HP's Global Anti-Counterfeit Investigation Program Manager,

controls over its Chinese subsidiary was also confirmed in the following testimony of Kevan

Bartley, designated to represent HP under Fed. R. Civ. P. 30(b)(6):

> **Q.** What was the difficulty [David Gill, HP's in-house counsel] described in working with H3C?
>
> **A.** [Mr. Bartley] As we talked about earlier, H3C is a wholly-owned subsidiary.  While it was a wholly-owned subsidiary, on a day-to-day business, they managed their own business, they didn't take direction from HP and certainly not from David Gill, and they did that to maintain their own independence, to allow them to continue to do business in China, more specifically, with the Chinese government, to keep their indigenous nature intact.
>
> **Q**. Why was that important?  Do you have an understanding of that, that they remain independent that way?
>
> **A.** To allow them to continue to do business in China and, again, more specifically, ***to do business with the Chinese government*** (emphasis added).
>
> **Q.** So that independence was by design?
>
> **A.** That is my understanding, yes.[36]
>
> **Q.** What if H3C did something that HP didn't know about, what that be the type of risk you are referring to?
>
> **A**. Given H3C were set up to operate independently, they would, obviously, do things that HP were not aware of.[37]

Although Bartley's testimony does not relate directly to internal accounting controls at HP, it does

indicate that H3C had a high level of institutional independence and was not subject to general HP

controls.

## IV.    Plaintiffs' Detainment and Arrest

---

stated that "H3C is a separate company.  [t]hey have their own anti-counterfeit program."); ECF No. 272 at 91-92 (Defendants' Counsel stated that "H3C was an island unto itself in China").

[36]    Defs.' 30(b)(6) Dep. Tr. at 41:22-25-42:14-19.

[37]    *Id.* at 44:9-11; 44:13-15.

58.     H3C approached the PSB to bring an enforcement action against counterfeit H3C products on or before December 9, 2012.[38] On the same day, an individual named Wang Shuanlao made an oral request on behalf of H3C to the PSB for an enforcement action to be brought against ICT,[39] which the PSB then conducted.[40]  H3C then submitted a formal written petition for the PSB's enforcement action on December 10, 2012.[41]

59.     On December 9, the PSB seized suspected counterfeit H3C products found in the Beijing apartment rented by Jason Yuyi.  H3C then submitted an appraisal report to the PSB in which it expressly declared and confirmed that the seized equipment bore counterfeit H3C trademark labels and requested that the PSB confiscate and destroy all the seized equipment and criminally punish the individuals and entities involved.[42]

60.     On the basis of these representations by H3C as the trademark owner, the PSB exercised its authority to proceed with the criminal counterfeiting investigation in this case.

61.     On December 9, the PSB detained ICT employees and Plaintiffs Jason Yuyi and Cathy Yu on the basis of H3C's representations and kept them in custody while the PSB began the process of obtaining a warrant for their arrest from the Beijing Procuratorate.  Under PRC law, the PSB has the authority to detain a person suspected of criminal activity.[43]  However, this custody

---

[38]   ICT0789727 (Recommendation to Prosecute, Beijing City Public Security Bureau Haidian Station).

[39]   *Id.*

[40]   From my experience, PRC enforcement authorities will act on an oral request if the PSB and the trademark owner have worked together in the past and have established familiarity with each other.  The trademark owners will sometimes make an oral request when time is of the essence in conducting a raid of counterfeiters.

[41]   *See* ICT0789727 (H3C Petition Letter to the PSB, dated Dec. 10, 2012).

[42]   ICT0789736.

[43]   PRC Criminal Procedure Law, art. 82.

is temporary and the PSB must then seek the authorization of an arrest from the Procuratorate or release the suspect.[44]

62.    On the basis of the representations in H3C's report, the PSB also detained a third employee, Plaintiff Jade Cheng, on December 21, 2012.  The Procuratorate subsequently issued the arrest warrant, and the PSB then officially arrested Jason Yuyi, Cathy Yu, and Jade Cheng on January 15, 2013.[45]

63.    In its Recommendation to Prosecute, dated March 14, 2013 and submitted to the Procuratorate, the PSB stated that: "Cheng Yongguo [Jade Cheng], Yu Yi [Jason Yuyi], and Yu Xiaomeng [Cathy Yu] violated Article 214 of the Criminal Law of the People's Republic of China," for the suspected crime of allegedly selling counterfeit products under a registered trademark.[46]  Based on the documents and my own experience, it is clear that the PSB had to rely on the opinion provided by H3C that the seized products were counterfeit to make this finding.

**OPINIONS**

**I.    Opinions on Potential Bases for the Arrests**

64.    Based on my review of the documents in this case authored by the Chinese authorities, the counterfeiting charges supported by H3C were the PSB's only basis for arresting and detaining Mr. Cheng, Mr. Yuyi, and Ms. Yu.  For example, a July 7, 2014 statement discussing

---

[44]   PRC Criminal Procedure Law, Art. 87.

[45]   ICT0789740-41 (Recommendation to Prosecute, Beijing City Public Security Bureau Haidian Station).

[46]   *Id.*

the post-release investigation of each incarcerated Plaintiff refers to only one suspected crime: "sales of counterfeit commodities under a registered trademark."[47]

65.     As explained above, the PSB does not have the capability or knowledge to determine that the products are counterfeit. The PSB relied on the determination by H3C, the trademark owner, that the seized equipment was counterfeit.[48]  Upon receipt of countervailing evidence from Mr. Cheng's attorney verifying the authenticity of the equipment using the H3C company website, the Procuratorate stated that H3C "should be required to explain the verification result on its website."[49]  Based on my experience, this tells me that the PSB and the prosecutor were both relying on H3C's representation that the seized equipment was counterfeit.  It is therefore reasonable to conclude, based on the PSB's practices and the facts in this case, that had the PSB not received such a determination from H3C, or had they received an affirmative determination that the equipment was not counterfeit then Mr. Cheng, Mr. Yuyi, and Ms. Yu would have been neither arrested nor detained.

66.     I have been asked opine on other potential reasons for the arrests, including ICT's alleged failure to obtain a business license in the PRC and any the process by which the seized equipment was imported to China.  Based on my review of the case materials and relevant PRC laws, I have concluded that the counterfeiting allegations are the only evidence in the record for

---

[47]  ICT0789821-22 (People's Procuratorate of Haidian District Beijing, Decision on Supplementary Investigation dated July 7, 2014).

[48]  *Id.*

[49]  *Id.*

the Plaintiffs' arrests.  Had there been other grounds, I would have expected those to have been reflected in the records based on the PSB's practices.

67.     All business entities in China, whether domestic, foreign-invested, or foreign-owned, must have a business license in order to operate lawfully.[50]  For example, to engage in sales of any product in China requires a business license.  To obtain a business license, the business entity must apply to the local Administration of Industry and Commerce ("AIC").[51]  The AIC will issue a business license if the entity has been lawfully organized under PRC law, has met any relevant capital requirements, and has obtained all the necessary government approvals.[52]

68.     Operating without a business license is a violation of Article 212 the Company Law of the PRC which provides for civil liability,[53] but it is not a criminal offense.[54]  The local AICs enforce the business license requirement and can impose fines and order the suspension of any

---

[50]    The Company Law of the People's Republic of China (hereinafter "PRC Company Law"), ch. I, art. 7 ("The business license for a company shall state therein such matters as the name, domicile, registered capital, actual paid-up capital, business scope, the name of the legal representative, etc."); *see also* Marteen Beekers, *How to Verify a China Business License in 5 Steps*, Chinatradeblog (Jan. 11, 2019), https://chinatradeblog.org/china-business-license-verification/#:~:text=Each%20business%20license%20in%20China,the%20authorities%20and%20operates%20legally ("Each business license . . . is an official certificate, that proves that a Chinese company has been registered with the authorities and operates legally.").

