# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ALEXANDER STYLLER, INTEGRATED
COMMUNICATIONS & TECHNOLOGIES
INC., JADE CHENG, JASON YUYI,
CATHY YU, CAROLINE MARAFAO
CHENG, PUSHUN CHENG, CHANGZHEN
NI, JUNFANG YU, MEIXIANG CHENG,
FANGSHOU YU, AND CHANGHUA NI

        *Plaintiffs*,

v.

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, HEWLETT-
PACKARD FINANCIAL SERVICES
(INDIA) PRIVATE LIMITED, HP INC.,
HEWLETT PACKARD ENTERPRISE
COMPANY, AND DAVID GILL,

        *Defendants*.

**Civil Action No. 1:16-CV-10386 (LTS)**

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated: August 2, 2021

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Luke Nikas
Alex Spiro
Jonathan Oblak
Alex Zuckerman
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849- 7000
lukenikas@quinnemanuel.com
alexspiro@quinnemanuel.com
jonoblak@quinnemanuel.com
alexzuckerman@quinnemanuel.com
*Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

**Page**

Preliminary Statement.................................................................................................1

Plaintiffs' Response to Defendants' Statement of  Undisputed Material Facts..............................5

    A.    ICT Contracts for the Promised Goods.................................................5

    B.    The Shipped Goods.................................................................6

    C.    The Arrests.......................................................................7

    D.    HP's Response ....................................................................8

Legal Standard ........................................................................................9

Argument ...........................................................................................10

I.    Defendants are not Entitled to Summary Judgment on the Counterfeiting Claims..........10

    A.    The authenticity of goods sold by HPFS India to ICT remains a disputed issue of material fact. ..........................................................10

        1.    The record contains substantial evidence that HPFS sold ICT goods with counterfeit trademarks..........................................10

        2.    There is a genuine dispute whether some of the goods that HPFS sold to ICT were manufactured by a party other than H3C. ....................12

    B.    The Defendants' state of mind as to each of the Counterfeiting Claims is a disputed issue of material fact...........................................16

    C.    The Individual Plaintiffs may sue for fraud, negligent misrepresentation, breach of warranty, and Unfair and Deceptive Trade Practices. ...........................17

    D.    Plaintiffs may pursue their Breach of Warranty claims (Count V) irrespective of any disclaimer provisions. ...........................................18

    E.    There is a genuine dispute regarding ICT's damages. ..........................19

II.    Defendants Are Not Entitled to Summary Judgment on the Conspiracy Claims. ...........20

    A.    H3C's agent status remains a disputed issue of material fact. ...............21

    B.    Defendants' ability to terminate the Individual Plaintiffs' prolonged detention is a disputed issue of material fact. .......................................23

    C.    Defendants are not entitled to summary judgment on the fraud claims (Count VII)....................................................................25

    D.    Defendants' state of mind regarding the false imprisonment claims (Count IX) is a disputed issue of material fact..........................................27

    E.    The duty and causation elements of the negligence claims (Count X) are disputed issues of material fact. ...........................................30

    F.    Defendants are not entitled to summary judgment on Plaintiffs' conspiracy claims (Count XI). .................................................................32

i

G.      Defendants are not entitled to summary judgment on Plaintiffs' claims for Intentional Infliction of Emotional Distress (Count XII). ....................................33

H.      Defendants are not entitled to summary judgment on the loss of consortium claims (Count XIII)..................................................................36

III.    This Court has Jurisdiction over the Unfair and Deceptive Trade Practices Claims (Counts VI and VIII)....................................................................37

IV.     Defendants are not entitled to Summary Judgment on their Counterclaims. ...................38

A.      Defendants' right to recovery under Section 8 of the RRSA is a disputed issue of material fact. ..............................................................39

B.      The applicability of the RRSA indemnity is a disputed issue of material fact...........................................................................40

Conclusion .............................................................................40

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re 201 Forest St. LLC*,
    409 B.R. 543 (Bankr. D. Mass. 2009) ............................................................. 37

*Abelson v. Strong*,
    1987 WL 15872 (D. Mass. July 30, 1987).......................................................... 17

*Amato v. Steele*,
    2015 WL 3466395 (D. Mass. June 1, 2015) ...................................................... 9

*Angelo v. USA Triathlon*,
    2014 WL 4716195 (D. Mass. Sept. 19, 2014) ................................................... 40

*Atl. Rsch. Mktg. Sys., Inc. v. Saco Def., Inc.*,
    997 F. Supp. 159 (D. Mass. 1998) .................................................................... 40

*Bacardi Int'l Ltd. v. V. Suarez & Co.*,
    719 F.3d 1 (1st Cir. 2013)................................................................................. 29

*Bros. v. Town of Millbury*,
    2014 WL 4102436 (D. Mass. Aug. 14, 2014) ................................................... 36

*Cady v. Marcella*,
    729 N.E.2d 1125 (2000)................................................................................... 39

*Cambridge Plating Co. v. Napco, Inc.*,
    85 F.3d 752 (1st Cir. 1996)............................................................................... 37

*Ciolino v. Eastman*,
    128 F. Supp. 3d 366 (D. Mass. 2015) ............................................................... 36

*CNE Direct, Inc. v. Blackberry Corp.*,
    2015 WL 4750847 (D. Mass. Aug. 10, 2015), *aff'd*, 821 F.3d 146 (1st Cir. 2016) ........ 23

*CRA Int'l, Inc. v. Painter*,
    2017 WL 2292737 (Mass. Super. Apr. 11, 2017)........................................... 39

*Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
    918 N.E.2d 36 (2009)....................................................................................... 17

*Cummings v. HPG Int'l, Inc.*,
    244 F.3d 16 (1st Cir. 2001).............................................................................. 17

*Dagi v. Delta Airlines, Inc.*,
    961 F.3d 22 (1st Cir. 2020)............................................................................... 27

*Damon v. Sun Co.*,
    87 F.3d 1467 (1st Cir. 1996) ......................................................................... 18

*Devlin v. WSI Corp.*,
    833 F. Supp. 69 (D. Mass. 1993) .................................................................. 21

*Diomed, Inc. v. Vascular Sols., Inc.*,
    2006 WL 516756 (D. Mass. Mar. 2, 2006) .................................................... 20

*DSF Invs., LLC v. Lyme Timber Co.*,
    2005 WL 1683928 (Mass. Super. May 11, 2005) .......................................... 20

*Edsall v. Assumption Coll.*,
    367 F. Supp. 2d 72 (D. Mass. 2005) ............................................................. 37

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    832 F.3d 1 (1st Cir. 2016) ............................................................................. 10

*First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*,
    839 F. Supp. 2d 407 (D. Mass. 2012) ........................................................... 18

*Fishman v. LaSalle Nat'l Bank*,
    247 F.3d 300 (1st Cir. 2001) ......................................................................... 39

*Framingham Tel. Answering Serv., Inc. v. Am. Tel. & Tel. Co.*,
    1994 WL 902948 (Mass. Sup. Ct. Oct. 21, 1994) ......................................... 34

*Garcia v. City of Merced*,
    637 F. Supp. 2d 731 (E.D. Cal. 2008) ........................................................... 29

*Garside v. Osco Drug, Inc.*,
    895 F.2d 46 (1st Cir. 1990) ........................................................................... 9

*HipSaver Co. v. J.T. Posey Co.*,
    490 F. Supp. 2d 55 (D. Mass. 2007) ............................................................. 37

*I.U. by Roy v. Pioneer Valley Chinese Immersion Charter Sch.*,
    2016 WL 8679257 (D. Mass. June 10, 2016) ................................................ 36

*Irish Venture, Inc. v. Fleetguard, Inc.*,
    270 F. Supp. 2d 84 (D. Mass. 2003) ............................................................. 18

*Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*,
    329 F.3d 216 (1st Cir. 2003) ......................................................................... 38

*Kosovich v. Metro Homes, LLC*,
    2009 WL 5171737 (S.D.N.Y. Dec. 30, 2009) ............................................... 18

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
    438 Mass. 459, 781 N.E.2d 787 (2003) ........................................................ 38

*Lawless v. Steward Health Care Sys., LLC*,
    894 F.3d 9 (1st Cir. 2018) ............................................................................. 9

*Limone v. United States,*
  497 F. Supp. 2d 143 (D. Mass. 2007) ...................................................... 31, 32

*Lynch v. Cotton,*
  2002 WL 31856409 (Mass. App. Ct. 2002) .................................................. 19

*Mackey v. Town of Tewksbury,*
  433 F. Supp. 3d 116 (D. Mass. 2020) .......................................................... 34

*Manning v. Zuckerman,*
  444 N.E.2d 1262 (1983) ................................................................................ 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ...................................................................................... 10

*Minh Tu v. Mut. Life Ins. Co. of New York,*
  136 F.3d 77 (1st Cir. 1998) .......................................................................... 12

*Nancy P. v. D'Amato,*
  517 N.E.2d 824 (1988) .................................................................................. 34

*Nota Constr. Corp. v. Keyes Assocs.,*
  694 N.E.2d 401 (Mass. App. Ct. 1998) ........................................................ 16

*NPS, LLC v. Ambac Assur. Corp.,*
  706 F. Supp. 2d 162 (D. Mass. 2010) ........................................................... 19

*O'Rourke v. Hampshire Council of Governments,*
  2016 WL 8679354 (D. Mass. Sept. 23, 2016) .............................................. 16

*Onofrio v. Dep't of Mental Health,*
  562 N.E.2d 1341 (1990) ................................................................................ 32

*Passatempo v. McMenimen,*
  960 N.E.2d 275 (2012) .................................................................................. 19

*Pujol v. Shearson Am. Exp., Inc.,*
  877 F.2d 132 (1st Cir. 1989) ........................................................................ 29

*Rader v. Odermatt,*
  2008 WL 2877826 (Mass App. Div. Dist. Ct. July 23, 2008) ....................... 35

*Republic of Turkey v. OKS Partners,*
  797 F. Supp. 64 (D. Mass. 1992) .................................................................. 38

*Rivera v. Double A Transp., Inc.,*
  727 A.2d 204 (1999) ..................................................................................... 27

*Shaw's Supermarkets, Inc. v. Delgiacco,*
  575 N.E.2d 1115 (Mass. 1991) ...................................................................... 39

*Shimizu Corp. v. Dow Roofing Sys., LLC,*
  2013 WL 5513035 (D. Mass. Sept. 27, 2013) .......................................... 17, 18

v

*Sietins v. Joseph,*
    238 F. Supp. 2d 366 (D. Mass. 2003) ............................................................. 27

*Simon v. Solomon,*
    431 N.E.2d 556 (1982) ...................................................................... 34, 35

*Sindi v. El-Moslimany,*
    896 F.3d 1 (1st Cir. 2018) ...................................................................... 34

*Smith v. City of Montgomery,*
    2011 WL 5216309 (M.D. Ala. Nov. 2, 2011) .......................................... 28

*Stepanischen v. Merchants Despatch Transp. Corp.,*
    722 F.2d 922 (1st Cir. 1983) ................................................................. 10

*Stolzoff v. Waste Sys. Int'l, Inc.,*
    792 N.E.2d 1031 (Mass. App. Ct. 2003) ......................................... 26, 27

*Talarico v. Marathon Shoe Co.,*
    221 F. Supp. 2d 35 (D. Me. 2002) ........................................................ 13

*Taylor v. Am. Chemistry Council,*
    576 F.3d 16 (1st Cir. 2009) .............................................................. 32, 33

*Thomas v. Harrington,*
    909 F.3d 483 (1st Cir. 2018) ................................................................. 32

*Uncle Henry's Inc. v. Plaut Consulting Co.,*
    399 F.3d 33 (1st Cir. 2005) ................................................................... 38

*United States v. Diaz,*
    597 F.3d 56 (1st Cir. 2010) ..................................................................... 7

*United States v. Feliz,*
    794 F.3d 123 (1st Cir. 2015) ................................................................... 7

*VMark Software, Inc. v. EMC Corp.,*
    642 N.E.2d 587 (Mass. App. Ct. 1994) ............................................... 37

*W.R. Const. & Consulting Inc. v. Jeld-Wen, Inc.,*
    2002 WL 31194870 (D. Mass. Sept. 20, 2002) .................................... 18

*W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,*
    493 U.S. 400 (1990) ............................................................................. 29

*Xiao Wei Yang Catering Linkage in Inner Mongolia Co. Ltd v. Inner Mongolia Xiao Wei
    Yang USA, Inc.,*
    2017 WL 507211 (D. Mass. Feb. 6, 2017) .......................................... 12

*Zaleskas v. Brigham & Women's Hosp.,*
    141 N.E.3d 927 (2020) ................................................................... 34, 35

*Zavras v. Capeway Rovers Motorcycle Club, Inc.,*
    687 N.E.2d 1263 (Mass. App. Ct. 1997) ............................................. 40

## <u>Statutes and Rules</u>

15 U.S.C. § 78m(b)(2)(B) .............................................................................. 21

F.R.C.P. 33(d) .............................................................................................. 20

F.R.E. 901(b)(4) ............................................................................................12

Fed. R. Civ. P. 56(a) ...................................................................................... 9

Fed. R. Evid. 803(6) ..................................................................................... 12

Fed. R. Evid. 803(8) ..................................................................................... 12

Fed. R. Evid. 901 .......................................................................................... 12

Mass. Gen. Laws. Ch. 93A, § 11 ................................................... 17, 18, 37, 38

## <u>Other Authorities</u>

Restatement (Second) of Torts § 35 ............................................................... 27

Restatement (Second) of Torts § 35 ............................................................... 27

Restatement (Second) of Torts §876 .............................................................. 32

## PRELIMINARY STATEMENT

For seven months in 2012 and 2013, Plaintiffs Jade Cheng, Jason Yuyi, and Cathy Yu were detained by the Chinese police.  They had no contact with friends or family.  They were denied sleep, privacy, hot water, and the right to speak.  They had no idea when the nightmare would end.  And they had done nothing wrong.  Jade, Jason, and Cathy (the "Individual Plaintiffs") were locked up because they trusted the Hewlett-Packard brand.  When two HP subsidiaries sold supposedly genuine goods to Jade, Jason, and Cathy's employer, they had no way of knowing that they had been saddled with counterfeits that the HP entities had never authenticated, inspected, or even possessed prior to the sale.  Jade, Jason, and Cathy were arrested for reselling those goods when a third HP subsidiary filed a false police report condemning them for relying on HP's guarantees.  But instead of owning up, the HP Defendants covered up:  conducting a sham investigation, concealing material information from both Plaintiffs and the police, making an official statement designed to shield the multi-national behemoth from any responsibility, then destroying evidence that would have freed the Individual Plaintiffs and shown that HP was to blame.  The facts are now clear: the Plaintiffs deserve their day in court.  Summary judgment should be denied.

