## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ALEXANDER STYLLER, INTEGRATED
COMMUNICATIONS & TECHNOLOGIES,
INC., JADE CHENG, JASON YUYI, CATHY
YU, CAROLINE MARAFAO CHENG,
PUSHUN CHENG, CHANGZHEN NI,
JUNFANG YU, MEIXIANG CHENG,
FANGSHOU YU, and CHANGHUA NI,
                                        Plaintiffs,

vs.

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY, HEWLETT-
PACKARD FINANCIAL SERVICES (INDIA)
PRIVATE LIMITED, HP INC., HEWLETT
PACKARD ENTERPRISE COMPANY, and
DAVID GILL,
                                        Defendants.

Civil Action No. 1:16-CV-10386 (LTS)

## UNIFIED STATEMENT OF UNDISPUTED FACTS

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     In 2011, HPFS India and ICT entered into a resale contract regarding computer networking
equipment ("Equipment") that HPFS India previously leased to another company for use
at the 2010 Commonwealth Games in Delhi, India.   Dkt. 101 (Second Amended
Complaint), ¶¶ 23, 25, 36;   Declaration of Kevin C. Quigley ("Quigley Decl."), Ex. 1
(RRSA).

   **RESPONSE**:  It is undisputed that in 2011 ICT negotiated a resale contract, the Referral

   and Revenue Share Agreement ("RRSA"), with HPFS India concerning the resale of

   genuine computer networking equipment that had been recently returned from a 7-month

   lease for use at the 2010 Commonwealth Games in India (the "CWG Goods") and which

   Defendants stated were manufactured by H3C, a Chinese subsidiary of the predecessor to

   Defendants HP Inc. and Hewlett Packard Enterprise Company.  (*See* Ex. 16 at 2561.)[1]  ICT

---

[1]   All exhibits referenced herein are those attached to the Declaration of Luke Nikas, filed alongside Plaintiff's
Opposition to Defendants' Motion for Summary Judgment.

understood that it would pay $250,000 to HPFS India via its broker Shinto, (Ex. 17), for each of the four installments of H3C products, (Ex. 7.)

However, Plaintiffs dispute that the goods ICT actually received (the "Shipped Goods") were the same as what was represented to ICT by Defendants (the "Promised Goods") given that the quality and condition of the goods ICT received was far inferior than the "practically new" goods ICT expected to receive.[2]  (*See* Ex. 91, Styller Tr. 75:14-22.) To this day, Defendants are "still not certain where Inspira [the original seller of the Shipped Goods] got the equipment from," (Ex. 96, Def.'s 30(b)(6) Tr. at 110:15-18), or "whether H3C manufactured" the Shipped Goods.  (Ex. 92, Patterson Tr. at 120:18-20).

Plaintiffs also dispute that the Shipped Goods are the same as the Promised Goods because a material provision of the parties' agreement was ICT's obligation and "right to direct the re-sale" of the Promised Goods.  (Ex. 16 at § 2.4; *see also* §§ 3-6.).  In light of the fact that HPFS employee Tom Harris concluded that the CWG Goods were not fit for resale, then by their very nature, the goods ICT received were not the Promised Goods; because ICT received the Shipped Goods, it was not possible for it to fulfill its resale obligations under the RRSA.  (*See* Ex. 66) ("we should not allow TT-G to re-sell [the unsold CWG Goods] they purchased from us."); *see also* Ex. 26 (Tom Harris observing that the remaining CWG Goods were "not packaged in a manner . . . need[ed] to make the

---

[2]  The goods were on leased for use at an event in India called the Commonwealth Games (Dkt. 341¶ 1); accordingly "**CWG Goods**" refers to all of the off-lease equipment returned to HPFS. "**Promised Goods**" refers to goods described by Defendants in the course of HPFS's negotiations with ICT, and those listed in the resulting agreement. "**Shipped Goods**" refers to the first and only installment of CWG Goods that ICT received pursuant to the resale agreement. "**Seized Equipment**" refers to the subset of Shipped Goods seized by the Chinese police on December 9, 2012.

sale," and that many of the units, 25% of which had shipped to ICT, carried "***multiple***

***stickers***, top and bottom . . . all [of which] should be removed.").)[3]

2.      The governing contracts were a Referral and Revenue Share Agreement (RRSA) between
HPFS India and ICT, and a Wholesale Sale Agreement (WSA) between HPFS India and
ICT's broker, Shinto.  Dkt. 101, ¶¶ 37, 38; Quigley Decl., Ex. 1 (RRSA); Quigley Decl.,
Ex. 37 (WSA).

   **RESPONSE**:  It is undisputed that the RRSA and WSA[4] are among the contracts

governing the agreement between ICT and HPFS India.

       Disputed that there was a binding contract properly executed between the parties

during the entirety of the relevant time period, including on the date of delivery of the

Shipped Goods on February 17, 2012.  (Dkt. 344-3 at 2.)  An HPFS representative did not

sign the contract on Defendants' behalf until June 6, 2012, six months after the Shipped

Goods were delivered.  (*See* Ex. 16 at 2553-66.)  Moreover, ICT did not receive a signed

version of the WSA until after the Individual Plaintiffs were already in the custody of the

Beijing Public Safety Bureau (hereinafter the "PSB" or "Chinese police").  On December

27, 2012, Alex Pekar requested a copy of the WSA from the Defendants that was also

"signed by HP," but was "not sure if [he would] get anything until next year."  (Ex. 43.)

3.      The Equipment included H3C-branded transceiver devices. Dkt. 101, ¶ 46.

   **RESPONSE**:  Disputed that Shipped Goods ICT actually received are the same as the

Promised Goods Defendants described.  (*See* Resp. ¶ 1, *supra*.)  Plaintiffs also dispute that

---

[3]  All emphases are supplied.

[4]  Because Quigley Ex. 37, (ECF 515-36), does not contain copies of the executed contracts referenced above,
Plaintiffs have reattached each of the operative agreements between ICT and HPFS India.  (*See* Ex. 16 at
DEF0002553-57 (the Wholesale Agreement ("WSA") between HPFS India and Shinto, ICT's broker); *id.* at
DEF0002558-60 (Shinto's Purchase Order with HPFS India); and *id.* at DEF0002561-66 (the RRSA between ICT
and HPFS India)).  The WSA and RRSA reflect what xPlaintiffs' view as the operative agreements in the transaction
between ICT and HPFS India.

the Shipped Goods were non-counterfeit H3C products, because, despite Defendants'
initial representations to ICT, "HPFS India did not participate in choosing any equipment,
nor did it inspect the [H3C] equipment before or during the lease." (Dkt. 515-9.)  Instead,
HPFS just "assum[ed]" without verifying that the CWG Goods were initially purchased by
Inspira directly from H3C, (Ex. 89, Harris Tr. at 107:23-108:24), because HP's position
was "as a lessor, HP is a passive financier[,] who doesn't] physically inspect product," (Ex.
96, Def.s' 30(b)(6) Tr. at 24:17-20), or bother "to determine whether a product [that comes
back from lease] is counterfeit," prior to its sale. (*Id.* at 24:8-10.)  Moreover, Defendants
themselves admit that because "nobody from HPFS saw the physical product" prior to the
sale. (*Id.* at 123:5-8.)  As a result, Defendants ignored the risk "that [HPFS] unknowingly
processe[d] counterfeit product[s]" in the sale to ICT.  (*Id.* at 129:21-25.)  This risk is
inherent in Defendants' "standard business practice," (*id.* at 24:8-10), which does not
require that HPFS or its agent, TTG, "test for the authenticity" of used goods before they
are resold, (*id.* at 133:16-18).

Further disputed to the extent the above implies that all of the Shipped Goods were
authentic H3C goods, given the fact that Defendants were never able to make "a concrete
determination as to the authenticity of the assets" because "the origination of the equipment
[was] questionable." (*See* Ex. 66.)  In their April 22, 2013 letter to the PSB, Defendants
concluded that "some of the sold equipment provided by Inspira did not originate from
HP."  (Dkt. 515-9.[5])  Even now, HP remains "[un]certain [from] where Inspira got the

---

[5]  Defendants' Exhibit 9, (Dkt. 515-9), contains two different translations of the same document, DEF0002899-2901.
Plaintiffs initially believed that the first translation performed by Pin Chen was Defendants' preferred translation given
Defendants' prior representation to the Court that they "ha[d] translated the April 2013 letter that was *actually*
submitted to the Chinese authorities." (Dkt. No. 371 at 5), and because the certification page does not indicate who
performed the translation.  Plaintiffs then commissioned a second translation, performed by Susannah Smith (Dkt.
414-9 at 6-9), which was inadvertently combined into one document with the first translation and used by Plaintiffs at
the depositions of Defendants' 30(b)(6) witness and Stuart Patterson as PX-185. While both translations are the same

[CWG Goods]," (Ex. 96, Defs. 30(b)(6) Tr. at 110:15-18), or whether it was actually "H3C [that] manufactured" the equipment.  (Ex. 92, Patterson Tr. at 120:18-20.)

Further disputed to the extent the above implies that all of the Shipped Goods bore authentic H3C trademark labels given that some or all of the goods ICT received were counterfeit due to damaged, illegible, or improper trademarks, as evidenced by the fact that the Chinese authorities charged the Individual Plaintiffs with violating "Article 214 of the Criminal Law," which penalizes the sale of "***sales of commodities under a fake registered trademark***."  (Ex. 72 (the "Bail Letters"); *see also* Resp. ¶ 14, *infra*.)  There is evidence that Defendants knew about this problem:  as early as June 2011, Defendants noted internally that the trademarks stickers on the CWG Goods, 25% of which were sent to ICT as the Shipped Goods, (Dkt. 341 ¶ 44), were out-of-date and required replacement because they "appear[ed] to be the last generation [of stickers] before HP commenced applying HP labelling to the product."  (*See* Ex. 8.)  And, two months prior to Individual Plaintiffs' detention, HPFS's Tom Harris observed that the remaining CWG Goods, after being stored "for the past two years" in a facility with "very questionable" material controls, (Ex. 28 at at 1118),  were "not packaged in a manner  . . . need[ed]" for resale, (Dkt. 515-9), and that many of the units carried "***multiple stickers***, top and bottom . . . all [of which] should be removed."  (Ex. 26 at 1109.)  There is no evidence that the CWG Goods were ever relabeled or that the improper stickers were ever removed.  Despite Defendants' awareness of these issues, "[n]obody . . . follow[ed]-up" with ICT to let them know that the CWG Goods were potentially counterfeit.  (Ex. 96, Def.s' 30(b)(6) Tr. at 138:21; 136:24-137:10.)

---

in substance, any references to Dkt. 515-9 herein are from the first translation by Pin Chen, available at docket entry ECF 515-9 at 2-5.

4.      ICT's broker, Shinto, took possession of the first installment of Equipment and shipped the same to ICT in China (via Hong Kong) in or after December 2011.  Dkt. 101, ¶ 46.

**RESPONSE**:  It is undisputed that Shinto was ICT's broker with respect to its transaction with HPFS India, and that Shinto signed the WSA.  Disputed that Shinto ever took possession of the first installment (the Shipped Goods), or that Shinto shipped the goods to ICT in China.  Defendants' logistics partner, TT Global ("TTG" or "TT-G"), was responsible for "[p]ick[ing] and [p]acking" the goods, (Ex. 12),in "early 2012," (Ex. 27), and "ship[ing them] direct[ly] to customs" without Shinto ever taking physical possession of the goods.  (Ex. 29 at 1121.)  It is undisputed that Shinto was ICT's broker with respect to its transaction with HPFS India, and that Shinto signed the WSA.

Further disputed to the extent that the above implies that HPFS or its agent delivered goods that were fit for resale as contemplated by the parties' agreements.  The record shows that, in connection with the sale of the CWG Goods, Defendants were aware of, ignored, and failed to communicate with ICT regarding the risks associated with importing into China "refurbished products" for resale when they might be "classified as e-waste."  (*See* Ex. 10.)  In an August 16, 2011 email discussing the potential sale of H3C products to ICT, HP's global trade division cautioned that the shipment of used goods to China is "a complex and sensitive practice involving multiple agencies," that HP normally "discourages . . . unless there is a compelling business case."  (*Id.*)  Defendants never told "ICT about the risks of selling equipment like" the Shipped Goods in China, but avoided those risks for themselves.  (Ex. 96, Def.'s 30(b)(6) Tr. at 109:6-9.)  Despite Defendants' knowledge of the CWG Goods' obvious issues and the fact that there could be "serious consequences," including that "[s]omebody could go to prison[,] if they were to remarket

nonauthentic product[s]" in China, Defendants proceeded with the sale to ICT anyway. (Ex. 96, Def.'s 30(b)(6) Tr. at 111:4-7; 130:14-15.)

5.    ICT employees began marketing the Equipment in China in 2012. Dkt. 101, ¶¶ 47, 52.

**RESPONSE**:  Disputed.  sThrough the Individual Plaintiffs and other ICT personnel, and in reliance on Defendants' representations regarding the Promised Goods' authenticity and quality, ICT first began marketing the Promised Goods in China in 2011, including performing by market research and speaking with prospective customers.  In connection with negotiations for ICT's purchase of the Promised Goods in August 2011, Defendants also investigated whether the list of H3C equipment sent to Alex Pekar "[could] be export[ed] to China." (Ex. 10 at 0991.)  In September 2011, Alex Styller asked Jade Cheng to determine which of the "[H3C] material coming in from HP India" ICT "[could] sell fastest and for the most money." (Ex. 14.)  On October 14, 2011, Jade Cheng informed Alex Styller that ICT "already [had] some clients who want to reserve some models." (Ex. 15.)

6.    On December 9, 2012, Chinese police conducted a raid and arrested Plaintiffs Cathy Yu and Jason Yuyi based on allegations that they were selling counterfeit H3C equipment. Dkt. 101, ¶ 55.

**RESPONSE**:  Disputed.  Official records from the Chinese authorities' case files show that the PSB detained Cathy Yu and Jason Yuyi beginning December 10, 2012.[6]  (*See* Ex. 54.)  Yu and Yuyi were not formally arrested until January 15, 2013.  (*Id.*).  Further disputed because Plaintiffs were arrested for violating Article 214 of the People's Republic

---

[6]  Under Chinese law, there is a distinction between being "detained" and being formally "arrested."  (*See, e.g.*, Ex. 54 (The PSB's Written Opinion Recommending Prosecution provides that all three Individual Plaintiffs were brought into the PSB's custody in December 2012, prior to being arrested on January 15, 2013.).)

of China Criminal Laws ("PRC Criminal Law"), which concerns "[sales] of commodities bearing **counterfeit registered trademarks**" and focuses on the authenticity of trademarks *affixed to* goods.  (Dkt. 341 ¶ 54; *see also* Resp. ¶ 14, *infra*.)

7.      Their supervisor, Plaintiff Jade Cheng, was arrested several days later (collectively, with Yu and Yuyi, the "Individual Plaintiffs").  Dkt. 101, ¶ 55.

**RESPONSE**:  Disputed.  The Chinese police formally detained Cathy Yu and Jason Yuyi beginning December 10, 2012, and Jade Cheng beginning December 21, 2012.  (*See* Resp. ¶ 6, *supra*; Ex. 54.)  All of the Individual Plaintiffs were not formally arrested until January 15, 2013.  (*Id.*)

8.      In connection with its investigation of ICT, the Chinese police seized 781 transceivers (the "Seized Equipment").  Dkt. 101, ¶¶ 54, 55.

**RESPONSE**:  Disputed that paragraphs from the Second Amended Complaint cited above either state or imply that there was any preexisting PSB investigation of Yu, Yuyi, Cheng or ICT.  The record shows that the PSB began investigating the Individual Plaintiffs, and not ICT, in response to "a complaint by H3C" made to the PSB.  (Ex. 92, Patterson Tr. at 166:15-18; *see also* Ex. 38.)

        This is also disputed to the extent it misstates the number of transceivers the PSB seized from Mr. Yu and Ms. Yuyi's possession (the "Seized Equipment").  Documents in the PSB's case file reflects that the PSB seized "778 transceivers with counterfeit H3C brand[ing]" when Jason Yu and Cathy Yuyi were taken into PSB custody.  (*See* Ex. 35.)  The arrest and property search and seizure reports do not mention ICT, or an investigation of ICT.  (*See* Ex. 37 (PSB's "Description of Seizure" Report); Ex. 34 (PSB's "Counting Record"); Ex. 35 (PSB's "Search Record"); Ex. 33 (PSB'S "Price Counting Record"); and Ex. 36 (PSB's Counting Record").)

9.      Plaintiffs allege that the raid and arrests were precipitated by a report to the Chinese police alleging that ICT was selling counterfeit H3C equipment.  Dkt. 101, ¶¶ 54, 55.

**RESPONSE**:  Undisputed that Plaintiffs allege the above, and undisputed that the raid and arrests were precipitated by a report to the PSB by H3C.  It is undisputed that the PSB would "start a case based on a complaint" lodged by a trademark holder.  (Ex. 100, Young Tr. 73:11-74:4.)  And, as Defendants admit, the Individual Plaintiffs' detention and arrests were triggered by a "complaint by H3C . . . about brand protection" which H3C submitted to the PSB.  (Ex. 92, Patterson Feb. 11, 2021 Tr. at 166:15-18.)  One month before the PSB formally arrested the Individual Plaintiffs, it received a Petition from H3C dated December 12, 2012, and requesting that the PSB "conduct an investigation [of] the [Individual Plaintiffs'] regarding their trademark infringement," and "impose the punishments" on them.  (Ex. 38; *see* Resp. ¶ 6, *supra*.)

10.     The Individual Plaintiffs were released on bail in July 2013, and Chinese authorities later issued "no criminal record" letters.  Dkt. 101, ¶ 194.

**RESPONSE**: Undisputed that the Individual Plaintiffs were "released on bail pending a guarantor" beginning on July 19, 2013.  (*See* Ex. 73 (Individual Plaintiffs' Bail Letters); *see also* (Ex. 98 ¶ 2 4(Ma Li Aff.).)  The charges against the Individual Plaintiffs were not officially dropped until over two years later when they were issued "no criminal record" letters from the Chinese authorities.  (*See, e.g.*, Ex. 81; Ex. 73.)

