UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER STYLLER, INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC., JADE CHENG, JASON YUYI, CATHY YU, CAROLINE MARAFAO CHENG, PUSHUN CHENG, CHANGZHEN NI, JUNFANG YU, MEIXIANG CHENG, FANGSHOU YU, and CHANGHUA NI,<br><br>    Plaintiffs,<br><br>vs.<br><br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY, HEWLETT-PACKARD FINANCIAL SERVICES (INDIA) PRIVATE LIMITED, HP INC., HEWLETT PACKARD ENTERPRISE COMPANY, and DAVID GILL,<br><br>    Defendants. | Civil Action No. 1:16-CV-10386 (LTS) |

**REPLY IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I.   THE COUNTERFEITING CLAIMS (COUNTS 1-6) SHOULD BE DISMISSED. ..........3

II.  THE CONSPIRACY CLAIMS (COUNTS 7-13) SHOULD BE DISMISSED. ................6

III. THE CHAPTER 93A CLAIMS (COUNTS 6 & 8) SHOULD BE DISMISSED...............9

IV.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
     COUNTERCLAIMS ON THE ISSUES OF BREACH AND
     INDEMNIFICATION. .........................................................................................10

CONCLUSION.....................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ADA Sols., Inc. v. Meadors*,
  98 F. Supp. 3d 240 (D. Mass. 2015) ...................................................................................9

*Chartier v. Brabender Technologie, Inc.*,
  2011 U.S. Dist. LEXIS 115033 (D. Mass. Oct. 5, 2011) ...................................................2, 7

*Devlin v. WSI Corp.*,
  833 F. Supp. 69 (D. Mass. 1993) ........................................................................................6

*Fid. & Deposit Co. of Md. v. Thompson*,
  2018 U.S. Dist. LEXIS 75480 (N.D. Okla. May 4, 2018), aff'd, 769 F. App'x
  538 (10th Cir. 2019) ............................................................................................................6

*First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*,
  839 F. Supp. 2d 407 (D. Mass. 2012)..................................................................................6

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
  483 Mass. 459 (2003)..........................................................................................................9

*Palmentere v. Campbell*,
  344 F.2d 234 (8th Cir. 1965) ...............................................................................................8

*Plastic Surgery Assocs., S.C., v. Cynosure, Inc.*,
  407 F. Supp. 3d 59 (D. Mass. 2019) ....................................................................................9

*Republic of Turkey v. OKS Partners*,
  797 F. Supp. 64 (D. Mass. 1992) .......................................................................................10

*Town of Westport v. Monsanto Co.*,
  877 F.3d 58 (1st Cir. 2017)..................................................................................................7

*Uncle Henry's, Inc. v. Plaut Consulting Co.*,
  399 F.3d 33 (1st Cir. 2005).................................................................................................9

*Wal-Mart Stores, Inc. v. Rodriguez*,
  92 S.W.3d 502 (Tex. 2002)..................................................................................................8

*Warren Envtl., Inc. v. Source One Envtl., Ltd.*,
  2020 U.S. Dist. LEXIS 72529 (D. Mass. Apr. 24, 2020).......................................................9

The linchpin of Plaintiffs' Opposition is one line in a draft letter to the Chinese police that Defendants undisputedly never sent, asserting something that indisputably never happened: "*H3C inspected the seized equipment on behalf of HPFS India*." From those ten words, Plaintiffs craft an agency theory that would admit H3C's hearsay (for the Counterfeiting Claims) and assign H3C's conduct to Defendants (for the Conspiracy Claims). In short, Plaintiffs say those ten words warrant a trial to hold Defendants liable for *H3C's* words and actions, even though Plaintiffs chose not to sue nor to take discovery from H3C.

But the record is now complete and the facts are settled: the Final Letter sent to the Chinese police did not include that statement—because it was not true. David Gill's testimony on this critical point is undisputed. Def. Br. at 5-6; SOF ¶¶ 28-35. Plaintiffs instead resort to innuendo around the timing of "purported" evidence identified after the first round of summary judgment, implying what their prior counsel had the chutzpah to say out loud: that Defendants fabricated the Final Letter.[1] But there is no honest dispute, let alone an evidentiary one: the Final Letter is the final letter, and nothing at trial could change that. The Court should not send this case to the jury on a false premise in a draft letter that Mr. Gill corrected years before Plaintiffs filed suit.

