UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTEGRATED COMMUNICATIONS & TECHNOLOGIES, INC. et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil No. 16-10386-LTS |
| HEWLETT-PACKARD FINANCIAL SERVICES COMPANY et al., | ) ) ) |
| Defendants. | ) ) |

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT (DOC. NO. 513) AND TO STRIKE (DOC. NO. 537)

November 22, 2021

SOROKIN, J.


I.    BACKGROUND

A terrible course of events happened to Jade Cheng, Cathy Yu, and Jason Yuyi ("the

Individual Plaintiffs) in 2012.  At that time, the Individual Plaintiffs were Chinese citizens living

in China.  Unified Statement of Facts[1] ("SOF"), Doc. No. 526 ¶ 81.[2]  The Individual Plaintiffs

worked together in China selling used computer equipment for their employer Integrated

Communications & Technologies, Inc. ("ICT") (Alexander Styller Aff., Doc. No. 101-2 ¶ 35), a

---

[1] The Court cites to Doc. No. 526 when referencing the Unified Statement of Facts.  An amended
version of the SOF appears at Doc. No. 553-3, Ex. C.  The amended version corrects an
erroneous citation that appears in paragraphs 48 and 56 of the original SOF, see Doc. No. 553 ¶¶
1-7 (explaining the error), but is otherwise identical to Doc. No. 526.  The Plaintiffs have also
submitted a corrected version of the exhibit erroneously cited to in the original SOF, which
appears at Doc. No. 553-2, Ex. A.
[2] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing
system; pincites are to the page numbers in the ECF header.

company based in Massachusetts (Doc. No. 520-91, Ex. 88).  During this time, the Individual

Plaintiffs were marketing equipment branded by H3C Technologies Co., Ltd. ("H3C"), some of

which ICT obtained from the Defendant HPFS India and some obtained from another source.

Alexander Styller Aff., Doc. No. 331-15 ¶ 10.  In December 2012, H3C, a Chinese company and

a subsidiary of Hewlett Packard, complained to the Beijing Public Safety Bureau ("PSB") that

the Individual Plaintiffs were selling counterfeit H3C goods in China.  Stuart Patterson Dep.,

Doc. No. 520-95, Ex. 92 at 116:15-18.  Apparently in response to H3C's complaint, the Chinese

authorities searched the apartment that the Individual Plaintiffs used as an office/warehouse,

seized goods, and apprehended Yu and Yuyi, who were present at the time of the raid.  SOF,

Doc. No. 526 ¶¶ 6, 84.  About ten or eleven days later, Cheng went to the Chinese authorities to

investigate the disappearance of his colleagues; he was then apprehended as well.  Id. ¶ 7, Jade

Cheng Aff., Doc. No. 101-1 ¶¶ 33, 76-77.

      The Individual Plaintiffs spent the next seven months in jail.  During the time the three

spent at the Haidian Detention Center in Beijing, they allege (1) that guards in the prison abused

and mistreated them; (2) that other prisoners threatened them without intervention by the guards;

(3) that the Chinese authorities cut them off from communication with their families; and (4) that

the Chinese authorities violated various Chinese laws governing arrest, detention, and

prosecution.  SOF, Doc. No. 526 ¶¶ 133-35; Jade Cheng Aff., Doc. No. 101-1 ¶¶ 78-79, 86-88,

91-92, 101-102, 111, 144; Cathy Yu Aff., Doc. No. 520-106, Ex. 103 ¶¶ 11-18; Jason Yuyi Aff.,

Doc. No. 520-107, Ex. 104 ¶¶ 13-22; Daniel Chow Report, Doc. No. 515-17 ¶ 98.  The Chinese

authorities released the Individual Plaintiffs from jail two days after Yuyi's criminal defense

lawyer informed the Chinese prosecutor that H3C's own online product authentication tool

verified that the goods seized by the police were genuine H3C products.  SOF, Doc. No. 526 ¶

10.  Thereafter, the criminal charges were dismissed.  There is no indication in the record that H3C ever objected to or challenged the results of the authentication check or the dismissal of charges.

The Individual Plaintiffs never sued the Chinese authorities for the alleged violations of Chinese law.  They never sued the guards for the abuse they describe.  They never sued the inmates for the harm they inflicted.  They never sued H3C for making the complaint or, indeed, any of its actions, even though it was H3C's complaint that resulted in their arrest and imprisonment.  Nor did any other Plaintiff—ICT, its CEO Alexander Styller, or the family members of the Individual Plaintiffs—sue any of the foregoing.

Instead, in this case, the Individual Plaintiffs, ICT, Styller, and many family members of the Individual Plaintiffs seek compensation for these injuries from others.  Second Amended Complaint ("SAC"), Doc. No. 101 ¶¶ 1-14.  Lawsuits seeking compensation for injuries allegedly suffered at the hands of police allegedly violating the law are not unusual in federal court.  This case is, however, unusual.  It is a lawsuit brought (substantially) by citizens of China seeking compensation under the laws of Massachusetts for injuries suffered in China in the course of a criminal prosecution under the laws of China due to the activities of Chinese law enforcement officials undertaken at the request of a Chinese company and prompted by events that occurred within China.  There are other unusual features of this case:

- As soon as the Chinese police detained Jade Cheng, he instructed ICT to "destroy" all the emails and other documents possessed by the Individual Plaintiffs.  ICT complied, immediately destroying the documents.  Order on Mot. for Spoliation Sanctions, Doc. No. 368 at 2-3.

- Although the Individual Plaintiffs secured their release and the termination of their criminal prosecution by producing evidence that they were selling genuine H3C goods, in this lawsuit they contend that they were not selling genuine H3C goods. See generally Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519.

- The lawyer representing the Plaintiffs for the vast majority of this lawsuit repeatedly committed misconduct.  See Order Concerning Att'y Discipline Under Local Rule 83.6.5, Doc. No. 448; Farrell v. Joffe, No. 21-91017-WGY (D. Mass. Sept. 7, 2021); Notice of Appeal of Order Imposing Discipline, No. 21-91017-WGY, Doc. No. 15. Plaintiffs are now represented by different counsel who bear no relationship to or responsibility for that misconduct.

The Court notes the unusual features of the case as they, along with the serious nature of the harm described by the Individual Plaintiffs, largely explain the five-year duration of this lawsuit.  During this time, the parties have had ample opportunity to conduct discovery, mediate the case to attempt to reach a voluntary settlement of their dispute, and raise for consideration by the Court any matter of concern to any party.  Trial in this matter commences on February 7, 2022.  Pending before the Court now is the Defendants' Motion for Summary Judgment.  The parties have briefed the Motion extensively, the Court having permitted each side to file briefs substantially longer than permitted by the Local Rules in light of the myriad issues raised by the claims and defenses.  The Court now turns to resolve the Motion, addressing each claim advanced in the SAC in turn and thereafter the Counterclaims advanced by the Defendants upon which they seek partial summary judgment.  In doing so, the Court also resolves a related Motion to Strike filed by the Defendants.  As in all matters, the Court starts with subject matter jurisdiction.

II.   JURISDICTION

The Court is "under an unflagging duty to ensure that it has jurisdiction over the subject matter of the cases it proposes to adjudicate."  Am. Policyholders Ins. Co. v. Nyacol Prod., Inc., 989 F.2d 1256, 1258 (1st Cir. 1993).  Accordingly, the Court sua sponte examines its subject matter jurisdiction here and finds that diversity jurisdiction exists.  Plaintiffs do not advance a federal claim, have never sought to advance a federal claim, and have never contended that a state law claim implicates a question of federal law sufficiently to give rise to a federal question.

Thus, the Court lacks so-called federal question subject matter jurisdiction under 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1332(a)(3), the Court has diversity jurisdiction where a matter in controversy exceeds $75,000 and is between "citizens of different States and in which citizens or subjects of a foreign state are additional parties[.]"

Here, the Plaintiffs are Alexander Styller (a citizen of Massachusetts (SAC, Doc. No. 101 ¶ 1)), ICT (a citizen of Massachusetts (SAC, Doc. No. 101 ¶ 2)), Jade Cheng (a citizen of New Hampshire (SAC, Doc. No 101 ¶ 3)), Caroline Marafao Cheng (a citizen of Brazil[3] (SAC, Doc. No 101 ¶ 7)), and Jason Yuyi, Cathy Yu, Pushun Cheng, Changzhen Ni, Junfang Yu, Meixiang Cheng, Fangshou Yu, and Changhua Ni (all citizens of China (SAC, Doc. No 101 ¶¶ 4-5, 8-13)).  The Defendants are HPFS India (a citizen of India (Answer by HPFS India, Doc. No. 108 at 47)), Hewlett-Packard Financial Services Company ("HPFS") (a citizen of Delaware and New Jersey (Answer by HPFS, Doc. No. 107 at 46)), HP Inc., ("HPI") (a citizen of Delaware and California (Answer by HPI, Doc. No. 123 at 46)), Hewlett Packard Enterprise Company ("HPE") (a citizen of Delaware and California (Answer by HPE, Doc. No. 106 at 47)), and David Gill (a citizen of New South Wales, Australia (Answer by David Gill, Doc. No. 131 ¶ 20)).

The requirements of diversity of citizenship jurisdiction are met here because there is complete diversity between the U.S. Plaintiffs and Defendants.  The existence of additional foreign individuals on both sides does not defeat diversity jurisdiction under 28 U.S.C. § 1332(a)(3) because they constitute additional parties to the U.S. citizens present on both sides.  Yarala v. Star Health & Allied Ins. Co. Ltd., No. 12-CV-11849-IT, 2014 WL 12689938,

---

[3] Alternatively, Caroline Cheng may be a citizen of New Hampshire for diversity purposes, Paparella v. Idreco Inv. S.p.A., 858 F. Supp. 283, 284 (D. Mass. 1994), that, however, would not affect the subject matter jurisdiction of this Court.

at *3 (D. Mass. July 11, 2014).  The Court now turns to the pending Motion for Summary Judgment.

III.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

On a motion for summary judgment, courts are "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  At the same time, courts may not credit "conclusory allegations, improbable inferences, and unsupported speculation."  Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008).

IV.   THE STATEMENT OF FACTS

The Unified Statement of Facts is lengthy, encompassing 170 factual assertions.  In many instances, the Plaintiffs respond not only with citations to portions of the record supported by brief explanations, but lengthy argument.  See, e.g., SOF, Doc. No. 526 ¶¶ 1, 3, 17.  As the Court analyzes each of the claims in the SAC, it describes and addresses the facts relevant to that claim

and applies the familiar summary judgment standard.  The Court presumes familiarity with the

general factual background of this case as well as its course since filing in 2016.  See Order on

Mot. for Leave to Amend, Doc. No. 95; Scheduling Order, Doc. No. 312 (establishing a trial date

of May 3, 2021); Doc. No. 326 (bifurcating the trial of the claims brought by certain family

members of the Individual Plaintiffs); Order on Summ. J., Doc. No. 369; Order on the Joint Mot.

to Amend the Scheduling Order, Doc. No. 447 (establishing a trial date of February 7, 2022);

Order on Pls.' Mot. for Leave to Supplement, Doc. No. 474; Order on Pls.' Mot. for

Reconsideration, Doc. No. 490.

V.   COUNT I: FRAUDULENT MISREPRESENTATION[4]

Count I of the SAC alleges a fraudulent misrepresentation claim against the "HPFS

Defendants"[5] on behalf of ICT, Styller, and the Individual Plaintiffs.[6]  SAC, Doc. No. 101 at 64.

Specifically, the Plaintiffs assert that the HPFS Defendants fraudulently misrepresented that they

were selling "genuine H3C equipment manufactured by HP's wholly-owned Chinese

manufacturer H3C."  Id. ¶ 238.  Plaintiffs bring their fraudulent misrepresentation claim under

Massachusetts law.[7]  The claim requires, inter alia, a knowing misrepresentation.  See, e.g., Rodi

---

[4] Counts I through VI are often referred to by the parties as "the counterfeiting claims."

[5] The SAC advances Count I against the "HPFS Defendants" and uses this term frequently
without definition.  The Court reads the term to include HPFS and HPFS India.  That the
Plaintiffs bring Count X against "the HPFS Defendants and Defendant Gill," thereby not
including Defendant Gill, the Assistant General Counsel and Assistant Secretary of HPFS, within
the term "HPFS Defendants," confirms the Court's conclusion that he is not included in the term
"HPFS Defendants" as the Plaintiffs use it.  SAC, Doc. No. 101 at 87.

[6] The Defendants argue that the Individual Plaintiffs cannot bring their fraudulent
misrepresentation (Count I), negligent misrepresentation (Count II), or related 93(A) (Count VI)
claims against the HPFS Defendants because "the Individual Plaintiffs never received, and were
never privy to, those alleged misrepresentations."  Defs.' Mot. for Summ. J., Doc. No. 514 at 10.
The Court need not resolve this issue because Counts I, II, and VI fail for the reasons discussed
in the text.

[7] Several factors support this conclusion.  Plaintiffs originally filed their complaint in the courts
of the Commonwealth of Massachusetts before the case was removed to this Court (Doc. No. 1-

<u>v. S. New England Sch. of L.</u>, 532 F.3d 11, 15 (1st Cir. 2008) (emphasis added) ("[T]o recover for fraudulent misrepresentation [the plaintiff] must allege and prove that: (i) the defendants made a false representation of a material fact with <u>knowledge of its falsity</u> for the purpose of inducing him to act thereon, (ii) he relied upon the representation as true and acted upon it to his detriment, and (iii) that his reliance was reasonable under the circumstances."); <u>Masingill v. EMC Corp., 870 N.E.2d 81, 88 (Mass. 2007)</u> (emphasis added) (<u>quoting</u> <u>Kilroy v. Barron</u>, 95 N.E.2d 190, 191 (Mass. 1950)) ("To recover for fraudulent misrepresentation, a plaintiff 'must allege and prove that the defendant made a false representation of a material fact with <u>knowledge of its falsity</u>[.]'").  Thus, to proceed on this claim in the face of a motion for summary judgment, the Plaintiffs must marshal sufficient evidence under the non-movant-friendly summary judgment standard to permit a reasonable jury to conclude both that (1) the goods sold by HPFS India to ICT were not genuine H3C equipment, and (2) the HPFS Defendants knew that the goods were not genuine H3C equipment at the time of the sale and nonetheless represented them as genuine.  The motion for summary judgment as to this claim is ALLOWED for the three reasons discussed below.

---

1).  This Court sits in Massachusetts, thus Massachusetts choice of law rules govern the determination of what law applies.  <u>Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas</u>, 571 U.S. 49, 65 (2013) ("[A] federal court sitting in diversity ordinarily must follow the choice-of-law rules of the state in which it sits.").  The parties consistently refer to Massachusetts law as applied by the courts of the Commonwealth or the federal courts within the First Circuit, and no party has argued that the law of a jurisdiction other than Massachusetts applies.  <u>See generally</u> Defs.' Mot. for Summ. J., Doc. No. 514; Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519.  Finally, the contract between the parties contains a Massachusetts choice of law provision.  Referral and Revenue Share Agreement ("RSSA"), Doc. No. 520-19, Ex. 16 at 14.  Thus, the Court applies the law of Massachusetts to all claims advanced by the Plaintiffs.

A. <u>Evidence of the Defendants' Knowledge that the Equipment was Not Genuine</u>

First, the Plaintiffs have failed to submit evidence sufficient to conclude that the HPFS

Defendants <u>knew</u> that the equipment was not genuine H3C equipment at the time of the sale.  For

purposes of this issue only, the Court assumes without deciding that the goods sold were in fact

not genuine.  The Plaintiffs point to the following evidence in support of their claim that the

Defendants knowingly misrepresented that the goods were genuine:

- "[N]o one from HP or any of its subsidiaries ever laid eyes on any of the goods before selling them to ICT[.]"  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 3; Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 123:5-8 (explaining that "nobody from HPFS saw" the equipment prior to its sale to ICT); <u>id.</u> at 129:21-25, (conceding that not inspecting equipment prior to its sale creates risks, including that HPFS "would unknowingly process a counterfeit product").

- HPFS India did not confirm the equipment's authenticity prior to the ICT sale.  <u>Id.</u> at 24:16-20 ("As a lessor, HP is a passive financier.  We don't physically inspect product. That's the responsibility of the customer working with the reseller."); New Final Letter, Doc. No. 515-9 at 3 (explaining that HPFS India neither chose nor inspected the equipment that it leased to Tata Consultancy); Thomas Harris Dep., Doc. No. 520-92, Ex. 89 at 107:16-108:24 (stating that HPFS did not confirm that Inspira purchased the equipment directly from H3C).

- The equipment returned after the lease expiration was not in the "practically new" condition discussed by the parties during negotiations.  Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-31, Ex. 28 (referencing Tom Harris's October 2012 inspection of the equipment, which raised concerns about the equipment's labeling, packaging, and cleanliness as well as the security in the TT Global site where the equipment was stored); Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-29, Ex. 26 at 2 ("The units have multiple stickers, top and bottom, I believe all should be removed.").

- Neither the HPFS Defendants (nor any Defendant) told the Plaintiffs that HPFS India was unable to obtain the importation documents from Inspira (the original seller of the goods), documents that might be necessary for exportation of the goods from India.[8]  Pls.' Opp.