[51]    *See* PRC Company Law, ch. I., art. 7  ("Company registration authorities shall issue business licenses for companies established under the law. The date of issuance of a business license for a company shall be the date of establishment of the company."). *See also* Chinatradeblog, *How to Verify a China Business License* ("Each business license in China is issued by a local branch of the [AIC].")

[52]    PRC Company Law, art. 7 ("Company registration authorities shall issue business licenses for companies established under the law.").  The company registration authority is the local branch of the AIC. *Supra* note 51.

[53]    PRC Company Law, art. 212 ("Where a foreign company violates this Law and establishes a branch within the territory of China without authorization, the relevant company registration authority shall order the foreign company to make correction or close down the branch, and may concurrently impose thereon a fine of not less than RMB 50,000 but not more than RMB 200,000.").  The "company registration authority" is the local branch of the AIC, which is an administrative authority and has no criminal enforcement power. *See also supra* note 52.

[54]    *Id.* ("Where a company violates the provisions of this Law, it shall bear the civil liability for compensation and pay the relevant fines and shall in the event that its property is not sufficient to make the payments, bear the civil liability for the compensation first.").

business activity without involving the PSB.[55]  I have reviewed the PRC Criminal Law and opine that it contains no provision that relates to the simple lack of a business license.

69.     Based on my experience working in China for P&G and on my expertise in Chinese law, it is my opinion that that the PSB will not bring a criminal case for the simple lack of a business a license.  Operating without a business license is simply not an infraction for which an entity can be charged criminally.

70.     Based on my examination of the record in this case, I do not see any evidence that ICT committed any violations of the customs laws of the PRC in importing the H3C products.  Nor do I see any evidence that the PSB either arrested or detained the Plaintiffs in this case for customs infractions.[56]

71.     Finally, the importation of parallel goods is not a criminal offense in the PRC. Parallel imports may violate Article 57 of the PRC Trademark Law, but based on my examination of the PRC Criminal Law, there is no provision in the current PRC Criminal Law that deals with parallel imports.  Cases that deal with parallel imports are brought in intellectual property or civil courts in China by the trademark owner against the importer for trademark infringement.[57]

---

[55]   *Id.*.

[56]   To the contrary, in my review of the case materials, including documents obtained from the PSB and the Procuratorate, I have only seen documents charging the plaintiffs with the crime of violating anti-counterfeiting laws. *See, e.g.*, ICT0789741 (Recommendation to Prosecute, Beijing City Public Security Bureau Haidian Station dated March 13, 2013); ICT0789727 (H3C's Petition Letter to the PSB dated Dec. 10, 2012).

[57]   *See* Aaron Winiger, *Guangzhou Intellectual Property Court Oks Parallel Imports*, The National L. Rev. (May 12, 2020), https://www.natlawreview.com/article/guangzhou-intellectual-property-court-oks-parallel-imports (discussing a trio of cases in Guangzhou that authorized parallel imports of lightning surge protections from Singapore into China); *see also* DEF0002147 (email from David Gill explaining that the Chinese authorities would view "a parallel import[s] matter . . . as primarily a commercial matter" that was not likely "to attract criminal penalties.").

72.     In addition, there is some dispute about whether parallel imports violate any provision of Chinese law, civil or criminal.  For example, in May 2020, three cases in the Guangzhou Intellectual Property courts authorized parallel imports.[58]

73.     Further, it is my opinion that even if the Plaintiffs engaged in parallel imports, and even if that activity was unlawful, I saw no evidence in the record indicating that it was a cause for their detention or arrest.

## II.   Opinions on Risks Incurred by Defendants for Failing to Exercise Supervisory Control over H3C

### A.  Risk that H3C Could Engage in Corruption

74.     One of the most significant risks to a U.S. parent company that fails to properly oversee its China-based subsidiary is that the subsidiary might engage in various forms of corruption, including making payments to the PSB in exchange for enforcement actions.  In my experience, many brand owners in China are eager to have PRC authorities bring criminal enforcement actions, but the PSB will not bring such actions without the payment of a "case fee," as further explained below.

75.     While working for P&G in China, I approached the PSB on several occasions to ask for a criminal investigation in counterfeiting and theft of trade secrets cases.  In every case, a PSB official explained to me that due to their limited resources, the PSB was be unable to commence a criminal investigation of counterfeit P&G products, such as shampoo or laundry detergent, which pose no danger to the public but will consume a great deal of financial resources and manpower.  The PSB official would then explain that if I were to pay a "case fee" the PSB would be willing to accept the case.  The official explained that the case fee would be used to

---

[58]     *Id.*

defray the expenses of the PSB so that the PSB would not have to tap its own resources.  In one case in Yiwu, a counterfeiting hotspot located near Shanghai, the PSB official also told me that he would willing to arrest counterfeiting suspects for a "reward" of USD $6,000 for each arrest.

76.     From my discussions with private investigators, I was told that even if I were to pay a case fee to begin an enforcement action, the PSB could ask for additional payments during the course of a long investigation, and that unless these additional payments were paid, the investigation would be abandoned.  From my experience, this is how dealing with the PSB then becomes a trap for the trademark owner who comes under pressure to make continuing payments in exchange for counterfeit enforcement.

77.     In every situation involving the PSB, I refused to pay the case fee or make any other type of payment due to P&G's internal corporate policies.  After these experiences, I became convinced that it was pointless to approach the PSB in counterfeiting cases.  Instead, I relied almost exclusively on the AICs to bring enforcement actions against counterfeiting.  The AICs did not ask for case fees because enforcement against counterfeiting was part of their primary duties and included in their budgets.  In addition, the more raids the AICs conduct, the more positive results the AICs can report, which can add to the power and prestige of the department and also be a basis for career advancement and promotion.[59]

78.     In my opinion, HP exposed itself and others to unnecessary risks by allowing H3C, its wholly owned subsidiary in China, to act independently of HP and not subject to its supervision and control.

---

[59]   The subject matter of case fees and other payments to the PSB is a sensitive matter that many actors and some lawyers argue fall into a "gray" area of Chinese laws prohibiting bribery.  I believe that such payments may fall within the proscription of Article 389, which provides in relevant part: "Whoever, for the purpose of securing illegitimate benefits, gives money or property to a State functionary shall be guilty of offering bribes."  *See* PRC Criminal Law, art. 389.  The payments may also violate other Chinese laws.