Defendants hope to avoid liability for their egregious conduct through a second motion for summary judgment that suffers from the same fatal defect as the first: there are genuine disputes of material fact that necessitate a trial in this case.  By Defendants' own account, there is conflicting evidence as to the origin and authenticity of the goods that led to Plaintiffs' wrongful detention.  In 2011, Defendant HPFS said an inventory list used to track the goods showed "discrepancies."   In 2012, after the Individual Plaintiffs' employer, Plaintiff Integrated Communications & Technologies, Inc. ("ICT") bought some of the goods, an HPFS employee said they were not fit for resale.  Two months later, HP's Chinese subsidiary, H3C, swore that all of the units in ICT's possession was counterfeit.  In 2013, while Jade, Jason, and Cathy sat in jail

1

waiting for HP to help, another HP subsidiary destroyed the remaining products that ICT had contracted to purchase due to their "questionable" origin.  Finally, once this litigation began, Defendants' expert claimed that 100% of the seized items on the HP's inventory list were authentic, making him the very first person paid by HP to credit that inventory as reliable.

While Defendants now want to focus solely on the opinion of their paid expert, they cannot ignore the contrary evidence and multitude of questions surrounding the origin and authenticity of the goods.  Those issues (like many others in this case) must be settled at trial.  And, although Defendants baldly assert that "[t]he truth" reveals "zero evidence" in support of Plaintiffs' "unprovable" claims, their arguments ask the Court to settle factual disputes in their favor, ignore admissible evidence, and revisit issues deemed triable long ago.  But even a brief overview of record shows that summary judgment is inappropriate:

**The HPFS Defendants sold ICT counterfeit goods.**  The Individual Plaintiffs were charged with a single crime under Chinese law: selling goods with fake trademarks.  That, as opposed to selling fake goods, has always been the alleged crime – as the Defendants admitted at the last round of summary judgment.  The record shows HPFS knew about the trademark problem before the arrests:  HPFS twice noted that goods from the same batch as those sold to ICT were not fit for resale due to improper labels.  Given that Jade, Jason, and Cathy went to jail because of those labels, the opinion of Defendants' expert that the H3C hardware is authentic "in fact" – i.e., manufactured by H3C – is irrelevant to the counterfeiting question.  But even if the Individual Plaintiffs had been charged with selling counterfeit hardware, there would still be a triable issue, because the inventory list used by Defendants' expert to purportedly "authenticate" the manufacturer of the hardware is incomplete, unreliable, and insufficient to reconcile every piece of equipment.  That is why Defendants admitted that some of the goods sold to ICT did not

originate from HP; and why it is impossible for them to say that the goods sold to ICT were genuine. In short, the counterfeiting issue is still in dispute, as this Court concluded last year.

**Defendants failed to inform ICT of numerous red flags that rendered the goods unfit for resale.**  Defendants admit that they "could have done more diligence" before selling the equipment to ICT.  "More" would have meant any diligence at all.  Because no one from HP or any of its subsidiaries ever laid eyes on any of the goods before selling them to ICT, Defendants were willfully ignorant of the equipment's authenticity, at best.  Worse, HPFS never shared with ICT its doubts that the goods could be lawfully exported from India, where the sale occurred, or the fact that the company discouraged the resale of used equipment in China.  Defendants' intentional and reckless failure to warn ICT while selling goods unfit for resale also merits a trial.

**H3C spearheaded the wrongful investigation of the Individual Plaintiffs while acting as HPFS's agent.**  A year ago, this Court found admissible evidence, in the form of HPFS's letter to the Chinese police, that HP's Chinese subsidiary H3C acted "on behalf of" Defendant HPFS when compiling the Verification Report, a document H3C submitted to the Chinese police explaining its bases for concluding that the goods were counterfeit.  Defendants have since disclosed an alternative version of HPFS's letter, which they claim is the actual version sent to the police, and which conveniently excises language the Court cited as evidence that H3C was acting as HPFS's agent.  But Defendants cannot make the evidence already in the record disappear.  Nor does that late-arriving document explain the Defendants' admissions that "HP had control of H3C's business strategy," "H3C reported [to] HP," or that "H3C conducted" another relevant inspection "at the request of [HPFS India]."  (*See* Point II.A., *infra*.)  Because there remains a dispute whether H3C acted as Defendants' agent during the investigation, the Court must again

deny the Defendants' motion for summary judgment on the Counterfeiting Claims.[1]

**HP was the cause of the Individual Plaintiffs prolonged detention.** Defendants hope to escape liability by arguing that they were unable to influence the Chinese police during Jade, Jason, and Cathy's detention. The only support for that claim is a mischaracterization of the opinion of Plaintiffs' Chinese law expert, who testified that HP could not control H3C's interactions with the police due to a corporate structure that allowed H3C to enforce its trademarks "indigenous[ly]" in China. HP's convoluted arrangement – which potentially constituted at least one violation of the U.S. Foreign Corrupt Practices Act – was by design, but not immutable. HP could have ordered its wholly-owned subsidiary to drop the charges; it chose not to. Yet the fact that Defendants acted as if they could help the Plaintiffs, including by communicating with the police numerous times during the detention, belies their newfound claim of impotence.

**HPFS destroyed exculpatory evidence while the Individual Plaintiffs were sitting in jail.** While Jade, Jason, and Cathy sat in jail, Defendants had access to the rest of the equipment that they had planned to sell to ICT, and which had the same problems. That remaining equipment was proof that Jade, Jason, and Cathy had not faked the product labels, and thus did not "knowingly sell[] commodities bearing counterfeit . . . trademarks," as required for a finding of guilt under Chinese law. It was also proof that HPFS itself was guilty of selling counterfeit goods. Defendants destroyed this "helpful" evidence, despite having "no reason to believe" that ICT or the Individual Plaintiffs had faked the trademarks. That act of willful indifference demonstrates the need for a trial on Plaintiffs' fraud, false imprisonment, and intentional infliction of emotional distress claims.

---

[1] For the Court's ease of reference, Plaintiffs adopt Defendants' usage of the defined terms "Counterfeiting Claims" and "Conspiracy Claims" throughout this brief. (*See* Dkt. 514, Def.'s Br., at 1-2.) Plaintiffs do not, however, accede to the implication that the Counterfeiting Claims each require proof of counterfeiting, or that the Conspiracy Claims each require evidence of conspiracy. "**Counterfeiting Claims**" simply refers to claims which arise from Defendants' pre-arrest conduct, while "**Conspiracy Claims**" refer to claims arising from Defendants' response to those arrests.

Plaintiffs are convinced that that these facts will persuade a jury; certainly, they are sufficient to warrant a trial.  As Defendants admit: this case arises from "a confusing situation."  It is not the sort that Rule 56 was meant to resolve.  A trial is needed.  For these reasons, and those that follow, Defendants' motion for summary judgment should be denied in full.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

**A.     ICT Contracts for the Promised Goods.**

In June 2011, Plaintiff ICT began to negotiate a resale agreement with HPFS for the purchase of networking hardware that had recently been returned from a 7-month lease in connection with the Commonwealth Games (the CWG Goods).  (SOF ¶ 1.)[3]  At the time, ICT and its employees believed that HPFS was offering genuine H3C products (the Promised Goods), and that "most of the product[s would be] new in original box[es]," "from [a] reliable source [HP]," and thus, "[were] not counterfeit, [and] not defective."  (*Id.* ¶¶ 1-3.)  ICT planned to sell the Promised Goods in China, the primary market for H3C goods, with the help of its Chinese employees: sales director Jade Cheng, then 31, who was at the beginning of a budding sales career; marketing representative; Jason Yuyi, then 25; and marketing assistant, Cathy Yu, 22.  (Exs. 104; 105; 106.)  With this plan in place, ICT entered into an agreement with HPFS's Indian affiliate, HPFS India (*see id.* ¶ 2; the "RRSA"), to purchase and resell the CWG Goods in four installments, paying $250,000 per installment and $1 million total.  (SOF ¶ 1.)  But when ICT received the first

---

[2]  Plaintiffs' responses to Defendants' statement of undisputed facts, as well as their counterstatement of material undisputed facts, have been filed with this opposition brief.  (Hereinafter, "SOF ¶ _.")  All exhibits referenced herein ("Ex. _") are those attached to the Declaration of Luke Nikas filed with this opposition brief.

[3]  The goods were leased by HPFS to be used in India during the 2010 Commonwealth Games (Dkt. 341¶ 1); accordingly, "**CWG Goods**" refers to all of the off-lease equipment returned to HPFS.  "**Promised Goods**" refers to goods described in the course of HPFS's negotiations with ICT, and those listed in the resulting agreement.  "**Shipped Goods**" refers to the first and only installment of CWG Goods that ICT received pursuant to the resale agreement.  "**Seized Equipment**" refers to the subset of Shipped Goods seized by the Chinese police on December 9, 2012.

installment of CWG Goods (the Shipped Goods), there were a host of issues.  (SOF ¶¶ 3, 4.)

### B.    The Shipped Goods

When the Shipped Goods arrived, the packaging was damaged, many of the units had extra stickers placed over the proper trademarks, and the shipment lacked an accurate packing list.  (SOF ¶¶ 1, 14, 17.)  ICT made their best efforts to sell the Shipped Goods, but had to do so at rates below what both parties expected when they entered into the RRSA.  (SOF ¶¶ 5, 46.)

In fact, HPFS has no basis to claim that the Shipped Goods, or their trademark labels, were genuine:  HPFS never possessed the goods, instead housing them with their Indian agent, TTG; never inspected the goods; and never checked if the goods were counterfeit before selling them to ICT.  (SOF ¶¶ 3, 17.)  HPFS also could not have checked for counterfeits among the Shipped Goods because HPFS never obtained a comprehensive list of serial numbers for those units.  (SOF ¶ 20.)  To this day, Defendants cannot say where the Shipped Goods were made, or who made them.  (SOF ¶ 1.)  Defendants knew that this failure to verify the product could result in HPFS selling counterfeit goods, and that a serious consequence of selling counterfeits is that the buyer could end up in prison, but they did not, as a matter of policy, ever inspect the goods they intended to sell to parties like ICT.  (SOF ¶ 3.)  And even though it understood the risk of importing used goods into China where another entity holds the trademark ("parallel imports"), HPFS did not warn ICT of the increased regulatory scrutiny it would face attempting to resell the Shipped Goods.  (SOF ¶¶ 90, 101.)  Nor, despite its inability to authorize the importation of H3C goods into China, did HPFS ever tell H3C about its resale agreement with ICT.  (*Id*.)

In October 2012, eight months after delivering the first installment to ICT, HPFS sent a representative to visit the TTG facility and view the remaining CWG Goods.  Although not an expert in counterfeiting, HPFS sales representative Tom Harris observed the CWG Goods had not been packaged in a manner fit for resale, in part due to the numerous stickers affixed to the products.

(SOF ¶¶ 1, 3.)  He also described the material control in the storage facility as "very questionable," which had damaged the packaging of the CWG Goods "for the past two years."  (*Id.*)  "Nobody . . . follow[ed]-up" on this report indicating the HPFS had sold ICT goods that were potentially counterfeit and certainly unfit for resale; and nobody told ICT about HPFS's inside view.  (SOF ¶ 3.)  Without revealing to ICT the problems HPFS had discussed internally, HPFS sold the remaining CWG Goods to TTG at an 80% discount.  (SOF ¶ 122.)