11.     The first six claims of the now-operative Second Amended Complaint are premised in part on the allegation that HPFS India sold counterfeit H3C equipment to ICT.  Dkt. 101, Counts I-VI, *e.g.*, ¶¶ 240, 255, 264, 267, 273; 285; Dkt. 341 at ¶ 15.

**RESPONSE**:  Undisputed that Counts I-VI of the Second Amended Complaint are premised, in part, on the allegation that at least some of the Shipped Goods ICT received from HPFS India were counterfeit, including the relevant definition of "counterfeit" goods

under Article 214 of the PRC Criminal Law, which includes the sale of goods bearing

counterfeit registered trademarks.  (*See* Dkt. 341 ¶ 54; Resp. ¶ 14, *infra*.)

12.  Plaintiffs did not sue H3C itself.  (Dkt. 1-1; Dkt. 101).

   **RESPONSE**: Undisputed.

13.  Plaintiffs have not sought any third-party discovery from H3C.  Dkt. 280 (Order on Plaintiffs' Motion to Compel (Doc. No. 249)) at 2, 13.

   **RESPONSE**:  Disputed.  Plaintiffs sought third-party discovery from H3C when it named

   Liu "Jessica" Rui, former "team lead for [the] H3C legal team," (Ex. 92, Patterson Tr. at

   83:2-4), as a potential deponent given Ms. Rui's involvement in "the counterfeit

   investigations in China, H3C's inspections of the ICT and [TTG] transceivers, and

   correspondence with the PSB." (Dkt. 308 at 14-15.)  Because Defendants later admitted

   that Ms. Rui was an "HP employee . . . [and] team lead for [the] H3C legal team" (Ex. 92,

   Patterson Tr. at 83:1-4), who "used both @hp.com and @h3c.com emails," and was

   "directly involved in . . . the [] counterfeit investigations in China," Plaintiff sought this

   H3C-specific discovery through HP.  (Dkt. 308 at 15.)

14.  Defendants retained Shelley Raina, an expert in counterfeiting.  Quigley Decl., Ex. 3 (Raina Report), ¶¶ 5-10.

   **RESPONSE**:  It is undisputed that Defendants retained Shelley Raina for the purpose of

   providing expert testimony on the issue of seized transceivers' authenticity and that Mr.

   Raina's opinions were based on his background in "engineering and computer science," as

   well as his experience as a "*hardware* design engineer" whose work included "preventing

   *hardware* counterfeiting."  (Dkt. 513-3 ¶¶ 6-10 (Raina Report).)

Plaintiffs dispute that Mr. Raina's "nearly two decades of experience in identifying counterfeit transceivers" through the use of "thorough forensic analysis" and the "comparison of unique product identifiers recorded on the product and in the EEPROM data," (Dkt. 513-3 ¶ 83) (Raina Report)), qualify him to opine on whether the Seized Equipment bore counterfeit trademarks under the relevant provisions of PRC Criminal Law.   The Individual Plaintiffs were charged with violating Article 214 of the PRC Criminal Law, (Dkt. 341 ¶ 54; Ex. 72), which provides in relevant part that, "[w]hoever knowingly sells commodities bearing ***counterfeit registered trademarks*** shall, if the amount of sales is relatively large, be sentenced to fixed-term imprisonment of not more than three years . . ." and covers both counterfeit hardware as well as counterfeit trademarks, even if they are affixed to otherwise authentic goods.  (*See* Ex. 3 (Art. 214).) However, nowhere in Mr. Raina's report does he consider the authenticity of the H3C trademarks affixed to the Seized Equipment.  (Dkt. 513-3 ¶¶ 25, 35 (Raina Report); *see also* Dkt. 369 at 22.)

The PSB documents confirm that the Individual Plaintiffs were arrested for selling goods bearing counterfeit trademarks, as does the Individual Plaintiffs' testimony. (*See* Ex. 93, Yu Jan. 19, 2021 Tr. at 204:19-205:19; Ex. 101, Yuyi May 10, 2021 Tr. at 101:9-105:18-20).   Defendants have also acknowledged: (i) that the PSB "investigated the Individual Plaintiffs for selling commodities bearing counterfeit registered trademarks, in violation of Article 214," (Dkt. 341 ¶ 54); (ii) that "the counterfeiting allegations ***relate to the labeling***," (Ex. 52); and (iii) that H3C decided the Seized Equipment were "counterfeit products *according to the logos on the equipment*." (Dkt. 515-9 at 2900.)   However, nowhere in Mr. Raina's report does he consider the authenticity of the H3C trademarks

11

affixed to the Seized Equipment.  (Dkt. 513-3 ¶¶ 25, 35 (Raina Report); *see also* Dkt. 369 at 22.)

15.   Mr. Raina affirmed his report under penalties of perjury.   *See* Dkt. 342-1 (Raina Declaration).

**RESPONSE**: Undisputed.

16.   Mr. Raina devised a reliable testing methodology based on his extensive training and experience with identifying counterfeit transceivers.  Quigley Decl., Ex. 3 (Raina Report), ¶¶ 51-53.

**RESPONSE**: Disputed that Mr. Raina's methodology is a reliable way to determine the authenticity of the trademarks labels on the Seized Equipment.  Mr. Raina's methodology purports to test the authenticity of the Seized Equipment's ***hardware*** via visual inspection and power-on tests, and does not take into account the authenticity of the holographic ***trademarks*** appearing on the transceivers' stickers.  (Dkt. 513-3 ¶¶ 51-53, 71 (Raina Report).)  In Mr. Raina's opinion, observations of holographic labels "are not helpful to answer the question of whether the Seized Equipment is *in* fact counterfeit or authentic." (*Id.* ¶ 82.)

The reliability of Mr. Raina's methodology is disputed to the extent it fails to address the authenticity of the trademarked H3C holographic stickers.  The outside appearance and holographic labels affixed to the transceivers were significant to H3C's determination in its Verification Report to the PSB that the Seized Equipment was counterfeit, particularly since H3C stated that performing an electrical test on such "obvious[ly] counterfeit" transceivers was "pointless."  (Dkt. 515-8 at 19-24; *see* Resp. ¶ 14, *supra*.)  H3C determined that the "abnormal[ity]" of the holographic labels alone was "sufficient enough to determine that at a least most of the these seized transceivers are counterfeit."  (*Id.* at 21.)  Indeed, H3C's auditor, Wang You, told the PSB in May 2013

that, even if a transceiver "passe[s] the power-up testing[, it] is not necessarily an authentic H3C product," because **the anti-counterfeiting trademark label is the most reliable indicator of reliability**.  (Ex. 69 at 8037 (W. You Interrogation Record).)  Given Mr. Raina's opinion that "holographic logos are not relevant to the counterfeit determination," his methodology is unreliable because it fails to consider whether the Seized Equipment was counterfeit under the relevant Chinese law.  (Ex. 85, Raina Tr. at 92:3-6.)

17.    The results of his testing are as follows:

- Of the 781 units of Seized Equipment provided for inspection, 647 bear serial numbers that appeared on the Shinto Inventory List. He determined that 646 units of Seized Equipment acquired from HPFS India by ICT were authentic, and one device was too damaged to inspect and reach a conclusive determination.

- Of the remaining 134 units of Seized Equipment not on the Shinto Inventory List – and therefore presumptively not acquired from HPFS India by ICT – at least 31 units of Seized Equipment were counterfeit.  Quigley Decl., Ex. 3 (Raina Report), ¶ 50.

**RESPONSE**:  It is undisputed that Mr. Raina's report contains the conclusions cited above.

Disputed that Mr. Raina's conclusions are correct because they rely on a flawed "Inventory List" that purports to identify the source of the allegedly counterfeit equipment. Plaintiffs dispute that the document that Defendants' refer to as the "Inventory List," (Dkt. 515-2), contains an accurate list of serial numbers for each of the Shipped Goods because Defendants stated there would be "no packing list provided," with the shipment, (Ex. 19 at 1685), and ICT never received a list of serial numbers for the equipment listed on its Purchase Order, (*see* Ex. 16; Dkt. 341¶ 45).  "Prior to the sale and in the course of negotiations, HPFS India only provided ICT a master list with over 12,000 items of the equipment returned [to HPFS] . . . after the Commonwealth Games and not the 3,370 items actually sold to ICT."  (Dkt. 331-15 ¶ 5).)

Plaintiffs further dispute that Defendants provided ICT with an accurate, itemized packing list containing the serial number of each of the Shipped Goods given that (1) there is "no evidence to suggest that Inspira ever sent" Defendants any importation documentation with a list of serial numbers for the CWG Goods, even though Defendants have "sent several requests to Inspira" since 2011, (Dkt. 331-6), and (2) Defendants took no steps to "physically inspect the [Shipped Goods]" before they were sold to ICT.  (Ex. 96, Def.'s 30(b)(6) Tr. at 24:17-20.)  To this day, both the origin and authenticity of the Shipped Goods remains in dispute.  (*See* Resp. ¶¶ 1, 3, *supra*.)

Plaintiffs further dispute Mr. Raina's conclusion that the 31 units of allegedly counterfeit transceivers were "presumptively not acquired from HPFS India by ICT" based on a comparison of the Inventory List on which Mr. Raina's conclusions rest against the Master List of all the CWG Goods, (Ex. 6), and the list of unsold CWG Goods remaining in TTG's possession after ICT's initial purchased, (Ex. 30).  This analysis revealed that the Inventory List contains "299 transceivers that also appear on [TTG's] list of equipment remaining in India in 2012 after the ICT sale." (Dkt. 331-15 ¶ 8.)  "Accordingly, the equipment sold by HPFS India to ICT . . . included *at least 299 transceivers*" which appear on the list of unsold CWG Goods, but not on the Inventory List.  (*Id.* ¶ 9.)

Moreover, Mr. Raina's reliance on the Inventory List goes against the contemporaneous conclusions reached both by Plaintiffs, as well as Defendants' own auditors, that this list was unreliable.  ICT employees identified discrepancies between what the Inventory List and the Shipped Goods ICT actually received.  (*See* Ex. 20 (describing an error on the "packing list" where "part numbers [were] switched").)  While the Individual Plaintiffs were in detention, Alex Styller told David Gill that the list of

14

equipment supplied with the Shipped Goods was "of very poor quality." (Ex. 49 at 1395)
Defendant David Gill echoed similar concerns regarding the Inventory List's accuracy
when he told Styller that after HPFS's auditor inspected 40% the Seized Equipment, "it
appears that the equipment seized is the same equipment sold by HPFS to . . . ICT," but
admitted that using the "list of equipment sold by HPFS India . . . [i]t was not possible to
reconcile 73 [of the 293 inspected] items."

18.     Dr. Fang testified that he is not qualified to render any opinion rebutting Mr. Raina.
        Quigley Decl., Ex. 4 (Fang Tr.), 14:18-15:5, 77:16-22.

        **RESPONSE**:  Disputed.  The scope of Dr. Fang's role as an expert was to "inspect the
        holographic logos [on the Seized Goods] and to determine whether the logos bare any
        indicators of counterfeiting in comparison to the report, the verification report, and the
        [H3C] security bulletin."  (Ex. 84, Fang Tr. at 22:5-11.)

                This is also disputed because the cited material does not support this statement.
        Although Dr. Fang did not offer an opinion on Mr. Raina's conclusion "regarding the unit
        serial numbers" because he a is "not an expert of [] transceivers," (Ex. 84, Fang Tr. at
        77:16-22), Dr. Fang testified that his expert "knowledge of optic and photonics to answer
        the indicators that are related to counterfeiting described in [H3C's] security bulletin and
        the Verification Report" informed his analysis regarding the authenticity of the
        holographic, anticounterfeiting labels affixed to the Seized Equipment, (Ex. 84, Fang Tr.
        at 20:8-16), which is a relevant consideration when determining whether commodities are
        considered counterfeit under relevant Chinese law.  (*See* Ex. 3 at 37.)

19.     Quigley Decl. Ex. 38 reflects a list of equipment subject to a sale transaction between HPFS
        India and Shinto in December 2011.  The parties understood at the time that Shinto would
        resell the same equipment to ICT and export it to ICT from India.  The equipment listed

was intended to be the first installment of equipment sold to Shinto, and ultimately to ICT. Dkt. 342-3.

**RESPONSE**:  Disputed that Exhibit 38 accurately reflects the list of Shipped Goods that ICT received from HPFS (India) because Defendants did not provide the Plaintiffs with an Inventory List at the time of ICT's purchase that included serial numbers for the Shipped Goods.  (*See* Dkt. 341 ¶ 45; Resp. ¶ 17, *supra*.)  The reliability of Exhibit 38 is further undermined given that Defendants failed to inspect the goods prior to their sale to ICT, (*see* Resp. ¶ 3, *supra*), and because both Plaintiffs and Defendants identified discrepancies in the various lists from which Exhibit 38 was created, (*see* Resp. ¶ 17, *supra*.)

20.     Quigley Decl. Ex. 39 reflects the "Master List" of equipment returned to TT Global after the Commonwealth Games.  Dkt. 342-3; Dkt. 341, ¶ 32.

**RESPONSE**:  Disputed that the document referred to by Defendants as the "Master List" accurately represents the inventory of CWG Goods returned to TTG after the Commonwealth Games.  Defendants never actually inspected the equipment or obtained the importation documentation necessary to verify the Master List's accuracy.  (*See* Resp. ¶¶ 3, 17, *supra*.)  Moreover, additional analyses performed by the Plaintiffs and Defendants' admissions in 2013 further undermine the reliability of the Master List as the foundational document from which the other inventory lists were created.  (*See* Resp. ¶ 17, *supra*.)

Plaintiffs further dispute the accuracy of the "Master List" given that Defendants' recognized "discrepancies" in what TTG actually received after Tata Consultancy's lease ended, including as to the number of transceivers.  (Ex. 4.)  Defendants failure to obtain the equipment's importation documentation made reconciling these discrepancies and matching up "[the] serial [numbers]" on the CWG Goods with the "individual bill of

entries" impossible.  (Ex. 9; *see also* Dkt. 341 ¶ 43.)  This further undermines the reliability

of any master inventory list given that Defendants' primary method of reconciliation after

a lease relies on "asset level data" in the form of electronic records.  (*See* Ex. 96, Def.'s

30(b)(6) Tr. at 18:19-25, 24:17-20.)  Defendants' admission that "[HP] could have done

more diligence" before reselling the equipment to ICT casts further doubt on the accuracy

of the Master List.  (Ex. 96, Def.'s 30(b)(6) Tr. at 31:25-33:25.)

Finally, the accuracy of the Master List is disputed insofar as it is no longer possible

for the parties to assess its accuracy due to HPFS's decision to have TTG destroy all of the

remaining CWG Goods that ICT did not purchase, (Ex. 96, Def.'s 30(b)(6) Tr. at 87:2

30(b)(6)), after HP determined that the "the origination of the [CWG Goods]" was

"questionable."  (Dkt. No. 341 ¶ 61.)

21.  Plaintiffs' position is that the relevant inventory list to trace the seized transceivers to their
source (HPFS India) is the "Master List" of all equipment returned to TT Global after the
Commonwealth Games.  Dkt. 341, ¶ 32.

**RESPONSE**: Disputed.  Based on the evidence in the record, as well as deposition

testimony taken since the last round of summary judgment briefing, Plaintiffs dispute that

the "Master List" is the "relevant inventory list."  (*See* Resp. ¶¶ 3, 17, 20, *supra*.)

22.  Plaintiffs agree that the 31 devices identified as counterfeit by Mr. Raina are not listed on
any inventory of equipment sold to ICT by HPFS India.  Quigley Decl., Ex. 5 (February
16, 2020 Ltr. from D. Joffe); Quigley Decl., Ex. 3 (Raina Report), Appendix A; Dkt. 341,
¶ 34.

**RESPONSE**: It is undisputed Mr. Raina reaches the conclusion above in his expert report.

Disputed because "[t]here was no inventory list with the [Shipped Goods'] serial numbers

accompanying [Shinto's] purchase order.  ICT never received an inventory list with serial

number of the [Shipped Goods] it purchased from HPFS India . . .  until Defendants

produced it in discovery." (Dkt. 331-15 ¶ 4.)  Further disputed because the list relied upon

by Mr. Raina is unreliable based on the additional analysis performed by the Plaintiffs as

referenced above.  (*See* Resp. ¶¶ 17, 20, *supra*.); *see also* Dkt. 331-15 ¶¶ 4-10 (citing Ex.

30).)

23.    Those 31 devices correspond exactly with the 31 devices Mr. Raina found to be counterfeit.
       Quigley Decl., Ex. 5; Quigley  Decl., Ex. 3 (Raina Report), Appendix A.

       **RESPONSE**:  It is undisputed that Mr. Raina reaches the conclusion above in his expert

       report.   However, Plaintiffs dispute the substance of Mr. Raina's conclusion because the

       list upon which his conclusion is based is unreliable.  (*See* Resp. ¶¶ 17, 20, *supra*.); *see*

       *also* Dkt. 331-15 ¶¶ 4-10 (citing Ex. 30).)

24.    The parties previously agreed that Counts 1-6 of the Second Amended Complaint (the
       "Counterfeiting Claims") "go away" if the equipment sold by HPFS India to ICT was *not*
       counterfeit.  Dkt. 189 (Jan. 11, 2019 Status Conference Tr.) at 5-6.

       **RESPONSE**:   Disputed that there is any agreement between the parties as to the

       Counterfeiting Claims.  In addition, the cited transcript misstates prior Counsel's position

       at the January 11, 2019 status conference where, prior to the close of discovery, Plaintiffs'

       counsel responded with an offhand comment to an inquiry by the Court.  (*See* Dkt. 189 at

       5-6 ("THE COURT:  . . . if the [Seized Equipment are] not counterfeit, then [Claims 1-6]

       *pretty much* go away.  Right, Mr. Joffe?  MR. JOFFE:  That's correct, Your Honor.").)  Mr.

       Joffe's response to the Court is not a previous agreement between the parties, particularly

       since, as the Court recognized at the same status conference, Plaintiffs had not yet gotten

       "all the discovery yet."  (Dkt. 189 at 8-9.)