With that linchpin cast aside, the wheels fall off Plaintiffs' case. To resolve Plaintiffs' thirteen claims, and the dozens of arguments piled into their Opposition, the Court need only answer three core questions posed by Defendants' opening brief:

---

[1] This is not the only tactic reminiscent of Plaintiffs' prior counsel, who has since been sanctioned. While peppering their brief with veiled—and baseless and irrelevant—threats to seek criminal prosecution under the FCPA, Plaintiffs launched a parallel media campaign accusing Defendants and their executives of human rights violations, in an apparent attempt to influence the jury pool and exert pressure on Defendants by promoting unfavorable (and untrue) media coverage. *See* **hpshame.com** (urging visitors to sign a petition demanding that Defendants "be held responsible for the brutal framing of three innocent Chinese office workers"; attaching "fact sheet" about this case, the Court, and the trial date; and linking to an August 2, 2021 Bloomberg article based on interviews offered by Styller and other Plaintiffs).

*May Plaintiffs rely on H3C's hearsay statements in the Verification Report?* No. Because the Final Letter does not say that H3C inspected the Seized Equipment on behalf of HPFS India, Plaintiffs cannot avail themselves of the narrow agency exception to hearsay. And without the benefit of H3C's statements in the Verification Report, Plaintiffs are left with no evidence on which a reasonable jury could find that the Seized Equipment sold by HPFS India was counterfeit—even under the supposed "fake label" distinction Plaintiffs now advance.

*May Plaintiffs introduce new and unpleaded theories to sustain their claims?* No. Plaintiffs may not amend their complaint through argument in a brief opposing summary judgment. *See* Def. Br. at 22 and cases cited. This rule bars many theories Plaintiffs now say support their Conspiracy Claims. It applies with special force to Plaintiffs' efforts to hold Defendants liable for the conduct of non-party H3C.

*May Plaintiffs disavow the sworn testimony of their expert, Professor Chow?* Again, no. Prof. Chow did not equivocate: Defendants could not affect the length of the Individual Plaintiffs' detention. Def. Br. at 14-15; SOF ¶¶ 48-58. This dooms each of the Conspiracy Claims. "It would undermine the integrity of the summary judgment process if a party were simply permitted to ignore any unhelpful testimony of his own expert witness." *Chartier v. Brabender Technologie, Inc.*, 2011 U.S. Dist. LEXIS 115033, at *22 (D. Mass. Oct. 5, 2011).

Plaintiffs' arguments fail for those main reasons, along with the many others set forth below and in Defendants' opening brief. Of particular note are (i) Plaintiffs' chapter 93A claims, because they are so far afield from the statutory jurisdiction; and (ii) many of the Individual Plaintiffs' claims, which they cannot sustain because they undisputedly did not receive Defendants' alleged misrepresentations. Finally, by overlooking the narrow rulings Defendants seek on their counterclaims, Plaintiffs concede Defendants' entitlement to that relief.

### I. THE COUNTERFEITING CLAIMS (COUNTS 1-6) SHOULD BE DISMISSED.

Buried in a footnote on page 10 of the Opposition is a remarkable assertion: Plaintiffs may prevail on their Counterfeiting Claims even if they cannot prove that HPFS India sold counterfeit goods to ICT. Opp. at 10 n.7. That is the first time in six years Plaintiffs have said so. It contradicts the as-pleaded claims of the SAC, their counsel's representations, the bifurcated summary judgment schedule, and the Court's reference to "the plain and uncontested legal proposition that for Plaintiffs to prevail on any one or all of these claims, ***Plaintiffs must establish that the goods sold by HPFS India to ICT were counterfeit at the time of sale***." ECF 369 at 2.