_____

[8] Plaintiffs assert that Defendants still do not know where Inspira obtained the goods returned to the HPFS Defendants' agent TT Global or whether H3C manufactured the equipment that ICT's broker Shinto ultimately sent to ICT.  SOF, Doc. No. 526 at 2.  While an employee of HPFS did testify that, at the time of discovery, Defendants were "not certain" from where Inspira obtained the equipment (Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 110:15-18), the equipment's origin was not a concern raised by any facts known to the HPFS Defendants at the time of the

to Defs.' Mot. for Summ. J., Doc. No. 519 at 16 (quoting Email from HPFS to Inspira, Doc. No. 520-12, Ex. 9 at 2); Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 138:5-11 (stating that HFPS "didn't tell [ICT] about the failure to find the Inspira documents" or "the internal concerns about exportation without documents").

For the reasons discussed below, neither individually nor collectively does this evidence support a reasonable inference, let alone provide a sufficient basis to conclude, that the HPFS Defendants knew the goods were not genuine H3C equipment when sold.  That the leaseholder (Tata Consultancy Services) returned the goods to an agent (TT Global) of the lessor (HPFS India) retained for the purpose of processing the equipment's return and storage without an independent inspection by the Defendants is hardly evidence that the goods were not genuine.  The Plaintiffs have failed to produce any evidence that this process followed by the HPFS Defendants: departed from industry custom, was likely to result in the sale of non-genuine equipment, ignored meaningful signs of non-genuine goods, or was otherwise untoward.  Similarly, the missing importation documents from Inspira, an authorized HP seller, cannot support an inference that the Defendants knew that the goods were not genuine.  The evidence in the record establishes only that the Defendants were aware that the documents were necessary for the equipment's export; it does not suggest that the Defendants were on notice that the goods were not genuine due to the absence of the documents.

The substandard condition of the remaining installments of equipment not sold to ICT, which was revealed during an inspection, is of no assistance to the Plaintiffs.[9]  This inspection

_____

sale to Shinto for resale to ICT.  Similarly, that an employee of the Defendants testified during discovery that he did not know, based on his personal knowledge, whether H3C manufactured the goods sold by the HPFS Defendants to Shinto for resale to ICT is barely, if at all, probative that the HPFS Defendants knew years earlier that the goods sold were not genuine.

[9] The inspected goods were shipments 2, 3, and 4 of goods returned to TT Global and originally part of HPFS's sale to ICT.  These installments were never shipped to ICT due to their poor condition.  SAC, Doc. No. 526 ¶ 122; Alexander Styller Aff., Doc. No. 101-2 ¶ 41.

occurred in October of 2012 (Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-31, Ex. 28 at 3-4; Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-29, Ex. 26 at 4), months after both the agreement was finalized (RSSA, Doc. No. 520-19, Ex. 16 at 5) and the goods at issue were shipped to China (SOF, Doc. No. 526 ¶ 4).  The inspection also occurred months after ICT received the goods in China (Pls.' Email Correspondence, Doc. No. 344-3 at 2) and well after ICT recognized that the goods it received were in substandard condition (id.).  The inspection is therefore not evidence that the HPFS Defendants made a knowing misrepresentation when they described the goods as "genuine H3C" equipment to ICT months earlier.  Of course, the October 2012 inspection was conducted jointly by representatives of the HPFS Defendants and ICT. SAC, Doc. No. 101 ¶ 50; Alexander Styller Aff., Doc. No. 101-2 ¶ 41.  There is no contemporaneous record of ICT's Representative's observations of the inspection because ICT failed to preserve his email despite an obligation to do so.  Order on Mot. for Spoliation Sanctions, Doc. No. 368 at 4-5.

Simply put, Plaintiffs have not shown that the HPFS Defendants knowingly misrepresented that they were selling "genuine H3C" equipment, an essential element of Count I. Nothing suggests that the HPFS Defendants believed the equipment to be not genuine at the time of the sale.  Thus, on this basis alone, the Motion for Summary Judgment is ALLOWED as to Count I.[10]

---

[10] Some Massachusetts authority suggests that a reckless or willful disregard of the truth of a statement can support a claim of fraudulent misrepresentation.  Demers et al., Business Torts in Massachusetts Chapter 1 Ex. 1C (2nd ed. 2016).  Even under the deferential summary judgment standard, the Plaintiffs cannot show that the HPFS Defendants recklessly or willfully disregarded the truth.  In addition, there is a line of Massachusetts cases referencing Page v. Bent, 2 Met. 371, 374 (Mass. 1841), in which Chief Justice Shaw stated that "[t]he principle is well settled, that if a person make a representation of a fact, as of his own knowledge, in relation to a subject matter susceptible of knowledge, and such representation is not true; if the party to whom it is made relies and acts upon it, as true, and sustains damage by it, it is a fraud and deceit, for which

B. <u>Evidence that the Goods were Not Genuine</u>

      1. *The Admissibility of the Verification Report*

Count I fails for a separate and independent reason: the Plaintiffs have failed to marshal sufficient evidence to establish that the goods sold were not genuine. Previously, the Court determined that the Plaintiffs had presented enough evidence to allow a reasonable jury to infer that the goods were not genuine. Order on Summ. J., Doc. No. 369 at 23-25. The Court did so based on the slender reed of a single "Verification Report" authored by H3C asserting that the goods were not genuine due to various inconsistencies in their labeling, packaging, and appearance. <u>Id.</u> at 6. In that Order, the Court ruled the Verification Report admissible only under Federal Rule of Evidence 801(d)(2)(D) as a nonhearsay statement of an opposing party's agent. <u>Id.</u> at 15. The Court's ruling was based on HPFS India's Old Final Letter[11] sent to the PSB, which stated that the H3C inspection that might have given rise to the Verification Report

---

the party making it is responsible." <u>Powell v. Rasmussen</u>, 243 N.E.2d 167, 168-69 (Mass. 1969). The Plaintiffs have not advanced this line of cases or theory at all and thus they have waived this argument. In any event, nothing in the record suggests that the HPFS Defendants represented the goods as genuine H3C goods "of [their] own knowledge." <u>Id.</u>; <u>cf.</u> <u>Chatham Furnace Co., v. Moffat</u>, 18 N.E. 168, 169 (Mass. 1888) (finding false defendant's statement that iron ore within defendant's land as shown on a survey when the defendant knew the survey was not a "real" survey of his land); <u>Damon v. Sun Co.</u>, 87 F.3d 1467, 1479-80 (1st Cir. 1996) (finding the defendant's false representation was "susceptible of knowledge" when defendant told the plaintiff that there had been no problem with the land when in fact there had been gasoline spill on the property). Here, the HPFS Defendants made no express representations of genuineness or statements asserting that their representations were "of their own knowledge." The HPFS Defendants never possessed or inspected the goods prior to sale and nothing suggested they had. Moreover, this case does not concern real property and the relevant contracts disclaimed prior oral and written representations (RSSA, Doc. No. 520-19, Ex. 16 at 13) and did nothing more than list the goods by item number (<u>id.</u> at 7).

[11] The Court follows the nomenclature of the parties terming the March 25, 2013 draft letter from Gill (Doc. No. 520-62, Ex. 59) the "March Draft Letter," the April 22, 2013 letter from Gill cited in the Court's original summary judgment decision (Doc. No. 331-4) the "Old Final Letter," and the April 22, 2013 signed letter from Gill relied upon by the Defendants in this renewed motion for summary judgment the "New Final Letter" (Doc. No. 515-9).

was performed "on behalf of" HPFS India.  Id.  The Court now revisits the admissibility of this

Verification Report.[12]

The Verification Report is not admissible.  After the Court's prior summary judgment

ruling (Doc. No. 369) the Defendants supplemented the record regarding the Old Final Letter

relied upon by the Court to determine that the Verification Report arose from an inspection that

H3C performed "on behalf of" HPFS.  Status Report by the Parties, Doc. No. 390.  Specifically,

David Gill, the author of the relevant letter, testified that prior to the submission of his letter to

the Chinese authorities he learned from Meng Tao, an employee of HP China, that: (1) the Old

Final Letter was incorrect in stating that H3C (a) inspected the goods "on behalf" of HPFS India

and (b) obtained a list of the seized goods for HPFS, and (2) that Tao knew of the errors because

he had obtained the list for HP China.  SOF, Doc. No. 526 ¶¶ 26-35; David Gill Dep., Doc. No.

515-10 at 288:10-15, 289:25-290:16, 303:22-315:17; Doc. No. 515-11 ¶¶ 5-7 (referencing the

New Final Letter (Doc. No. 515-9)).  Gill further explained that the errors arose from his twin

mistaken beliefs that Tao worked for H3C rather than HP China and had in fact inspected the

goods.[13]  SOF Doc. No. 526 ¶ 34; Doc. No. 515-10 at 288:10-15, 289:25-290:16, 303:22-315:17.

---

[12] The Court previously declined to revisit its ruling on the Verification Report in response to
supplemental information from the Defendants.  Doc. No. 399.  This ruling, however, came
before the Plaintiffs completed deposition discovery; before the Plaintiffs filed (Doc. No. 419),
and subsequently withdrew (Doc. No. 444), a motion to compel regarding the New Final Letter;
before the parties proposed a revised schedule that included a new round of summary judgment
(Doc. No. 439) to which the Court ultimately agreed (Doc. No. 447); and before the parties fully
briefed the new round of summary judgment in which Defendants advance the contention that
the Verification Report is inadmissible for the reasons described in the text (Defs.' Mot. for
Summ. J., Doc. No. 514 at 6-7). These circumstances warrant revisiting the issue.
[13] In response to the Defendants' assertion that the Old Final Letter's discussion of a physical
inspection of the goods is inaccurate, the Plaintiffs argue "to the extent that the April 2013 Letter
was modified to correct Gill's 'misunderstanding,' at the time that 'Meng Tao had physically
inspected the equipment,' that correction is not reflected in Defendants' interrogatory
responses."  SOF, Doc. No. 526 ¶ 34.  The underlying interrogatory response that the Plaintiffs
cite does not confirm that Meng Tao conducted a physical inspection of the goods, but rather

Gill stated he then made corrections reflecting what he learned from Tao and arranged for the submission of the New Final Letter.  SOF, Doc. No. 526 ¶ 35; David Gill Dep., Doc. No. 515-10 at 303:22-315:17; Doc. No. 515-11 ¶ 7 (referencing the New Final Letter (Doc. No. 515-9)).  Neither the Plaintiffs' record citations nor their extensive arguments set forth in their memoranda and SOF materially dispute the foregoing evidence.  See generally SOF, Doc. No. 526 ¶ 26-35; Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 10-19.

No evidence contradicts Gill on these points and, for the purposes of summary judgment, these points are undisputed.  Nonetheless, the Court notes that other evidence conforms with the foregoing.  In his April 30, 2013 cover email, Gill informed Les Riordan, ICT's outside counsel, that he was sending a Mandarin version of the letter to the Chinese authorities.  Doc. No. 520-70, Ex. 67 at 5.  Gill told Riordan that he had made some "minor amendments" unrelated to "the sequence of events between HPFS India and ICT."  Id.  Of course, the deletion of the "on behalf of" language does not concern the sequence of events between ICT and HPFS.  Thus, the contemporaneous email confirms rather than contradicts Gill's testimony.  Another document submitted by the Plaintiffs shows that HP China wrote to the PSB requesting an opportunity to inspect the seized goods in April 2013.  Doc. No. 520-63, Ex. 60.  This is not evidence of an inspection by H3C on behalf of HPFS.  It is consistent with, rather than contradicting of, Gill's statement that he worked with Tao of HP China, who did not conduct an inspection of the seized goods.

---

states "[t]o the extent that a review or partial inventory of the Seized Equipment by the Defendants, or any of them, was permitted by the relevant Chinese authorities, the same was carried out or conducted by Meng Tao."  Response to Interrogatory No. 3, Doc. No. 249-11, Ex. J at 18.  This interrogatory response is dated April 17, 2019, well before the Defendants' alerted the Court to the mistake in October 2020 (Doc. No. 390).

In an attempt to link the Verification Report to the HPFS Defendants, the Plaintiffs point to evidence suggesting an agency relationship between HPFS and H3C to support the contention that all actions of and statements by H3C can be attributed to HPFS.  Pls.' Opp to Defs.' Mot. for Summ. J., Doc. No. 519 at 22 (quoting Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 10:5-19 (explaining that H3C was a wholly owned subsidiary of HP)); see also id. (quoting Paul Saso Decl., Doc. No. 258 ¶¶ 45-46 (explaining that H3C inspected TT Global equipment at the request of HPFS India)); Stuart Patterson Dep., Doc. No. 553-2, Ex. A at 138:7-11 ("HP had control over H3C's business strategy."); id. at 83:1-15 (stating that Jessica Liu was an HP employee charged with heading the H3C legal team).  As explained in the seminal Supreme Judicial Court decision on the topic of agency, "corporations are generally to be regarded as separate from each other . . . where there is no occasion to look beyond the corporate form for the purpose of defeating fraud or wrong[.]"  My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 751 (Mass. 1968) (citations omitted).  The minimal evidence that the Plaintiffs have presented does not support piercing the corporate veil as the "presumption of corporate separateness may be overcome only 'in rare particular situations in order to prevent gross inequity.'"  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 128 (1st Cir. 2006) (quoting My Bread Baking Co., 233 N.E.2d at 752).  The Plaintiffs do not even address the My Bread Baking Co. analysis, let alone establish a basis to pierce the corporate veil.  Thus, the Court rejects the Plaintiffs' agency argument.  Finally, even if H3C's statements can be attributed to H3C's corporate parent (and they cannot), the Plaintiffs brought Count I only against the two HPFS Defendants, neither of which is the corporate parent of H3C.  Therefore, this theory is of no assistance to Plaintiffs in any event.

Next, the Plaintiffs assert that "H3C drafted a Verification Report 'specifically generated at the direction of [Defendants'] counsel.'" SOF, Doc. No. 526 at 24 (quoting Doc. No. 258 ¶ 46). Here, Plaintiffs are confusing two different Verification Reports. There is no doubt that the March Draft Letter (Doc. No. 520-62, Ex. 59 at 4) and the Old Final Letter (Doc. No. 331-4 at 3) included the "on behalf of" language that the Court construed as reaching the Verification Report apparently submitted to the Chinese Authorities. Paragraph 46 of Doc. No. 258 cited by Plaintiffs says nothing about <u>this</u> Verification Report. Rather that paragraph discusses a different verification report prepared by H3C at the request of counsel. Doc. No. 258 ¶¶ 45-46. That other report "relates to two sample devices that were sent by TT Global to H3C." <u>Id.</u> ¶ 45. This is not evidence that H3C prepared the Verification Report at issue as an agent of HPFS. <u>See also</u> Order on Summ. J., Doc. No. 369 at 9 (explaining the distinction between the two Verification Reports).

Finally, the Plaintiffs point out that H3C undertook at least two different acts on behalf of HPFS: (1) H3C transmitted Gill's letter to the Chinese authorities (Doc. No. 291 at 17) and (2) H3C examined two transceivers in TT Global's possession at the request of the Defendants' counsel (Doc. No. 258 ¶¶ 45-46). That H3C may have undertaken these actions on behalf of the HPFS Defendants does not establish either that H3C prepared the Verification Report at issue based on an inspection of the seized goods undertaken "on behalf of" HPFS India or that H3C was generally an agent of HPFS India.

Because the "on behalf of" language does not appear in the New Final Letter, the undisputed evidence removes the only basis for treating the Verification Report as admissible

nonhearsay under Rule 801(d)(2)(D).[14]  The Plaintiffs have also failed to link the Verification

Report to HPFS Defendants in any other way.  Without a basis to establish the admissibility of

the Verification Report, the Plaintiffs cannot rely upon it to oppose summary judgment.[15]

     Though the Court need go no further on this point, there is more.  The Plaintiffs submit

evidence that shows that H3C authored the Verification Report without HPFS India's permission

or knowledge.  One of the documents the Plaintiffs submit is Exhibit 65 (Doc. No. 520-68),

which, according to the Plaintiffs' attorney, is "a true and correct copy of the H3C cover letter

dated May 2, 2013."  Nikas Decl., Doc. No. 520 ¶ 66.  The letter, which is addressed to the PSB,

states: "[o]n December 9, 2012, per request of the Public Security Bureau, the H3C Brand

Protection Department conducted an on-site verification of a batch of 'H3C' brand transceivers."

Doc. No. 520-68, Ex. 65 at 3.[16]  This document says that H3C performed its inspection of the

seized goods on December 9, 2012, well before the Defendants learned in late January, 2013 of

the activities of the Chinese authorities.  Email Correspondence between ICT and HP, Doc. No.

---

[14] The Court rejects the notion that an erroneous statement (the "on behalf of" language in the Old Final Letter) in a document never sent (because the author realized and corrected the error before it was sent) results in the admission of an otherwise hearsay document (the Verification Report).

[15] Plaintiffs suggest the Verification Report is admissible for the nonhearsay purpose of showing "the effect of the words spoken on the listener."  Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 519 at 7 n.4.  This argument is of no assistance to the Plaintiffs; the relevant question for this Count is whether the Plaintiffs have submitted sufficient evidence to establish that the goods sold were not genuine H3C equipment.  The Plaintiffs concede that the nonhearsay purpose they advance concerns why the Chinese authorities detained the Individual Plaintiffs, a fact not at issue in Count I.