79.     In his deposition under Fed. R. Civ. P. 30(b)(6), HP's corporate representative, Kevan Bartley, indicated that on a day-to-day basis, business officials at H3C "maintain[ed] their own independence"[60] which "allow[ed] them to continue to do business . . . with the Chinese government"[61] and "keep their indigenous nature intact."[62]  Mr. Bartley acknowledged that H3C's independence was by design.[63]  When asked if H3C ever did things that HP was unaware of, Mr. Bartley answered, "[g]iven that H3C were [sic] set up to operate independently, they would, obviously, do things that HP were not aware [of]."[64]

80.     If such a conversation occurred at P&G, alarm bells would have gone off, and the issue would have immediately been brought to the attention of the legal and compliance departments at the most senior levels.  If a Chinese subsidiary of P&G demanded to operate independently in order to continue "to do business with the Chinese government" in accordance with "indigenous" culture and practices, P&G officials would have immediately come to the conclusion that the subsidiary wanted to engage in unethical or illegal conduct and to hide it from the parent company.  It is difficult to believe, even shocking, that a sophisticated multinational company like HP would accept such an arrangement.

81.     I opine that HP incurred unnecessary risks in allowing a Chinese subsidiary to shield itself from supervision and monitoring by the parent company and to operate independently by design.  This corporate structure would allow the subsidiary to engage in conduct that could be

---

[60]   Defs. 30(b)(6) Dep. Tr. at 42:6.

[61]   *Id.* at 42:14-17.

[62]   *Id.* at 42:9-10; *see also* DEF0002083-84 (in an email sent by Robert Cozzolina following plaintiffs' arrests, he stated: "I would surmise that H3C folks are working with the [PSB]. I'm not certain HP should have any further involvement in this matter.").

[63]   Defs. 30(b)(6) Dep. Tr. at 42:18-19 ("Q: So [H3C's] independence was by design?  A: Yes that is my understanding.").

[64]   *Id.* at 42:14-15.

hidden from the parent company.  This type of corporate structure is especially precarious given the attendant risks and dangers in the Chinese business environment where problems of corruption continue to be prevalent.

82.     Based on my knowledge of FCPA cases, the SEC often investigates companies that have internal accounting controls like the ones that existed at HP at the time of this case, given H3C's apparent independence and the facts that I have reviewed.  As a matter of good and lawful practice, HP should not have operated in this manner vis-à-vis H3C.

### B.  Risk that H3C Would be Uncooperative or Undermine HP's Efforts to Resolve the PSB's Investigation.

83.     In examining the record of this case, I believe that H3C played a critical role in initiating the PSB's counterfeiting investigation and in allowing it to continue for 7 months while the plaintiffs were held in police custody.  The documents show that the PSB followed a similar procedure in this case as the one outlined above in Background § I.C.  H3C submitted a request for counterfeit enforcement to the PSB[65] and then produced a copy of its trademark certificate.[66] H3C then examined the equipment and certified to the PSB that the goods were counterfeit, a position that H3C maintained throughout the entirety of the plaintiffs' detention and beyond.[67]

84.     By not controlling the Chinese trademark while selling H3C goods outside of China, HP and HPFS created a situation where imported used or refurbished equipment under an older H3C trademark might displace sales of new H3C products produced in China, leading to lost

---

[65]     *See, e.g.*, ICT0789739 ("per request of the Public Security Bureau, the H3C Brand Protection Department conducted an on-site verification of a batch of 'H3C' transceivers."); ICT0789727 (H3C's Petition Letter to the PSB dated Dec. 10, 2012).

[66]     *See* ICT0789860-61 (H3C's Application Letter to the PSB dated Dec. 9, 2012).

[67]     *See, e.g.*, ICT0789739   ("H3C Brand Protection Department issued a certificate to the [PSB] after verification and identified these transceivers as alleged counterfeit[s].").

sales revenue for H3C.[68]

85.     Avoiding conflicts and rivalries between corporate affiliates in different national markets is another reason why it is always advisable to register all trademarks in the name of the U.S. parent company and then for the parent to license the trademarks to the subsidiaries.  In my experience, such a practice will avoid conflicts over parallel imports.

86.     In my experience, even if the parent company does not agree with the actions of its Chinese subsidiary towards parallel imports, so long as the subsidiary is the trademark holder in China, the parent will not have the ability to intervene in its independent subsidiary's efforts to curb parallel import competition.  If the parent company and its subsidiary have conflicting views on parallel imports, it risks a situation where the subsidiary pursues an enforcement action against the will of its parent.

87.     If the parent company in the United Sates is the registered trademark owner, then the parent company can decide based on a global perspective whether it will allow parallel imports in its various national markets and it will be able to control trademark enforcement, as well. However, where that subsidiary is acting independently of its parent, as H3C apparently did in this case according to HP, the parent may be unable to override the subsidiary's decisions that conflict with the parent's parallel import prerogatives. For example, based on my experience, H3C may have viewed ICT's parallel imports of goods bought from HPFS as competition to H3C's sales.

88.     Based on my review of the documents and deposition transcripts in this case, it is my opinion that HP left H3C free to embark upon a policy to rid the Chinese market of parallel imports.  Based on my experience with PRC trademark law, HPFS should not have allowed ICT

---

[68]    Based on my review of the documents, it is clear that employees of HPFS and HPFS (India) were at least aware of, and proactively communicative about, the potential risk that the previously used H3C equipment it sold to ICT could cause tension between ICT and H3C if it were to enter the market. *See, e.g.*, DEF0000946.

to resell H3C's trademarked equipment in China without first contacting H3C; there is nothing in the record to indicate that happened in this case.  It appears H3C then decided to take an independent course of action to curb that competition without advising HP, which HP had limited ability to halt.

89.     Therefore, even though it was reasonable for ICT to assume that any HP products purchased from an HP entity would be genuine, by allowing H3C to enforce its trademarks independently, HP could not ensure that ICT would be safe from prosecution in China and could not ensure that it would be able to participate fully in any Chinese enforcement action to help ICT's defense.

### C.  Risk that HP Would be Unable to Inspect the Equipment in the PSB's Custody, or Verify its Authenticity, Without Holding the Registered Trademark

90.     It must be emphasized that since H3C – and not HP, HPFS, or HPFS (India) – was the registered owner of all H3C China trademarks and controlled all trademark enforcement actions, the PSB would have looked only to and accepted direction only from H3C and not directly from its parent company.  From my review of the documents, I believe that H3C was interested in maintaining its independent relationship with the PSB.[69]

91.     Had HP registered as the owner of the H3C trademark in China, it would have been able to participate directly in the PSB investigation and could have told the PSB to end the investigation and release the plaintiffs.[70]  If HP were the owner of the registered trademark in China, there may not have been an investigation to begin with, since, unlike H3C, HP was aware

---

[69]   *See* ICT0789796 (H3C writes in its letter to the PSB that "[t]he sole owner of the "H3C" trademark and its intellectual properties is: Hangzhou H3C Technologies Co., Ltd." and "that "H3C has never designated Hewlett-Packard for the … distribution of products with the "H3C trademark in China.").

[70]   *Cf.* ICT0789739 ("H3C hereby declares that HPFS and H3C conduct operations independent of each other. H3C has no knowledge whatsoever as to whether or not the transaction between HPFS and ICT aforementioned in HPFS' statement did occur.").

that ICT was an authorized H3C distributor selling the equipment pursuant to a contract it entered into with HPFS.

92.     Because H3C maintained control over its own operations in China, including the counterfeiting investigation, it would have been very difficult for HP to either collect information from, or provide information to, the PSB regarding the equipment that HPFS had sold to ICT. These difficulties would have included HP's inability to complete a visual inspection of the equipment in PSB custody to check H3C's determination that the equipment was counterfeit.