### C.    The Arrests

Less than two months later, on December 9, 2012, H3C accused Jason Yuyi and Cathy Yu of selling counterfeit goods, leading the Beijing Public Security Bureau ("PSB" or "Chinese police") to arrest them and seize the 778 units of Shipped Goods still in their possession ("Seized Equipment").  (SOF ¶¶ 6, 9.)  In its report to the PSB ("Verification Report"), H3C concluded the Seized Equipment was counterfeit based on "abnormal" labels.  (Dkt. 515-8 at 21.)[4]  Jason and Cathy were charged with violating Article 214 of the criminal law of the People's Republic of China, which penalizes the "[sale] of commodities bearing counterfeit registered trademarks;" they were not charged with selling actually counterfeit products.  (SOF ¶¶ 11, 101.)  Their supervisor at ICT, Jade Cheng, traveled to Beijing to provide copies of the contract between ICT and HPFS India to the police so as to prove the authenticity of the Seized Equipment.  (SOF ¶¶ 7, 61, 130.)  When the police contacted Meng Tao, an employee of "HP in China," to authenticate the contracts, he responded that "HP d[id] not recognize" the agreement with ICT.  (SOF ¶¶ 49, 56.)  Despite presenting proof that the products were validly purchased from HP, Jade was also detained.

---

[4]  As discussed further in footnote 8, *infra*, the Verification Report is admissible for the truth of the statements therein. But even if the Court finds otherwise, H3C's statements to the PSB are admissible "to show the effect of the words spoken on the listener," that is, to show that those statements were the cause of Jade, Jason, and Cathy's arrests and detention.  *United States v. Feliz*, 794 F.3d 123, 132 (1st Cir. 2015); *see United States v. Diaz*, 597 F.3d 56, 65 (1st Cir. 2010) ("[Admissible] [v]erbal acts include statements whose utterance gives rise to legal consequences, such as the words used . . . by individuals charged with making a threat, bribe or misrepresentation.").

The Individual Plaintiffs spent over 200 days in the Haidian Detention Center in Beijing. (SOF ¶ 129.)  During that time, they were confined to a single room with dozens of other detainees, denied sleep, completely isolated from their families and friends, not allowed to speak, forced to take cold showers, and feared for their lives due to the prevalence of gangs in the facility.  (SOF ¶¶ 133-135.)  They had no idea how long they would be detained, or if they would ever get out. (SOF ¶¶ 136.)  They could only hope that someone on the outside was working to help them.

**D.      HP's Response**

When ICT CEO Alex Styller learned that his employees had been arrested, he asked HPFS to tell the police that it had sold ICT the Seized Equipment.  (Dkt 101-2 ¶¶ 58, 65, 66.)  Initially, Defendant Gill, who led HPFS's response, agreed with Styller "that the [Seized Equipment] is the same equipment sold by HPFS to . . . ICT." (SOF ¶ 17).  He also realized the core problem preventing ICT from exonerating Jade, Jason, and Cathy: the Inventory List HPFS provided was incomplete and unreliable.  (SOF ¶ 17).  Gill told Styller that Defendants were working "so that [the situation] can be resolved as soon as possible."  (SOF ¶ 69.)  But Gill left out that Defendants were working to ensure that HP and its subsidiaries avoided any consequences for their actions.

The so-called "as soon as possible" HP response had two components: (i) "gather[ing] information" from H3C, which continued to press the counterfeiting charges; and (ii) writing one letter to the PSB.  (SOF ¶ 76.)  As part of the investigation, HPFS and H3C worked together to arrange the delivery of samples of the CWG goods to H3C employee Wang You, who inspected them "at the request of . . . HPFS India."  (Dkt. 341 ¶¶ 58-60; SOF ¶157.)  As Gill and HPFS admitted in a draft of the letter to the PSB, shared with Styller in March 2013, the CWG goods matched the Seized Equipment; therefore, "the relevant counterfeiting activities occurred at some point prior" to ICT's purchase.  (SOF ¶ 64.)  But Defendants never sent the March draft; instead, they revised it to remove every single statement that might have implicated Defendants in the

potential sale of counterfeit goods.  In addition to removing HPFS's admission about the timing of the counterfeiting, the letter to the PSB no longer included the two prior admissions most helpful to Jade, Jason, and Cathy:  that (i) "the [Seized Equipment] in China is the same equipment sold by HPFS to ICT;" and that (ii) "the [counterfeit] logos presently affixed to the [Seized Equipment] were present" when HPFS sent the goods to ICT.  (*Compare* Dkt. 515-9, *with* Dkt. 331-4.)[5] Nonetheless, on April 30, 2013, Gill told Styller that the letter sent to the PSB was "substantively the same" as the earlier draft.  (SOF ¶ 64.)  That was demonstrably untrue.

One week later, HPFS decided that "the origination of the [CWG Goods] [was] questionable," and destroyed them.  (SOF ¶ 64.)  Defendants never told the PSB that this evidence existed, despite their later admission that the CWG Goods "would [have] . . . helped to resolve" the charges against the Plaintiffs by proving their innocence.  (*Id.*)  But Jade, Jason, and Cathy received no "help" from Defendants.  They were released after seven months in jail, and their charges were dropped in their entirety in 2015.  (SOF ¶ 10.)

## LEGAL STANDARD

The summary judgment mechanism "pierce[s] the pleadings and . . .  assess[es] the proof in order to see whether there is a genuine need for trial."  *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).[6]  Summary judgment must be denied unless, after considering "all properly supported evidence in the light most favorable to the nonmovant and draw[ing] all reasonable inferences in the nonmovant's favor," *Amato v. Steele*, 2015 WL 3466395, at *2 (D. Mass. June 1, 2015), the Court determines that "the record . . . presents no genuine issue as to any material fact." *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20-21 (1st Cir. 2018); Fed. R. Civ. P.

---

[5]  As discussed in Point I.A.2, *infra*, there is a genuine dispute about which version of HPFS's letter was sent to the police; it is undisputed that neither contains the text quoted above.

[6]  All internal quotations and citations have been omitted, and all emphases are added, except where noted otherwise.

56(a)).  "An issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  *Id.*  If

a "rational trier of fact [could] find for the non-moving party," summary judgment must be denied.

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 7 (1st Cir. 2016) (quoting *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Summary judgment is often

inappropriate where "the state of mind of one of the parties is crucial to the outcome of the case."

*Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983).

**ARGUMENT**

I.   **DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE COUNTERFEITING CLAIMS.**[7]

   A.   **The authenticity of goods sold by HPFS India to ICT remains a disputed issue of material fact.**

The Court ordered an initial round of summary judgment briefing "regarding whether the

goods at issue . . . were counterfeit."  (Dkt. 280 at 16.)  The parties agreed "that no further record

[was] required for the Court to rule on the counterfeit issue."  (Dkt. 308 at 6.)  After considering

the parties' cross-motions, the Court concluded that there was a genuine dispute, and said

"although it is resolved for summary judgment purposes, the counterfeit issue is far from settled."

(Dkt. 369 ("SJ Order"), at 24.)  Discovery since then has only confirmed the correctness of that

conclusion: the counterfeit nature of the Seized Equipment is a disputed issue of material fact.

   1.   <u>The record contains substantial evidence that HPFS sold ICT goods with counterfeit trademarks.</u>

Throughout this litigation, Defendants have been laser-focused on proving that the Seized

Equipment was not "in fact counterfeit," (Def.'s Br. at 8), ignoring the Court's observations at the

---

[7]  Contrary to Defendants' assertion, the parties never "agreed that . . . [the Counterfeiting Claims] 'go away'" if it were proven that the Shipped Equipment was not counterfeit.  (Def.'s Br. at 1.)  No stipulation or Court order mandates that result, nor may Defendants achieve it by citing an offhand response by Plaintiffs' counsel at a status conference before Defendants had produced any documents in this case.  (*See* Dkt. 194 ("Defendants made their initial production . . . on January 31, 2019").)  Even so, the comment was made in response to a hypothetical about Defendants' "in fact counterfeit" theory, and is irrelevant to the actual cause of the Plaintiffs' injuries: fake trademarks.

10

outset of the case that the goods "might also be counterfeit in a second way" and that this central dispute is not "solely about whether the equipment is counterfeit, but how it's counterfeit." (Dkt. 129 at 39:8-19). The Court correctly recognized that the question is not just whether the hardware is genuine, but also whether the goods *appear* to be counterfeit. Indeed, in its Verification Report, H3C concluded that the Seized Equipment was counterfeit based on a "compar[ison] with genuine H3C products *in terms of product packaging, product appearance, and labeling*." (SJ Order at 6 (citing Dkt. 331-18 at 3-13.) Thus, denying Defendants' first motion for summary judgment, the Court understood that "evidence that the labels affixed to particular goods are counterfeit may be evidence that the goods themselves are counterfeit." (*Id.* at 19.) That is entirely consistent with the fact that the Individual Plaintiffs were arrested for selling goods with fake trademarks, rather than for selling fake goods. (SOF ¶ 14.)

In their motion, Defendants do not address the fact that the arrests were for counterfeit trademarks, not counterfeit goods. Instead, they recycle arguments this Court rejected last year, contending the Verification Report is not admissible evidence. (Def. Br. at 6-7.) While Defendants are still wrong in that regard, the report is not the only support for Plaintiffs' claims.[8] An abundance of *other* evidence shows that at least some the Shipped Goods were counterfeit on account of inadequate or fake trademarks:

- In June 2011, HPFS reported that the CWG Goods had the wrong labels and "appear[ed] to be the last generation before HP commenced applying HP labelling to the product." (SOF ¶ 3.) There is no evidence that HPFS relabeled the CWG Goods.

- Two months prior to the arrests, HPFS employee Tom Harris observed that the remaining CWG Goods were "not packaged in a manner . . . need[ed] to make the sale,"

---

[8]   The Verification Report is admissible. As the Court noted, HPFS admitted "that H3C inspected the seized transceivers *on behalf of HPFS India*." (*See* SJ Order at 15.) That conclusion is unchanged by Defendants' disclosure of a second purported letter to the police, and supported by extensive other evidence. (*See* Point II.A., *infra*.) Defendants' suggestion that the Verification Report merely "purports to contain H3C's statements to the Chinese police" (Def.'s Br. at 4) – is baffling, especially given their claims that the Report was "submitted by H3C," (SOF ¶ 25), was "*created by H3C*." (*id.*), and that "H3C issued a report to the police," (Dkt. 129 at 32:19-20) after "hav[ing] . . . examin[ed] the equipment," (*id.* at 35:10-11).

and that many of the units, 25% of which had already been shipped to ICT, carried "**multiple stickers**, top and bottom . . . all [of which] should be removed." (SOF ¶ 3.)

- Defendants previously admitted that the PSB investigated the Individual Plaintiffs for one crime, under Article 214 of the Criminal Law: "**sales of commodities under a fake registered trademark**." (SOF ¶¶ 11, 14, Ex. 73 ("Bail Letters"); Dkt. 515-17, ¶ 63.)[9]

- Based on a letter from the prosecutor, Defendants Gill told Styller that "the counterfeiting allegations **relate to the labeling**." (SOF ¶ 14.)

- HPFS claims that H3C informed the PSB that the Seized Equipment "were counterfeit products **according to the logos** on the equipment." (*Id.* (quoting Dkt. 515-9, at 4).)

Based on that evidence, as well as the Verification Report, a reasonable jury could conclude that the goods HPFS sold to ICT that were "counterfeit" under Chinese law by virtue of their fake trademark labels, which demonstrates a genuine need for a trial on the Counterfeiting Claims.