              Further disputed to the extent that Defendants improperly cabin the "Counterfeiting

       Claims" to their narrow definition of goods that are "*in fact* counterfeit," (Dkt. 514 at 16),

       which excludes counterfeiting charges that may arise from "product packaging, product

appearance, and labeling," and which ignores the Court's prior ruling that "evidence that the labels affixed to particular goods are counterfeit may be evidence that the goods themselves are counterfeit."  (Dkt. 369 at 6, 19; *see also* Resp. ¶ 14, *supra*.)  Given Defendants' admission that "[t]he PSB investigated the Individual Plaintiffs for selling commodities bearing counterfeit registered trademarks, in violation of Article 214 of the Chinese Criminal Code," Defendants' conception of the "Counterfeiting Claims" is itself in dispute.  (Dkt. 341 ¶ 54)

25.     The Verification Report is an undated Mandarin-language document that purports to contain H3C's statements to the Chinese police about the Seized Transceivers.  Quigley Decl., Ex. 8 (Verification Report).

**RESPONSE**:  Disputed to the extent that Defendants imply that the Verification report was not authored by H3C.  In a sworn affidavit, Defendants' counsel stated that the Verification Report was "***created by H3C***" and "submitted by H3C to the Chinese authorities apparently explaining its position concerning the counterfeiting allegations." (Dkt. 292 ¶¶ 36-37.)  While the Verification Report itself is undated, Defendants' privilege log shows that it was received by David Gill directly from Jessica Liu, an "HP employee," and former "team lead for [the] H3C legal team," (Ex. 92, Patterson Tr. at 83:1-4), in July 2013, (Dkt. No. 390-1 at Entry 646).  Plaintiffs produced photos of the same Verification Report taken by Cathy Yu's Chinese defense counsel, (Ex. 71), showing a portion of H3C's stamp, which is "the equivalent of a signature" on official documents in China.  (Ex. 100, Young Tr. at 92:15-20.)

26.     Within weeks of the Court's summary judgment decision, Defendants' counsel realized that the signed document previously assumed to be HPFS India's letter to the Chinese police was in fact a never-submitted draft containing factual inaccuracies, and the final version inadvertently had not been produced by Defendants in the litigation.   Dkt. 390.

**RESPONSE**:  It is undisputed that Defendants proffered the above statement in their October 30, 2020 Status Report to the Court in an attempt to explain which version of HPFS's letter was submitted to the PSB, as well to explain why the "final version" referred to above (Dkt. 515-9; the "New Final Letter") was withheld until long after the close of document discovery.  (Dkt. 390.)  However, Plaintiffs dispute: (i) that the New Final Letter is the version of HPFS's letter that was actually submitted to the PS; and (ii) that the version the Court previously considers (Dkt. 331-4; the "Old Final Letter"), contained factual inaccuracies regarding the agency relationship between HPFS and H3C.

First, Plaintiffs dispute which version of the letter was actually submitted to the PSB, because Defendants' counsel previously represented that the Old Final Letter was actually HPFS's "letter to the PSB."  (Dkt. 341 ¶ 56.)  In addition, during the Individual Plaintiffs' detention in 2013, Defendants David Gill told ICT's attorney, Les Riordan, that, aside from "some minor amendments," the HPFS letter submitted to the PSB was "substantively the same" as the March 25, 2013 draft Gill sent previously.  (Ex. 67 at 1514.)

Plaintiffs also dispute that the Old Final Letter contained "factual inaccuracies" regarding H3C's relationship to HPFS, given that, as Defendants readily admit, the New Final Letter is "*more* favorable to Defendants than the version that the Court relied upon" in the prior summary judgment order.  (Dkt. 390 at 4, n.2.)

Plaintiffs disput that the New Final Letter is accurate to the extent Defendants' claim it now shows H3C was not acting as HPFS's agent simply because it does not include the statement that H3C inspected the equipment "on behalf of" HPFS India, where Defendants provided the Old Final Letter including the same statement on April 22, 2013.  (Dkt. 331-4.)  The accuracy of the New Final Letter is further disputed with respect to the

description of the H3C-HPFS agency relationship in light of other evidence that suggests H3C was working on Defendants' behalf.  For example, as Defendants' privilege log makes clear, H3C and HPFS acted in a coordinated manner while HPFS was writing the letter to the PSB and H3C was compiling its Verification Report.  (*See* Dkt. No. 390-1 at Entries 646 – 651; Dkt. No. 515-8.)   Defendants worked closely with H3C throughout the Individual Plaintiffs' detention, including directing parts of H3C's investigative efforts; for example, Defendants explained that July 2013 entries in their privilege log reference a "Verification report" written by H3C that "was specifically generated at the direction of counsel," and related to "two sample devices that were sent by [TTG to H3C] *at the request of counsel* for the purpose of providing legal advice." (Dkt. 258 ¶¶ 44-47.)

Plaintiffs' also dispute that Defendants' representation that "H3C inspected the seized equipment on behalf of HPFS India" constitutes a factual inaccuracy.  (*See* Dkt. 331-4.)  H3C auditors visually inspected the Seized Equipment "on behalf of HPFS India" sometime after "December 2012."  (Dkt. 341 ¶ 48.).  David Gill viewed H3C's auditors as part of his own team, including referring to them as "[o]ur internal audit team," (Ex. 49 at 1382), and stating that "[t]he PSB did not give *our auditor* access to inspect the remaining 60% of the equipment."  (Ex. 51 at 2574.)  Furthermore, in a May 20, 2013 email, Gill explained that HPFS's "letter [to the PSB] found its way to the right person" because "[o]ne of *our people* attended the PSB on Friday," (Ex. 67); the record shows that H3C submitted that letter on Defendants' behalf in April 2013.  (*See* Dkt. 291 at 20-21.)

27.   Defendants then produced the true (as-submitted) final letter, which reflects revisions made to correct those inaccuracies.  Dkt. 390; Quigley Decl., Ex. 9 ("Final Letter"); Quigley Decl., Ex. 11 (Declaration of David Gill), ¶ 7.

**RESPONSE**:  Plaintiffs dispute that the New Final Letter is the version of HPFS's letter that was actually submitted to the PSB and that the Old Final Letter contained factual

inaccuracies regarding the agency relationship between HPFS and H3C, as stated above.

(*See* Resp. ¶ 26, *supra*.)

28. The Final Letter, unlike the prior draft, does not say that "H3C inspected the seized equipment on behalf of HPFS India and also obtained a partial list of the seized equipment from the Beijing City Haidian District Public Security Bureau." Quigley Decl., Ex. 9.

   **RESPONSE**: Undisputed that the New Final Letter does not contain the quoted language.

   Plaintiffs dispute that the New Final Letter is the version of HPFS's letter that was actually

   submitted to the PSB and that the Old Final Letter contained factual inaccuracies regarding

   the agency relationship between HPFS and H3C, as stated above. (*See* Resp. ¶ 26, *supra*.)

29. Instead, at the relevant place it states (in translation) that "HPFS India immediately launched an investigation on this matter, comparing the data of a partial list of the seized devices which were obtained from the Public Safety Department of Haidian District, Beijing with the data of their sold equipment." Quigley Decl., Ex. 9 at DKT. 515-9.

   **RESPONSE**: Undisputed that the New Final Letter contains the quoted language.

30. Defendant David Gill's signature appears on the Final Letter (as well as the never-submitted letter cited in the Court's order denying summary judgment). Quigley Decl., Ex. 9; Dkt. 331-4 at 3,

   **RESPONSE**: Undisputed that David Gill's signature appears on both the Old Final Letter

   and the New Final Letter. Plaintiffs dispute that the New Final Letter is the version of

   HPFS's letter actually submitted to the PSB, as stated above. (*See* Resp. ¶ 26, *supra*.)

31. Mr. Gill confirmed that the Final Letter was the document submitted to the Chinese police. Quigley Decl., Ex. 10 (Gill Tr.), 303:22-315:17; Quigley Decl., Ex. 11 (Declaration of David Gill), ¶ 7.

   **RESPONSE**: Undisputed that some version of the HPFS letter was submitted to the

   Chinese police. Plaintiffs dispute that the New Final Letter is the version of HPFS's letter

   actually submitted to the PSB. (*See* Resp. ¶ 26, *supra*.).

32.   He explained that shortly before the Mandarin-language letter was finalized, an employee of HP China, Meng Tao, alerted him that the reference to H3C conducting an inspection and obtaining a list of seized equipment was inaccurate.  Quigley Decl., Ex. 10 (Gill Tr.), 288:10-15; 289:25-290:16; 303:22-315:17.

   **RESPONSE**:  Undisputed that some version of the HPFS letter was submitted to the Chinese police.  Plaintiffs dispute that the New Final Letter is the version of HPFS's letter that was actually submitted to the PSB and that the Old Final Letter contained factual inaccuracies regarding the agency relationship between HPFS and H3C, as stated above.

   (*See* Resp. ¶ 26, *supra*.)

33.   Meng Tao knew that the draft April 2013 letter was inaccurate because he was the person who obtained the list from the police.  Quigley Decl., Ex. 10 (Gill Tr.), 314:5-315:17.

   **RESPONSE**:  Undisputed that some version of the HPFS letter was submitted to the Chinese police.  Plaintiffs dispute that the New Final Letter is the version of HPFS's letter that was actually submitted to the PSB and that the Old Final Letter contained factual inaccuracies regarding the agency relationship between HPFS and H3C, as stated above.

   (*See* Resp. ¶ 26, *supra*.)

34.   Mr. Gill explained that the inaccurate statement in prior drafts arose from his own mistaken beliefs that (i) Meng Tao was an employee of (non-party) H3C, rather than an employee of (non-party) HP China; and (ii) Meng Tao had physically inspected the equipment, rather than simply obtaining a partial list from the Chinese police.  Both of those mistaken assumptions were corrected by Meng Tao before Mr. Gill submitted his letter to the Chinese police.  Quigley Decl., Ex. 10 (Gill Tr.), 288:10-15; 289:25-290:16; 303:22-315:17.

   **RESPONSE**:  Undisputed that some version of the HPFS letter was submitted to the Chinese police.  Plaintiffs dispute that the New Final Letter is the version of HPFS's letter that was actually submitted to the PSB and that the Old Final Letter contained factual inaccuracies regarding the agency relationship between HPFS and H3C, as stated above.

   (*See* Resp. ¶ 26, *supra*.)

Plaintiffs also dispute that Meng Tao, "part of HP in China," (Ex. 96, Def.'s 30(b)(6) Tr. at 162:18-20), did not perform a visual inspection of the Seized Equipment. In February 2013, Gill told Styller that the PSB had "granted [HPFS] permission to view the seized goods." (Ex. 49.)  Following up on that viewing, Gill confirmed in an email to Styller that HPFS "inspected about 40% of the seized products." (*Id.* at 1385.)  Defendants' previously represented that "to the extent that review of partial inventory of the Seized Equipment by the Defendants . . . was permitted . . . the same was carried or conducted by Meng Tao in or about February to March 2013." (*See* Dkt. 249-11 at 18 (HPE's April 17, 2019 Response to Interrogatory No. 3 of Plaintiffs' First Set of Interrogatories).)  To the extent that the April 2013 Letter was modified to correct Gill's "misunderstanding," at the time that "Meng Tao had physically inspected the equipment," that correction is not reflected in Defendants' interrogatory responses.

35.  The letter was thus corrected, Mr. Gill signed it, and the Final Letter was submitted to the police. Quigley Decl., Ex. 10 (Gill Tr.), 303:22-315:17; Quigley Decl., Ex. 11 (Declaration of David Gill), ¶ 7.

**RESPONSE**:  Undisputed that some version of the HPFS letter was submitted to the Chinese police.  Plaintiffs dispute that the New Final Letter is the version of HPFS's letter that was actually submitted to the PSB and that the Old Final Letter contained factual inaccuracies regarding the agency relationship between HPFS and H3C, as stated above. (*See* Resp. ¶ 26, *supra*.)

36.  Plaintiffs did not seek third-party discovery from HP China.

**RESPONSE**:  Disputed.  "[P]laintiffs initially requested that the defendants produce documents from other HP entities[, including HP China,] in the course of the parties' negotiation over discovery in [April] 2018." (*See* Dkt. 149-1.)  Plaintiffs' requests were

based, in part, on Defendants' Initial Disclosures identifying HP China employees Meng

Tao and James Kwok as "[p]ersons with relevant knowledge" of the case, (Dkt. 249-5), as

well as on Defendants' representation that "[f]rom 2009 until approximately March 2015 .

. . HP hosted Microsoft Exchange user accounts for all of the Corporate Defendants using

the '@hp.com' email domain," (Dkt. 149 at 4), which Tao and Kwok both used, (*see, e.g.,*

Dkt. 390-1 at Entries 646 and 651.)   Because Defendants refused to produce Tao and

Kwok's documents despite being in their custody and control, Plaintiffs' discovery

requests related to Tao and Kwok's documents were also the subject of Plaintiffs' Motion

to Compel, (*see* Dkt. 223 at 12-15), and Plaintiffs' Motion for Reconsideration, (*see* Dkt.

249 at 12-14, 21).

37.   Plaintiffs did not seek third-party discovery from Inspira.

   **RESPONSE**:  Undisputed.

38.   No Individual Plaintiff has ever spoken with any employee of the HPFS Defendants.
Quigley Decl., Ex. 12 (May 10, 2021 Yuyi Tr.), 63:20-22; Quigley Ex. 13 (Jan. 19, 2021
Yu Tr.), 271:21-273:5; Quigley Decl., Ex. 14 (Jan. 22, 2021 Cheng Tr.), 7:24-8:13.

   **RESPONSE**:  Undisputed.

39.   The Individual Plaintiffs were not involved in the negotiations or execution of the
Agreements.  Quigley Decl, Ex. 15 (Pekar Tr.), 103:21-104:8; Quigley Decl., Ex. 16 (Nov.
11, 2020 Styller Tr.), 81:4-8, 82:12-21, 86:18-24; Quigley Decl., Ex. 13 (Jan. 19, 2021 Yu
Tr.), 273:2-5.

   **RESPONSE**: Undisputed.

40.   The Individual Plaintiffs never read the contracts before ICT signed them.  Quigley Decl.,
Ex. 12 (May 10, 2021 Yuyi Tr.), 63:14-19; Quigley Decl., Ex. 13 (Jan. 19, 2021 Yu Tr.),
273:6-10; Quigley Decl., Ex. 14 (Jan. 22, 2021 Cheng Tr.), 7:20-23.

   **RESPONSE**: Undisputed.

41.    The WSA provides: "The Equipment is sold "AS IS WITH DEFECTS" and, to the fullest extent permitted by law, Seller makes no warranty, express or implied, as to any matter whatsoever[.]."  Quigley Decl., Ex. 37.

**RESPONSE**:  Disputed.  During negotiations between ICT and HPFS India, Defendants represented to ICT's Mike Pekar that many of the CWG Goods, coming off a 7-month lease, would have the remaining "original H3C warranty" and a "90 days warranty" from HP.  (*See* Ex. 91, Styller Tr. at 102:18-103:5; *see also* Ex. 7 at 2192.)  Prior to the sale of the first installment to ICT, HPFS confirmed that "[t]he warranties [on the CWG Goods] ARE transferable from one bona fide end-user to another bona fide end user, either directly or via a HP [a]uthorised reseller."  (*See* Ex. 8 at 0962.)

42.    The RRSA provides:  "<u>HPFS Warranties</u> To the maximum extent permitted by applicable law, HPFS makes no warranty whatsoever concerning the Active Equipment and no such warranty will be implied."  Quigley Decl., Ex. 1.

**RESPONSE**: Undisputed to the extent that the quoted language is contained within the RRSA.

43.    The RRSA provides:  "To the fullest extent permitted by law, HPFS' liability under this Agreement will in no event exceed the Referral Fee.  In no event will HPFS be liable to ICT for incidental, indirect, exemplary or consequential damages or for any loss of profits, revenue, interest or goodwill arising in connection with this Agreement."  Quigley Decl., Ex. 1.

**RESPONSE**: Undisputed to the extent that the quoted language is contained within the RRSA.

44.    ICT's out-of-pocket expenses for selling the Equipment totals $302,500.00.  Quigley Decl., Ex. 31 (ICT Interrogatory Responses); Quigley Decl., Ex. 32 (ICT Amended Interrogatory Responses); Quigley Decl., Ex. 33 (Plaintiffs' Initial Disclosures).

**RESPONSE**:   :   It is undisputed that ICT stated in its interrogatory responses that it's out of pocket expenses totaled $302,500.00.  Disputed to the extent that Defendants present a legal conclusion regarding ICT's damages as a fact.

45.    ICT earned $322,535.67 in revenue selling the Equipment.  Quigley Decl., Ex. 31 at 7-8.

**RESPONSE**:  Undisputed to the extent that the quoted revenue number appears in ICT's interrogatory responses.  Disputed to the extent that it is implied that Plaintiffs' realized any revenue from the Promised Goods as opposed to the Shipped Goods it actually received. (*See* Resp. ¶ 1, *supra*.)

46.    ICT generated $20,035.67 in profit from selling the Equipment.  Quigley Decl., Ex. 31 at 7-8; Quigley Decl., Ex. 32; Quigley Decl., Ex. 33.

**RESPONSE**:  Disputed to the extent that it is implied that Plaintiffs' realized any revenue from the Promised Goods as opposed to the Shipped Goods it actually received.  (*See* Resp. ¶ 1, *supra*.)  Further disputed to the extent the above relies solely upon Plaintiffs' written discovery responses issued at the outset of the case.  Pursuant to Rule 33(d), Plaintiffs produced profit and loss documents for ICT's Chinese operations, (*see e.g.*, Ex. 77), as well as transaction-level data for sales of Shipped Goods in China (*see, e.g.*, Ex. 76). Defendants' damages expert, G. William Kennedy, who proposed the same figures that Defendants present as undisputed here, did not reference any of those documents when calculating ICT's damages.

Kennedy admitted that he had not seen "an item-by-item account of ICT's sales in India," (Ex. 102, Kennedy Tr. at 199:19-24), and that his estimate of ICT's revenue did not account for the number of units sold, (*id.* at 54:4-8).  Rather, Kennedy relied heavily on ICT's interrogatory responses, which only identify ICT's customers who purchased some

of the Shipped Goods, the date of their purchases, and the total revenue realized from each purchase – but which do not include (because Defendants did not ask about) the number of units sold, the type of unit sold, or ICT's expected profit upon purchase of the Promised Goods from Defendants.  (Dkt. 515-30 (ICT's Objections and Responses to Defendants' First Set of Interrogatories); Dkt. 515-31 (ICT's Amended Objections and Responses to Defendants' First Set of Interrogatories).)