Plaintiffs then argue that the Individual Plaintiffs were investigated by the PSB for "sales of commodities under a fake registered trademark," and therefore that they may prove counterfeiting by showing that HPFS India sold ICT equipment with "fake trademark labels." Opp. at 10-12. Fine, so far as it goes.[2] But Plaintiffs go a step further, and (in line with FN 7) suggest that *authentic* labels on *authentic* equipment would suffice if the labels were "inadequate" or caused others to mistakenly believe the goods were counterfeit. *Id.* at 11. No. Even under Plaintiffs' stated premises, and the Court's quoted commentary, Plaintiffs must at least identify "evidence that the labels affixed to particular goods are counterfeit." *Id.*, quoting ECF 369 at 19.[3]

Plaintiffs point to no admissible evidence that HPFS India sold ICT equipment bearing fake labels. H3C's statements about the labels in the Verification Report are inadmissible hearsay.[4]

---

[2] As explained below, Defendants disagree with the supposed distinction, but accept it for purposes of summary judgment because Plaintiffs cannot show that the labels are fake, either.

[3] Even Prof. Chow has opined that "parallel imports"—authentic goods bearing authentic labels, but imported without the permission of the trademark owner—may cause confusion, but they do not lead to criminal liability under Chinese law. ECF 515-17 (Chow Report ¶¶ 46, 71).

[4] Again, because the Final Letter does not say that "H3C inspected the seized equipment on behalf of HPFS India," Plaintiffs cannot rely on the Rule 801(d)(2)(D) agency exception to admit the Verification Report. Plaintiffs' backup arguments for admissibility fail for the following reasons:

And the bullet-point list on pages 11 and 12 of the Opposition does not offer an "abundance of other evidence," but a collection of immaterial facts and more inadmissible hearsay:

- The June 2011 email (ECF 520-11) merely notes that the CWG equipment had *authentic* labels from the "last generation." The discussion was about re-labeling the products to reflect current "HP co-branding with H3C" if HPFS itself was to resell the equipment—not about fixing any "fake" labeling.

- Tom Harris's October 2012 observations of the remaining CWG equipment—*i.e.*, equipment *not* sold to ICT—do not suggest counterfeiting. The other stickers were *authentic* but extraneous customer and logistics vendor stickers, not fake H3C labels. ECF 520-29; ECF 520-31.

- That the PSB was *investigating* the Individual Plaintiffs for selling goods "under a fake registered trademark" cannot meet Plaintiffs' burden of proving that they *were* selling goods with fake labels sold by HPFS India.[5] And other references to H3C's allegations suffer from the same hearsay problem as the Verification Report.

For those reasons, Plaintiffs' "fake labels" theory gets them nowhere.

---

- Defendants did not "represent[] to Alex Styller that the police received the Old Final Letter." Opp. at 13 n. 11 (citing SOF ¶ 26). The cited evidence says only that David Gill told Les Riordan that the PSB received a letter with "minor amendments" to the March 25, 2013 draft letter previously sent to ICT.

- What Plaintiffs call the "Old Final Letter"—*i.e.*, the draft—was not "an admission, sent to ICT in the course of the investigation, that H3C was acting 'on behalf of' HPFS.'" Opp. at 13. As the Court recognized, statements in draft letters not "actually made to the Chinese police," even if sent to ICT, do not trigger hearsay exceptions. ECF 369 at 11-12.

- Even if Plaintiffs could admit the Verification Report for a nonhearsay purpose (Opp. at 7 n. 4), it would be no help to their Counterfeiting Claims, which rely on the truth of H3C's statements therein. In any case, because it remains true that "there is no evidence in the record indicating *when* [the Verification Report] was transmitted to the Chinese police" (ECF 369 at 6), Plaintiffs cannot use it to show "the cause of Jade, Jason, and Cathy's arrests." Opp. at 7. And Plaintiffs still have yet to explain how they can possibly authenticate the Verification Report at trial, with no witnesses (or even discovery) from H3C or the PSB.