[16] An inspection by H3C on the day of the seizure of the challenged goods is, per the affidavit of the Plaintiffs' expert, unsurprising.  According to the Plaintiffs' expert, brand owners often assist with the enforcement and investigation of counterfeiting activities and help the PSB identify the counterfeit products.  Daniel Chow Report, Doc. No. 515-17 ¶¶ 38-41.

515-35, Ex. 36 at 2-3.  It also says H3C conducted the inspection at the "request" of the PSB,

i.e., not HPFS India.  Thus, the inspection was not undertaken "on behalf of" HPFS India.[17]

Accordingly, the Court VACATES its prior ruling that the Verification Report is

admissible as the statement of an agent of a party-opponent and concludes that the Verification

Report is not admissible.[18]

2. *The Remaining Evidence that the Goods were Not Genuine*

Without the Verification Report, the Plaintiffs are left with virtually no evidence that the

goods sold were not genuine H3C equipment.  The evidence remaining is outlined below:

- The Defendants' inability to obtain the importation documents from Inspira.  Email from HPFS to Inspira, Doc. No. 520-12, Ex. 9 at 2; Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 138:5-11.

- That HPFS did not confirm the equipment's authenticity prior to the ICT sale.  Id. at 24:16-20; New Final Letter, Doc. No. 515-9 at 3, Thomas Harris Dep., Doc. No. 520-92, Ex. 89 at 107:16-108:24.

---

[17] Indeed, at the time of its original summary judgment ruling, the Court warned that "the counterfeit issue is far from settled" and observed that the "Verification Report . . . [might describe] an inspection conducted by H3C prior to HPFS India's learning of the arrests" (Doc. No. 369 at 24-25).  That fact, of course, renders the Verification Report inadmissible.

[18] The Defendants assert that the Court should determine whether the Verification Report is admissible under the rubric of Federal Rule of Evidence 104(a).  In particular, the Defendants contend that the Court must determine the admissibility of the Verification Report using the preponderance of the evidence standard, rather than the summary judgment standard under Federal Rule of Civil Procedure 56, which requires all reasonable inferences to be drawn in favor of the non-movant.  United States v. Garza, 435 F.3d 73, 77 (1st Cir. 2006) ("Questions of admissibility are decided by the court, Fed. R. Evid. 104(a), using the preponderance of the evidence standard.").  Because the Court determined that the Verification Report is inadmissible even under the summary judgment standard, which is more favorable to the Plaintiffs, the Court does not reach the question of whether the preponderance of the evidence standard applies in the present context and precludes the drawing of inferences in favor of Plaintiffs.  There is, however, authority that tends to support the Defendants' position.  See Glob. Med. Sols., Ltd v. Simon, No. CV1204686MMMJCX, 2013 WL 12065418, at *11 n.112 (C.D. Cal. Sept. 24, 2013) ("The fact that the court has determined the admissibility of the emails under Rules 104(a)['s preponderance of the evidence standard] and 801(d)(2) does not conflict with application of the summary judgment standard.").

- The results of the October 2012 inspection, which raised concerns about the equipment's labeling, packaging, and cleanliness as well as the security in the TT Global site where the equipment was stored. Defs.' Email Correspondence, Doc. No. 520-31, Ex. 28.

- That the Chinese authorities detained the Individual Plaintiffs and later released them, dismissed the prosecution, and issued no criminal record letters. Doc. No. 520-84, Ex. 81.

- The language in the March Draft Letter by Gill stating that "the seized equipment is counterfeit" (Doc. No. 520-62, Ex. 59 at 4[19]) and the language in the New Final Letter stating that "some of the sold equipment supplied by Inspira were not originally from HP" (Doc. No. 515-9 at 5).

- That TT Global, at the direction of the HPFS Defendants, recycled the unsold Commonwealth Games goods (shipments 2, 3 and 4) (Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 87:2-16) sometime after an internal HPFS email exchange in which one employee referred to the origin of the equipment as "questionable" when describing the goods in TT Global's possession (Doc. No. 520-69, Ex. 66 at 2).

- That the Defendants' expert, Shelley Raina, determined that 31 of the 781 seized transceivers returned by the PSB were "counterfeit," in the sense that they are not genuine H3C goods. Doc. No. 515-3 at 3.[20]

Neither individually nor collectively is this evidence sufficient to create a genuine question of material fact regarding the equipment's authenticity, which the Plaintiffs must raise to survive summary judgment. The lack of proof of the equipment's source in the form of importation documents suggests only that the Defendants knew that export of the goods outside of India would be difficult, not that the goods were non-genuine. That the Defendants did not inspect the equipment prior to the sale, has little, if any, bearing on the issue of genuineness, especially given the lack of evidence that a failure to inspect has resulted in the sale of non-

---

[19] This letter was inadvertently cited, incorrectly, as "Doc. No. 311 at 4," in the Court's original summary judgment decision (Doc. No. 369) on page 24.

[20] The Plaintiffs' expert report authored by Dr. Nicholas Fang cannot support the claim that the equipment was non-genuine. In the Court's earlier summary judgment ruling, it determined that Fang's "opinions that the Seized Transceivers are counterfeit are STRUCK." Doc. No. 369 at 21. Plaintiffs have never sought reconsideration of that ruling nor does the current summary judgment record provide a basis for reconsidering that ruling.

genuine goods in the past or that the failure of HPFS India to perform an inspection departed from industry practice. Similarly, the "counterfeit" statement in the March letter appeared in an unsigned draft with every page stamped with a large "DRAFT" watermark. Doc. No. 520-62, Ex. 59. Neither the Old nor the New Final Letter contained this statement. The statement in the New Final Letter that "some of the sold equipment supplied by Inspira were not originally from HP" (Doc. No. 515-9 at 5) is only a reflection of HPFS's knowledge at the time, which was incomplete and evolving.

There is no indication based on the evidence cited by the Plaintiffs that the October 2012 inspection should have or did trigger concerns about the equipment's genuineness, either by HPFS or ICT. See Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-31, Ex. 28 (referencing Tom Harris's October 2012 inspection of the equipment, which raised concerns about the equipment's labeling, packaging, cleanliness, and security, but not its genuineness); Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-29, Ex. 26 at 2 (same). Nor did ICT ever raise a question regarding the bona fides of the goods it purchased during the many months it possessed and sold them in China before the Individual Plaintiffs' apprehension. This evidence may suggest that the goods were in substandard condition, but this fact, without more evidence that the way in which they were substandard is suggestive of non-genuineness, does not establish that the goods were not genuine.

Finally, the Defendants' decision to recycle the remaining TT Global goods is not sufficient evidence to support the contention that the goods were non-genuine. There are many business reasons, other than that the goods were non-genuine, why the Defendants may have chosen to recycle substandard goods with a "questionable origin," including that the absence of the original import documents from Inspira or the events in China might preclude purchase by

commercial buyers.  Especially when viewed alongside the subsequent evidence suggesting that

the goods were genuine, see infra at 22-23 (discussing Ma Li's affidavit), the destruction of the

equipment cannot support a reasonable inference that the goods were non-genuine.

Instead of raising a genuine dispute about the equipment's genuineness, the cited

evidence sounds in a less than perfect business transaction in which the Defendants sold ICT

fairly used goods with insufficient documentation for resale in a country other than India rather

than the nearly new equipment ICT was expecting.  Even when the evidence is viewed

collectively, it does not support the notion that the goods were not genuine.  In short, the

Plaintiffs have conflated evidence of the equipment's poor condition and missing documentation

with evidence of non-genuineness; without the latter, the Plaintiffs cannot survive the

Defendants' motion for summary judgment.

As for Raina's finding that 31 transceivers were counterfeit, this evidence is of no

assistance to the Plaintiffs because they bear the burden to establish that these 31 transceivers

were included in the installment of equipment sold by HPFS India to Shinto and then ICT.[21]

None of the 31 transceivers found by Raina to be not genuine appear on the Inventory List[22] of

equipment sold by HPFS to ICT.  Shelley Raina Report, Doc. No. 515-3 at 3.  The Plaintiffs

concede that they marketed H3C equipment during 2012 from a source other than HPFS India.

Alexander Styller Aff., Doc. No. 331-15 ¶ 10.  Though the Plaintiffs contend that all of the H3C

---

[21] The importance of making this evidentiary connection is obvious.  Moreover, the Court
specifically reminded the Plaintiffs of this point in its prior summary judgment opinion.  Doc.
No. 369 at 26 n.14.  Yet, in opposing the pending motion for summary judgment, the Plaintiffs
submitted no new witness affidavits on this point.

[22] The inaccuracy of the Inventory List alleged by the Plaintiffs, see, e.g., Doc. No. 526 ¶ 17;
Alexander Styller Aff., Doc. No. 331-15 ¶¶ 4-9, may undermine the list, but it does not provide
affirmative evidence linking the 31 transceivers to HPFS let alone satisfy their burden of proof
on this issue.

transceivers marked with two particular part numbers came from HPFS (id.), they fail to connect these part numbers to the 31 transceivers Raina deemed counterfeit or, more generally, to the entire group of seized transceivers of which the 31 was a subset.  Indeed, to the contrary, Raina's report contains photographs of two transceivers bearing different H3C part numbers.  Doc. No. 515-3 at 15.  Without a connection between the HPFS Defendants and the 31 transceivers, and there is none, Raina's finding is of no assistance to the Plaintiffs.  Of course, that the Plaintiffs fail to connect these 31 transceivers to the shipment from HPFS India is unsurprising given that ICT "destroyed" the Individual Plaintiffs' electronic documents upon their detention and later deleted the emails of the ICT employee tasked with handling communications related to the HPFS India transaction.  Order on Mot. for Spoliation Sanctions, Doc. No. 368 at 2-5.  Though the Court could and would draw an adverse inference here based on its prior spoliation ruling (Doc. No. 368), it has not done so solely because the Plaintiffs' argument fails even absent an adverse spoliation inference.

Accordingly, the Court VACATES its prior ruling that the Plaintiffs submitted sufficient evidence to support the conclusion that the goods sold were not genuine H3C equipment (Order on Summ., J., Doc. No. 369 at 25), and instead ALLOWS the Defendants' Motion for Summary Judgment on Count I because the Plaintiffs have failed to marshal enough evidence to establish that the goods sold were not genuine H3C equipment.

There is a further reason that the Plaintiffs fail to establish the goods were not genuine H3C equipment as they must to succeed in Count I.  Assuming without deciding that the additional exhibits the Plaintiffs submit and the Defendants challenge in a motion to strike (Doc. No. 537) are fairly considered, one of these documents defeats the assertion that the goods sold were not genuine H3C equipment.  The Plaintiffs submit an affidavit from Cathy Yu's criminal

defense lawyer, Ma Li.  Doc. No. 520-101, Ex. 98.  According to her affidavit, Li conducted an inspection of the seized goods and entered the barcodes of some of the seized devices into H3C's official online "Barcode Anti-counterfeiting Check."  Id. at ¶¶ 20-23.  Her search revealed that the goods were "genuine products bearing the H3C trademark."  Id. at ¶ 21.  On July 16, 2013, Li reported these results to the prosecutor managing the Individual Plaintiffs' case who confirmed that "there [was] insufficient evidence to prosecute" them.  Id. at ¶¶ 22-23.  Two days later, on July 18, 2013, the Chinese prosecutor issued a "Decision on Release on Bail Pending Trial" to the Individual Plaintiffs, released them from detention, and made no further efforts to prosecute the case.  Id. at ¶¶ 24-25.  Indeed, the undisputed evidence establishes, per the Plaintiffs' documents, that the PSB dropped the charges against the Individual Plaintiffs by issuing "no criminal conviction" letters.  Criminal Conviction Letter, Doc. No. 520-84, Ex. 81; SOF, Doc. No. 526 ¶ 10.  There is simply no evidence in the record before the Court that (1) H3C disputed Li's determination,[23] or (2) this determination is inaccurate.[24]  Thus, the additional document that the Plaintiffs offer does not establish that the goods sold were not genuine H3C equipment, but rather that they were genuine.

---

[23] Plaintiffs offer no evidence suggesting that H3C ever challenged the evidence that the seized equipment was genuine.  Indeed, the Plaintiffs' evidence suggests the opposite.  The Plaintiffs' expert opined that in July of 2014 the Chinese prosecutor stated that H3C should be required to explain Li's findings regarding the authenticity of the equipment.  Daniel Chow Report, Doc. No. 515-17 ¶ 65.  Neither the expert nor the Plaintiffs identify any response from H3C.  Subsequently, the Plaintiffs point out that the criminal case against the Individual Plaintiffs was dismissed.  SOF, Doc. No. 526 ¶ 10.

[24] Even if the Verification Report were admissible (and it is not), it would not enable the Plaintiffs to meet their burden of establishing that the goods were not genuine.  Though evidence of false labels might in some circumstances support an inference that an item is not genuine (Order on Summ. J., Doc. No. 369 at 19), they cannot support such an inference here, in the face of the evidence described in the text (assuming that evidence was admitted at trial notwithstanding the Defendants' discovery objection).

Even without the report from Defendants' expert finding the goods genuine (Shelley

Raina Report, Doc. No. 515-3), no reasonable jury could conclude that the goods sold were not

genuine H3C equipment based on Plaintiffs' evidence. The Motion for Summary Judgment is

ALLOWED as to Count I.

C.  Plaintiffs New Arguments Fail

The Motion for Summary Judgment as to Count I is allowed for a third reason.  The

Plaintiffs may not rely upon the two new arguments they advance both of which, in any event,

fail on the merits.

1.    *The Counterfeit Trademark Theory*

The Plaintiffs contend that they need not establish that the equipment was not genuine

because "an abundance of other evidence shows that at least some of the Shipped Goods were

counterfeit on account of inadequate or fake trademarks."  Pls.' Opp. to Defs.' Mot. for Summ.

J., Doc. No. 519 at 11; see also id. at 4 n.1 ("Plaintiffs do not, however, accede to the implication

that the Counterfeiting Claims each require proof of counterfeiting."); id. at 2 ("Given that Jade,

Jason, and Cathy went to jail because of those labels, the opinion of Defendants' expert that the

H3C hardware is authentic "in fact"—i.e., manufactured by H3C—is irrelevant to the

counterfeiting question.").  According to this argument, the relevant question is not whether the

equipment itself was not genuine, but rather whether "the goods HPFS sold to ICT . . . were

'counterfeit' under Chinese law by virtue of their fake trademark labels[.]"  Pls.' Opp. to Defs.'

Mot. for Summ. J., Doc. No. 519 at 12.  In support of this new trademark theory, the Plaintiffs

emphasize that the Individual Plaintiffs were charged with the unlawful sale of commodities

under a fake registered trademark.  Id. at 11-12.

Earlier in this case, the Court pointed out that the Plaintiffs could prove that the goods were not genuine in two ways: directly, with evidence that the goods themselves were not genuine, or indirectly by an inference drawn from other evidence such as the appearance of the goods or the labels.  Order on Summ J., Doc. No. 369 at 19.  The counterfeit trademark theory that the Plaintiffs advance does not qualify as this "second" way to prove the goods were not genuine; rather, it is a wholly distinct, unpled theory seeking to prove something different—"that the Shipped Goods were counterfeit on account of inadequate trademarks," even if the goods themselves are genuine.  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 11.

In introducing this unpled trademark theory, the Plaintiffs essentially attempt to amend their complaint through their summary judgment papers.  See Estrada v. Progressive Direct Ins. Co., 53 F. Supp. 3d 484, 497 (D. Mass. 2014) (holding that the plaintiffs could not, through their summary judgment papers, assert a new theory of liability grounded in the defendant's misrepresentations over the telephone when their complaint was based solely on alleged misrepresentations that appeared on the defendant's website); Diomed, Inc. v. Vascular Sols., Inc., 417 F. Supp. 2d 137, 141 (D. Mass. 2006) (holding that the plaintiff "impermissibly [sought] to amend its complaint without ever filing a motion for leave to amend" when it raised a breach of one agreement in its complaint and "raise[d] the breach of an entirely different agreement when it confront[ed] difficulty in its original allegation").  The Plaintiffs have not sought leave to amend and the Court is under no obligation to grant such leave sua sponte. Hochendoner v. Genzyme Corp., 823 F.3d 724, 735-36 (1st Cir. 2016) ("In the absence of exceptional circumstances, a district court is under no obligation to offer a party leave to amend when such leave has not been requested by motion.").  Thus, Plaintiffs cannot rely upon this

theory.  Even if the Court examines, <u>sua sponte</u>, amendment to permit this theory at this phase in the litigation, amendment is DENIED.

After the time for amending as a matter of course has passed, the Federal Rules of Civil Procedure permit a party to amend its pleading only with the court's leave or the opposing party's written consent.  Fed. R. Civ. P. 15(a)(2).  Though the Federal Rules instruct courts to "freely give leave when justice so requires," <u>id.</u>, a motion to amend "will be treated differently depending on its timing and the context in which it is filed."  <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 11-12 (1st Cir. 2004).  Thus, "[w]here the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show 'substantial and convincing evidence' to justify a belated attempt to amend a complaint."  <u>Id.</u> at 12 (quoting <u>Resolution Tr. Corp. v. Gold</u>, 30 F.3d 251, 252 (1st Cir. 1994)).  Such "substantial and convincing evidence" is not present here.