93.     Additionally, in my experience, because HP was not the owner of the registered trademark, HP struggled to communicate directly with the PSB and was thus unable to effectively advocate for the individual Plaintiffs' release from PSB custody.  For instance, there is nothing in the record to suggest that HP ever spoke with the prosecutor or provided evidence to the PSB to contradict the counterfeiting allegations made by H3C.[71]

94.     Thus, HP never clarified the situation for the PSB after H3C claimed that ICT was selling counterfeit goods.  There is no indication in the record that anyone employed by HP or HPFS ever conducted a physical inspection of the equipment, or that HP or HPFS ever provided the PSB or the Procuratorate, or attempted to provide the PSB or the Procuratorate, with the "authenticity verification" conducted by the plaintiff's defense lawyer "through the official website of H3C."[72]

95.     In my opinion, HP's independent subsidiary structure created a completely avoidable and careless risk that one of its non-China-based subsidiaries would sell H3C equipment

---

[71]  *See, e.g.*, ICT0789798; ICT0789800; DEF2899-2901.

[72]  ICT0789822.

for resale in China and expose the reseller to a counterfeiting investigation by H3C in which HP could not easily intervene.

## III.   Opinions on the PSB's Resulting Treatment of the Incarcerated Plaintiffs.

96.    Based on my experience and knowledge, I believe that the PSB was far more severe in dealing with these young plaintiffs than the type of accused crime warranted, which may have been the result of interventions from H3C.  Based on my experience and understanding of their enforcement practices, the PSB would not ordinarily take such harsh measures in this type of case.

97.    Based on my review of the documents, it appears that the PSB ignored specific guidelines limiting the period of post-arrest custody that should have applied in this case.  For example, under the PRC Criminal Procedure Law, once a suspect is detained the PSB must apply to the Procuratorate for an arrest warrant within 3 days;[73] in special circumstances, the time period can be extended 1-4 days.[74]  The period can be extended for another 30 days but only in cases where the suspect has committed crimes across multiple jurisdictions or has committed multiple crimes.[75]

98.    Moreover, under the PRC Criminal Procedure Law, once an arrest has been made, the suspect's post-arrest custody period cannot normally exceed two months while the criminal investigation is ongoing.[76]  This post-arrest period can be extended in stages for another five months (for a total of seven months), but this extension is available only in the case of major,

---

[73]   PRC Criminal Procedure Law, art. 91.

[74]   *Id.*

[75]   *Id.*

[76]   PRC Criminal Procedure Law, art. 156.

complicated crimes and only after the Supreme People's Procuratorate has submitted the case to the National People's Congress for specific approval.[77]

99.    Based on my review of documents, I understand that the three plaintiffs in this case were in post-arrest custody for a total of seven months, despite the fact that the record is devoid of any indication that any higher-level approvals were ever obtained.  In addition, from my experience working for P&G in China, the type of crime alleged to have occurred in this case (selling counterfeit computer equipment) is not the type of major, complicated case that would merit such an extension by high-level PRC authorities of the post-arrest period of custody.

100.    While the PSB does not always follow the Criminal Procedure Law, in my experience, it is not common for the PSB to ignore legal requirements in cases involving low-level economic crimes.  For example, in 2020, the Congressional Executive Commission on China (CECC) issued an extensive report on the use by the PSB of various provisions in the Criminal Law to detain suspects, including the arbitrary detention beyond legal limits.[78]  Each of the cases detailed in the report dealt with political dissent, such as criticism of the government or the Communist Party, religious freedom, and environmental activism.[79]  In discussing arbitrary detention, the CECC report discuss several cases involving subversive activities.[80]  None of the cases involved ordinary and low level economic crimes.

101.    In my experience, it is highly unusual that in the ordinary performance of their duties, the PSB would hold persons accused of a low-level economic crime in post-arrest detention

---

[77]    PRC Criminal Procedure Law, arts. 157 & 158.

[78]    Congressional-Executive Commission on China, Annual Report, 86-89 (2020), https://www.cecc.gov/sites/chinacommission.house.gov/files/2020%20ANNUAL%20REPORT%20FINAL%201223.pdf

[79]    *Id.* at 88-89.

[80]    *Id.* at 90.

for 7 months in violation of the PRC Criminal Procedure Law.  I opine that it is highly unlikely that the PSB would have detained these plaintiffs for 7 months for this type of offense without interventions by H3C not in the record.

Dated: March 1, 2021

*Daniel C.K. Chow*

Daniel C.K. Chow

# Exhibit A

## Daniel C.K. Chow: Expert Engagements in Past Four Years

*Articure, Inc. v. Dr. Jian "Larry" Meng, Dr. Ganglu Bai, Beijing Medical Scientific Co., Ltd. d/b/a Med-Zenith, a Chinese Company*, Case No. 1:19-cv-00054-MRB, Southern District of Ohio, Hon. Michael R. Barrett (expert report in 2019 on corruption in Chinese judicial system and theft of trade secrets from U.S. bio-technology company).

*Fuse Chicken LLC v. Amazon Case*, No. 5:17-cv-01538-SL, Northern District of Ohio, Hon. Sara Loi (expert report in 2019 on sales of counterfeit goods on the internet)

*In re Alibaba Group Holding Limited Securities Litigation*, Civil Action No. 1:15-md-02631-CM, Southern District of New York, Hon. Colleen McMahon (expert report in 2019 on sales of counterfeit goods over the internet, corruption in Chinese administrative system, business license)

# Exhibit B

**DANIEL C. K. CHOW**

Frank E. and Virginia H. Bazler Chair in Business Law
The Ohio State University College of Law
55 West 12th Avenue
Columbus, Ohio, USA 43210
Tel: (614) 292-0948
Fax: (614) 292-2035
e-mail: chow.1@osu.edu

Experience

2014-present, Frank E. and Virginia H. Bazler Chair in Business Law

2012-14, Associate Dean for International and Graduate Programs

January –April 2012, Resident Faculty Director, Moritz-Oxford (England) Semester Law Program

2007-14, Joseph S. Platt-Porter Wright Morris & Arthur Professor Law, The Ohio State University Michael E. Moritz College of Law, Columbus, Ohio

2002-20007, Robert J. Nordstrom/Porter, Wright, Morris & Arthur Designated Professor in Law, the Ohio State University Michael E. Moritz College of Law, Columbus, Ohio

1999-2005, Of counsel, Squire Sanders & Dempsey. Work on enforcement of intellectual property rights and commercial law matters.

August 1997 - August 1999, In-House Legal Counsel, Procter & Gamble (China) Ltd., Guangzhou, Guangdong Province, People's Republic of China. Handled all work associated with a general counsel position with a focus on enforcement of the company's intellectual property rights against counterfeiting. Helped to organize the China Anti-Counterfeiting Coalition (now called the Quality Brands Protection Committee), the first industry group of brandowners in China dedicated to working with the PRC government on counterfeiting.