      2.    <u>There is a genuine dispute whether some of the goods that HPFS sold to ICT were manufactured by a party other than H3C.</u>

Ignoring the extensive evidence showing that the Seized Equipment carried counterfeit trademarks, Defendants argue summary judgment is appropriate if this Court reverses its ruling that the Verification Report was admissible evidence. Specifically, the Court ruled that the report

---

[9] The Court may consider documents from the files of the Chinese authorities, including the Bail Letters (as well as, *e.g.*, Exhibits 33-38, 40, 45, 50, 54, 60, & 83 to the Declaration of Luke Nikas), to be both authenticated and admissible. In *Xiao Wei Yang Catering Linkage in Inner Mongolia Co. Ltd v. Inner Mongolia Xiao Wei Yang USA, Inc.*, 2017 WL 507211, at *4 (D. Mass. Feb. 6, 2017), the court held that screenshots from a Chinese government database website could be properly authenticated pursuant to Federal Rule of Evidence 901. *Id.* at *4 (citing F.R.E. 901(b)(4)). The court found that the website address and contents, and the fact that the pictures included "the type [of information] one would expect to find on a public government database" were sufficient to authenticate the screenshots. *Id.* And, "for similar reasons, [the screenshots] fall within hearsay exceptions." (*Id.* (citing Fed. R. Evid. 803(6), (8).) As in *Xiao*, the Bail Letters state that they were authored by a government agency: the People's Procuratorate of Haidian District Beijing. As in *Xiao*, the Bail Letters contain the type of information one would expect to find in a prosecutor's letter authorizing bail, including: (i) the charged crime; (ii) the name of the bail bondsperson; (iii) the conditions on the Individual Plaintiffs' release; (iv) the signature and fingerprint of each Individual Plaintiff; and (v) the Procuratorate's official stamp. Furthermore, two more sources provide "independent evidence showing that [Bail Letters are] were what [Plaintiffs] claim[]." *Minh Tu v. Mut. Life Ins. Co. of New York*, 136 F.3d 77, 81 (1st Cir. 1998) First, Defendants' Chinese law expert, Laura Young, confirmed that the Bail Letters bore a seal and fingerprints "typical of what you would find on a bail release form" in the files of the Chinese police. (Young Tr. at 65:8-71:3.) Second, Cathy Yu's criminal defense attorney, Ma Li, who previously submitted an affidavit in this case (Dkt. 101-4), affirmed that the Individual Plaintiffs were released on bail on July 18, 2013 pursuant to an order from the prosecutor titled "Decision on Release on Bail Pending Trial" – clearly referring to the Bail Letters. (SOF ¶ 10 Ex. 98.) Defendants chose not to seek discovery from Ma Li, who, like H3C, resides in Mainland China.

was admissible because "H3C served as an agent of HP India for purposes of inspecting the [Seized Equipment]," based on the statement in the only version of HPFS's letter to the police then in the record that "H3C inspected the seized equipment ***on behalf of*** HPFS India."  (SJ Order at 14; Dkt. 331-4; the "Old Final Letter".)[10]  After their first motion for summary judgment was denied, Defendants produced a new version of the letter.  ("New Final Letter").  (*See* Dkt. 390 at 1-2.) Defendants were candid: the New Final Letter does not contain the words "on behalf of" and is thus "*more* favorable to Defendants that the version that the Court relied upon" previously.  (Dkt. 390 at 4, n.2.).)[11]  Notwithstanding all the questions surrounding Defendants' timing and changed positions concerning this production, the New Final Letter cannot erase the Old Final Letter. Defendants may not expunge the evidence that the Court relied upon when denying their first motion for summary judgment, just so they may move again on the same grounds.  *See Talarico v. Marathon Shoe Co.*, 221 F. Supp. 2d 35, 39 (D. Me. 2002) ("second try at summary judgment . . . misses the mark to the extent that [the movant] relitigates . . . issues . . . .").  Nor does it matter which version was actually sent to the police: the Old Final Letter was an admission, sent to ICT in the course of the investigation, that H3C was acting "on behalf of" HPFS.  It still is.

Even if the Old Final Letter were ignored – as Defendants now urge – the record still calls into question not just the authenticity of the marks, but the authenticity of the goods themselves. For instance, the New Final Letter supports the conclusion that the Seized Equipment was "in fact counterfeit."  HPFS admitted that some of the Shipped Goods received from HPFS "were not originally from HP."  (Dkt. 515-9 at 5.)  That is consistent with both the March 25, 2013 draft of

---

[10]  Defendants previously referred to the Old Final Letter as "HPFS India's letter to the [PSB]" without controversy. (Dkt. 342 at 9.)  They only disclosed the New Final Letter after the close of fact discovery. (Dkt. 372 at 3.)

[11]  As explained in Point I.A.1, *supra*, the Court need not determine which version of the letter HPFS actually sent to the Chinese police, although the existence of multiple versions, Defendants' representations to Alex Styller that the police received the Old Final Letter (*see* SOF ¶ 26), and Defendants' struggle to locate the final version each suggest that determining which letter was delivered is yet another question for the factfinder.

the letter, which said that "the relevant counterfeiting activity occurred at some point in time prior to the return of the sold equipment to HPFS India," (SOF ¶ 64), and HP's later admission that "the origination of the [CWG Goods] is questionable." (SOF ¶¶ 20, 48.)

Defendants were never able to authenticate the goods that HPFS India sold to ICT, and still do not know where they all came from, because "[a]s a lessor, HP is a passive lessor. *We don't physically inspect product*." (SOF ¶ 3.) Defendants admitted that HPFS's failure to inspect the product creates a risk "that [HPFS] unknowingly processes counterfeit product." (*Id.*) Because HP does not bother "to determine whether a product [that comes back from lease] is counterfeit," "*it is possible that [HP] could have done more diligence*" before reselling the equipment. (*see* SOF ¶ 17.) As the Court noted, Defendants cannot trace the products because they never received the corresponding import documentation, "including the serial numbers." (SJ Order at 24; *see also* SOF ¶ 17.) Defendants cannot credibly argue that this lack of information is "neutral" as to the counterfeiting question when their expert's opinions, offered as proof of authenticity, rely on the missing serial numbers. (*See* Dkt. 515-3.)

Nonetheless, Defendants claim that the expert opinions of Shelley Raina conclusively establish HPFS only sold ICT authentic goods, and that ICT was selling counterfeit goods "obtained . . .from other sources, not HPFS India." (Def.'s Br. at 10.) But all Mr. Raina's methodology consisted of was a visual inspection and an analysis of data only readable when the unit is plugged in. (Dkt. 515-3, ¶¶ 36-49.) Even if Defendants could trace the Seized Equipment, this methodology could not settle the counterfeiting question, because it does not address whether "the labels . . . conform[ed] to H3C's standards" – that is, Mr. Raina does not opine on the authenticity of the trademark labels, or whether the goods are "counterfeit in a second way," – as the Court already recognized. (SJ Order at 22; Dkt. 129 a 39:8-19.) Indeed, in Mr. Raina' view,

a fake trademark is not indicative of counterfeiting.  (Dkt. 331-1, at 93:20-22.)[12]  That would come

as news to the Chinese authorities, who arrested the Individual Plaintiffs and held them for seven

months for "sales of commodities under a ***fake registered trademark***."  (SOF ¶ 11.)[13]

Relatedly, the core problem with Mr. Raina's methodology is that it draws conclusions

regarding authenticity by "compar[ing] the serial numbers on each piece of Seized Equipment with

the serial numbers on the [I]nventory [L]ist of equipment sold by HPFS India to ICT."  (*Id.* at 23.)

There is substantial evidence showing that the Inventory List is unreliable and unfit for this purpose.

The Inventory List was compiled from incomplete information that HPFS received when the CWG

Goods were returned from lease.  (SOF ¶ 17.)  Later, Alex Styller told HPFS that the list of

equipment supplied with the Shipped Goods was "of very poor quality," (SOF ¶ 17), and he

identified 299 units sent to ICT but not on the list, as well as 299 serial numbers that appeared on

the list but which belonged to goods that were never sent to ICT.  (Dkt. 331-15 ¶ 8.)[14]  Defendant

Gill echoed similar concerns about the Inventory List:  after HPFS's auditor inspected of 40% the

Seized Equipment, Gill told Styller that "it appears that the equipment seized is the same

equipment sold by HPFS to . . . ICT," but admitted that using the "list of equipment sold by

[HPFS] . . . [i]t was not possible to reconcile 73 [of 293 inspected] items."  (SOF ¶ 17.)  As such,

Mr. Raina's claims that the goods sold by HPFS were authentic, based on the suspect Inventory

---

[12] Still, Mr. Raina confirmed that some units had "labels . . . applied back on the wrong product." (Dkt. 515-3, ¶ 62.)

[13] Indeed, the PSB would have been especially suspicious of Mr. Raina's methodology for detecting counterfeits, which involved plugging each transceiver into a computer to read and analyze each unit's data.  (Dkt. 515-3 ¶ 40.) H3C's auditor, Wang You, who acted as HPFS's agent when comparing the samples of CWG goods to the Seized Equipment (Dkt. 341 ¶ 58) told the PSB in May 2013 that "a transceiver that passes the verification by power-up cannot be proved to be an authentic H3C brand product."  (SOF ¶ 16.**)**  That statement may be considered as the statement of HPFS's agent within a regularly kept public record (the PSB files), *see* F.R.E. 803(6), 803(8), 801(d)(2)(D). Further, it is authentic under F.R.E. 901(b)(4) because: (i) Defendants' Chinese law expert identified an identical stamp to the one on the Wang You transcript as the H3C stamp that is "basically the equivalent of a signature." (SOF ¶¶ 142, 143, 168, 159.); and (ii) Ma Li affirmed that she reviewed the transcript in the prosecutor's files.  (Ex. 98, Ma Li. Aff. ¶¶ 15, 19.)  Even if Wang You's statements are deemed inadmissible hearsay, they may be considered for "the effect of the words spoken on the [PSB]."  (*See* note 4, *supra*.)

[14] Defendants cannot disprove Styller's analysis, because HPFS destroyed the CWG Goods. (Dkt. No. 341 ¶ 61.)

List, remain "subject to significant challenge," as this Court found last year.  (SJ Order at 24.)[15]

**B.    The Defendants' state of mind as to each of the Counterfeiting Claims is a disputed issue of material fact.**

Defendants acknowledge that certain red flags existed regarding the equipment.  (Def.'s Br. at 19).  That, itself, should be dispositive.  "[S]ummary judgment procedures should be used sparingly . . . where the issues of motive and intent play leading roles."  *O'Rourke v. Hampshire Council of Governments*, 2016 WL 8679354, at *9 (D. Mass. Sept. 23, 2016).  Defendants' motion does not present an exception to that general rule, and should be denied as to Counts I & III-VI.

To survive a motion for summary judgment on their negligent misrepresentation claims (Count II), Plaintiffs must show that Defendants "supplie[d] false information . . . with failure to exercise reasonable care or competence in obtaining . . . the information."  *Nota Constr. Corp. v. Keyes Assocs.*, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998).  Discovery has shown several examples of that neglect (which Defendants do not address); and Defendants admitted they "could have done more diligence" checking for counterfeits.  (SOF ¶ 20.)  And beyond negligence, Defendants also knowingly withheld material information, never telling ICT that: HPFS lacked the documents "require[d] . . . to complete a successful re-export of the [CWG Goods]" (*See* SOF ¶ 90); or that HP "discouraged" the sale of used H3C goods in China.  (SOF ¶ 9.)  These facts also support Plaintiffs' fraud-based claims (Counts I & IV), which must be decided at trial if the evidence shows that Defendants assured ICT that the goods were fit for resale despite either (a) knowing or believing that was not the case; (b) "not hav[ing] the confidence in the accuracy of [the] representation . . . or (c) know[ing] that [HPFS did] not have the basis for [its] representation."

---

[15]  For the same reason, drawing an adverse inference that "the source of the 31 counterfeit transceivers was not HPFS India" (Def. Br. at 9) would not resolve the Counterfeiting Claims.  The unreliability of the Inventory list, coupled with H3C's Verification Report claiming that every single piece of Seized Equipment was counterfeit (Dkt. 515-8), would leave a genuine dispute as to the source of 750 pieces of Seized Equipment, and require trial on the same claims.

*Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 23 (1st Cir. 2001).  HPFS's willful ignorance and utter lack of diligence during the contract talks more than qualifies.

    C.    **The Individual Plaintiffs may sue for fraud, negligent misrepresentation, breach of warranty, and Unfair and Deceptive Trade Practices.**

Defendants next ask the Court to reject the Individual Plaintiffs' fraud, negligent misrepresentation, breach of warranty, and M.G.L. Chapter 93A claims on the grounds that they did not communicate directly with the Defendants.  (Def.'s Br. at 10-12.)  But there is no requirement that plaintiffs bringing fraud-based claims be among the intended audience for the misrepresentation.  Those who rely on misrepresentations heard second or third-hand may sue "as long as those second and third-hand sources . . . trace . . . back to the misrepresentations made by defendants." *Abelson v. Strong*, 1987 WL 15872, at *5 (D. Mass. July 30, 1987).  Here, the RRSA stated that HPFS India would deliver genuine H3C goods (Dkt. 515-1) – even though HPFS had not confirmed, and knew that it was unable to confirm, the authenticity of the products in question.  (SOF ¶¶ 3, 17, 20.)  Based on those representations, and HP's international reputation, Jade, Jason, and Cathy presumed that ICT bought genuine goods with genuine H3C trademarks from HPFS.  (SOF ¶¶ 119; *see Brockton*, 577 F. Supp. at 1287 (proper fraud plaintiffs include all those who learn and rely upon "the terms of the alleged misrepresentation").)  The Individual Plaintiffs would not have chosen to sell the unsourced goods in the Chinese market had they known the truth.  *See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 49 (2009) (plaintiffs must present "evidence showing that they would have acted differently").[16]  Further, the Individual

---

[16]  No authority supports Defendants' position that employees aware of and relying on a misrepresentation made to their employer cannot be proper plaintiffs in a fraud action.  (*See* Def. Br. at 11.)  In *Shimizu Corp. v. Dow Roofing Sys., LLC*, 2013 WL 5513035 (D. Mass. Sept. 27, 2013), the court found "no evidence that *any* representative" of the plaintiff company had received the representation.  *Id.* at *15.  And in *Kosovich v. Metro Homes, LLC*, 2009 WL 5171717 (S.D.N.Y. Dec. 30, 2009), the plaintiff sought recovery for an act allegedly taken in reliance on a misrepresentation received four years after the act.  Here, by contrast, Pekar and Styller received and relied on Defendants' misrepresentations, and they immediately relayed them to the Individual Plaintiffs.