Further disputed to the extent that it refers to any realized revenue below the Parties' reasonable expectations as "profits."  This realized revenue falls far below Defendants' own expectations, as they projected that the "[e]xpected sale value" of the goods once resold would fall between 1 million and 2.75 million USD.  (Ex. 11.)  The revenue also fell below Jade Cheng's expectations prior to the deal.  (*See* Ex. 15 at 1244.) For example, prior to receiving the substandard goods, Mr. Cheng estimated that ICT could sell parts numbered H3C-0235A24U in China for at least $1,500 each; however, ICT's sales records show that those unit eventually sold for just $628.33.  (*See* Ex. 15 at 1244; Ex. 76.)

47.    ICT has never paid a Referral Fee under the RRSA.  Quigley Decl., Ex. 16 (Nov. 11, 2020 Styller Tr.), 113:10-22; Quigley Decl., Ex. 11, ¶ 8.

**RESPONSE**:  Undisputed that Plaintiffs did not pay a Referral Fee under the RRSA; however, because HPFS did not "invoice ICT for the Referral Fee" as required by the RRSA, no such payment was due. (*See* Ex. 16 at 2561.)

48.    Defendants did not     the detention of the Individual Plaintiffs.  Quigley Decl., Ex. 17 (Chow Report); Quigley Decl., Ex. 18 (Chow Rebuttal Report); Quigley Decl., Ex. 19 (Chow Tr.), 277:18-278:2.

**RESPONSE**:   Disputed.   The Individual Plaintiffs' detention was prolonged by Defendants' actions and inactions both before and during the Individual Plaintiffs' time in PSB custody.

First, prior to the Individual Plaintiffs' detention, HP's decision to allow H3C to own enforce its own trademark rights in China "indigenous[ly]," (Ex. 96, Def.'s 30(b)(6) Tr. at 41:24-42:10), "exposed [HP] and others [including the Individual Plaintiffs to unnecessary risks." (Dkt. 515-17 ¶¶ 78, 81.)  Defendants were limited in their ability to directly intervene in the PSB investigation as a result of HP's decision to enact "a corporate structure where it could benefit from allowing H3C to operate without regard to U.S. laws that govern relationships between U.S. parent corporations and their foreign subsidiaries." (Dkt. 515-17 ¶¶ 19-21.)   That structure prolonged the Individual Plaintiffs' detention because it created the risk of "a counterfeiting investigation by H3C in which HP could not easily intervene."  (Dkt. 515-17 ¶ 95.)

Second, the above is disputed because HP ultimately "had control of" H3C as its wholly-owned subsidiary, (Ex. 96, Def.'s (30(b)(6) Tr. at 138:10-11), and its failure to use that power also prolonged the Individual Plaintiffs' detention.  As the parent corporation, HP could have directed H3C to stop its support for the PSB's prosecution of the Individual Plaintiffs, irrespective of how the PSB would react because, as a "wholly-owned subsidiary . . . H3C reported [to] HP."  (Ex. 96, Def.'s 30(b)(6) Tr. at 13-17.)  The record shows that H3C took instruction from HPFS throughout Defendants' investigation of the Individual Plaintiffs, including when "H3C inspected the seized equipment no behalf of HPFS India," (Dkt. 331-4 at 3; *see also* Dkt. 341 ¶¶ 48, 60), and when H3C drafted a Verification Report "specifically generated at the direction of [Defendants'] counsel."  (Dkt. 258 ¶ 46.)

29

Third, the above is further disputed because Defendants could have done more to end the Individual Plaintiffs' time in detention separate from their control over H3C. The record confirms Professor Chow's opinion that Defendants had at least a "limited ability" to "clarify the situation for the PSB," as evidenced by the fact that the PSB frequently sought information from them. (Dkt. 515-17 ¶¶ 88, 94.) When Jade, Jason and Cathy were first detained, the police asked Meng Tao, "part of HP in China" (Ex. 96, at Def.s' 30(b)(6) 162:18-20), to verify the authenticity of ICT's contract with HPFS India – to which he responded that "HP does not recognize any contract . . . signed by [ICT]." (Ex. 45.) Later, after the police "granted [HPFS] permission to view the seized goods," and HPFS "inspected 40% of the seized products," (Ex. 49), HP China voluntarily contacted the Chinese authorities to request a "detailed inspection of all the [Seized Equipment.]," (Ex. 60.) The prosecutor also told the police to "verify with HP . . . whether the company has acquired the brand H3C and sold [H3C] products." (Ex. 52 at 3424.)

Yet, despite the time it took to prepare, Gill's letter failed to include key exonerating information for the Individual Plaintiffs, including that, at the time, Defendants had "no reason to believe" that the Individual Plaintiffs were selling anything other than the Shipped Goods from HPFS. (Ex. 96, Def.'s 30(b)(6) Tr. at 149:9-14.) Gill's letter also did not include "anything about Mr. Harris checking on the remaining [CWG Goods in India], the TTG equipment and having [] concerns about the equipment and the custody in which it was maintained;" nor did it contain any information about "TTG's processes" for reconciling equipment returned from a lease or "[t]he fact that ICT was emailing HPFS to discuss the selling of the [Shipped Goods] into China . . . before [ICT] even had the equipment." (*Id.* at 183:3-185:15; *see also* Resp. ¶ 49, *infra.*)

Finally, Defendants also prolonged the Individual Plaintiffs' detention by ordering TTG to destroy the remaining CWG Goods, even though those could have been "helpful" for the Individual Plaintiffs to "compare" the CWG Goods in TTG's possession to the Seized Equipment, (Ex. 96, Def.'s 30(b)(6) Tr. at 80:12-21), after Defendants determined that "the origination of the [off-lease] equipment," – which matched the Seized Equipment in PSB custody – was "questionable."  (*See* Dkt. No. 341 ¶ 61.)

49.   Defendants could not prolong the detention of the Individual Plaintiffs.  Quigley Decl., Ex. 17 (Chow Report); Quigley Decl., Ex. 18 (Chow Rebuttal Report); Quigley Decl., Ex. 19 (Chow Tr.), 277:18-278:2.

**RESPONSE**:  Disputed.  Professor Chow is not a fact witness in this matter.

It is further disputed because the "[Individual Plaintiffs] were arrested because of a complaint by H3C," (Ex. 92, Patterson Tr. at 116:15-18), HP's "wholly-owned subsidiary," (Ex. 96, Def.s'. 30(b)(6) Tr. at 10:5-17); *see also* Resp. ¶ 48, *supra*).  Because HP's subsidiaries "reported up into HP," HP is responsible for their statements prolonging the Individual Plaintiffs' detention, (Ex. 96, Def.s' 30(b)(6) Tr. at 11:12-21), including: H3C's statement to the PSB that "[i]t has never designated Hewlett-Packard for the domestic sales and distribution of productions with 'H3C' trademark in China" (Ex. 42); and Meng Tao's statement to the PSB that "HP d[id] not recognize" the agreement between ICT and HPFS India and that he could not verify the authenticity of the contracts between ICT and HPFS India and that "[ICT] is required to provide details of HP's contact person in order to prove [the] authenticity of the agreement[s]."  (Ex. 45.)

The statement is further disputed because HPFS and Gill withheld the full scope of the Procuratorate's request for additional information.  On March 14, 2013, Gill sent Styller a one-page image displaying a Mandarin-language document which he identified as "the

prosecutor's request for information related to [ICT's] business license, customs clearance," and which included a list of five numbered requests, two of which were redacted.  (Ex. 52.)  Later, Plaintiffs learned that the redacted requests sought information about ICT's sales in China, which would have helped to show that the Individual Plaintiffs should not be charged and detained for a serious economic crime.  (*Compare* Ex. 52 at 3424 (Redacted Prosecutor's letter) *and* Ex. 46 (Unredacted Prosecutor's letter));[7] (*see also* Dkt. 515-18 ¶ 33 (Chow Report) (providing that there is a "a threshold test with the level of criminal liability increasing based on the *value of sales* of counterfeit goods.").)

The above statement is also disputed because it takes out of context the conclusion reached by Professor Chow in his Report.  Professor Chow's report stated that "as the registered trademark holder in China, H3C was the only entity that could affect the [PSB's] counterfeiting investigation."  (Dkt. 515-18 ¶ 16.)  Moreover, in his affirmative report, Professor Chow stated that HP and HPFS had a "limited ability" to "clarify the situation for the PSB," but failed to do so.  (Dkt. 515-17 ¶¶ 88, 94.)  Thus, he did not opine that HP's corporate structure was immutable;  rather, Professor Chow's report makes clear that HP's inability to intervene directly with the PSB was a function of its own corporate structure.  (*Id.* ¶¶ 19-21; *see also* Resp. ¶ 48, *supra*.)

50. Prof. Chow affirmed the opinions in his reports under oath.  Quigley Decl., Ex. 19 (Chow Tr.), 27:4-28:15.

**RESPONSE**:  Undisputed.

---

[7]  The way in which Gill presented the prosecutor's request for information to Styller conveyed that ICT was being actively investigated by the PSB and that ICT's delay in providing the requested documents was the cause of the Individual Plaintiffs' continued detention.  However, years later, Plaintiffs discovered that the document Gill had used to pressure Styller was a two-page letter from the prosecutor to the PSB, not ICT.  (*See* Ex. 98 ¶ 11 (Ma Li Aff.).)  Moreover, included in that letter from the prosecutor was the statement that the evidence collected by the PSB was insufficient "to make legitimate charges" against the Individual Plaintiffs.  (Ex. 46.)

51.   HP could not control H3C's interactions with the PSB and was unable to directly obtain
      the release of the plaintiffs from the PSB.  Quigley Decl., Ex. 17 (Chow Report) ¶ 20.

      **RESPONSE**:  Disputed.  Professor Chow is not a fact witness in this matter.  The above

      statement is also disputed because it takes out of context the conclusion reached by

      Professor Chow in his Report.  Although H3C "maintain[ed] their own independence . . .

      keep[ing] their indigenous nature intact," (Ex. 96, Def.'s 30(b)(6) Tr. at 41:24-42:10), it is

      not as though HP was incapable of controlling the actions of its wholly-owned subsidiary.

      (*See* Resp. ¶¶ 48, 49, *supra*.)   Rather than being hamstrung by some immutable

      characteristic, HP actively chose to allow H3C to be "independen[t] . .  by design."  (*See*

      *also* Ex. 96, Def.'s 30(b)(6) Tr. at 42:14-19.)   Since the PSB relies on the registered

      trademark owner – in this case H3C – to guide its investigation, HP's failure to register

      H3C's trademarks in its name made it difficult for HP to "clarif[y] the situation for the

      PSB."  (Dkt. 515-17 ¶¶ 42, 94.)

52.   "As the registered trademark holder in China, H3C was the only entity that could affect the
      counterfeiting investigation."  Quigley Decl., Ex. 18 (Chow Rebuttal Report) ¶ 16.

      **RESPONSE**:  Undisputed that the quoted language appears in Professor Chow's Rebuttal

      Report.  However, it is disputed to the extent that Defendants take Professor Chow's

      statement out of context.  Professor Chow opined that "[d]ue to Defendants' corporate

      organization, . . . the PSB had no legal basis for recognizing any of the HP entities

      established outside of China or any of the contracts, transactions, or events occurring

      outside of China.  Because H3C is the registered trademark holder in China, only H3C's

      consent or acquiescence would have persuaded the PSB drop this case against the

      Plaintiffs," (Dkt. 515-18 ¶ 35), or "verify the authenticity" and relevance of any documents

      provided by ICT, (*id.* ¶ 16).

Further disputed for the reasons set forth in detail above, which demonstrate that Defendants had several ways to influence the counterfeiting investigation, including by exercising its absolute control over H3C as a wholly-owned subsidiary. (*See* Resp. ¶¶ 48, 49, *supra*.)

Plaintiffs also dispute that H3C was the only entity capable of impacting the PSB's counterfeiting investigation because the Chinese authorities sought information regarding the case against the Individual Plaintiffs from sources others than H3C. For example, the Chinese authorities accepted various materials from Alexander Styller intended to verify the authenticity of ICT's agreements with HPFS India and provide a connect between the Seized Equipment and Shipped Equipment. (*See* Ex. 106 ¶¶ 7-12 (Affidavit of Alexander Styller ("Styller Aff.")); *see also* Resp.¶¶ 61, 107, *infra*), as well as information from Cathy Yu's Chinese defense attorney, Ma Li, verifying the authenticity of the serial numbers on several pieces of the Seized Equipment. (*See* Ex. 98 ¶¶ 20-23 (Ma Li Aff.).)

53. The PSB had no legal basis for recognizing any of the HP entities established outside of China or any of the contracts, transactions, or events occurring outside of China. Because H3C is the registered trademark holder in China, only H3C's consent or acquiescence would have persuaded the PSB to drop this case against the Plaintiffs. Quigley Decl., Ex. 18 (Chow Rebuttal Report), ¶ 35.

**RESPONSE**: Disputed. Professor Chow is not a fact witness in this matter. The above statement is also disputed because it takes out of context the conclusion reached by Professor Chow in his Report.

Further, Plaintiffs dispute that HP was incapable of controlling H3C because, as HP's "wholly-owned subsidiary," H3C was "ultimately reported to" and was controlled by HP. (Ex. 96, Def.'s 30(b)(6) Tr. at 10:5-17.) The risks resulting from H3C's "high level of institutional independence," (Dkt. 515-17 ¶ 57), is that "HP would struggle to

communicate directly with [Chinese] authorities" and that "H3C could engage in unethical and illegal practices without the knowledge of HP," (*id.* ¶ 20).

To the extent that HP's corporate-subsidiary structure was such that H3C was "set up to operate independently" and "would, obviously, do things that HP were not aware of," (Ex. 96, Def.'s 30(b)(6) Tr. at 42:14-15), this organization could give rise to civil or criminal liability under the Foreign Corrupt Practices Act. (*See* Ex. 99, Chow Tr. at 224:14-19 ("I believe that the SEC would be very interested in investigating HP and its practices with H3C.").) By choosing not to supervise or monitor its Chinese subsidiary, HP allowed H3C to operate with "no internal accounting controls . . . in place," in violation of 15 U.S.C. § 78m(b)(2)(B), a structure that may have afforded H3C the opportunity to bribe the Chinese police to prolong the detention of the Individual Plaintiffs.

It is undisputed that the cited language appears in Professor Chow's Rebuttal Report.

54.   Prof. Chow testified: "Q: So it's your opinion at least that HP couldn't affect the counterfeiting investigation, isn't that right? A: Yes, sir. Q: And HPFS couldn't affect the counterfeiting investigation, correct? A: Yes, sir. Q: And David Gill couldn't affect the counterfeiting investigation, correct? Yes, sir." Quigley Decl., Ex. 19 (Chow Tr.), 277:18-278:2.

**RESPONSE**: It is undisputed that this is an accurate quotation from Professor Chow's deposition testimony, however, Plaintiffs dispute the presentation of Professor Chow's expert opinion out of context. Professor Chow did not suggest that there was *no way* in which HP, HPFS, or David Gill could have affected the PSB's investigation; rather, he opined that "if HP were the registered trademark owner of the H3C trsdemark, this case never would have occurred." (Ex. 99, D. Chow Tr. at 238:7-12; *see also* Dkt. 515-17 ¶ 91.)

Further, the record shows that the PSB's investigation was precipitated and continuously encouraged by H3C, HP's wholly-owned subsidiary. (*See, e.g.*, Ex. 38 (containing a letter from H3C to the PSB requesting the Individual Plaintiffs' arrest); Ex. 31 (H3C's report to the PSB containing a valuation of the Seized Equipment ("H3C's Valuation Report") for purposes of the Individual Plaintiffs' continued prosecution by Chinese authorities).)

Further, there was a high volume of coordination between Defendants and personnel at H3C and HP China throughout the Individual Plaintiffs' detention, (*see* Dkt. 390-1 at Entries 149-658), including the fact that Jessica Liu, "HP employee" Jessica Liu acted as "team lead for [the] H3C legal team," (Ex. 92, Patterson Tr. at 83:1-4), throughout the course of HP's investigation into the Individual Plaintiffs' arrests.

55.   Since H3C – and not HP, HPFS, or HPFS (India) – was the registered owner of all H3C China trademarks and controlled all trademark enforcement actions, the PSB would have looked only to and accepted direction from H3C and not directly from its parent company. Quigley Decl., Ex. 17 (Chow Report), ¶ 90.

**RESPONSE**: Undisputed that the quoted language appears in Professor Chow's Rebuttal Report.

Disputed to the extent that Professor Chow is not a fact witness in this matter. The above statement is also disputed because it takes out of context the conclusion reached by Professor Chow in his Report. Professor Chow qualifies the above statement by explaining, "[h]ad HP registered as the owner of the H3C trademark in China, it would have been able to participate directly in the PSB investigation and could have told the PSB to end the investigation and release the plaintiffs. If HP were the owner of the registered trademark in China, there may not have been an investigation to begin with, since, unlike

H3C, HP was aware that ICT was an authorized H3C distributor selling the equipment pursuant to a contract it entered into with HPFS."  (Dkt. 515-17 ¶ 91.).

It is not disputed that the "PSB does not have the capability or knowledge" to assess whether a product is counterfeit and must rely on the trademark owner to make such a determination.  (Dkt. 515-17 ¶ 16.)  However, the PSB typically does not undertake criminal enforcement actions for allegedly counterfeit products that "pose no danger to the public but will consume a great deal of financial resources and manpower" absent the payment of a "case fee" by the brand owner. (Dkt. 515-17 ¶¶ 74-77.)