[5] Here and elsewhere, Plaintiffs strain to characterize purported "documents from the files of the Chinese authorities" as authenticated and admissible. Opp. at 12 n.9, 15 n.13. But unlike the authenticated database screenshots in Plaintiffs' cited case (*Xiao*), the "files" here appear to be a jumble of photographs taken by some unidentified person, interspersed with commentary by some other unidentified person. SOF ¶ 144. Defendants' expert, Laura Young, specifically testified that she could *not* authenticate the documents and did not view them as reliable. *Id.* And Plaintiffs' belatedly proffered affidavit from Ma Li and accompanying productions (dated March 2021 and May 2021) are not properly part of the summary judgment record. Plaintiffs had access to Ma Li for eight years, and indeed (as Laura Young explained) could have obtained official, authenticated records from the Chinese authorities—but chose not to. SOF ¶¶ 58, 144.

Nor can Plaintiffs create a genuine dispute of material fact by challenging Shelley Raina's methodology, or the reliability of various inventory lists.[6] It is *Plaintiffs*' burden to put forth admissible evidence on which a jury could find that HPFS India sold counterfeit goods to ICT. Plaintiffs cannot survive summary judgment by pointing to alleged "question[s]" about the equipment's origins, or "risk[s]" allegedly created by Defendants' leasing model. Opp. at 13-14. Plaintiffs need to show *actual* admissible evidence that HPFS India *in fact* sold fake equipment (hardware or label) to ICT. They have none. And if there were any close question, Plaintiffs lost the benefit of the doubt when they "willfully and recklessly destroyed various kinds of evidence that was potentially relevant to this litigation." ECF 368 at 1; Def. Br. at 9.[7]

Finally, the Individual Plaintiffs argue that their Counterfeiting Claims can survive even though they concede that they never received any misrepresentations from Defendants—on the theory that "[t]hose who rely on misrepresentations heard second or third-hand may sue[.]" Opp. at 17 (citing *Abelson*, a factually irrelevant securities fraud case about class certification under a fraud-on-the-market theory); *see* SOF ¶¶ 38-40. But the Individual Plaintiffs never alleged, and cite no evidence now, that they even heard the alleged misrepresentations "second or third-hand."[8] If the Counterfeiting Claims move forward at all, they should be limited to Styller and ICT.

---

[6] Plaintiffs' challenges miss the mark, at any rate. Plaintiffs do not dispute that counterfeit hardware bearing H3C labels (under Mr. Raina's analysis) would still qualify as bearing a "fake trademark" under their cited Article 214 standard, and therefore that Mr. Raina's expert analysis remains relevant to the counterfeiting question. And, as detailed in the SOF (¶ 17 reply), Plaintiffs mischaracterize both Styller's affidavit and Gill's email quoted on page 15 of the Opposition.

[7] Plaintiffs' insistence that "Defendants' state of mind … is a disputed issue of material fact" (Opp. at 16-17) is a red herring—Defendants did not argue that element in their motion.

[8] The Individual Plaintiffs state in the SOF that their reliance is based on "representations made by Defendants to Alex Styller," (SOF ¶ 119, citing their affidavits), but those affidavits never state that they spoke to Styller about these alleged statements. In fact, Styller has never spoken with Jason or Cathy—ever. SOF ¶ 119. And though the Opposition asserts that Pekar joined Styller in "immediately" relaying misrepresentations to the Individual Plaintiffs (Opp. at 17 n.16), there is

**II.     THE CONSPIRACY CLAIMS (COUNTS 7-13) SHOULD BE DISMISSED.**

Plaintiffs' Opposition confirms that they intend to pursue their Conspiracy Claims under theories of liability found nowhere in the Second Amended Complaint. This Court should follow First Circuit precedent and bar such theories at the threshold. *See* Def. Br. at 22, *id.* n.13.

Most prominent among Plaintiffs' improper new theories is their attempt to hold Defendants liable for the alleged words and actions of H3C—a company that Plaintiffs never sued or even sought discovery from. If the Court considers the new theory, it should confirm that H3C was not the agent of any Defendant. Plaintiffs cannot make the required showing even under their preferred standard: that "the parent dominates the subsidiary in a pervasive manner that necessitates treating the dominated corporation as an agent of the principal." Opp. at 21 (quoting *Devlin v. WSI Corp.*, 833 F. Supp. 69, 74 (D. Mass. 1993)); ECF 369 at 14 (finding "no evidence of such dominance").