For one, the Plaintiffs have had ample opportunity to develop their theories in the operative complaint.  <u>See</u> <u>U.S. ex rel. Gagne v. City of Worcester</u>, 565 F.3d 40, 48 (1st Cir. 2009) (affirming the lower court's decision that leave to amend was not warranted when the party had multiple opportunities to cure pleading deficiencies).  They spent well over a year sharpening their allegations, <u>see, e.g.</u>, Compl., Doc. No. 1-1; Am. Compl., Doc. No. 41; SAC, Doc. No. 101, all the while expressly alleging that the goods were not "genuine."  SAC, Doc. No. 101 ¶¶ 237-53.  They never alleged a counterfeit trademark theory.  <u>Id.</u>  Late in discovery, the Plaintiffs retained new experienced counsel from a large national law firm.  Doc. No. 435. Counsel reviewed the case, and thereafter the Court amended the schedule accordingly.  Doc. No. 447.  Once again, the Plaintiffs failed to advance the false trademark theory.  It was only after the close of discovery that the Plaintiffs finally did so.  Of course, the Plaintiffs had every

reason to advance this theory from the outset if they thought it viable as they knew as early as July 2013 that the goods were genuine according to H3C's website, their criminal defense attorney, and, in some sense, the Chinese authorities.  See supra at 22-23.

In addition, an amendment at this phase in the litigation would cause significant prejudice to the Defendants, who have not taken discovery on the issue of counterfeit trademarks and have premised their motion for summary judgment on the original non-genuine goods theory that the Plaintiffs presented in the SAC and pursued for five years.  Steir, 383 F.3d at 12 ("Particularly disfavored are motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs, a significant postponement of the trial, and a likely major alteration in trial tactics and strategy.'") (quoting Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 52 (1st Cir.1998)).  The Plaintiffs have failed to articulate a justification for introducing this new theory compelling enough to outweigh the time and cost-related burdens that would result from an amendment.  For reasons previously noted and in light of the existence of a firm trial date, a continuance is not warranted given the age and circumstances of this case.  Thus, the Court would not and does not permit the Plaintiffs to amend to advance the false trademark theory.

Moreover, the false trademark theory is without merit.  The Plaintiffs fail to present evidence suggesting that the HPFS Defendants were aware that the trademarks were counterfeit at the time of the sale.[25]  Similarly, Plaintiffs point to no representations by the HPFS Defendants

---

[25] That the goods had "last generation labeling" does not, as the Plaintiffs argue, suggest that the Defendants knew or should have known that the trademarks were counterfeit, but only that the labels were from a prior generation of genuine labels.  Defs.' Email Correspondence, Doc. No. 520-11, Ex. 8 at 2 (noting that "the India Comm Games equipment appears to be the last generation before HP commenced applying HP labelling to the product").  Similarly, in the email correspondence following the October 2012 inspection, HPFS representatives did not voice any concerns that the trademarks affixed to the goods were counterfeit.  With regard to labeling,

that the goods complied with Chinese trademark law specifically or even that the sale of the goods complied generally with Chinese law.  Without evidence of a knowing misrepresentation, there is no claim for fraud.  Moreover, the contract documents specifically placed the burden on ICT to "be responsible for complying with all applicable laws and regulations and for obtaining all required export and import authorizations" in the event that ICT moved the goods out of India and into any other country including China.  RSSA, Doc. No. 520-19, Ex. 16 at 13; Wholesale Sale Agreement ("WSA"), Doc. No. 520-19, Ex. 16 at 4 ("If Buyer exports, re-exports, imports or otherwise transfers Equipment, Software, technology, or technical data purchased hereunder, it assumes responsibility for complying with applicable laws and regulations.").  In short, the parties contemplated the burden of complying with other laws, such as the law of a jurisdiction into which ICT might import the goods, and they placed that burden of compliance on ICT.  The false trademark theory would fail on the merits, if available.

### 2.   *The Corporate Structure Theory*

The Plaintiffs also advance a new corporate structure theory.  The Plaintiffs point to evidence that despite being HP's wholly owned subsidiary, H3C possessed operational autonomy.[26]  Daniel Chow Dep., Doc. No. 520-102, Ex. 99 at 222:5-224:19; Kevan Bartley Dep., Doc. No. 510-99, Ex. 96 at 44:9-15.  In other words, H3C operated independently of HP, enforced its own intellectual property rights, held its own trademark, and was permitted to do business with the Chinese government.  Daniel Chow Report, Doc. No. 515-17 ¶¶ 19-20.

---

these emails state that customer ID tags and/or logistics carrier tags had not been removed from the equipment, and not that trademarks contained indications of counterfeiting.  Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-31, Ex. 28; Defs.' Oct. 2012 Email Correspondence, Doc. No. 520-29, Ex. 26.

[26] After the events at issue in this lawsuit, HP split into Hewlett Packard Enterprise Company (HPE) and HP Inc. (HPI) in November of 2015.  Neither party contends that the division into two entities itself precludes HPE or HPI's responsibility for the actions of H3C.

Plaintiffs retained Daniel Chow, an expert in Chinese law at Ohio State University, to testify on this issue.  Id. ¶¶ 1-9.  Chow opined that the Chinese authorities only recognize the actual trademark holder when pursuing enforcement actions that arise from disputes over the authenticity of trademarks.  See Doc. No. 515-17 ¶¶ 42, 86.  Here, Chinese authorities detained the Individual Plaintiffs on charges of violating Article 214 of the People's Republic of China Criminal Laws, which prohibits "knowingly [selling] commodities bearing counterfeit registered trademarks."  Criminal Law of the People's Republic of China Art. 214, Doc. No. 520-3 at 38.  Chow further opined that HP's corporate structure resulted in at least three primary effects: (1) that HP would "struggle to communicate directly with authorities since it would not be the trademark holder of record" (Doc No. 515-17 ¶ 20); (2) that "HP could not control H3C's interactions with the PSB and [would be] unable to directly obtain the release of the plaintiffs from the PSB" (id.); and (3) that HPFS, without prior approval by HP, could sell equipment to ICT that would "displace" H3C's sales, "leading to lost sales revenue" (id. ¶ 84).

The Plaintiffs cannot advance this theory for the first time at this stage of the proceedings for the same reasons they cannot advance the unpled trademark theory.  Even if they could advance the corporate structure theory and even assuming that the record provides sufficient evidentiary support for it, the theory is of no assistance to the Plaintiffs in defeating the Defendants' motion for summary judgment on Count I.   HPFS and HPFS India are the only defendants named in Count I.[27]  Neither HPFS nor HPFS India is responsible for establishing the corporate structure Chow describes.  Id. ¶ 19 (explaining that HP "did not follow the most advisable practices" when adopting its corporate structure).  Nothing in the record suggests that the HPFS Defendants were aware of the possibility that H3C might pursue an enforcement action

---

[27] See supra note 5.

in response to ICT's resale of the equipment sourced from HPFS India, or that such an occurrence had happened in the past.  Similarly, the Plaintiffs do not allege, let alone advance sufficient evidence to establish, that the HPFS Defendants possessed enough knowledge of HP's corporate structure, the autonomy of H3C, or the nuances of Chinese trademark enforcement actions that they can be said to have committed fraud at the time of the sale of the goods.[28]

      D.     <u>Conclusion of Count I</u>

The Motion for Summary Judgment is ALLOWED as to Count I.  Much of the Court's analysis of Counts II through XIII derives from Count I.

  VI.     <u>COUNT II: NEGLIGENT MISREPRESENTATION</u>

Count II of the SAC alleges a claim of negligent misrepresentation against the HPFS Defendants[29] on behalf of ICT, Styller, and the Individual Plaintiffs.  SAC, Doc. No. 101 at 69.  Specifically, the Plaintiffs assert that the Defendants negligently misrepresented that the goods sold were "genuine" H3C equipment.  <u>Id.</u> ¶ 255.  This is a claim under Massachusetts law and requires the plaintiff to prove, <u>inter alia</u>, that the defendant: "suppli[ed] false information for the guidance of others in their business transactions" and failed to exercise "reasonable care or

---

[28] The Plaintiffs point to emails from August of 2011 in which Edward Chin of HPFS Asia Pacific asks another HPFS Asia Pacific representative whether the equipment that HPFS planned to sell to ICT could be exported to China and, specifically, if the Chinese Government "allow[s] these refurbished products to be imported from the USA."  Doc. No. 520-13, Ex. 10 at 3.  In response to Chin's question, the HPFS Asia Pacific representative states "the importation of refurbished or used products into China is a complex and sensitive practice involving multiple agencies.  [Global Trade] typically discourages the BU's from considering this practice unless there is a compelling business case."  <u>Id.</u> at 3.  Though this email correspondence suggests that the HPFS Defendants were aware that ICT might resell the equipment in China and that such sale raised complicated issues, it does not support the claim that the HPFS Defendants knew of the risks stemming from HP's corporate structure.  Instead, these emails discuss the complexities arising from regulations on imports imposed by the Chinese government, not HP's own corporate structure.  In the relevant contracts, ICT undertook the burden to comply with those laws and regulations.  RSSA, Doc. No. 19, Ex. 16 at 13; WSA, Doc. No. 19, Ex. 16 at 4.
[29] <u>See</u> <u>supra</u> note 5.

competence in obtaining or communicating the information." [30]  See Cumis Ins. Soc'y, Inc. v.

BJ's Wholesale Club, Inc., 918 N.E.2d 36, 48 (Mass. 2009) (citing Nycal Corp. v. KPMG Peat

Marwick LLP, 688 N.E.2d 1368. 1371-72 (Mass. 1998) (reciting the elements of a negligent

misrepresentation claim, which also require the plaintiff to prove that the defendant (1) was

acting "in the course of [their] business, profession or employment" and (2) caused others to

justifiably rely on the false information and suffer pecuniary loss as a result).  Thus, the Plaintiffs

must present evidence sufficient to allow a reasonable jury to conclude both that the goods sold

by HPFS India were not genuine, and that the HPFS Defendants knew or should have known that

at the time of the sale.

This claim fails for at least four reasons.  First, the Plaintiffs have failed to marshal

evidence sufficient to support their claim that the HPFS Defendants knew or should have known

at the time of the sale that the equipment was not genuine, i.e., that their misrepresentation, if

any, was negligent.  As discussed previously, the Plaintiffs point to evidence that (1) the HPFS

Defendants never inspected the goods nor verified their authenticity; (2) the HPFS Defendants

did not disclose their inability to obtain the original importation documents from Inspira; and (3)

a later inspection conducted in October of 2012 revealed that the equipment was in substandard

condition.  See supra at 9-10.  Indeed, the HPFS Defendants' standard policies did not call for

verifying the authenticity of the equipment prior to sale.  Nothing in the record, however,

suggests these policies deviated from industry standards or constituted an unreasonable business

practice.  Cf. Quinlan v. Clasby, 879 N.E.2d 703, 708 (Mass. App. Ct. 2008) (evaluating an

alleged negligent misrepresentation in a 93A case, and determining that a real estate broker did

not act unreasonably when she failed to the search a property's zoning history because "brokers

---

[30] See supra note 7.

31

do not typically review zoning records").  For example, there is no evidence that HPFS India's inspection policy resulted in the sale of non-genuine goods in the past or that other companies similar to HPFS or HPFS India have instituted more robust inspection processes.  Moreover, the Plaintiffs fail to explain why the lack of importation documents should have created in the HPFS Defendants a belief that the equipment was not genuine.  There are a myriad of other possible reasons for the absence of paperwork from a third party (Inspira) long after the transaction (Inspira's acquisition of the goods) occurred.  Finally, the October 2012 inspection, which occurred months after the first equipment installment was sold to ICT, see supra at 10-11, is not relevant to the issue of negligent misrepresentations made at the time of the sale.

Second, the Plaintiffs cannot establish that the equipment was not genuine H3C equipment.  See supra at 12-28.  Without evidence that the HPFS Defendants' representations about the equipment's authenticity were, in fact, false, the Plaintiffs' negligent misrepresentation claim necessarily fails.  See Weber v. Sanborn, 526 F. Supp. 2d 135, 148-49 (D. Mass. 2007) (granting the defendants' motion for summary judgment because plaintiffs failed to present evidence of a false statement).

Third, the RSSA's integration clause defeats the Plaintiffs' negligent misrepresentation claim.  The RSSA, signed by ICT and the HPFS Defendants, disclaims "all prior agreements and understandings, both written and oral, related to its subject matter."  RSSA, Doc. No. 520-19, Ex. 16 at 13.  While the general rule holds that an integration or exculpatory clause does not provide a valid defense against a fraud claim, Massachusetts courts have found that the public policy concerns motivating this rule are not applicable in the context of negligent misrepresentation.  See Sound Techniques, Inc. v. Hoffman, 737 N.E.2d 920, 926 (Mass. App. Ct. 2000) (rejecting a negligent misrepresentation claim due to an integration clause because

"there is nothing in the evidence before us that shows or even suggests that the integrity of the bargaining process was tainted by illegality, fraud, duress, unconscionability, or any other invalidating cause"). In light of the explicit language disclaiming previously made representations, the RSSA negates this claim.

Fourth, for the reasons previously explained, see supra at 24-30, neither the Plaintiffs' corporate structure theory nor their newfound trademark theory can sustain Count II.

The Motion for Summary Judgment is ALLOWED as to Count II for each of these four reasons.

## VII.    COUNT III: BREACH OF CONTRACT

Count III of the Plaintiffs' SAC alleges that Defendant HPFS India breached its contract with ICT by selling "counterfeit equipment." SAC, Doc. No. 101 ¶ 264. Massachusetts law applies to this claim for the reasons discussed previously.[31] As the Court has already explained, the Plaintiffs cannot establish that the HPFS Defendants sold ICT equipment that was not genuine, the only breach of contract alleged in the complaint. See supra at 12-28. Because Plaintiffs cannot prevail on this claim without proving a breach of the contract, the Motion for Summary Judgment is ALLOWED as to Count III.

## VIII.    COUNT IV: FRAUDULENT INDUCEMENT

Count IV of the Plaintiffs' SAC alleges a claim of fraudulent inducement against the HPFS Defendants on behalf of ICT, arguing that the RSSA is void because ICT would not have executed the agreement but for the Defendants' alleged false representations that the goods were genuine. SAC, Doc. No. 101 ¶¶ 267-69. Once again, Massachusetts law applies to this claim.[32]

---

[31] See supra note 7.
[32] See supra note 7.

Under Massachusetts law the Plaintiffs must establish: "1) that the defendant made a false representation of a material fact, 2) with knowledge of its falsity, 3) with the purpose of inducing the plaintiff to act thereon and 4) that the plaintiff relied upon the representation to his detriment." Berwind Prop. Grp. Inc. v. Env't Mgmt. Grp., Inc., No. CIV.A. 04-11411-NMG, 2007 WL 4707647, at *3 (D. Mass. Feb. 5, 2007) (citing Sebago, Inc. v. Beazer East, Inc., 18 F. Supp. 2d 70, 85 (D. Mass. 1998)).

This claim fails for at least two reasons. As discussed previously, the Plaintiffs can neither establish that the equipment was not genuine, nor that Defendants knew so. See supra at 9-28. For each of these two independent and separate reasons, the Motion for Summary Judgment on Count IV is ALLOWED. The Court further notes that the Plaintiffs' new theories regarding corporate structure and counterfeit trademarks under Chinese law are unavailing for the reasons previously stated. See supra at 24-30.

## IX.    COUNT V: BREACH OF WARRANTY

In Count V, ICT, Styller, and the Individual Plaintiffs allege a breach of warranty claim against the HPFS Defendants.[33] The Plaintiffs claim that the HPFS Defendants breached their express warranty that the goods were "genuine H3C equipment" as well as the warranty of title included in every contract for the sale of goods. SAC, Doc. No. 101 ¶¶ 271, 276. Massachusetts law applies to the claim for the reasons explained above, see supra note 7, and by virtue of the

---

[33] The Defendants contend that the Individual Plaintiffs cannot bring the breach of warranty claim because they did not directly "read or receive[]" the warranty. Defs.' Mot. for Summ. J., Doc. No. 514 at 10. That the Individual Plaintiffs did not "read or receive" the warranty does not preclude their claim. See Roth v. Ray-Stel's Hair Stylists, Inc., 470 N.E.2d 137, 139 (Mass. App. Ct. 1984) (finding that the Plaintiff could bring a breach of warranty claim against the manufacturer of hair bleach when she relied on her "hairdresser's recommendation rather than on her own knowledge about the product['s] express warranty]"). The Court views this argument as distinct from the Defendants' contractual privity argument discussed infra at note 36.

fact that the Plaintiffs invoke Massachusetts law in this count of their SAC.  SAC, Doc. No. 101
¶ 272.