1992-93, Visiting Scholar, Sun Yat-Sen Institute for Social Sciences and Philosophy, Academia Sinica, Taipei, Taiwan

1985-1997, 1999-2002, Assistant, Associate, and Professor of Law, The Ohio State University College of Law

1983-85, Associate, Debevoise & Plimpton, New York, New York

1982-83, Law Clerk, The Hon. Constance Baker Motley, Chief Judge, United States District Court for the Southern District of New York

<u>Education</u>

Yale College, BA 1979
Summa Cum Laude
Phi Beta Kappa

Yale Law School, J.D. 1982

<u>Courses Taught</u>

Property
Civil Procedure
International Business Transactions
International Trade Law
International Intellectual Property

<u>Publications: Books</u>

INTERNATIONAL INTELLECTUAL PROPERTY IN A NUTSHELL (forthcoming West 2022)

INTERNATIONAL INTELLECTUAL PROPERTY: PROBLEMS, CASES, AND MATERIALS (with E. Lee) (West 4th ed. 2021)

INTERNATIONAL INTELLECTUAL PROPERTY DOCUMENTS SUPPLEMENT (with E. Lee) (West 2017)

INTERNATIONAL BUSINESS TRANSACTIONS: PROBLEMS, CASES, AND MATERIALS (with T. Schoenbaum) (Aspen 4th edition 2021)

INTERNATIONAL BUSINESS TRANSACTIONS DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen 2021)

INTERNATIONAL INTELLECTUAL PROPERTY: PROBLEMS, CASES, AND MATERIALS (with E. Lee) (West 3d ed. 2017)

INTERNATIONAL INTELLECTUAL PROPERTY DOCUMENTS SUPPLEMENT (with E. Lee) (West 2017)

INTERNATIONAL TRADE LAW: PROBLEMS, CASES, AND MATERIALS (with T. Schoenbaum) (Aspen 3d ed. 2017)

INTERNATIONAL TRADE LAW DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen forthcoming 2017)

INTERNATIONAL BUSINESS TRANSACTIONS: PROBLEMS, CASES, AND MATERIALS (with T. Schoenbaum) (Aspen 3rd edition 2015)

INTERNATIONAL BUSINESS TRANSACTIONS DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen 2015)

THE LEGAL SYSTEM OF THE PEOPLE'S REPUBLIC OF CHINA (West 3rd edition 2015)

INTERNATIONAL TRADE LAW: PROBLEMS, CASES, AND MATERIALS (with T. Schoenbaum) (Aspen 2d ed. 2012)

INTERNATIONAL TRADE LAW 2010-2011 DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen 2011)

INTERNATIONAL INTELLECTUAL PROPERTY: PROBLEMS, CASES, AND MATERIALS (with E. Lee) (West 2d ed. 2012)

INTERNATIONAL INTELLECTUAL PROPERTY DOCUMENTS SUPPLEMENT (with E. Lee) (West 2012)

DOING BUSINESS IN CHINA: PROBLEMS, CASES, AND MATERIALS (with A. Han) (West 2012)

DOING BUSINESS IN CHINA DOCUMENTS SUPPLEMENT (with A. Han) (West 2012)

INTERNATIONAL BUSINESS TRANSACTIONS: PROBLEMS, CASES, AND MATERIALS (with T. Schoenbaum) (2d ed. Aspen 2010)

INTERNATIONAL BUSINESS TRANSACTIONS DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen 2010)

THE LEGAL SYSTEM OF THE PEOPLE'S REPUBLIC OF CHINA (West 2nd edition 2009)

INTERNATIONAL TRADE LAW: PROBLEMS, CASES AND MATERIALS (with T. Schoenbaum) (Aspen 2008)

INTERNATIONAL TRADE LAW DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen 2008)

INTERNATIONAL INTELLECTUAL PROPERTY: PROBLEMS, CASES AND MATERIALS (with E. Lee) (West 2006)

INTERNATIONAL INTELLECTUAL PROPERTY DOCUMENTS SUPPLEMENT (with E. Lee) (West 2006)

INTERNATIONAL BUSINESS TRANSACTIONS: PROBLEMS, CASES, AND MATERIALS (with T. Schoenbaum) (Aspen 2005)

INTERNATIONAL BUSINESS TRANSACTIONS DOCUMENTS SUPPLEMENT (with T. Schoenbaum) (Aspen 2005)

THE LEGAL SYSTEM OF THE PEOPLE'S REPUBLIC OF CHINA IN A NUTSHELL, 483 pages (West Publishing 2003)

A PRIMER ON FOREIGN INVESTMENT ENTERPRISES AND PROTECTION OF INTELLECTUAL

PROPERTY IN CHINA (Kluwer Law International 2002)

## Articles, etc.

Understanding the Economic and Political Effects of Trump's China Tariffs, William & Mary Business Law Review (forthcoming 2021)

Why the 2020 U.S.-China Trade Agreement Needs Anti-Corruption Provisions for the Protection of Intellectual Property, Notre Dame Journal of International & Comparative Law (forthcoming 2021)

A New and Controversial Approach to Dispute Resolution under the U.S.-China Trade Agreement of 2020, Harvard Negotiation Law Review 31 (2020)

U.S. Trade Infallibility and the Crisis of the World Trade Organization, 2020 Michigan State Law Review 599 (2020)

The Myth of China's Open Market Reforms and the World Trade Organization, 41 University of Pennsylvania Journal of International Law 939 (2020)

Alibaba, Amazon, and Counterfeiting in the Age of the Internet, 40 Northwestern Journal of International Law & Business 157 (2020)

Economic Nationalism, U.S. and Chinese Style, 14 Ohio State Business Law Journal 1 (2020)

A New Approach to Deter and Identify China's Internet Counterfeiters, World Trademark Review (2019), https://www.worldtrademarkreview.com/anti-counterfeiting/new-approach-deter-and-identify-chinas-internet-counterfeiters-exclusive

Is Strict Reciprocity Required for Fair Trade? (with I. Sheldon), 52 Vanderbilt Journal of Transnational Law 1 (2019)

How the United States Withdrawal from the Trans-Pacific Partnership Benefits China (with I. Sheldon and W. McGuire), 4 University of Pennsylvania Journal of Law and Public Affairs 37 (2019)

The Perils of Economic Nationalism and a Proposed Pathway to Trade Harmony (with T. Schoenbaum), 30 Stanford Law and Policy Review 115 (2019)

United States Unilateralism and the World Trade Organization, 37 Boston University International Law Journal 1 (2019)

The Revival of Economic Nationalism and the Global Trading System (with I. Sheldon & W. McGuire), 40 Cardozo Law Review 2133 (2019)

Trade Sanctions and the Division of Federal-State Power over International Trade, 79 Ohio State Law Journal 651 (2018)

China's Crackdown on Corruption and the Foreign Corrupt Practices Act, 5 Texas A&M Law Review 323 (2018)

The Costly Problem of Poorly Drafted Choice of Law Clauses, Washington Law Review Online (2017) available at https://www.law.uw.edu/wlr/online-edition/.