Plaintiffs' Chapter 93A claims are predicated on fraud, and "misrepresentation claims provide a basis for liability under [Chapter 93A]." *Damon v. Sun Co.*, 87 F.3d 1467, 1483 (1st Cir. 1996).

As for the Individual Plaintiffs' breach of warranty claims, their lack of privity with the HPFS Defendants is irrelevant. "Massachusetts law recognizes two different breach of warranty theories"—one based in contract, the other based in tort. *W.R. Const. & Consulting Inc. v. Jeld-Wen, Inc.*, 2002 WL 31194870, at *6 (D. Mass. Sept. 20, 2002). "[T]ort-based warranty claims rest[] on the presence . . . of personal injury or property damage," *id.*, and M.G.L. Chapter 106, § 2-318 "eliminates the vertical privity requirement . . . for tort-based breach of warranty claims," *First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*, 839 F. Supp. 2d 407, 412 (D. Mass. 2012). There is no vertical privity requirement for the Individual Plaintiffs because their primary injuries are physical and psychological – not economic. (Dkt. 515-32.)[17] Defendants' motion for summary judgment on Count V as to the Individual Plaintiffs must be denied.

### D. Plaintiffs may pursue their Breach of Warranty claims (Count V) irrespective of any disclaimer provisions.

Despite HPFS's pre-sale misrepresentations to ICT, Defendants argue that the disclaimer provisions in the operative agreements bar Plaintiffs' breach of warranty claims. (Def.'s Br. at 13.) Not so: the parties dispute whether the contracts, including the disclaimers, are enforceable against ICT. Again, Plaintiffs will show at trial that Defendants made material misrepresentations about the marketability and authenticity of the equipment HPFS sold to ICT in order to induce the contract. (SOF ¶ 1, 3-4.) "If . . . assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is

---

[17] In contrast, Defendants' cited cases requiring privity each involve a retailer complaining of purely economic losses. *See First Choice*, 839 F. Supp. at 410-13 (absent a contract, retailer could not sue manufacturer for lost profits when manufacturer's raw material was outlawed); *Irish Venture, Inc. v. Fleetguard, Inc.*, 270 F. Supp. 2d 84, 85 (D. Mass. 2003) (boat operator could not sue manufacturer for defective part purchased through a local distributor).

18

voidable by the recipient." *NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 169–70 (D. Mass. 2010). That same principle applies when the contract rests on negligent misrepresentations, especially where, as here, the tortfeasor is in a better position to know the truth. *See, e.g.*, *Lynch v. Cotton*, 2002 WL 31856409, at *2 (Mass. App. Ct. 2002) (negligent misrepresentation claim allowed where defendant had "superior knowledge" to plaintiff).

Furthermore, the breach of warranty claim is not duplicative, as argued. (Def.'s Br. at 12-13.) If the RRSA and WSA are void due to Defendants' misrepresentations, Count V may proceed based on the express warranties made by HPFS in the course of negotiations. (SOF ¶ 41.)

**E.     There is a genuine dispute regarding ICT's damages.**

Defendants argue that ICT's claims related to the sale should be dismissed because: (i) ICT disclaimed its right to consequential damages in the RRSA; and (ii) ICT suffered no non-consequential damages since it profited from the sale of the Shipped Goods. (Def.'s Br. at 13.) These arguments are circular to the extent they presume that the RRSA is a valid contract not induced through fraudulent or negligent misrepresentations. Where, as here, there is proof that the contract was the product of misrepresentation, and "the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it," then the benefit of the bargain – not the contract language – is the appropriate measure of damages. *Passatempo v. McMenimen*, 960 N.E.2d 275, 292 (2012). Thus, if the Court finds evidence that Defendants knew or should have known that the Shipped Goods were counterfeit, then the RRSA and WSA provisions precluding consequential damages are moot.

Furthermore, if the contract is the product of fraud, then the consequential/non-consequential damages distinction is irrelevant: "where fraud or deceit (i.e., intentional misrepresentation) is proved, benefit of the bargain damages should be awarded." *DSF Invs., LLC v. Lyme Timber Co.*, 2005 WL 1683928, at *1 (Mass. Super. May 11, 2005). ICT's ability to

19

realize slim margins on the Shipped Goods does not preclude them from recovering lost profits; their damages equal the difference between what they were expected to earn at the outset of the deal (50% of $1-2.75 million according to HPFS (SOF ¶ 46)), and what ICT actually earned.

Besides, "in business tort cases, where the focus is on the wrongfulness of the defendant's conduct, 'the award of damages is permissible on meager evidence.'" *Diomed, Inc. v. Vascular Sols., Inc.*, 2006 WL 516756, at *1 (D. Mass. Mar. 2, 2006)).  ICT can easily clear that low bar. For example, prior to receiving the substandard goods, Mr. Cheng estimated that ICT could sell parts numbered H3C-0235A24U in China for at least $1,500 each; however, ICT's sales records show that those units eventually sold for just $628.33.  (SOF ¶ 46.)[18]  That gap is due to Defendants' misrepresentations during the bargaining process.  By touting the quality of goods they had never seen, Defendants induced ICT to purchase what it believed to be genuine H3C equipment and established expectations that the Shipped Goods could and would never meet.  ICT is entitled to a trial on damages arising from those misrepresentations.

## II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY CLAIMS.

Defendants' reckless disregard for the consequences of selling unverified goods did not change once the Individual Plaintiffs were taken into custody; rather than help the Individual Plaintiffs, Defendants worked alongside H3C, the party responsible for the arrests.  In the course thereof, Defendants made numerous false statements to Alex Styller and the police and destroyed evidence that would have incriminated them while exonerating Jade, Jason, and Cathy.

---

[18]   In their motion and statement of facts, Defendants did not cite ICT's actual sales records, only the Plaintiffs' interrogatory responses.  However, due to the scope of those Interrogatories, Plaintiffs' responses did not include part numbers or units sold, (Dkt. 515-30 at 7-8);  Plaintiffs later produced documents containing that data pursuant to F.R.C.P. 33(d).  (SOF ¶ 46.)  Defendants' damages expert, G. William Kennedy, did not review those documents to reach his damages calculation, which Defendants reproduce uncritically here.  (*See, e.g.*, **Kennedy Report**; Kennedy Tr. at 199:19-24 (admitting he had not seen "an item-by-item account of ICT's sales in India"); *id.* at 54:4-8 (admitting his estimate of ICT's revenue did not account for number of units sold).)  Given their shaky foundation, Mr. Kennedy's opinions and ICT's damages are very much in dispute.

Defendants now compound that injury by denying any responsibility for the Individual Plaintiffs' 7-month detention caused in part by H3C on the grounds that: (1) H3C did not act as the agent of any Defendant during the relevant time period; and (2) no Defendant was independently capable of influencing the investigation, or apparently, intervening in H3C's trademark enforcement strategy.[19]  After the Court denied their first motion for summary judgment, Defendants attempted to undermine the Court's ruling that H3C inspected the Seized Equipment on behalf of HPFS.  As Defendants would have it, this purportedly new evidence shows that Defendants were each powerless bystanders to H3C's conduct.  But the most these post-hoc justifications achieve is creating a triable issue of fact.  Those facts are not good for the Defendants.  Because they lied to ICT and Mr. Styller, withheld exculpatory evidence from the police, then chose to destroy it, Defendants' motion for summary judgment on the Conspiracy Claims should be denied.

### A.      H3C's agent status remains a disputed issue of material fact.

"A parent corporation may be liable for the acts of its subsidiary if the parent dominates the subsidiary in a pervasive manner that necessitates treating the dominated corporation as an agent of the principal."  *Devlin v. WSI Corp.*, 833 F. Supp. 69, 74 (D. Mass. 1993).  Because Defendants' control over H3C during portions of the Individual Plaintiffs' detention is a disputed issue of material fact, Defendants' motion for summary judgment should be denied on this point.

The Court previously found that the Old Final Letter was "admissible evidence . . . that H3C served as an agent of HP India for purposes of inspecting the seized goods."  (SJ Order at

---

[19]  HP's arguments on the second point, if proven true, could give rise to civil or criminal liability under the Foreign Corrupt Practices Act ("FCPA"). (*See* 515-17 ¶ 20.)  Defendants' corporate representative claimed that H3C was "set up to operate independently" and "would, obviously, do things that HP were not aware of." (SOF ¶ 53.)  By shielding its Chinese subsidiary from supervision and monitoring, the evidence and testimony suggests that HP allowed H3C to operate with "a high level of institutional independence . . . [with] no internal accounting controls . . . in place," in violation of 15 U.S.C. § 78m(b)(2)(B), a structure that may have afforded H3C the opportunity to bribe the Chinese police to prolong the detention of the Individual Plaintiffs.  (SOF ¶¶ 53, 71.)

14.)  In that letter, HPFS admitted that "H3C inspected the seized equipment **on behalf of** HPFS India." (Dkt. 331-4 at 3.)  After the denial of summary judgment based in part on that admission, Defendants produced the New Final Letter, now omitting the "on behalf of" sentence that the Court's relied on to admit the Verification Report.  (*See* Dkt. 515-9.)  They now argue the dueling letters – one produced after the close of document discovery – establish that "H3C was indisputably not acting as HPFS India's agent." (Def.'s Br. at 6 n.4.)  But the letters do nothing more than establish a dispute of fact.  As discussed above, the Old Final Letter is an admission to ICT made during the course of Defendants' investigation.  And even if that version was never sent to the PSB, and HPFS revised the letter to remove the "on behalf of" language, then the New Final Letter is simply further proof that HPFS acted to shield itself from liability with careful lawyering.

No matter which letter the police received, HPFS told ICT that H3C was acting as its agent, and acted as though that were the case.  In any event, the Old Final Letter is not the only evidence in the record that shows H3C was acting "on behalf of" Defendants:

- Stuart Patterson, the HP lawyer who went to China to address the situation admitted that HP "ask[ed] . . . H3C, to help determine the nature of the goods involved with the arrests," and that "HP had control of H3C's business strategy."  (SOF ¶¶ 48, 56.)

- Defendant's corporate representative confirmed that "because it was a wholly-owned subsidiary . . . H3C reported [to] HP."  (SOF ¶ 53.)

- Jessica Liu, "the team lead for [the] H3C legal team" during HP's investigation, was at the same time an HP employee who "reported to [HP's Patterson]." (SOF ¶ 54.)

- Defendants admitted that "H3C conducted the inspection of the [TTG] transceivers **at the request of** [HPFS India]."  (Dkt. 341 ¶ 60; *see also* SOF ¶¶ 26, 109.)

Drawing all inferences in Plaintiffs' favor, these admissions (combined with the Court's earlier ruling) are sufficient to find that a genuine dispute exists regarding whether H3C acted as HP's agent in certain of its interactions with the police concerning the Individual Plaintiffs. *CNE Direct, Inc. v. Blackberry Corp.*, 2015 WL 4750847, at *6 (D. Mass. Aug. 10, 2015), *aff'd*, 821 F.3d 146

(1st Cir. 2016) ("Whether an agency relationship exists is a question of fact for the jury . . . .").[20]

**B.    Defendants' ability to terminate the Individual Plaintiffs' prolonged detention is a disputed issue of material fact.**

Whether HP's agent or not, there is no dispute that H3C was the principal subsidiary of HP in China when the Plaintiffs were arrested (Dkt. 108 ¶ 10), and there is substantial evidence that H3C got and kept the Individual Plaintiffs detained with numerous statements and reports to the police accusing them of counterfeiting, (*e.g.* SOF ¶¶ 9, 54).  In Defendants' view, H3C's leading role in the police investigation into the Seized Equipment means that Defendants "did not (and could not) prolong the detention of the Individual Plaintiffs," (Def.'s Br. at 14), and therefore, that their actions could not have caused the injuries alleged in the post-arrest Conspiracy Claims.

Defendants could have intervened in the investigation in two ways.  First, HP could have directed H3C, which it "control[led]" (SOF ¶ 48), to drop their criminal complaint.  H3C took instruction from HPFS (*see* Dkt. 331-4) and HPFS India (Dkt. 341 ¶ 60), but there is nothing in the record to suggest that Defendants ever ordered (or even asked) H3C to simply drop the charges.  Second, Defendants could have gone directly to the police and told them what they admitted to Styller: they sold ICT all of the Seized Equipment; the fake trademarks were on the Seized Equipment before the sale; and Jade, Jason, and Cathy were blameless.  (Dkt. 331-4.)