Because "[e]conomic crimes, such as counterfeiting, are not viewed as priorities and the PSB will actively pursue such cases only in special situations that involve victims that have been harmed or killed," (*id.* ¶ 35.), "the [police] will not bring such actions without payment of a 'case fee,'" (*id.* ¶ 74).  The PSB may also "ask for additional payments during the course of along [criminal] investigation, and [] unless these additional payments were paid, the investigation would be abandoned."  (Dkt. 515-17 ¶ 76.)  Thus, by creating a corporate structure which allowed H3C to "maintain their . . . independence" and "do things that HP [was] not aware of," HP "creat[ed] a structure where H3C could pay case fees to the PSB to initiate criminal investigations into H3C's competitors that harm those competitors."  (Dkt. 515-17 ¶ 21 (citing Ex. 96, Def.'s 30(b)(6) Tr. at 41:24-42:10, 44:9-15).)  In doing so, HP created a "completely avoidable and careless risk that one of its non-China based subsidiaries, [like HPFS or HPFS India] would sell H3C equipment for resale in China and expose the reseller to a counterfeiting investigation by H3C in which HP could not easily intervene."  (Dkt. 515-17 ¶ 95.)

It is also disputed to the extent that PSB sought information from parties other than

H3C.  (*See, e.g.*, Resp. ¶¶ 7, 49, 61.)

56.    HP struggled to communicate directly with the PSB and was unable to effectively advocate
       for the individual Plaintiffs' release from PSB custody.  Quigley Decl., Ex. 17 (Chow
       Report), ¶ 93.

**RESPONSE**:  Disputed to the extent that Professor Chow is not a fact witness.  The above

statement is also disputed because it takes out of context the conclusion reached by

Professor Chow in his Rebuttal Report.  Professor Chow stated that Defendants struggled

to influence the PSB not because they were powerless to do so, but because "HP created a

corporate structure where it could benefit from allowing H3C to operate without regard to

U.S. laws that govern relationships between U.S. parent corporations and their foreign

subsidiaries" including the Foreign Corrupt Practices Act. (Dkt. 515-17 ¶¶ 19-21.).

Further, although HP ultimately "had control of" H3C as its wholly-owned

subsidiary, (Ex. 96, Def.'s 30(b)(6) Tr. at 138:10-11), there is no evidence in the record

that HP ever used that authority to direct H3C to tell "the PSB to end the investigation and

release the plaintiffs."  (Dkt. 515-17 ¶ 91; *see also* Resp. ¶¶ 48, 49, *supra*.)

Moreover, Professor Chow explained that "the PSB would not have recognized any

of the underlying [contracts between ICT and HPFS India] as valid evidence . . . *absent

direction from H3C regarding the validity of such contracts*, *which the documents show

H3C was unwilling to give* despite being contacted directly by HPFS about its contract with

ICT."  (Dkt. 515-18 ¶ 42.)  Despite admissions by the Defendants that they were regularly

in contact with H3C personnel while the Individual Plaintiffs were detained, the record

reflects that no such instruction was ever given to H3C in order to assist in securing the

Individual Plaintiffs' release.  Instead, on May 2, 2013, H3C submitted a cover letter to the

PSB ("H3C Cover Letter") "in conjunction with HPFS India's April 2013 letter to the Chinese authorities," (Dkt. 291 at 20), which stated that H3C "ha[d] no knowledge whatsoever as to whether or not the transaction between HPFS and ICT aforementioned in HPFS' statement did occur" and that "*[p]er HPFS' request*, H3C hereby forwards [this] information to the Public Security Bureau." (Ex. 65.)

H3C's refusal to verify the authenticity of the contract between ICT and HPFS India was the same approach taken by Meng Tao, "part of HP in China." (Ex. 96, Def.'s 30(b)(6) Tr. 162:18-20.) On more than one occasion, Mr. Tao refused to verify the authenticity of ICT and HPFS India's contracts and told the PSB that "HP d[id] not recognize" the agreement between ICT and HPFS India. (*See* Ex. 45; *see also* Resp. ¶ 49, *supra*.) Mr. Tao could have corroborated the fact that HPFS had sold the Seized Equipment to ICT, which he knew since he was in contact with HPFS through Gill. (*See, e.g.*, Ex. 90, Gill Tr. at 211:8-14; *id.* at 220:21-221:19.)

57. The only entity the PSB fully recognized and relied upon while investigating the counterfeit charges was H3C. Quigley Decl., Ex. 18 (Chow Rebuttal Report), ¶ 43.

**RESPONSE**: Disputed to the extent that Professor Chow is not a fact witness. It is further disputed because the record shows that the PSB sought information from entities other than H3C during its enforcement action against the Individual Plaintiffs. For example, the Chinese authorities spoke with "Meng Tao" at HP China, (Ex. 45**)**, and accepted information related to ICT and the Individual Plaintiffs sent to the Procuratorate by Alex Styller via the Chinese Consulate in New York. (*See* Resp. ¶ 59, *infra*.)

Furthermore, this is disputed because Defendants claimed to have the ability to influence the PSB at the time of the Individual Plaintiffs' detention. (*See* Ex. 61 (On April 3, 2013, Gill informed ICT's attorney Les Riordan, "if it can be confirmed that the

equipment is genuine, then the police/prosecutor will view the situation much less seriously.").)

58.     So far as the PSB was concerned, the only valid evidence in this case originated in China from H3C.  Quigley Decl., Ex. 18 (Chow Rebuttal Report), ¶ 43.

**RESPONSE**:  Disputed to the extent that Professor Chow is not a fact witness.  It is also disputed because the record contains evidence that the Chinese authorities sought additional information related to "ICT's business and importation" in order to verify "the defenses raised by the [Individual Plaintiffs]" who argued that the Seized Equipment was not counterfeit because it was purchased directly from HP.  (Dkt. 515-18 ¶ 15 (Chow Rebuttal); *see also* Resp. ¶ 59, *infra*.))

Further, Defendants themselves recognized that the Chinese enforcement authorities sought information from sources other than H3C as part of their investigation. Attached to a March 14, 2013 email from David Gill to Alex Styller was "the [Procuratorate's] request for information related to [ICT's] business license, customs clearance, etc."  (Ex. 52; *see also* Ex. 53 (containing the same document which Gill represented as being from the Procuratorate, as produced by Defendants).)  The partially redacted document from the Procuratorate seeks information from various parties other than H3C, including the "U.S. Embassy" and "HP" in order to "verify . . . the oral reply given by [HP] as in the case statement [on] whether [HP] has acquired the brand H3C and sold products under it.  A written explanation should be obtained from the company."  (Ex. 52 at 3424.)

Additionally, Cathy Yu's Chinese defense lawyer recently provided Plaintiffs with a complete, unredacted version of the same Procuratorate document, revealing that the Chinese authorities, also sought information related to Jason Yuyi's "sales records" and

"[t]he proceeds of the sales of transceivers," all of which would have been outside the custody and control of H3C. (*See* Ex. 46 (Unredacted letter and translation) (*see also* Ex. 98 ¶ 11 (Ma Li Aff.) ("I have been told that a partially redacted copy of the first page of the Procuratorate's letter to the PSB requesting additional evidence to legitimize the counterfeiting charge on which the Plaintiffs were arrested was previously produced as an email attachment from Defendant David Gill to Alexander Styller bearing bates stamp number ICT0003424. I have recently provided the Plaintiffs with a complete, unredacted version of that two-page letter.").) Gill's May 21, 2013 email concerning the submission of the Old Final Letter to the PSB also recognized that the PSB would "be willing to take the contents into content," if ICT could "prove a connection between the company and the [Individual Plaintiffs]." (Dkt. 515-38 at 1.)

59.   David Gill wrote to ICT's counsel on June 24, 2013: "The relevant authorities in China have reviewed the letter submitted by [HPFS India] explaining the history of the equipment sold to HPFS to ICT. However, based on an informal response from the authorities, it appears that they are currently unwilling to utilize that letter as evidence in this matter." Quigley Decl., Ex. 7.

**<u>RESPONSE</u>**: Undisputed that this statement accurately reflects the content of David Gill's June 24, 2013 letter to ICT's counsel. Disputed to the extent that the statements in Gill's letter describing the Chinese authorities' "informal response" are inadmissible hearsay because Gill himself did not speak with the authorities directly. (*See* Ex. 90, Gill Tr. at 220:7-22.)

Further disputed because Alex Styller and ICT did provide the Chinese authorities with the requested information, including "information related to ICT [], the agreements between ICT Company and [HPFS India, and] information about [the Individual Plaintiffs'] work at ICT," to China via the Chinese Consulate in New York, which the

Individual Plaintiffs' Chinese defense lawyer then "provided [to] the Procuratorate" in June 2013.  (Ex. 98 ¶¶ 16-17 (Ma Li Aff.); *see also* Ex. 106 ¶¶ 7-12 (Styller Aff.).)   After delivering the materials to the Chinese authorities , Ma Li, Cathy Yu's defense attorney, explained that a "policeman . . . in charge of investigation . . . told me he wants someone as representative for ICT USA [to] call him" so the he could "ask some questions about this case" and determine "whether our evidence[ is] true or not."  (Ex. 70 at 3332.)

Further, Professor Chow has also concluded that "the sole basis for the detention and arrest of the [Individual Plaintiffs] was due to the counterfeiting allegations asserted by H3C."  (Dkt. 515-17 ¶ 14; *see also id.* ¶ 66.)

60.     The PSB reviewed HPFS India's letter but "[i]t appear[ed] that, in order for them to be willing to take the contents into account, it will be necessary for ICT to prove a connection between the company and these individuals. You will recall that the prosecutor, some time ago, asked for information related to ICT's establishment in China and information around the customs declarations etc. related to the import of the equipment."  Quigley Decl., Ex. 40.

**RESPONSE**:  Disputed.  There is evidence in the record that shows that Alex Styller did provide the Chinese authorities with the requested information and that the Chinese authorities considered that information.  (*See* Resp. ¶ 59, *supra*.)

61.     The PSB sought information concerning customs documentation and business licensing from ICT.  Quigley Decl., Ex. 41; Quigley Decl., Ex. 7; Quigley Decl., Ex. 42.

**RESPONSE**:  It is undisputed that the PSB sought this information about ICT.  However, Plaintiffs dispute any implication that this information was sought by the PSB for any reason other than to verify the defense that the Individual "Plaintiffs raised [regarding] their valid purchased of authentic goods bearing a [H3C] trademark from HPFS (India), a wholly-owned subsidiary of Hewlett-Packard."  (Dkt. 515-18 ¶ 5 (Chow Report); *see also id.* ¶¶ 33, 66, 70.)  The record reflects that this defense, raised by Jade Cheng to the PSB

before his detention even began and then "many time[s]" after that was the reason that the PSB "need[ed] to verify and confirm with HP" the details of the contract between HPFS India and ICT.  (Ex. 94, Cheng Jan. 29, 2021 Tr. at 11:10-12:4.)  Defendant Gill also sent to Styller a document from the Chinese prosecutor's case file requiring the PSB to "obtain relevant information about [ICT's customs clearance]" "[b]ased on the statement made by suspect [Jade Cheng], the [Seized Equipment] were delivered from HPFS India (a subsidiary of HP).").)  (Ex. 53; *see also* Ex. 105 ¶ 6 (Affidavit of Jade Cheng) ("Cheng Aff.")).)

62.   There is no evidence that anyone at ICT relayed either of the following alleged statements about the April 2013 Letter to any Individual Plaintiff during their detention: the assertion that the April 2013 letter was substantively the same as the March 2013 draft letter; and the assertion that the April 2013 letter was appropriately 'filed.'

**RESPONSE**:  Undisputed that no one at ICT relayed either of the statements above to the Individual Plaintiffs while they were in PSB custody.

63.   There is no evidence showing that HPE or HPI directed HPFS India to make either of the statements referenced in the previous paragraph.

**RESPONSE**:  Disputed to the extent that Defendants cite no evidentiary support in the record for the above statement.  It is further disputed because Defendants' privilege log shows that individuals from HPE and HP were heavily involved in drafting of the letter to the PSB from HPFS India.  (*See* Dkt. 390-1.)  Defendant Gill also stated that "Ching Chua" of HP China and "Jessica Liu" – an HP employee (*see* Resp. ¶ 25, *supra*),  "review[ed]" and "sen[t Gill] comments [about] the letter."  (Ex. 90, Gill Tr. at 277:21-278:11.)

64.   Plaintiffs allege that in reliance on those two statements, they abstained from "view[ing] Defendants as adversaries" and from "pursu[ing] different legal venues and strategies in their quest to free the Individual Plaintiffs," thereby prolonging their detention.  Dkt. 101, ¶¶ 304, 307.

**RESPONSE**:  Undisputed that the paragraphs cited contain the quoted language.  Disputed that these two statements were the sum total of Defendants' fraudulent representations and omissions as alleged in the Second Amended Complaint that Plaintiffs' relied upon.

For example, on March 20, 2013, Gill told Styller that "[a] sample of the [CWG Goods were] being sent by [TTG] to China for analysis."  (Ex. 57.)  Later, in his March 25 draft letter to the PSB, David Gill stated that H3C's testing of the TTG Equipment led HPFS to believe that "the relevant counterfeiting activities [referring to the logos on the Seized Equipment] occurred at some point in time prior to the return of the [CWG Goods] to HPFS India."  (Ex. 59 at 1433.)  As a result of Gill's representation, Alex Styller expected that HPFS was making its best efforts to get his employees out of detention.  (Dkt. 101-2 ¶ 124.)  In truth, however, HPFS had  removed that exonerating language from the HPFS's letter, despite viewing the TTG Equipment as proof of ICT's innocence and believing that it "would [have] . . . helped to resolve" the issues in China, (Ex. 96, Def.'s 30(b)(6) Tr. at 79:21-25), Gill represented that HPFS's letter to the PSB was "substantively the same" as the March 25 draft with only "some minor amendments but nothing that changed the description of the relevant sequence of events between HPFS India and ICT." (Ex. 67 at 1514.)

Further, HPFS never told the PSB about the results of H3C's inspection of the sample transceivers sent by TTG, even though Defendants determined that the "origination" of a large portion of the Seized Equipment came from "the same batch of property" in TTG's possession.  (Ex. 96, Def.'s 30(b)(6) Tr. at 148:6-21).  In May 2013, after HPFS concluded that "the origination of the [off-lease]  equipment" – which matched the Seized Equipment – "[was] questionable, and as such, [Defendants] should not allow

[TTG] to re-sell what they purchased from us;" Defendants' then determined that "the correct course of action [is to] . . . instruct[] [TTG] to destroy the [remaining] equipment," (*See* Ex. 66), and HPFS employees Kevan Bartley, JT Silvestri, Jim O'Grady, and Ross West met in Andover, Massachusetts to discuss next steps.  (Ex. 66 at 1845.)  Ultimately, the remaining CWG Goods in TTG's possession were destroyed at "HP['s] . . . direction." (*See* Ex. 96, Def.'s 30(b)(6) Tr. at 87:2.)

Defendants omitted these conclusions from HPFS's final letter to the PSB, (Dkt. 515-9), and never shared them with ICT.  (Ex. 96, Def.'s 30(b)(6) Tr. at 137:11-25.)

65.  Plaintiff Yuyi was unaware of the existence of the April 2013 Letter until his deposition in May 2021.  Quigley Decl., Ex. 20 (May 11, 2021 Yuyi Tr.), 189:16-190:14, 192:22-193:12.

**RESPONSE**:  Disputed.  The above misstates Mr. Yuyi's testimony who did not say that he was "unaware" of any letter "HP wrote to the Chinese authorities;" but that he "didn't know" whether that occurred and "didn't remember" whether he had ever heard that information before.  (Ex. 101, Yuyi May 11, 2021 Tr. at 189:16-190:14.[8]).)

66.  There is no evidence that, before the sale, any Defendant knew of the existence of the Individual Plaintiffs.  Quigley Decl., Ex. 12 (May 10, 2021 Yuyi Tr.), 63:20-22; Quigley Decl., Ex. 13 (Jan. 19, 2021 Yu Tr.), 271:21-273:5; Quigley Decl., Ex. 14 (Jan. 22, 2021 Cheng Tr.), 7:24-8:13.

**RESPONSE**:  Undisputed.

67.  There is no evidence that, before the sale, any Defendant harbored some desire to see the Individual Plaintiffs falsely imprisoned for handling counterfeit equipment that Defendants would sell to ICT.

**RESPONSE**:  Undisputed.

---

[8]   In addition to the pages cited in Plaintiffs' response, for completeness, Plaintiffs' Ex. 101 also includes pages 192 and 193 as referenced in Kevin Quigley's Ex. 20 because they were omitted in docket entry ECF 515-20.

68.   ICT informed Defendants of the Individual Plaintiffs' detention on or about January 31, 2013.  Quigley Decl., Ex. 36.

**RESPONSE**:  Disputed to the extent that Plaintiffs attempted to contact Defendants via ICT employee Alex Pekar about the Individual Plaintiffs' detention as early as December 24, 2012, but because "all [of the] guys who have some kind of involvement on this are on vacations till . . .  next month," Pekar was unable to reach them.  (Ex. 40.)  He explained that it was "very difficult to communicate with them at this time" despite "emailing, calling, and [sending] SMS [messages]."  (*Id.*)  By December 27, 2012, Alex Pekar had also reached out to Defendants for a copy of the parties' agreement that was "signed by HP," and not just by ICT, as requested by the Individual Plaintiffs' Chinese defense attorney.  (*See* Ex. 43.)

69.   There is no evidence that, after learning of the Individual Plaintiffs' detention, any Defendant harbored some desire to see the Individual Plaintiffs falsely imprisoned.