- The Court's earlier finding on the agency exception to hearsay—a narrow ruling under a more lenient evidentiary standard inapplicable here (Def. Br. at 24 n.17)—turned out to depend on a mistake of fact later corrected based on the full record now before the Court. Given the Final Letter, Plaintiffs cannot rely on the indisputably untrue statement that H3C conducted an inspection on behalf of HPFS India.

- The other "admissions" cited in the bullet-point list on page 22 of the Opposition amount to unremarkable acknowledgements that H3C was a subsidiary of HP[9] and that H3C assented to several of its *fellow subsidiaries'* requests—not that HP (the only possible "parent") "*dominated [H3C] in a pervasive manner.*"

---

no record cite for that assertion. Finally, Plaintiffs may not rely on Defendants' "reputation" to ground a misrepresentation claim. *See Fid. & Deposit Co. of Md. v. Thompson*, 2018 U.S. Dist. LEXIS 75480, at *23 n.8 (N.D. Okla. May 4, 2018), aff'd, 769 F. App'x 538 (10th Cir. 2019) (reputation is neither "false information [nor] a misstatement of fact").

Moreover, on the warranty claim, Plaintiffs cite *First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.* for the proposition that UCC §2-318 "'eliminates the vertical privity requirement . . . for tort-based breach of warranty claims.'" (Opp. at 18, quoting 839 F. Supp. 2d 407, 412 (D. Mass. 2012)). But Plaintiffs' ellipses and abbreviated quote alter the holding entirely. The court held that §2-318 "eliminates the vertical privity requirement *only* for tort-based breach of warranty claims *by consumers, not for contract-based breach of warranty claims by commercial retailers*." *Id.* (emphasis added). Plaintiffs were commercial resellers, not consumers.

[9] H3C was not "the principal subsidiary of HP in China." Opp. at 23 (citing ECF 108 ¶ 10, which does not support). H3C was one of several subsidiaries of 3Com, which HP acquired in 2010.

Separately, and unsurprisingly, Plaintiffs now try to distance themselves from the crystal-clear testimony of their own expert, Prof. Chow, that Defendants did not (and could not) prolong the detention of the Individual Plaintiffs. *See* Def. Br. at 14-15 (collecting and quoting Chow's sworn opinions in his reports and deposition). Defendants do not agree with Prof. Chow on many fronts, but his opinions are *Plaintiffs'*, and cannot be discarded at Plaintiffs' convenience. *See Chartier*, 2011 U.S. Dist. LEXIS 115033, at *22; *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66-67 (1st Cir. 2017) (affirming summary judgment given concessions of plaintiff's own expert). Nor does Plaintiffs' cited evidence counsel any contrary result.[10]

Defendants respond below to miscellaneous points in Plaintiffs' claim-by-claim arguments, but ask that the Court consider each claim as pleaded (and set forth in Defendant's opening brief), and with Prof. Chow's binding opinions in mind. Those principles dispose of each and every Conspiracy Claim.

*Fraud:* The Opposition offers no substantive response to Defendants' argument that the Individual Plaintiffs cannot show that they relied on either of the two pleaded statements that the Court found to clear Rule 9(b)—or any unpleaded statements or omissions, for that matter—*at all*, much less to their detriment. Def. Br. at 17. The Individual Plaintiffs never received the allegedly fraudulent statements, and could not have changed their conduct while incarcerated. *Id.*; SOF ¶ 65.

*False Imprisonment:* Plaintiffs admit that their false imprisonment claim (under any pleaded or unpleaded theory) turns on whether they are allowed and able to attribute H3C's conduct to Defendants. Opp. at 27. They are not. Each theory also fails because "substantial

---

[10] HP did not "control" H3C such that it could "order" H3C to drop a complaint. Opp. at 23 (citing draft letter and unrelated example of a *request* to H3C from *another subsidiary*, HPFS India); *see supra* p. 6. And none of the cited excerpts from the "PSB file" are authenticated or admissible. Opp. at 25; *see supra* p. 5 n. 5. (Note, too, that Plaintiffs' bracketed insertion of "[ICT]" changes the meaning of the document quoted in SOF ¶ 49.)

certainty"—as explained in Defendants' opening brief—is simply too high a bar for Plaintiffs to clear. Def. Br. at 18. Even reckless disregard of risk is not enough. *Id.*[11]

***Negligence:***  Plaintiffs' new theory about "HPFS's failure to inform ICT of . . . deficiencies" observed during a 2012 inspection of the remaining Commonwealth Games equipment, besides being unpleaded, fails because there was nothing to "inform" ICT about: ICT's own Alexander Pekar was right by Tom Harris's side in New Delhi. SOF ¶ 1; ECF 101 ¶ 50.