The Plaintiffs allege that the HPFS Defendants breached the express warranty that the
goods they sold to ICT were genuine H3C equipment.[34]  SAC, Doc. No. 101 ¶ 272.  They point
to the HPFS Defendants' descriptions of the equipment as genuine "both during the negotiations
leading up to the contracts [sic] execution, in the contract documents themselves, and by the
Equipment's serial numbers and trademark logos."  Id. ¶ 271; see Alexander Styller Dep., Doc.
No. 520-94, Ex. 91 at 101:3-104:7 (explaining that the HPFS Defendants described the goods as
new H3C equipment); WSA, Doc. No. 520-19, Ex. 16 at 6-7 (describing the goods as "H3C"
models in the purchase order attached to the WSA).  Under Massachusetts law, an express
warranty can be created by "any description of the goods which is made part of the basis of the
bargain."  Mass. Gen. Laws Ann. ch. 106, § 2-313(1)(b) (West).  Though the Defendants'
descriptions of the goods as H3C equipment formed the basis of the bargain and therefore
created an express warranty, the Plaintiffs' breach of warranty claim nevertheless fails.[35]  The

---

[34] The Defendants assert that the Plaintiffs' breach of warranty claim is duplicative of the breach
of contract claim and therefore must be dismissed.  The case that the Defendants cite in support
of this argument states that the court may consider independent breach of warranty and breach of
contract claims together if the two state the same claim.  Johnson v. Educ. Testing Serv., 754
F.2d 20, 26 (1st Cir. 1985).  To provide a complete discussion of each claim, the Court addresses
the Plaintiffs' breach of contract and breach of warranty claims separately.
[35] The Defendants argue that the warranty disclaimers included in the RSSA and the WSA defeat
the Plaintiffs' breach of warranty claim.  RSSA, Doc. No. 520-19, Ex. 16 at 14; WSA, Doc. No.
520-19, Ex. 16 at 3.  This argument fails.  The Massachusetts Uniform Commercial Code does
not give effect to warranty disclaimers that are facially inconsistent with a seller's express
warranty.  Mass. Gen. Laws Ann. ch. 106, § 2-316 (West) ("Words or conduct relevant to the
creation of an express warranty and words or conduct tending to negate or limit warranty shall be
construed wherever reasonable as consistent with each other; but . . . negation or limitation is
inoperative to the extent that such construction is unreasonable.").  The WSA's description of the
goods as H3C models (Doc. No. 520-19, Ex. 16 at 6-7) created an express warranty that the
equipment was manufactured by H3C, which is entirely inconsistent with a disclaimer allowing

Plaintiffs cannot establish that the goods were not genuine H3C equipment and therefore are

unable to support their claim that the warranties were in fact breached.  The Motion for

Summary Judgment is ALLOWED as to Count V.[36]

## X.   COUNT VI: BREACH OF CHAPTER 93A OF THE MASSACHUSETTS GENERAL LAWS

Count VI, which is brought by ICT, Styller, and the Individual Plaintiffs against the

HPFS Defendants, alleges a violation of Chapter 93A of the Massachusetts General Laws.  SAC,

Doc. No. 101 at 76.  The Plaintiffs argue that the "HPFS Defendants' misrepresentation of the

Equipment as genuine H3C equipment during the 2011 negotiations and sale transaction

constitutes unfair and deceptive trade practices[.]"  Id. ¶ 286.

The Defendants argue that the Plaintiffs cannot sustain their 93A claim because they have

not satisfied the statute's threshold jurisdictional requirement that the allegedly unfair or

deceptive act have occurred "primarily and substantially within the Commonwealth."  Mass.

---

HPFS to sell ICT non-genuine equipment.  Thus, the disclaimers contained in the RSSA and WSA do not negate the Plaintiffs' breach of warranty claim.

[36] Defendants argue that the Individual Plaintiffs cannot bring the breach of express warranty claim because they were not in contractual privity with the HPFS Defendants, a requirement of some breach of warranty claims.  First Choice Armor & Equip., Inc. v. Toyobo Am., Inc., 839 F. Supp. 2d 407, 412-13 (D. Mass. 2012).  The Plaintiffs point out that the Massachusetts Uniform Commercial Code softens the traditional rule that only immediate buyers can bring a breach of warranty claim against a seller by eliminating the contractual privity requirement for "tort-based breach of warranty claims by consumers."  Id. at 412 (emphasis added).  As the Defendants note, however, the Individual Plaintiffs are commercial retailers, not consumers, and they bring a tort-based breach of warranty claim.  Mass. Gen. Laws Ann. ch. 106, § 9-102(a)(23) (West) ("Consumer goods' means goods that are used or bought for use primarily for personal, family, or household purposes.").  Though Massachusetts courts have held that the vertical privity requirement remains in place for "contract-based breach of warranty claims by commercial retailers," First Choice Armor & Equip., Inc., 839 F. Supp. 2d at 412 (emphasis added), they have not specifically addressed whether the requirement reaches tort-based claims by commercial retailers.  See Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.), Inc., 263 F. Supp. 2d 140, 146 (D. Mass. 2003).  The Court need not resolve whether the vertical privity requirement applies to situations where, as here, a tort-based breach of warranty claim is brought by a commercial reseller because Count V fails for the reasons discussed in the text.

Gen. Laws Ann. ch. 93A, § 11 (West).  Because the Defendants raised this jurisdictional issue, they bear the burden of proving that the deceptive acts occurred primarily and substantially outside the Commonwealth.  Id. ("[T]he burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.").

Massachusetts courts have not adopted a "precise formula" for determining whether 93A's jurisdictional requirement is met.  Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp., 781 N.E.2d 787, 798 (Mass. 2003).  Instead, courts employ a "fact intensive" approach "in which a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  Id. at 798-99.  This 93A claim centers on the HPFS Defendants' alleged misrepresentations during negotiations that the goods were genuine H3C equipment.  SAC, Doc. No. 101 ¶ 286.  Therefore, the relevant question is where the Defendants' representations concerning the genuine nature of the goods substantially occurred.  See Kuwaiti Danish Comput. Co., 781 N.E.2d at 800 (analyzing only "the conduct that can be said to be unfair or deceptive" to determine whether the 93A jurisdictional requirement was met).  Defendants point to the following factors in support of their contention that the "center of gravity" fell outside of Massachusetts:

- The equipment was stored in India after its original lease expired.  Alexander Pekar Dep., Doc. No. 520-98, Ex. 95 at 116:6-11.

- HPFS India conducted its negotiations of the RSSA and WSA from New Jersey.  David Gill Decl., Doc. No. 515-11 ¶ 4 ("When I was involved in HPFS India's negotiations of the December 2011 agreements at issue in this litigation (the RRSA and the WSA), I was located in New Jersey.").

- The equipment was originally sold to Shinto, an Indian broker.  SOF, Doc. No. 526 ¶ 79.

- ICT planned to sell the equipment in China.  <u>Id.</u> ¶ 5.

- The Individual Plaintiffs are Chinese nationals (<u>id.</u> ¶ 81) and did not participate in the U.S. negotiations (<u>id.</u> ¶ 39).

- The Plaintiffs' alleged place of injury is China.  <u>Id.</u> ¶¶ 84-86.

Plaintiffs assert that the following factors indicate that the center of gravity was Massachusetts.

- ICT's state of incorporation and principal place of business is Massachusetts.  ICT Business Entity Summary, Doc. No. 520-91, Ex. 88.

- JT Silvestri, an HPFS India officer, met with ICT's Alexander Pekar in Andover, Massachusetts to discuss the equipment prior to the sale.  Alexander Pekar Dep., Doc. No. 520-98, Ex. 95 at 111:15-114:4 (describing the Andover meeting during which Silvestri explained the origin and state of the equipment).

- Alexander Styller, a resident of Massachusetts, is the Chief Executive Officer of ICT and assisted with the negotiations.  Alexander Styller Aff., Doc. No. 101-2 ¶ 1; Alexander Pekar Dep., Doc. No. 515-15 at 103:21-104:6.

- The RSSA includes a Massachusetts choice of law and forum selection provisions.  RSSA, Doc. No. 520-19, Ex. 16 at 14.

- Jim O'Grady, an HPFS officer, is based in Andover, MA and signed the Shinto Purchase Order on behalf of HPFS India.  Email from Jim O'Grady, Doc. No. 520-22, Ex. 19 at 2.

- Plaintiffs allege that Pekar signed the contract in Massachusetts, though they cite to no evidence in support of this assertion.  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 37-38.

- Finally, Plaintiffs claim that ICT and Styller suffered economic damages in the form of lost profits in Massachusetts because their bank accounts are maintained in the state.  SOF, Doc. No. 526 ¶ 112.

The Defendants have not met their burden of proving that the events that form the basis of the 93A claim occurred primarily and substantially outside of the Commonwealth.  The facts cited by the Defendants are "ancillary to . . . misrepresentations" that undergird the Plaintiffs' 93A claim.  <u>Kenda Corp. v. Pot O'Gold Money Leagues, Inc.</u>, 329 F.3d 216, 236 (1st Cir. 2003). The equipment's location after the lease expired, sale to Shinto, and ultimate transport to China

are merely the results of HPFS's alleged misrepresentations to ICT during contract negotiations. Similarly, the Individual Plaintiffs' place of citizenship and injury have no bearing on the contract negotiation process.  Instead, the facts most relevant to the Plaintiffs 93A claim are: (1) the location where the negotiations occurred and (2) the location where the contracts were signed.  Kenda Corp., 329 F.3d at 235 (finding that the center of gravity was the location where "some of the primary events [plaintiff] points to in support of its Chapter 93A claim" occurred including "the misrepresentations and the signing of contracts").  Though HPFS conducted its negotiations from New Jersey, Silvestri and Pekar met to discuss the equipment in Andover, Styller presumably engaged in the negotiation process from his home base in Massachusetts, and the WSA was signed by Jim O'Grady, who is based in Massachusetts.  Though these factors do not definitively establish that the center of gravity was Massachusetts, the Defendants have not met their burden under the summary judgment standard.

Nevertheless, the 93A claim fails because the Plaintiffs are unable to establish the deceptive or unfair conduct underlying their claim, i.e., that the HPFS Defendants knowingly sold non-genuine equipment.  See supra at 9-28.  Therefore, Count VI is DISMISSED.

XI.   COUNT VII: FRAUD[37]

In Count VII, ICT, Styller, and the Individual Plaintiffs bring a fraud claim against all the Defendants.[38]  SAC, Doc. No. 101 at 78.  Count VII alleges that the Defendants concocted and

---

[37] Counts VII through XIII are occasionally referred to by the Court and the parties as "the conspiracy claims."

[38] As discussed below, none of the Plaintiffs have sufficiently supported their claim for fraud against the Defendants.  Even if ICT and Styller could proceed with this claim, however, the Individual Plaintiffs could not.  This is so because the undisputed evidence confirms that the Individual Plaintiffs never heard, let alone detrimentally relied on, the allegedly fraudulent misrepresentations by the Defendants.  SOF, Doc. No. 526 ¶ 62.  Because detrimental reliance is a required element of a fraudulent misrepresentation claim, see infra at 41, the Defendants'

carried out a "frame job and cover-up scheme that commenced in 2013" after the Individual

Plaintiffs were arrested.  Id. ¶ 291.  According to the SAC, the Defendants provided "sham"

assistance to the Plaintiffs while secretly withholding exonerating evidence from the New Final

Letter that would have helped secure the Individual Plaintiffs' release.  Id. ¶¶ 291-95.

    Count VII revolves around two statements that were included in the March Draft Letter

but were later omitted from the New Final Letter submitted to the Chinese authorities.[39]  For the

purposes of summary judgment, the Court concludes that the "Draft Letter" is the letter dated

March 25, 2013 (Doc. No. 520-62, Ex. 59) and referred to by the Court as the March Draft

Letter.  See supra note 11.  In making this determination, the Court relies on Alexander Styller's

affidavit, which quotes a March 25 draft and states that Gill sent Styller the letter for his review

and approval on March 27, 2013 (Doc. No. 101-2 ¶¶ 118-122). [40]  In its order on the Plaintiffs'

motion to amend, the Court permitted Count VII to proceed as "to fraud arising out of only two

properly pled statements, the first being the assertion made to some Plaintiffs that the April 2013

---

[39] Motion for Summary Judgment is ALLOWED on this count as to the Individual Plaintiffs for this reason alone.

[39] The SAC makes allegations regarding the letter sent by David Gill to the Chinese authorities and refers to this letter as the "final letter," the "April letter," or the "Chinese version" of the letter.  Here, the Court assumes that all such references are to the New Final Letter defined supra at note 11.  Even if the Old Final Letter was the version Gill actually sent the Chinese authorities, the analysis of this claim would not change.

[40] Styller also testified that, after reviewing the draft letter sent to him on March 27 by Gill, he suggested the addition of one sentence confirming that "HPFS sold equipment to ICT as genuine."  Doc. No. 101-2 ¶¶ 118-20.  In response, according to Styller, Gill sent him a new version on April 1, which included the following statements: (1) "HPFS India sold the equipment to ICT as genuine H3C equipment"; (2) "ICT was entitled to rely on HPFS India's representations in this regard."  Id. ¶ 121.  Thereafter, Styller approved the April 1 version of the draft and was under the impression that it was sent, without changes, to the Chinese authorities. Id. at 122, 138-139.  Because neither party has submitted the revised April version referred to in Styller's affidavit and because the additions are not material to Count VII's allegations, the Court relies on the initial draft dated March 25, 2013 and refers to it as the March Draft letter.  See supra note 11.

letter [the New Final Letter] was substantively the same as the March 2013 draft letter [the March Draft Letter], and the second being that the April 2013 letter [the New Final Letter] was appropriately 'filed.'"  Order on Mot. for Leave to Amend, Doc. No. 95 at 6.  While the evidence upon which the Plaintiffs may rely is not limited to the assertions in the SAC, the scope of this claim is limited to the two theories of fraud that the Court determined met the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and allowed to proceed in its prior Order.  See Garfield v. NDC Health Corp., 466 F.3d 1255, 1271 (11th Cir. 2006) (finding that the district court may limit the scope of an amended complaint or grant conditional leave to amend); Newman v. Metro. Life Ins. Co., No. 12-CV-10078, 2015 WL 275703, at *6 (D. Mass. Jan. 21, 2015), aff'd sub nom. Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19 (1st Cir. 2018) (striking a new claim from the plaintiff's second amended complaint when the court's grant of leave to amend was limited to certain claims and defendants); see also Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004) (explaining that fraud claims may proceed only when pleaded with particularity).

As explained previously, to succeed in their claim for fraudulent misrepresentation the Plaintiffs must prove that "(i) the defendants made a false representation of a material fact with knowledge of its falsity for the purpose of inducing [the Plaintiffs] to act thereon, (ii) [the Plaintiffs] relied upon the representation as true and acted upon it to [their] detriment, and (iii) that [the Plaintiffs'] reliance was reasonable under the circumstances." Rodi, 532 F.3d at 15.

A.  Fraud Based on the Assertion that the New Final Letter was Substantively the Same as the March Draft Letter

Under their first theory of fraud, the Plaintiffs argue that the Defendants intentionally concealed the substantive changes made to the March Draft Letter.  The Plaintiffs point specifically to an email exchange between David Gill and Les Riordan in which Riordan asked

Gill whether HPFS India's letter is "substantially the same as the last draft."[41]  Doc. No. 520-70, Ex. 67 at 6.  In response, Gill assured Riordan that "[t]here were some minor amendments but nothing that changed the description of the relevant sequence of events between HPFS India and ICT."  Id. at 5.  In fact, the March Draft Letter and the New Final Letter are different in a number of ways—while the draft unequivocally states HPFS India's beliefs that "the counterfeit H3C equipment seized in China is the same equipment sold by HPFS to ICT," the seized goods are "counterfeit," and ICT should not "reasonably be held responsible for selling counterfeit equipment," the New Final Letter is significantly less definitive with respect to each of these points.  Compare March Draft Letter, Doc. No. 520-62, Ex. 59 at 4, with New Final Letter, Doc. No. 515-9 at 5.  The Plaintiffs have therefore established, at least for the purposes of summary judgment, that Gill's statement concerning the letters was false.  As for the materiality of the false statement, a misrepresentation is material if "a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question." Zimmerman v. Kent, 575 N.E.2d 70, 74 (Mass. App. Ct. 1991) (alteration in original) (quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir.1966)).  The Defendants have failed to establish that Riordan acted unreasonably when he took Gill at his word and allowed HPFS India to send the letter without protest, without request for further supplementation, and without further questions about its contents.  Thus, the Plaintiffs have alleged a false representation of material fact sufficient to satisfy the first prong of the fraud analysis.

In addition to establishing a misrepresentation of material fact, the Plaintiffs must show that they relied on the false statement.  Rodi, 532 F.3d at 15.  The Plaintiffs point out that "ICT,

---

[41] Based on the summary judgment record, the "last draft" is the March Draft Letter.  See supra note 40.

as well as the families of our incarcerated sales guys, relied on Gill's promises and were counting days, hours and minutes to the HP letter[.]"  Alexander Styller Aff., Doc. No. 101-2 ¶ 124.  That ICT requested no further edits to the letter prior to its submission to the Chinese authorities is further evidence of reliance.  Had Riordan or Styller known that Gill made substantive changes to the March Draft Letter, they would have presumably sought further revisions.  See id. ¶ 119-122 (explaining that Styller asked Gill to make edits to prior iterations of the letter).