Trade Liberalization and Institutional Constraints on Moves to Protectionism: Multilateralism vs. Regionalism (with I. Sheldon & W. McGuire), American Journal of Agricultural Economics (2018)

Three Major Problems Threatening Multi-National Pharmaceutical Companies Doing Business in China, 19 Columbia Science and Technology Law Review 47 (2017)

A Legal and Economic Critique of President Trump's China Trade Policies (I. Sheldon & W. McGuire), 79 University of Pittsburgh Law Review 205 (2017)

Cultural Barriers to Effective Enforcement of Foreign Corrupt Practices Compliance Programs in China, 48 University of Toledo Law Review 519 (2017)

Can the United States Impose Trade Sanctions on China for Currency Manipulation?, 16 Washington University Global Studies Law Review 295 (2017)

How the United States Uses the Trans-Pacific Partnership to Contain China in International Trade, 17 Chicago Journal of International Law 370 (2017)

Why China Established the Asia Infrastructure Investment Bank, 49 Vanderbilt Journal of Transnational Law 1255 (2017)

Why Multinational Companies Doing Business in China Fall into the Trap of Making Payments to China's Police, 16 Richmond Journal of Global Law and Business 1 (2017)

How China Promotes its State-Owned Enterprises at the Expense of Multi-National Companies Doing Business in China and in Other Countries, 41 North Carolina Journal of International Law 455 (2016)

China's Enforcement of its Anti-Monopoly Law and Risks to Multinational Companies, 14 Santa Clara Journal of International Law 99 (2016)

China's Regulation of International Trade, book chapter forthcoming in "China in a Changing World" (Brookings Institution Press) (Goldstein and deLisle, eds. 2016)

How China's Crackdown on Corruption Has Led to Less Transparency in the Enforcement of China's Anti-Bribery Laws, 48 UC Davis Law Review 685 (2015)

Why China wants a Bilateral Investment Treaty with the United States, 33 Boston University International Law Journal 421 (2015)

Trademark Squatting and the Limits of the Famous Marks Doctrine in China, 46 George Washington International Law Review 57 (2015)

Navigating the Minefield of Trade Secrets Protection in China, 48 Vanderbilt Journal of Transnational Law 1007 (2014)

Three Major Risks under the Foreign Corruption Practices Act for U.S. Multinational Companies Doing Business in China, 38 Fordham International Law Journal 1183 (2014)

Why China's Crackdown on Commercial Bribery Threatens Multinational Companies Doing Business in China, 31 Arizona Journal of Comparative and International Law 512 (2014)

A Comparison of EU-China Competition Law that Applies to Technology Transfer Contracts, 9 I/S: A Journal of Law and Policy of the Information Society 497 (2014)

Trademark Enforcement in Developing Countries: Counterfeiting as an Externality Imposed by Multinational Companies on Developing Countries, Chapter 17 in TRADEMARK PROTECTION AND TERRITORIALITY CHALLENGES IN A GLOBAL ECONOMY, Edward Elgar Press (Calboli and Lee, eds) (2014)

How China Uses International Trade to Promote its View of Human Rights, 45 George Washington International Law Review 681 (2013)

Why China Opposes Human Rights in the World Trade Organization, 34 University of Pennsylvania Journal of International Law 61 (2013)

China's Indigenous Innovation Policies and the World Trade Organization, 34 Northwestern J. Int'l Law & Business 81 (2013)

China's Crackdown on Commercial Bribery, Corruption in State-Owned Enterprises, and the Impact on U.S.-based Multinational Companies Doing Business in China, Written Statement Before the Congressional-Executive Commission on China, November 21, 2013 Appendix, p. 29 available at https://www.gpo.gov/fdsys/pkg/CHRG-113hhrg86657/html/CHRG-113hhrg86657.htm

China's Coming Trade War with the United States, 81 UMKC L. Rev. 257 (2012)

China, Human Rights, and International Trade, 9 South Carolina J. International Law and Business 13 (2012)

The Interplay between the Foreign Corrupt Practices Act and China's new Anti-Bribery Law, 73 Ohio State Law Journal 1015 (2012)

China under the Foreign Corrupt Practices Act, 2012 Wisconsin Law Review 573 (2012)

Lessons from Pfizer's Disputes over its Viagra Trademarks in China, 27 Maryland Journal of International Law 82 (2012)

Counterfeiting as an Externality Imposed by Multi-National Companies on Developing Countries, 51 Virginia Journal of International Law 785 (2011)

Exhaustion of Trademarks and Parallel Imports in China, 51 Santa Clara Law Review 1283 (2011)

China's Response to the Global Economic Crisis: Implications for U.S.-China Economic Relations, 1 Global Bus. L. Rev. 47 (2011)

Anti-Counterfeiting Strategies of Multi-National Companies in China: How a Flawed Approach is Making the Problem Worse, 41 Georgetown Journal of International Law 749 (2010)

Intellectual Property and Foreign Direct Investment in INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY (Peter Yu, ed.) (Praeger 2006)

Why China Does Not Take Commercial Piracy Seriously, Ohio Northern University Law Review (2006)

Counterfeiting in China and its Effect on US Manufacturing, Written Testimony Before Senate Government Oversight and Management Committee, April 20, 2004, available at https://www.hsgac.senate.gov/imo/media/doc/042004chow.pdf

Local Protectionism, Organized Crime, and the Trade in Counterfeit Goods in China, China Economic Review, 14 China Economic Review 473 (2003)

Culture Matters: Book Review of NEGOTIATING GLOBALLY: HOW TO NEGOTIATE DEALS, RESOLVE DISPUTES, AND MAKE DECISIONS ACROSS CULTURAL BOUNDARIES, 18 Ohio St. J. On Dispute Resolution 1003 (2002)

A New Era of Legalism for Dispute Settlement in the WTO: Review of DISPUTE SETTLEMENT IN THE WORLD TRADE ORGANIZATION (1999), 15 Ohio St. J. on Dispute Resolution 447 (2001)

Enforcement Against Counterfeiting in China, 20 Northwestern Journal of International Law & Business 447 (2000)

Counterfeiting in the People's Republic of China, 78 Washington University L. Q. 1 (2000)

Conversion and Reorganization of a Joint Venture Into a Wholly Foreign Owned Enterprise, 73 Tulane L. Rev. 619 (1998)

The Limited Partnership Joint Venture Model in the People's Republic of China, 29 Law & Pol'y Int'l Bus. 1 (1998)

An Analysis of The Political Economy of China's Enterprise Conglomerates: A Study of the Reform of the Electric Power Industry, 28 Law & Pol'y Int'l Bus. 383 (1997)

Recognizing the Environmental Costs of the Recognition Problem: The Advantages of Taiwan's Direct Participation in International Environmental Law Treatises, 14 Stan. Env. L. J. 256 (1995)

A Pragmatic Theory of Law, 67 Wash. L. Rev. 755 (1992)

Trashing Nihilism, 65 Tulane L. Rev. 221(1990)

Limiting Erie in a New Era of International Law: Toward a Federal Common Law of International Choice of Law, 74 Iowa L. Rev. 165 (1988)

Rethinking the Act of State Doctrine: An Analysis in Terms of Jurisdiction to Prescribe, 62 Wash. L. Rev. 397 (1987).