Even though Defendants never tried simply being honest with the police, they now say it would not have made a difference, citing Professor Chow's opinion that "HP couldn't affect the counterfeiting investigation."  (SOF ¶ 54.)  Defendants' reliance on Professor Chow's opinions is

---

[20]  Nor, as Defendants argue, should the Court disregard the agency theory as "unpleaded."  (Def.'s Br. at 21.)  The Court has already found admissible evidence in the records supporting this theory.  (SJ Order at 14.)  And Plaintiffs made clear four years ago, in the Second Amended Complaint, that their theory of the case includes Defendants' coordination with and control over HP's Chinese subsidiary.  (*See, e.g.*, Dkt. No 101 ¶ 122 ("H3C . . . was also working closely with the Defendants"); ¶ 161 ("H3C's withholding of the exculpatory evidence and stonewalling the state authorities' requests thus continued in concert with the Defendants' own wrongful actions . . . .").)  Defendants cannot claim surprise about this genuine, and long-running, dispute.

misplaced. His report and testimony do not absolve the Defendants of responsibility in this sequence of events. Instead, taking "HP's asserted lack of supervisory control [over H3C]" at face value, Professor Chow explains that by allowing H3C to enforce its trademarks "indigenous[ly]," "HP exposed itself and others to unnecessary risks," (SOF ¶ 48) – including that resellers like Jade, Jason, and Cathy would end up in jail for selling parallel imports without H3C's approval. Defendants could not control H3C's interactions with the PSB not because they were powerless to do so, but specifically because "HP created a corporate structure where it could benefit from allowing H3C to operate without regard to U.S. laws," including the Foreign Corrupt Practices Act. (SOF ¶ 53; Dkt. 515-17 ¶¶ 19-21.) Indeed, Professor Chow opined that the most likely explanation for the counterfeiting case was that H3C had bribed the PSB because "the [police] will not bring such actions without the payment of a 'case fee'." (SOF ¶ 55.)[21] In other words, Professor Chow agrees with Plaintiffs: Defendants caused Plaintiffs' injuries by exposing them "to a counterfeiting investigation by H3C in which HP could not easily intervene." (SOF ¶ 48.)

Moreover, Defendants could have actually ended the detention, not just through their control of H3C, but by presenting evidence of Plaintiffs' innocence to the Chinese authorities. Professor Chow did not opine that the PSB would ignore all evidence provided by Defendants; rather, he affirmed that HP and HPFS had a "limited ability" to "clarify the situation for the PSB" but chose not to. (Dkt 515-17 ¶¶ 88, 94.) Defendants cannot claim they were powerless to help when the record shows that they frequently withheld critical information requested by the PSB.

---

[21] H3C would not be the first HP entity to engage in bribery. (*See* Ex. 80, DEPARTMENT OF JUSTICE, Office of Public Affairs, "Hewlett-Packard Russia Pleads Guilty to and Sentenced for Bribery of Russian Government Officials," Press Release No. 14-972 (Sept. 11, 2014), *available at* https://www.justice.gov/opa/pr/hewlett-packard-russia-pleads-guilty-and-sentenced-bribery-russian-government-officials (last visited Aug. 1, 2021).) Nor would this case be the first time that HP made misleading statements regarding its sales practices. (*See* Ex. 86, U.S. SECURITIES AND EXCHANGE COMMISSION, "SEC Charges HP Inc. With Disclosure Violations and Control Failures," Press Release No. 2020-241 (Sept. 30, 2020), *available at* https://www.sec.gov/news/press-release/2020-241 (last visited Aug. 2, 2021).)

When Jade, Jason and Cathy were first detained, the police asked Meng Tao, "part of HP in China" (Ex. 96 at 162:18-20), to verify the authenticity of ICT's contract with HPFS India – to which he responded that "HP does not recognize any contract . . . signed by [ICT]." (SOF ¶ 49.) Later, the police "granted [HPFS] permission to view the seized goods," and HPFS "inspected 40% of the seized products." (SOF ¶ 34.) The prosecutor also told the police to "verify with HP . . . whether the company has acquired the brand H3C and sold [H3C] products." (SOF ¶ 58.) HPFS ultimately responded to that request for information with the misleading Final Letter, in which David Gill withheld exculpatory information about the Individual Plaintiffs, despite his professed ability to make "the police/prosecutor . . . view the situation much less seriously." (SOF ¶ 57.) In sum, Defendants acted as if they could help to resolve the situation with the PSB; they told Alex Styller they could help; and they engaged some 70 lawyers in order to "help." (*See* Dkt. 331-10.) Whether Defendants could have freed the Individual Plaintiffs is a triable issue.

### C. Defendants are not entitled to summary judgment on the fraud claims (Count VII).

Defendants argue that they are entitled to summary judgment on the Plaintiffs' fraud claims because (i) those claims are limited to two statements David Gill made to Alex Styller about the letter to the PSB, and (ii) Plaintiffs cannot prove the reliance elements of their fraud claims because, no matter what Plaintiffs had known at the time, "no action by Defendants could affect the Individual Plaintiffs' detention." (Def. Br. at 15-16 (citing Dkt. 95 at 6.) The first prong of that argument fails because, cherry-picked citations aside, the Court never precluded Plaintiffs from uncovering additional instances of fraud in discovery, which they have in droves. (*E.g.*, SOF ¶¶ 3, 64, 69.) That HP and HPFS withheld and destroyed evidence without telling Plaintiffs or the PSB only strengthens the Court conclusion that Plaintiffs may prove that "the HPFS Defendants fraudulently sold counterfeit equipment . . . and later, with the aid of HP, . . . misled Chinese

authorities to avoid liability for doing so," including, but by no means limited to, "by intentionally changing language in the March 2013 draft letter." (Dkt. 95 at 5-6.) At the very least, that means Plaintiffs may show that the letter itself was fraudulent – not just Gill's statements about it.

The second prong of the argument fails because the Court never addressed, let alone dismissed, Plaintiffs' reliance on Defendants' fraudulent omissions. An omission is "actionable as fraud . . . when there is a duty to disclose" under Massachusetts law, including when "there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." *Stolzoff v. Waste Sys. Int'l, Inc.*, 792 N.E.2d 1031, 1044 (Mass. App. Ct. 2003). There were many such instances in which the HPFS Defendants violated that duty to the Plaintiffs. For example: on March 20, 2013, Gill told Styller that "[a] sample of the [CWG Goods were] being sent by [TTG] to China for analysis by H3C." (SOF ¶ 64.) Then, in the March 25 draft letter, Gill wrote that H3C's testing of the TTG Equipment led HPFS to believe that "the relevant counterfeiting activities [referring to the logos on the Seized Equipment] occurred at some point in time prior to the return of the [CWG Goods] to HPFS India." (Dkt. 311-11 at 4.) Upon reading that draft, Styller expected that HPFS was making its best efforts to get his employees out of detention. (Dkt. 101-2 ¶ 124.) But the truth was that HPFS removed that language, and all references to the TTG samples, from the Final Letter, along with their admission that HPFS had sold ICT "the counterfeit equipment seized in China." (*Compare* Dkt. 311-11, *with* Dkt. 515-9.) While telling Styller that the New Final Letter was "substantively the same" as the prior draft (SOF ¶ 64), in reality, HPFS had removed everything from the letter that might incriminate Defendants, including information would have exculpated the Individual Plaintiffs. (Dkt. 515-9.) As such, Defendants' only communication with police left out the results of the TTG inspection and the fact that HPFS had the remaining CWG goods destroyed. (SOF

¶ 69.)  Defendants chose to protect themselves over getting Jade, Jason, and Cathy out of jail.

At best, Gill's statements about the TTG inspection and the letter were actionable "half-truths and misleading assurances," *Stolzoff*, 792 N.E.2d at 1044; at worst, they were knowing misrepresentations that gave Plaintiffs false hope that HPFS was helping.  As for Defendants other arguments, "the materiality of . . . nondisclosures to the plaintiffs' decisions and the reasonableness of the plaintiffs' reliance on what was told them . . . is for a fact finder to determine."  *Id.*

### D.     Defendants' state of mind regarding the false imprisonment claims (Count IX) is a disputed issue of material fact.

False imprisonment consists of "(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement."  *Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 29 (1st Cir. 2020) (citing *Sietins v. Joseph*, 238 F. Supp. 2d 366, 381 (D. Mass. 2003); Restatement (Second) of Torts § 35 (1965)).  To prevail on this claim at trial, Plaintiffs must present evidence that one or more of the Defendants took action "with knowledge that such confinement would, to a substantial certainty, result from it."  *See* Dkt No. 95 at 12 (citing Restatement (Second) of Torts § 35).[22]  Substantial certainty includes "a rather extreme brand of recklessness."  *Rivera v. Double A Transp., Inc.*, 727 A.2d 204, 209 (1999).  Defendants argue that there is no evidence that they knew, to a substantial certainty, that Jade, Jason, and Cathy would be detained as a result of their sale of counterfeits or their response to the arrests.  (Def.'s Br. at 19.)  Those positions rest on the disputed assumption that H3C conducted itself independently of the Defendants.  Thus, it is genuinely disputed whether Defendants are liable for the following actions taken with an utter disregard for the likelihood that Jade, Jason, and Cathy would be detained, or continue to be detained:

---

[22]   While Massachusetts courts "have not squarely addressed" the bounds of "substantial certainty" element, they have generally followed the Restatement when considering false imprisonment claims.  (Dkt. 95 at 11.)

***Selling Counterfeit Goods:*** Defendants know that selling goods with counterfeit trademarks can result in "serious consequences," including prison time. (SOF ¶ 4 ("Somebody could go to prison if they were to remarket nonauthentic product.").) HP and HPFS were aware of that risk prior to selling ICT the purportedly H3C-manufactured goods. (*Id.*) Nonetheless, "nobody from HPFS saw the physical product," or ever tested for the authenticity of the goods sold to ICT. (SOF ¶ 3.) That total lack of safeguards, combined with Defendants' admission that HPFS could have done more diligence, is enough to generate a genuine dispute as to HPFS's level of recklessness when selling the goods to ICT. And, HP knew that H3C zealously enforced its trademarks in China, and that suspected counterfeiters would be dealt with harshly. (SOF ¶ 90.)

***False Police Reports:*** Defendants rely on expert testimony to argue that 647 of the units seized by the PSB were in fact authentic. (Def.'s Br. at 8 (citing SOF ¶¶ 14-17).) While that conclusion is subject to significant challenge, taken at face value it is a damning indictment of H3C's false and unjustified statements to the PSB that every single piece of equipment in ICT's custody at the time of the raid was counterfeit. At least one of H3C's reports was made on May 2, 2013, after HPFS admitted in the Old Final Letter that H3C was acting as its agent while inspecting the Seized Equipment. (SOF ¶ 56.) Filing a false police report is a quintessential basis for a false imprisonment claim, *see, e.g.*, *Smith v. City of Montgomery*, 2011 WL 5216309, at *8 (M.D. Ala. Nov. 2, 2011) (denying summary judgment to officer that had no objective basis for arrest) – especially when, as here, the suspects are in custody at the time of the report, and thus, the complainant is all the more certain that their report will cause their continued detention.[23]

---

[23] Finding a genuine dispute as to Defendants' liability for H3C's actions does not, as Defendants' maintain, implicate the act of state doctrine, nor does it render H3C as an indispensable party. (Def. Br. at 23 n.15 & 16.) First, as the Court correctly noted when rejecting Defendants' previous attempt to dismiss this case on act of state doctrine grounds, the doctrine "does not bar a suit in which judgment for the plaintiff would merely 'imput[e] to foreign officials an unlawful motivation in the performance of . . . an official act,'" (Dkt. 69 at 13 (quoting *W.S. Kirkpatrick & Co., Inc.*

*Watering down the April 22, 2013 Letter:* Gill and HPFS acted with "substantial certainty" when they "concealed essential exculpatory evidence . . . [and] knowingly presented false information." *See, e.g.*, *Garcia v. City of Merced*, 637 F. Supp. 2d 731, 753 (E.D. Cal. 2008) (false imprisonment claims based on statements "[d]efendants did not reasonably believe"). After months of promising Alex Styller and ICT that they would provide a full explanation of the situation to the police, including their conclusion "that the [Seized Equipment] is the same equipment sold by HPFS to . . . ICT," (Dkt. 331-11 at 4), HPFS and David Gill reversed course. The letter they actually sent to the PSB left out the following undisputed facts, each of which demonstrate that the HPFS Defendants, not the Individual Plaintiffs, were responsible for the suspected counterfeiting: (i) HPFS never obtained the comprehensive list of serial numbers from Inspira needed to check whether the CWG goods had proper trademarks; (ii) HPFS never independently checked whether the Shipped Goods or their logos were counterfeit, despite several red flags; and (iii) HPFS's belief at the time of the writing that all of the Seized Equipment had been sold by HPFS to ICT – specifically, that Defendants had "no reason to believe" that Plaintiffs were selling anything other than the Shipped Goods. (SOF ¶¶ 17, 48.) In that context, the "Final Letter" was not only oblique; it was recklessly indifferent to the fates of the Individual Plaintiffs. Worse, HP admitted that "[a] lot of time passed while people were sitting in jail" while HPFS was

---

*v. End. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990)). Whether the detention was prompted by H3C's bribe or not – "Plaintiffs are not trying to invalidate China's 'governmental action, but only to obtain damages from private parties who' caused it." (*Id.* at 14 (quoting *Kirkpatrick*, 493 U.S. at 407.) The act of state doctrine is not a bar to this suit .Second, H3C is not an indispensable party. In this Circuit, "[t]he mere fact . . . that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party." *Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 136 (1st Cir. 1989). That is especially true where, as here, the unjoined party is a wholly-owned subsidiary with "interests in this case are virtually identical" to its defendant parent. *Id.* at 135; *see also Bacardi Int'l Ltd. v. V. Suarez & Co.*, 719 F.3d 1, 11 (1st Cir. 2013) (unjoined party not indispensable where the joined party intends to show "exactly what [the unjoined party] would"). Because Defendants will argue, as H3C would, that H3C did not bribe the PSB, H3C is not an indispensable party.