**RESPONSE**:  Disputed.  The record shows that in many instances, Defendants delayed their response and withheld critical information, including potentially exonerating evidence, that would have strengthened the Individual Plaintiffs' ability to fight the counterfeiting allegations and implicated Defendants as the source of the Seized Equipment, including:

- Defendants withheld the conclusion of H3C's inspection – that the Seized Equipment was from "the same batch of property" in TTG's possession, (Ex. 96, Def.'s 30(b)(6) Tr. at 148:6-21) – from the PSB and the Plaintiffs "many weeks" while the Individual Plaintiffs were "sitting in prison," (*id.* at 155:24-156:25), then ordered TTG to destroy the remaining CWG Goods (*see* Resp. ¶ 64, *supra*);

- Defendants worked closely with H3C throughout the Individual Plaintiffs' detention, including in the process of drafting the letter HPFS ultimately submitted to the PSB, (*see* Resp. ¶ 63, *supra*), and by suggesting that Alex Styller request that the Individual Plaintiffs' local defense counsel "make a formal request . . . for ***H3C's auditors*** to be granted access to inspect the equipment," (Ex. 51 at 2574), despite evidence that the H3C continued to enthusiastically pursue the

46

counterfeiting charges against the Individual Plaintiffs at the same times, (*see, e.g.*, Ex. 65 (H3C Cover Letter to PSB); Ex. 69); and

- Gill repeatedly told Styller that the PSB was "still waiting for ICT to provide [a] . . . business licenses . . . [and] customs clearance documentation" (Ex. 56 at 1413), in a manner that suggested that the Individual Plaintiffs' prolonged detention was that fault of ICT's;  and

- HP never sent a counterfeiting expert to China to assist in Defendants' investigation; instead, after two months, all they sent was Stuart Patterson, a lawyer from HP (*see* Ex. 96, Def.'s 30(b)(6) Tr. at 161:4-14); and

- Despite assurances from Gill to Styller as early as February 21, 2013, that Defendants were working "so that [the situation] can be resolved as soon as possible," (Ex. 49 at 1383), Defendants' letter to the PSB was not submitted until nearly three months later, on May 20, 2013.  (Ex. 67 at 1514.)

Moreover, despite HPFS's letter being the only "affirmative fact" statement Defendants ever made to the PSB, it failed to clearly state that Defendants' belief that they had no reason to suspect ICT of any wrongdoing.  (Ex. 96, Def.'s 30(b)(6) Tr. at 167:10-16.)  Defendants also had the letter delivered to the Chinese authorities "*by H3C*," (Dkt. 291 at 20-21), the same entity responsible for the Individual Plaintiffs' arrests in the first place.  (*See* Ex. 38; *see also* Resp. ¶ 9, *supra*.)

70. During the meet-and-confer process preceding this motion, Plaintiffs' counsel wrote that the "false imprisonment and conspiracy claims arise out of the police report made by Defendants' agent, H3C, which claimed that all of the ICT inventory seized by the police was counterfeit under Chinese Law."  Quigley Decl., Ex. 21 (June 4, 2021 email from L. Nikas).

**RESPONSE**:  Undisputed that Plaintiffs' Counsel wrote this in a communication regarding this case.

71. Prof. Chow opines that H3C conducted its counterfeiting investigation and communicated with the Chinese police independently of any involvement by Defendants.  *See* Quigley Decl., Ex. 17 (Chow Report), *e.g.*, ¶¶ 90-92 ("From my review of the documents, I believe that H3C was interested in maintaining its independent relationship with the PSB … H3C maintained control over its own operations in China, including the counterfeiting

investigation[.]"); ¶¶ 55-57 ("H3C had a high level of institutional independence and was not subject to general HP controls.").

**RESPONSE**:  Undisputed that the quoted language appears in Professor Chow's report. Disputed to the extent that Professor Chow is not a fact witness.  Further disputed to the extent that above implies Defendants were not involved in the PSB investigation and detention of the Individual Plaintiffs.  (*See, e.g.*, Resp. ¶¶ 26, 34, 48, 69 *supra*.)

72.   Prof. Chow opines that that Chinese law prohibits detention beyond two months on the charges for which the Individual Plaintiffs were detained; that their detention would not have been extended to seven months unless H3C paid a "case fee"—a bribe—to the Chinese police; and that bribery falls into a "gray area" of Chinese law.  Quigley Decl., Ex. 17 (Chow Report), *e.g.*, ¶¶ 21, 77 n.59, 98.

**RESPONSE**:  Undisputed that the quoted language appears in Professor Chow's report.

73.   Gill was, at all relevant times, acting exclusively in his role as an employee of the HPFS Defendants.  Quigley Decl., Ex. 10, 13:18-23; Quigley Decl., Ex. 11, ¶ 3.

**RESPONSE**:  Disputed.  Given the various parties with which Defendant David Gill was communicating at all relevant times (*see* Dkt. 390-1 (Def's. privilege log), Plaintiffs dispute that Gill was working exclusively in his capacity as an HPFS employee at all relevant times.  Defendants' privilege log contains over 120 communications involving David Gill and at least one individual from H3C or HP China, including on issues such as "letter [] to the Chinese police," (*id.* at Entry 286), "inspection of [the seized] equipment," (*id.* at Entry 280), "product verification," (*id.* at Entry 381), and a product "verification report," (*id.* at Entries 410, 646, 651), among others.  Gill also testified that, in addition to himself, Stuart Patterson, Ching Chua of HP China, and Jessica Liu, "counsel for H3C," (Ex. 90, Gill Tr. 152:15-17), were the "main lawyers" working together on all aspects of this matter.  (Ex. 90, Gill Tr. at 150:18-21.)  Jessica Liu worked simultaneously as an "HP employee," and "team lead for [the] H3C legal team."  (Ex. 92, Patterson Tr. at 83:1-4.)

74.    Prof. Chow concludes that "HP's independent subsidiary structure created a completely avoidable and careless risk that one of its non-China based subsidiaries would sell H3C equipment for resale in China and expose the reseller to a counterfeiting investigation by H3C in which HP could not easily intervene." Quigley Decl., Ex. 17 (Chow Report), ¶ 95; *see* also *id.* ¶¶ 78, 81, 87.

**RESPONSE**: It is undisputed that above accurately states one of the conclusions reached by Professor Chow in his expert report. (*See* Dkt. 515-17 ¶ 95 (Chow Report).) However, Professor Chow's report further explains that HP *could have* controlled the PSB investigation through its wholly-owned subsidiary H3C, but instead chose to "incur[] unnecessary risks in allowing [its] Chinese subsidiary . . . to operate independently *by design.*" (*Id.* ¶¶ 78-79 .) If, for instance, "HP [had] registered as the owner of the H3C trademark in China, it would have been able to participate directly in the PSB investigation and could have told the PSB to end the investigation and release the plaintiffs." (*Id.* ¶ 91.) HP also could have directed H3C not to request the investigation in the first place, preventing the Individual Plaintiffs' entire detention and arrest. (*Id.*).

75.    Styller suffered from anxiety, stress, and depression before the events at issue in this case. Quigley Decl., Ex. 16 (Nov. 11, 2020 Styller Tr.), 227:20-21; Quigley Decl., Ex. 34; Quigley Decl., Ex. 35.

**RESPONSE**: Undisputed.

76.    The record shows that Defendants conducted an investigation and tried to help secure the Individual Plaintiffs' release. Quigley Decl. Ex. 10, 171:23-172:2, 179:18-181:19; Quigley Decl., Ex. 7; Quigley Decl., Ex. 41; Quigley Decl., Ex. 43; Quigley Decl., Ex. 44.

**RESPONSE**: It is undisputed that Defendants investigated the events that led to the Individual Plaintiffs' arrest and detention. However, despite David Gill's representation that "[a] number of people within HP are devoting a significant amount of time to this matter and trying to work it out as quickly as possible," (Dkt. 515-39 at 1; Ex. 57), it is

disputed that Defendants' involvement was intended to help secure the Individual
Plaintiffs' release from PSB custody rather than protect Defendants' interests.

The record shows that in many instances, Defendants delayed their response and
withheld critical, and potentially exonerating, that would have strengthened the Individual
Plaintiffs' ability to fight the counterfeiting allegations and implicated Defendants as the
source of the Seized Equipment, including:

- Defendants ordered TTG to destroy the remaining CWG Goods, even though it
  could have helped the Chinese police determine the Individual Plaintiffs'
  innocence, because HP determined that the "the origination of the [off-lease]
  equipment," – which matched the Seized Equipment in PSB custody – was
  "questionable," (Dkt. No. 341 ¶ 61); and

- Although Defendants worked with H3C on a Verification Report that was
  "specifically generated [by H3C] at the direction of [Defendants'] counsel," (Dkt.
  258 ¶¶ 45-46), and compared TTG's sample transceivers "to the transceivers after
  they had been seized by the Chinese Police," (Dkt. No. 369 at 15), Defendants
  refused to make known the results of H3C's analysis, including whether HPFS had
  been aware of those results back in 2013.  (*see* Ex. 90, Gill Tr. at 274:9-16 (Q. . . .
  [Y]ou didn't know, in 2013, what H3C had concluded in that report about [the
  Seized Equipment, correct? . . . A. . . . I cannot answer that question without
  disclosing privileged information.")); and

- Despite repeated requests from Alex Styller that David Gill "make an effort to
  convince your H3C counterpart in China to instruct [the PSB] to free [the Individual
  Plaintiffs]," (Ex. 49), there is no evidence in the record suggesting Gill did so.
  Instead, Defendants worked closely with H3C throughout the Individual Plaintiffs'
  detention, including in the process of drafting the letter HPFS ultimately submitted
  to the PSB, (Ex. 90, Gill Tr. at 277:8-278:4), despite H3C's ongoing and
  enthusiastic pursuit of the counterfeiting charges against the Individual Plaintiffs;
  and

- After a nearly two month-long investigation and the involvement of some 70
  lawyers, (*see* Dkt. 390-1.), the only facts provided by "HP or its subsidiaries to the
  [PSB] to help them make a decision" about the Individual Plaintiffs' detention was
  contained in an ineffective three-page letter, (Ex. 96, Def.'s 30(b)(6) Tr. at 163:3-
  10); and

- Defendants worked closely with H3C as it actively and continuously disputed the
  reliability of a barcode verification or power-on test to authenticate the Seized
  Equipment, even though verifying barcodes on the Seized Equipment via H3C's
  website was ultimately the reason for the Individual Plaintiffs' release from

detention, (*see* Ex. 98 ¶¶ 20-25 (Affidavit of Ma Li) ("Ma Li Aff.") (ICT0802110) ("The prosecutor examined and acknowledged the anti-counterfeiting verification results [from H3C's website], confirming that there [was] insufficient evidence to prosecute [the Individual Plaintiffs] for selling counterfeit registered trademark products.").); and

- David Gill suggested Alex Styller request that the Individual Plaintiffs' local defense counsel "make a formal request . . . for *H3C's auditors* to be granted access to inspect the equipment," (Ex. 51 at 2574), even though H3C continued to relentlessly pursue its counterfeiting case against the Individual Plaintiffs at that time; and

- Defendants refused to share any details regarding Meng Tao's audit on 40% of the Seized Equipment, (Ex. 51 at 2573-75).

The record shows that beyond submitting a single letter to the PSB and "gather[ing] information" from H3C–the same entity advocating for the Individual Plaintiffs' continued detention and prosecution–Defendants did little to help secure the Individual Plaintiffs' release from prison.  (Ex. 92, Patterson Tr. at 277:6-281:18; *see also* Resp. ¶¶ 69, 9, *supra*.)

77.   HPFS India's negotiations of the operative agreements occurred from New Jersey.  Quigley Decl., Ex. 11, ¶ 4.

**RESPONSE**: Disputed given that Defendants themselves recognize that "many of the [parties'] communications . . .  were sent or received in Massachusetts." (Dkt. 257 at 27.). Additionally, HPFS India's negotiations of the operative agreements with ICT occurred primarily in Massachusetts, ICT 's state of incorporation and principal place of business. (*See* Ex. 88 (ICT's Massachusetts Business Entity Summary .)  On behalf of HPFS, negotiations were conducted by JT Silvestri who met with ICT's Alex Pekar in Massachusetts to "discuss" the transaction between ICT and HPFS India on September 13, 2011, Ex. 13), at a "restaurant outside of [Silvestri's] office in Andover, Massachusetts," (Ex. 95, Pekar Tr. at 113:19-114:3.)  HPFS's Jim O'Grady also worked out of HP's office in Andover, Massachusetts and was similarly involved in the negotiations, as he signed the

Shinto Purchase Order on behalf of HPFS India.  (*See* Ex. 19 at 1673.)  Alex Styller, who

works from ICT's office in Massachusetts, was also involved in negotiating the terms and

conditions of the deal while in Massachusetts.  (*See* Dkt. 515-15 at 104; Dkt. 101-2 ¶ 10.)

78.     The allegedly counterfeit Equipment was leased and returned to HPFS India in India.
        Quigley Decl., Ex. 15 (Pekar Tr.), 111:19-112:7, 116:6-11; Dkt. 101, ¶¶ 21-23.

        **RESPONSE**:  Disputed.  The cited material does not support this statement.  At his

        deposition, Alex Pekar stated only that JT Silvestri told him that "[HPFS] supplied [the

        Promised Goods] to support [the Commonwealth Games], but for whatever reason the

        product was never used for . . . [its] original purpose."  (Dkt. 515-15 (Pekar Tr. at 111:11-

        112:7).)  It is further disputed that the CWG Goods were "returned to HPFS India" because

        HPFS India never physically possessed the goods, but instead had them stored at an "HP

        facility" in India, maintained by TTG, prior to ICT's purchase.  (*Id.* at 116:6-11.)

79.     HP's internal policy required an Indian buyer, so HPFS India first sold the Equipment to
        Shinto, an Indian broker.  Dkt. 101, ¶ 37.  Quigley Decl., Ex. 22 (Silvestri Tr.), 125:8-13;
        Quigley Decl., Ex. 15 (Pekar Tr.), 96:8-18.

        **RESPONSE**:  Disputed.  The evidence cited does not support the above statement.  JT

        Silvestri testified only that "[t]here was an agreement to sell the equipment" to ICT through

        its broker, Shinto.  (*See* Dkt. 515-22 at 125:8-15 (J. Silvestri Tr.).)  Similarly, Mike Pekar

        affirmed that ICT purchased the equipment from HPFS India "through a broker," but he

        did not testify regarding any of HP's internal policies on this matter.  (Ex. 95, Pekar Tr.

        96:8-14.)

                Undisputed that Shinto acted as ICT's broker in India for purposes of the

        transaction between ICT and HPFS India for ICT's purchase of the CWG Goods.

80.     Shinto then exported the first installment of the Equipment to China, where it was forwarded to ICT's sales offices in China.  Dkt. 101, ¶¶ 46-47.

**RESPONSE**:  Disputed.  Plaintiffs dispute that Shinto was the party responsible for exporting the Shipped Equipment because Indian law has an "export requirement that the exporter of record must pack the equipment," and TTG was the entity "packed the equipment" and "shipp[ed] it direct to customs."  (*See* Ex. 28.)

81.     All of the Individual Plaintiffs were Chinese nationals, and Yu and Yuyi had never set foot in the U.S.  Dkt. 101, ¶¶ 3-5; Quigley Decl., Ex. 12 (May 10, 2021 Yuyi Tr.), 55:23-25; Dkt. 495 (Declaration of Jason Yuyi), ¶ 2; Quigley Decl., Ex. 24, (Jan. 18, 2021 Yu Tr.), 164:15-16.

**RESPONSE**:  Undisputed that the Individual Plaintiffs, Cheng, Yu, and Yuyi, are all Chinese nationals and that Yu and Yuyi have never traveled to the United States. .

82.     Jade Cheng had only visited Massachusetts once before, and his visit was unconnected to the events at issue.  Quigley Decl., Ex. 25 (Cheng Visa Application) at ICT0801558.

**RESPONSE**:  Disputed to the extent that the above statement is vague because it fails to specify what is intended by the phrase "once before," and because the evidence cited does not support Defendants statement.  Jade Cheng's U.S. Visa Application provides that he previously visited the U.S. in September 11, 2012 for purposes of a "business/conference" and that he remained in the U.S. for 8 days.  (Dkt. 515-25 at 6 (Quigley Ex. 25 (sealed)).)  The record shows that purpose of Mr. Cheng's trip to Massachusetts was related to his work at ICT.  (*See* Ex. at 23 at 2023-24, 31.)  Mr. Cheng was extensively involved in the sale of the Shipped Goods, as well as the management of Yu and Yuyi, all of which was ongoing when he traveled to Massachusetts. (Ex. 105 ¶ 3 (Cheng Aff.).)

83.     ICT received and re-sold the Equipment in China.  Quigley Decl., Ex. 26, (Feb. 12, 2020 Tr.), 118:23-119:2; Quigley Decl., Ex. 16 (Nov. 11, 2020 Styller Tr.), 55:18-21, 57:4-7, 59:7-8.

**RESPONSE**:  Disputed.  The Promised Goods, as Defendants represented them to ICT, were not the same as the Shipped Goods ICT actually received.  (*See* Resp. ¶¶ 1, 3, *supra*.) Plaintiffs also dispute that ICT received the Shipped Goods in China because ICT first engaged freight forwarding company DVS to import the HPFS Goods into Hong Kong from India, (Ex. 41 at 4987.), and then used a second freight forwarding company via its logistics and warehousing partner, iHub, to ship the goods from Hong Kong to "iHub [in Beijing]," (Ex. 24).

84.    The Chinese authorities raided Yuyi and Yu's apartment and seized the Equipment in China.  Quigley Decl., Ex. 27 (Jan. 17, 2021 Yu Tr.), 61:15-18, 62:3-4, 63:2-10; Quigley Decl. Ex. 12 (May 10, 2021 Yuyi Tr.), 81:6-84:12; 103:5-12.

**RESPONSE**:  Disputed to the extent that the above implies that Yuyi and Yu were storing any ICT merchandise in their own personal apartment.  The Shipped Goods were seized by the Chinese authorities from an apartment paid for by ICT for use by Yu and Yuyi when conducting ICT-related business out of Beijing.  (Ex. 22 (the purpose of ICT paying for Yu and Yuyi's use of the apartment was to enable "[ICT to] have our own people on the ground in [Beijing]").)

85.    The Individual Plaintiffs were arrested and detained in China.  Quigley Decl., Ex. 27 (Jan. 17, 2021 Yu Tr.), 23:1-3, 66:5-11, 66:19, 70:25-72:21; Quigley Decl., Ex. 28 (Yu Interrogatory Responses) at 4-5; Quigley Decl., Ex. 12 (May 10, 2021 Yuyi Tr.), 89:7-91:23, 92:20-95:25; Quigley Decl., Ex. 29 (Cheng Interrogatory Responses) at 5-6; Quigley Decl., Ex. 30 (Nov. 11, 2020 Cheng Tr.), 54:18-20, 56:4-12.

**RESPONSE**:  Undisputed.

86.    ICT claims to have lost its Chinese business and closed its offices in China.  Dkt. 101, ¶¶ 60, 190, 229, 249, 269.