***Conspiracy:***  Plaintiffs implicitly concede that David Gill cannot be held to have conspired with the HPFS Defendants, as Plaintiffs pleaded. Nor should the Court credit Plaintiffs' baseless (and unpleaded) suggestion that Gill conspired with H3C to keep innocent people "locked up by any means available."[12] Opp. at 33 n.26.

***IIED:***  Defendants stand by the statements of law and fact in their opening brief, and further note that Plaintiffs have not identified a single false statement in the Final Letter that would support their unpleaded theory of the letter being a "false report" to the PSB. *Cf.* Opp. at 35.

---

[11] For example, Plaintiffs claim that Defendants "withheld" supposedly exculpatory information from the Chinese authorities (Opp. at 21, 23-25) and "water[ed] down" the April 2013 Letter (*id.* at 29-30), but even if those things were true (and they are not), inaction does not support liability on a false imprisonment claim. *See, e.g.*, *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 510 (Tex. 2002) ("Merely providing inaccurate or incomplete information [] will not make a party liable for instigating a subsequent false imprisonment."); *Palmentere v. Campbell*, 344 F.2d 234, 238 (8th Cir. 1965) ("A cause of action for false imprisonment cannot be based upon a mere negation or failure to speak or act . . .") (internal citation omitted).

Nor is there anything improper, much less actionable, about Defendants' instruction that TTG recycle the leftover Commonwealth Games equipment in its possession. Given that this equipment was not sold to ICT and therefore not seized by the Chinese authorities, it is irrelevant. Even so, Plaintiffs emphasize that HPFS India asked TTG to recycle the Dubai equipment because its origination was "questionable," but omit that part of the same email which states that "there hasn't been a concrete determination as to the authenticity of the assets." SOF ¶ 3. Now there has been: the equipment HPFS India sold to ICT (the only relevant equipment here) was authentic. SOF ¶ 17.

[12] Plaintiffs' only cited support is a connect-the-dots conjecture among documents and privilege log entries that they say "seem" and "appear" to show certain things—which Plaintiffs never asked Gill about at his deposition. Opp. at 33 n.26; *see also id.* at 30 n.25 (similarly baseless speculation); SOF ¶¶ 58, 69, 161 (refuting Plaintiffs' interpretation of cited evidence).

**III.    THE CHAPTER 93A CLAIMS (COUNTS 6 & 8) SHOULD BE DISMISSED.**

"Whether [Defendants'] actions and transactions occurred primarily and substantially in Massachusetts for purposes of Chapter 93A jurisdiction is a matter of law" for the Court to decide—not, as Plaintiffs suggest, a "disputed issue of material fact." Opp. at 38; *Warren Envtl., Inc. v. Source One Envtl., Ltd.*, 2020 U.S. Dist. LEXIS 72529, at *26-27 (D. Mass. Apr. 24, 2020).

*Count 6 (Counterfeiting):*  Plaintiffs focus on a single (mischaracterized) meeting between ICT's Alexander Pekar and HPFS's JT Silvestri in Massachusetts,[13] along with ICT's and Styller's residency in Massachusetts, to the exclusion of conduct, circumstances, and claimed injuries spanning the globe. *See* Def. Br. at 34 (cataloging relevant facts). But a 93A "center of gravity" analysis requires the Court to consider "the context of the *entire* § 11 claim." *Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp.*, 483 Mass. 459, 473 (2003). Even "if the significant contacts of the competing jurisdictions"—India, China, New Jersey, and Massachusetts—"are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005); *see also ADA Sols., Inc. v. Meadors*, 98 F. Supp. 3d 240, 267 (D. Mass. 2015) (holding at summary judgment that although "at least some of the discussions giving rise to the transaction at issue occurred in Massachusetts . . . [and] that is where the aggrieved party [] is based and where it may have suffered harm," Massachusetts was not the center of gravity).[14]