Reliance alone, however, is not enough; to satisfy the second element of the fraudulent misrepresentation claim, the Plaintiffs must also establish that they acted upon the misrepresentation to their "detriment."  Rodi, 532 F.3d at 15.  In support of their detrimental reliance argument, the Plaintiffs contend that the contents of the Draft letter created the false impression that HPFS India was ICT's ally in securing the Individual Plaintiffs' release.  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 26; Alexander Styller Aff., Doc. No. 101-2 ¶ 124.  According to the Plaintiffs' allegations in the SAC, had they known that the Defendants were adversaries they would have "pursued different legal venues and strategies in their quest to free the Individual Plaintiffs" and filed "criminal complaints against Defendants in India and/or China."  Doc. No. 101 ¶ 304.  The Plaintiffs' summary judgment papers, however, fail to introduce any evidence in support of this detrimental reliance argument.  For example, the Plaintiffs submit no evidence describing specific "legal venues and strategies" they would have pursued, no evidence of the viability of any such legal strategies or the reasonableness of any decisions to forego additional efforts, and no explanation of why criminal complaints against the Defendants would have been effective in mitigating or avoiding harm to the Plaintiffs.  The conclusory statements in the SAC, without more, are insufficient to prove detrimental reliance at

summary judgment.  Kuwaiti Danish Comput. Co., 781 N.E.2d at 796 (finding the plaintiff's

negligent misrepresentation claim deficient because it offered "no evidence that, but for the

alleged misrepresentation" it would have avoided harm); Rodi, 532 F.3d at 16 (noting that

"conclusory allegation[s]" about reliance are "insufficient to defeat summary judgment").

Simply put, the Plaintiffs fail to establish that they relied on Gill's statements to their detriment.

The Plaintiffs' detrimental reliance argument fails for another reason, namely that they

fail to establish, as they must to prove this element of their claim, that sending a different version

of the letter would have impacted the investigation.  The Plaintiffs' own Chinese law expert

repeatedly opined that HP, HPFS, and HPFS India were powerless to halt the investigation,

opining instead that the "PSB would have looked only to and accepted direction only from H3C"

(Daniel Chow Report, Doc. No. 515-17 ¶ 90 (emphasis added)) and "only H3C's consent or

acquiescence would have persuaded the PSB drop this case against the Plaintiffs" (Daniel Chow

Rebuttal Report, Doc. No. 515-18 ¶ 35 (emphasis added)); [42] see also Daniel Chow Dep., Doc.

No. 515-19 at 277:12-278:15 (testifying that HP, HPFS, and Gill "couldn't affect the

counterfeiting investigation").  The record does not provide a basis to conclude that the failure to

send the March Draft Letter harmed the Plaintiffs.  Therefore, the Plaintiffs' first theory of fraud

fails for lack of detrimental reliance.

B.  Fraud Based on the Assertion that the Letter was Filed

The Plaintiffs' second theory in support of their fraud claim is that the Defendants falsely

assured ICT that the letter was filed.  This theory is based on a May 2013 email from Gill to

Riordan, in which Gill confirmed that "the letter was definitely filed."  Doc. No. 520-70, Ex. 67

---

[42] The Chow Rebuttal Report submitted as Doc. No. 515-18 is not signed by Chow.  The
Defendants have provided a signed signature page at Doc. No. 546-1, Ex. A.

at 4.  Prior to the email at issue, Riordan informed Gill on April 3, 2013 that the letter should be sent to "both the prosecutor and the police."  Email from Riordan to Gill, Doc. No. 520-64, Ex. 61 at 2-3.  On May 2, 2013, Gill wrote Riordan to "confirm the letter has been filed" (Doc. No. 520-70, Ex. 67 at 5) to which Riordan responded on May 16 that "[w]e are getting some communications from the contact in China that the letter has not been delivered, or that the prosecutors do not have it yet" (id. at 4).  Gill's response contains the allegedly fraudulent statement that "the letter was definitely filed" with "the captain of Haidian PSB."  Id.  Gill did not say the letter was filed with the prosecutor.  Riordan then clarified that the letter was incorrectly addressed to an individual with a name very similar to that of the intended recipient at the PSB.  Id. at 3.  Finally, on May 20, Gill tells Riordan that "[o]ne of our people attended the PSB on Friday so I'm sure the letter found its way to the right person."  Id. at 2.  Though it is unclear with whom the letter was ultimately filed, it appears that, contrary to Riordan's initial delivery instructions, only the PSB and not the prosecutor received it.  Id. ("I [Gill] can confirm that the PSB have reviewed the letter.") (emphasis added).

This theory fails for three reasons.  First, the Plaintiffs cannot establish any false representations by Gill.  In his email, Gill assured Riordan only that the letter was reviewed by the PSB; he makes no representations about the letter being filed with the prosecutor.  Id.  Second, any reliance by Riordan in this circumstance was unreasonable.  Based on Gill's statements, it would be unreasonable for Riordan to assume that the letter was sent to the prosecutor as initially requested.  Nothing in the record suggests either that Riordan corrected Gill or took further steps to ensure that the prosecutor received the letter.  Third, the Plaintiffs have not demonstrated detrimental reliance because they have not introduced evidence sufficient to establish that the prosecutors never reviewed the letter even if Gill did not specifically send it

to them.  Moreover, there is no evidence that the letter would have mattered to the prosecutors as explained previously.  See supra at 44.  For these separate and independent reasons, the Plaintiffs' second theory of fraud is unavailing.

The Motion for Summary Judgment is ALLOWED as to Count VII.[43]

XII.   COUNT VIII: BREACH OF CHAPTER 93A OF THE MASSACHUSETTS GENERAL LAWS

Count VIII brings a claim for the violation of 93A against all Defendants on behalf of ICT, Styller, and the Individual Plaintiffs.  Plaintiffs allege that in orchestrating the "frame job and cover-up scheme" underlying Count VII, Defendants violated 93A's prohibition of unfair and deceptive practices.  SAC, Doc. No. 101 ¶ 314.  This claim arises from the same allegedly fraudulent statements as Count VII.  It fails for two reasons.  First, the "center of gravity," Kuwaiti Danish Comput. Co.,781 N.E.2d at 799, of this claim is not in Massachusetts.  This claim alleges a fraud arising out of an email Gill sent while he was in Australia (SOF, Doc. No. 526 ¶¶ 87-88) regarding the imprisonment of three Chinese citizens by the Chinese authorities.  In addition, the alleged harm resulting from the fraud, i.e., the prolonged detention of the Individual Plaintiffs, was felt primarily in China, where the Individual Plaintiffs were detained.  Cf. Auto Shine Car Wash Sys., Inc. v. Nice 'N Clean Car Wash, Inc., 792 N.E.2d 682, 686 (Mass. App. Ct. 2003) (finding that Massachusetts was the center of gravity when "the deception and resulting harm that form the basis of the . . . claim both occurred in Massachusetts").

---

[43] The Plaintiffs' corporate structure and agency theories are also unavailing.  For one, these theories are unpled and, as discussed, see supra at 25-27, amendment is not warranted at this phase of the litigation.  Second, there is no indication that the theories are relevant to this claim.  The agency theory is based on the notion that H3C acted as the Defendants' agent, but it is undisputed that Gill, not H3C, wrote the email at issue.  As for the corporate structure theory, there is no indication that HP's corporate structure facilitated or permitted Gill's alleged misrepresentations.

Therefore, Count VIII fails because the "center of gravity" is outside of Massachusetts and thus Chapter 93A jurisdiction does not exist.

Second, this claim fails for all the same reasons discussed in Count VII.[44]  See supra at 39-46.  The Motion for Summary Judgment is therefore ALLOWED as to Count VIII.

XIII.   COUNT IX: FALSE IMPRISONMENT

Count IX brings a claim for false imprisonment against all Defendants on behalf of the Individual Plaintiffs.  SAC, Doc. No. 101 at 84.  The Plaintiffs advance several theories in support of the false imprisonment claim.  The Court will address each in turn.

Under Massachusetts law, false imprisonment "consists of '(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.'"  Dagi v. Delta Airlines, Inc., 961 F.3d 22, 29 (1st Cir. 2020) (quoting Sietins v. Joseph, 238 F. Supp. 2d 366, 381 (D. Mass. 2003)).  Though Massachusetts courts have not precisely defined the intent element, the Restatement (Second) of Torts is instructive on this point.  Because the Supreme Judicial Court and lower courts have cited the Restatement (Second) of Torts in explaining the elements of false imprisonment, the Court looks to it for guidance here.  E.g., Foley v. Polaroid Corp., 508 N.E.2d 72, 77 (Mass. 1987); Sarvis v. Boston Safe Deposit & Trust Co., 711 N.E.2d 911, 921 (1999).

_____

[44] The Court notes that Massachusetts law does not require proof of reliance to state a claim for misrepresentation under 93A.  Int'l Fid. Ins. Co. v. Wilson, 443 N.E.2d 1308, 1314 (Mass. 1983) (explaining that the "court has rejected the proposition that a plaintiff must show proof of actual reliance on a misrepresentation" under 93A).  Though reliance is not a required element under 93A, the statute requires proof that the unfair or deceptive act caused the plaintiff's injury.  Hershenow v. Enter. Rent-A-Car Co. of Boston, Inc., 840 N.E.2d 526, 528 (Mass. 2006) ("[P]roving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery.").  For the same reasons that the Plaintiffs have not established detrimental reliance, they have not sufficiently shown that the Defendants' actions caused their injury.  As a result, the Plaintiffs' claim fails under both the 93A and common law fraud standards.

The Restatement defines the requisite intent element of a false imprisonment claim as acting with the intent "to confine the other."  Restatement (Second) of Torts § 35 (Am. L. Inst. 1965).  The Restatement's comments define an intentional act of confinement as one "done for the purpose of imposing confinement upon the other or with knowledge that such confinement would, to a substantial certainty, result from it."  Id. § 35 cmt. d (emphasis added).  To satisfy the intent element under the Restatement "[i]t is not enough that the actor realizes or should realize that his actions involve a risk of causing a confinement, so long as the likelihood that it will do so falls short of a substantial certainty."  Id. § 35 cmt. h.  Of course, the Restatement's definition of intent raises additional questions, namely what constitutes "substantial certainty," and whether substantial certainty is more akin to an intentional or reckless mental state.  The comments to the Restatement's general definition of intent provide an answer to these questions by distinguishing substantial certainty from recklessness:

> If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.  As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.

Id. § 8A cmt. b (emphasis added).  In light of the Restatement's language, other courts have defined substantial certainty as a "rather extreme brand of recklessness" that exists on the spectrum between intentional and reckless conduct.  Rivera v. Double A Transp., Inc., 727 A.2d 204, 208 (Conn. 1999).

A. The Counterfeit Equipment Theory

First, Plaintiffs argue that the "fraudulent sale of counterfeit equipment" to the Plaintiffs created a substantially certain risk that the Individual Plaintiffs would be imprisoned for selling non-genuine goods.  SAC, Doc. No. 101 ¶ 320.  For the reasons discussed at length above, see

supra at 12-28, the Plaintiffs have failed to establish even for the purposes of summary judgment that HPFS India sold ICT non-genuine goods. Nor have the Plaintiffs introduced evidence sufficient to support the contention that the Defendants knew or should have known, let alone knew to a substantial certainty, that the equipment was non-genuine. See supra at 9-11. Finally, no other evidence in the record suffices to establish that any Defendant knew to a "substantial certainty" that imprisonment would result from this sale of goods. Therefore, the Plaintiffs' first theory in support of their false imprisonment claim fails.

B. The Agency Theory

Second, Plaintiffs argue that H3C's allegations against the Individual Plaintiffs were substantially certain to result in the Individual Plaintiffs' imprisonment and must be attributed to HP, H3C's corporate parent. Pls.' Opp. to Defs.' M. for Summ J., Doc. No. 519 at 28. This theory fails because it is unpled and, for the reasons discussed above, the Plaintiffs cannot amend the SAC through their summary judgment memoranda. See supra at 25-27. Even if the Plaintiffs could rely on the unpled agency theory, it is nevertheless unavailing. As discussed previously, see supra at 15, the Plaintiffs have not introduced sufficient evidence to prove that HP's actions warrant piercing the corporate veil due to the "interrelationship" of H3C and HP. Platten, 437 F.3d at 128; see also Abdallah v. Bain Capital LLC, 752 F.3d 114, 121 (1st Cir. 2014) ("[A]llegations that a parent directs or controls particular actions by a subsidiary are generally not enough to render the parent liable for all torts related to those actions.") (citations omitted). If anything, the Plaintiffs' evidence shows that the two organizations operated independently and that HP lacked "day-to-day" control over H3C's operations (Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 10:9-24) even if HP possessed control over H3C's business strategy (Stuart Patterson Dep., Doc. No. 553-2, Ex. A at 138:7-11). Finally, there is no

evidence that when H3C made the complaint presumably giving rise to the apprehension, arrest, and detention of the Individual Plaintiffs that it was acting on behalf of, i.e., as an agent for, any Defendant.  Therefore, the Plaintiffs' agency theory cannot support their false imprisonment claim against HP.

C.  The Corporate Structure Theory

Third, the Plaintiffs argue that HP's corporate structure created risks "including that resellers like [the Individual Plaintiffs] would end up in jail for selling parallel imports without H3C's approval."  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 24.  Once again, the Plaintiffs cannot rely on a newfound theory without first moving to amend their complaint.  The corporate structure theory is unpled and amendment is not warranted at this late date for the reasons previously stated.  See supra at 25-30.  In any event, the theory cannot support the Plaintiffs' claim against HP, HPFS, HPFS India, or David Gill for false imprisonment.  As to the HPFS Defendants and Gill, the Plaintiffs fail to introduce any evidence that HPFS, HPFS India, or Gill had control over HP's corporate structure.  The HPFS Defendants and Gill cannot be held liable for a corporate structure that they neither created nor controlled.  Nor is there any evidence that would support a reasonable inference that these Defendants understood to a substantial certainty that imprisonment would result from the sale of goods due to HP's corporate structure.

Turning to the claim against HP, the Plaintiffs have failed to introduce evidence sufficient to support their claim that, at the time of the equipment's sale, HP knew to a substantial certainty that its corporate structure would result in the Individual Plaintiffs' imprisonment.  Chow's report does not indicate that HP knew or should have known that the Individual Plaintiffs' detention was substantially certain to result from the corporate structure, nor is there evidence that H3C's actions led to the imprisonment of resellers in the past and therefore that HP was on

50

notice of such a risk.  Cf. Edelman v. Page, No. 3:00-cv-01166 (JAM), 2015 WL 1395893, at

*11 (D. Conn. Mar. 25, 2015) (finding that the defendant did not know to a substantial certainty

that his false police report against the plaintiff would result in the plaintiff's arrest because "a

police officer conducted the investigation, made a probable cause determination, and decided" to

complete the arrest).  As a result, the Plaintiffs' corporate structure theory fails.[45]

### D.  The Duty to Aid Theory

Finally, the Plaintiffs argue that the Defendants prolonged the Individual Plaintiffs'

detention by failing to assist in their release.  SAC, Doc. No. 101 ¶ 321.  The Plaintiffs' duty to

aid argument appears to be grounded in the Restatement, which states "[i]f the actor is under a

duty to . . . aid in such release by providing a means of escape, his refusal to do so with the

intention of confining the other is a sufficient act of confinement to make him subject to

liability."  Restatement (Second) of Torts § 45 (Am. L. Inst. 1965).  First, the Plaintiffs argue

that the Defendants neglected their duty to aid the Individual Plaintiffs' release when they

"water[ed] down" the New Final Letter and "destroyed exculpatory evidence."  Pls.' Opp. to

Defs.' Mot. for Summ. J., Doc. No. 519 at 29-30.  Second, and with respect only to HP, the

---

[45] The Plaintiffs' Chinese Law expert implies that H3C bribed the PSB to arrest the Individual Plaintiffs because the PSB will not bring such actions without the payment of a 'case fee.'" Daniel Chow Report, Doc. No. 515-17 ¶ 74.  Chow's opinions on the issue of bribery are of no assistance to the Plaintiffs.  First, there is no evidence that such a bribe in fact occurred and Chow does not expressly opine that it did.  Second, Chinese law prohibits bribery.  Id. at 25 n.59. The Supreme Judicial Court recently confirmed that unforeseeable criminal conduct by third parties, like the payment of an illegal bribe by H3C, does not give rise to a duty to protect against such harm in the analogous context of negligence.  Heath-Latson v. Styller, 169 N.E.3d 155, 159 (Mass. 2021).  Because there is no basis to infer that HP was aware of H3C paying bribes in the past or that such conduct by H3C was foreseeable, HP did not have a duty to protect ICT against H3C's allegedly illegal conduct.  See also Order on Mot. to Amend, Doc. No. 95 at 12 (finding that "the SAC does not plead factual allegations stating a plausible claim that the HP Defendants had [] a duty to aid" in the Individual Plaintiffs' release).

Plaintiffs contend that HP could have secured the Individual Plaintiffs' release by ordering H3C

to drop its complaint.  The Court will discuss these sub-theories separately.