<u>Selected Presentations</u>

Why China Established the Asia Infrastructure Bank, Harvard Law School China Law Society, Nov. 10, 2016

China's Regulation of Patents, University of Pennsylvania School of Law, China and India Law Symposium, Oct. 23, 2016

China and Intellectual Property Piracy, United States International Trade Commission, June 10, 2010

China and Enforcement of Intellectual Property Laws, Congressional Executive Committee on China, Washington, D.C., April 15, 2005

Interview on The World's Greatest Fakes, CBS News 60 Minutes, August 16, 2004

Counterfeiting in China and its Effect on U.S. Manufacturing, Senate Subcommittee on Government Oversight and Management, Washington, D.C., April 4, 2004

"China and the WTO: Its Implications for Protecting Intellectual Property," presentation given at Governor's Advisory Conference, Kunming Municipality, Yunnan Province, China, June 16, 2001

"Protecting Intellectual Property Rights in China," presentation given at Harvard Business School, Harvard Asia Business Conference, February 13, 2001

"Counterfeiting of Pharmaceuticals in China," presentation given at Pharmaceutical Manufacturing Association of America, Annual Asia Regional Meetings, on November 3, 2000 in Hong Kong

"Protecting Your Intellectual Property Against Commercial Piracy in China," presentation given at Fischer College of Business, Ohio State University, on October 14, 2000 in Columbus, Ohio

"Counterfeiting and Other Intellectual Property Rights Problems in China," Inaugural Lecture, Modern Chinese Studies Lecture Series at Ohio State University, on January 15, 2000 in Columbus, Ohio

"Counterfeiting in China," presentation on December 21, 1999 in Hong Kong at City University of Hong Kong Law School

"Counterfeiting in China – An Analysis of Problems from the Perspective of the Multi-National Enterprise Doing Business in China," presentation on Nov. 18, 1999 in Shanghai before The Economist Conferences, Business Group Shanghai

"Counterfeiting in the People's Republic of China – Issues from the Perspective of Foreign Investors," presentation given on October 1, 1999, in Cleveland, Ohio before The China Roundtable, a business and legal group

"Economic Aspects of Counterfeiting in the PRC," presentation given on May 20, 1999 in Hong Kong before the Pacific Basin Economic Council

"Counterfeiting in the People's Republic of China," presentation given on May 19,1999 in Beijing, People's Republic of China before the Economist Business China Group

"An Overview of International Commercial Law," lectures before Ukrainian Higher Arbitration Court Judges in Kiev, Ukraine given on December 4-7, 1995

"An Overview of China's Economic, Political, and Legal Systems," presentation given on April 12, 1995 in Columbus, Ohio to The Ohio Business Mission, a group composed of the Governor of Ohio, his associates and a group of Ohio business officials who will travel under the auspices of the State of Ohio to China in late April 1995

"Intellectual Property Rights and Other Trade Issues Between the United States and China," presentation (in Chinese) given at Wuhan University School of Law, Hubei, China on December 27, 1994

"Intellectual Property Rights and Other Trade Issues Between the United States and South Korea," presentation given at Korea University, Seoul, South Korea on December 16, 1994

"Intellectual Property Rights and Other Trade Issues Between the United States, Taiwan, and Hong Kong," presentation given at the Finance Department of the Hong Kong University of

Science & Technology, Hong Kong, on December 19, 1994

"Legal Aspects of Doing Business in China," presentation given during Ohio State College of Business symposium for U.S. business representatives, Columbus, Ohio, on June 7, 1994

"Introduction to the Legal System of China," presentation given before Columbus Bar Association, International Committee Section, on Sept. 15, 1994

Discussion of trends in American legal education at Wuhan University Law School, Hubei, People's Republic of China, given on July 20, 1993

Final report on strategies for Taiwan to comply with the international environmental law treaties of the United Nations given before the Taiwan Environmental Protection Agency, Taipei, Taiwan on May 15, 1993

Discussion of the status of Taiwan under international law given at the Sun-Eighth Sen Institute of Social Science and Philosophy, Academia Sinica, Taipei, Taiwan on April 10, 1993

Discussion of trends in American jurisprudence given at National Cheng Chi University School of Law, Taipei, Taiwan, March 5, 1993

Discussion of American critical legal scholarship at Soochow University School of Law, Taipei, Taiwan, March 28, 1993

Interim report on the international legal obligations of Taiwan under the international environmental law regime of the United Nations given before the Taiwan Environmental Protection Agency, Taipei, Taiwan on March 2, 1993

Discussion of recent trends in United States Supreme Court opinions given at the Sun-Yat Sen Institute of Social Science and Philosophy, Academia, Taipei, Taiwan on April 10, 1993

Languages

Mandarin Chinese; conversational Cantonese

# Exhibit C

## Documents and Data Upon Which Expert Daniel Chow May Rely

Documents Produced in Discovery

1) ECF No. 101
2) DEF0002585
3) DEF0002586
4) DEF0002807-17 (Mandarin and English)
5) ICT0002154-58
6) DEF0002352-70
7) DEF0001029
8) ICT0789715-950
9) DEF0002374-75
10) DEF0002374-75
11) ICT0729755-59
12) ICT0253916-17
13) DEF00000948-50
14) ICT00029192
15) ICT0791450-53
16) ICT0750451
17) ICT0615501-02
18) ICT0214060
19) ICT0002192
20) DEF0000962-66
21) ICT0760062-64
22) DEF0000989-91
23) ICT0037718-20
24) ICT0231244-45
25) ICT0231298-306
26) ICT0282363-66
27) ICT0002154-58
28) DEF0002352-70
29) DEF0001029
30) ICT0286909-12
31) ICT0198714-24
32) ICT0198740-42
33) ICT0287762-65
34) ECF No. 446-6
35) ECF No. 344-7
36) ICT0199362-63
37) ICT0199374-76
38) ECF No. 344-4
39) ECF No. 344-5
40) ICT0200312-13
41) ICT0200496-99
42) ICT0561517-21

43) ICT0028659-63
44) ICT0037656-59
45) ICT0625069
46) ICT0564940-43
47) ICT0290220-26
48) ICT0605819
49) ICT0604481-83
50) DEF0002890-98
51) DEF0001109
52) DEF0001117-19
53) DEF0001113
54) DEF0001120
55) ICT0223281-83
56) ICT0297433-35
57) ICT0717179-84
58) ICT0293916-20
59) DOC0284673
60) ICT0228874-79
61) ICT0222977-78
62) ICT0794209-11
63) DEF0002023-25
64) DEF0002040-44
65) ICT0227983-86
66) DEF0002063-67
67) ICT0228628-33
68) DEF0001376
69) DEF0001382-84
70) DEF0002083-85
71) DEF0001385
72) ICT0002634-35
73) ICT0003391
74) DEF0001731-32
75) DEF0001389-91
76) DEF0002089
77) DEF0002092-95
78) DEF0002573
79) ICT0580643-46
80) ICT0002789-93
81) ICT0003555-58
82) ICT0003419-24
83) ECF No. 331-13
84) DEF0001392
85) DEF0001192-98
86) ICT0229677
87) DEF0001415
88) DEF0002115

89) DEF0001416-17
90) DEF0001421-23
91) DEF0001424-27
92) DEF0001221-23
93) DEF0001428-37
94) DEF0001456-58
95) DEF0001230
96) DEF0002142-45
97) DEF0002147-49
98) DEF0002174
99) DEF0001465
100)   DEF0001470-71
101)   DEF001472-1506
102)   ICT0001966
103)   ICT0002094
104)   DEF0001843-46
105)   DEF0001509-10
106)   DEF0002208-11
107)   DEF0002214-17
108)   ICT0792302-10
109)   DEF0002218-37
110)   ICT0792717-21
111)   ICT0792357-64
112)   DEF0002250
113)   DEF0002254
114)   ICT0001386,
115)   ICT0001372,
116)   ICT0001361
117)   ECF No. 331-12
118)   DEF0002263
119)   ICT0795372-89
120)   DEF0002273-74
121)   DEF0001521
122)   DEF0002850
123)   DEF0001330
124)   ICT0240655-58
125)   ICT0545686-87
126)   DEF0002868
127)   ECF No. 344-14
128)   ECF No. 344-15
129)   ICT0248561-62
130)   ICT0792505-10
131)   ECF No. 331-18
132)   DEF0002899
133)   DEF0002899
134)   Alexander Styller's Personal Deposition Transcript