 Even if Defendants did not direct H3C's false reports, their post-arrest actions were substantially certain to prolong the detention of the Individual Plaintiffs because they knew that H3C continued to press its trademark infringement claims, and HP decided not to intervene despite controlling H3C. (*See, e.g.* SOF ¶¶ 48, 49, 55.)

"revis[ing] the letter," to remove any information that would have exonerated them.  (SOF ¶ 163.)[24]

***Destroying Exculpatory Evidence:***  Defendants' reckless acts were not limited to sins of omission; they also actively destroyed evidence that would have helped the PSB determine that the Individual Plaintiffs were innocent.  At the same time that HPFS and its auditors reached the conclusion that all of the seized equipment had come from India – and, thus, had not been counterfeited by ICT – HP gave the order to TTG to destroy the remaining off-lease equipment.  (SOF ¶ 64.)  The order was given because HP determined that the "the origination of the [off-lease] equipment," – which matched the Seized Equipment – "is questionable, and as such, we should not allow [TTG] to re-sell what they purchased from us."  (*Id.*)  In other words, as soon as Defendants actually inspected units from the batch they sold to ICT, they realized the goods were not fit for resale.  And rather than alert Plaintiffs or the PSB, Defendants protected themselves by destroying the only physical evidence capable of proving the Individual Plaintiffs' innocence.[25]

### E.   The duty and causation elements of the negligence claims (Count X) are disputed issues of material fact.

---

[24]  Again, that Defendants wrote any letter at all, let alone spent nearly two months fine-tuning the language of it, is wholly inconsistent with their present position that "no matter what a letter from the Defendants said, it could not have resulted in an earlier release of the Individual Plaintiffs from confinement."  (Def.'s Br. at 20.)  That is clearly not what Defendants believed at the time (or not what their actual goal was in writing the letter), and not what they told Alex Styller as he and the Individual Plaintiffs continued to rely on their aid.  (SOF ¶ 57.)

[25]  There is also evidence that Defendants actively interfered with ICT's and Styller's efforts to free the Individual Plaintiffs.  On March 14, 2013, Gill forwarded Styller a one-page .jpg file showing a Mandarin-language document he identified as "the prosecutor's request for information related to [ICT's] business license, customs clearance," which showed five numbered requests, with requests 2 and 3 redacted.  (SOF ¶¶ 49, 58.)  This message came a few days after Gill had told Styller that the police were "still waiting for ICT to provide . . . business licenses . . . [and] customs clearance documentation."  (SOF ¶ 69.)  The way in which Gill presented the prosecutor's request to Styller suggested that ICT was being investigated, and that ICT was prolonging the Individual Plaintiffs' continued detention.  Not so.  ***Years later***, Plaintiffs discovered that the document Gill had used to pressure Styller was a ***two***-page letter from the prosecutor to ***the PSB*** (not ICT), which asked Plaintiffs for nothing.  (SOF ¶ 49 n.6.)  Had Gill sent Styller the complete, unredacted document, Styller would have learned that: (i) the police had yet to obtain ICT's sales records, which were necessary to prove any charge under Article 214 (SOF ¶ 49 (citing Dkt. 515-18 ¶ 33)); (ii) the police identified two other ICT customers whom Styller could have used to show that ICT had only been making sales of the Shipped Goods; and (iii) as of January 16, 2013 (the date of the letter), the prosecutor did not have enough evidence to support legitimate charges."  (SOF ¶ 49 n.6.)  Styller learned none of this, was prevented from helping his employees, and was thus left to assume it was somehow all his fault – which is exactly what Gill and HPFS wanted him to think.

Defendants' post-arrest conduct is also actionable under a negligence theory: "a duty to prevent harm to others arises when one creates a dangerous situation, whether that situation was created intentionally or negligently." *Limone v. United States*, 497 F. Supp. 2d 143, 230 (D. Mass. 2007). Here, Defendants created a dangerous situation by, *inter alia*, failing to inspect the equipment and detect potential counterfeits (SOF ¶ 3); by selling the goods into the Chinese market even though it was "discourage[d]" by HP's global trade consultant (SOF ¶ 4); and by allowing H3C to enforce its trademarks "indigenous[ly]," (SOF ¶ 48) – all of which combined to cause Plainitffs' injuries. Yet Defendants argue that Plaintiffs cannot prove the duty or causation elements of this claim. (Def.'s Br. at 24-26.) Because both elements are intertwined with genuine factual disputes discussed elsewhere herein, neither is a ground for dismissing the negligence claim.

*First*, Defendants' sole argument that they owed no duty to the Individual Plaintiffs is that "HPFS India did *not* sell counterfeit equipment to ICT." (Def.'s Br. at 26.) Again, that is not a colorable argument at this stage; crediting it would require the Court to flip the summary judgment burden of proof on its head and resolve all inferences in favor of the *movants*. Whether the goods were counterfeit is disputed. HPFS's sale of counterfeit goods "needed to be accompanied by some kind of warning" in order to discharge HPFS's "duty to act reasonably." *Com. v. Levesque*, 436 Mass. 443, 449-50 (Mass. 2002) (duty to warn). No such warning was provided here.

*Second*, contrary to the Defendants' assertion, it is not "undisputed that no action or inaction of HPFS or HPFS India could have affected the length of the Individual Plaintiffs' detention." (Def.'s Br. at 25.) HPFS knew in October 2012, two months before the Individual Plaintiffs were put in jail, that there was "customer information left on the [CWG Goods]," including, "***multiple stickers***, top and bottom," which made the products unfit for resale. (SOF ¶ 3.) But having created and realized this risk, HPFS did not discharge its "duty to take reasonable steps

to alleviate [it]." *Limone*, 497 F. Supp. 3d at 230.  A reasonable jury could find that HPFS's failure

to inform ICT of these deficiencies (i) caused ICT to continue selling the Shipped Goods despite

the dangers, and, (ii) caused Plaintiffs' injuries, even if H3C acted on its own when it accused the

Individual Plaintiffs of counterfeiting.  *Onofrio v. Dep't of Mental Health*, 562 N.E.2d 1341, 1345

(1990) (social workers whose pyromaniac client burned down his boarding house owed duty to

landlord whom workers failed to warn of their client's history of violent behavior).  The motion

for summary judgment on Count X should be denied.

F.    **Defendants are not entitled to summary judgment on Plaintiffs' conspiracy claims (Count XI).**

A conspiracy may consist of "first, a common design or an agreement, although not

necessarily express, between two or more persons to do a wrongful act and, second, proof of some

tortious act in furtherance of the agreement."  *Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir.

2018).  A defendant conspires with another if he "knows that the other's conduct constitutes a

breach of duty and gives substantial assistance or encouragement to the other."  *Taylor v. Am.*

*Chemistry Council*, 576 F.3d 16, 35 (1st Cir. 2009) (quoting Restatement (Second) of Torts

§876(b)).  Substantial assistance "does not require an agreement between the defendant and the

tortfeasor."  *Id.*  Defendants contend there is "no evidence" that they had "actual knowledge " of

counterfeit labels or awareness of a "wrongful purpose" (Def.'s Br. at 27.)  They are wrong.

On the Counterfeiting Claims, the underlying tort was at least negligent misrepresentation,

and potentially fraud.  There is evidence that the HP and HPFS Defendants reached an agreement,

or common design, whereby HP and the HPFS Defendants adopted a structure with: (i) HP acting

as a "passive lessor;" (ii) no process for physically inspecting the goods HPFS and HPFS India

would sell to companies like ICT; and (iii) no standard procedure "to determine whether a product

is counterfeit" before offering it for resale.  (SOF ¶ 3.)  Each Defendant understood that HPFS and

32

HPFS India did not have a colorable basis to represent to ICT that the goods they sold were genuine. And even after HPFS determined that the CWG Goods were not fit for resale, it never told ICT. (SOF ¶¶ 3, 48 64.)  Whether this was purposeful, or merely reckless, each Defendant "share[d] the mental state of the principal violator," *Taylor*, 576 F.3d at 35 n.21 – in this case, HPFS India, when it sold goods to ICT without knowing whether they were counterfeit.

As for a post-arrest conspiracy, Defendants argue that there can be none "because it is undisputed that Defendants' conduct . . . could not prolong (or shorten) the Individual Plaintiffs' detention." (Def.'s Br. at 28.)  The argument is recycled and unavailing.  (*See* Point II.B, *supra.*) HP could conspire with H3C, whose participation was necessary for the PSB to continue holding the Individual Plaintiffs, to prolong the Individual Plaintiffs' detention because HP controlled H3C. (SOF ¶ 48, 49.)  HPFS could conspire with HP to prolong the detention because H3C was acting at its direction for at least some of that time.  (SJ Order at 14; Dkt. 341 ¶ 60.)  And there is a genuine dispute whether Gill conspired with H3C given his close working relationship with H3C while the latter was urging the PSB to prolong the Individual Plaintiffs' detention.  (SOF ¶¶ 27, 48, 69.)[26]  Summary judgment on Count XI should be denied as to all Defendants.

### G.    Defendants are not entitled to summary judgment on Plaintiffs' claims for Intentional Infliction of Emotional Distress (Count XII).

Defendants contend that Plaintiffs' claims for intentional infliction of emotional distress fail for lack of proof that Defendants acted with "actual knowledge" or "specific intent," to "target"

---

[26]   For example, Gill had a document titled "H3C verification report template" on his computer on April 17, 2013, which appears to be a blank version of the form H3C submitted to the PSB to secure Jason and Cathy's arrest. (SOF ¶ 161.) It seems that Gill obtained this blank form when H3C's head of legal, HP employee Jessica Liu, sent him a message on April 17, 2013 "regarding [a] verification report and confiscated equipment" with the subject line "FWD: Verification Report Template." (Dkt. No. 331-10 row 420.)  Emails with the same subject line show that Gill and HP lawyer Patterson were involved in making "updates and edits to [a] draft verification report."   (*Id.* row 431.) Defendants' Chinese law expert, Ms. Young, relied on the filled-in version of this template to support her conclusion that the PSB investigated the Individual Plaintiffs for a "serious crime" that warranted their extended detention. (*See* Ex. 97, Young Rebuttal Report ¶¶ 28-30 (citing ICT0789736).)  This is compelling evidence that Gill played an integral role in H3C's plan to keep Jade, Jason, and Cathy locked up by any means available.

particular Plaintiffs.  (Def.'s Br. at 30-31).  Those arguments are wrong as a matter of law.  To prevail on these claims, Plaintiffs must show "(1) that [defendant] intended, knew, ***or should have known*** that [his] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe.'"  *Mackey v. Town of Tewksbury*, 433 F. Supp. 3d 116, 172 (D. Mass. 2020).  Proof of recklessness with respect to a victim's mental state is sufficient to sustain a claim for intentional infliction at this stage, because the Massachusetts Supreme Judicial Court "ha[s] placed reckless and intentional infliction of emotion distress in the same category."  *Nancy P. v. D'Amato*, 517 N.E.2d 824, 827 (1988).  Therefore, a genuine dispute exists if the Defendants should have known their actions "were very likely to cause emotional harm."  *Simon v. Solomon*, 431 N.E.2d 556, 562 (1982).  Plaintiffs have made that showing with respect to Defendants' pre and post-arrest conduct.

***Counterfeiting Claims:*** applying the proper standard, and "[p]utting, as summary judgment requires, as harsh a face on [Defendants'] actions . . . as the basic facts would reasonably allow," *Zaleskas v. Brigham & Women's Hosp.*, 141 N.E.3d 927, 941 (2020), the evidence shows that "reasonable people could differ" about the Defendants' extreme and outrageous decision to sell unverified goods, sight unseen and with a  host of red flags, into a marketplace zealously policed for counterfeits, *Framingham Tel. Answering Serv., Inc. v. Am. Tel. & Tel. Co.*, 1994 WL 902948, at *2 (Mass. Sup. Ct. Oct. 21, 1994).  Nor does liability for intentional infliction of emotional distress need to turn on a single exceptional incident.  *Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018) ("[N]either a factfinder nor an appellate court is obliged to balkanize the defendant's course of conduct, isolating its component parts and, in the bargain, minimizing their net effect.").  Thus, the jury could find that Defendants' pre-arrest conduct reached extreme and outrageous levels when, months after sending the goods to ICT in China, HPFS realized that the

goods had been kept in a condition unfit for resale, but said nothing to Plaintiffs. (SOF ¶¶ 3, 4.) In light of these "red flags" – which Defendants admit repeatedly in their motion but do not attempt to explain or justify – and given Defendants' understanding that counterfeiting was a serious crime that could result in prison time, (SOF ¶ 4), a reasonable jury could find that Defendants should have known that their year of silence made it "very likely" that the salespeople they kept in the dark would be incarcerated. *Simon*, 431 N.E.2d at 562 ("The jury could . . . find that . . . a long and repetitious . . . pattern of indifference . . . was outrageous.").