**RESPONSE**:  Disputed to the extent that this statement implies that ICT did not lose its business or close its offices in China.  As a result of Defendants' misrepresentations about

the Promised Goods, ICT's profits on the Shipped Goods fell far below both its own and Defendants' expectations. (*See* Resp. ¶ 46, *supra*.)

Further disputed because as a result of the poor quality of the Shipped Goods, as well as the Individual Plaintiffs' detention and arrest, ICT closed its office in China and suffered significant harm to "[it's] reputation." (*See, e.g.*, Ex. 44 at 6442.)

87.   David Gill drafted the April 2013 Letter on behalf of HPFS India in Australia.  Dkt. 101, ¶ 20; Quigley Decl., Ex. 10, 6:19-21, 13:18-23; Quigley Decl., Ex. 11, ¶ 5.

**RESPONSE**:  Undisputed to the extent that Plaintiffs agree that David Gill participated in drafting all relevant versions of the HPFS letter submitted to the PSB and that Gill represented that he was working for HPFS India from Australia at that time.

Disputed to the extent that other individuals employed by HP and its affiliates outside Australia were also involved in drafting Defendants' letter to the PSB, including, "[Stuart] Patterson, Jessica Liu, and Ching Chua." (Ex. 90, Gill Tr. at 187:5-8.) David Gill also spoke with Meng Tao from the "HP brand security team in China," as part of his investigatory and letter writing process. (Ex. 90, Gill Tr. at 186:20-187:8.) Gill also testified that Meng Tao was the person responsible for pointing out a "factual inaccuracy" in what Defendants allege is an unsubmitted draft of their letter to the PSB. (Ex. 90, Gill Tr. at 313:18-314:4.)

88.   David Gill communicated with ICT concerning the proposed letter from HPFS India to the PSB from Australia.  Dkt. 101, ¶ 20; Quigley Decl., Ex. 10, 6:19-21, 13:18-23; Quigley Decl., Ex. 11, ¶ 6.

**RESPONSE**:  Undisputed.

89.   The April 2013 Letter was submitted to the Chinese authorities in Beijing.  Quigley Decl., Ex. 10, 181:17-19.

**RESPONSE**:  Plaintiffs dispute that the New Final Letter is the version of HPFS's letter actually submitted to the PSB.  (*See* Resp. ¶ 26, *supra*.).

90.   Section 8 of the RRSA provides that "[i]f the re-sale of the Active Equipment requires it to be exported, re-exported, or imported, ICT will be responsible for complying with all applicable laws and regulations and for obtaining all required export and import authorizations." Quigley Decl., Ex. 1.

**RESPONSE**:  Undisputed that the document cited contains the quoted language.  Disputed to the extent the above statement calls for a legal conclusion.  Plaintiffs further dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws., as opposed to only those laws relevant to the export, re-export, and import of the Promised Goods.

The statement is further disputed because Defendants failed to inform ICT that HPFS India never received the importation documents from Inspira that were "required . . . to complete a successful re-export of the [CWG Goods]" despite attempting to pass all exported-related liability onto ICT through the RRSA.  (Ex. 9.)

Additionally, Plaintiffs dispute any implication by Defendants that ICT was in a better position than HP, as H3C's parent corporation, to obtain the import authorizations from H3C necessary to avoid raising a "parallel imports" or a "primarily commercial matter [arising] between [a] manufacturer and its resellers" when the registered trademark holder has not provided the reseller with express permission to remarket previously used H3C goods in China.  (*See* Ex. 61; *see also* Ex. 42 (H3C's December 27, 2012 letter to the PSB provided that "[H3C] has never designated [HP] for the domestic sales and distribution of products with the 'H3C' trademark in China.").)

Although Defendants themselves could not authorize the importation of H3C goods into China, HPFS never communicated to H3C about its resale agreement with ICT or

requested that H3C provide that authorization.  (Ex. 96, Def.'s 30(b)(6) Tr. at 14:6-10.)

That request was necessary because Defendants knew that that H3C zealously enforced its

intellectual property rights and that suspected counterfeiters would be dealt with harshly.

(Ex. 96, Def.'s 30(b)(6) Tr. at 130:5-131:7; *see also* Ex. 10 (acknowledging that the

"import of refurbished items into [China]" is a "complex and sensitive practice" which

Defendants "typically discourage[]."").)

91.    Section 10.4 of the RRSA provides that "ICT will Indemnify HPFS and its affiliates,
       officers, directors, agents and employees harmless from and against any and all claims,
       actions, proceedings, losses, expenses (including reasonable attorneys fees), demands or
       judgments which result or arise from [] ICT's use, operation, handling, treatment, storage,
       disposal, transportation, recycling, re-sale or destruction of any Active Equipment. This
       Section 10.4 will survive the termination of this Agreement."  Quigley Decl., Ex. 1.

       **RESPONSE**:  It is undisputed that the document cited contains the quoted language.

       Disputed to the extent the above statement calls for a legal conclusion.

92.    Laura Wen-yu Young affirmed the opinions in her expert reports under oath.  Quigley
       Decl., Ex. 45 (Declaration of Laura Wen-Yu Young).

       **RESPONSE**:  It is undisputed that the document cited contains the quoted language.

93.    ICT imported the Equipment into China.  Quigley Decl., Ex. 26, (Feb. 12, 2020 Tr.),
       118:23-119:2; Quigley Decl., Ex. 16 (Nov. 11, 2020 Styller Tr.), 55:18-21, 57:4-7, 59:7-8.

       **RESPONSE**:  Disputed that ICT imported the Shipped Goods into China.  (*See* Resp. ¶

       83, *supra*.)

94.    Chinese law requires every company doing business in China to be legally registered.
       Quigley Decl., Ex. 46 (Young Report), ¶¶ 35-46 and cited evidence.

       **RESPONSE**:  Disputed to the extent the above statement calls for a legal conclusion.

       Disputed to the extent that Defendants imply that lack of a busines license is criminally

       punishable because the "lack of a business license does not give rise to criminal culpability

under Chinese law." (Dkt. 515-18 ¶¶ 29-31 (Chow Rebuttal Report) (citing Dkt. 515-44 ¶

46 (Young's Report).)  Plaintiffs further dispute the relevance of this fact to the extent it

implies that ICT had a contractual obligation to any Defendant to comply with all Chinese

laws.

95.    ICT did not have a business license.  Quigley Decl., Ex. 46, ¶¶ 83-92 and cited evidence;
       Quigley Decl. Ex. 32, Response to Interrogatory No. 14; Quigley Decl. Exs. 49-52.

       **RESPONSE**: Disputed.  ICT maintains a business license registered in Massachusetts.

       (*See* Ex. 88 (ICT's Massachusetts Business Entity Summary).)  ICT also maintained a

       "business license [and] office lease" in China from 2010 through "late September [2011]."

       (Ex. 5 at 9088-095; *see also* Ex. 2 at 6679-80 (containing a copy of ICT's "Representative

       Office" business registration).)  Plaintiffs further dispute the relevance of this fact to the

       extent it implies that ICT had a contractual obligation to any Defendant to comply with all

       Chinese laws.

96.    Prof. Chow opines and admits that ICT's failure to have a business license would violate
       Chinese law.  Quigley Decl. Ex. 17 (Chow Report), ¶ 67; Quigley Decl. Ex. 19 (Chow Tr.),
       259:3-260:5.

       **RESPONSE**:  Disputed to the extent the above statement calls for a legal conclusion.

       Disputed to the extent that the statement above implies that operating without a business

       license gives rise to criminal liability.  Plaintiffs further dispute the relevance of this fact

       to the extent it implies that ICT had a contractual obligation to any Defendant to comply

       with all Chinese laws.  Professor Chow opined that "[o]perating without a business license

       is a violation of Article 212 the Company Law of the PRC which provides for civil liability,

       *but not a criminal offense*."  (Dkt. 515-17 ¶ 68 (Chow Expert Report); *see also id.* ¶¶ 67-

       69 ("I have reviewed the PRC Criminal Law and opine that it contains no provision that

relates to the simple lack of a business license."); Dkt. 515-18 ¶ 8 ("the simple lack of a business license is not a criminal offense.").)

This is further disputed to the extent that Defendants misstate Professor Chow's testimony.  Professor Chow did not offer an opinion regarding whether ICT had a Chinese business license; rather, he stated that he "[didn't] know one way or the other" as he "was not asked . . . to opine" on this point.  (Ex. 99, Chow Tr. at 258:14-259:2-5.)

97.   Without a compliant, registered business entity in China, ICT could not legally employ staff physically located in China.  Quigley Decl., Ex. 46, ¶¶ 48-53; 93-100 and cited evidence; Quigley Decl. Exs. 49-52.

**RESPONSE**:  Disputed.  ICT had a Chinese business license for its "Representative Office" for part of the relevant time period.  (Ex. 2 at 6679-80.)  Further disputed to the extent the above statement calls for a legal conclusion.  Plaintiffs further dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws.

This is further disputed because Defendants' statement is overbroad.  In China, a "legitimate business" with a Representative Office that "has no income" is not required to pay Chinese taxes.  (Ex. 99, Chow Tr. at 260:20-25.)

98.   ICT admitted in a sworn interrogatory response that it did not obtain any such permits, licenses, or governmental approvals.  Quigley Decl. Ex. 32, Response to Interrogatory No. 14

**RESPONSE**:  Plaintiffs do not dispute that ICT made the above statement in response to Defendants' interrogatory.  Plaintiffs dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws.

99. While the Individual Plaintiffs were detained in January 2013, Styller wrote, "There is no evidence of direct employment… We didn't run legitimate payroll in China nor USA. If we need to prove employment we will have nothing to show."  Quigley Decl. Ex. 52.

**RESPONSE**:  It is undisputed that the document cited contains the quoted language.

100. Before attempting to sell the Equipment in China, ICT was obligated to comply with various Chinese customs laws.  Quigley Decl., Ex. 46, ¶¶ 54-68 and cited evidence.

**RESPONSE**:  Undisputed.

101. Because ICT did not comply with business registration requirements, ICT was not qualified to import the Equipment.  Quigley Decl., Ex. 46, ¶¶ 102 and cited evidence.

**RESPONSE**: Disputed.  Defendants' statement is vague, overbroad, and fails to specify the "business registration requirements" or country of import to which it refers.  Further disputed to the extent the above statement calls for a legal conclusion.  Plaintiffs further dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws.

This is also disputed because ICT did not import the Shipped Goods to China; it first imported them to Hong Kong via its broker Shinto through DVS, a freight forwarding company.  (Ex. 41 at 4987.)  As Professor Chow stated at his deposition, whether a busines "operating in the PRC must follow the appropriate rules for the importation of goods into the PRC for resale" is "complicated . . . because Hong Kong [has] a different legal system," separate from that of the PRC.  (Ex. 99, Chow Tr. at 264:19-265:5.)

The above is further disputed to the extent that it implies ICT was otherwise authorized by HPFS or H3C to importing used goods into China where another entity holds the trademark ("parallel imports").  HPFS did not warn ICT of the increased regulatory scrutiny it would face attempting to resell the Shipped Goods as parallel imports.  (Ex. 10 at 0989.)  Further, despite its inability to authorize the importation of H3C goods into

China, HPFS never "conferred with H3C about the sale" of the Shipped Goods to ICT, (Ex. 96, Def.'s 30(b)(6) Tr. at 14:6-10), even though there is evidence in the record that shows Defendants were aware that ICT intended to export the goods. (*See* Ex. 42 (H3C's December 27, 2012 letter to the PSB stating that "[H3C] has never designated [HP] for the domestic sales and distribution of products with the 'H3C' trademark in China.").)

This is further disputed to the extent it implies that ICT imported the goods it purchased from HPFS India. Rather, ICT worked with its broker, Shinto, and engaged freight forwarding company DVS to import the Shipped Goods into Hong Kong from India. (Ex. 41 at 4987; Ex. 22 at 9936.)

102. Moreover, ICT produced no evidence indicating that it complied with regulations or obtained the required approvals. Quigley Decl., Ex. 46, ¶¶ 101-110 and cited evidence.

**RESPONSE**: Disputed. Defendants' statement is vague and overbroad, and calls for a legal conclusion. Further disputed because ICT produced documentation showing that it had engaged freight forwarding company DVS to import the Shipped Goods into Hong Kong from India. (Ex. 41 at 4987.) Plaintiffs further dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws.

Additionally, there is no evidence in the record that the PSB were investigating anything other than whether the Individual Plaintiffs had "knowingly [sold] commodities bearing counterfeit registered trademarks." (Ex. 3 at 37 (Article 214 of the PRC Criminal law).) Defendants' Chinese law expert admitted that the PSB's case files do not "refer[] to any other crime[s]" the Individual Plaintiffs might have committed, (Ex. 100, Young Tr. at 22:5-24), and the Individual Plaintiffs' Bail Letters contain no references to the crimes related to "business license, . . . employment laws, . . . customs or duty . . . , taxes, . . .

smuggling, or providing false statements to the PSB. She also confirmed that the prosecutor's documents were similarly devoid of any such references. (*See id.* at 59:10-20; *id.* at 79:14-18; *id.* at 80:3-9.)

103. Failing to comply with customs laws is a crime in China. Quigley Decl., Ex. 46, ¶¶ 67-68 and cited evidence.

**RESPONSE**: Disputed . Defendants' statement is overbroad and calls for a legal conclusion. Failure to comply with Chinese customs laws give rise to criminal liability, only if "the statutory . . . monetary thresholds in the customs law" are met. (Ex. 99, Chow Tr. at 272:2-5; *see also* Ex. 3 (Art. 153 of PRC Criminal Law).)

104. Because ICT derived revenue from products (including the Equipment) sold in China and purported to employ the Individual Plaintiffs in China, ICT was obligated to pay taxes in China. Quigley Decl., Ex. 46, ¶¶ 69-72 and cited evidence.

**RESPONSE**: Undisputed, on information and belief. Plaintiffs dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws.

105. ICT did not pay any taxes in China. Quigley Decl., Ex. 46, ¶¶ 111-116 and cited evidence.

**RESPONSE**: Undisputed. Plaintiffs dispute the relevance of this fact to the extent it implies that ICT had a contractual obligation to any Defendant to comply with all Chinese laws.

106. Tax evasion is a crime in China. Quigley Decl., Ex. 46, ¶¶ 116 and cited evidence.

**RESPONSE**: Disputed. Defendants' statement is overbroad and calls for a legal conclusion. Although tax evasion is a violation of Chinese law, "there is no liability of any type," criminal or otherwise, if the legally prescribed "monetary threshold" is not met. (Ex. 99, Chow Tr. at 166:1-167:2; *see also* Ex. 3 (Art. 201 of PRC Criminal Law).)

Plaintiffs further dispute the relevance of this fact to the extent it implies that ICT

had a contractual obligation to any Defendant to comply with all Chinese laws.

107.   Prof. Chow fails to rebut any of Laura Young's conclusions concerning ICT's failure to
comply with Chinese laws, although he admits he is qualified to opine on the same subject
matter.   Quigley Decl. Exs. 18 (Chow Rebuttal Report), Ex. 19 (Chow Tr.) at 234, 258-60,
295-297.

**RESPONSE**:   Disputed to the extent that Defendants present as a legal conclusion as a

fact.   Further disputed because Professor Chow's Rebuttal Report makes clear that for each

of the Chinese laws cited in Laura Young's expert report, ICT faced no possible criminal

liability absent an economic threshold being met.   Regarding Ms. Young's conclusion that

failing to maintain a business license is a crime, Professor Chow stated that he was "not

aware of any provision of any of the PRC laws that Ms. Young cites which support her

opinion that the simple lack of a business license can give rise to criminal liability."   (*See*

Dkt. 515-18 ¶¶ 9-13; *see also* Chow Tr. at 45:11-25; 274-6-7.)   Professor Chow reached a

similar conclusion about Ms. Young's opinion potential criminal liability for failure to

comply with Chinese employment laws, and concluded that ICT's supposed infractions

"pertaining to employment law are also not violations of Chinese criminal law."   (Dkt. 515-

18 ¶14.)

Further disputed because Professor Chow rebutted Ms. Young's conclusion that

"the PSB's requests for [information about ICT] were consistent with [its] efforts to

determine whether ICT complied with . . . Chinese legal and regulatory requirements."

(Dkt. 515-17 (citing Dkt. 515-44 ¶  78).)   Not only was this a focus of Professor Chow's

affirmative report, (*see* Dkt. 515-17 ¶¶ 15, 64), he also rebutted this conclusion in his

response report, explaining that "[n]otes from the PSB's case file show that the PSB only

sought information about ICT in connection with the documents presented by the Detained

Plaintiffs in their defense and not in connection with an independent criminal investigation." (Dkt. 515-18 ¶ 28; *see also id.* ¶¶ 28-29, 30-33.)  Further, Professor Chow's Rebuttal Report notes that, "[a]lthough the Young Report purports not to offer 'any opinion regarding the reasons why the Chinese police arrested and detained [the Individual Plaintiffs] . . . Young later opines that the PSB's requests for information related to ICT's business status in China, including requests for a business license and import documents, 'were consistent with the PSB's efforts to determine whether ICT complied with [] Chinese legal and regulatory requirements.'" (Dkt. 515-18 ¶ 2).  Professor Chow rebutted this opinion directly and concluded that "none of the alleged violations of PRC law discussed in the Young Report could have been the basis for the PSB's detention and arrest of the [Individual] Plaintiffs." (*Id.* ¶ 3; *see also id.* ¶ 5.)

Undisputed that Professor Chow is qualified to opine on the same subject matter as Defendants Chinese law expert, Laura Young.

108.   In 2012, Plaintiffs were selling H3C-branded transceivers in China that ICT had acquired from sources other than HPFS India.  Quigley Decl. Ex. 47; Jul. 12, 2019 Status Conference Tr. at 7.

**RESPONSE**:  Disputed.  While it is true that "in China in 2012, ICT also had a batch of H3C-branded equipment previously acquired from 3COM . . . the 3COM equipment . . . did not contain H3C transceivers with the same part numbers, H3C-0231A563 and H3C-0231A438, that ICT purchased from HPFS India." (Dkt. 331-15 ¶ 10.)  "ICT's only source of . . . H3C transceivers [with those part numbers] marketed or sold in China in 2012 was . . . HPFS India." (*Id.*; *see also* Ex. 76.)