---

[13] The Opposition says Pekar "had meetings with HPFS employees to discuss the deal in Andover, Massachusetts, during which they misrepresented the state and nature of the equipment several times." Opp. at 37 (citing SOF ¶ 77). Those various plurals find no support in the SOF, which cites a ***single*** meeting with a ***single*** HPFS employee, and ***zero***—let alone "several"—misrepresentations.

[14] Massachusetts law "place[s] little weight" on ICT's and Styller's place of injury, which in any event must be taken together with the Individual Plaintiffs' claimed injuries in China—the core of the claim. *Kuwaiti Danish*, 438 Mass. at 472 n. 13.  And the choice-of-law provision in the RRSA does not alter the balance because Plaintiffs' 93A claims "sound in tort, rather than in contract." *See Plastic Surgery Assocs., S.C.*, v. *Cynosure, Inc.*, 407 F. Supp. 3d 59, 78 (D. Mass. 2019).

*Count 8 (Conspiracy)*:  By the same principles, as explained in Defendants' opening brief, Count 8 is even further removed from Massachusetts.  Def. Br. at 35.[15]

*Individual Plaintiffs*:  The Individual Plaintiffs advance no center-of-gravity argument.[16] They did not participate in the Massachusetts meeting, were not parties to any communication at issue, and (except for one unrelated visit by Jade) had never been to Massachusetts before suing in this Court.  Their 93A claims should be summarily dismissed.

### IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COUNTERCLAIMS ON THE ISSUES OF BREACH AND INDEMNIFICATION.

Plaintiffs implicitly concede that ICT's customs violations breach the RRSA.  Opp. at 39. They argue only that "the genuine dispute over Defendants' earlier breach precludes summary judgment" on Defendant's counterclaim.  *Id.* at 40.  But Defendants do not seek summary judgment on the entire counterclaim—only on the question of breach, which Plaintiffs have now conceded. Similarly, nothing in Plaintiffs' response to the indemnity counterclaim contradicts item (i) of the limited relief Defendants seek, and the Court may simply modify item (ii) to account for Defendants' gross negligence caveat.  *See* Opp. at 40; Def. Br. at 39.  Summary judgment should enter on the Counterclaims as Defendants requested.

### CONCLUSION

The Court should grant the relief specified in the Conclusion to Defendants' opening brief.

---

[15] Plaintiffs selectively quote Defendants' previous statement that "many other communications that may have touched China . . . were sent or received in Massachusetts."  Opp. at 38.  But that quote continues: ". . . *or other forums* that recognize an attorney-client privilege, *such as India and Australia*."  ECF 257 at 12.  The full, unaltered quote makes clear that Defendants were discussing an issue unrelated to the 93A claims.  More importantly, it confirms that Massachusetts is just one of many forums from and to which communications were sent and received, underscoring that Massachusetts is *not* the center of gravity.

[16] *Republic of Turkey v. OKS Partners*, cited on page 38 of the Opposition, addresses whether a foreign government qualifies as a "person" under chapter 93A.  797 F. Supp. 64, 68 (D. Mass. 1992).  It says nothing material to this case, or helpful to the Individual Plaintiffs.

Dated: August 16, 2021

Respectfully submitted,

/s/ *Michael H. Bunis*
Michael H. Bunis (BBO No. 566839)
G. Mark Edgarton (BBO No. 657593)
Kevin C. Quigley (BBO No. 685015)
**CHOATE HALL & STEWART LLP**
Two International Place
Boston, Massachusetts  02110
(617) 248-5000
mbunis@choate.com
medgarton@choate.com
kquigley@choate.com

Anthony P. Callaghan
Paul A. Saso
**GIBBONS P.C.**
One Pennsylvania Plaza, 37th Floor
New York, New York, 10119
(212) 613-2000

*Counsel for Defendants*

10443827v2