     1.  *Watering Down the New Final Letter*

     To support their argument regarding the "water[ed] down" letter, the Plaintiffs contend

that the Defendants should have provided the following information to ICT or the Chinese

authorities.[46]

---

[46]   One other piece of evidence bears mention here.  On January 16, 2013, the Chinese
prosecutor sent a two-page letter to the PSB directing it to collect eight pieces of evidence related
to the investigation of the Individual Plaintiffs.  Doc. No. 520-49, Ex. 46 at 4-5.  The eight pieces
of evidence requested were outlined in a numbered list in the body of the letter.  Id.  On March
14, 2013, Gill emailed Styller and Riordan attaching a copy, in Chinese, of page one of the letter,
which he describes as the prosecutor's request "for information [from ICT] related to business
license, customs clearance etc." and from HPFS India related to the goods it sold to ICT.  Doc.
No. 520-55, Ex. 52 at 2.  Any person viewing the one-page letter attached to Gill's email
appreciates immediately that text in the middle of the body of the letter was redacted by a blank
piece of paper.  Id. at 7.  The English translation of this document confirms the obvious as bullet
points 1, 4, and 5 are translated, while bullet points 2 and 3 are described as redacted.  Id. at 8.
Gill's email contains no discussion of or reference to the obvious redaction or whether he was
aware that the actual letter is two pages.  Id. at 2.  Nothing in the record indicates the source of
the redactions or that Riordan, Styller, or anyone else sought an explanation of the redaction.
Finally, Yu's lawyer, Ma Li, obtained a complete and unredacted copy of the entire two-page
January 16 letter.  Ma Li Aff., Doc. No. 520-101, Ex. 98 ¶ 11.
     Now Plaintiffs contend that the Defendants withheld the redacted information.  Pls.' Opp.
to Defs.' Mot. for Summ. J., Doc. No. 519 at 30 n.25.  Specifically, they claim that HP "actively
interfered with ICT's and Styller's efforts to free the Individual Plaintiffs" by withholding the
entirety of the Chinese Prosecutor's letter.  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519
at 30 n.25; see also Pls.' Opp to Defs.' Mot. to Strike, Doc. No. 541 at 17 (emphasis in original)
(asserting that the redactions are "**Defendants' redactions**).  This argument fails.
     First, neither the facts presented nor the totality of the record support a reasonable
inference that (1) the Defendants possessed a complete and unredacted version of the letter (for
example, there is no evidence that the Defendants produced a complete version of the letter in
discovery as they would have been required to had they possessed it); or (2) that the
Defendants, rather than the Chinese prosecutor or police, redacted the letter.  While the
unredacted items relate to evidence the Prosecutor directed the police to obtain from ICT or
HPFS India, the redacted items describe evidence the Prosecutor wanted from: third party
witness interviews, a search of a computer in police custody, a seizure of funds in the bank
account of a third party, and a search of internal police documents for information such as a
thumb print from one defendant.  None of the foregoing suggests redaction by the Defendants,

- That HPFS India never obtained importation documents from Inspira.  Email from HPFS to Inspira, Doc. No. 520-12, Ex. 9 at 2; Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 138:5-11.

- That HPFS India never verified the authenticity of the equipment despite the concerns raised by the October 2012 inspection.  Doc. No. 520-31, Ex. 29 (referencing Tom Harris's October 2012 inspection of the equipment, which raised concerns about the equipment); October 2012 Email Correspondence between HPFS Representatives, Doc. No. 520-29, Ex. 26 (same).

- That HPFS India had no reason to believe that the Individual Plaintiffs were selling anything other than the equipment sold to them by HPFS India.  Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 149:7-25.

These pieces of information are not plainly exonerating, but rather peripheral to the genuineness of the goods and the culpability of the Individual Plaintiffs.  Therefore, no Defendant knew or should have known that the omission of these facts would, to a substantial certainty, prolong the detention of the Individual Plaintiffs.

Put another way, the Plaintiffs' argument fails for lack of causation.  As explained in the Court's discussion of Count VII, Plaintiffs fail to marshal evidence sufficient to support the contention that sending an altered version of the New Final letter would have expedited the Individual Plaintiffs' release.  See supra at 44.  For the same reasons, there is no indication that

---

which the Plaintiffs bear the burden of proving.  If anything, the text suggests law enforcement redaction.

Second, even if Plaintiffs had established that HPFS India (or any Defendant) redacted the document, the Plaintiffs were aware of the complete text of the document.  Yu's criminal defense lawyer in China had the entire unredacted document.  Ma Li Aff., Doc. No. 520-101, Ex. 98 ¶ 11.  Indeed, the date stamp on her photograph of the letter bears the date of March 25, 2013.  Doc. No. 520-49, Ex. 46 at 2-3.  Plaintiffs cannot complain about the withholding of information of which they were aware.

Third, the content of the redacted portions of the letter is insignificant.  It merely shows that the Prosecutor directed the police to obtain information from various witnesses regarding the value of the sales completed by the Individual Plaintiffs—an obvious point since the scale of the charged offense depended upon the monetary value of the sales (Daniel Chow Report, Doc. No. 515-17 ¶ 33)—and the seizure of the proceeds from certain sales.

informing the PSB or ICT of the information above, either in a letter or another form, would have helped the Individual Plaintiffs.  Therefore, the Plaintiffs have not sufficiently proven that the Defendants' actions caused or prolonged the Individual Plaintiffs' confinement, as required under the false imprisonment standard.  Dagi, 961 F.3d at 29.  Moreover, even if the HPFS Defendants and/or Gill had no reason at the time the letter was sent to believe that the Individual Plaintiffs were selling H3C equipment obtained from a source other than HPFS India, a statement to that effect would have been misleading because the Individual Plaintiffs were, in fact, marketing H3C branded equipment from another source as conceded by Styller.  Alexander Styller Aff., Doc. No. 331-15 ¶ 10.

Next, Plaintiffs point to the Defendants' decision around May of 2013 to order TT Global to destroy the remaining Commonwealth Games equipment that had not been sold to ICT.  Email from Kevan Bartley, Doc. No. 520-69, Ex. 66 at 2; Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 87:2-24.  In the Plaintiffs' words, the "Defendants protected themselves by destroying the only physical evidence capable of proving the Individual Plaintiffs' innocence."  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 30.  The decision to destroy the goods came in the wake of an inspection that revealed concerns about the equipment's origin.  See Email from Kevan Bartley, Doc. No. 520-69, Ex. 66 at 2 ("[W]hilst there hasn't been a concrete determination as to the authenticity of the assets, the advice that we are getting is that the origination of the equipment is questionable and, as such, we should not allow TT-G to re-sell what they purchased from us.").  If the goods in TT Global's possession (the remainder of the returns from the Commonwealth Games) were in fact not genuine (something the Plaintiffs argue, but do not establish), this non-genuineness would not be evidence of the innocence of the Individual Plaintiffs, but rather evidence of their guilt.  The Individual Plaintiffs were not arrested for

manufacturing counterfeit goods, but for knowingly selling goods with counterfeit trademarks. PSB Decision on Release on Bail, Doc. No. 520-75, Ex. 72.  Thus, any evidence, if it existed, that the goods in TT Global's possession were non-genuine would have tended to show that the Individual Plaintiffs were selling counterfeit goods, leaving open only the question of their knowledge that the goods were counterfeit.  See Criminal Law of the People's Republic of China Art. 214, Doc. No. 520-3 at 38 (prohibiting "knowing" sale of goods bearing counterfeit trademarks).  By not sharing potentially unhelpful information, the Defendants did not prolong the Individual Plaintiffs' detention or breach any duty to aid in their release.

In any event, the Plaintiffs knew about the goods in TT Global's possession, knew that they came from a common source as the goods sold by HPFS India to ICT via Shinto, and had even inspected those goods during the earlier October 2012 inspection.  See SAC, Doc. No. 101 ¶ 50; Alexander Styller Aff., Doc. No. 101-2 ¶ 41.  The summary judgment record is devoid of evidence that the Plaintiffs asked to reinspect these goods, requested their preservation, suggested an authenticity evaluation, or sought to use their existence to aid in the release of the Individual Plaintiffs.

For these reasons, the Plaintiffs have failed to submit sufficient evidence to establish either a breach of the duty to aid by the Defendants or that any such breach caused to a substantial certainty a prolonging of the Individual Plaintiffs' detention.

2.  *Ordering H3C to Drop the Complaint*

In support of the argument that HP failed to sufficiently aid in the Individual Plaintiffs' release, Plaintiffs contend that HP refused to simply order its wholly owned subsidiary, H3C, to drop its criminal complaint.  See Stuart Patterson Dep., Doc. No. 553-2, Ex. A at 138:7-11 ("HP had control over H3C's business strategy.").  Though the Plaintiffs do not explicitly point to an

55

action by HP that gave rise to a duty to aid the Plaintiffs, they argue that HP's corporate structure created the "unnecessary risk" that that "resellers like [the Individual Plaintiffs] would end up in jail for selling parallel imports without H3C's approval."  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 24 (citing Daniel Chow Report, Doc. No. 515-17 ¶ 78).  According to this theory, HP was obligated to assist the Individual Plaintiffs upon realizing that its corporate structure had contributed to their imprisonment.

Before addressing the merits of this argument, the Court must determine whether the Plaintiffs are permitted to litigate the duty to aid theory against HP.  The Plaintiffs cannot proceed with their duty to aid argument for two reasons.  First, in its Order on the Plaintiffs' motion to amend, the Court determined that "the SAC does not plead factual allegations stating a plausible claim that the HP Defendants had such a duty to aid" the Plaintiffs.  Doc. No. 95 at 12. The Plaintiffs never sought to amend the SAC to advance a duty to aid theory against HP, nor did they seek reconsideration of the Court's decision; they cannot now seek amendment or reconsideration through their summary judgment papers.  See supra at 25-27.  Allowing the Plaintiffs to amend at this phase in the litigation would cause significant prejudice to the Defendants, who have not sought discovery on the issue of HP's duty to aid or had notice that HP was exposed to liability on such a theory.  Id.  Moreover, the re-opening of discovery and postponement of the trial that such a decision would necessitate is not warranted in light of the many opportunities that the Plaintiffs have had to assert this theory earlier in litigation, the age of this case, the firm trial date, and the other reasons previously stated by the Court.  In addition, the Plaintiffs' duty to aid argument is grounded in the unpled corporate structure theory because any duty HP had resulted from the alleged "unnecessary risks" created by its decision to allow H3C to enforce its trademarks indigenously.  Pls'. Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at

24 (citing Daniel Chow Report, Doc. No. 515-17 ¶ 78).  The Plaintiffs cannot base their duty to

aid argument on an unpled theory that they have not sought to introduce through a properly

allowed motion to amend.[47]

Second, even assuming that the Plaintiffs could proceed on their duty to aid theory, it is

unavailing for the reasons explained in the Court's discussion of the Negligence Count.  See

infra at 57-58 (explaining that it is unclear whether Massachusetts courts would recognize a duty

to aid in the context of this case).

The Motion for Summary Judgment is therefore ALLOWED as to Count IX.

XIV.    COUNT X: NEGLIGENCE

Count X of the Plaintiffs' SAC alleges a claim for negligence against the HPFS

Defendants on behalf of ICT, Styller, and the Individual Plaintiffs.[48]  According to the SAC, the

Defendants were under a duty to aid the Plaintiffs by making "a prompt and complete disclosure

of true facts to the police to secure their release" after learning of the Individual Plaintiffs'

detention.  Doc. No. 101 ¶ 331.

The Plaintiffs have failed to direct the Court's attention to case law recognizing a duty to

aid in situations analogous to this one, nor is the Court aware of any.  The only Supreme Judicial

Court decision that the Plaintiffs cite is a case recognizing a duty to aid victims directly harmed

---

[47] Even if the Court reached the merits, the Plaintiffs point to no evidence supporting the
conclusion that HP did not tell H3C to withdraw the complaint.  The mere fact that the record
contains no evidence of H3C actually withdrawing the complaint is insufficient.
[48] Count X cannot proceed against David Gill in light of the Court's prior Order on the Plaintiffs'
motion to amend, which explicitly states: "[t]he [negligence] claim survives against the HPFS
defendants but fails to state a claim against any other defendant, for Plaintiffs have not shown
that any other defendant had a duty to act."  Doc. No. 95 at 13.  The term "HPFS Defendants"
does not include David Gill.  See supra note 5; Order on Mot. to Amend, Doc. No. 95 at 5 n.4
("The HPFS Defendants are HPFS and HPFS India.").  Thus, the Court rejects the Plaintiffs'
continued attempt to bring Count X against Gill.

by a negligent act that results in an immediate and obvious risk of physical danger.  See

Commonwealth v. Levesque, 447, 766 N.E.2d 50, 57 (Mass. 2002) (finding persons who

negligently started a fire within a building breached their duty to aid firefighters by failing to

alert authorities to the fire).  Imposing the duty to aid in the very different circumstances

presented by this case would create a substantial expansion of liability under state law.  The

Plaintiffs fail to cite to Massachusetts cases suggesting that such an expansion is appropriate in

this context.  Thus, Count X fails for the absence of a duty.  See CVS Pharmacy, Inc. v. Lavin,

951 F.3d 50, 58 (1st Cir. 2020) ("[Federal Courts] must 'take care not to extend state law beyond

its well-marked boundaries in an area . . . that is quintessentially the province of state courts.'")

(alteration in original) (quoting Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir. 1996)); Rakes v.

United States, 352 F. Supp. 2d 47, 58 (D. Mass. 2005), aff'd, 442 F.3d 7 (1st Cir. 2006)

(declining to find the existence of a duty to aid because "it is uncertain whether the Supreme

Judicial Court would apply it to this particular case").

 Even if the HPFS Defendants had a duty under Massachusetts law to aid in the Individual

Plaintiffs' release from prison (they do not, see supra at 57-58), Plaintiffs must marshal sufficient

evidence to allow a reasonable jury to conclude that: (1) the Defendants breached this duty; (2)

that the Plaintiffs suffered damages, and; (3) that the breach was the proximate cause of those

damages.  Bennett v. Eagle Brook Country Store, 557 N.E.2d 1166, 1168 (Mass. 1990).

 In support their negligence claim, the Plaintiffs argue that the Defendants failed to fulfill

their obligation to disclose the following exculpatory facts to the Chinese authorities or ICT

either in the New Final Letter or another form:

- That the Defendants had no reason to believe that the Individual Plaintiffs were selling anything but the equipment provided by HPFS.  Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 149:7-25.

- HPFS India's inability to secure the importation documents from Inspira. Email from HPFS to Inspira, Doc. No. 520-12, Ex. 9 at 2; Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 138:5-11.

- HPFS India's failure to verify the authenticity of the equipment even after the October 2012 inspection raised concerns about it. Doc. No. 520-31, Ex. 29 (referencing Tom Harris's October 2012 inspection of the equipment, which raised concerns about the equipment); Oct. 2012 Email Correspondence between HPFS Representatives, Doc. No. 520-29, Ex. 26 (same).

- The decision to destroy the remaining, unsold Commonwealth Games equipment. Email from Kevan Bartley, Doc. No. 520-69, Ex. 66 at 2; Kevan Bartley Dep., Doc. No. 520-99, Ex. 96 at 87:2-24

For the reasons already discussed, these facts are neither exonerating nor of any particular significance. In addition, the first fact (that the Defendants had no reason to believe ICT was selling other H3C equipment) is plainly inaccurate given Plaintiffs' concession that they were marketing other H3C goods in 2012, nor is it a fact of which the HPFS Defendants would then have reasonably been aware. As for the last fact (the decision to destroy the TT Global goods), Plaintiffs were well-aware of the existence of these goods as explained previously. The failure to provide this information to the Chinese authorities was neither a breach of any duty to aid, nor a proximate cause of any damage to the Plaintiffs. Of course, there is a further causation problem: nothing in the record suggests that any actions or statements by the HPFS Defendants would have made a difference to the Chinese authorities. Indeed, the Plaintiffs' expert report suggests the opposite—that "only H3C's consent or acquiescence would have persuaded the PSB drop this case against the Plaintiffs." Daniel Chow Rebuttal Report, Doc. No. 515-18 ¶ 35.

Plaintiffs also advance their corporate structure and agency theories in support of this claim. For the reasons previously discussed, these theories are neither available to the Plaintiffs against the HPFS Defendants, nor sufficient if available.

The Motion for Summary Judgment is therefore ALLOWED as to Count X.

## XV.   COUNT XI: CIVIL CONSPIRACY

In Count XI, all Plaintiffs bring a claim for civil conspiracy against all Defendants.  The SAC alleges two principal theories in support of this claim: the Defendants "falsely represent[ed] the Equipment as genuine" and "facilitate[ed] the frame job and the cover-up scheme against Plaintiffs[.]"  Doc. No. 101 ¶¶ 339-42.