135) Defendants' 30(b)(6) Deposition Transcript
136) ICT0207147
137) DEF0002218-37
138) ICT07091508-24
139) Ryan Quinn's Deposition Transcript
140) ECF No. 369
141) ECF No. 331-4
142) ECF No. 331-18
143) ICT0003419-24 (English and Mandarin)
144) DEF0002083
145) ECF No. 272
146) ECF No. 280
147) ECF No. 342
148) ICT0207147-49

## Secondary Sources

Treaties
World Trade Organization Agreement on Trade Related Intellectual Property Rights, Article 61

PRC Statutes
PRC Anti-Unfair Competition Law

PRC Company Law, Articles 7, 212, 213, 214, 215

PRC Criminal Law, Articles 140, 214, 389[1]

PRC Criminal Procedure Law, Articles 82, 87, 91, 156, 157, 158

PRC Trademark Law, Articles 2, 61, 62, 60, 63


U.S. Statutes
Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, 78dd-2, 78dd-3 (anti-bribery provisions) (Section 30A of the Securities and Exchange Act of 1934)

Foreign Corrupt Practices Act, 15 U.S.C. § 78m(b)(2)(A) (books and records provisions) (Section 13(b)(2)(A) of the Securities and Exchange Act of 1934)

Foreign Corrupt Practices Act, 15 U.S.C. § 78m(b)(2)(B) (internal controls provisions) (Section 13(b)(2)(B)


U.S. Cases
*United States v. Kay*, 359 F.3d 738, 748 (5th Cir. 2004)

*In the Matter of Alexion Pharmaceuticals, Inc.*, Securities Exchange Act of 1934, Release No. 89214 (July 2, 2020)

*In the Matter of Diagnostic Products Corporation,* Securities Exchange Act of 1934, Release No. 51724 (May 20, 2005)


U.S. Congressional Reports
Congressional Executive Commission on China, Annual Report, 2020 at 86-89, https://www.cecc.gov/sites/chinacommission.house.gov/files/2020%20ANNUAL%20REPORT%20FINAL%201223.pdf

---

[1]     I also reviewed the entirety of the PRC Criminal Law for any articles establishing criminal liability for lack of a business license and for parallel imports)

Books

Daniel C.K. Chow, *The Legal System of the People's Republic of China* (3d ed. 2015)

Daniel C.K. Chow & Thomas J. Schoenbaum, *International Business Transactions: Problems, Cases, and Materials* (4th ed. 2020)

Daniel C.K. Chow & Thomas J. Schoenbaum, *Documents Supplement for International Business Transactions* (2020)

Daniel C.K. Chow & Thomas J. Schoenbaum, *International Trade Law: Problems, Cases, and Materials* (3d ed. 2017)

Daniel C.K. Chow & Edward Lee, *International Intellectual Property: Problems, Cases, and Materials* (3d ed. 2017)

Law Review Articles

Daniel C.K. Chow, *Why the 2020 U.S.-China Trade Agreement Needs Anti-Corruption Provisions for the Protection of Intellectual Property*, Notre Dame J. of Int'l & Comparative L. (forthcoming 2021), https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=241239

Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 Nw. J. of Int'l L. & Bus. 157 (2020)

Daniel C.K. Chow, *China's Crackdown on Corruption and the Foreign Corrupt Practices Act*, 5 Tex. A&M L. Rev. 323 (2018)

Daniel C.K. Chow, *Three Major Problems Threatening Multi-National Pharmaceutical Companies Doing Business in China*, 19 Colum. Sci. & Tech. L. Rev. 47 (2017)

Daniel C.K. Chow, *How China's Crackdown on Corruption Has Led to Less Transparency in the Enforcement of China's Anti-Bribery Laws*, 48 U.C. Davis L. Rev. 685 (2015)

Daniel C.K. Chow, *Navigating the Minefield of Trade Secrets Protection in China*, 48 Vand. J. of Transat'l L. 1007 (2014)

Daniel C.K. Chow, *Why China's Crackdown on Commercial Bribery Threatens Multinational Companies Doing Business in China*, 31 Ariz. J. of Comparative & Int'l L. 512 (2014)

Daniel C.K. Chow, *China under the Foreign Corrupt Practices Act*, 2012 Wis. L. Rev. 573 (2012)

Daniel C.K. Chow, *The Interplay between the Foreign Corrupt Practices Act and China's new Anti-Bribery Law*, 73 Ohio State L. J. 1015 (2012)

Daniel C.K. Chow, *Exhaustion of Trademarks and Parallel Imports in China*, 51 Santa Clara L. Rev. 1283 (2011)

Daniel C.K. Chow, *Counterfeiting in the People's Republic of China*, 78 Wash. U. L. Q. 1 (2000)

Suzanne E. Scoggins, *Policing Modern China* (Apr. 19, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3358916


Websites and Blogs

The State Council of the People's Republic of China, Ministry of Public Security (updated Aug. 25, 2015), http://english.www.gov.cn/state_council/2014/09/09/content_281474986284154.htm.

Marteen Beekers, *How to Verify a China Business License in 5 Steps*, Chinatradeblog (Jan. 11, 2019), https://chinatradeblog.org/china-business-license-verification/


News Articles

BBC News, *China arrests 1,900 in Crackdown on Fake Drugs*, (Aug. 6, 2013), https://www.bbc.com/news/world-asia-china-19144556#:~:text=Police%20in%20China%20have%20arrested,(%24182m%3B%20%C2%A317m)

*Guangzhou Intellectual Property Court Oks Parallel Imports*, The National Law Review  (May 12, 2020), https://www.natlawreview.com/article/guangzhou-intellectual-property-court-oks-parallel-imports

Hewlett-Packard, *HP to Acquire 3Com for $2.7 Billion*, Press Release (Nov. 11, 2009), https://www8.hp.com/us/en/hp-news/press-release.html?id=169454.

Hewlett-Packard Enterprise, *HPE Closes Transaction with Tsinghua Holdings*, Press Release (May 4, 2016), https://www.hpe.com/us/en/newsroom/press-release/2017/03/hewlett-packard-enterprise-closes-transaction-with-tsinghua-holdings.html.

Aaron Winiger, *Guangzhou Intellectual Property Court Oks Parallel Imports*, National L. Rev. (May 12, 2020), https://www.natlawreview.com/article/guangzhou-intellectual-property-court-oks-parallel-imports

XinhuaNet, *13 Jailed for Making Fake Moutai Liquor in SW China* (Dec. 28, 2020), http://www.xinhuanet.com/english/2020-12/28/c_139624357.htm

XinhuaNet, *Chinese Police Seize 422-mln-yuan Counterfeit Money*, (May 15, 2020), http://www.xinhuanet.com/english/2020-05/15/c_139057549.htm

<u>Other</u>
I also performed general internet research.