***Conspiracy Claims:*** Defendants strain to minimize their post-arrest conduct to nothing more than "delays, misstatements, and omissions." (Def.'s Br. at 31.) As an initial matter, "making false reports to [the] police," such as those embodied in the New Final Letter (*see* Point II.D, *supra*), may "constitute[] extreme and outrageous conduct." *Rader v. Odermatt*, 2008 WL 2877826, at *2 (Mass App. Div. Dist. Ct. July 23, 2008). So too can statements contradicting previous assurances – such as Gill's to Styller - if made "in an apparent attempt to hide wrongdoing." *Zaleskas*, 141 N.E.3d at 941 (medical technicians acted extremely and outrageously by covering up departure from operation plan). A reasonable factfinder could conclude that the HPFS Defendants, including Gill, acted beyond all bounds of decency when they intentionally submitted a factually inaccurate and vague statement to the Chinese police, despite knowing their own culpability in the Individual Plaintiffs' arrests. They could also find that concealing evidence in an act of corporate self-preservation, while destroying evidence that would have freed the Individual Plaintiffs, was "extreme and outrageous" under the circumstances. (SOF ¶ 3.)[27] Also

---

[27] Defendants' direct misrepresentations to Alex Styller were extreme and outrageous given his level of concern about Jade, Jason and Cathy (SOF ¶ 140.) Defendants argue that Mr. Styller's claim for intentional infliction of emotional distress fails because "[h]e did not endure any emotional response of a severity sufficient to justify recovery." (Def.'s Br. at 32.) That is not a proper basis for granting summary judgment: "whether . . . alleged distress was

actionable is HPFS's self-serving investigation, which hid the truth from the authorities and prolonged the Individual Plaintiffs' detention. *See I.U. by Roy v. Pioneer Valley Chinese Immersion Charter Sch.*, 2016 WL 8679257, at *6 (D. Mass. June 10, 2016) (investigation punishing plaintiff "for misconduct he did not commit" was extreme and outrageous).

Furthermore, Defendants are not entitled to the inference, as argued in their brief, that their post-arrest conduct amounts to nothing more than a slow and imprecise written response to "a confusing situation." (Def. Br. at 8.) Defendants were not "confused" when they spent weeks fine-tuning the New Final Letter to remove their earlier admissions that HPFS sold ICT "the counterfeit H3C equipment seized in China," and that "the [counterfeit] logos currently affixed to the [Seized Equipment] were present" when HPFS sent ICT the Shipped Goods. (Dkt. 331-11 at 4.) Nor was HPFS confused when it destroyed the remaining CWG Goods – evidence that would have simultaneously incriminated the HPFS Defendants and exculpated the Individual Plaintiffs with respect to the counterfeiting charges. (*See* SOF ¶ 76.) Whether that sort of intentional conduct (the last step HPFS took before washing its hands of the Individual Plaintiffs), qualifies as extreme and outrageous is a question for the jury. *See, e.g.*, *Bros. v. Town of Millbury*, 2014 WL 4102436, at *8 (D. Mass. Aug. 14, 2014) ("reports full of false statements, and . . . destr[uction of] exculpatory evidence" could cause emotional distress for suspect).

### H.    Defendants are not entitled to summary judgment on the loss of consortium claims (Count XIII).

Defendants argue that Jade Cheng and his wife, Caroline, may no longer maintain a claim for loss of consortium because there is no evidence of any predicate tort. (Def. Br. at 32.) As

---

'severe' . . . is a question that should be resolved by a jury." *Ciolino v. Eastman*, 128 F. Supp. 3d 366, 379 (D. Mass. 2015).

explained herein, both Jade and Caroline have viable tort claims,[28] which means that their "ancillary loss-of consortium count need not be dismissed."  *Edsall v. Assumption Coll.*, 367 F. Supp. 2d 72, 86 (D. Mass. 2005).  Summary judgment on Count XIII should be denied.

## III.   THIS COURT HAS JURISDICTION OVER THE UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIMS (COUNTS VI AND VIII).

Defendants concede that Plaintiffs' theory of the case, if proven, qualifies as a deceptive or unfair trade practice under the Massachusetts Consumer Protection Act ("Chapter 93A").  As they must.[29]  Unable to challenge the merits of the Chapter 93A claims, Defendants claim this Court lacks jurisdiction, arguing that their conduct did not "occur[] primarily and substantially within the Commonwealth."  (Def.'s Br. at 33 (quoting Mass. Gen. Laws. Ch. 93A, § 11).)

Count VI relates to HPFS's misrepresentations during the 2011 RRSA negotiations and arises from events that occurred entirely in the Commonwealth.  "To determine a claim's center of gravity, the First Circuit has adopted a three-prong balancing test . . . (1) where the defendant commits the unfair or deceptive act . . . ; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct."  *HipSaver Co. v. J.T. Posey Co.*, 490 F. Supp. 2d 55, 71 (D. Mass. 2007).  Here, Alexander Pekar of ICT had meetings with HPFS employees to discuss the deal in Andover, Massachusetts, during which they misrepresented the state and nature of the equipment several times.  (SOF ¶ 77.)  Styller, who worked from ICT's office in Massachusetts, was also involved in negotiating the terms and conditions of the deal.  (*Id.*)  ICT acted on those misrepresentations when Pekar signed a contract

---

[28]  Caroline's claims, to be adjudicated in a bifurcated proceeding, are not presently before the Court.  (Dkt. 326.)

[29]  *See, e.g.*, *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir. 1996) (seller's failure to disclose product defect was deceptive under Chapter 93A); *VMark Software, Inc. v. EMC Corp.*, 642 N.E.2d 587, 596 (Mass. App. Ct. 1994) (finding "[d]elivery of a defective product without revealing its defects" actionable under Chapter 93A); *In re 201 Forest St. LLC*, 409 B.R. 543, 579 (Bankr. D. Mass. 2009) ("A misrepresentation . . . can be actionable under 93A, and . . . even a negligent misrepresentation that is so extreme or egregious may be sufficient.").

in Massachusetts with a Massachusetts choice of law and forum selection provisions.  (*See* Dkt, 515-1.)[30]  And ICT and Styller suffered damages in this jurisdiction. (SOF ¶¶ 46; 112.)

Jade, Jason, and Cathy also have standing to bring Count VI.  *See Manning v. Zuckerman*, 444 N.E.2d 1262, 1266 (1983) ("[Chapter 93A] . . . protect[s] . . . not only . . . specific individuals involved in a transaction, but also . . . the public as a whole.")  If foreign governments without personal ties to Massachusetts may bring Chapter 93A claims, *see Republic of Turkey v. OKS Partners*, 797 F. Supp. 64, 68 (D. Mass. 1992), then surely employees of a Massachusetts corporation can too.  Summary judgment should be denied on Count VI as to all Plaintiffs.

The same goes for Count VIII.  While Defendants are wrong that their only two fraudulent acts post-arrest were (i) saying that the Final Letter sent to the PSB was "substantively the same" as the last version shared with ICT, and (ii) claiming that the letter was "filed," it is undisputed that Gill made those statements to Les Riordan, an attorney located in Massachusetts representing Alex Styller and ICT.  (SOF ¶¶ 26, 64, 113.)  And, while Gill was stringing along Styller and ICT, O'Grady, Silvestri, and HPFS employee Ross West met in Andover to discuss destroying the remaining CWG Goods, which they did at "HP['s] . . . direction."  (SOF ¶ 64.)  And as Defendants previously admitted, "many other communications that may have touched China . . . were sent or received in Massachusetts." (Dkt. 257 at 27.)   Whether the 93A claims were centered in Massachusetts is a disputed issue of material fact.

**IV.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR COUNTERCLAIMS.**

Defendants are not entitled to judgment on their contract-based counterclaims because a

---

[30]  Defendants' cite cases where courts found the conduct in question to be outside the jurisdiction of Chapter 93A; none, however, involve a contract negotiated and executed in Massachusetts, and governed by Massachusetts law. *See Uncle Henry's Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 38 (1st Cir. 2005) ("[A]ll the challenged misrepresentations were received and relied upon in Maine . . . the contract was primarily negotiated in Maine, and . . . any damages were incurred in Maine . . . ."); *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 236 (1st Cir. 2003) (misrepresentations made and contracts signed in Michigan)."; *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 462, 781 N.E.2d 787, 791 (2003) (deal finalized in Washington, D.C.).

genuine dispute exists as to the validity and enforceability of the RRSA.  "A contract induced by fraudulent misrepresentations is voidable."  *Shaw's Supermarkets, Inc. v. Delgiacco*, 575 N.E.2d 1115, 1117 (Mass. 1991).  The same is true "if a party was induced to enter into [the contract] by a nonfraudulent, negligent misrepresentation of a material fact."  *CRA Int'l, Inc. v. Painter*, 2017 WL 2292737, at *5 (Mass. Super. Apr. 11, 2017).[31]  Yet even if the RRSA is enforceable, Defendants' motion for summary judgment on the counterclaims should be denied.

### A.    Defendants' right to recovery under Section 8 of the RRSA is a disputed issue of material fact.

When construing a commercial contract, "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons."  *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir. 2001).  Therefore "[t]he contract must be construed as a whole, in a reasonable and practical way, consistent with its language, background and purpose."  *Cady v. Marcella*, 729 N.E.2d 1125, 1129–30 (2000).  Nothing in Section 8 of the RRSA, titled "Export Compliance," supports Defendants' position that ICT was promising its compliance with all Chinese law irrespective of subject matter.  The relevant language states that ***in the event of an export, re-export, or import***, "ICT will be responsible for complying with all applicable laws and regulations and for obtaining all required export and import authorizations."  (Dkt. 515-1 at 5.)  If "all applicable laws" means every Chinese law, it means that HPFS India could sue for breach if ICT violated the fire code or the speed limit.  Because that runs counter to common sense, Defendants' insinuations about ICT's licenses, taxes, and employment practices are irrelevant.

Nor do the supposed customs violations constitute an actionable breach of the RRSA. Defendants cannot recover for breach if it is found that the HPFS defendants "had already

---

[31]    While it is true that negligent misrepresentation claims may be barred by an integration clause, that rule only applies if the misrepresentations predate the agreement.  *CRA*, 2017 WL 2292737, at *5.  Here, the misrepresentations at issue – *i.e.* that HPFS was selling genuine H3C equipment – were contained in the document itself.

committed a material breach" – by delivering counterfeit goods – "that relieved Plaintiffs of further obligations under the [RRSA]."  *Atl. Rsch. Mktg. Sys., Inc. v. Saco Def., Inc.*, 997 F. Supp. 159, 171 (D. Mass. 1998) (material breach by one party relieves other party of any further performance obligations).  Indeed, even if ICT violated customs laws, the genuine dispute over Defendants' earlier breach precludes summary judgment on Defendants' breach of contract counterclaim.[32]

### B.    The applicability of the RRSA indemnity is a disputed issue of material fact.

Defendants admit that a party may not be indemnified for its own intentional torts.  (Def.'s Br. at 38.)  Thus, if the Court denies summary judgment on any of Counts I, III–IX, XI, or XII, it must deny summary judgment on the indemnification counterclaim.  The same holds true for grossly negligent or reckless conduct that may be found in connection with Counts II and X.  *Angelo v. USA Triathlon*, 2014 WL 4716195, at *4 (D. Mass. Sept. 19, 2014) (Sorokin, J.) ("Massachusetts courts would not enforce an indemnity provision . . . reliev[ing] a party from liability stemming from . . . gross negligence.")  Gross negligence "is very great negligence, or the absence of slight diligence, or the want of even scant care."  *Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 687 N.E.2d 1263, 1265–66 (Mass. App. Ct. 1997).  Whether selling counterfeit goods without verification, inspection, or warning rises to the level of "gross negligence" is a question for the jury.  Summary judgment should be denied on Defendants' indemnification counterclaim.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendants' Motion for Summary Judgment.

Dated: August 2, 2021
        New York, New York

---

[32]  Defendants' legal expert testified that she "didn't see anything" to indicate that any Plaintiff was ever suspected of any crime besides selling goods with counterfeiting trademarks.  (SOF ¶ 132.)

Respectfully submitted,
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Luke Nikas*
  Luke Nikas
  Alex Spiro
  Jonathan Oblak
  Alex Zuckerman
  51 Madison Avenue, 22nd Floor
  New York, NY 10010
  Telephone: (212) 849-7000
  Email:  lukenikas@quinnemanuel.com

  *Attorneys for Plaintiffs Alexander Styller,*
  *Integrated Communications & Technologies,*
  *Jade Cheng, Jason Yuyi, Cathy Yu, Caroline*
  *Marafao Cheng, Changzhen Ni, Junfang Yu,*
  *Meixiang Cheng, Fangshou Yu, and Changua*
  *Ni*

**CERTIFICATE OF SERVICE**

I, Luke Nikas, hereby certify that on August 2, 2021, I caused a copy of Plaintiffs'
Opposition to Defendants' Motion for Summary Judgment to be served by ECF upon Defendants'
counsel of record.

*/s/ Luke Nikas*
Luke Nikas