This statement is also disputed to the extent that it implies that the H3C transceivers ICT received from HPFS India and were selling in China were adequately branded.  Prior

to the sale of the Shipped Goods to ICT, Defendants noted that "[t]he [CWG Goods] appear[ed] to be the last generation before HP commenced applying HP labelling to the product (HP co-branding with H3C . . . )." (Ex. 8.) However, Defendants present is no evidence that the CWG Goods were ever relabeled.

Further disputed because the cited material does not support this statement. The email cited by Defendants, dated November 11, 2011, refers to the sale of H3C equipment in China in 2011 – not 2012, as represented above. (*See* Dkt. 515-45.) Defendants also misstate the statements made by Plaintiffs' Counsel at the July 12, 2019 status conference as he made no representations about China, 2012, or transceivers; rather, in an update to the Court about search terms, Plaintiffs' Counsel stated only that running the search term "H3C" was "entirely too broad, given that [ICT had] other sources of business lines that included those sorts of machines." (Dkt. 204 at 7-8.)

109.   The PSB refused to grant HPFS India's request to inspect the Seized Equipment. Quigley Decl., Ex. 10 (Gill Tr.) p. 291.

**RESPONSE**:  Disputed to the extent that H3C, as an agent of HPFS India, inspected the Seized Goods. Defendants' statements to Plaintiffs in real-time, both before and after HPFS's letter was submitted to the PSB, describing its relationship with H3C in a manner that suggests H3C was working on Defendants' behalf. (*See, e.g.*, Ex. 67; *see also* Resp. ¶ 26, *supra*.) Further, earlier drafts of the April 2013 letter provided that "H3C inspected the seized equipment on behalf of HPFS India and also obtained a partial list of the seized equipment from the Beijing City Haidian District Public Security Bureau." (Dkt. 331-11.) Other contemporaneous representations made by David Gill also show that he viewed H3C's auditors, who inspected the Seized Equipment, as his own. (*See* Resp. ¶ 26, *supra*.)

Additionally, it is undisputed that an H3C employee visually inspected the Seized Equipment.  (*Id*.)  The record also shows that H3C's investigative efforts were directed by HPFS India at various times, including in H3C's creation of the Verification Report.  (*See, e.g.*, Dkt. 258 ¶¶ 44-47 ("Defendants' privilege log, which was contemporaneously referred to as a 'verification report[,]' . . . relates to two sample devices that were sent by [TTG to H3C] *at **the request of counsel*** for the purpose of providing legal advice.  ***The second 'verification report' was specifically generated at the direction of counsel.***")).)  Further, soon after the TTG samples were sent to H3C for inspection, Defendants concluded "that the [Seized Equipment] in China [was] the same" as the TTG samples.  (Dkt. 331-11.) Given that Defendants "did not physically inspect" the Seized Equipment otherwise, (Ex. 96, Def.'s 30(b)(6) Tr. at 65:22-66:11), this conclusion could only be reached in connection with H3C's inspection of the TTG samples, which H3C performed "at the request of . . . HPFS India."  (Dkt. 341 ¶ 60.)

110.   Plaintiffs' counsel wrote that "red flags" regarding the source of the Equipment included "HPFS India's failure to perform a unit-by-unit inspection to verify the authenticity of the goods, and its awareness of the increased regulatory scrutiny ICT would face reselling the goods in China."  Quigley Decl., Ex. 21 (June 4, 2021 email from L. Nikas).

   **RESPONSE**:  Undisputed.

111.   Defendants requested that ICT produce documents that would show its compliance with applicable laws.  Quigley Decl., Ex. 48, RFP Nos. 19, 20, 21.

   **RESPONSE**:  Undisputed.

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

112.   ICT and Alex Styller maintained bank accounts in Massachusetts during the relevant time period.  (Ex. 106, ¶ 3 (Styller Aff.).)

113.   Les Riordan is a Massachusetts-barred attorney with offices in Massachusetts.  (*See* Dkt. 33-1 (Affidavit of Les Riordan).)

66

114.   HP informed its shareholder in 2009 that it purchased H3C for the purpose of profiting off of the sale of H3C goods in China.  (*See* Ex. 1 (HP Company's § 14(a) Proxy Statement announcing acquisition of 3Com Corporation).)

115.   From April 1, 2011 to July 18, 2013, Jim O'Grady was an HPFS employee who worked out of HPFS's office in Andover, Massachusetts.  (*See* Ex. 19;  Dkt. 249-5 at 5 (Def.s' Initial Disclosure).)

116.   On August 8, 2011, Tom Harris sent Alex Pekar a list of H3C equipment, explicitly contemplating a resale agreement that would send the Equipment to China.  (*See* Ex. 10 at at 0991.)

117.   HPFS employees JT Silvestri and Jim O'Grady told Alex Pekar that the equipment was "coming from a short-term lease with good physical condition, good packaging, in working condition, genuine product."  (Ex. 95, Pekar Tr. at 141:22-143:13.)

118.   Based on Defendants' representations, ICT and its employees understood they were purchasing genuine H3C goods "from [a] reliable source" which were neither "counterfeit" nor "defective," (Ex. 95, Pekar Tr. at 206:24-206:2), and most of which would be "new in original box[es]." (Ex. 7.)

119.   Based on representations made by Defendants to Alex Styller, as well as on HP's international reputation, Mr. Cheng, Mr. Yuyi, and Ms. Yu presumed that ICT purchased genuine goods with genuine H3C trademarks in its transaction with HPFS India.  (*See* Ex. 105 ¶¶ 3-4 (Cheng Aff.); Ex. 103 ¶¶ 3-4 Affidavit of Cathy Yu ("Yu Aff."); Ex. 104 ¶¶ 3-4 Affidavit of Jason Yuyi ("Yuyi Aff.").)

120.   HPFS knew that the labeling of H3C equipment had changed since the Equipment as issue was manufactured.  (*See* Dkt. No. 317-4; Ex. 3 (Fang Report).)

121.   In an August 26, 2013 letter to ICT's counsel, HP's lawyer admitted that the Shipped Goods "bore labels from different manufacturers" and that it sold the Shipped Goods to "[ICT] on a discounted basis."  (Ex. 74 (McCarthy Letters).)

122.   TTG purchased the remaining CWG Goods for $120,000, a discount of 80 percent.  (*See* Ex. 74 (McCarthy Letters); Ex. 75.)

123.   The resale value of the CWG Goods depended upon having the proper import documentation from Inspira.  (*See* Ex. 89, Harris Tr. at 67:15-68:4; Ex. 9.)

124.   Prior to ICT's purchase, the Shipped Goods had been "depreciat[ing]" and "sitting idle in India" while stored in a warehouse by HPFS' logistics company, TTG.  (Ex. 9.)

125.   HPFS lost money each day that the Equipment sat in India without a partner to conduct the resale efforts.  (*See* Ex. 9.)

126.   HPFS India knew that ICT planned to export the Goods from India and ultimately intended to ship and sell the Promised Goods in mainland China.  (*See* Ex. 18 at 1963; Ex. 19 at 1682-83.)

127.   The RRSA "clearly authorize[d] ICT to sell [the Shipped Goods] to pursuant to the arrangement" and "ICT was free to sell the equipment outside of the USA," including where the Shipped Goods would need to be "export[ed] and/or re-export[ed]."  (Ex. 16 at 2120.)

128.   In an August 26, 2013 letter to ICT's attorney, HP's lawyer admitted that the CWG Goods "had been used for a number of years" prior to being purchased by ICT.  (Ex. 74 (McCarthy Letters).)

129.   The Individual Plaintiffs spent over 200 days in the Haidian Detention Center in Beijing based on a Complaint submitted by H3C to the police.  (*See* Ex. 105 ¶¶ 6, 10 (Cheng Aff.); Ex. 103 ¶¶ 6, 20 (Yu Aff.); Ex. 104 ¶¶ 6, 23 (Yuyi Aff.).)

130.   Prior to his own detention, but after Cathy Yu and Jason Yuyi were already in PSB custody, Jade Cheng traveled to the Beijing to provide the PSB with copies of the contracts between ICT and HPFS India in an effort to show that the Seized Equipment was genuine and purchased directly from HP.  (*See* Ex. 94, Cheng Jan. 29, 2021 Tr. at 11:10-12:4.)

131.   Documents obtained from the Chinese authorities show that the defense raised by Mr. Cheng was the impetus for the PSB's investigation into ICT's business license in China. (*See* Ex. 53; *see also* Dkt. 515-18 ¶ 5 (Chow Report).)

132.   Defendants' Chinese law expert, Laura Young, testified that she "didn't see anything" to indicate that any Plaintiff was ever suspected of any infraction other than counterfeiting. (*See* Ex. 100, Young Tr. at 22:5-24.)

133.   While detained, the Individual Plaintiffs, were confined to a single room with dozens of other detainees and were denied sleep, completely isolated from their families and friends, not allowed to speak, forced to take cold showers, and feared for their lives due to the prevalence of gangs in the facility.  (*See* Ex. 103 ¶¶ 12-19 (Yu Aff.); Ex. 104 ¶¶ 13-22 (Yuyi Aff.); Dkt. 101-1 ¶¶ 78-82, 96, 101-03, 106, 111, 125, 144 (Cheng 2017 Aff.).)

134.   While detained, the Individual Plaintiffs received in adequate food and water.  (*See* Ex. 103 ¶ 16 (Yu Aff.); Ex. 104 ¶ 11 (Yuyi Aff.); Dkt. 101-1 ¶¶ 88-89, 94.)

135.   While detained, "the only person[s] . . . allowed to have any communication" with the Individual Plaintiffs from the outside world were their Chinese defense attorneys.  (Ex. 47); *see also* Ex. 94, Cheng Nov. 11, 2020 Tr. at 72:11-13; Ex. 93, Yu Jan. 18, 2021 Tr. at 95:3-6; Ex. 101, Yuyi May 10, 2021 Tr. at 62:16-19.).)

136.   The Individual Plaintiffs did not know how long they would be detained or if they would ever get out.  (*See* Ex. 103 ¶ 19 (Yu Aff.); Ex. 104 ¶ 21 (Yuyi Aff.); Dkt. 101-1 ¶¶ 117, 126-31 (Cheng 2017 Aff.).)

137. Ma Li was Cathy Yu's defense attorney while she was in PSB custody.  (Ex. 98 ¶ 4 (Ma Li Aff.); Ex 103 ¶ 16 (Yu Aff.).)

138. Ma Li submitted an affidavit in this action four years ago in connection with Plaintiffs' Second Amended Complaint.  (Dkt. 101-4.)

139. Ma Li communicated with ICT employees Alex Styller and Ryan Quinn in emails produced in this litigation.  (Ex. 70.)

140. Alex Styller suffered severe emotional stress as a result of Individual Plaintiffs' detention and his efforts to help secure their release. (Dkt. 101-2 ¶¶ 56, 69, 78, 80 (Styller 2017 Aff.).)

141. Because the Chinese authorities do not provide copies of their case files, Chinese must take photos of any such documents in order to review them later. (Ex. 98 ¶ 19 (Ma Li Aff.).)

142. In China, it is a "fairly common practice" to use stamps (also known as a "seal" or a "chop") as "the equivalent of a signature" on official documents.  (Ex. 100, Young Tr. at 92:15-20; *see also* Dkt. 515-18 ¶ 19 (Chow Rebuttal Repot).)

143. Defendants' Chinese law expert, Laura Young, stated that the seal visible in Ex. 38 belonged to H3C.  (Ex. 100, Young Tr. at 92:6-14.)

144. Defendants' Chinese law expert, Laura Young, confirmed that the Bail Letters bore a seal and fingerprints "typical of what you would find on a bail release form" in the files of the Chinese police.  (Ex. 100, Young Tr. at 65:8-71:3.)

145. Defendants counsel identified four documents in Plaintiffs' production (ICT0002094, ICT0259193, ICT0734766, and ICT0791783), (Ex. 63), as the cover letter written by H3C ("H3C Cover Letter") that was submitted to the PSB along with David Gill's 2013 letter to the PSB.  (*See* Dkt. 291 at 20-21 (*citing* Plaintiffs' production at ICT0002094, ICT0259193, ICT0734766, and ICT0791783) (emphasis in original).)

146. All four versions of H3C's May 2, 2013 Cover Letter to the PSB are the same document. (*See* Dkt. 291 at 17-18 (identifying ICT0002094, ICT0259193, ICT0734766, and ICT0791783 as H3C's cover letters).)

147. The documents identified by Defendants' counsel as the H3C Cover Letter are English-language translations of ICT0734765, ICT0791782, ICT0259192 in Exhibit 64 (the "Mandarin H3C Cover letter").

148. Each Mandarin-language version of H3C's Cover Letter is redacted using a sheet of paper to cover the bottom right hand corner of the document.  (*See* Ex. 64 (ICT0259192, ICT0734765, ICT0791782).)

149. The Mandarin H3C Cover Letter contains the same text in the body of the document as the text in the body of the higher quality reproduction of the same document, bates range ICT0018060, available at Ex. 65.

150.    The H3C Cover Letter at Ex. 54 is stamped with the H3C seal and dated May 2, 2013.

151.    The H3C seal visible on the H3C Cover Letter in Exhibit 65 matches exactly the H3C seal identified by Defendants' Chinese law expert on other documents in Plaintiffs' production. (*Compare* Ex. 65 *and* Ex. 100, Young Tr. at 92:6-14 (identifying Ex. 38 at 89856 as containing "Hangzhou H3C Technologies" seal).)

152.    The H3C seal visible on the higher quality H3C Cover letter in Exhibit 65 matches a document produced by Defendants. (*Compare* Ex. 65 *and* (Ex. 31 (Defendants' production of the 2.8 m RMB H3C valuation sheet) ("H3C Valuation Sheet").)

153.    Defendants' expert on Chinese law, Laura Young, confirmed that the official stamp of "Hangzhou H3C Technologies" appears on H3C's December 12, 2012 Petition to the PSB. (Ex. 100, Young Tr. at 92:2-14 (describing Ex. 38.)

154.    The H3C seal visible on the H3C Cover Letter is the same as the seal visible on H3C's December 9, 2012 Petition to the PSB. (*See* Ex. 105 ¶ 16 (Cheng Aff.); Ex. 100 Young Tr. at 90:24-92-14.)

155.    At the request of David Gill, Kevan Bartley helped to coordinate the delivery of the sample TTG transceivers to Wang You at H3C.  (Dkt. 341 ¶¶ 58-60.)

156.    Wang You was an employee of H3C.  (*See* Ex. 87, Bartley Tr. at 155:24-156:6; Dkt. 341 ¶ 58; Ex. 58 at 2317.)

157.    Defendants arranged to have TTG send a sample of unsold CWG Goods for inspection to Wang You, an H3C employee in China.  (*See* Ex. 58 at 2317; Dkt. 258 ¶¶ 44-47.)

158.    On May 23, 2013, Wang You was interrogated by the PSB.  (*See* Ex. 69; Ex. 68.)

159.    The PSB interrogation of Wang You at ICT0789807-09, (Ex. 68), is a copy of the same document referenced in Ma Li's affidavit ICT0018035-37, (Ex. 69).

160.    Defendants' Chinese law expert relied on a version of the H3C Valuation Sheet produced by Plaintiffs in forming her decision regarding the seriousness of the Individual Plaintiffs' alleged criminal activity.  (*See* Ex. 97 ¶ 29 (Young Rebuttal Report) (citing Ex. 38 at 9856).)

161.    A blank, template version of H3C's Valuation Sheet was produced from David Gill's computer and is dated April 17, 2013.  (Ex. 62.)

162.    In 2013, Defendants received from H3C the H3C Verification Report, (Dkt. 515-8), that had "been submitted to the PSB."  (Dkt. 342 at 10; Dkt. 342-2 ¶¶ 4-5 .)

163.    Defendants stated that the sum total of assistance they directly offered to the Individual Plaintiffs was Gill's three-page letter to the PSB, which took Defendants "many weeks" to prepare, (Ex. 96, Def.'s 30(b)(6) Tr. at 155:24-156:25), "while people were sitting in jail" and HPFS was "revis[ing] the letter," (*id.* at 193:10-23).

164.    HP did not monitor H3C's internal accounting procedures.  (Ex. 99, Chow Tr. at 222:5-224:19.)

165.    HP's annual reports for the years 2012 and 2013 do not include information about the transactions of H3C.  (Ex. 99, Chow Tr. at 225:14-25.)

166.    HP did not have any policies or procedures in place to ensure that all transactions entered into by H3C were authorized by H3C management. (Ex. 99, Chow Tr. at 222:5-224:19.)

167.    HP did not maintain day-to-day knowledge of H3C's operations, including its interactions with the PSB.  (Ex. 96, 30(b)(6) Tr. at 44:9-15.)

168.    H3C told the police, "[H3C] and its trademark are well known in the Chinese and the global market of network devices." (Ex. 39.)

169.    HPFS knew that H3C enforced its trademark rights, but HPFS never communicated with H3C when the former resold the latter's equipment.  Bartley acknowledge "there are risks with that strategy." (Ex. 96, Def.'s 30(b)(6) Tr. at 42:24-43:17.)

170.    All three versions of H3C's December 9, 2012 Petition to the PSB contain identical text in the body of the document.  (*Compare* Ex. 8 *and* Ex. 39 (ICT0018135-36 and ICT0802104-05).)

Dated: August 2, 2021
       New York, New York

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:  */s/ Luke Nikas*
      Luke Nikas
      Alex Spiro
      Jonathan Oblak
      Alex Zuckerman
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      Telephone: (212) 849-7000
      Email:  lukenikas@quinnemanuel.com

*Attorneys for Plaintiffs Alexander Styller, Integrated Communications & Technologies, Jade Cheng, Jason Yuyi, Cathy Yu, Caroline Marafao Cheng, Changzhen Ni, Junfang Yu, Meixiang Cheng, Fangshou Yu, and Changua Ni*

## CERTIFICATE OF SERVICE

I, Luke Nikas, attorney for Plaintiffs, hereby certify that on August 2, 2021, I caused a copy of the foregoing document to be filed using the CM/ECF system.

*/s/ Luke Nikas*
Luke Nikas