Massachusetts law recognizes two forms of civil conspiracy: concerted action conspiracy, "whereby liability is imposed on one individual for the tort of another," and coercive conspiracy, which requires the plaintiff to "allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994); Kurker v. Hill, 689 N.E.2d 833, 836 (Mass. App. Ct. 1998).  Because there is no indication that the Plaintiffs rely on the latter, and there is no evidence of coercive conspiracy in any event, the Court treats their civil conspiracy claim as one based on a theory of concerted action.  Concerted action conspiracy "is a form of vicarious liability for the tortious conduct of others" and thus requires the plaintiff "to prove an underlying tort."  Snyder v. Collura, 812 F.3d 46, 52 (1st Cir 2016) (citation omitted). As discussed above and below, none of the torts underlying the Plaintiffs' civil conspiracy claim survive the Defendants' motion for summary judgment.

Thus, the Motion for Summary Judgment is ALLOWED as to Count XI.

## XVI.   COUNT XII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Count XII alleges a claim for intentional infliction of emotional distress ("IIED") on behalf the Individual Plaintiffs, Styler, and the Family Plaintiffs.[49]  The Plaintiffs contend that

---

[49] The SAC does not specify against whom this claim is brought.  The Court thus assumes it is brought against all Defendants.

the Defendants' "initial fraudulent sale, the frame job, and the cover-up" constitute extreme and outrageous conduct that caused their emotional distress.  SAC, Doc. No. 101 ¶ 346.

The Plaintiffs' IIED claim is premised on the following theories: (1) the Defendants sold ICT non-genuine equipment; (2) the Defendants failed to adequately inspect the goods prior to sale or warn the Plaintiffs about "red flags" concerning the equipment's origin; (3) the Defendants submitted a false police report through their agent, H3C; (4) the Defendants misrepresented the contents of and excluded exonerating details from the New Final Letter; and (5) the Defendants destroyed exculpatory evidence (i.e., the TT Global transceivers).  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 34-36.  The Court will address the counterfeiting and conspiracy-related theories separately.

To state a claim for intentional infliction of emotional distress under Massachusetts law, a plaintiff must establish: (1) that the defendant intended to inflict emotional distress or knew that emotional distress was likely to result, (2) that the defendant's conduct was extreme and outrageous, (3) that the actions of the defendant were the cause of the plaintiff's emotional distress, and (4) that "the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it."  Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997).  Conduct is "extreme and outrageous" if it is "beyond all possible bounds of decency and utterly intolerable in a civilized community."  Id.  It is not enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (quotation marks

omitted); accord Tetrault, 681 N.E.2d at 1197.  This is a "high bar."  Doherty v. Emerson Coll.,
No. 1:14-CV-13281-LTS, 2017 WL 4364406, at *11 (D. Mass. Sept. 29, 2017).

    A.   The Theories that the Equipment was Not Genuine

        Plaintiffs premise their first set of IIED theories on the allegation that the Defendants sold
ICT non-genuine equipment.  As discussed above, see supra at 9-28, the Plaintiffs have failed to
introduce evidence sufficient for a reasonable jury to conclude that the Defendants knew or
should have known that the goods were non-genuine, or that the goods were non-genuine in the
first place.  At base, the Plaintiffs' theory reduces to the following: Defendants sold ICT goods
that it did not inspect in accordance with its business practices (Kevan Bartley Dep., Doc. No.
520-99, Ex. 96 at 123:2-8) and, thereafter, failed to disclose its concerns about the equipment to
the Plaintiffs when the October 2012 inspection attended by ICT representatives revealed issues
with its labeling, packaging, and security (Defendants' October 2012 Email Correspondence,
Doc. No. 520-31, Ex. 28).  Because these allegations simply do not rise to the level of "targeted,
deliberate, and malicious conduct required for an IIED claim," the counterfeiting theory fails.
Abernathy v. Dewey, 277 F. Supp. 3d 129, 140 (D. Mass. 2017).

    B.   The Conspiracy-based Theories

        The Plaintiffs' conspiracy-based theories also fail.  First, for reasons similar to those
stated above, a reasonable jury could not find that the Defendants' conduct was "beyond all
possible bounds of decency."  Rather, the evidence suggests that the Defendants did take steps,
i.e., by sending the New Final Letter, to aid the Plaintiffs in a manner "consistent with [the
Defendants'] legitimate business concerns."  Foley, 508 N.E.2d at 82.  Defendants' conduct does
not meet the "extreme and outrageous" bar set forth by the IIED standard.  Finally, for the
reasons stated above, see supra at 15, 49-50, the Plaintiffs' agency theory fails.

The Court ALLOWS the Motion for Summary Judgment as to Count XII.

XVII.    COUNT XIII: LOSS OF CONSORTIUM

Count XIII is a loss of consortium claim brought by Jade Cheng and his wife, Caroline Marafau Cheng.[50]  Though Plaintiff Caroline Cheng's claims were severed for the purposes of discovery (Doc. No. 326), the Court considers her loss of consortium claim here because it is grounded in the tort claims underlying her husband's prolonged detention.  SAC, Doc. No. 101 ¶¶ 350-53.  The Plaintiffs have not challenged the principle that a loss of consortium claim necessarily fails absent proof of underlying tortious conduct.  See Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994) ("As a general rule, a claim for loss of consortium requires proof of a tortious act that caused the claimant's spouse personal injury.").  Because the Court has dismissed the Plaintiffs' predicate tort claims, Count XIII cannot survive.

The Court ALLOWS the Motion for Summary Judgment as to Count XIII.

XVIII.   CLAIMS BY THE FAMILY PLAINTIFFS

The Family Plaintiffs join in Counts XI (civil conspiracy) and XII (IIED) of the SAC. Previously, the Court bifurcated trial of their claims both to manage the main trial efficiently and because their claims are entirely derivative of the claims of the other Plaintiffs.  Doc. No. 326. Because the Court has allowed the Motion for Summary Judgment as to both of these Counts (and all of the other claims advanced by the non-Family Plaintiffs) the claims of the Family Plaintiffs necessarily fail.  Accordingly, the Court enters Summary Judgment in favor of the Defendants as to the Family Plaintiffs' claims.

---

[50] The SAC does not specify against whom this claim is brought. The Court thus assumes it is brought against all Defendants.

XIX.    <u>DEFENDANTS' COUNTERCLAIMS</u>

HPFS India advanced three counterclaims for: (1) contractual indemnification against ICT; (2) breach of contract against ICT; and (3) contribution against ICT, Styller, and the Individual Plaintiffs.  All Defendants join in the indemnification and contribution counterclaims. The Defendants now move for summary judgment as to some issues raised by the indemnification and breach of contract counterclaims. The Court addresses the breach of contract claim first.

A.  <u>Counterclaim II: Breach of Contract</u>

In their second counterclaim, HPFS India alleges that ICT breached Section 8 of the RSSA by failing to comply with applicable Chinese laws during its resale of the equipment. Doc. No. 108 ¶¶ 91-92.

"To succeed on their breach of contract claim, [HPFS India] must show (1) the existence of a valid contract; (2) that it has performed its obligations under the contract; and (3) a breach of the contract that causes damages."  <u>Lombard Med. Techs., Inc. v. Johannessen</u>, 729 F. Supp. 2d 432, 438 (D. Mass. 2010) (citing <u>Persson v. Scotia Prince Cruises, Ltd</u>., 330 F.3d 28, 34 (1st Cir. 2003)).    Section 8 of the RSSA states, in relevant part:

> if the re-sale of the Active Equipment requires it to be exported, re-exported or imported, ICT will be responsible for complying with all applicable laws and regulations and for obtaining all required export and import authorizations.

RSSA, Doc. No. 520-19, Ex. 16 at 13.

In their Motion, HPFS India does not seek summary judgment on the entirety of this counterclaim, but only a determination of whether ICT breached the contract. Defs.' Mot. for Summ. J., Doc. No. 514 at 40.  Thus, the Court limits its discussion to the topic of breach and, specifically, whether the HPFS India has established that ICT failed to comply with applicable

laws.  The Defendants' Chinese law expert, Laura Wen-Yu Young opined that "Chinese law requires every business with a presence in China to be legally registered."  Laura Wen-Yu Young Report, Doc. No. 515-44, Ex. 46 ¶ 35.  Though registration requirements differ depending on the activity of the company, "[a] foreign enterprise may carry out its production and business activities only after it has been approved and registered by the registration authorities and obtained an approval certificate and a business license."  Id. ¶ 38.  A company that imports goods for the purpose of marketing and sale in China and fails to "properly establish, register, and maintain a business entity . . . necessarily violates customs regulations."  Id. ¶ 56.

Young opined that ICT's business operations in China, including the marketing and sale of equipment physically located there, required that it establish and register a compliant Chinese business entity.  Id. ¶ 83; see SOF, Doc. No. 526 ¶ 5 (stating that "ICT first began marketing the Promised Goods in China in 2011").  In the sworn response to an interrogatory requesting that ICT "identify all permits, licenses or other governmental approvals obtained by ICT to operate and/or do business in . . . Mainland China," ICT stated that "it was not required to obtain such permits or licenses and did not obtain them."  Resp. to Interrogatory No. 14, Doc. No. 515-31, Ex. 32 at 4 (emphasis added).   In further support of the contention that ICT did not comply with business registration requirements, including obtaining a business license, HPFS India points to emails from ICT employees indicating that they could not conduct marketing and sales in China due to their registration status.  See Apr. 2011 Email from Ryan Quinn, Doc. No. 515-48, Ex. 50 at 8 ("As we are a Rep Office in China, we cannot do direct sales to our customers."); Nov. 2011 Email from Jade Cheng, Doc. No. 515-49, Ex. 51 at 2 (stating that "[n]o local ICT register [sic] in China).  Relying on this evidence, Young opined that "ICT was not qualified to import

shipments for marketing and resale purposes in China because ICT did not comply with business entity formation and registration regulations."  Laura Wen-Yu Young Report, Doc. No. 515-44, Ex. 46 ¶ 102.

ICT has not materially disputed the allegation regarding its breach of the contractual obligation to comply with these laws.  Instead, ICT contends that it had a business license registered in Massachusetts (SOF, Doc. No. 526 ¶ 95), but its registration in Massachusetts has no bearing on its registration in China.  Next, ICT argues that it maintained a Chinese business license and office lease through late September of 2011.  Id.  This license is also irrelevant because it became invalid before the goods were shipped to China in December of 2011 (SOF, Doc. No. 526 ¶ 4).  See Email from Ryan Quinn Attaching Business License, Doc. No. 520-2 at 4 (stating that the license is valid from October 15, 2010 to October 14, 2011).  Finally, ICT argues that Shinto, not ICT, was charged with importing the goods, but the undisputed evidence makes it clear that Shinto imported the goods on ICT's behalf.  SOF, Doc. No. 526 ¶ 79 ("Undisputed that Shinto acted as ICT's broker in India for purposes of the transaction between ICT and HPFS India for ICT's purchase of the CWG Goods.").  Moreover, there is no dispute that the goods were seized in Beijing.  Id. ¶ 84 ("The Shipped Goods were seized by the Chinese authorities from an apartment paid for by ICT for use by Yu and Yuyi when conducting ICT-related business out of Beijing.").  Thus, the evidence establishes that ICT did not comply with all applicable laws and regulations.

ICT contends that any breach on its part is excused by the breach(es) HPFS India had already committed and which give rise to the claims ICT has advanced in the SAC.  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 39-40.  However, the Court has rejected all of ICT's claims and thus there is no "first" breach to excuse ICT's breach.  ICT advances no other

argument in its opposition to the motion as to this counterclaim.  Of course, to recover on this claim HPFS India must also establish that the breach <u>caused</u> the damages it seeks.  The Court need not address causation because, as previously explained, HPFS India has sought summary judgment only on the issue of breach.  Defs.' Mot. for Summ. J., Doc. No. 514 at 40.  The Motion for Summary Judgment is ALLOWED as to Counterclaim II to the extent that the Court determines that ICT breached the contract as described in this section.

B.  <u>Counterclaim I: Indemnification</u>

In Counterclaim I, all Defendants bring a claim for indemnification against ICT.  The Defendants allege that ICT breached the indemnity clause contained in Section 10.4 of the RSSA, which states:

> ICT will indemnify HPFS and its affiliates, officers, directors, agents and employers harmless from and against any and all claims, actions, proceedings, losses expenses (including reasonable attorneys' fees), demands or judgments <u>which result or arise from the ICT's use, operation, handling, treatment, storage, disposal, transportation, recycling, re-sale</u> or destruction of any Active Equipment.

Doc. No. 520-19, Ex. 16 at 13 (emphasis added).[51]  Defendants contend that this lawsuit, and the damages resulting therefrom, fall within the indemnity provision because they "arose from" ICT's transport and resale of the equipment.  Their indemnity counterclaim seeks damages to compensate Defendants for "any losses [they] sustain (and fees and expenses they incur) in connection with this lawsuit."  Defs.' Mot. for Summ. J., Doc. No. 519 at 39.

Under Massachusetts law, "the term 'arising out of' should be broadly construed" and encompasses "a wider range of causation than the concept of proximate causation in tort law."

---

[51] ICT advances no argument that one or more of the Defendants are unprotected by this provision.  In addition, this provision undisputedly protects each Defendant because each Defendant is an "affiliate," "officer," "agent," or "employer" of HPFS.

Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 6-7 (1st Cir. 2000) (quoting Rischitelli v. Safety Ins. Co., 671 N.E.2d 1243, 1245 (Mass. 1996)).  The phrase is synonymous with "originating from," "growing out of," "flowing from," "incident to," or "having connection with." Id. at 7.

In the motion, Defendants seek only a determination that they are entitled to indemnification based on the contract's language.  Defs.' Mot. for Summ. J., Doc. No. 519 at 40.  The Defendants have not asked the Court to determine whether any particular damages "arose from" ICT's sale of the equipment or, if so, the amount of those damages.  ICT opposes solely on the ground that indemnification is unavailable under Massachusetts law for a party's intentional, reckless, or grossly negligent conduct.  Pls.' Opp. to Defs.' Mot. for Summ. J., Doc. No. 519 at 8.  For support that Defendants engaged in intentional, reckless, or grossly negligent conduct, ICT points simply to its other claims.  Id.  Having rejected those claims by entering summary judgment in favor of Defendants, that argument is no longer a basis to deny Defendants' Motion as to this Counterclaim.  Accordingly, and in light of the plain language of the contract considered under Massachusetts law, Defendants' Motion is ALLOWED to the extent that each Defendant is entitled to indemnification.  Whether any particular damages (and, if so, which damages) "arose from" ICT's defined activities under the terms of the indemnity clause was not put in issue by the Motion, and therefore the Court does not address or resolve that issue.

XX.   MOTION TO STRIKE

Defendants also filed a motion to strike certain documents submitted by the Plaintiffs in their papers opposing the motion for summary judgment on the grounds that the documents, or the witnesses authoring the documents, were not disclosed as required by the Rules of Civil

Procedure or the governing scheduling orders.  Defs.' Mot. to Strike, Doc. No. 537.  The Court

has resolved the issues raised by the Motion for Summary Judgment both without and with

consideration of these documents.  Because the Motion for Summary Judgment succeeds in both

circumstances, resolution of the Motion to Strike is not required.  The Clerk shall TERMINATE

the Motion to Strike (Doc. No. 537).

XXI.    <u>CONCLUSION</u>

The Defendants' Motion for Summary Judgment (Doc. No. 513) is ALLOWED resulting

in the entry of summary judgment in favor of Defendants and against the Plaintiffs on each claim

in the SAC, as explained in detail below:

- **Counts I, II, V, VI, X**: Summary Judgment is entered in favor of the HPFS Defendants and against Plaintiffs ICT, Styller, and the Individual Plaintiffs.
- **Counts III-IV**: Summary Judgment is entered in favor of HPFS India and against Plaintiff ICT.
- **Count VII-VIII**: Summary Judgment is entered in favor of all Defendants and against Plaintiffs ICT, Styller, and the Individual Plaintiffs.
- **Count IX**: Summary Judgment is entered in favor of all Defendants and against the Individual Plaintiffs.
- **Count XI**: Summary Judgment is entered in favor of all Defendants and against all Plaintiffs.
- **Count XII**: Summary Judgment is entered in favor of all Defendants and against Plaintiff Styller, the Individual Plaintiffs, and the Family Plaintiffs.
- **Count XIII**: Summary Judgment is entered in favor of all Defendants and against Plaintiffs Jade Cheng and Caroline Marafao Cheng.

The Motion for Summary Judgment is also ALLOWED as to two of the Defendants' three

counterclaims, resulting in the entry of Partial Summary Judgment as follows:

- **Counterclaim II**: Summary Judgment is entered in favor of the HPFS Defendants and against Plaintiff ICT only insofar as the Court concludes that ICT breached the relevant contract.
- **Counterclaim I**: Summary Judgment is entered in favor of all Defendants and against Plaintiff ICT only insofar as the Court concludes that each Defendant is entitled to indemnification.

The Clerk shall terminate the Motion to Strike (Doc. No. 537).

As explained in this Memorandum and Order, the remainder of the counterclaims remain unadjudicated.  The remaining parties (ICT and all Defendants) shall file a joint status report by December 3, 2021 stating their joint or separate proposals as to (1) how the remainder of this case shall proceed in light of this Order including the anticipated duration of the trial, and (2) whether the remaining counterclaims can be resolved as a matter of law without trial.  The February 7, 2022 trial date remains the date for trial in this case.

SO ORDERED.


 /s/ Leo T. Sorokin                        
Leo T. Sorokin
United States District Judge